IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; MISSISSIPPI STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; JACKSON CITY BRANCH OF THE NAACP; DERRICK JOHNSON; FRANK FIGGERS; CHARLES TAYLOR; MARKYEL PITTMAN; CHARLES JONES; and NSOMBI LAMBRIGHT-HAYNES,<br><br>      *Plaintiffs*,<br><br> v.<br><br>TATE REEVES, in his official capacity as Governor of the State of Mississippi; SEAN TINDELL, in his official capacity as Commissioner of Public Safety; BO LUCKEY, in his official capacity as Chief of the Mississippi Department of Public Safety Office of Capitol Police; MICHAEL K. RANDOLPH, in his official capacity as Chief Justice of the Mississippi Supreme Court; and LYNN FITCH, in her official capacity as Attorney General of the State of Mississippi,<br><br>      *Defendants*. | Case No. 3:23-cv-272-HTW-LGI<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' NECESSITOUS AND URGENT MOTION FOR A TEMPORARY RESTRAINING ORDER** |

## INTRODUCTION

  By May 8—within 10 days of this filing—H.B. 1020, sec. 1(1)(2), requires

Defendant Randolph to appoint four judges to the Hinds County Circuit Court for nearly

four-year terms. As Plaintiffs demonstrate below, this appointment provision denies

1

Black residents of Hinds County equal protection of the laws, and the irreparable harm caused by denial of this constitutional right will begin immediately upon the appointments.  Further, vacating these state-court appointments after the fact would be more disruptive to the Hinds County Circuit Court and those with cases before it than temporarily enjoining the appointments while the parties litigate and the Court rules on the motion for a preliminary injunction that Plaintiffs will file.  Plaintiffs submit that the instant memorandum contains sufficient grounds for a preliminary injunction, but there are additional facts and legal arguments that Plaintiffs wish to add in support of a preliminary injunction.  However, due to the exigent circumstance created by the 15-day deadline for Defendant Randolph to appoint the additional judges, Plaintiffs are constrained to seek a temporary restraining order, supported by this memorandum which is a summary of their arguments why the judicial appointments provision of H.B. 1020 violates the Equal Protection Clause.[1]  Accordingly, Plaintiffs request a temporary restraining order enjoining Defendant Randolph from appointing judges pursuant to H.B. 1020 pending the briefing, hearing, and resolution of Plaintiffs' forthcoming motion for a preliminary injunction.

## STATEMENT OF FACTS

On April 21, 2023, Mississippi Governor Tate Reeves signed House Bill 1020 ("H.B. 1020") into law.  Ex. 1.  The law requires, among other things, that the Chief

---

[1] Plaintiffs are ***not*** seeking an ex parte order.  They have served summonses on Defendants, counsel for several of them have entered appearances, and this motion is being served on those attorneys.  Plaintiffs also have provided a copy of the complaint and this motion to the Attorney General, both as a professional courtesy and in compliance with Fed. R. Civ. P. 5.1(a)(2).

Justice of the Mississippi Supreme Court appoint four "special temporary" judges to Hinds County's Seventh Circuit Court District no later than 15 days after passage of the Act. *Id.* §§ 1(1)-(2). Unlike normal Circuit Court judges, the new Hinds County judges will not be elected by the local community they serve, nor are they required to reside in Hinds County. *See id.* And, unlike temporary judges who may be assigned to other Mississippi courts on an "emergency" basis, the new Hinds County judges will serve through December 31, 2026—nearly the full four years that an elected Circuit Court judge serves. *Compare* Miss. Code § 9-1-105(2), *with* Ex. 1, § 1(1).

The State has repeatedly packed the Hinds County's Circuit Court with judges selected by a white State official rather than authorize more judges for the majority-Black population to elect. The State has not increased the number of elected judges (four) on the Circuit Court since 1994, *see* 1994 Miss. Laws Ch. 564, despite state constitutional and statutory requirements that circuit courts expand based, among other factors, on case load and circuit needs, *see* Miss. Const. art. 6, § 152; Miss. Code § 9-7-3(3). Instead, in August 2020, the Chief Justice temporarily appointed four additional judges—doubling the size of that court—for four months to help with a backlog of cases. Then in September 2022, the Chief Justice again temporarily appointed four judges to the court, citing a "criminal case backlog." While each of the court's elected judges is Black, *see* Decl. of Charles Taylor ("Taylor Decl."), Ex. D, two of the judges appointed in 2020 were white, as are three of the most recently appointed judges. *See id.*, Exs. A–B.

H.B. 1020 ratifies this pattern of a white state official appointing white outsiders to sit in judgment of Hinds County's predominantly Black residents. Meanwhile, no

3

other circuit court has had a temporary judge appointed since 2020.  *See id.*, Ex. E.  To make matters worse, H.B. 1020 allows the current "temporary" judges to be "reappoint[ed]," *id.*, Ex. 1, § 1(2), giving them terms on the Hinds County's Circuit Court beyond the Mississippi Constitution's four-year limit for elected judges.  *See* Miss. Const. art. 6, § 153.

Plaintiffs and their members include Black voters who reside in Jackson, Mississippi, which makes up two-thirds of the population of Hinds County.  They have voted in Hinds County Circuit Court elections in the past and plan to do so in future.  They believe, as former Mississippi Chief Justice Prather once wrote, that "elected judges are reactive to public opinion, while appointed ones who never face popular confirmation are largely free of its constraint."  Lenore L. Prather, *Judicial Selection—What is Right for Mississippi?*, 21 Miss. Coll. L. Rev. 199, 206–07 (2002) (citing Daniel R. Pinello, *The Impact of Judicial-Selection Method on State-Supreme-Court Policy: Innovation, Reaction, and Atrophy* 130 (Greenwood Press, 1995)).  Plaintiffs bring this suit and request for a temporary restraining order to prevent H.B. 1020 from depriving them of rights afforded to Mississippi voters in all other counties and diluting the voting strength of Hinds County's majority-Black citizens.

## ARGUMENT

A plaintiff is entitled to emergency injunctive relief where, as here, it shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) the threatened injury outweighs any harm the injunction might cause defendants; and (4) the injunction will not disserve the public

interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Here, each factor weighs in favor of granting Plaintiffs' narrow request for temporary injunctive relief.

> I. **Plaintiffs Are Substantially Likely to Succeed on the Merits.**

To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Plaintiffs have more than prima facie evidence here.

The Fourteenth Amendment's Equal Protection Clause forbids states from enacting legislation that is motivated by racial discrimination. *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000). That prohibition forbids establishing judicial selection processes with the "purpose and operative effect" of denying or "dilut[ing] the voting strength of [B]lack citizens." *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 212 (5th Cir. 1980). Here, H.B. 1020 deprives Hinds County's Black voters of the "local control rights given to all other [] voters in the State," thus denying them equal protection of the laws. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 120 F. Supp. 3d 479, 489 (M.D.N.C. 2015). H.B. 1020 transfers responsibility for electing half of Hinds County's Circuit Court judges from its majority-Black voters to the Chief Justice of the Mississippi Supreme Court, who is elected in a district that does not include Hinds County and is in no way accountable to the residents of Hinds County. *See* Taylor Decl., Ex. F; *see also Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626–27 ("Statutes granting the franchise to residents on a selective basis always pose the danger

of denying some citizens any effective voice in the governmental affairs which substantially affect their lives.").

Plaintiffs need only show that racial discrimination was a "substantial" or "motivating" factor behind enactment of the law to shift the burden "to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Notably, "[r]acial discrimination need only be one purpose, and not even a primary purpose," to violate the Equal Protection Clause. *Id.* at 230 (citation and internal quotations omitted). When evaluating intent, a court may consider "'direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions.'" *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (citations omitted); *see also Rogers v. Lodge*, 458 U.S. 613, 618 (1982) ("discriminatory intent need not be proved by direct evidence").

### A.     H.B. 1020's Disproportionate Impact Is Clear

When evaluating whether racial discrimination was a motivating factor behind an official action, a disparate impact on one race more than another can be an "important starting point." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Here, it is beyond dispute that H.B. 1020 will have a disparate impact on Black citizens. Nearly 75% of Hinds County's residents are Black, Taylor Decl., Ex. G, compared with only 38% of Mississippi's residents overall. *Id.*, Ex. H. Hinds County is home to the largest Black population of any Mississippi county. *Id.*, Ex. I. Hinds County

6

also includes the city of Jackson, which has one of the highest proportions of Black residents in the United States (more than 80%). The overwhelmingly Black residents of Hinds County—alone among all other residents of Mississippi—have been stripped of the right to vote for their circuit judges and to have circuit judges who reside in the County. The "foreseeability" of this consequence supports "a strong inference" that Defendants intended H.B. 1020 to adversely impact Black citizens. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979).

### B. H.B. 1020's Discriminatory Intent is Clear

The Fifth Circuit has noted that "[i]n this day and age," legislators "rarely . . . announc[e] an intent to discriminate based upon race" because they are often "careful about what they [say] and [write] about the purposes" of a law likely to be challenged, like H.B. 1020. *Veasey*, 830 F.3d at 235 & n.19. Here, however, discriminatory intent was actually expressed.

In a telling exchange, H.B. 1020's principal author, Rep. Trey Lamar, justified appointing judges in Hinds County by saying: "[D]o we not want our best and brightest sitting in judgment, whether that may come from Holmes County or Madison County or wherever they may be? Why would we limit the talent pool to here?"[2] Rep. Lamar offered no race-neutral explanation for why the "best and brightest" candidates could not be found within the state's most populous county, which is predominantly Black.

---

[2] Trey Lamar, MS House Floor - 7 February, 2023; 10:00 AM, YouTube at 6:46:47 (Feb. 7, 2023), https://www.youtube.com/live/HtruSFI0avs?feature=share&t=24394.

7

Rep. Lamar is not the first member of the Legislature to argue that predominantly Black residents of Hinds County and the City of Jackson are incapable of governing themselves. In 2015, Mississippi State Rep. Lester "Bubba" Carpenter—who voted for H.B. 1020—connected the dots in telling supporters to vote against a funding initiative because "[i]f [it] passes in its form, a judge in Hinds County, Mississippi, predominantly Black—it's going to be a Black judge—they're going to tell us where the state education money goes." Taylor Decl., Ex. J.

  C. ***Additional Factors Demonstrate H.B. 1020's Discriminatory Purpose***

Courts apply the framework set forth in *Arlington Heights* to determine whether a state law was enacted with a discriminatory purpose. *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*). Those factors include: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton v. City of Austin*, 871 529, 540, (5th Cir. 1989).. Each of these additional *Arlington Heights* factors supports Plaintiffs' substantial likelihood of succeeding on the merits of their equal protection challenge to H.B. 1020's appointment of temporary judges.

  1. **Historical background**

With respect to the first *Arlington Heights* factor, courts recognize that "history provides context and that historical discrimination . . . can have effects for many years." *Veasey*, 830 F.3d at 232 (plurality opinion); *see, e.g.*, *Patino v. City of Pasadena*, 230 F.

Supp. 3d 667, 682 (S.D. Tex. 2017) (holding that historical evidence supported a showing of discriminatory purpose where a city had "a long history of discrimination against minorities, . . . as well as a history of more recent events that are more probative"). In this case, the evidence is both historical and recent.

H.B. 1020's appointment of judges who are not accountable to Hinds County's voters represents the latest step in the Mississippi Legislature's campaign to deny Black residents equal political power. This Court has found that Mississippi has a "long history of official discrimination" that impaired Black Mississippians' right to vote and "extended to the bar and consequently to the judiciary." *Martin v. Allain*, 658 F. Supp. 1183, 1192 (S.D. Miss. 1987). Mississippi was the first state to provide for election of all judges, Miss. Const. 1832, art. 4, § 2, but it had no Black judges from Reconstruction until 1977. *Martin*, 658 F. Supp. at 1193. In 1987, this Court struck down the prior system for electing Hinds County Circuit Court judges in a multi-member district because it provided Black residents "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at 1204; *see also League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 170 (W.D. Tex. 2022) (discriminatory intent supported by evidence that in every decade "since the statute was passed in 1965, federal courts have held that Texas violated" the Voting Rights Act).

More recently, the State has denied Jackson's majority-Black citizens and elected leadership access to the federal transportation funds that the city merits due to its size and needs; sought to strip the city of control over its municipal airport; and diverted and

9

constrained the city's share of the sales tax revenue collected in Jackson. Taylor Decl., Exs. K–N. It has deprived Jackson, its Black leadership, and its majority-Black residents of the funds they need to operate Jackson's water systems, and even considered fully taking control of Jackson's water systems in order to hijack the approximately $800 million that Congress appropriated to remediate the Jackson water crisis. Taylor Decl., Exs. O–P.

Further, H.B. 1020 was enacted against the backdrop of Mississippi's racially polarized voting. *See, e.g.*, *Martin v. Allain*, 658 F. Supp. 1183, 1202 (S.D. Miss. 1987). Black voters in Hinds County have historically voted for different candidates for statewide office than their white counterparts in the State. All four of Hinds County's elected circuit judges are Black, but Mississippi has not elected a Black official to statewide office since Reconstruction, and State officials do not need to appeal to Black voters to get elected. Taylor Decl., Ex. Q.

### 2. Specific sequence of events

The next *Arlington Heights* factor considers whether the specific sequence of events leading up to the decision demonstrates a focus on race. As the Fifth Circuit has stressed, "[c]ontext matters." *Veasey*, 830 F.3d at 236.

The context of H.B. 1020's introduction is striking for what the Legislature did not do. Despite purporting to assist Hinds County and Jackson, Rep. Lamar did not consult their Black representatives before introducing the bill. Taylor Decl., Ex. R. Nor did the Legislature ever propose increasing the number of Hinds County's elected judges to address a backlog of cases. *Id.*

H.B. 1020 originated as a more than 1,000-page bill that would have substantially remade the justice system in Hinds County, including by adding appointed judges. After its introduction, the judges of the Circuit, Chancery, County, and Justice Courts of all Judicial Districts of Hinds County issued public statements condemning the bill for "disenfranchising the voters of Hinds County." Taylor Decl., Ex. S, at 2.

During the House deliberations on H.B. 1020, Rep. Robert L. Johnson offered an amendment to partially remedy the bill's discriminatory treatment of Hinds County's majority-Black residents by requiring that the appointed judges "be residents of Hinds County,"[3] consistent with the requirements for elected judges. *See* Miss. Code § 9-7-1. The amendment was voted down, providing further evidence that the Legislature intended to treat Black citizens less favorably than white citizens of Mississippi.[4] *See Veasey*, 830 F.3d at 236 (describing that rejecting ameliorative amendments can be evidence of discriminatory intent).

As ultimately enacted, H.B. 1020 and its counterpart legislation, S.B. 2343, also impose on Jackson unelected prosecutors, create a new unelected court, expands the jurisdiction of the State-run police force, create harsher criminal penalties for Jackson residents, and constrain residents' free speech in ways that provide further evidence of racial animus and disparate treatment. Ex. 1, §§ 4(1), 5(1), 8; S.B. 2343 §§ 1(1), (6)(a)-(c). Plaintiffs have challenged these provisions in their Complaint, but because they have

---

[3] Robert Johnson, *MS House Floor - 7 February, 2023; 10:00 AM*, YouTube at 6:46:34 (Feb. 7, 2023), https://www.youtube.com/live/HtruSFI0avs?feature=share&t=24394.

[4] *Id.*

11

later effective dates, Plaintiffs do not seek emergency relief with respect to them. Nonetheless, these provisions provide important context for the judicial appointment provision. *See N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 228 (4th Cir. 2016) (stressing the need to consider "the whole picture" under *Arlington Heights*).

### 3. Procedural departures

The third *Arlington Heights* factor considers departures from the normal procedural sequence of legislation. 429 U.S. at 267. This, too, demonstrates the discriminatory intent of H.B. 1020.

At the outset, House Speaker Philip Gunn sent H.B. 1020 to Rep. Lamar's House Ways and Means Committee rather than the House Judiciary Committee, where similar legislation normally would be heard. Taylor Decl., Ex. R.

During the conference committee process, the only Black member of the conference committee that drafted and approved H.B. 1020 was never shown the amended text of the bill until a vote was taken. Taylor Decl., Ex. T.

Further, at no point was H.B. 1020 referred to the standing committee on local and private legislation. Mississippi's Constitution, however, deems laws like H.B. 1020 that are "limited in operation . . . to certain districts of the territory of the State" to be "local and private legislation," and commands that "[n]o local or private bill shall be passed by either house until it shall have been referred to" the "standing committee on local and private legislation." *State ex rel. Pair v. Burroughs*, 487 So. 2d 220, 223 (Miss. 1986) (citations omitted). The Legislature's violation of the Mississippi Constitution's

procedural requirements for legislation of this nature provides still further evidence of the law's racially discriminatory intent.

### 4.     Substantive departures

The fourth factor in the *Arlington Heights* inquiry considers whether, as here, the law demonstrates a stark substantive departure from the legal principles "usually considered important" in Mississippi.  *See Arlington Heights*, 429 U.S. at 267.

For over 100 years, Mississippi's Constitution has guaranteed that Circuit Court judges "shall be elected by the people" for "a term of four years."  Miss. Const. art. 6, § 153.  Furthermore, since 1994, Mississippi law has required that Circuit Court judges "be elected for and from" their local districts.  1994 Miss. Laws, Ch. 564, § 37 (codified at Miss. Code. § 9-7-1).  But as described above, H.B. 1020's four new Circuit Court judges will not be elected, need not reside in Hinds County, and may serve for more than four years.

The Mississippi Constitution also forbids setting the number of Circuit Court judges on an ad hoc basis.  Instead, it requires that "[t]he Legislature shall, by statute, establish certain criteria by which the number of judges in each district shall be determined, such criteria to be based on population, the number of cases filed and other appropriate data."  Miss. Const. art. 6, § 152. Accordingly, Mississippi law establishes that "[t]he number of judges in each circuit court district shall be determined" based on "[t]he population of the district; [t]he number of cases filed in the district; [t]he case load of each judge in the district; [t]he geographic area of the district; [a]n analysis of the needs of the district by the court personnel of the district; and [a]ny other appropriate

13

criteria." Miss. Code § 9-7-3(3). No such analysis was conducted in connection with H.B. 1020. Instead the statute directs the Legislature consider case load and case disposition data only *after* these four appointments are made, and even then only to consider whether to add just one permanent elected judge. Ex. 1, § 12.

Indeed, Mississippi's constitutionally mandated criteria would have favored the creation of new elected, not appointed, judgeships. As the Chief Justice has recognized, the Hinds County Circuit Court "is the most populous single Circuit Court District." Taylor Decl., Ex. C. Yet it still has the same four elected judgeships as several less populous districts. *See, e.g.*, Miss. Code §§ 9-7-7, -11, -17.

H.B. 1020 also departs from the Legislature's recent approach with majority-white counties. In 2020, the Legislature took Desoto County out of the Seventeenth Circuit Court District and made the county into the Twenty-Third Circuit Court District. *See* 2020 Miss. Laws Ch. 474. The legislation effectively created a new judgeship, reducing the former district from three to two judges while creating two new seats for the Desoto County Circuit Court. *Id*. According to 2020 U.S. Census data, nearly 65% of Desoto County's population is white, while less than 35% of the population is Black. Taylor Decl., Ex. U.

Each of these instances support an inference that H.B. 1020 was enacted with discriminatory intent due to the Legislature's "convenient disregard of substantive standards." *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1222 (2d Cir. 1987) (holding that a city violated the Equal Protection Clause where it ignored substantive

standards by the Planning Board to build low-income homes only in minority areas because those homes disproportionately housed Black people).

### 5. Legislative history

The final *Arlington Heights* factor is the legislative history and legislators' statements. As noted above, the comments of legislators are sufficient by themselves to establish discriminatory intent.

## II. Plaintiffs Will Suffer Irreparable Harm if H.B. 1020 Takes Effect.

Because imminent constitutional violations like those threatened here "cannot be undone through monetary remedies," they are necessarily irreparable. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). Indeed, courts often find that "irreparable injury is present as a matter of law" where a motion for emergency injunctive relief is based on a violation of the Equal Protection Clause, as here. *Killebrew v. City of Greenwood*, 988 F. Supp. 1014, 1016 (N.D. Miss. 1997); *see, e.g.*, *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 529 (S.D. Tex. 2020) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law.").

Indeed, this Court noted in *Church at Jackson v. Hinds County,* No. 3:21-CV-298-HTW-LGI, 2021 WL 4344886 (S.D. Miss. Sept. 23, 2021), that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.* at *6 (citation omitted). That case is closely on point to this one because it involved an ordinance that plaintiffs claimed treated religious institutions "on less than equal terms with other non-religious entities," in violation of a

15

federal statute. *Id.* at *3. The Court recognized that because "there is an 'equal terms' violation . . . there is a presumption of irreparable injury, as there would be in a free exercise case under the First Amendment," *id.* at *6, and "the loss of First Amendment freedoms even for minimal periods of time, unquestionably constitutes irreparable harm." *Id.* (citation and internal quotations omitted). Similarly, the violation of the Equal Protection Clause—even for minimal periods of time—constitutes irreparable harm.

Moreover, the harms inflicted by H.B. 1020 are real and concrete, not theoretical or hypothetical. *See generally* Taylor Decl.; Declaration of Frank Figgers; Declaration of Nsombi Lambright-Haynes.

### III. The Injuries to Plaintiffs Far Outweigh Any Harm to Defendants.

The balance of equities greatly favors Plaintiffs because a TRO (to be followed by a preliminary injunction) would merely preserve the status quo, shielding Plaintiffs' constitutional rights from violation while causing Defendants no injury whatsoever. Defendants cannot be harmed by being prevented from violating the Constitution. *See Deerfield Med. Ctr.*, 661 F.2d at 338–39. The harm that H.B. 1020 inflicts on Plaintiffs thus grossly outweighs any purported harm to the Defendants from an injunction.

### IV. A Preliminary Injunction Will Serve the Public Interest.

Finally, H.B. 1020 is "unconstitutional [and] so the public interest [is] not disserved by an injunction preventing [their] implementation." *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). That is because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation

16

omitted). And as a general rule, the public interest is served by "maintaining the status quo pending a full trial on the merits" to make a final determination as to constitutionality.  *See, e.g.*, *United States v. Texas*, 508 F.2d 98, 101 (5th Cir. 1975).

That is particularly true here because waiting to vacate H.B. 1020's judicial appointment provision until after the appointments have been made would mean unseating the appointed judges, possibly after they have begun to hear cases.  This would be highly disruptive to the Court and litigants.  *Cf. Ioppolo v. Rumana*, 581 F. App'x 321, 332 (5th Cir. 2014) (noting the "public[] interest in the proper administration of the judicial system.").  Temporarily enjoining the appointments before they are made while this Court adjudicates plaintiffs' claim will preserve the status quo and serve the public interest.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court issue a temporary restraining order prohibiting Defendant Randolph from appointing judges pursuant to H.B. 1020 pending the briefing, hearing, and resolution of Plaintiffs' motion for a preliminary injunction.

Respectfully submitted this 28th day of April, 2023.

*/s/ Eric H. Holder, Jr.*
Eric H. Holder, Jr.,* DC Bar # 303115
Carol M. Browner,* DC Bar # 90004293
Megan A. Crowley,* DC Bar # 1049027
Gary S. Guzy,* DC Bar # 375977
Mark H. Lynch,* DC Bar # 193110
Brenden J. Cline,* DC Bar # 1021317
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6291
eholder@cov.com
cbrowner@cov.com
mcrowley@cov.com
gguzy@cov.com
mlynch@cov.com
bcline@cov.com

*Counsel for NAACP*

**Pro Hac Vice* Applications to be Filed*

*/s/ Carroll Rhodes*
Carroll Rhodes, Esq. MS Bar, # 5314
**LAW OFFICES OF CARROLL RHODES**
POST OFFICE BOX 588
HAZLEHURST, MS 39083
Telephone: (601) 894-4323
Fax: (601) 894-1464
crhode@bellsouth.net

Janette Louard,* OH Bar # 066257
Anthony Ashton,* MD Bar # 9712160021
Joe R. Schottenfeld,* DC Bar # 1735796
**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
Fax: (410) 358-9350
jlouard@naacpnet.org
aashton@naacpnet.org
jschottenfeld@naacpnet.org

*Counsel for All Plaintiffs*

**Pro Hac Vice* Applications to be Filed*

## CERTIFICATE OF SERVICE

    I hereby certify that on April 28th, 2023, I electronically filed the foregoing Plaintiffs' Motion for a Preliminary Injunction with the Clerk of the Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

                                   <u>/s/ Carroll Rhodes</u>
                                   Carroll Rhodes