# **EXHIBIT 4**

## DECLARATION OF JED HANDELSMAN SHUGERMAN

I, Jed Handelsman Shugerman, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am a Professor of Law at Fordham Law School. Starting July 1, 2023, I will be a Professor of Law at Boston University School of Law. I received my B.A., J.D., and Ph.D. in History all from Yale University.

2. My scholarship has focused extensively on the history and importance of the election of judges in our nation. My doctoral dissertation at Yale was on the subject of the history of judicial elections in America. Entitled "The People's Courts: The Rise of Judicial Elections and Judicial Power in America," it won the American Society of Legal History's 2009 Cromwell Prize for the best dissertation or article in American legal history. I am the author of the primary in-depth book on judicial elections, *The People's Courts: Pursuing Judicial Independence in America*, which was published by Harvard University Press in 2012. This book traces the rise of judicial elections, judicial review, and the influence of money and parties in American courts. I also have authored more than two dozen published scholarly articles, including Economic Crisis and the Rise of Judicial Elections and Judicial Review, 125 Harv. L. Rev. 1061 (2010). I am the co-author of amicus briefs on the history of presidential power, the Emoluments Clauses, the Appointments Clause, the First Amendment rights of elected judges, and the due process problems of

|   |   |
|---|---|
|   | elected judges in death penalty cases. I am currently working on two books on the history of executive power and prosecution in America. |
| 3. | My work on judicial history and judicial elections has been by cited the Supreme Court of the United States, where Chief Justice Roberts referred to it in his opinion for the Court in *Williams-Yulee v. Florida Bar,* 135 S. Ct. 1656, 1662, 1672 (2015). Justice Ginsburg also cited my work in her opinion concurring in part and concurring in the judgment in that case. *Id.* at 1674. |
| 4. | The nature and the quality of its judiciary is a fundamental and defining aspect of the system of justice that every democratic government provides to its citizens. The judicial system provided by a government affects all citizens, not just those who come into contact with it. |
| 5. | Elected judges are a key element of the State of Mississippi's system of justice, and they have long been a central, defining, and intentional feature of Mississippi's legal system. In 1832, the State became the first in the nation to choose all of its judges by popular election. Shugerman, *The People's Courts* at 57. *See also* Joseph A. Ranney, A Legal History of Mississippi: Race, Class, and the Struggle for Opportunity at 4 (Univ. Press of Mississippi 2019). |
| 6. | My scholarship reveals that Mississippi, like other states that followed its lead, adopted judicial elections to promote both judicial accountability *and* judicial independence, believing that an informed public would elect fair and impartial judges who could not hide their self-interests from informed voters. Elected |

  judgeships were created to foster the promise of a fair and responsive judiciary in the face of unrepresentative appointments and a lack of local control. *The People's Courts* at 66. Both the right to vote for judges and the benefits that flow from an elected judiciary are key features of citizenship throughout Mississippi, even for those citizens who do not vote or never come into contact with the courts.

7.  Mississippi was a pioneer in adopting judicial elections for more local and direct control. Before 1832, judicial appointments had been subject to the centralized state-wide control the governor and state legislature, with the wealthy insiders of Natchez dominating the process. Judicial elections by districts shifted control to local voters and away from state-wide political control and the control of outside commercial interests. My opinion, based upon my understanding of this history and context, is that it would be a fundamental diminishment of those rights and benefits to take away or limit elected judges and the ability to vote for them in any jurisdiction in Mississippi, as H.B. 1020 does. Elected and locally-based judges are not casual features of the judicial system in Mississippi or the other states that have adopted elected judiciaries, but central to the promise of fair treatment provided by our legal system. Further, in my opinion, to take away the right to vote for judges and the benefits that flow from an elected judiciary in one county while preserving those rights and benefits in all other counties would be a profound example of unequal treatment of the citizens of the deprived county.

8.  Concern for an independent judiciary stems from the earliest days of our nation's founding. *See, e.g.*, The Declaration of Independence para. 11 (U.S. 1776) ("[King George] has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries."). Once the colonies won their independence, the newly-formed states sought to structure their judiciaries to prevent judicial dependency on a central power. *See* Evan Haynes, *The Selection and Tenure of Judges* 101–33 (2005). Despite these efforts, state judiciaries in the early nineteenth century were nonetheless beholden to the political branches of government and, by extension, the parties that controlled them.

9.  Despite initial efforts to guard against dependence upon and influence from a central power, by the early nineteenth century Mississippi's judiciary had increasingly become beholden to the legislature, the executive, and the parties that controlled them. Governors with the power of appointment typically nominated persons supporting their agendas, and then threatened those judges with removal if they behaved independently.

10. The election of judges was a distinctive and intentional democratic reform effort to protect direct and local democratic control. This innovation was seen as essential to an independent judiciary as well as state constitutional promises "to protect the rights of the people." And these reforms spread from Mississippi across the nation. By 1860, eighteen of the thirty-one States in the Union elected all of their judges,

    and five additional States elected some of their judges.  *The People's Courts, supra* at 105 (compiling state data).

11. As I have explained in my academic analysis, "[t]he overall goal of these democratic and populist reformers was to make judges more accountable to the grassroots, to facilitate more direct contact with voters, and also to make them more independent from centralized control of governors, insiders, and commercial elites who tended to be in the state's urban center or capital."  Shugerman, Countering Gerrymandered Courts: Comment on Miriam Seifter's 'Countermajoritarian Legislatures', *Columbia Law Review,* Vol. 122, 2022 at n 49.  These are benefits, in addition to the right to vote for one's judges, that flow from an elected judiciary.  In short, these reforms -- accomplished through the institutionalization of judicial elections -- were designed to separate law from politics, as "direct popular elections were better than insider appointments in protecting the unique judicial role from partisanship."  *The People's Courts* at 111-112.

12. Further, preserving this system of elected judges, and applying it evenhandedly to all citizens, is essential to preserve public confidence in the integrity of the judiciary.  In general, the reform efforts that resulted in a system of elected judges in Mississippi (and in other states) were motivated by the belief that an informed and engaged electorate would choose candidates "based on honesty, integrity, a commitment to constitutional principles, and an understanding of the legal system."  Shugerman, *The People's Courts*, *supra*, at 273.

13. In many states, localism was a core premise for the adoption and continuation of judicial elections. Mississippi's political reformers who adopted judicial elections believed that the state's citizens -- whether facing criminal sanctions or financial consequences -- were entitled to have their fates affected by more locally selected judges, who were more likely to understand their circumstances and social conditions. Indeed, Mississippi's Constitution of 1832 was designed to remedy the concern that remote judges appointed by distant elites with centralized and unaccountable authority (then centered in Natchez, which was both the State Capitol and the State's commercial hub) held undue sway. As the then new state developed and settled in the early decades of the 1800s, these issues had come to the fore and spawned clashes around land ownership rights and regional tensions. The subject of judicial elections was an intense focus of Mississippi's 1832 constitutional convention. Shugerman, at 66-79.

14. In a wave of Jacksonian democratic reform, the delegates to the 1832 Constitutional Convention established an elected judiciary with the expectation that this innovation would provide judges with more independence and more political legitimacy to more carefully review governmental actions. *See* Shugerman, Economic Crisis, supra, at 1115. Although the initial motivations of the proponents of an elected judiciary in Mississippi also revolved, in part, around ensuring sufficiently pro-slavery protections for rural farmers, those elements of the new judicial structure receded and others came to the fore. For example, the doctrine

    of substantive due process for property rights emerged from this movement, *Id*. at 1123, which served the laudatory purpose of limiting the state from infringing on property and liberty interests. Shugerman, supra, at 128.

15. Over time—and central to the circumstances here presented by H.B. 1020—one of the key themes that emerged from the increase in judicial review facilitated by elected courts is a recognition that elected judges better serve, on the whole, to defend individuals and minority communities against abuses of power by the majority and by the elite. *The People's Courts* at 123-33.

16. I have also noted in my scholarship, and it continues to be my opinion, that courts have carefully scrutinized the manner in which voting for elected judges is organized and occurs, in order to assure the continuing fundamental values that the system of elected judges embodies. Courts have, for example, found that even if "one-person/one-vote" did not apply to judicial elections, the Fourteenth Amendment separately prohibits a "vote dilution" scheme, because "the election of . . . judges . . . implicates the goal of equal protection and issues of fair and effective representation." Shugerman, Countering Gerrymandered Courts at nn. 91-97, citing *Republican Party of North Carolina v. Martin*, 980 F.3d 943, 953 (4th Cir. 1992). In particular, and as recognized in a series of decisions regarding how Mississippi has drawn its judicial districts -- including for the Hinds County Circuit Court at issue in H.B. 1020 -- the ability of voters to sustain these underlying values of judicial independence, accountability, and locality is a fundamental concern that

7

can be compromised by those election details. *See Martin v. Allain,* 658 F. Supp. 1183, 1192 (S.D. Miss. 1987).

17. The history and context for the development of elected judges in Mississippi reflects an intentional commitment to profound democratic values. While this system has not been perfect -- and has been the subject of various additional reforms -- the values and structure embodied in Mississippi's system of elected judges are rooted in the protective function that the judiciary strives to serve, and the equal application of those laws. Mississippi experimented with removing these protections during the post-Reconstruction period, but returned to this structure.

18. It is my expert opinion, based on my years of scholarship in this area, that H.B. 1020 is inconsistent with the original public meaning of Mississippi's constitutional commitments to judicial elections and local direct control. Whether one thinks electing judges is a good or a bad idea, the citizens of Mississippi chose this system for the fundamental principles of judicial accountability to the voters, of local control of the courts, and of judicial independence from state-wide from centralized state-wide control. Mississippi has been committed to these values for nearly two centuries through its system of electing judges. And there is no small measure of irony that this is being attempted in the first state in the nation to establish an elected judiciary and affecting the citizens of the very city, Jackson, named after the president who was most associated with the wave of democratizing reforms that led to the establishment of an elected judiciary. It would be no small matter for some

citizens to be afforded such protections and for others to be denied them, particularly where a key determinant for whether or not these core values are breached is the race of the citizens affected.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

Executed this 24 day of May, 2023.

_____
Jed Handelsman Shugerman

9