**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,<br><br>*Plaintiffs*,<br><br>v.<br><br>TATE REEVES, in his official capacity as Governor of the State of Mississippi, ET AL.,<br><br>*Defendants*. | Case No. 3:23-cv-272-HTW-LGI<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RE APPOINTMENT OF JUDGES** |

## INTRODUCTION

This Court is the only thing keeping Chief Justice Randolph from packing the Hinds County Circuit Court with judges who are unelected and unaccountable to the County's majority-Black population.  As demonstrated below, Plaintiffs are likely to show the appointment provision of H.B. 1020 denies Black residents of Hinds County equal protection of the laws, and the irreparable harm caused by denial of this constitutional right will begin immediately upon the appointments.

The State defends H.B. 1020's excesses by invoking Jackson's public safety struggles and calls into question the capabilities of the City's Black elected leadership.  This pretext should not divert attention from Plaintiffs' central contention here: Whatever Jackson's current challenges, its citizens cannot be deprived of equal protection of the laws.  There is no reason the State could not have addressed any shortcomings it perceives with the Hinds County Circuit Court by adding elected local judges instead of treating Hinds County voters differently—and less favorably on a central feature of citizenship—than anyone else in the State.

1

## STATEMENT OF FACTS

On April 21, 2023, Mississippi Governor Tate Reeves signed House Bill 1020 ("H.B. 1020") into law.  ECF No. 12-1.  The law directs the Chief Justice of the Mississippi Supreme Court to appoint four "special temporary" judges to Hinds County's Seventh Circuit Court District no later than 15 days after passage of the Act.  *Id.* §§ 1(1)-(2).  Unlike normal Circuit Court judges, the new Hinds County judges will not be elected by the local community they serve, nor are they required to reside in Hinds County.  *See id.*  And, unlike temporary judges who may be assigned to other Mississippi courts on an "emergency" basis, the new Hinds County judges will serve regardless of any emergency through December 31, 2026—nearly the full four years for elected judges.  *Compare* Miss. Code § 9-1-105(2), *with* ECF No. 12-1, § 1(1).

The State Executive Defendants point to the pandemic and "spike in homicides and violent crimes in 2020" as the events that created a need for additional judges.  ECF No. 34 at 23.  But Hinds County Circuit Court has needed additional judges since long before 2020.  Seventh Circuit Court judges have a "special statutory role"—Mississippi law vests "exclusive jurisdiction in them over cases involving the state and its agencies"—so "more cases are necessarily directed to the circuit and chancery courts in that county."  Decl. of Tomie Green ("Green Decl."), ¶ 9 (quoting *id.*, Ex. A).  In 2001, for example, a judicial study committee recognized the heavy caseload Seventh Circuit judges face.  *Id.*, Ex. A. Since then, Seventh Circuit judges have regularly called for more elected judges to fulfill their statutory role as well as handle the high proportion of criminal cases in Hinds County.  *Id.* ¶¶ 12-14.

The State has not increased the number of elected judges on the court since it authorized four elected judgeships in 1994.  *See* Miss. Code § 9-7-25 (citing 1994 Miss. Laws Ch. 564 § 51).  In 2006, the Mississippi Supreme Court had to exercise its emergency appointment authority to provide "two special judges to help expedite criminal cases in Hinds County Circuit

Court and relieve the criminal case backlog." ECF No. 34-6 at 2. And judges on the Seventh Circuit have tried to adopt creative practices to manage their heavy caseload. Green Decl. ¶ 11; ECF No. 34 at 23 (citing *Safeco Ins. Co. of Am. v. State ex rel. Hood*, -- So. 3d --, 2019 WL 3955084, at *2 (Miss. Aug. 22, 2019), as "reflecting Judge Green's intent to appoint special master, in part 'on the grounds of [the court's] overcrowded civil and criminal dockets'").

Rather than authorize more judges for the majority-Black population to elect, the State has taken to packing the Hinds County Circuit Court with judges selected by a white State official with no connection to Hinds County. In August 2020, the Chief Justice appointed four additional judges—doubling the size of that court—to help with the pandemic-related case backlog. ECF No. 12-2 at 13. Those judges were supposed to serve for four months, *id.*, but according to the Lieutenant Governor, "two of [them continued] working in Jackson for [a] year and a half to two years." Second Decl. of Charles Taylor ("Taylor Decl."), Ex. A. Then in September 2022, the Chief Justice again temporarily appointed four judges to the court— including reappointing one of the original "temporary" judges—citing the "criminal case backlog." ECF No. 12-2 at 18. None of these judges were from Hinds County. *See id.* at 13-19. Three of the most recent appointees are still sitting. *See* Taylor Decl. Exs. B-C.

While each of the court's elected judges is Black, *see* ECF No. 12-2 at 26—and has been since 2018 when Hinds County voters elected four Black judges for the first time, *see* Green Decl. ¶ 15—two of the judges appointed in 2020 are white, as are three of the most recently appointed judges. *See id.* at 13-19. Plaintiffs do not question whether individual judges, on account of their race, can be fair and just. The point is that the racial composition of the appointed judges does not match the racial composition of the judges the citizens of Hinds County elect, and in no other county is the will of the electorate thwarted in this regard.

H.B. 1020 ratifies and multiplies this pattern of a white state official—whom Hinds County residents cannot vote for—appointing mostly white outsiders to sit in judgment of Hinds County's predominantly Black residents.  No other circuit court has had a "temporary" judge appointed since 2020.  *See* ECF No. 12-2 at 42.  To make matters worse, H.B. 1020 allows the current "temporary" judges to be "reappoint[ed]," ECF No. 12-1, § 1(2), giving them terms on the Hinds County Circuit Court beyond the Mississippi Constitution's four-year limit for elected judges.  *See* Miss. Const. art. 6, § 153.  And if Defendant Randolph appoints different judges instead, then Hinds County will host ***seven*** of his Circuit judge appointees—three left under Miss. Code § 9-1-105(2), and four under H.B. 1020.

Plaintiffs and their members include Black voters who reside in Jackson, Mississippi, which makes up two-thirds of the population of Hinds County.  They have voted in Hinds County Circuit Court elections in the past and plan to do so in future.  They believe, as former Mississippi Chief Justice Prather once wrote, that "elected judges are reactive to public opinion, while appointed ones who never face popular confirmation are largely free of its constraint." Lenore L. Prather, *Judicial Selection—What is Right for Mississippi?*, 21 Miss. Coll. L. Rev. 199, 206–07 (2002) (citing Daniel R. Pinello, *The Impact of Judicial-Selection Method on State-Supreme-Court Policy: Innovation, Reaction, and Atrophy* 130 (Greenwood Press, 1995)). Plaintiffs bring this suit and request for a preliminary injunction to prevent H.B. 1020 from depriving Hinds County's majority-Black citizens of equal voting and political power and the benefits afforded to Mississippi residents in all other counties.

## ARGUMENT

A plaintiff is entitled to a preliminary injunction where, as here, it shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) the threatened injury outweighs any harm the injunction might cause

defendants; and (4) the injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Each factor favors granting the preliminary injunction request.

### I.      Plaintiffs Have Standing to Challenge H.B. 1020 § 1.

As an initial matter, at the "preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). The three elements of standing are that a plaintiff must "(1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Id.* At this early stage in the proceedings, "the manner and degree of evidence required to show standing is less than at later stages." *Id.* at 329.

Plaintiffs have standing on multiple grounds here. Plaintiffs and their members include Black voters who have voted in Hinds County Circuit Court elections in the past and plan to do so in the future and who live in Hinds County. *See* First Decl. of Charles Taylor, ECF No. 12-2, ¶¶ 1–4; Decl. of Frank Figgers, ECF No. 12-3, ¶¶ 1–3; Second Decl. of Nsombi Lambright-Haynes ("Lambright-Haynes Decl."), ¶¶ 1–3. Unless Defendant Randolph is enjoined from appointing judges under H.B. 1020 § 1, Plaintiffs will have their rights as voters and interests as residents impaired.[1]

Most simply, H.B. 1020 "would deprive voters of the right to vote for all judges with general jurisdiction over their county." *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993) (en banc). In *Clements*, two elected Texas judges intervened to oppose a Voting Rights Act settlement agreement that would have split their counties into

---

[1] This case has nothing to do with a judge's "juror oath" at issue in *Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1284-85 (5th Cir. 1992), the only case cited by the State Executive Defendants for more than the general principles of standing. *See* ECF No. 34 at 5-6.

subdistricts.  *Id.* at 838.  The court held that the judges "have standing as voters" to intervene and defend against the subdistricting.  *Id.* at 845.  Here, H.B. 1020 is worse than subdistricting: it effectively makes the Hinds County Circuit Court an eight-member court until 2027, with voters electing only four of those judges.  *See* Miss. Code § 9-2-23(2); *Hadley v. Junior Coll. Dist. of Metro. Kansas City*, 397 U.S. 50, 58 (1970) (recognizing that if "a State chooses to select members of an official body by appointment rather than election," that choice may "offend the Constitution").

Similarly, by packing the Circuit Court with unelected judges, H.B. 1020 dilutes the voting strength of Hinds County's majority-Black voters.  It is blackletter law that voters challenging the method for selecting the judges in a court district "plainly ha[ve] standing." *Fusilier v. Landry*, 963 F.3d 447, 454 (5th Cir. 2020).  In *Fusilier*, the Fifth Circuit found standing for "African-American voters and the Terrebonne Parish NAACP" to challenge the selection of judges via at-large voting.  *Id.* at 452-54.  Again, H.B. 1020 is worse, because it reduces Plaintiffs' voting strength to zero for each of the new judgeships.  *See Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 211 (5th Cir. 1980) ("To hold that a system designed to dilute the voting strength of black citizens and prevent the election of blacks as Judges is immune from attack would be to ignore both the language and purpose of the Fourteenth and Fifteenth Amendments.").[2]

---

[2] The State Executive Defendants previously argued that the "Plaintiffs' right to vote is not at issue in this case," because the Chancery Court concluded that H.B. 1020 did not violate Mississippi's constitutional guarantees. ECF No. 34 at 6-7, 9-10.  But the Supreme Court has repeatedly underscored that under the U.S. Constitution, "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."  *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966).

Further, H.B. 1020 "perpetuat[es] archaic and stereotypic notions" and "stigmatiz[es]" Hinds County's Black residents as "innately inferior and therefore as less worthy participants in the political community." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (citation omitted). "Stigmatic injur[ies]" provide standing to "those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984) (citation omitted). By telling the world that Hinds County's Black residents cannot govern themselves—to the extent that the State has to appoint half of their judges—H.B. 1020 treats them like second-class citizens and imposes a stigmatizing injury sufficient for standing. The Attorney General's Office embraces this theme and adds fuel to the fire, asserting that "Jackson and Hinds County have both suffered undeniable crises of local leadership" and have "failed local leadership"—when that leadership was chosen by Black voters. ECF No. 34 at 2, 12. The State's paternalistic efforts to save Hinds County from its voters' choices and substitute the Chief Justice's handpicked appointees subordinates and stigmatizes Hinds County's Black residents.

Setting aside the individual Plaintiffs' status as voters, they are also Hinds County residents who have benefited from its elected judiciary and stand to lose those benefits. An elected and locally resident judiciary provides benefits to all the citizens of a state that guarantees judges elected by the people, including those who do not vote or come into contact with the courts. Decl. of Jed Handelsman Shugerman ("Shugerman Decl."), ¶¶ 6, 11, 15; Green Decl. ¶ 25 (describing the Circuit Court's role as "'guards' of justice in our community," not "'gods' in a far-off courthouse"). The benefits include familiarity with the locality, local accountability, and independence from the executive and legislative branches. Shugerman Decl. ¶¶ 6, 11, 15; Green Decl. ¶¶ 24-25.

The individual Plaintiffs and retired Hinds County Circuit Court Judge Tomie Green articulate these benefits in concrete terms. *See, e.g.*, Decl. of Frank Figgers, ECF No. 12-3, ¶¶ 7-14 ("[W]hen I was sworn in as a member of the Jackson School Board of Trustees, the three Seventh Circuit Court judges who attended my swearing-in had all graduated from the same high school in my district. . . . These close connections with candidates ensure that I know where candidates stand and can trust them to serve our community well while on the bench."); Green Decl. ¶¶ 23-24 ("Because we must run for office, elected circuit judges must not only demonstrate that we are from the community that we serve, but we also understand the concerns and experiences of that community. Take caseloads: If the administration of justice is moving too slowly in a circuit, elections offer a chance for voters to consider whether those who administer justice in their communities are doing so fast enough or effectively enough."); Lambright-Haynes Decl. ¶¶ 11-13 ("I have heard Seventh Circuit judges describe their desire to focus their judicial decision-making on compassion and reformation."). These benefits are fundamental components of the system of justice that affects the lives of all citizens. Shugerman Decl. ¶¶ 4-8. H.B. 1020 takes these benefits away from Hinds County citizens and diminishes the system of justice that is available to them while leaving those benefits available to the citizens of all other counties. *See, e.g.*, *Chisom v. Roemer*, 501 U.S. 380, 400–01 (1991) ("When each of several members of a court must be a resident of a separate district, and must be elected by the voters of that district, it seems both reasonable and realistic to characterize the winners as representatives of that district."); *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 120 F. Supp. 3d 479, 490 (M.D.N.C. 2015) (finding irreparable harm where "citizens will [be] governed, at least for a time, by . . . the only City Council in the state that was elected through a system and process established without local participation or oversight").

Any of these grounds for standing is sufficient to satisfy Plaintiffs' obligations here. Accordingly, they have standing for a preliminary injunction.

**II.    Plaintiffs Are Likely to Succeed on the Merits.**

Turning to the first preliminary injunction factor, this Court has recognized that "plaintiffs must provide evidence sufficient to support a prima facie case, but the evidentiary standard is not as high as would be required to entitle them to summary judgment." *Asbury MS Gray-Daniels, L.L.C. v. Daniels*, 812 F. Supp. 2d 771, 776 (S.D. Miss. 2011); *accord Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Accordingly, Plaintiffs need not prevail on every disputed issue of material fact nor show that they are "certain to win." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011); *see also Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011) ("[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."). Plaintiffs set forth more than a prima facie case here.

The Fourteenth Amendment's Equal Protection Clause forbids states from enacting legislation that is motivated by racial discrimination. *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000). That prohibition forbids establishing judicial selection processes with the "purpose and operative effect" of denying or "dilut[ing] the voting strength of [B]lack citizens." *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 212 (5th Cir. 1980). H.B. 1020 also deprives Hinds County's majority-Black residents of the benefits of "local control rights given to all other [] voters in the State," thus denying them equal protection of the laws. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 120 F. Supp. 3d 479, 489 (M.D.N.C. 2015). H.B. 1020 transfers responsibility for selecting half of Hinds County's Circuit Court judges from its majority-Black voters to the Chief Justice of the Mississippi Supreme Court, who is elected in a

district that does not include Hinds County and is in no way accountable to the residents of Hinds County. *See* ECF No. 12-2 at 65; *see also Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626–27 (1969) ("Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives.").

Plaintiffs need only show that racial discrimination was a "substantial" or "motivating" factor behind enactment of the law to shift the burden "to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Notably, "[r]acial discrimination need only be one purpose, and not even a primary purpose," to violate the Equal Protection Clause. *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*) (citation omitted). For example, legislators who voted to eliminate elected judges for Hinds County may have had a sincere intention to reduce crime in Jackson, but also have been motivated by the discriminatory trope that Black residents do not know how to police themselves or are not sufficiently "tough on crime." *See* Green Decl. ¶ 15 (noting that such complaints were frequently aimed at the Black judges on the Hinds County Circuit Court); Lambright-Haynes Decl. ¶¶ 13, 16 (describing different views on criminal justice issues between Black residents of Hinds County and statewide elected leadership). When evaluating intent, a court may consider "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions." *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (citations omitted).

### A. Section 1's Disproportionate Impact Is Sufficiently Great to Establish Discriminatory Intent

When evaluating whether racial discrimination was a motivating factor behind an official action, a disparate impact on one race can be an "important starting point." *Vill. of Arlington*

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  But generally "[p]roof of racially discriminatory intent or purpose" is also required.  *Id*. at 265.  In some cases, however, "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."  *Id*. (citing as examples *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

This is such a case.  Like the "uncouth twenty-eight-sided" voting district in *Gomillion* that operated to exclude nearly all of Tuskegee's Black voters and the overwhelming impact of a city ordinance on Chinese laundry owners in *Yick Wo* that the Supreme Court deemed sufficient evidence by itself of impermissible discrimination, "[t]he essential inevitable effect of" H.B. 1020's appointment provision is specifically to deprive Hinds County's disproportionately Black voters of the benefits of choosing judges who reside in their county.  *Gomillion*, 364 U.S. at 341.

The disparate impact of the appointments provision on the Black citizens of Hinds County versus the citizens of all other counties is beyond dispute.[3]  Mississippi has 22 other circuit court districts.  But H.B. 1020 affects only Hinds County's Circuit Court.  Nearly 75% of Hinds County's residents are Black, ECF No. 12-2 at 72, compared with only 38% of Mississippi's residents overall.  *Id.* at 76.  Hinds County is home to the largest Black population of any Mississippi county.  *Id.* at 80.  Hinds County also includes the city of Jackson, which has one of the highest proportions of Black residents in the United States (more than 80%) and Black leadership.  The overwhelmingly Black residents of Hinds County—alone among Mississippi residents—have been stripped of the right to vote for all their circuit judges and to have those

---

[3] In their Response in Opposition to Plaintiffs' TRO Motion (ECF No. 34 at 11), the State Executive Defendants cited *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352 (6th Cir. 2002), which similarly considered a law affecting Detroit's "nearly 80 percent African-American" population and concluded that it caused a "disproportionate impact."  *Id.* at 369.

judges reside in the County.  The obvious "foreseeability" of H.B. 1020's impact supports "a strong inference" that the Legislature intended to adversely impact Black citizens.  *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979); *see also Veasey*, 830 F.3d at 235 ("To find discriminatory intent, direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions may be considered.").

> **B.**     **Arlington Heights** *Factors Demonstrate Section 1's Discriminatory Purpose*

Application of the factors set forth in *Arlington Heights* to determine whether a state law was enacted with a discriminatory purpose further demonstrate that is what happened here. *Veasey*, 830 F.3d at 230.  Those factors include: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body."  *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989).  Each of these *Arlington Heights* factors supports Plaintiffs' likelihood of succeeding on the merits of their equal protection challenge to H.B. 1020's requirement that the Chief Justice appoint four judges to the Seventh Circuit.

> **1.     Historical background**

With respect to the first *Arlington Heights* factor, courts recognize that "history provides context and that historical discrimination . . . can have effects for many years."  *Veasey*, 830 F.3d at 232 (plurality opinion); *see, e.g.*, *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682 (S.D. Tex. 2017) (holding that historical evidence supported finding discriminatory purpose where a city had "a long history of discrimination against minorities, . . . as well as a history of more recent events that are more probative").  In this case, the evidence is both historical and recent.

H.B. 1020's appointment of judges who are not accountable to Hinds County's voters represents the latest step in the Mississippi Legislature's campaign to deny Black residents equal

political power.  This Court has found that Mississippi has a "long history of official

discrimination" that impaired Black Mississippians' right to vote and "extended to the bar and

consequently to the judiciary."  *Martin v. Allain*, 658 F. Supp. 1183, 1192 (S.D. Miss. 1987); *see*

*also* Declaration of Edward Blackmon, Jr. ("Blackmon Decl."), ¶¶ 4-5.  Mississippi was the first

state to provide for election of all judges, Shugerman Decl. ¶ 7, but it had no Black judges from

the end of Reconstruction until 1977.  *Martin*, 658 F. Supp. at 1193.  In 1987, this Court struck

down the Hinds County Circuit Court multi-member judicial district because it provided Black

voters "less opportunity than other members of the electorate to participate in the political

process and to elect representatives of their choice."  *Id.* at 1204.

In the following 25 years, the Department of Justice ("DOJ") twice issued objection

letters—in 1991 and 2012—to proposed election law changes in Hinds County because the State

failed to prove the proposed changes would have no discriminatory purpose or effect.  Taylor

Decl. Exs. D-E.  Those letters were issued against the backdrop of the DOJ's issuance of over

150 objection letters to the State since the Voting Rights Act was enacted.[4]  And this history

supports a finding of discrimination at issue.  *See Veasey*, 830 F.3d at 240 n.29 (recognizing

relevance of State's history of receiving DOJ objection letters); *League of United Latin Am.*

*Citizens v. Abbott*, 601 F. Supp. 3d 147, 170 (W.D. Tex. 2022) (discriminatory intent supported

by fact that in every decade "since the statute was passed in 1965, federal courts have held that

Texas violated" the Voting Rights Act).

---

[4] *See* U.S. DOJ, Civil Rights Div., *Voting Determination Letters for Mississippi* (Aug. 7, 2015), https://www.justice.gov/crt/voting-determination-letters-mississippi.  Following the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), which severely cabined DOJ's role in enforcing the Voting Rights Act, DOJ discontinued its objection letters.  Thus, the absence of such letters after 2012 does not mean that Mississippi reformed its ways.

Even more recently, the Legislature has denied Jackson's majority-Black citizens and elected leadership of Jackson access to the federal transportation funds that the city merits due to its size and needs; sought to strip the city of control over its municipal airport; took over and controlled the disbursement of American Rescue Plan Act COVID  recovery funds under S.B. 2822 (2022) in a manner exclusive to Jackson; and diverted and constrained the city's share of the sales tax revenue collected in Jackson.  ECF No. 12-2 at 99-114; Taylor Decl., Ex. F-G.  It has deprived Jackson, its Black leadership, and its majority-Black residents of the funds they need to operate Jackson's water systems, and even considered fully taking control of Jackson's water systems in order to hijack the approximately $800 million that Congress appropriated to remediate the Jackson water crisis.  *Id.* at 115-130.  Governor Reeves has also targeted Jackson for disinvestment, punitively vetoing spending on recreational opportunities funded elsewhere because "Jackson is not one suburban golf course and one planetarium away from thriving." Taylor Decl., Ex. J.  Indeed, much of what the State Executive Defendants call "dysfunctional government," ECF No. 34 at 12, is the result of the hostility of the Executive and Legislative branches of the State government toward Jackson.  *See, e.g.*, Taylor Decl. Ex. I (U.S. EPA opening investigation of Mississippi agencies for discriminating against Jackson's majority-Black population in funding water infrastructure and treatment programs and activities).

Further, H.B. 1020 was enacted against the backdrop of Mississippi's racially polarized voting, including in Hinds County.  *See* Taylor Decl. Exs. J-K.  Black voters in Hinds County have historically voted for different candidates for statewide office than their white counterparts in Hinds County and across the State.  All four of Hinds County's elected circuit judges are Black, but Mississippi has not elected a Black official to statewide office since Reconstruction, and State officials do not need to appeal to Black voters to get elected.  ECF No. 12-2 at 131.

14

This history also is reflected in the Legislature's changes to the number of elected circuit court judges in recent decades. Since 1994, when the current Hinds County Circuit Court was created, nearly half of the circuit court districts have gained an elected judge, and the number of elected circuit judges state-wide has grown by nearly 20%. *Compare* 1994 Miss. Laws, Ch. 564 (48 circuit judges), *with* Miss. Code §§ 9-7-5 to -64 (57 circuit judges); *see also* Green Decl. ¶ 13. All nine of those circuits that gained an elected judgeship have much whiter populations than Hinds County—including the Twentieth Circuit, which covers neighboring Rankin and Madison Counties. Hinds County, however, has received none. *See* 2015 Miss. Laws Ch. 476 §§ 47-48, 51, 58 (H.B. 703) (Twelfth, Thirteenth, Fifteenth, and Twentieth Circuits); 2005 Miss. Laws Ch. 501 §§ 9-10, 15-16 (S.B. 2339) (First, Third, Sixteenth, and Seventeenth Circuits); 1997 Miss. Laws Ch. 378 § 1 (S.B. 2046) (Eighth Circuit); Taylor Decl., Ex. K (showing demographic data for all Mississippi counties). Yet, despite making up a smaller share of the State's judiciary since 1994, the Seventh Circuit has steadily taken on more of the State's caseload: in 2000, the court disposed of less than 5% of the State total criminal cases, while in 2010 that figure was 7%, and in 2020 it was 8%. *See* Green Decl., Exs. B-C; Taylor Decl. Ex. Z.

The State Executive Defendants assert that "Plaintiffs proceed as though the presumption of legislative good faith does not exist." ECF No. 34 at 12. In truth, the Legislature—through both historic and recent actions—has forfeited any such presumption when it comes to its treatment of Jackson and its Black populace and leadership. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (noting that notwithstanding the presumption, the "historical background" of a decision provides "one evidentiary source relevant to the question of intent" (citation omitted)).

15

2.      **Specific sequence of events**

The next *Arlington Heights* factor considers whether the specific sequence of events leading up to the decision demonstrates a focus on race.  As the Fifth Circuit has stressed, "[c]ontext matters."  *Veasey*, 830 F.3d at 236.

The context of H.B. 1020's introduction is striking for what the Legislature did not do. Despite purporting to assist Hinds County and Jackson, the bill's principal author, Rep. Trey Lamar, did not consult their Black representatives before introducing the bill.  ECF No. 12-2 at 140.  Nor did the Legislature ever propose providing administrative funding or increasing the number of Hinds County's elected judges to address the heavy caseload that supposedly warranted H.B. 1020's enactment.

H.B. 1020 originated as a more than 1,000-page bill aimed at substantially remaking the justice system in Hinds County, including by adding appointed judges.  After its introduction, the judges of Hinds County's Circuit, Chancery, County, and Justice Courts issued statements condemning the bill for "disenfranchising the voters of Hinds County" and "oppos[ing] the addition of any appointed Judges to the 7th Circuit."  ECF No. 12-2 at 148; Taylor Decl, Ex. M. Instead, the Circuit judges asked for two new elected judgeships. Taylor Decl., Ex. M.

During the debates on H.B. 1020, several amendments were offered to try to remedy the bill's discriminatory treatment of Hinds County's majority-Black residents.  In the House, Rep. Robert L. Johnson introduced an amendment requiring that the appointed judges "be residents of Hinds County," Taylor Decl., Ex. N,[5] consistent with the requirements for elected judges.  *See* Miss. Code § 9-7-1.  In the Senate, Sen. Barbara Blackmon proposed striking H.B. 1020 § 1 and

_____

[5] Robert Johnson, *MS House Floor  - 7 February, 2023; 10:00 AM*, YouTube at 6:46:34 (Feb. 7, 2023), https://www.youtube.com/live/HtruSFI0avs?feature=share&t=24394.

16

instead granting Hinds County's Circuit Court two new judgeships as of January 1, 2025, with the vacancies filled by appointees of the Senior Circuit Judge for two years until the start of the next judicial term.  Taylor Decl., Ex. O.  Sen. Derrick T. Simmons similarly proposed striking § 1 and adding two new judgeships, but beginning in January 1, 2024 and having those judges chosen via special elections.  *See id.*, Ex. P.  All three amendments were voted down.  *See id.*, Exs. N-P.  These actions provide further evidence that the Legislature intended to treat Black citizens less favorably than white citizens of Mississippi.  *See Veasey*, 830 F.3d at 236 (rejecting ameliorative amendments can be evidence of discriminatory intent).

As enacted, H.B. 1020 was "part and parcel" of a legislative effort with S.B. 2343.  ECF No. 34 at 22.  Together, these laws impose unelected prosecutors on Jackson, create a new unelected court, expand the jurisdiction of the State-run police force, create harsher criminal penalties for Jackson residents, remove political decisions to a different level of government, and weaken Hinds County residents' ability to participate in the political process in ways that provide further evidence of racial animus and disparate treatment.  ECF No. 12-1, §§ 4(1), 5(1), 8; S.B. 2343 §§ 1(1), (6)(a)-(c).[6]  These provisions provide important context for the judicial appointment provision, as do the other actions during the same 2023 Legislative Session targeting Jackson and its citizens, such as the effort to take over Jackson's water system and create a Regional Water Authority with S.B. 2889.  *See McCrory*, 831 F.3d at 228 (stressing the need to consider "the whole picture" under *Arlington Heights*).

---

[6] Plaintiffs have challenged these provisions in their Complaint, but because they have later effective dates, Plaintiffs do not seek emergency relief with respect to them at this time.

3.       **Procedural departures**

The third *Arlington Heights* factor considers departures from the normal legislative procedures.  429 U.S. at 267.  This, too, demonstrates the discriminatory intent of H.B. 1020.

From the outset, proponents of H.B. 1020's judicial appointment provision departed from standard legislative process.  By framing "the original version of H.B. 1020 [as] a revenue bill that brought forward hundreds of code sections on state revenues," ECF No. 34 at 17 (citing ECF No. 34-1 at 4-1043), Rep. Lamar was able to have his bill sent to the House Ways and Means Committee that he chaired.  ECF No. 12-1 at 37; Taylor Decl. Ex. Q.  Under his leadership, the committee passed the bill.  ECF No. 12-1 at 36.  Rep. Lamar then introduced an amended version of H.B. 1020 that cut the 1,000 pages on "state revenues" from the bill.  *See* ECF No. 12-1 at 36; Taylor Decl. Ex. R.  By employing this maneuver, Rep. Lamar and H.B. 1020's supporters were able to avoid the scrutiny of the House Judiciary Committee, where legislation similar to the amended H.B. 1020 normally would be heard.  ECF No. 12-2 at 140; Blackmon Decl. ¶¶ 9-10, 12.

Similarly, at no point was H.B. 1020 referred to the standing committee on local and private legislation.  Blackmon Decl. ¶¶ 11-12.  Article 4, Sections 87–90 of the Mississippi Constitution, however, deem laws like H.B. 1020 that are "limited in operation . . . to certain districts of the territory of the State" to be "local and private legislation," and commands that "[n]o local or private bill shall be passed by either house until it shall have been referred to" the "standing committee on local and private legislation." *State ex rel. Pair v. Burroughs*, 487 So.2d 220, 223 (Miss. 1986) (citations omitted).  Indeed, Sen. Barbara Blackmon criticized the bill as "local and private legislation" when proposing her amendment to treat Hinds County the same as

all other counties by authorizing only elected judgeships.  Taylor Decl. Ex. S.[7]  Regardless of whether this deviation would be ground for a judicially cognizable claim in state court, it is further evidence of the way in which the Legislature skirted procedural requirements to facilitate H.B. 1020's enactment.  *See Veasey*, 830 F.3d at 237-38 (recognizing that deviations like "bypass[ing] the ordinary committee process" represent meaningful procedural departures).

And, just as bill proponents skewed committee referrals, they manipulated legislative participation.  During the conference committee process, for example, the only Black member of the conference committee that drafted and approved H.B. 1020, was excluded from committee meetings where the final version of the bill was prepared and was handed the final copy of the bill just minutes before the deadline for voting on the measure.  ECF No. 12-2 at 150.  Under Rule 23A of the Joint Rules of the Senate and House, those meetings were not only supposed to be open to all conferees, but to any interested members of the public.  Taylor Decl. Ex. T.  These actions further evince the procedural departures and racial discrimination surrounding H.B. 1020's enactment.

The timing of H.B. 1020's judicial appointment terms also conflicts with the Legislature's established practice for judicial redistricting.  As supporters of the bill recognized throughout the debates, the Legislature has a "duty to do the judicial redistricting, which will be next year, and [they] have a process in place to do that."  Taylor Decl. Ex. S.[8]  It is highly irregular to appoint a spate of judges to nearly four-year terms on the eve of redistricting and special elections to fill the newly authorized seats.

---

[7] Sen. Barbara Blackmon, MS Senate Floor - 7 March, 2023; 10:00 AM, YouTube at 3:19:47 (Mar. 7, 2023), https://www.youtube.com/live/4J_8j_RMMJY?feature=share&t=10216.

[8] Sen. Brice Wiggins, Chair of Judiciary Division A, MS Senate Floor - 7 March, 2023; 10:00 AM, YouTube at 3:19:47 (Mar. 7, 2023), https://www.youtube.com/live/4J_8j_RMMJY?feature=share&t=11987.

### 4.      Substantive departures

The fourth factor in the *Arlington Heights* inquiry considers whether, as here, the law

demonstrates a stark substantive departure from the legal principles "usually considered

important" in Mississippi.  *See Arlington Heights*, 429 U.S. at 267.

For over 100 years, Mississippi's Constitution has guaranteed that Circuit Court judges

"shall be elected by the people" for "a term of four years."  Miss. Const. art. 6, § 153.  Since

1994, Mississippi law has required that Circuit Court judges "be elected for and from" their local

districts.  Miss. Code. § 9-7-1 (citing 1994 Miss. Laws, Ch. 564, § 37).  But as described above,

H.B. 1020's four new Circuit Court judges will not be elected, need not reside in Hinds County,

and may serve for more than four years.

The Mississippi Constitution also forbids setting the number of Circuit Court judges on

an ad hoc basis.  Instead, it requires that "[t]he Legislature shall, by statute, establish certain

criteria by which the number of judges in each district shall be determined, such criteria to be

based on population, the number of cases filed and other appropriate data."  Miss. Const. art. 6,

§ 152.  Accordingly, Miss. Code § 9-7-3(3) establishes that "[t]he number of judges in each

circuit court district shall be determined" based on consideration of six factors: (1) the district's

"population," (2) "[t]he number of cases filed in the district," (3) "[t]he case load of each judge

in the district," (4) the district's "geographic area," (5) "[a]n analysis of the needs of the district

by the court personnel of the district," and (6) "[a]ny other appropriate criteria."

In enacting H.B. 1020, however, the Legislature did not consider these constitutionally

and statutorily mandated factors.  Instead, H.B. 1020 directs the Legislature to consider case load

and case disposition data only ***after*** the four appointments, and even then only to consider

whether to add just one elected judge.  ECF No. 12-1, § 12; *see Veasey*, 830 F.3d at 237 (noting

as evidence of irregularity that legislature had refused "to delay implementation . . . until an impact study had been completed").

In fact, under Mississippi's constitutionally mandated factors, the Legislature should be adding elected, not appointed, judges for Hinds County.  In 2020, the Chief Justice called Hinds County "the most populous single Circuit Court District," ECF No. 12-2 at 14; the Second Circuit has only recently eclipsed it (factor (1)).  The Seventh Circuit has "always had a heavy caseload" during Judge Green's 24-year tenure (factors (2) and (3)).  Green Decl. ¶ 9.  Hinds County encompasses the City of Jackson, which is by far the largest urban area in Mississippi (factor (4)).  Taylor Decl., Ex. U.  The Hinds County Circuit Court has publicly asked for two new elected judgeships to help with its "heavy caseload" (factor (5)).  Taylor Decl., Ex. M.  And, as early as 2001, a Study Commission on the Mississippi Judicial System created by the Legislature recognized that "Hinds County courts receive more case filings because of its unique position of being the seat of state government, as well as having exclusive jurisdiction over state agency cases and appeals" (factor (6)).  Taylor Decl., Ex. V; *see also* Green Decl. ¶ 2.

Indeed, the Legislature conducted "much study and review of the caseloads, both regular cases and violent crimes," in enacting H.B. 834 during the 2023 session to fund more assistant district attorneys ("ADAs") and criminal investigators state-wide, Taylor Decl., Ex. W,[9] but it ignored that data when it came to H.B. 1020.  *See Shelby Cnty.*, 570 U.S. at 554 (faulting Congress for "not us[ing] the record it compiled").  The contemporaneous caseload data led to both a permanent and temporary increase in these prosecutorial positions in Hinds County's

---

[9] Senate Appropriations Chair W. Briggs Hopson III, MS Senate Floor - 27 March, 2023; 10:00 AM, YouTube at 6:21:25 (Mar. 27, 2023), https://www.youtube.com/live/FoubDh6R_yM?feature=share&t=22885.

Seventh Circuit Court District, *see* 2023 Miss. Laws H.B. 834 §§ 1(1)(g), 2(4), while H.B. 1020

authorizes only a temporary increase in appointed judgeships, ECF No. 12-1, § 1(1).[10]

Moreover, H.B. 834 gave Hinds County's district more ADAs and criminal investigators than

any other district, and *six times* more ADAs than the lowest-need district.  *See* 2023 Miss. Laws

H.B. 834 §§ 1–2; *compare id.* § 1(1)(g) (12 ADAs for Seventh Circuit), *with id.* § 1(1)(r) (2

ADAs for Eighteenth Circuit).  Not surprisingly, the Hinds County Circuit Court has likewise

requested six elected judgeships.  Taylor Decl., Ex. M.  But it still has only four elected circuit

judgeships, the same as districts that were assigned 25% fewer criminal investigators and

roughly 10% to 50% fewer ADAs.  *See* Miss. Code § 9-7-7, -11, -17, -25; 2023 Miss. Laws H.B.

834 §§ 1(1)(a), (b), (d), (f); *id.* §§ 2(3), (4).

The State Executive Defendants concede several of the factors that should have led the

Legislature to grant Hinds County more elected judgeships.  They agree that there has been a

"steady strain on Hinds County criminal dockets in recent years."  ECF No. 34 at 9.  They point

out that Hinds County is the "most populous county; the seat of State government; the home of

the State Capitol, museums, medical center, State office buildings, and multiple universities; and,

unfortunately, home to one of the State's most crime-ridden metropolitan areas—a reality

heightened by its sheer size."  *Id.* at 10.  Those factors warrant adding elected judgeships, not

stacking the Seventh Circuit with four unelected judges for the third time in four years.

Each of these departures support the inference that H.B. 1020 was enacted with

discriminatory intent due to the Legislature's "convenient disregard of substantive standards."

---

[10] The data also led the Legislature to temporarily increase the number of Hinds County ADAs by 17% (from 12 to 14) for two years until July 2025, see 2023 Miss. Laws H.B. 834 §§ 1(1)(g), while H.B. 1020 temporarily increases its Circuit Court judgeships by 100% (from 4 to 8) for nearly four years until December 2026, *see* ECF No. 12-1, § 1(1).  No race-neutral explanation has been given for the stark differences between these intertwined funding decisions.

*United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1222 (2d Cir. 1987) (holding that a city violated the Equal Protection Clause where it ignored substantive standards by the Planning Board to build low-income homes only in minority areas because those homes disproportionately housed Black people).

### 5.   Legislative history

The Fifth Circuit has noted that "[i]n this day and age," legislators "rarely . . . announc[e] an intent to discriminate based upon race" because they are often "careful about what they [say] and [write] about the purposes" of a law likely to be challenged, like H.B. 1020.  *Veasey*, 830 F.3d at 235 & n.19; *see also Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence.").  Here, however, discriminatory intent was publicly expressed.

In a telling exchange, H.B. 1020's principal author, Rep. Trey Lamar, justified appointing non-resident judges in Hinds County alone by saying: "[D]o we not want our best and brightest sitting in judgment, whether that may come from Holmes County or Madison County or wherever they may be?  Why would we limit the talent pool to here?"  Taylor Decl., Ex. N.[11]  Rep. Lamar offered no race-neutral explanation for why the State's most populous county would not have the "best and brightest" candidates or why it would need such candidates from elsewhere to sit in judgment of the criminal cases that H.B. 1020 assigns to outsiders.

When interviewed about the legislation for Law360, Rep. Lamar "implied . . . that there was no need to expand the existing court system's [elected] bench" despite the Circuit Court's "heavy caseload" of about "500 open criminal cases" per judge—all felonies.  Taylor Decl.,

---

[11] Trey Lamar, MS House Floor - 7 February, 2023; 10:00 AM, YouTube at 6:46:47 (Feb. 7, 2023), https://www.youtube.com/live/HtruSFI0avs?feature=share&t=24394.

Ex. X.  Rep. Lamar justified his position by impugning the Black judges' competence, stating, "A lot of people believe that four judges should be able to get the job done in Hinds County. And you know, there's a lot of factors that go into that as to why they're not." *Id.* "Asked to clarify what specifically the judges in Hinds County were doing wrong, he declined to elaborate." *Id.* This coy response—lot of factors, but he won't elaborate on them—is a standard ploy of racial demagoguery.  At this stage of the litigation, both of Rep. Lamar's statements—one in debate and one to the press—can reasonably be interpreted as a thinly veiled jab at the all-Black roster of judges on the Hinds County Circuit Court.  Further, these were the statements not of a mere legislator, but the principal author of the law who shepherded it through enactment.  *See Veasey*, 830 F.3d at 236-237 (considering bill author's deposition testimony that he "believe[s] today the Voting Rights Act has outlived its useful life" as potential evidence of intent).

Rep. Lamar is not the first key supporter of H.B. 1020 to cast aspersions on Hinds County's Black judiciary.  In 2015, Rep. Lester "Bubba" Carpenter—who voted for H.B. 1020—dropped any pretense of race neutrality when he urged supporters to vote against a funding initiative because "[i]f [it] passes in its form, a judge in Hinds County, Mississippi, predominantly Black—it's going to be a Black judge—they're going to tell us where the state education money goes."  ECF No. 12-2 at 90.  The State Executive Defendants attempt to dismiss Rep. Carpenter's statement because it was made eight years ago.  ECF No. 34 at 15.  But the fact that the statement was made by a supporter of H.B. 1020 who was a member of the Ways and Means Committee that fast-tracked the bill makes his 2015 statements about Hinds County Circuit Court judges relevant to the instant dispute.  This is not a statement that has been washed away by changing times and changed perspectives about race.  At the very least, "the sheer outrageousness of these public statements by a party leader does provide some evidence of

the racial and partisan political environment in which the [Legislature] enacted the law." *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 229 n.7 (4th Cir. 2016).

> ### C.   Defendants Cannot Show Section 1 Would Have Been Enacted Absent Racial Discrimination.

Defendants may respond that any racial prejudice was irrelevant to H.B. 1020's enactment.  But they cannot carry their burden of showing that H.B. 1020's judicial appointment provision would have been enacted without the "substantial" or "motivating" factor of racial discrimination.  *Hunter*, 471 U.S. at 228.

As demonstrated by the Legislature's contemporaneous consideration of "violent crime" and other "caseload" data for the circuit courts state-wide, *supra*, pp. 21-22, if H.B. 1020 had been guided by the relevant data rather than racial discrimination, the State would have empowered Hinds County's majority-Black population to elect one or more judges to new seats.

### III.   Plaintiffs Will Suffer Irreparable Harm if Section 1 Takes Effect.

Because imminent constitutional violations like those threatened here "cannot be undone through monetary remedies," they are necessarily irreparable.  *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).  Indeed, courts often find that "irreparable injury is present as a matter of law" where a motion for emergency injunctive relief is based on a violation of the Equal Protection Clause, as it is here.  *Killebrew v. City of Greenwood*, 988 F. Supp. 1014, 1016 (N.D. Miss. 1997); *see, e.g.*, *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 529 (S.D. Tex. 2020) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law."). As this Court noted in *Church at Jackson v. Hinds County,* No. 3:21-CV-298-HTW-LGI, 2021 WL 4344886 (S.D. Miss. Sept. 23, 2021), "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.* at

*6 (citation omitted); *see also id.* (noting that because "there is an 'equal terms' violation . . . there is a presumption of irreparable harm).

Moreover, the harms inflicted by H.B. 1020 are real and concrete, not theoretical or hypothetical.  *See supra*, pp. 5-8.

### IV.     The Injuries to Plaintiffs Far Outweigh Any Harm to Defendants.

The balance of equities greatly favors Plaintiffs because a preliminary injunction will merely preserve the status quo and shield Plaintiffs' constitutional rights from violation while causing the restrained party (Defendant Randolph) no injury whatsoever.  Defendant Randolph cannot be harmed by being prevented from violating the Constitution.  *See Deerfield Med. Ctr.*, 661 F.2d at 338–39.  The violation of Plaintiffs' rights thus grossly outweighs any purported harm to Defendant Randolph from an injunction—especially since Defendant Randolph's counsel has suggested that ***he*** may be harmed by H.B. 1020 § 1 because it poses a "separation of powers issue" regarding "whether or not [his] judicial office has been encroached on."  *See* Transcript of May 1, 2023 Status Conference, Taylor Decl., Ex. Y at 17:19–18:2.

### V.     A Preliminary Injunction Will Serve the Public Interest.

Finally, Plaintiffs have made a prima facie case that H.B. 1020 is "unconstitutional [and] so the public interest [is] not disserved by an injunction preventing [their] implementation."  *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996).  "It is always in the public interest to prevent the violation of a party's constitutional rights."  *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted).

The State Executive Defendants' contention that the public interest in public safety "substantially outweigh[s]" H.B. 1020's "constitutional injury" is both frightening and wrong.  ECF No. 34 at 3.  Even the laudable goal of addressing crime must be pursued through means that do not violate the Constitution.  *See, e.g.*, *Villas at Parkside Partners v. City of Farmers*

26

*Branch*, No. CA 3:06-CV-2376-L, 2007 WL 1498763, at *10 (N.D. Tex. May 21, 2007) ("[T]he 'public interest . . . does not extend so far as to allow . . . actions that interfere with the exercise of fundamental rights.'" (quoting *Deerfield Med. Center v. City of Deerfield Beach*, 661 F.2d 328, 338-339 (5th Cir. 1981)); *Phillips v. Cole*, 298 F. Supp. 1049, 1053 (N.D. Miss. 1968) ("The State of Mississippi, in undertaking to define crime and prosecution thereof, must, at all events, comply with the demands of the Constitution of the United States."); *see also, e.g.*, *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) ("There is generally no public interest in the perpetuation of unlawful [government] action.").  The simple answer is that any purported need for more judges as a key part of a public safety solution could be accomplished in a non-discriminatory fashion by increasing the number of elected judges in Hinds County.

Further, contrary to the State Executive Defendants' portrayal (ECF No. 34 at 22-23), granting preliminary relief would have no impact on the ongoing response to Jackson's public-safety emergency or criminal case backlog.  The status quo is that the Circuit Court has three temporary appointees on an "emergency" basis under Miss. Code § 9-1-105.  If Defendant Randolph is enjoined from reappointing these judges or appointing new judges under H.B. 1020, the current temporary judges will still continue to reduce the court's current docket.  Plaintiffs seek only to stop H.B. 1020's discriminatory appointment of judges to serve until December 2026, after this backlog will likely be resolved.  And as a general rule, the public interest is served by "maintaining the status quo pending a full trial on the merits" to make a final determination as to constitutionality.  *United States v. Texas*, 508 F.2d 98, 101 (5th Cir. 1975).  To do otherwise will deprive Hinds County citizens of the full benefit of an elected judiciary, which for centuries has been a defining and central feature of Mississippi's legal system and has promoted judicial accountability and independence.  Shugerman Decl. ¶¶ 5, 7, 17.

27

The status quo is particularly important to preserve here because waiting to vacate H.B. 1020's judicial appointment provision until after the appointments have been made would mean unseating the appointed judges, possibly after they have begun to hear cases.  This would be highly disruptive to the Court and litigants.  *See Ioppolo v. Rumana*, 581 F. App'x 321, 332 (5th Cir. 2014) (noting the "public[] interest in the proper administration of the judicial system").  Enjoining these appointments before they are made while this Court adjudicates Plaintiffs' claim will thus serve the public interest.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting Defendant Randolph from appointing judges pursuant to H.B. 1020 pending the resolution of this litigation.

Respectfully submitted this 24th day of May, 2023.

/s/ Eric H. Holder, Jr.
Eric H. Holder, Jr.,[†] DC Bar # 303115
Carol M. Browner,[†] DC Bar # 90004293
Megan A. Crowley,[*] DC Bar # 1049027
Gary S. Guzy,[*] DC Bar # 375977
Mark H. Lynch,[*] DC Bar # 193110
Brenden J. Cline,[*] DC Bar # 1021317
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6291
eholder@cov.com
cbrowner@cov.com
mcrowley@cov.com
gguzy@cov.com
mlynch@cov.com
bcline@cov.com

*Counsel for NAACP*

*Pro Hac Vice
†Pro Hac Vice* Applications to be Filed

/s/ Carroll Rhodes
Carroll Rhodes, Esq. MS Bar, # 5314
**LAW OFFICES OF CARROLL RHODES**
POST OFFICE BOX 588
HAZLEHURST, MS 39083
Telephone: (601) 894-4323
Fax: (601) 894-1464
crhode@bellsouth.net

Janette Louard,[†] OH Bar # 066257
Anthony Ashton,[†] MD Bar # 9712160021
Joe R. Schottenfeld,[*] DC Bar # 1735796
**NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE**
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
Fax: (410) 358-9350
jlouard@naacpnet.org
aashton@naacpnet.org
jschottenfeld@naacpnet.org

*Counsel for All Plaintiffs*

*Pro Hac Vice
†Pro Hac Vice* Applications to be Filed

## CERTIFICATE OF SERVICE

I hereby certify that on May 24th, 2023, I electronically filed the foregoing Plaintiffs'

Memorandum in Support of Motion for a Preliminary Injunction re Appointment of Judges with

the Clerk of the Court by using the Court's CM/ECF system, which will send a notice of

electronic filing to all counsel of record.

/s/ Mark H. Lynch
Mark H. Lynch