**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**NATIONAL ASSOCIATION FOR THE**
**ADVANCEMENT OF COLORED PEOPLE;**
**MISSISSIPPI STATE CONFERENCE OF**
**THE NATIONAL ASSOCIATION FOR THE**
**ADVANCEMENT OF COLORED PEOPLE;**
**JACKSON CITY BRANCH OF THE NAACP;**
**DERRICK JOHNSON; FRANK FIGGERS;**
**CHARLES TAYLOR; MARKYEL PITTMAN;**
**CHARLES JONES; and NSOMBI**
**LAMBRIGHT-HAYNES**                                                    **PLAINTIFFS**

**vs.**                                                **CIVIL ACTION No.: 3:23-CV-272-HTW-LGI**

**TATE REEVES, in his official capacity as**
**Governor of the State of Mississippi; SEAN**
**TINDELL, in his official capacity as**
**Commissioner of Public Safety; BO LUCKEY,**
**in his official capacity as Chief of Mississippi**
**Department Public Office of Capitol Police;**
**MICHAEL K. RANDOLPH, in his official**
**capacity as Chief Justice of the Mississippi**
**Supreme Court; and LYNN FITCH, in her**
**official capacity as Attorney General of the**
**State of Mississippi**                                              **DEFENDANTS**

---

**ORDER**

---

**THE PARTIES and CAUSE OF ACTION**

Plaintiffs herein are: The National Association for the Advancement of Colored People ("NAACP"); Mississippi State Conference of the NAACP; Jackson City Branch of the NAACP; and six individuals who allege to be citizens of Jackson, Mississippi- Derrick Johnson; Frank Figgers; Charles Taylor; Markyel Pittman; Charles Jones; and Nsombi Lambright-Haynes.

They are suing the following parties: Hon. Tate Reeves, in his official capacity as Governor of the State of Mississippi; Sean Tindell, in his official capacity as Commissioner of Public Safety;

1

Bo Luckey, in his official capacity as Chief of the Mississippi Department of Public Safety Office of Capitol Police; Hon. Michael K. Randolph, in his official capacity as Chief Justice of the Mississippi Supreme Court; and Lynn Fitch, in her official capacity as Attorney General of the State of Mississippi.

For their cause of action, they have resorted to 42 U.S.C. §1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

Plaintiffs' §1983 lawsuit invokes the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

On April 21, 2023, the Governor of the State of Mississippi signed into law House Bill 1020 (H.B. 1020) and Senate Bill 2343 (S.B. 2343).  H.B. 1020, *inter alia*, commands Chief Justice Defendant Hon. Michael K. Randolph ("the Chief Justice") to appoint four (4) temporary special circuit judges for the Seventh Circuit Court[1] District of Hinds County, Mississippi no later than fifteen (15) days after the passage of the Act.

Aggrieved, the Plaintiffs herein bemoan that H.B. 1020[2] is aimed at robbing the citizenry of Hinds County, Mississippi and Jackson, Mississippi, the State's Capitol, located within Hinds County (both predominately African American) of equal protection of the laws by depriving them of certain

---

[1] In Mississippi, Circuit Courts have jurisdiction over felony criminal prosecutions and civil lawsuits. Circuit Courts hear appeals from County, Justice and Municipal courts, and from administrative boards and commissions such as the Workers' Compensation Commission and the Mississippi Department of Employment Security.

[2] As stated *supra*, the Mississippi State Legislature also enacted S.B. 2343, which law's constitutionality is also challenged by Plaintiffs in the lawsuit *sub judice*. This Order, however, only addresses H.B. 1020, and, more specifically, that law's specific provision, § 1, which mandates appointment of special judges by the Chief Justice of the Mississippi Supreme Court.

rights accorded to every other Mississippi resident, specifically, the right to elect their Circuit Court judges.

Defendant Hon. Michael K. Randolph, sued only in his official capacity as Chief Justice of the Mississippi Supreme Court, has answered the lawsuit, but contends that he is not a proper party to this dispute. Under the law, he urges, he cannot be sued at all. Accordingly, the Chief Justice has filed a Motion to dismiss him from this lawsuit **[Docket no. 19]**. His motion, filed under the auspices of Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure[3], manifests that the Doctrine of Judicial Immunity dictates his dismissal from this action.

## INTRODUCTION TO JUDICIAL IMMUNITY

To survive, our national system of justice has had to compromise a basic tenet: that every wrong-doer targeted for lawsuit by an ailing plaintiff will suffer accordingly in a court of justice. This elementary, urging principle, many opine, is actually the bedrock of our venerable legal system. Pilgrims of every race, color, gender, and station in life rejoice in the trumpeted declaration that justice is unmistakably the sum of all equations whereby persuasive facts plus cogent law, whether in a bench trial (judge alone), or in a jury trial with a judge, justice will win out.

But not always! Hovering over some trials is the discordant threat of immunities- a rubric of law which, in various instances, not only shelters the wrong-doer from liability, but may prevent the injured party from prosecuting the dispute in court at all. Before our lifetimes, founding jurists of our legal system determined that certain key elements of our legal system must be provided a degree of independence and protection from lawsuits, which, at times, appear to run counter to the supposedly

---

[3] Rule 12 of the Federal Rules of Civil Procedure provides, in pertinent part :
    (b) How to Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:…
        (1) lack of subject matter jurisdiction;….
        (6) failure to state a claim upon which relief can be granted…
Fed. R. Civ. P. 12.

fundamental principle addressed at the top of this introduction.

The immunities, whether legislative, executive, prosecutorial, or judicial, are viewed as essential to the continued survival of our legal system. Persons exercising discretion in these areas, so go the arguments, must not be distracted nor intimidated by the threat of lawsuits nor the bringing of certain lawsuits. Long ago, judges were recognized as those most in need of immunity. Certain instances are grammar-school clear: convicted felons in criminal cases would treasure an opportunity to wage a personal attack against their sentencing judges. Losing parties in civil cases would regularly cry foul when on the receiving end of a hard-fought large money judgment.

Judicial immunity, then, when developed, was pointed not so much at the outcome of the dispute, but, rather, if the ruling judge had proper jurisdiction over the dispute to exercise his (her) broad discretion. The legion of federal cases, including those by the United States Supreme Court, then, commands this court to apply a certain test to the targeted circumstance, to ascertain whether the judge under review has, or had, the power to exercise discretion, no matter that the exercised discretion may offend the general public, or parties to a lawsuit.

## HISTORICAL, STATUTORY AND FACTUAL CONTEXT

Since 1989, Mississippi's statutory scheme has empowered the State's Chief Judicial Officer to appoint judges temporarily to sit in districts with various vacancies, which could not be filled by unscheduled public elections. This statute, Mississippi Code Annotated § 9-1-105, addresses vacancies created by "absence or disability" of a judicial officer.

In 2005, the Mississippi State Legislature authorized the Chief Justice of the Mississippi Supreme Court to appoint special judges, from any county within the State, to address crowded circuit-court dockets. *See* 2005 S.B. 2339, § 18 (amending MISS. CODE ANN. § 9-1-105(2) to allow for Chief Justice appointments of special judges to circuit courts "in the event of an emergency or

overcrowded docket" and "for whatever period of time is designated by the Chief Justice").

To date, the current Chief Justice of the Mississippi Supreme Court, Hon. Michael K. Randolph, has appointed over 200 such special judges[4], who, once appointed, enjoy the same judicial powers as all other sitting judges to adjudicate disputes and to fulfill judicial obligations. Once appointed, they are also clothed with judicial immunity.

The Plaintiffs herein do not dispute these facts; these Plaintiffs, at this juncture, only challenge the Chief Justice's garment of judicial immunity in this §1983 lawsuit, and the Chief Justice's appointment power as bestowed by H.B. 1020. Plaintiffs raise no quarrel with the empowerment of Miss Code Ann. § 9-1-105. Indeed, just recently, in May of 2023, the Chief Justice, under §9-1-105, appointed an emergency judge in Tallahatchie County, Mississippi, First Judicial District, to serve as a temporary chancellor where the sitting judges had recused themselves from the case at bar. Upon being notified of the matter, this court invited the parties herein to offer comments/objections to this development and the Chief Justice's aim to undertake an emergency appointment. The Plaintiffs responded that, on that matter, they took no position. In other words, they raised no objection and the person selected by the Chief Justice is now serving.

Meanwhile, the Plaintiffs herein continue to wage their disputes over the somewhat similar pronouncements of H.B. 1020, §1. Significant differences, they say, adorn the two legislative acts.

In pertinent parts, the most recent version of Miss Code Ann. § 9-1-105 states:

(1) Whenever any judicial officer is unwilling or unable to hear a case or unable to hold or attend any of the courts at the time and place required by law by reason of the physical disability or sickness of such judicial officer, by reason of the absence of such judicial

---

[4] Hon. Michael K. Randolph became the Chief Justice of the Mississippi Supreme Court on February 1, 2019. This federal court has determined that from 2019 to May 2023, Chief Justice Randolph appointed "over 200" special judges as revealed by the public data available on the Mississippi Supreme Court's website regarding special judge appointments during this time period. This court notes, however, that this number does not accurately the total number of appointments made in "sealed" or "confidential" cases, nor does this number take into account appointment of certain named judges to more than one matter.

officer from the state, by reason of the disqualification of such judicial officer pursuant to the provision of Section 165, Mississippi Constitution of 1890, or any provision of the Code of Judicial Conduct, or for any other reason, the Chief Justice of the Mississippi Supreme Court, with the advice and consent of a majority of the justices of the Mississippi Supreme Court, may appoint a person as a special judge to hear the case or attend and hold a court.

(2) Upon the request of the Chief Judge of the Court of Appeals, the senior judge of a chancery or circuit court district, the senior judge of a county court, or upon his own motion, the Chief Justice of the Mississippi Supreme Court, with the advice and consent of a majority of the justices of the Mississippi Supreme Court, shall have the authority to appoint a special judge to serve on a temporary basis in a circuit, chancery or county court in the event of an emergency or overcrowded docket. It shall be the duty of any special judge so appointed to assist the court to which he is assigned in the disposition of causes so pending in such court for whatever period of time is designated by the Chief Justice. The Chief Justice, in his discretion, may appoint the special judge to hear particular cases, a particular type of case, or a particular portion of the court's docket.

(3) When a vacancy exists for any of the reasons enumerated in Section 9-1-103, the vacancy has not been filled within seven (7) days by an appointment by the Governor, and there is a pending cause or are pending causes in the court where the vacancy exists that in the interests of justice and in the orderly dispatch of the court's business require the appointment of a special judge, the Chief Justice of the Supreme Court, with the advice and consent of a majority of the justices of the Mississippi Supreme Court, may appoint a qualified person as a special judge to fill the vacancy until the Governor makes his appointment and such appointee has taken the oath of office.

Miss. Code. Ann. § 9-1-105 (West). The statute also provides that if the Governor makes an appointment under his executive authority, the Chief Justice's appointment becomes void. Miss. Code. Ann. §9-1-105 (4) (West).

H.B. 1020, § 1 states:

(1) The Chief Justice of the Supreme Court shall appoint four (4) temporary special circuit judges for the Seventh Circuit Court District[5]. No limitation whatsoever shall be placed upon the powers and duties of the judges other than those provided by the Constitution and

---

[5] The Seventh Circuit Court sits in Hinds County, Mississippi. In this trial court, circuit judges preside over all felony criminal prosecutions and civil lawsuits where damages claimed exceed $250,000. The Circuit Court has concurrent jurisdiction with Justice and County courts.

laws of this state. The term of the temporary special circuit judges shall expire on December 31, 2026.

(2) The judges shall be appointed no later than fifteen (15) days after the passage of this act[6] according to applicable state laws. The Chief Justice of the Supreme Court may elect to reappoint circuit judges that are serving on a temporary basis as of the effective date of this act in the Seventh Circuit Court District.

(3)     (a) Each temporary special circuit judge shall receive an office operating allowance to be used for the purposes described and in amounts equal to those authorized in Section 9-1-36.

        (b) The Administrative Office of Courts shall establish personnel policies to compensate the support staff for each temporary special circuit judge.

(4) This section shall stand repealed on December 31, 2026.

2023 Mississippi House Bill No. 1020, Mississippi One Hundred Thirty-Eighth Legislative Session.

Plaintiffs point out, what they contend as, significant differences between the two enactments, as well as contradictions between H.B. 1020 § 1 and the Mississippi State Constitution, as follows.

Mississippi's Constitution, say the Plaintiffs, guarantees that Circuit Court judges "shall be elected by the people" for "a term of four years." Miss. Const. art. 6, § 153. Furthermore, argue Plaintiffs, since 1994, Mississippi law has required that Circuit Court judges "be elected for and from" their local districts. 1994 Miss. Laws, Ch. 564, § 37 (codified at Miss. Code. § 9-7-1). But as described above, H.B. 1020's four (4) new Circuit Court judges will not be elected, need not reside in Hinds County, and, if validly reappointed, may serve for more than four years under H.B. 1020 §1 (2).

---

[6] The Governor signed H.B. 1020 into law on April 21, 2023.

Notably absent from H.B. 1020 is §9-1-105's language stating that the Chief Justice "may appoint…with the advice and consent of a majority of the justices of the Mississippi Supreme Court". H.B. 1020, rather, mandates that the Chief Justice, seemingly acting alone, "shall" appoint four (4) special judges no later than fifteen (15) days after the passage of the Act. This mandate, argue Plaintiffs, has been issued without identifying an "emergency or overcrowded docket" in H.B. 1020's text.

Further, no provision of H.B. 1020 states that an appointment made by the Chief Justice shall be void should the Governor thereafter exercise his constitutional and statutory appointive authority. The Chief Justice's authority, therefore, is unfettered, with no apparent authority reserved for Mississippi's executive branch.

The Mississippi Constitution also requires that "[t]he Legislature shall, by statute, establish certain criteria by which the number of judges in each district shall be determined, such criteria to be based on population, the number of cases filed and other appropriate data." Miss. Const. art. 6, § 152. Accordingly, Mississippi law establishes that "[t]he number of judges in each circuit court district shall be determined" based on "[t]he population of the district; [t]he number of cases filed in the district; [t]he case load of each judge in the district; [t]he geographic area of the district; [a]n analysis of the needs of the district by the court personnel of the district; and [a]ny other appropriate criteria." Miss. Code § 9-7-3(3). Plaintiffs allege that no such analysis was conducted in prescribing the number of judges to be appointed under H.B. 1020.

This is an appropriate place in this Judicial Immunity debate to mention Plaintiff's §1983 lawsuit and what role H.B. 1020 plays in this controversy. Plaintiff's §1983 lawsuit is about race discrimination. Hinds County, Mississippi is the State' s most populous county and venue for the State's capitol city, Jackson. Jackson is the seat of State government, the home of the State Capitol, multiple hospitals and medical providers, museums, several universities, and a plethora of retail and

restaurant establishments. Both Hinds County and Jackson are majority African American, the former being 72.8%, while the latter being 82.8%.

Jackson's crime problem is sweltering, undisputed and suffocating. The FBI crime statistics tell the sorrowful story: In 2020, Jackson reported 130 homicides—a record number at that time. In 2021, Jackson surpassed that record with at least 155 reported homicides—"the highest per capita murder rate in the nation . . . . [h]igher than Birmingham, Atlanta, Detroit, and even Chicago." [Docket no. 34-4 at 3]. In 2022, even with a 14% decline in homicides, Jackson reported 138 homicides that year, and Jackson's "homicide rate still managed to surpass every other major city in the U.S. for the second straight year." *Id.* at 20.

Homicides may be the headline grabber, but Jackson's other violent crime categories battle for equal condemnation: Rape, Robbery, Aggravated Assault, Sexual Assault, and Burglary rates continue to be among the highest nationwide, per capita.

Caught in this "race to the grave" are the most innocent- young children whose still developing lungs had barely tasted the nutritious air which was their birthright. On the other end of this "killfest", are the senior citizens hoping to spend their golden years in retired harmony with family and friends, instead of outfitting their homes as fortresses, fearing any strange noise around their houses and dreading the prospect of having to arm themselves.

Jackson street gangs, who successfully recruit the impressed baby-minded school dropouts who "wannabe gangsters" when they grow up, figure prominently in this story of a City coming apart and in search of enduring glue to hold it together.

These "facts of Jackson" have cripped the criminal justice system, especially with a police presence which is crying for reinforcement. Once this proud City boasted a force of approximately 400 sworn police officers, with applicants aplenty vying for the occasional vacancy which occurred. Now, the situation is markedly different. Jackson now has a police force of approximately 258 sworn

officers, with hardly any applicants. Many welcome recruits take the oath, undergo free police certification in a 28-week regimen[7], then take the earned certification, valid anywhere else in the nation, to another State/City where the pay is much higher, and the job danger is much lower.

Jackson points to its fiscal dilemmas as the source of its plight-- fiscal concerns rooted in, *inter alia*, downgrading of the City's bond rating, urban blight, growing vagrancy, a dysfunctional city government, and a poverty-stricken citizenry. Regardless, Jackson has a crime cancer.

The Mississippi Legislature has taken notes, but not in the manner Jackson desires. Jackson laments that it is in dire need of state funds for its endeavors, for its police force, and for courts and its personnel. The State Legislature, nervous about sending money to Jackson for its courts, passed H.B. 1020.

As above-mentioned, H.B. 1020, §1 aims to bring additional judicial resources to bear on the problem of reducing the ongoing strain on Hinds County's overburdened criminal-court system[8]. The Plaintiffs herein, though, cry foul and accuse the Legislature of accelerating the process of "taking over Jackson" by whites. The Chief Justice is white. Most of his temporary appointments in Hinds County have been white, while most of Hinds County, as a whole, is mostly African American[9]. Smelling a conspiracy in the making, Plaintiffs manifest that H.B. 1020 is but a piece of this "takeover hijacking" by the State, which recently has seen the squabble over the control of the Jackson Municipal Airport; access to federal transportation funds; access and control of federal funds

---

[7] "New recruits to the Jackson Police Department undergo 16 weeks of intensive Basic Law Enforcement Academy Training… and an Intensive Physical Fitness Program. This training is followed by a 12-week period of field training and then job training and evaluation with a field training officer. Trainees are compensated with salary, benefits, and provided a uniform during training." The City of Jackson, Mississippi, *Jackson Police Department*, https://www.jacksonms.gov/training-recruitment/ (last visited March 26, 2023).

[8] In 2021, Hinds County District Attorney Jody Owens reported 2,600 criminal cases on the Hinds County Circuit Court docket, with another 600 cases in which the defendant had yet to appear before a judge.

[9] Plaintiffs do not question whether individual judges, on account of their race, can be fair and just. Plaintiffs, rather, seek to show that where the racial composition of the appointed judges does not match the racial composition of the 4 circuit judges historically elected by Hinds County citizens, the will of the electorate has been wrongfully thwarted.

to assist with Jackson's drinking water systems; and allocation of the sales tax revenue collected in Jackson.

Plaintiffs, aggrieved by the alleged racially discriminatory purpose of H.B. 1020§1, ask this court preliminarily and permanently to enjoin the Chief Justice from exercising the authority granted him by H.B. 1020, thus prohibiting him from appointing any additional special judges to the Hinds County Circuit Court. The Chief Justice, however, has raised the defense of Judicial Immunity, which defense shields judges from civil liability for acts performed in their judicial capacities.

**JUDICIAL IMMUNITY- Case Law Overview**

Vital to the independence of the judiciary and the finality of judgment is the Doctrine of Judicial Immunity. Judges must possess requisite freedom to perform their myriad judicial duties without fear of retaliation, intimidation, harassment or anxiety over the public consequences of an act falling under their asserted, authorized powers. As early as 1871, the United States Supreme Court held that "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. *Bradley v. Fisher*, 80 U.S. 335, 347(1871). Our system of justice, likewise, cannot flourish where every outcome is first a challenge between the parties to the litigation, and, then, a personal attack upon the judge, resulting in further protracted litigation.

The Doctrine of Judicial Immunity was created to ameliorate these concerns, with the aim of granting judges freedom to make independent judicial decisions based on the law, without fear of prosecution or other external factors. The Supreme Court in *Pierson v. Ray* stated that Judicial Immunity applies "even when the judge is accused of acting maliciously and corruptly, and it "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public,

whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." The Court held:

> It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision making but to intimidation.

*Pierson v. Ray*, 386 U.S. 547, 553-54 (1967) (internal citation omitted).

Although this hoary doctrine has its detractors, in the main, it has well-served the American system of justice, especially when its non-controversial application is readily understood by the reasonable, intelligent court watchers.

On the other hand, the ordered embrace of Judicial Immunity in various cases has had court watchers begging for its demise and burial, even where the ruling court, the United States Supreme Court even, has prefaced its holding behind an in-depth discussion of the oft-cited bases for Judicial Immunity.

The holding by the United States Supreme Court decision in *Stump v. Sparkman,* 435 U.S. 349 (1978) comes immediately to mind. The players in the *Stump* litigation were: a fifteen (15) year old female; her mother; and a Circuit Court judge sitting in the State of Indiana. Fearful that her daughter might surrender her sexually, fertile body to the lust of some male, the mother sought judicial assistance. She petitioned the judge to sign an order requiring a medical provider to perform a sterilization procedure on her daughter, only fifteen. In support of her Petition, the mother alleged that her daughter was "somewhat retarded although she is attending the public schools…and has been passed along with other children in her age level…" *Id* at n.1. The teen was not informed by court papers, medical documents, nor orally by her mother, nor even the doctor the true nature of the surgical procedure for which she was being delivered to the hospital. She was not afforded any opportunity to ascertain the fate which awaited her. She was sterilized, at fifteen years of age,

forevermore, because of the irreversible operation, unable henceforth to bear any children from her body. Years later, after attainting adulthood, and after settling upon the beau with whom she desired to unite in holy matrimony and fulfill her dream of starting a beautiful family, she learned the awful truth. She would never welcome her flesh and blood into the world; she had been sterilized that mysterious day when her mother had placed her in the medical custody of a doctor who subsequently medically operated on her body under the guise of an appendectomy.

She and her husband sued the judge, the mother, the mother's attorney, the doctors who performed the operation, and the hospital -- the cast of characters who had so egregiously violated her constitutional rights sounding in privacy, equality, due process, and reproductive liberty. The district court dismissed the judge from the case before trial, finding that the judge was entitled to the defense of Judicial Immunity. The appellate court reversed. The United States Supreme Court agreed to review the case.

On March 28, 1978, the United States Supreme Court, in a 5-3 decision upheld the judge's defense of Judicial Immunity. The *Stump* Court held that "a judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the "clear absence of all jurisdiction." *Id*. at 356-357. The Court held that the daughter's claims were barred by judicial immunity because although the judge had no authority to order her sterilization, he did have authority under Indiana law to order sterilization of other institutionalized persons; therefore, the judge did not act in "clear absence of all jurisdiction" *Id*. at 357-358.

The judge's approval of the sterilization petition, said the Court, was a "judicial act" because even "state judges with general jurisdiction not infrequently are called upon in their official capacity to approve petitions relating to the affair of minors," *Id*. at 362, and, at the time he approved the

petition, the judge was "acting as a county circuit court judge". *Id* at 360.  The judge, accordingly, did not act in "clear absence of all jurisdiction."  *Id.* at 357.

The Supreme Court opined that despite the unfairness to litigants that sometimes results, the doctrine of Judicial Immunity is thought to be in the best interests of "the proper administration of justice . . . [, for it allows] a judicial officer, in exercising the authority vested in him [to] be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id*. at 363 (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1871)).

Perhaps the *Stump* decision, decided back in 1978, may be viewed as outdated. The law, however, still is good law and still provides quotable principles of Judicial Immunity, and perhaps should be viewed as an outlier ruling focused more upon the preservation of Judicial Immunity and the presumed dire consequences which could befall our system of justice if the Doctrine suffered a collapse.

Indeed, the Doctrine has survived, and not without further controversy in some cases. Consider *Mireles v. Waco*, 502 U.S. 9 (1991). The main characters in this theater were: a California Superior Court judge, a county public defender, and two police officers.  The interactions/actions were as follows: when a defense attorney failed to appear for a scheduled hearing, the judge, "angered by the absence of attorneys from his courtroom," ordered the police officer defendants "to forcibly and with excessive force seize and bring plaintiff into his courtroom." The officers, then allegedly "by means of unreasonable force and violence seize[d] plaintiff and remove[d] him backwards" from another courtroom where he was waiting to appear, cursed him, and called him "vulgar and offensive names," then "without necessity slammed" him through the doors and swinging gates into the Judge's courtroom. The judge allegedly "knowingly and deliberately approved and ratified each of the aforedescribed acts" of the police officers. *Mireles*, 502 U.S. at 10. According to a news report at the time, the judge ordered the police officers to bring him a "piece" or "body part" of the public

defender, and "rough him up a little" to teach the attorney a lesson[10].

The Supreme Court found the judge to have absolute immunity from the plaintiff's lawsuit arising from the resulting "beating" because, opined the Supreme Court,  the alleged misbehavior occurred entirely within his activities as a judge presiding over a court. The *Mireles* holding states that "[t]here are only two circumstances under which judicial immunity may be overcome. First, a judge is not immune from liability for nonjudicial action, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, although judicial in nature, taken in the complete absence of all jurisdiction".  *Id.* at 11. The Court further held that, like other forms of official immunity, Judicial Immunity is an immunity from suit, not just from ultimate assessment of damages. *Id*.

Finally, this court looks to the case of *Holloway v. Walker*, 765 F.2d 517 (5th Cir. 1985). The Complaint in that matter alleged that a state court judge had seized control of the plaintiff's oil company through abuse of his judicial office by: placing the oil company into receivership; discharging many of the company's key employees, posting in its corporate headquarters guards who intimidated and frightened its personnel; seizing control of all of the company's stock; and appointing an allegedly incompetent receiver for the company. *Id*. at 523. The Complaint further alleged that many of these acts were committed in open defiance of a proscriptive writ of the Texas Court of Appeals ordering the judge to desist from interference in the affairs of the oil company. *Id.* This proscriptive writ, argued the plaintiffs in *Holloway*, clearly deprived the judge of all jurisdictions and thus stripped him of judicial immunity from liability for these acts. *Id*.

The Court of Appeals for the Fifth Circuit disagreed. Citing *Stump*, the *Holloway* Court held

---

[10] Since the case against Judge Mireles never went to trial, these facts have not been judicially determined. The referenced Los Angeles Times news article is cited as follows: Patricia K. Lerner, *A Peremptory Summons Leaves Court in an Uproar*, L.A. TIMES, Nov. 7, 1989, at B3.

that "[a] ll of the harms.. the judge is claimed to have caused are alleged to have been perpetrated by him through judicial acts not performed in the clear absence of all jurisdiction; accordingly [the judge's] immunity bars a [claim for damages] against him for these harms." *Id*. at 523. The Court, in lockstep with *Stump*, found that, "even though resulting from bribe or conspiracy", the judge's actions were "judicial acts" to which absolute immunity applies. *Id*. at 517.

By mentioning the above cases, this court is neither stating, nor implying this iconic doctrine has lost its purposeful vitality and now should be moth-balled; instead, this court's intent here is to demonstrate how a fact-intensive inquiry reviewed under a jurisprudence kindly slanted towards judicial immunity could result in awkward decisions.

Over the proud era of the American judicial system, honorable and enlightened courts have understood the placement of Judicial Immunity. Arguably, a flood of litigation would not be the only consequence of diluting the protective shield provided by the Doctrine. If judges were to become liable for damages suits, for example, self-interest would allegedly lead to overcautiousness, thus impairing independent and impartial adjudication.

Importantly, in § 1983 actions, such as the case *sub judice*, Judicial Immunity applies to complaints both seeking monetary damages and complaints seeking injunctive relief. The United States Supreme Court in *Pulliam v. Allen*, 466 U.S. 522 (1984), held that while Judicial Immunity prevents § 1983 lawsuits against judges for monetary damages, it does not protect judges from lawsuits for injunctive relief nor from the award of attorney's fees under § 1988 for bringing a successful § 1983 action. Congress, however, effectively reversed *Pulliam v. Allen* by enacting the Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, 110 Stat. 3847, amending § 1983 to provide that Judicial Immunity applies to § 1983 actions for injunctive relief as well, except when the injunction is granted because the judicial official violated a declaratory decree or declaratory relief was not available.

16

### GUIDEPOST FACORS

The Doctrine, however, is not a free-wheeling grant to judges to act totally without any fear of consequences. Our jurisprudence, recognizing the imperfection and facilities of the human mind, no matter that of a judge, must ordain a check on judicial power exercised outside its warranted limitations. The limitations afterwards here discussed are not found in precise mathematical differential equations; instead, the courts have resorted to certain guideposts etched in the annals of caselaw; namely that there are four factors "for determining whether a judge's actions were judicial in nature", and thus, protected by the shield of Judicial Immunity: (1) was a "normal judicial function" involved; (2) did the relevant act occur in or adjacent to a court room; (3) did the "controversy" involve a pending case in some manner; and (4) did the act arise "directly out of a visit to the judge in his official capacity." *Daves v. Dallas County, Texas*, 22 F. 4th 522, 539 (5th Cir. 2022).

As stated *supra*, a judge is not immune for acts that are nonjudicial in nature. The Court of Appeals for the Sixth Circuit provided an example of such "nonjudicial acts" when it held that where a judge sexually assaulted, stalked, and harassed two women working in his chambers, the judge did not enjoy the protections of absolute immunity because those are not "judicial acts." *Archie v. Lanier*, 95 F.3d 438, 441 (6th Cir. 1996).

Judicial immunity further does not apply to purely administrative acts of a judge, such as hiring and firing employees, because these acts have been held to be "nonjudicial" in nature. *See, e.g.*, *Forrester v. White*, 484 U.S. 219, 229 (1988).  According to the Fifth Circuit: [I]n determining whether the judges had engaged in a judicial act as opposed to an administrative or other category of action, we considered "the particular act's relation to a general function normally performed by a judge." *Davis*, 565 F. 3d at 221-22 (internal citation omitted).

In *Kemp ex rel. Kemp v. Perkins*, 324 Fed. Appx. 409, 412 (5th Cir. 2009), a civil action was

brought by a former detainee against the special judge who entered his detention order and the youth-court judge who appointed the special judge pursuant to a statutorily-authorized "general standing order" of appointment in cases of his recusal. *Kemp*, 324 Fed. Appx. at 409. The Northern District of Mississippi granted summary judgment to both judges on grounds of Judicial Immunity and the United States Court of Appeals for the Fifth Circuit affirmed that ruling. The Fifth Circuit discussed the four-factor standard stated above, and determined that the subject "appointment of a special judge for a pending case" was "clearly" a "judicial act," and "not the type of administrative or ministerial conduct for which judicial immunity is unavailable." *Id*. at 412. According to the Fifth Circuit, "[t]hese instances of challenged conduct are normally performed by judges, occurred in or near a courtroom, concerned the case against [the plaintiff] pending in....youth court, and arose directly out of visits to [the judges] in their official capacities as judge and special judge." *Kemp*, 324 Fed. Appx. at 410 n.1, 412-13.

The following also held been held to be "judicial acts" protected by Judicial Immunity: the act of creating guidance for setting bail. *Daves,* 22 F. 4th at 541; The act of appointing counsel. *Pleasant v. Sinz*, 2016 U.S. Dist. Lexis 119566 (E.D. Tex. August 5, 2016); appointing a temporary guardian. *Bauer v. Texas*, 341 F. 3d 352, 361 (5th Cir. 2003); selecting attorneys "for inclusion on a list of attorneys eligible for court appointments" *Roth v. King*, 449 F. 3d 1272, 1286-87 (D.C. Cir. 2006); and the appointment of a receiver. *Dupree v. Bivona*, 2009 U.S. App. Lexis 612 (2nd Cir. 2009) cert. denied, 2009 U.S. Lexis 4406 (2009).

## ARGUMENTS

Plaintiffs argue that the Chief Justice's appointment of special circuit judges to serve multi-year terms with "no limitation whatsoever" on their "powers and duties" is not a "normal judicial

18

function". The selection of judges for these positions created by H.B. 1020, §1, say Plaintiffs, is a function normally performed by voters.  The Chief Justice, contend the Plaintiffs, cannot invoke the protections of Judicial Immunity for this "nonjudicial act".

Plaintiffs, in support of their position, assert that the roles customarily played by the electorate and the Governor in the selection of judges in Mississippi show that the appointment authority granted to the Chief Justice under H.B. 1020 does not fall within the scope of a "normal judicial function". Rather, say Plaintiffs, it is "a task that might as well have been committed to a private person as to one holding the office of a judge." *Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 225 (5th Cir. 2009) (quoting *Ex parte Virginia*, 100 U.S. 339, 348 (1879)). Plaintiffs argue that H.B. 1020 discriminates against the over 70% Black population of Hinds County by packing their Circuit Court and depriving them of elected judges who are residents of Hinds County, and that Chief Justice Randolph is a proper and necessary defendant to this suit because H.B. 1020 requires him to take the actions to effectuate this allegedly discriminatory statutory scheme.

The Chief Justice, contrariwise, argues that that the appointment of judges is a "judicial act", as established under the Mississippi Constitution, as well as §9-1-105, a longstanding statute passed by the Mississippi legislature.

For authority, the Chief Justice focuses on the Act itself: that he is merely a neutral party who has been mandated by the Legislature to carry out specific appointment duties.

The Chief Justice also asserts that this court should find in his favor under the principle of comity, as the Chancery Court of Hinds County, First Judicial District dismissed him from the state court case *Saunders v. Randolph*, Civil Action No. 23-cv-00421 [Docket no. 23-1], finding that the appointment of judges under H.B. 1020 and Miss. Code Ann. Section 9-1-105 was "judicial acts." The Chancellor, in that matter, held that the Plaintiffs' suit against the Chief Justice for declaratory and injunctive relief was barred by Judicial Immunity. The Chancellor based his

decision on the Mississippi case of *Vinson v. Prather*, 897 So.2d 1053 (Miss. App. Ct. 2004), which held that "an appointment (of a special judge) pursuant to . . . section 9-1-105 (is) a judicial act."

This court notes that although this court may consider the Chancellor's ruling under the principles of comity, it must make its own analysis on the Judicial Immunity issue under federal law. Moreover, this court notes that no Plaintiff herein was a party to the Chancery Court case; none of the Plaintiffs' claims in this case, based on the Equal Protection Clause of the United States Constitution, was raised in the Chancery Court lawsuit. The claims in that lawsuit were based solely on the Mississippi Constitution.

The Chief Justice further contends that he is clearly not a necessary party for a determination of H.B. 1020's constitutionality. The Fifth Circuit notes that in a constitutional challenge to a state law, the state official sued "must have some connection with the enforcement of the [challenged] act." *Texas Alliance for Retired Americans v. Scott*, 28 F. 4th 669, 672 (5th Cir. 2022)(quoting *Ex Parte Young*, 209 U.S. 123, 157 (1908)).

## RULING FINDINGS

H.B. 1020 requires the Chief Justice to appoint four (4) temporary special judges for the Seven Circuit Court District.

The term of temporary judges shall expire on December 31, 2023. The Chief Justice, though, may reappoint circuit judges who currently are serving on a temporary basis to another four years under H.B. 1020.

Chief Justice Randolph is white.

Hinds County and the City of Jackson, Mississippi are overwhelmingly African American ----Hinds County being more than 70%, while the City of Jackson, located in Hinds County, being

more than 80% African American.

Hinds County currently has four (4) elected Circuit Court judges; all of them are African American. Their terms are four (4) years.

The criminal justice system in Hinds County is in crisis. The Capitol City of Jackson has led the nation in homicides per capita. The Hinds County District Attorney's docket is overwhelming.

Plaintiffs herein do not address the crime problem and whether four (4) additional temporary special circuit judges could assist in alleviating the burgeoning crime problem.

Plaintiffs focus, instead, on: the Chief Justice's independence; the non-requirement of Hinds County residence; the "appointment" versus the "elective" process; that the number of special judges (4) to be appointed was not based on Hinds County population nor the number of pending Hinds County cases. Plaintiffs also argue that H.B. 1020, in its text, does not justify the need for additional special judges due to an overcrowded docket.

Plaintiffs, thus, focus on the effect of the appointment process.

Defendant Randolph, instead, calls the court's attention to his appointment itself, directing this court's gaze at the Doctrine of Judicial Immunity.

Judicial Immunity shields judges from lawsuit, including damages and injunctions, where the judge with jurisdiction, is performing a "judicial act".

A "judicial act" must be determined from the facts of an inquiry: whether the targeted act is "judicial" in nature, and whether the judge committed said act in the "absence of all jurisdiction."

Chief Justice Randolph has jurisdiction to appoint four (4) special temporary circuit judges by way of H.B. 1020-- a "legislative grant" of jurisdiction.

Chief Justice Randolph has made over 200 appointments of special temporary judges under §9-1-105.

Although §9-1-105 and H.B. 1020 have differences, both allow the Chief Justice to appoint

special temporary circuit judges. All parties herein admit this fact.

Mississippi case law, *Vinson v. Prather*, 879 So. 2d 1053 (Miss. Ct. App. 2004), without dispute, holds that when the Chief Justice appoints special temporary judges, he is performing a "judicial act". When performing a "judicial act", a legion of federal cases conclude that such judge is covered by Judicial Immunity: *See* e.g. *Kemp ex rel. Kemp v. Perkins*, 324 Fed. Appx. 409, (5th Cir. 2009); *Davis v. Tarrant County, Texas*, 565 F. 3d 214, 221 (5th Cir. 2009); *Bauer v. Texas*, (5th Cir. 2003); *Holloway v. Walker*, 765 F.2d 517 (5th Cir. 1985).

Although this a §1983 lawsuit, essentially alleging race discrimination, the Doctrine of Judicial Immunity still covers the Chief Justice and prevents this court from holding him in this lawsuit.

As mentioned earlier, Plaintiffs focus on the effect of the appointment process of H.B. 1020-i.e. appointed versus elected judges; non-residential requirement to live in Hinds County; the number of judges not based on population and number of cases; no limitation on the Chief Justice's appointment power; no necessity to confer with other justices; and the failure of the Act to identify clearly its purpose. This court views the above matters as possibly bearing upon the constitutionality of H.B. 1020, but do not occupy a dominant role under the analysis for "judicial acts" as delineated by controlling federal law. *See*, e.g. *Daves, supra,* which lists four factors but does not required that all four factors be satisfied.

Even so, if later, this court finds H.B. 1020 to be unconstitutional, and unenforceable, that ruling, by necessity would nullify the Chief Justice's power to appoint any judges under H.B. 1020.

## CONCLUSION

Plaintiffs herein primarily argue H.B. 1020's "alleged" re-awakening throwback to Mississippi's racist past-- whites monopolizing Mississippi's court system:unequal appointment of

whites to serve as judges in Mississippi courtrooms; the State's refusal to provide African Americans the same resources they need to extricate themselves of the present crime woes; and the effective destruction of African American voting power.

In his papers, Defendant Chief Justice Randolph sees no need to address the above concerns. The above matters, he says, are issues for other Defendants, because he has no business being drawn into this lawsuit. Judicial Immunity, he proclaims, teaches that here, he is a non-combatant because Plaintiff's fight is not, and cannot be, with him.

As seen in the foregoing pages, this doctrine of Judicial Immunity shelters judges from lawsuits, whether declaratory or injunctive, when the judge, within his jurisdiction, performs a "judicial act", or is about to perform a judicial act. Often-cited caselaw found in these pages, shows that this Doctrine is alive and vigorous, and at times, still controversial in its broad application, even by the United States Supreme Court, and the Court of Appeals for the Fifth Circuit.

This court has applied their guiding principles and arrived at the only conclusion it could: Chief Justice Randolph must be dismissed from this litigation, which still will continue with the remaining parties to address the constitutionality of H.B. 1020 as a whole.

If this court determines that H.B. 1020 is unconstitutional, the appointment power that Chief Justice Randolph would possess to appoint four (4) special temporary circuit judges would become a nullity.

It is therefore **ORDERED and ADJUDGED** that Defendant Michael K. Randolph, in his official capacity as the Chief Justice of the Mississippi Supreme Court, be dismissed from this litigation because of Judicial Immunity.

The Motion to Dismiss **[Docket no. 19],** filed by the Chief Justice, hereby is **GRANTED**.

It is further **ORDERED** that this lawsuit by the Plaintiffs against the other Defendants[11] on whether H.B. 1020 is constitutional shall continue.

      **SO ORDERED this the 1st day of June, 2023.**

                  **/s/HENRY T. WINGATE**
                  **UNITED STATES DISTRICT COURT JUDGE**

---

[11] Plaintiffs, on May 31, 2023, voluntarily dismissed Defendant Governor Tate Reeves from this lawsuit [Docket no. 44].