**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, ET AL.**                    **PLAINTIFFS**

**VS.**                                                        **CASE NO. 3:23-cv-00272-HTW-LGI**

**TATE REEVES, in his official capacity
As Governor of the State of Mississippi, ET AL.**            **DEFENDANTS**

---

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION RE APPOINTMENT OF JUDGES [DKT. #40]**

---

**INTRODUCTION**

This Court should deny Plaintiffs' motion for preliminary injunction [Dkt. #40], which seeks to halt an important provision of 2023 H.B. 1020 that authorizes the appointment of several temporary judges to enhance public safety and alleviate a dangerous strain on Hinds County's overburdened criminal-court system.  Plaintiffs contend that H.B. 1020's judicial-appointment provision violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and seek immediate relief on that basis.  Plaintiffs' request fails for multiple reasons: (1) they lack standing to obtain the extraordinary relief that they demand; (2) their claim fails on the merits; and (3) they flunk all remaining preliminary injunction requirements.  Granting them relief would cause irreparable harm to the people of Mississippi by exacerbating the very public-safety and criminal-justice emergencies that the challenged law seeks to address.

To start, given the recent dismissal of Chief Justice Randolph as a defendant on judicial immunity grounds, this Court cannot enjoin him from making the challenged judicial appointments.  The remaining defendants have no authority to make the challenged appointments

1

and are not specifically tasked with enforcing the judicial-appointment provision of H.B. 1020. Thus, any alleged injuries associated with the challenged appointments are not redressable, and Plaintiffs' claim is also barred by sovereign immunity.  Further, Plaintiffs have no basis to seek relief—especially extraordinary injunctive relief—against the appointment provision because they have failed to establish that the provision will ever harm them.  None of the individual plaintiffs has shown that he or she is or will be a party to (or be involved in) any civil or criminal proceeding presided over by any temporary judge appointed under H.B. 1020.  Nor have the NAACP plaintiffs shown that they or their members will suffer any actual injury from H.B. 1020's appointment provision.  Plaintiffs claim that the appointment provision is unlawful, but that does not establish their standing.  They have done nothing to show that the appointment provision will harm *them* or affect *them* in any way that is different from how the provision "affects" any other member of the public.  This failure to establish standing—on multiple grounds—dooms Plaintiffs' motion for preliminary injunction, and their judicial-appointment claim should be dismissed on that basis.

Next, even if Plaintiffs could show standing for injunctive relief, they cannot be granted a preliminary injunction because their equal-protection claim fails on the merits. The challenged judicial-appointment provision is race-neutral on its face and rationally advances legitimate purposes.  It is therefore constitutional unless Plaintiffs show that it was driven by a discriminatory purpose and has a discriminatory effect.  They have made neither showing.  The Legislature enacted H.B. 1020 to address Jackson's ongoing public-safety and criminal-justice emergencies. Those emergencies gravely affect not just those living in Jackson, but all Mississippians: the many Mississippians who work in and visit Jackson; the many Mississippians affected by public-safety and criminal-justice problems that cannot be confined to Jackson or Hinds County; and every Mississippian who is entitled to a functioning capital city or is concerned for the future of their

capital.  Plaintiffs disregard these realities and rely instead on tired talking points claiming that H.B. 1020 was improperly motivated by race—despite the glaring fact that appointed temporary circuit judges have been an accepted, repeatedly-used, uncontroversial feature of Mississippi law for almost 20 years.  Plaintiffs' claims are irreconcilable with the grim reality that so many Jacksonians and non-Jacksonians alike must contend constantly with the consequences of Jackson's ongoing crime problem, failed local leadership, and perpetual inability to sustain basic city and human services—problems that affect all Mississippians, regardless of race.  The Legislature acted to address those problems—without regard to race.  H.B. 1020's appointment provision satisfies the Equal Protection Clause.

Finally, Plaintiffs' motion flunks all of the remaining preliminary injunction factors.  For reasons already explained, Plaintiffs cannot show that they stand to suffer any imminent injury as a result of the challenged appointment provision.  That provision does not affect any plaintiff in any personal way.  H.B. 1020 does not implicate Plaintiffs' voting rights:  there is no right to vote for temporary special circuit judges.   Plaintiffs' vague notions of constitutional injury are substantially outweighed by the public interest in enhancing public safety and supporting the criminal-justice system in Hinds County's courts—interests that Plaintiffs ignore.  As this Court has recognized, "Jackson has a crime cancer"—a "crime problem [that] is sweltering, undisputed and suffocating"—and "[t]he criminal justice system in Hinds Count is in crisis."  Dkt. #45 at 9-10, 21.  But on the requisite equitable factors, Plaintiffs do little more than repeat their claim of an equal-protection violation.  Even if they had established a likely equal-protection violation—and they have not—that would not carry their burden on the separate, distinct injunctive factors of irreparable harm, the equities, and the public interest.  Those are separate requirements for preliminary injunctive relief, and Plaintiffs have not satisfied them.

For these reasons and those set forth herein, Plaintiffs fail to make the requisite showing for a preliminary injunction. Their motion should be denied, and their judicial-appointment claim should be dismissed for lack of standing.

## STATEMENT OF FACTS

**Factual Background.** On April 21, 2023, H.B. 1020 was signed into law. Dkt. #34-1 at 2193-2226. H.B. 1020 requires the Chief Justice of the Mississippi Supreme Court to appoint four temporary special circuit judges for the Hinds County Circuit Court. 2023 H.B. 1020, § 1(1). "The term of the temporary special circuit judges shall expire on December 31, 2026." *Id.* H.B. 1020 further provides that "[t]he Chief Justice . . . may elect to reappoint circuit judges that are serving on a temporary basis as of the effective date of this act in the Seventh Circuit Court District." *Id.* § 1(2).

The Legislature's provision for temporary special circuit judges appointed by the Chief Justice is not new in Mississippi. The practice has endured for decades without controversy. For over 30 years, MISS. CODE ANN. § 9-1-105 has authorized the Chief Justice to appoint special circuit judges to serve in emergencies. *See* MISS. CODE ANN. § 9-1-105(2), 1991 Miss. Laws Ch. 373 (S.B. 2556). Since 2005, § 9-1-105 has authorized the Chief Justice, "with the advice and consent of a majority of the justices of the Mississippi Supreme Court," to appoint "special judge[s] to serve on a temporary basis" in Mississippi's circuit courts "in the event of an emergency or overcrowded docket." § 9-1-105(2). This temporary emergency/overcrowded docket appointment power originated with 2005 S.B. 2339. *See* Ex. 1a at 11-119. At every stage of its enactment in 2005—even after a provision to add an elected, permanent circuit judge in Hinds County was removed from the bill—S.B. 2339 garnered overwhelming support in both the Senate and House, including the support of many black legislators. *See id.* at 106-119. Rep. Ed Blackmon handled

the conference report in the House and voted for the bill, as did many other members of the Mississippi Legislative Black Caucus. *See id.* The U.S. Department of Justice ("DOJ") precleared S.B. 2339. *Id.* at 10.

Circuit judges in Hinds County soon welcomed the assistance of temporary special circuit judges in managing their caseloads in times of overcrowded dockets. In 2006, the Mississippi Supreme Court "appointed two special judges to help expedite criminal cases in Hinds County Circuit Court and relieve the criminal case backlog." Dkt. #34-6 at 2. In remarking on those appointments at that time, Hinds County Circuit Judge Winston Kidd said, "I appreciate the Supreme Court's appointment of Senior Retired Circuit Judges Breland Hilburn and William Coleman. Judge Hilburn has been a tremendous help in reducing the number of criminal cases on my docket." *Id.* at 4. Judge Kidd (who is black) did not assert that the appointment provision was improperly motivated by race.

Fast-forward to the summer of 2020. At the height of the COVID-19 pandemic, Chief Justice Mike Randolph appointed temporary special judges throughout the state "on a temporary basis to provide assistance" to permanent circuit, county, and chancery court judges "in performing their duties due to the unforeseen needs proximately caused and/or contributed by [*sic*] COVID-19." *See, e.g.*, Ex. 2 at 59-62, 65-66, 71-72, 75-78, 87-88, 129-130, reflecting several such orders.

The events of 2020 brought to the capital city a new emergency concomitant with the pandemic—namely, an unprecedented surge in violent crime. As this Court has recognized, "[i]n 2020, Jackson reported 130 homicides—a record number at that time. In 2021, Jackson surpassed that record with at least 155 reported homicides—'the highest per capita murder rate in the nation . . . . [h]igher than Birmingham, Atlanta, Detroit, and even Chicago.' [Citations omitted.] In 2022, even with a 14% decline in homicides, Jackson reported 138 homicides that year, and Jackson's

'homicide rate still managed to surpass every other major city in the U.S. for the second straight year.'" Dkt. #45 at 9.  As this Court has further noted, "[h]omicides may be the headline grabber, but Jackson's other violent crime categories battle for equal condemnation:  Rape, Robbery, Aggravated Assault, Sexual Assault, and Burglary rates continue to be among the highest nationwide, per capita."  *Id.*  In the words of this Court, "Jackson has a crime cancer"—a "crime problem [that] is sweltering, undisputed and suffocating."  *Id.* at 9-10.[1]

The city's escalating crime rate is attributable in part to Jackson's failure to provide an adequately staffed police force.  As this Court has recognized, Jackson's "police presence is crying for reinforcement."  Dkt. #45 at 9.  Estimates have placed the necessary number of police officers for Jackson at approximately 600.  *See* Dkt. #34-4 at 15-16.  But "Jackson now has a police force of approximately 258 sworn officers."  Dkt. #45 at 9.  It is no surprise that "one of the factors leading to the surge of crime in Jackson is a shortage of officers from dispatcher to sworn officers."  *See* Dkt. #34-4 at 7.  *See also id.* at 19, 76.

Jackson's soaring crime rate, coupled with the lingering impacts of the pandemic, exacerbated a judicial backlog of criminal cases on the Hinds County Circuit Court docket.  In early 2021, Hinds County District Attorney Jody Owens reported 2,600 criminal cases on that docket, with another 600 cases in which the defendant had yet to appear before a judge.  *See* Dkt. #34-4 at 23-28.  Following a spike in homicides and violent crimes in 2020, D.A. Owens "said one factor contributing to the increase in crime is the lack of cases being resolved in the court system."  *Id.* at 24.  *See also* Dkt. #34-5 at 1-2, 3-4, 5-8.  As this Court has recognized, D.A. Owens' "docket is overwhelming," and "[t]he criminal justice system in Hinds County is in crisis."  Dkt. #45 at 21.  In an effort to alleviate this backlog of criminal cases, Chief Justice Randolph in September 2022

---

[1] Jackson's ongoing crime epidemic has been widely reported.  The following sampling of additional reports is illustrative:  Dkt. #34-4 at 3, 10, 20, 29-30, 31-33, 34-38, 39-40, 41-44, 45-46, 47-65, 67, 86-88.

appointed four temporary special circuit judges "to preside and enter judgment" in over 200 criminal cases (collectively) pending in Hinds County Circuit Court. Ex. 2 at 1-19. There was no public outcry of racism or any related controversy surrounding any of the aforementioned appointments.

The following month, on October 10, 2022, a legislative committee convened a hearing to receive testimony from multiple witnesses regarding Jackson's ongoing crime problem and the status of Hinds County's judicial backlog. *See* Video 1.[2] *See also* Ex. 1b at 169-210. During this hearing, Hinds County Sheriff Tyree Jones told lawmakers that due to the "backlog of [criminal] cases" in Hinds County, approximately 800 pretrial detainees are in jail at the Raymond Detention Center awaiting trial—some for as long as five or six years. Ex. 1b at 172. Sheriff Jones stated that Jackson's "lack of police officers" cannot be ignored, and that he "welcome[s], as the Sheriff of Hinds County, all resources that are available to help us address the violent crime issue in the City of Jackson and in Hinds County." *Id.* at 172-173. He further "welcome[d] all partners" in this endeavor—including "state partners." *Id.* at 171.

At the hearing, Capitol Police Chief Bo Luckey told legislators that Capitol Police officers are "starting to see a lot more individuals riding around with assault rifles in their laps, literally making Instagram stories and TikToks as they're riding around the City." *Id.* at 177. He also stated that a hurdle that his agency faces "is a backlog with the Hinds County Justice System." *Id.* at 180. Chief Luckey stated that a suspect "may be out on the street for the next five years for, waiting to go through Hinds County['s] system because it's backlogged the way it is." *Id.* at 181.

Hinds County D.A. Jody Owens told the legislative committee that his office is "indicting thousands of individuals every year" and every month "at just astronomical rates." *Id.* at 186.

---

[2] All video clips cited herein are keyed to the Appendix at the end of this document.

D.A. Owens thanked the committee for the Legislature's provision of funding to employ the "four special court judges that have been appointed" for Hinds County by Chief Justice Randolph.  *Id.* He stated that "if you look at where we are now with our new [temporary special] judges . . . [w]e have this unique possibility in Hinds County . . . to get it right."  *Id.*  D.A. Owens emphasized to the legislators that "our challenges [in Hinds County] are very different than anywhere else in the state" and attributed the backlog of criminal cases in Hinds County to high volume.  *See id.* at 187, 189.  He complimented Chief Justice Randolph for appointing temporary special circuit judges "who were senior judges who had low rates of appeals because this is an expensive process and you don't want to waste taxpayers['] time and then have to do it all over again.  So we wanted to make sure we identified judges with the experience and the record . . . . [to] make sure they knew what they were doing.  And I think we've done that so far."  *Id.* at 189.

State Public Defender André de Gruy affirmed that "[t]here's no question there's a backlog" of criminal cases in Hinds County Circuit Court.  *See id.* at 190.  Mr. de Gruy further emphasized that in the City of Jackson "[i]t's homicides that are the real problem."  *Id.* at 193. During this same hearing, John Gomez, president of Downtown Partners, told the legislators that "Downtown has been one of the most safest places in the state up until recent years where we've seen increases in our crime, and the past year we've seen some violent incidences that we're just not accustomed to."  *Id.* at 195.  He stressed the need "to increase public safety as a way to help make [people] feel better about their investments downtown."  *Id.*  Jackson Police Chief James Davis thereafter thanked the committee "for all the judges" and testified to the need for more cameras, a crime lab, and a holding facility to address the crime problem.  *See id.* at 197-198.

Finally, Chief Justice Randolph told the legislators that he met with all stakeholders to develop a plan to get cases to trial in Hinds County, and that prior to appointing the four temporary

special circuit judges for Hinds County in September 2022, he vetted temporary judge candidates to ensure that they did not have high reversal rates. *Id.* at 204-206. Chief Justice Randolph told lawmakers that by "working together we can get rid of this backlog," which will "help you get rid of the crime." *See id.* at 207. He affirmed that "the backlog is real" and that all branches of government are working together to try to get rid of the backlog. *Id.* at 206. Chief Justice Randolph advised the committee that "[i]f you give us the amount of money we ask for, and you give me two years and you won't have a backlog . . . . It's just that simple." *Id.* at 207.

Against this backdrop of escalating crime, a temporary backlog of criminal cases in Hinds County, and a good-faith effort by stakeholders to seek solutions, H.B. 1020 was introduced in the House at the outset of the 2023 Legislative Session. *See* Dkt. #34-1 at 1. Originally a revenue bill assigned to the House Ways and Means Committee, H.B. 1020, as initially approved by the House, provided for two new inferior courts within the Capitol Complex Improvement District ("CCID"), each to be staffed by a judge to be appointed by the Chief Justice. Dkt. #34-1 at 6. A competing version of the bill approved by the Senate provided for temporary special judges through 2026 with a new elected, permanent circuit judge to take office in 2027. *See* Dkt. #34-1 at 2299-2309. *See also* Video 5. Over nearly four months from January to April 2023, the Legislature reviewed, negotiated, amended, and debated H.B. 1020. *See* Dkt. #34-1 at 1-2. *See also* Videos 1-8. As the submitted videos of the hours-long floor debates confirm, the debate was robust and exhaustive. To the extent opponents of the bill argued for an additional permanent circuit judge seat for Hinds County, those concerns were considered. In fact, H.B. 1020 requires timely reporting of case disposition and caseload data to assist the Legislature in its consideration of whether to authorize an additional, elected permanent circuit judge for Hinds County. *Id.* at 2224. H.B. 1020 passed in the House by a vote of 76-38 and in the Senate by a vote of 34-15. Dkt. #34-1 at 2227-2228.

**Procedural Background.**   On April 21, 2023, six alleged residents of Jackson and three NAACP entities filed *Plaintiffs' Complaint for Declaratory and Injunctive Relief* against Mississippi Governor Tate Reeves, Mississippi Department of Public Safety Commissioner Sean Tindell, Chief of the Mississippi Department of Public Safety Office of the Capitol Police Bo Luckey, Chief Justice of the Mississippi Supreme Court Michael K. Randolph, and Mississippi Attorney General Lynn Fitch, in their official capacities.  Dkt. #1.  Plaintiffs claim that H.B. 1020's judicial-appointment provision violates the Fourteenth Amendment's Equal Protection Clause.  *Id.* at 46-50, ¶¶ 131-49.  They seek declaratory and injunctive relief.  *Id.* at 50-51, ¶¶ A-J.

On April 28, 2023, Plaintiffs filed a "necessitous and urgent" motion for a TRO.  Dkt. #11, #12.  Following additional developments in a separate state-court challenge to H.B. 1020—which action was ultimately dismissed with prejudice by the Hinds County Chancery Court on May 15, 2023, see Mem. Op. (Dkt. #34-2) and Final Judgment (Dkt. #34-3)—Plaintiffs filed a "renewed necessitous and urgent" motion for a TRO on May 11, 2023.  Dkt. #24.  After a hearing, this Court ordered Plaintiffs to file any motion for preliminary injunction on the judicial-appointment issue by May 24, 2023.  Dkt. #38 at 2.  The Court's Order continued to restrain Chief Justice Randolph from making any judicial appointments pursuant to H.B. 1020 "until such a time that this Court renders its ruling on the Plaintiffs' forthcoming Motion for Preliminary Injunction."  *Id.*

On May 24, 2023, Plaintiffs filed their motion for a preliminary injunction to prohibit Chief Justice Randolph "from appointing judges pursuant to H.B. 1020 pending the resolution of this litigation."  Dkt. #41 at 28.  Plaintiffs thereafter voluntarily dismissed their claims against Governor Reeves, and the Court subsequently dismissed Plaintiffs' claims against Chief Justice Randolph on judicial immunity grounds.  Dkt. #44, #45.  The remaining three defendants— Commissioner Sean Tindell, Chief Bo Luckey, and Attorney General Lynn Fitch (hereinafter

collectively "Defendants")—having previously answered Plaintiffs' complaint, see Dkt. #33, hereby file the instant response in opposition to Plaintiffs' motion for preliminary injunction.

## ARGUMENT

## I. PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE THEY LACK STANDING TO OBTAIN A PRELIMINARY INJUNCTION.

### A. Plaintiffs' alleged injury is not redressable given Chief Justice Randolph's dismissal, nor can Plaintiffs show any actual or imminent, concrete and particularized injury.

To maintain any lawsuit in federal court, plaintiffs must establish Article III standing by showing injury in fact, traceability, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). But plaintiffs bear a heavier burden where they seek prospective injunctive relief. A plaintiff must always show an injury traceable to the defendant's conduct that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quotation marks omitted). But when plaintiffs seek relief aimed at future conduct, their alleged "threatened injury must be *certainly impending* to constitute injury in fact," and "[a]llegations of *possible* future injury are not sufficient." *Id.* (quotation marks omitted; emphasis in original). *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019); *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285-86 (5th Cir. 1992) (en banc).

Here, Plaintiffs lack standing for multiple reasons. First, on June 1, 2023, this Court entered its Order dismissing Plaintiffs' claims against Chief Justice Randolph on the grounds that he enjoys judicial immunity. Dkt. #45. Because Chief Justice Randolph is no longer a party to this action, there is no longer anyone with the subject power of appointment who is left to enjoin in this case. The remaining defendants have no authority to make the challenged appointments. *See* H.B. 1020. Thus, any alleged injury stemming from the appointments is not redressable by

them, and Plaintiffs lack standing to assert their judicial-appointment claim.  *See Okpalobi v. Foster*, 244 F.3d 405, 424-29 (5th Cir. 2001) ("[A] state official cannot be enjoined to act in any way that is beyond his authority to act in the first place."); *Latitude Solutions, Inc. v. DeJoria*, 922 F.3d 690, 695 (5th Cir. 2019) ("a plaintiff must demonstrate standing for each claim he seeks to press and have standing separately for each form of relief sought") (cleaned up).  And because the remaining defendants are not specifically tasked with enforcing the judicial-appointment provision, Plaintiffs' judicial-appointment claim is further barred by sovereign immunity.  *See Tex. All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022).  The dismissal of Chief Justice Randolph robs this Court of jurisdiction over Plaintiffs' judicial-appointment claim.

Second, none of the individual plaintiffs has standing to seek a preliminary injunction because none can show any concrete, imminent injury flowing from the challenged judicial-appointment provision of H.B. 1020.  The individual plaintiffs purport to be residents of and registered voters in Jackson. Dkt. #1 at 6-9, ¶¶ 16-21.  They do not claim any specific past, present, or anticipated future status as a civil litigant, a criminal defendant, or any other party to any proceeding pending in Hinds County Circuit Court.  Plaintiffs have neither shown nor alleged that they are in actual or imminent danger of experiencing any concrete and particularized injury resulting from the challenged appointments.  None of the individual plaintiffs has shown that he or she is or will be a party to any civil or criminal proceeding (or involved at all in any proceeding) to be presided over by any temporary special circuit judge appointed pursuant to H.B. 1020.

For these reasons, this Court should deny Plaintiffs' motion for preliminary injunction and dismiss their judicial-appointment claim.

B. **Plaintiffs' alleged status as voters does not confer standing.**

Plaintiffs contend that their status as registered voters in Jackson gives them standing, but that assertion is baseless, as Plaintiffs' right to vote is not impaired or implicated <u>at all</u> in this matter. That is consistent with the Hinds County Chancery Court's May 15, 2023, ruling that H.B. 1020 does not provide for *permanent* circuit judges and hence does not violate § 153 of the Mississippi Constitution requiring the election of *permanent* circuit judges. *See* Mem. Op. at 17-21 (Dkt. #34-2). Accordingly, Plaintiffs' right to vote—which they allege arises from MISS. CONST. art. VI, § 153 exclusively, see Dkt. #1 at 30, ¶ 82; 32, ¶ 88—is not at issue here.

Further, even without H.B. 1020—and even if Chief Justice Randolph were still subject to the Court's injunctive power, which he is not—the Chief Justice is separately authorized to appoint temporary special circuit judges pursuant to MISS. CODE ANN. § 9-1-105(2), which Plaintiffs do not challenge. Therefore, even if the judicial appointment provision of H.B. 1020 were found unconstitutional, that finding would not redress any "harm," as Chief Justice Randolph could make the same appointments pursuant to his unchallenged statutory authority.

Plaintiffs attempt to distinguish *Herman*, *supra*, for the reason that the case at bar has nothing to do with the "juror oath" at issue in that case. Dkt. #41 at 5, n.1. That is a distinction without a difference, as *Herman* exemplifies the Fifth Circuit's application of the proposition that standing does <u>not</u> exist—there being "no actual controversy"—where the prospect of injury at the hands of a judge is "speculative" and "remote." *See Herman*, 959 F.2d at 1286-87. Applied here, where Plaintiffs cannot show a likelihood of ever appearing before any temporary special judge appointed pursuant to H.B. 1020, *Herman* counsels against any finding of standing.

Plaintiffs cite *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831 (5th Cir. 1993) ("*LULAC*"), a Voting Rights Act case, in support of their assertion that H.B. 1020 would

deprive them of "the right to vote" for judges in Hinds County.  But Plaintiffs fail to acknowledge that consistent with the May 15, 2023, final judgment of the Hinds County Chancery Court, Mississippi law does not afford a right to vote for temporary special circuit judges.  *See* Dkt. #34-2, #34-3.  *LULAC* stands for the principle that "the standing of voters in a voting rights case cannot be gainsaid."  *LULAC*, 999 F.2d at 845.  But, as explained *supra*, this case does not involve the right to vote, so Plaintiffs cannot show standing based on a claimed denial of a right to vote.

Plaintiffs' reliance on *Hadley v. Junior Coll. Dist. of Metro. Kansas City*, 397 U.S. 50 (1970), is likewise misplaced.  *Hadley* stands for the proposition that a shift from electing to appointing officials to a given public office may implicate constitutional concerns.  *See Hadley*, 397 U.S. at 59.  Plaintiffs similarly cite *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966), for the proposition that "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."  Dkt. #41 at 6, n.2.  But here, there is no shift from election to appointment—and no impairment of "the franchise"—because (a) there is no right to elect temporary special circuit judges in Mississippi; and (b) Hinds County's permanent circuit judges will still be elected, as they have always been, once H.B. 1020 takes effect.  The *Hadley* Court in fact recognized that governments "may need many innovations, numerous combinations of old and new devices, [and] great flexibility . . . to meet changing urban conditions.  We see nothing in the Constitution to prevent experimentation."  *Hadley*, 397 U.S. at 59.  Because H.B. 1020 does not alter the existing practice of electing permanent circuit judges, it does not violate the precepts espoused in *Hadley* and constitutes exactly the sort of "experimentation" that *Hadley* permits.

Plaintiffs further cite *Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020), for the proposition that "voters challenging the method for selecting the judges" in a given court "plainly ha[ve]

standing" solely by virtue of being voters.  Dkt. #41 at 6.  But like *LULAC*, and unlike the case at bar, *Fusilier* is a Voting Rights Act case.  As noted, there is no right to vote for temporary special circuit judges.  And Plaintiffs are not challenging "the method for selecting the judges" in Hinds County.  They are quite satisfied with the method of selecting permanent circuit judges via election.  Nothing in the judicial appointment provision of H.B. 1020—which focuses only on temporary special circuit judges—alters that selection method.  Plaintiffs also cite *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208 (5th Cir. 1980), for the proposition that "a system designed to dilute the voting strength of black citizens and prevent the election of blacks as Judges" is not "immune from attack" as violating the Fourteenth Amendment.  Dkt. #41 at 6.  But *Voter Info. Project* did not address standing.  And Plaintiffs here had no "voting strength" to elect temporary special circuit judges *before* H.B. 1020.  That temporary special circuit judges will continue to be appointed—not elected—pursuant to H.B. 1020 confirms that Plaintiffs have no injury conferring standing.

Furthermore, the Northern District of Mississippi has held that the virtually identical judicial-appointment power conferred on the Chief Justice by MISS. CODE ANN. § 9-1-105 does not "affect[] the substance of voting power," there being nothing in § 9-1-105 (or, Defendants submit, by the same token, in H.B. 1020) "which prohibits voters from electing judges formerly subject to their approval."  *Prewitt v. Moore*, 840 F. Supp. 428, 435 (N.D. Miss. 1993).  "Changes which affect only the distribution of power among officials . . . have no direct relation to, or impact on, voting."  *Id.* at 436 (quoting *Presley v. Etowah County Comm'n*, 502 U.S. 491, 506 (1992)).

C. **Plaintiffs cannot establish "stigmatic-injury" standing or standing predicated on a purported loss of "benefits" by all citizens of Hinds County.**

Plaintiffs assert that "H.B. 1020 treats them like second-class citizens and imposes a stigmatizing injury sufficient for standing."  Dkt. #41 at 7.  They cite *Allen v. Wright*, 468 U.S.

737 (1984), for the proposition that "'[s]tigmatic injur[ies]' provide standing to 'those persons who are personally denied equal treatment by the challenged discriminatory conduct.'" *Id.*  But "to plead stigmatic injury standing," a plaintiff "must plead that he was personally subjected to discriminatory treatment." *Moore v. Bryant*, 853 F.3d 245, 249 (5th Cir. 2017).  "Being subject to a racial classification differs materially from having personally been denied equal treatment . . . and we do not find . . . any authority supporting the proposition that racial classification alone amounts to a showing of individualized harm." *Id.* (quoting *Carroll v. Nakatani*, 342 F. 3d 934, 946 (9th Cir. 2003)).  Where the plaintiff fails to plead that he was "personally subject to discriminatory treatment," he "fails to plead injury" and lacks "stigmatic-injury" standing. *See id.*

Here, Plaintiffs have neither shown nor alleged that any of them have been "personally subjected" to any "discriminatory treatment" as a result of the judicial appointment provision of H.B. 1020.  They allege only that the challenged provision somehow "stigmatizes Hinds County's Black residents" as a whole.  Dkt. #41 at 7.  They further assert that they "do not question whether individual [appointed] judges, on account of their race, can be fair and just." *Id.* at 3.  Having failed to show that they will be *personally* subjected to some discriminatory treatment via the appointment of temporary special circuit judges under H.B. 1020, Plaintiffs cannot establish standing via their alternative theory of "stigmatic injury."

Plaintiffs further assert that the appointment of temporary special circuit judges under H.B. 1020 will result in a loss of "benefits" by citizens of Hinds County—namely, judges' "familiarity with the locality, local accountability, and independence from the executive and legislative branches." *Id.* at 7.  Plaintiffs argue that "H.B. 1020 takes these benefits away from Hinds County citizens and diminishes the system of justice that is available to them while leaving those benefits available to the citizens of all other counties." *Id.* at 8.  In support of this theory of standing,

Plaintiffs cite *Chisom v. Roemer*, 501 U.S. 380 (1991), and *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 120 F. Supp. 3d 479 (M.D.N.C. 2015).   Neither case addresses standing at all. Regardless, Plaintiffs have not shown or alleged that they suffered any such loss of benefits from the previous appointment of temporary special circuit judges pursuant to MISS. CODE ANN. § 9-1-105(2).   Again, Plaintiffs have never had the right to elect temporary special circuit judges, and H.B. 1020 does not deprive them of the right to elect the permanent circuit judges of Hinds County. Moreover, any assertion of standing predicated on a purported loss of "benefits" to the citizens of an entire county constitutes "a generalized grievance, common to all citizens," and that cannot support Article III standing.   *Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 219 (5th Cir. 2001).

Under settled Fifth Circuit law, none of the individual plaintiffs has experienced or will experience any actual or imminent, concrete and particularized harm as a result of H.B. 1020's judicial-appointment provision.   Thus, none of them has standing to seek a preliminary injunction.

**D.**   **Plaintiffs cannot establish associational or organizational standing.**

None of the three NAACP entity plaintiffs has associational or organizational standing to seek preliminary injunctive relief.   Associational standing requires an association to show that its members would independently meet Article III standing requirements.   *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006).   Organizational standing requires an organization to establish standing in its own name by meeting the same standing test that applies to individuals. *Tenth Street Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020).   The NAACP plaintiffs do not make the showings required under either doctrine.   Because their members cannot independently establish standing, see *supra*, the NAACP plaintiffs lack associational standing.   Similarly, the NAACP plaintiffs have not shown any concrete, imminent injury arising from the appointment of temporary special circuit judges pursuant to H.B. 1020.

They have not explained how the temporary judicial-appointment provision of H.B. 1020 has caused or will cause them to undertake any actions that "differ from the [NAACP]'s routine lobbying activities," nor have they identified "any specific project that [they] had to put on hold or otherwise curtail in order to respond to" H.B. 1020.  *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010).  Thus, the NAACP plaintiffs likewise lack organizational standing.

Having failed to show how any purported injury is redressable given Chief Justice Randolph's dismissal—and further having failed to show any concrete, imminent injury caused by the challenged judicial-appointment provision—Plaintiffs lack standing to obtain a preliminary injunction against the appointment of temporary special circuit judges under H.B. 1020.  This Court accordingly lacks jurisdiction to issue such relief and should deny Plaintiffs' motion for preliminary injunction and dismiss their judicial-appointment claim.

## II. ALTERNATIVELY, PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE NONE OF THE GOVERNING FACTORS SUPPORTS A PRELIMINARY INJUNCTION.

To obtain a preliminary injunction, Plaintiffs must establish:  (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant outweighs any harm to the nonmovant that may result from the injunction; and (4) that the injunction will not disserve the public interest.  *Beswick v. Barr*, Civil Action No. 5:20-cv-98-DCB-MTP, 2020 WL 3520312, at *3 (S.D. Miss. June 29, 2020).  The last two requirements merge when the government is the opposing party.  *Pacharne v. Dep't of Homeland Sec.*, 565 F. Supp. 3d 785, 802 (N.D. Miss. 2021).  A preliminary injunction is an "extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors."  *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).  Plaintiffs fail to satisfy any of the preliminary injunction factors.

A. **Plaintiffs seek a preliminary injunction against H.B. 1020's judicial-appointment provision based solely on an equal-protection claim.  Because they are likely to fail on that claim, the Court should deny a preliminary injunction.**

1. **The challenged judicial-appointment provision of H.B. 1020 is race-neutral and rationally advances legitimate purposes; therefore, it is constitutional.**

The challenged judicial-appointment provision aims at alleviating a backlog of criminal cases in Hinds County Circuit Court.  Because H.B. 1020 does not implicate any fundamental right or suspect classification, the provision is subject only to rational-basis review.  *See Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016).  "Statutory classifications are given broad deference under rational basis review and will survive if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Id.* (quotation marks omitted).  "The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it whether or not the basis has a foundation in the record."  *Id.* (quotation marks omitted).

Plaintiffs cannot meet their burden to invalidate the judicial-appointment provision.  The State of Mississippi has a legitimate interest in reducing overcrowded criminal dockets in its most populous county—particularly to ensure that victims and defendants alike have timely access to justice in the Hinds County criminal court system.  This is especially important in the seat of State government, where a rise in violent crime has placed a steady strain on Hinds County's criminal dockets in recent years.  The judicial-appointment provision is rationally related to the State's legitimate interest.  That provision brings additional judicial resources to bear on the problem of reducing the ongoing strain on Hinds County's presently overburdened criminal-court system.  Because the challenged judicial-appointment provision is rationally related to a legitimate governmental interest, it does not violate the Equal Protection Clause and is constitutional.

**2.   Plaintiffs cannot show discriminatory effect or discriminatory purpose.**

Plaintiffs contend that the judicial-appointment provision violates the Equal Protection Clause because it discriminates based on race.  *See* Dkt. #41 at 9-10.  To prevail on this argument, Plaintiffs must show that the appointment provision has a "discriminatory effect and . . . discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996).  Plaintiffs do not make either showing, so their merits argument doubly fails.

*First*, **Plaintiffs cannot show discriminatory effect.**  Plaintiffs have not established that the judicial-appointment provision has any "discriminatory effect." *Armstrong*, 517 U.S. at 465. To claim that H.B. 1020 will have a "disparate impact on the Black citizens of Hinds County," Plaintiffs argue that Hinds County has a higher percentage of black residents than other parts of the State and that only "[t]he overwhelmingly Black residents of Hinds County . . . have been stripped of the right to vote for all their circuit judges and to have those judges reside in the County." Dkt. #41 at 11-12. But Plaintiffs' right to vote is not implicated <u>at all</u> in this matter.  As Plaintiffs acknowledge in their complaint, any right to vote for Hinds County circuit judges can only be derived from § 153 of the Mississippi Constitution.  *See* Dkt. #1 at 30, ¶ 82; 32, ¶ 88.  On May 15, 2023, the Hinds County Chancery Court ruled that H.B. 1020 does not violate § 153 of the Mississippi Constitution, which provides for the election of *permanent* circuit judges in Mississippi.  *See* Mem. Op. at 17-21 (Dkt. #34-2).  The Court held that "H.B. 1020 does not provide for the creation of permanent judgeships.  It allows for the appointment on an emergency basis to assist in an overcrowded docket and it expires automatically on December 31, 2026." *Id.* at 20.  Because any voting rights afforded pursuant to § 153 of the Mississippi Constitution are not implicated by H.B. 1020's provision for appointment of temporary special circuit judges, Plaintiffs' right to vote is not at issue in this case.  If the challenged judicial-appointment provision

is allowed to take effect, Plaintiffs will still elect permanent circuit judges and will still be subject to the appointment of temporary special circuit judges (by virtue of MISS. CODE ANN. § 9-1-105(2))—just like everyone else in every other county in Mississippi.

Plaintiffs' claim has another fundamental problem.  Equal-protection principles require comparing those who are "similarly situated." *Armstrong*, 517 U.S. at 465.  Plaintiffs have given no reason to believe that Hinds County is similarly situated with any other county in the State. They do not even try to make that showing.  And indeed Hinds County is not similarly situated to any other county in the State.  It is the State's most populous county; the seat of State government; the home of the State Capitol, museums, a medical center, State office buildings, and multiple universities; and, unfortunately, home to one of the State's most crime-ridden metropolitan areas— a reality heightened by its size and by the unusual unwillingness of its local leaders to acknowledge and address the County's many problems that hurt all Mississippians.  *See In re Ord. Establishing Civ., Crim. Divisions in Hinds Cnty. Cir. Ct.*, 166 So. 3d 481, 485 (Miss. 2012) (Carlson, P.J., specially concurring) ("Hinds County presents different issues than other circuit courts in Mississippi . . . issues that are unique to that circuit").  Because Plaintiffs have not established a discriminatory effect, their equal-protection claim fails for this reason alone.

While conceding that H.B. 1020 is race-neutral on its face, Plaintiffs nevertheless argue that "a clear pattern, unexplainable on grounds other than race," should obviate the need for any proof of discriminatory intent or purpose in this case.  Dkt. #41 at 10-11.  In support of this argument, Plaintiffs cite only *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), neither of which helps them.  In *Gomillion*, the Supreme Court held that while race-neutral on its face, an Alabama law evidenced discriminatory intent where it altered the shape of a city from a square to a 28-sided figure, disenfranchising all but four or five of 400 black

voters while not removing any white voters.  *See Gomillion*, 364 U.S. at 340-48.  Plaintiffs marshal no evidence of such racial animus here.  H.B. 1020's judicial-appointment provision applies equally to all citizens of Hinds County—both black and white alike—and all 82 Mississippi counties remain subject to the Chief Justice's appointment power for temporary special circuit judges by virtue of MISS. CODE ANN. § 9-1-105(2).  Thus, Plaintiffs get no help from *Gomillion*.

*Yick Wo* is equally unhelpful to Plaintiffs.  The central precept of *Yick Wo* is that biased enforcement of a race-neutral law can violate the Equal Protection Clause.  *See Yick Wo*, 118 U.S. at 373-74 ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand. . . the denial of equal justice is still within the prohibition of the constitution").  Plaintiffs have not shown that the judicial appointment provisions of H.B. 1020 will be subject to biased enforcement against black citizens, or how that could even be possible where the temporary special circuit judges will preside over matters involving *all* citizens of Hinds County.  *Yick Wo* avails Plaintiffs nothing.

It bears noting that, on Plaintiffs' disparate-impact reasoning, every legislative action ever taken with regard to Jackson or Hinds County alone would, given the City and County's racial demographics, by definition have a discriminatory effect.  That is not a legally sound way to establish discriminatory effect, nor does it prove invidious racial discrimination.  *Cf. Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002) (holding that statute providing for appointment of school reform board only in Detroit school district, which had disparate impact on black citizens, did not constitute invidious racial discrimination, and therefore did not violate Equal Protection Clause, where state legislators sought to address problem that they perceived to exist in school districts with large populations, not to disenfranchise black citizens).  An equal-protection claim requires a demanding showing, and Plaintiffs' facile approach falls short.

**Second, Plaintiffs cannot show discriminatory purpose.**  Plaintiffs have not established that the judicial-appointment provision has any "discriminatory purpose."  *Armstrong*, 517 U.S. at 465.  As noted, the law is race-neutral on its face and advances legitimate objectives.  Plaintiffs make several arguments to show discriminatory intent, Dkt. #41 at 12-25, but each fails.  And the burden of proof is squarely on the plaintiffs.  *See Abbott v. Perez*, 138 S. Ct. 2305, 2324-35 (2018).

As a threshold matter, Plaintiffs skip over several points of blackletter law.  These errors permeate their discriminatory-intent argument.

State legislators are entitled to a presumption of good faith.  *See Miller v. Johnson*, 515 U.S. 900, 915 (1995).  *See also Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020) ("state legislatures are afforded a presumption of good faith").  Furthermore, the subjective motivations of particular legislators in voting for a bill are not a sufficient basis from which to infer the purpose of the entire Legislature.  *See, e.g., United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); *Fusilier*, 963 F.3d at 466 (overemphasizing statements of individual legislators deemed improper).

Plaintiffs reject the presumption of legislative good faith.  The undercurrent running through their filings is that white State legislators enacted H.B. 1020 with racially discriminatory intent—specifically, that despite not eliminating a single circuit judgeship in Hinds County, they wished to prevent the black citizens of Jackson and Hinds County from electing circuit court judges.  But the objective facts, set forth in detail *supra*, tell a very different story.  Hinds County "is the State's most populous county" and the home of the State's capital city.  Dkt. #45 at 8.  Moreover, Jackson is Mississippi's largest city, "the seat of State government, the home of the State Capitol, multiple hospitals and medical providers, museums, several universities, and a

plethora of retail and restaurant establishments." *Id.* at 8-9.  The City of Jackson and Hinds County have both suffered undeniable crises of local leadership in recent years.  Citizens of Jackson have been forced to contend almost continuously with all manner of infrastructure and related issues, including numerous and prolonged city-wide water outages, indefinite disruption to garbage collection, ubiquitous potholes, urban blight, growing vagrancy, a dysfunctional city government, physical fights at multiple county-board-of-supervisors meetings[3]—and a widespread increase in violent crime.  These problems affect not only the residents of the City of Jackson and Hinds County, but also the many people who commute to Jackson from surrounding areas daily to work and do business, as well as the many people who travel to Jackson to visit the state capital for medical care, shopping/retail opportunities, and tourism/recreational attractions.  Jackson/Hinds County's problems do not stop at the county lines—the fallout spreads considerably further.

All of these attributes make Jackson/Hinds County unique among Mississippi cities/counties—and thus the problems in Jackson/Hinds County warrant action from the State. The State has a strong interest in the wellbeing of all area citizens and in creating conditions under which the capital city functions like a real city, with adequate resources to address not only infrastructure and related issues but—perhaps most importantly—surging crime.

H.B. 1020 is an effort to focus additional resources on the Jackson-area crime problem—a problem the Legislature is entitled to address for the safety and wellbeing of all Mississippians who live in, live around, travel to, or care about Jackson/Hinds County.  There is nothing discriminatory about that.  And every provision of H.B. 1020 is facially race-neutral and affects both black and white citizens equally.

---

[3] *See, e.g.*, Dkt. #34-5 at 9-10, 11-14, 15-17, 18-21, 22-28, 29-39, 40-42, 43-46, 47-53, 54-61, 62-65, 66-67, 68-75, 76-79, 80-83, 84-87.  *See also Lumumba v. City Council of Jackson*, 358 So. 3d 318 (Miss. 2023).

With those points in mind, Defendants address, in turn, Plaintiffs' assertions regarding discriminatory intent.

First, Plaintiffs argue that the "historical background" of the judicial-appointment provision shows discriminatory purpose. Dkt. #41 at 12-15. Plaintiffs rely primarily on a case decided more than 35 years ago about events dating back 60 years. *See id.* at 13. But "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324. *See also Veasey v. Abbott*, 830 F.3d 216, 232 (5th Cir. 2016) (en banc) ("historical evidence" provides "little probative value" when it is not "reasonably contemporaneous" to a challenged enactment); *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 945 F.3d 206, 216 (5th Cir. 2019) (as to things cited in long-ago judicial opinions: "presumption of legislative good faith" is "not changed by a finding of past discrimination").

Plaintiffs also cite two DOJ "objection letters" (from 1991 and 2012) issued in connection with Hinds County, see Dkt. #41 at 13, as purportedly demonstrative of historical discrimination bearing on H.B. 1020's enactment. These letters addressed county redistricting and redistricting by the City of Clinton, respectively. Neither letter addressed actions of the Legislature. *See id.* Thus, neither letter is probative of any purported history of recent discrimination against any citizens of Hinds County by the Mississippi Legislature. *See Veasey*, 830 F.3d at 232 (actions of county officials not probative of intent of state legislators).

Plaintiffs further assert that the State of Mississippi has discriminated against Jackson's citizens and leadership in funding and in purported efforts to secure control of Jackson's infrastructure. Dkt. #41 at 14. The facts do not bear out Plaintiffs' allegations, which parrot political talking points and mischaracterizations having no basis in truth. For instance, the purported State-attempted "takeover" of Jackson's ever-failing water system, see Dkt. #41 at 14,

refers to 2023 S.B. 2889, a utility bill that died in the Legislature in March 2023.  *See* Ex. 1a at 138-194; Ex. 1b at 1-159.  The State is not "taking over" Jackson's water system, which is currently under <u>federal</u> control.  *See* Ex. 4 at 107-143.  In fact, the State has made considerable efforts in recent years to aid the City of Jackson in dealing with its extensive recurring water issues, including providing overwhelming State support to avoid a total collapse of Jackson's water system in 2022.  *See* Ex. 5.  Nor has the State deprived the City of Jackson of access to federal ARPA funds.  *See id.* at 1-195.  The principal legislation paving the way for the appropriation of such funds, 2022 H.B. 1031, passed on a bipartisan vote with the unanimous support of black members of the Mississippi Legislature.  Ex. 1b at 165-168.  The tired partisan theme that the State is intent on harming its capital city—with racist intentions, no less—is unfounded.

Plaintiffs further assert that the Legislature has discriminated against Hinds County by adding permanent, elected circuit judgeships to nine other circuit court districts that, Plaintiffs allege, "have much whiter populations than Hinds County."  Dkt. #41 at 15.  But those nine other circuit court districts each experienced a population increase between 1990 and 2021.  *See* Ex. 3a; Ex. 3b.  For instance, the Twentieth Circuit Court District, which comprises Madison and Rankin Counties, experienced a 91% population growth (an increase of approximately 128,000 people) during that time frame.  *See id.*  In the same time frame, the population of Jackson declined by 13% (by approximately 32,000 people).  *See id.*  These population changes do not support Plaintiffs' arguments that Hinds County has been wrongly deprived of additional judgeships, or that circuits such as the Twentieth Circuit received additional judgeships, on the basis of racial considerations.

Plaintiffs assert that the Mississippi Legislature "through both historic and recent actions— has forfeited any . . . presumption [of good faith] when it comes to its treatment of Jackson and its

Black populace and leadership." Dkt. #41 at 15.  But, as shown above, Plaintiffs' allegations of "recent" discrimination have no basis in fact, and as a matter of law, "[t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbot*, 138 S. Ct. at 2324.

Second, Plaintiffs contend that the "sequence" of legislative "events" that produced H.B. 1020 suggests discriminatory intent. Dkt. #41 at 16-17.  But H.B. 1020 was the product of an intensive, protracted, and well-documented legislative process that is a matter of public record. *See* Dkt. #34-1.  *See also* Videos 1-8.  Plaintiffs' few cherry-picked complaints about what the Legislature did and "did not do" in that process fail to prove that legislators unlawfully "focus[ed] on race." Dkt. #41 at 16.  Rather, the legislative record proves that legislators engaged in "sincere" and "serious legislative debate on the wisdom" of H.B. 1020.  *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021).  As a result of the legislative process and the robust debate during H.B. 1020's evolution, the version of H.B. 1020 that was enacted varied materially from the version first introduced, reflecting certain preferences of the bill's opponents.

Third, Plaintiffs also argue that "procedural departures" from "the normal legislative procedures" and "substantive departures" suggest discriminatory intent.  Dkt. #41 at 18-23.  But again, Plaintiffs' accusations of "departures" are meritless and fail to establish the "numerous and radical procedural departures that may lend credence to an inference of discriminatory intent" in this context.  *See Veasey*, 830 F.3d at 238.

On so-called "procedural departures," Plaintiffs claim that the original version of H.B. 1020 should not have been assigned to the House Ways and Means Committee.  *See* Dkt. #41 at 18.  But as Plaintiffs now acknowledge, see *id.*, the original version of H.B. 1020 was a revenue bill that brought forward hundreds of code sections on state revenues.  *See* Dkt. #34-1 at 4-1043.

Assigning revenue bills to the House committee charged with handling revenue bills is proper. Plaintiffs also contend that a Democrat member of the House conference committee on H.B. 1020 "was excluded from committee meetings where the final version of the bill was prepared and was handed the final copy of the bill just minutes before the deadline for voting on the measure." Dkt. #41 at 19 (citing Dkt. #12-2 at Ex. T).  But the newspaper-article source of Plaintiffs' accusation further says that Rep. Banks said that "he was able to add provisions that would benefit the city" and "requested the changes" after the final version "was handed to him" before the deadline.  Dkt. #12-2 (Ex. T) at 153.  Even if Plaintiffs' characterization of Rep. Banks's reported statements was not misleading, it would not matter.  Statements of a law's opponents are not valid evidence to prove that the law's supporters acted with discriminatory intent.  *See Veasey*, 830 F.3d at 233.

Next on "procedural departures," Plaintiffs accuse the Legislature of violating Section 89 of the Mississippi Constitution by failing to run H.B. 1020 through the "standing committee on local and private legislation." Dkt. #41 at 18.  But H.B. 1020 is not "local and private legislation" so there was no such violation.  *See*, *e.g.*, *Sec'y of State v. Wiesenberg*, 633 So. 2d 983, 995 (Miss. 1994) ("a general State problem, though confined to a specific geographical area, may require and benefit from State action, without that action violating the constitution").  *See also Loden v. Miss. Pub. Serv. Comm'n*, 279 So. 2d 636, 639 (Miss. 1973); *Culley v. Pearl River Industrial Comm'n*, 108 So. 2d 390, 397-98 (Miss. 1959).  And Plaintiffs have not even brought (let alone proved) any claim for a violation of Section 89.  Nor have Plaintiffs cited any authority for the proposition that the Legislature has any "duty to do . . . judicial redistricting." Dkt. #41 at 19.  There is nothing irregular about appointing temporary special judges where that practice has been employed for many years without controversy.  *See* MISS. CODE ANN. § 9-1-105(2).

Plaintiffs' accusations of "substantive departures" fail, too.  *See* Dkt. #41 at 20-23.
Plaintiffs characterize the temporary special judges appointed under H.B. 1020 to relieve Hinds
County's overcrowded docket as "new Circuit Court judges" and call that a "departure" from past
practice.  *Id.* at 20, 22.  But as set forth in detail *supra*, appointing special judges to relieve
overcrowded dockets <u>is</u> *past practice*, not a "departure" from it.  Plaintiffs ignore that the
Legislature nearly 20 years ago (when their allies controlled it) authorized the same thing that the
Legislature of today has done, all to cast a policy decision they disagree with as "racist."

Plaintiffs' attempt to shame the Legislature for not creating new circuit judgeships in Hinds
County with thin policy arguments cast as "substantive departures" is likewise meritless.  Dkt. #41
at 21-23.  They contend that "the Legislature should be adding elected, not appointed, judges for
Hinds County" because until recently, it was the "most populous single Circuit Court District" and
has a "heavy caseload."  *Id.* at 21.  While population is not the only factor that legislators must
consider in setting judgeships, see MISS. CODE ANN. § 9-7-3(3), Plaintiffs reference the Second
District, which has four judges and serves a population of over 281,000 persons—far more than
Hinds County's four-judge district.  *See* Dkt. #12-2 at 72 (estimating Hinds County's population
at 271,730 persons and noting Hinds County's population has decreased by 28,000 over the past
decade).  If anything, comparing the two districts' judgeships and populations shows that Hinds
County should need *fewer* judges.  Regardless, it does not prove any "substantive departure"
evincing that H.B. 1020 was animated by racial intent.

Fourth, Plaintiffs argue that legislators "publicly expressed" their discriminatory intent
behind H.B. 1020.  Dkt. #41 at 23.  But their weak anecdotal references to statements by two
legislators prove no such thing.  Dkt. #12 at 7-8.  It is true that, during protracted floor debate on
an early version of H.B. 1020, Rep. Lamar argued that the Legislature should not limit the "talent

pool" of special judges by excluding the "best and brightest" judges from "Holmes County or Madison County or wherever they may be." *See* Dkt. #41 at 23 & n.11. But that quote—excised from an argument that special judges could potentially come from the home counties of principal opponents of H.B. 1020—fails to prove that Rep. Lamar acted with any ill-motivation.

Plaintiffs point to only one other quotation attributed to Rep. Lamar. They cite a March 24, 2023, *Law360* article wherein it was reported that Rep. Lamar expressed a belief that "four judges should be able to get the job done in Hinds County." *Id.* at 24. *See also* Dkt. #40-1 at 852. Plaintiffs argue that because Rep. Lamar reportedly declined to elaborate to *Law360* on this comment, he was engaging in "a standard ploy of racial demagoguery" and that his view could be motivated only by racial discrimination toward the black citizens of Hinds County. *See id.* That is a non sequitur. And other snippets from Plaintiffs' own cherry-picked newspaper articles further undercut their attempt to vilify Rep. Lamar. *See*, *e.g.*, Dkt. #12-2 at 88. To the extent any question remains about the sincerity of Rep. Lamar's convictions where H.B. 1020 is concerned, his closing remarks from the House floor on March 31, 2023, are perhaps the most demonstrative. *See* Video 8 (Part 2) at 1:33:23-1:40:24 ("I'm doing this for the right reasons, in my heart, and that's it . . . . And we are all . . . all of us, equal children of God. I believe it's the right thing to provide protection from criminal activity and help the capital city of Mississippi. And it is my hope, and it is my prayer, that this bill will assist."). *See also* Video 9. While Plaintiffs may disagree with Rep. Lamar's position on H.B. 1020, there is no evidence that his actions on its enactment were motivated by racial discrimination.

If anything, it is telling that Plaintiffs' so-called proof of "public expressions" of discriminatory intent consists of their spin on two statements made by one legislator as H.B. 1020

made its way through a robust, months-long legislative process.  Regardless, anything Rep. Lamar said about H.B. 1020 fails to prove that the entire Legislature's motive was unlawful.

Plaintiffs' only other piece of anecdotal proof of legislative statements is even weaker. They suggest that a single statement—made eight years ago, by one legislator, on a proposed constitutional amendment that was voted down by the State's entire electorate—shows that discriminatory intent motivated other legislators to back H.B. 1020.  Dkt. #41 at 24.  That eight-year-old quote proves nothing about any motivations behind H.B. 1020.  *See* Dkt. #12-2 at 90. And in any event, one legislator's statements cannot be extrapolated to cast doubt on the motivations of an entire Legislature.  *See Brnovich*, 141 S. Ct. at 2349-50.  Nor are legislators' statements made about unrelated legislation probative of discriminatory intent.  *See, e.g., Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1325 (11th Cir. 2021).  *See also Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1916 (2020) (reaffirming that statements that are "remote in time and made in unrelated contexts—do not qualify as 'contemporary statements' probative" of discriminatory motive).

As a final point:  The fact-intensive nature of Plaintiffs' claims of intentional discrimination militates against blocking a state law with a preliminary injunction.  Where the plaintiffs' success on the merits will "require a difficult battle" in proving that the actions in question were done with a certain motive, the "likelihood of success prong" has not been satisfied.  *Cf. Fleishut v. Avondale Indus.*, Civ. A. No. 94–3500, 1995 WL 27464, at *4 (E.D. La. Jan. 23, 1995).  A preliminary injunction "should not be granted unless the question presented by the movant is free from doubt." *See Metal Mgmt. Miss., Inc. v. Barbour*, Civil Action No. 3:08-CV-00431 HTW-LRA, 2008 WL 3842979, at *5 (S.D. Miss. Aug. 13, 2008).  This matter is—at best for Plaintiffs—rife with doubts regarding their ability to prove any discriminatory effect or intent in connection with H.B. 1020.

B. **Plaintiffs cannot demonstrate irreparable harm.**

Plaintiffs' failure to show irreparable harm also precludes a preliminary injunction.  As noted, the individual plaintiffs purport to be residents of and registered voters in Jackson.  Dkt. #1 at 6-9, ¶¶ 16-21.  They do not claim any specific past, present, or anticipated future status as a civil litigant, a criminal defendant, or any other party to (or any involvement in) any proceeding pending in Hinds County Circuit Court.  Plaintiffs have neither shown nor alleged that they are in actual or imminent danger of any concrete and particularized, real-world injury from the challenged appointments.  No individual plaintiff has shown that he or she is or will be  party to any proceeding to be presided over by any judge appointed under H.B. 1020.  Nor have the NAACP plaintiffs offered any proof that they or their members will suffer any irreparable injury from the appointment provision.  To the extent Plaintiffs contend that their right to vote is harmed, that argument fails because H.B. 1020's judicial-appointment provision does not affect voting rights.

The mere "possibility" of irreparable injury does not support preliminary injunctive relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Rather, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Id.* (citing *Lyons*, 461 U.S. at 103) (emphasis in original).  There is no evidence that Plaintiffs will experience any irreparable harm from the appointment of temporary special circuit judges.  In fact, Plaintiffs "do not question whether individual judges, on account of their race, can be fair and just."  Dkt. #41 at 3.  Plaintiffs allege that "irreparable injury is present as a matter of law where" their equal-protection rights have been violated.  *See id.* at 25.  But that presupposes an equal-protection violation, which—as shown above—has not occurred here.  And irreparable injury is a separate preliminary injunction requirement:  Plaintiffs cannot satisfy it simply by pointing back to a showing on the merits requirement for injunctive relief.

**C.** **The harm to the State in granting an injunction would far exceed any purported harm to Plaintiffs, and the public interest thus favors denying Plaintiffs' motion.**

As noted above, the balance of the equities and the public interest merge when the government is the opposing party. *Pacharne v. Dep't of Homeland Sec.*, 565 F. Supp. 3d 785, 802 (N.D. Miss. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Those features strongly weigh against a preliminary injunction. A preliminary injunction would undermine legislative efforts to mitigate Jackson's ongoing public-safety and criminal-justice emergencies.

First, the judicial-appointment provision is a duly-enacted law of the Mississippi Legislature—*viz.*, the people's representatives. It reflects the will of the people of the State. The State is harmed any time that will is enjoined by a federal court on behalf of a handful of individual plaintiffs who are unhappy with the actions of the Legislature. *See Abbott*, 138 S. Ct. at 2324 n.17 ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State").

Second, the City of Jackson—the seat of State government—is engulfed in a public-safety emergency stemming from a significant increase in violent crime, and a preliminary injunction would undercut efforts to address that emergency. The challenged laws are part and parcel of a broader legislative effort to address this ongoing public safety crisis with the objective of creating a safer capital city for all Jacksonians and all Mississippians. H.B. 1020 provides additional judicial resources designed to further this effort by increasing the efficiency and effectiveness of the criminal court system in Hinds County. *See* Ex. 6 at 28-29. The harm in enjoining the challenged provision of H.B. 1020 far exceeds any harm that it could cause Plaintiffs.

Third, the Hinds County Circuit Court has in recent years been plagued by a backlog of criminal cases largely created by overcrowded dockets. The high crime rate in the Jackson area has placed a strain on judicial resources that affects the ability of both victims and the accused to timely access justice through the courts. Former Hinds County Circuit Senior Judge Tomie Green

recognized this problem. *See, e.g., Safeco Ins. Co. of Am. v. State ex rel. Hood*, -- So. 3d --, 2019 WL 3955084, at *2 (Miss. Aug. 22, 2019) (Judge Green acknowledging "overcrowded civil and criminal dockets"); *Johnson v. State*, 68 So. 3d 1239, 1242 (Miss. 2011) (Judge Green acknowledging "backlog"); *Scott v. State*, 8 So. 3d 871, 876 (Miss. Ct. App. 2008) (Judge Green acknowledging "overcrowded docket"). The appointment of temporary special circuit judges has helped to alleviate overcrowded dockets. *See* "Statement of Facts," *supra*, discussing Judge Winston Kidd's comments. *See also* Ex. 6 at 5 (reflecting Mississippi Legislative Black Caucus Democrat Sen. John Horhn's comments that appointed temporary special circuit judges have "done wonders in moving the caseload through the process").

As crime rates have soared in Hinds County in recent years, the problem of overcrowded criminal dockets has not abated. That is confirmed by the statements of D.A. Owens, Chief Justice Randolph, and others set forth in detail above. H.B. 1020 provides additional judicial resources to ease this ongoing strain on the criminal dockets of permanent circuit court judges in Hinds County. A preliminary injunction would block these much-needed resources and exacerbate ongoing problems in Hinds County's administration of criminal justice. The harm in enjoining the challenged provision of H.B. 1020 far exceeds any purported harm that has been or could be experienced by plaintiffs who have shown only that they live and vote in Jackson.

Plaintiffs contend that a preliminary injunction should issue now to avoid "unseating the appointed judges, possibly after they have begun to hear cases." Dkt. #12 at 17. But that is no reason to deprive the public in the meantime of the benefit of these additional judicial resources authorized by the Mississippi Legislature. The reassignment of cases is not a novel occurrence, and the Hinds County Circuit Court can adapt if needed.

Weighed in the balance against the legitimate legislative policy considerations of law and order, public safety, and increased access to justice, Plaintiffs' claim that a preliminary injunction would serve the public interest rings hollow.

## **CONCLUSION**

For all these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction [Dkt. #40] in its entirety and dismiss Plaintiffs' judicial-appointment claim.

## **APPENDIX**

The following video clips are being filed with the Clerk and submitted to the Court on USB flash drives in MP4 format:

1.   Video 1:  Excerpt of House Judiciary B Legislative Committee Meeting (10/10/2022)

   Full video may be found at: https://www.youtube.com/live/qc6fTrAwW4E?feature=share

2.   Video 2:  Excerpt of House Judiciary B Legislative Committee Meeting (11/21/2022)

   Full video may be found at: https://www.youtube.com/live/MuPzrQUNJ8Q?feature=share

3.   Video 3:  Excerpt of House Judiciary B Legislative Committee Meeting (11/21/2022)

   Full video may be found at: https://www.youtube.com/live/mrBKZY8Be_Y?feature=share

4.   Video 4:  Excerpt of House Floor Debate (2/07/2023)

   Full video may be found at: https://www.youtube.com/live/HtruSFI0avs?feature=share

5.   Video 5:  Excerpt of Senate Judiciary A Legislative Committee Meeting (2/23/2023)

   Full video may be found at: https://www.youtube.com/live/vj6QKjsksB8?feature=share

6.      Video 6:  Excerpt of Senate Floor Debate (3/07/2023)

Full video may be found at:
https://www.youtube.com/live/4J_8j_RMMJY?feature=share

7.      Video 7:  Excerpt of Senate Floor Debate (3/30/2023)

Full video may be found at:
https://www.youtube.com/live/0alwh50heYg?feature=share

8.      Video 8:  Excerpt of House Floor Debate (3/31/2023) – saved in two parts

Full video may be found at:
https://www.youtube.com/live/OOXgDRIDEpM?feature=share

9.      Video 9:  SuperTalk Mississippi Interview of Trey Lamar (6/01/2023)

Full video may be found at:
https://www.youtube.com/watch?v=18CNDBXPnfc

THIS the 7th day of June, 2023.

Respectfully submitted,

SEAN TINDELL, in his official capacity as
Commissioner of the Mississippi Department of
Public Safety; BO LUCKEY, in his official capacity
as Chief of the Mississippi Department of Public
Safety Office of Capitol Police; and LYNN FITCH,
in her official capacity as Attorney General of the
State of Mississippi, DEFENDANTS

By:    LYNN  FITCH,  ATTORNEY  GENERAL
FOR THE STATE OF MISSISSIPPI

By:    s/Rex M. Shannon III
REX M. SHANNON III (MSB #102974)
Special Assistant Attorney General

REX M. SHANNON III (MSB #102974)
GERALD L. KUCIA (MSB #8716)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220

Jackson, Mississippi  39205-0220
Tel.:  (601) 359-4184
Fax:  (601) 359-2003
rex.shannon@ago.ms.gov
gerald.kucia@ago.ms.gov

ATTORNEYS FOR DEFENDANTS SEAN TINDELL,
in his official capacity as Commissioner of the Mississippi
Department of Public Safety; BO LUCKEY, in his
official capacity as Chief of the Mississippi Department
of Public Safety Office of Capitol Police; and LYNN FITCH,
in her official capacity as Attorney General of the State of Mississippi

## CERTIFICATE OF SERVICE

I, Rex M. Shannon III, Special Assistant Attorney General and one of the attorneys for the above-named defendants, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 7th day of June, 2023.

s/Rex M. Shannon III
REX M. SHANNON III