44  and control over the water system currently owned by the city of
45  Jackson to operate the system after the receiver's work concludes
46  in the next two years; and

47        (f)  The creation and organization of a utility district
48  prior to the date of the conclusion of the receiver's work will
49  allow the best opportunity for minimal disruption in water,
50  wastewater and storm water service and maximum ease of transition
51  after the receiver has concluded his work in overseeing and
52  operating the water system.

53     (2)  Therefore, it is the intent of the Mississippi
54  Legislature to:

55        (a)  Provide authority to the Mississippi Capitol Region
56  Utility Authority to transfer water, wastewater and storm water
57  services provided by the City of Jackson to the utility
58  authority's ownership, management and control when the
59  court-appointed receiver's work concludes with the water system to
60  ensure all citizens have access to safe, clean and reliable water,
61  wastewater and storm water systems at affordable, regulated rates
62  which are just, reasonable and provide an adequate amount of
63  capital to keep such systems in good repair; and

64        (b)  Partner with the Mississippi Department of Health,
65  Mississippi Department of Environmental Quality, local
66  governments, including the City of Jackson, within the boundaries
67  of the utility district, and any other federal, state or local
68  entity in taking any action necessary under this act to ensure all

S. B. No. 2889      ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
23/SS26/R699.2                              ~ OFFICIAL ~
PAGE 3 (cap\kr)

69  citizens have access to safe, clean and reliable water, wastewater
70  and storm water systems, with the understanding that federal and
71  state agencies are solely responsible for regulating, but not
72  operating, the utility authority.

73  **SECTION 3.**  As used in this act, the following words and
74  phrases have the meanings ascribed herein, unless the context
75  clearly indicates otherwise:

76          (a)  "Act" means the Mississippi Capitol Region Utility
77  Act.

78          (b)  "Board" means the Board of Directors of the
79  Mississippi Capitol Region Utility Authority.

80          (c)  "Bonds" means revenue bonds and other certificates
81  of indebtedness of the authority issued under the provisions of
82  this act.

83          (d)  "Fiscal year" means the period of time beginning on
84  July 1 of each year and ending on June 30 of each year.

85          (e)  "Major procurement" means the procurement of any
86  good or service in excess of One Million Dollars ($1,000,000.00).

87          (f)  "Municipality" means any incorporated city, town or
88  village of the State of Mississippi, whether operating under
89  general law or special charter.

90          (g)  "Person" means the State of Mississippi, a county,
91  a municipality, any state agency or any other city, town, village
92  or political subdivision or governmental agency or instrumentality
93  of the State of Mississippi or of the United States of America, or

S. B. No. 2889
23/SS26/R699.2                                              ~ OFFICIAL ~
PAGE 4 (cap\kr)

94    any private utility, individual, copartnership, association, firm,

95    trust, estate or any other entity whatsoever.

96         (h)  "Project" means the construction, development or

97    acquisition by the utility authority of any infrastructure for

98    water, wastewater and storm water systems or services and includes

99    upgrading or repair of existing systems.

100        (i)  "Public agency" means any county, municipality,

101   state board or utility authority owning or operating properties,

102   districts created pursuant to the general laws or local and

103   private laws of the State of Mississippi, or any other political

104   subdivision of the State of Mississippi possessing the power to

105   own and operate waterworks, water supply systems, sewerage

106   systems, sewage treatment systems or other facilities or systems

107   for the collection, transportation and treatment of water,

108   wastewater, and storm water.

109        (j)  "Receiver" means the interim third-party manager

110   for the water system owned by the city of Jackson who was

111   appointed by the U.S. District Court for the Southern District of

112   Mississippi on November 29th, 2022, to oversee and operate the

113   water system during the negotiation of a consent decree related to

114   compliance with the Safe Drinking Water Act and other laws.

115        (k)  "Storm water" means any flow occurring during or

116   following any form of natural precipitation and resulting from

117   that precipitation.

118        (l)   "System" or "systems" means any plants, structures,

119   facilities and other real and personal property used or useful in

120   the generation, storage, transportation or supply of water, and

121   the collection, transportation, treatment or disposal of

122   wastewater and storm water, including tanks, lakes, streams,

123   ponds, popes, trunk lines, mains, sewers, conduits, pipelines,

124   pumping and ventilating stations, plants, works, connections and

125   any other real or personal property and rights therein necessary,

126   useful or convenient for the purposes of the utility board or

127   authorities in connection therewith.

128        (m)   "Utility authority" shall mean the Mississippi

129   Capitol Region Utility Authority.

130        (n)   "Wastewater" means water being disposed of by any

131   person and which is contaminated with waste or sewage, including

132   industrial, municipal, and any other wastewater that may cause

133   impairment of the quality of waters in the state.

134        (o)   "Water" means potable water, service water and

135   groundwater.

136   **SECTION 4.**   (1)   There is hereby created and established a

137   public body corporate and politic constituting a political

138   subdivision of the State of Mississippi to be known as the

139   Mississippi Capitol Region Utility Authority.   The authority will

140   be composed of geographic areas receiving water, wastewater and

141   storm water services from the city of Jackson as of the date of

142   enactment of this act for the planning, acquisition, construction,

143 maintenance, operation and coordination of water, wastewater and
144 storm water systems in order to ensure the delivery of water,
145 wastewater and storm water services to citizens.  Such utility
146 authority is created solely to accomplish the purposes of the
147 State under this act and the exercise by the utility authority of
148 the powers conferred by this act shall be deemed and held to be
149 the performance of an essential public function promoting the
150 health, welfare and prosperity of the general public.

151     (2)  The existence of the utility authority shall begin upon
152 the appointment of a majority of its board as provided in Section
153 5 of this act.

154     (3)  The utility authority shall assume ownership, management
155 and control over the water, wastewater and storm water systems on
156 the date of termination of the receiver by the U.S. District Court
157 for the Southern District of Mississippi.

158     (4)  In the event of any action or matter against the utility
159 authority, the Chief Justice shall select an appropriate Circuit
160 or Chancery Court, which shall have exclusive jurisdiction over
161 the matter.  For purposes of court costs, the utility authority
162 shall be a private corporation.

163 **SECTION 5.**  (1)  The affairs of the utility authority shall
164 be administered by the Mississippi Capitol Region Utility
165 Authority Board of Directors.  The board shall be composed of nine
166 (9) members to be selected as follows: The Mayor of the City of
167 Jackson, with the advice and consent of the Senate, shall appoint

168  four (4) members.  The Mayor of the City of Jackson shall consult
169  with the Mayor of the City of Byram to appoint one (1) of their
170  four (4) appointments as long as the City of Byram is included
171  within the boundaries of the systems.  The Mayor of the City of
172  Jackson shall consult with the Mayor of the City of Ridgeland to
173  appoint one (1) of their four (4) appointments as long as the City
174  of Ridgeland is included within the boundaries of the systems.
175  The Governor, with the advice and consent of the Senate, shall
176  appoint three (3) members.  The Lieutenant Governor, with the
177  advice and consent of the Senate, shall appoint two (2) members.
178  All members shall be appointed within sixty (60) days of the
179  enactment of this act.

180      In the appointment process, appointing authorities shall
181  attempt to see that all portions of society and its diversity are
182  represented in members of the utility authority.  All appointed
183  members must be residents of the State of Mississippi, must be
184  ratepayers within the system boundaries, and must have
185  significant, demonstrated experience in business management,
186  fiscal affairs, public health or public utilities.

187      (2)  The initial terms of the Board of Directors shall be as
188  follows:  One (1) member appointed by the Mayor of the City of
189  Jackson shall serve for an initial term of four (4) years.  One
190  (1) member appointed by the Mayor of the City of Jackson shall
191  serve for an initial term of three (3) years.  One (1) member
192  appointed by the Mayor of the City of Jackson shall serve for an

S. B. No. 2889
23/SS26/R699.2
PAGE 8 (cap\kr)                              ~ OFFICIAL ~

193   initial term of two (2) years.  One (1) member appointed by the

194   Mayor of the City of Jackson shall serve for an initial term of

195   one (1) year.  The Governor shall appoint one (1) member for a

196   term of four (4) years, one (1) member for a term of three (3)

197   years, and one (1) member for a term of two (2) years.  The

198   Lieutenant Governor shall appoint one (1) member for a term of

199   four (4) years and one (1) member for a term of three (3) years.

200       (3)  Except as provided in Section 5(2) of this act,

201   appointments shall be for a term of four (4) years.  Each member

202   shall hold office until his successor has been appointed and

203   qualified.  Vacancies shall be filled by appointment by the

204   appropriate appointing authority, subject to the advice and

205   consent of the Senate, for the length of the unexpired term only.

206   Any member of the utility authority shall be eligible for

207   reappointment for a maximum of two (2) full terms.  Each member of

208   the utility authority shall before entering upon his duty take an

209   oath of office to administer the duties of his office faithfully

210   and impartially, and a record of such oath shall be filed in the

211   office of the Secretary of State. The utility authority shall

212   annually elect from its membership a chairman and vice chairman

213   who shall be eligible for reelection.  The utility authority shall

214   also elect or appoint, and prescribe the duties of, such other

215   officers, who need not be members, as the utility authority deems

216   necessary or advisable and the utility authority shall fix the

217   compensation of such officers.  The utility authority may delegate

S. B. No. 2889    |||||||||||||||||||||||||||||     ~ OFFICIAL ~
23/SS26/R699.2
PAGE 9 (cap\kr)

218  to one or more of its members, officers, employees or agents such
219  powers and duties as it may deem proper, not inconsistent with
220  this article or other provisions of law.

221      (4)  The members of the utility authority shall serve without
222  salary, but shall be entitled to receive a per diem pay as
223  provided in Section 25-3-69, plus travel and necessary expenses,
224  including mileage, as provided in Section 25-3-41, incurred while
225  in the performance of his or her duties as a member of the board
226  of directors of the utility authority upon authorization by the
227  board. Expenses shall be paid from the available funds of the
228  utility authority after the utility authority assumes ownership,
229  management and control of the water, wastewater and storm systems
230  as provided in this act.  Until the date the utility authority
231  assumes ownership, management and control of the water, wastewater
232  and stormwater systems as provided in this act, expenses shall be
233  paid by the State of Mississippi.

234      (5)  All meetings of the board shall be subject to the Open
235  Meetings Act in Section 25-41-1 et seq.  The chairman or a
236  majority of members of the utility authority may convene the board
237  for a meeting.

238      (6)  Except as may be provided by law, all records of the
239  utility authority shall be deemed public records and subject to
240  public inspection as provided by Section 25-61-1 et seq.

241      (7)  The board may by majority vote excuse the absence of any
242  member of the board.  In the event that any member of the board is

243   absent for two board meetings in a twelve-month period without
244   such absences being excused by the board, his or her membership on
245   the board shall be terminated as a function of law, without any
246   action by the board, and the removed member of the board shall be
247   ineligible for reappointment to the board.  The original
248   appointing authority shall retain their right to appoint a new
249   board member to replace the removed board member.

250        (8)  No employee of the utility authority shall be a member
251   of the board.

252        (9)  Until such time that the utility district assumes
253   ownership, management, and control of the water, wastewater and
254   storm water systems, the board shall cooperate and coordinate with
255   the receiver in order to provide the best opportunity to for
256   minimal disruption in service and maximum ease of transition after
257   the receiver has concluded his work in overseeing and operating
258   the water system.

259   **SECTION 6.**   (1) The utility authority shall consult with the
260   receiver and the City of Jackson in appointing a president by
261   January 1, 2024, who shall serve at the will and pleasure of the
262   board.  If the utility authority does not have ownership,
263   management, and control of the water, wastewater and storm water
264   systems by the date of the appointment of a president, the State
265   of Mississippi shall pay the salary of the president on a
266   bimonthly basis.  The president shall manage the daily affairs of
267   the utility authority and shall have such powers and duties as

268 specified by this act, by the board, and any rules or regulations
269 adopted by the board.  The president shall not be a member of the
270 board.  The president shall serve at the will and pleasure of the
271 board.

272     (2)  Until such time that the utility district assumes
273 ownership, management, and control of the water, wastewater and
274 storm water systems, the president shall cooperate and coordinate
275 with the receiver in order to provide the best opportunity to for
276 minimal disruption in service and maximum ease of transition after
277 the receiver has concluded his work in overseeing and operating
278 the water system.

279     (3)  The president shall employ such personnel as he or she
280 deems necessary.  All personnel shall serve at the will and
281 pleasure of the president, unless otherwise specified by the
282 president.

283     (4)  The board shall set the salary of the president at such
284 level as is necessary to recruit and retain a qualified
285 professional with the expertise necessary in a public utility.
286 The board may authorize whatsoever incentive compensation program
287 for the president and utility authority staff as it deems
288 necessary and proper. The utility authority shall be exempt from
289 the provisions of Section 25-3-39.

290 **SECTION 7.**  (1)  The utility authority shall have the power,
291 duty and responsibility to exercise general supervision over the

292   design, construction, operation and maintenance of water,
293   wastewater and storm water systems.

294        (2)   The utility authority shall adopt rules and regulations
295   regarding the design, construction or installation, operation and
296   maintenance of water, wastewater and storm water systems.

297        (3)   The utility authority shall adopt rules and regulations
298   regarding the use of decentralized treatment systems, individual
299   on-site wastewater treatment systems and centralized wastewater
300   treatment systems.

301        (4)   The utility authority shall adopt rules establishing
302   performance standards for water, wastewater and storm water
303   systems and the operation and maintenance of the same.   Such rules
304   and regulations shall include the implementation of a standard
305   application form for the installation, operation and maintenance
306   of such systems; application review; approval or denial procedures
307   for any proposed system; inspection, monitoring and reporting
308   guidelines; and enforcement procedures.

309        (5)   (a)   Before a building or development which requires the
310   installation of a water, wastewater or storm water system is
311   constructed, the system must be submitted to the utility authority
312   for certification that the system complies with the utility
313   authority requirements for such system.

314             (b)   Before approving or renewing a water, wastewater or
315   storm water related permit for a system within a utility

S. B. No. 2889
23/SS26/R699.2                                            ~ **OFFICIAL** ~
PAGE 13 (cap\kr)

316  authority, the state agency must require certification that the
317  system complies with the requirements of the utility authority.

318     (6)  Any system of any municipality, public agency or other
319  persons which contracts with a utility authority shall be subject
320  to the terms of that contract and the terms of this act.

321     (7)  Notwithstanding the provisions of Section 51-39-1 et
322  seq., the utility authority shall have the full power to adopt
323  rules and regulations and to construct, maintain, lease and
324  operate facilities for the control of storm water quality and
325  quantity.  In addition, the provisions of Section 51-33-1 relating
326  to drainage districts and flood control districts do not apply to
327  the utility authority.

328     (8)  The utility authority may control and operate the local
329  retail water, wastewater or storm water services and may provide
330  or be responsible for direct servicing of those services to
331  residences, businesses and individuals; however, the utility
332  authority shall not provide the same service in an area provided
333  by a public utility or person holding a certificate of public
334  convenience and necessity issued by the Mississippi Public Service
335  Commission for the provision of such services in the certificated
336  area.

337     **SECTION 8.**  (1)  The utility authority, in addition to any
338  other powers granted under any other provision of law, including,
339  but not limited to the following:

340      (a)  To acquire, construct, improve, enlarge, extend,
341 repair, operate and maintain one or more of its systems used for
342 the collection, transportation, treatment and disposal of water,
343 wastewater and storm water;

344      (b)  To make contracts with any person in furtherance
345 thereof; and to make contracts with any person, under the terms of
346 which the utility authority will collect, transport, treat or
347 dispose of water, wastewater and storm water for such person, and
348 to cancel any contracts existing as of the date of enactment of
349 this act;

350      (c)  To make contracts with any person to design and
351 construct any water, wastewater and storm water systems or
352 facilities, and thereafter to purchase, lease or sell, by
353 installments over such terms as may be deemed desirable,
354 reasonable and necessary, or otherwise, any such system or
355 systems;

356      (d)  To enter into operating agreements with any person,
357 for such terms and upon such conditions as may be deemed
358 desirable, for the operation of any water, wastewater and storm
359 water systems; and the utility authority may lease to or from any
360 person, for such term and upon such conditions as may be deemed
361 desirable, any water, wastewater and storm water collection,
362 transportation, treatment or its other facilities or systems.  Any
363 such contract may contain provisions requiring any public agency
364 or other person to regulate the quality and strength of materials

365  to be handled by the respective system or systems and also may
366  provide that the utility authority shall have the right to use any
367  streets, alleys and public ways and places within the jurisdiction
368  of a public agency or other person during the term of the
369  contract;

370          (e)  To enter into contracts with any person or any
371  public agency, including, but not limited to, contracts authorized
372  by this act, in furtherance of any of the purposes authorized
373  under this act upon such consideration as the board of directors
374  and such person may agree.  Any such contract may extend over any
375  period of time, notwithstanding any provision or rule of law to
376  the contrary; may be upon such terms and for such consideration,
377  nominal or otherwise, as the parties thereto shall agree; and may
378  provide that it shall continue in effect until bonds specified
379  therein, refunding bonds issued in lieu of such bonds, and all
380  other obligations specified therein are paid or terminated.  Any
381  such contract shall be binding upon the parties thereto according
382  to its terms;

383          (f)  To sue and be sued, in its own name, and to enjoy
384  all of the protections, immunities and benefits provided by the
385  Mississippi Tort Claims Act, Section 11-46-1 et seq., as it may be
386  amended or supplemented from time to time;

387          (g)  To maintain office space at such place or places
388  within the utility authority's boundaries as it may determine;

~ OFFICIAL ~

389          (h)  To invest money of the utility authority, including
390  proceeds from the sale of any bonds subject to any agreements with
391  bondholders, on such terms and in such manner as the utility
392  authority deems proper;

393          (i)  To pay any outstanding City of Jackson bonds
394  relating to the water and sewer systems under their existing
395  terms;

396          (j)  To require the necessary relocation or rerouting of
397  roads and highways, railroad, telephone and telegraph lines, and
398  properties, electric power lines, gas pipelines and related
399  facilities, or to require the anchoring or other protection of any
400  of these, provided fair compensation is first paid to the owners
401  or an agreement with such owners regarding the payment of the cost
402  of such relocation, and to acquire easements or rights-of-way for
403  such relocation or rerouting and to convey the same to the owners
404  of the property being relocated or rerouted in connection with the
405  purposes of this act.  This provision shall be in accordance with
406  Mississippi Constitution Article 17A, Section 11-27-30, and House
407  Bill No. 1769 as passed during the 2022 Legislative Session;

408          (k)  To acquire, construct, improve or modify, to
409  operate or cause to be operated and maintained, either as owner of
410  all or of any part in common with others, any water, wastewater or
411  storm water system within the utility authority's service area.
412  The utility authority may pay all or part of the cost of any
413  system from any contribution by persons, firms, public agencies or

S. B. No. 2889
23/SS26/R699.2                                    ~ OFFICIAL ~
PAGE 17 (cap\kr)

414    corporations.  The utility authority may receive, accept and use
415    all funds, public or private, and pay all costs of the
416    development, implementation and maintenance as may be determined
417    as necessary for any project;

418             (l)  To acquire, in its own name, by purchase on any
419    terms and conditions and in any manner as it may deem proper,
420    property for public use, or by gift, grant, lease, or otherwise,
421    real property or easements therein, franchises and personal
422    property necessary or convenient for its corporate purposes.  This
423    provision shall be in accordance with Mississippi Constitution
424    Article 17A, Section 11-27-30, and House Bill No. 1769 as passed
425    during the 2022 Legislative Session;

426             (m)  To acquire insurance for the utility authority's
427    systems, facilities, buildings, treatment plants and all property,
428    real or personal, to insure against all risks as any insurance
429    may, from time to time, be available;

430             (n)  To use any property and rent or lease any property
431    to or from others, including public agencies, or make contracts
432    for the use of the property.  The utility authority may sell,
433    lease, exchange, transfer, assign, pledge, mortgage or grant a
434    security interest for any property.  The powers to acquire, use
435    and dispose of property as set forth in this paragraph shall
436    include the power to acquire, use and dispose of any interest in
437    that property, whether divided or undivided. Title to any property

438 of the utility authority shall be held by the utility authority
439 exclusively for the benefit of the public;

440         (o) To apply, contract for, accept, receive and
441 administer gifts, grants, appropriations and donations of money,
442 materials and property of any kind, including loans and grants
443 from the United States, the state, a unit of local government, or
444 any agency, department, district or instrumentality of any of the
445 foregoing, upon any terms and conditions as the United States, the
446 state, a unit of local government, or any agency, department,
447 district or instrumentality shall impose.  The utility authority
448 may administer trusts.  The utility authority may sell, lease,
449 transfer, convey, appropriate and pledge any and all of its
450 property and assets;

451         (p) To make and enforce, and from time to time amend
452 and repeal, bylaws, rules, ordinances and regulations for the
453 management of its business and affairs and for the construction,
454 use, maintenance and operation of any of the systems under its
455 management and control;

456         (q) To employ and terminate staff and other personnel,
457 including attorneys, engineers and consultants as may be necessary
458 to the functioning of the utility authority;

459         (r) To establish and maintain rates, fees and any other
460 charges for services and the use of systems and facilities within
461 the control of the utility authority, and from time to time, to
462 adjust such rates, fees and any other charges to the end that the

463  revenues therefrom will be sufficient at all times to pay the
464  expenses of operating and maintaining of the facilities and
465  treatment systems and all of the persons' obligations under any
466  contract or bonds resolution with respect thereto or any
467  obligation of any person under any agreement, contract, indenture
468  or bonds resolution with respect thereto.  Such rates, fees,
469  assessments and any other charges shall be subject to the
470  jurisdiction of the Mississippi Public Service Commission.  Such
471  rates, fees, assessments or any other charges shall be equal as
472  levied on citizens throughout the utility authority's boundaries.
473  For purposes of Section 77-3-33, the rates charged by the utility
474  authority shall be just and reasonable if they are adequate to
475  provide safe and reliable water, wastewater and storm water
476  service to its customers, including providing an adequate amount
477  of capital for the utility authority to perform such repairs,
478  upgrades and improvements as it deems necessary on an ongoing
479  basis.  The Mississippi Public Service Commission shall defer to
480  the utility authority's determination of what rates are just and
481  reasonable absent a showing of manifest error;

482        (s)  To adopt rules and regulations necessary to
483  accomplish the purposes of the utility authority and to assure the
484  payment of each participating person or public agency of its
485  proportionate share of the costs for use of any of the systems and
486  facilities of the utility authority and for the utility
487  authority's proportionate share of the costs of the board;

488  (t)  To enter on public or private lands, waters or
489  premises for the purpose of making surveys, borings or soundings,
490  or conducting tests, examinations or inspections for the purposes
491  of the authority, subject to responsibility for any damage done to
492  property entered;

493  (u)  To accept industrial wastewater from within the
494  boundaries of the utility authority for treatment and to require
495  the pretreatment of same when, in the opinion of the utility
496  authority, such pretreatment is necessary;

497  (v)  To control and operate local retail water,
498  wastewater and storm water services, and may provide or be
499  responsible for direct servicing of those services to residences,
500  businesses and individuals; however, the utility authority shall
501  not provide the same services in an area provided by a public
502  utility or person holding a certificate of public convenience and
503  necessity issued by the Mississippi Public Service Commission for
504  the provision of such services in the certificated area;

505  (w)  To assume control and administer, within the
506  utility authority's jurisdiction, any water, wastewater or storm
507  water system or systems by agreement or contract with any person
508  if the person providing such services requests to be relieved of
509  that responsibility.  However, the person may maintain control
510  over connections in their service areas and may charge rates, fees
511  and any other charges in addition to the rates, fees and any
512  charges of the utility authority;

513         (x)  The utility authority shall have the power to
514  acquire property designated by plan to sufficiently accommodate
515  the location of water, wastewater or storm water systems and such
516  requirements related directly thereto pursuant to the provisions
517  of Title 11, Chapter 27, Mississippi Code of 1972.  The utility
518  authority may acquire property necessary for any system and the
519  exercise of the powers, rights and duties conferred upon the
520  utility authority by this act.  No person owning the drilling
521  rights or the right to share in production shall be prevented from
522  exploring, developing or producing oil or gas with necessary
523  rights-of-way for ingress and egress, pipelines and other means of
524  transporting such interests on any lands or interest of the
525  utility authority held or used for the purposes of this act, but
526  any such activities shall be subject to reasonable regulations by
527  the board of directors that will adequately protect the systems or
528  projects of the utility authority.  This provision shall be in
529  accordance with Mississippi Constitution Article 17A and House
530  Bill No. 1769 as passed during the 2022 Legislative Session;
531         (y)  To use any legally available funds to acquire,
532  rebuild, operate and maintain any existing water, wastewater or
533  storm water systems owned or operated by any person;
534         (z)  To refuse to receive water, wastewater or storm
535  water from any public agency or person;
536         (aa)  So long as any indebtedness on the systems of the
537  utility authority remains outstanding, to require a member public

S. B. No. 2889
23/SS26/R699.2                                      ~ OFFICIAL ~
PAGE 22 (cap\kr)

538 agency, or other person, that all water, wastewater and storm
539 water within the boundaries of the respective utility authority be
540 disposed of through the appropriate treatment system to the extent
541 that the same may be available, but no public agency shall be
542 precluded from constructing, operating and maintaining its own
543 such system after the current indebtedness owing on the system as
544 of the date of enactment of this act, is paid in full; and

545     (bb)  Adopt a seal and a symbol, and hold patents,
546 copyrights, trademarks, and service marks and enforce its rights
547 with respect thereto.

548     (3)  The utility authority shall:

549     (a)  Submit annual reports to the Governor, Lieutenant
550 Governor, Speaker of the House of Representatives, State Auditor,
551 Joint Legislative Committee on Performance Evaluation and
552 Expenditure Review and the governing authorities of any
553 municipality whose citizens are within the utility authority's
554 boundaries regarding the water quality and financial conditions of
555 such system or systems, as well as a schedule of currently planned
556 repairs, upgrades or improvements planned by the utility
557 authority;

558     (b)  Immediately submit to the Governor, Lieutenant
559 Governor, Speaker of the House of Representatives and the
560 governing authorities of any municipality whose citizens are
561 within the utility authority's boundaries any information received
562 from the Mississippi State Department of Health or Department of

S. B. No. 2889
23/SS26/R699.2
PAGE 23 (cap\kr)                ~ OFFICIAL ~

563   Environmental Quality or other state or federal regulatory
564   agencies regarding the condition of a transferred eligible
565   municipal system.  The utility authority, in addition to abiding
566   by any other federal or state reporting requirements, must also
567   report such information to the public on its website and to
568   individuals residing within the municipality as required by
569   federal or state law;

570           (c)  Publish audited annual financial statements, which
571   shall be made available to the public. The annual financial
572   statements shall include disposition of all funds expended by the
573   Utility authority for any purpose. Quarterly financial statements
574   shall be made available to the public by posting on the Utility
575   authority's website;

576           (d)  Adopt by administrative rules and regulations a
577   system of continuous internal audits;

578           (e)  Adopt by administrative rules and regulations a
579   code of ethics for officers and employees of the utility authority
580   to carry out the standards of conduct established by this act; and

581           (f)  Adopt by administrative rules and regulations
582   guidelines for the disposal of property if the utility authority
583   is dissolved.

584   **SECTION 9.**   (1)  The president, as executive director of the
585   utility authority, if so appointed by the utility authority, shall
586   direct and supervise all administrative and technical activities
587   in accordance with the provisions of this act, within the

588 administrative rules and regulations adopted by the board, and in
589 accordance with industry practice.  The president shall:

590     (a)   Supervise and administer or contract for the
591 supervision and administration of the water, wastewater and storm
592 water systems owned, managed or controlled by the utility
593 authority.

594     (b)   Employ and direct such personnel as may be
595 necessary to carry out the purposes of this act and utilize such
596 services, personnel or facilities of the utility authority as he
597 or she may deem necessary.

598     (c)   Make available for inspection by the board or any
599 member of the board or the Governor, Lieutenant Governor, Speaker
600 of the House or the governing authorities of any municipality
601 whose citizens are served by the utility authority, upon request,
602 all books, records, files and other information and documents of
603 his or her office and advise the board and recommend such
604 administrative rules and regulations and other matters he or she
605 deems necessary and advisable to improve the operation and
606 administration of the utility authority.

607     (d)   Attend meetings of the board or appoint a designee
608 to attend on his or her behalf.

609     (e)   Not later than thirty (30) days before the
610 beginning of the utility authority's fiscal year, submit the
611 proposed annual budget of the utility authority to the board for
612 review and approval.  This shall include a schedule of planned

613  repairs, upgrades or improvements to the systems and the
614  anticipated capital cost of each.  In addition, the proposed
615  annual budget of the utility authority shall include a personnel
616  table reporting information for each full-time and part-time
617  permanent position, as follows:

618            (i)  The position title and the salary for each
619  position in the existing operating budget for the current fiscal
620  year, indicating whether each position is filled or vacant as of
621  the reporting date; and

622            (ii)  The position title and the salary recommended
623  for each position for the next fiscal year.

624       (f)  The president shall require bond of fifty thousand
625  dollars ($50,000.00) from employees with access to funds or in
626  such an amount as provided in the administrative rules and
627  regulations of the board.

628    (2)  The president may:

629       (a)  Require bond from other employees as he or she
630  deems necessary; and

631       (b)  For good cause, and with approval from the majority
632  of the board, suspend, revoke or refuse to renew any contract
633  entered into in accordance with this act or the administrative
634  rules and regulations of the board.

635       (c)  Upon specific or general approval of the board,
636  enter into personal service contracts pursuant to administrative
637  rules and regulations adopted by the board and compensate such

638  consultants and technical assistants as may be required to carry
639  out the provisions of this act.

640      (3)  Agencies, departments or units of state government,
641  including, but not limited to, the Mississippi Department of
642  Health and the Mississippi Department of Environmental Quality,
643  shall cooperate with the utility authority to regulate the utility
644  authority and assure the effective operation of the utility
645  authority's systems, with the understanding that such agencies act
646  as a regulator and not operator of such systems.  All state
647  officers are hereby empowered and required to render such services
648  to the utility authority within their respective functions as may
649  be requested by the utility authority.

650      **SECTION 10.**  Employees of the utility authority shall serve
651  at the will and pleasure of the president who shall determine
652  their compensation and benefits.  The compensation of officers at
653  the division head level and above shall be determined by the
654  board.

655      **SECTION 11.**  Neither the directors of the utility authority,
656  the board, its employees, nor any person or persons acting on
657  their behalf, while acting within the scope of their authority,
658  shall be subject to personal liability resulting from carrying out
659  any of the powers granted herein in accordance with his or her
660  good faith belief that he or she is acting in the best interests
661  of the utility authority.

662      **SECTION 12.** (1) The utility authority shall enter into its
663 contracts for major procurements after a competitive and open
664 procurement process. The utility authority may adopt
665 administrative rules and regulations pursuant to the provisions of
666 this act providing for special procedures whereby the utility
667 authority may make any class of procurement. The utility
668 authority shall endeavor to ensure the transparency and
669 competitiveness of procurements of all sizes.

670      (2) In its bidding processes, the utility authority may do
671 its own bidding and procurement or may utilize the services of
672 other state agencies as appropriate and necessary. The president
673 may, with the approval of a majority of the board, declare an
674 emergency for purchasing purposes which shall be governed by the
675 administrative rules and regulations adopted by the board.

676      **SECTION 13.** All monies received by the utility authority
677 shall be deposited into an operating account. Such account shall
678 be established in a custodian financial institution domiciled in
679 the State of Mississippi, insured by the Federal Deposit Insurance
680 Corporation and collateralized as prescribed by Section 27-105-5.

681      **SECTION 14.** All division heads, officers and employees of
682 the utility authority shall be considered public servants as
683 defined in Section 25-4-103. All division heads and officers of
684 the utility authority are subject to Section 25-4-25 and shall be
685 required to file a Statement of Economic Interest with the
686 Mississippi Ethics Commission.

687     **SECTION 15.**   (1)  Any public agency or person, pursuant to a
688 duly adopted resolution of the governing body of such public
689 agency or person, may enter into contracts with the utility
690 authority under the terms of which the utility authority will
691 manage, operate and contract for usage of its systems and
692 facilities, or other services, for such person or public agency.

693     (2)  Any public agency or person may enter into contracts
694 with the utility authority for the utility authority to purchase
695 or sell, by installments over such terms as may be deemed
696 desirable, or otherwise, to any person or any systems.  Any public
697 agency may sell, donate, convey, or otherwise dispose of water,
698 wastewater and storm water facilities or systems; or any
699 equipment, personal property or any other things, deemed necessary
700 for the construction, operation, and maintenance to the utility
701 authority without the necessity of appraisal, advertising, or
702 bidding. This section creates an alternative method of disposal of
703 public property.

704     (3)  Any public agency is authorized to enter into operating
705 agreements with the utility authority, for such terms and upon
706 such conditions as may be deemed desirable, for the operation of
707 any of its systems of any person by the utility authority or by
708 any person contracting with the utility authority to operate such
709 systems.

710       (4)  Any public agency may lease to or from the utility
711  authority, for such term and upon such conditions as may be deemed
712  desirable, any of its systems.

713       (5)  Any municipality or county may donate office space,
714  equipment, supplies, and materials to the utility authority.

715       (6)  Any such contract may contain provisions requiring any
716  public agency or other person to regulate the quality and strength
717  of the material to be handled by the wastewater or storm water
718  systems and may also provide that the utility authority shall have
719  the right to use any streets, alleys and public ways and places
720  within the jurisdiction of a public agency or other person during
721  the term of the contract.  Such contracts may obligate the public
722  agency to make payments to the utility authority or to a trustee
723  in amounts which shall be sufficient to enable the utility
724  authority to defray the expenses of administering, operating and
725  maintaining its respective systems, to pay interest and principal
726  (whether at maturity upon redemption or otherwise) on bonds of the
727  utility authority, issued under this act and to fund reserves for
728  debt service, for operation and maintenance and for renewals and
729  replacements, to fulfill the requirements of any rate covenant
730  with respect to debt service coverage contained in any resolution,
731  trust indenture or other security agreement relating to the bonds
732  of the utility authority issued under this act or to fulfill any
733  other requirement relating to bonds issued pursuant to this act.

734      (7)  Any public agency shall have the power to enter into
735  such contracts with the utility authority as in the discretion of
736  the governing body of the public agency would be in the best
737  interest of the public agency.  Such contracts may include a
738  pledge of the full faith and credit of such public agency and/or
739  the avails of any special assessments made by such public agency
740  against property receiving benefits, as now or hereafter are
741  provided by law. Any such contract may provide for the sale, or
742  lease to, or use of by the utility authority, of the systems or
743  any part thereof, of the public agency; and may provide that the
744  utility authority shall operate its systems or any part thereof of
745  the public agency; and may provide that any public agency shall
746  have the right to continued use and/or priority use of the systems
747  or any part thereof during the useful life thereof upon payment of
748  reasonable charges therefor; and may contain provisions to assure
749  equitable treatment of persons or public agencies who contract
750  with the utility authority under this act; and may contain such
751  other provisions and requirements as the parties thereto may
752  determine to be appropriate or necessary.  Such contracts may
753  extend over any period of time, notwithstanding any provisions of
754  law to the contrary, and may extend beyond the life of the
755  respective systems or any part thereof or the term of the bonds
756  sold with respect to such facilities or improvements thereto.
757      (8)  The obligations of a public agency arising under the
758  terms of any contract referred to in this act, whether or not

S. B. No. 2889
23/SS26/R699.2                                          ~ OFFICIAL ~
PAGE 31 (cap\kr)

759  payable solely from a pledge of revenues, shall not be included
760  within the indebtedness limitations of the public agency for
761  purposes of any constitutional or statutory limitation or
762  provision.  To the extent provided in such contract and to the
763  extent such obligations of the public agency are payable wholly or
764  in part from the revenues and other monies derived by the public
765  agency from the operation of its systems or of its combined
766  systems, or any part thereof, such obligations shall be treated as
767  expenses of operating such systems.

768      (9)  Contracts referred to in this section may also provide
769  for payments in the form of contributions to defray the cost of
770  any purpose set forth in the contracts and as advances for the
771  respective systems or any part thereof subject to repayment by the
772  utility authority.  A public agency may make such contributions or
773  advances from its general fund or surplus fund or from special
774  assessments or from any monies legally available therefor.

775      (10)  Subject to the terms of a contract or contracts
776  referred to in this act, the utility authority is hereby
777  authorized to do and perform any and all acts or things necessary,
778  convenient or desirable to carry out the purposes of such
779  contracts, including the fixing, charging, collecting, maintaining
780  and revising of rates, fees and other charges for the services
781  rendered to any user of any of the systems operated or maintained
782  by the utility authority, whether or not such systems are owned by
783  the utility authority.

784    (11)  No provision of this act shall be construed to prohibit
785  any public agency, otherwise permitted by law to issue bonds, from
786  issuing bonds in the manner provided by law for the construction,
787  renovation, repair or development of any of the utility
788  authority's systems, or any part thereof, owned or operated by
789  such public agency.

790  **SECTION 16.**  Whenever a public agency shall have executed a
791  contract under this act and the payments thereunder are to be made
792  either wholly or partly from the revenues of the public agency's
793  systems, or any part thereof, or a combination of such systems,
794  the duty is hereby imposed on the public agency to establish and
795  maintain and from time to time to adjust the rate or fees charged
796  by the public agency for the services of such systems, so that the
797  revenues therefrom, together with any taxes and special
798  assessments levied in support thereof, will be sufficient at all
799  times to pay:

800    (a)  The expense of operating and maintaining such
801  systems, including, but not limited to, all of the public agency's
802  obligations to the utility authority and the cost required to
803  staff such systems, its successors or assigns under such contract;
804  and

805    (b)  All of the public agency's obligations under and in
806  connection with bonds theretofore issued, or which may be issued
807  thereafter and secured by the revenues of such systems. Any such
808  contract may require the use of consulting engineers and financial

809  experts to advise the public agency whether and when such rates
810  and fees are to be adjusted.

811  **SECTION 17.**  (1)  Notwithstanding the provisions of Sections
812  77-3-21 and 77-3-23,  the certificate of public convenience and
813  necessity held by any municipality, public agency, district,
814  public utility or other person authorized by law to provide water,
815  sewer and wastewater services may be cancelled and its powers,
816  duties and responsibilities transferred to the utility authority
817  in the manner provided by this section.

818      (2)  Any entity described in subsection (1) of this section
819  desiring to have its certificate of public convenience and
820  necessity cancelled and its powers, duties and responsibilities
821  transferred to the utility authority shall make a determination to
822  that effect on its official minutes if a public entity, or by
823  affidavit if not a public entity, and transmit such determination
824  to the utility authority.

825      (3)  Upon receipt of the document evidencing such
826  determination from an entity to transfer its powers, duties and
827  responsibilities to the utility authority, the utility authority
828  shall, by resolution, declare whether it is willing and able to
829  accept such transfer from the entity.

830      (4)  Upon completion of the requirements of subsections (2)
831  and (3) of this section herein and agreement by both parties to
832  the transfer, the holder of the certificate of public convenience
833  and necessity and the utility authority shall jointly petition the

~ OFFICIAL ~

834 Public Service Commission to cancel the certificate of public
835 convenience and necessity.  The petition must be accompanied by
836 copies of the official minutes, affidavit or resolution, as the
837 case may be, reflecting the actions of the petitioners. After
838 review of the petition and any other evidence as the Public
839 Service Commission deems necessary, the commission may issue an
840 order canceling the certificate and transferring to the utility
841 authority the powers, duties and responsibilities granted by the
842 certificate, including all assets and debts of the transferor
843 petitioner related to such certificated services, real or
844 personal, or both, if it finds that:

845       (a)  Subsections (2) and (3) of this section have been
846 complied with; and

847       (b)  Such action is in the public interest.

848    (5)  The utility authority and providers of water, sewer,
849 wastewater and storm water services that are not holders of a
850 certificate of a public convenience and necessity from the Public
851 Service Commission may enter into agreements for the provision of
852 such services, including, but not limited to, the transfer to the
853 utility authority of such provider's powers, duties,
854 responsibilities, assets and debts.

855    (6)  Nothing herein shall require a municipality currently
856 served by the utility authority to remain within the boundaries of
857 the utility authority.

858    **SECTION 18.**   (1)  Any system of a municipality, public agency
859    or person that becomes subject to the jurisdiction of a utility
860    authority and this act shall not impair, invalidate or abrogate
861    any liens, bonds or other certificates of indebtedness related to
862    water, storm water or wastewater facilities and systems incurred
863    prior to becoming subject to the jurisdiction of the utility
864    authority.

865       (2)  The utility authority may do and perform any and all
866    acts necessary, convenient or desirable to ensure the payment,
867    redemption or satisfaction of such liens, bonds or other
868    certificates of indebtedness.

869    **SECTION 19.**   (1)  Sections 49-17-753 through 49-17-771 apply
870    to all bonds to be issued after the date of enactment of this act,
871    and such provisions shall not affect, limit or alter the rights
872    and powers of any utility authority under this act or any law of
873    Mississippi to conduct the activities referred to herein in any
874    way pertinent to the interests of the bondholders, including,
875    without limitation, such utility authority's right to charge and
876    collect rates, fees and charges and to fulfill the terms of any
877    covenants made with the registered owners of any existing bonds,
878    or in any other way impair the rights and remedies of the
879    registered owners of any existing bonds, unless provision for full
880    payment of such bonds, by escrow or otherwise, has been made
881    pursuant to the terms of the bonds or the resolution, trust
882    indenture or security interest securing the bonds.

S. B. No. 2889
23/SS26/R699.2
PAGE 36 (cap\kr)                                    ~ **OFFICIAL** ~

883    (2)  The utility authority shall have the power and is hereby
884  authorized, from time to time, to borrow money and to issue
885  revenue bonds and interim notes in such principal amounts as the
886  utility authority may determine to be necessary to provide
887  sufficient funds for achieving one or more of the purposes of this
888  act, including, without limiting the generality of the foregoing,
889  to defray all the costs of the project, the cost of the
890  acquisition, construction, improvement, repair or extension of a
891  system, or any part thereof, whether or not such facilities are
892  owned by the utility authority, the payment of interest on bonds
893  of the utility authority issued pursuant to this act,
894  establishment of reserves to secure such bonds and payment of the
895  interest thereon, expenses incident to the issuance of such bonds
896  and to the implementation of the utility authority's system, and
897  all other expenditures of the utility authority incident to or
898  necessary or convenient to carry out the purposes of this act.
899    (3)  Before issuing bonds, other than interim notes or
900  refunding bonds as provided in Section 49-17-757, the board of
901  directors of the utility authority shall adopt a resolution
902  declaring its intention to issue such bonds and stating the
903  maximum principal amount of bonds proposed to be issued, a general
904  generic description of the proposed improvements and the proposed
905  location thereof and the date, time and place at which the board
906  of directors proposes to take further action with respect to the
907  issuance of such bonds.  The resolution shall be published once a

908  week for at least three (3) consecutive weeks in at least one (1)
909  newspaper having a general circulation within the geographical
910  limits of all of the public agencies which have contracted with
911  the utility authority pursuant to this act.

912      (4)  Bonds of the utility authority issued pursuant to this
913  act shall be payable from and secured by a pledge of all or any
914  part of the revenues under one or more contracts entered into
915  pursuant to this act between the utility authority and one or more
916  of its contracting public agencies and from all or any part of the
917  revenues derived from the operation of any designated system or
918  any part or parts thereof and any other monies legally available
919  and designated therefor, as may be determined by such utility
920  authority, subject only to any agreement with the purchasers of
921  the bonds. Such bonds may be further secured by a trust indenture
922  between such utility authority and a corporate trustee, which may
923  be any trust company or bank having powers of a trust company
924  without or within the state.

925      (5)  Bonds of the utility authority issued pursuant to this
926  act shall be authorized by a resolution or resolutions adopted by
927  a majority affirmative vote of the total membership of the board
928  of directors of the utility authority.  Such bonds may be issued
929  in series, and each series of such bonds shall bear such date or
930  dates, mature at such time or times, bear interest at such rate or
931  rates (not exceeding the maximum rate set out in Section
932  75-17-103, Mississippi Code of 1972), be in such denomination or

933 denominations, be in such form, carry such conversion privileges,
934 have such rank or priority, be executed in such manner and by such
935 officers, be payable from such sources in such medium of payment
936 at such place or places within or without the state, provided that
937 one such place shall be within the state, and be subject to such
938 terms of redemption prior to maturity, all as may be provided by
939 resolution or resolutions of the board of directors.  The term of
940 such bonds issued pursuant to this act shall not exceed forty (40)
941 years.

942     (6)  Bonds of the utility authority issued pursuant to this
943 act may be sold at such price or prices, at public or private
944 sale, in such manner and at such times as may be determined by
945 such utility authority to be in the public interest, and such
946 utility authority may pay all expenses, premiums, fees and
947 commissions which it may deem necessary and advantageous in
948 connection with the issuance and sale thereof.

949     (7)  Any pledge of earnings, revenues or other monies made by
950 the utility authority shall be valid and binding from the time the
951 pledge is made.  The earnings, revenues or other monies so pledged
952 and thereafter received by such utility authority shall
953 immediately be subject to the lien of such pledge without any
954 physical delivery thereof or further act, and the lien of any such
955 pledge shall be valid and binding as against all parties having
956 claims of any kind in tort, contract or otherwise against such
957 utility authority irrespective of whether such parties have notice

958  thereof. Neither the resolution nor any other instrument by which
959  a pledge is created need be recorded.

960     (8)  Neither the members of the board of directors nor any
961  person executing the bonds shall be personally liable on the bonds
962  or be subject to any personal liability or accountability by
963  reason of the issuance thereof.

964     (9)  Proceeds from the sale of bonds of the utility authority
965  may be invested, pending their use, in such securities as may be
966  specified in the resolution authorizing the issuance of the bonds
967  or the trust indenture securing them, and the earnings on such
968  investments applied as provided in such resolution or trust
969  indenture.

970     (10)  Whenever any bonds shall have been signed by the
971  officer(s) designated by the resolution of the board of directors
972  to sign the bonds who were in office at the time of such signing
973  but who may have ceased to be such officer(s) prior to the sale
974  and delivery of such bonds, or who may not have been in office on
975  the date such bonds may bear, the manual or facsimile signatures
976  of such officer(s) upon such bonds shall nevertheless be valid and
977  sufficient for all purposes and have the same effect as if the
978  person so officially executing such bonds had remained in office
979  until the delivery of the same to the purchaser or had been in
980  office on the date such bonds may bear.

981     (11)  The utility authority has the discretion to advance or
982  borrow funds needed to satisfy any short-term cash flow demands or

983  deficiencies or to cover start-up costs until such time as
984  sufficient bonds, assets and revenues have been secured to satisfy
985  the needs of the utility authority.

986  **SECTION 20.** (1)  The utility authority may, by resolution
987  adopted by its board of directors, issue refunding bonds for the
988  purpose of paying any of its bonds at or prior to maturity or upon
989  acceleration or redemption.  Refunding bonds may be issued at such
990  time prior to the maturity or redemption of the refunded bonds as
991  the board of directors deems to be in the public interest, without
992  an election on the question of the issuance thereof. The refunding
993  bonds may be issued in sufficient amounts to pay or provide the
994  principal of the bonds being refunded, together with any
995  redemption premium thereon, any interest accrued or to accrue to
996  the date of payment of such bonds, the expenses of issue of the
997  refunding bonds, the expenses of redeeming the bonds being
998  refunded, and such reserves for debt service or other capital or
999  current expenses from the proceeds of such refunding bonds as may
1000 be required by the resolution, trust indenture or other security
1001 instruments.  The issue of refunding bonds, the maturities and
1002 other details thereof, the security therefor, the rights of the
1003 holders and the rights, duties and obligations of the utility
1004 authority in respect of the same shall be governed by the
1005 provisions of this act relating to the issue of bonds other than
1006 refunding bonds insofar as the same may be applicable.  Any such
1007 refunding may be effected, whether the obligations to be refunded

1008  shall have then matured or shall thereafter mature, either by the
1009  exchange of the refunding bonds for the obligations to be refunded
1010  thereby with the consent of the holders of the obligations so to
1011  be refunded, or by sale of the refunding bonds and the application
1012  of the proceeds thereof to the payment of the obligations proposed
1013  to be refunded thereby, and regardless of whether the obligations
1014  proposed to be refunded shall be payable on the same date or
1015  different dates or shall be due serially or otherwise.

1016      (2)  Borrowing by the utility authority may be made by the
1017  delivery of interim notes to any person or public agency or
1018  financial institution by a majority vote of the board of
1019  directors.

1020  **SECTION 21.**  All bonds (other than refunding bonds, interim
1021  notes and certificates of indebtedness, which may be validated)
1022  issued pursuant to this act shall be validated as now provided by
1023  law in Sections 31-13-1 through 31-13-11, Mississippi Code of
1024  1972; however, notice of such validation proceedings shall be
1025  addressed to the citizens of the respective public agencies (a)
1026  which have contracted with the utility authority pursuant to this
1027  act, and (b) whose contracts and the payments to be made by the
1028  public agencies thereunder constitute security for the bonds of
1029  such utility authority proposed to be issued, and that such notice
1030  shall be published at least once in a newspaper or newspapers
1031  having a general circulation within the geographical boundaries of
1032  each of the contracting public agencies to whose citizens the

1033  notice is addressed.  Such validation proceedings shall be
1034  instituted in any chancery courts within the boundaries of the
1035  utility authority.  The validity of the bonds so validated and of
1036  the contracts and payments to be made by the public agencies
1037  thereunder constituting security for the bonds shall be forever
1038  conclusive against the utility authority and the public agencies
1039  which are parties to said contracts; and the validity of said
1040  bonds and said contracts and the payments to be made thereunder
1041  shall never be called in question in any court in this state.

1042  **SECTION 22.**  Bonds issued under the provisions of this act
1043  shall not be deemed to constitute, within the meaning of any
1044  constitutional or statutory limitation, an indebtedness of the
1045  utility authority or the state.  Such bonds shall be payable
1046  solely from the revenues or assets of the utility authority
1047  pledged therefor.  Each bond issued under this act shall contain
1048  on the face thereof a statement to the effect that such utility
1049  authority, nor the state, shall not be obligated to pay the same
1050  nor the interest thereon except from the revenues or assets
1051  pledged therefor.

1052  **SECTION 23.**  The utility authority shall have power in
1053  connection with the issuance of its bonds pursuant to this act to:
1054        (a)  Covenant as to the use of any or all of its
1055  property, real or personal;
1056        (b)  Redeem the bonds, to covenant for their redemption
1057  and to provide the terms and conditions thereof;

1058          (c)  Covenant to charge rates, fees and charges
1059 sufficient to meet operating and maintenance expenses, renewals
1060 and replacements, principal and debt service on bonds, creation
1061 and maintenance of any reserves required by a bonds resolution,
1062 trust indenture or other security instrument and to provide for
1063 any margins or coverages over and above debt service on the bonds
1064 deemed desirable for the marketability of the bonds;

1065          (d)  Covenant and prescribe as to events of default and
1066 terms and conditions upon which any or all of its bonds shall
1067 become or may be declared due before maturity, as to the terms and
1068 conditions upon which such declaration and its consequences may be
1069 waived and as to the consequences of default and the remedies of
1070 the registered owners of the bonds;

1071          (e)  Covenant as to the mortgage or pledge of or the
1072 grant of a security interest in any real or personal property and
1073 all or any part of the revenues from any designated system or any
1074 part thereof or any revenue-producing contract or contracts made
1075 by a utility authority with any person to secure the payment of
1076 bonds, subject to such agreements with the registered owners of
1077 bonds as may then exist;

1078          (f)  Covenant as to the custody, collection, securing,
1079 investment and payment of any revenues, assets, monies, funds or
1080 property with respect to which a utility authority may have any
1081 rights or interest;

1082    (g)  Covenant as to the purposes to which the proceeds
1083  from the sale of any bonds then or thereafter to be issued may be
1084  applied, and the pledge of such proceeds to secure the payment of
1085  the bonds;

1086    (h)  Covenant as to the limitations on the issuance of
1087  any additional bonds, the terms upon which additional bonds may be
1088  issued and secured, and the refunding of outstanding bonds;

1089    (i)  Covenant as to the rank or priority of any bonds
1090  with respect to any lien or security;

1091    (j)  Covenant as to the procedure by which the terms of
1092  any contract with or for the benefit of the registered owners of
1093  bonds may be amended or abrogated, the amount of bonds the
1094  registered owners of which must consent thereto, and the manner in
1095  which such consent may be given;

1096    (k)  Covenant as to the custody of any of its
1097  properties or investments, the safekeeping thereof, the insurance
1098  to be carried thereon, and the use and disposition of insurance
1099  proceeds;

1100    (l)  Covenant as to the vesting in a trustee or
1101  trustees, within or outside the state, of such properties, rights,
1102  powers and duties in trust as such utility authority may
1103  determine;

1104    (m)  Covenant as to the appointing and providing for the
1105  duties and obligations of a paying agent or paying agents or other
1106  fiduciaries within or outside the state;

1107        (n)  Make all other covenants and to do any and all such
1108 acts and things as may be necessary or convenient or desirable in
1109 order to secure its bonds, or in the absolute discretion of the
1110 utility authority tend to make the bonds more marketable,
1111 notwithstanding that such covenants, acts or things may not be
1112 enumerated herein; it being the intention hereof to give any
1113 utility authority power to do all things in the issuance of bonds
1114 and in the provisions for security thereof which are not
1115 inconsistent with the Constitution of the state; and

1116        (o)  Execute all instruments necessary or convenient in
1117 the exercise of the powers herein granted or in the performance of
1118 covenants or duties, which may contain such covenants and
1119 provisions, as any purchaser of the bonds of the utility authority
1120 may reasonably require.

1121 **SECTION 24.**  The utility authority may, in any authorizing
1122 resolution of the board of directors, trust indenture or other
1123 security instrument relating to its bonds issued pursuant to this
1124 act, provide for the appointment of a trustee who shall have such
1125 powers as are provided therein to represent the registered owners
1126 of any issue of bonds in the enforcement or protection of their
1127 rights under any such resolution, trust indenture or security
1128 instrument.  The utility authority may also provide in such
1129 resolution, trust indenture or other security instrument that the
1130 trustee, or in the event that the trustee so appointed shall fail
1131 or decline to so protect and enforce such registered owners'

1132   rights then such percentage of registered owners as shall be set
1133   forth in, and subject to the provisions of, such resolution, trust
1134   indenture or other security interest, may petition the court of
1135   proper jurisdiction for the appointment of a receiver of the
1136   utility authority's systems, the revenues of which are pledged to
1137   the payment of the principal of and interest on the bonds of such
1138   registered owners.  Such receiver may exercise any power as may be
1139   granted in any such resolution, trust indenture or security
1140   instrument to enter upon and take possession of, acquire,
1141   construct or reconstruct or operate and maintain such system, fix
1142   charges for services of the system and enforce collection thereof,
1143   and receive all revenues derived from such system or facilities
1144   and perform the public duties and carry out the contracts and
1145   obligations of such utility authority in the same manner as such
1146   utility authority itself might do, all under the direction of such
1147   court.

1148   **SECTION 25.**   (1)  The exercise of the powers granted by this
1149   act will be in all respects for the benefit of the people of the
1150   state, for their well-being and prosperity and for the improvement
1151   of their social and economic conditions, and the utility authority
1152   shall not be required to pay any tax or assessment on any property
1153   owned by the utility authority under the provisions of this act or
1154   upon the income therefrom; nor shall the utility authority be
1155   required to pay any recording fee or transfer tax of any kind on
1156   account of instruments recorded by it or on its behalf.

1157      (2)  Any bonds issued by the utility authority under and
1158  pursuant to the provisions of this act, their transfer and the
1159  income therefrom shall at all times be free from taxation by the
1160  state or any local unit or political subdivision or other
1161  instrumentality of the state, excepting inheritance and gift
1162  taxes.

1163  **SECTION 26.**  All bonds issued under the provisions of this
1164  act shall be legal investments for trustees, other fiduciaries,
1165  savings banks, trust companies and insurance companies organized
1166  under the laws of the State of Mississippi; and such bonds shall
1167  be legal securities which may be deposited with and shall be
1168  received by all public officers and bodies of the state and all
1169  municipalities and other political subdivisions thereof for the
1170  purpose of securing the deposit of public funds.

1171  **SECTION 27.**  The state hereby covenants with the registered
1172  owners of any bonds of any utility authority that so long as the
1173  bonds are outstanding and unpaid the state will not limit or alter
1174  the rights and powers of any utility authority under this act to
1175  conduct the activities referred to herein in any way pertinent to
1176  the interests of the bondholders, including, without limitation,
1177  such utility authority's right to charge and collect rates, fees,
1178  assessments and charges and to fulfill the terms of any covenants
1179  made with the registered owners of the bonds, or in any other way
1180  impair the rights and remedies of the registered owners of the
1181  bonds, unless provision for full payment of such bonds, by escrow

S. B. No. 2889
23/SS26/R699.2
PAGE 48 (cap\kr)                                        ~ OFFICIAL ~

1182  or otherwise, has been made pursuant to the terms of the bonds or
1183  the resolution, trust indenture or security interest securing the
1184  bonds.

1185  <u>**SECTION 28.**</u>  For the purposes of satisfying any temporary
1186  cash flow demands and deficiencies, and to maintain a working
1187  balance for the utility authority, the county, municipalities or
1188  public agencies within the geographic boundaries of the utility
1189  authority, or other persons, subject to their lawful authority to
1190  do so, are authorized to advance, at any time, such funds which,
1191  in its discretion, are necessary, or borrow such funds by issuance
1192  of notes, for initial capital contribution and to cover start-up
1193  costs until such times as sufficient bonds, assets and revenues
1194  have been secured to satisfy the needs of the utility authority
1195  for its management, operation and formation.  To this end, the
1196  county, municipality, public agency or person, subject to their
1197  lawful authority to do so, shall advance such funds, or borrow
1198  such funds by issuance of notes, under such terms and conditions
1199  as may be provided by resolution of the governing body, or other
1200  persons as defined in this act, subject to their lawful authority
1201  to do so, except that each such resolution shall state:
1202        (a)  The need for the proceeds advanced or borrowed;
1203        (b)  The amount to be advanced or the amount to be
1204  borrowed;

1205             (c)  The maximum principal amount of any note issued the
1206   interest rate or maximum interest rate to be incurred, and the
1207   maturity date of said note;

1208             (d)  In addition, the governing body, or other persons
1209   as defined in this act, subject to their lawful authority to do
1210   so, may arrange for lines of credit with any bank, firm or person
1211   for the purpose of providing an additional source of repayment for
1212   notes issued pursuant to this section.  Amounts drawn on a line of
1213   credit may be evidenced by negotiable or nonnegotiable notes or
1214   other evidences of indebtedness and contain such terms and
1215   conditions as the governing body, or other persons as defined in
1216   this act, subject to their lawful authority to do so, may
1217   authorize in the resolution approving the same;

1218             (e)  The governing body of the county, municipalities or
1219   other persons as defined in this act, subject to their lawful
1220   authority to do so, may authorize the repayment of such advances,
1221   notes, lines of credit and other debt incurred under this section,
1222   along with all costs associated with the same, including, but not
1223   limited to, rating agency fees, printing costs, legal fees, bank
1224   or trust company fees, line of credit fees and other charges to be
1225   reimbursed by the utility authority under such terms and
1226   conditions as are reasonable and are to be provided for by
1227   resolution of the governing body, or terms agreed upon with other
1228   persons as defined in this act, subject to their lawful authority
1229   to do so;

1230          (f)   In addition, the governing body of the county,
1231  municipality or public agency may lease or donate office space and
1232  equipment to the utility authority under such terms and conditions
1233  as are reasonable and are to be provided for by resolution of the
1234  governing body, or terms agreed upon by the utility authority.
1235      **SECTION 29.**   This act being necessary for the welfare of the
1236  state and its inhabitants shall be liberally construed to effect
1237  the purposes thereof. If any section, provision, paragraph,
1238  sentence, phrase, or word of this act shall be held invalid by any
1239  court of competent jurisdiction, the remainder of this act shall
1240  not be affected thereby.
1241      **SECTION 30.**   Sections 1 through 29 of this act shall be
1242  codified in Title 77, Mississippi Code of 1972.
1243      **SECTION 31.**   This act shall take effect and be in force from
1244  and after July 1, 2023.

ST:  Mississippi Capitol Region Utility Act;
create.                              ~ OFFICIAL ~

Mississippi State Senate
2023 Regular Session

YEAS AND NAYS On S. B. No. 2889. On motion of Senator Parker, the rules were suspended, the bill considered engrossed, read the third time and, the yeas and nays being taken, it passed, title standing as stated, by the following vote:

Yeas--Barrett, Blackwell, Boyd, Branning, Carter, Caughman, Chassaniol, Chism, DeBar, DeLano, England, Fillingane, Harkins, Hill, Johnson, Kirby, McCaughn, McDaniel, McLendon, McMahan, Michel, Moran, Parker, Polk, Seymour, Sojourner, Sparks, Suber, Tate, Thompson, Whaley, Wiggins, Williams, Younger. Total--34.

Nays--Barnett, Blackmon, Blount, Butler A. (36th), Butler K. (38th), Frazier, Hickman, Horhn, Jackson, Jordan, Norwood, Simmons D. T. (12th), Simmons S. (13th), Thomas, Turner-Ford. Total--15.

Absent and those not voting--Bryan, Hopson, Parks. Total--3.

DISCLAIMER

All information provided on the Mississippi Legislative Website is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.
The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

**Adopted**
**AMENDMENT NO 1 PROPOSED TO**

**Cmte Sub for Senate Bill No. 2889**

**BY: Senator(s) Parker**

**Amend by striking all after the enacting clause and inserting in lieu thereof the following:**

8       **SECTION 1.**   This act shall be known and may be cited as the
9    "Mississippi Capitol Region Utility Act."
10      **SECTION 2.**   (1)   The Mississippi Legislature finds the
11   following:
12            (a)   For the benefit of the citizens centrally located
13    in the State of Mississippi, including citizens residing or
14    working in the capital city of the State of Mississippi, it is
15    essential to have access to safe, clean and reliable water,
16    wastewater and storm water systems at affordable, regulated rates

23/SS08/SB2889A.J
PAGE 1

17  which are just, reasonable and provide an adequate amount of
18  capital to keep such systems in good repair;

19      (b)   The availability of safe, clean and reliable water,
20  wastewater and storm water has vast impacts on health, schools and
21  academic outcomes, crime and safety, state and local government
22  operations, businesses and economic development, the availability
23  of a workforce, tourism and many other critical areas;

24      (c)   The availability of safe, clean and reliable water,
25  wastewater and storm water systems requires significant financial
26  resources and human capital to engage in the planning,
27  acquisition, construction, maintenance, coordination and operation
28  required to deliver transparent and efficient services which meet
29  and exceed federal and state regulations and requirements;

30      (d)   On November 29, 2022, the Department of Justice
31  filed a complaint alleging that the City of Jackson has failed to
32  provide drinking water that is reliably compliant with the Safe
33  Drinking Water Act to citizens within the boundaries of the water
34  system.  The Department of Justice simultaneously filed a proposal
35  which would appoint a receiver, or an interim third-party manager,
36  to stabilize the City of Jackson's public drinking water system
37  and build confidence in the water system's ability to supply safe,
38  clean and reliable water to citizens within the boundaries of the
39  water system.  The U.S. District Court for the Southern District
40  of Mississippi appointed a receiver to oversee and operate the
41  water system on November 29, 2022.

42          (e)  The receiver appointed by the U.S. District Court
43   for the Southern District of Mississippi provided in his January
44   27, 2023, plan for the water system that he would like a concept
45   for future governance in place by September 30, 2023, and a
46   utility authority or corporate nonprofit entity are viable options
47   for the concept of future governance;

48          (f)  The creation and organization of a structure for
49   future governance requires legislation for it to continue in
50   perpetuity beyond the eventual end of the receiver's work and
51   related federal court orders; and

52          (g)  The creation and organization of a structure for
53   future governance prior to the date of the conclusion of the
54   receiver's work will allow the best opportunity for minimal
55   disruption in water, wastewater and storm water service and
56   maximum ease of transition after the receiver has concluded his
57   work in overseeing and operating the water system.

58     (2)  Therefore, it is the intent of the Mississippi
59   Legislature to:

60          (a)  Provide authority to the Mississippi Capitol Region
61   Utility Authority to transfer water, wastewater and storm water
62   services provided by the City of Jackson to the utility
63   authority's ownership, management and control when the
64   court-appointed receiver's work concludes with the water system to
65   ensure all citizens have access to safe, clean and reliable water,
66   wastewater and storm water systems at affordable, regulated rates

67  which are just, reasonable and provide an adequate amount of
68  capital to keep such systems in good repair; and
69          (b)  Partner with the Mississippi Department of Health,
70  Mississippi Department of Environmental Quality, local
71  governments, including the City of Jackson, within the boundaries
72  of the utility district, and any other federal, state or local
73  entity in taking any action necessary under this act to ensure all
74  citizens have access to safe, clean and reliable water, wastewater
75  and storm water systems, with the understanding that federal and
76  state agencies are solely responsible for regulating, but not
77  operating, the utility authority.
78      **SECTION 3.**  As used in this act, the following words and
79  phrases have the meanings ascribed herein, unless the context
80  clearly indicates otherwise:-
81          (a)  "Act" means the Mississippi Capitol Region Utility
82  Act.
83          (b)  "Board" means the Board of Directors of the
84  Mississippi Capitol Region Utility Authority.
85          (c)  "Bonds" means revenue bonds and other certificates
86  of indebtedness of the authority issued under the provisions of
87  this act.
88          (d)  "Fiscal year" means the period of time beginning on
89  July 1 of each year and ending on June 30 of each year.
90          (e)  "Major procurement" means the procurement of any
91  good or service in excess of One Million Dollars ($1,000,000.00).

23/SS08/SB2889A.J
PAGE 4

92     (f)  "Municipality" means any incorporated city, town or
93  village of the State of Mississippi, whether operating under
94  general law or special charter.

95     (g)  "Person" means the State of Mississippi, a county,
96  a municipality, any state agency or any other city, town, village
97  or political subdivision or governmental agency or instrumentality
98  of the State of Mississippi or of the United States of America, or
99  any private utility, individual, copartnership, association, firm,
100  trust, estate or any other entity whatsoever.

101     (h)  "Project" means the construction, development or
102  acquisition by the utility authority of any infrastructure for
103  water, wastewater and storm water systems or services and includes
104  upgrading or repair of existing systems.

105     (i)  "Public agency" means any county, municipality,
106  state board or utility authority owning or operating properties,
107  districts created pursuant to the general laws or local and
108  private laws of the State of Mississippi, or any other political
109  subdivision of the State of Mississippi possessing the power to
110  own and operate waterworks, water supply systems, sewerage
111  systems, sewage treatment systems or other facilities or systems
112  for the collection, transportation and treatment of water,
113  wastewater, and storm water.

114     (j)  "Receiver" means the interim third-party manager
115  for the water system owned by the City of Jackson who was
116  appointed by the U.S. District Court for the Southern District of

117 Mississippi on November 29, 2022, to oversee and operate the water
118 system during the negotiation of a consent decree related to
119 compliance with the Safe Drinking Water Act and other laws.

120     (k)   "Storm water" means any flow occurring during or
121 following any form of natural precipitation and resulting from
122 that precipitation.

123     (l)   "System" or "systems" means any plants, structures,
124 facilities and other real and personal property used or useful in
125 the generation, storage, transportation or supply of water, and
126 the collection, transportation, treatment or disposal of
127 wastewater and storm water, including tanks, lakes, streams,
128 ponds, pipes, trunk lines, mains, sewers, conduits, pipelines,
129 pumping and ventilating stations, plants, works, connections and
130 any other real or personal property and rights therein necessary,
131 useful or convenient for the purposes of the utility board or
132 authorities in connection therewith.

133     (m)   "Utility authority" shall mean the Mississippi
134 Capitol Region Utility Authority.

135     (n)   "Wastewater" means water being disposed of by any
136 person and which is contaminated with waste or sewage, including
137 industrial, municipal, and any other wastewater that may cause
138 impairment of the quality of waters in the state.

139     (o)   "Water" means potable water, surface water and
140 groundwater.

141  **SECTION 4.**  (1)  There is hereby created and established a
142  corporate nonprofit known as the Mississippi Capitol Region
143  Utility Authority.  The authority will be composed of geographic
144  areas receiving water, wastewater and storm water services from
145  the City of Jackson as of the date of enactment of this act for
146  the planning, acquisition, construction, maintenance, operation
147  and coordination of water, wastewater and storm water systems in
148  order to ensure the delivery of water, wastewater and storm water
149  services to citizens.  Such utility authority is created solely to
150  accomplish the purposes of the State under this act and the
151  exercise by the utility authority of the powers conferred by this
152  act shall be deemed and held to be the performance of an essential
153  public function promoting the health, welfare and prosperity of
154  the general public.  It is the intent of the Legislature that the
155  utility authority shall be accountable to ratepayers within the
156  systems through the audits, reports and disclosures required by
157  this act.

158      (2)  The existence of the corporate nonprofit utility
159  authority, which shall be domiciled in the State of Mississippi,
160  shall begin upon the appointment of a majority of its board as
161  provided in Section 5 of this act.

162      (3)  The utility authority shall assume ownership, management
163  and control over the water, wastewater and storm water systems on
164  the date of termination of the receiver by the U.S. District Court
165  for the Southern District of Mississippi.

166         (4)   In the event of any action or matter against the utility
167   authority, the Chief Justice of the Mississippi Supreme Court
168   shall select an appropriate Circuit or Chancery Court, which shall
169   have exclusive jurisdiction over the matter.   For purposes of
170   court costs, the utility authority shall be a private corporation.
171         (5)   All funds provided by the federal government in H.R.
172   2617, the Consolidated Appropriations Act of 2023, and any other
173   funds provided by the state or federal government in response to
174   the water crisis detailed by the U.S. District Court for the
175   Southern District of Mississippi in Case No. 3:22-cv-00686, *United*
176   *States v. City of Jackson*, shall be spent according to the
177   direction of the receiver and federal court within the service
178   territory impacted by the water crisis and in accordance with
179   federal law.
180   **SECTION 5.**   (1)   The affairs of the utility authority shall
181   be administered by the Mississippi Capitol Region Utility
182   Authority Board of Directors.   The board shall be composed of nine
183   (9) members to be selected as follows:   the Mayor of the City of
184   Jackson, with the advice and consent of the Senate, shall appoint
185   four (4) members.   The Governor, with the advice and consent of
186   the Senate, shall appoint three (3) members.   The Governor shall
187   consult with the City of Byram to appoint one (1) of the three (3)
188   appointments, so long as the City of Byram is included within the
189   boundaries of the systems.   The Lieutenant Governor, with the
190   advice and consent of the Senate, shall appoint two (2) members.

191  The Lieutenant Governor shall consult with the Mayor of the City

192  of Ridgeland to appoint one (1) of their two (2) appointments, so

193  long as the City of Ridgeland is included within the boundaries of

194  the systems.  All members shall be appointed within sixty (60)

195  days of the enactment of this act.

196      In the appointment process, appointing authorities shall

197  attempt to see that all portions of society and its diversity are

198  represented in members of the utility authority.  All appointed

199  members must be residents of the State of Mississippi, must be

200  ratepayers within the system boundaries, and must have

201  significant, demonstrated experience in business management,

202  fiscal affairs, public health or public utilities.

203      (2)  The initial terms of the board of directors shall be as

204  follows:  One (1) member appointed by the Mayor of the City of

205  Jackson shall serve for an initial term of four (4) years.  One

206  (1) member appointed by the Mayor of the City of Jackson shall

207  serve for an initial term of three (3) years.  One (1) member

208  appointed by the Mayor of the City of Jackson shall serve for an

209  initial term of two (2) years.  One (1) member appointed by the

210  Mayor of the City of Jackson shall serve for an initial term of

211  one (1) year.  The Governor shall appoint one (1) member for a

212  term of four (4) years, one (1) member for a term of three (3)

213  years, and one (1) member for a term of two (2) years.  The

214  Lieutenant Governor shall appoint one (1) member for a term of

215  four (4) years and one (1) member for a term of three (3) years.

216     (3)  Except as provided in Subsection 2 of this section,
217 appointments shall be for a term of four (4) years.  Each member
218 shall hold office until his successor has been appointed and
219 qualified.  Vacancies shall be filled by appointment by the
220 appropriate appointing authority, subject to the advice and
221 consent of the Senate, for the length of the unexpired term only.
222 Any member of the utility authority shall be eligible for
223 reappointment for a maximum of two (2) full terms.  Each member of
224 the utility authority shall, before entering upon his duty, take
225 an oath of office to administer the duties of his office
226 faithfully and impartially, and a record of such oath shall be
227 filed in the Office of the Secretary of State.  The utility
228 authority shall annually elect from its membership a chairman and
229 vice chairman who shall be eligible for reelection.  The utility
230 authority shall also elect or appoint, and prescribe the duties
231 of, such other officers, who need not be members, as the utility
232 authority deems necessary or advisable and the utility authority
233 shall fix the compensation of such officers.  The utility
234 authority may delegate to one or more of its members, officers,
235 employees or agents such powers and duties as it may deem proper,
236 not inconsistent with this article or other provisions of law.
237     (4)  The members of the utility authority shall serve without
238 salary, but shall be entitled to receive per diem pay as provided
239 in Section 25-3-69, plus travel and necessary expenses, including
240 mileage, as provided in Section 25-3-41, incurred while in the

23/SS08/SB2889A.J
PAGE 10

241  performance of his or her duties as a member of the board of
242  directors of the utility authority upon authorization by the
243  board.  Expenses shall be paid from the available funds of the
244  utility authority after the utility authority assumes ownership,
245  management and control of the water, wastewater and storm systems
246  as provided in this act.  Until the date the utility authority
247  assumes ownership, management and control of the water, wastewater
248  and stormwater systems as provided in this act, expenses shall be
249  paid by the State of Mississippi.

250      (5)  All meetings of the board shall be subject to the Open
251  Meetings Act in Section 25-41-1 et seq.  The chairman or a
252  majority of members of the utility authority may convene the board
253  for a meeting.

254      (6)  Except as may be provided by law, all records of the
255  utility authority shall be deemed public records and subject to
256  public inspection as provided by Section 25-61-1 et seq.

257      (7)  The board may by majority vote excuse the absence of any
258  member of the board.  In the event that any member of the board is
259  absent for two (2) board meetings in a twelve-month period without
260  such absences being excused by the board, his or her membership on
261  the board shall be terminated as a function of law, without any
262  action by the board, and the removed member of the board shall be
263  ineligible for reappointment to the board.  The original
264  appointing authority shall retain their right to appoint a new
265  board member to replace the removed board member.

266        (8)  No employee of the utility authority shall be a member
267   of the board.

268        (9)  Until such time that the utility district assumes
269   ownership, management, and control of the water, wastewater and
270   storm water systems, the board shall cooperate and coordinate with
271   the receiver in order to provide the best opportunity for minimal
272   disruption in service and maximum ease of transition after the
273   receiver has concluded his work in overseeing and operating the
274   water system.

275   **SECTION 6.**   (1)  The utility authority shall consult with the
276   receiver and the City of Jackson in appointing a president by
277   January 1, 2024, who shall serve at the will and pleasure of the
278   board.  If the utility authority does not have ownership,
279   management, and control of the water, wastewater and storm water
280   systems by the date of the appointment of a president, the State
281   of Mississippi shall pay the salary of the president on a
282   bimonthly basis.  The president shall manage the daily affairs of
283   the utility authority and shall have such powers and duties as
284   specified by this act, by the board, and any rules or regulations
285   adopted by the board.  The president shall not be a member of the
286   board.  The president shall serve at the will and pleasure of the
287   board.

288        (2)  Until such time that the utility district assumes
289   ownership, management, and control of the water, wastewater and
290   storm water systems, the president shall cooperate and coordinate

23/SS08/SB2889A.J
PAGE 12

291  with the receiver in order to provide the best opportunity for
292  minimal disruption in service and maximum ease of transition after
293  the receiver has concluded his work in overseeing and operating
294  the water system.

295      (3)   The president shall employ such personnel as he or she
296  deems necessary.  All personnel shall serve at the will and
297  pleasure of the president, unless otherwise specified by the
298  president.

299      (4)   The board shall set the salary of the president at such
300  level as is necessary to recruit and retain a qualified
301  professional with the expertise necessary in a public utility.
302  The board may authorize whatsoever incentive compensation program
303  for the president and utility authority staff as it deems
304  necessary and proper.  The utility authority shall be exempt from
305  the provisions of Section 25-3-39.

306  **SECTION 7.**  (1)  The utility authority shall have the power,
307  duty and responsibility to exercise general supervision over the
308  design, construction, operation and maintenance of water,
309  wastewater and storm water systems.

310      (2)   The utility authority shall adopt rules and regulations
311  regarding the design, construction or installation, operation and
312  maintenance of water, wastewater and storm water systems.

313      (3)   The utility authority shall adopt rules and regulations
314  regarding the use of decentralized treatment systems, individual

315  on-site wastewater treatment systems and centralized wastewater
316  treatment systems.

317     (4)  The utility authority shall adopt rules establishing
318  performance standards for water, wastewater and storm water
319  systems and the operation and maintenance of the same.  Such rules
320  and regulations shall include the implementation of a standard
321  application form for the installation, operation and maintenance
322  of such systems; application review; approval or denial procedures
323  for any proposed system; inspection, monitoring and reporting
324  guidelines; and enforcement procedures.

325     (5)  (a)  Before a building or development which requires the
326  installation of a water, wastewater or storm water system is
327  constructed, the system must be submitted to the utility authority
328  for certification that the system complies with the utility
329  authority requirements for such system.

330       (b)  Before approving or renewing a water, wastewater or
331  storm water related permit for a system within a utility
332  authority, the state agency must require certification that the
333  system complies with the requirements of the utility authority.

334     (6)  Any system of any municipality, public agency or other
335  persons which contracts with a utility authority shall be subject
336  to the terms of that contract and the terms of this act.

337     (7)  Notwithstanding the provisions of Section 51-39-1 et
338  seq., the utility authority shall have the full power to adopt
339  rules and regulations and to construct, maintain, lease and

340  operate facilities for the control of storm water quality and
341  quantity.  In addition, the provisions of Section 51-33-1 relating
342  to drainage districts and flood control districts do not apply to
343  the utility authority.

344       (8)  The utility authority may control and operate the local
345  retail water, wastewater or storm water services and may provide
346  or be responsible for direct servicing of those services to
347  residences, businesses and individuals; however, the utility
348  authority shall not provide the same service in an area provided
349  by a public utility or person holding a certificate of public
350  convenience and necessity issued by the Mississippi Public Service
351  Commission for the provision of such services in the certificated
352  area.

353       (9)  The utility authority shall enter into contracts for
354  major procurements after bidding.  The utility authority may adopt
355  administrative rules and regulations pursuant to the provisions of
356  this act providing for special procedures whereby the utility
357  authority may make any class of procurement.

358       (10)  In its bidding processes, the utility authority may do
359  its own bidding and procurement or may utilize the services of the
360  Department of Finance and Administration, the Department of
361  Information Technology Services or other state agencies as
362  appropriate and necessary.

363       (11)  The utility authority shall only have oversight or
364  control of wastewater service provided to ratepayers in the City

365 of Ridgeland, which is only served by the wastewater system as of
366 the effective date of this act.  To maintain consistency with the
367 agreement in place with the City of Jackson prior to the existence
368 of the utility authority, the City of Ridgeland shall have control
369 over its rate structure, with the City of Ridgeland compensating
370 the utility authority for its prorated share of wastewater
371 conveyance, treatment, capital improvements and debt service.

372 **SECTION 8.**  (1)  The utility authority, in addition to any
373 other powers granted under any other provision of law is
374 authorized:

375         (a)  To acquire, construct, improve, enlarge, extend,
376 repair, operate and maintain one or more of its systems used for
377 the collection, transportation, treatment and disposal of water,
378 wastewater and storm water;

379         (b)  To make contracts with any person in furtherance
380 thereof; and to make contracts with any person, under the terms of
381 which the utility authority will collect, transport, treat or
382 dispose of water, wastewater and storm water for such person, and
383 to cancel any contracts existing as of the date of enactment of
384 this act;

385         (c)  To make contracts with any person to design and
386 construct any water, wastewater and storm water systems or
387 facilities, and thereafter to purchase, lease or sell, by
388 installments over such terms as may be deemed desirable,

389   reasonable and necessary, or otherwise, any such system or
390   systems;

391          (d)   To enter into operating agreements with any person,
392   for such terms and upon such conditions as may be deemed
393   desirable, for the operation of any water, wastewater and storm
394   water systems; and the utility authority may lease to or from any
395   person, for such term and upon such conditions as may be deemed
396   desirable, any water, wastewater and storm water collection,
397   transportation, treatment or its other facilities or systems.  Any
398   such contract may contain provisions requiring any public agency
399   or other person to regulate the quality and strength of materials
400   to be handled by the respective system or systems and also may
401   provide that the utility authority shall have the right to use any
402   streets, alleys and public ways and places within the jurisdiction
403   of a public agency or other person during the term of the
404   contract;

405          (e)   To enter into contracts with any person or any
406   public agency, including, but not limited to, contracts authorized
407   by this act, in furtherance of any of the purposes authorized
408   under this act upon such consideration as the board of directors
409   and such person may agree.  Any such contract may extend over any
410   period of time, notwithstanding any provision or rule of law to
411   the contrary; may be upon such terms and for such consideration,
412   nominal or otherwise, as the parties thereto shall agree; and may
413   provide that it shall continue in effect until bonds specified

414  therein, refunding bonds issued in lieu of such bonds, and all
415  other obligations specified therein are paid or terminated.  Any
416  such contract shall be binding upon the parties thereto according
417  to its terms;

418         (f)  To sue and be sued, in its own name, and to enjoy
419  all of the protections, immunities and benefits provided by the
420  Mississippi Tort Claims Act, Section 11-46-1 et seq., as it may be
421  amended or supplemented from time to time;

422         (g)  To maintain office space at such place or places
423  within the utility authority's boundaries as it may determine;

424         (h)  To invest money of the utility authority, including
425  proceeds from the sale of any bonds subject to any agreements with
426  bondholders, on such terms and in such manner as the utility
427  authority deems proper;

428         (i)  To pay any outstanding City of Jackson bonds
429  relating to the water and sewer systems under their existing
430  terms;

431         (j)  To require the necessary relocation or rerouting of
432  roads and highways, railroad, telephone and telegraph lines, and
433  properties, electric power lines, gas pipelines and related
434  facilities, or to require the anchoring or other protection of any
435  of these, provided fair compensation is first paid to the owners
436  or an agreement with such owners regarding the payment of the cost
437  of such relocation, and to acquire easements or rights-of-way for
438  such relocation or rerouting and to convey the same to the owners

439  of the property being relocated or rerouted in connection with the
440  purposes of this act.  This provision shall be in accordance with
441  Mississippi Constitution Article 17A, Section 11-27-30, and House
442  Bill No. 1769 as passed during the 2022 Legislative Session;

443          (k)  To acquire, construct, improve or modify, to
444  operate or cause to be operated and maintained, either as owner of
445  all or of any part in common with others, any water, wastewater or
446  storm water system within the utility authority's service area.
447  The utility authority may pay all or part of the cost of any
448  system from any contribution by persons, firms, public agencies or
449  corporations.  The utility authority may receive, accept and use
450  all funds, public or private, and pay all costs of the
451  development, implementation and maintenance as may be determined
452  as necessary for any project;

453          (l)  To acquire, in its own name, by purchase on any
454  terms and conditions and in any manner as it may deem proper,
455  property for public use, or by gift, grant, lease, or otherwise,
456  real property or easements therein, franchises and personal
457  property necessary or convenient for its corporate purposes.  This
458  provision shall be in accordance with Mississippi Constitution
459  Article 17A, Section 11-27-30, and House Bill No. 1769 as passed
460  during the 2022 Legislative Session;

461          (m)  To acquire insurance for the utility authority's
462  systems, facilities, buildings, treatment plants and all property,

463 real or personal, to insure against all risks as any insurance
464 may, from time to time, be available;

465         (n)  To use any property and rent or lease any property
466 to or from others, including public agencies, or make contracts
467 for the use of the property.  The utility authority may sell,
468 lease, exchange, transfer, assign, pledge, mortgage or grant a
469 security interest for any property.  The powers to acquire, use
470 and dispose of property as set forth in this paragraph shall
471 include the power to acquire, use and dispose of any interest in
472 that property, whether divided or undivided.  Title to any
473 property of the utility authority shall be held by the utility
474 authority exclusively for the benefit of the public;

475         (o)  To apply, contract for, accept, receive and
476 administer gifts, grants, appropriations and donations of money,
477 materials and property of any kind, including loans and grants
478 from the United States, the state, a unit of local government, or
479 any agency, department, district or instrumentality of any of the
480 foregoing, upon any terms and conditions as the United States, the
481 state, a unit of local government, or any agency, department,
482 district or instrumentality shall impose.  The utility authority
483 may administer trusts.  The utility authority may sell, lease,
484 transfer, convey, appropriate and pledge any and all of its
485 property and assets;

486         (p)  To make and enforce, and from time to time amend
487 and repeal, bylaws, rules, ordinances and regulations for the

488  management of its business and affairs and for the construction,
489  use, maintenance and operation of any of the systems under its
490  management and control;

491        (q)  To employ and terminate staff and other personnel,
492  including attorneys, engineers and consultants as may be necessary
493  to the functioning of the utility authority;

494        (r)  To establish and maintain rates, fees and any other
495  charges for services and the use of systems and facilities within
496  the control of the utility authority, and from time to time, to
497  adjust such rates, fees and any other charges to the end that the
498  revenues therefrom will be sufficient at all times to pay the
499  expenses of operating and maintaining of the facilities and
500  treatment systems and all of the persons' obligations under any
501  contract or bonds resolution with respect thereto or any
502  obligation of any person under any agreement, contract, indenture
503  or bonds resolution with respect thereto.  Such rates, fees,
504  assessments and any other charges shall be subject to the
505  jurisdiction of the Mississippi Public Service Commission.  Such
506  rates, fees, assessments or any other charges shall be equal as
507  levied on citizens throughout the utility authority's boundaries.
508  For purposes of Section 77-3-33, the rates charged by the utility
509  authority shall be just and reasonable if they are adequate to
510  provide safe and reliable water, wastewater and storm water
511  service to its customers, including providing an adequate amount
512  of capital for the utility authority to perform such repairs,

23/SS08/SB2889A.J
PAGE 21

513  upgrades and improvements as it deems necessary on an ongoing
514  basis.  The Mississippi Public Service Commission shall defer to
515  the utility authority's determination of what rates are just and
516  reasonable absent a showing of manifest error;

517        (s)   To adopt rules and regulations necessary to
518  accomplish the purposes of the utility authority and to assure the
519  payment of each participating person or public agency of its
520  proportionate share of the costs for use of any of the systems and
521  facilities of the utility authority and for the utility
522  authority's proportionate share of the costs of the board;

523        (t)   To enter on public or private lands, waters or
524  premises for the purpose of making surveys, borings or soundings,
525  or conducting tests, examinations or inspections for the purposes
526  of the authority, subject to responsibility for any damage done to
527  property entered;

528        (u)   To accept industrial wastewater from within the
529  boundaries of the utility authority for treatment and to require
530  the pretreatment of same when, in the opinion of the utility
531  authority, such pretreatment is necessary;

532        (v)   To control and operate local retail water,
533  wastewater and storm water services, and may provide or be
534  responsible for direct servicing of those services to residences,
535  businesses and individuals; however, the utility authority shall
536  not provide the same services in an area provided by a public
537  utility or person holding a certificate of public convenience and

538  necessity issued by the Mississippi Public Service Commission for
539  the provision of such services in the certificated area;
540      (w)  To assume control and administer, within the
541  utility authority's jurisdiction, any water, wastewater or storm
542  water system or systems by agreement or contract with any person
543  if the person providing such services requests to be relieved of
544  that responsibility.  However, the person may maintain control
545  over connections in their service areas and may charge rates, fees
546  and any other charges in addition to the rates, fees and any
547  charges of the utility authority;
548      (x)  To acquire property designated by plan to
549  sufficiently accommodate the location of water, wastewater or
550  storm water systems and such requirements related directly thereto
551  pursuant to the provisions of Title 11, Chapter 27, Mississippi
552  Code of 1972.  The utility authority may acquire property
553  necessary for any system and the exercise of the powers, rights
554  and duties conferred upon the utility authority by this act.  No
555  person owning the drilling rights or the right to share in
556  production shall be prevented from exploring, developing or
557  producing oil or gas with necessary rights-of-way for ingress and
558  egress, pipelines and other means of transporting such interests
559  on any lands or interest of the utility authority held or used for
560  the purposes of this act, but any such activities shall be subject
561  to reasonable regulations by the board of directors that will
562  adequately protect the systems or projects of the utility

563    authority.  This provision shall be in accordance with Mississippi
564    Constitution Article 17A and House Bill No. 1769 as passed during
565    the 2022 Legislative Session;

566         (y)  To use any legally available funds to acquire,
567    rebuild, operate and maintain any existing water, wastewater or
568    storm water systems owned or operated by any person;

569         (z)  To refuse to receive water, wastewater or storm
570    water from any public agency or person, except with regard to
571    municipalities or other areas within the service territory of the
572    systems as of the effective date of this act;

573         (aa)  So long as any indebtedness on the systems of the
574    utility authority remains outstanding, to require a member public
575    agency, or other person, that all water, wastewater and storm
576    water within the boundaries of the respective utility authority be
577    disposed of through the appropriate treatment system to the extent
578    that the same may be available, but no public agency shall be
579    precluded from constructing, operating and maintaining its own
580    such system after the current indebtedness owing on the system as
581    of the date of enactment of this act, is paid in full; and

582         (bb)  To adopt a seal and a symbol, and hold patents,
583    copyrights, trademarks, and service marks and enforce its rights
584    with respect thereto.

585    (3)  The utility authority shall:

586         (a)  Submit annual reports to the Governor, Lieutenant
587    Governor, Speaker of the House of Representatives, State Auditor,

23/SS08/SB2889A.J
PAGE 24

588  Joint Legislative Committee on Performance Evaluation and
589  Expenditure Review and the governing authorities of any
590  municipality whose citizens are within the utility authority's
591  boundaries regarding the water quality and financial conditions of
592  such system or systems, as well as a schedule of currently planned
593  repairs, upgrades or improvements planned by the utility
594  authority;

595          (b)   Immediately submit to the Governor, Lieutenant
596  Governor, Speaker of the House of Representatives and the
597  governing authorities of any municipality whose citizens are
598  within the utility authority's boundaries any information received
599  from the Mississippi State Department of Health or Department of
600  Environmental Quality or other state or federal regulatory
601  agencies regarding the condition of a transferred eligible
602  municipal system.  The utility authority, in addition to abiding
603  by any other federal or state reporting requirements, must also
604  report such information to the public on its website and to
605  individuals residing within the municipality as required by
606  federal or state law;

607          (c)   Publish audited annual financial statements, which
608  shall be made available to the public.  The annual financial
609  statements shall include disposition of all funds expended by the
610  Utility authority for any purpose.  Quarterly financial statements
611  shall be made available to the public by posting on the utility
612  authority's website;

613          (d)  Adopt by administrative rules and regulations a
614  system of continuous internal audits;

615          (e)  Adopt by administrative rules and regulations a
616  code of ethics for officers and employees of the utility authority
617  to carry out the standards of conduct established by this act; and

618          (f)  Adopt by administrative rules and regulations
619  guidelines for the disposal of property if the utility authority
620  is dissolved.  Such administrative rules and regulations shall
621  include that ownership, management and control of the systems
622  shall revert to the City of Jackson.

623  **SECTION 9.**  (1)  The president, as executive director of the
624  utility authority, if so appointed by the utility authority, shall
625  direct and supervise all administrative and technical activities
626  in accordance with the provisions of this act, within the
627  administrative rules and regulations adopted by the board, and in
628  accordance with industry practice.  The president shall:

629          (a)  Supervise and administer or contract for the
630  supervision and administration of the water, wastewater and storm
631  water systems owned, managed or controlled by the utility
632  authority.

633          (b)  Employ and direct such personnel as may be
634  necessary to carry out the purposes of this act and utilize such
635  services, personnel or facilities of the utility authority as he
636  or she may deem necessary.

637          (c)  Make available for inspection by the board or any
638     member of the board or the Governor, Lieutenant Governor, Speaker
639     of the House or the governing authorities of any municipality
640     whose citizens are served by the utility authority, upon request,
641     all books, records, files and other information and documents of
642     his or her office and advise the board and recommend such
643     administrative rules and regulations and other matters he or she
644     deems necessary and advisable to improve the operation and
645     administration of the utility authority.

646          (d)  Attend meetings of the board or appoint a designee
647     to attend on his or her behalf.

648          (e)  Not later than thirty (30) days before the
649     beginning of the utility authority's fiscal year, submit the
650     proposed annual budget of the utility authority to the board for
651     review and approval.  This shall include a schedule of planned
652     repairs, upgrades or improvements to the systems and the
653     anticipated capital cost of each.  In addition, the proposed
654     annual budget of the utility authority shall include a personnel
655     table reporting information for each full-time and part-time
656     permanent position, as follows:

657          (i)  The position title and the salary for each
658     position in the existing operating budget for the current fiscal
659     year, indicating whether each position is filled or vacant as of
660     the reporting date; and

661           (ii)  The position title and the salary recommended
662      for each position for the next fiscal year.
663           (f)  The president shall require bond of Fifty Thousand
664      Dollars ($50,000.00) from employees with access to funds or in
665      such an amount as provided in the administrative rules and
666      regulations of the board.
667      (2)  The president may:
668           (a)  Require bond from other employees as he or she
669      deems necessary;
670           (b)  For good cause, and with approval from the majority
671      of the board, suspend, revoke or refuse to renew any contract
672      entered into in accordance with this act or the administrative
673      rules and regulations of the board; and
674           (c)  Upon specific or general approval of the board,
675      enter into personal service contracts pursuant to administrative
676      rules and regulations adopted by the board and compensate such
677      consultants and technical assistants as may be required to carry
678      out the provisions of this act.
679      (3)  Agencies, departments or units of state government,
680      including, but not limited to, the Mississippi Department of
681      Health and the Mississippi Department of Environmental Quality,
682      shall cooperate with the utility authority to regulate the utility
683      authority and assure the effective operation of the utility
684      authority's systems, with the understanding that such agencies act
685      as a regulator and not operator of such systems.  All state

686  officers are hereby empowered and required to render such services
687  to the utility authority within their respective functions as may
688  be requested by the utility authority.

689  **SECTION 10.**  Employees of the utility authority shall serve
690  at the will and pleasure of the president who shall determine
691  their compensation and benefits.  The compensation of officers at
692  the division head level and above shall be determined by the
693  board.

694  **SECTION 11.**  Neither the directors of the utility authority,
695  the board, its employees, nor any person or persons acting on
696  their behalf, while acting within the scope of their authority,
697  shall be subject to personal liability resulting from carrying out
698  any of the powers granted herein in accordance with his or her
699  good-faith belief that he or she is acting in the best interests
700  of the utility authority.

701  **SECTION 12.**  (1)  The utility authority shall enter into its
702  contracts for major procurements after a competitive and open
703  procurement process.  The utility authority may adopt
704  administrative rules and regulations pursuant to the provisions of
705  this act providing for special procedures whereby the utility
706  authority may make any class of procurement.  The utility
707  authority shall endeavor to ensure the transparency and
708  competitiveness of procurements of all sizes.

709  (2)  In its bidding processes, the utility authority may do
710  its own bidding and procurement or may utilize the services of

23/SS08/SB2889A.J
PAGE 29

711  other state agencies as appropriate and necessary.  The president
712  may, with the approval of a majority of the board, declare an
713  emergency for purchasing purposes which shall be governed by the
714  administrative rules and regulations adopted by the board.
715      **SECTION 13.**  All monies received by the utility authority
716  shall be deposited into an operating account.  Such account shall
717  be established in a custodian financial institution domiciled in
718  the State of Mississippi, insured by the Federal Deposit Insurance
719  Corporation and collateralized as prescribed by Section 27-105-5.
720      **SECTION 14.**  All division heads, officers and employees of
721  the utility authority shall be considered public servants as
722  defined in Section 25-4-103.  All division heads and officers of
723  the utility authority are subject to Section 25-4-25 and shall be
724  required to file a Statement of Economic Interest with the
725  Mississippi Ethics Commission.
726      **SECTION 15.**  (1)  Any public agency or person, pursuant to a
727  duly adopted resolution of the governing body of such public
728  agency or person, may enter into contracts with the utility
729  authority under the terms of which the utility authority will
730  manage, operate and contract for usage of its systems and
731  facilities, or other services, for such person or public agency.
732      (2)  Any public agency or person may enter into contracts
733  with the utility authority for the utility authority to purchase
734  or sell, by installments over such terms as may be deemed
735  desirable, or otherwise, to any person or any systems.  Any public

736  agency may sell, donate, convey, or otherwise dispose of water,
737  wastewater and storm water facilities or systems; or any
738  equipment, personal property or any other things, deemed necessary
739  for the construction, operation, and maintenance to the utility
740  authority without the necessity of appraisal, advertising, or
741  bidding.  This section creates an alternative method of disposal
742  of public property.

743      (3)  Any public agency is authorized to enter into operating
744  agreements with the utility authority, for such terms and upon
745  such conditions as may be deemed desirable, for the operation of
746  any of its systems of any person by the utility authority or by
747  any person contracting with the utility authority to operate such
748  systems.

749      (4)  Any public agency may lease to or from the utility
750  authority, for such term and upon such conditions as may be deemed
751  desirable, any of its systems.

752      (5)  Any municipality or county may donate office space,
753  equipment, supplies, and materials to the utility authority.

754      (6)  Any such contract may contain provisions requiring any
755  public agency or other person to regulate the quality and strength
756  of the material to be handled by the wastewater or storm water
757  systems and may also provide that the utility authority shall have
758  the right to use any streets, alleys and public ways and places
759  within the jurisdiction of a public agency or other person during
760  the term of the contract.  Such contracts may obligate the public

23/SS08/SB2889A.J
PAGE 31

761  agency to make payments to the utility authority or to a trustee
762  in amounts which shall be sufficient to enable the utility
763  authority to defray the expenses of administering, operating and
764  maintaining its respective systems, to pay interest and principal
765  (whether at maturity upon redemption or otherwise) on bonds of the
766  utility authority, issued under this act and to fund reserves for
767  debt service, for operation and maintenance and for renewals and
768  replacements, to fulfill the requirements of any rate covenant
769  with respect to debt service coverage contained in any resolution,
770  trust indenture or other security agreement relating to the bonds
771  of the utility authority issued under this act or to fulfill any
772  other requirement relating to bonds issued pursuant to this act.

773       (7)  Any public agency shall have the power to enter into
774  such contracts with the utility authority as in the discretion of
775  the governing body of the public agency would be in the best
776  interest of the public agency.  Such contracts may include a
777  pledge of the full faith and credit of such public agency and/or
778  the avails of any special assessments made by such public agency
779  against property receiving benefits, as now or hereafter are
780  provided by law.  Any such contract may provide for the sale, or
781  lease to, or use of by the utility authority, of the systems or
782  any part thereof, of the public agency; and may provide that the
783  utility authority shall operate its systems or any part thereof of
784  the public agency; and may provide that any public agency shall
785  have the right to continued use and/or priority use of the systems

786 or any part thereof during the useful life thereof upon payment of
787 reasonable charges therefor; and may contain provisions to assure
788 equitable treatment of persons or public agencies who contract
789 with the utility authority under this act; and may contain such
790 other provisions and requirements as the parties thereto may
791 determine to be appropriate or necessary.  Such contracts may
792 extend over any period of time, notwithstanding any provisions of
793 law to the contrary, and may extend beyond the life of the
794 respective systems or any part thereof or the term of the bonds
795 sold with respect to such facilities or improvements thereto.
796     (8)  The obligations of a public agency arising under the
797 terms of any contract referred to in this act, whether or not
798 payable solely from a pledge of revenues, shall not be included
799 within the indebtedness limitations of the public agency for
800 purposes of any constitutional or statutory limitation or
801 provision.  To the extent provided in such contract and to the
802 extent such obligations of the public agency are payable wholly or
803 in part from the revenues and other monies derived by the public
804 agency from the operation of its systems or of its combined
805 systems, or any part thereof, such obligations shall be treated as
806 expenses of operating such systems.
807     (9)  Contracts referred to in this section may also provide
808 for payments in the form of contributions to defray the cost of
809 any purpose set forth in the contracts and as advances for the
810 respective systems or any part thereof subject to repayment by the

811  utility authority.  A public agency may make such contributions or
812  advances from its general fund or surplus fund or from special
813  assessments or from any monies legally available therefor.

814       (10)  Subject to the terms of a contract or contracts
815  referred to in this act, the utility authority is hereby
816  authorized to do and perform any and all acts or things necessary,
817  convenient or desirable to carry out the purposes of such
818  contracts, including the fixing, charging, collecting, maintaining
819  and revising of rates, fees and other charges for the services
820  rendered to any user of any of the systems operated or maintained
821  by the utility authority, whether or not such systems are owned by
822  the utility authority.

823       (11)  No provision of this act shall be construed to prohibit
824  any public agency, otherwise permitted by law to issue bonds, from
825  issuing bonds in the manner provided by law for the construction,
826  renovation, repair or development of any of the utility
827  authority's systems, or any part thereof, owned or operated by
828  such public agency.

829  **SECTION 16.**  Whenever a public agency shall have executed a
830  contract under this act and the payments thereunder are to be made
831  either wholly or partly from the revenues of the public agency's
832  systems, or any part thereof, or a combination of such systems,
833  the duty is hereby imposed on the public agency to establish and
834  maintain and from time to time to adjust the rate or fees charged
835  by the public agency for the services of such systems, so that the

836   revenues therefrom, together with any taxes and special
837   assessments levied in support thereof, will be sufficient at all
838   times to pay:

839          (a)  The expense of operating and maintaining such
840   systems, including, but not limited to, all of the public agency's
841   obligations to the utility authority and the cost required to
842   staff such systems, its successors or assigns under such contract;
843   and

844          (b)  All of the public agency's obligations under and in
845   connection with bonds theretofore issued, or which may be issued
846   thereafter and secured by the revenues of such systems.  Any such
847   contract may require the use of consulting engineers and financial
848   experts to advise the public agency whether and when such rates
849   and fees are to be adjusted.

850   **SECTION 17.**  (1)  Notwithstanding the provisions of Sections
851   77-3-21 and 77-3-23, the certificate of public convenience and
852   necessity held by any municipality, public agency, district,
853   public utility or other person authorized by law to provide water,
854   sewer and wastewater services may be cancelled and its powers,
855   duties and responsibilities transferred to the utility authority
856   in the manner provided by this section.

857   (2)  Any entity described in subsection (1) of this section
858   desiring to have its certificate of public convenience and
859   necessity cancelled and its powers, duties and responsibilities
860   transferred to the utility authority shall make a determination to

861   that effect on its official minutes if a public entity, or by
862   affidavit if not a public entity, and transmit such determination
863   to the utility authority.

864        (3)   Upon receipt of the document evidencing such
865   determination from an entity to transfer its powers, duties and
866   responsibilities to the utility authority, the utility authority
867   shall, by resolution, declare whether it is willing and able to
868   accept such transfer from the entity.

869        (4)   Upon completion of the requirements of subsections (2)
870   and (3) of this section herein and agreement by both parties to
871   the transfer, the holder of the certificate of public convenience
872   and necessity and the utility authority shall jointly petition the
873   Public Service Commission to cancel the certificate of public
874   convenience and necessity.   The petition must be accompanied by
875   copies of the official minutes, affidavit or resolution, as the
876   case may be, reflecting the actions of the petitioners.   After
877   review of the petition and any other evidence as the Public
878   Service Commission deems necessary, the commission may issue an
879   order canceling the certificate and transferring to the utility
880   authority the powers, duties and responsibilities granted by the
881   certificate, including all assets and debts of the transferor
882   petitioner related to such certificated services, real or
883   personal, or both, if it finds that:

884        (a)   Subsections (2) and (3) of this section have been
885   complied with; and

886       (b)  Such action is in the public interest.

887    (5)  The utility authority and providers of water, sewer,

888 wastewater and storm water services that are not holders of a

889 certificate of a public convenience and necessity from the Public

890 Service Commission may enter into agreements for the provision of

891 such services, including, but not limited to, the transfer to the

892 utility authority of such provider's powers, duties,

893 responsibilities, assets and debts.

894    (6)  Nothing herein shall require a municipality currently

895 served by the utility authority to remain within the boundaries of

896 the utility authority.

897    **SECTION 18.**  (1)  Any system of a municipality, public agency

898 or person that becomes subject to the jurisdiction of a utility

899 authority and this act shall not impair, invalidate or abrogate

900 any liens, bonds or other certificates of indebtedness related to

901 water, storm water or wastewater facilities and systems incurred

902 prior to becoming subject to the jurisdiction of the utility

903 authority.

904    (2)  The utility authority may do and perform any and all

905 acts necessary, convenient or desirable to ensure the payment,

906 redemption or satisfaction of such liens, bonds or other

907 certificates of indebtedness.

908    **SECTION 19.**  (1)  Sections 18 through 27 of this act apply to

909 all bonds to be issued after the date of enactment of this act,

910 and such provisions shall not affect, limit or alter the rights

911   and powers of any utility authority under this act or any law of
912   Mississippi to conduct the activities referred to herein in any
913   way pertinent to the interests of the bondholders, including,
914   without limitation, such utility authority's right to charge and
915   collect rates, fees and charges and to fulfill the terms of any
916   covenants made with the registered owners of any existing bonds,
917   or in any other way impair the rights and remedies of the
918   registered owners of any existing bonds, unless provision for full
919   payment of such bonds, by escrow or otherwise, has been made
920   pursuant to the terms of the bonds or the resolution, trust
921   indenture or security interest securing the bonds.
922       (2)  The utility authority shall have the power and is hereby
923   authorized, from time to time, to borrow money and to issue
924   revenue bonds and interim notes in such principal amounts as the
925   utility authority may determine to be necessary to provide
926   sufficient funds for achieving one or more of the purposes of this
927   act, including, without limiting the generality of the foregoing,
928   to defray all the costs of the project, the cost of the
929   acquisition, construction, improvement, repair or extension of a
930   system, or any part thereof, whether or not such facilities are
931   owned by the utility authority, the payment of interest on bonds
932   of the utility authority issued pursuant to this act,
933   establishment of reserves to secure such bonds and payment of the
934   interest thereon, expenses incident to the issuance of such bonds
935   and to the implementation of the utility authority's system, and

936  all other expenditures of the utility authority incident to or
937  necessary or convenient to carry out the purposes of this act.
938      (3)  Before issuing bonds, other than interim notes or
939  refunding bonds as provided in Section 20 of this act, the board
940  of directors of the utility authority shall adopt a resolution
941  declaring its intention to issue such bonds and stating the
942  maximum principal amount of bonds proposed to be issued, a general
943  generic description of the proposed improvements and the proposed
944  location thereof and the date, time and place at which the board
945  of directors proposes to take further action with respect to the
946  issuance of such bonds.  The resolution shall be published once a
947  week for at least three (3) consecutive weeks in at least one (1)
948  newspaper having a general circulation within the geographical
949  limits of all of the public agencies which have contracted with
950  the utility authority pursuant to this act.
951      (4)  Bonds of the utility authority issued pursuant to this
952  act shall be payable from and secured by a pledge of all or any
953  part of the revenues under one or more contracts entered into
954  pursuant to this act between the utility authority and one or more
955  of its contracting public agencies and from all or any part of the
956  revenues derived from the operation of any designated system or
957  any part or parts thereof and any other monies legally available
958  and designated therefor, as may be determined by such utility
959  authority, subject only to any agreement with the purchasers of
960  the bonds.  Such bonds may be further secured by a trust indenture

961   between such utility authority and a corporate trustee, which may
962   be any trust company or bank having powers of a trust company
963   without or within the state.

964       (5)  Bonds of the utility authority issued pursuant to this
965   act shall be authorized by a resolution or resolutions adopted by
966   a majority affirmative vote of the total membership of the board
967   of directors of the utility authority.  Such bonds may be issued
968   in series, and each series of such bonds shall bear such date or
969   dates, mature at such time or times, bear interest at such rate or
970   rates (not exceeding the maximum rate set out in Section
971   75-17-103, Mississippi Code of 1972), be in such denomination or
972   denominations, be in such form, carry such conversion privileges,
973   have such rank or priority, be executed in such manner and by such
974   officers, be payable from such sources in such medium of payment
975   at such place or places within or without the state, provided that
976   one such place shall be within the state, and be subject to such
977   terms of redemption prior to maturity, all as may be provided by
978   resolution or resolutions of the board of directors.  The term of
979   such bonds issued pursuant to this act shall not exceed forty (40)
980   years.

981       (6)  Bonds of the utility authority issued pursuant to this
982   act may be sold at such price or prices, at public or private
983   sale, in such manner and at such times as may be determined by
984   such utility authority to be in the public interest, and such
985   utility authority may pay all expenses, premiums, fees and

986  commissions which it may deem necessary and advantageous in
987  connection with the issuance and sale thereof.
988      (7)  Any pledge of earnings, revenues or other monies made by
989  the utility authority shall be valid and binding from the time the
990  pledge is made.  The earnings, revenues or other monies so pledged
991  and thereafter received by such utility authority shall
992  immediately be subject to the lien of such pledge without any
993  physical delivery thereof or further act, and the lien of any such
994  pledge shall be valid and binding as against all parties having
995  claims of any kind in tort, contract or otherwise against such
996  utility authority irrespective of whether such parties have notice
997  thereof. Neither the resolution nor any other instrument by which
998  a pledge is created need be recorded.
999      (8)  Neither the members of the board of directors nor any
1000 person executing the bonds shall be personally liable on the bonds
1001 or be subject to any personal liability or accountability by
1002 reason of the issuance thereof.
1003     (9)  Proceeds from the sale of bonds of the utility authority
1004 may be invested, pending their use, in such securities as may be
1005 specified in the resolution authorizing the issuance of the bonds
1006 or the trust indenture securing them, and the earnings on such
1007 investments applied as provided in such resolution or trust
1008 indenture.
1009     (10)  Whenever any bonds shall have been signed by the
1010 officer(s) designated by the resolution of the board of directors

1011   to sign the bonds who were in office at the time of such signing
1012   but who may have ceased to be such officer(s) prior to the sale
1013   and delivery of such bonds, or who may not have been in office on
1014   the date such bonds may bear, the manual or facsimile signatures
1015   of such officer(s) upon such bonds shall nevertheless be valid and
1016   sufficient for all purposes and have the same effect as if the
1017   person so officially executing such bonds had remained in office
1018   until the delivery of the same to the purchaser or had been in
1019   office on the date such bonds may bear.

1020       (11)  The utility authority has the discretion to advance or
1021   borrow funds needed to satisfy any short-term cash flow demands or
1022   deficiencies or to cover start-up costs until such time as
1023   sufficient bonds, assets and revenues have been secured to satisfy
1024   the needs of the utility authority.

1025   **SECTION 20.**  (1)  The utility authority may, by resolution
1026   adopted by its board of directors, issue refunding bonds for the
1027   purpose of paying any of its bonds at or prior to maturity or upon
1028   acceleration or redemption.  Refunding bonds may be issued at such
1029   time prior to the maturity or redemption of the refunded bonds as
1030   the board of directors deems to be in the public interest, without
1031   an election on the question of the issuance thereof.  The
1032   refunding bonds may be issued in sufficient amounts to pay or
1033   provide the principal of the bonds being refunded, together with
1034   any redemption premium thereon, any interest accrued or to accrue
1035   to the date of payment of such bonds, the expenses of issue of the

1036  refunding bonds, the expenses of redeeming the bonds being
1037  refunded, and such reserves for debt service or other capital or
1038  current expenses from the proceeds of such refunding bonds as may
1039  be required by the resolution, trust indenture or other security
1040  instruments.  The issue of refunding bonds, the maturities and
1041  other details thereof, the security therefor, the rights of the
1042  holders and the rights, duties and obligations of the utility
1043  authority in respect of the same shall be governed by the
1044  provisions of this act relating to the issue of bonds other than
1045  refunding bonds insofar as the same may be applicable.  Any such
1046  refunding may be effected, whether the obligations to be refunded
1047  shall have then matured or shall thereafter mature, either by the
1048  exchange of the refunding bonds for the obligations to be refunded
1049  thereby with the consent of the holders of the obligations so to
1050  be refunded, or by sale of the refunding bonds and the application
1051  of the proceeds thereof to the payment of the obligations proposed
1052  to be refunded thereby, and regardless of whether the obligations
1053  proposed to be refunded shall be payable on the same date or
1054  different dates or shall be due serially or otherwise.
1055      (2)  Borrowing by the utility authority may be made by the
1056  delivery of interim notes to any person or public agency or
1057  financial institution by a majority vote of the board of
1058  directors.
1059      **SECTION 21.**  All bonds, other than refunding bonds, interim
1060  notes and certificates of indebtedness, which may be validated

1061   issued pursuant to this act shall be validated as now provided by
1062   law in Sections 31-13-1 through 31-13-11, Mississippi Code of
1063   1972; however, notice of such validation proceedings shall be
1064   addressed to the citizens of the respective public agencies (a)
1065   which have contracted with the utility authority pursuant to this
1066   act, and (b) whose contracts and the payments to be made by the
1067   public agencies thereunder constitute security for the bonds of
1068   such utility authority proposed to be issued, and that such notice
1069   shall be published at least once in a newspaper or newspapers
1070   having a general circulation within the geographical boundaries of
1071   each of the contracting public agencies to whose citizens the
1072   notice is addressed.  Such validation proceedings shall be
1073   instituted in any chancery courts within the boundaries of the
1074   utility authority.  The validity of the bonds so validated and of
1075   the contracts and payments to be made by the public agencies
1076   thereunder constituting security for the bonds shall be forever
1077   conclusive against the utility authority and the public agencies,
1078   which are parties to said contracts; and the validity of said
1079   bonds and said contracts and the payments to be made thereunder
1080   shall never be called in question in any court in this state.
1081   **SECTION 22.**  Bonds issued under the provisions of this act
1082   shall not be deemed to constitute, within the meaning of any
1083   constitutional or statutory limitation, an indebtedness of the
1084   utility authority or the state.  Such bonds shall be payable
1085   solely from the revenues or assets of the utility authority

1086 pledged therefor.  Each bond issued under this act shall contain
1087 on the face thereof a statement to the effect that such utility
1088 authority, nor the state, shall not be obligated to pay the same
1089 nor the interest thereon except from the revenues or assets
1090 pledged therefor.

1091 **SECTION 23.**  The utility authority shall have power in
1092 connection with the issuance of its bonds pursuant to this act to:
1093     (a)  Covenant as to the use of any or all of its
1094 property, real or personal;
1095     (b)  Redeem the bonds, to covenant for their redemption
1096 and to provide the terms and conditions thereof;
1097     (c)  Covenant to charge rates, fees and charges
1098 sufficient to meet operating and maintenance expenses, renewals
1099 and replacements, principal and debt service on bonds, creation
1100 and maintenance of any reserves required by a bonds resolution,
1101 trust indenture or other security instrument and to provide for
1102 any margins or coverages over and above debt service on the bonds
1103 deemed desirable for the marketability of the bonds;
1104     (d)  Covenant and prescribe as to events of default and
1105 terms and conditions upon which any or all of its bonds shall
1106 become or may be declared due before maturity, as to the terms and
1107 conditions upon which such declaration and its consequences may be
1108 waived and as to the consequences of default and the remedies of
1109 the registered owners of the bonds;

23/SS08/SB2889A.J
PAGE 45

1110   (e) Covenant as to the mortgage or pledge of or the
1111 grant of a security interest in any real or personal property and
1112 all or any part of the revenues from any designated system or any
1113 part thereof or any revenue-producing contract or contracts made
1114 by a utility authority with any person to secure the payment of
1115 bonds, subject to such agreements with the registered owners of
1116 bonds as may then exist;

1117   (f) Covenant as to the custody, collection, securing,
1118 investment and payment of any revenues, assets, monies, funds or
1119 property with respect to which a utility authority may have any
1120 rights or interest;

1121   (g) Covenant as to the purposes to which the proceeds
1122 from the sale of any bonds then or thereafter to be issued may be
1123 applied, and the pledge of such proceeds to secure the payment of
1124 the bonds;

1125   (h) Covenant as to the limitations on the issuance of
1126 any additional bonds, the terms upon which additional bonds may be
1127 issued and secured, and the refunding of outstanding bonds;

1128   (i) Covenant as to the rank or priority of any bonds
1129 with respect to any lien or security;

1130   (j) Covenant as to the procedure by which the terms of
1131 any contract with or for the benefit of the registered owners of
1132 bonds may be amended or abrogated, the amount of bonds the
1133 registered owners of which must consent thereto, and the manner in
1134 which such consent may be given;



1135          (k)  Covenant as to the custody of any of its properties
1136     or investments, the safekeeping thereof, the insurance to be
1137     carried thereon, and the use and disposition of insurance
1138     proceeds;

1139          (l)  Covenant as to the vesting in a trustee or
1140     trustees, within or outside the state, of such properties, rights,
1141     powers and duties in trust as such utility authority may
1142     determine;

1143          (m)  Covenant as to the appointing and providing for the
1144     duties and obligations of a paying agent or paying agents or other
1145     fiduciaries within or outside the state;

1146          (n)  Make all other covenants and to do any and all such
1147     acts and things as may be necessary or convenient or desirable in
1148     order to secure its bonds, or in the absolute discretion of the
1149     utility authority tend to make the bonds more marketable,
1150     notwithstanding that such covenants, acts or things may not be
1151     enumerated herein; it being the intention hereof to give any
1152     utility authority power to do all things in the issuance of bonds
1153     and in the provisions for security thereof which are not
1154     inconsistent with the Constitution of the state; and

1155          (o)  Execute all instruments necessary or convenient in
1156     the exercise of the powers herein granted or in the performance of
1157     covenants or duties, which may contain such covenants and
1158     provisions, as any purchaser of the bonds of the utility authority
1159     may reasonably require.



1160    **SECTION 24.**   The utility authority may, in any authorizing
1161    resolution of the board of directors, trust indenture or other
1162    security instrument relating to its bonds issued pursuant to this
1163    act, provide for the appointment of a trustee who shall have such
1164    powers as are provided therein to represent the registered owners
1165    of any issue of bonds in the enforcement or protection of their
1166    rights under any such resolution, trust indenture or security
1167    instrument.   The utility authority may also provide in such
1168    resolution, trust indenture or other security instrument that the
1169    trustee, or in the event that the trustee so appointed shall fail
1170    or decline to so protect and enforce such registered owners'
1171    rights then such percentage of registered owners as shall be set
1172    forth in, and subject to the provisions of, such resolution, trust
1173    indenture or other security interest, may petition the court of
1174    proper jurisdiction for the appointment of a receiver of the
1175    utility authority's systems, the revenues of which are pledged to
1176    the payment of the principal of and interest on the bonds of such
1177    registered owners.   Such receiver may exercise any power as may be
1178    granted in any such resolution, trust indenture or security
1179    instrument to enter upon and take possession of, acquire,
1180    construct, reconstruct or operate and maintain such system, fix
1181    charges for services of the system and enforce collection thereof,
1182    and receive all revenues derived from such system or facilities
1183    and perform the public duties and carry out the contracts and
1184    obligations of such utility authority in the same manner as such

1185   utility authority itself might do, all under the direction of such
1186   court.

1187   **SECTION 25.**   (1)   The exercise of the powers granted by this
1188   act will be in all respects for the benefit of the people of the
1189   state, for their well-being and prosperity and for the improvement
1190   of their social and economic conditions, and the utility authority
1191   shall not be required to pay any tax or assessment on any property
1192   owned by the utility authority under the provisions of this act or
1193   upon the income therefrom; nor shall the utility authority be
1194   required to pay any recording fee or transfer tax of any kind on
1195   account of instruments recorded by it or on its behalf.

1196      (2)   Any bonds issued by the utility authority under and
1197   pursuant to the provisions of this act, their transfer and the
1198   income therefrom shall at all times be free from taxation by the
1199   state or any local unit or political subdivision or other
1200   instrumentality of the state, excepting inheritance and gift
1201   taxes.

1202   **SECTION 26.**   All bonds issued under the provisions of this
1203   act shall be legal investments for trustees, other fiduciaries,
1204   savings banks, trust companies and insurance companies organized
1205   under the laws of the State of Mississippi; and such bonds shall
1206   be legal securities which may be deposited with and shall be
1207   received by all public officers and bodies of the state and all
1208   municipalities and other political subdivisions thereof for the
1209   purpose of securing the deposit of public funds.

23/SS08/SB2889A.J
PAGE 49

1210     **SECTION 27.**   The state hereby covenants with the registered
1211 owners of any bonds of any utility authority that so long as the
1212 bonds are outstanding and unpaid, the state will not limit or
1213 alter the rights and powers of any utility authority under this
1214 act to conduct the activities referred to herein in any way
1215 pertinent to the interests of the bondholders, including, without
1216 limitation, such utility authority's right to charge and collect
1217 rates, fees, assessments and charges and to fulfill the terms of
1218 any covenants made with the registered owners of the bonds, or in
1219 any other way impair the rights and remedies of the registered
1220 owners of the bonds, unless provision for full payment of such
1221 bonds, by escrow or otherwise, has been made pursuant to the terms
1222 of the bonds or the resolution, trust indenture or security
1223 interest securing the bonds.

1224     **SECTION 28.**   For the purposes of satisfying any temporary
1225 cash flow demands and deficiencies, and to maintain a working
1226 balance for the utility authority, the county, municipalities or
1227 public agencies within the geographic boundaries of the utility
1228 authority, or other persons, subject to their lawful authority to
1229 do so, are authorized to advance, at any time, such funds which,
1230 in its discretion, are necessary, or borrow such funds by issuance
1231 of notes, for initial capital contribution and to cover start-up
1232 costs until such times as sufficient bonds, assets and revenues
1233 have been secured to satisfy the needs of the utility authority
1234 for its management, operation and formation.   To this end, the

23/SS08/SB2889A.J
PAGE 50

1235    county, municipality, public agency or person, subject to their
1236    lawful authority to do so, shall advance such funds, or borrow
1237    such funds by issuance of notes, under such terms and conditions
1238    as may be provided by resolution of the governing body, or other
1239    persons as defined in this act, subject to their lawful authority
1240    to do so, except that each such resolution shall state:

1241         (a)  The need for the proceeds advanced or borrowed;

1242         (b)  The amount to be advanced or the amount to be
1243    borrowed;

1244

1245         (c)  The maximum principal amount of any note issued the
1245    interest rate or maximum interest rate to be incurred, and the
1246    maturity date of said note;

1247

1248         (d)  In addition, the governing body, or other persons
1248    as defined in this act, subject to their lawful authority to do
1249    so, may arrange for lines of credit with any bank, firm or person
1250    for the purpose of providing an additional source of repayment for
1251    notes issued pursuant to this section.  Amounts drawn on a line of
1252    credit may be evidenced by negotiable or nonnegotiable notes or
1253    other evidences of indebtedness and contain such terms and
1254    conditions as the governing body, or other persons as defined in
1255    this act, subject to their lawful authority to do so, may
1256    authorize in the resolution approving the same;

1257         (e)  The governing body of the county, municipalities or
1258    other persons as defined in this act, subject to their lawful
1259    authority to do so, may authorize the repayment of such advances,

1260  notes, lines of credit and other debt incurred under this section,
1261  along with all costs associated with the same, including, but not
1262  limited to, rating agency fees, printing costs, legal fees, bank
1263  or trust company fees, line of credit fees and other charges to be
1264  reimbursed by the utility authority under such terms and
1265  conditions as are reasonable and are to be provided for by
1266  resolution of the governing body, or terms agreed upon with other
1267  persons as defined in this act, subject to their lawful authority
1268  to do so; and
1269

1270          (f)  In addition, the governing body of the county,
1271  municipality or public agency may lease or donate office space and
1272  equipment to the utility authority under such terms and conditions
1273  as are reasonable and are to be provided for by resolution of the
1274  governing body, or terms agreed upon by the utility authority.

1275  **SECTION 29.**  This act being necessary for the welfare of the
1276  state and its inhabitants shall be liberally construed to effect
1277  the purposes thereof.  If any section, provision, paragraph,
1278  sentence, phrase or word of this act shall be held invalid by any
1279  court of competent jurisdiction, the remainder of this act shall
1280  not be affected thereby.

1281  **SECTION 30.**  Sections 1 through 29 of this act shall be
1282  codified in Title 77, Mississippi Code of 1972.

1283  **SECTION 31.**  This act shall take effect and be in force from
1284  and after July 1, 2023.

          **FURTHER, AMEND the title to conform.**

Further, amend by striking the title in its entirety and inserting in lieu thereof the following:

1     AN ACT TO CREATE THE MISSISSIPPI CAPITOL REGION UTILITY ACT;
2 TO ESTABLISH THE MISSISSIPPI CAPITOL REGION UTILITY AUTHORITY; TO
3 PROVIDE FOR THE APPOINTMENT OF A PRESIDENT AND A BOARD OF
4 DIRECTORS FOR SUCH AUTHORITY; TO CLARIFY THE POWERS AND DUTIES OF
5 SUCH BOARD; TO ENSURE ACCESS TO SAFE, CLEAN AND RELIABLE WATER FOR
6 THE CITIZENS OF CENTRAL MISSISSIPPI; AND FOR RELATED PURPOSES.

**Adopted**
AMENDMENT NO 1 TO AMENDMENT NO 1 PROPOSED TO

Cmte Sub for Senate Bill No. 2889

BY: Senator(s) Horhn

1
2       AMEND on line 1284 by inserting before the period the
following language:
3       , and shall stand repealed on June 30, 2023.

23/SS36/SB2889A.3J
PAGE 1

**Not Germane**
**AMENDMENT NO 2 PROPOSED TO**

## Cmte Sub for Senate Bill No. 2889

### BY: Senator(s) McMahan

Amend by striking all after the enacting clause and inserting in lieu thereof the following:

5    SECTION 1.   The capital of the State of Mississippi shall be
6  moved to the City of Tupelo in Lee County by 2025.
7    SECTION 2.   This act shall take effect and be in force from
8  and after July 1, 2023.

Further, amend by striking the title in its entirety and inserting in lieu thereof the following:

1    AN ACT TO PROVIDE THAT THE CAPITAL OF THE STATE OF
2  MISSISSIPPI SHALL BE MOVED TO THE CITY OF TUPELO IN LEE COUNTY BY
3  2025.

23/SS36/SB2889A.2J
PAGE 1



**Pending**
**COMMITTEE AMENDMENT NO 1 PROPOSED TO**

.

**Senate Bill No. 2889**

**BY: Committee**

**Amend by striking all after the enacting clause and inserting in lieu thereof the following:**

8      **SECTION 1.**  This act shall be known and may be cited as the
9    "Mississippi Capitol Region Utility Act."
10      **SECTION 2.**   (1)   The Mississippi Legislature finds the
11   following:
12            (a)   For the benefit of the citizens centrally located
13   in the State of Mississippi, including citizens residing or
14   working in the capital city of the State of Mississippi, it is
15   essential to have access to safe, clean and reliable water,
16   wastewater and storm water systems at affordable, regulated rates

17  which are just, reasonable and provide an adequate amount of
18  capital to keep such systems in good repair;

19        (b)  The availability of safe, clean and reliable water,
20  wastewater and storm water has vast impacts on health, schools and
21  academic outcomes, crime and safety, state and local government
22  operations, businesses and economic development, the availability
23  of a workforce, tourism and many other critical areas;

24        (c)  The availability of safe, clean and reliable water,
25  wastewater and storm water systems requires significant financial
26  resources and human capital to engage in the planning,
27  acquisition, construction, maintenance, coordination and operation
28  required to deliver transparent and efficient services which meet
29  and exceed federal and state regulations and requirements;

30        (d)  On November 29, 2022, the Department of Justice
31  filed a complaint alleging that the City of Jackson has failed to
32  provide drinking water that is reliably compliant with the Safe
33  Drinking Water Act to citizens within the boundaries of the water
34  system.  The Department of Justice simultaneously filed a proposal
35  which would appoint a receiver, or an interim third-party manager,
36  to stabilize the City of Jackson's public drinking water system
37  and build confidence in the water system's ability to supply safe,
38  clean and reliable water to citizens within the boundaries of the
39  water system.  The U.S. District Court for the Southern District
40  of Mississippi appointed a receiver to oversee and operate the
41  water system on November 29, 2022.

42          (e)  The receiver appointed by the U.S. District Court
43   for the Southern District of Mississippi provided in his January
44   27, 2023, plan for the water system that he would like a concept
45   for future governance in place by September 30, 2023, and a
46   utility authority or corporate nonprofit entity are viable options
47   for the concept of future governance;

48          (f)  The creation and organization of a structure for
49   future governance requires legislation for it to continue in
50   perpetuity beyond the eventual end of the receiver's work and
51   related federal court orders; and

52          (g)  The creation and organization of a structure for
53   future governance prior to the date of the conclusion of the
54   receiver's work will allow the best opportunity for minimal
55   disruption in water, wastewater and storm water service and
56   maximum ease of transition after the receiver has concluded his
57   work in overseeing and operating the water system.

58      (2)  Therefore, it is the intent of the Mississippi
59   Legislature to:

60          (a)  Provide authority to the Mississippi Capitol Region
61   Utility Authority to transfer water, wastewater and storm water
62   services provided by the City of Jackson to the utility
63   authority's management and control when the court-appointed
64   receiver's work concludes with the water system to ensure all
65   citizens have access to safe, clean and reliable water, wastewater
66   and storm water systems at affordable, regulated rates which are

67  just, reasonable and provide an adequate amount of capital to keep
68  such systems in good repair; and

69          (b)  Partner with the Mississippi Department of Health,
70  Mississippi Department of Environmental Quality, local
71  governments, including the City of Jackson, within the boundaries
72  of the utility district, and any other federal, state or local
73  entity in taking any action necessary under this act to ensure all
74  citizens have access to safe, clean and reliable water, wastewater
75  and storm water systems, with the understanding that federal and
76  state agencies are solely responsible for regulating, but not
77  operating, the utility authority.

78  **SECTION 3.**  As used in this act, the following words and
79  phrases have the meanings ascribed herein, unless the context
80  clearly indicates otherwise:

81          (a)  "Act" means the Mississippi Capitol Region Utility
82  Act.

83          (b)  "Board" means the Board of Directors of the
84  Mississippi Capitol Region Utility Authority.

85          (c)  "Bonds" means revenue bonds and other certificates
86  of indebtedness of the authority issued under the provisions of
87  this act.

88          (d)  "Fiscal year" means the period of time beginning on
89  July 1 of each year and ending on June 30 of each year.

90          (e)  "Major procurement" means the procurement of any
91  good or service in excess of One Million Dollars ($1,000,000.00).

23/HR43/SB2889A.3J
PAGE 4
(MCL/EW)

92   (f) "Municipality" means any incorporated city, town or
93 village of the State of Mississippi, whether operating under
94 general law or special charter.

95   (g) "Person" means the State of Mississippi, a county,
96 a municipality, any state agency or any other city, town, village
97 or political subdivision or governmental agency or instrumentality
98 of the State of Mississippi or of the United States of America, or
99 any private utility, individual, copartnership, association, firm,
100 trust, estate or any other entity whatsoever.

101   (h) "Project" means the construction, development or
102 acquisition by the utility authority of any infrastructure for
103 water, wastewater and storm water systems or services and includes
104 upgrading or repair of existing systems.

105   (i) "Public agency" means any county, municipality,
106 state board or utility authority owning or operating properties,
107 districts created pursuant to the general laws or local and
108 private laws of the State of Mississippi, or any other political
109 subdivision of the State of Mississippi possessing the power to
110 own and operate waterworks, water supply systems, sewerage
111 systems, sewage treatment systems or other facilities or systems
112 for the collection, transportation and treatment of water,
113 wastewater, and storm water.

114   (j) "Receiver" means the interim third-party manager
115 for the water system owned by the City of Jackson who was
116 appointed by the U.S. District Court for the Southern District of

117  Mississippi on November 29, 2022, to oversee and operate the water

118  system during the negotiation of a consent decree related to

119  compliance with the Safe Drinking Water Act and other laws.

120       (k)  "Storm water" means any flow occurring during or

121  following any form of natural precipitation and resulting from

122  that precipitation.

123       (l)  "System" or "systems" means any plants, structures,

124  facilities and other real and personal property used or useful in

125  the generation, storage, transportation or supply of water, and

126  the collection, transportation, treatment or disposal of

127  wastewater and storm water, including tanks, lakes, streams,

128  ponds, pipes, trunk lines, mains, sewers, conduits, pipelines,

129  pumping and ventilating stations, plants, works, connections and

130  any other real or personal property and rights therein necessary,

131  useful or convenient for the purposes of the utility board or

132  authorities in connection therewith.

133       (m)  "Utility authority" shall mean the Mississippi

134  Capitol Region Utility Authority.

135       (n)  "Wastewater" means water being disposed of by any

136  person and which is contaminated with waste or sewage, including

137  industrial, municipal, and any other wastewater that may cause

138  impairment of the quality of waters in the state.

139       (o)  "Water" means potable water, surface water and

140  groundwater.



141   **SECTION 4.**   (1)  There is hereby created and established a
142   corporate nonprofit known as the Mississippi Capitol Region
143   Utility Authority.  The authority will be composed of geographic
144   areas receiving water, wastewater and storm water services from
145   the City of Jackson as of the date of enactment of this act for
146   the planning, acquisition, construction, maintenance, operation
147   and coordination of water, wastewater and storm water systems in
148   order to ensure the delivery of water, wastewater and storm water
149   services to citizens.  Such utility authority is created solely to
150   accomplish the purposes of the State under this act and the
151   exercise by the utility authority of the powers conferred by this
152   act shall be deemed and held to be the performance of an essential
153   public function promoting the health, welfare and prosperity of
154   the general public.  It is the intent of the Legislature that the
155   utility authority shall be accountable to ratepayers within the
156   systems through the audits, reports and disclosures required by
157   this act.

158         (2)  The existence of the corporate nonprofit utility
159   authority, which shall be domiciled in the State of Mississippi,
160   shall begin upon the appointment of a majority of its board as
161   provided in Section 5 of this act.

162         (3)  The utility authority shall possess a leasehold in all
163   water, wastewater and storm water system assets beginning on the
164   date of termination of the receiver by the U.S. District Court for

165  the Southern District of Mississippi.  The City of Jackson shall

166  maintain ownership of all assets.

167      (4)  All funds obtained by the utility authority in excess of

168  expenses to operate and maintain the water, wastewater and storm

169  water systems, including, but not limited to, capital

170  expenditures, debt service and reserve funds as needed as

171  determined by the utility authority, shall return to the City of

172  Jackson.

173      (5)  In the event of any action or matter against the utility

174  authority, the Chief Justice of the Mississippi Supreme Court

175  shall select an appropriate Circuit or Chancery Court, which shall

176  have exclusive jurisdiction over the matter.  For purposes of

177  court costs, the utility authority shall be a private corporation.

178      (6)  All funds provided by the federal government in H.R.

179  2617, the Consolidated Appropriations Act of 2023, and any other

180  funds provided by the state or federal government in response to

181  the water crisis detailed by the U.S. District Court for the

182  Southern District of Mississippi in Case No. 3:22-cv-00686, *United*

183  *States v. City of Jackson*, shall be spent according to the

184  direction of the receiver and federal court within the service

185  territory impacted by the water crisis and in accordance with

186  federal law.

187      **SECTION 5.**  (1)  The affairs of the utility authority shall

188  be administered by the Mississippi Capitol Region Utility

189  Authority Board of Directors.  The board shall be composed of nine

190   (9) members to be selected as follows:  the Mayor of the City of
191   Jackson, with the advice and consent of the Senate, shall appoint
192   four (4) members, one (1) of whom shall be a resident of the City
193   of Jackson who receives water from the west/south Jackson water
194   well systems of the City of Jackson.  The Governor, with the
195   advice and consent of the Senate, shall appoint three (3) members.
196   The Governor shall consult with the City of Byram to appoint one
197   (1) of the three (3) appointments, so long as the City of Byram is
198   included within the boundaries of the systems.  The Lieutenant
199   Governor, with the advice and consent of the Senate, shall appoint
200   two (2) members.  The Lieutenant Governor shall consult with the
201   Mayor of the City of Ridgeland to appoint one (1) of their two (2)
202   appointments, so long as the City of Ridgeland is included within
203   the boundaries of the systems.  All members shall be appointed
204   within sixty (60) days of the enactment of this act.
205       In the appointment process, appointing authorities shall
206   attempt to see that all portions of society and its diversity are
207   represented in members of the utility authority.  All appointed
208   members must be residents of the State of Mississippi, must be
209   ratepayers within the system boundaries, and must have
210   significant, demonstrated experience in business management,
211   fiscal affairs, public health or public utilities.
212       (2)  The initial terms of the board of directors shall be as
213   follows:  One (1) member appointed by the Mayor of the City of
214   Jackson shall serve for an initial term of four (4) years.  One

215   (1) member appointed by the Mayor of the City of Jackson shall
216   serve for an initial term of three (3) years.  One (1) member
217   appointed by the Mayor of the City of Jackson shall serve for an
218   initial term of two (2) years.  One (1) member appointed by the
219   Mayor of the City of Jackson shall serve for an initial term of
220   one (1) year.  The Governor shall appoint one (1) member for a
221   term of four (4) years, one (1) member for a term of three (3)
222   years, and one (1) member for a term of two (2) years.  The
223   Lieutenant Governor shall appoint one (1) member for a term of
224   four (4) years and one (1) member for a term of three (3) years.
225        (3)  Except as provided in Subsection 2 of this section,
226   appointments shall be for a term of four (4) years.  Each member
227   shall hold office until his successor has been appointed and
228   qualified.  Vacancies shall be filled by appointment by the
229   appropriate appointing authority, subject to the advice and
230   consent of the Senate, for the length of the unexpired term only.
231   Any member of the utility authority shall be eligible for
232   reappointment for a maximum of two (2) full terms.  Each member of
233   the utility authority shall, before entering upon his duty, take
234   an oath of office to administer the duties of his office
235   faithfully and impartially, and a record of such oath shall be
236   filed in the Office of the Secretary of State.  The utility
237   authority shall annually elect from its membership a chairman and
238   vice chairman who shall be eligible for reelection.  The utility
239   authority shall also elect or appoint, and prescribe the duties

240  of, such other officers, who need not be members, as the utility
241  authority deems necessary or advisable and the utility authority
242  shall fix the compensation of such officers.  The utility
243  authority may delegate to one or more of its members, officers,
244  employees or agents such powers and duties as it may deem proper,
245  not inconsistent with this article or other provisions of law.
246      (4)  The members of the utility authority shall serve without
247  salary, but shall be entitled to receive per diem pay as provided
248  in Section 25-3-69, plus travel and necessary expenses, including
249  mileage, as provided in Section 25-3-41, incurred while in the
250  performance of his or her duties as a member of the board of
251  directors of the utility authority upon authorization by the
252  board.  Expenses shall be paid from the available funds of the
253  utility authority after the utility authority assumes management
254  and control of the water, wastewater and storm systems as provided
255  in this act.  Until the date the utility authority assumes
256  management and control of the water, wastewater and stormwater
257  systems as provided in this act, expenses shall be paid by the
258  State of Mississippi.
259      (5)  All meetings of the board shall be subject to the Open
260  Meetings Act in Section 25-41-1 et seq.  The Mississippi
261  Department of Health, Mississippi Department of Environmental
262  Quality, and U.S. Environmental Protection Agency shall be
263  provided notice of all meetings, including emergency meetings.
264  Representatives from the Mississippi Department of Health,

265   Mississippi Department of Environmental Quality, and U.S.
266   Environmental Protection Agency may attend meetings to provide
267   information as agencies which regulate and enforce laws which
268   pertain to the utility authority.  The chairman or a majority of
269   members of the utility authority may convene the board for a
270   meeting.

271       (6)  Except as may be provided by law, all records of the
272   utility authority shall be deemed public records and subject to
273   public inspection as provided by Section 25-61-1 et seq.

274       (7)  The board may by majority vote excuse the absence of any
275   member of the board.  In the event that any member of the board is
276   absent for two (2) board meetings in a twelve-month period without
277   such absences being excused by the board, his or her membership on
278   the board shall be terminated as a function of law, without any
279   action by the board, and the removed member of the board shall be
280   ineligible for reappointment to the board.  The original
281   appointing authority shall retain their right to appoint a new
282   board member to replace the removed board member.

283       (8)  No employee of the utility authority shall be a member
284   of the board.

285       (9)  Until such time that the utility district assumes
286   management and control of the water, wastewater and storm water
287   systems, the board shall cooperate and coordinate with the
288   receiver in order to provide the best opportunity for minimal
289   disruption in service and maximum ease of transition after the

23/HR43/SB2889A.3J
PAGE 12
(MCL/EW)

290  receiver has concluded his work in overseeing and operating the
291  water system.

292  **SECTION 6.**  (1)  The utility authority shall consult with the
293  receiver and the City of Jackson in appointing an Executive
294  Director by January 1, 2024, who shall serve at the will and
295  pleasure of the board.  If the utility authority does not have
296  management and control of the water, wastewater and storm water
297  systems by the date of the appointment of an Executive Director,
298  the State of Mississippi shall pay the salary of the Executive
299  Director on a bimonthly basis.  The Executive Director shall
300  manage the daily affairs of the utility authority and shall have
301  such powers and duties as specified by this act, by the board, and
302  any rules or regulations adopted by the board.  The Executive
303  Director shall not be a member of the board.  The Executive
304  Director shall serve at the will and pleasure of the board.

305      (2)  Until such time that the utility district assumes
306  management and control of the water, wastewater and storm water
307  systems, the Executive Director shall cooperate and coordinate
308  with the receiver in order to provide the best opportunity for
309  minimal disruption in service and maximum ease of transition after
310  the receiver has concluded his work in overseeing and operating
311  the water system.

312      (3)  The Executive Director shall employ such personnel as he
313  or she deems necessary.  All personnel shall serve at the will and

314 pleasure of the Executive Director, unless otherwise specified by
315 the Executive Director.

316     (4)   The board shall set the salary of the Executive Director
317 at such level as is necessary to recruit and retain a qualified
318 professional with the expertise necessary in a public utility.
319 The board may authorize whatsoever incentive compensation program
320 for the Executive Director and utility authority staff as it deems
321 necessary and proper.  The utility authority shall be exempt from
322 the provisions of Section 25-3-39.

323     **SECTION 7.**   (1)   The utility authority shall have the power,
324 duty and responsibility to exercise general supervision over the
325 design, construction, operation and maintenance of water,
326 wastewater and storm water systems. The utility authority must
327 abide by applicable state and federal law in exercising this
328 authority.

329     (2)   The utility authority shall adopt rules and regulations
330 regarding the design, construction or installation, operation and
331 maintenance of water, wastewater and storm water systems.

332     (3)   The utility authority shall adopt rules and regulations
333 regarding the use of decentralized treatment systems, individual
334 on-site wastewater treatment systems and centralized wastewater
335 treatment systems.

336     (4)   The utility authority shall adopt rules establishing
337 performance standards for water, wastewater and storm water
338 systems and the operation and maintenance of the same.  Such rules

339  and regulations shall include the implementation of a standard
340  application form for the installation, operation and maintenance
341  of such systems; application review; approval or denial procedures
342  for any proposed system; inspection, monitoring and reporting
343  guidelines; and enforcement procedures.

344       (5)  (a)  Before a building or development which requires the
345  installation of a water, wastewater or storm water system is
346  constructed, the system must be submitted to the utility authority
347  for certification that the system complies with the utility
348  authority requirements for such system.

349            (b)  Before approving or renewing a water, wastewater or
350  storm water related permit for a system within a utility
351  authority, the state agency must require certification that the
352  system complies with the requirements of the utility authority.

353       (6)  Any system of any municipality, public agency or other
354  persons which contracts with a utility authority shall be subject
355  to the terms of that contract and the terms of this act.

356       (7)  Notwithstanding the provisions of Section 51-39-1 et
357  seq., the utility authority shall have the full power to adopt
358  rules and regulations and to construct, maintain, lease and
359  operate facilities for the control of storm water quality and
360  quantity.  In addition, the provisions of Section 51-33-1 relating
361  to drainage districts and flood control districts do not apply to
362  the utility authority.

363      (8)  The utility authority may control and operate the local

364   retail water, wastewater or storm water services and may provide

365   or be responsible for direct servicing of those services to

366   residences, businesses and individuals; however, the utility

367   authority shall not provide the same service in an area provided

368   by a public utility or person holding a certificate of public

369   convenience and necessity issued by the Mississippi Public Service

370   Commission for the provision of such services in the certificated

371   area.

372      (9)  The utility authority shall enter into contracts for

373   major procurements after bidding.  The utility authority may adopt

374   administrative rules and regulations pursuant to the provisions of

375   this act providing for special procedures whereby the utility

376   authority may make any class of procurement.

377      (10)  In its bidding processes, the utility authority may do

378   its own bidding and procurement or may utilize the services of the

379   Department of Finance and Administration, the Department of

380   Information Technology Services or other state agencies as

381   appropriate and necessary.

382      (11)  The utility authority shall only have oversight or

383   control of wastewater service provided to ratepayers in the City

384   of Ridgeland, which is only served by the wastewater system as of

385   the effective date of this act.  To maintain consistency with the

386   agreement in place with the City of Jackson prior to the existence

387   of the utility authority, the City of Ridgeland shall have control



388   over its rate structure, with the City of Ridgeland compensating

389   the utility authority for its prorated share of wastewater

390   conveyance, treatment, capital improvements and debt service.

391        (12)   The utility authority shall maintain all west/south

392   Jackson water well systems within the City of Jackson as either a

393   primary source or alternative source of water for the residents of

394   the City of Jackson who receive water from such systems.

395        **SECTION 8.**   (1)   The utility authority, in addition to any

396   other powers granted under any other provision of law is

397   authorized:

398              (a)   To acquire, construct, improve, enlarge, extend,

399   repair, operate and maintain one or more of its systems used for

400   the collection, transportation, treatment and disposal of water,

401   wastewater and storm water;

402              (b)   To make contracts with any person in furtherance

403   thereof; and to make contracts with any person, under the terms of

404   which the utility authority will collect, transport, treat or

405   dispose of water, wastewater and storm water for such person, and

406   to cancel any contracts existing as of the date of enactment of

407   this act;

408              (c)   To make contracts with any person to design and

409   construct any water, wastewater and storm water systems or

410   facilities, and thereafter to purchase, lease or sell, by

411   installments over such terms as may be deemed desirable,

412    reasonable and necessary, or otherwise, any such system or

413    systems;

414            (d)  To enter into operating agreements with any person,

415    for such terms and upon such conditions as may be deemed

416    desirable, for the operation of any water, wastewater and storm

417    water systems; and the utility authority may lease to or from any

418    person, for such term and upon such conditions as may be deemed

419    desirable, any water, wastewater and storm water collection,

420    transportation, treatment or its other facilities or systems.  Any

421    such contract may contain provisions requiring any public agency

422    or other person to regulate the quality and strength of materials

423    to be handled by the respective system or systems and also may

424    provide that the utility authority shall have the right to use any

425    streets, alleys and public ways and places within the jurisdiction

426    of a public agency or other person during the term of the

427    contract;

428            (e)  To enter into contracts with any person or any

429    public agency, including, but not limited to, contracts authorized

430    by this act, in furtherance of any of the purposes authorized

431    under this act upon such consideration as the board of directors

432    and such person may agree.  Any such contract may extend over any

433    period of time, notwithstanding any provision or rule of law to

434    the contrary; may be upon such terms and for such consideration,

435    nominal or otherwise, as the parties thereto shall agree; and may

436    provide that it shall continue in effect until bonds specified

437 therein, refunding bonds issued in lieu of such bonds, and all
438 other obligations specified therein are paid or terminated.  Any
439 such contract shall be binding upon the parties thereto according
440 to its terms;

441      (f)  To sue and be sued, in its own name, and to enjoy
442 all of the protections, immunities and benefits provided by the
443 Mississippi Tort Claims Act, Section 11-46-1 et seq., as it may be
444 amended or supplemented from time to time;

445      (g)  To maintain office space at such place or places
446 within the utility authority's boundaries as it may determine;

447      (h)  To invest money of the utility authority, including
448 proceeds from the sale of any bonds subject to any agreements with
449 bondholders, on such terms and in such manner as the utility
450 authority deems proper;

451      (i)  To pay any outstanding City of Jackson bonds
452 relating to the water and sewer systems under their existing
453 terms;

454      (j)  To require the necessary relocation or rerouting of
455 roads and highways, railroad, telephone and telegraph lines, and
456 properties, electric power lines, gas pipelines and related
457 facilities, or to require the anchoring or other protection of any
458 of these, provided fair compensation is first paid to the owners
459 or an agreement with such owners regarding the payment of the cost
460 of such relocation, and to acquire easements or rights-of-way for
461 such relocation or rerouting and to convey the same to the owners

462    of the property being relocated or rerouted in connection with the

463    purposes of this act.  This provision shall be in accordance with

464    Mississippi Constitution Article 17A, Section 11-27-30, and House

465    Bill No. 1769 as passed during the 2022 Legislative Session;

466         (k)  To acquire, construct, improve or modify, to

467    operate or cause to be operated and maintained, either as owner of

468    all or of any part in common with others, any water, wastewater or

469    storm water system within the utility authority's service area.

470    The utility authority may pay all or part of the cost of any

471    system from any contribution by persons, firms, public agencies or

472    corporations.  The utility authority may receive, accept and use

473    all funds, public or private, and pay all costs of the

474    development, implementation and maintenance as may be determined

475    as necessary for any project;

476         (l)  To acquire, in its own name, by purchase on any

477    terms and conditions and in any manner as it may deem proper,

478    property for public use, or by gift, grant, lease, or otherwise,

479    real property or easements therein, franchises and personal

480    property necessary or convenient for its corporate purposes.  This

481    provision shall be in accordance with Mississippi Constitution

482    Article 17A, Section 11-27-30, and House Bill No. 1769 as passed

483    during the 2022 Legislative Session;

484         (m)  To acquire insurance for the utility authority's

485    systems, facilities, buildings, treatment plants and all property,

486  real or personal, to insure against all risks as any insurance
487  may, from time to time, be available;

488      (n)  To use any property and rent or lease any property
489  to or from others, including public agencies, or make contracts
490  for the use of the property.  The utility authority may sell,
491  lease, exchange, transfer, assign, pledge, mortgage or grant a
492  security interest for any property.  The powers to acquire, use
493  and dispose of property as set forth in this paragraph shall
494  include the power to acquire, use and dispose of any interest in
495  that property, whether divided or undivided.  Title to any
496  property of the utility authority shall be held by the utility
497  authority exclusively for the benefit of the public;

498      (o)  To apply, contract for, accept, receive and
499  administer gifts, grants, appropriations and donations of money,
500  materials and property of any kind, including loans and grants
501  from the United States, the state, a unit of local government, or
502  any agency, department, district or instrumentality of any of the
503  foregoing, upon any terms and conditions as the United States, the
504  state, a unit of local government, or any agency, department,
505  district or instrumentality shall impose.  The utility authority
506  may administer trusts.  The utility authority may sell, lease,
507  transfer, convey, appropriate and pledge any and all of its
508  property and assets;

509      (p)  To make and enforce, and from time to time amend
510  and repeal, bylaws, rules, ordinances and regulations for the

23/HR43/SB2889A.3J
PAGE 21
(MCL/EW)

511 management of its business and affairs and for the construction,
512 use, maintenance and operation of any of the systems under its
513 management and control;

514   (q)  To employ and terminate staff and other personnel,
515 including attorneys, engineers and consultants as may be necessary
516 to the functioning of the utility authority;

517   (r)  To establish and maintain rates, fees and any other
518 charges for services and the use of systems and facilities within
519 the control of the utility authority, and from time to time, to
520 adjust such rates, fees and any other charges to the end that the
521 revenues therefrom will be sufficient at all times to pay the
522 expenses of operating and maintaining of the facilities and
523 treatment systems and all of the persons' obligations under any
524 contract or bonds resolution with respect thereto or any
525 obligation of any person under any agreement, contract, indenture
526 or bonds resolution with respect thereto.  Such rates, fees,
527 assessments and any other charges shall be subject to the
528 jurisdiction of the Mississippi Public Service Commission.  Such
529 rates, fees, assessments or any other charges shall be equal as
530 levied on citizens throughout the utility authority's boundaries.
531 For purposes of Section 77-3-33, the rates charged by the utility
532 authority shall be just and reasonable if they are adequate to
533 provide safe and reliable water, wastewater and storm water
534 service to its customers, including providing an adequate amount
535 of capital for the utility authority to perform such repairs,

536  upgrades and improvements as it deems necessary on an ongoing
537  basis.  The Mississippi Public Service Commission shall defer to
538  the utility authority's determination of what rates are just and
539  reasonable absent a showing of manifest error;

540           (s)  To adopt rules and regulations necessary to
541  accomplish the purposes of the utility authority and to assure the
542  payment of each participating person or public agency of its
543  proportionate share of the costs for use of any of the systems and
544  facilities of the utility authority and for the utility
545  authority's proportionate share of the costs of the board;

546           (t)  To enter on public or private lands, waters or
547  premises for the purpose of making surveys, borings or soundings,
548  or conducting tests, examinations or inspections for the purposes
549  of the authority, subject to responsibility for any damage done to
550  property entered;

551           (u)  To accept industrial wastewater from within the
552  boundaries of the utility authority for treatment and to require
553  the pretreatment of same when, in the opinion of the utility
554  authority, such pretreatment is necessary;

555           (v)  To control and operate local retail water,
556  wastewater and storm water services, and may provide or be
557  responsible for direct servicing of those services to residences,
558  businesses and individuals; however, the utility authority shall
559  not provide the same services in an area provided by a public
560  utility or person holding a certificate of public convenience and

561   necessity issued by the Mississippi Public Service Commission for
562   the provision of such services in the certificated area;

563        (w)  To assume control and administer, within the
564   utility authority's jurisdiction, any water, wastewater or storm
565   water system or systems by agreement or contract with any person
566   if the person providing such services requests to be relieved of
567   that responsibility.  However, the person may maintain control
568   over connections in their service areas and may charge rates, fees
569   and any other charges in addition to the rates, fees and any
570   charges of the utility authority;

571        (x)  To acquire property designated by plan to
572   sufficiently accommodate the location of water, wastewater or
573   storm water systems and such requirements related directly thereto
574   pursuant to the provisions of Title 11, Chapter 27, Mississippi
575   Code of 1972.  The utility authority may acquire property
576   necessary for any system and the exercise of the powers, rights
577   and duties conferred upon the utility authority by this act.  No
578   person owning the drilling rights or the right to share in
579   production shall be prevented from exploring, developing or
580   producing oil or gas with necessary rights-of-way for ingress and
581   egress, pipelines and other means of transporting such interests
582   on any lands or interest of the utility authority held or used for
583   the purposes of this act, but any such activities shall be subject
584   to reasonable regulations by the board of directors that will
585   adequately protect the systems or projects of the utility

23/HR43/SB2889A.3J
PAGE 24
(MCL/EW)

586  authority.  This provision shall be in accordance with Mississippi
587  Constitution Article 17A and House Bill No. 1769 as passed during
588  the 2022 Legislative Session;

589      (y)  To use any legally available funds to acquire,
590  rebuild, operate and maintain any existing water, wastewater or
591  storm water systems owned or operated by any person;

592      (z)  To refuse to receive water, wastewater or storm
593  water from any public agency or person, except with regard to
594  municipalities or other areas within the service territory of the
595  systems as of the effective date of this act;

596      (aa)  So long as any indebtedness on the systems of the
597  utility authority remains outstanding, to require a member public
598  agency, or other person, that all water, wastewater and storm
599  water within the boundaries of the respective utility authority be
600  disposed of through the appropriate treatment system to the extent
601  that the same may be available, but no public agency shall be
602  precluded from constructing, operating and maintaining its own
603  such system after the current indebtedness owing on the system as
604  of the date of enactment of this act, is paid in full; and

605      (bb)  To adopt a seal and a symbol, and hold patents,
606  copyrights, trademarks, and service marks and enforce its rights
607  with respect thereto.

608      (3)  The utility authority shall:

609      (a)  Submit annual reports to the Governor, Lieutenant
610  Governor, Speaker of the House of Representatives, State Auditor,

611  Joint Legislative Committee on Performance Evaluation and
612  Expenditure Review and the governing authorities of any
613  municipality whose citizens are within the utility authority's
614  boundaries regarding the water quality and financial conditions of
615  such system or systems, as well as a schedule of currently planned
616  repairs, upgrades or improvements planned by the utility
617  authority;

618           (b)   Immediately submit to the Governor, Lieutenant
619  Governor, Speaker of the House of Representatives and the
620  governing authorities of any municipality whose citizens are
621  within the utility authority's boundaries any information received
622  from the Mississippi Department of Health or Department of
623  Environmental Quality or other state or federal regulatory
624  agencies regarding the condition of a transferred eligible
625  municipal system.  The utility authority, in addition to abiding
626  by any other federal or state reporting requirements, must also
627  report such information to the public on its website and to
628  individuals residing within the municipality as required by
629  federal or state law;

630           (c)   Publish audited annual financial statements, which
631  shall be made available to the public.  The annual financial
632  statements shall include disposition of all funds expended by the
633  Utility authority for any purpose.  Quarterly financial statements
634  shall be made available to the public by posting on the utility
635  authority's website;

636         (d)  Adopt by administrative rules and regulations a
637 system of continuous internal audits;

638         (e)  Adopt by administrative rules and regulations a
639 code of ethics for officers and employees of the utility authority
640 to carry out the standards of conduct established by this act; and

641         (f)  Adopt by administrative rules and regulations
642 guidelines for the disposal of property if the utility authority
643 is dissolved.  Such administrative rules and regulations shall
644 include that management and control of the systems shall revert to
645 the City of Jackson.

646 **SECTION 9.**  (1)  The Executive Director, as executive
647 director of the utility authority, if so appointed by the utility
648 authority, shall direct and supervise all administrative and
649 technical activities in accordance with the provisions of this
650 act, within the administrative rules and regulations adopted by
651 the board, and in accordance with industry practice.  The
652 Executive Director shall:

653         (a)  Supervise and administer or contract for the
654 supervision and administration of the water, wastewater and storm
655 water systems owned, managed or controlled by the utility
656 authority.

657         (b)  Employ and direct such personnel as may be
658 necessary to carry out the purposes of this act and utilize such
659 services, personnel or facilities of the utility authority as he
660 or she may deem necessary.

23/HR43/SB2889A.3J
PAGE 27
(MCL/EW)

661          (c)  Make available for inspection by the board or any
662    member of the board or the Governor, Lieutenant Governor, Speaker
663    of the House or the governing authorities of any municipality
664    whose citizens are served by the utility authority, upon request,
665    all books, records, files and other information and documents of
666    his or her office and advise the board and recommend such
667    administrative rules and regulations and other matters he or she
668    deems necessary and advisable to improve the operation and
669    administration of the utility authority.

670          (d)  Attend meetings of the board or appoint a designee
671    to attend on his or her behalf.

672          (e)  Not later than thirty (30) days before the
673    beginning of the utility authority's fiscal year, submit the
674    proposed annual budget of the utility authority to the board for
675    review and approval.  This shall include a schedule of planned
676    repairs, upgrades or improvements to the systems and the
677    anticipated capital cost of each.  In addition, the proposed
678    annual budget of the utility authority shall include a personnel
679    table reporting information for each full-time and part-time
680    permanent position, as follows:

681              (i)  The position title and the salary for each
682    position in the existing operating budget for the current fiscal
683    year, indicating whether each position is filled or vacant as of
684    the reporting date; and

685          (ii)  The position title and the salary recommended
686  for each position for the next fiscal year.

687          (f)  The Executive Director shall require bond of Fifty
688  Thousand Dollars ($50,000.00) from employees with access to funds
689  or in such an amount as provided in the administrative rules and
690  regulations of the board.

691     (2)  The Executive Director may:

692          (a)  Require bond from other employees as he or she
693  deems necessary;

694          (b)  For good cause, and with approval from the majority
695  of the board, suspend, revoke or refuse to renew any contract
696  entered into in accordance with this act or the administrative
697  rules and regulations of the board; and

698          (c)  Upon specific or general approval of the board,
699  enter into personal service contracts pursuant to administrative
700  rules and regulations adopted by the board and compensate such
701  consultants and technical assistants as may be required to carry
702  out the provisions of this act.

703     (3)  Agencies, departments or units of state government,
704  including, but not limited to, the Mississippi Department of
705  Health and the Mississippi Department of Environmental Quality,
706  shall cooperate with the utility authority to regulate the utility
707  authority and assure the effective operation of the utility
708  authority's systems, with the understanding that such agencies act
709  as a regulator and not operator of such systems.  All state

710  officers are hereby empowered and required to render such services
711  to the utility authority within their respective functions as may
712  be requested by the utility authority.

713       **SECTION 10.**  Employees of the utility authority shall serve
714  at the will and pleasure of the Executive Director who shall
715  determine their compensation and benefits.  The compensation of
716  officers at the division head level and above shall be determined
717  by the board.

718       **SECTION 11.**  Neither the directors of the utility authority,
719  the board, its employees, nor any person or persons acting on
720  their behalf, while acting within the scope of their authority,
721  shall be subject to personal liability resulting from carrying out
722  any of the powers granted herein in accordance with his or her
723  good-faith belief that he or she is acting in the best interests
724  of the utility authority.

725       **SECTION 12.**  (1)  The utility authority shall enter into its
726  contracts for major procurements after a competitive and open
727  procurement process.  The utility authority may adopt
728  administrative rules and regulations pursuant to the provisions of
729  this act providing for special procedures whereby the utility
730  authority may make any class of procurement.  The utility
731  authority shall endeavor to ensure the transparency and
732  competitiveness of procurements of all sizes.

733       (2)  In its bidding processes, the utility authority may do
734  its own bidding and procurement or may utilize the services of

735 other state agencies as appropriate and necessary.  The Executive
736 Director may, with the approval of a majority of the board,
737 declare an emergency for purchasing purposes which shall be
738 governed by the administrative rules and regulations adopted by
739 the board.

740   **SECTION 13.**  All monies received by the utility authority
741 shall be deposited into an operating account.  Such account shall
742 be established in a custodian financial institution domiciled in
743 the State of Mississippi, insured by the Federal Deposit Insurance
744 Corporation and collateralized as prescribed by Section 27-105-5.

745   **SECTION 14.**  All division heads, officers and employees of
746 the utility authority shall be considered public servants as
747 defined in Section 25-4-103.  All division heads and officers of
748 the utility authority are subject to Section 25-4-25 and shall be
749 required to file a Statement of Economic Interest with the
750 Mississippi Ethics Commission.

751   **SECTION 15.**  (1)  Any public agency or person, pursuant to a
752 duly adopted resolution of the governing body of such public
753 agency or person, may enter into contracts with the utility
754 authority under the terms of which the utility authority will
755 manage, operate and contract for usage of its systems and
756 facilities, or other services, for such person or public agency.

757   (2)  Any public agency or person may enter into contracts
758 with the utility authority for the utility authority to purchase
759 or sell, by installments over such terms as may be deemed

760  desirable, or otherwise, to any person or any systems.  Any public
761  agency may sell, donate, convey, or otherwise dispose of water,
762  wastewater and storm water facilities or systems; or any
763  equipment, personal property or any other things, deemed necessary
764  for the construction, operation, and maintenance to the utility
765  authority without the necessity of appraisal, advertising, or
766  bidding.  This section creates an alternative method of disposal
767  of public property.

768      (3)  Any public agency is authorized to enter into operating
769  agreements with the utility authority, for such terms and upon
770  such conditions as may be deemed desirable, for the operation of
771  any of its systems of any person by the utility authority or by
772  any person contracting with the utility authority to operate such
773  systems.

774      (4)  Any public agency may lease to or from the utility
775  authority, for such term and upon such conditions as may be deemed
776  desirable, any of its systems.

777      (5)  Any municipality or county may donate office space,
778  equipment, supplies, and materials to the utility authority.

779      (6)  Any such contract may contain provisions requiring any
780  public agency or other person to regulate the quality and strength
781  of the material to be handled by the wastewater or storm water
782  systems and may also provide that the utility authority shall have
783  the right to use any streets, alleys and public ways and places
784  within the jurisdiction of a public agency or other person during

785  the term of the contract.  Such contracts may obligate the public
786  agency to make payments to the utility authority or to a trustee
787  in amounts which shall be sufficient to enable the utility
788  authority to defray the expenses of administering, operating and
789  maintaining its respective systems, to pay interest and principal
790  (whether at maturity upon redemption or otherwise) on bonds of the
791  utility authority, issued under this act and to fund reserves for
792  debt service, for operation and maintenance and for renewals and
793  replacements, to fulfill the requirements of any rate covenant
794  with respect to debt service coverage contained in any resolution,
795  trust indenture or other security agreement relating to the bonds
796  of the utility authority issued under this act or to fulfill any
797  other requirement relating to bonds issued pursuant to this act.

798      (7)  Any public agency shall have the power to enter into
799  such contracts with the utility authority as in the discretion of
800  the governing body of the public agency would be in the best
801  interest of the public agency.  Such contracts may include a
802  pledge of the full faith and credit of such public agency and/or
803  the avails of any special assessments made by such public agency
804  against property receiving benefits, as now or hereafter are
805  provided by law.  Any such contract may provide for the sale, or
806  lease to, or use of by the utility authority, of the systems or
807  any part thereof, of the public agency; and may provide that the
808  utility authority shall operate its systems or any part thereof of
809  the public agency; and may provide that any public agency shall

810  have the right to continued use and/or priority use of the systems

811  or any part thereof during the useful life thereof upon payment of

812  reasonable charges therefor; and may contain provisions to assure

813  equitable treatment of persons or public agencies who contract

814  with the utility authority under this act; and may contain such

815  other provisions and requirements as the parties thereto may

816  determine to be appropriate or necessary.  Such contracts may

817  extend over any period of time, notwithstanding any provisions of

818  law to the contrary, and may extend beyond the life of the

819  respective systems or any part thereof or the term of the bonds

820  sold with respect to such facilities or improvements thereto.

821      (8)  The obligations of a public agency arising under the

822  terms of any contract referred to in this act, whether or not

823  payable solely from a pledge of revenues, shall not be included

824  within the indebtedness limitations of the public agency for

825  purposes of any constitutional or statutory limitation or

826  provision.  To the extent provided in such contract and to the

827  extent such obligations of the public agency are payable wholly or

828  in part from the revenues and other monies derived by the public

829  agency from the operation of its systems or of its combined

830  systems, or any part thereof, such obligations shall be treated as

831  expenses of operating such systems.

832      (9)  Contracts referred to in this section may also provide

833  for payments in the form of contributions to defray the cost of

834  any purpose set forth in the contracts and as advances for the

835    respective systems or any part thereof subject to repayment by the
836    utility authority.  A public agency may make such contributions or
837    advances from its general fund or surplus fund or from special
838    assessments or from any monies legally available therefor.

839        (10)  Subject to the terms of a contract or contracts
840    referred to in this act, the utility authority is hereby
841    authorized to do and perform any and all acts or things necessary,
842    convenient or desirable to carry out the purposes of such
843    contracts, including the fixing, charging, collecting, maintaining
844    and revising of rates, fees and other charges for the services
845    rendered to any user of any of the systems operated or maintained
846    by the utility authority, whether or not such systems are owned by
847    the utility authority.

848        (11)  No provision of this act shall be construed to prohibit
849    any public agency, otherwise permitted by law to issue bonds, from
850    issuing bonds in the manner provided by law for the construction,
851    renovation, repair or development of any of the utility
852    authority's systems, or any part thereof, owned or operated by
853    such public agency.

854    **SECTION 16.**  Whenever a public agency shall have executed a
855    contract under this act and the payments thereunder are to be made
856    either wholly or partly from the revenues of the public agency's
857    systems, or any part thereof, or a combination of such systems,
858    the duty is hereby imposed on the public agency to establish and
859    maintain and from time to time to adjust the rate or fees charged

860    by the public agency for the services of such systems, so that the

861    revenues therefrom, together with any taxes and special

862    assessments levied in support thereof, will be sufficient at all

863    times to pay:

864         (a)  The expense of operating and maintaining such

865    systems, including, but not limited to, all of the public agency's

866    obligations to the utility authority and the cost required to

867    staff such systems, its successors or assigns under such contract;

868    and

869         (b)  All of the public agency's obligations under and in

870    connection with bonds theretofore issued, or which may be issued

871    thereafter and secured by the revenues of such systems.  Any such

872    contract may require the use of consulting engineers and financial

873    experts to advise the public agency whether and when such rates

874    and fees are to be adjusted.

875    **SECTION 17.**  (1)  Notwithstanding the provisions of Sections

876    77-3-21 and 77-3-23, the certificate of public convenience and

877    necessity held by any municipality, public agency, district,

878    public utility or other person authorized by law to provide water,

879    sewer and wastewater services may be cancelled and its powers,

880    duties and responsibilities transferred to the utility authority

881    in the manner provided by this section.

882    (2)  Any entity described in subsection (1) of this section

883    desiring to have its certificate of public convenience and

884    necessity cancelled and its powers, duties and responsibilities

885  transferred to the utility authority shall make a determination to
886  that effect on its official minutes if a public entity, or by
887  affidavit if not a public entity, and transmit such determination
888  to the utility authority.

889      (3)  Upon receipt of the document evidencing such
890  determination from an entity to transfer its powers, duties and
891  responsibilities to the utility authority, the utility authority
892  shall, by resolution, declare whether it is willing and able to
893  accept such transfer from the entity.

894      (4)  Upon completion of the requirements of subsections (2)
895  and (3) of this section herein and agreement by both parties to
896  the transfer, the holder of the certificate of public convenience
897  and necessity and the utility authority shall jointly petition the
898  Public Service Commission to cancel the certificate of public
899  convenience and necessity.  The petition must be accompanied by
900  copies of the official minutes, affidavit or resolution, as the
901  case may be, reflecting the actions of the petitioners.  After
902  review of the petition and any other evidence as the Public
903  Service Commission deems necessary, the commission may issue an
904  order canceling the certificate and transferring to the utility
905  authority the powers, duties and responsibilities granted by the
906  certificate, including all assets and debts of the transferor
907  petitioner related to such certificated services, real or
908  personal, or both, if it finds that:

909         (a)  Subsections (2) and (3) of this section have been

910  complied with; and

911         (b)  Such action is in the public interest.

912     (5)  The utility authority and providers of water, sewer,

913  wastewater and storm water services that are not holders of a

914  certificate of a public convenience and necessity from the Public

915  Service Commission may enter into agreements for the provision of

916  such services, including, but not limited to, the transfer to the

917  utility authority of such provider's powers, duties,

918  responsibilities, assets and debts.

919     (6)  Nothing herein shall require the City of Byram or City

920  of Ridgeland, which were served by the utility authority as of the

921  date of enactment of this act, to remain within the boundaries of

922  the utility authority.

923     **SECTION 18.**  (1)  Any system of a municipality, public agency

924  or person that becomes subject to the jurisdiction of a utility

925  authority and this act shall not impair, invalidate or abrogate

926  any liens, bonds or other certificates of indebtedness related to

927  water, storm water or wastewater facilities and systems incurred

928  prior to becoming subject to the jurisdiction of the utility

929  authority.

930     (2)  The utility authority may do and perform any and all

931  acts necessary, convenient or desirable to ensure the payment,

932  redemption or satisfaction of such liens, bonds or other

933  certificates of indebtedness.

934      **SECTION 19.**   (1)   Sections 18 through 27 of this act apply to
935   all bonds to be issued after the date of enactment of this act,
936   and such provisions shall not affect, limit or alter the rights
937   and powers of any utility authority under this act or any law of
938   Mississippi to conduct the activities referred to herein in any
939   way pertinent to the interests of the bondholders, including,
940   without limitation, such utility authority's right to charge and
941   collect rates, fees and charges and to fulfill the terms of any
942   covenants made with the registered owners of any existing bonds,
943   or in any other way impair the rights and remedies of the
944   registered owners of any existing bonds, unless provision for full
945   payment of such bonds, by escrow or otherwise, has been made
946   pursuant to the terms of the bonds or the resolution, trust
947   indenture or security interest securing the bonds.

948      (2)   The utility authority shall have the power and is hereby
949   authorized, from time to time, to borrow money and to issue
950   revenue bonds and interim notes in such principal amounts as the
951   utility authority may determine to be necessary to provide
952   sufficient funds for achieving one or more of the purposes of this
953   act, including, without limiting the generality of the foregoing,
954   to defray all the costs of the project, the cost of the
955   acquisition, construction, improvement, repair or extension of a
956   system, or any part thereof, whether or not such facilities are
957   owned by the utility authority, the payment of interest on bonds
958   of the utility authority issued pursuant to this act,

959   establishment of reserves to secure such bonds and payment of the

960   interest thereon, expenses incident to the issuance of such bonds

961   and to the implementation of the utility authority's system, and

962   all other expenditures of the utility authority incident to or

963   necessary or convenient to carry out the purposes of this act.

964        (3)   Before issuing bonds, other than interim notes or

965   refunding bonds as provided in Section 20 of this act, the board

966   of directors of the utility authority shall adopt a resolution

967   declaring its intention to issue such bonds and stating the

968   maximum principal amount of bonds proposed to be issued, a general

969   generic description of the proposed improvements and the proposed

970   location thereof and the date, time and place at which the board

971   of directors proposes to take further action with respect to the

972   issuance of such bonds.   The resolution shall be published once a

973   week for at least three (3) consecutive weeks in at least one (1)

974   newspaper having a general circulation within the geographical

975   limits of all of the public agencies which have contracted with

976   the utility authority pursuant to this act.

977        (4)   Bonds of the utility authority issued pursuant to this

978   act shall be payable from and secured by a pledge of all or any

979   part of the revenues under one or more contracts entered into

980   pursuant to this act between the utility authority and one or more

981   of its contracting public agencies and from all or any part of the

982   revenues derived from the operation of any designated system or

983   any part or parts thereof and any other monies legally available

984  and designated therefor, as may be determined by such utility
985  authority, subject only to any agreement with the purchasers of
986  the bonds.  Such bonds may be further secured by a trust indenture
987  between such utility authority and a corporate trustee, which may
988  be any trust company or bank having powers of a trust company
989  without or within the state.

990       (5)  Bonds of the utility authority issued pursuant to this
991  act shall be authorized by a resolution or resolutions adopted by
992  a majority affirmative vote of the total membership of the board
993  of directors of the utility authority.  Such bonds may be issued
994  in series, and each series of such bonds shall bear such date or
995  dates, mature at such time or times, bear interest at such rate or
996  rates (not exceeding the maximum rate set out in Section
997  75-17-103, Mississippi Code of 1972), be in such denomination or
998  denominations, be in such form, carry such conversion privileges,
999  have such rank or priority, be executed in such manner and by such
1000 officers, be payable from such sources in such medium of payment
1001 at such place or places within or without the state, provided that
1002 one such place shall be within the state, and be subject to such
1003 terms of redemption prior to maturity, all as may be provided by
1004 resolution or resolutions of the board of directors.  The term of
1005 such bonds issued pursuant to this act shall not exceed forty (40)
1006 years.

1007      (6)  Bonds of the utility authority issued pursuant to this
1008 act may be sold at such price or prices, at public or private

23/HR43/SB2889A.3J
PAGE 41
 (MCL/EW)

1009  sale, in such manner and at such times as may be determined by
1010  such utility authority to be in the public interest, and such
1011  utility authority may pay all expenses, premiums, fees and
1012  commissions which it may deem necessary and advantageous in
1013  connection with the issuance and sale thereof.

1014       (7)  Any pledge of earnings, revenues or other monies made by
1015  the utility authority shall be valid and binding from the time the
1016  pledge is made.  The earnings, revenues or other monies so pledged
1017  and thereafter received by such utility authority shall
1018  immediately be subject to the lien of such pledge without any
1019  physical delivery thereof or further act, and the lien of any such
1020  pledge shall be valid and binding as against all parties having
1021  claims of any kind in tort, contract or otherwise against such
1022  utility authority irrespective of whether such parties have notice
1023  thereof. Neither the resolution nor any other instrument by which
1024  a pledge is created need be recorded.

1025       (8)  Neither the members of the board of directors nor any
1026  person executing the bonds shall be personally liable on the bonds
1027  or be subject to any personal liability or accountability by
1028  reason of the issuance thereof.

1029       (9)  Proceeds from the sale of bonds of the utility authority
1030  may be invested, pending their use, in such securities as may be
1031  specified in the resolution authorizing the issuance of the bonds
1032  or the trust indenture securing them, and the earnings on such

1033   investments applied as provided in such resolution or trust
1034   indenture.

1035       (10)  Whenever any bonds shall have been signed by the
1036   officer(s) designated by the resolution of the board of directors
1037   to sign the bonds who were in office at the time of such signing
1038   but who may have ceased to be such officer(s) prior to the sale
1039   and delivery of such bonds, or who may not have been in office on
1040   the date such bonds may bear, the manual or facsimile signatures
1041   of such officer(s) upon such bonds shall nevertheless be valid and
1042   sufficient for all purposes and have the same effect as if the
1043   person so officially executing such bonds had remained in office
1044   until the delivery of the same to the purchaser or had been in
1045   office on the date such bonds may bear.

1046       (11)  The utility authority has the discretion to advance or
1047   borrow funds needed to satisfy any short-term cash flow demands or
1048   deficiencies or to cover start-up costs until such time as
1049   sufficient bonds, assets and revenues have been secured to satisfy
1050   the needs of the utility authority.

1051       **SECTION 20.**  (1)  The utility authority may, by resolution
1052   adopted by its board of directors, issue refunding bonds for the
1053   purpose of paying any of its bonds at or prior to maturity or upon
1054   acceleration or redemption.  Refunding bonds may be issued at such
1055   time prior to the maturity or redemption of the refunded bonds as
1056   the board of directors deems to be in the public interest, without
1057   an election on the question of the issuance thereof.  The

1058  refunding bonds may be issued in sufficient amounts to pay or
1059  provide the principal of the bonds being refunded, together with
1060  any redemption premium thereon, any interest accrued or to accrue
1061  to the date of payment of such bonds, the expenses of issue of the
1062  refunding bonds, the expenses of redeeming the bonds being
1063  refunded, and such reserves for debt service or other capital or
1064  current expenses from the proceeds of such refunding bonds as may
1065  be required by the resolution, trust indenture or other security
1066  instruments.  The issue of refunding bonds, the maturities and
1067  other details thereof, the security therefor, the rights of the
1068  holders and the rights, duties and obligations of the utility
1069  authority in respect of the same shall be governed by the
1070  provisions of this act relating to the issue of bonds other than
1071  refunding bonds insofar as the same may be applicable.  Any such
1072  refunding may be effected, whether the obligations to be refunded
1073  shall have then matured or shall thereafter mature, either by the
1074  exchange of the refunding bonds for the obligations to be refunded
1075  thereby with the consent of the holders of the obligations so to
1076  be refunded, or by sale of the refunding bonds and the application
1077  of the proceeds thereof to the payment of the obligations proposed
1078  to be refunded thereby, and regardless of whether the obligations
1079  proposed to be refunded shall be payable on the same date or
1080  different dates or shall be due serially or otherwise.
1081       (2)  Borrowing by the utility authority may be made by the
1082  delivery of interim notes to any person or public agency or

1083  financial institution by a majority vote of the board of
1084  directors.
1085  **SECTION 21.**  All bonds, other than refunding bonds, interim
1086  notes and certificates of indebtedness, which may be validated
1087  issued pursuant to this act shall be validated as now provided by
1088  law in Sections 31-13-1 through 31-13-11, Mississippi Code of
1089  1972; however, notice of such validation proceedings shall be
1090  addressed to the citizens of the respective public agencies (a)
1091  which have contracted with the utility authority pursuant to this
1092  act, and (b) whose contracts and the payments to be made by the
1093  public agencies thereunder constitute security for the bonds of
1094  such utility authority proposed to be issued, and that such notice
1095  shall be published at least once in a newspaper or newspapers
1096  having a general circulation within the geographical boundaries of
1097  each of the contracting public agencies to whose citizens the
1098  notice is addressed.  Such validation proceedings shall be
1099  instituted in any chancery courts within the boundaries of the
1100  utility authority.  The validity of the bonds so validated and of
1101  the contracts and payments to be made by the public agencies
1102  thereunder constituting security for the bonds shall be forever
1103  conclusive against the utility authority and the public agencies,
1104  which are parties to said contracts; and the validity of said
1105  bonds and said contracts and the payments to be made thereunder
1106  shall never be called in question in any court in this state.

1107   **SECTION 22.**   Bonds issued under the provisions of this act
1108   shall not be deemed to constitute, within the meaning of any
1109   constitutional or statutory limitation, an indebtedness of the
1110   utility authority or the state.   Such bonds shall be payable
1111   solely from the revenues or assets of the utility authority
1112   pledged therefor.   Each bond issued under this act shall contain
1113   on the face thereof a statement to the effect that such utility
1114   authority, nor the state, shall not be obligated to pay the same
1115   nor the interest thereon except from the revenues or assets
1116   pledged therefor.

1117   **SECTION 23.**   The utility authority shall have power in
1118   connection with the issuance of its bonds pursuant to this act to:

1119        (a)   Covenant as to the use of any or all of its
1120   property, real or personal;

1121        (b)   Redeem the bonds, to covenant for their redemption
1122   and to provide the terms and conditions thereof;

1123        (c)   Covenant to charge rates, fees and charges
1124   sufficient to meet operating and maintenance expenses, renewals
1125   and replacements, principal and debt service on bonds, creation
1126   and maintenance of any reserves required by a bonds resolution,
1127   trust indenture or other security instrument and to provide for
1128   any margins or coverages over and above debt service on the bonds
1129   deemed desirable for the marketability of the bonds;

1130        (d)   Covenant and prescribe as to events of default and
1131   terms and conditions upon which any or all of its bonds shall

1132    become or may be declared due before maturity, as to the terms and
1133    conditions upon which such declaration and its consequences may be
1134    waived and as to the consequences of default and the remedies of
1135    the registered owners of the bonds;

1136            (e)  Covenant as to the mortgage or pledge of or the
1137    grant of a security interest in any real or personal property and
1138    all or any part of the revenues from any designated system or any
1139    part thereof or any revenue-producing contract or contracts made
1140    by a utility authority with any person to secure the payment of
1141    bonds, subject to such agreements with the registered owners of
1142    bonds as may then exist;

1143            (f)  Covenant as to the custody, collection, securing,
1144    investment and payment of any revenues, assets, monies, funds or
1145    property with respect to which a utility authority may have any
1146    rights or interest;

1147            (g)  Covenant as to the purposes to which the proceeds
1148    from the sale of any bonds then or thereafter to be issued may be
1149    applied, and the pledge of such proceeds to secure the payment of
1150    the bonds;

1151            (h)  Covenant as to the limitations on the issuance of
1152    any additional bonds, the terms upon which additional bonds may be
1153    issued and secured, and the refunding of outstanding bonds;

1154            (i)  Covenant as to the rank or priority of any bonds
1155    with respect to any lien or security;

1156          (j)  Covenant as to the procedure by which the terms of
1157   any contract with or for the benefit of the registered owners of
1158   bonds may be amended or abrogated, the amount of bonds the
1159   registered owners of which must consent thereto, and the manner in
1160   which such consent may be given;

1161          (k)  Covenant as to the custody of any of its properties
1162   or investments, the safekeeping thereof, the insurance to be
1163   carried thereon, and the use and disposition of insurance
1164   proceeds;

1165          (l)  Covenant as to the vesting in a trustee or
1166   trustees, within or outside the state, of such properties, rights,
1167   powers and duties in trust as such utility authority may
1168   determine;

1169          (m)  Covenant as to the appointing and providing for the
1170   duties and obligations of a paying agent or paying agents or other
1171   fiduciaries within or outside the state;

1172          (n)  Make all other covenants and to do any and all such
1173   acts and things as may be necessary or convenient or desirable in
1174   order to secure its bonds, or in the absolute discretion of the
1175   utility authority tend to make the bonds more marketable,
1176   notwithstanding that such covenants, acts or things may not be
1177   enumerated herein; it being the intention hereof to give any
1178   utility authority power to do all things in the issuance of bonds
1179   and in the provisions for security thereof which are not
1180   inconsistent with the Constitution of the state; and

1181          (o)  Execute all instruments necessary or convenient in

1182    the exercise of the powers herein granted or in the performance of

1183    covenants or duties, which may contain such covenants and

1184    provisions, as any purchaser of the bonds of the utility authority

1185    may reasonably require.

1186        **SECTION 24.**   The utility authority may, in any authorizing

1187    resolution of the board of directors, trust indenture or other

1188    security instrument relating to its bonds issued pursuant to this

1189    act, provide for the appointment of a trustee who shall have such

1190    powers as are provided therein to represent the registered owners

1191    of any issue of bonds in the enforcement or protection of their

1192    rights under any such resolution, trust indenture or security

1193    instrument.  The utility authority may also provide in such

1194    resolution, trust indenture or other security instrument that the

1195    trustee, or in the event that the trustee so appointed shall fail

1196    or decline to so protect and enforce such registered owners'

1197    rights then such percentage of registered owners as shall be set

1198    forth in, and subject to the provisions of, such resolution, trust

1199    indenture or other security interest, may petition the court of

1200    proper jurisdiction for the appointment of a receiver of the

1201    utility authority's systems, the revenues of which are pledged to

1202    the payment of the principal of and interest on the bonds of such

1203    registered owners.  Such receiver may exercise any power as may be

1204    granted in any such resolution, trust indenture or security

1205    instrument to enter upon and take possession of, acquire,




1206   construct, reconstruct or operate and maintain such system, fix

1207   charges for services of the system and enforce collection thereof,

1208   and receive all revenues derived from such system or facilities

1209   and perform the public duties and carry out the contracts and

1210   obligations of such utility authority in the same manner as such

1211   utility authority itself might do, all under the direction of such

1212   court.

1213   **SECTION 25.**   (1)  The exercise of the powers granted by this

1214   act will be in all respects for the benefit of the people of the

1215   state, for their well-being and prosperity and for the improvement

1216   of their social and economic conditions, and the utility authority

1217   shall not be required to pay any tax or assessment on any property

1218   owned by the utility authority under the provisions of this act or

1219   upon the income therefrom; nor shall the utility authority be

1220   required to pay any recording fee or transfer tax of any kind on

1221   account of instruments recorded by it or on its behalf.

1222   (2)  Any bonds issued by the utility authority under and

1223   pursuant to the provisions of this act, their transfer and the

1224   income therefrom shall at all times be free from taxation by the

1225   state or any local unit or political subdivision or other

1226   instrumentality of the state, excepting inheritance and gift

1227   taxes.

1228   **SECTION 26.**   All bonds issued under the provisions of this

1229   act shall be legal investments for trustees, other fiduciaries,

1230   savings banks, trust companies and insurance companies organized

1231  under the laws of the State of Mississippi; and such bonds shall
1232  be legal securities which may be deposited with and shall be
1233  received by all public officers and bodies of the state and all
1234  municipalities and other political subdivisions thereof for the
1235  purpose of securing the deposit of public funds.

1236      **SECTION 27.**   The state hereby covenants with the registered
1237  owners of any bonds of any utility authority that so long as the
1238  bonds are outstanding and unpaid, the state will not limit or
1239  alter the rights and powers of any utility authority under this
1240  act to conduct the activities referred to herein in any way
1241  pertinent to the interests of the bondholders, including, without
1242  limitation, such utility authority's right to charge and collect
1243  rates, fees, assessments and charges and to fulfill the terms of
1244  any covenants made with the registered owners of the bonds, or in
1245  any other way impair the rights and remedies of the registered
1246  owners of the bonds, unless provision for full payment of such
1247  bonds, by escrow or otherwise, has been made pursuant to the terms
1248  of the bonds or the resolution, trust indenture or security
1249  interest securing the bonds.

1250      **SECTION 28.**   For the purposes of satisfying any temporary
1251  cash flow demands and deficiencies, and to maintain a working
1252  balance for the utility authority, the county, municipalities or
1253  public agencies within the geographic boundaries of the utility
1254  authority, or other persons, subject to their lawful authority to
1255  do so, are authorized to advance, at any time, such funds which,

23/HR43/SB2889A.3J
PAGE 51
(MCL/EW)

1256  in its discretion, are necessary, or borrow such funds by issuance
1257  of notes, for initial capital contribution and to cover start-up
1258  costs until such times as sufficient bonds, assets and revenues
1259  have been secured to satisfy the needs of the utility authority
1260  for its management, operation and formation.  To this end, the
1261  county, municipality, public agency or person, subject to their
1262  lawful authority to do so, shall advance such funds, or borrow
1263  such funds by issuance of notes, under such terms and conditions
1264  as may be provided by resolution of the governing body, or other
1265  persons as defined in this act, subject to their lawful authority
1266  to do so, except that each such resolution shall state:
1267          (a)  The need for the proceeds advanced or borrowed;
1268          (b)  The amount to be advanced or the amount to be
1269  borrowed;
1270          (c)  The maximum principal amount of any note issued the
1271  interest rate or maximum interest rate to be incurred, and the
1272  maturity date of said note;
1273          (d)  In addition, the governing body, or other persons
1274  as defined in this act, subject to their lawful authority to do
1275  so, may arrange for lines of credit with any bank, firm or person
1276  for the purpose of providing an additional source of repayment for
1277  notes issued pursuant to this section.  Amounts drawn on a line of
1278  credit may be evidenced by negotiable or nonnegotiable notes or
1279  other evidences of indebtedness and contain such terms and
1280  conditions as the governing body, or other persons as defined in

1281  this act, subject to their lawful authority to do so, may
1282  authorize in the resolution approving the same;

1283      (e)  The governing body of the county, municipalities or
1284  other persons as defined in this act, subject to their lawful
1285  authority to do so, may authorize the repayment of such advances,
1286  notes, lines of credit and other debt incurred under this section,
1287  along with all costs associated with the same, including, but not
1288  limited to, rating agency fees, printing costs, legal fees, bank
1289  or trust company fees, line of credit fees and other charges to be
1290  reimbursed by the utility authority under such terms and
1291  conditions as are reasonable and are to be provided for by
1292  resolution of the governing body, or terms agreed upon with other
1293  persons as defined in this act, subject to their lawful authority
1294  to do so; and

1295      (f)  In addition, the governing body of the county,
1296  municipality or public agency may lease or donate office space and
1297  equipment to the utility authority under such terms and conditions
1298  as are reasonable and are to be provided for by resolution of the
1299  governing body, or terms agreed upon by the utility authority.

1300  **SECTION 29.**  This act being necessary for the welfare of the
1301  state and its inhabitants shall be liberally construed to effect
1302  the purposes thereof.  If any section, provision, paragraph,
1303  sentence, phrase or word of this act shall be held invalid by any
1304  court of competent jurisdiction, the remainder of this act shall
1305  not be affected thereby.

23/HR43/SB2889A.3J
PAGE 53
(MCL/EW)

1306     **SECTION 30.**  Sections 1 through 29 of this act shall be
1307 codified in Title 77, Mississippi Code of 1972.

1308     **SECTION 31.**  This act shall take effect and be in force from
1309 and after July 1, 2023, and shall stand repealed on June 30, 2023.

    **Further, amend by striking the title in its entirety and inserting in lieu thereof the following:**

1     AN ACT TO CREATE THE MISSISSIPPI CAPITOL REGION UTILITY ACT;
2 TO ESTABLISH THE MISSISSIPPI CAPITOL REGION UTILITY AUTHORITY; TO
3 PROVIDE FOR THE APPOINTMENT OF AN EXECUTIVE DIRECTOR AND A BOARD
4 OF DIRECTORS FOR SUCH AUTHORITY; TO CLARIFY THE POWERS AND DUTIES
5 OF SUCH BOARD; TO ENSURE ACCESS TO SAFE, CLEAN AND RELIABLE WATER
6 FOR THE CITIZENS OF CENTRAL MISSISSIPPI; AND FOR RELATED PURPOSES.

Mississippi State Senate
2022 Regular Session

YEAS AND NAYS On S. B. No. 2822.  On motion of Senator Polk, the rules were suspended, the bill considered engrossed, read the third time and, the yeas and nays being taken, it passed, title standing as stated, by the following vote:

Yeas--Barnett, Barrett, Blackmon, Blackwell, Blount, Boyd, Branning, Bryan, Butler A. (36th), Butler K. (38th), Carter, Caughman, Chassaniol, Chism, DeBar, DeLano, England, Fillingane, Frazier, Harkins, Hickman, Hill, Hopson, Horhn, Jackson (11th), Johnson, Jordan, Kirby, McCaughn, McDaniel, McLendon, McMahan, Michel, Moran, Norwood, Parker, Parks, Polk, Seymour, Simmons D. T. (12th), Simmons S. (13th), Sojourner, Sparks, Suber, Tate, Thomas, Thompson, Turner-Ford, Whaley, Wiggins, Williams, Younger.  Total--52.
Nays--None.
Absent and those not voting----None.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.
The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

Mississippi House of Representatives
2022 Regular Session

S. B. No. 2822 passed by the following vote:

Yeas--Aguirre, Anderson (110th), Anderson (122nd), Anthony, Arnold, Bailey, Bain, Banks, Barnett, Barton, Beckett, Bell (21st), Bell (65th), Bennett, Blackmon, Bounds, Boyd, Brown (20th), Brown (70th), Burnett, Busby, Byrd, Calvert, Carpenter, Clark, Clarke, Cockerham, Crawford, Creekmore IV, Crudup, Currie, Darnell, Denton, Deweese, Eubanks, Eure, Evans (45th), Evans (91st), Faulkner, Felsher, Ford (54th), Ford (73rd), Foster, Gibbs (36th), Gibbs (72nd), Goodin, Guice, Hale, Haney, Harness, Hines, Hobgood-Wilkes, Holloway, Hood, Hopkins, Horan, Horne, Huddleston, Jackson, Johnson, Karriem, Kinkade, Ladner, Lamar, Lancaster, Mangold, Massengill, McCarty, McCray, McGee, McKnight, McLean, McLeod, Mickens, Miles, Mims, Morgan, Newman, Oliver, Osborne, Owen, Paden, Patterson, Pigott, Porter, Powell, Read, Reynolds, Roberson, Robinson, Rosebud, Rushing, Sanders, Sanford, Scoggin, Scott, Shanks, Smith, Stamps, Steverson, Straughter, Summers, Taylor, Thompson, Tubb, Tullos, Turner, Walker, Wallace, Watson, Weathersby, White, Williams-Barnes, Williamson, Wright, Yancey, Yates, Young, Zuber, Mr. Speaker.  Total--120.
Nays--Bomgar, Criswell.  Total--2.
Absent or those not voting--None.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.

The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

Mississippi House of Representatives
2022 Regular Session

The conference report on S. B. No. 2822 was adopted by the following vote:

Yeas--Aguirre, Anderson (110th), Anderson (122nd), Anthony, Arnold, Bailey, Bain, Banks, Barnett, Barton, Beckett, Bell (21st), Bell (65th), Bennett, Blackmon, Bounds, Boyd, Brown (70th), Burnett, Busby, Byrd, Calvert, Carpenter, Clark, Clarke, Cockerham, Crawford, Creekmore IV, Crudup, Currie, Darnell, Denton, Deweese, Eubanks, Eure, Evans (45th), Evans (91st), Faulkner, Felsher, Ford (54th), Ford (73rd), Foster, Gibbs (36th), Gibbs (72nd), Goodin, Guice, Hale, Haney, Harness, Hines, Hobgood-Wilkes, Holloway, Hood, Hopkins, Horan, Horne, Huddleston, Jackson, Johnson, Karriem, Ladner, Lamar, Lancaster, Mangold, Massengill, McCarty, McCray, McGee, McKnight, McLean, McLeod, Mickens, Miles, Mims, Morgan, Newman, Oliver, Osborne, Owen, Paden, Patterson, Pigott, Porter, Powell, Read, Reynolds, Roberson, Robinson, Rushing, Sanders, Sanford, Scoggin, Shanks, Smith, Stamps, Steverson, Straughter, Summers, Taylor, Thompson, Tubb, Tullos, Turner, Walker, Wallace, Watson, Weathersby, White, Williams-Barnes, Williamson, Wright, Yancey, Yates, Young, Zuber, Mr. Speaker.  Total--116.

Nays--None.

Absent or those not voting--Bomgar, Brown (20th), Criswell, Kinkade, Scott. Total--5.

Present--Rosebud.  Total--1.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.

The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

Mississippi State Senate
2022 Regular Session

YEAS AND NAYS.  The yeas and nays being taken, the Report of Conference Committee on S. B. No. 2822 (version 2) was adopted:

Yeas--Barnett, Barrett, Blackmon, Blackwell, Blount, Boyd, Branning, Bryan, Butler A. (36th), Butler K. (38th), Carter, Caughman, Chassaniol, Chism, DeBar, DeLano, England, Fillingane, Frazier, Harkins, Hickman, Hopson, Horhn, Jackson (11th), Johnson, Jordan, Kirby, McCaughn, McDaniel, McLendon, McMahan, Michel, Moran, Norwood, Parker, Polk, Seymour, Simmons D. T. (12th), Simmons S. (13th), Sojourner, Sparks, Suber, Tate, Thomas, Thompson, Turner-Ford, Whaley, Wiggins, Williams, Younger.  Total--50.
Nays--None.
Absent and those not voting--Hill, Parks.  Total--2.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.
The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

Mississippi House of Representatives
2022 Regular Session

The conference report on S. B. No. 2822 was adopted by the following vote:

Yeas--Aguirre, Anderson (110th), Anderson (122nd), Anthony, Arnold, Bailey, Bain, Banks, Barnett, Barton, Beckett, Bell (21st), Bell (65th), Bennett, Blackmon, Bounds, Boyd, Brown (70th), Burnett, Busby, Byrd, Calvert, Carpenter, Clarke, Cockerham, Crawford, Creekmore IV, Crudup, Currie, Darnell, Denton, Deweese, Eubanks, Eure, Evans (45th), Evans (91st), Faulkner, Felsher, Ford (54th), Ford (73rd), Foster, Gibbs (36th), Gibbs (72nd), Goodin, Guice, Hale, Haney, Harness, Hines, Holloway, Hood, Horan, Horne, Huddleston, Jackson, Johnson, Karriem, Kinkade, Ladner, Lamar, Lancaster, Mangold, Massengill, McCarty, McCray, McGee, McKnight, McLean, McLeod, Mickens, Miles, Mims, Morgan, Newman, Oliver, Osborne, Owen, Paden, Patterson, Pigott, Porter, Powell, Read, Reynolds, Roberson, Robinson, Rushing, Sanders, Shanks, Smith, Stamps, Steverson, Straughter, Taylor, Thompson, Tubb, Turner, Walker, Wallace, Watson, Weathersby, White, Williams-Barnes, Wright, Yancey, Yates, Zuber, Mr. Speaker.  Total--108.

Nays--None.
Absent or those not voting--Bomgar, Brown (20th), Clark, Criswell, Hobgood-Wilkes, Hopkins, Sanford, Scoggin, Scott, Summers, Tullos, Williamson.  Total--12.
Present--Rosebud, Young.  Total--2.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.
The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

Mississippi House of Representatives
2022 Regular Session

H. B. No. 1031 passed by the following vote:

Yeas--Aguirre, Anderson (110th), Anderson (122nd), Anthony, Arnold, Bain, Banks, Barnett, Barton, Beckett, Bell (21st), Bell (65th), Bennett, Blackmon, Bounds, Boyd, Brown (70th), Burnett, Busby, Byrd, Calvert, Carpenter, Clark, Clarke, Cockerham, Crawford, Creekmore IV, Crudup, Currie, Darnell, Denton, Deweese, Eure, Evans (45th), Evans (91st), Faulkner, Felsher, Ford (54th), Ford (73rd), Foster, Gibbs (36th), Gibbs (72nd), Goodin, Guice, Hale, Harness, Hines, Hobgood-Wilkes, Holloway, Hood, Horan, Horne, Huddleston, Jackson, Johnson, Karriem, Kinkade, Ladner, Lamar, Lancaster, Mangold, Massengill, McCarty, McCray, McGee, McKnight, McLean, McLeod, Mickens, Miles, Mims, Morgan, Newman, Oliver, Osborne, Owen, Paden, Patterson, Pigott, Porter, Powell, Read, Reynolds, Roberson, Robinson, Rosebud, Rushing, Sanders, Sanford, Scoggin, Shanks, Smith, Stamps, Steverson, Straughter, Summers, Taylor, Thompson, Tubb, Tullos, Turner, Walker, Wallace, Watson, Weathersby, White, Williams-Barnes, Wright, Yancey, Yates, Young, Zuber, Mr. Speaker.  Total--113.

Nays--Bailey, Bomgar, Brown (20th), Criswell, Eubanks, Hopkins, Williamson. Total--7.

Absent or those not voting--Haney.  Total--1.

Present--Scott.  Total--1.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.

The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

Mississippi State Senate
2022 Regular Session

YEAS AND NAYS On H. B. No. 1031.  On motion of Senator Polk, the rules were suspended, the bill considered engrossed, read the third time and, the yeas and nays being taken, it passed as amended, title standing as stated, by the following vote:

Yeas--Barnett, Barrett, Blackmon, Blackwell, Blount, Boyd, Branning, Bryan, Butler A. (36th), Butler K. (38th), Carter, Caughman, Chassaniol, Chism, DeBar, DeLano, England, Fillingane, Frazier, Harkins, Hickman, Hill, Hopson, Horhn, Jackson (11th), Johnson, Jordan, Kirby, McCaughn, McLendon, McMahan, Michel, Moran, Norwood, Parker, Parks, Polk, Seymour, Simmons D. T. (12th), Simmons S. (13th), Sparks, Suber, Tate, Thomas, Thompson, Turner-Ford, Whaley, Wiggins, Williams, Younger.  Total--50.
Nays--McDaniel, Sojourner.  Total--2.
Absent and those not voting----None.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.

The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

Mississippi House of Representatives
2022 Regular Session

The conference report on H. B. No. 1031 was adopted by the following vote:

Yeas--Aguirre, Anderson (110th), Anderson (122nd), Anthony, Arnold, Bailey, Bain, Banks, Barnett, Barton, Beckett, Bell (21st), Bell (65th), Bennett, Blackmon, Bounds, Boyd, Brown (70th), Burnett, Busby, Byrd, Calvert, Carpenter, Clark, Clarke, Cockerham, Crawford, Creekmore IV, Crudup, Currie, Darnell, Denton, Deweese, Eure, Evans (45th), Evans (91st), Faulkner, Felsher, Ford (54th), Ford (73rd), Foster, Gibbs (36th), Gibbs (72nd), Goodin, Guice, Hale, Haney, Harness, Hines, Hobgood-Wilkes, Holloway, Hood, Horan, Jackson, Johnson, Karriem, Kinkade, Ladner, Lamar, Lancaster, Mangold, Massengill, McCarty, McCray, McGee, McKnight, McLean, McLeod, Mickens, Miles, Mims, Morgan, Newman, Oliver, Osborne, Owen, Paden, Patterson, Pigott, Porter, Powell, Read, Reynolds, Roberson, Robinson, Rosebud, Rushing, Sanders, Sanford, Scoggin, Scott, Shanks, Smith, Stamps, Steverson, Straughter, Summers, Taylor, Thompson, Tubb, Tullos, Turner, Walker, Wallace, Watson, Weathersby, White, Williams-Barnes, Wright, Yancey, Yates, Young, Zuber, Mr. Speaker.  Total--114.

Nays--Bomgar, Brown (20th), Criswell, Hopkins, Horne, Williamson.  Total--6.

Absent or those not voting--Eubanks, Huddleston.  Total--2.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.

The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

Mississippi State Senate
2022 Regular Session

YEAS AND NAYS.  The yeas and nays being taken, the Report of Conference Committee on H. B. No. 1031 was adopted:

Yeas--Barnett, Barrett, Blackmon, Blackwell, Blount, Boyd, Branning, Bryan, Butler A. (36th), Butler K. (38th), Carter, Caughman, Chassaniol, Chism, DeBar, DeLano, England, Fillingane, Frazier, Harkins, Hickman, Hill, Hopson, Horhn, Jackson (11th), Johnson, Jordan, Kirby, McCaughn, McDaniel, McLendon, McMahan, Michel, Moran, Norwood, Parker, Parks, Polk, Seymour, Simmons D. T. (12th), Simmons S. (13th), Sojourner, Sparks, Suber, Tate, Thomas, Thompson, Turner-Ford, Whaley, Wiggins, Williams, Younger.  Total--52.
Nays--None.
Absent and those not voting----None.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form or any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.

The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

# Judiciary B Meeting

October 10, 2022

All depositions & exhibits are available for downloading at
www.brookscourtreporting.com
Please call or e-mail info@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi - Alabama - Louisiana - Tennessee - New York
1-800-245-3376**

Judiciary B Meeting 10/10/2022

Page 1

AUDIO TRANSCRIPT OF
JUDICIARY B MEETING

Page 3

1 and I'm a part of Jackson.  I went to law
2 school here.  I worked here.  I had my first
3 job as a lawyer just a few blocks away in the
4 Heritage Building.  I am a part of Jackson.
5 My daughter was born here.
6     I have, for the past twelve years, been
7 a member of this body.  And of those twelve
8 years, as you know, three months out of the
9 year, I'm here.  So over three years of my
10 life I've been down here as a member of this
11 body.
12     My youngest son is nine years old, so
13 that's one third of his life I've spent right
14 here.  So Jackson is near and dear to my
15 heart.  Jackson is my second home.  So what
16 happens here in this City is important to me,
17 and it's going to be important to this
18 Committee.
19     So with that said, we began having
20 discussions back in July about having a
21 hearing on Jackson crime.  I got with the
22 lady from Hinds, Ms. Yates, about getting
23 this set up, and she began getting speakers
24 and organizing today's agenda.  And I do
25 think she's done a marvelous job of getting

Page 2

1     COMMISSIONER BAINS:  All right, I've got
2 09:00.  We'll go ahead and get started.  If
3 everybody can find a seat -- meeting members.
4 If there are any -- any other House members
5 in here, you're welcome to sit at the table.
6 You may not get -- you may not ask questions,
7 but I will let you sit at the table.  But
8 we'll go ahead and get started.  We got a big
9 agenda.  Everybody has been handed -- handed
10 an agenda, all the members.
11     I want to thank everybody for being
12 here.  This is a very, very important topic
13 for, not only the City of Jackson, but for
14 all of Mississippi.  So I do want us to have
15 a very spirited debate and very informative
16 hearing here today.  Now, our topic is crime
17 in Jackson, Jackson crime.  And really,
18 what's going on.  Now, people may under --
19 ask, why are we doing this?  And I say, well,
20 this is a problem for Mississippi, not just
21 for Jackson, but for the entire state.
22     Now, I live in Horns, Mississippi, as
23 you all know.  I drive further than any
24 member of the legislature to get here.  I'm
25 four hours away, but Jackson is a part of me,

Page 4

1 people here and getting the proper
2 stakeholders here to testify.
3     Everybody that is on the agenda was
4 confirmed to be here, as late as Friday of
5 last week.  Yesterday, at 12:00, Mayor
6 Lamumba, who was supposed to be here to speak
7 first, informed us that he was not going to
8 be here and informed us that he had some
9 sickness and was unable to be here.  I
10 understand that at -- later that day at 04:00
11 in the afternoon, the Mayor and the Police
12 chief sent an email stating, unfortunately
13 the Mayor and Chief Davis will be unable to
14 attend the hearing.  Please keep us posted as
15 to future events.  So both of them told us
16 that they were not going to be here.
17     Neither correspondence was any
18 representative offered in their -- in their
19 replacement to provide any of the information
20 that we're asking for.  They did not offer us
21 a representative on their behalf to come and
22 talk to us.  And, as such, we don't know
23 where the City of Jackson, the Mayor or the
24 Police Department what their position is on
25 crime in Jackson.

1 (Pages 1 to 4)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 5

1    It is imperative and it is going to be
2    noted today that the State of Mississippi
3    stands willing and read to help the City of
4    Jackson but have not -- partake in this
5    hearing and have been obstinate in their
6    attendance here today.  So with that said, we
7    are going to issue a subpoena to both of
8    them.  We're placing both the City of -- the
9    Mayor of Jackson under subpoena and we will
10   place the Chief of Police under subpoena to
11   be back here on November 17 to offer
12   testimony in front of this Committee as to
13   their plan for Jackson and the crime that is
14   sweeping this city.
15       Again, that will be November 17, 09:00,
16   in this room.  We have given him -- both of
17   them ample opportunity to be here to have a
18   replacement here to testify.  I want it to be
19   noted that we are willing and ready and able
20   to help the City of Jackson and that's why
21   we're taking the steps that we are, placing
22   them under subpoena to be here on
23   November 17.
24       With that said, we are going to move
25   ahead in the agenda.  Both of those were to

Page 6

1    be our first two speakers.  So, we're going
2    to skip and go to the Sheriff of Hinds
3    County, Tyree Jones.  Sheriff, you're here
4    and I'm going to go ahead and -- you can
5    speak where you're at.  That's fine.  And
6    just offer your testimony.
7        You are recognized, sir.  Thank you for
8    being here.
9        SHERIFF TYREE JONES:  There we go.  Yes,
10   sir.  Thank you.  Before I get started, I
11   just want to recognize that a member from the
12   City did just walk in and I'm not exactly
13   sure if Mr. Wright is here to speak on behalf
14   of this, but I just want to let you know that
15   he has, you know, walked in.  So I'm not sure
16   if you want to yield back to him or you want
17   me to go ahead and get started.
18       Okay.  So first of all, I thank you all
19   for this opportunity to be here.  And again,
20   I always look forward to working collectively
21   with everybody as it relates to not only
22   crime in Hinds County, but crime in the City
23   of Jackson, as well.  So as the Sheriff of
24   Hinds County, as you all know, I have a huge
25   responsibility.  It's not just City of

Page 7

1    Jackson, but it's Hinds County as a whole.
2    And we're talking about the rural and
3    unincorporated areas of Hinds County as well,
4    where we have primary responsibility.
5        But as it relates to specifically the
6    City of Jackson and crime in the City of
7    Jackson, I think that we all know that there
8    is a dark cloud over what I would consider
9    some of the criminal activity and criminal
10   element in the City of Jackson, which has
11   victimized several people over the last few
12   years.  And as the Sheriff of Hinds County, I
13   have dedicated resources specifically for the
14   City of Jackson to work collaboratively with
15   other agencies to be able to target and
16   address some of the criminal activity and
17   criminal elements, as well.
18       But as you all know, we can't do it
19   alone.  The Sheriff's Office can't do it
20   alone.  We have to work with other agencies,
21   not only the Jackson Police Department, but
22   we welcome all partners to help us address
23   crime in the City of Jackson and Hinds
24   County.  And when I say other partners, I
25   mean other local partners, state partners,

Page 8

1    and federal partners, as well, because we
2    have to depend on others for resources and
3    other tools that we need to move forward with
4    the criminal activity in the City of Jackson.
5        I think that the main issue that we've
6    been facing in the City of Jackson is the
7    homicide rate.  The violent crimes have
8    nearly doubled or more over the last few
9    years.  And what I've known and what I've
10   recognized about some of that is -- is a lot
11   of negligence on behalf of individuals that
12   have some type of issue with each other.  And
13   when I say that there is a lack of conflict
14   resolution, there's a lack of de-escalation.
15   And as a result, many people have been
16   victimized and people have lost their lives
17   as a result of this.  Some of them being
18   targets and some of them not necessarily
19   being targets or based on affiliation with
20   some of these individuals, as well, that may
21   have been actively involved in other criminal
22   activity.
23       And another thing that's very important
24   is we have to address the situation regarding
25   our youth.  There has been an uprise in youth

2 (Pages 5 to 8)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 9

1 criminal activity and youth violence. If you
2 go down to the Henley Young Youth Detention
3 Center right now, I have about 34, 35
4 juveniles that are there that are charged as
5 adults. And about probably 80 to 90 percent
6 of that 34 to 35 individuals are charged with
7 some type of murder or some type of violent
8 crime. Some of them are charged with more
9 than one murder. And there has been a
10 significant uptick regarding youth and
11 violent crimes. Not only youth being
12 suspected of violent crimes, but youth being
13 victims of violent crimes as well. And when
14 I refer to youth, I'm talking about people
15 that are 18 years or younger, meaning, you
16 know, they are still considered juveniles.
17 So that has been an issue that I have
18 been able to recognize. Another thing that
19 we have also noticed is when these
20 individuals have been involved in some of the
21 violence and some of the violent crimes, when
22 they see each other, they don't necessarily
23 know -- not know -- they don't necessarily
24 care where they are at any particular time.
25 As if, if I see you in this particular area,

Page 11

1 coming together. So you can't always say
2 that it's gang activity or gangs involved.
3 But we just have negligent people in our
4 community that have not been held accountable
5 for some of the criminal activity they've
6 been involved in. And another thing that we
7 cannot ignore the fact that I think is very
8 important is the lack of police officers,
9 boots on the ground right now. And it's not
10 just here in Hinds County. It's not just in
11 the City of Jackson. It's not in the State
12 of Mississippi. It's nationwide. There has
13 been a shortage of law enforcement personnel.
14 It's just not a very desirable career.
15 The criminal justice system has been
16 bagged up. Some of these individuals have
17 not been held accountable, that have been
18 arrested, have been charged in a timely
19 manner, or they have not been held
20 accountable at all. So when you send that
21 signal out to the people in the community,
22 and even the criminals that are creating
23 havoc and being involved in some of these
24 crimes, they feel that they can get away with
25 it because nobody is being held accountable.

Page 10

1 if I see you at this red light and we have
2 some type of issue. They're being very
3 negligent, and they produce guns. And as you
4 all know, shots of fire and people are
5 injured and/or people are killed. And that's
6 very concerning.
7 I did 20 years with the Jackson Police
8 Department and about 15 of my years with the
9 police department, I work specifically in the
10 violent crime division, so I'm very familiar
11 with violent crimes, the rate of violent
12 crimes, investigating violent crimes and
13 knowing exactly what some of these
14 criminals -- I'm sorry, this criminal
15 activity stems from.
16 We talk about gangs, we talk about gang
17 activity and some things of that nature.
18 It's not always gang activity or gang
19 related. Some of the things that I realized
20 when I was with the Jackson Police
21 Department, when we spoke specifically about
22 gangs, we noticed at one time that rival
23 gangs were coming together and going out and
24 committing violent crimes, victimizing
25 people, robbing people, and even rival gangs

Page 12

1 You don't have enough police officers. You
2 don't always have enough investigators.
3 Whereas in the past, you did have enough
4 police officers at one time, or you had
5 enough investigators to investigate these
6 crimes and hold them accountable. Another
7 thing that's very important is the backlog of
8 cases that we face, especially here in Hinds
9 County.
10 If you go down to the Raymond Detention
11 Center and to the Work Center right now that
12 I'm responsible for, you have about
13 800 individuals that are in jail that are
14 pretrial detainees, meaning they are waiting
15 to go to trial. They have been charged with
16 the crime, they're in jail, and they have not
17 gone before a judge for a trial or some type
18 of plea in all of this time. And I think
19 about people that have been down there five
20 or six years that are in jail waiting to go
21 to trial. So, you know, all of these
22 elements play a factor and play a role when
23 we talk about violent crimes in the City of
24 Jackson. And some of the people that are
25 involved, they say a lack of accountability

3 (Pages 9 to 12)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 13

1  sometime.
2      And I welcome, as the Sheriff of Hinds
3  County, all resources that are available to
4  help us address the violent crime issue in
5  the City of Jackson and in Hinds County. We
6  need to help. We have to have partnerships
7  and we have to have partners to be able to
8  address the issues that we're facing here in
9  the City of Jackson and Hinds County, as
10  well. And when I talk about that, I talk
11  about other law enforcement agencies. I want
12  to work with everybody to make sure that we
13  are all communicating effectively and
14  adjacently across the board to be able to
15  address these issues.
16      Without effective communication with
17  other law enforcement agencies, without
18  sharing information, without platforms like
19  we have right now, we will find ourselves
20  ineffective and we will show the community
21  that there is no plan or there is no -- there
22  is nothing -- we're doing or we should be
23  doing is our responsibility to address these
24  issues. So I welcome any type of platform
25  and I welcome any type of help and

Page 14

1  communication that we can get to be able to
2  address these issues in the City of Jackson.
3      I have been working effectively with the
4  Jackson Police Department. I have been
5  working with our federal partners, the ATF,
6  the FBI and the U.S. attorney's Office to be
7  able to effectively communicate with those
8  agencies as well. I have been working very
9  effectively with the Capitol Police and I
10  communicate with people from the Capitol
11  Police sometimes almost on a daily basis. If
12  it's just to share information or to find out
13  exactly is there anything that I can do to
14  assist them or let them know that we may need
15  some assistance as well.
16      So it's bigger than the highest county
17  sheriff's office. It's bigger than the
18  Jackson Police Department. This -- it's a
19  matter of everybody that can come together,
20  elected officials, appointed officials, to be
21  able to address the issue that we're facing
22  in the City of Jackson.
23      COMMISSIONER BAINS: Thank you, Sheriff.
24  I do appreciate your testimony. I appreciate
25  you being here. Are there any questions --

Page 15

1  lady from Hinds.
2      Speaker C: Good morning, Sheriff. How
3  are you?
4      SHERIFF TYREE JONES: Good morning.
5      Speaker C: I have just a few quick
6  questions. You mentioned lack of officers.
7  How many officers do you have? How many do
8  you need? And is it the lack of officers due
9  to lack of funding or just inability to
10  actually find people to fill the positions?
11      SHERIFF TYREE JONES: Probably all of
12  the above. Right now, you know, of course,
13  we have sworn personnel. We have an
14  operations division with the Hinds County
15  Sheriff's Office and we have detention staff.
16  When we're talking about addressing crime,
17  that refers to our Operations Division, our
18  Law Enforcement Division. And as of right
19  now, I think I have probably anywhere from 70
20  to 80 deputies that are sworn.
21      But these are not people that are always
22  on the streets answering calls for services.
23  This goes all the way from your patrol deputy
24  all the way up to me as the sheriff and
25  certified law enforcement officers with

Page 16

1  arrest powers that can effectively address
2  crime. So you're talking about patrol,
3  you're talking about investigations, your
4  warrants division, your task forces, and we
5  even have some certified deputies that work
6  in the courthouses as court security and
7  bailers.
8      You know, we are -- we are short. We
9  need more personnel. We're short on money
10  right now. I have been fighting for my men
11  and women of the sheriff's office to get a
12  raise. They are -- the Hinds County
13  Sheriff's Office is way behind when it comes
14  to effectively paying the deputies, the men
15  and women that are out on the front lines,
16  boots on the ground, that are answering calls
17  for service.
18      And this is a very fluid and ongoing
19  conversations that I'm currently having with
20  the people that are responsible for salaries,
21  salary realignments and salary increases.
22  So, yes, we need more money and we need more
23  people as well.
24      Speaker C: How many more officers would
25  you say, or deputies would you say you need?

4  (Pages 13 to 16)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                                                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 17

1     SHERIFF TYREE JONES: I would probably
2 say about 15 to 20 that I would like to have
3 in our Patrol Operations Division and in our
4 Investigations Division, as well. That way
5 we can dedicate a few more resources to the
6 City of Jackson. You know, when we talk
7 about our deputies to answer calls for
8 service -- if you are unincorporated -- in
9 rural Hinds County, you call 911, you're
10 going to get a highest county deputy to
11 respond to that call because we are primarily
12 responsible for those areas. Whereas you
13 have municipalities within Hinds County that
14 are respectively responsible for that
15 municipality as well. So, we need more
16 people in Hinds County and I want to be able
17 to dedicate more resources to the City of
18 Jackson and have more of a presence here in
19 the City of Jackson, while also addressing
20 rural and unincorporated Hinds County as
21 well.
22     Speaker C: My follow up question was,
23 assuming you were able to get all of the
24 deputies that you needed, would you be able
25 to then allocate deputies within the city

Page 18

1 limits? How would that work?
2     Explain to me sort of what you would be
3 able to do for the City of Jackson with
4 respect to crime.
5     SHERIFF TYREE JONES: You're absolutely
6 right. That's why I said I want to be able
7 to do that. We're talking about putting a
8 group of people together, specifically to
9 address the City of Jackson -- a group of
10 deputies, some type of task force that we can
11 have where they can work again collectively
12 with other agencies to be able to address
13 crime specifically in the City of Jackson.
14     Because right now we have resources that
15 we can put in the City of Jackson, but
16 it's -- it's very limited, and we do put them
17 in specific areas to address crime. You
18 know, We did it earlier this year when we had
19 the violent crimes that occurred in Belhaven.
20 We were very successful, and we worked
21 effectively doing that operation. But I'll
22 just use that as an example.
23     When it was over, we had to pull those
24 resources out of Belhaven and move elsewhere
25 throughout the City of Jackson and Hinds

Page 19

1 county. Because Hinds County is big and we
2 have other areas we have to go to, but if we
3 had a group of deputies that can work
4 specifically in the City of Jackson, and that
5 would be their sole responsibility and still
6 have coverage in unincorporated and rural
7 Hinds County, that would be very effective
8 for us.
9     Speaker C: And when you use these task
10 forces within the city limits, do you have to
11 get permission from JPD since you're within
12 the city limits, or how does that agreement
13 or how does that work?
14     SHERIFF TYREE JONES: No, ma'am. The
15 Hinds County Sheriff's Office has
16 jurisdiction throughout all of Hinds County.
17 We don't necessarily have to let another
18 agency know that we're conducting an
19 operation within a municipality because we
20 have countywide jurisdiction.
21     Now, if it's something that we feel may
22 affect that municipality, we may let them
23 know that we're within that municipality
24 conducting an operation or just out of
25 respect to let them know that we are here.

Page 20

1 But other than that, we have jurisdiction,
2 and we don't have to get any type of
3 permission to conduct operations in the City
4 of Jackson.
5     Speaker C: Thank you, sheriff.
6     SHERIFF TYREE JONES: Thank you.
7     COMMISSIONER BAINS: Sheriff -- could
8 you -- and you might not be able to tell me
9 this, but could you tell me, or do you know
10 in Hinds County, City of Jackson, where is
11 the highest concentration of your violent
12 offenses?
13     SHERIFF TYREE JONES: I don't have
14 those -- I don't have a geographical area
15 right now.
16     COMMISSIONER BAINS: That's fine. I
17 understand. I just didn't know if you
18 could -- off top your head.
19     SHERIFF TYREE JONES: You know, I would
20 just be honest with you, in full
21 transparency. I -- I think it is an issue.
22 You've had violent crime in all areas of the
23 City of Jackson. We can't just necessarily
24 say it's concentrated all the time in one
25 specific area, because it's not. We've had

5 (Pages 17 to 20)

Brooks Court Reporting, Inc.
(601) 362-1995

Judiciary B Meeting 10/10/2022

Page 21

1    violent crime in North Jackson, South
2    Jackson, West Jackson, Northeast Jackson. So
3    it is an issue that has occurred in the city,
4    and I just don't have the geographical
5    numbers to designate it to a specific area.
6         COMMISSIONER BAINS: You said something
7    that -- that kind of piqued my interest in
8    your opening about pretrial detainees and
9    being in Raymond. You said that some of them
10   had five to six years and pretrial hadn't --
11   hadn't been to court in that long. Is that
12   accurate?
13        SHERIFF TYREE JONES: Yes, sir, that's
14   very accurate.
15        COMMISSIONER BAINS: I'm sorry. Go
16   ahead.
17        SHERIFF TYREE JONES: We have several
18   detainees that are in our jail that have been
19   there for five years, six years. Some of
20   these individuals we arrested or I arrested
21   when I was with the Jackson Police Department
22   in the Violent Crime Division, and I've been
23   going from there for several years with the
24   Hinds County Sheriff's Office, and they're
25   still there awaiting trial -- awaiting to go

Page 22

1    to trial.
2         COMMISSIONER BAINS: And those are
3    violent offenders?
4         SHERIFF TYREE JONES: Yes, sir. These
5    are individuals that are charged with murder,
6    aggravated assault, but mostly murder.
7         COMMISSIONER BAINS: Will you -- can you
8    provide me with a list of those -- not
9    necessarily names or anything, but a number
10   of how many of those inmates you have?
11        SHERIFF TYREE JONES: Yes, sir. I can.
12        COMMISSIONER BAINS: Okay.
13        SHERIFF TYREE JONES: Yes, sir.
14        COMMISSIONER BAINS: Okay. Any other
15   further questions? Lady from Madison.
16        Speaker C: Thank you, Mr. Chairman.
17   And thank you, Sheriff. You're always so
18   accessible and I appreciate you. I
19   understand that you said that your
20   relationship with the Capitol Police is
21   excellent. Could you tell us a little bit
22   about your relationship with the City of
23   Jackson Police?
24        SHERIFF TYREE JONES: I still have a --
25   an effective relationship with the City of

Page 23

1    Jackson. I communicate with people there
2    almost on a daily basis as well. Maybe not
3    necessarily all of the time with the upper
4    command staff, but maybe investigators or
5    some of the people that's responsible for
6    investigating some of the crimes.
7         We have worked very effectively together
8    to be able to address and solve some of the
9    violent crimes, as well. You know, Sometimes
10   people may bring me information or bring
11   information to the Hinds County Sheriff's
12   Office. For me, as an individual, based on
13   relationships that I formed through the years
14   that may help solve some of the violent crime
15   or solve a murder, I will in turn get that
16   information and I will communicate with the
17   people that are responsible at the Jackson
18   Police Department for this.
19        And it has been very effective regarding
20   sharing information to help them solve some
21   of the violent crimes as well. So, I still
22   have a very good working relationship with
23   the Jackson Police Department. I tell people
24   all the time, even though I'm no longer
25   there, I still feel like I work for them

Page 24

1    because I still communicate with them.
2         I'm a City of Jackson resident. I was
3    born and raised here, in the City of Jackson.
4    So I will always have an invested interest in
5    the City of Jackson because I want to see a
6    difference and I want to make sure that we
7    are communicating to make a change and do
8    things different in the City of Jackson, as
9    well.
10        Speaker C: If you were king for the
11   day, what would you have us do?
12        SHERIFF TYREE JONES: If I was king for
13   a day, what would I have you all to do? I
14   need money and I need manpower.
15        Speaker C: Thank you, Mr. Chairman.
16        COMMISSIONER BAINS: Any further
17   questions from committee members? Lady from
18   Hinds, Ms. Gibbs.
19        MS. GIBBS: Thank you. Thank you,
20   Sheriff Jones, for being here. You mentioned
21   you want money. I understand that, and that
22   if you had 15 to 20 more deputies that you
23   would be able to be more effective.
24        Could you explain how effective you can
25   be, in particularly when you talk about that

6 (Pages 21 to 24)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 25

1    there are gangs and then you said that the
2    rivalry -- the rivalry gangs were getting
3    together in terms of committing felonies.  So
4    if you had the additional 15 to 20 deputies,
5    how would that assist in that issue?
6        SHERIFF TYREE JONES:  Well, they would
7    be specifically addressing violent crimes in
8    the City of Jackson, areas where there is an
9    uptick in violent crimes, investigating
10   violent crimes, and just being able to have
11   more personnel in the City of Jackson.  You
12   have to think creatively as well.  When
13   you're talking about addressing violent
14   crime.  You have -- when you have individuals
15   that can be prosecuted on the state level,
16   but you also want to be able to prosecute
17   some of these individuals on the federal
18   level, as well.
19       This sends a strong message to the
20   community and it sends a strong message to
21   these individuals that are committing some of
22   these crimes that not only will you be held
23   accountable on the state level, but on a
24   federal level as well.  When I was with the
25   police department back, maybe 2015 to 2016, I

Page 26

1    saw how this worked personally.  There was
2    a -- a double digit decrease in violent
3    crimes due to us working collaboratively with
4    other agencies and our federal partners to be
5    able to address violent crime in the City of
6    Jackson.  So when you have more personnel and
7    you have that personnel assigned specifically
8    to one task, then this shows that you have
9    presence, you have individuals that are
10   addressing the issue and you have them
11   holding these individuals accountable as
12   well.
13       MS. GIBBS:  Thank you.  So that staff
14   that we're talking about, they may be boots
15   on the ground, they may be an administrative
16   part, they may be part of task force work
17   with other state and federal agencies.  Is
18   what I hear you saying?
19       SHERIFF TYREE JONES:  They're not going
20   to be part of administration, they're going
21   to be boots on the ground and investigating.
22   So that's what we need.  And I wouldn't
23   necessarily use the word "aggressive", but I
24   will say that they will be addressing
25   specifically one thing, and that is violent

Page 27

1    crimes or criminal activity in the City of
2    Jackson.  And again, effectively
3    communicating with everybody that should be
4    involved as well.
5        MS. GIBBS:  Thank you.
6        COMMISSIONER BAINS:  Any further --
7    gentlemen from Union?
8        JODY OWENS:  Thanks, Sheriff --
9    Mr. Chairman.  If there was a percentage of
10   the calls that people you investigate that
11   had mental health issues, could you just give
12   me a percentage of that, please?
13       SHERIFF TYREE JONES:  When we talk about
14   mental health and law enforcement, mental
15   health should always be addressed and it's
16   always an issue.  I had this conversation the
17   other day and I just look at the pretrial
18   detainees we have in jail right now.  You
19   probably have about 60 percent or more of
20   those that are suffering from some type of
21   mental health issue.
22       And when I say mental health, I'm
23   talking about all the way from a minor case
24   of a mental health issue all the way up to a
25   major.  But we cannot always say that mental

Page 28

1    health -- or use mental health as an excuse
2    for individuals that are committing some of
3    these crimes to be able to not be held
4    accountable.
5        But yes, we do come in contact with
6    several people on a daily basis that are
7    suffering from some type of mental health
8    issue.  You have to bring the mental health
9    experts in and have partnerships with mental
10   health companies or mental health providers,
11   as well.
12       JODY OWENS:  And are some of your
13   offers -- officers trained in mental health?
14   And there's a couple of different levels you
15   can go to?
16       SHERIFF TYREE JONES:  Yes, sir.  We have
17   several officers that are trained in mental
18   health.  Just recently, I think last week, we
19   have a partnership with Hinds Behavior
20   Health, where they train officers in crisis
21   intervention.  And that's for officers to be
22   able to effectively recognize mental health
23   issues, be able to communicate with
24   individuals they come in contact with,
25   regarding a mental health episode or a mental

7 (Pages 25 to 28)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 29

1   health issue, to be able to minimize
2   situations to keep them from escalating and
3   to also be able to get them some of the help
4   that they need.
5       I wish that I had some of the mental
6   health training some 23 years ago when I got
7   started that's provided to law enforcement
8   today because there is a wide range of mental
9   health training that is provided to officers.
10  And we take this seriously.  And I think that
11  all officers should receive this mental
12  health training as well.
13      COMMISSIONER BAINS:  Thank you, sheriff.
14      COMMISSIONER BAINS:  Thank you.  Any
15  further questions for sheriff?
16      Sheriff, again, thank you for your time.
17  You provided us with a lot of information and
18  some good information.  We appreciate your
19  service and your work for Hinds County and
20  for Mississippi.  Thank you.  You're excused
21  and you're welcome to stay or head or
22  whatever you need to do.
23      SHERIFF TYREE JONES:  I'm going to hang
24  out.  Thank you.
25      COMMISSIONER BAINS:  Okay.  All right,

Page 30

1   our next is Bo Luckey, Chief of Capitol
2   Police and you're recognized.  Thank you Bo.
3       CHIEF BO LUCKEY:  Good morning.  I'd
4   like to start by reading a statement from
5   Commissioner Tyndall, who couldn't be here
6   today.
7       He says, "Chairman Bain, members of the
8   House Judiciary Committee, thank you for the
9   opportunity to appear before this committee
10  to discuss crime in the City of Jackson and
11  the Capitol Improvement District.
12  Unfortunately, I'm not able to attend today
13  due to my speaking engagement at a symposium
14  on cybersecurity for the State of
15  Mississippi.
16      Even though I'm unable to attend today's
17  hearing, I want to let each of you know how
18  thankful we are -- I'm sorry -- how thankful
19  we are in the confidence that you have placed
20  in the Department of Public Safety and the
21  Capitol Police.  Without your support, the
22  strides we have made in public safety would
23  not be possible.  Chief Lucky and his team
24  have done an excellent job and have my full
25  support.

Page 31

1       We are committed to working with our law
2   enforcement partners and making the capitol
3   city safe for all Mississippians.  After all,
4   our common objective is to remove the
5   criminal element that has plagued the City
6   for far too long, while also securing and
7   maintaining the public trust.  Again, thank
8   you for your support.  If any of you would
9   like to discuss any issue with me personally,
10  feel free to contact me at your convenience."
11      And again, that's a statement from
12  Commissioner Sean Tyndall, who couldn't be
13  here today.
14      Now, I like to start by saying thank you
15  from me for allowing me to be here today as
16  well.  Sheriff Jones hit the nail on the
17  head.  He was spot on -- everything that he
18  said.  I couldn't have said it better.  the
19  short time that I have been here as Capitol
20  Police Chief, I've noticed a lot of the same
21  things that he's mentioned.
22      There is a -- well, let me start with
23  one of the first things I've noticed is there
24  seems to be a disrespect for authority in the
25  youth in the Jackson area.  And, like you

Page 32

1   said, it's hard to pinpoint any certain area.
2   However, it's certainly a problem and it's
3   certainly increasing.  Like you said, we're
4   starting to see a lot more individuals riding
5   around with assault rifles in their laps,
6   literally making Instagram stories and
7   TikToks as they're riding around the City,
8   pouring their narcotics out and counting in
9   front of the camera, fanning money around and
10  these individuals are our youth.
11      That's a problem.  That's a problem that
12  we're going to have to address somehow.  And
13  I don't have the answer for that right now.
14  However, we are looking at ways to get more
15  actively involved in the community, in
16  programs that can help to mentor our youth in
17  a more effective manner.
18      Like I said, most of what Sheriff Jones
19  has mentioned, I couldn't have said it
20  better, and I see it myself every day.  Since
21  I've been here -- I'll tell you a little bit
22  about what we have tried to do.  When I
23  started at Capitol Police, we had
24  approximately 66 sworn law enforcement
25  officers, since I know that question may be

8  (Pages 29 to 32)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 33

1  coming. Today, we're sitting at 104. It
2  started on May 23rd of this year. Prior to
3  us taking in the CCID, Capitol Police was
4  primarily seen as a more of a security force
5  for the state grounds. This building being
6  one of them.
7       Our mission now is much different.
8  We're here to assist JPD, we're here to
9  assist Hinds County, we're here to assist our
10  other state agencies and our other federal
11  partners, as much as possible. And that's
12  what we're vowing to do. But in order to do
13  that, we had to expand, and we're going to
14  keep expanding.
15       The 40 officers that we have hired so
16  far has allowed us to expand our patrol
17  division from 15 sworn law enforcement
18  officers to approximately 36, so far. We
19  have also activated a Street Crime
20  Suppression Unit known as our Flex Unit that
21  consists of 11 sworn law enforcement
22  officers. We have also increased our
23  investigative division from one full time
24  officer to three full time officers and one
25  part time.

Page 34

1       Our command staff was lacking. We had
2  lieutenants answering to assistant chiefs,
3  which is not a very efficient chain of
4  command -- way too many officers and not
5  enough command staff. We had to increase
6  that. And what we try to do is make it as
7  efficient as possible.
8       So in building out the new organization
9  of Capitol Police, we've separated these
10  divisions somewhat. So now, instead of it
11  being officers answering to one lieutenant or
12  one assistant chief, we've now built out to
13  where we have an Assistant Chief over patrol,
14  an Assistant Chief over security, and
15  Assistant Chief over admin.
16       Our security divisions obviously handles
17  the buildings and mostly tries to take care
18  of special events, as well. That division
19  consists of about 41 sworn law enforcement
20  officers and 6 non-sworn security guards.
21  We'll say we're trying to get more law
22  enforcement officers on that side as well as
23  non-sworn security guards on that side.
24  Unfortunately, whenever you're working these
25  buildings, it's going to be eight hour --

Page 35

1  eight hour shift, which requires you to do a
2  rotation of days off.
3       And we're running into some issues with
4  buildings opening up early, buildings closing
5  late, things like that. But we are covering
6  it. We're going to continue to have it
7  covered, but we are trying to add some to
8  that. So, if there is anything that seemed
9  to be lacking on the security side, just know
10  that we are working on that.
11       On our patrol side as I mentioned, when
12  I started at Capitol Police, we had 15 sworn
13  law enforcement officers that operated on
14  eight hour shifts. They are now operating on
15  twelve hour shifts. So, now you have eight
16  officers on the street at any given time,
17  whereas prior to this, you had maybe one,
18  maybe two. Just the day whoever was off that
19  date or whoever called in sick dictated how
20  many people were there. Now it's pretty much
21  a given, you're going to have a minimum of
22  eight sworn patrol officers on the streets at
23  any given time.
24       Our Flex Unit also operates in the
25  afternoon hours, generally from lunchtime to

Page 36

1  about 1, 2, 3:00 in the morning. That's
2  going to be generally your high crime time
3  periods and we try to focus them in their
4  efforts during that time period -- that time
5  frame. So with that said, there's usually
6  about six of those officers also on the
7  grounds, which brings your sworn law
8  enforcement officer presence up to about 14
9  officers at any given time in the afternoon
10  hours.
11       On top of that, you also have on the
12  security side, you have units that are out
13  roaming and patrolling. Usually that's about
14  four or five officers. So again, that brings
15  you up to about 18 officers at any given time
16  in the afternoon hours, during the Capitol
17  City Improvement District.
18       Now, our Flex Unit has gotten a lot of
19  attention lately and -- and it's pretty much
20  what Sheriff Jones was speaking on. When you
21  speak on a Violent Crime Unit or a Street
22  Crime Suppression Unit, the purpose behind
23  this unit was to have a group of individuals
24  who are highly trained to deal with violent
25  crimes, narcotics, things that are plaguing

9  (Pages 33 to 36)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                              eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 37

1    the City and -- and causing a lot of the
2    criminal activity here, or a few of the
3    criminal activity here.
4        To give you an idea of how successful
5    this unit has been, since July 18th of this
6    year, they've made 59 felony arrests, eight
7    misdemeanor arrests, seized 29 firearms, 13
8    of those were stolen. Stolen property
9    recovered, only two stolen vehicles recovered
10   three, US currency seized $10,536. Narcotics
11   seized: six pounds of marijuana, 2 ounces of
12   methamphetamine, 100 MDMA dosage units, 20
13   grams of crack cocaine, 1 gram of fentanyl,
14   30 dosage units of hydrocodone.
15       So they're out there -- and what this
16   group is doing and what makes them unique is
17   they're not answering calls. These numbers
18   that they're putting up is not from anybody
19   calling and saying, this is what's going on.
20   This is from having boots on the ground out
21   there and proactively policing the CCID,
22   knowing what they're looking for and going
23   after it. They operate with sources and CIs,
24   just much like a narcotics division would
25   now.

Page 38

1        On top of their success, in such a short
2    period of time, our patrol division has also
3    been very proactive in their efforts. Our
4    patrol division, so far, has written
5    approximately 984 citations. That's just in
6    the last month. DUI arrest, only one.
7    However, I will say I was told the other day
8    that Sheriff Jones -- his DUI unit has
9    reported to my guys that he has gotten 55 DUI
10   arrests off of working with our checkpoints
11   within the CCID. And we're happy that
12   Sheriff Jones allows his DUI units to work
13   with us so closely, and we're more than happy
14   to help him out in any way we can.
15       Felony arrest on patrol is 23.
16   Misdemeanor arrest on patrol is 30. Stolen
17   vehicles recovered on patrol is five. So,
18   again, my patrol division is very proactive.
19   They're out there -- they're out there
20   enforcing the law. They're issuing
21   citations. They're conducting safety
22   checkpoints in random places throughout the
23   City.
24       And overall, they're letting the
25   criminal element know that they're out there.

Page 39

1    They're being seen. They're being a
2    deterrent. They're also letting the public
3    know that we're out here, we're here for you.
4    The success that we've seen, a lot of the
5    compliments that I receive on a daily basis,
6    is based on the efforts of our patrol unit
7    being out there, so visible.
8        I had an individual contact me last
9    night and said he lives in the Belhaven area.
10   Said he walked his dog at night for the first
11   time in a very long time. He said he felt
12   safe and he appreciated everything that we're
13   doing. I had another individual that
14   contacted me whenever I first took over at
15   Capitol Police and was pretty heated in the
16   conversation, begging me to do something
17   different. Said he was ready to leave, he
18   was ready to move. And he called me -- I
19   guess it was Monday I spoke with him just
20   going on and on about how safe he feels and
21   how appreciative he is for everything.
22       And these individuals are not calling
23   because we have done, you know, anything
24   specifically for them. It's because they see
25   what we're doing as a whole. They see the

Page 40

1    visibility of patrol. They see that their
2    neighborhoods are quieter now. They see that
3    there's checkpoints around. They -- I can't
4    tell how many times people have made the
5    conversation about these safety checkpoints
6    and how they make them feel safer because it
7    does shut the criminal element that we're out
8    there in full force. And that's what it's
9    about with patrol is determent, detecting the
10   crime, enforcing the law, and deterring
11   criminal activity.
12       Now, our investigative division, another
13   problem that we ran into when I started in
14   May, or another thing that I tried to address
15   quickly, we had a large number of homeless in
16   the CCID. And it was from the interstate all
17   the way back to as far as CCID goes. I don't
18   know how many of you in here have noticed,
19   but if you get off the interstate on High
20   Street today, you may see one or two randomly
21   walking around. We've we've been able to be
22   a visible presence for them as well.
23       We don't -- we take a zero tolerance on
24   crime in general. It doesn't matter to us if
25   you're homeless or if you're not. If you

10 (Pages 37 to 40)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)          eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 41

1  commit a crime, we're going to arrest you,
2  we're going to cite you, we're going to deal
3  with you in the same way we would anybody
4  else. I think that's one of the factors that
5  has helped us out in solving a lot of
6  business burglaries that were going on.
7      I don't know if you all remember, but in
8  one weekend there was about five or six
9  business burglaries right here together in
10  downtown Jackson. We responded to those
11  complaints on a Sunday -- I'm sorry -- we
12  responded to those complaints on a Saturday
13  with a vandalized ATM machine here at, I
14  believe it's Court Street, the BancorpSouth,
15  I believe, over here. We had that gentleman
16  in custody the next morning. Our patrol
17  division was able to find him, locate him,
18  and we had him in custody the next morning
19  and he was charged with multiple other
20  business burglaries.
21      However, we learned during that
22  investigation that he was not the only one.
23  We were successful in finding the other
24  culprits involved as well. We also had a
25  rash of burglaries in the downtown area not

Page 42

1  too long ago and ended up charging an
2  individual with, I believe it was seven
3  counts of business burglary. Some of the
4  businesses he broke it into multiple times in
5  the course of a week and a half.
6      These are problems that we see on a
7  daily basis. When the foot traffic, the
8  pedestrian traffic at 3:00 in the morning,
9  especially with the homeless community is out
10  like it is, you're going to have these
11  issues. They're breaking in and look, I'm
12  not going to sugarcoat it, they're stealing
13  food a lot of times. They're breaking into
14  restaurants, they're breaking into vending
15  machines. I think we've all seen that on
16  social media.
17      But we're not going to allow that to
18  happen, and that's not something that can
19  happen. We can't allow homelessness to be an
20  excuse for criminal activity. So -- we've
21  also, in showing the proactiveness of this
22  department, one of the first arrests we made
23  whenever I started was for terroristic
24  threats on the Fairgrounds, which is busy
25  most days.

Page 43

1      If you remember this summer, we had
2  numerous high schools doing the graduation
3  ceremonies there, and social media was hit
4  with some threats pointed towards one of the
5  high school graduations. And when I was
6  contacted, it was right after the Uvalde
7  shootings. And I told my guys, you know,
8  we're not going to sit back and just wait for
9  something to happen. We're going to go
10  forward head on. And that's what we did. We
11  were able to arrest that individual in the
12  early morning hours, probably around 1:00 in
13  the morning, and he was charged with felony
14  domestic threats or domestic terrorist
15  threats.
16      So we try to be proactive. We try to
17  provide the law abiding citizens with the
18  level of security that they deserve, that
19  they want. We want you all to feel safe. We
20  want you all to know that we are here for
21  you. And at the same time, we try to show
22  the criminal element that we're not going to
23  tolerate anything.
24      When we talk about determinant, one of
25  the hurdles we do face, as Sheriff Jones

Page 44

1  mentioned, is a backlog with the Hinds County
2  Justice System. I tell people all the time,
3  Hinds County is one of the few courtrooms
4  that operates pretty much all day, every day.
5  I mean, It's going -- it's just a backlog
6  that has been inherited from past
7  administrations that has only grown. It's --
8  I don't blame anybody in particular for that
9  backlog. I wouldn't know where to start to
10  blame anybody. It's just, in my opinion, the
11  crime in the City of Jackson has just been on
12  such an uptick that I don't think anybody
13  could have kept up with that docket.
14      So what we have tried to do, as Sheriff
15  Jones has mentioned, we have teamed up with
16  the U.S. Attorney's office and we have
17  started sending a lot of our violent felonies
18  to them. More specifically, ones that
19  involve your gun charges. I'm not sure how
20  many cases we've sent to them, as of yet. If
21  I had to guess, it'd be somewhere in the
22  neighborhood of about 29 or 30 cases that we
23  have presented to the U.S. Attorney's Office,
24  to date.
25      And what that does, when you talk about

11 (Pages 41 to 44)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                          eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 45

1     a -- like Sheriff Jones mentioned, some
2     inmates sitting pretrial for three, four,
3     five years, when you complain somebody in the
4     federal system, they will go from complaint
5     to sentencing in approximately nine months.
6     So that is, for lack of a better term, just
7     lightning fast compared to our county system.
8     And that right there is a deterrent enough to
9     show people that, look, they're not playing
10    around, they're going through the U.S.
11    Attorney's office.  When you get complained,
12    nine months from now, you're spending five
13    years to ten years for a gun crime that you
14    may be out on the street for the next five
15    years for, waiting to go through Hinds County
16    system because it's backlogged the way it is.
17    I think that's a huge, huge deterrent there.
18      And once we start getting some
19    successful prosecutions on the federal side,
20    I think it's just going to only get better.
21    But, my last thing I'll talk about is the
22    collaboration between Hinds County and
23    Jackson Police Department.  I don't know how
24    many of you here have been to the fair yet,
25    but I think it's a great example of what we

Page 46

1     can do when we work together.  I'd say the
2     fair this year feels safer than it has in
3     many years.  It's just a different
4     environment.  It's more laid back.  It's
5     more -- it just feels more family oriented.
6     You feel safe.
7      That's in part because of the plan that
8     Commissioner Gibson's staff put together.
9     It's a great plan, but the majority of the
10    reason why the fair has been so successful
11    this year and why you feel safe there is
12    because of Sheriff Jones, Chief Davis,
13    myself, and other agencies who have thrown
14    manpower there to form this united front.
15    And that's what it's all about.  That's what
16    it's going to take outside of the fair.
17    That's what's going to take on the streets.
18      We've got to get boots on the ground
19    together.  We've got to work together.  My
20    staff works on a daily basis with Jackson
21    Police Department's staff on the patrol side.
22    Again, Sheriff Jones staff works very well
23    with us.  I think my assistant chief over
24    patrol probably talks to Sheriff Jones, like
25    he said, almost every day.  And every time

Page 47

1     we've picked up the phone and requested
2     anything from Jackson Police Department or
3     Hinds County Sheriff's Department, they've --
4     they've been more than happy to help out, and
5     we're going to do the same for them.
6      When we talk about boots on the ground,
7     like Sheriff Jones said, it's across the
8     board, law enforcement numbers are down.  My
9     numbers are up from where they were,
10    obviously, but across the board, it's hard to
11    find law enforcement officers.
12      In today's environment, I would -- I
13    would argue that it's extremely hard to find
14    anybody that wants to be a police officer.
15    Unfortunately, with the negativity
16    surrounding law enforcement today, with the
17    constant criticism, the constant spotlight,
18    our applicant pool is slowly dwindling.  Even
19    with my pay raises and incentives that I've
20    offered to hire people, it's not like it used
21    to be.  And I don't know what the answer is
22    to get that back.
23      The quality of applicants is not as high
24    as it used to be, and the quantity is
25    certainly not as high as it used to be.

Page 48

1     It's -- we could all use more money, we could
2     all use more equipment, and we all need
3     more -- more law enforcement officers.  We
4     need more help out there, but I don't know
5     how to get that.  We're going to try to
6     actually start incorporating some more
7     aggressive recruitment efforts.
8      I met with National Guard yesterday
9     about trying to get involved in a work
10    program they have to provide servicemen and
11    women with employment.  I believe they were
12    telling me, Chief Davis is already involved
13    in that program, and working with them has
14    been for some time now.  We're trying all we
15    can to get more people involved in law
16    enforcement, get more professional,
17    proactive, passionate people involved in law
18    enforcement.
19      And it's a challenge, but I think we can
20    do it.  And again, thank you all for allowing
21    me to be here today and I'm here for anything
22    you may need
23      COMMISSIONER BAINS:  Chief, thank you.
24    First off, let me ask you, you stated, if I
25    heard the numbers right when you began you

12  (Pages 45 to 48)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                 eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 49

1  were at 66, is that right?  Now you're up to
2  over 100.
3      CHIEF BO LUCKEY:  Yes, sir.  104.
4      COMMISSIONER BAINS:  Is that -- like you
5  said, obviously everybody can use more but do
6  you feel that that's an adequate number of
7  where you're at?
8      CHIEF BO LUCKEY:  It is not.
9      COMMISSIONER BAINS:  What would you
10  estimate?  You heard Sheriff talk about
11  another 15 to 20 officers.  Of course Hinds
12  County is much larger than the CCID.  So I'm
13  just curious.
14      CHIEF BO LUCKEY:  Yes, sir.  Right now
15  the anticipated number of employees for
16  Capitol Police this time next year is going
17  to be somewhere around 150 to 160.  And the
18  reason for that is going to be because we're
19  more than just patrol.  We're more than just
20  having people on the streets.
21      We need more manpower in our security
22  division to help out with the security of
23  these buildings.  We need more manpower and
24  investigative division, we need more manpower
25  in our command staff still, mainly with

Page 50

1  training fleet, things like that.  We need
2  more manpower on patrol and all those
3  areas -- different areas, we're trying to
4  build up the diversity and enforcement.
5  We're going to need more manpower.
6      COMMISSIONER BAINS:  Okay.  Questions
7  from committee members?  I saw the lady from
8  Pearl River first.
9      Speaker C:  Thank you gentlemen.  Thank
10  you Chief, and thank you Sheriff Jones for
11  all that you all are doing and
12  congratulations on the victories you're
13  having.  I would just like to make a few
14  statements.  You all have addressed all the
15  issues and things that you're battling in the
16  field.  I want to address, this summer I went
17  to a leadership conference and the speaker
18  and I were the only two in attendance there
19  from Mississippi.  And one of the things that
20  they were talking about when we were there
21  were crime -- was crime across this nation
22  and how bad it is and it comes on down home.
23  They also addressed the so called criminal
24  justice reform, that the state legislatures
25  have been passing and how that we were duped

Page 51

1  by the reforms, that they weren't really
2  reforms and how much problems that we've had
3  from those.
4      So, I say that to say that as you're
5  trying to do your jobs, I want to work with
6  all of our law enforcement, DA, sheriffs,
7  police chiefs.  The speaker has committed to
8  work with me to -- if we need to repeal some
9  things or pass new legislation to help you
10  guys and I look forward to working with our
11  Chairman Bain to address some of these things
12  because we want to do legislatively what we
13  can do also to help you with these things.
14      So these things on either expungement,
15  habitual offenders, some early releases, I
16  know, like I've heard about shoplifting, how
17  they know the dollar amount for felony and so
18  maybe we need a cumulative amount so that
19  they go in on all these individual times and
20  they never get charged with a felony because
21  it's always under the amount and they don't
22  add together.
23      So I think there's a lot of things that
24  we can do maybe to help y'all with those
25  things and look at some of the mistakes that

Page 52

1  we've made in the past and do better as well.
2  So, I thank you for what you're doing and
3  just ask if you will think about those and
4  get with me before Session and let's work on
5  some legislation to help you all in those
6  areas as well.
7      COMMISSIONER BAINS:  Lady from Hinds.
8  You're recognized.
9      Speaker C:  Thank you.  I have a few
10  questions.  So, you and I know the boundaries
11  of the CCID, obviously.  But those who live
12  within or just outside of those boundaries
13  may not be exactly familiar.  So if someone
14  has an issue, they call 911.  Are they
15  automatically directed to either Capitol
16  Police or JPD or the Sheriff's Department?
17  How does that work for just an individual
18  that needs assistance?
19      CHIEF BO LUCKEY:  So, we do not have a
20  911 center at Capitol Police.  Jackson Police
21  Department is who responds to 911 calls.
22  I've had conversations with Chief Davis that,
23  I understand he is short on manpower.  I
24  understand that he has officers that are
25  spread out in further areas than just the

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 53

1   CCID and it may take them some time to get
2   there.
3       I have -- we have talked about
4   transitioning phone calls over to Capitol
5   Police and they are doing that.  So when JPD
6   receives a 911 call, if their officers are
7   tied up somewhere else, if their officers are
8   busy on another call, then they will forward
9   that phone call to Capitol Police in a timely
10  manner to where we can respond to it and --
11  and deal with the -- call.
12      Speaker C:  Is there a better system
13  that you could envision so that the person
14  that's calling 911 is not left waiting?  For
15  instance, I'll use myself as an example.  I
16  mean if I'm home alone with my seven year old
17  and there's a home invasion happening.  I
18  call 911 and I'm being rerouted because
19  somebody's too busy to come and help.  I feel
20  like there has to be a better solution for
21  that.  Do you have a suggestion?
22      CHIEF BO LUCKEY:  We have looked at and
23  we are looking at you, know, we get our new
24  police department over here at Wright in
25  Ferguson, we are looking at having a 911 line

Page 54

1   at that point.  We've talked to AT&T who is
2   over that about geofencing the area and
3   everything that's involved in that.  That's
4   really going to be the most effective thing
5   that I can think of is that if we had our own
6   911, which we are looking at.
7       Speaker C:  My next question.
8   Hypothetically speaking, do you feel like the
9   structure that you've created with Capitol
10  Police, as it currently exists, would work if
11  the CCID were expanded?  In other words, do
12  you feel like you would be able to cover more
13  ground assuming you had more officers?
14      CHIEF BO LUCKEY:  Absolutely.
15  Absolutely.  The structure that I've built at
16  Capitol Police, the foundation of the police
17  department itself is strong, it's there.  And
18  just adding more numbers to the officers, to
19  the investigators, to the security side, to
20  wherever needed.  We can certainly cover more
21  ground if need be.
22      Speaker C:  And my last question.  The
23  Flex Unit that you mentioned, those officers
24  are in unmarked vehicles.  Is that accurate?
25      CHIEF BO LUCKEY:  That is.

Page 55

1       Speaker C:  And they're in plain clothes
2   but with vests on.  Is that right?
3       CHIEF BO LUCKEY:  Correct.
4       Speaker C:  A group of us with young
5   children were out having dinner, and we saw
6   those men stop a vehicle, pull three men out
7   of the vehicle, and several guns out of the
8   vehicle just a few feet from where we were
9   having dinner in Belhaven.  So, tell them
10  thank you.
11      CHIEF BO LUCKEY:  Yes, ma'am.  I will
12  let them know.
13      COMMISSIONER BAINS:  Are there any
14  further questions.  Lady from Hinds,
15  Ms. Gibbs.
16      MS. GIBBS:  Thank you, Chairman Bain.
17  And thank you, Chief Lucky, for being here.
18  I conducted a hearing during the last
19  legislative session with Commissioner Tyndall
20  and Chief Davis that was in that meeting and
21  we talked about the 911 calls.  And at that
22  time, as I understand and Chief Davis can
23  also correct me, is that those calls was
24  coming into JPD, and you just mentioned that
25  those calls are then transferred to you.

Page 56

1       I understood at that meeting that it
2   would take a year to two years before the
3   Capitol Police could have that system set up.
4   And I believe it was your intention, as far
5   as the Capitol Police, to have their own 911
6   system, is that correct?  That you all want
7   to have your own 911 system coming into you
8   versus going into JPD and having to transfer
9   it over.  Is that correct?
10      CHIEF BO LUCKEY:  Okay.  So like I
11  mentioned, we're talking about having the
12  capabilities by the time we move into the
13  Wright and Ferguson, which I should have
14  mentioned, is probably about a year and a
15  half to two years away.  So you're correct on
16  your timeline.
17      Now, we are looking at buying more
18  dispatch equipment to beef up our dispatch to
19  handle the large number of calls that we will
20  be receiving when we do go, or if we do go
21  with a 911 call center.  Now, the
22  Commissioner has not told me directly that it
23  is his plan to have a 911 Call Center,
24  because historically, the state is not the
25  primary responding agency within any

14  (Pages 53 to 56)

Brooks Court Reporting, Inc.
(601) 362-1995

Judiciary B Meeting 10/10/2022

Page 57

1  jurisdiction.
2      We're here primarily to assist with
3  assets and resources, manpower. However, we
4  would like to have the capability there in
5  case the need arises for us to have a 911
6  Call Center.
7      MS. GIBBS: And so with the increased
8  staff that you have, 104, I believe you said
9  at this time, and you could at least have 150
10 to 160 officers. So those officers are
11 basically monitoring the Capitol Complex
12 District area, is that correct?
13     They're just monitoring the area, and if
14 they get a 911 call, then they are dispatched
15 at that time?
16     CHIEF BO LUCKEY: Correct.
17     MS. GIBBS: Okay. Another question I
18 would like to know. You talked about the
19 homelessness in terms of the people that are
20 on the streets, breaking into businesses
21 because they are hungry and things like that.
22 Do you have any solutions for that? Have you
23 worked with those agencies that deal with
24 homelessness on the streets of the City of
25 Jackson?

Page 58

1      CHIEF BO LUCKEY: I have worked with
2  Shower Power in the past. We're looking at,
3  like I mentioned earlier, we're going to try
4  to come up with some better solutions to some
5  of the problems we're identifying. I've only
6  been there five months. I'm trying to --
7  I've been trying to get this department up
8  and going and restructured for the past five
9  months. But we have every intention of
10 trying to get more involved with individuals
11 that are working in the community with the
12 homeless and also with our youth.
13     Speaker C: Thank you. And I hope that
14 we're going to be able to work on the 911
15 calls, in terms of when citizens want to call
16 in, whether those calls go to JPD, we have
17 enough staff to handle that. I think our
18 constituents are concerned about that -- as
19 Representative Yates mentioned, where those
20 calls go and have an adequate police officers
21 to be able to address that issue on the first
22 911 call. Thank you so much for being here.
23     CHIEF BO LUCKEY: Yes, ma'am.
24     COMMISSIONER BAINS: Chief, briefly,
25 could you explain to those of us that don't

Page 59

1  know, to the best of your ability, the
2  boundary lines and -- of the CCID and the
3  Complex district?
4      CHIEF BO LUCKEY: So the CCID on the
5  south side boundary is South Street. It runs
6  South Street out and takes in JSU. And once
7  it takes in JSU, it cuts back up to Bailey
8  Avenue. It then runs north on Bailey Avenue
9  up into the Woodrow Wilson area, where it
10 takes a slight deviation and cuts out and I
11 can't remember the street name, forgive me,
12 but the -- it cuts west just a little bit and
13 then continues north up through the Fondren
14 business area to where then it cuts back
15 in -- the boundary line, cuts back in east,
16 and then there's an odd shaped triangle at
17 the top of the Fondren area that goes to
18 Meadowbrook. Now our east side boundaries,
19 we have -- and this is where it gets a little
20 odd, we have to Ridgewood Road on Lakeland
21 and then we take in the AG museum and all
22 that area there, LaFleur Park, all that. And
23 then it cuts back up to highway or I'm sorry,
24 Interstate 55 south around Fortification or
25 just past Fortification. We can go back up

Page 60

1  to 55 and back down in line with South
2  Street. North of Lakeland, we have basically
3  the AG museum and Smith Wills Stadium, that
4  area. But we stop right at the district, and
5  so, literally, depending on which side of the
6  street you're on the district as to whether
7  or not you're in the CCID or JPD. So, the --
8  like I said, the boundaries in the north
9  section of the CCID is a little irregular and
10 could use some revision, to be honest with
11 you. It's a little muddled.
12     COMMISSIONER BAINS: Okay. Are there
13 any further questions for the Chief? Chief,
14 again, thank you for your testimony. Thank
15 you for coming. We appreciate your work. We
16 always stand ready to help you in any way
17 possible. Okay.
18     CHIEF BO LUCKEY: Thank you.
19     COMMISSIONER BAINS: I'm going to move
20 down the agenda again. I see my good friend
21 and a friend of the committee, the District
22 Attorney of Hinds County, Jody Owens, at the
23 end. If -- Jody, you are recognized when
24 you're ready.
25     JODY OWENS: Thank you, Mr. Chairman.

15 (Pages 57 to 60)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 61

1    Thank you, Mr. Chairman.  My colleague, Ada
2    Johann Layman, is passing out to the
3    committee members about six or seven
4    documents that I would like to aid my
5    comments today.  I think it's important that
6    we make these conversations fruitful by
7    providing the committee with the actual data
8    of what we're seeing in the City of Jackson,
9    the capitol city, and in Hinds County as we
10   try to explain where we are and how we got
11   here.  I'll start first by making some brief
12   comments, and I'll be happy to answer any
13   questions.
14       Again, good morning.  My name is Jody
15   Owens.  I'm the Hinds County District
16   Attorney.  Thank you for opportunity to speak
17   with you today regarding the state of crime
18   in the capitol city.  Like many of you, as
19   thought leaders, we've worked hard to come up
20   with a solution to have a manageable justice
21   system in the capitol city.  But first, we
22   must acknowledge that we have very serious
23   and real problems.
24       I was sworn in the office on
25   January 1, 2000 as the district attorney here

Page 62

1    in the capitol city.  As you can see in the
2    first handout, in 2018 and 2019, we had a
3    homicide rate of 84 and 81 individuals,
4    respectively.  And that's this handout here
5    for those who are following me.
6    Subsequently, over the next first two years
7    of my administration, we saw increases of 130
8    and 154 homicides.  That represents a
9    60.5 percent increase the first year and a
10   78.5 percent increase in the next year.  I'm
11   sad to say that we have more than 25
12   (inaudible) homicides in the State of
13   Mississippi, which is represented by the next
14   three documents.  The sheet to the homicide
15   ray by county in 2020, 2021, and 2022.  Karen
16   Baines, if you follow, you will notice that
17   Hinds County in 2022, which is a year still
18   going right now, has 150 homicides.  And
19   sadly, we had three homicides last night.  In
20   2021, we had 156 homicides in Hinds County
21   and again in 2020 and 139 again.  That's more
22   than 26 percent right now of the entire state
23   of Mississippi.
24       The problems are complex and there's no
25   single problem or solution to crime.  Whether

Page 63

1    it's the family unit, the absence of faith
2    based support, schools that need improving
3    economic opportunities, or just to understaff
4    and overwhelmed criminal justice system.
5    It's important to note that the District
6    Attorney's Office for the State of
7    Mississippi is a state agency.  My actual
8    title is the 7th Judicial State Attorney
9    position, and the state has funded all of our
10   attorneys and selects how many attorneys we
11   have for every district attorney office in
12   all your respective counties.
13       If you look at the chart, my next
14   handout chart, you will look at legislation
15   from 2014.  it looks like this.  So since
16   2007, the legislature has not funded any full
17   time additional positions for the Hinds
18   County Capitol City District Attorney's
19   Office.  But in 2014, almost every District
20   Attorney's Office received additional
21   resources, but the one who needed the most,
22   that being the capitol city.  So we have
23   fought the need for more resources since we
24   got here.  And in 2020, we first came to
25   legislature and asked for additional

Page 64

1    resources and unfortunately, we were not
2    successful.  We had the conversation, we
3    spoke to the state's leadership to provide
4    them with the data that we were actually
5    doing our job.  And if you gave us the
6    resources that we needed, having the most
7    crime, having one of the most populous
8    counties in the state, that we could do more
9    comparably.  And again, right now, the state
10   statute only gives us eleven assistant
11   district attorneys.  The statute calls
12   assistant district attorneys legal
13   assistants.  So when you look at that
14   document, it says legal assistants, that's
15   referring to assistant district attorneys.
16   So just if you look at the eleven ADAs that
17   we have in our office, and you compare that
18   to the number of homicides we have just in
19   the capitol -- just homicides, you will find
20   that our District Attorney's Office is the
21   largest, with the largest volume of crime,
22   but vastly understaffed.  And we've been that
23   way since 2007, despite other District
24   Attorney's Office getting more resources,
25   which is why we work within the Prosecutors

16  (Pages 61 to 64)

Brooks Court Reporting, Inc.
(601) 362-1995

Judiciary B Meeting 10/10/2022

Page 65

1   Association, and we request additional
2   resources year after year after year. But
3   Chairman Bains, what we did was we started
4   trying to show you all as thought leaders
5   what we were doing. So we showed you the
6   next handout was how many individuals that
7   were being caught by the Jackson Police
8   Department and now the Capitol City Police,
9   how many individuals were being indicted for
10  crimes. So when people try to understand
11  what's actually happening in Hinds County, I
12  think it's important for you to realize that
13  people are being arrested and people are
14  being indicted at astronomical numbers. And
15  I would challenge you to compare these
16  numbers to any other District Attorney's
17  office in the state. We are indicting
18  thousands of individuals every year and in
19  fact, every month we're indicting individuals
20  at just astronomical rates. But every year
21  we've come back to this body and we're not
22  going to get resources until last year. Last
23  year was a game changer for crime in the
24  capitol city. Last year, a unique group of
25  individuals came together, and we thank you

Page 66

1   for what you did. We're working right now
2   with the State Public Defender, my
3   counterpart, Gail Lowry, Hinds County Public
4   Defender is in this office. I see my good
5   friend, Chief Jessie Randolph and his group,
6   we're working together with a plan. And that
7   plan has come together. And let me tell you
8   about that plan.
9         That plan is afforded us the opportunity
10  that, when this bill was signed by the
11  Governor, and the resources were released in
12  July to allow us to have, for a limited
13  period of time, just one year's funding six
14  new ADAS. For a limited period of time, we
15  have four special court judges that have been
16  appointed to the Capitol City. For a limited
17  period of time, the Public Defender's Office
18  has new resources, because if we're being
19  realistic, more than 80 percent of crimes
20  that are committed are individuals in the
21  public defender system. And if we don't fund
22  that system, we can't get a handle on crime.
23  Because if I have a bunch of ADAS, it doesn't
24  make a difference if we can't vet the cases
25  appropriately.

Page 67

1         But one of the things I want to make
2   sure I highlight here is that in this chart
3   right here, this is before our special judges
4   are here. Hinds County -- in the last ten
5   months, we've had 25 jury trials. We've had
6   500 cases resolved, 275 guilty pleas. You
7   know, We're doing a lot -- the existing four
8   circuit court judges, that's before we've had
9   any trial whatsoever. We've had 79 percent
10  of all active cases disposed. So we're doing
11  so much with so little. But if you look at
12  we are now with our new judges, that being
13  Judge Vollor, who, of course comes from is a
14  representative of Hinds -- Warren County;
15  Judge Sanders, who's coming from
16  representative Moran and Osbourne County, and
17  representative Harworth, coming from
18  representative Williams, represent Stevenson
19  and Creek -- Morris County. We have this
20  unique possibility in Hinds County, in the
21  capitol city, to get it right. But we don't
22  even know what that looks like now because we
23  just had our first docket call this week.
24        So, as you know, in your process, you go
25  through your process to get the resources,

Page 68

1   which we got in July. Our office, as well as
2   Gail's team, hired all new lawyers, which is
3   difficult to do, but we did that in two
4   months. We have new teams that fight
5   this thing. And we talk about police with
6   Chief Luckey and Chief Davis and hundreds of
7   officers, but we're talking about a small
8   group of lawyers that you need to prosecute
9   people. The example I give people all the
10  time is when someone breaks out of jail, we
11  get the SWAT team, the dogs, the helicopters.
12  We go looking for them, right?
13        But when you put them in that jail, how
14  few people are you funding to prosecute them?
15  How few people are you funding to determine
16  whether or not they need to be misdemeanor or
17  they need drug treatment or mental health
18  treatment. And that's why, I think, today I
19  want you to know that what you've done so far
20  has been significant but as the lady asked,
21  she said, what if you were king for the day?
22  I would say you have to make this permanent.
23  I would say you at least have to fund it for
24  a minimum of two or three years to see what
25  we can do.

17 (Pages 65 to 68)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                          eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 69

1    It's so difficult for us, who are hiring
2    lawyers, to hire them for one year the six
3    lawyers I've hired, I've hired from the
4    Attorney General's Office, from the DA
5    Offices of the Prosecutors, because they
6    believe in the capitol city. They want the
7    capitol city to be great. But if we have one
8    year of funding and this is not duplicated
9    next year, it was all for not. We just had
10   our first docket call this week because it
11   takes time for judges to get those dockets.
12   The Chief Justice has given all the new
13   judges pieces of the existing judges cases,
14   right?
15   So everybody understands the problem,
16   that our volume is too high. We have to do
17   something about it, and we have to fund the
18   system appropriately, which we've never done
19   in the last decade, despite funding other
20   systems. And the last thing I would leave
21   you with is that there's four pages of
22   notable prosecutions. It's not accurate to
23   say that people in the capitol city are not
24   being prosecuted. We're giving people life
25   and 30 years time and time and time again,

Page 70

1    but the volume is just so high that it's
2    newsworthy and it hits the media cycles.
3    But people are working really hard and
4    really diligent, and we're going to keep
5    doing that. But we need consistent funding.
6    And at the very least, we need you to do what
7    you did last year again so we can be in a
8    place to show you that if we've already done
9    26 trials in a year, we're valuing new
10   judges. Let's show you we can do 50 in a
11   year. Because you know those who represent
12   people, it's not the trials that move the
13   dockets to pleas, but to be able to be in a
14   position to get pleas, you have to be able to
15   have trial and judges who are ready.
16   But our existing judges are doing more
17   than any other judges in the State of
18   Mississippi. Again, 25 percent of the
19   violent crime by way of murders happens in
20   one county. And that county has the same
21   budget, roughly $79,000 allocated from the
22   state as every other county. And some of
23   those counties have three homicides a year.
24   Yet and still when I have 160 homicides last
25   year -- I'm trying to get the crime lab, I'm

Page 71

1    trying to get experts, I'm trying to get DNA
2    tests. so when you look at the problem, look
3    at the solution as being fund us
4    appropriately, support us, because our
5    challenges are very different than anywhere
6    else in the state.
7    Our white collar crime group that many
8    of you know, because the DHS prosecution has
9    more challenges, because we are tasked with
10   that. If you all are threatened when you're
11   here in Capitol City or the Governor's
12   threatened, the Lieutenant Governor's
13   threatened, or the Speakers threatened, those
14   cases come to our office. So we prosecute
15   more -- related to state agencies than anyone
16   else with the same resources to everyone
17   else. at this time, I'm happy to take any
18   questions, and thank you for listening.
19   COMMISSIONER BAINS: Thank you, Jody.
20   We appreciate your testimony. We appreciate
21   what you're doing. My understanding, okay,
22   just for the record, I guess. And to clear
23   it up, you have six new ADAs, is that right?
24   JODY OWENS: Yes, sir. I was allowed a
25   certain amount of money to get investigators,

Page 72

1    ADAs and paralegals. We have six currently.
2    The funding has only, you know, one year
3    component with a commitment to do two years
4    hopefully. We're working with some great
5    groups, but right now, the six just got their
6    dockets, but they've been working existing
7    cases as soon as we hired them.
8    COMMISSIONER BAINS: Okay. And the
9    judges are in place.
10   JODY OWENS: They all have been reached
11   out to about their docket calls, and they are
12   all currently scheduled. Unfortunately, as
13   you know, this time of year, things somewhat
14   slow down with the courts as you get into
15   holidays. But the judges have been
16   appointed, they have dockets, and all have
17   been coordinated with.
18   One of the additional challenges that we
19   have that particularly my good friend Greg
20   Snowden has been helpful with, is locations.
21   Judges need courtrooms. They have juries now
22   in trials. And we've had an amazing synergy.
23   Everyone from Chairman now Commissioner
24   Gibson, and people have offered space. I
25   think they've even allowed us to use the

18 (Pages 69 to 72)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                        eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 73

1  elbow room from time to time.  We've looked
2  at spaces to have trials to move the docket.
3  But this has been a massive undertaking.  I
4  mean, we've essentially tried to double our
5  system temporarily, and that's been hard.
6      COMMISSIONER BAINS:  How far out are you
7  in starting those cases, those trials in
8  those places?
9      JODY OWENS:  Realistically, I think we
10  could probably have trials in the next 30
11  days.  I mean, we've had to fix ceilings and
12  chairs and create space for people.  So,
13  again, I think that what you would see, if
14  you would invite me to come back sometime in
15  the spring, I could show you an increased
16  number of cases that we're resolving, but you
17  really won't see the full thing until we have
18  a year.
19      And you need to see a year of this
20  working that way in all fronts.  I talk to
21  the chief about this all the time.  The best
22  practices in the country are from someone
23  being arrested to prosecute your case being
24  resolved in a year's time.  When we were
25  elected, we were closer to almost two and a

Page 74

1  half years.  Now we're about a year and 16,
2  17 months.  Albeit some of the things they
3  discussed, reviewing the Sheriff mental
4  health examinations, you know, that can
5  extend the case two or three years.
6      COMMISSIONER BAINS:  And crime lab
7  issues I'm sure.
8      JODY OWENS:  Yes, sir.
9      COMMISSIONER BAINS:  When that gets up
10  and running, I'm just curious as to the whole
11  procedure of that.  The judges are going to
12  be -- they're fully -- full circuit judges.
13      JODY OWENS:  They're senior judges who
14  are all part time judges.  So we anticipate
15  is those judges being able to do up to two
16  trials a month.
17      COMMISSIONER BAINS:  That's where I was
18  going.  Are these judges going to be more --
19  having- do you anticipate them having more
20  trials, more pleas?  Is this a mechanism for
21  the kind of funnel trials of these judges, or
22  is it just they're going to do what?  They
23  have their own docket and they take care of
24  their cases.  However, those cases are
25  disposed -- that's how they're disposed.

Page 75

1      JODY OWENS:  That's correct.  They have
2  people trials and pleas and we're in their
3  dockets and hopefully the Chief Justices will
4  continue to identify more cases.  I mean,
5  we're all working in collaboration with each
6  other.
7      COMMISSIONER BAINS:  Okay.  Any
8  questions for -- yes.  Tell us how those
9  cases assigned by the senior circuit judge,
10  by Chief Justice, or is it just pick straw?
11      JODY OWENS:  I believe that the Chief
12  Justice asked the existing circuit court
13  judges to identify cases to be released to
14  those judges.  Thus far, the Chief Justice
15  does have the authority within his purview to
16  take parts of the docket himself, but I think
17  we're working in conjunction with each other
18  so far.
19      COMMISSIONER BAINS:  Okay.  And -- okay.
20  So there's no really -- like Sheriff Jones
21  gave something that bothered me.  He said
22  that there were some people in his jail who
23  have been there for six -- five, six years
24  pretrial.  Those type of cases are still just
25  they're not going to get priority under these

Page 76

1  new judges?
2      JODY OWENS:  Certainly the jail
3  population always gets priority.  If you look
4  at the list of notable cases that have
5  happened the last two years, if you look at
6  those case numbers, you will see some of
7  those case numbers are four and five years
8  old.  Those are the cases that we're trying
9  to try.  We get a list every month from the
10  Sheriff's Office of those individuals who
11  have been in the jail for how long, how part
12  is to make sure they've been indicted and
13  their cases are moving and nothing stopping
14  those cases from moving.  Procedurally, there
15  are things to halt those cases.  Again, like
16  we mentioned, but no one should be at the
17  jail pretrial detention for that period of
18  time.  Our goal is get those individuals
19  prosecuted in DOC's custody.
20      COMMISSIONER BAINS:  Understand.  Any
21  questions from committee members, gentlemen,
22  from Pearl River, thank you.
23      CHIEF DAVIS:  Thank you, Mr. Owens.
24  Just a quick question.  What wait time are
25  you seeing with the state hospital as far as

19 (Pages 73 to 76)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 77

1 competency exams are concerned?
2 JODY OWENS: Minimum of a year. There's
3 generally two years for us -- there's a wait
4 for beds. Obviously, we have the highest
5 population of individuals waiting for beds
6 and then getting those reports back. And
7 then again, whether you're restoring the
8 individual, he or she can be competent for
9 trial. Alternatively, on our end as the
10 state, we want to see and wait that process
11 out. So two and a half years is very normal
12 for us. I think that if you look at the
13 sheriff's population and those individuals
14 who are waiting, a vast majority are waiting
15 for those beds, all those examinations, and
16 that, at the end, that's very different for
17 the system.
18 CHIEF DAVIS: And that was going to be
19 my follow up, just to provide clarity to the
20 committee. So when you're waiting for a bed
21 at the state hospital to be examined, you're
22 waiting in the jail, is that correct?
23 JODY OWENS: Correct. The jail is a de
24 facto mental health asylum at that point, a
25 facility. They can't provide the resources.

Page 78

1 And what we're seeing is those individuals
2 are the most disruptive, obviously, in the
3 jail, the most self harm, and those
4 individuals. Unfortunately, that's the
5 system we have in place.
6 CHIEF DAVIS: Okay, thank you.
7 COMMISSIONER BAINS: I think I saw --
8 lady from Hinds.
9 Speaker C: Thank you, Dee, for being
10 here today. Could you just clarify something
11 for me? Because I think all of you all have
12 mentioned about the backlog. And I'm hearing
13 the backlog starts at the beginning with law
14 enforcement, in terms of arresting people,
15 and now they're in jail, and they're waiting
16 pretrial. And so that's a backlog, because
17 the increase of crime, I guess, don't let me
18 put words in your mouth. I'm just trying to
19 repeat what I'm understanding so that's a
20 backlog from that perspective. But when it
21 gets to the Circuit Court perspective, I
22 understand we have provided funding for
23 senior staff judges not to come and help with
24 that load. So I'm trying to figure out where
25 the backlog is as it relates to the Circuit

Page 79

1 Court piece, because we have increased the
2 number -- well, we haven't increased the
3 number of Circuit Court judges, and I know
4 that's been an issue as well.
5 JODY OWENS: Yes, ma'am.
6 Speaker C: Okay. So are we saying that
7 we need additional Circuit Court judges
8 because we now have senior staff judges that
9 are helping because of the backlog? I'm just
10 trying to figure out, strategically in my
11 mind, the Circuit Court is in the middle, law
12 enforcement on one side, and then we got
13 appointed senior judges on the other side.
14 What do we need to do to help with that flow
15 perhaps on more of a permanent basis?
16 JODY OWENS: And I think we use the term
17 backlog to mean a lot of different things. I
18 think the challenge would be really to
19 understand that when you have 80 percent
20 increase in two years of homicides, you also
21 have generally an 80 percent increase of all
22 crimes. So when you have four Circuit Court
23 judges who are working diligently, but half
24 of their dockets are civil, and then you give
25 them 80 percent more work to do, that's

Page 80

1 difficult, if not impossible, for anyone.
2 When we look at the backlog, we look at
3 about, you know, case volume. Are we moving
4 cases, and do we have the resources to move
5 cases quick enough? I think in many ways,
6 the volume is synonymous with backlog because
7 the volume is so high. We certainly need a
8 permanent judicial seat in the capitol city.
9 Other districts throughout the state have got
10 that the same amount of time, we don't have
11 that, and I think most people will agree with
12 that.
13 When you look at the special judges, one
14 of the things that Chief Justice and I
15 discussed was that we wanted to make sure
16 that the defendant's rights were protected.
17 And he picked special judges who were senior
18 judges who had low rates of appeals because
19 this is an expensive process and you don't
20 want to waste the taxpayers time and then
21 have to do it all over again. So we wanted
22 to make sure we identified judges with the
23 experience and the record. They could make
24 sure that they knew what they were doing.
25 And I think we've done that so far.

20 (Pages 77 to 80)

Brooks Court Reporting, Inc.
(601) 362-1995

Judiciary B Meeting 10/10/2022

## Page 81

1    COMMISSIONER BAINS:  That it, lady --
2    okay.  Any further questions for Mr. DA?  I
3    think that's it.  Jody, thank you.  You're
4    always welcome to this committee.  We
5    appreciate your hard work, and like I told
6    the Sheriff, you're free to stay or to go,
7    but we do appreciate you coming here, and
8    anything we can do, we stand ready.
9    JODY OWENS:  Thank you, sir, very much.
10    COMMISSIONER BAINS:  All right, next up
11    is a good friend, Andre de Gruy.  Andre, if
12    you'll come, you know, you've testified a
13    number of times, so you recognize when you're
14    ready.
15    ANDRE DE GRUY:  Thank you Mr. Chairman.
16    Good morning and thank you all for allowing
17    me to be here, inviting me to be here.  It's
18    a wonderful opportunity.  I was excited to
19    hear that this committee wanted to go in on
20    specifically what's going on in Jackson.
21    Jackson.  I am Andre de Gruy, the State
22    Public Defender, so I speak for public
23    defenders all over the state.  We're looking
24    to make changes and reforms in the public
25    defender system all over the state.

## Page 82

1    But I've also been a resident of Jackson
2    for over 35 years.  My wife and I have raised
3    five children here.  Three of my adult
4    children -- or two of my three adult children
5    have returned to Jackson.  They starting
6    their careers in Jackson.  none of them
7    living with me, so that's good.  I also spent
8    early in my career, five and a half years in
9    the Hinds County Public Defender System.
10    And then, of course, most recently, as
11    has been mentioned, I'm having an
12    opportunity, maybe at the end of my career,
13    to come back and work closely with the Hinds
14    County Public Defender's Office.  as the
15    District Attorney alluded to this has been
16    getting started on this project has been
17    difficult.  It's been a challenge,
18    particularly that one year limit, to try to
19    bring in experienced lawyers.  And that's
20    what we knew we were going to have to have.
21    We had to sit down and -- Gail Lowry,
22    our Hinds County Public Defender is here
23    today.  Gail and I started meeting early on
24    to figure out how we meet this challenge,
25    knowing full well what we were jumping into.

## Page 83

1    We had to -- we had, from the defense
2    perspective, I think, some additional
3    challenges, because while we have all of
4    these people in this backlog system -- and
5    there's no question there's a backlog, that
6    they all had attorneys, some a few had
7    retained counsel, some conflict outside
8    counsel.
9    And we've assumed some of those cases,
10    as well as the majority of what we're doing,
11    is coming in with the Hinds County Public
12    Defender's office not to take over their
13    cases, but to handle these cases with them
14    and much like what we see with Capitol Police
15    and Jackson Police working together and the
16    Sheriff working together, that if you bring
17    more people in, even though they're in
18    different agencies, there's only so much time
19    in the day for the officer to patrol, for the
20    attorney to work on his cases.
21    And so we determined that bringing in --
22    coming in as a second attorney with the
23    extent the already established relationship
24    and not disturbing that between attorney and
25    client.  I suspect most of you have not been

## Page 84

1    in the system in that capacity, where you're
2    a client depending upon a lawyer to protect
3    you.  And you really need that relationship
4    to be strong.  And so we are basically
5    blending cultures from two different offices
6    and two different styles.
7    You know, those of you who know me will
8    find this as a surprise, but I'm not always
9    easy to get along with.  And so blending that
10    in and then on the individual cases, it has
11    been a challenge.  Our lawyers -- and we've
12    got the first two pages I like to say it's
13    one page because it's front and back, but
14    it's technically two pages -- is an overview
15    of what we have developed in this program.
16    So while the judges just got appointed last
17    month, our lawyers have been working since
18    August 1st.
19    We have some challenges in how we're
20    setting it up.  But you'll see, on the second
21    page, we have some goals.  And our goals are
22    to reduce the jail population and to
23    particularly reduce the jail -- not just
24    pretrial detention, that's what's supposed to
25    be in the jail, but the unindicted, what's

21 (Pages 81 to 84)

Electronically signed by A. Virginia Brooks (301-160-119-1279)    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 85

1  been referred to in the media as the dead
2  zone.  People who go from their preliminary
3  hearing until they are indicted.  And the
4  Sheriff, I would say, is doing because I've
5  got some data, pictures in here for you --
6  the Sheriff is collecting very good data and
7  sharing it, which is really important because
8  too many agencies are operating in these
9  silos, looking at their own data and not
10  sharing it.
11      But the Sheriff has -- you know, you're
12  asking for who's in the jail, Mr. Chairman.
13  He can tell you.  He can tell you why they're
14  there, how long they've been there.  And so
15  when we started looking at that data,
16  initially we thought we were going to come
17  in, we were going to take a whole bunch of
18  homicide cases.  So we hired lawyers who were
19  experienced in homicide cases and we'd be
20  trying cases.  And what we found was, while
21  that's certainly the biggest problem, it
22  is -- it's not the only problem.  And so we
23  have, working with the Public Defender's
24  Office, we are shifting some of our focus
25  this week, really.  we were taking 100 of

Page 87

1  they hired a new public defender because they
2  had a system where you had representation at
3  the preliminary hearing, and then you had no
4  lawyer until you got indicted.
5      And after the new rules came out from
6  the Supreme Court, Judge Emfinger, then the
7  Circuit Judge -- Senior Circuit Judge,
8  changed how they did it, and he convinced the
9  Board of Supervisors to hire another lawyer
10  just to handle those, what I'll call the dead
11  zone cases.  And they're just different
12  things you can do.  It's not always bail
13  advocacy, although we know that there are
14  people getting left behind there, but we know
15  it's also -- these are people that can
16  resolve this case.
17      And rather than waiting for the District
18  Attorney to be able to get it, and I think he
19  alluded to this a little bit, we can screen
20  these cases and take them to him to plea on
21  an information and certainly identifying the
22  huge problem with the mental health
23  population.  You know, we're talking about
24  hundreds of people in there, and a lot of it
25  is, as one of the earlier speakers talked

Page 86

1  these, 200, I think from the Sheriff's last
2  report, just not indicted for they've been in
3  jail for 90 days or more and aren't indicted
4  yet -- 221 people.
5      And the majority of those are public
6  defender clients.  And so we're taking almost
7  100 of those cases.  We're going through them
8  right now.  We've already found somebody who
9  has been indicted and it just hadn't updated
10  in the system yet.  But for the most part --
11  these are -- we're going to take these I
12  think it's around 90 people, the numbers in
13  the report, and we're going to start meeting
14  with them.  And I told -- it's a part of the
15  system that Ms. Lowry is very concerned about
16  that their lawyers handling most of these 25
17  trials and moving these pleas, just don't
18  have the time to focus on that.
19      And so we're going to dedicate a good
20  chunk of our time on those cases.  And these
21  are some people who need -- maybe they should
22  be on bail.  We've got to look into that.
23  But we think a lot of these people would be
24  able to plea on information.  It's actually a
25  model that comes out of Rankin County that

Page 88

1  about, the homelessness problem isn't just
2  homelessness, it's also mental health.
3      There's a lot of crossover there.  And
4  then you have the breaking into buildings.
5  So, these are not violent crimes.  They have
6  to be addressed.  But we need to find a way
7  to address them without clogging the system
8  further and to get people both help and to
9  prevent these future crimes.  And so one of
10  the components that we want to introduce here
11  that hasn't been done in indigent defense in
12  Mississippi, and again, needing an
13  experienced person who can work -- they have
14  to work part time.  They're not going to quit
15  a job on a nine month promise.
16      And -- but we want to bring social
17  workers in, and we're going to bring multiple
18  on contract to work with these lawyers to
19  identify problems and solutions for these
20  people, because that's what the social worker
21  brings.  You know, you do enough criminal
22  defense work, you can identify a mental
23  health problem, but you don't know what the
24  solution is, or even a homelessness problem,
25  but you don't know the solution.  And so

22  (Pages 85 to 88)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 89

```
 1   introducing social work to this, we think is
 2   going to be very beneficial.
 3       Now, going past that, as we started, I
 4   would say the first thing you need to do
 5   before you make any decisions on -- is to ask
 6   the king for his data. Don't just say you're
 7   the king for the day. Tell me what to do.
 8   We have to look at the data. And so what we
 9   started in these early meetings of -- first
10   with the public defender, and then I've met
11   individually with three of the four judges
12   and also we've had some meetings where the
13   judges and the prosecutors and the defenders
14   were in the same meeting. And then the
15   defenders and the prosecutors are meeting
16   individually, just -- without the judges
17   present. Sometimes we just have to do that,
18   just like they meet without us.
19       So one of the first things we wanted to
20   know, you know, we're hearing about this
21   backlog, we know we hear in the media what's
22   about crimes. So what the District Attorney
23   brought to the first meeting was some data
24   from JPD that was comparing it -- the meeting
25   was on June 2nd. So they went through May.
```

Page 90

```
 1   So we took that data that they provided and
 2   the available public data and tried to do a
 3   chart that sort of compares -- this is just
 4   five months. It's not a full year. And
 5   we're asking for update to that data. But
 6   you can see this is from the Major Crimes
 7   Division report of JPD that crime has been
 8   fluctuating. And these are crime reports,
 9   not necessarily arrests. We've talked
10   about -- earlier speakers have talked about
11   what they call clearance rates. So this
12   isn't necessarily impacting the criminals --
13   the legal system yet because there are people
14   that haven't been arrested.
15       But the one clear thing when you look at
16   across the pre-pandemic years, the pandemic
17   years where we are today, a 30 percent
18   increase in homicides over the three year
19   average before, and it was already going up.
20   So that number from -- when you look if you
21   look back to the early months of 2019,
22   39 homicides, the first five months of 2022,
23   59 homicides. So I do want to say one thing,
24   because people often talk about youth and
25   look to youth, and I appreciate the Sheriff
```

Page 91

```
 1   saying he's also seeing the youth as victims.
 2   That happened -- that's happening.
 3       But we track data all over the state
 4   because of the U.S. Supreme Court decision
 5   that allows youth under 18 to have a
 6   sentencing option on a homicide case or any
 7   case that carries a life sentence. So we've
 8   been tracking that data. And I could tell
 9   you that youth crime, homicides where a youth
10   is the suspect, have increased in Jackson --
11   or in Hinds County because we track it by
12   county, but it's -- they are not responsible
13   for this doubling of homicides. And the
14   number, the increase among youth is a smaller
15   percentage than the total increase in
16   homicides.
17       So it is across the board, but this is
18   not simply a problem of youth being out of
19   control. And so -- but when we talk about
20   three dozen kids in youth detention charged
21   as adults, being housed for adult crimes,
22   that way too many. I do want to tell you
23   that the next page you see is criminal
24   dispositions. And this comes from the AOC --
25   across -- this is all criminal cases and
```

Page 92

```
 1   comparing it to the 7th Circuit Court
 2   District. So we've had a decade of declining
 3   dispositions. Now there's a huge gap in this
 4   data.
 5       And I want you to know we're working on
 6   this because the HB585 required cities and
 7   counties to -- also justice courts -- to
 8   start collecting data on their dispositions.
 9   And so we now have about six years of data,
10   and we're going to isolate the City of
11   Jackson, Jackson Municipal Court, and be
12   able -- and then just the violent felonies
13   and see where they are compared over years,
14   what trends happening. So by the start of
15   the session, I think we will have the mental
16   picture in this display that's probably, I
17   think, the most important. Who's coming into
18   the system. You'll be able to see in that --
19   and it comes in six month chunks, so you can
20   look at it in six months and in a year, and
21   in two years -- people who are arrested,
22   released and rearrested.
23       And I think, you know, it happens, and
24   none of us would on the defense side would
25   pretend it doesn't happen. I think we're
```

23 (Pages 89 to 92)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 93

1  going to find that it doesn't happen as
2  nearly as often as people believe it does,
3  but that's a gap in the data.
4      The next two are the new data from the
5  FBI on just trends. And this is comparing
6  Mississippi and the nation. And I will tell
7  you it cuts off at 2020 because there are a
8  lot of questions. They've shifted to a new
9  data system and not everyone's reporting.
10 And as far as I know, City of Jackson's not
11 reporting to the FBI -- their Uniform Crime
12 Report. This is just the data through the
13 old system in 2020 where we see trends and
14 they have property offenses and violent
15 offenses separately and we see where the
16 uptick is, is in violent offenses.
17     And that's during the very beginning
18 of -- or the first year of COVID And so what
19 we see more of what we're looking at in the
20 City of Jackson is really homicides. It's
21 not just violent crimes, it's homicides that
22 are the real problem.
23     So the next picture I have is -- we've
24 talked about this big blue bar here of what
25 this legislature appropriated to the Capitol

Page 94

1  Police. And that's -- we've already heard,
2  and I know they are asking for even more, but
3  right now they've got about $12 million -- it
4  looks like $11 million of state funding.
5  That's on top of what the city is doing and
6  the county is doing.
7      The District Attorney told you about --
8  he's a state official. The vast majority of
9  his budget comes from you. What we're
10 spending on the prosecution, what we're
11 spending on the courts. And there's been, I
12 would say yes to the District Attorney saying
13 maybe we need another judge. I would say
14 from our meetings with these judges over the
15 last six months and the fact that they're
16 telling you they've done 25 trials, they may
17 be wearing out, but they are doing -- the
18 problem with this backlog is not the courts.
19 I'm not saying they don't need another
20 judge -- I think they may be, but they'll
21 make that case for you.
22     But there's nothing -- we're not
23 spending anything other than this year, one
24 year of ARPA funds on the 6th Amendment, the
25 right to counsel, that the vast majority of

Page 95

1  people who are brought into the criminal
2  legal system cannot afford a lawyer, and they
3  languish in jail because they can't afford a
4  lawyer, nobody to advocate for them. They're
5  stuck there.
6      And so the last document is, what the
7  latest version of our next step -- because,
8  again, I'm the State Public Defender, not the
9  Jackson Public Defender. But we've got a
10 plan. We need improvements all over the
11 state. But if you turn to the last page, we
12 have a unique model that we would like to
13 introduce in the City of Jackson. And it
14 would bring together, not just -- that it
15 would be unique in the State of Mississippi.
16 It's not unique everywhere. It's been
17 implemented in the City of Detroit. It
18 started in the City of New York. And it
19 is -- it would blend together not just
20 lawyers who represent people on felony cases,
21 but they could also handle municipal court
22 misdemeanors.
23     They also -- that would be the house for
24 our parent defender, who the largest
25 population of foster kids is always

Page 96

1  fluctuating between Harrison and Hinds
2  County. And we're funding a part time parent
3  defender, and we would want to bring that in
4  and give them access, both full time and
5  access to social workers, because this office
6  would include social workers and
7  investigators.
8      And I think we have a concept paper that
9  we're working on with the neighborhood
10 defender on what it would be. And the
11 advantage to this is that they would also
12 bring in private funds to include a civil
13 legal service arm, too, to relieve the
14 pressure on our legal service system in
15 Mississippi for civil matters, particularly
16 things like evictions that lead to criminal
17 activity. People lose their job, they get
18 kicked out of their house, and then they're
19 breaking in someplace. And so it's a
20 holistic approach, and we will be coming to
21 you. And it's in our budget request already
22 that we're asking the authority to do that in
23 a permanent way.
24     And with that, I would be happy to field
25 any questions about anything related to

24 (Pages 93 to 96)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 97

1   public defense or the City of Jackson,
2   including places to eat out and good
3   neighborhoods.
4       COMMISSIONER BAINS:  All right, any --
5   Andre, thank you for your testimony.  Any
6   questions for Mr. de Gruy?  You always say
7   good job, always well prepared.  We do
8   appreciate what you're doing.  I represent --
9   I'm the public defender for Tishmingo County,
10  so I understand, and I sympathize with a lot
11  of the stuff.
12      We have different issues up there, but
13  they're all still the same.  And one of the
14  very things is that we do on the start of
15  every term is we go over the jail docket and
16  talk about those that have been over in jail
17  more than a year to see what the problem is.
18  And very often, as you've alluded to, and I
19  think you were saying this in your testimony
20  about the backlog and the creation of the
21  backlog -- some of that I understand.
22      COVID did a number on a lot of things.
23  Some of that is stuff that has to do with the
24  crime lab, with mental evaluations, psychotic
25  evaluations and stuff such as that, that are

Page 98

1   out of the hands of law enforcement, out of
2   the hands of lawyers and the courts.  And
3   that -- that goes to the delay of some of
4   these prosecutions.  Your office or Hinds
5   County Public Defender's Office, I didn't
6   catch it, I don't think, but they're able to
7   begin representing these clients at the
8   preliminary hearing?
9       ANDRE DE GRUY:  Yes, they do.  They pick
10  the cases up.  Actually, they -- they have --
11  they usually have a presence at initial
12  appearance, but they do the preliminary
13  hearings, and then -- and they still
14  represent the person, but they just have not
15  had the time to actually spend if the person
16  doesn't call them regularly to draw them
17  down, the majority of their lawyers are in
18  the trial -- in the circuit court working.
19      COMMISSIONER BAINS:  That's where I was
20  going.  Forgive me, because I do not deal
21  with a county court.  I don't have a county
22  court in my county, and I only have one in my
23  judicial district.  Those preliminary
24  hearings, are those dealt with at the county
25  court level or Justice Court or how -- or at

Page 99

1   what point where are you going with those?
2       ANDRE DE GRUY:  What the practice in
3   Hinds County is, if it's a county case, if it
4   happens outside of any municipality, they
5   do -- they usually around the rest of the
6   state, they go to Justice Court.  Hinds
7   County, those go to a county court judge.
8   They have one dedicated county court judge,
9   Byram, Clinton, Utica.  They will have their
10  own preliminary hearings.  And I think the
11  Public Defender's Office does -- they go at
12  least to Clinton.  I don't know if they go to
13  other of these smaller municipalities.
14  Jackson Municipal Court does, obviously, the
15  majority of preliminary hearings but -- so,
16  to get from Jackson Municipal Court to the
17  county court.  For those, the cases are
18  actually transferred.
19      And this is something that started when
20  I was in public defender's office in the
21  '90s.  They transfer usually violent crimes.
22  They'll do the prelim in the county court.
23  So I would say they definitely need another
24  county court judge.  I don't know if the
25  county is asking for that, because I know

Page 100

1   they have to pay for it.
2       COMMISSIONER BAINS:  How many does Hinds
3   County have now?
4       ANDRE DE GRUY:  They have three.  One
5   does exclusively youth court, one does all
6   the civil matters, one does the criminal
7   matters, which is majority of their time is
8   dealing with these felonies.
9       COMMISSIONER BAINS:  How many Justice
10  Court judges does Hinds County have?
11      ANDRE DE GRUY:  I assume five, but I
12  don't.
13      COMMISSIONER BAINS:  Okay.
14      ANDRE DE GRUY:  Yeah, they have five.
15  Again, they don't touch the felony criminal
16  case.
17      COMMISSIONER BAINS:  They don't do
18  preliminaries at all.
19      ANDRE DE GRUY:  No.
20      COMMISSIONER BAINS:  But the city
21  judges -- and what about, like, the cities of
22  Byram or Raymond that -- they have the
23  preliminaries in those cities?
24      ANDRE DE GRUY:  They do have the prelims
25  there.  You know, I can remember going to

25  (Pages 97 to 100)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                        eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

### Page 101

1  Edwards to do a preliminary hearing, and the
2  entire city was in the room we were having
3  the hearing in, I think. But, yeah, they
4  do -- obviously far fewer people. They're
5  also dealing with the misdemeanors in those
6  cases, in those jurisdictions.
7     COMMISSIONER BAINS: Right. Okay. Any
8  further questions for Andre? I don't see
9  any. Thank you, Andre.
10     ANDRE DE GRUY: Thank you.
11     COMMISSIONER BAINS: You're always
12  welcome. Next we're going to go to John
13  Gomez of Downtown Jackson Partners.
14  Mr. Gomez, if you would, just go to the end
15  of the table and you are recognized to begin
16  when you are ready.
17     JOHN GOMEZ: Morning. I would like to
18  thank the House Judiciary Committee for
19  allowing me to speak today.
20     My name is John Gomez, I'm the president
21  of Downtown Jackson Partners. Downtown
22  Jackson Partners oversees the 65 block
23  business improvement district. The district
24  was formed in 1996 by private property owners
25  who saw the challenges downtown were facing

### Page 102

1  across the nation and decided to assess
2  themselves with fee to improve the downtown
3  district. These visionaries saw the need to
4  supplement city services of the city with
5  additional security and maintenance programs
6  and to promote downtown as a place to live,
7  work, and play.
8     Downtown has seen approximately
9  $1 billion in development since 2000. Local
10  and out of state developers have invested in
11  downtown, most notably turning downtown into
12  a residential neighborhood with around 400
13  residents. Public investments have been
14  immense during that time frame, with state
15  renovating constructing new offices and
16  local -- the city renovating their office
17  buildings. They did beef -- their code --
18  facilitator to bring groups together to
19  better downtown.
20     And I think we've heard from speakers
21  earlier about the crime issue in the city,
22  but in my 17 years at Downtown Jackson
23  Partners, the perception of downtown did not
24  feed the reality of downtown. Downtown has
25  been one of the most safest places in the

### Page 103

1  state up until recent years where we've seen
2  increases in our crime, and the past year
3  we've seen some violent incidences that we're
4  just not accustomed to.
5     So, I'd like to thank the legislature,
6  the Speaker, Lieutenant Governor, and
7  Governor for funding more capitol police
8  officers in this past session, judges for
9  Hinds County and attorneys for Hinds District
10  Attorney's Office and Public Defender's
11  Office, because the people that investing in
12  downtown live downtown -- they're watching
13  what's happening. They see these new
14  developments increase public safety as a way
15  to help make them feel better about their
16  investments in downtown.
17     So -- I would like to say that we
18  appreciated the increased patrols because
19  that's what our investors, anybody that's in
20  downtown, they want to see more police on the
21  street, they want to see that presence
22  because you hear all the information about
23  the lack of officers. So anytime you see
24  more police presence on the -- in downtown,
25  it's been greatly appreciated.

### Page 104

1     I know we've asked previous speakers
2  about what they'd like to see. What I think
3  a big issue for downtown is that we've
4  touched on earlier in this meeting is that
5  Downtown Partners would like to help create a
6  comprehensive plan for all these different
7  agencies that are -- have jurisdiction in the
8  CCID and downtown to have that created.
9  Because what we want, what we hope for is if
10  there's someone in need, they contact law
11  enforcement, we need a seamless transition or
12  response to when they call and someone
13  responds. Because we -- quite frankly,
14  people don't really care who responds to
15  them, their time of need, but they just need
16  to know when we call 911, someone's going to
17  be there to respond quickly and effortlessly.
18     And I think -- as we've seen more
19  capitol police officers in downtown, I think
20  one plus that -- one thing that I would ask
21  everyone to just review, to look at is since
22  Capitol Place is such a presence in downtown
23  in the Capitol Complex Improvement District,
24  if they could have some expansion of their
25  authority to enforce local ordinances. I

26 (Pages 101 to 104)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 105

1  think as we've touched on, a lot of these
2  small issues that -- that affect us greatly
3  or just being able to keep people free of
4  sidewalks, move people out of places where
5  the local ordinance says if it's closed, you
6  know, they need to move along.  So a lot of
7  this has to do with the homelessness issues
8  because quite frankly, it has a negative
9  effect on downtown.
10      We have -- we've hired a homeless
11  outreach worker for the last two years to go
12  to the streets and assess the homeless
13  population because we just felt like we had
14  to do something to help with homelessness
15  issue.  And we found that the homelessness
16  population is a diverse group of people
17  filled with individuals who have addiction
18  issues, mental health issues -- that we've
19  all noted earlier, and that we've gotten good
20  data on the homeless population now.  And if
21  I could ask this body for additional help, I
22  would say anything -- any additional funding
23  to help with the mental health population
24  would be greatly appreciated because a lot of
25  this care for these individuals, they just

Page 106

1  need a specialized care that they need a lot
2  of round the clock assistance for, so.  A
3  lot of our local organizations, they do
4  great job.  Social service organizations like
5  Stewpot Gateway providing meals and services.
6  But a lot of the homeless population just
7  needs a specialized care that even though
8  these service providers are working as hard
9  as they can, they're just not equipped to
10  meet those needs.
11      I do want to also thank the State for
12  funding several projects for Jackson in the
13  past session.  I know this goes beyond public
14  safety, but making downtown a vibrant
15  community, we need things like the Thalia
16  Mara Hall that provides a venue for concerts,
17  symphony performances, Broadway plays.  And
18  next summer, we're hosting the International
19  Ballet Competition.  It's -- we're one of
20  four cities -- Varna, Bulgaria, Moscow and
21  Tokyo.  I know Tokyo is kind of odd to be in
22  this list of places, but we're bringing 100
23  dancers from around the world, 40,000 people
24  to Mississippi to showcase Mississippi.  And
25  having a great venue like Thalia Mara Hall

Page 107

1  makes it just that much easier to showcase
2  what Mississippi has to offer to the world.
3  So we appreciate that.
4      And -- again, kind of parting from, I
5  guess, the focus of this, we I do want to
6  thank the state with helping us with our
7  water crisis, because even though this is not
8  public safety and infrastructure, two of our
9  biggest concerns when we're trying to attract
10  businesses and retain businesses because they
11  want reliability.  They want to make sure
12  that they have water that they can drink,
13  they can -- they're in office tower that
14  their cooling system can work with the proper
15  pressure and their bathrooms can flush the
16  toilets -- will flush in the bathrooms.  This
17  is a major concern of ours and solving this
18  water crisis has been great for us.  We
19  really appreciate it.
20      And those are my prepared comments if
21  you have any.
22      COMMISSIONER BAINS:  Thank you.  John,
23  we do appreciate you.  You had touched on
24  wanting to do a coordinated effort between
25  all this different stakeholders, the city,

Page 108

1  the city -- the Hinds County Sheriff, Jackson
2  PD, Capitol Complex PD, or whatever the case
3  may be.  Has any of that happened -- about
4  getting this plan, about a plan together
5  between the private sector and these public
6  entities, so to speak?
7      JOHN GOMEZ:  It has been discussed, but
8  we'd be more than happy to help anywhere we
9  can.  But I think that's something that needs
10  to be worked on and looked at.  I know we've
11  talked about having a seamless 911 system,
12  and I think that's part of it because, you
13  know, you have three different entities
14  Department of Public Safety, Hinds County
15  Sheriff's and Jackson Police Department that
16  have jurisdiction within CCID.  And it's
17  still relatively new, but I think having that
18  plan in place needs to be done.
19      COMMISSIONER BAINS:  I'll recommend any
20  members have any questions.  Okay.  I don't
21  see any.  John, thank you for coming.  We
22  appreciate what you do for downtown Jackson
23  and the State in general.  Okay.  Thank you.
24      JOHN GOMEZ:  Thank you.
25      COMMISSIONER BAINS:  I'm going to go

27 (Pages 105 to 108)

ectronically signed by A. Virginia Brooks (301-160-119-1279)

eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 109

1   now -- I've been told that the Chief of
2   Jackson Police has showed up. Chief Davis,
3   if you will. I'll recognize you. I'm going
4   to keep the Chief Justice last. Judges
5   always make me wait, Chief Justice. So I'll
6   get an opportunity to make you wait. So I'll
7   recognize Chief Davis. When you're ready,
8   you're recognized.
9       CHIEF DAVIS: Well, good morning
10  everyone. Thank you for having us. The
11  mayor is out, so he is unable to be here.
12  But I want to just talk about crime. Crime
13  is multi-fashion. We deal with a lot and
14  like other cities across -- major cities
15  across America since the Pandemic, we have
16  seen a surge in violent crime all across
17  America, not just Jackson, Mississippi.
18      So when you're talking about crime,
19  there's three C's to the criminal justice
20  system: cops, court and correction. Anytime
21  a major city is faced with obstacles of not
22  able to put people in jail, having to depend
23  on the state crime lab for evidence to
24  prosecute a case. Again the bottleneck and a
25  lot of individuals that should be in jail are

Page 110

1   out on the streets. The community see it,
2   law enforcement see it. When law enforcement
3   apprehends someone catching for a crime and
4   you have to wait to be prosecuted and these
5   individuals are still out on the street
6   committing more crime to homicides. We have
7   many cases individuals should have been in
8   jail, they're out on the streets committing
9   crime. And when the justice system is
10  disturbed, or broken. What you start seeing
11  across the streets is street justice.
12      I was -- before I came here, I was
13  dealing with a homicide wherein a kid got a
14  gun and shot another kid. And many of our
15  homicides in the City of Jackson is
16  interpersonal. Many of these homicides it's
17  very hard to predict or prevent because it's
18  happening between two people don't know how
19  to resolve their issues without pulling out a
20  gun. And they bold enough to do it, they're
21  bold enough to do it. So it drives a lot of
22  our numbers.
23      But I can talk about some of the things
24  that the Jackson Police Department is doing.
25  Year to date, we have -- we have made over

Page 111

1   4,000 arrests. So we are working, we have
2   made 1,200 felony arrests and 2,850
3   misdemeanor arrests. Last couple of years we
4   have been plagued with not having a holding
5   facility. And as a result, we had to fear
6   (phonic) release so many people. So when a
7   community feels that there's no consequences
8   because we don't have that holy facility,
9   that becomes a problem for the community,
10  that becomes a problem for officers, because
11  we need the necessary tools. Any major city,
12  you need the necessary tools to enforce the
13  law. And when you don't have that most vital
14  tool, as a holding facility -- now, what you
15  have is individuals on the streets knowing
16  that they can get away.
17      And I meet with our community, I meet
18  with our officers. And right now, today,
19  we're trying to -- we're working on in the
20  very near future, open to the Jackson
21  Detention Holding Facility, so that we can
22  put a clear cut message out to these bad
23  actors, that if you commit a crime in
24  Jackson, you will go to jail.
25      And thank you for all the judges, thank

Page 112

1   you for the attorneys, but what the City of
2   Jackson needs, because all our evidence have
3   to go to the State -- the State collects the
4   whole State evidence. So we had a Capitol
5   City Crime Lab so that we can address the
6   crimes in Capitol City that would help. So
7   Capitol Police, Hinds County and Jackson
8   making the arrests, we are making these
9   arrests, you can see that -- see the numbers
10  but if we cannot collect and analyze all the
11  evidence herein, Jackson, we still, even
12  though we have all these attorneys, we're
13  still in the same situation, waiting on
14  evidence.
15      So what I see, Jackson and Hinds County
16  needing more right now to help expedite these
17  cases with the evidence to go to trial, we
18  need a Capitol City Complex, I mean, a
19  Capitol City Crime Lab housed here for the
20  Capitol Police and all our law enforcement --
21  law enforcement agencies. And we have a
22  great working relationship with our federal
23  partners. But before all this evidence, all
24  this -- before we go to trial, we need the
25  evidence. So this is one of my needs. And

28  (Pages 109 to 112)

Brooks Court Reporting, Inc.
(601) 362-1995

Judiciary B Meeting 10/10/2022

Page 113

1   also what I'm requesting, in 2000 -- I
2   believe '19, I realized that we must tap into
3   technology to best serve our community. And
4   technology is a force multiplier because
5   we're losing law enforcement officers all
6   over the state, all over the country. People
7   just don't inspire to be police. We can't
8   give up. We must tap into the technology.
9       And what we have, what we built from the
10  ground up is a real-time command center. And
11  what it is is a force multiplier where we can
12  put cameras in our hotspot areas, so that we
13  can monitor these cameras 24 hours a day. So
14  we can best deploy our resources to these
15  areas to prevent, hopefully with the blue
16  light, to prevent crime. But we can have the
17  evidence, the eyes inside of communities so
18  that we can best use the manpower that we do
19  have. And plus, it's an investigation tool
20  that we can use to prosecute these bad
21  actors. And we move -- must move towards
22  technology.
23      I hear from business owners, some of the
24  schools in our communities, and when we put
25  those cameras down in South Jackson, crime

Page 114

1   reduced by 51 percent -- left South Jackson.
2   Guess where it went? Towards north. The
3   same bad actors left South Jackson because
4   they know they was watched by police. We
5   have made an arrest. We have seen shootings.
6   So when we start making these arrests and
7   publicizing, it moved towards the Belhaven or
8   the Fondren. We're working right now with
9   Dr. Reid to try to put cameras in those
10  areas.
11      Last year, Representative Gibbs and I
12  met with many individuals here soliciting
13  money so that we can put cameras across the
14  city, so we can best keep all of Jackson safe
15  because people are walking away from this
16  profession. But technology is the way to go
17  right now. Yes, we need more money. We need
18  to pay police officers -- we need to pay
19  police officers more because it's a very
20  difficult job. We see the good and the bad
21  and the ugly of life, and it's very difficult
22  to understand why a son will kill his mother,
23  why two friends would get into a senseless
24  argument and shoot each other down, why kids
25  walking around with assault rifles shooting

Page 115

1   up our Fairgrounds.
2       It's a very difficult job. And all that
3   stress is on the shoulders of police
4   officers. So we must search for best
5   practices. We must tap into technology.
6       But I truly believe, and I like the
7   direction that we're going right now,
8   everybody's at the table, because it's Hinds
9   County is short, JPD is short, Capitol Police
10  is short. But if we all come together and
11  work under one umbrella to keep the capitol
12  city safe, it's a force multiplier. The DA
13  is prosecuting cases. We get a state
14  crime -- a capitol complex crime lab to
15  prosecute cases. And these bad actors
16  realize that if I commit a crime now in
17  Jackson, I won't go home.
18      And we must get our jail situation
19  because you get a community realize the
20  difference between Rankin County, Madison
21  County and Hinds County, Rankin County and
22  Madison County have the jail, and the bad
23  actors know it. And that's what we're
24  working to get -- that Jackson Detention
25  Facility open so we can help fix this broken

Page 116

1   correction system here in our capitol city.
2   So, I'm open for any questions.
3       COMMISSIONER BAINS: Yes, sir. Thank
4   you, Chief. Thank you for your heartfelt
5   testimony and sincerity on some of the stuff
6   you said. I want to talk about this holding
7   facility or jail.
8       When I practiced law in Jackson, there
9   was a little place, I guess kind of behind
10  the courthouse. I know there was a lot of
11  women there. Is that still in operation
12      CHIEF DAVIS: Behind the courthouse?
13      COMMISSIONER BAINS: I thought there was
14  one old Jackson. There was a little
15  detention center back there. No, it burned.
16  That building is burned. So what we are
17  doing is the downtown Jackson facility, in
18  the -- in the court building we're looking
19  to -- because it's vacant right now, and
20  we're working with Hinds County Board of
21  Supervisors to do some rehabbing.
22      And we're meeting every other week to
23  try to see where we at on getting that open,
24  taking care of some necessary repairs. And
25  we are looking to open that up so that we can

29 (Pages 113 to 116)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 117

1  house some of our misdemeanor offenders.
2  Because right now in the City of Jackson, we
3  have nowhere to take these misdemeanor
4  offenders. And when a misdemeanor offender
5  realized that I'm not going to go to jail for
6  taking something under $1,000 from a dollar
7  store, we are in jeopardy of losing that
8  business, losing that tax base.
9      So that's why I'm so aggressively trying
10  to get this facility open and put that
11  message out. So we talk it every other
12  weekend, I mean every other week to try to
13  make this happen -- meeting.
14      COMMISSIONER BAINS: Is that place --
15  have you got that place designated and ready
16  to go? You know where you're going with it?
17      CHIEF DAVIS: Yes, sir. Yes, sir. We
18  have identified and we are working with the
19  Hinds County Board of Supervisors and Mayor's
20  office. Council on board. So everybody's on
21  board. We're just looking to fund it.
22      COMMISSIONER BAINS: How much, for lack
23  of better word, beds, or how many will you be
24  able to hold there?
25      CHIEF DAVIS: Well, the whole facility

Page 118

1  right now, I believe 180-something beds. So
2  we want to start on, I believe, the third
3  floor, which would give us maybe 50, 60 bids
4  just to start. And it will be a pilot, but
5  we must start. And so we identified a
6  floor -- making the necessary repairs. We
7  have been approved to hire more detention
8  officers to staff it, to feed them, to
9  transport them. So, all the business of
10  running a holding facility, we have put that
11  in place, and we're looking now how it looked
12  to fund that.
13      And I believe that if we get that and we
14  can partner with capitol -- or the state to
15  help us fund that, that's that force
16  multiplier. And I believe that some of these
17  misdemeanor offenders that is terrorizing
18  downtown partners, they will have somewhere
19  to go.
20      COMMISSIONER BAINS: Do you -- so when
21  someone in the city of Jackson commits a
22  felony, at this point, do you take them to
23  Raymond?
24      CHIEF DAVIS: Yes.
25      COMMISSIONER BAINS: Until they might

Page 119

1  bond, if they might bond or whatever the case
2  may be.
3      CHIEF DAVIS: Correct.
4      COMMISSIONER BAINS: Okay. Okay. You
5  talked about these cameras. You said you put
6  them in South Jackson?
7      CHIEF DAVIS: Yes, sir.
8      COMMISSIONER BAINS: What was the
9  process of that? Was that something the city
10  council did? Was that something the police
11  department did, or how was it funded? And
12  just if you will tell me how that came about.
13      CHIEF DAVIS: Well, it came about, if
14  you can recall, late 2018, I think Evan just
15  became Chief around late 2018 and going into
16  2018. We had an active shooter scare inside
17  the UMMC hospital where they reported that
18  they had an active shooting inside the
19  hospital.
20      So they have their own police
21  department, so they called me right there in
22  front of -- which their jurisdiction and
23  State Street, an individual shot into a car,
24  hit two babies. The mother got out of the
25  car and ran into the emergency room with two

Page 120

1  bloody babies. So during that time, the
2  hospital shut down -- UMC shut down and said
3  that they had an active shooter.
4      I responded to the scene and I was
5  trying to locate -- because I had to deploy
6  my SWAT team. So, I'm responding to the
7  scene and I'm trying to get some surveillance
8  to locate this active shooter inside the
9  hospital. I knew they had cameras. So, come
10  to find out, it was not an active shooter
11  inside the hospital. So I knew right then,
12  and I had to answer all that. UMC didn't
13  have the answer. No other law enforcement
14  agency had to answer. I had to address the
15  media about what we're going to do to keep
16  UMC safe.
17      So that's when I went into the pursuit
18  of technology, so that if or when it ever
19  happened again, we will be able to override
20  and tap into the camera system at UMMC so
21  that if there's a case of an active shooter,
22  we can deploy the resources to save time and
23  lives. So, that's why I went into the Real
24  Time Command Center and we built this from
25  zero.

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 121

1    So, I got with my grant writer and we
2   was able to write a grant, a hotspot grant,
3   and that is to put cameras in high crime
4   area, which at that time was South Jackson.
5   So, we was awarded a grant.  The mayor gave
6   us a building.  We renovated the building.
7   The mayor gave us the money to outfit it with
8   all the cameras so that we can tie into that
9   hotspot area and we can monitor area 24 hours
10  a day.
11   And the success it took on, crime
12  reduced 51 percent.  We knew that was the
13  direction to go.  And when crime reduced, and
14  Belhaven realized their crime increased.  And
15  some of the bad actors was down in South
16  Jackson, was armed robbing folks in Belhaven.
17  We make the arrest.  The bad thing about it,
18  some of those individuals are still out.  But
19  due to their success, I realized that that is
20  the way to go.  That is a force multiplier
21  because we can't afford to put police
22  officers on every corner, but we can put eyes
23  and ears in the community so that we can keep
24  our citizens safe.
25   COMMISSIONER BAINS:  When you say it

Page 122

1   dropped 51 percent, what time frame was that
2   over?
3    CHIEF DAVIS:  It was about a year and a
4   half by the time we put those cameras up.
5   And we was able to monitor and build a real
6   time command center, and we was able to
7   deploy resources anytime that we saw
8   suspicious activity.
9    COMMISSIONER BAINS:  And JPD owns the
10  cameras?
11   CHIEF DAVIS:  Yes.
12   COMMISSIONER BAINS:  You can use those
13  in court as a custodian record.  That's how
14  you provide the evidence.
15   CHIEF DAVIS:  Yes.
16   COMMISSIONER BAINS:  Okay.  Okay.  So
17  that was pay for by a grant.  I asked the
18  Sheriff and the hotspots in the city -- now
19  would you classify that as a Belhaven area,
20  Fondren area?
21   CHIEF DAVIS:  Well, it's crime just
22  moving around so rapidly.  It's kind of all
23  over.  And I want to put cameras all over.  I
24  want to partner with Capitol Complex to try
25  to put cameras around the fairground.  I want

Page 123

1   to put cameras -- more cameras in West
2   Jackson, North Jackson, the Fondren area,
3   Belhaven.  I met with many of the
4   neighborhood associations, and desert is
5   their number one request.  They want cameras,
6   and I believe that if we can continue to go
7   in the direction that we will go into working
8   together.
9    I met with Capitol Police and other
10  agencies.  They can have an officer there at
11  our Realtime Command Center, monitoring the
12  cameras within their jurisdiction so that --
13  if they don't have a communication dispatch,
14  if they're not up and running, at least they
15  can have an officer with a radio, watching
16  the cameras inside their complex, where they
17  can deploy those resources that are also
18  there -- to possible threats.  And I have
19  offered that to Chief Luckey.  So it's
20  available in our communication center.  If
21  you want to bring a dispatcher to our
22  communication center, I told the commission
23  we're open for it.  We have a seat at the
24  table if they want to use it.
25   COMMISSIONER BAINS:  Any questions?

Page 124

1   Lady from Madison.
2    SPEAKER G:  Thank you so much, Chief,
3   for being here and thank you for the job that
4   you're doing.  I know it's a tough one and I
5   appreciate it.  I represent the city of
6   Madison here at the State House, and we have
7   cameras there, and I believe that it is a
8   huge deterrent of crime.  And so I hope that
9   your mayor and board of alderman or
10  councilman will see that that's an important
11  issue for the city of Jackson as well.  But I
12  wanted to elaborate or ask you a question
13  that Andre had mentioned.
14   If his kingdom -- he wanted more data.
15  I thought he was going to say he didn't need
16  more money, but by the end of his speech, he
17  said he did need more money.  But I wanted to
18  go back to the data and the -- why -- just
19  wanted to know why the city of Jackson does
20  not report their data to the FBI?
21   CHIEF DAVIS:  Well, it's on our website.
22  We have a new system that we went to, the
23  Tyler system and with that new system, it's
24  still a work in progress.  So instead of
25  reporting inaccurate numbers because the

31 (Pages 121 to 124)

Brooks Court Reporting, Inc.
(601) 362-1995

Judiciary B Meeting 10/10/2022

Page 125

1　number fluctuate, we built in a system, so
2　when we make all the necessary corrections,
3　we will report those numbers to the FBI.
4　　　Speaker C: When do you see that day?
5　　　CHIEF DAVIS: We're working on that
6　whole brand new system. We're working on
7　that. So hopefully within the next three to
8　six months, we can -- we can be able to have
9　all the necessary repairs done to report the
10　correct numbers.
11　　　SPEAKER G: Good. I know that he's
12　thankful for that.
13　　　CHIEF DAVIS: Yes.
14　　　COMMISSIONER BAINS: Lady from Hinds?
15　　　Speaker C: Thank you. Chief. With
16　respect to the holding facility, you
17　mentioned that there are active discussions
18　going on between JPD and City Counsel and the
19　Board of Supervisors. Has the Board of
20　Supervisors or the City committed actual
21　dollars towards making this happen or is it
22　just being discussed?
23　　　CHIEF DAVIS: Well, of course the city
24　is definitely committed dollars, manpower,
25　resources, but the infrastructure of that

Page 126

1　building -- we definitely need money for
2　that. When I say infrastructure, whether the
3　plumbing, the sales, things of that nature.
4　But as far as we are fully committed because
5　we are committing the budget, the manpower,
6　the resources that it takes to run that
7　facility.
8　　　Speaker C: Let me reask the question.
9　I'm not referring specifically to JPD running
10　the facility once it's renovated. I mean
11　specifically, has the City Council voted to
12　pledge or give any funds towards renovating
13　the facility so that it can be opened?
14　　　CHIEF DAVIS: I'm not sure on that
15　dollar amount. I don't know -- I'm not sure.
16　I know we had many conversations. I don't
17　know if any money has been allocated to that.
18　But there are in agreements to do what they
19　need to do so that we can open it.
20　　　The Board of Supervisors, the building
21　maintenance, some small issues that we're
22　trying to work out as it works -- as it
23　relates to the needs to house human beings,
24　some of the problems that we Department of
25　Justice had with that facility. So we're

Page 127

1　trying to make sure -- working together with
2　the Board of Supervisors and the City Council
3　to prepare all those necessary needs. If
4　that answers your question.
5　　　Speaker C: Those needs though, to get
6　the building up to code, so to speak, to
7　satisfy DOJ's issues, that just takes money,
8　right?
9　　　CHIEF DAVIS: Yes.
10　　　Speaker C: And neither the City Council
11　nor the Board of Supervisors have given you
12　money?
13　　　COMMISSIONER BAINS: No. No, I have
14　not -- no one has given me money.
15　　　Speaker C: Okay, thank you.
16　　　CHIEF DAVIS: Thank you. But we need
17　money. So if we can get the money to get
18　that, I think we will see a big difference in
19　our crime, in summer especially. Send a
20　message to our bad actors.
21　　　COMMISSIONER BAINS: Lady from Hinds?
22　Ms. Gibbs.
23　　　MS. GIBBS: Thank you. Thank you Chief,
24　for being here.
25　　　CHIEF DAVIS: Yes.

Page 128

1　　　MS. GIBBS: You didn't mention the
2　number of police officers you have currently.
3　　　CHIEF DAVIS: Yes, we currently have 250
4　and we budget for 304. And I appreciate th
5　City, the Mayor and the City Counsel. We was
6　able to give an increase, pay increase, a
7　raise for officers this year because we was
8　losing officers in record numbers -- in
9　record numbers because of the pay and we need
10　more money because this is a very stressful
11　job and I believe that we must put public
12　safety above a lot because if people don't
13　feel safe and it's bad for any city. And the
14　number one issue right now is the officers
15　need to get paid.
16　　　MS. GIBBS: Another key point you
17　mentioned was the state crime lab.
18　　　CHIEF DAVIS: Yes.
19　　　MS. GIBBS: So do you know the duration
20　of time from the state crime law being able
21　to process evidence so that a trial can
22　commence?
23　　　CHIEF DAVIS: I don't know the exact
24　time but just like the DA mentioned, they're
25　playing catch up right now. I think it was

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)　　　　　　　　　　eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 129

1    like 18 months and due to COVID right now is
2    even longer right now. They're prosecuting
3    old cases -- old cases. So I don't know that
4    time. But I believe that we can speed it up
5    the evidence if we had a capitol city crime
6    lab.
7        MS. GIBBS: Well, is the issue dealing
8    with staff at the state crime lab? Is that
9    what the delay?
10       CHIEF DAVIS: I can't speak for the
11   state crime lab but I know we just one
12   customer. The state crime lab catered to
13   they get evidence from all over the state so
14   I can imagine with COVID -- from departments
15   from all over the state, I can imagine all
16   the evidence they have to process so that a
17   case can go to trial, all over the state.
18       So with the workload and the population
19   here in Hinds County, I believe that that is
20   one of the things will help the judges, help
21   the attorneys, help law enforcement, if we
22   had a state -- Capitol City Crime Lab.
23       Speaker C: And you mentioned the need
24   for cameras, where we did request funding to
25   have additional cameras. And you also

Page 130

1    mentioned the fact that you had offered to
2    Capitol Police to have a staff there to be
3    able to -- to be able to look at the cameras,
4    to be able to access them.
5        CHIEF DAVIS: Yes.
6        MS. GIBBS: So I think that's a good
7    idea as we talked about being able to on live
8    time be able to see any crime that might be
9    occurring in the capitol accomplice district.
10   So you're going to wait on the capitol police
11   to determine whether or not they want to have
12   that excess. So you've offered that?
13       CHIEF DAVIS: Yes. Yes. I've offered
14   that many times. Just like Mr. Gomez said,
15   he don't care who respond, someone will have
16   to respond. And I believe that if you
17   running the department you must communicate.
18   People need to have someone because I think
19   Capitol Complex maybe have 21 miles -- square
20   miles of patrol. We have 115 square miles
21   and we are short also and I believe we
22   receive over 900,000 calls a year. That's a
23   lot of calls. That's a lot of calls and we
24   average about 8,000 calls -- 8,000 calls a
25   week.

Page 131

1    So I believe if we continue to work
2    together and come together and strategize
3    together and to provide the best police
4    services for Jackson -- all of Jackson. I'm
5    concerned about all of Jackson and also the
6    Capitol Complex. But if we work together,
7    it's a force multiplier and we can make a
8    difference.
9        MS. GIBBS: Thank you chief. Thank you.
10       COMMISSIONER BAINS: Chief, a
11   reoccurring theme I spoke to the police Chief
12   association down in Biloxi, back in June or
13   July and a reoccurring theme among all police
14   chiefs was a couple of things. One of it was
15   pay, one of it was mental health issues and
16   one of it was recruitment. You've been doing
17   this a number of years.
18       I know pay is an incentive to get people
19   there, but I don't know that's enough to get
20   people to be officers. What, in your view,
21   can be out there to create a better
22   environment to recruit new officers?
23       CHIEF DAVIS: Well.
24       COMMISSIONER BAINS: It's a chicken
25   versus that type of thing. You lower crime,

Page 132

1    you get better officers, you get better
2    officer, you lower crime. And I know there's
3    not an end all be all. It's kind of eating
4    the elephant but just any idea that you may
5    have.
6        CHIEF DAVIS: Well, officers come to
7    work to work and you have to be especially
8    individuals to sign up to deal with the good
9    and the bad and ugly of life. But I think
10   the best award that a police officer can get
11   is knowing that the justice system will work,
12   knowing that a police officer have the
13   resources. If I catch an individual, I got
14   an award.
15       Now the courts in the corrections is
16   going to do their part. I believe that an
17   officer will want to stay because it's a
18   calling that they're making a difference for
19   a community. And when an officer see that,
20   and I have had some young officers to
21   approach me, very frustrated about an
22   individual terrorizing a local store, the
23   store owners in their community depending on
24   that officer to make a difference, to be
25   their superhero. It's a self satisfaction

33 (Pages 129 to 132)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 133

1    when the justice system work and the law
2    enforcement can see the justice system work.
3        I believe that would be the big
4    recruiting tool. Of course, money. And we
5    have did a great job with providing them with
6    body cameras to be able to tell their story
7    in case something happened. Tasers, laptop,
8    new patrol SUVs. We have did a great job of
9    giving them, but that's not enough. But what
10   I'm hearing from officers -- to retain
11   officers, to take that stress off these
12   officers -- to know that the justice system
13   will work because these officers have to
14   patrol a particular beat.
15       And these officers -- these citizens on
16   these beat believe that these officers will
17   make them safe. These officers want to make
18   them safe. But what -- when they see the
19   same individuals, it's not everybody. These
20   bad actors, they know they can get away with
21   it, terrorizing the community and they're
22   still on the streets is difficult.
23       And another thing is mental health.
24   It's a very very sad and it's a dark
25   situation. People can't take care of

Page 134

1    themselves. Mental health is on the rise and
2    we -- what do we do with them? We have no --
3    we have no way because they're human beings.
4    We have no way to police mental illness,
5    homeless population. It's not illegal to be
6    homeless. It's not illegal to be mentally
7    ill. But we are faced with those individuals
8    each and every day, all day.
9        For a community for downtown to
10   thrive -- Mr. Gomez, I've dealt with him many
11   times. It's a lot of mental illness business
12   leaving due to mental illness, homeless
13   population. That is a very stressful
14   situation that if we can bring some attention
15   to that, because that's a human need that you
16   cannot police, and it's very delicate --
17   so -- and that puts stress on an officer.
18   And if we can clean that up, put some
19   attention on that, I believe that will help
20   an officer stay on the job a little longer.
21       COMMISSIONER BAINS: Okay. Thank you.
22   Are there any other questions from committee
23   members? I don't see any. Chief, we
24   appreciate you coming. Thank you for your
25   hard work. This committee stands ready to

Page 135

1    help you in any way, shape or form. Okay?
2        CHIEF DAVIS: Thank you. Thank you very
3    much.
4        COMMISSIONER BAINS: All right, Chief
5    Justice, you're up to bat close to lunch.
6        And Chief Justice, just for the record,
7    before we got started today, we took a poll.
8    Did we want Greg Snowden to talk, or did we
9    want you to talk? And we all voted for you,
10   so...
11       CHIEF JUSTICE: I would have voted with
12   you all as well.
13       Sitting here looking at a group of
14   people near the size of a jury, reminds me of
15   a trial I was in in West Virginia years ago.
16   And when I got up to speak to the jury, what
17   I said is, I am the person that you all been
18   waiting to hear from all day long, not
19   because of who I am, but because I'm last.
20       So -- I do want to -- I've got some
21   handouts coming around. Catherine, if you
22   get those out. It's really unique to me that
23   the Sheriff opened up talking about mental
24   health today. And then the next thing I
25   heard is, Mr. Chairman, you talked about

Page 136

1    mental health, and then the Chief talked
2    about mental health. So one thing I wanted
3    to bring out, and I brought these along, I'm
4    showing you, number one, I believe that the
5    Courts of Mississippi is the most efficient
6    part of government, bar none.
7        And I'll support that with what I'm
8    going to show you today. So when you give
9    money to the courts, it's wisely spent. If
10   it's not spent, it's returned. And -- but
11   the reason I bring up mental health is one of
12   the things is because of the Chairman, along
13   with Representative Creekmore, last year
14   stood tall and helped the courts increase
15   funding for mental health. And I'm pleased
16   to report -- I don't know that's been
17   reported publicly, but Hinds County will have
18   its own Mental Health Court Judge. Faye
19   Peterson has agreed to do that. And so I
20   thought that'd be good news for you all to
21   understand that, yes, the court is thinking
22   about it, dealing with it, training people,
23   and going to expand it.
24       The document you have before you is the
25   amount of savings that intervention courts in

34  (Pages 133 to 136)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 137

1  this state have saved the State of
2  Mississippi. It's a billion dollars. Those
3  are not -- all these numbers are easy to back
4  up. And most important to people like the
5  Sheriff and the Chief of Police is recidivism
6  rate. The people who graduate from these
7  courts, the recidivism rate is 3.2 percent; 3
8  percent. Recidivism rate for people go to
9  parchment is 35 percent. You can't spend
10 better money than you do. You'll see on that
11 report will breakdown the number of mothers
12 that have drug-free babies is amazing at how
13 much money that costs the state if it doesn't
14 work. So the court is into a lot more
15 things.
16      Now, I know today's topic is about
17 crime. That's the reason I gave you that.
18 You can take it home and read it. You can
19 call me and want to talk about it, but we're
20 mighty proud of what we're doing. And it
21 certainly ties in with one of the problems
22 with the crime rate, both in this City as
23 well as throughout the State. Now I'm going
24 to back up a little bit and say this.
25      If we want to figure out where we're

Page 138

1  heading, we got to examine where we've been.
2  And so some of the things and questions that
3  I heard answered today, I'm going to try to
4  fill in the blanks for you. The monies that
5  have been given to the court at this point,
6  both through the CARES Act originally and now
7  through ARPA, our rescue plan, those monies
8  are designated and the federal government has
9  locked in. those expenditures have to be
10 COVID related. Okay? So if it's not COVID
11 related, those monies are not available.
12      That's not to say that we're not taking
13 care of other matters that are not COVID
14 related. I practiced law and I've tried
15 cases in 14 different states and federal
16 state court. Even tried to try a case up
17 here in Jackson before I went on the Supreme
18 Court almost 20 years ago and I couldn't get
19 a trial. So that's not a new thing. That's
20 not new.
21      However, the efforts that we're making
22 now -- one of the questions I heard is how
23 old are some of these cases that we're
24 assigning judges? And I wrote down here --
25 about the 200 cases. So right now I have

Page 139

1  appointed judges and I have a whole nother
2  list of more judges to appoint, should I need
3  more? Because we're now just figuring out
4  what are we doing. We've had a lot of
5  contacts with the court and they want to
6  know, well, who you appointing and when's it
7  going to start? Well, it started way back
8  when and it goes back to the CARES Act just
9  for one second. And the reason I want to
10 bring that out is that the history of COVID
11 from our standpoint and government standpoint
12 was about March 2020. That's when everybody
13 find out something's going on.
14      And at that time, one of the first calls
15 that I got was from Meridian, Mississippi and
16 they said, Judge, the people are leaving the
17 courthouse, the employees are going home, the
18 clerks. And I said, well, they can't the
19 courts have to stay open. The courts have to
20 stay open. And I talked to the Governor's
21 Office about the stay at home order they put
22 in. And I said, the judiciary is different.
23 Constitutionally, we're a branch of
24 government, and we control when we're open,
25 when we're closed. And we got to be open all

Page 140

1  the time because crime don't take no time
2  off. And by the time the meth lab blows up
3  in the middle of night, some judges got to be
4  available to decide where those young
5  children are going to go to. And when
6  there's a domestic violence in the middle of
7  the night, some spouse needs a Protective
8  Order signed by a judge. So we had to stay
9  open.
10      And I'm very proud of the judges
11 throughout the state. It's just like when
12 we're starting the project we're on now,
13 which I'll get to in a minute, which is the
14 Rescue Act funds. We started studying the
15 problem first. Jody Owens contacted me. The
16 Lieutenant Governor contacted me. The
17 Speaker contacted me. And the first thing we
18 did is I met with Sally Norwood, and Jody and
19 Jen McBride and said, okay, what's going on?
20      And they pointed out the problems in
21 trying to get their cases to try. Well, in
22 the meantime, I was reading in the newspapers
23 or over the Internet or whatever that the
24 problem was the judges. You know, judges in
25 Hinds County were the problem. And while all

35 (Pages 137 to 140)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                          eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 141

1    this was going on, nobody was talking to the
2    judges because they kept saying, when is
3    somebody going to talk to us?  Well, I didn't
4    have anything to say til I knew what the plan
5    was going to be.
6        But we started having meetings, and one
7    of the first people invited to the meetings
8    when I met with the judge was Andre, because
9    we said, okay, if we're going to beef up the
10   prosecution, you got to beef up the criminal
11   defense.  And -- so those meetings started
12   transpiring.  I asked the District Attorney,
13   I said, when do you expect you can start
14   trying additional cases?  When I start
15   appointing judges.  He said, July 1st.  And I
16   thought, I don't think so.  I've been trying
17   cases a long time.  The money didn't start
18   flowing until July 1st.  Couldn't pay
19   anybody.
20       I called Andre, and said I can't meet
21   with you right now.  I've got another thing
22   going on.  But he and I had a nice long
23   conversation as I was commuting back and
24   forth, and he thought that maybe we could get
25   cases started by September 1st, if I recall

Page 142

1    right.  And I thought, well, that's more
2    realistic.  You got to get these people
3    hired, and the staff -- people need to know
4    what the cases are.  So once we started
5    working with -- the fall was our goal to
6    start cases, the press wanted a magic bullet.
7    You got this money.  Legislature say you can
8    appoint judges, where they at?  Who are they?
9    Well, I didn't want to do that.  It wasn't
10   time to rush into because we had to get brick
11   and mortar in place.  We had to have places
12   to hold trials.
13       So I'm meeting with the judges.  I'm
14   meeting with the defenders, both local and
15   state.  Gail met with us as well and we
16   started working toward a plan and identifying
17   cases that would be ready for trial.  I
18   mentioned -- I'll give you those dates, those
19   dates of the cases.  Some of the cases have
20   been assigned.  Go back as far as 2008, 2011,
21   2010 and 2014.
22       Now, recognizing that I've got to keep
23   separation from the inner workings of a trial
24   because the Constitution requires me -- all
25   I'm trying to do is facilitate and make sure

Page 143

1    that everybody understands what the issues
2    are.  I was hearing from one side, we can't
3    get trials, and the judge will say, we got
4    criminal dockets here.  We hold criminal
5    docket every month.  I said, the problem is
6    they're not ready for trial.  Well, we're
7    hearing today one of the reasons they're not
8    ready for trial is because they have to wait
9    for information to come from expert
10   witnesses, state crime labs, and things like
11   that.
12       So that was one of the dams that caused
13   this thing to get backed up.  When going back
14   to CARES Act, I first realized that
15   statewide, we were opening about 120,000
16   cases a year.  And I realized when COVID
17   first hit, it was basically, keep the court
18   only open for absolute critical things that
19   had to be open.  Hinds County was one of the
20   hardest counties hit by COVID.  And so
21   everything slowed down but did not stop.
22   When our computers -- we'd have a backlog of
23   about 35,000 cases.  I was thinking when it
24   first started this is going to last three
25   months it's going to be over, but it didn't

Page 144

1    work out that way.  But knowing that I had
2    35,000 cases at that time when the federal
3    government said, we'll give some money to the
4    states to try to work at that time, if you
5    all recall, at first the Governor was going
6    to spend the money.  and then the legislature
7    said, we're not so fast Governor, we're going
8    to spend the money.  So I already sent a
9    letter to the Governor.  then I sent a letter
10   to the Senate and asked for $5 million, and
11   the legislature was kind enough to give me
12   two and a half million dollars.
13       And that is one thing I want to talk
14   about.  Any future funding, please involve us
15   through Representative Snowden.  He's
16   representing, when he's over here, he's a
17   director over there, to work together to
18   design the Bill.  Because one of the
19   problems, once we started spending money, I
20   get a call from the Lieutenant Governor and
21   said, the DA needs some assistance.  And the
22   next thing I got was a letter from Andre
23   saying, if you're going to give them
24   assistance, give us some too, and that's only
25   fair.  However, the Bill that was sent over

36 (Pages 141 to 144)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)          eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 145

1  by the House that gave us that initial two
2  and a half million dollars in spending money,
3  restricted us to spending money on judges
4  only.
5      And -- so that's all we're going to do.
6  We're going to follow what the law is.  In
7  the meantime, I met with the Governor and
8  said, look, you didn't put any restrictions
9  on the two and a half million dollars that
10  you gave the court to deal with this.  And if
11  you don't mind, the District Attorney and the
12  Public Defenders would like to have some
13  money so they can beef up their staff.  And
14  he said, fine, go ahead and do that.  And so
15  that's what was done.
16      When everything was said and done we
17  returned -- because of the way the
18  legislation was coming out of here, and the
19  cut off dates when the money had to be spent
20  by the two and a half million dollars that
21  the legislature gave the courts to work on
22  these projects, we returned to $864,000 back
23  to the legislature.  And that's the way --
24  anything that you all direct toward the
25  courts will be spent on what is directed for

Page 146

1  and what is not spent will come right back
2  over here.  We don't go buy a new car or
3  something like -- matter of fact, we don't
4  own any cars over there.  I think they have
5  one van to deliver for something.  But the
6  bottom line is, it's wisely spent, it's
7  returned.  We can document everything.
8      So that's how we got them -- coming up
9  with ARPA.  The rescue act then started
10  coming.  The request started coming, and we
11  started working on it.  But there was no
12  reason for me -- I was getting telephone
13  calls now from senators and representatives
14  asking when are you going to appoint judges?
15  Well, I'd already talked to Isadora Patrick.
16  Isadora, would you be a judge for me?  Yes.
17  I'd already talked to Kenneth Thomas up in
18  the Delta.  Would you be a judge for me?  I'd
19  already talked to Betty Saunders and asked,
20  would you be a judge for me?
21      I talked -- before I talked to anybody,
22  the first thing I did is identified about
23  twelve judges, and I then had our legal
24  department -- I said, I want to know what
25  these people's records are on appeal.  I want

Page 147

1  to know if these judges get reversed all the
2  time, because I don't want to bring judges in
3  that are going to have bad trials.  And so
4  after vetting the judges, now, as it turned
5  out, the first appointment group was four.
6  But that's not who I was looking at.
7  Unfortunately Isadora Patrick's wife's
8  caregiver's mother had some kind of incident.
9  He had to start taking care of his wife.  He
10  had to back out.  Three or four days ago, I
11  got a letter from Kenneth Thomas who said,
12  I'm 80 years old.  This is after he called me
13  and said, I'm on, I'm off, I'm on.  I didn't
14  realize his wife was a County Judge.  She
15  said, you need to get down and help them out
16  in Hinds County.  And -- but finally the
17  decisions made that he wouldn't come down.
18      So anyhow, the judges selected that way,
19  I still have another category of judges to
20  appoint.  So what we're starting with is
21  we're starting with getting four courtrooms
22  ready.  And they're almost ready.  I get
23  daily reports -- well Greg does, and he
24  forwards them to me about the status of
25  having the courtrooms ready.  And so the

Page 148

1  Public Defenders and the DA's Office and
2  Administrative Officer Courts are physically
3  looking. also they're talking to the Hinds
4  County Board Supervisors, who I think also --
5  it was either $500 or $700,000 -- that they
6  put into the project to have courtrooms ready
7  as well.
8      So you've got all branches of government
9  working together to try to get rid of the
10  backlog.  And the backlog is real.  The
11  numbers are going up.  And I went through --
12  let's see if I can find some notes here.
13  Well, I'm glad I found this one.  We knew the
14  backlog was continuing.  In November of '21,
15  Greg Snowden sent a letter to -- I think it
16  went to every member over here, and basically
17  what it said was out of the rescue money that
18  the courts asked for -- the following money,
19  we asked for $10 million to continue working
20  on the case backlog.
21      The reason we asked for that, the
22  original money we had, the $5 million we had
23  closed about 8,000 cases, but we still had
24  another 24,000 to go.  So that's the reason
25  we asked for that money.  Now, the money --

37 (Pages 145 to 148)

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 149

1  the amount of money that was passed last year
2  in the bill was $1.7 million.  So if you want
3  to get the job done, it's not going to get
4  done for $1.7.  We already spent $5 million
5  getting rid of 8,000 cases in backlog.  So
6  the whole key to it, and that's the reason I
7  said you got to know where we've been.  These
8  are hard numbers.  We know what they are.
9  And I got to be careful about what I say
10  here, but I really thought in my mind this,
11  that if you give us the amount of money we
12  ask for, you give me two years and you won't
13  have a backlog or Michael take it to the
14  house.  It's just that simple.  But I've got
15  to have the money to get it done.
16      And the ability of the Public Defenders
17  and the DA's Office working together with the
18  judges, we have a good number of good judges
19  throughout the state that can come in and
20  help us.  But we will be trying twice the
21  number of cases, just for starters.  And what
22  I did find out is -- is that we appointed
23  judges for 200 cases.  All right?  So that's
24  our test -- four judges, 50 cases.  You get
25  your own dockets, you got your own courtroom,

Page 151

1      At the same time, I was watching the
2  people in New Orleans struggling because
3  police officers were not showing up for work.
4  The politicians had nobody to govern.  The
5  whole thing fell apart.  And you can't let
6  that happen here or any place else.  These
7  crime statistics statewide are up all over
8  the state.  I've got numbers from the coast
9  to Memphis, and I can show you that they're
10  up.  The severity crime though, is really
11  high here.
12      And so what we did as we worked
13  together, working with the Public Defender's
14  Office, working with the DA's Office, and
15  say, give us serious crimes.  We don't want
16  any death penalty cases.  And the reason we
17  didn't want death penalty cases, because you
18  had to bring in such large jurors -- amounts
19  of jurors.  But as far as capitol cases, yes,
20  give me 50 of your worst crimes.  Give me
21  your high profile felonies.  So that's the
22  cases that are going to be tried and whether
23  it gets started next week, the week after
24  that, I'm not sure
25      COMMISSIONER BAINS:  I want to ask on

Page 150

1  you got your own court administrator, you got
2  your own bailiff.  The Sheriff has already
3  said, I'll provide the bailiff.  They'll be
4  there.  So thank you for that.  And -- so,
5  working together we can get rid of this
6  backlog.  And the backlog will help you get
7  rid of the crime, because you already are
8  hearing what's happening is that the people
9  that are being arrested are not afraid
10  because they're not going anywhere.  They
11  will go nowhere.
12      I'm reminded of the time when Katrina
13  hit.  When Katrina hit, I've got a -- I still
14  have a vision of it because people were
15  looting the streets of Hattiesburg, left and
16  right.  And finally the Sheriff said, we're
17  going to do something about it.  They put up
18  a chain lake fence out there.  They said, if
19  you violate the curfew, you get to spend some
20  time inside the chain lake fence.  And that's
21  what they did.  They got two bottles of water
22  and a chain link fence.  A terrific view.
23  And you know what?  It solved the issue
24  because it was prompt, it was justice, it was
25  immediate.

Page 152

1  that.  I'm going to interrupt you just
2  quickly, because I'll forget.  Are any of
3  those judges, are they just doing criminal or
4  are they doing civil work, too?
5      CHIEF JUSTICE:  The criminal cases are
6  Rescue Act cases.  I have -- one of the local
7  judges said, I got a seven week trial, civil
8  case.  And I said, well, we're going to
9  alleviate that.  So what's going to happen is
10  and I appointed a judge to hear that case,
11  and I'm being told that's working out well,
12  going to trial in January.  So what we're
13  trying to do is to free up the judges here to
14  try cases, as well as the ones we're bringing
15  in, so we can double up the effort.  But
16  civil cases will be tried.  They're not going
17  to be ignored.  Criminal cases get priority
18  on the docket.
19      COMMISSIONER BAINS:  These four judges
20  can hear civil cases?
21      CHIEF JUSTICE:  Pardon?
22      COMMISSIONER BAINS:  The four judges --
23      CHIEF JUSTICE:  The four judges --
24      COMMISSIONER BAINS:  Their just
25  criminal?

38  (Pages 149 to 152)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                                                          eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

## Page 153

1    CHIEF JUSTICE:  They're being assigned
2  criminal case numbers only.  Let me quit
3  talking.  I'll start answering questions.
4  I'm sure there are some, so...
5    COMMISSIONER BAINS:  You talked about
6  money.  How much are you talking about to
7  alleviate, do you think, to alleviate the
8  backlog or at least to get it manageable?
9    CHIEF JUSTICE:  We've got to eliminate
10  it.  That's the goal.  It's not get
11  manageable because you manage anything.  And
12  that's where things have been manned.  I want
13  to clean out that doc -- that's one of my
14  goals.  I've got certain goals while I'm
15  chief.  One of them is to get rid of all the
16  backlog.  The other goal I have for you all
17  that might have an interest is working with
18  CPS.  We're going to try to do 1,000
19  adoptions this next year and y'all were kind
20  enough to give us money to do that too.  So
21  that's another goal I'm working on.
22    So we're expanding.  I mentioned drug
23  courts when I started actually is going to be
24  five drug courts -- not drug courts, I'm
25  sorry, but regular mental health course is

## Page 154

1  going to be five.  Those are pilot programs
2  that we're going to try to do the best we can
3  to eliminate that issue, which is part of the
4  crime issue.  When the Sheriff has to pick
5  up -- he's going to have people down there,
6  they pick up once every four days.
7    The problem -- most of the problems in
8  the mental health court is caused by people
9  failing to take their medications.  Okay?
10  Failure to take medication is a leading
11  problem and I've had to fight with
12  unfortunately -- your Chairman backed me up
13  when other legislators said, well, just
14  combine them all.  You can throw drug courts
15  and mental health courts and veterans courts
16  altogether.  Well, no, you can't.  I'm a
17  Vietnam veteran.  It's different.  Just --
18  veterans got special problems.
19    Think about it.  In a drug intervention
20  court, you got 30 or 40 people.  Winston Kidd
21  has that here.  And you say, if you all not
22  drinking, you're not taking your drugs,
23  you're going to work there.  So he goes to
24  the litany and then what was being suggested,
25  we bring those mental health people in and

## Page 155

1  say, oh, by the way, are you on your drugs?
2  Are you taking your drug?  You can't have
3  those people the same.  They got different
4  problems, requires different administration.
5  And so we've got that straightened out and
6  that's going to work very well.  I'm
7  comfortable that at least we can get some
8  progress in that area.
9    COMMISSIONER BAINS:  Are there any
10  questions from -- any other questions for the
11  committee?  Yes, ma'am.
12    MS. GIBBS:  Thank you.  Here you
13  mentioned 35,000 cases.
14    CHIEF JUSTICE:  That was projected
15  number based on the number of filings.  And
16  then looking at it and pretty much it's been
17  proven out it's about the right number.
18    MS. GIBBS:  So your objective is to
19  eliminate the backlog, as far as criminal
20  cases are concerned?
21    CHIEF JUSTICE:  Well, the money that we
22  have provided by the federal government has
23  to be COVID related.  Okay?  Now some of
24  that's trickle down because if you can't free
25  a judge up to get rid of normal backlog, they

## Page 156

1  can't get those cases.
2    But we do have a defined area to make
3  sure that we're not encumbering.  Well, one
4  of the things we did -- let me explain to you
5  what we do and we do, spending the money.
6  When the CARES Act came the first thing I
7  asked for was a meeting with the state
8  auditor and asked him to come to the court
9  and meet with us -- our staff.  And that
10  brought another auditor because they had to
11  be an outside auditor.
12    And we were able to get them to approve
13  any expenditures that the court was making in
14  realtime so that we never had to worry about
15  a call back.  Well, you should have spent
16  that on this.  So we have to with rescue
17  funds, we've got to stay within the confines
18  of COVID related.  But let me say this,
19  outside of that, through the appointment of
20  special judges and knowing what the problem
21  in Hinds County was, I also appointed James
22  Bell and a couple of other people works over
23  there with the county court system.  They
24  closed off the dockets 120,000 cases last
25  year.  120,000.  And we weren't spending

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 157

1  Rescue money on that. We used money that you
2  all allot to us for special judge
3  appointments. And if I see a problem, then
4  we're going to try to identify it and get
5  people in there. But over 100,000 cases were
6  closed.
7      MS. GIBBS: Your estimate is that using
8  four special judges, it may take us about two
9  years to clear the COVID related cases.
10      CHIEF JUSTICE: No, there's two
11  different things. Okay? The Rescue Act
12  allows expenditures, and you all correct me
13  over if I'm wrong, but I think through 2024.
14  Is that right? So that -- my plan on that,
15  as far as the crime and getting these
16  criminal dockets, we're going to keep going.
17  Now, this is not a one shot deal. All this
18  is -- this is the start. And I think that
19  maybe that's what Andre and Jody were trying
20  to say.
21      Look, this is not going to be over
22  tomorrow or next week or anything like that.
23  It's going to take a while. But if it works
24  according to plan, one of the things that
25  happens for your nonlawyer type is once you

Page 158

1  start trying case, you start getting police
2  and then people start playing out. What is
3  important to the local people here is getting
4  them out underneath the Sheriff. Until
5  they're convicted, they belong to Hinds
6  County. If they're convicted, then they're
7  in Parchmen. That's a state issue. And if
8  they're acquitted, then they go home and see
9  that's one of the other things that we saw
10  happening in the month.
11      There was a period of time where I
12  looked at about a five month period, if I
13  recall right, about how many cases are
14  getting tried. Out of a number of cases that
15  were tried, there was a real high rate of
16  acquittals. Now, if you all not lawyers,
17  that means twelve people said not guilty.
18  That don't mean we can't decide. It means
19  not guilty, go home. And so out of 25 cases,
20  well, a couple of things are happening there.
21  Either the defense did a great job, guy was
22  innocent, or somebody broke down on the side
23  or maybe shouldn't been indicted to start
24  with. Because that's what the judges here in
25  this committee were complaining to me about

Page 159

1  was all you read about is the convictions.
2  You're not reading them -- you don't see it
3  in the newspapers about the dismissals.
4      Otherwise the case gets ready to come up
5  to trial. The guy's been sitting in jail 600
6  days and the Sheriff's going to back it up.
7  All of a sudden it's a nol process and he
8  gets to go home. He sat there for two years,
9  never was tried. And that's stuff that is
10  coming to halt. I mean that's -- seeing
11  these things has made me realize from the
12  standpoint of the justice side, forget about
13  the administrative aspect, that's where I'm
14  trying to get AOC to take care of the
15  administrative thing.
16      Because some of these people we're
17  sitting here talking about are going to
18  appear in my court one day. And I don't want
19  to say I favor/disfavor any of them. Look at
20  the law. If the law was followed and they
21  were convicted, that they stay convicted, not
22  they get reversed and get another trial. But
23  I don't have any knowledge of any singular
24  case or anything like that. But I do know or
25  I've been assured by the judges that the 50

Page 160

1  cases that were going to each of these first
2  four judges are serious felony cases. Are
3  you find that to be true, Andre? They are,
4  yeah. Okay.
5      That was real important to me. There's
6  one thing for DA said we got this number of
7  cases ready, but if they haven't done their
8  discovery and all these things are going on
9  in the case -- and the reason I didn't
10  appoint judges immediately is because if I
11  appoint them and they showed up and said,
12  okay, we've called case 001, what have you to
13  say? We need a continuance. I didn't want
14  that. I didn't want the City to be
15  encumbered and the State encumbered with a
16  bunch of that.
17      What we're trying to do is get cases
18  ready. And so when the bell rings,
19  everybody's ready to go and we're going to
20  have some trials and we are going to continue
21  those trials as long as the money lasts.
22  Okay?
23      COMMISSIONER BAINS: Chief justice, are
24  there any questions for? I don't see any.
25  We always welcome you to the committee. We

40  (Pages 157 to 160)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                                    eef53687-082f-48a6-a2e1-3fb4b062fba5

Judiciary B Meeting 10/10/2022

Page 161

1    appreciate what you do across the street.
2    You are doing yammas work and you are really
3    going to get a special swear in your crown
4    dealing with Greg Snowden every day.
5        CHIEF JUSTICE:  Well, right now it just
6    feels like a sharp point.
7        COMMISSIONER BAINS:  Thank you, sir.  We
8    appreciate you.  Thank you, ladies.  That
9    concludes the hearing.  I am going to, I
10   guess, adjourn it until November 17 and we'll
11   get the Mayor -- a subpoena will be issued
12   for his attendance here on that date to tell
13   us what his plan for the City of Jackson and
14   the crime is.  So until November 17, we are
15   adjourned.
16       *****END OF TRANSCRIPT*****
17
18
19
20
21
22
23
24
25

Page 162

1        CERTIFICATE OF COURT REPORTER
2        I, Ginger H. Brooks, Court Reporter
3    and Notary Public, in and for the State of
4    Mississippi, hereby certify that the
5    foregoing contains a true and correct
6    transcript of the testimony, reduced to
7    typewritten form under my supervision by
8    means of computer-aided transcription.
9        I further certify that, to the best of
10   my knowledge, I am not in the employ of or
11   related to any party in this matter and have
12   no interest, monetary or otherwise, in the
13   final outcome of this matter.
14       Witness my signature and seal this the
15   day of            , 2023.
16
17
         GINGER H. BROOKS, #1165
18           CRR, RPR, CCR
19   My Commission Expires:
     September 18, 2025
20
21
22
23
24
25

41 (Pages 161 to 162)

Brooks Court Reporting, Inc.
(601) 362-1995

Electronically signed by A. Virginia Brooks (301-160-119-1279)                    eef53687-082f-48a6-a2e1-3fb4b062fba5