

## State of Mississippi

### TATE REEVES
Governor

October 31, 2022

The Honorable Rep. Carolyn B. Maloney
Chairwoman, Comm. on Oversight and Reform
2308 Rayburn House Office Building
United States House of Representatives
Washington, DC 20515

The Honorable Rep. Bennie G. Thompson
Chairman, Comm. on Homeland Security
2466 Rayburn House Office Building
United States House of Representatives
Washington, DC 20515

*Re: Jackson Mississippi Water System*

Dear Representative Maloney and Representative Thompson:

Thank you for your October 17, 2022, letter and your ongoing concern about the recent water crisis in the City of Jackson, Mississippi ("City"). Let me begin by stating my administration is deeply committed to ensuring that all federal funds received by Mississippi for drinking water systems upgrades have been in the past and will continue to be in the future made available and distributed among Mississippi's more than 1,100 water systems on an objective and race-neutral basis.

We are deeply grateful for the concern of both esteemed Representatives, and in particular share the concerns laid out by Chairman Thompson in his public messaging that the City is not capable of properly running its water system due to mismanagement at the local level. We noted and considered the Chairman's remarks that: "I would not be in favor of the City being given back the authority to run it… We want a system that meets federal and state regulations…"[1]

As Chairman Thompson expressed to WJTV News, "I think it would be advantageous for the City to come up with a plan…I know there's a water problem with the City of Jackson, but nobody has shared the facts on the problem with me as one of the representatives as well as the cure or the plan for correcting it. So, as soon as that occurs, I think people will readily roll up their sleeves and do it… Produce that plan that we can begin to sell…I think just saying 'We need help' and not saying what that help entails is where the problem lies... When we don't see the plan for that investment, there is a reluctance to invest on it… You can't just say 'we need money.' You have to say, 'If we had this money, here are the steps based on the plan that we have adopted.' I think that gives confidence to anybody who would give money, that once that money is given it

---

[1] *Rep. Bennie Thompson: Treat Jackson fairly, but if it can't run water system, let someone else,* MISSISSIPPI TODAY (September 2, 2022) https://mississippitoday.org/2022/09/02/bennie-thompson-jackson-water-crisis/

Rep. Maloney and Rep. Thompson
October 31, 2022
Page 2

would actually be spent for that purpose." This clearly articulates many of the shared challenges the state has had with efforts to assist Jackson political leadership in addressing their water issues.[2]

The City's water system consists of two water treatment plants, O.B. Curtis Water Treatment Plant and J.H. Fewell Water Treatment Plant. Fewell was constructed in or around 1914, with a current capacity of 20 million gallons a day. O.B. Curtis was constructed in two phases, with phase 1, a conventional filter system, constructed in or around 1992, and phase 2, a membrane filter system, constructed in or around 2007. O.B. Curtis has a capacity of 50 million gallons a day, with a capacity of 25 million gallons a day from each of its two systems.

For the past several years, state and federal regulators have been actively involved in enforcement efforts against the City relating to its mismanagement of the water system. Specifically, the Mississippi State Department of Health ("MSDH"), the state agency with primary jurisdiction over drinking water systems in Mississippi, began raising concern with the City in 2016. When the City ignored the actions of the MSDH, on February 28, 2020, MSDH requested the EPA to help address the City's non-compliance with the Safe Drinking Water Act.[3]

In April 2020, the EPA issued an Emergency Administrative Order requiring the City, among other action items, to "develop and implement a plan to address all monitoring equipment and appurtenant treatment equipment repairs and/or replacement."[4] The Administrative Order was entered into "to address long-term challenges and make needed improvements to the drinking water system."[5] The combined state and federal enforcement efforts ultimately culminated in a July 2021 Administrative Compliance Consent Order due to the City's ongoing non-compliance.[6] Thereafter, despite agreeing to the EPA's objectives and timeline, receiving nearly $28 million in available DWSRF funds, and a $90 million legal settlement with a vendor (Siemens), little to no progress was made. As of last month, the City had still failed to produce a plan to identify and

---

[2] *Mississippi Insight*, WJTV (August 21, 2022) https://www.youtube.com/watch?v=MTjscKHkS-k

[3] *See* May 11, 2020, EPA Correspondence, at note 1, https://www.epa.gov/system/files/documents/2021-07/may-11-2020-notice-of-noncompliance_jackson.pdf

[4] *In the Matter of: City of Jackson Miss. United States Environmental Protection Agency*, Dkt. No. SDWA-04-2020-2031, March 27, 2021 Emergency Admin. Order
https://www.epa.gov/system/files/documents/2021-07/march-27-2020-emergency-order_jackson-final-signed.pdf

[5] *EPA and the City of Jackson, Mississippi Reach Agreement to Improve Drinking Water and Protect Public Health*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, News Release, (July 1, 2021)
https://www.epa.gov/newsreleases/epa-and-city-jackson-mississippi-reach-agreement-improve-drinking-water-and-protect

[6] *In the Matter of: City of Jackson Miss. United States Environmental Protection Agency*, Dkt. No. SDWA-04-2020-2031, July 21, 2022 Admin. Compliance Order on Consent,
https://www.epa.gov/system/files/documents/2021-07/city-of-jackson-aoc-executed-by-city.pdf

Rep. Maloney and Rep. Thompson
October 31, 2022
Page 3

address the priorities, the needs, or even the ball-park cost.[7]  Nor, despite the identified critical need, were necessary steps taken to hire operators and staff.[8]

In fact, "EPA leadership warned that the City of Jackson has put no visible effort into hiring new employees," as reported by Mississippi Free Press. "We have not seen any evidence that (the City of Jackson) has tried to reach that labor pool," Carol Kemker, the director of the EPA's Enforcement and Compliance Assurance Division stated publicly. "They could be reaching out to technical colleges, they could be holding recruitment events, they could be scheduling interviews, they could be putting in advertisements. (This is) what we do when we recruit. We're not seeing those types of things."[9]

In late August, with a nearly month-long boil water alert in place, and the two primary raw water pumps at O.B. Curtis previously removed for repairs and out of commission, the total collapse of the City's water system was imminent.  A total collapse would have left approximately 150,000 residents of Hinds County without running water, flushing toilets, or functioning fire hydrants.  In order to avoid this impending humanitarian crisis, and in coordination with the Mississippi Emergency Management Agency ("MEMA") and the MSDH, on August 30, 2022, I issued a Proclamation declaring a State of Emergency[10] in the City and surrounding areas of Hinds County that receive water from the O.B. Curtis Water Treatment Plant.    Additionally, I immediately requested the President issue a federal emergency measures declaration.[11]  The MSDH also issued its emergency order regarding the City's water system.[12] Specifically the MSDH Order found:

- Insufficient number of certified operators at Fewell and O.B. Curtis.
- Insufficient number of maintenance staff at all water treatment plants and to support distribution system.
- Failure of multiple raw water pumps at O.B. Curtis.

---

[7] *With long-term Jackson water fix in mind, leaders ask the mayor: Where's your plan?*, MISSISSIPPI TODAY (Sept. 8, 2022) https://mississippitoday.org/2022/09/08/jackson-water-plan-mayor-state-solution/
[8] *EXCLUSIVE: Emails reveal staffing shortage threatened to shut down water treatment plants*, WLBT (August 18, 2022) https://www.wlbt.com/2022/08/18/exclusive-emails-reveal-staffing-shortage-threatened-shut-down-water-treatment-plants/
[9] *'No Efforts To Recruit': EPA Says Jackson Failed To Address Water System Needs*, MISSISSIPPI FREE PRESS (August 30, 2022) https://www.mississippifreepress.org/26791/no-efforts-to-recruit-epa-says-jackson-failed-to-address-water-system-needs
[10] Proclamation of State of Emergency (August 30, 2022) https://mcusercontent.com/08cb3e52aa1308600f84d49ea/files/8169eb65-c9c5-d7fe-7bc5-f2a811032381/PROC_SOE_Water_Plant_8_30_22.pdf
[11] Request for Emergency Measures Declaration (August 30, 2022) https://www.msema.org/wp-content/uploads/2022/08/Emergency-Dec-Request-Water-Crisis.pdf
[12] *State Health Officer Issues Emergency Order Regarding City of Jackson Water*, MISSISSIPPI STATE DEPARTMENT OF HEALTH, News Release (August 30, 2022) https://www.msdh.ms.gov/page/23,24664,341.html

Rep. Maloney and Rep. Thompson
October 31, 2022
Page 4

- Low levels of water in storage tanks.
- Low water pressure impacting proper sanitation and education opportunities.
- Disinfectant levels not consistently optimal developing the potential to have the presence of enteric organisms, including but not limited to, E.Coli, Cryptosporidium, or Giardia in the drinking water being served to customers.

At my instruction, MEMA and MSDH established the State Incident Command Center to take all necessary actions to abate the emergency. In addition to representatives of MEMA and MSDH, representatives of the City, EPA, and FEMA comprise the State Incident Command Center. In less than 72 hours, water pressure was returned to the City, and in less than 15 days the boil water alert was lifted. During the boil water alert, the state through MEMA and the National Guard distributed over 13.7 million bottles of water to the City's residents. To date, the state has incurred obligations totaling $12.6 million in connection with this State of Emergency.

On September 26, 2022, the United States Department of Justice, on behalf of the EPA, issued a letter[13] to the City expressing its intention to file an action against the City under the Safe Drinking Water Act.[14] The letter detailed the numerous violations by the City of the Safe Drinking Water Act, as well as its failure to comply with the April 2020 Emergency Administrative Order and July 2021 Administrative Compliance Consent Order. Specifically, the DOJ asserted that the City failed to protect public health by the following: (1) Failure to adequately staff water treatment plants with Class A operators, (2) Failure to implement an Alternative Water Supply Plan pursuant to the Administrative Order, (3) Failure to comply with the timeline for general filter rehabilitation pursuant to the Administrative Compliance Consent Order, (4) Failure to install corrosion control pursuant to the Lead and Copper Rule, (5) Exceedance of the haloacetric acids five maximum contaminant level, and (6) Exceedance of single turbidity limits. The letter requested the City immediately enter into negotiation with the DOJ regarding the recent drinking water crisis.

Before responding to your specific requests for information, it is necessary to correct three significant misstatements in your letter:

- No floodwaters seeped into the O.B. Curtis Plant resulting in the failure of the plant. Rather, due to the City's failure to maintain the equipment at the Plant and to staff the Plant with sufficient personnel, the Plant was unable to adequately account for and respond to a change in the makeup of the chemical composition of the water in the reservoir, the source of raw water for the Plant, resulting I n the Plant's failure.

---

[13] UNITED STATES DEPARTMENT OF JUSTICE, *Letter Re: Safe Drinking Water Act Matter Regarding Jackson, Mississippi* (September 26, 2022) https://www.scribd.com/document/596865146/US-DOJ-letter#download&from_embed; and

[14] *Dept. of Justice says water not safe, prepared to file action against Jackson under Safe Drinking Water Act*, WDAM (Sept. 26, 2022) https://www.wdam.com/2022/09/26/dept-justice-says-water-not-safe-prepared-file-action-against-jackson-under-safe-drinking-water-act/

Rep. Maloney and Rep. Thompson
October 31, 2022
Page 5

- The City has not experienced a reduction of tax revenue due to "a steady exodus of white and affluent residents." Between 2003 and 2020, the City has seen an $84 million *increase* in total revenue from $180 million to $264 million. Specifically, during this time property tax revenues have increased by $19 million from just under $60 million to $79 million, and sales tax and other revenue has increased $18 million from $36 million to $54 million.[15]

- There have been no "State-related roadblocks" that have prevented the City from maintaining its water system. Rather, it has been the ongoing and historic mismanagement of the system[16] that has seen the system's operating income fall from a $7 million *profit* in 2012 to a $17 million *deficit* in 2019 (which was reduced to a $10 million deficit in 2020 due to a $14 million infusion from a legal settlement with Siemens).[17] Furthermore, the City has received an additional $84 million in direct ARPA funding,[18] and as discussed in more detail below, the City recently received nearly $28 million in DWSRF funds in FY 2021, and it is anticipated to receive an additional $35.6 million in matching ARPA funds from the state pursuant to the Municipality and County Water Infrastructure Grant program. Indeed, of the more than 1,100 water systems in Mississippi, only the system operated by the City is unable to set and collect rates sufficient to cover its costs of operations, maintenance and debt service.

Responses to requests for information:

**Request Number 1**

The Mississippi Legislature dedicated $750 million (out of a total of $1.8 billion) in ARPA funds to provide grants to Mississippi's 1,100 water systems. Specifically, HB 1421 (2022 Session) established the Rural Water Associations Infrastructure Grant program under the purview of the MSDH, and HB 1538 (2022 Session) appropriated $300 million to this program. SB 2822 (2022 Session) established the Municipality and County Water Infrastructure Grant program under the purview of the Mississippi Department of Environmental Quality ("MDEQ"), and SB 3054 (2022 Session) appropriated $450 million to this program.

---

[15] *How Jackson's Water System Collapsed*, JACKSON JAMBALAYA (Sept. 20, 2022) http://kingfish1935.blogspot.com/2022/09/how-jacksons-water-system-collapsed.html
[16] *Jackson's Water Woes Explained*, WSJ, Sept. 6, 2022, at A16.
[17] *How Jackson's Water System Collapsed* (Sept. 20, 2022).

[18] *Will Jackson receive its ARPA funds?*, WJTV (September 28, 2022) https://www.wjtv.com/news/local-news/will-jackson-receive-its-arpa-funds/

Rep. Maloney and Rep. Thompson
October 31, 2022
Page 6

The City of Jackson has submitted an application for $35.6 million in funding through the first round of the Municipality and County Water Infrastructure Grant program.[19] Program rules and regulations are available at the Mississippi Municipality & County Water Infrastructure Grant Program portal.[20] To date, no awards have been made by MDEQ. It is anticipated that awards will be announced in the first part of 2023.

**Request Number 2**

In 2022, the Mississippi Legislature nearly unanimously passed HB 1031,[21] bipartisan legislation creating the Capital City Water/Sewer Projects Fund as a special fund to be administered by the Mississippi Department of Finance and Administration ("DFA"). The legislation requires "funds appropriated or otherwise made available by the Legislature" and placed into this special fund to be used "for the purpose of providing funds to assist the City of Jackson in paying costs associated with projects (defined as "construction, reconstruction, repairs, upgrades and improvements to the City of Jackson's water and sewer systems and facilities.")." Further, the legislation states if the City wishes to utilize such funds, "it must establish a plan for the project or projects for which the governing authorities desire assistance and submit the plan and an application for assistance to [DFA]." That legislation was sponsored by Rep. Shanda Yates (D), Rep. Debra Gibbs (D), Rep. Gregory Holloway (D), Rep. Ronnie Crudup (D), Rep. Zakiya Summers (D), Rep. Stephanie Foster(D), Rep. Alyce Clarke (D), Rep. William Brown (D), Rep. Earle Banks (D), Rep. Christopher Bell (D). It was passed with the unanimous support of all Democratic and all Black members of the Mississippi Legislature.

Senate Bill 2822 (2022 Session) states all funds awarded to the City of Jackson pursuant to the Municipality and County Water Infrastructure Program "shall be deposited in the Capital City Water/Sewer Projects Fund of the State of Mississippi."[22] To date, no awards have been made by MDEQ for any municipality, thus no ARPA funds have been deposited into the Capital City

---

[19] *Jackson seeking $35.6M from state infrastructure program to help fund water and sewer projects,* WLBT (October 7, 2022), https://www.wlbt.com/2022/10/08/jackson-seeking-356m-state-infrastructure-program-help-fund-water-sewer-projects/ Specifically, the City is seeking $1,650,000 to replace aging raw water pumps at O.B. Curtis, $8,800,000 to rehab filters on the O.B. Curtis Plant's conventional and membrane filtration sides, $1,450,000 to convert manual chemical feeds to automated ones at O.B. Curtis and the J.H. Fewell Treatment Plants, $8,798,000 to replace filters and finish construction of a 48-inch water transmission line at Fewell, and $2,750,000 to repair and rehab aged pumps at Fewell.

[20] *Mississippi Municipality & County Water Infrastructure Grant Program,* MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY, https://mswaterinfrastructure.com/

[21] HB 1031 (http://billstatus.ls.state.ms.us/documents/2022/pdf/HB/1000-1099/HB1031SG.pdf) passed the House 114-6 (http://billstatus.ls.state.ms.us/2022/pdf/votes/house/0850052.pdf) and passed the Senate 52-0 (http://billstatus.ls.state.ms.us/2022/pdf/votes/senate/0860008.pdf ).

[22] SB 2822 (http://billstatus.ls.state.ms.us/documents/2022/pdf/SB/2800-2899/SB2822SG.pdf) at Lines 209-211. SB 2822 passed unanimously in both the House
(http://billstatus.ls.state.ms.us/2022/pdf/votes/senate/0860008.pdf ) and Senate
(http://billstatus.ls.state.ms.us/2022/pdf/votes/senate/0860054.pdf).

Rep. Maloney and Rep. Thompson
October 31, 2022
Page 7

Water/Sewer Projects Fund. It is anticipated that awards will be announced in the first part of 2023.

## Request Number 3

On August 26, 2022, the Board of the MSDH approved the Fiscal Year 2022 Intended Use Plan ("IUP")[23] for the Drinking Water Systems Improvements Revolving Loan Fund Program ("DWSRF").[24] Consistent with the directives of Congress, the IUP places emphasis on assisting smaller drinking water systems to ensure that these systems have adequate technical, managerial, and financial resources to achieve or maintain compliance and provide safe drinking water. The total amount of federal and state matching funds to be placed into the DWSRF for FY 2022 is estimated at $30.36 million.

Pursuant to the FY 2022 IUP, in order to ensure that funds are equally available to each of Mississippi's 1,100 water systems, the maximum amount for any loan is $5 million (subject to a case-by-case evaluation of need by the Board). No more than one loan shall be made to any borrower in any fiscal year, and interest is the lesser of 1.9% or the rate for twenty-year tax-exempt bonds. The standard loan term is 20 years; however, a maximum loan term of 30 years may be approved, or even up to 40 years for disadvantaged communities. To ensure that principal forgiveness is available to as many "disadvantaged communities" as possible, a $500,000 limit has been set for principal forgiveness.

The City of Jackson has received considerable funding over the years. Specifically, in FY 2021, Jackson was awarded assistance from the DWSRF in the amount of $27,953,300, that is 68.4% of total funds disbursed, and over 93% of the total amount to large communities (population greater than 10,000) throughout the entire state of Mississippi (and far in *excess* of the $5 million cap.)[25] To date, the City has committed less than $16 million[26] of the nearly $28 million made available to it in FY 2021. No awards were made to the City in FY 2022 because the City did not request any additional funding. Jackson has applied only three times for the Drinking Water State Revolving Fund program, which the Biden administration has repeatedly touted as their vehicle

---

[23] *State of Mississippi Drinking Water Systems Improvement Revolving Loan Fund Program, FFY - 2022 Intended Use Plan*, MISSISSIPPI DEPARTMENT OF HEALTH, Approved August 26, 2022, https://msdh.ms.gov/msdhsite/_static/resources/17153.pdf

[24] Mississippi Code Ann. § 41-3-16 establishes the Local Governments and Rural Water Systems Improvements Board (under the MSDH) to administer the local governments and rural water systems improvement revolving loan and grant program.

[25] In addition to its request in FY 2021, the City previously requested a DWSRF loan on *two* prior occasions since the inception of the program in 1996. In FY 2016, the City requested and received a loan in the principal amount of $10,861,920, representing 33% of the total funds available. In FY 2019, the City requested and received a loan in the principal amount of $12,903,093, representing 35% of the total funds available. The City has *never* had an application for a DWSRF loan denied.

[26] The City has committed approximately $4 million for a winterization project at O. B. Curtis, $9.6 million for corrosion control improvements at J.H. Fewell, and $1.7 million for filter rehabilitation at J.H. Fewell.

Rep. Maloney and Rep. Thompson
October 31, 2022
Page 8

for investment in water systems. MSDH has awarded every single application that Jackson submitted. The $500,000 principal forgiveness cap applies to the FY 2021 loan received by the City, and this cap applies to all loans funded in FY 2022.

The Office of the Governor plays no role in setting the terms and conditions of the IUP; thus, this Office is unable to answer any questions regarding the FY 2023 IUP. All federal funds, including funds pursuant to ARPA and the BIL, are available to the City on the same terms and conditions that apply to all 1,100 water systems throughout the State.

With respect to your request for a "breakdown of the racial demographics" of the locations that received DWSRF loans in FY 2022, MSDH neither collects, nor considers racial demographic information in connection with DWSRF loan program. As you are no doubt aware, consideration of or awarding loans based on race would violate a number of federal laws, including Title VI. Pursuant to the IUP, "disadvantaged communities" eligible for principal forgiveness are determined on a race-neutral basis. The amount of principal forgiveness is determined by calculating the percentage of the median household income of the applicant versus the median household income of the state. For example, an applicant with a median household income 70% or less of the state median household income ($46,511) will be eligible for 45% principal forgiveness.

In response to your request, the MSDH, utilizing the applicants zip code and Census QuickFacts data, has attempted to approximate the racial demographics of the recipients of DWSRF loans in FY 2021 and 2022. That data is compiled in the attached charts[27] but summarized here. For FY 2021, a total of nearly $41 million in loans were awarded with over $31 million going to applicants that serve a majority Black population, representing *76.6%* of the funds disbursed. As noted above, the 2021 award of $27,953,300 to the City of Jackson itself accounted for over *68%* of the total awards.[28] For FY 2022, a total of $42.7 million in loans were awarded with over $17.6 million going to applicants that serve a majority Black population, representing *41.3%* of the funds disbursed. According to the latest Census, Mississippi's population is 38% Black.[29] Thus, there is no factual basis whatsoever to suggest that there has been an "underinvestment" in the City or that it received disproportionately less than any other area of the state. To the contrary, the City has never been denied a request for DWSRF funding and in fact has received a greater share of all awards made to all other water systems throughout the state. There is therefore no support for the assertion that the terms and conditions of the IUP for FY 2021

---

[27] Attached Compilations for DWSRF Projects for Fiscal Years 2021 and 2022.
[28] According to the latest Census Data, with a population of 149,761, Jackson, Mississippi accounts for approximately *5%* of a total state population of 2,949,965.
https://www.census.gov/quickfacts/fact/table/jacksoncitymississippi,MS/PST045221 .
[29] *U.S. Census Bureau* QuickFacts: Mississippi; United States,
https://www.census.gov/quickfacts/fact/table/MS/PST045221

Rep. Maloney and Rep. Thompson
October 31, 2022
Page 9

or 2022 effected any systemic discrimination or inequality on the City or any other majority Black communities across the state.

I am both proud and grateful for the efforts of MEMA, MSDH and the Mississippi National Guard, as well as the leadership of the State Incident Command, the tireless work of too few Jackson public works operators who selflessly worked to keep the O.B. Curtis Plant operating, and for the efforts and resources of all the EMAC workers who answered MEMA's call to leave their home states and families and promptly repair the failed plants and restore clean water for the residents of the City.

Thank you for the opportunity to provide this information to assist the Committees in addressing the topics raised in your letter.

Sincerely,

Tate Reeves
Governor

Attachment

cc:   The Honorable Senator Roger Wicker

The Honorable Senator Cindy Hyde-Smith

The Honorable Rep. James Comer, Ranking Member, Committee on Oversight and Reform

The Honorable Rep. John Katko, Ranking Member, Committee on Homeland Security

The Honorable Rep. Michael Guest

The Honorable Rep. Trent Kelly

The Honorable Rep. Steve Palazzo

| FISCAL YEAR 2021 Project | Project Description | Zip Code | County | Service Area Population | MHI of Population Served by the Project | White alone, percent | Black or African American alone, percent | Loan Amount Requested | Loan Amount Received |
|---|---|---|---|---|---|---|---|---|---|
| 1 City of Jackson | Water and Distribution System Improvements | 39201 | Hinds | 165000 | $ 38,819 | 16.2% | 82.5% | $ 27,953,300 | $ 27,953,300 |
| 2 City of Lexington | Elevated Tank Rehab | 39095 | Holmes * | 1735 | $ 24,631 | 15.7% | 83.1% | $ 326,350 | $ 326,350 |
| 3 St Thomas Water Association | Water System Improvements | 39041 | Hinds | 732 | $ 43,338 | 23.2% | 72.7% | $ 135,523 | $ 135,523 |
| 4 Thomasville Water Association | Water and Distribution Systems Improvements | 39073 | Rankin | 1294 | $ 43,825 | 70.1% | 20.1% | $ 1,800,000 | $ 1,800,000 |
| 5 Plum Point Community W/A | Water and Distribution System Improvements/New Well | 38658 | Panola* | 115 | $ 41,111 | 47.9% | 50.4% | $ 308,532 | $ 308,532 |
| 6 Sylvarena W/A | New Water Well | 39153 | Smith* | 786 | $ 37,835 | 74.8% | 23.8% | $ 711,000 | $ 711,000 |
| 7 Days W/A | Install 12" Water Lines/Electrical Controls | 38651 | Desoto * | 3500 | $ 56,787 | 63.5% | 32.6% | $ 733,290 | $ 733,290 |
| 8 Leesburg W/A | Replace Approx. 165,000 LF Water Mains W/4"-8" PVC | 39145 | Rankin* | 4182 | $ 37,491 | 75.8% | 13.6% | $ 2,505,000 | $ 2,505,000 |
| 9 Central Yazoo W/A | New Water Well, Distribution Improvements, & | 39194 | Yazoo* | 9960 | $ 34,968 | 40.0% | 57.7% | $ 2,075,000 | $ 2,075,000 |
| 10 City of Pearl | Distribution Ph./Water Ph. 2 Systems Improvements | 39208 | Rankin | 26500 | $ 37,782 | 63.9% | 31.8% | $ 1,850,000 | $ 1,850,000 |
| 11 Town of Mount Olive | Replacement of Water Lines | 39119 | Covington * | 1000 | $ 30,467 | 61.4% | 35.6% | $ 1,032,027 | $ 1,032,027 |
| 12 Town of Raleigh | Water System Improvements | 39153 | Smith* | 1462 | $ 32,133 | 74.8% | 23.8% | $ 922,000 | $ 922,000 |
| 13 Rose Hill W/A | Replace 5.5 Miles of 4"-6" Water Mains/Appurtenance | 39356 | Jasper* | 1188 | $ 31,814 | 45.0% | 53.4% | $ 506,623 | $ 506,623 |

Note: This demographic data is not normally collected by the program. Staff used the system zip code and the Census QuickFacts to collect this data.
The Program defines Disadvantaged Communities as a project's service population with an MHI less than the State's MHI.

Zip code information was not available. Therefore, the county data was used.

| FISCAL YEAR 2022 Project | Project Description | Zip Code | County | Service Area Population | MHI of Population Served by the Project | White alone, percent | Black or African American alone, percent | Loan Amount Requested | Loan Amount Received |
|---|---|---|---|---|---|---|---|---|---|
| 1 Hazelhurst, Town of | Water Treatment Facility/Water System Improvements | 39083 | Copiah* | 3838 | $26,883 | 46.2% | 51.7% | $4,490,015 | $4,490,015 |
| 2 Golding Acres W/A | New Water Well | 38701 | Washington* | 105 | $29,083 | 25.5% | 72.7% | $444,012 | $444,012 |
| 3 Central Yazoo W/A | Water Distribution Improvements | 39194 | Yazoo* | 9960 | $34,968 | 40.0% | 57.7% | $1,589,330 | $1,589,330 |
| 4 Pearl, City of | Distribution Improvements | 39208 | Rankin | 26500 | $38,391 | 63.9% | 31.8% | $1,150,000 | $1,150,000 |
| 5 NE Ittawamba W/A | Water System Improvements | 38847 | Itawamba | 4700 | $33,496 | 91.0% | 7.0% | $1,589,330 | $1,589,330 |
| 6 Southern Rankin W/A | Water System Improvements | 39073 | Rankin* | 3975 | $44,138 | 74.5% | 22.5% | $2,400,000 | $2,400,000 |
| 7 Eudora Utilities | New W.T. Plant/300,000. Gal Tank/12" Water Lines | 38632 | Desoto | 3702 | $68,906 | 63.5% | 32.6% | $906,000 | $906,000 |
| 8 Rocky Creek W/A | New Elevated Storage Tank | 39452 | George | 2200 | $44,922 | 89.1% | 8.0% | $1,445,256 | $1,445,256 |
| 9 Central W/A | Rehab/ Replacement of Existing Facilities | 39350 | Neshoba* | 12082 | $36,820 | 58.7% | 21.4% | $4,038,251 | $4,038,251 |
| 10 North Hinds W/A | Rehab Storage Facilities | 39071 | Madison* | 10150 | $49,927 | 57.3% | 38.5% | $537,000 | $537,000 |
| 11 Hattiesburg, City of | Rehab/ Replacement of Existing Facilities | 39403 | Forrest | 45951 | $45,022 | 40.4% | 54.6% | $1,511,937 | $1,511,937 |
| 12 Brandon, City of | Replace Water Lines | 39042 | Rankin | 26355 | $66,676 | 76.0% | 21.8% | $5,000,000 | $5,000,000 |
| 13 Magee's Creek W/A | Water System Improvements | 38667 | Walthall | 7194 | $35,822 | 54.2% | 43.0% | $780,500 | $780,500 |
| 14 Hub W/A | 50,000 G Tank/400 GPM Well/Valves/Elec Controls | 39429 | Marion* | 3300 | $39,285 | 66.3% | 31.6% | $2,458,500 | $2,458,500 |
| 15 Union Church W/A | Treatment plant rehabilitation and backup well | 39668 | Jefferson | 1608 | $33,113 | 13.8% | 84.9% | $3,242,000 | $3,242,000 |
| 16 Friar's Point, Town of | Distribution System Improvements | 38631 | Coahoma* | 1200 | $21,818 | 20.7% | 77.7% | $1,337,914 | $1,337,914 |
| 17 Thomasville W/A | New Well | 39073 | Rankin* | 1294 | $43,825 | 74.5% | 22.5% | $1,450,000 | $1,450,000 |
| 18 Culkin Water District | Rehab/ Replacement of Existing Facilities | 39183 | Warren* | 11409 | $43,907 | 27.0% | 69.4% | $5,000,000 | $5,000,000 |
| 19 Decatur, Town of | Rehab/ Replacement of Existing Facilities | 39327 | Newton* | 1705 | $48,252 | 61.4% | 31.4% | $3,300,725 | $3,300,725 |

Note: This demographic data is not normally collected by the program. Staff used the system zip code and the Census QuickFacts to collect this data.
The Program defines Disadvantaged Communities as a project's service population with an MHI less than the State's MHI.

Zip code information was not available.
Therefore, the county data was used.

**Mᴄ MISSISSIPPI TODAY**

CONTINUING COVERAGE     Jackson Water Crisis     The Backchannel     Health     COVID-19     Welfare Scandal     Abortion Law     Culture

GOVERNMENT

# Rep. Bennie Thompson: Treat Jackson fairly, but if it can't run water system, let someone else

*Congressman Thompson said he has been talking with the mayor and other city leaders and repeated, "I have not seen a plan," about a long-term fix for the water system.*

 by **Geoff Pender**
September 2, 2022



U.S. Rep. Bennie Thompson, D–Miss., takes his ballot from election managers Gail Davis, left, and Joyce Moore to vote at his home precinct in Bolton, Miss., in Mississippi's Second Congressional Democratic Primary, Tuesday, June 7, 2022. (AP Photo/Rogelio V. Solis)

1 of 3

U.S. Rep. Bennie Thompson said the state bears some blame for neglecting Jackson for decades, but if the capital city cannot properly run its water system, "I would not be in favor of the city being given back the authority to run it."

"Because it doesn't make sense," Thompson said in an exclusive interview on Friday with Mississippi Today for its "The Other Side" podcast about the continuing water crisis in Jackson. "Those negotiations (about long-term solutions) have to be fair. They have to include the owners of the system. But we want a system that meets federal and state regulations. Now if we see that Jackson can't do it, then obviously we have to look at an alternative."

Thompson, whose federal district covers most of Jackson, said, "I expect to be intricately involved in the negotiations."

State leaders have been meeting privately this week to discuss long-term solutions for the capital city's collapsing system as state and federal emergency crews distribute water to thousands of residents and make emergency repairs.

Proposals they have come up with include:

- Creating a "regional water authority" to run the system, which also serves Byram and parts of Hinds County for water and parts of Rankin and Madison counties and other areas for sewerage.
- Putting the city water system in a temporary conservatorship run by the state Public Service Commission, with the goal of passing the system back to city leaders after service has been restored.
- Creating some new state entity or commission to take full, permanent control of the city's water system.
- Privatizing Jackson's water system, leasing it to a private company that would manage it moving forward.

**READ MORE:** State leaders meet privately to discuss long-term solutions for Jackson water crisis

Thompson said he's not going to opine on specific proposals at this point. He noted, "You can own the system

and not operate it."

But Thompson repeatedly said the city must be treated fairly in any negotiations on solutions.

"Years of neglect have contributed to what we have in Jackson," Thompson said. "… Jackson has been treated differently than other communities. So there has to be give and take on both sides. I encourage that. But I resist with every fiber in my body for Jackson to be singled out just because it's Jackson and being treated differently than all other communities and all water systems."

Thompson said he has been talking with the mayor and other city leaders and repeated, "I have not seen a plan," about a long-term fix for the water system.

"I've heard from the mayor and others that they have a plan, they're working on it, but I have not physically ( ) a plan with my own eyes," Thompson said. "I look forward to it. If it's one that is verifiable, I'll be happy to promote it. But, you know, I said a couple of weeks ago I was looking for a plan. And I say right now, I continue to look for a plan. And that speaks to management that I talked about earlier. It would be difficult to get the kind of resources needed to fix the Jackson water system without a verifiable plan.

"As soon as it's completed, I would encourage that plan to be as widely distributed as possible because that would instill confidence in the public that something is actually being done," Thompson said.

To hear Mississippi Today editor-in-chief Adam Ganucheau's full interview with Thompson, listen to <u>"The Other Side"</u> podcast, which will air starting Monday. Thompson discussed more about the ongoing conversations he's had with city and state leaders, and he talked about his work as chair of the House Jan. 6 Committee and the ongoing welfare scandal investigation.

**READ MORE:** <u>Answers to commonly asked questions about the Jackson water crisis</u>

© 2022 Nonprofit Mississippi News.
Proudly powered by Newspack by Automattic

10/31/2022, 10:56 AM

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

MAY 11, 2020

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

The Honorable Chokwe A. Lumumba
Mayor of City of Jackson
219 South President Street
Jackson, Mississippi 39205

     Re:    Notice of Noncompliance Pursuant to Section 1414(a)(1)(A) of the Safe Drinking Water
             Act, 42 U.S.C. § 300g-3(a)(1)(A), City of Jackson Public Water System, Jackson,
             Mississippi, PWS ID No. MS0250008

Dear Mayor Lumumba:

The U.S. Environmental Protection Agency is responsible for assuring public water systems provide
safe drinking water in accordance with the Safe Drinking Water Act (SDWA), 42 U.S.C. § 300f et. seq.,
and the regulations promulgated thereunder. Based on information contained in the Safe Drinking Water
Information System (SDWIS), the City of Jackson Public Water System (System) has approximately
71,486 service connections, serves approximately 173,514 persons, and is owned and/or operated by the
City of Jackson, Mississippi (hereinafter, the City). Pursuant to Section 1401(15) of the SDWA,
42 U.S.C. § 300f(15), it is therefore a community water system. As a community water system, the
Jackson Public Water System (PWS) is subject to the requirements of the National Primary Drinking
Water Regulations (NPDWR), 40 C.F.R. Part 141, and the Mississippi Primary Drinking Water
Regulations (MPDWR), promulgated pursuant to the Mississippi Safe Drinking Water Act of 1997,
Miss. Code Ann. § 46-21-1 et. seq.

Based on information provided by the City in response to the EPA's information request issued on
November 22, 2019 pursuant to its authority under Section 1445 of the SDWA, 42 U.S.C. § 300j-4 and
40 C.F.R. § 141.31; information collected during the EPA's Inspection of the System conducted during
the week of February 3, 2020; information provided to the EPA from the Mississippi Department of
Health (MSDH)[1]; information provided by the System's Monthly Operating Reports (MORs); and
information contained in SDWIS, the EPA finds that the System is in noncompliance with the SDWA,
the NPDWR, and the MPDWR, as described below.[2] Consistent with Executive Order No. 13892,
"Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement
and Adjudication" (Oct. 9, 2019), the EPA provided the City with advance notice of and an opportunity
to discuss these violations during a meeting between the EPA and the City on April 28, 2020.

---

[1] The MSDH is the entity in the State of Mississippi with primary enforcement authority over the SDWA, pursuant to SDWA
Section 1413, 42 U.S.C. § 300g-2. On February 28, 2020, MSDH sent a written request for EPA to assist in addressing the
City of Jackson's SDWA noncompliance.

[2] The violations contained herein are in addition to those violations alleged in the Emergency Administrative Order, Docket
No. SDWA-04-2020-2300, issued by the EPA to the City on March 27, 2020 (Enclosure A).

1. Miss. Admin. Code § 15-20-72.2.2.1(5) requires a certified Class A operator shall be onsite whenever the treatment plant for a Class A public water system treating surface water is in operation. The System is a Class A public water system, because it has surface water treatment, groundwater under the direct influence of surface water, lime softening, or coagulation and filtration for the removal of constituents other than iron or manganese. See Miss. Code Ann. § 15-20-72.2.2.1(5).

   A review of the City's operating logbooks, provided to the EPA by MSDH on March 11, 2020, indicated that the System is not always fully covered by a Class A certified operator. Therefore, the City is in noncompliance with the MPDWR, Miss. Admin. Code § 15-20-72.2.2.1(5), for failure to maintain certified operators to operate the facilities.

2. 40 C.F.R. § 141.719(b)(3) and Miss. Admin. Code § 15-20-72.1.7.1 require that a PWS must conduct direct integrity testing of membrane units to demonstrate removal efficiencies.

   During the February 2020 Inspection and upon review of the City's March 2020 MOR, the EPA found that the City was unable to perform direct integrity testing of some membrane units due to wear and breakage of components and compressor, and malfunctioning equipment at the O.B. Curtis WTP. Therefore, the City is in noncompliance with 40 C.F.R. § 141.719(b)(3) and Miss. Code Ann. § 15-20-72.1.7.1.

3. 40 C.F.R. § 141.719(b)(4) and Miss. Admin. Code § 15-20-72.1.7.1 require that a PWS must conduct continuous indirect integrity monitoring on each membrane unit unless the system implements continuous direct integrity testing of membrane units in accordance with the criteria in 40 § C.F.R. 141.719 (b)(3)(i) through (v). If indirect integrity monitoring includes turbidity and if the filtrate turbidity readings are above 0.15 nephelometric units (NTU), the PWS must immediately perform direct integrity testing on the associated membrane unit in accordance with 40 C.F.R. § 141.719(b)(3). Pursuant to 40 C.F.R. § 141.719(b)(3), the direct integrity testing log removal value (LRV) for the membrane units at O.B. Curtis Water Treatment Plant (WTP) must be greater than or equal to the control limit[3] of 4, or else it is considered to have failed the direct integrity testing and the System must remove the membrane unit from service, conduct a direct integrity test to verify any repairs, and may return the membrane unit to service only if the direct integrity test is within the control limit. See 40 C.F.R. § 141.719(b)(3)(v).

   As indicated by a review of the City's MORs, on several days in March 2020, the indirect integrity monitoring of the membrane units at the O.B. Curtis WTP showed turbidity readings greater than 0.15 NTU. Subsequent direct integrity testing performed showed failures of several of the membrane units, due to LRVs lower than the control limit of 4. The City did not remove these membrane units from service, as required by 40 C.F.R. § 141.719(b)(3)(v). Therefore, the City is in noncompliance with 40 C.F.R. §§ 141.719(b)(3)(v) and 141.719(b)(4) and Miss. Code Ann. § 15-20-72.1.7.1.

---

[3] Under 40 C.F.R. § 141.719(b)(3)(iv), a System must establish a control limit within the sensitivity limits of the direct integrity test that is indicative of an integral membrane unit capable of meeting the removal credit awarded by the State. This control limit is known as the minimum log removal value and is set by the primary enforcement agency for membrane treatment systems (in this matter, MSDH).

4. Pursuant to 40 C.F.R. § 141.132(b)(2) and Miss. Code Ann. § 15-20-72.1.3.6, a PWS using chlorine dioxide for disinfection or oxidation must conduct daily monitoring for chlorite.

   On February 5, 2020, the EPA observed the System treating with chlorine dioxide at the J.H. Fewell WTP. However, the February 2020 MOR stated that the System did not use chlorine dioxide at the J.H. Fewell WTP on February 5, 2020, nor did the report show that the System conducted the required monitoring on that date for chlorite. Therefore, the City is in noncompliance with 40 C.F.R. §§ 141.132(b)(2) and Miss. Code Ann. § 15-20-72.1.3.6.

5. Pursuant to 40 C.F.R. § 141.90(a)(3) and Miss. Code Ann. § 15-20-72.1.5.1, as early as possible prior to the addition of a new source or any long-term change in water treatment, a water system deemed to have optimized corrosion control under 40 C.F.R. § 141.81(b)(3) or a water system subject to reduced monitoring pursuant to 40 C.F.R. § 141.86(d)(4) shall submit written documentation to the State describing the change or addition. Under 40 C.F.R. § 141.90(a)(3), the State must review and approve the addition of a new source or long-term change in treatment before it is implemented by the PWS.

   In 2014, the City had been deemed to have both optimized corrosion control and was, at that time, subject to reduced monitoring. In or around October 2014, the City merged the ground water system and the surface water systems under the PWS ID No. MS0250008, thereby replacing the groundwater system area with surface water from the O.B. Curtis WTP and turning the ground water wells into an emergency supply source. According to the City, this was intended to be a long-term change. In or around July 2015, due to water treatment plant and distribution issues, the City turned the wells back on and began using ground water for those areas served by surface water after the merger. The City returned the System to its pre-October 2014 operational configuration, as follows: (1) ground water system service area was again fully served by ground water only; (2) this service area was no longer served by surface water; and (3) the ground water service area was again using gaseous chlorine for disinfection. However, the System remained merged under the PWS ID No. MS0250008 and was not identified as two separate public water systems, despite the System no longer operationally considering the ground water wells as an emergency source. In October 2014, the City did not provide a formal request to MSDH to change its source from groundwater to surface water; nor did it notify MSDH in 2015, when the change from surface water back to groundwater occurred. Therefore, the City is in noncompliance with 40 C.F.R. §§ 141.90(a)(3) and 141.81(b)(3) and Miss. Code Ann. § 15-20-72.1.5.1.

6. Pursuant to 40 C.F.R. § 141.80(c) and Miss. Code Ann. § 15-20-72.1.3.2, the lead action level is exceeded if the concentration of lead in more than 10% of tap water samples collected during any monitoring period conducted in accordance with 40 C.F.R. § 141.86 is greater than 0.015 mg/L, (i.e., if the "90th percentile" lead level is greater than 0.015 milligrams per liter (mg/L) (or 15 parts per billion (ppb))). Under 40 C.F.R. § 141.80(e), any PWS exceeding the lead action level shall implement all applicable source water treatment requirements specified by the State under 40 C.F.R. § 141.83. Pursuant to 40 C.F.R. § 141.83, any PWS exceeding the lead action level must complete source water monitoring and make treatment recommendations to the State within 180 days after the end of the monitoring period during which the lead action level was exceeded. The State then makes a determination regarding source water treatment, and, if necessary, the State may require the PWS to install and operate such treatment.

The System exceeded the lead action level of 0.015 mg/L for the following monitoring periods: January – June 2015; January – June 2016; and July – December 2016. On February 12, 2016, MSDH issued a compliance plan to the City to address the lead action level exceedances (ALEs). As a result of the June 2015 lead ALE, the City conducted an optimal corrosion control treatment (OCCT) study between October 2016 and April 2017 and provided the recommended treatment to MSDH on June 13, 2017. MSDH concurred with the recommended treatment and provided a deadline of May 31, 2019 to complete source water treatment installation. Although MSDH later extended the completion date to December 2019, this deadline remains unmet and the City has failed to install OCCT at the J.H. Fewell WTP. Therefore, the City is in noncompliance with 40 C.F.R. §§ 141.80(e) and 141.83 and Miss. Code Ann. § 15-20-72.1.3.2, for failure to install OCCT and provide applicable source water treatment.

7.  Pursuant to 40 C.F.R. § 141.82(g) and Miss. Code Ann. § 15-20-72.1.4.3, all systems optimizing corrosion control shall continue to operate and maintain OCCT, including maintaining water quality parameters (WQPs) at or above minimum values or within ranges designated by the State under 40 C.F.R. § 141.82(f). A water system is out of compliance with the requirements of 40 C.F.R. § 141.82(g) for a six-month period if it has excursions for any State-specified WQP on more than nine days during the period. An excursion occurs whenever the daily value for one or more of the WQPs measured at a sampling location is below the minimum value or outside the range designated by the State. Additionally, PWSs must provide the public notice of treatment technique requirement violations (such as WQP excursions) within 30 days of learning of the violation, pursuant to 40 C.F.R. § 141.203 and Miss. Code Ann. § 15-20-72.1.5.2.

    The City failed to comply with the lead and copper rule (LCR) treatment technique requirements for pH and/or alkalinity WQPs for the following monitoring periods:

    - January – June 2016 (186 days of excursions of WQPs);
    - July – December 2016 (221 days of excursions of WQPs);
    - January – June 2017 (200 days of excursions of WQPs);
    - July – December 2017 (258 days of excursions of WQPs);
    - January – June 2018 (91 days of excursions of WQPs);
    - July – December 2018 (166 days of excursions of WQPs);
    - January – June 2019 (211 days of excursions of WQPs);
    - July – December 2019 (113 days of excursions of WQPs); and
    - January – June 2020 (62 days of excursions of WQPs – Note: this is based on data through April 2020).

    The City failed to report the WQP violations to SDWIS and did not provide public notification for the following monitoring periods: July – December 2016; January – June 2017; and July – December 2017. Therefore, the City is in noncompliance with 40 C.F.R. §§ 141.82(g) and 141.203 and Miss. Code Ann. §§ 15-20-72.1.4.3 and 72.1.5.2 for failure to maintain optimal WQPs and provide the appropriate public notification.

8.  Pursuant to 40 C.F.R. § 141.723(d) and Miss. Admin. Code § 15-20-72.1.4.1, a PWS must correct any significant deficiencies identified in an EPA- or State-conducted sanitary survey in accordance with EPA- or State-approved schedules.

On November 18, 2016, MSDH conducted a sanitary survey, during which MSDH made a finding of inadequate application of treatment chemicals and techniques. Thereafter, MSDH issued a significant deficiency report on May 12, 2017 citing the System for failure to achieve the target hardness and alkalinity goals [i.e. WQPs], and thereafter issued a compliance plan to the System, requiring improvements to the System to be completed by December 29, 2019 to bring the System into compliance. The System failed to complete the required compliance measures by the December 29, 2019 deadline established by the State. Therefore, the City is in noncompliance with 40 C.F.R. § 141.723(d) and Miss. Admin. Code § 15-20-72.1.4.1.

9.  Pursuant to 40 C.F.R. §§ 141.80(f) and 141.84(a) and Miss. Code Ann. § 15-20-72.1.3.2, a water system that fails to meet the lead action level in tap samples taken pursuant to 40 C.F.R. § 141.86(d)(2), after installing corrosion control and/or source water treatment (whichever sampling occurs later), shall replace lead service lines in accordance with the requirements of 40 C.F.R. § 141.84 and Miss. Code Ann. § 15-20-72.1.1.6(8).

    Pursuant to 40 C.F.R. § 141.84(b), a water system shall replace annually at least seven percent (7%) of the initial number of lead service lines in its distribution system. The initial number of lead service lines is the number of lead lines in place at the time the replacement program begins. The system shall identify the initial number of lead service lines in its distribution system, including an identification of the portion(s) owned by the system, based on a materials evaluation, including the evaluation required under § 141.86(a) and legal authorities (e.g., contracts, local ordinances) regarding the portion owned by the system. The first year of lead service line replacement shall begin on the first day following the end of the monitoring period in which the action level was exceeded.

    As detailed under Item No. 6 above, the City was required to commence its lead service line replacement program in June 2016. Despite exceeding the lead action level on several occasions, the City has failed to implement a lead service line replacement program at any time from June 2016 to the present. Therefore, the City is in noncompliance with 40 C.F.R. §§ 141.80(f) and 141.84 and Miss. Code Ann. § 15-20-72.1.1.6(8).

10. Pursuant to 40 C.F.R. § 141.86(a)(1) and Miss. Code Ann. § 15-20-72.1.3.2, each water system shall complete a materials evaluation of its distribution system in order to identify a pool of targeted sampling sites that meets the requirements of this section, and which is sufficiently large to ensure that the water system can collect the number of lead and copper tap samples required in 40 C.F.R. § 141.86(c).

    The EPA requested in its November 2019 Information Request that the City provide its materials evaluation required under 40 C.F.R. § 141.86(a)(1) and Miss. Code Ann. § 15-20-72.1.3.2. Additionally, during the February 2020 inspection, EPA questioned the City about a materials evaluation and what information was used to make sampling site selections. The City has not provided a complete materials evaluation, utilizing the information specified in 40 C.F.R. § 141.86(a)(2), to identify potential lead service lines, which was required when the LCR was promulgated in 1991. Therefore, the City is in noncompliance with 40 C.F.R. § 141.86(a)(1) and Miss. Code Ann. § 15-20-72.1.3.2.

11. Pursuant to 40 C.F.R. § 141.86(b)(2) and Miss. Code Ann. § 15-20-72.1.3.2, each first-draw tap sample for lead and copper shall be one liter in volume and have stood motionless in the plumbing system of each sampling site for at least six hours.

Based upon a review of the City's records conducted during the EPA's February 2020 Inspection, the EPA found that information on the System's customer sampling procedure forms showed that either the samples failed to sit motionless for at least six hours and/or did not have enough information provided for the determination to be made. Therefore, the City is in noncompliance with 40 C.F.R. § 141.86(b)(2) and Miss. Code Ann. § 15-20-72.1.3.2.

12. Pursuant to 40 C.F.R. § 141.86(c) and Miss. Code Ann. § 15-20-72.1.3.2, the City is required to collect 100 unique tap samples every six months.

The City collected duplicate tap samples from the same site in the same compliance period and used those samples to meet the required minimum number of samples. This was observed in the monitoring data collected by the City and submitted to MSDH in October 2017, October 2018, April 2019, and October 2019. Therefore, the City is in noncompliance with 40 C.F.R. § 141.86(c) and Miss. Code Ann. § 15-20-72.1.3.2.

13. 40 C.F.R. § 141.86 and Miss. Code Ann. § 15-20-72.1.3.2 require all sample results to be from sites or locations listed on the approved lead and copper sampling plan. 40 C.F.R. § 141.86(b)(4) requires that each first draw tap sample be collected from the same sampling site from which the system collected previous samples, unless the system cannot gain entry to collect a follow-up tap sample; under such circumstances, the system may collect a follow-up tap sample from another sampling site in its sampling pool as long as the new site meets the same criteria outlined in 40 C.F.R. § 141.86(a)(3) through (7) and is within reasonable proximity of the original site.

40 C.F.R. § 141.90(a)(1)(i) and Miss. Code Ann. § 15-20-72.1.5.1 require the City to report the results of all tap samples, including the location of each sampling site and the criteria under 40C.F.R. § 141.86(a)(3) through (7) under which the site was selected, to the State.

In monitoring data collected by the City and submitted to MSDH in May 2017, October 2017, April 2018, October 2018, April 2019, and October 2019, the City provided sample results from sites or locations not listed on the approved lead and copper sampling plan and/or those sites or locations could not be identified from the information included on the form. Therefore, the City is in noncompliance with 40 C.F.R. § 141.86 and Miss. Code Ann. § 15-20-72.1.3.2.

Additionally, the City changed sample sites from monitoring period to monitoring period with no documentation of MSDH's approval of such changes or how the new sampling sites met the selection criteria in 40 C.F.R. § 141.86(a)(3) through (7). Therefore, the City is in noncompliance with 40 C.F.R. §§ 141.86(b)(4) and 141.90(a)(1)(i) and Miss. Code Ann. §§ 15-20-72.1.3.2 and 72.1.5.1.

14. Pursuant to 40 C.F.R. § 141.90(a) and Miss. Code Ann. § 15-20-72.1.5.1(1), a PWS is required to analyze and report to the State the information obtained for all water samples taken pursuant to the lead and copper sampling requirements of 40 C.F.R. § 141.86. Pursuant to Miss. Code Ann. § 15-20-72.1.5.5(2), each supplier of water must utilize the services of certified laboratory or party approved by the State where applicable to complete all water quality analyses as stipulated in the NPDWRs.

During the April 2019 compliance monitoring period, some lead and copper samples collected by the City were not taken to a certified laboratory or party approved by the State for analysis. Additionally, while the City retained sample collection forms for sites 12 and 181, no

corresponding laboratory results were reported to the State for these sites. Therefore, the City is in noncompliance with 40 C.F.R. § 141.90(a) and Miss. Code Ann. §§ 15-20-72.1.5.1(1) and - 72.1.5.5(2).

15. Pursuant to 40 C.F.R. § 141.85(d) and Miss. Code Ann. § 15-20-72.1.5.2, all water systems must deliver a consumer notice of all individual lead tap water monitoring results to persons served by the water system at sites that are tested. A water system that exceeds the lead action level shall deliver the public education materials contained in 40 C.F.R. § 141.85(a) in accordance with 40 C.F.R. § 141.85(b). A water system must provide the consumer notice as soon as practical, but no later than 30 days after the system learns of the tap monitoring results.

For the first half of 2016, City provided notification to MSDH by certification that consumer notices were distributed in February 2016. However, the last sample result for February was not analyzed until March 2016 and was not included in the consumer notice for that period. Therefore, the consumer notices that went out in February 2016 were incomplete. Therefore, the City is in noncompliance with 40 C.F.R. §§ 141.85(a) and 141.85(d) and Miss. Code Ann. § 15-20-72.1.5.2.

16. Under 40 C.F.R. § 141.90(f)(3) and Miss. Code Ann. § 15-20-72.1.5.1, no later than three months following the end of each monitoring period, each system shall mail a sample copy of the consumer notification of tap results to the State along with a certification that the notification has been distributed in a manner consistent with the requirements of 40 C.F.R. § 141.85(d).

Based on a review of records obtained during the EPA's February 2020 Inspection, the City failed to provide MSDH with the consumer notice certification forms required by 40 C.F.R. § 141.90(f)(3) for the second half of 2017 and the second half of 2018. Therefore, the City is in noncompliance with 40 C.F.R. § 141.90(f)(3) and Miss. Code Ann. § 15-20-72.1.5.1.

17. Pursuant to 40 C.F.R. § 141.85(d) and Miss. Code Ann. § 15-20-72.1.5.2, all water systems must provide a notice of the individual tap results from lead tap water monitoring carried out under 40 C.F.R. § 141.86 to the persons served by the water system at the specific sampling site from which the sample was taken.

Customer complaints on the "Homeowner Lead/Copper Sample Collection" forms from tap sampling conducted in October 2018 indicate that several customers were not notified of the lead and copper sampling results. Therefore, the City is in noncompliance with 40 C.F.R. § 141.85(d) and Miss. Code Ann. § 15-20-72.1.5.2.

18. Pursuant to 40 C.F.R. § 141.153 and Miss. Code Ann. § 15-20-72.1.18.1, each PWS must provide to its customers an annual report (known as a "Consumer Confidence Report") which contains the informed identified in 40 C.F.R. §§ 141.153 and 141.154. Under 40 C.F.R. § 141.153(d)(4)(vi), a Consumer Confidence Report must include the 90th percentile value of the most recent round of sampling and number of sampling sites exceeding the ALE.

The City did not fully provide lead and copper results for the 2016 and 2018 monitoring periods in its Consumer Confidence Reports for those years. Therefore, the City is in noncompliance with 40 C.F.R. §141.153(d)(4)(vi) and Miss. Code Ann. § 15-20-72.1.18.1.

Consistent with Section 1414(a)(1)(A) of the SDWA, 42 U.S.C § 300g-3(a)(1)(A), the EPA is hereby notifying the City of such noncompliance. This Notice shall not be construed as a final agency action subject to judicial review under Section 1414(g) of the SDWA, 42 U.S.C. § 300g-3(g).

Therefore, within ten (10) calendar days of receipt of this Notice of Noncompliance, the City must contact this office to arrange a meeting to show cause why the EPA should not initiate legal proceedings against the City for these violations. In lieu of appearing in the EPA's offices for this meeting, a telephone conference may be scheduled. The City should be prepared to provide all relevant information with documentation pertaining to the above violations. The EPA's legal counsel may also be present at this meeting. Accordingly, the City has the right to have its legal counsel present.

To arrange the particulars of this meeting or to arrange for a telephone conference, please contact Amanda Driskell at (404) 562-9735 or Driskell.Amanda@epa.gov. If the City fails to attend the scheduled meeting/telephone conference or to contact Ms. Driskell prior to the meeting/conference date, the EPA may proceed with formal enforcement against the City without further notice.

The City may, if it so desires, assert a confidential business information (CBI) claim covering any or all information furnished to the EPA during our meeting. Every CBI claim must be made in a manner described in 40 C.F.R. § 2.203 and must be fully substantiated with documentary evidence which shows how the claim meets every criterion listed in 40 C.F.R. §§ 2.208 and 2.304. If no CBI claim accompanies the City's information when it is received by the EPA, it may be made available to the public by the EPA without further notice to the City. Further details, including how to make a business confidentiality claim, are included in Enclosure B.

If you have any questions regarding this matter, please contact Ms. Driskell at the phone number or email listed above. For legal inquiries, please have your attorneys contact Suzanne K. Armor, Associate Regional Counsel, at (404) 562-9701 or Armor.Suzanne@epa.gov.

Sincerely,

**CAROL KEMKER**

Digitally signed by CAROL KEMKER
Date: 2020.05.11 17:49:07 -04'00'

Carol L. Kemker
Director
Enforcement and Compliance Assurance Division

Enclosures

cc:    Robert K Miller, Director
       City of Jackson Department of Public Works

       Lester Herrington, Director
       Office of Environmental Health, MSDH

8

ENCLOSURE A

City of Jackson SDWA Section 1431, 42 U.S.C. § 300g-2

## ENCLOSURE B

## RIGHT TO ASSERT BUSINESS CONFIDENTIALITY CLAIMS
### (40 C.F.R. Part 2)

Except for information which deals with the existence, absence, or level of contaminants in drinking water, you may, if you desire, assert a business confidentiality claim as to any or all of the information that the EPA is requesting from you. Applicable EPA regulations relating to business confidentiality claims are at 40 C.F.R. Part 2 and 40 CFR § 2.304(e).

If you assert such a claim for the requested information, the EPA will only disclose the information to the extent and under the procedures set out in the cited regulations. If no business confidentiality claim accompanies the information, the EPA may make the information available to the public without any further notice to you.

40 C.F.R. § 2.203(b). **Method and time of asserting business confidentiality claim.** A business which is submitting information to the EPA may assert a business confidentiality claim covering the information by placing on (or attaching to) the information, at the time it is submitted to the EPA, a cover sheet, stamped or typed legend, or other suitable form of notice employing language such as "trade secret," "proprietary," or "company confidential." Allegedly confidential portions of otherwise non-confidential documents should be clearly identified by the business and may be submitted separately to facilitate identification and handling by the EPA. If the business desires confidential treatment only until a certain date or until the occurrence of a certain event, the notice should so state.

Mailing Addresses for the CCs:
Mr. Robert K. Miller, Director
City of Jackson Department of Public Works
200 South President Street
Jackson, Mississippi  39205-0017

Lester Herrington, MSDH
Bureau of Public Water Supply
P.O. Box 1700
2423 North State Street
Jackson, MS 39215-1700



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

**MAR 27 2020**

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

The Honorable Chokwe A. Lumumba
Mayor of City of Jackson
219 South President Street
Jackson, Mississippi  39205

      Re:  Emergency Administrative Order under SDWA Section 1431, 42 U.S.C. § 300i
           Public Water System: City of Jackson Public Water System
           PWS ID Number: MS0250008
           Docket No.: SDWA-SDWA-04-2020-2300

Dear Mayor Lumumba:

Enclosed is an Emergency Administrative Order (Order) issued by the U.S. Environmental Protection Agency to the City of Jackson, Mississippi (Respondent), as the owner/operator of the City of Jackson Public Water System (System), pursuant to section 1431 of the Safe Drinking Water Act (SDWA), 42 U.S.C. § 300i.

Based on observations made by the EPA during its inspection conducted the week of February 3, 2020, and review of the documents provided by Respondent in response to the EPA's request for information issued pursuant to its authority under section 1445 of the SDWA, 42 U.S.C. § 300j-4, the EPA has determined that conditions exist at the System that present an imminent and substantial endangerment to the persons served by the System. Based on evidence of turbidity exceedances, disinfection treatment concerns, and/or the condition of the distribution system, the System has the potential to have the presence of *E. Coli*, *Cryptosporidium*, or *Giardia* in the drinking water being served to its customers. Therefore, pursuant to section 1431 of the SDWA, 42 U.S.C. § 300i, the EPA is authorized to take actions necessary to protect human health. The Order and its requirements are necessary to ensure adequate protection of public health.

The enclosed Order sets forth the actions that must be taken to ensure that the people served by the System are provided with safe drinking water. The Order requires the System to, among other things: (1) develop and implement a plan to address all monitoring equipment and appurtenant treatment equipment repairs and/or replacements; (2) address dosing processes for disinfection and pH control; (3) develop and implement a plan to provide alternative drinking water when specific triggers are met; and (4) take additional total coliform bacteria samples under prescribed conditions.

The Order constitutes a final agency action and under Section 1448(a) of the SDWA, 42 U.S.C. § 300j-7(a) you may seek federal judicial review. If you have any questions or wish to discuss this Order, please contact Amanda Driskell at (404) 562-9735 or Driskell.Amanda@epa.gov. For legal inquiries,

please have your attorneys contact Suzanne Armor, Associate Regional Counsel, at (404) 562-9701 or Armor.Suzanne@epa.gov. Thank you for your attention to this matter.

Sincerely,

Carol L. Kemker
Director
Enforcement and Compliance Assurance Division

Enclosure

cc:  Robert K Miller, Director, City of Jackson Department of Public Works
    Lester Herrington, Director of Office of Environmental Health,
     Mississippi State Department of Health

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 4**

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Docket No. SDWA-04-2020-2300 |
| | ) | |
| City of Jackson, Mississippi, | ) | **EMERGENCY ADMINISTRATIVE** |
| | ) | **ORDER** |
|   Respondent. | ) | |
| | ) | Proceeding pursuant to Section 1431(a) |
| Public Water System, PWS ID. No. MS0250008. | ) | of the Safe Drinking Water Act, |
| | ) | 42 U.S.C. § 300i(a). |

## I.    AUTHORITY

1.  This Emergency Administrative Order ("Order") is issued to the City of Jackson, Mississippi ("Respondent") pursuant to the authority vested in the Administrator of the U.S. Environmental Protection Agency Section 1431(a) of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300i(a). The Administrator has delegated this authority to the Regional Administrator of the EPA Region 4, who has, in turn, delegated this authority to the Director of the Enforcement Compliance and Assurance Division.

2.  The EPA has jurisdiction to issue emergency orders pursuant to Section 1431 of the SDWA, 42 U.S.C. § 300i.

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

**General Findings**

3.  Respondent is a municipality created under the laws of the State of Mississippi and is therefore a "person" as that term is defined in the SDWA. 42 U.S.C. § 300f(12); 40 C.F.R. § 141.2.

4.  Respondent owns and/or operates a public water system located in the City of Jackson, Mississippi, PWS ID No. MS0250008 ("System"). The System provides water for human consumption to a population of approximately 173,514.

5.  The System is a "public water system" within the meaning of Section 1401(4) of the SDWA, 42 U.S.C. § 300f(4); 40 C.F.R. § 141.2.

6.  The System regularly serves at least 25 year-round residents and is therefore a "community water system" ("CWS") within the meaning of Section 1401(15) of the SDWA, 42 U.S.C. § 300f(15), and 40 C.F.R. § 141.2.

7.  Respondent's ownership and/or operation of the System makes it a "supplier of water" within the meaning of Section 1401(5) of the SDWA, 42 U.S.C. § 300f(5), and 40 C.F.R. § 141.2, and subject to the requirements of Part B of the SDWA, 42 U.S.C. § 300g, and the National Primary Drinking Water Regulations ("NPDWRs") at 40 C.F.R. § 141.

8.  Pursuant to SDWA Section 1413, 42 U.S.C. § 300g-2, the Mississippi State Department of Health ("MSDH") has primary responsibility for the implementation and enforcement of the public water supply program in Mississippi.

9.  The System consists of two water treatment plants, known as the O.B. Curtis Water Treatment Plant ("O.B. Curtis WTP")[1] and the J.H. Fewell Water Treatment Plant ("J.H. Fewell WTP"),[2] a number of groundwater wells,[3] and appurtenant collection, treatment, storage, and distribution facilities.[4]

10. Portions of the System can be supplied by both ground and surface water sources, while others are served only by surface water sources. The surface water sources are the Ross Barnett Reservoir and the Pearl River. The ground water source is the Sparta Aquifer.

11. The O.B. Curtis and J.H. Fewell WTPs, both of which treat the surface water portions of the System, employ conventional filtration with ultraviolet ("UV") systems to inactivate pathogens. Finished water at the WTPs is disinfected using chloramines.

12. UV disinfection treatment is installed on each individual filter effluent ("IFE") flow at both the O.B. Curtis and J.H. Fewell WTPs to treat for viruses, including *Cryptosporidium* and *Giardia*.

13. Respondent's PWS is required to provide filtration pursuant to 40 C.F.R. §§ 141.73 and 141.173, and disinfection pursuant to 40 C.F.R. §§ 141.72(b) and 141.172.

14. Ground water from the wells is treated at the point of withdrawal using gaseous chlorine.

15. The term "contaminant" means any physical, chemical, biological, or radiological substance or matter in water." 42 U.S.C. § 300f(6).

16. Turbidity is a measure of the cloudiness of water. It is used to indicate water quality and filtration effectiveness (such as whether disease-causing organisms are present). Higher turbidity levels are often associated with higher levels of disease-causing microorganisms.

17. *E. coli*, *Cryptosporidium*, and *Giardia* are contaminants under the meaning of 42 U.S.C. § 300f(6), and are or may be present in the System.

18. On November 22, 2019, the EPA issued a Request for Information to Respondent, pursuant to Section 1445 of the SDWA, 42 U.S.C. § 300j-4, and 40 C.F.R. § 141.31, seeking information to determine Respondent's compliance with federal drinking water regulations.

19. On December 23, 2019, Respondent provided its response to the EPA's Request for Information.

---

[1] To the EPA's knowledge and belief, the O.B. Curtis WTP was initially constructed in or around 1992.

[2] To the EPA's knowledge and belief, the J.H. Fewell WTP was initially constructed in or around 1914.

[3] Respondent maintains at least six active groundwater wells (T.V. Road Well, Willo-O-Wood Well, Wiggins Road Well, Siwell Road Well, Highway 18 Well, and Maddox Road Well), along with three inactive groundwater wells (Forest Hill Road Well, Rainey Road Well, and Presidential Hill Well).

[4] Until approximately October 2014, there were two separately identified public drinking water systems owned by the City of Jackson, Mississippi. One was supplied entirely by groundwater and identified under the PWS ID No. MS0250012; the other was supplied by surface water and identified under the PWS ID No. MS0250008.

20. On January 15 and 16, 2020, consistent with the requirements of Section 1445(b)(1), 42 U.S.C. § 300j-4(b)(1), the EPA notified MSDH and Respondent, respectively, of its intent to inspect the PWS.

21. On February 3 to 7, 2020, representatives of the EPA conducted an inspection of the PWS, pursuant to its authority under Section 1445(b)(1) of the SDWA, 42 U.S.C. § 300j-4(b)(1).

**Bacterial Contamination and Proper Disinfection**

22. During the inspection, the EPA identified the following preliminary concerns related to bacterial contamination and proper disinfection:

   a. The necessary chemical dosing of coagulant to address turbidity is determined by the streaming current detectors ("SCDs"); however, Respondent's SCDs were not properly calibrated at either the O.B. Curtis or J.H. Fewell WTPs, thus failing to provide accurate dosing for proper treatment of drinking water;

   b. Continuous monitoring equipment at the O.B. Curtis WTP has not been repaired or calibrated for approximately three years since the instrument technician position was vacated. This equipment includes pH meters, flow measurement devices, turbidimeters, and the SCDs. Comparisons of operator laboratory bench sheet results indicated that the readouts from the continuous pH meters are off by up to 2 units in some instances. It was indicated on the monthly operating reports submitted in response to the EPA's November 22, 2019 Request for Information, that this equipment was used as the basis for the values reported for compliance.

   c. Jar tests are commonly used in the industry as "bench-scale" simulations of full-scale coagulation/flocculation/sedimentation water treatment processes. Respondent does not follow the industry standard of conducting regular jar tests at both the O.B. Curtis and J.H. Fewell WTPs. Because the SCDs are used as the basis for those coagulant dosing decisions without having been calibrated, the lack of jar testing is an additional indicator in evaluating the ability of the WTPs to deliver safe drinking water to the System's users.

   d. Respondent conducts membrane cleaning cycles without the use of automatic monitoring equipment for pH and chlorine levels. Excess chlorine levels can damage and reduce membrane efficiency. In addition, membrane cleaning is partially dependent on pH, requiring either higher or lower pH cleaning regimes based on the foulants present. This automatic monitoring equipment has been nonfunctional for several years.

   e. Respondent cannot currently perform membrane integrity testing at O.B. Curtis WTP due to wear and breakage of the system components and compressor. This is concerning due to the inability of the Respondent to evaluate the membrane filters' mechanical integrity during times of turbidity exceedance.

   f. Respondent has failed to perform filter maintenance at O.B. Curtis WTP and J.H. Fewell. Considering the recent turbidity exceedances, it is crucial that Respondent maintain the System filters to perform in optimal condition for protection of human health.

   g. NDPWRs require a system's combined filtered water at each plant be less than or equal to 0.3 NTU in at least 95% of the measurements taken each month, and the turbidity level of a

3

system's combined filtered water at each plant must at no time exceed 1 NTU. Turbidity exceedances were reported at both the O.B. Curtis and J.H. Fewell WTPs in the January 2020 monthly operating report ("MOR"). Finished water turbidity reached 1.35 NTU at the O.B. Curtis WTP and 3.00 NTU at the J.H. Fewell WTP. Additionally, at the O.B. Curtis WTP, 93.5% of turbidity samples were equal to or less than the turbidity limit of 0.3 NTU. The EPA's inspectors observed that the continuous turbidity monitoring equipment at the O.B. Curtis WTP has read inaccurately for approximately three years due to a lack of calibration and maintenance, and that turbidity samples were taken during this time period at a frequency of once per shift, for a total of three times per day. Given that the turbidity monitoring equipment was not operational, the system, to maintain compliance with NDPRWs, should have conducted grab sampling every four hours in lieu of continuous monitoring, but for no more than five working days following the nonoperation of the equipment.

h. UV disinfection devices were found to be offline for significant periods of time at both the O.B. Curtis and J.H. Fewell WTPs. UV disinfection devices are to be operated continuously. In its January 2020 MOR, Respondent reported the following:

   i. At the J.H. Fewell WTP:

   - UV Reactor 1 was offline for the entire month of January 2020 (and had been offline since October 16, 2019);

   - UV Reactor 2 was offline for 15 of 31 days;

   - UV Reactor 3 was offline for 17 of 31 days; and

   - UV Reactor 4 was offline for 17 of 31 days.

   ii. At the O.B. Curtis WTP:

   - UV Reactor 1 was offline for two of 31 days;

   - UV Reactor 2 was offline for four of 31 days;

   - UV Reactor 3 was offline for one of 31 days;

   - UV Reactor 4 was offline for three of 31 days; and

   - UV Reactor 5 was offline for 10 of 31 days.

23. MSDH provided the EPA with a list of all Boil Water Notices ("BWNs") issued between January 2, 2016 and February 1, 2020, to provide notice to the public of the potential to have serious adverse effects on human health as a result of short-term exposure pursuant to 40 C.F.R. § 141.202. The majority of the BWNs issued were due to loss of pressure from leaks and/or line breaks. Low-pressure and loss of pressure in a drinking water distribution system may cause a net movement of water from outside the pipe to the inside through cracks, breaks, or joints in the distribution system. Crack, breaks and joints are common in all water systems. Backsiphonage occurs when pressure is lost in pipes creating a negative pressure and a partial vacuum that pulls water from a contaminated source outside the pipe into the treated, potable water inside the pipe. This creates a suitable environment for bacteriological contamination and other disease-causing organisms, including *E. coli*, to enter the water distribution system downstream of the WTPs, which is then delivered to users.

4

24. High levels of turbidity increase the likelihood that drinking water may contain disease-causing organisms, such as *Cryptosporidium*, *Giardia*, *Legionella*, and *E. coli* because particles of turbidity provide shelter for microbes and reduce the microbes' exposure to disinfectants. If particulate material is not removed, a high turbidity event can provide shelter for and promote regrowth of pathogens in the water, leading to an outbreak of waterborne diseases.

25. Pathogens, such as *Giardia*, *Cryptosporidium*, and *Legionella*, are often found in water. If consumed, these pathogens can cause gastrointestinal illness (e.g., diarrhea, vomiting, cramps) and other health problems. These illnesses may be severe and sometimes fatal for people with weakened immune systems. *Cryptosporidium* is a significant concern in drinking water because it is resistant to chlorine and other disinfectants.

26. *E. coli* are bacteria, that when present, indicate the water may have been contaminated with human and/or animal wastes. Human and/or animal wastes may contain pathogens that can cause short-term health impacts, such as diarrhea, cramps, nausea, headaches, or other symptoms. Pathogens may pose a greater health risk for infants, young children, the elderly, and people with severely compromised immune systems.

## MSDH Actions and the EPA's Coordination with MSDH

27. MSDH has pursued informal enforcement actions against Respondent for Lead and Copper Rule ("LCR") treatment technique violations and Long-Term Enhanced Surface Water Treatment Rule violations due to turbidity exceedances. Additionally, MSDH issued a compliance plan to Respondent on February 12, 2016, to address the LCR violations that occurred starting in June 2015. However, these actions have not been effective in adequately protecting the health of the System's users with respect to the findings above.

28. EPA consulted with the City of Jackson and MSDH, to the extent practicable in light of the imminent endangerment, to confirm the correctness of the information on which this Order is based and to ascertain the action which such authorities were or would be taking.

29. Based on the findings above, the EPA has determined that the System has numerous SDWA violations, including violations of the NPDWRs.

30. Based on the findings above, and despite actions taken by MSDH, the local authorities have not undertaken all actions necessary to protect the public health and conditions exist at the System that may present an imminent and substantial endangerment to the health of persons served by the System. On February 28, 2020, MSDH submitted a written request for the EPA to assist with addressing the System's SDWA noncompliance. Therefore, this Order is necessary to protect human health.

31. The EPA has therefore determined that the actions specified in this Order are necessary to protect the health of persons.

## III.    ORDER

Based on the foregoing findings and conclusions, and pursuant to Section 1431 of the Act, 42 U.S.C. § 300i, it is ordered:

### Intent to Comply

32.  Within 72 hours of receipt of this Order, Respondent must notify the EPA in writing of its intent to comply with the terms of this Order. To satisfy this requirement, Respondent shall email the EPA point of contact identified below in Paragraph 44.

### Public Notification

33.  Effective immediately upon the Effective Date of this Order, Respondent shall carry out the public notice requirements as required by 40 C.F.R. Part 141, Subpart Q for all future violations of NPDWRs. Additionally, Respondent must treat any exceedances of maximum allowable turbidity levels and breaks in water lines or other low pressure or loss of pressure events likely to cause contamination in the System's distribution system as requiring Tier 1 public notification as required by 40 C.F.R. § 141.202 until notified by the EPA that this is no longer necessary.

### Treatment and Distribution System Management

34.  Notwithstanding the requirements of this Order, Respondent shall continue to implement all applicable monitoring and reporting requirements of the SDWA and NPDWRs in accordance with 40 C.F.R. Part 141.

35.  Dosing Process Repair. Within one week of the Effective Date of this Order, Respondent shall fix dosing process for disinfection and pH control.

36.  Repair and/or Replacement of Equipment.

   a.  Within one week of the Effective Date of this Order, Respondent shall provide to the EPA and MSDH a status of all monitoring equipment and appurtenant treatment equipment (including, but not limited to, pH meters, flow measurement devices, turbidimeters, SCDs, chlorine analyzers, raw water screens, UV reactors, automatic sludge removal system, membrane filtration treatment train flocculator motors, membrane integrity testing system, and filters). This must include, at a minimum, descriptions of the conditions of the equipment, identify in which facility this equipment is located, any needed repairs, and status of calibration.

   b.  Within 30 days of the Effective Date of this Order, Respondent shall submit a comprehensive plan, including a schedule of implementation, for the EPA's review and approval, to repair and/or replace monitoring equipment and repair, replace, and/or perform maintenance on the appurtenant treatment equipment to ensure the System has the appropriate treatment equipment and appropriate information to make treatment decisions, and that the water quality is properly measured for compliance with the NPDWRs. All future MORs and weekly data, as required pursuant to Paragraph 43(43.a), shall include the date of last calibration and any repairs and/or replacement of monitoring equipment done since the last report was provided, until further notice by the EPA.

6

c. Until such time as the monitoring equipment has been repaired and/or replaced and properly maintained, Respondent shall conduct monitoring by collecting grab samples every four hours in lieu of the continuous monitoring. For any instance where grab sampling is conducted in lieu of the required continuous monitoring, Respondent shall identify this deviation in the weekly MORs provided in accordance with Paragraph 43(43.a) of this Order.

37. CFE Turbidity Exceedance Events.

   a. In the event of CFE turbidity measurements exceeding 1.0 NTU, Respondent shall implement the following:

      i. Comply with all requirements of NPDWRs, including 40 C.F.R. §§ 141.170 – 141.175.

      ii. Notify the EPA and MSDH within 24 hours. If cause of the exceedance is known, include this information with notice. However, do not hold or delay the notification in instances where the cause of the exceedance is not known.

      iii. Consult with MSDH on the exceedance and the appropriate BWN.

      iv. Respondent shall issue a Tier 1 public notice as required by 40 C.F.R. § 141.202.

      v. Within 24 hours after the CFE turbidity is less than 0.3 NTU, Respondent shall collect consecutive daily (one sample per calendar day) special purpose samples (bacteriological and microbial) (defined in 40 C.F.R. § 141.21(a)(6)) from the entry point to the distribution system of the treatment plant that had the turbidity exceedance, as well as any other distribution sampling location deemed necessary as identified by MSDH. Respondent shall ensure that each sample is analyzed for total coliform, *E. coli* (if sample is total coliform positive), and chlorine residual.

      vi. Provide the EPA with chlorine residual results as measured at the entry point to the System and in the System's distribution for 10 calendar days preceding and following the event.

   b. In the event of CFE turbidity measurements exceeding 2.0 NTU, Respondent shall implement the following:

      i. Comply with all requirements of NPDWRs, including 40 C.F.R. §§ 141.170 – 141.175.

      ii. Immediately issue an appropriate BWN, provide notice and consult with MSDH within 24 hours, and provide notice to the EPA within 24 hours.

      iii. Respondent shall issue a Tier 1 public notice as required by 40 C.F.R. § 141.202.

      iv. Within 24 hours after the CFE turbidity is less than 0.3 NTU, the System shall collect consecutive daily (one sample per calendar day) special purpose samples (bacteriological and microbial) (defined in 40 C.F.R. § 141.21(a)(6)) from the entry point to the distribution system of the treatment plant that had the turbidity

exceedance as well as any other distribution sampling location deemed necessary, as identified by MSDH. Respondent shall ensure that each sample is analyzed for total coliform, *E. coli* (if sample is total coliform positive), and chlorine residual.

   v. Provide the EPA with chlorine residual results as measured at the entry point to the System and in the System's distribution for 10 calendar days preceding and following the event.

   vi. Respondent shall provide the EPA and MSDH a self-assessment evaluation of CFE and IFE to include: (1) assessment of filter performance: (2) development of a filter profile; (3) identification and prioritization of factors limiting filter performance; and (4) corrective action plan to address the issue.

38. <u>Low Pressure/Loss of Pressure Events</u>. In the future event that Respondent experiences breaks in water lines or other low pressure or loss of pressure events likely to cause contamination in the System's distribution system, Respondent will take the following actions:

   a. Respondent shall consult with MSDH within 24 hours to determine if a BWN is required and provide notification to the EPA within 24 hours.

   b. Respondent shall issue a Tier 1 public notice as required by 40 C.F.R. § 141.202.

   c. Respondent shall immediately repair the line break or cause of the low pressure/loss of pressure. When satisfied that system pressure will be maintained and there is adequate chlorine residual, Respondent shall begin sampling from the affected area as described below. MSDH typically recommends a free chlorine residual of 0.5 mg/l at the ends of your distribution system.

   d. Within 24 hours after making repair(s) to the water line(s) as required above, Respondent shall begin collecting special purpose samples (bacteriological and microbial) (defined in 40 C.F.R. § 141.21(a)(6)) from the System's distribution system. The chart, in Attachment I to this Order, lists the number of samples required based on the number of customers affected. If the entire system is placed on BWN, samples should be collected from sites representing the entire water system. Respondent shall ensure that each sample is analyzed for total coliform, *E.coli* (if the sample is total coliform positive), and chlorine residual. Respondent shall continue sampling until results from two consecutive rounds are total coliform negative.

39. <u>Alternative Water Source Plan Development and Implementation</u>.

   a. Within 14 days of the Effective Date of this Order, Respondent shall develop, and submit to the EPA for review and approval, an Alternative Water Source Plan ("AWSP"). In the AWSP, Respondent shall detail how and where it will provide at least one gallon of potable water per day, per person to every person served by the System. This allotment of alternative water must be made available at no cost to every person served by the System, as needed for drinking, cooking, maintaining oral hygiene, and dish washing. The AWSP will also outline how Respondent will inform every person served by the System of when and how an alternative water source is made available. As part of its AWSP, Respondent may opt to provide an alternate water supply that is: (1) provided by a licensed water distributor; (2) purchased bottle water; or (3) provided by another public water system that meets the requirements of

8

the NPDWRs. *Note:* If the AWSP trigger is localized to a specific portion of the distribution system and the entire system is not impacted, Respondent may opt to only serve alternative water to the portion of the population impacted. In order to consider this approach, the AWSP must include a detailed map of the System.

b. The alternative source of water provided shall meet all applicable SDWA requirements at 40 C.F.R. §141. If bottled water will be used by Respondent as an alternative water in accordance with this Order, Respondent must ensure that the bottled water is certified by the International Bottled Water Association or National Sanitation Foundation International.

c. <u>AWSP Implementation Triggers</u>.

    i. If, based upon Respondent's Revised Total Coliform Rule ("RTCR") sampling data collected in accordance with 40 C.F.R. § 141.857 and as outlined in Paragraph 41 below, the PWS exceeds 5.0% total coliform-positive samples in any monthly period during the term of this Order, Respondent shall comply with the "Level 1" assessment requirements of the RTCR at 40 C.F.R. § 141.859(b). In addition, Respondent shall begin implementation of the AWSP within 24 hours of receiving such sampling results. Respondent shall continue implementing the AWSP until the EPA provides written notification to Respondent that AWSP implementation is no longer required; or

    ii. Within 24 hours of Respondent's collection of daily special purpose samples required under Paragraphs 37 and 38 above, Respondent shall begin implementation of the AWSP. Respondent shall continue implementing the AWSP until all daily special purpose sample results are total coliform negative. *Note:* The AWSP may consider, in certain situations, that only a portion of the population is impacted by the triggering event and therefore alternative water only needs to be provided to those impacted. See requirements under Paragraph 39(a) above.

### Notifications and Reporting

40. Within 72 hours of the Effective Date of this Order, Respondent shall provide the February 2020 MORs, including the IFE data for all conventional filters at both the O.B. Curtis and J.H. Fewell WTPs during this timeframe.

41. <u>Sample Siting Plan</u>.

a. Within one week of the Effective Date of this Order, Respondent shall review its current Sample Siting Plan developed pursuant to 40 C.F.R. § 141.853, to ensure consistency with the RTCR, at 40 C.F.R. Part 141, subpart Y, and simultaneously provide a copy of the current Sample Siting Plan to the EPA for the EPA's concurrent review.

b. If the current Sample Siting Plan does not include a minimum of 120 sampling locations per month as required under 40 C.F.R. § 141.857(b), Respondent shall update the Sample Siting Plan to achieve the required minimum monitoring frequency for the monthly monitoring period after the Effective Date of this Order.

c. Within 10 business days of the Effective Date of this Order, Respondent shall provide to the EPA, RTCR sampling data for the months of January 2020 and February 2020. If the Respondent has not yet conducted the March 2020 sampling, this sampling shall be conducted within one week of the Effective Date of this Order and the results submitted within 10 days of receipt of the sampling analysis. If the March 2020 sampling has been completed prior to the Effective Date of this Order, Respondent shall submit these results along with the January 2020 and February 2020 results. All RTCR sampling data shall include the chlorine residual data for the RTCR locations.

d. The Respondent shall continue to submit the RTCR sampling data to the EPA until directed otherwise. This data shall include all chlorine residual data for all RTCR sampling locations.

42. Respondent must notify the EPA within 24 hours after learning of a violation of this Order or any NPDWRs, or of a situation with the potential to have serious adverse effects on human health as a result of short-term exposure to contaminants.

43. Establishing Regular Contact with the EPA.

   a. Immediately upon the Effective Date of this Order and until further notice by the EPA, Respondent shall submit MOR information weekly as follows:

      i. Reports must run from Sunday to Saturday each week;

      ii. Weekly reports must be submitted to the EPA and MSDH by Tuesday of the following week (e.g., for the monitoring timeframe of Sunday, March 29 through Saturday, April 4, the report must be submitted by Tuesday, April 7).

      iii. IFE data must be submitted with each weekly MOR until further notice.

      iv. If at any time, the Respondent is notified, by the EPA or MSDH that a revision to the MOR is required, the Respondent shall implement the revision on the following report required unless the EPA or MSDH provides a specific alternate timeline for implementation.

   b. Within five business days of the Effective Date of this Order, Respondent shall begin submitting weekly updates to the EPA on Respondent's progress complying with this Order. Respondent shall submit subsequent weekly reports on Tuesday of each subsequent week. Each weekly update shall identify and describe all actions taken in the previous week to meet the requirements of this Order.

   c. Within seven business days of the Effective Date of this Order, Respondent shall contact the EPA to set up a mutually agreeable meeting schedule. The purpose of the meetings to be scheduled pursuant to this paragraph are to accomplish the following goals:

      i. Provide an opportunity for the Respondent and the EPA to clarify requirements and timelines,

      ii. Provide an opportunity for Respondent to report to the EPA any issues, concerns, or problems it faces in complying with the terms of this Order, and

10

      iii.    Provide an opportunity for Respondent and the EPA to maintain an open channel of communication wherein new information can be shared.

   d. Respondent shall prepare an outline of all the requirements in this Order, how Respondent plans to meet all the requirements of this Order, and submit to the EPA in writing at least 48 hours in advance of the first agreed-upon meeting required under Paragraph 43(c) above. If this falls on a weekend, Respondent shall provide the outline on the last workday before the meeting.

44. Respondent shall send all reports, notifications, documentation and submittals required by this Order in writing or via e-mail to:

> U.S. EPA, Region 4
> Enforcement and Compliance Assurance Division
> Attn: Amanda Driskell
> U.S. Environmental Protection Agency
> 61 Forsyth Street
> Atlanta, GA 30303
> Email: driskell.amanda@epa.gov

45. All reports, notifications, documentation, and submissions required by this Order must be signed by a duly authorized representative of Respondent and must include the following statement:

> "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## IV.     **PARTIES BOUND**

46. The provisions of this Order shall apply to and be binding upon Respondent, its officers, employees, agents, successors, and assigns.

## V.     **GENERAL PROVISIONS**

47. This Order constitutes final agency action. Under Section 1448(a) of the SDWA, 42 U.S.C. § 300j-7(a), Respondent may seek federal judicial review.

48. The EPA may modify this Order to ensure protection of human health. The EPA will communicate any modification(s) to Respondent in writing and the modification(s) shall be incorporated into this Order.

49. Compliance with the terms and conditions of this Order shall not in any way be construed to relieve Respondent from its obligations to comply with all provisions of federal, state, or local law, nor shall it be construed to be a determination of any issue related to any federal, state or local permit.

Compliance with this Order shall not be a defense to any actions subsequently commenced for any violation of federal laws and regulations administered by the EPA, and it is the responsibility of Respondent to comply with such laws and regulations.

50. Pursuant to SDWA Section 1431(b), 42 U.S.C. § 300i(b), in the event Respondent violates, fails or refuses to comply with any of the terms or provisions of this Order, the EPA may commence a civil action in U.S. District Court to require compliance with this Order and to assess a civil penalty of up to $24,386 per day of violation under the SDWA, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, amended by the Debt Collection Improvement Act of 1996, and the subsequent Civil Monetary Penalty Inflation Adjustment Rule, 40 C.F.R. § 19.

51. The EPA reserves all rights against Respondent and all other persons to take any further civil, criminal, or administrative enforcement action pursuant to any available legal authority, and to exercise its information gathering and inspection authorities. Nothing in this Order shall preclude the EPA from taking any additional enforcement actions, including modification of this Order or issuance of additional Orders, and/or additional actions as the EPA may deem necessary, and/or from requiring Respondent in the future to perform additional activities pursuant to the SDWA or any other applicable law.

## VI.     **EFFECTIVE DATE**

52. Under SDWA Section 1431, 42 U.S.C. § 300i, this Order shall be effective immediately upon Respondent's receipt of this Order. If modifications are made by the EPA to this Order, such modifications will be effective on the date received by Respondent. This Order shall remain in effect until the provisions identified in the Order have been met in accordance with the EPA's written approval.

## VII.     **TERMINATION**

53. The provisions of this Order shall be deemed satisfied upon Respondent's receipt of written notice from the EPA that Respondent has demonstrated, to the satisfaction of the EPA, that the terms of this Order have been satisfactorily completed.

**FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

Carol L. Kemker, Director                    Date

Enforcement and Compliance Assurance Division
Region 4

13

# ATTACHMENT I

## Sampling Requirements

| # of Connections Affected | # of Samples Required | # of Connections Affected | # of Samples Required |
|---|---|---|---|
| 1 – 100 | 2 | 4,301 – 5,700 | 18 |
| 101 – 300 | 3 | 5,701 – 8,300 | 20 |
| 301 – 500 | 4 | 8,301 – 11,000 | 30 |
| 501 – 700 | 5 | 11,001 – 13,000 | 40 |
| 701 – 900 | 6 | 13,001 – 16,000 | 50 |
| 901 – 1,100 | 7 | 16,001 – 19,000 | 60 |
| 1,101 – 1,300 | 8 | 19,001 – 23,000 | 70 |
| 1,301 – 1,600 | 9 | 23,001 – 27,000 | 80 |
| 1,601 – 2,200 | 10 | 27,001 – 32,000 | 90 |
| 2,201 – 2,500 | 11 | 32,001 – 43,000 | 100 |
| 2,501 – 2,800 | 12 | 43,001 – 73,000 | 120 |
| 2,801 – 4,300 | 15 | 73,001 – 107,000 | 150 |

Note: Equivalent connections (and population served) will be considered when determining the number of samples which must be collected for a system with a large ratio of population to connections.

14



🇺🇸 An official website of the United States government

**EPA** United States
Environmental Protection
Agency

MENU

Search EPA.gov

**News Releases:  Region 04**
<https://epa.gov/newsreleases
/search/press_office/region-
04-226167>

CONTACT US <https://epa.gov/newsreleases/forms/contact-us>

# EPA and the City of Jackson, Mississippi Reach Agreement to Improve Drinking Water and Protect Public Health

July 1, 2021

**Contact Information**
Melba Table (region4press@epa.gov)
404.844.7011 (Direct), 404 562-8400 (Main)

**JACKSON, Miss. (July 1, 2021) –** Today, the U.S. Environmental Protection Agency (EPA) and the City of Jackson, Miss. (City) entered into a Safe Drinking Water Act (SDWA) Administrative Order on Consent (AOC <https://epa.gov/sites/production/files/2021-07/documents /city_of_jackson_aoc_executed_by_city.pdf>) to address long-term challenges and make needed improvements to the drinking water system. The agreement memorializes enforceable steps and specific timeframes for the City to come into compliance with national and state regulations to reliably deliver safe drinking water and ensure the public's health is protected.

"EPA and the City's partnership is vital to ensure all Jackson residents have access to clean and safe drinking water," **said John Blevins, EPA Acting Region 4**

**Administrator.** "Today's agreement reflects EPA's commitment to working with local communities and to protecting those most vulnerable to pollution. We appreciate the City's dedication to come into compliance with laws that are critical to protecting public health."

The AOC builds on steps the City has taken to address concerns identified in EPA's February 2020 inspection <https://epa.gov/sites/production/files/2021-06/documents/neic_civil_investigation_report_city_of_jackson_public_water_system.pdf>, and the subsequent March 2020 Emergency Order <https://epa.gov/sites/production/files/2021-06/documents/march_27_2020_emergency_order_jackson_final_signed.pdf> and Notices of Noncompliance dated May 2020 <https://epa.gov/sites/production/files/2021-06/documents/may_11_2020_notice_of_noncompliance_jackson.pdf> and April 2021 <https://epa.gov/sites/production/files/2021-06/documents/april_26_2021_notice_of_noncompliance_jackson.pdf>. The EPA identified compliance deficiencies, including operational and maintenance concerns. The March 2020 Emergency Order required the City to address system deficiencies of immediate concern. The AOC announced today establishes enforceable timeframes for the City to develop and implement plans to ensure the City comes into compliance with safe drinking water regulations.

The City of Jackson's system has over 71,000 water connections, serving the largest city in Mississippi with a population of almost 173,514. EPA inspected the system in February 2020 and issued the March 2020 Emergency Order to address some of the more prevalent, persistent and concerning violations that were noted during the inspection. The March 2020 Emergency Order requires the City to: (1) develop and implement a plan to address all monitoring equipment and appurtenant treatment equipment repairs and/or replacements; (2) address dosing processes for disinfection and pH control; (3) develop and implement a plan to provide alternative drinking water when specific triggers are met; and (4) take additional total coliform bacteria samples under prescribed conditions.

In February 2021, Jackson experienced a system-wide failure due to extreme weather conditions that caused pipes to freeze and lose pressure. This resulted in many areas of the system being without water for several weeks. Following the winter storms, EPA provided technical assistance to the City and discussed financial assistance to support impacted communities.

EPA has identified the protection of drinking water as priority as part of the National

Compliance Initiative (NCI). EPA's NCI on Reducing Noncompliance with Drinking Water Standards at Community Water Systems supports EPA's goal of a 25 percent reduction in the number of community water systems that are out of compliance with health-based standards by the end of fiscal year 2022.

For more information on the NCI: click here <https://epa.gov/enforcement/national-compliance-initiatives>.

For more information on Jackson's drinking water compliance: click here. <https://epa.gov/ms/jackson-ms-drinking-water>

Contact Us <https://epa.gov/newsreleases/forms/contact-us> to ask a question, provide feedback, or report a problem.

LAST UPDATED ON JULY 8, 2021



# Discover

- 

## Accessibility
<https://epa.gov/accessibility>

## Budget & Performance
<https://epa.gov/planandbudget>

## Contracting
<https://epa.gov/contracts>

## EPA www Web Snapshot
<https://epa.gov/utilities/wwwepagov-snapshots>

# Connect.

## Data.gov ⧉
<https://www.data.gov/>

## Inspector General
<https://epa.gov/office-inspector-general/about-epas-office-inspector-general>

## Jobs <https://epa.gov/careers>

## Newsroom
<https://epa.gov/newsroom>

## Open Government
<https://epa.gov/data>

# Ask.

## Contact EPA
<https://epa.gov/home/forms/contact-epa>

## EPA Disclaimers
<https://epa.gov/web-policies-and-procedures/epa-disclaimers>

## Hotlines
<https://epa.gov/aboutepa/epa-hotlines>

## FOIA Requests
<https://epa.gov/foia>

11/1/2022, 10:59 AM

EPA and the C... https://www.epa.gov/newsreleases/epa-and-city-jackson-mississippi-

## Grants
<https://epa.gov/grants>

## No FEAR Act Data <https://epa.gov/ocr/whistleblower-protections-epa-and-how-they-relate-non-disclosure-agreements-signed-epa>

## Plain Writing
<https://epa.gov/web-policies-and-procedures/plain-writing>

## Privacy
<https://epa.gov/privacy>

## Privacy and Security Notice
<https://epa.gov/privacy/privacy-and-security-notice>

## Regulations.gov ⤢
<https://www.regulations.gov/>

## Subscribe
<https://epa.gov/newsroom/email-subscriptions-epa-news-releases>

## USA.gov ⤢
<https://www.usa.gov/>

## White House ⤢
<https://www.whitehouse.gov/>

## Frequent Questions
<https://epa.gov/home/frequent-questions-specific-epa-programstopics>

# Follow.




**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 4**

| | |
|---|---|
| **IN THE MATTER OF:** ) | Docket No. SDWA-04-2020-2301 |
| ) | |
| City of Jackson, Mississippi, ) | **ADMINISTRATIVE COMPLIANCE** |
| ) | **ORDER ON CONSENT** |
| Respondent. ) | |
| ) | Proceeding pursuant to Section 1414(g) of |
| Public Water System, PWS ID. No. MS0250008. ) | the Safe Drinking Water Act, 42 U.S.C. |
| ) | § 300g-3(g). |

## I.    STATUTORY AUTHORITY

1.     This Administrative Compliance Order on Consent ("AOC") is issued to the City of Jackson, Mississippi ("Respondent" or "City") pursuant to the authority vested in the Administrator of the U.S. Environmental Protection Agency ("EPA") by Section 1414(g) of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300g-3(g). The Administrator has delegated this authority to the Regional Administrator of EPA Region 4, who has, in turn, delegated this authority to the Director of the Enforcement Compliance and Assurance Division.

## II.    EPA's FINDINGS OF FACT AND CONCLUSIONS OF LAW

2.     Respondent is a municipality created under the laws of the State of Mississippi and is therefore a "person" as that term is defined in the SDWA. 42 U.S.C. § 300f(12); 40 C.F.R. § 141.2.

3.     Respondent owns and/or operates a public water system located in the City of Jackson, Mississippi, PWS ID No. MS0250008 ("System"). The System provides water for human consumption to a population of approximately 173,514.[1]

4.     The System is a "public water system" within the meaning of Section 1401(4) of the SDWA, 42 U.S.C. § 300f(4); 40 C.F.R. § 141.2.

5.     The System regularly serves at least 25 year-round residents and is therefore a "community water system" ("CWS") within the meaning of Section 1401(15) of the SDWA, 42 U.S.C. § 300f(15), and 40 C.F.R. § 141.2.

---

[1] Until approximately October 2014, there were two separately identified public drinking water systems owned by the City. One was supplied entirely by groundwater and identified under the PWS ID No. MS0250012; the other was supplied by surface water and identified under the PWS ID No. MS0250008. In or around October 2014, the City requested the removal of the PWS ID No. MS0250012, as the City intended to stop utilizing the groundwater sources as primary sources of drinking water. At the time of the EPA's Civil Investigation ("Investigation"), the EPA identified that the groundwater sources were still being utilized as a primary source for a portion of the distribution and requested that the PWS ID No. MS0250012 be reinstated for the groundwater portion of the system. In or around July 2020, MSDH reinstated the PWS ID No. MS0250012. This Order addresses only those violations alleged to have occurred in the surface water system. PWS ID No. MS0250008.

6.      Respondent's ownership and/or operation of the System makes it a "supplier of water" within the meaning of Section 1401(5) of the SDWA, 42 U.S.C. § 300f(5), and 40 C.F.R. § 141.2, and subject to the requirements of Part B of the SDWA, 42 U.S.C. § 300g, the National Primary Drinking Water Regulations ("NPDWRs") at 40 C.F.R. Part 141, and the Mississippi Primary Drinking Water Regulations ("MPDWRs"), promulgated pursuant to the Mississippi Safe Drinking Water Act of 1997 ("MSDWA"), Miss. Code Ann. § 41-26-1 et. seq.

7.      Pursuant to SDWA Section 1413, 42 U.S.C. § 300g-2, the Mississippi State Department of Health ("MSDH" or the "State") has primary responsibility for the implementation and enforcement of the public water supply program in Mississippi.

8.      Requirements of, or permits issued to Respondent under, the MSDWA and its implementing regulations are "applicable requirements" pursuant to Section 1414(i)(4) of the SDWA, 42 U.S.C. § 300g-3(i)(4), and may therefore be enforced by the EPA under Section 1414(g)(1) of the SDWA, 42 U.S.C. § 300g-3(g)(1).

9.      The System consists of two water treatment plants, known as the O.B. Curtis Water Treatment Plant ("O.B. Curtis WTP")[2] and the J.H. Fewell Water Treatment Plant ("J.H. Fewell WTP"),[3] and appurtenant collection, treatment, storage, and distribution facilities.

10.     The surface water sources that contribute to the System are the Ross Barnett Reservoir, which serves O. B. Curtis WTP, and the Pearl River, which serves the J. H. Fewell WTP.

11.     The O.B. Curtis and J.H. Fewell WTPs employ conventional filtration with ultraviolet ("UV") systems to inactivate pathogens. The O.B. Curtis WTP also employs a membrane filtration system for a portion of the water that goes through this WTP. Finished water at the WTPs is disinfected using chloramines.

12.     UV disinfection treatment is installed on each conventional individual filter effluent ("IFE") flow at the O.B. Curtis WTP and on each high service pump at the J.H. Fewell WTP to treat for viruses, including *Cryptosporidium* and *Giardia*. Pursuant to 40 C.F.R. § 141.720(d)(3)(ii), systems must treat at least 95% of the water delivered to the public during each month by UV reactors operating within validated conditions for the required UV dose.

13.     The System is required to provide filtration pursuant to 40 C.F.R. §§ 141.73, 141.173, 141.719(b), and 141.720(d); and disinfection pursuant to 40 C.F.R. §§ 141.72(b) and 141.172.

14.     The term "contaminant" means any physical, chemical, biological, or radiological substance or matter in water." 42 U.S.C. § 300f(6).

15.     Turbidity is a measure of the cloudiness of water. It is used to indicate water quality and filtration effectiveness (such as whether disease-causing organisms are present). Higher turbidity levels are often associated with the potential for higher levels of disease-causing microorganisms.

[2] To the EPA's knowledge and belief, the O.B. Curtis WTP was initially constructed in or around 1992.
[3] To the EPA's knowledge and belief, the J.H. Fewell WTP was initially constructed in or around 1914.

16.     Lead, *E. coli, Cryptosporidium, Giardia*, haloacetic acids (HAA5), and total trihalomethanes (TTHM) are contaminants under the meaning of 42 U.S.C. § 300f(6) and are or may be present in the System.

17.     On November 22, 2019, the EPA issued a Request for Information to Respondent, pursuant to Section 1445 of the SDWA, 42 U.S.C. § 300j-4, and 40 C.F.R. § 141.31, seeking information to determine Respondent's compliance with federal drinking water regulations.

18.     On December 23, 2019, Respondent provided its response to the EPA's Request for Information.

19.     On January 15 and 16, 2020, consistent with the requirements of Section 1445(b)(1), 42 U.S.C. § 300j-4(b)(1), the EPA notified MSDH and Respondent, respectively, of its intent to inspect the System.

20.     On February 3 to 7, 2020, representatives of the EPA conducted an Investigation of the System, pursuant to its authority under Section 1445(b)(1) of the SDWA, 42 U.S.C. § 300j-4(b)(1).

21.     On March 30, 2020, the EPA transmitted a copy of the Civil Investigation Report to the Respondent, which identified a number of concerns related to bacterial contamination and proper disinfection.

22.     Effective April 2, 2020, the EPA issued Respondent an Emergency Administrative Order, Docket No. SDWA-04-2020-2300 ("Emergency Order"), pursuant to Section 1431 of the SDWA, 42 U.S.C. § 300i(a).

23.     In the Emergency Order, the EPA found that Respondent had NPDWR violations and that conditions existed within the System that presented an imminent and substantial endangerment to the health of persons served by the System. The NPDWR violations alleged in the Emergency Order included, but were not limited to:

    a.     At the time of the Investigation, Respondent could not perform membrane integrity testing at O.B. Curtis WTP due to wear and breakage of the system components and compressor, in contravention of 40 C.F.R. § 141.719; and

    b.     NDPWRs require a system's combined filtered water at each plant be less than or equal to 0.3 NTU in at least 95%of the measurements taken each month, and the turbidity level of a system's combined filtered water at each plant must at no time exceed 1 NTU. Turbidity exceedances were reported at both the O.B. Curtis and J.H. Fewell WTPs in the January 2020 monthly operating report ("MOR"). Finished water turbidity reached 1.35 NTU at the O.B. Curtis WTP and 3.00 NTU at the J.H. Fewell WTP. Additionally, at the O.B. Curtis WTP, 93.5% of turbidity samples were equal to or less than the turbidity limit of 0.3 NTU. At the time of the Investigation, the EPA's inspectors observed that the continuous turbidity monitoring equipment at the O.B. Curtis WTP had read inaccurately for approximately three years due to a lack of calibration and maintenance, and that turbidity samples were taken during that time period at a frequency of once per shift, for a total of three times per day. Given that the turbidity monitoring equipment was not operational, the system, to maintain compliance with NPDWRs, should have

conducted grab sampling every four hours in lieu of continuous monitoring, but for no more than five working days following the nonoperation of the equipment.

24.     In order to ensure that the System has appropriate treatment equipment and appropriate information to make treatment decisions, and that the water quality is properly measured for compliance with NPDWRs, the Emergency Order required Respondent to submit a Comprehensive Equipment Repair Plan ("CERP") for the EPA's review and approval, including a schedule of implementation, to repair and/or replace monitoring equipment and repair, replace, and/or perform maintenance on the appurtenant treatment equipment. The Emergency Order also required the Respondent to fix the dosing process for disinfection and pH control; to increase reporting and notice requirements for exceedances of turbidity requirements; provide boil water notices to the public as required under 40 C.F.R. Part 141, Subpart Q, and provide notice thereof to the EPA; develop and implement, after specific triggering events, an Alternative Water Source Plan; provide Revised Total Coliform Rule ("RTCR")  sampling data to the EPA; provide the information to be summarized in its monthly operating reports on a weekly basis to the EPA; and provide weekly  updates on compliance with the Emergency Order.

25.     Although Respondent developed a CERP, the EPA has not approved the CERP as of the Effective Date of this AOC because the parties have not reached mutual agreement on the schedules of implementation for the items included therein. Respondent has reported that some work, including repairs and/or replacement, has been completed or is ongoing. Respondent has not yet fully completed the tasks identified therein, including the repair, replacement and/or maintenance of much of the equipment identified as needing such work.

26.     On May 11, 2020 and April 26, 2021, the EPA issued Notices of Noncompliance to Respondent detailing additional violations beyond those previously identified in the Emergency Order. The allegations contained in these Notices of Noncompliance are detailed more fully below, where such alleged noncompliance has not been fully resolved as of the Effective Date of this AOC and/or where the EPA believes additional compliance measures are required at this time to address such noncompliance.

27.     Miss. Admin. Code § 15-20-72.2.2.1(5) requires that a certified Class A operator shall be onsite whenever the treatment plant for a Class A public water system treating surface water is in operation. The System is a Class A public water system because it has surface water treatment, groundwater under the direct influence of surface water, lime softening, or coagulation and filtration for the removal of constituents other than iron or manganese. See Miss. Admin. Code § 15-20-72.2.2.1(5).

A review of the City's operating logbooks, provided to the EPA by MSDH on March 11, 2020, and records of discussions between the City, the EPA and MSDH indicate that the System is not always fully covered by a Class A certified operator. Therefore, the Cityis in noncompliance with the MPDWR, Miss. Admin. Code § 15-20-72.2.2.1(5), for failure to maintain certified operators to operate the facilities.

28.     40 C.F.R. § 141.719(b)(3) and Miss. Admin. Code § 15-20-72.1.7.1 require that a PWS must conduct direct integrity testing of membrane units at a frequency of not less than once per day that the membrane unit is in operation to demonstrate removal efficiencies.

During the February 2020 Investigation and upon review of the City's subsequent MORs, the EPA found that the City was unable to perform direct integrity testing of the membrane units at O.B. Curtis WTP on a number of occasions due to wear and breakage of components and/or malfunctioning equipment. Therefore, the City failed to comply with 40 C.F.R. § 141.719(b)(3) and Miss. Admin. Code § 15-20-72.1.7.1.

29.     40 C.F.R. § 141.719(b)(4) and Miss. Admin. Code § 15-20-72.1.7.1 require that a PWS conduct continuous indirect integrity monitoring on each membrane unit unless the system implements continuous direct integrity testing of membrane units in accordance with the criteria in 40 C.F.R. § 141.719 (b)(3)(i) through (v). If indirect integrity monitoring includes turbidity and if the filtrate turbidity readings are above 0.15 nephelometric units ("NTU"), the PWS must immediately perform direct integrity testing on the associated membrane unit in accordance with 40 C.F.R. § 141.719(b)(3). Pursuant to 40 C.F.R. § 141.719(b)(3), the direct integrity testing log removal value ("LRV") for the membrane units at the O.B. Curtis WTP must be greater than or equal to the control limit[4] of 4, or else it is considered to have failed the direct integrity testing and the System must remove the membrane unit from service, conduct a direct integrity test to verify any repairs, and may return the membrane unit to service only if the direct integrity test is within the control limit. See 40 C.F.R. § 141.719(b)(3)(v).

As indicated by a review of the City's MORs, on multiple days between March 2020 and April 2021, the indirect integrity monitoring of the membrane units at the O.B. Curtis WTP showed turbidity readings greater than 0.15 NTU. Subsequent direct integrity testing, when able to be performed, showed failures of several of the membrane units due to LRVs lower than the control limit of 4. As stated in the MORs for these periods, the City did not remove these membrane units from service, as required by 40 C.F.R. § 141.719(b)(3)(v). Therefore, the City failed to comply with 40 C.F.R. §§ 141.719(b)(3)(v) and 141.719(b)(4) and Miss. Admin. Code § 15-20-72.1.7.1.

30.     Pursuant to 40 C.F.R. § 141.132(b)(2) and Miss. Admin. Code § 15-20-72.1.3.6, a PWS using chlorine dioxide for disinfection or oxidation must conduct daily monitoring for chlorite.

On February 5, 2020, the EPA observed the System treating with chlorine dioxide at the J.H. Fewell WTP. However, the February 2020 MOR stated that the System did not use chlorine dioxide at the J.H. Fewell WTP on February 5, 2020, nor did the report show that the System conducted the required monitoring on that date for chlorite.[5] Therefore, the City did not conduct daily monitoring and failed to comply with 40 C.F.R. §§ 141.132(b)(2) and Miss. Admin. Code § 15-20-72.1.3.6.

31.     Pursuant to 40 C.F.R. § 141.80(c) and Miss. Admin. Code § 15-20-72.1.3.2, the lead action level is exceeded if the concentration of lead in more than 10% of tap water samples collected during any monitoring period conducted in accordance with 40 C.F.R. § 141.86 is greater than 0.015 mg/L, (i.e., if the "90th percentile" lead level is greater than 0.015 milligrams per liter ("mg/L") (or 15 parts per billion ("ppb"))). Under 40 C.F.R. § 141.80(e), any PWS exceeding the lead action level shall implement all applicable source water treatment requirements specified by the State under

---

[4] Under 40 C.F.R. § 141.719(b)(3)(i), a System must establish a control limit within the sensitivity limits of the direct integrity test that is indicative of an integral membrane unit capable of meeting the removal credit awarded by the State. This control limit is known as the minimum log removal value and is set by the primary enforcement agency for membrane treatment systems (in this matter, MSDH).

[5] According to the State, Respondent currently has the ability to use chlorine dioxide (ClO₂) for manganese removal at both the J.H. Fewell WTP and O.B. Curtis WTP, but not for disinfection.

40 C.F.R. § 141.83. Pursuant to 40 C.F.R. § 141.83, any PWS exceeding the lead action level must complete source water monitoring and make treatment recommendations to the State within 180 days after the end of the monitoring period during which the lead action level was exceeded. The State then makes a determination regarding source water treatment, and, if necessary, the State may require the PWS to install and operate such treatment.

The System exceeded the lead action level of 0.015 mg/L for the following monitoring periods:January – June 2015; January – June 2016; and July – December 2016. On February 12, 2016, MSDH issued a compliance plan to the City to address the lead action level exceedances ("ALEs"). As a resultof the June 2015 lead ALE, the City conducted an optimal corrosion control treatment ("OCCT") studybetween October 2016 and April 2017 and provided the recommended treatment to MSDH on June 13, 2017. MSDH concurred with the recommended treatment and provided a deadline of May 31, 2019 to complete source water treatment installation. MSDH later extended the completion date to December 2019; yet, the City failed to install OCCT at the J.H. Fewell WTP in accordance with the State's deadline. Therefore, the City failed to comply with 40 C.F.R. §§ 141.80(e) and 141.83 and Miss. Admin. Code § 15-20-72.1.3.2, when it failed to install OCCT and provide applicable source water treatment by the December 2019 deadline. The City subsequently conducted an OCCT study amendment in 2021 and presented its results and recommended source water treatment to MSDH in a February 2021 report. MSDH accepted the results and recommended source water treatment plan on June 4, 2021. Given that the City's report recommended a different source water treatment than identified in its initial 2017 OCCT study, and that MSDH established new deadlines for completion of the source water treatment, the OCCT remains unaddressed at J.H. Fewell WTP as of the Effective Date of this AOC.

32.     Pursuant to 40 C.F.R. § 141.82(g) and Miss. Admin. Code § 15-20-72.1.4.3, all systems optimizing corrosion control shall continue to operate and maintain OCCT, including maintaining water quality parameters ("WQPs") at or above minimum values or within ranges designated by the State under 40 C.F.R. § 141.82(f). A water system is out of compliance with the requirements of 40 C.F.R. § 141.82(g) for a six-month period if it has excursions for any State-specified WQP on more than nine days during the period. An excursion occurs whenever the daily value for one or more of the WQPs measured at a sampling location is below the minimum value or outside the range designated by the State. PWSs are required to report any WQP sampling results to the State, pursuant to 40 C.F.R. § 141.90(a). Additionally, PWSs must provide the public notice of treatment technique requirement violations (such as WQP excursions) within 30 days of learning of the violation, pursuant to 40 C.F.R. § 141.203 and Miss. Admin. Code § 15-20-72.1.5.2.

A review of the City's WQP sampling records indicates that the City failed to comply with the lead and copper rule ("LCR") treatment technique requirements for the applicable pH and/or alkalinity WQPs[6] for at least the following monitoring periods:

- January – June 2016 (144 days of excursions of WQPs);
- July – December 2016 (179 days of excursions of WQPs);
- January – June 2017 (183 days of excursions of WQPs);

---

[6] In its June 4, 2021 acceptance of the OCCT study amendment recommendations, MSDH set interim WQPs for the System, effective July 1, 2021, and final WQPs, to be effective January 1, 2023. The WQPs referenced in this paragraph are the WQPs in place as of June 4, 2021.

- July – December 2017 (186 days of excursions of WQPs);
- January – June 2018 (167 days of excursions of WQPs);
- July – December 2018 (183 days of excursions of WQPs);
- January – June 2019 (89 days of excursions of WQPs);
- July – December 2019 (59 days of excursions of WQPs);
- January – June 2020 (181 days of excursions of WQPs);
- July – December 2020 (63 days of excursions of WQPs); and
- January – June 2021 (42 days of excursions, through April 28, 2021).

According to the State, the City failed to report the WQP violations to the State and did not provide public notification for the following monitoring periods: July – December 2016; January – June 2017; and July – December2017. Therefore, the City failed to comply with 40 C.F.R. §§ 141.82(g), 141.90(a), and 141.203 and Miss. Admin. Code §§ 15-20-72.1.4.3 and 72.1.5.2 for failure to maintain optimal WQPs and provide the appropriate public notification.

33.    Pursuant to 40 C.F.R. § 141.723(d) and Miss. Admin. Code § 15-20-72.1.4.1, a PWS must correct any significant deficiencies identified in an EPA- or State-conducted sanitary survey in accordance with EPA- or State-approved schedules.

On November 18, 2016, MSDH conducted a sanitary survey, during which MSDH made a finding of inadequate application of treatment chemicals and techniques. On May 12, 2017, MSDH issued a significant deficiency report citing the System for failure to achieve the target hardness and alkalinity goals [i.e., WQPs], and thereafter issued a compliance plan to the System, requiring improvements to the System be completed by December 29, 2019 to bring the System into compliance.The City failed to complete the required compliance measures at the System by the December 29, 2019 deadline established by the State, and, according to the State, has still not completed these compliance measures as of the Effective Date of this AOC. Therefore, the City is in noncompliance with 40 C.F.R. § 141.723(d)and Miss. Admin. Code § 15-20-72.1.4.1.

34.    Pursuant to 40 C.F.R. §§ 141.80(f) and 141.84(a) and Miss. Admin. Code § 15-20-72.1.3.2, a water system that fails to meet the lead action level in tap samples taken pursuant to 40 C.F.R. § 141.86(d)(2), after installing corrosion control and/or source water treatment (whichever sampling occurs later), shall replace lead service lines in accordance with the requirements of 40 C.F.R. § 141.84 and Miss. Admin. Code § 15-20-72.1.1.6(8).

Pursuant to 40 C.F.R. § 141.84(b), a water system shall replace annually at least seven percent (7%) of the initial number of lead service lines in its distribution system. The initial number of lead service lines is the number of lead lines in place at the time the replacement program begins. The system shall identify the initial number of lead service lines in its distribution system, including an identification of the portion(s) owned by the system, based on a materials evaluation, including the evaluation required under § 141.86(a) and legal authorities (e.g., contracts, local ordinances) regarding the portion owned by the system. The first year of lead service line replacement shall begin on the first day following the end of the monitoring period in which the action level was exceeded.

The System exceeded the lead action level of 0.015 mg/L for the following monitoring periods: January – June 2015; January – June 2016; and July – December 2016. Therefore, the City

was required to commence its lead service line replacement program in June 2015. Despite exceeding the lead action level on several occasions, the City has failed to implement a lead service line replacement program at any time from June 2015 to the present.[7] Therefore, the City is in noncompliance with 40 C.F.R. §§ 141.80(f) and 141.84 and Miss. Admin. Code § 15-20-72.1.1.6(8).

35.      Pursuant to 40 C.F.R. § 141.86(a)(1) and Miss. Admin. Code § 15-20-72.1.3.2. each water system shall complete a materials evaluation of its distribution system in order to identify a pool of targeted sampling sites that meets the requirements of this section, and which is sufficiently large to ensure that the water system can collect the number of lead and copper tap samples required in 40 C.F.R. § 141.86(c). Systems shall use the information on lead, copper and galvanized steel that it is required to collect under 40 C.F.R. § 141.42(d) when conducting a materials evaluation, including identifying the presence of certain construction materials in the distribution system.

As of the Effective Date of this AOC, Respondent has not provided EPA with a complete materials evaluation, utilizing the information specified in 40 C.F.R. § 141.86(a)(2), to identify potential lead service lines, which was required when the LCR was promulgated in 1991.

36.      Pursuant to 40 C.F.R. § 141.64(b)(2) and Miss. Admin. Code 15-20-72.1.2.6, the maximum contaminant level (MCL) for total HAA5 is 60 micrograms per liter ($\mu$g/L). determined as a locational running annual average8 (LRAA) at each monitoring location. Systems must include the highest LRAA for HAA5 and the range of individual sample results for all monitoring locations expressed in the same units as the MCL. If more than one location exceeds the HAA5 MCL. the System must include the LRAA for all locations that exceed the MCL.

As stated in a public notice issued by the City to its consumers on March 31, 2021, as required under 40 C.F.R. § 141.629, the City's testing results from 4th Quarter 2020 and 1st Quarter 2021 show that the System exceeded the HAA5 MCL during those periods. The level of HAA5 averaged at one of the System's locations for 4th Quarter 2020 was 66 $\mu$g/L. and for 1st Quarter 2021 was 65 $\mu$g/L. Therefore, the City is in noncompliance with 40 C.F.R. § 141.64(b)(2) and Miss. Admin. Code 15-20-72.1.2.6.

37.      Based on the findings above, the EPA has determined that the System has numerous SDWA violations. including violations of the NPDWRs.

## III.    AGREEMENT ON CONSENT

Based on the foregoing FINDINGS. and pursuant to the authority of Section 1414(g) of the SDWA, 42 U.S.C. § 300g-3(g), the EPA is issuing this AOC, to place the Respondent on an enforceable schedule to comply with 40 C.F.R. Part 141 and applicable requirements of Miss. Admin. Code. **The EPA hereby ORDERS and Respondent hereby AGREES:**

---

[7] Although the City has prepared a draft Lead Service Line Replacement Program Plan for the EPA's approval, a review of the EPA's files and correspondence with the City indicates that the Plan has not been finalized, nor has it been implemented by the City to date.

[8] The locational running annual average is the average of sample analytical results for samples taken at a particular monitoring location during the previous four calendar quarters. 40 C.F.R. § 141.2

38.     Public Notification. Upon the Effective Date of this AOC, Respondent shall carry out the public notice requirements as required by 40 C.F.R. Part 141, Subpart Q for all future violations of the NPDWRs.

39.     Comprehensive Staffing Plan. Within thirty (30) days of the Effective Date of this AOC, Respondent shall provide the EPA with a Comprehensive Staffing Plan. This Plan shall include the staff's primary duty location (i.e., either O.B. Curtis or J.H. Fewell), role(s), and years of experience in that role along with including date of original certification(s). Additionally, Respondent's Plan shall identify how it will ensure that a Class A operator is onsite at all times, including any backup plans in case staff are unavailable.

40.     Comprehensive Equipment Repair Plan. The Comprehensive Equipment Repair Plan is incorporated herein as Appendix A, and includes items to be addressed by Respondent. Immediately upon receipt of this AOC, Respondent shall begin implementation of the tasks described in Appendix A in accordance with the schedules of implementation identified therein, including interim milestones, maintenance schedules, and completion deadlines. If, at any time after the Effective Date of this AOC Respondent determines that revisions are required, including extension of timeframes in accordance with Paragraph 50 below, Respondent shall submit a request for revision to the EPA at least ten (10) days prior to implementing any changes explaining why revisions are required and shall not begin implementing such revisions until EPA approval is received. If the EPA determines, during the term of this AOC, that revisions are required, the EPA will notify Respondent in writing of such revisions and Respondent shall submit such revisions to the EPA within thirty (30) days of receipt of the EPA's determination and shall implement such revisions in accordance with the EPA's approval and any associated schedule. Once a task is completed, Respondent shall submit documentation demonstrating completion. Documentation may include, but is not limited to, state concurrence, a contractor work completion acknowledgement, or another document approved by EPA.

41.     Asset Management Plan Development and Implementation.

a.      Within sixty (60) days of the Effective Date of this AOC, Respondent shall provide a scope of work for the EPA's review and approval for development of an Asset Management Plan. The Asset Management Plan shall include detailed asset inventories (including, at minimum, age, condition, and criticality), operation and maintenance tasks, and long-range financial planning.  The scope of work shall include interim milestones and timeframes for completion of the Asset Management Plan. Completion of the Asset Management Plan shall be accomplished within nine (9) months of the EPA's approval of the scope of work. The Asset Management Plan must include an evaluation of all Respondent's assets to facilitate effective and efficient system-wide operational sustainability. See the attached, "*Asset Management: A Best Practices Guide*," for guidance on this topic.[9] The Asset Management Plan must be developed by a qualified entity, and Respondent shall include in its scope of work a description of the entity that will develop the Plan. See the attached, "*Building an Asset Management Team*,"[10] for

_____

[9] Additional resources on Asset Management can be found at the following EPA website: https://www.epa.gov/sustainable-water-infrastructure/asset-management-resilience-and-infrastructure-finance. These resources are provided for informational purposes, and do not constitute regulatory requirements.

[10] Available at https://ceppowg.epa.gov/les/2019/03/documents/13046.fit_to_fix_fb_Building_Asset_Team.pdf.

guidance on this topic. Interim milestones and timeframes contained in the approved scope of work will be enforceable pursuant to this AOC.

    b.    The Asset Management Plan shall be submitted to EPA for review and approval in accordance with the timeframes contained in the above referenced scope of work. Upon the EPA's approval of the Asset Management Plan, the Plan shall become an enforceable requirement of this AOC. Respondent shall begin implementation of the Asset Management Plan immediately upon receipt of EPA's approval.

42. <u>LCR Corrosion Control Treatment</u>. Within seven (7) days the Effective Date of this AOC, Respondent shall submit to the EPA, for review and approval, a copy of the OCCT Study Amendment report. A proposed treatment plan shall be submitted as outlined in Appendix A. Item 40. Until EPA concurrence is received on the proposed treatment plan, Respondent shall make any revisions as requested by the EPA. Upon receipt of the EPA's concurrence on the proposed treatment plan, the plan will become an enforceable component of this AOC.

43. <u>LCR Materials Evaluation and Lead Service Line Replacement</u>.

    a.    Within thirty (30) days of the Effective Date of this AOC, Respondent shall submit to the EPA for review and approval a plan for development of an updated materials evaluation which complies with the requirements of 40 C.F.R. § 141.86 and Miss. Admin. Code § 15-20-72, and shall submit the completed materials evaluation within six (6) months of EPA's approval of the materials evaluation plan.

    b.    Within thirty (30) days of the completed materials evaluation, Respondent shall develop and provide to the EPA for review and concurrence an updated Lead Service Line Replacement Program Plan ("LSLRPP") that identifies timeframes for implementing the identified activities and addresses EPA's comments. The LSLRPP shall include how Respondent will address current inventory and future inventory; how Respondent plans to begin replacement as required by 40 C.F.R. § 141.84; and how the information gathered through the evaluation steps will be utilized to update the materials evaluation and sample siting plans, as necessary.

    c.    Within fifteen (15) days of receipt of the EPA's concurrence on the revised LSLRPP, Respondent shall begin implementation of the LSLRPP. This shall continue, at a minimum, until such time as Optimal Corrosion Control has been installed and is determined to be effective based on follow-up sampling.

44. <u>Stage 2 Disinfection Byproducts Requirements.</u>

    a.    Respondent shall conduct monitoring quarterly for TTHM and HAA5 in accordance with 40 C.F.R. § 141.621(a) and its state approved monitoring plan. Samples shall be analyzed in accordance with 40 C.F.R. § 141.621(b). Respondent shall calculate the LRAAs for TTHM and HAA5 using monitoring results collected, in accordance with 40 C.F.R. § 141.620(d). Specifically, Respondent must calculate compliance with the MCL based on the available data from the most recent four

quarters.

b.      Within thirty (30) days of the Effective Date of this AOC, Respondent shall submit documentation that all public notice requirements specified in 40 C.F.R. Part 141, Subpart Q have been completed for the DBP MCL violations noted in this AOC. Thereafter, Respondent must continue to repeat public notice quarterly until the violations have been resolved.

c.      Respondent shall submit to the EPA, in addition to routine reporting to MSDH, the results of the monitoring required pursuant to 40 C.F.R. § 141.621 by the 10th day of the month following the end of the calendar quarter within which the sample was collected in accordance with 40 C.F.R. § 141.629. Respondent shall report quarterly to the EPA until directed otherwise.

45. Reporting and Notification.

a.      Effective immediately upon the Effective Date of this AOC and until further notice by the EPA, or termination of this AOC pursuant to Section IV, whichever comes first, Respondent shall submit MOR information weekly as follows:

i.      Reports must run from Sunday to Saturday each week;

ii.     Weekly reports must be submitted to the EPA by Tuesday of the following week (e.g., for the monitoring timeframe of Sunday, July 5 through Saturday, July 11, the report must be submitted by Tuesday, July 14).

iii.    Respondent shall report the MOR in the formatting requested by the EPA.

b.      Respondent shall continue to submit the WQP sampling data to the EPA for a period of twelve (12) months following the Effective Date of this AOC, which may be extended by the EPA if data indicates noncompliance or if submission of such data is not timely or complete at any time during this twelve (12)-month period. The data shall be reported as follows:

i.      WQP results for the entry points to the distribution system sampling shall be included with the weekly MOR submittals.

ii.     WQP results for the tap sampling shall be submitted within fifteen (15) days of the end of each month (e.g., for the monitoring timeframe of July 1 through July 31, the results must be submitted by August 15, 2021).

c.      Effective immediately upon the Effective Date of this AOC and until further notice by the EPA or Termination of this AOC pursuant to Section IV, whichever comes first, if and when Respondent uses chlorine dioxide for disinfection or oxidation at either J.H. Fewell WTP or O.B. Curtis WTP, Respondent shall conduct daily monitoring for chlorite on each such day. Respondent shall include chlorite

monitoring data on a weekly basis with its MOR information, as required under Paragraph 45(a) above.

d.      Effective immediately upon the Effective Date of this AOC and until further notice by the EPA, or termination of this AOC pursuant to Section IV, whichever comes first, Respondent shall submit weekly updates to the EPA as follows:

   i.      Weekly updates shall include the Respondent's progress in complying with this AOC and identify any failures to comply with the AOC as well as any violations that occurred during the previous week.

   ii.      Reports must run from Sunday to Saturday each week;

   iii.      Weekly updates shall be submitted with the weekly MORs to the EPA by Tuesday of the following week (e.g., for the monitoring timeframe of July 1 through July 31, the results must be submitted by August 3, 2021).

   iv.      Weekly updates shall follow the format provided by the EPA and be submitted electronically.

e.      Respondent shall send all reports, notifications, documentation and submittals required by this AOC in writing via e-mail to:

>      U.S. EPA, Region 4
>      Enforcement and Compliance Assurance Division
>      Attn: Amanda Driskell
>      Email: driskell.amanda@epa.gov

>      AND

>      U.S. EPA, Region 4
>      Enforcement and Compliance Assurance Division
>      Attn: Bryan Myers
>      Email: myers.bryan@epa.gov

f.      All reports, notifications, documentation, and submissions required by this AOC must be signed by a duly authorized representative of the Respondent and must include the following statement:

>      "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the

12

possibility of fine and imprisonment for knowing violations."

## IV.    FINAL REPORT AND TERMINATION OF AOC

46. Within thirty (30) calendar days after Respondent has fully completed and implemented the actions required by Section III (Agreement on Consent) of this AOC, including work outlined in the CERP, Respondent shall submit for the EPA's review and approval a final report (Final Report) that includes: (a) a description of all of the actions which have been taken toward achieving compliance with this AOC; (b) an assessment of the effectiveness of such actions; and (c) an analysis of whether additional actions beyond the scope of this AOC are necessary to further comply with the SDWA and this AOC.

47. If the EPA determines, after review of the Final Report, that all the requirements of this AOC have been completed and implemented in accordance with this AOC and no further actions are necessary to comply with the SDWA, the EPA will provide notice to Respondent and this AOC shall be deemed terminated.

48. If the EPA determines, after review of the Final Report, that, despite all the requirements of this AOC having been completed and implemented in accordance with this AOC, further actions are necessary to comply with the SDWA, the NPDWRs, and the MPDWRs, the Parties agree that this AOC may be amended to reflect such necessary additional actions. Such amendment must be agreed to in writing to become effective under this AOC.

49. If the EPA determines that any requirement has not been completed and implemented in accordance with this AOC, the EPA will notify the Respondent, provide a list of deficiencies, and may require Respondent to modify its actions as appropriate in order to correct such deficiencies. If so required, Respondent shall implement the modified and approved requirement(s) and submit a modified Final Report in accordance with the EPA notice. Failure by Respondent to implement any of the approved modified requirement(s) shall be a violation of this AOC.

50. Notwithstanding the provisions above, the EPA may extend any timeframe contained in this AOC (including, but not limited to, Appendix A) upon a showing of good cause as to why such timeframe (interim or final) cannot be achieved. Such extensions of time to the tasks in Appendix A shall be in writing, but may be incorporated into a revision to Appendix A and not necessarily in a revision or amendment to this AOC.

## V.    GENERAL PROVISIONS

51. Nothing in this AOC shall constitute a waiver, suspension, or modification of SDWA, the MSDWA, their respective implementing regulations, or terms and conditions of any permit issued thereunder to Respondent, which remain in full force and effect.

52. Failure to comply with the requirements herein shall constitute a violation of this AOC and the SDWA, and may subject the Respondent to penalties as provided in Section

13

1414(g)(3) of the SDWA, 42 U.S.C. § 300g-3(g)(3), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended, and as codified by the EPA at 40 C.F.R. Part 19.

53. Respondent's compliance with this AOC does not necessarily constitute compliance with the provisions of the SDWA, 42 U.S.C. § 300f et seq.; the MSDWA, Miss. Code Ann. § 41-26-1 et. seq.; or their respective implementing regulations.

54. Any sampling done to comply with the terms of this AOC shall be done in a manner consistent with EPA approved methodologies. The EPA reserves the right to require Respondent to conduct additional sampling if the EPA determines that Respondent's sampling is not being conducted in accordance with EPA-approved methodologies.

55. This AOC addresses only those violations alleged herein. Nothing in this AOC shall be construed as relieving the Respondent of its obligation to comply with all applicable provisions of federal, state, or local law, nor shall it be construed to be a ruling on, or determination of, any issue related to any other federal, state, or local permit. Compliance with this AOC shall not be a defense to any actions subsequently commenced pursuant to federal laws and regulations administered by the EPA.

56. Issuance of this AOC shall not be deemed as prohibiting, altering, or in any way limiting the ability of the EPA to pursue any other enforcement actions available to it under law. Such actions may include, without limitation, any administrative, civil, or criminal action to seek penalties, fines, injunctive, or other appropriate relief, or to initiate an action for imminent and substantial endangerment under the SDWA or any other federal or state statute, regulation, or permit.

57. The EPA reserves all rights and remedies, legal and equitable, available to enforce any violation cited in this AOC and to enforce this AOC.

58. Nothing in this AOC is intended to nor shall be construed to operate in any way to resolve any criminal liability of Respondent, or other liability resulting from violations that were not alleged in this AOC.

59. This AOC applies to and is binding upon Respondent and its officers, directors, employees, agents, successors, and assigns.

60. Any change in the legal status of Respondent, including but not limited to any transfer of assets of real or personal property, shall not alter Respondent's responsibilities under this AOC.

61. Respondent admits to the jurisdictional allegations set forth within this AOC.

62. Respondent neither admits nor denies the factual allegations set forth within this AOC.

63. Respondent waives any and all claims for relief and otherwise available rights or remedies to judicial or administrative review which Respondent may have with respect to any issue

of fact or law set forth in this AOC, including, but not limited to any right of judicial review of the AOC under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

64. Each party shall bear its own costs and attorneys' fees in connection with the action resolved by this AOC.

65. Pursuant to Section 1414(g)(2) of the SDWA, 42 U.S.C. § 300g-3(g)(2), the EPA has conferred with and sent a copy of this AOC to the State of Mississippi.

66. Each undersigned representative of the parties to this AOC certifies that he or she is fully authorized to enter the terms and conditions of this AOC and to execute and legally bind that party to it.

## VI.    EFFECTIVE DATE

67. This AOC shall become effective on the date on which Respondent receives a fully executed copy of this AOC, after signature by the Director, EPA Region 4 Enforcement and Compliance Assurance Division.

## VII.    MULTIPLE COUNTERPARTS

68. This AOC may be executed in counterparts, each of which shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

FOR THE RESPONDENT:

6/30/2021
Date

Chokwe Antar Lumumba, Mayor
City of Jackson, Mississippi

SO ORDERED this _____ day of __7/1/21_____, 20_____.

CAROL KEMKER    Digitally signed by CAROL KEMKER
Date: 2021.07.01 10:07:19 -04'00'

Carol L. Kemker, Director
Enforcement and Compliance Assurance Division
Region 4

15

## APPENDIX A
Comprehensive Equipment Repair Plan (CERP) Schedule of Implementation

A-1

## APPENDIX A
### Comprehensive Equipment Repair Plan (CERP) Schedule of Implementation

| Task# | Plant and/or Category | Task | Deadline or Timeframe |
|---|---|---|---|
| **General Tasks** | | | |
| 1 | Operator/Staffing | City will hire an Instrument Technician for O.B. Curtis | Within 3 months of order effective date. |
| 2 | Operator/Staffing | 2. Provide documentation of completion or 2.A. Submit documentation of funding for an additional two (2) operators for O.B. Curtis. 2.B.City will hire 2 unlicensed operators for O.B. Curtis in FY2020-21. | 2. Within 1 month of order effective date. or 2.A and 2.B Within 6 months of order effective date. |
| 3 | Operator/Staffing | Both operations new hires should be eligible for licensure and must complete testing for Class A Waterworks | Within 7 months of order effective date. |
| **Fewell** | | | |
| 4 | Clari-Trac | Clari-Trac System shall be functioning and operational and repairs completed for all Basins including Butterfly Valves, Actuators, Drives, and Vacuum Hoses.4. Provide documentation of completion or 4.A. Contact Manufacturer and identify necessary work/schedule and submit Scope of Work' to EPA; 4.B. Clari-Trac system shall be fully functional and operational with all repairs completed | 4. Within 1 month of order effective date. or 4.A. Within 30 days of order effective date  4.B. Within 6 months of order effective date |
| 5 | UV Reactors | UV Sensors - Functional and fully operational. 5. Provide documentation of completion or 5.A. Order parts identified on the parts list provided by the Technician report from the 1/19/2021 evaluation. Provide the Technician Report/parts list and date parts were ordered to EPA. 5.B. Return all UV Sensors to fully functional/operational status. | 5. Within 1 month of order effective date. or 5.A. Within 30 days of order effective date 5.B. Within 6 months of order effective date |
| 6 | Filters | 6.COJ will develop a Scope of Work' with timeframes for returning filters to fully operational and functional status. Upon EPA approval of Scope of Work/plan, the CERP will be updated to include the individual tasks and timeframes. | Within 60 days of order effective date |
| 7 | Monitoring Equip | 7.A. Flow Measurement Devices - Research and assessment completed 7.B Flow Measurement Devices -will be functional and fully operational. | 7.A. Within 30 days of order effective date 7.B. Within 6 months of order effective date |

## APPENDIX A
### Comprehensive Equipment Repair Plan (CERP) Schedule of Implementation

| Task# | Plant and/or Category | Task | Deadline or Timeframe |
|---|---|---|---|
| 8 | Monitoring Equip | 8. Provide documentation of completion or 8.A. Submit a status report for all turbidimeters, to include current status (operational or not) and what repairs/replacement is needed for each item. 8.B. Return all to fully operational status. | 8. Within 1 month of order effective date. or 8.A. Within 30 days of order effective date 8.B. Within 3 months of order effective date |
| 9 | Intake Structure | Pedestrian Bridge | Within 6 months of order effective date |
| 10 | Entire Plant | Corrosion Control report | Within 30 days of order effective date |

**Curtis**

| Task# | Plant and/or Category | Task | Deadline or Timeframe |
|---|---|---|---|
| 11 | Conventional - Chlorine Room | Weight indicator - 11.A Parts ordered 11.B Functional and fully operational. | 11.A. Within 30 days of order effective date  11.B. Within 90 days of order effective date |
| 12 | Conventional - Chlorine Room | HS#1 - Documentation showing functioning and operational. | Within 30 days of order effective date |
| 13 | Conventional - All Conventional Basins | Clari-Trac System shall be functioning and operational and repairs completed for all Basins including Butterfly Valves, Actuators, Drives, and Vacuum Hoses. 13.A. Contact Manufacturer and identify necessary work/schedule and submit Scope of Work to EPA"; 13 B. Clari-Trac system shall be fully functional and operational with all repairs completed | 13.A. Within 30 days of order effective date  13 B. Within 7 months of order effective date |
| 14 | Conventional - Turbidimeters for Basis 1, 2, 3 | 14. Provide documentation of completion or 14.A. Submit a status report for all turbidimeters, to include current status (operational or not) and what repairs/replacement is needed for each item. 14.B. Return all to fully operational status. | 14. Within 1 month of order effective date or 14.A. Within 30 days of order effective date  14.B. Within 3 months of order effective date |
| 15 | Conventional - UV Filter Gallery | UV #5 - Operational and Fully functional | Within 30 days of order effective date |
| 16 | Membrane - HS#2 | Chlorine analyzers - Operational and Fully functional. Provide documentation of replacement of one chlorine analyzer and installation of second chlorine analyzer | Within 1 month of order effective date. |
| 17 | Membrane - Blower Room | Blower C - 17. Provide documentation of completion or 17.A Assessment of root cause completed 17.B Submit plan to address the concerns identified in assessment. Upon EPA approval of the plan, Appendix A will be updated to include those individual tasks and timeframes | 17. Within 1 month of order effective date. or 17.A. Within 30 days of order effective date  17.B. Within 60 days of order effective date |
| 18 | Conventional-Intake | Microscreens -18. Provide documentation of completion or 18.A. Submit status report for the microscreens, include current status and any needed repairs/replacement; 18 B. Complete any needed repairs/replacement | 18. Within 1 month of order effective date. or 18.A. Within 30 days of order effective date  18.B. Within 60 days of order effective date |
| 19 | Conventional-Intake | 60-inch sluice gate - 19. Provide documentation of completion or 19.A. Submit status report, include current status and any needed repairs/replacement; 19 B. Complete any needed repairs/replacement | 19. Within 1 month of order effective date or 19.A. Within 30 days of order effective date  19.B. Within 60 days of order effective date |

# APPENDIX A

## Comprehensive Equipment Repair Plan (CERP) Schedule of Implementation

| Task# | Plant and/or Category | Task | Deadline or Timeframe |
|---|---|---|---|
| 20 | Conventional-Intake | 72-inch sluice gate - 20. Provide documentation of completion or 20.A. Submit status report, include current status and any needed repairs/replacement; 20.B. Complete any needed repairs/replacement | 20. Within 1 month of order effective date. or 20.A. Within 30 days of order effective date   20.B. Within 60 days of order effective date |
| 21 | Both - Intake | Roof Repairs/Potassium Permanganate feeder | Within 3 months of order effective date. |
| 22 | Membrane - Intake | Microscreens -22. Provide documentation of completion or 22.A. Submit status report for the microscreens, include current status and any needed repairs/replacement; 22.B. Complete any needed repairs/replacement | 22. Within 1 month of order effective date. or 22.A. Within 30 days of order effective date   22.B. Within 60 days of order effective date |
| 23 | Membrane - Intake | 60-inch sluice gate - 23. Provide documentation of completion or 23.A. Submit status report, include current status and any needed repairs/replacement; 23.B. Complete any needed repairs/replacement | 23. Within 1 month of order effective date. or 23.A. Within 30 days of order effective date   23.B. Within 60 days of order effective date |
| 24 | Membrane - Sludge Plant Handling Facility | Gravity Thickener #1 and #2 - Functional and Fully Operational | Within 5 months of order effective date. |
| 25 | Both - Filters | Filter Rehab - Submit detailed Scope of Work* Upon approval of the Scope of Work, the tasks will be updated to include additional milestones and final completion of this task. | Within 60 days of order effective date |
| 26 | Membrane - Trains #1-6 | 26.A. Submit a report on the current status and any needed repairs/replacement for each membrane train and its components including sluice gate, flocculator, centrifuge, reject valve, turbidimeter and rapid mixer. 26.B. Submit detailed Scope of Work* to address the identified concerns, including any sequencing. Upon approval of the Scope of Work, the tasks will be updated to include additional milestones and final completion of this task. | 26.A. Within 30 days of order effective date   26.B. Within 60 days of order effective date |
| 27 | Membrane - Cover | Complete Membrane Basin Building Structure Project. | Within 6 months of order effective date |
| 28 | Conventional - Soda Ash System | dilution system - - Functional and Fully Operational - Provide documentation of completion or repair the dry powder level indicators | Within 30 days of order effective date |

## Groundwater System-Storage Tank

| Task# | Plant and/or Category | Task | Deadline or Timeframe |
|---|---|---|---|
| 29 | Storage Tanks | Maddox Rd (Hwy 18) - Provide documentation that tank is fully functioning and operational. | Within 30 days of order effective date |
| 30 | Storage Tanks | TV Rd Booster Station - Submit plan for bringing back into service. | Within 6 months of order effective date |

## APPENDIX A
### Comprehensive Equipment Repair Plan (CERP) Schedule of Implementation

| Task# | Plant and/or Category | Task | Deadline or Timeframe |
|---|---|---|---|
| 31 | Wells | Provide a status and plan for each of the wells, include a status of each well, identify any need repairs/replacement, and propose timeframe for addressing these repairs/replacement including any interim steps. Upon EPA approval of the plan, Appendix A will be updated to include those individual tasks and timeframes for each well. | Within 60 days of order effective date |
| 32 | Well House | Well Houses - Submit Scope of Work* including proposed timeframes. Upon EPA approval of the Scope of Work, Appendix A will be updated to include those individual tasks and timeframes. | Within 60 days of order effective date |

**Dosing Automation**

| Task# | Plant and/or Category | Task | Deadline or Timeframe |
|---|---|---|---|
| 33 | Curtis | O.B. Curtis: Submit detailed Scope of Work*, that includes schedule of tasks and timeframes for completion of interim and final tasks. Upon approval of the Scope of Work, Appendix A will be amended to add additional tasks/timeframes for completion of automation. | Within 60 days of order effective date |
| 34 | Curtis | Ammonia/Chlorine Feeds: All chlorinator and ammoniator equipment and appurtenances will be fully functional with automatic, flow-pacing capabilities in service and redundancy present. Submit detailed Scope of Work*, that includes schedule of tasks and timeframes for completion of interim and final tasks. Upon approval of the Scope of Work, Appendix A will be amended to add additional tasks/timeframes for completion of automation. | Within 60 days of order effective date |

## APPENDIX A
### Comprehensive Equipment Repair Plan (CERP) Schedule of Implementation

| Task# | Plant and/or Category | Task | Deadline or Timeframe |
|---|---|---|---|
| 35 | Curtis | ACH (Aluminum Chlorohydrate) (coagulant): The treatment system was installed by using the same method as the Alum/lime system that was previously being used and not tweaked for the new ACH coagulant. Studying the coagulation system to determine if $CO_2$ treatment addition will be helpful in improving the treatment system for future automation. Submit detailed Scope of Work*, that includes schedule of tasks and timeframes for completion of interim and final tasks. Upon approval of the Scope of Work, Appendix A will be amended to add additional tasks/timeframes for completion of automation. | Within 60 days of order effective date |
| 36 | Curtis | O.B. Curtis: Potassium Permanganate Feeds: flow pacing or feedback loop. Submit detailed Scope of Work*, that includes schedule of tasks and timeframes for completion of interim and final tasks. Upon approval of the Scope of Work, Appendix A will be amended to add additional tasks/timeframes for completion of automation. | Within 60 days of order effective date |
| 37 | Curtis | O.B. Curtis: Fluoride - Submit detailed Scope of Work*, that includes schedule of tasks and timeframes for completion of interim and final tasks. Upon approval of the Scope of Work, Appendix A will be amended to add additional tasks/timeframes for completion of automation. | Within 60 days of order effective date |
| 38 | Curtis | O.B. Curtis: pH metering information: Replaced/Repaired and are being calibrated as required. Information from the meters is not fed directly into the chemical feeding systems, but manually by operators. This can result in missing peaks. Submit detailed Scope of Work*, that includes schedule of tasks and timeframes for completion of interim and final tasks. Upon approval of the Scope of Work, Appendix A will be amended to add additional tasks/timeframes for completion of automation. | Within 60 days of order effective date |

## APPENDIX A
### Comprehensive Equipment Repair Plan (CERP) Schedule of Implementation

| Task# | Plant and/or Category | Task | Deadline or Timeframe |
|---|---|---|---|
| 39 | Curtis | O.8 Curtis: Raw Water Flow Meter - Conventional plant (related to the Clari-Trac System): Not currently running automatically. Submit detailed Scope of Work*, that includes schedule of tasks and timeframes for completion of interim and final tasks. Upon approval of the Scope of Work, Appendix A will be amended to add additional tasks/timeframes for completion of automation. | Within 60 days of order effective date |
| 40 | Fewell | The dosing equipment has always been run in manual for disinfection and pH at the Fewell plant. 40.A. Submit a plan to complete research/assessment; 40.B. Based on research, submit work proposal, which should include a proposed treatment plan; 40.C. Complete work. | Task 40.A will be due one month after approval of OCCT Study Findings Plan and Task 40.B will be due two months after approval. Upon approval, Appendix A will be updated to include completion timeframe for Task40.C A proposed treatment plan shall include a scope of work, timeframes for completion of any necessary treatment modifications, and identify funding for implementation of the treatment plan. |

*The Scope of Work (SOW) submitted to the EPA must contain detailed descriptions of all work necessary to successfully complete the Task listed in this AOC. The SOW must include all interim steps, including completion dates and/or timeframes to complete each interim step. In addition to completion dates/timeframes for each interim step, the SOW must also contain the deadline (date) for the completion of the entire Task. Scope of Works may be combined if tasks will all be a part of same project.

The EPA understands that the City may not be able to provide exact completion dates due to the complex nature of some Tasks included in the AOC. If the City is unable to project exact dates of completion for each interim step necessary to complete a Task, the City must, at a minimum, describe the interim steps necessary to complete each Task, along with timeframes that the City reasonably expects to be necessary for each interim step to be completed. For example, if the City has a requirement to submit and receive approval of a "Plans and Specs" document for review and approval to the MSDH. If the SOW could include a statement similar to, "The City will submit "Plans and Specs" document to the MSDH as an interim step, the SOW could approval of "Plans and Specs" document, the City will put the work out for bid."

This level of detail must be provided for each interim step necessary to complete each Task identified in the AOC. Without specific, detailed SOWs, including interim steps and completion dates or timeframes for completion, the EPA is unable to adequately review and approve the SOW proposed by the City

Leaders ask ... water plan : Mississippi...    https://mississippitoday.org/2022/09/08/jackson-water-plan-mayor-s...

**MISSISSIPPI TODAY**

**CONTINUING COVERAGE**  Jackson Water Crisis   The Backchannel   Health   COVID-19   Welfare Scandal   Abortion Law   Culture

GOVERNMENT

# With long-term Jackson water fix in mind, leaders ask the mayor: Where's your plan?

*In response to a Mississippi Today public records request, the mayor's office sent several documents that lay out short- and medium-range water system funding ideas. None of the documents projected spending plans for longer than five years.*

  by Alex Rozier
September 8, 2022



Mayor Chokwe Antar Lumumba speaks during a news conference at City Hall in Jackson, Miss., regarding updates on the ongoing water

infrastructure issues, Tuesday, Sept. 6, 2022. (AP Photo/Rogelio V. Solis)

Jackson Mayor Chokwe Antar Lumumba said Tuesday that the city has had "many, many plans" to fund repairs for its beleaguered drinking water system.

But as of this week, Lumumba had not shared a comprehensive, long-term vision for improving the city's water infrastructure system with state and federal leaders — the only ones who can pay for the needed repairs and replacements necessary to ensure safe, reliable water for the future.

Generations of Jackson elected officials neglected the capital city's water system, culminating with its failure to produce running water last week. State and federal leaders, who for decades ignored city leaders' dire warnings and funding requests, acted swiftly to restore water service to the city's 150,000-plus residents.

With running water again flowing across the capital city, state leaders are now turning their focus to the critical negotiations about how — or even if — they can ensure Mississippi's largest city won't lose water again.

Jackson officials have been caught in a "fluid" planning cycle, city spokesman Justin Vicory explained. The city in recent years has planned spending based on what state and federal money is available. Meanwhile, state and federal officials say they need a plan from Jackson in order to free up funding.

Lumumba has, as recently as last week, mentioned creating a committee to formalize a new, long-term strategy. While staying quiet on many specifics, he has said that part of the new plan will include looking to contract out operations and maintenance services to support water treatment.

But without that plan in hand, state and federal officials are left with several unanswered fundamental questions as they begin to negotiate a long-term solution: Which repairs take top priority? Is a patchwork of repairs feasible, or is system replacement the only option? How much, even ballpark, might a long-term solution cost?

The mayor has repeatedly estimated that $1 billion would fix the city's water system, although none of Jackson's released spending plans tally up anywhere near that total.

During a meeting with the mayor and Mississippi's congressional delegation at Jackson State University on Wednesday, U.S. Environmental Protection Agency Administrator Michael Regan was asked about what constitutes a plan.

"When I think about a plan, I think about what's required to unlock federal dollars," Regan said. "If we want to have access to the state revolving loan fund resources, the (money from the State Revolving Loan Fund) that currently exists, being competitive for the bipartisan infrastructure dollars that will exist, we need to see a plan in place that demonstrates how those resources will be spent and what they will be spent on."

Regan said that there's currently $43 million in existing funds from the EPA's State Revolving Loan Fund that Jackson has access to, and that Mississippi will receive over $26 million through the program later this year.

Both Democratic U.S. Rep. Bennie Thompson and Republican Gov. Tate Reeves in recent days have called on city leadership for not producing a long-term water improvement plan. The city's Democratic delegates at the state capitol, Senate leader Lt. Gov. Delbert Hosemann, and House Speaker Philip Gunn have all also said they haven't seen a plan.

"I have not seen a plan. I've heard from the mayor and others that they have a plan, that they're working on it, but I have not physically seen a plan with my own eyes," Thompson told Mississippi Today last week. "… It would be difficult to get the kind of resources needed to fix the Jackson water system without a verifiable plan."

"Unfortunately, we've never received a real plan from the city of Jackson on how to improve their water system so that the state could continue funding it," Reeves said on Monday.

**READ MORE:** Rep. Bennie Thompson: Treat Jackson fairly, but if it can't run water system, let someone else

The mayor disputed those assertions in a press conference on Tuesday. And in response to a Mississippi Today public records request, the mayor's office sent several documents on Tuesday that lay out short- and medium-range water system funding ideas. The longest term spending published in this trove of newly released documents is from a 2020 report that laid out a water spending plan of five years.

Responding to Reeves specifically, Lumumba on Tuesday pointed to a letter he sent the governor on Mar. 3, 2021, asking for $47 million in repairs after last year's winter storms knocked out water service to thousands of Jacksonians. Hosemann, Gunn, Thompson and Hinds County's legislative delegation were all copied on the letter. State officials, Lumumba said, never replied to the letter.

Case 3:23-cv-00272-HTW-LGI   Document 50-7   Filed 06/07/23   Page 73 of 230

"I know a good part of the narrative has been a lack of a plan for the city," Lumumba said. "You, the media, have asked questions about that, and we've shared that we've had many, many plans."

Lumumba's office, for the first time on Tuesday, shared several documents with Mississippi Today that itemize specific needs, including improvements at the city's largest water treatment plant, replacements of water main lines, and pay raises for the city's water operators.

But it remains unclear what Jackson's current spending proposal is.

One of the documents the city shared with Mississippi Today on Tuesday was a 45-page commissioned report from three private engineering firms that lays out $80 million in proposed water spending over five years. The $80 million in projects consists mostly of distribution line and water main repairs, and also includes some elevated water tank improvements.

A separate document the city released is a plan Lumumba said he presented to Hinds County's legislative delegation last year, prioritizing spending of the city's American Rescue Plan Act money. The slideshow lays out about $21 million in proposed repairs to the O.B. Curtis water plant, about $15 million in fixes for J.H Fewell water plant and about $34 million in distribution system repairs.

Another guiding document the mayor shared with Mississippi Today on Tuesday is a list of repairs outlined by the Environmental Protection Agency in an Administrative Order on Consent the agency entered into with Jackson in 2021. While the list includes deadlines for each repair, Lumumba said the EPA has been flexible in negotiating timelines.

The mayor added Tuesday that the city expects to finish rolling out its new water meters – which have been at the root of Jackson's inability to bill customers, leading to a $90 million settlement with Siemens – by March of next year.

About an hour after Mississippi Today filed a records request for the plans the mayor discussed Tuesday, the city provided several documents.

Yet three weeks ago, when another reporter asked for the city's plan, the mayor made no reference to those documents, instead saying, "We look forward to sharing our fully-outlined plan – one that is supported by the expert advice of the U.S. Water Alliance and the Kellogg Foundation."

When the reporter, WJTV's Richard Lake, asked the mayor's office for a copy of any plan, Lake was told by a city employee, "You'll need to file a records request."

Ten days later, the request came back in the city's automated filing system as "no records exist." When Lake asked for clarification from a city employee, the reporter was told, simply: "There is a plan that is under review."

Meanwhile, many people outside Jackson City Hall — Democrats and Republicans, Black and white officials, state and federal officials, reporters and Jackson taxpayers — are increasingly asking why the city has not produced a plan, leading to questions of whether the city can run the water system by itself any longer.

"If (the city's) plan demonstrates that they can operate a system and get the state health department's approval as well as the enforcement order from EPA lifted, then we're off to the races," Thompson said. "But you can't l  the lives of your citizens at risk … we just, in good conscience, can't do that. If that's not available, you then look, perhaps, at an alternative management.

"… I understand that there are some other interests out here that want to help the city get the plan done," Thompson continued. "As soon as it's completed, I would encourage that plan to be distributed as widely as possible. That, too, instills confidence in the public that something is being done."

**EXCLUSIVE**: Rep. Bennie Thompson opens up about Jackson water crisis

*Editor-in-chief Adam Ganucheau contributed reporting for this story.*

*Editor's note: Mississippi Today is one of five Jackson-based newsrooms working together since 2021 as Mississippi Spotlight, a local news collaborative which is independently funded by Microsoft Corp. and the W.K. Kellogg Foundation, in partnership with the Community Foundation for Mississippi. The collaborative's current project — agreed upon by the cohort's newsroom leaders, independent of guidance from the supporting grant makers — is the Jackson water crisis. As is our editorial policy since we launched in 2016, donors to Mississippi Today have no influence or control over editorial decisions.*

© 2022 Nonprofit Mississippi News.

Proudly powered by Newspack by Automattic

☰   **News**   **Watch Live**   **Traffic**

ADVERTISEMENT

# EXCLUSIVE: Emails reveal staffing shortage threatened to shut down water treatment plants



By Anthony Warren and C.J. LeMaster
*Published: Aug. 18, 2022 at 5:43 PM CDT*



JACKSON, Miss. (WLBT) - If one email best encapsulates the staffing crisis at Jackson's water treatment plants, it's one from Mary Carter b May.

At the time, the city's chief water official said she could no longer fulfill her duties as deputy director of water operations while having to operator at the O.B. Curtis Water Treatment Plant.

"At this point, I am just worn down," she wrote to Public Works Director Marlin King. "I hope that somehow you understand."

Carter's email is one of dozens of documents the city recently submitted to the Environmental Protection Agency in regard to staffing issu plants.

EPA requested the information in late June, amid yet another Jackson water crisis.

⊗



The documents paint a stark picture, showing that the Curtis plant, which provides water to some 43,000 connections, has just two Class ⸻ water operators on the payroll, one-sixth the number it needs to be fully staffed.

A November 2021 email from then-City Engineer Charles Williams said that the shortages were so bad that if one more water operator le⸻ would have to shut down one of its plants.

Meanwhile, timesheets for June 2022 show that water operators at the J.H. Fewell plant logged hundreds of hours of overtime to ensure ⸻ operator was on duty at all times, a requirement under federal law.

Jackson must have a Class A-certified worker on duty at each plant 24 hours a day, seven days a week, per the Safe Drinking Water Act. T⸻ workers are mandated for all "systems with surface water treatment, lime softening or coagulation and filtration for the removal of consti⸻ other than iron or manganese," according to operator regulations provided by the Mississippi Secretary of State's Office.

Emails reveal that for about six months in 2021, Carter herself also put in massive amounts of overtime to ensure plant coverage.

"I worked 24 to 36 hours at OBC every Saturday and Sunday," she wrote. "I don't want us in the news for a notice of violation from USEPA ⸻ having a Class A operator on site at all times."

Carter said employees are worn out by putting in the extra hours but are "dedicated to their jobs."

"They want to make sure that they're putting out good water for our citizens, you know because they live here," she said. "These are their ⸻ so, they want to do all they can to make sure that the city delivers clean drinking water."

Carter's correspondence also reveals another, more troubling fact. Carter asked Public Works Director Marlin King multiple times for a "w⸻ loader," a document that includes information on all positions currently filled, open and frozen.

She said she needed the information so she could "devise a plan" to bring on a part-time water operator to provide relief.

More than a month after asking for that document, though, she had still not received it, and as of August 18, no worker has been hired.

"Never has a PW director forbade a deputy director from receiving an employee loader," she told King. "It appears you don't understand ⸻ urgency of this situation."

Ward 7 Councilwoman Virgi Lindsay first read the email when she was provided a copy by 3 On Your Side. "I'm about to cry," she said. "I r⸻ is unbelievable."

We also shared the email with King, who said he instructed Carter to get in touch with LaSaundra Johnson, one of the department's traini⸻ coordinators, who would handle the hiring.

King said he moved personnel responsibilities under the training coordinator to ensure that no employees were given preferential treatm⸻

⊗

"I think traditionally, a lot of managers have worked off the loaders. And, as I've worked through the department and met with other divis
of their concern was that people sometimes got preferential treatment in terms of raises," he said. "And so, we wanted an independent b
LaSaundra, to work with every division to make sure that as we get salary adjustments that everybody in those divisions are accounted fo

Carter says that as a deputy director, she should be privy to employee loaders and that she already could have had the part-time worker
had she been given the information. "Since he has taken over as director, he doesn't want the deputies to look at loaders or anything. An
makes it hard to even figure out personnel," she said. "Ms. Johnson is supposed to be the training coordinator, but the only thing sl
get in contact with personnel, and personnel told her [the position] wasn't available."

June timesheets show that Fewell has six water operators, five of whom are certified Class A. Curtis has 10 operators, but only two with ac
A certifications. Two others workers at Curtis previously had the certifications, but let them lapse.

Carter said those two operators are working to get their certifications renewed. "Because they had been out so long, they lost their licens
they're working to get their license back," she said. "Whenever they take their test and pass, then we will have at least two [more] at O.B. 

Ideally, the city could have at least 12 certified operators on the payroll at both plants. The positions are needed to ensure 24-hour-a-day
and to ensure there is enough personnel to fill in when workers take vacation days or call in sick.

Now, though, employees are having to work hundreds of hours of overtime to ensure full coverage. Between June 1 and July 25, three en
put in more than 200 hours of overtime, while four others logged more than 100 extra hours on the clock, according to timesheets.

One worker, James Jackson, worked 295.53 hours overtime, or an additional 36.9 hours a week on top of his normal 40-hour schedule.

On June 15 and 16, an operator at the Curtis plant, Vincent Thomas Jr., worked more than 22 hours straight before taking 12 hours off an
returning for another 12-hour shift.

"I think that's one of the reasons why it's hard to attract [workers] to the city of Jackson," Lindsay said. "That's abusive. And I regret that I
know that."

Even with the overtime, a 3 On Your Side analysis of timesheets sent to the EPA -- plotted like events on a calendar -- show that in June, t
approximately 153 hours where no Class A operator was on duty at Curtis.

King said gaps in coverage were likely filled by Carter, who is not required to clock in. "So, yeah, that's not a situation where you can just
timesheets, because again, she does not have to clock in."

We asked if the EPA would get the impression that the plant was not staffed during those hours. King said that is something that could b
explained if the city was questioned.

said.

King later backtracked on claims a Class A worker was on duty at those times. "I would like to think so. But going back to that time, I can' it. I know at that time, our focus was, 'we were under a boil water notice. We were trying to get it lifted,'" he said. "I just can't speak to wh happening there other than day-to-day. It was 'what do we need to do so we can get that boil water notice lifted?'"

**PART TWO: Records leaked to 3OYS show pattern of federal noncompliance with Jackson water plants**



Staffing has been a problem at the city's treatment plants for years, and the city has struggled to address it. At one point, Jackson conside setting up a mobile home at the plant to ensure a Class A worker was on the site 24/7.

In November, the city council approved across-the-board pay raises for operators, with the lowest-paid operator receiving at least $8,00C annually.

Jackson Mayor Chokwe Antar Lumumba said the city has made no secret of its staffing problems, alluding to the issue at a press conferer August 1.

That press conference came just days after the Mississippi State Department of Health issued a boil water notice for all customers on the water system.

"We have said that our plant is in a fragile state, and we have recognized our staffing challenges within this plant," Lumumba said. "The st challenges become more pronounced when you have a plant that is as aged and has the challenges that ours has."

Curtis, which is located in Ridgeland next to the Barnett Reservoir, was constructed in the late 1980s or early 1990s and was expanded in Today, it has the capacity to treat about 50 million gallons of water daily.

In recent years, the plant has been plagued with challenges. In February 2021, plant operations were crippled after two winter storms ripp the region, bringing in days of below-freezing temperatures. As a result, thousands of customers were without water for weeks.

**Incidents at O.B. Curtis plant since February 2021 winter storm**

April 2021                                                                    Electrical panel fire

**Incidents at O.B. Curtis plant since February 2021 winter storm**

| | |
|---|---|
| September 2021 | Bad batch of aluminum chlorohydrate |
| November 2021 | Treatment chemical explosion |
| April 2022 | Line break causing flooding in polymer room |
| June 2022 | Ammonia leak |
| July 2022 | Turbidity violation |
| Ongoing | Water production problems and low volume in elevated storag |
| Ongoing | Failure of treatment components due to lack of maintenance |
| Ongoing | High turbidity numbers |

After that, in April 2021, the plant was taken offline for a short time after an electrical fire broke out there. This year, on June 21, the city is water conservation advisory after additional equipment failures at the plant. That advisory was followed by a boil water notice on June 24

Amid that crisis, on June 30, EPA sent a demand letter to Jackson seeking all communications on staffing, staffing shortages, and plans to positions at the plants. The feds also sought information on whether any current positions were filled with contractors, whether there wer unpaid invoices related to those contracts, and timesheets for hours worked by all employees.

EPA officials outlined the problems at a city council committee meeting on Wednesday. "A number of these... especially the ongoing prob water production problems and the low volume in the elevated storage tanks... We feel that these are symptomatic of low staffing levels,' Kemker, director of the agency's Enforcement and Compliance Assurance Division for Region 4.

Jackson was required to respond to EPA's request in seven days, or face daily fines. The city did not fulfill the request until July 22.

Among emails, in November 2021, Charles Williams sent one to the administration informing them that Jackson could be headed for ano if it didn't boost staffing levels.

"We currently have one senior licensed water operator and one part-time licensed operator at our main water treatment plant facility (Cu have five licensed water operators at J.H. Fewell... Four who are in operations and one who is the maintenance supervisor... We are about one of the four operators to another job paying more money and [offering] a better working schedule," he wrote. "If we lose any additior operators at either plant, a shutdown is unavoidable. We are in an emergency crisis."



"I wish we, the city council, had been informed of that because we certainly would have been interested in making sure that the operation plant was protected and comfortably operating without any threats of losing personnel," he said. "It's a shame we weren't better informe

Foote was unsure why staffing numbers hadn't improved since the raise was implemented, but said the council would do whatever is nec fill vacancies.

"Certainly, it begs for more exploration as to why they didn't hire additional people," the councilman said. "And I don't know whether tha problem or what, but you know, we've got serious issues in a number of departments. And this is certainly the most important one right i because we're really affecting the quality of life of our citizens across the city."

| Salaries for Water Plant Operators | Previous | Current |
|---|---|---|
| Plant Operator 1 | $26,448.66 to $31,745.56 | $34,698 to $41,797.64 |
| Plant Operator 2 | $27,661.67 to $33,223.46 | $36,323.42 to $43,776 |
| Senior Plant Operator | $30,272.58 to $36,405.06 | $39,822.11 to $48,039.06 |
| Maintenance Supervisor | $34,698.50 to $41,797.64 | $45,753.36 to $55,267.76 |
| Operations Supervisor | $36,323.38 to $43,776.56 | $47,931.11 to $57,919.92 |

Raises aside, the administration's efforts to fill positions have been equally unsuccessful. On the advice of EPA, Lumumba said the city ent mutual aid agreement with the Mississippi Rural Water Association to provide an operations consultant to the city.

However, according to Jackson's EPA response, "the operations consultant, while licensed, had no experience with the operation of a plar membrane filtration. Consequently, he was not able to provide any shift relief for the Class A operators at the O.B. Curtis plant."

Curtis treats water two ways, through conventional and membrane filtration methods. On the conventional side, water is brought in from reservoir and is allowed to settle in a large basin before it is chemically treated and sent into the distribution system. On the membrane s water is diverted past the conventional basin and pushed through membrane filters as part of the treatment process.

"We were optimistic about five water professionals that were coming from Florida... to help augment some of these challenges. And on th them arriving in Jackson, they sent us a memo, saying, 'hey, listen. We can't come, because we have the same staffing... challenges as well Lumumba said.

"That is the type of challenge that we find ourselves in, where we follow the suggestion and recommendation of those that are tasked wit responsibility of oversight, but sometimes they don't... yield the results that we would like to see."

The council is now pushing the mayor into bringing on a private firm to manage the plant. At its meeting Tuesday, members passed a res urging the mayor to bring on a firm as expediently as possible.

Public Works is also stepping up efforts. King says his department is working to bring in retired and part-time workers to help alleviate sh currently. He also wants to work with local colleges and high schools to recruit workers.

"I've spoken with one of our retirees, who is still very active with us, and she talked about programs we used to do in terms of... getting o high schools to meet with a lot of those kids - kids that may not want to go to college, kids that don't want to join the military, but they c necessarily want to take a minimum wage job - to talk about a career in water," he said. "That's where we want to focus, that is to build uj pipeline," King said. "So, right now, we have to do what we need to do in terms of staffing up, but the only way that we can really make th sustainable is we have to get more people interested in careers in water."

*Want more WLBT news in your inbox? Click here to subscribe to our newsletter.*

*Copyright 2022 WLBT. All rights reserved.*

**If You Need To Kill Time On Your Computer, You Have to Play this Vintage Game. No Install.**

®

**Bone-On-Bone Knees? See This!**

**Roofers Tested 17 Gutter Guards... Here's What They Discovered**

**The most relaxing farm game of 2022. No Install**

**Genius Wireless Security Bulb Keeps Your Property Safe**

**Cardiologists: Do You Have Too Much Belly Fat? Do This Before You Go To Bed**

ADVERTISEMENT

**Mississippi Legalizes 'Arthritis Gummies' 3:**

## Latest News

### Today at 11 - WLBT
Updated: 37 minutes ago

### ⊙ Things To Know Monday, October 31
Updated: 2 hours ago   |   By WLBT.com Staff

If you missed a few of the most important headlines, here are the top stories from our website to get you up to speed.

### ⊙ First Alert Forecast: clouds, some sun early week; warmer late week
Updated: 4 hours ago   |   By Patrick Ellis

Clouds linger a bit longer with some more sun breaks early week; a few rogue showers can't be ruled out Monday or Tuesday before cle mid-week

### First Alert Forecast: no tricks, just treats for Halloween Monday
Updated: 4 hours ago

### Fire breaks out in South Jackson home
Updated: 5 hours ago

## Latest News

### ▶ Vicksburg native receives $25,000 grant from 'Shark Tank' investor

Updated: 12 hours ago  |  By Patrice Clark

Recently, eight Black business owners from around the country took home a $25,000 grant and some exclusive mentorship from entrepr businessman, and Shark Tank investor Daymond John during the Black Entrepreneurs Day 2022 live stream Thursday.

### ▶ Local non-profit works to address health disparities among African American men

Updated: 12 hours ago  |  By Brendan Hall

The Institute for the Advancement of Minority Health (IAMH) held the first event in its "Choppin' It Up Barbershop Series" in Jackson Sur

### ESPN's College GameDay made an impact in Jackson; "Had me darn in tears just thinking a where we started from and where we are today"

Updated: 12 hours ago  |  By Sydney Wicker

"And I'm so darn proud of Jackson, Mississippi," said head coach Deion Sanders on Jackson State's turnout at ESPN's College GameDay.

### Gulfport Boo Bash brings in big crowd for some Halloween fun

Updated: 14 hours ago  |  By Mike Lacy

The city of Gulfport's 11th annual Boo Bash drew a big crowd to a huge space at the Gulfport Sportsplex.

### Petal raises nearly $1 million in 1st 11 months of sales tax

Updated: 15 hours ago  |  By Will Polston

Money raised can be used for tourism or recreational needs.

### Walthall County deputy involved in crash with 18-wheeler Saturday night

Updated: 15 hours ago  |  By WLBT.com Staff

According to the Walthall County Sheriff's Office, Deputy Nickie Willoughby collided with an 18-wheeler while responding to a call in Ty

News
Weather
Coronavirus
Careers

Watch Live
Sports
Programming
About Us

**WLBT**
715 South Jefferson Street
Jackson, MS 39201
(601)948-3333

Public Inspection File     PUBLICFILE@WLBT.COM · 601-960-4436     Closed Captioning/Audio Description     Terms of Service     Privacy Policy     EEO R

FCC Applications     Advertising

A Gray Media Group, Inc. Station · © 2002-2022 Gray Television, Inc

 

https://www.mississippifreepress.org/26791/no-efforts-to-recruit-ep...

Click 'Allow' and get the latest headlines.

(https://www.mississip

Cancel     Allow

**FOCUS:** Housing & Evictions (http://www.mississippifreepress.org/tag/evictions) • Jackson Garbage (http://www.mississippifreepress.org/tag/jackson-garbage) • #MSWelfare Scandal (https://www.mississippifreepress.org/tag/tanf) • Jackson Water (https://www.mississippifreepress.org/jackson-water-crisis-investigation) • Abortion (https://www.mississippifreepress.org/tag/abortion) • 2022 Elections (https://www.mississippifreepress.org/tag/2022-elections) • Race & Racism (https://www.mississippifreepress.org/tag/race) • Policing (https://www.mississippifreepress.org/tag/police/) • Incarceration (https://www.mississippifreepress.org/tag/prisons/) •

# 'No Efforts To Recruit': EPA Says Jackson Failed To Address Water System Needs

BY NICK JUDIN(HTTPS://WWW.MISSISSIPPIFREEPRESS.ORG/AUTHOR/NICK-JUDIN)
AUGUST 30, 2022(HTTPS://WWW.MISSISSIPPIFREEPRESS.ORG/DATE/2022/08/30)



10/31/2022, 11:00 AM




**MISS FREE**

JACKSON, Miss.
Environmental
(https://www.mississip
leaders in purst

Click 'Allow' and get the latest headlines.

Cancel   Allow

These compounding errors have emerged as the foundation of the new stage of the Jackson water crisis, with City of Jackson facilities unable to generate enough clean water to keep the system close to full pressure.

In spite of critical staffing shortages threatening the basic operation of the O.B. Curtis Water Treatment Plant, EPA leadership warned that the City of Jackson has put no visible effort into hiring new employees.

"There's very specific training to become a Class A (water) operator," Carol Kemker, the director of the EPA's Enforcement and Compliance Assurance Division, told the Mississippi Free Press in an Aug. 26 interview. Kemker has previously visited Jackson to tour its water system.

"We have not seen any evidence that (the City of Jackson) has tried to reach that labor pool," she said.

Currently, Jackson is over a month into one of the longest citywide boil-water notices in recent history. Following persistent failure of key water pumps at O.B. Curtis and flooding from the Pearl River's over 35-foot crest, the city has now entered a water shortage closer to the acute crisis of February 2021 (https://www.mississippifreepress.org/10153/under-the-surface-part-one-jackson-residents-struggle-from-neglected-water-system). Last night, Gov. Tate Reeves announced a state-level intervention (https://www.mississippifreepress.org/26768/do-not-drink-the-water-jackson-water-system-failing-for-180000-people) to prop up the water treatment plant and deliver water to Jackson residents.

## 'I Don't Know That They've Tried'

Kemker and a team of EPA officials have worked closely with the City of Jackson in recent years to address manifest failures in the city's water system, from lead and copper rule exceedances to turbidity violations. In the past, Kemker has expressed cautious optimism (https://www.mississippifreepress.org/14050/epa-tours-jackson-water-treatment-plants-as-city-faces-long-road-to-rehab) about the city's progress in upgrading its water treatment facilities.

But just last Friday, she offered a grim assessment of the City's attempts to address its single greatest need: qualified water operators. Not only is Jackson nowhere near acquiring the necessary staff to operate O.B. Curtis at full capacity, the EPA says it has yet to see the City even try.

10/31/2022, 11:00 AM

We asked in an
documentation

Click 'Allow' and get the latest headlines.

MISS
FREE

Cancel          Allow

ting. In (both)
ruit. So I don't
they have
or recruitment
s need at its

water treatment facilities.

"They could be reaching out to technical colleges, they could be holding recruitment events, they could be scheduling interviews, they could be putting in advertisements," Kemker said. "(This is) what we do when we recruit. We're not seeing those types of things."



*The O.B. Curtis Water Treatment Plant's staffing needs are beyond crisis level. The plant requires additional certified operators and more regular maintenance staff. Photo courtesy City of Jackson*

The staffing shortage at O.B. Curtis Water Treatment is well beyond crisis level. Just this month, WLBT's C.J. LeMaster obtained communications (https://www.wlbt.com/2022/08/18/exclusive-emails-reveal-staffing-shortage-threatened-shut-down-water-treatment-plants/) from former Public Workers Director Charles Williams warning that even the loss of one water operator could cause a full shutdown of the plant. Now, even without the loss of that final operator, the State is intervening to prevent such a shutdown.

two Class A operators at O.B. Curtis," she explained. "(But) they have a third that they can bring into that slot for a period of time until they recruit another. So to my knowledge, there are three Class A certified operators that would be available. They're currently using two."

Two Class A operators for an operation the size of O.B. Curtis is still a razor-thin staffing margin. The plant would need 10 more Class A operators to be fully staffed. Clean Water Act regulations mandate at least one Class A operator on duty for a water treatment plant to operate. As it stands, WLBT obtained documents (https://www.wlbt.com/2022/08/18/exclusive-emails-reveal-staffing-shortage-threatened-shut-down-water-treatment-plants/) showing that O.B. Curtis currently runs on hundreds of hours of overtime shared among its few certified employees.

While the most immediate threat to the continued operation of the plant is a lack of Class A operators, Kemker stressed that even basic maintenance personnel were sorely lacking at the plant. "It's not just the certified operator issue—it's also a lack of staffing to do routine maintenance. You can fix systems, but if you don't do the routine maintenance, if you operate systems without maintaining them, they break again and you end up in a fix-break-fix cycle," she said.

Safe Drinking Water Branch Chief Brian Smith went further, adding that EPA was open to virtually any methods that Jackson might be willing to use to address the staffing shortage, including contracting.

"If they want to hire city employees, that's fine. If they want to contract for operators or maintenance technicians, that's acceptable as well. And they do it on the wastewater side," Smith said.

"That was the other thing we were looking for. We saw no information or correspondence that they were seeking a contract to do it," Kemker said. "The mayor asked if that was an option, and I said yes it is. We do not dictate how you staff."

Shortly before this story went live, the City of Jackson "reassigned" (https://twitter.com /radamsWAPT/status/1564637762019622912) Public Works Director Marlon King. Former Director of Planning and Development Jordan Hillman was announced (https://twitter.com/radamsWAPT /status/1564641556317016064?s=20&t=j83RSA6YDANyzXOGT9gpcg) as interim public works director in his place.

10/31/2022, 11:00 AM

As flooding fror



Click 'Allow' and get the latest headlines.

Cancel        Allow

ı and the
lan. Now, it
aster of 2021

(https://www.mississip
Kemker said th.                                                                                                          second
biggest issue alongside its lack of initiative on hiring. "The City has an approved alternative water
plan," she explained. "They have not implemented that plan. So our work with them is to
implement that alternative water plan because that is critical."

"If O.B. Curtis is taken down completely, they would need to implement alternative water
immediately," Kemker continued. Her warning, which came as the Pearl River rose to its fourth-
highest recorded crest, proved immediate in its prescience.

Only days later, the City of Jackson's water system came to the cusp of complete failure. Gov. Tate
Reeves held a press event Monday night announcing the State's intervention in the capital city's
water-treatment plant as well as in water distribution to up to 180,000 residents in and around
the city.



*"Do not drink the water," Mississippi Gov. Tate Reeves warned residents of Jackson, Miss., in an emergency press briefing on Monday, Aug. 29, 2022. "In too many cases, water from the reservoir is being pushed through the pipes." The governor announced*

Click 'Allow' and get the latest headlines.

Cancel        Allow

"We don't tell cities how to provide water (in emergencies)," Kemker said in the Aug. 26 interview. "Sometimes they do the distribution themselves. and that's their decision, but this is the plan that was submitted by the City for our approval. In essence, it was for them to enter into a contract with a third party, whether it's a local grocery store, to provide sufficient bottled water available for City of Jackson customers in areas affected by an incident like a boil-water notice."

The EPA provided a document titled "Alternative Water Source Plan Development and Implementation," which Keyshia Sanders, manager of the Department of Constituent Services, wrote.

The brief plan outlines steps for notifying residents of water outages and delivering water to those in need. But critically, the first step in the process is a term-bid agreement with a licensed water distributor or grocery store in the city—a contract that could ensure water deliveries in a crisis.

EPA officials told the Mississippi Free Press in a statement that Jackson had failed to implement a two-year term bid agreement in the intervening years in spite of the fact that the EPA requested the plan in March 2020, and Jackson submitted the plan in April 2020.

Earlier, the City of Jackson warned that ongoing problems at O.B. Curtis would disrupt water delivery for some time.

"The flooding of the Pearl River has created problems with treating water at the O.B. Curtis Water Plant," City of Jackson Executive Writer Justin Vicory wrote on Monday. "Adjustments to the water treatment process are being made and has led to a temporary decrease in the production of water for some areas. This will remain an issue for the next couple days as we work to refill the tanks."

Reeves acknowledged that he did not invite Lumumba to last night's press event, nor had he spoken to the mayor directly about the ongoing crisis.

### 'Marshaling Tremendous Resources'

On Tuesday morning, Reeves announced that he was activating the National Guard (https://twitter.com/tatereeves/status/1564652267210407939) to assist the operations at O.B.



Click 'Allow' and get the latest headlines.

Cancel        Allow

at the City of Jackson water treatment facilities.



*White House Press Secretary Karine Jean-Pierre said "FEMA is working closely with the state officials" in Mississippi "to identify needs" in a statement about the Jackson water crisis on Aug. 30, 2022. Official White House Photo by Cameron Smith*

Reeves responded shortly afterwards. (https://twitter.com/tatereeves/status /1564661750355697667) "The state has created an incident command center to step in and restore water at the city's plant. We are sending a request for a federally-declared disaster to support state and city emergencies. Clear communication between locals/state/feds. Please keep Jackson in your prayers!" he wrote.

The City of Jackson declined multiple requests for an interview for this story, explaining that the weekend flooding was occupying the mayor's time.

Today, after press time, outside Jackson City Hall, Mayor Chokwe A. Lumumba responded to the

EPA Says Jackson Failed To Address Water System Needs    https://www.mississippifreepress.org/36057/epa-to-recruit-ep...

**MISS F**

(https://www.this.reg

**EPA's comment**
said, "I can tell
right now as
unfinished an
"Our human re...

Click 'Allow' and get the latest headlines.

Cancel        Allow

...nker is," he
...ss A Operators
be able to be
...rears."

...d traveling to
...serves in order

to bring in people … we're looking to bring in retired employees that can work a maximum of 20 hours for the timeframe prescribed without endangering their retirement."

For contract employees, the mayor said, the city was waiting on proposals from companies. "There's nothing to provide. We've been waiting on a proposal from certain companies that we have not received … we've been working to bring in a third party company over a six month period," Lumumba acknowledged.

"That process has not been completed, but we are in active and ongoing discussions with multiple agencies and multiple firms that are looking to enterprise us from today," he concluded.

With regards to the alternative water distribution plan, Lumumba said that the Jackson City Council had agreed to a contract with the Coca-Cola Company earlier that day. Prior to the contract, he added, the city had made use of donated water to fill the need.

"We didn't have a contract in place, but were receiving the donations to meet the need. And so we were getting it by donations and not by expense," he concluded. "That's where we get into technical violations, which is to say that we didn't have a contract, but the reality is that we were providing that water."

*Also read Nick Judin's award-winning 2021 multi-part series* (https://www.mississippifreepress.org /jackson-water-crisis-investigation) *revealing factors creating the Jackson water crisis over the decades.*



(https://www.mississippifreepress.org/author/nick-judin)

## Nick Judin

(https://www.mississippifreepress.org /author/nick-judin)

Nick Judin began his career in journalism at the Jackson Free Press in 2019, coming on as State Reporter to cover the 2020 legislative session. That posting quickly gave way to a year leading the JFP's COVID-19 coverage. Nick's reports from the frontline of coronavirus have repeatedly made national headlines, as he has asked hard questions of state leadership and done critical interviews with the state's top public-health experts. Email the Jackson, Miss.,

10/31/2022, 11:00 AM

EPA Says Jackson Failed To Address Water System Needs          https://www.mississippifreepress.org/20721ppifreepress.org and

@nickjudin.

Click 'Allow' and get the latest headlines.

STS
PPIFREEPRESS.ORG
K-JUDIN)

Cancel          Allow




(https://www.mississip

**Republish This Story**
**(mailto:donna@mississippifreepress.com)**

# Comments

Click 'Allow' and get the latest headlines.

Cancel        Allow        llment
                                   burg-aca-

Read More » (https://www.mississippifreepress.org/28745/hattiesburg-aca-call-center-workers-to-
strike-as-open-enrollment-begins)



(https://www.mississippifreepress.org
/28745/hattiesburg-
aca-call-center-
workers-to-strike-as-
open-enrollment-
begins)

### Crime Is On the Ballot, But Data Do Not Support the Rhetoric (https://www.mississippifreepress.org/28684/crime-is-on-the-ballot-and-voters-are-choosing-whether-prosecutors-with-reform-agendas-are-the-ones-who-can-best-bring-law-order-and-justice)

Read More » (https://www.mississippifreepress.org/28684/crime-is-on-the-ballot-and-voters-are-
choosing-whether-prosecutors-with-reform-agendas-are-the-ones-who-can-best-bring-law-order-
and-justice)

(https://www.mississippifreepress.org
/28684/crime-is-on-
the-ballot-and-voters-
are-choosing-whether-
prosecutors-with-
reform-agendas-are-
the-ones-who-can-
best-bring-law-order-
and-justice)



### Judge Orders Independent Inspection of Cleveland Apartments After Deaths, Warnings (https://www.mississippifreepress.org/28665/judge-orders-independent-inspection-of-cleveland-apartments-after-deaths-warnings)

Read More » (https://www.mississippifreepress.org/28665/judge-orders-independent-inspection-of-
cleveland-apartments-after-deaths-warnings)

(https://www.mississippifreepress.org
/28665/judge-orders-
independent-
inspection-of-
cleveland-apartments-
after-deaths-warnings)

10/31/2022, 11:00 AM





Click 'Allow' and get the latest headlines.

Cancel          Allow          ss? ♥

(https://www.mississip
The Mississippi                                                    ians and others

who care about the state.

With your help, we can do even more important stories like this one.

**Support the MFP** ♥
**(https://mfp.ms/donate/)**

◀ (https://www.mississippifreepress.org/26775/state-auditornor-on-jackson-water-quality-says-system-improved-overnight)

Click 'Allow' and get the latest headlines.

Cancel          Allow

MISS
FREE
(https://www.mississip

the state, devoted
eople.

Donate
(http://mfp.ms/donate)

MFP VIP Club Member Page (mailto:tips@mississippifreepress.org)

CONTACT INFO

125 S. Congress Street #1324
Jackson, MS  39201

info@mississippifreepress.org (mailto:info@mississippifreepress.org)
tips@mississippifreepress.org (mailto:tips@mississippifreepress.org)
(601) 301-2021

(/mfp-live-home)

QUICKLINKS

News
MFP Voices
In-Depth
Solutions
Culture
Investigations
People
Who We Are
Contact the MFP
Jobs

NEWSLETTER

Get our headlines in your inbox. We won't sell or rent your address.

Your email address *

Click 'Allow' and get the latest headlines.



Cancel          Allow





(https://inn.org/)



(https://inn.org/)



(https://www.lionpublishers.com/)

The Mississippi Free Press is a project of the Mississippi Journalism and Education Group, a 501(c)(3) nonprofit journalism organization (EIN 85-1403937).

Copyright Mississippi Journalism and Education Group. All rights reserved.

# STATE OF MISSISSIPPI

## *Office of the Governor*



### PROCLAMATION

**WHEREAS**, the O.B. Curtis Water Treatment Plant ("Plant") provides water to over 43,000 connections representing over 160,000 residents in the City of Jackson, Mississippi and surrounding areas of Hinds County; and

**WHEREAS**, the City of Jackson and surrounding areas of Hinds County that receive water from the Plant frequently have experienced low water pressure and have been under the most recent boil water notice since July 29, 2022; and

**WHEREAS**, the Mississippi Department of Health and the State Health Officer have advised me that the two primary raw water pumps at the Plant have been removed and sent offsite for repairs, and that the Plant's two secondary raw water pumps are currently responsible for all water intake from the reservoir at the Plant and produce two to four million less gallons of water per day than the primary pumps resulting in the reduction of water pressure throughout the City of Jackson and surrounding areas of Hinds County; and

**WHEREAS**, due in part to the diminished operating capacity of the Plant, the City of Jackson and surrounding areas of Hinds County are now experiencing a total or near total loss of water pressure; and

**WHEREAS**, the Mayor of Jackson has declared a water system emergency due to "excessive rainfall and extreme flooding"; and

**WHEREAS**, the Mississippi Department of Health has declared a public drinking supply emergency in the City of Jackson based upon the following information: "(1) Insufficient number of certified operators at J.H. Fewell and O.B. Curtis Water Treatment Plants; (2) Insufficient number of maintenance staff at all water treatment plants and to support the distribution system; (3) Failure of multiple raw water pumps at O.B. Curtis Water Treatment Plant; (4) Low levels of water in storage tank; (5) Low water pressure impacting proper sanitation and education opportunities; and (6) Disinfection levels not consistently optimal developing the potential to have the presence of enteric organisms, including but not limited to, E.Coli, Cryptosporidium, or Giardia in the drinking water being served to customers"; and

**WHEREAS**, the total or near total loss of water pressure throughout the City of Jackson and surrounding areas of Hinds County that receive water from the Plant has created a condition of disaster and extreme peril to the safety of persons and property of such a magnitude that would be beyond the control of the services, personnel, equipment and facilities of the City of Jackson and Hinds County to combat; and

**WHEREAS**, the total or near total loss of water pressure throughout the City of Jackson and surrounding areas of Hinds County that receive water from the Plant has the potential to result in substantial injury or harm to the population and substantial damage to or loss of property; and

**WHEREAS**, in consideration of the health and safety of the residents of the City of Jackson and surrounding areas of Hinds County that receive water from the Plant and the protection of their property within the affected areas, and in the public interest, all steps should immediately be taken to protect people and property.

**NOW, THEREFORE,** I, Tate Reeves, Governor of the State of Mississippi, pursuant to the authority vested in me under the Mississippi Constitution and Miss. Code Ann. § 33-15-11(b)(17), and in the public interest and for the general welfare, and in consultation with the Mississippi Department of Health and the Mississippi Emergency Management Agency do hereby proclaim a State of Emergency to exist in the City of Jackson and surrounding areas of Hinds County that

receive water from the O.B. Curtis Water Treatment Plant. The provisions of this Proclamation shall exist and remain in effect until such time as the pumps at the Plant are brought back into service, necessary maintenance and/or repairs are performed, and adequate staff is hired on a contract basis to operate the Plant, or the threat to public safety shall cease to exist as prescribed in Section 33-15-11(b)(17). I shall consult with the Executive Director of the Mississippi Emergency Management Agency and the State Health Officer at least every thirty days regarding the need for continuing this state of emergency, and the state of emergency shall terminate at the earliest possible date.

**FURTHER,** I hereby direct the Mississippi Department of Health and the Mississippi Emergency Management Agency to establish the State Incident Command Center and take all necessary actions to abate this emergency including overseeing the repairs and/or replacement of the two primary raw water pumps, the necessary maintenance and/or repairs to the two secondary raw water pumps, to enter into a contract(s) for sufficient staff to operate the Plant, and to take any additional action deemed necessary to improve the operations of the Plant to mitigate against future emergencies.

**FURTHER,** pursuant to Miss. Code Ann. § 33-15-11(c)(1), the provisions of state statutes, rules, regulations or orders are suspended if compliance would prevent, hinder or delay necessary action in coping with this emergency.

**FURTHER,** pursuant to Miss. Code Ann § 33-15-31(b), all existing laws, ordinances, rules and regulations inconsistent with the provisions of the Mississippi Emergency Management Law shall be suspended during the pendency of this emergency.

**FURTHER,** the Mississippi Emergency Management Agency shall take all steps necessary to plan for and abate the public health emergency created by the total or near total loss of water pressure throughout the City of Jackson and surrounding areas of Hinds County that receive water from the Plant.

**FURTHER,** the Mississippi State Department of Health and the Mississippi Emergency Management Agency shall seek federal assistance as may be available.

**FURTHER,** all other agencies of the State of Mississippi shall discharge their emergency responsibilities as deemed necessary as set forth in the State of Mississippi's Comprehensive Emergency Management Plan.

**IN WITNESS WHEREOF,** I have hereunto set my hand and caused the Great Seal of the State of Mississippi to be affixed.

**DONE** in the City of Jackson, on the 30th day of August, in the year of our Lord, two thousand and twenty-two, and of the Independence of the United States of America, the two hundred and forty-seventh.

**TATE REEVES**
**GOVERNOR**

**BY THE GOVERNOR**

**MICHAEL WATSON**
**SECRETARY OF STATE**



# State of Mississippi

**TATE REEVES**
Governor

August 30, 2022

The Honorable Joseph R. Biden Jr.
President of the United States
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Through:       Gracia B. Szczech, Regional Administrator
               FEMA Region IV
               3005 Chamblee Tucker Road
               Atlanta, Georgia 30341

Re:  City of Jackson and Hinds County Water Crisis

Dear Mr. President:

Under the provisions of Section 501 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§5121-5207 (the "Stafford Act"), as implemented by 44 C.F.R. §206.35. I request that you declare an emergency for the State of Mississippi due to the City of Jackson's and Hinds County's Water Crisis. This request is timely under 44 C.F.R. §206.35(a), and I submit this request to avoid devastating impacts on approximately 180,000 citizens in and around the Jackson Metro Area. Without water pressure, the fire-fighting capability of the City of Jackson and Hinds County will be severely diminished. The University of Mississippi Medical Center and Merit Health Central hospital are dependent on water for fire suppression and patient care. Additionally, citizens reliant on Jackson's water system will be without accessible water to drink, bathe, cook, clean, and flush. While the City of Jackson has had issues with its aged water system, the current situation is now critical and requires assistance from the federal government.

On March 27, 2020, the City of Jackson entered into a Safe Drinking Water Act (SDWA) Emergency Administrative Order (EAO) which required the City of Jackson to (1) develop and implement a plan to address all monitoring equipment and appurtenant treatment equipment repairs and/or replacements; (2) address the dosing processes for disinfection and pH control; (3) develop and implement a plan to provide alternative drinking water when triggers are met; and (4) take additional total coliform bacteria samples under prescribed conditions.

The Honorable Joseph R. Biden, Jr.
August 30, 2022
Page 2

In February 2021, the City of Jackson experienced a system-wide failure due to extreme winter conditions that caused pipes to freeze and lose pressure leaving many areas without water for several weeks. On July 1, 2021, the City of Jackson entered into an SDWA Administrative Order on Consent (AOC) to address concerns identified by the Environmental Protection Agency (EPA). On July 29, 2022, the City of Jackson issued its most recent Boil Water Notice based on water samples that showed high turbidity levels. The City of Jackson has remained under this Boil Water Notice for more than thirty (30) days. Finally, beginning on August 25, 2022, and continuing, excessive rainfall and extreme flooding created a water system emergency in the Jackson Metro Area, including a temporary decrease in water production at the O.B. Curtis Water Plant.

The Mississippi Department of Health also declared a public drinking supply emergency based on the following: (1) Insufficient number of certified operators at the two water treatment plants; (2) Insufficient number of maintenance staff at the treatment plants to support the distribution system; (3) Failure of multiple raw water pumps at O.B. Curtis Water Treatment Plant; (4) Low levels of water in storage tank; (5) Low water pressure impacting proper sanitation and education opportunities; and (6) Disinfection levels not consistently optimal developing the potential to have the presence of enteric organisms, including but not limited to, E.coli, Cryptosporidium, or Giardia in the drinking water being served to customers.

The total or near total loss of water pressure throughout the City of Jackson and surrounding areas of Hinds County has created a condition of disaster and extreme peril to the safety of persons and property. This peril is of such magnitude that services, personnel, equipment, and facilities are above the capabilities of the City, County, and State. In response to the current situation, I have taken the appropriate action under state law by directing the execution of the State's emergency management plan and declaring a state of emergency on August 30, 2022. Additionally, I have deployed state assets, including Area Coordinators, Disaster Reservists, and the Mississippi Department of Health, to the impacted area. I am preparing to mobilize the Department of Transportation, Public Utilities, the Mississippi National Guard, and Department of Public Safety to assist in life-safety efforts.

I anticipate that emergency actions will be ongoing until the water pumps at the O.B. Curtis Water Treatment Plant are brought back into service and water pressure restored to the impacted residents. At that time, I intend to withdraw the agencies listed above and allow the City of Jackson to maintain its system.

## DISASTER HISTORY

Since 2020, eight (8) major disasters and four (4) emergency declaration events have afflicted Mississippi. The following list summarizes those events:

**FEMA 4478** – Severe Storms, Tornadoes, Straight-line Winds, and Flooding – Declared March 12, 2020. The following 13 counties were declared: Bolivar, Chickasaw, Choctaw, Clay, Desoto,

The Honorable Joseph R. Biden, Jr.
August 30, 2022
Page 3

Oktibbeha, Panola, Prentiss, Quitman, Sunflower, Tallahatchie, Tishomingo, and Washington. On January 10, 2020, this event brought severe storms, flooding, straight-line winds, and seventeen (17) confirmed tornadoes to the northern part of the State. Twenty-nine (29) counties reported damages, twenty (20) counties, and four (4) cities filed local proclamations of emergency. The storm caused twenty-one (21) injuries and one (1) death in the impacted area. Out of the initial twenty-nine (29) counties reporting damages, twenty-eight (28) applicants have submitted R.P.A.s, seventy-three (73) project worksheets are in various stages of development, and the Damage Assessment amount for this storm was approximately $8 million.

**FEMA 4528** – COVID 19 – Declared April 5, 2020 – Statewide. On March 12, 2020, the SEOC moved to Level 1 status in response to COVID-19. Coupled with all previous events, this unprecedented event's response and mitigation measures have exhausted the State's workforce capability. Currently, the SEOC is at Level 2 for the continued response to this event, and over 433 entities have submitted R.P.A.s. Due to this event's nature, the total amount of applications, project worksheets, and costs exceed the workforce capability to respond appropriately. As of August 30, 2022, over 905,000 Mississippians have been diagnosed with COVID-19, and 12,766 have died. During the COVID-19 Public Health Emergency, shelter operations required that Mississippi consider additional strategies to ensure that survivors are sheltered in a manner that does not increase the risk of exposure to or further transmission of COVID-19.

**FEMA 4536** – Severe Storms, Tornadoes, Straight-line Winds, and Flooding – Declared April 16, 2020. The following 20 counties were declared: Bolivar, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, Covington, Grenada, Holmes, Jasper, Jefferson Davis, Jones, Lafayette, Lawrence, Leake, Montgomery, Noxubee, Panola, and Quitman. On Easter Sunday, April 12, 2020, two (2) rounds of severe weather, including destructive tornadoes, hail, damaging winds, thunderstorms, and heavy rain, struck Mississippi, impacting one-third of the State. The National Weather Service in Jackson confirmed that multiple EF-5 tornadoes struck portions of Covington, Jefferson Davis, and Jones Counties on Easter Sunday, reaching an estimated wind speed above 200 miles per hour. These tornadoes tracked a half-mile wide and over 100 miles long through multiple counties. Twelve (12) Mississippians lost their lives in this storm. At present, there are 64 applicants, and project worksheets are under development. The Joint Preliminary Damage Assessments yielded approximately $35 million in damages.

**FEMA 4538** – Severe Storms, Flooding, and Mudslides – Declared April 23, 2020. The following 15 counties were declared: Attala, Carroll, Claiborne, Clay, Copiah, Grenada, Hinds, Holmes, Issaquena, Leflore, Marion, Sharkey, Warren, Wilkinson, and Yazoo. When these storms entered Mississippi, they brought tremendous amounts of rain over four days, with up to 10" of rain coming down quickly in ten (10) counties. This deluge rapidly made its way in the Ross Barnett Reservoir next to the City of Jackson and resulted in a maximum outflow of the reservoir into the Pearl River. This massive release of water resulted in catastrophic flooding downstream. Twenty-seven (27) counties submitted initial damage reports from February 10 through February 18, 2020. Of the

The Honorable Joseph R. Biden, Jr.
August 30, 2022
Page 4

twenty-seven (27) counties reporting damages, twenty (20) counties and six (6) cities filed local proclamations of emergency. Local governments reported four (4) injuries in the impacted area, and the Small Business Administration (S.B.A.) granted a declaration for this event. At present, there are twenty-one (21) applicants, and the project worksheets are under development. The Joint Preliminary Damage Assessments yielded approximately $10 million in damages.

**FEMA 4551** – Severe Storms, Straight-line Winds, Tornadoes, and Flooding. Submitted request for Major Federal Declaration on June 5, 2020. The following 11 counties were declared: Amite, Claiborne, Covington, George, Jefferson Davis, Jones, Lawrence, Pike, Simpson, Smith, and Wayne. Severe storms and powerful tornadoes entered Mississippi on April 22 and caused enough significant destruction for twenty (20) counties to report damages. Eleven (11) counties and five (5) cities filed local proclamations, and three (3) people were injured. The Joint Preliminary Damage Assessments yielded approximately $8 million in damages.

**FEMA 4576** – Hurricane Zeta. Major Disaster declared on December 31, 2020. The following counties were declared for Individual Assistance: George, Greene, Hancock, Harrison, Jackson, and Stone. Public Assistance was declared for George, Greene, Hancock, Harrison, Jackson, Perry, Stone, and Wayne. Hurricane Zeta impacted the State on October 28-29, caused $50M in debris and infrastructure damage, and damaged thousands of homes.

**FEMA 4598** – Severe Winter Storms. A Major Disaster was declared on May 4, 2021, for 31 counties and one Tribe: Adams, Attala, Choctaw, Claiborne, Copiah, Covington, Franklin, Grenada, Hinds, Jasper, Jefferson, Jefferson Davis, Kemper, Lafayette, Lauderdale, Lawrence, Leake, Lincoln, Neshoba, Newton, Noxubee, Pike, Rankin, Scott, Simpson, Smith, Tallahatchie, Walthall, Warren, Winston, Yazoo, and the Mississippi Band of Choctaw Indians. This winter storm caused approximately $30M in debris and infrastructure damage.

**FEMA 4626** – Hurricane Ida. A Major Disaster was declared on October 22, 2021, for 19 counties: Amite, Claiborne, Copiah, Covington, Franklin, George, Hancock, Harrison, Jackson, Jefferson, Jefferson Davis, Lawrence, Lincoln, Pearl River, Pike, Simpson, Walthall, Wayne and Wilkinson. This storm caused approximately $27M in debris and infrastructure damage.

**EM 3539** – Mississippi Hurricane Marco and Tropical Storm Laura. Submitted request for Pre-Landfall Declaration on August 28, 2020. The following 24 counties were declared: Adams, Amite, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Jackson, Jefferson, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Marion, Pearl River, Perry, Pike, Stone, Walthall, Wayne, and Wilkinson. Hurricane Marco and Tropical Storm Laura did not directly impact Mississippi, and minimal costs were incurred.

**EM 3544** – Hurricane Sally. Submitted request for Pre-Landfall Declaration on September 13, 2020. The following 24 counties were declared: Adams, Amite, Covington, Forrest, Franklin, George, Greene, Hancock, Harrison, Jackson, Jefferson, Jefferson Davis, Jones, Lamar, Lawrence, Lincoln, Marion, Pearl River, Perry, Pike, Stone, Walthall, Wayne, and Wilkinson. As a Category

The Honorable Joseph R. Biden, Jr.
August 30, 2022
Page 5

B declaration, the State recently conducted the Applicant Briefing and receiving Requests for Public Assistance.

**EM 3548** – Hurricane Delta. Submitted request for Pre-Landfall Declaration on October 7, 2020. The following three counties were declared for Category B emergency protective measures, including Direct Federal Assistance: Hancock, Harrison, and Wilkinson. The following counties were authorized Category B emergency protective measures, limited to Direct Federal Assistance: Adams, Amite, Claiborne, Copiah, Forrest, Franklin, George, Hinds, Humphreys, Issaquena, Jackson, Jefferson, Jefferson Davis, Lawrence, Lincoln, Madison, Marion, Pearl River, Pike, Rankin, Stone, Walthall, Warren, and Yazoo. As a Category B declaration, the State recently conducted the Applicant Briefing and receiving Requests for Public Assistance.

**EM 3569** – Hurricane Ida. Pre-Landfall Declaration was approved on August 28, 2021. As a Category B declaration, all 82 counties were declared.

The total or near total loss of water pressure throughout the City of Jackson and surrounding areas can result in substantial injury or harm to the population and significant damage to or loss of property. I specifically request an emergency declaration for Public Assistance – Category B, including Direct Federal Assistance.

The State of Mississippi is determined to recover from this water crisis. Mississippi is prepared to expend funds in response to this disaster; however, federal assistance is necessary due to the severity and magnitude of the disaster. Coupled with ongoing recovery efforts related to the above-referenced disasters of 2020-2022, as well as COVID-19, Mississippi will not be able to recover without the aid of the federal government.

Sincerely,

Tate Reeves
Governor

Enclosures

 MISSISSIPPI STATE DEPARTMENT OF HEALTH

ABOUT    LOCATIONS    CONTACT    TOPICS A-Z    SEARCH

**Menu** 

News, Events & Alerts

News Releases

News Releases 2020

News Releases 2021

### State Health Officer Issues Emergency Order Regarding City of Jackson Water

*August 30, 2022*

G Select Language ▼

## E-Newsletter

Get updates on public health topics when you subscribe to our e-mail newsletter.

 email address

■ SUBSCRIBE


MISSISSIPPI STATE DEPARTMENT OF HEALTH
## NEWS RELEASE

**JACKSON, Miss.** - Pursuant to the Mississippi Safe Drinking Water Act of 1997 (§41-26-1 et sec.), the Mississippi State Department of Health, upon receipt of information that emergency circumstances exist for customers of the City of Jackson, Mississippi drinking water system to receive safe drinking water and that a public water system emergency exists, is imminent or can reasonably be expected to occur without the immediate implementation of additional staffing and remediation measures hereby declares a public drinking water supply emergency in the City of Jackson, Mississippi.

Such Declaration is based upon information received by the Mississippi State Department of Health ("MSDH") as follows:

- Insufficient number of certified operators at J.H. Fewell and O.B. Curtis Water Treatment Plants
- Insufficient number of maintenance staff at all water treatment plants and to support the distribution system
- Failure of multiple raw water pumps at O.B. Curtis Water Treatment Plant
- Low levels of water in storage tank
- Low water pressure impacting proper sanitation and education opportunities

- Disinfection levels not consistently optimal developing the potential to have the presence of enteric organisms, including but not limited to, E.Coli, Cryptosporidium, or Giardia in the drinking water being served to customers.

## ORDER

Pursuant to §41-26-7 of Mississippi Safe Drinking Water Act of 1997 and based on the Declaration, the State Health Officer hereby orders that the City of Jackson including, but not limited to, employees of the Public Works Department and Emergency Management immediately cooperate with state response teams and contractors deployed to augment current staffing and to take remediation actions deemed necessary by the State Incident Commander.

Notwithstanding the requirements of this Order, the City of Jackson shall continue to be responsible for compliance with the Safe Drinking Water Act, any U.S. EPA Emergency Administrative Orders, and implement all applicable monitoring and reporting requirements of the Safe Drinking Water Act.

Compliance with this Order shall not in any way be construed to relieve the City of Jackson from its obligations to comply with all provisions of federal, state, or local law.

This Order shall remain in full force and effect for not more than one hundred twenty (120) days. The State Health Officer may extend such Order for additional periods of thirty (30) days, to the extent deemed appropriate.

For more information, visit HealthyMS.com/jacksonwater.

Follow MSDH by e-mail and social media at HealthyMS.com/connect.

---

**Press Contact:** MSDH Office of Communications, (601) 576-7667
**Note to media:** After hours or during emergencies, call (601) 576-7400

Last reviewed on Aug 3, 2022

11/1/2022, 11:17 AM

| error on this page? | email page | print |

Sign up for weekly public health updates by e-mail: 



| AGENCY | INFORMATION | I NEED A ... |
|---|---|---|
| About Us | Apps | Birth Certificate |
| Administration | Calendar of Events | Certificate of Need |
| Board of Health | Contact Us | Children's Health Insurance |
| County Offices | Meetings | Complaint Form |
| Institutional Review | Health Resources | Criminal History Check |
| Jobs | Hotlines | Death Certificate |
| Locations | Locations | Divorce Record |
| Public Health Laboratory | News | Food Permit |
| RFPs/Grants | Newsletter | Immunization Record |
| More » | Phone Numbers | J-1 Visa |
| | Español | License Verification |
| Intranet | | Marriage Record |
| OHIT+ER Service Center | | Professional License |
| Webmail | | Public Records Request |
| | | Wastewater Application |

**PUBLICATIONS**

Annual Report

CON Weekly Reports
Health Facilities Directory
Mississippi Morbidity
Reports
State Health Plan
Strategic Plan
*More »*

Mississippi State Department of Health · 570 East Woodrow Wilson Dr · Jackson, MS 39216 · 866-HLTHY4U
Contact and information





**U.S. Department of Justice**

Environment and Natural Resources Division

DJ No. 90-5-1-1-09841/1

Assistant Attorney General
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Telephone (202) 514-2701
Facsimile (202) 514-0557

*[By Hand Delivery/Email]*

September 26, 2022

The Honorable Chokwe A. Lumumba
Mayor of the City of Jackson
219 South President Street
Jackson, Mississippi  39205
calumumba@jacksonms.gov

Catoria Martin, Esq.
City Attorney
219 South President Street
Jackson, Mississippi  39205
cmartin@jacksonms.gov

Terry Williamson, Esq.
Assistant City Attorney
219 South President Street
Jackson, Mississippi  39205
twilliamson@jacksonms.gov

Re: Safe Drinking Water Act Matter Regarding Jackson, Mississippi

Dear Mayor Lumumba, Ms. Martin, and Mr. Williamson:

The United States Department of Justice, on behalf of the Environmental Protection Agency, invites the City of Jackson to engage in immediate negotiations relating to the City's recent drinking water crisis. We are prepared to file an action against the City under the Safe Drinking Water Act but would hope this matter could be resolved with an enforceable agreement that is in the best interest of both the City and the United States.

A judicially enforceable settlement would have to address the violations of the Safe Drinking Water Act (SDWA) related to the City's public water system described below. The United States also believes that an imminent and substantial endangerment to human health exists, as evidenced by the roughly 300 boil water notices that have been issued over the past two years, the multiple line breaks during that same time period, and the recent drinking water crisis where most City residents did not have access to running water for many days.

The United States intends to seek appropriate relief pursuant to Sections 1414 and 1431 of the SDWA, 42 U.S.C. §§ 300g-3 and 300i, to remedy these violations. Specifically, we intend to seek a comprehensive plan for remedying the violations and a schedule for implementing that plan. Negotiations would include discussion of accountability mechanisms such as temporary third-party management of the system. We invite the City to negotiate that plan with the United States and request that an initial meeting occur later this week.

<u>Violations</u>

As noted, the Justice Department believes that contaminants are in or likely to enter the City's public water system that may present an imminent and substantial endangerment to public health. The Justice Department further believes that State and local authorities have not acted to protect public health, pursuant to Section 1431 of the SDWA, 42 U.S.C. § 300i. The claims to be resolved also include the following violations of Section 1414 of the SDWA, 42 U.S.C. § 300g-3, including (i) National Primary Drinking Water Regulations; (ii) Mississippi Primary Drinking Water Regulations; and (iii) an Administrative Compliance Order on Consent pursuant to Section 1414(g) of the SDWA, effective July 1, 2021, Docket No. SDWA-04-2020-2301 ("AOC"), entered into between the City and EPA, and violations of EPA's Emergency Administrative Order pursuant to Section 1431 of the SDWA, effective April 2, 2020, Docket No. SDWA-04-2020-2300 (amended by Docket No. SDWA-04-020-2300) ("Emergency Order"):

1) Failure to adequately staff water treatment plants with Class A operators (Miss. Admin. Code § 15-20-72.2.2.1(5));
2) Failure to implement an Alternative Water Supply Plan pursuant to EPA's Emergency Order;
3) Failure to comply with the timeline for general filter rehabilitation pursuant to the AOC;
4) Failure to install corrosion control pursuant to the Lead and Copper Rule (40 C.F.R. §§ 141.80(e) and 141.83; Miss. Admin. Code § 15-20-72.1.3.2);
5) Exceedance of the haloacetic acids five (HAA5) maximum contaminant level (40 C.F.R. § 141.64(b)(2) and Miss. Admin. Code § 15-20-72.1.2.6);
6) Exceedance of single turbidity limits (40 C.F.R. § 141.173(a)(2) and Miss. Admin. Code § 15-20-72.1.7.4) and monthly turbidity limits (40 C.F.R. § 141.173(a)(1) and Miss. Admin. Code § 15-20-72.1.7.4).

There may be other violations, claims, or matters not listed above that might be addressed in comprehensive negotiations, or that the United States might pursue in litigation absent a negotiated settlement.

In addition, the City must also address Clean Water Act (CWA) violations at its wastewater system and violations of the consent decree entered in *United States and State of Mississippi v. City of Jackson, Mississippi*, Case No. 3:12-CV-790 (S.D. Miss.). Negotiations could therefore address any overlap in the appropriate resolution of the CWA matter with the SDWA claims. The terms of a negotiated settlement would be subject to approval of the appropriate officials at the Department of Justice and Environmental Protection Agency.

    ◆    *    ◆

       We hope you will join us to discuss the path forward in our shared goal of ensuring reliable delivery of safe drinking water to the people of Jackson and Hinds County. If you would like to pursue settlement discussions, please respond as soon as you can, and no later than Wednesday, September 28, so we can attempt to schedule an initial meeting this week. If you have any questions, please do not hesitate to contact me at any time.

                Sincerely,

                TODD KIM
                Assistant Attorney General
                Environment and Natural Resources Division

                KARL J. FINGERHOOD
                ANGELA MO
                Senior Counsel
                Environmental Enforcement Section
                U.S. Department of Justice

cc (via email):

        Suzanne Armor, EPA Region 4
        Jim Vinch, EPA OECA
        Cassandra B. Walter, MSDH
        Angela Givens Williams, Civil Chief, US Attorney's Office

☰  **Home**  **News**  **Watch Live**

🔍

Mc

ADVERTISEMENT

# Dept. of Justice says water not safe, prepared to file action aga Jackson under Safe Drinking Water Act

By Anthony Warren and Courtney Ann Jackson
*Published: Sep. 26, 2022 at 11:58 AM CDT*

JACKSON, Miss. (**WLBT**) - The U.S. Department of Justice is prepared to file an action against the city of Jackson under the Safe Drinking W but hopes negotiations with the city can prevent the need to.

Monday, DOJ notified Mayor Chokwe Antar Lumumba that it was prepared to file a complaint against the city under the Safe Water Drink citing years of problems with Jackson's water system.

However, the department also is urging the city leaders to begin "immediate negotiations" on a path forward, in an effort to stave off tha legal action.

"We are prepared to file an action... but would hope this matter could be resolved with an enforceable agreement that is in the best intere the city and the United States," wrote Todd Kim, an assistant attorney general with DOJ's Environmental and Natural Resources Division. " you will join us to discuss the path forward in our shared goal of ensuring reliable delivery of safe drinking water to the people of Jackso

Kim goes on to state that DOJ believes that when it comes to Jackson water, "an imminent and substantial endangerment to human healt
evidenced by the roughly 300 boil water notices that have been issued over the past two years, the multiple line breaks during that same
and the recent drinking water crisis."

He asked the city to respond to the department's request by September 28, and for an initial meeting between city leaders, DOJ, and the
Environmental Protection Agency to begin this week.

The news comes about a month after the state took over operations at the O.B. Curtis Water Treatment Plant after equipment failures the
of thousands of people without water. It also comes as EPA Administrator Michael Regan makes his third visit to the capital city in less tha

On Monday, Regan met with about two dozen pastors at New Hope Baptist Church to discuss the water situation. He also met with city le
prior to that meeting to begin talks on the future of Jackson water.

ADVERTISEMENT

"The people of Jackson, Mississippi, have lacked access to safe and reliable water for decades. After years of neglect, Jackson's water syste
reached a breaking point this summer, leaving tens of thousands of people without any running water for weeks," he said in a statement
what he told religious leaders. "These conditions are unacceptable in the United States of America."

Jackson's most recent water crisis began on August 29, when equipment failures at Curtis cut water service for tens of thousands of peop
time, much of the city had been under a state-imposed boil water notice for a month, one that the city had been unable to get lifted prio
crisis.

The crisis, along with the boil water notice, prompted a visit from EPA recently, where Regan heard from residents first-hand. The crisis als
prompted EPA's Office of Inspector General to launch an investigation into Jackson's water emergency.

During this visit, Regan said he "conveyed [the agency's] desire to work with the city to reach a judicially enforceable agreement that ens
sustainable water system in the mid and long-terms."

ADVERTISEMENT

Exactly what that that enforceable agreement looks like remains to be seen. For its part, DOJ is seeking a "comprehensive plan for remedy
violations and a schedule for implementing that plan."

US DOJ letter by Anthony Warren on Scribd

⊗

☰  **Home    News    Watch Live**                                                                Q

Additionally, DOJ states that any negotiations with the city would include the implementation of "accountability mechanisms, such as tem third-party management of the system."

Regan wouldn't say whether the third-party management would come in the form of a takeover but told reporters that all options are cul the table.

"There are lots of conversations about a lot of things," Regan said, standing outside New Hope's sanctuary. "We want to work out a situat there's judicial oversight and an agreed upon strategy on how we move forward, how we spent federal dollars, how we make financial de

Meanwhile, he said his office would be working with the mayor, governor, and Congress "to ensure that we put together a package that e the delivery of clean, reliable, and safe drinking water to the people of Jackson."

Gov. Tate Reeves said on social media that he "appreciate[s] continued efforts to ensure Mississippians in Jackson have access to clean wa continues via the state's incident command structure to pump out clean water in the short-term and this represents the potential for long solutions."

We reached out to the Governor's Office for further comment and are waiting to hear back.

Previous EPA mandates, including its 2012 sewer consent decree, are unfunded, meaning Jackson must bring the system into compliance help from the federal government. The city is currently working to modify the terms of the 2012 decree, arguing it cannot afford its nearly price tag.

Kim states that Jackson still must address violations associated with its wastewater decree and that talks regarding the water system and system could overlap.

Regan didn't say how long negotiations related to the water system would take. "We are responding with a sense of urgency. I'll be speak the governor, I believe, later this week. Our schedules didn't align today so he and I could have a conversation," he said. "But I want to be There is a sense of urgency amongst all of us to resolve this as quickly as possible."

⊗



Dept. of Justice says water not safe, prepared to seek legal action against Jackson under Safe Drinking Water Act  (WLBT)

In its letter, DOJ outlined six Safe Drinking Water Act violations by the city, including a failure to adequately staff water plants, failure to ir an alternative water supply plan pursuant to EPA's previous emergency order, failure to comply with a timeline for general filter rehabilita failure to install corrosion control pursuant to the federal lead and copper rule, the exceedance of certain contaminant levels, and exceed turbidity levels.

In August, a WLBT investigation revealed that personnel shortages at the city's two water treatment facilities were so severe that a loss of employee could have trigged a plant shutdown. Our subsequent review of timesheets submitted to EPA showed water operators that ren staff logged hundreds of hours of overtime in a matter of weeks to ensure that the plants were staffed at all times with Class A-certified v requirement under state and federal statutes.

As for turbidity, the high levels of turbidity led to a state-imposed boil water notice put in place for all of Jackson's surface water custome 29. Turbidity is the cloudiness of the water. The higher the turbidity, the more likely it contains disease-causing pathogens that were not I during the treatment process. That notice remained in place until mid-September, after the state had made numerous improvements at t plant.

Lumumba, who does not support a state or federal takeover of the water system, says he believes Regan understands Jackson's challenge the EPA, under Regan's leadership, will work with the best interests of the city in mind.

"I thank him for bringing forward a vision for the EPA that isn't merely about its regulatory function, which is valued and necessary, but al: understanding of what communities are really facing," he said. "Based on ongoing conversations, and even our discussion today, I'm happ we're moving forward in a collaborative effort, in a collaborative way."

*Want more WLBT news in your inbox? Click here to subscribe to our newsletter.*

*Copyright 2022 WLBT. All rights reserved.*

⊗

**Jackson: Unsold Never-Driven Cars Now Almost Being Given Away: See Prices**

SUV Deals | Search Ads | Sponsored


**Chevy Has Done It Again. This Year's Lineup Has Left Us Speechless**

All Things Auto | Sponsored


**Cardiologist: Too Much Belly Fat? Do This Before Bed**

Healthbay | Sponsored


**How to Easily Clean Earwax**

Earwax is known to cause hearing and memory loss. Use this easy trick to clear earwax.
KleanEars | Sponsored                                                  ADVERTISEMENT

**The Best Way to Withdraw From Retirement**

Have you considered how you'll withdraw your retire                              d cost you thousands of dollars.
SmartAsset | Sponsored


**Amazon Has Millions of Prime Subscrit                                        is Savings Trick**

Capital One Shopping | Sponsored

## Most Read

Taylorsville man arrested after high-speed chase



JSU shuts down, shuts out, Southern U.



Driver killed, passenger injured after vehicle crashes into utility pole in Warren County

®

Home    News    Watch Live





▶ Truck driver dies after tanker explodes on highway, officials say

ADVERTISEMENT

## Latest News



▶ USM continued Sunday silent movie tradition in Marsh Auditorium



Laurel police awaiting delivery of new cars

USM hosted silent movie viewing Sunday





**Perry County was 'lucky,' sheriff says**

News
Sports

Weather
Contact Us

**WDAM**
2362 U.S. Hwy 11 Moselle
Moselle, MS 39459
(800) 844-9326

Terms of Service    Privacy Policy    Public Inspection File    publicfile@wdam.com - 601-544-4730    EEO Report    FCC Applications

Closed Captioning/Audio Description    WDAM Careers    Advertising

A Gray Media Group Inc. Station   © 2002-2022 Gray Television, Inc.

# Jackson Jambalaya

A website of news, commentary, culture, & jackassery in the Jackson, Mississippi area.

**Home**      **Entries (RSS)**      **Comments (RSS)**      **About**

## Tuesday, September 20, 2022

## How Jackson's Water System Collapsed

*Now it's JJ's turn to tell the REST of the story.*

Much has been said in the media about the Jackson water crisis by reporters who are experts on everything and knowledgeable about nothing.  They blame the flooding of the O.B. Curtis plant, white flight, racism, and a mean ole legislature that refuses to help Jackson.  Jackson Mayor Chokwe Antar Lumumba wasn't about to discourage such tales of woe as he sought to avoid any responsibility for the catastrophe that happened on his watch.  Well, perhaps it's time to tell the real story of how the Jackson water treatment system fell apart, media be damned.

The O.B. Curtis water treatment plant opened in 1993 with a treatment capacity of 25 million gallons per day. The plant used a conventional filter system. The J.H. Fewell plant treated up to 50 million gallons per day. Part of Fewell was built in 1914 but it was expanded several times over the years. However, the plant was not built to handle sludge so MDEQ urged Jackson to replace the plant with another source of water in the late 1990's.

Jackson built the membrane side of the O.B. Curtis plant in 2007, doubling capacity to 50 million gallons per day. The expansion allowed Fewell to reduce production to 20 million gallons per day. Thankfully, Jackson never shut down the workhorse by the Waterworks Curve.

Read those two paragraphs again.  Despite all the shrieks about the old and worn out O.B. Curtis plant in the national media, the plant is fairly young.  Such plants are supposed to have much longer lives than the NFL stadiums that seem to be replaced every 25 years now.  **Half of the plant is 29 years old while the other half is only 15 years old.**  However, actual facts don't fit the media narrative so the facts are ignored by all, including the mayor.



Such a narrative may be convenient but is totally at odds with reality: Jackson receives more tax revenue than ever despite "the loss of its tax base."  Even if such were not true, the loss of the tax base should not affect the water treatment system.

The water treatment system is a stand-alone enterprise that should fund itself.  How a public



BRIARWOOD
Wine and Spirits
4949 Old Canton Road
601.956.5108



SUB-SPECIALIZED CARE. BETTER RESULTS.

NO REFERRAL NEEDED

601.354.4488



CLICK HERE FOR JACKSON JAMBALAYA COVERAGE OF THE WATER CRISIS

**EMAIL ADDRESS**

**kingfish1935@gmail.com**

**SUPPORT THIS SITE.**

utility works is simple enough to understand, even for reporters. Set the rates, bill the customers, collect from the customers, and cut off service when the customer does not pay. The rates should reflect what it costs to provide service, perform maintenance, and make improvements as needed. Unfortunately, such reductive analysis places more blame on Jackson than it does racism, hence its downplay by both the media and the mayor.

To truly understand how Jackson's water system collapsed, one must go back in time ten years ago to the Siemens project, the original sin from which all Jackson's water problems flow. As 2013 mayoral candidate Jonathan Lee warned, the Siemens project blew up the water system worse than anyone could imagine.

### Siemen's Project

Mayor Harvey Johnson conjured up the $90 million Siemens project in 2012. Siemens promised to replace Jackson's water meters with new-fangled models that would yield $123 million in savings through more accurate billing. Dazzled by the nine-figure savings, Election Man conned the City Council into issuing a no-bid contract to Siemens at the end of 2012, six months before he left office.

Unfortunately, the Siemens deal turned into a Predators Ball of sorts for Jackson. The Mayor's financial consultant roped Jackson along into this bad bond deal as he walked out with a $182,000 fee. He recently pleaded guilty to fraud on a bond deal while the SEC permanently revoked his license. As bond pimps raked in fees, the Mayor forced his "contractor" buddies down Siemens' throat under the guise of minority participation. Unqualified contractors were added to the project, driving up costs while lowering the quality of the work. As is too often the case in Mississippi, quality is ignored when pockets are stuffed and the Siemens project was no exception.

The Siemens project may have promised more money but it instead delivered chaos, breaking the billing system. Thousands of customers stopped received bills while thousands more received "crazy bills" as their bills jumped to thousands of dollars. Frustrated customers sought help in vain as phone calls to customer service often went unanswered. The billing debacle turned into a volcano that blew up the water/sewer when it erupted and erupted it did.

### The Destruction of Jackson Water/Sewer System Finances

Mayor Lumumba's father, Chokwe Lumumba, replaced Mayor Johnson in July 2013 but unexpectedly died in February 2014. Councilman Tony Yarber became mayor in 2014 as the billing fiasco spiraled out of control. Outrage grew until a panicked Yarber administration told customers not to pay their bills as it issued a moratorium on water cutoffs in 2016 and 2017. Mayor Chokwe Antar Lumumba removed the moratorium after he assumed the purple in July 2017. The bout of financial responsibility did not last as Mayor Lumumba quietly reinstated the moratorium in May 2020 without informing the public nor the City Council. The moratorium remained secret until this website broke the story in June 2021.

Cutting off the cutoffs had predictable results. Tell people they don't have to pay their bills and guess what? They don't pay their bills. The combination of the billing debacle and the moratorium on disconnects cratered Jackson's water/sewer revenue.

How deep was the crater? The Lumumba administration stated at a 2021 press conference Jackson suffered nearly $40 million in uncollected water bills from 14,588 active accounts, including stranded bills. While so-called journalists sneer at "blaming" customers who didn't pay their bills, the income statements told a different story as the old adage of following the money was never more true.



Donate

Mail donations to:
ATTN: Jackson Jambalaya
P.O. Box 2092
Ridgeland, MS 39158



magnolia health
BUILDING
HEALTHIER
COMMUNITIES
LEARN MORE



X

HAPAX
CREATIVE

COMMUNICATIONS
STRATEGY
MEDIA
FILM & VIDEO
PHOTOGRAPHY



THE JAMBALAYA
WITH THE KINGFISH

MARSHALL RAMSEY

One call, that's all
Daily Coloring Sheet:
October 14, 2022
October 13, 2022: Ramsey
Blog
October 13, 2022 Coloring
Sheet: IT Department

The city's annual audits show every measure of the water/sewer finances went in the wrong direction after meter installation began:

*Operating income fell from $7 million in 2012 to -$17 million in 2019. It climbed back to -$10 million in 2020 – after it received a $14 million infusion of Siemens settlement funds.



*Cash on Hand disappeared as it fell from $13 million in 2014 to $0.0 in 2017 where it remained for years.



*Accounts Receivables skyrocketed from $25 million in 2013 to $55 million in 2018.

*Water sales fell from $70 million in 2014 to $48 million in 2020.

One person can change your world.

**CLARION-LEDGER**

At least 5 tornadoes confirmed in Mississippi, Alabama Gulf Coast outbreak
Dia de los Muertos: How Day of the Dead allows people to mourn, honor and love lost ones
Mississippi governor extends Jackson water emergency order
It takes hard work and talent
One man hired both the Jackson State football and Southern head coaches

**PACER: SOUTHERN DIST.**

3:22-cv-00522 Moore v. Belk et al
2:22-cr-00005-1 USA v. Walker
2:21-cv-00117 McFarland v. Fitch et al
3:19-cr-00171-1 USA v. Lopez-Mazariegos
3:19-cr-00173-1 USA v. Baltazar-Sebastian

**WAPT**

Kyiv mayor says most of Ukraine's capital without water after Russian airstrikes
Man arrested in connection to 2017 killings of 2 teen girls in Indiana, authorities say
2 American college students among more than 150 killed in Halloween crowd surge in South Korea

|  | Water/ Sewage Disposal System | | San Jaban | |
|---|---|---|---|---|
| **OPERATING REVENUES** | | | | |
| Sales to customers | $ | 47,702,464 | $ | 8,527,996 |
| Contributions - Participants | | | | |
| Contributions - City | | | | |
| Other revenues | | 51,919 | | 9,282 |
| Total operating revenues | | 47,754,387 | | 8,536,878 |
| **OPERATING EXPENSES** | | | | |
| Personnel services | | 5,266,346 | | 930,089 |
| Supplies | | 4,979,015 | | 137,400 |
| Other services and charges | | 26,814,979 | | 9,546,614 |
| Depreciation | | 17,701,246 | | 146,238 |
| Total operating expenses | | 52,751,256 | | 10,760,221 |
| Operating loss | | (9,996,899) | | (2,223,343) |
| **NONOPERATING REVENUES (EXPENSES)** | | | | |
| Noncapital grants | | | | 55,146 |
| Interest revenue | | 301,021 | | 168 |
| Interest and service charges on long-term debt | | (10,525,426) | | (3,151) |
| Gain on sale of capital assets | | 70,050 | | |
| Litigation settlement gain on capital assets | | 14,625,137 | | |
| Total nonoperating revenues (expenses) | | 4,530,782 | | 34,205 |
| Income (loss) before capital contribut'ons and transfers | | (5,456,117) | | (2,169,138) |
| Capital contributions and grants | | 500,000 | | |
| Transfers out | | (7,088,561) | | |
| Transfers in | | 5,891,992 | | 3,709,686 |
| Change in net position | | (6,660,671) | | 3,530,548 |
| Total net position - beginning | | 230,580,731 | | 1796,619) |
| Total net position - ending | $ | 223,930,110 | $ | 4,723,909 |

*Click on image to enlarge.*

The charts all have one thing in common: they start going in the wrong direction within two years after the approval of the Siemens project.

Mayor Lumumba sued Siemens for $225 million in 2019. The principal and interest was $200 million over the life of the bonds. However, the city settled for $90 million in 2020. Only $14 million of the settlement went into the water/sewer system while $30 million went to attorneys, including a criminal defense attorney who had questionable expertise on such matters. The rest of the settlement repaid various loans.

What does it all mean? It means there was no revenue to fix things. No revenue to hire staff. No revenue to purchase chemicals or equipment (as shown in a water operator's emails). No staff meant no maintenance. More and more of the plant depended on back-up parts as the first-line parts failed, never replaced. The city was forced to use the general fund budget to shore up the water/sewer budget, almost unheard of in an American city.

### Myth: Jackson Went Broke Because of White Flight

As Jackson's water/sewer system crumbled, the media drooled as it pulled out a familiar scapegoat: racism. It was a convenient trope requiring no analysis: Whites left Jackson, taking precious dollars with them to the burbs while the state was blamed for not giving Jackson a blank check.

Following the money tells a different story although it might be a bit much to expect reporters to actually read Jackson's financial statements as most of them are ignorant on such things. More than a few probably think a debit is the sound of a frog. However, annual audits show more money than ever is going into Jackson's coffers. Does this look like Jackson's tax revenue "disappeared"?

Temperatures gradually go up through the week

After more than a decade, consent decree for Henley Young looks to be terminated

### BABYLON BEE

Report: Jesus Is Aware That Your 'Harvest Festival' Is Really A Halloween Party

10 Most Controversial Things You Can Finally Say On Twitter Now

Divorce Attorney Conveniently Located At IKEA Exit

Op-Ed: Citizens Being Able To Vote The Ruling Party Out Of Power Is The End Of Democracy

Man Celebrates 40th Birthday With Finely-Aged, Single Malt Bottle Of Advil

### Y'ALL POLITICS

Senate hearings on women, children and families show areas for improvement for Mississippi

Governor Reeves extends State of Emergency for Jackson water crisis

Group wants felon disenfranchisement in Mississippi Constitution reviewed by SCOTUS

### THE REZ NEWS

RunStrong Hosts Reservoir Loop Challenge If Soggy Sweat Was Here Today - Soggy Sweat on Changing the State Flag

Coalition of Business for

Case 3:23-cv-00272-HTW-LGI    Document 50-7    Filed 06/07/23    Page 127 of 230



Follow the money once again to get the rest of the story:

* **Total revenue increased from $180 million in 2003 to $264 million in 2020.**

*Property tax revenue rose from $59 million in 2002 to $79 million in 2020. Does that sound like disappearing property taxes?

*Sales tax & other revenue increased from $36 million in 2002 to $54 million in 2020.

The media ignores this picture because it doesn't fit the narrative of a broke city ruined by whites fleeing en masse because they are scared of blacks. It is much easier to blame racism than report that as Jackson collected more, it served less.

## Who is in Charge?

**Jackson is a $300 million enterprise yet its leaders lack any management experience.** Mayor Lumumba practiced law in a small firm prior to becoming Mayor at age 34. The Chief of Staff was a Jackson State University professor. The mayor's first Chief Administrative Officer was a JSU music professor. His next CAO was an architect. The architect moved over to run Public Works after a few months even though he had no experience in such matters. The current CAO was a customer service manager at Entergy. Dickens comes to mind:

> "Military officers destitute of military knowledge; naval officers with no idea of a ship; civil officers without a notion of affairs; brazen ecclesiastics, of the worst world worldly, with sensual eyes, loose tongues, and looser lives; all totally unfit for their several callings, all lying horribly in pretending to belong to them, but all nearly or remotely of the order of Monseigneur, and therefore foisted on all public employments from which anything was to be got" (A Tale of Two Cities, Book II, Chapter VII)

No managers means simple management tasks don't get done. Job openings for desperately needed positions are not posted online. No managers means shucking and jiving the health department while never taking its warnings seriously. No managers means not firing employees when they should be fired. No managers means nothing gets done nor is anyone held accountable. No managers means the Fewell plant comes within hours of shutting down this summer because no one could agree on ordering much-needed chemicals. No managers means making excuses matters more than making things happen.

No managers is how you blow off the EPA and allow a water system to fall apart through incompetence and neglect.

## Orders & Coverups

The Mississippi State Department of Health began sounding the alarm on the water system in 2016. Successive administrations blew off the Health Department until the agency went running to big brother EPA near the end of 2019.

The EPA inspected the water treatment plants in February 2020 and discovered they were falling apart due to neglect, incompetence, and a shortage of employees. The agency issued an Emergency Administrative Order in March 2020 that is filled with crucial but eye-glazing

Flag Change

**AND THE VALLEY SHOOK**

Ole Miss Film Review Part 1: Fax Machine

Link Gumbo: WRU needs to deliver

Christian Brathwaite Flips From Baylor to LSU

**NAKED CAPITALISM**

Links 5/7/2022

Why Canceling Student Debt Is a Matter of Racial Justice

Did UN Secretary-General Guterres Commit A War Crime At Azovstal?

CalPERS Long-Term Care Program Fiasco

Site Transfer Starting Saturday May 7 at Noon EDT; Comments Warning

**NMISSCOMMENTOR**

Hello world!

The Right Nicotine Strength Makes A Difference In The Vaping World

Even worse than the good old days

**CALCULATED RISK**

Year-over-year Pace of Rent Increases Continues to Slow

Housing October 31st Weekly Update: Inventory Increased, New High for 2022

Four High Frequency Indicators for the Economy



details.

The lack of a technician meant "continuous monitoring equipment" at O.B. Curtis was "not repaired or calibrated" for over three years. pH meters, flow measurement devices, and other crucial equipment were not maintained. The continuous pH meters were off by up to 2 units in some cases. Plant operators were somewhat operating in the dark as they simply could not know the quality of the water they were treating. One-third of the south Jackson wells were out of action.

The staff didn't conduct jar tests even though the system could not determine turbidity. No one knew if the membrane filters worked because no maintenance was performed. The UV filters used to disinfect water went offline for weeks at a time. A multitude of cheap parts did not work even though they are easy to replace. The sludge handling facility was inoperable. Record management, a foundation of water system management, was sloppy or at times non-existent.



BREESE LAW OFFICE PLLC recently obtained an **AWARD OF $3.2 MILLION** for customers of a stockbroker who had mishandled their accounts.

Breese Law

Contact us for a **FREE CONSULTATION.**

601.351.3339
breeselaw.com

If you have an investment account that has lost money or underperformed, and you don't understand why, you may have a claim for compensation.

Jackson's negligence didn't end with the water treatment plants. The city ignored all federal laws requiring Jackson to create and implement a lead service line replace program for years. Flint, Michigan, anyone?

The order set various deadlines for repairs and reports but Jackson repeatedly blew off the deadlines.

**Mayor Lumumba kept the EPA emergency administrative order secret for over a year until this website broke the news of its existence in April 2021.** Mayor Lumumba obfuscated, calling the order a "letter" or an "administrative process gap" at times as he tried mightily to avoid all talk of the order.

The Mayor refused to discuss the order with the City Council except behind closed doors. Mayor Lumumba told a Councilman, a West Point graduate no less, the order was "over your head" when the Councilman wanted to discuss the order at a City Council meeting.

No chutzpah was too small for the mayor as he blamed the public for being "ill-informed" about the orderr as he quashed all discussion. When the order was mentioned, Mayor Lumumba deflected as he claimed the EPA said the water was safe to drink.

The water might have been safe to drink but the EPA order covered the working condition of the water treatment plants, not the quality of the drinking water. Big difference. Big, huge difference. It does not matter if the water is safe if there is no water to drink.

### The Perfect Storm Arrives

While the Mayor covered up, the system veered towards collapse. Health Department employees prophetically warned in a June 2021 internal email:

> **This year has shown that the City of Jackson's Water system is rapidly building toward a "perfect storm": 1) Poor asset management and maintenance, 2) financial difficulties with an unwillingness to spend needed funds,** and 3) the inability to consistently achieve compliance with various provisions of the SDWA (Safe Drinking Water Act). Considering the NEIC's visit in February 2020, I believe that we can agree that the city is going in a negative direction. **Logs indicated system components are being stretched to their breakpoint** and membrane trains are one continuous failed MIT away from a shutdown along with logbook statements

*such as "called J. H. Fewell to go up on high service flows per M. Carter due to customer low pressure calls". Plants are on the edge of failure. Items that are repeatedly reported by upper management as functional or repaired are continuously reported by plant staff as having issues or failing in the WOR and the Operator log submissions (specifically the MIT system for trains). we are very concerned about the city of Jackson's growing amount of mechanical issues at the O.B. Curtis Water Treatment Plant and overall its ability to maintain adequate production of safe drinking water for its customers.*

In other words, the Lumumba administration lied about the water treatment plants as they fell apart.

The perfect storm came in the form of the February 2021 double ice storm that crippled Jackson. The city lost water pressure for a week although some areas lost water service for a month. Desperate residents got water out of creeks just to flush their toilets. Icy roads made it difficult for many to get water while the same conditions prevented stores from opening or restocking.

The media descended upon Jackson for what would not be the last time, asking how an American city could go without water. The mayor stood ready with his usual arsenal of answers. White flight destroyed the city's tax base. The state wouldn't give the mayor a blank check. Racist city leaders ignored the south and west Jackson when they built the water plants. Such claims became a mantra, never challenged. The real truth was Jackson received more revenue than ever, but the Siemens fiasco transformed a healthy water/sewer system into a cripple unable to take care of itself.

Lies continued to roll as the media latched on to the mayor's every word. Mayor Lumumba repeatedly blamed the state, telling national media such as the *New York Times* the state did not pay its water bills. The lapdogs slurped it all up with nary a challenging word. Such things are not done today, you understand. Yet again, the mayor lied and lied repeatedly about the unpaid water bills.

This website dug into the weeds and published records showing the state did indeed pay for its water, usually over $1 million per year. The mayor backtracked, claiming at a press conference he was "misinformed" as the media took him at his word. It would not be the last time the mayor was so "misinformed."

Neglect and incompetence continued to plague O.B. Curtis. A fire broke out at the plant in April 2021, ,knocking out an electrical panel that controlled several pumps. Water production fell as the plant operated on the proverbial shoestring. The media wondered nine months later why the pumps were not yet fixed. The mayor said "supply-chain problems" kept Jackson from getting the electrical panel it needed to bring the pumps back online.

However, JJ caught the mayor shucking and jiving yet again. Health Department emails in December showed the Lumumba administration never ordered the electrical panel despite his claims to the contrary. The agency told Jackson to order the part within thirty days. Jackson finally did so –the day before the deadline expired in January. The panel finally arrived in May, a year after the fire.

More problems continued. The system lost water pressure in November 2021. The Lumumba administration said the injection of "bad batch of chemicals" into the system in November caused system pressure to drop to 65 psi. The "bad batch" indeed caused problems but that is not what crashed the system.

Health Department emails yet again told the real story as they revealed the lines feeding the chemicals into the injection point were clogged and did not work. Such lines are supposed to have back-up lines but these were the back-up lines. Health Department representatives caught a plant employee using a rubber hose to inject the needed chemicals. Yet again, the failure to maintain and replace equipment broke the Jackson water system while the administration hid the truth.

### Total Collapse

The system limped along as Jackson endured five boil water notices in 18 months. Residents grew battle-weary while restaurants struggled survive. Business owners publicly pleaded with everyone and anyone who would listen to fix the water system. Such was the status quo in the summer of 2022.

The O.B. Curtis plant suffered an ammonia leak that interrupted treatment for "more than two days" in June. However, the city only issued a boil water notice and warned some areas might lack water pressure. The city did not report the ammonia leak nor the evacuation of the employees to the public nor the Health Department. The media discovered the leak when a

report of the leak appeared on the National Response Center's website. The Chief of Staff refused to answer any questions on whether any employees were injured, citing HIPAA. Noticing a pattern?

Through it all, the plants lacked qualified personnel, including precious Class A water operators. The EPA noted the lack of Class A operators in its 2020 order yet Mayor Lumumba said they were almost impossible to find due to the dual filtration systems at O.B. Curtis even though earlier Mayors kept the plants staffed.

A fed-up EPA ordered Jackson to answer basic questions such as how many vacancies existed, all correspondence about staffing issues, and how the water system maintained pressure when part of O.B. Curtis was out of action. Jackson being Jackson, the Lumumba administration submitted the answers after the deadline.

The EPA inspected the plants in March 2022 and found the water treatment system was still going backwards despite the federal government's efforts to help Jackson. **The agency warned in July the system was close to failure.**

The system continued to suffer from a lack of operators. No one could take time off unless someone worked extra hours. The system suffered an "exodus" of employees due to low pay. "Malfunctioning water meters" caused water revenue to fall a full third since 2016, depriving the system of the money it needed to operate. Jackson suffered triple the number of average line breaks for such a system. The water at both plants was frequently outside the recommended pH.

Amargeddon almost struck in July when Fewell came within hours of closing due to a lack of necessary chemicals. Public works officials bickered over purchasing the chemicals as precious days ticked away. Jackson finally purchased the chemicals on the same day the plant would have shut down.

The Health Department issued a boil-water notice for Jackson in July as well although Mayor Lumumba heatedly disputed the order, claiming the water was safe. He even said the agency's leadership disagreed with its own staff as he took his brinkmanship to the limit. Behind the scenes, Health Department officials knew the real state of the water system, despite Mayor Lumumba's protestations.

Doomsday finally arrived in the form of a flood. A 24-hour rainstorm dumped over five inches of water on the Jackson metro area. The O.B. Curtis plant easily survived the 2020 and 2014 floods but its luck finally gave out although flooding did not reach the plant. JJ drone photos shot at 4 PM on August 29 show the floodwaters never came close to the plant. Mayor Lumumba tried to say they were taken before the flood. Sorry, Mr. Mayor. Former 30-year *Clarion-Ledger* photographer Rick Guy shot those photos for *JJ*.

Floodwater upriver changed the chemical composition of the lake that provides Jackson's water. Lacking the staff and working equipment to handle the change, the plant failed. Two pumps were already down while the plant depended on smaller backups. More problems developed as homes and businesses began reporting a loss of water service on August 20. Jackson's water treatment system crashed. Faced with no other choice, the state moved in and took over the water treatment plants.

Reporters moved in with patented phony outrage and "analysis" as they pulled out their well-worn playbooks. Some even reported O.B. Curtis flooded even though floodwaters never reached the plant. The networks ignored their own local reporters who knew the story backwards and forwards as their national reporters parachuted in to Jackson, asked their cookie cutter questions about equity and environmental racism, and went back home to their bubbles.

Instead of investigating, the media spoke to the one person who had the strongest motive to lie and lie he did as Mayor Lumumba appeared in countless interviews, spinning tale after tale of how it was all the fault of Republicans. Unfortunately for all, the media reported it all as fact, not to be questioned. Such is the state of modern journalism today. Why report reality when it can be manufactured?

The reality is a decade of incompetence blew up Jackson's water system. Mayor Johnson destroyed the billing system with his Siemen's project. Mayors Yarber and Lumumba cut off the cut offs, depriving the water/sewer system of much needed revenue. Mayor Lumumba covered up the truth as the water treatment plants fell apart on his watch and that, my friends, is the bottom line.

**A16** | Tuesday, September 6, 2022

## OPINION

### REVIEW & OUTLOOK

# Jackson's Water Woes Explained

It's inevitable these days that any urban calamity immediately becomes a progressive parable of systemic racism and "anti-government ideology," as one columnist put it. That's been the media spin after last week's failure of a water treatment plant in Jackson, Miss., but the truth isn't that simple. This is another local government failure of the kind that is becoming all too common in America's cities.

Mississippi Gov. Tate Reeves said Monday that "we have returned water pressure to the city," but Jackson residents suffered a week without a reliable water supply after flooding of the Pearl River overwhelmed the 30-year-old O.B. Curtis water treatment plant. Much of the blame belongs to chronic mismanagement by elected officials in the city of about 150,000, which is also the state capital.

\* \* \*

Ensuring safe and reliable drinking water is fundamentally a local responsibility under the U.S. federalist system, with the state and federal government providing some oversight. But many cities like Jackson are struggling to perform this core government responsibility.

Jackson's water woes aren't new. In 2014, 90% of city voters approved a one percentage-point increase in the sales tax in part to fund water and sewer repairs. In the past nine years, the city has allocated nearly $490 million from its capital budget to water and sewers—about $3,200 per resident. But much of the money hasn't been well spent, and the city's water problems have worsened.

In the month before the flood, Jackson residents were under a boil-water notice—a frequent occurrence in the city—due to failed pumps at the Curtis plant. In April 2021, an electrical fire caused the plant to temporarily shut down, and a winter storm that year also interrupted the water supply for many residents for weeks. The city's progressive mayor, Democrat Chokwe Lumumba, blames white state Republicans for not providing sufficient funding.

Yet the state made available nearly $170 million in loans and grants from 2016 to 2021

*The Mississippi city is another example of failed local government.*

for Jackson's water and sewer infrastructure. Earlier this year, Mr. Lumumba grumbled when the state offered another $25 million from federal American Rescue Plan Act funds because lawmakers insisted on exercising oversight on how the money was spent. The state had good reason.

In March 2020, the federal Environmental Protection Agency issued an Emergency Administrative Order to Jackson citing conditions "that present an imminent and substantial endangerment to the persons served" by the water system. The city had "failed to perform filter maintenance" at both of its water treatment plants. EPA noted. Jackson residents say the city doesn't respond to calls when pipes burst or sewage backs up in their homes.

The progressive media narrative is that Jackson's problems are the inevitable result of whites fleeing the predominantly black city, resulting in a shrinking of the local tax base. But many blacks have been escaping too. Blame lousy schools and infrastructure and a homicide rate that is among the highest in the U.S. In any case, city revenue increased to $264 million from $242 million between 2018 and 2020. Yet the city's water and sewage disposal system ran $27 million in operating deficits during that time.

Uncollected bills are one problem. Faulty meters installed under a $90 million contract with Siemens in 2013 have resulted in the city losing as much as $1.8 million a month, according to the Jackson Water Sewer Business Administration. In March 2020 as Covid hit, the state imposed a two-month moratorium on water shutoffs to unpaid bills. But the city maintained a moratorium until September 2021, which meant the city collected less money to fund repairs.

\* \* \*

Jackson's competence problems read like those in Detroit and Flint, Mich. State receiverships helped fix their chronic fiscal and management problems, and this is an idea worth considering for Jackson. Gov. Reeves has promised to cover half the costs of the repairs for the current crisis, but Jackson needs more help than money alone can provide.

https://www.wjtv.com/news/local-news/will-jackson-receive-its-arp...

# Will Jackson receive its ARPA funds?

*Richard Lake*

JACKSON, Miss. (WJTV) – The City of Jackson could receive at least $84,000,000 in American Rescue Plan Act (ARPA) funds due to a dollar-for-dollar match program.

The funds are expected to be put towards water and sewer infrastructure in Hinds County. In an interview Monday afternoon with WJTV 12 News, Lt. Governor Delbert Hosemann said the City of Jackson had not yet applied for these fund.

With applications due Friday, Jackson officials said there should be no issue.

"We voted for it to approve the applications, and they should have been sent to this state at that point in time," said Jackson City Council President Ashby Foote, Ward 1.

"Everything is right on time," said Jackson Mayor Chokwe Antar Lumumba. "We're making sure that we do all of our homework, and we're going to meet our deadline, and we're going to have a robust request. The question then becomes that that be met."

According to Lumumba, the City of Jackson has been working with the Army Corps of Engineers and the Mississippi State Department of Health (MSDH) on developing the ARPA funds request.

10/31/2022, 11:10 AM

https://www.wlbt.com/2022/10/08/jackson-seeking-356m-state-infr...

# Jackson seeking $35.6M from state infrastructure program to help fund water and sewer projects

*Anthony Warren*

JACKSON, Miss. (WLBT) - Jackson's application for state ARPA funds shows the city would use the additional money to target raw water pumps at its main water treatment plant, as well as a sewer transmission line that is a major source of contention with the EPA.

Last week, the city submitted its application for funding to the Mississippi Municipality and County Water Infrastructure Grant Program (MCWI).

The city is seeking more than $35.6 million in matching funds to address priority water and sewer needs, including millions to correct problems at Jackson's O.B. Curtis Water Treatment Plant, the epicenter of the August/September water crisis, and millions more to repair broken sewer lines that have led to sanitary sewer overflows, something Jackson must do to address mandates in its sewer consent decree.

MCWI was established by the Mississippi Legislature earlier this year to provide local governments with matching funds to make repairs to water, sewer, and drainage infrastructure. Under terms of the program, cities and counties can receive a dollar-for-dollar match for all eligible projects they fund using American Rescue Plan Act Dollars. Lawmakers set aside $450 million of the state's ARPA money to fund the work.

The deadline to apply for the first round of funding was September 30. In all, 429 cities and counties are seeking a combined $434.7 million. However, less than half of those applications will be approved, with the legislature mandating that just 40 percent of the $450 million be awarded in the first round.

Among requests, Jackson is seeking $1,650,000 to replace aging raw water pumps at O.B. Curtis, Jackson's main water treatment facility. According to the application, the pumps failed this summer, prompting the city to bring in backup pumps. Those backup devices, in turn, failed, leading to the water crisis that left tens of thousands of people with little to no water service.

"The ability to reliably bring in reservoir water for treatment is a necessary investment," the city's application states. "Without it, residents of the surface water system, and major industries such as Nissan may... experience sudden pressure loss and water outages... which happened in early August 2022, prior to the Pearl River Flood that resulted in the current water system emergency."

The state stepped in to help stabilize the facility in late August. The effort that included repairing failed pumps. But even with those repairs, Jackson's application says the devices need to be retired. "Given the age of the equipment and lack of system redundancy at the plant... the pumps must be replaced to [ensure] steady water supply," the application states.

10/31/2022, 11:10 AM

Jackson seeking $35.6M from state infrastructure program to pump...                    https://www.wlbt.com/2022/10/08/jackson-seeking-356m-state-inf...

c. Provide a detailed scope of work for the project including issues to be resolved, goal
metrics. Explain why the project is a "Necessary Investment".
Refer to MCWI Regulations, Rule 1.2, Section D for additional information on necessary

The City of Jackson intends to replace aging raw water pumps at the O.B. Curtis v
provides drinking water for most of Jackson, parts of Byram, and parts of uninco
t also produces water sold to the Nissan plant and neighboring industries near C

The raw water pumps at the plant are original equipment to the plant dating to t
umps and early-mid 2000s for the additional pumps installed under the membrai
s experienced two sudden pump failures in the summer of 2022 that lead to a re
caused by limited water intake. This in turn led to reduced system pressure for th
he failed pumps were repaired and placed back into service under the water syst
30, 2022. However, given the age of the equipment and lack of system redundar
bulk of water production and system pressure, the pumps must be replaced to in
stem redundancy.

The ability to reliably bring in reservoir water for treatment is a necessary investm
surface water system and major industries such as Nissan may be forced to expe
water outages caused by reduced production in the event of a sudden raw wate
n early August 2022 prior to the Pearl River flood that resulted in the current wat
f Jackson is currently under an EPA Administrative Order of Consent. On Septemt
City to negotiations for a judicially enforceable settlement to address violations

City seeking funding to replace the raw water pumps at O.B. Curtis.(WLBT)

Jackson also is seeking $8,800,000 to rehab filters on the Curtis plant's conventional and
membrane filtration sides, $1,450,000 to convert manual chemical feeds to automated ones at
Curtis and the J.H. Fewell Treatment Plant, $8,798,000 to replace filters and finish construction of
a 48-inch water transmission line at Fewell, and $2,750,000 to repair and rehab aged pumps at
Fewell.

Fewell, which is located in the waterworks curve, is the city's backup treatment facility, and is
authorized to treat up to 20 million gallons of water a day. The plant was allowed to treat up to 30
million gallons a day during the water crisis. Pumps at that facility also appear to be on their last
legs.

City documents show an inspection of the equipment there in September 2022 revealed that one of
its larger raw water pump was ruled out for future use "due to mechanical and structural
problems," while another main pump would "wear out within a couple of years" without immediate
repairs.

Inspections also reveal that other pumps still in use at the plant "appear to be original equipment
from the 1940s, save for a couple of parts... In order to extend the life of J.H. Fewell, the raw water
intake pumps need to be replaced," the city's application states.

To address sewer needs, Jackson is seeking $7.5 million to continue rehabbing the West Bank
Interceptor, a major sewer collection line that runs along the west bank of the Pearl River from
Northeast Jackson to the Savanna Street Wastewater Treatment Plant, and $4,681,520 to repair a
broken main under N. Mill Street.



Sewer Pump at Mill Street.(Pearl Riverkeeper)

WLBT reported that between April 1 and June 30 of this year, nearly 20 million gallons of untreated wastewater were released into the environment due to a main break and sewer pump failure at Mill Street, a major violation of the city's sewer consent decree.

As for the West Bank Interceptor, the line "has a number of locations that are in need of rehab" to reduce inflow from the Pearl River. A number of manholes also need to be raised and waterproofed, also to prevent infiltration when river levels rise to flood stage, the city's MCWI application states.

Council President Ashby Foote says that even if the city's requests are approved, Jackson will have to maintain the repairs/replacements once work is complete.

"I think at the end of the day, you go back to early July, the EPA was more worried about personnel than it was money," he said. "So, it's a combination. We can't forget about the human capital that is critical to having successful enterprises."

Documents obtained by WLBT showed that staffing shortages threatened to shut down the city's treatment plants and led to employees having to work hundreds of extra hours overtime in short periods of time.

At a meeting shortly before our report aired, EPA officials said a lack of staffing likely contributed to the numerous Safe Drinking Water Violations reported by the city in recent years, including the 2021 winter water crisis, when days of below-freezing temperatures crippled water production at Curtis.

According to its application, the city says it is working with the Mississippi Management Agency to bring on a third-party firm to take over operations and maintenance at its two water treatment plants as well as its two well water systems in south and west Jackson.

Want more WLBT news in your inbox? Click here to subscribe to our newsletter.

Copyright 2022 WLBT. All rights reserved.

☰

# Mississippi Municipality & County Water Infrastructure Grant Program

**APPLICATION PORTAL** ↗

10/31/2022, 11:11 AM

## Recent Updates and Changes ▾

(!) **Please note that the MCWI Program is no longer accepting first round applications.** The application period closed on September 30, 2022 at 11:59 PM CST.

A second round of grant funding is coming soon. We will be announcing its opening date on our website, on social media, and by email.

**Application Instructions**

**Data Tools**                                        ▾

**Application Walk-Through Video**                    ▾

                                                      ▾

**Procurement Training Video**



American Rescue Plan Act
State & Local Fiscal
Recovery Funds

Procurement Overview

Alex Yarbrough, HORNE

36:20

2 of 12

10/31/2022, 11:11 AM



# Frequently Asked Questions

## Download the list of FAQs



# Recent Updates

09-30-22 - FAQ Update

09-23-22 - FAQ Update                                             ▼

09-15-22 - Application Portal Questions                           ▼

09-15-22 - Procurement Training Video                             ▼

09-13-22 - State of MS MAGIC link                                 ▼

09-13-22 - Data Tools added                                       ▼

09-06-22 - Application Portal Questions                           ▼

08-17-22 - Grant Program Regulations                              ▼

08-17-22 - Scoring System Update                                  ▼

                                                                  ▼

The Mississippi Legislature and Governor Tate Reeves have created the Mississippi Municipality & County Water Infrastructure Grant Program Act (MCWI) to provide matching funds to eligible entities for making necessary investments in water, waste water and stormwater infrastructure.

Senate Bill 2822 provides the funding and parameters for the program, which is derived from the American Rescue Plan Act (ARPA). More specifically, State Fiscal Recovery Funds available under ARPA are being made available to match Local Fiscal Recovery Funds received by counties and municipalities.

The Mississippi Department of Environmental Quality (MDEQ) will manage this program. Moreover, MDEQ will produce Rules and Regulations as to the administration of the program, will determine eligibility based on submission of applications for match funds, will rank eligible applications, award funding and monitor the funded programs to assure compliance with federal and state laws, rules and regulations.

10/31/2022, 11:11 AM



These regulations, adopted pursuant to Senate Bill No. 2822, shall govern the Mississippi Municipality and County Water Infrastructure (MCWI) Grant Program and its implementation.

**Regulations**



The MDEQ has developed a scoring system based on twelve factors set forth in the "Mississippi Municipality and County Water Infrastructure Grant Program Act of 2022"

**Scoring Summary**



The following questions are not to be used for submitting applications. The list of questions will be turned into an application to be submitted via the online portal.

## Application Portal Questions



The Coronavirus State and Local Fiscal Recovery Funds (SLFRF) program, a part of the American Rescue Plan, delivers $350 billion to state, local, and Tribal governments across the country.

### Treasury.gov Guidelines



Senate Bill No. 2822 to establish the Mississippi Municipality and County Water Infrastructure Grant Program Act of 2022 administered by the Mississippi Department of Environmental Quality.

### Senate Bill No. 2822



Coronavirus State & Local Fiscal Recovery Funds: Overview of the Final Rule U.S. from the Department of The Treasury – a simplified user guide to the final rule provisions.

**Summary of Final Rule**

ⓘ

Aug 18, 2022

Face-to-Face Discussion

**Watch the Recording**

ⓘ

July 28, 2022 Webinar

**Watch the Recording \***


**Download the Presentation \***


*\* updated since the original presentation*



# Eligibility and Compliance

There are three types of entities that may apply for match funds: (1) municipalities; (2) counties; and (3) certain public utilities not regulated by the Public Service Commission. The match funds can be utilized to make necessary and cost reasonable investments in water, wastewater and stormwater projects. The funding will be provided to eligible entities in the form of reimbursement grants.

Applicants for these grant funds will have to certify to MDEQ that each expenditure of the funds awarded to them under this Act is in compliance with ARPA guidelines, guidance, rules, regulations and other criteria, as may be amended from time to time by the United States Department of Treasury.



# Required Information

MDEQ will have a portal in which applicants can submit

their applications online and which will allow applicants to upload documents. Senate Bill 2822 requires applicants to provide the following information, at a minimum: (a) applicant contact information; (b) a detailed project description and type of project; (c) project map (likely in the form of a shape file); (d) estimate of population affected by the project; (e) disadvantaged community criteria, to include population, median household income, unemployment rate, and current water/sewer rates; (f) estimated project cost; (g) list of match funds of direct Coronavirus Local Fiscal Recovery Funds received or to be received from the federal government and a certification that such funds have been or will be used for the project detailed in the application and documentation of commitment; (h) estimated project schedule and readiness to proceed; (i) engineering services agreement; (j) engineering reports; and (k) information about the status of obtaining any required permits.



## Additional Information

MDEQ may add requirements associated with the list

of items above and these will be made available through the published Rules & Regulations. MDEQ will take this information and rank each applicant based on a number of factors prescribed by SB2822. In other words, this is a competitive grant process. Therefore, completeness and thoroughness in the application is key for applicants to establish eligibility and to be ranked relative to other applicants. MDEQ will provide a series of webinars detailing the application process and answering any questions. Moreover, this site will have a continually updated Frequently Asked Questions section.



# Information Hub

This page will serve as an information hub for applicants and interested parties for the life of the program. It will be periodically updated with information provided by the U.S. Treasury as well as pertinent information specific to the program as may be determined by MDEQ. Applicants should not use this site as their sole basis for knowledge regarding federal requirements associated with ARPA programs.



# Need More Help?

## Contact Us



Copyright 2022 Mississippi Department of Environmental Quality.

MISSISSIPPI LEGISLATURE

REGULAR SESSION 2022

By:  Representatives Yates, Gibbs (72nd),
Holloway, Crudup, Summers, Foster, Clarke,
Brown (70th), Banks, Bell (65th)

To:  Ways and Means

HOUSE BILL NO. 1031
(As Sent to Governor)

1   AN ACT TO CREATE THE CAPITAL CITY WATER/SEWER PROJECTS FUND
2  AS A SPECIAL FUND IN THE STATE TREASURY TO BE ADMINISTERED BY THE
3  DEPARTMENT OF FINANCE AND ADMINISTRATION FOR THE PURPOSE OF
4  PROVIDING FUNDS TO ASSIST THE CITY OF JACKSON, MISSISSIPPI, IN
5  PAYING COSTS ASSOCIATED WITH CONSTRUCTION, RECONSTRUCTION,
6  REPAIRS, UPGRADES AND IMPROVEMENTS TO THE CITY OF JACKSON'S WATER
7  AND SEWER SYSTEMS AND RELATED FACILITIES; TO PROVIDE THAT IF THE
8  CITY OF JACKSON DESIRES ASSISTANCE UNDER THIS ACT, THE CITY MUST
9  ESTABLISH A PLAN FOR THE PROJECT OR PROJECTS FOR WHICH IT DESIRES
10  ASSISTANCE AND SUBMIT THE PLAN AND AN APPLICATION FOR ASSISTANCE
11  TO THE DEPARTMENT OF FINANCE AND ADMINISTRATION; TO PROVIDE THAT
12  IF THE DEPARTMENT OF FINANCE AND ADMINISTRATION PROVIDES
13  ASSISTANCE TO THE CITY OF JACKSON UNDER THIS ACT, THE CITY SHALL
14  PROVIDE QUARTERLY REPORTS TO THE DEPARTMENT OF FINANCE AND
15  ADMINISTRATION DESCRIBING THE RECEIPT AND EXPENDITURE OF SUCH
16  ASSISTANCE, THE STATUS OF THE PROJECT OR PROJECTS AND ANY OTHER
17  INFORMATION REQUIRED BY THE DEPARTMENT; AND FOR RELATED PURPOSES.

18   BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MISSISSIPPI:

19   **SECTION 1.**  (1)  As used in this section, the following words

20  and phrases shall have the meanings ascribed in this section

21  unless the context clearly indicates otherwise:

22    (a)  "Department" means the Department of Finance and

23  Administration.

24    (b)  "Governing authorities" means the governing

25  authorities of the City of Jackson, Mississippi.

26    (c) "Project" or "projects" means construction,

27 reconstruction, repairs, upgrades and improvements to the City of

28 Jackson's water and sewer systems and related facilities.

29    (2) (a) There is created in the State Treasury a special

30 fund, to be designated as the "Capital City Water/Sewer Projects

31 Fund," which shall consist of funds appropriated or otherwise made

32 available by the Legislature in any manner and funds from any

33 other source designated for deposit into such fund.  The fund

34 shall be maintained by the State Treasurer as a separate and

35 special fund, separate and apart from the General Fund of the

36 state.  Unexpended amounts remaining in the fund at the end of a

37 fiscal year shall not lapse into the State General Fund, and any

38 interest earned or investment earnings on amounts in the fund

39 shall be deposited into such fund.  However, any unexpended

40 amounts remaining in the fund on January 1, 2027, shall lapse into

41 the State General Fund.

42    (b) Except as otherwise provided in this paragraph (b),

43 monies in the fund shall be used by the department, upon

44 appropriation by the Legislature, for the purpose of providing

45 funds to assist the City of Jackson in paying costs associated

46 with projects.  An amount not to exceed one percent (1%) of the

47 monies deposited into the fund may be used, upon appropriation by

48 the Legislature, to reimburse the department for reasonable actual

49 and necessary costs incurred by the department in performing its

50 duties under this section.

51        (3)   (a)   If the governing authorities desire assistance
52  under this section, the governing authorities must establish a
53  plan for the project or projects for which the governing
54  authorities desire assistance and submit the plan and an
55  application for assistance to the department.  The plan shall
56  include at least the following:

57              (i)   A description of the project or projects for
58  which the assistance is requested, including the projected cost of
59  the project or projects;

60              (ii)   The projected starting date and completion
61  date for the project or projects;

62              (iii)   A description of any funds from other
63  sources that may be available to the City of Jackson to assist
64  with paying the costs of the project or projects; and

65              (iv)   Any other information required by the
66  department.

67        (b)   The department shall review the application and
68  determine whether to approve the assistance requested, and if
69  approved, whether to provide the assistance in whole or in part.
70  In addition to using assistance received under this section to
71  fully fund a project or projects, the governing authorities may
72  use the assistance to fund a portion of a project or projects in
73  cases in which other funds are available for the project or
74  projects and may be used as leverage or matching funds for the
75  project or projects.  If the department provides assistance for a

76   project or projects under this section, the governing authorities
77   shall provide quarterly reports to the department describing the
78   receipt and expenditure of such assistance, the status of the
79   project or projects and any other information required by the
80   department.

81       (4)  The department shall have all powers necessary to
82   implement and administer the provisions of this section, and the
83   department shall promulgate rules and regulations, in accordance
84   with the Mississippi Administrative Procedures Law, necessary for
85   the implementation of this section.

86       (5)  This section shall stand repealed on January 1, 2027.

87       **SECTION 2.**  This act shall take effect and be in force from
88   and after its passage.

H. B. No. 1031
22/HR31/R849SG
PAGE 4 (BS\JAB)

~ OFFICIAL ~
ST:  Capital City Water/Sewer Projects Fund;
create and require DFA to develop plan for
improvements projects.

Mississippi House of Representatives
2022 Regular Session

The conference report on H. B. No. 1031 was adopted by the following vote:

Yeas--Aguirre, Anderson (110th), Anderson (122nd), Anthony, Arnold, Bailey, Bain, Banks, Barnett, Barton, Beckett, Bell (21st), Bell (65th), Bennett, Blackmon, Bounds, Boyd, Brown (70th), Burnett, Busby, Byrd, Calvert, Carpenter, Clark, Clarke, Cockerham, Crawford, Creekmore IV, Crudup, Currie, Darnell, Denton, Deweese, Eure, Evans (45th), Evans (91st), Faulkner, Felsher, Ford (54th), Ford (73rd), Foster, Gibbs (36th), Gibbs (72nd), Goodin, Guice, Hale, Haney, Harness, Hines, Hobgood-Wilkes, Holloway, Hood, Horan, Jackson, Johnson, Karriem, Kinkade, Ladner, Lamar, Lancaster, Mangold, Massengill, McCarty, McCray, McGee, McKnight, McLean, McLeod, Mickens, Miles, Mims, Morgan, Newman, Oliver, Osborne, Owen, Paden, Patterson, Pigott, Porter, Powell, Read, Reynolds, Roberson, Robinson, Rosebud, Rushing, Sanders, Sanford, Scoggin, Scott, Shanks, Smith, Stamps, Steverson, Straughter, Summers, Taylor, Thompson, Tubb, Tullos, Turner, Walker, Wallace, Watson, Weathersby, White, Williams-Barnes, Wright, Yancey, Yates, Young, Zuber, Mr. Speaker. Total--114.

Nays--Bomgar, Brown (20th), Criswell, Hopkins, Horne, Williamson. Total--6.
Absent or those not voting--Eubanks, Huddleston. Total--2.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.

The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

Mississippi State Senate
2022 Regular Session

YEAS AND NAYS.  The yeas and nays being taken, the Report of Conference
Committee on H. B. No. 1031 was adopted:

Yeas--Barnett, Barrett, Blackmon, Blackwell, Blount, Boyd, Branning, Bryan,
Butler A. (36th), Butler K. (38th), Carter, Caughman, Chassaniol, Chism, DeBar,
DeLano, England, Fillingane, Frazier, Harkins, Hickman, Hill, Hopson, Horhn, Jackson
(11th), Johnson, Jordan, Kirby, McCaughn, McDaniel, McLendon, McMahan, Michel,
Moran, Norwood, Parker, Parks, Polk, Seymour, Simmons D. T. (12th), Simmons S.
(13th), Sojourner, Sparks, Suber, Tate, Thomas, Thompson, Turner-Ford, Whaley,
Wiggins, Williams, Younger.  Total--52.
        Nays--None.
        Absent and those not voting----None.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed
for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site
do not display the text of these documents exactly as the printed versions.
        The information contained on this website is provided as a service to the Internet community. We try to provide quality
information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information
contained in or linked to this website.

MISSISSIPPI LEGISLATURE                    REGULAR SESSION 2022

By: Senator(s) Michel, Polk, Butler (36th),    To: Appropriations
Frazier, Parks, Williams, McLendon, Branning,
Boyd, McMahan, Parker, Seymour, Sparks, Hill,
England, Barrett, Moran, Caughman


COMMITTEE SUBSTITUTE
FOR
SENATE BILL NO. 2822

1   AN ACT TO ESTABLISH THE "MISSISSIPPI WATER INFRASTRUCTURE
2   GRANT PROGRAM ACT OF 2022" ADMINISTERED BY THE MISSISSIPPI
3   DEPARTMENT OF ENVIRONMENTAL QUALITY UTILIZING CORONAVIRUS STATE
4   FISCAL RECOVERY FUNDS MADE AVAILABLE UNDER THE FEDERAL AMERICAN
5   RESCUE PLAN ACT (ARPA); TO PROVIDE THAT SUCH GRANTS SHALL BE MADE
6   AVAILABLE TO MUNICIPALITIES, COUNTIES, RURAL WATER ASSOCIATIONS
7   AND UTILITY AUTHORITIES ON A ONE-TO-ONE MATCHING BASIS AND TO
8   PROVIDE AN ADDITIONAL GRANT TO SMALLER MUNICIPALITIES BASED ON
9   CORONAVIRUS LOCAL FISCAL RECOVERY FUNDS; TO PRESCRIBE ELIGIBLE
10  PROJECTS UNDER THE GRANT PROGRAM; TO AUTHORIZE MULTIPLE ROUNDS OF
11  WATER, WASTEWATER, AND STORMWATER INFRASTRUCTURE GRANT PROJECTS;
12  TO AUTHORIZE THE DEPARTMENT OF ENVIRONMENTAL QUALITY TO PROMULGATE
13  GRANT APPLICATION REGULATIONS AND ENGINEERING ASSISTANCE; TO
14  AUTHORIZE THE DEPARTMENT OF ENVIRONMENTAL QUALITY TO ADMINISTER
15  THE MCWI AND RWI GRANT PROGRAMS AND RETAIN ADMINISTRATIVE COSTS;
16  TO CREATE IN THE STATE TREASURY SPECIAL FUNDS DESIGNATED AS THE
17  "MISSISSIPPI MUNICIPAL-COUNTY WATER INFRASTRUCTURE (MCWI) GRANT
18  PROGRAM FUND" AND THE "MISSISSIPPI RURAL WATER INFRASTRUCTURE
19  (RWI) GRANT PROGRAM FUND"; TO AMEND SECTIONS 49-2-9 AND 41-3-15,
20  MISSISSIPPI CODE OF 1972, IN CONFORMITY; AND FOR RELATED PURPOSES.

21  BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MISSISSIPPI:

22  **SECTION 1.**  (1)  This act shall be known and may be cited as

23  the "Mississippi Water Infrastructure Grant Program Act of 2022."

24  (2)  There is hereby established within the Mississippi

25  Department of Environmental Quality the Mississippi Municipality

26  and County Water Infrastructure (MCWI) Grant Program under which

27  municipalities and counties may apply for reimbursable grants to

28 make necessary investments in water, wastewater, and stormwater

29 infrastructure to be funded by the Legislature utilizing

30 Coronavirus State Fiscal Recovery Funds made available under the

31 federal American Rescue Plan Act of 2021 (ARPA).  Such grants

32 shall be made available to municipalities and counties to be

33 matched with the Coronavirus Local Fiscal Recovery Funds awarded

34 to them under ARPA on a one-to-one matching basis.  Any

35 Coronavirus Local Fiscal Recovery Funds that a county transfers to

36 a municipality will also be matched on a one-to-one matching

37 basis.  Municipalities that received less than One Million Dollars

38 ($1,000,000.00) in the total allocation of Coronavirus Local

39 Fiscal Recovery Funds shall be provided a two-to-one match only on

40 the Coronavirus Local Fiscal Recovery Funds awarded to them under

41 ARPA.  The total funds provided for all two-to-one matches shall

42 not exceed Fifty Million Dollars ($50,000,000.00) of the funds

43 provided to the MCWI Grant Program.  None of the grants provided

44 to municipalities and counties by the MCWI Grant Program shall be

45 used for the reimbursement of professional fees.

46  (3)  There is hereby established within the Mississippi

47 Department of Environmental Quality, the Mississippi Rural Water

48 Infrastructure (RWI) Grant Program under which rural water

49 associations and utility authorities with two hundred fifty (250)

50 residential meters or more may apply for reimbursable grants to

51 make necessary investments in water, wastewater, and stormwater

52 infrastructure to be funded by the Legislature utilizing

53 Coronavirus State Fiscal Recovery Funds made available under the
54 federal American Rescue Plan Act of 2021 (ARPA).  Such grants
55 shall be made available to rural water associations and utility
56 authorities to be matched on a one-to-one matching basis from any
57 funds available.  Any Coronavirus Local Recovery Funds that a
58 county transfers to a rural water association or utility authority
59 shall also be matched on a one-to-one matching basis.  The maximum
60 allowable amount of funds awarded to any rural water association
61 or utility authority shall be Two Million Five Hundred Thousand
62 Dollars ($2,500,000.00).  None of the grants provided to a rural
63 water association or utility authority shall be used for the
64 reimbursement of professional fees.

65     (4)  For purposes of this act, unless the context requires
66 otherwise, the following terms shall have the meanings ascribed
67 herein:

68     (a)  "MCWI Grant Program" shall mean the Mississippi
69 Municipality and County Water Infrastructure Grant Program.

70     (b)  "RWI Grant Program" shall mean the Mississippi
71 Rural Water Infrastructure Grant Program.

72     (c)  "ARPA" shall mean the federal American Rescue Plan
73 Act of 2021, Public Law 117-2, which amends Title VI of the Social
74 Security Act.

75     (d)  "State Recovery Funds" shall mean Coronavirus State
76 Fiscal Recovery Funds awarded through Section 602 of Title VI of

~ OFFICIAL ~

77  the Social Security Act amended by Section 9901 of the federal

78  American Rescue Plan Act of 2021, Public Law 117-2.

79          (e)  "Local Recovery Funds" shall mean Coronavirus Local

80  Fiscal Recovery Funds awarded through Section 603 of Title VI of

81  the Social Security Act amended by Section 9901 of the federal

82  American Rescue Plan Act of 2021, Public Law 117-2.

83          (f) "Department" shall mean the Department of

84  Environmental Quality.

85          (g)  "Professional fees" shall mean fees for the

86  services of attorneys, engineering, surveying, and environmental

87  studies.

88      (5)  On or before July 1, 2022, the Department of

89  Environmental Quality shall promulgate rules and regulations

90  necessary to administer the MCWI and the RWI Grant Program

91  prescribed under this act, including application procedures and

92  deadlines.  The Department of Health shall advise the Mississippi

93  Department of Environmental Quality regarding all such rules and

94  regulations as related to the federal Safe Drinking Water Act.

95      (6)  Funding under the MCWI and the RWI Grant Programs shall

96  be allocated to projects certified by the Mississippi Department

97  of Environmental Quality as eligible for federal funding

98  including, but not be limited to, the following:

99          (a)  Construction of publicly owned treatment works;

100          (b)   Projects pursuant to the implementation of a
101   nonpoint source pollution management program established under the
102   Clean Water Act (CWA);

103          (c)   Decentralized wastewater treatment systems that
104   treat municipal wastewater or domestic sewage;

105          (d)   Management and treatment of stormwater or
106   subsurface drainage water;

107          (e)   Water conservation, efficiency, or reuse measures;

108          (f)   Development and implementation of a conservation
109   and management plan under the CWA;

110          (g)   Watershed projects meeting the criteria set forth
111   in the CWA;

112          (h)   Energy consumption reduction for publicly owned
113   treatment works;

114          (i)   Reuse or recycling of wastewater, stormwater, or
115   subsurface drainage water;

116          (j)   Facilities to improve drinking water quality;

117          (k)   Transmission and distribution, including
118   improvements of water pressure or prevention of contamination in
119   infrastructure and lead service line replacements;

120          (l)   New sources to replace contaminated drinking water
121   or increase drought resilience, including aquifer storage and
122   recovery system for water storage;

123          (m)   Storage of drinking water, such as to prevent
124   contaminants or equalize water demands;

125          (n)  Purchase of water systems and interconnection of
126  systems;

127          (o)  New community water systems;

128          (p)  Culvert repair, resizing, and removal, replacement
129  of storm sewers, and additional types of stormwater
130  infrastructure;

131          (q)  Dam and reservoir rehabilitation, if the primary
132  purpose of dam or reservoir is for drinking water supply and
133  project is necessary for the provision of drinking water;

134          (r)  Broad set of lead remediation projects eligible
135  under EPA grant programs authorized by the Water Infrastructure
136  Improvements for the Nation (WIIN) Act; and

137          (s)  Any eligible drinking water, wastewater or
138  stormwater project through ARPA guidelines, guidance, rules,
139  regulations and/or other criteria, as may be amended from time to
140  time, by the United States Department of the Treasury.

141     (7)  The governing authorities of a municipality, county,
142  rural water association or utility authority may submit an
143  application for grant funds under this act.  Applicants shall
144  certify to the department that each expenditure of the funds
145  awarded to them under this act is in compliance with ARPA
146  guidelines, guidance, rules, regulations and/or other criteria, as
147  may be amended from time to time, by the United States Department
148  of the Treasury regarding the use of monies from the State

149   Coronavirus State Fiscal Recovery Funds.  Subsequent submissions

150   will be due by the dates established by the department.

151       (8)  An application for a grant under this act shall be

152   submitted at such time, be in such form, and contain such

153   information as the department prescribes.  Each application for

154   grant funds shall include the following at a minimum:  applicant

155   contact information; project description and type of project;

156   project map; estimate of population served by the projects;

157   disadvantaged community criteria (population, median household

158   income, unemployment, current water/sewer rates); estimated

159   project cost; list of available match funds and documentation of

160   commitment; estimated project schedule and readiness to proceed;

161   engineering services agreement; engineering reports; and

162   information about status of obtaining any required permits.

163       (9)  The department shall develop a system for use in ranking

164   the grant applications received.  When developing the ranking

165   system, the department shall apply a greater weight to projects

166   that have approved engineering/design, plans, permits and the

167   department has deemed the project is ready to begin construction

168   within six (6) months.  Projects that are included on the

169   municipal or county engineer's approved list and provide

170   applicable supporting documentation shall receive additional

171   consideration awarded to the application.  The ranking system

172   shall include the following factors, at a minimum:  the

173   environmental impact of the proposed project; the proposed

174   project's ability to address noncompliance with state/federal

175   requirements; the extent to which the project promotes economic

176   development; the number of people served by the project (both new

177   and existing users); impacts of the proposed project on

178   disadvantaged/overburdened communities; the grant applicant's

179   prior efforts to secure funding to address the proposed project's

180   objectives; the grant applicant's proposed contribution of other

181   funds or in-kind cost-sharing to the proposed project; the grant

182   applicant's long-term plans for the financial and physical

183   operation and maintenance of the project; the grant applicant's

184   capacity to initiate construction in a timely manner and complete

185   the proposed project by the deadline specified by the United

186   States Department of Treasury rules for ARPA funds; and any other

187   factors as determined by the department.

188       (10)  The grant program shall include a specific emphasis on

189   addressing the needs of an economically disadvantaged community,

190   including providing safe, reliable drinking water in areas that

191   lack infrastructure, providing sewage treatment capacity in

192   unsewered areas and providing regional development of

193   infrastructure to serve multiple communities.

194       (11)  Applications shall be reviewed and scored as they are

195   received.  The Mississippi Department of Environmental Quality

196   shall certify that each project submitted is a "necessary

197   investment" in water, wastewater, or stormwater infrastructure as

198   defined in the American Rescue Plan Act and all applicable

~ OFFICIAL ~

199  guidance issued by the United States Department of the Treasury.
200  The Department of Environmental Quality shall review the lists of
201  recommended water, wastewater, or stormwater infrastructure
202  projects and issue its list of recommended projects to the
203  Mississippi Department of Health for its advice.  Grant agreements
204  shall be executed between the recipient and the Mississippi
205  Department of Environmental Quality.  All final awards shall be
206  determined at the discretion of the executive director of the
207  department.  Funds shall be obligated to a grantee upon the
208  execution of a grant agreement between the department and the
209  approved applicant.  Funds shall be made available to a grantee
210  when the department obtains the necessary support for
211  reimbursement.  The department is authorized to conduct additional
212  rounds of grants as needed; however, in the first round no more
213  than forty percent (40%) of the total funds appropriated for each
214  grant program may be awarded by the department, and the remaining
215  funds may be awarded in the second or subsequent rounds which
216  shall occur no later than six (6) months from the previous round.

217       (12)  Grant requirements shall be used prospectively and
218  grants shall not be available to cover the costs of debt incurred
219  before the enactment of this program.  The applicant shall agree
220  to obtain all necessary state and federal permits, follow all
221  state biding and contracting laws and fiscally sound practices in
222  the administration of the funds.

~ OFFICIAL ~

223      (13)  (a)  There is hereby created in the State Treasury two

224  (2) special funds to be known as (a) the "Mississippi

225  Municipal-County Water Infrastructure (MCWI) Grant Program Fund,"

226  and (b) the "Mississippi Rural Water Infrastructure (RWI) Grant

227  Program Fund," which shall consist of funds appropriated by the

228  Legislature from federal American Rescue Plan (ARPA) monies or

229  other available federal grant funds for the purposes of awarding

230  grants under this act to be disbursed by the Mississippi

231  Department of Environmental Quality.

232      (b)  All monies disbursed from the funds created in this

233  act shall be in compliance with the guidelines, guidance, rules,

234  regulations or other criteria, as may be amended from time to

235  time, of the United States Department of the Treasury regarding

236  the use of monies from the Coronavirus State Fiscal Recovery Fund,

237  established by the American Rescue Plan of 2021.  Unexpended

238  amounts remaining in the funds at the end of the fiscal year shall

239  not lapse into the Coronavirus State Fiscal Recovery Fund or the

240  State General Fund, and any investment earnings or interest earned

241  on amounts in the funds shall remain in the respective grant

242  program funds.

243      (c)  If there are unobligated Coronavirus State Fiscal

244  Recovery Fund monies remaining in the funds created in this act,

245  on the later of December 17, 2024, or fourteen (14) days prior to

246  the fund obligation deadline provided by the federal government,

247  the Department of Finance and Administration shall transfer these

248  unobligated balances to the Coronavirus State Fiscal Recovery

249  Fund.  The Department of Finance and Administration shall then

250  transfer the unobligated balance of Coronavirus State Fiscal

251  Recovery Funds from the Coronavirus State Fiscal Recovery Fund to

252  the State and School Employees' Life and Health Insurance Fund for

253  an amount not to exceed the lesser of Sixty Million Dollars

254  ($60,000,000.00) or the amount of allowable ARPA expenditures, by

255  no later than December 31, 2024, or on the date of the fund

256  obligation deadline provided by the federal government.  The

257  Department of Finance and Administration shall then transfer all

258  remaining unobligated balances of Coronavirus State Fiscal

259  Recovery Funds from the Coronavirus State Fiscal Recovery Fund to

260  the Unemployment Compensation Fund up to the ARPA allowable

261  amount, by no later than December 31, 2024, or on the date of the

262  fund obligation deadline provided by the federal government.

263          (d)   The use of funds allocated under this program shall

264  be subject to audit by the United States Department of the

265  Treasury's Office of Inspector General and the Mississippi Office

266  of the State Auditor.  Each person receiving funds under these

267  programs found to be fully or partially noncompliant with the

268  requirements in this act shall return to the state all or a

269  portion of the funds received.

270      (14)  It is the intent of the Legislature that, in the first

271  fiscal year after the effective date of this act, forty percent

272  (40%) of the funds appropriated to the (MCWI) Grant Program Fund

273  and the (RWI) Grant Program Fund be obligated to projects that

274  have completed plans and specifications, acquired all necessary

275  land and/or easements, and are ready to proceed to construction.

276       (15)  The department shall submit to the Lieutenant Governor,

277  Speaker of the House, House and Senate Appropriations Chairmen,

278  and the Legislative Budget Office quarterly reports and annual

279  reports that are due by the dates established in the Compliance

280  and Reporting Guidance by the United States Department of

281  Treasury.  The reports shall contain the applications received,

282  the score of the applications, the amount of grant funds awarded

283  to each applicant, the amount of grant funds expended by each

284  applicant, and status of each applicant's project.

285       (16)  Grant funds shall be available under this act through

286  December 31, 2026, or on the date of the fund expenditure deadline

287  provided by the federal government, whichever occurs later.  Each

288  grant recipient shall certify for any project that a grant is

289  awarded that in the event the project is not completed by December

290  31, 2026, and the United States Congress does not enact an

291  extension of the deadline on the availability of ARPA Funds, then

292  the grant recipient will complete the project through any other

293  funds available.

294       (17)  The Mississippi Department of Environmental Quality may

295  retain an amount not to exceed two percent (2%) of the total funds

296  allocated to the program to defray administrative costs.

297        (18)  The department shall be exempt from provisions of the

298   Public Procurement Review Board for any requirements of personal

299   or professional service contracts or the pre-approval of the

300   solicitation for such contracts used in the execution of its

301   responsibilities under this act.

302        (19)  The provisions of this section shall stand repealed on

303   July 1, 2026.

304        **SECTION 2.**  Section 49-2-9, Mississippi Code of 1972, is

305   amended as follows:

306        49-2-9.  (1)  Effective July 1, 1979, the commission shall

307   have the following powers and duties:

308            (a)  To formulate the policy of the department regarding

309   natural resources within the jurisdiction of the department;

310            (b)  To adopt, modify, repeal, and promulgate, after due

311   notice and hearing, and where not otherwise prohibited by federal

312   or state law, to make exceptions to and grant exemptions and

313   variances from, and to enforce rules and regulations implementing

314   or effectuating the powers and duties of the commission under any

315   and all statutes within the commission's jurisdiction, and as the

316   commission may deem necessary to prevent, control and abate

317   existing or potential pollution;

318            (c)  To apply for, receive and expend any federal or

319   state funds or contributions, gifts, devises, bequests or funds

320   from any other source;

321          (d)  To commission or conduct studies designed to

322   determine alternative methods of managing or using the natural

323   resources of this state, in a manner to insure efficiency and

324   maximum productivity;

325          (e)  To enter into, and to authorize the executive

326   director to execute with the approval of the commission,

327   contracts, grants and cooperative agreements with any federal or

328   state agency or subdivision thereof, or any public or private

329   institution located inside or outside the State of Mississippi, or

330   any person, corporation or association in connection with carrying

331   out the provisions of this chapter; but this authority under this

332   chapter and under any and all statutes within the commission's

333   jurisdiction, except those statutes relating to the Bureau of

334   Recreation and Parks, shall not include contracts, grants or

335   cooperative agreements which do not develop data or information

336   usable by the commission, or which provide goods, services or

337   facilities to the commission or any of its bureaus, and shall

338   exclude any monies for special interest groups for purposes of

339   lobbying or otherwise promoting their special interests; and

340          (f)  To discharge such other duties, responsibilities

341   and powers as are necessary to implement the provisions of this

342   chapter.

343    (2)  The Mississippi Department of Environmental Quality,

344   Office of Geology and Energy Resources shall be responsible for

345   program management, procurement, development and maintenance of

~ OFFICIAL ~

346    the Mississippi Digital Earth Model, which should include the

347    following seven (7) core data layers of a digital land base

348    computer model of the State of Mississippi:

349           (a)   Geodetic control;

350           (b)   Elevation and bathymetry;

351           (c)   Orthoimagery;

352           (d)   Hydrography;

353           (e)   Transportation;

354           (f)   Government boundaries; and

355           (g)   Cadastral.. With respect to the cadastral layer,

356    the authority and responsibility of the Mississippi Department of

357    Environmental Quality, Office of Geology and Energy Resources

358    shall be limited to compiling information submitted by counties.

359      For all seven (7) framework layers, the Mississippi

360    Department of Environmental Quality, Office of Geology and Energy

361    Resources shall be the integrator of data from all sources and the

362    guarantor of data completeness and consistency and shall

363    administer the council's policies and standards for the

364    procurement of remote sensing and geographic information system

365    data by state and local governmental entities.

366      (3)   The Mississippi Department of Environmental Quality

367    shall have as additional responsibilities, the administration of

368    the Mississippi Water Infrastructure Grant Program Act of 2022 and

369    shall promulgate necessary rules and regulations relating to the

370    application of eligible municipalities, counties, rural water

371  associations and utility authorities for grant funds and the

372  awarding of such grants.

373      **SECTION 3.**  Section 41-3-15, Mississippi Code of 1972, is

374  amended as follows:

375      41-3-15.  (1)  (a)  There shall be a State Department of

376  Health.

377          (b)  The State Board of Health shall have the following

378  powers and duties:

379              (i)  To formulate the policy of the State

380  Department of Health regarding public health matters within the

381  jurisdiction of the department;

382              (ii)  To adopt, modify, repeal and promulgate,

383  after due notice and hearing, and enforce rules and regulations

384  implementing or effectuating the powers and duties of the

385  department under any and all statutes within the department's

386  jurisdiction, and as the board may deem necessary;

387              (iii)  To apply for, receive, accept and expend any

388  federal or state funds or contributions, gifts, trusts, devises,

389  bequests, grants, endowments or funds from any other source or

390  transfers of property of any kind;

391              (iv)  To enter into, and to authorize the executive

392  officer to execute contracts, grants and cooperative agreements

393  with any federal or state agency or subdivision thereof, or any

394  public or private institution located inside or outside the State

395  of Mississippi, or any person, corporation or association in

396   connection with carrying out the provisions of this chapter, if it
397   finds those actions to be in the public interest and the contracts
398   or agreements do not have a financial cost that exceeds the
399   amounts appropriated for those purposes by the Legislature;

400          (v)   To appoint, upon recommendation of the
401   Executive Officer of the State Department of Health, a Director of
402   Internal Audit who shall be either a Certified Public Accountant
403   or Certified Internal Auditor, and whose employment shall be
404   continued at the discretion of the board, and who shall report
405   directly to the board, or its designee; and

406          (vi)   To discharge such other duties,
407   responsibilities and powers as are necessary to implement the
408   provisions of this chapter.

409      (c)   The Executive Officer of the State Department of
410   Health shall have the following powers and duties:

411          (i)   To administer the policies of the State Board
412   of Health within the authority granted by the board;

413          (ii)   To supervise and direct all administrative
414   and technical activities of the department, except that the
415   department's internal auditor shall be subject to the sole
416   supervision and direction of the board;

417          (iii)   To organize the administrative units of the
418   department in accordance with the plan adopted by the board and,
419   with board approval, alter the organizational plan and reassign

420  responsibilities as he or she may deem necessary to carry out the
421  policies of the board;

422              (iv)  To coordinate the activities of the various
423  offices of the department;

424              (v)  To employ, subject to regulations of the State
425  Personnel Board, qualified professional personnel in the subject
426  matter or fields of each office, and such other technical and
427  clerical staff as may be required for the operation of the
428  department.  The executive officer shall be the appointing
429  authority for the department, and shall have the power to delegate
430  the authority to appoint or dismiss employees to appropriate
431  subordinates, subject to the rules and regulations of the State
432  Personnel Board;

433              (vi)  To recommend to the board such studies and
434  investigations as he or she may deem appropriate, and to carry out
435  the approved recommendations in conjunction with the various
436  offices;

437              (vii)  To prepare and deliver to the Legislature
438  and the Governor on or before January 1 of each year, and at such
439  other times as may be required by the Legislature or Governor, a
440  full report of the work of the department and the offices thereof,
441  including a detailed statement of expenditures of the department
442  and any recommendations the board may have;

443              (viii)  To prepare and deliver to the Chairmen of
444  the Public Health and Welfare/Human Services Committees of the

~ OFFICIAL ~

445  Senate and House on or before January 1 of each year, a plan for
446  monitoring infant mortality in Mississippi and a full report of
447  the work of the department on reducing Mississippi's infant
448  mortality and morbidity rates and improving the status of maternal
449  and infant health; and

450          (ix)  To enter into contracts, grants and
451  cooperative agreements with any federal or state agency or
452  subdivision thereof, or any public or private institution located
453  inside or outside the State of Mississippi, or any person,
454  corporation or association in connection with carrying out the
455  provisions of this chapter, if he or she finds those actions to be
456  in the public interest and the contracts or agreements do not have
457  a financial cost that exceeds the amounts appropriated for those
458  purposes by the Legislature.  Each contract or agreement entered
459  into by the executive officer shall be submitted to the board
460  before its next meeting.

461  (2)  The State Board of Health shall have the authority to
462  establish an Office of Rural Health within the department.  The
463  duties and responsibilities of this office shall include the
464  following:

465          (a)  To collect and evaluate data on rural health
466  conditions and needs;

467          (b)  To engage in policy analysis, policy development
468  and economic impact studies with regard to rural health issues;

469          (c)   To develop and implement plans and provide
470  technical assistance to enable community health systems to respond
471  to various changes in their circumstances;

472          (d)   To plan and assist in professional recruitment and
473  retention of medical professionals and assistants; and

474          (e)   To establish information clearinghouses to improve
475  access to and sharing of rural health care information.

476     (3)   The State Board of Health shall have general supervision
477  of the health interests of the people of the state and to exercise
478  the rights, powers and duties of those acts which it is authorized
479  by law to enforce.

480     (4)   The State Board of Health shall have authority:

481          (a)   To make investigations and inquiries with respect
482  to the causes of disease and death, and to investigate the effect
483  of environment, including conditions of employment and other
484  conditions that may affect health, and to make such other
485  investigations as it may deem necessary for the preservation and
486  improvement of health.

487          (b)   To make such sanitary investigations as it may,
488  from time to time, deem necessary for the protection and
489  improvement of health and to investigate nuisance questions that
490  affect the security of life and health within the state.

491          (c)   To direct and control sanitary and quarantine
492  measures for dealing with all diseases within the state possible
493  to suppress same and prevent their spread.

494          (d)   To obtain, collect and preserve such information
495    relative to mortality, morbidity, disease and health as may be
496    useful in the discharge of its duties or may contribute to the
497    prevention of disease or the promotion of health in this state.

498          (e)   To charge and collect reasonable fees for health
499    services, including immunizations, inspections and related
500    activities, and the board shall charge fees for those services;
501    however, if it is determined that a person receiving services is
502    unable to pay the total fee, the board shall collect any amount
503    that the person is able to pay.  Any increase in the fees charged
504    by the board under this paragraph shall be in accordance with the
505    provisions of Section 41-3-65.

506          (f)   (i)   To establish standards for, issue permits and
507    exercise control over, any cafes, restaurants, food or drink
508    stands, sandwich manufacturing establishments, and all other
509    establishments, other than churches, church-related and private
510    schools, and other nonprofit or charitable organizations, where
511    food or drink is regularly prepared, handled and served for pay;
512    and

513          (ii)   To require that a permit be obtained from the
514    Department of Health before those persons begin operation.  If any
515    such person fails to obtain the permit required in this
516    subparagraph (ii), the State Board of Health, after due notice and
517    opportunity for a hearing, may impose a monetary penalty not to
518    exceed One Thousand Dollars ($1,000.00) for each violation.

519   However, the department is not authorized to impose a monetary

520   penalty against any person whose gross annual prepared food sales

521   are less than Five Thousand Dollars ($5,000.00).  Money collected

522   by the board under this subparagraph (ii) shall be deposited to

523   the credit of the State General Fund of the State Treasury.

524          (g)   To promulgate rules and regulations and exercise

525   control over the production and sale of milk pursuant to the

526   provisions of Sections 75-31-41 through 75-31-49.

527          (h)   On presentation of proper authority, to enter into

528   and inspect any public place or building where the State Health

529   Officer or his representative deems it necessary and proper to

530   enter for the discovery and suppression of disease and for the

531   enforcement of any health or sanitary laws and regulations in the

532   state.

533          (i)   To conduct investigations, inquiries and hearings,

534   and to issue subpoenas for the attendance of witnesses and the

535   production of books and records at any hearing when authorized and

536   required by statute to be conducted by the State Health Officer or

537   the State Board of Health.

538          (j)   To promulgate rules and regulations, and to collect

539   data and information, on (i) the delivery of services through the

540   practice of telemedicine; and (ii) the use of electronic records

541   for the delivery of telemedicine services.

542          (k)   To enforce and regulate domestic and imported fish

543   as authorized under Section 69-7-601 et seq.

S. B. No. 2822
22/SS36/R560CS          ~ OFFICIAL ~
PAGE 22

544          (5)   (a)   The State Board of Health shall have the authority,

545     in its discretion, to establish programs to promote the public

546     health, to be administered by the State Department of Health.

547     Specifically, those programs may include, but shall not be limited

548     to, programs in the following areas:

549                    (i)   Maternal and child health;

550                    (ii)   Family planning;

551                    (iii)   Pediatric services;

552                    (iv)   Services to crippled and disabled children;

553                    (v)   Control of communicable and noncommunicable

554     disease;

555                    (vi)   Chronic disease;

556                    (vii)   Accidental deaths and injuries;

557                    (viii)   Child care licensure;

558                    (ix)   Radiological health;

559                    (x)   Dental health;

560                    (xi)   Milk sanitation;

561                    (xii)   Occupational safety and health;

562                    (xiii)   Food, vector control and general

563     sanitation;

564                    (xiv)   Protection of drinking water;

565                    (xv)   Sanitation in food handling establishments

566     open to the public;

567                    (xvi)   Registration of births and deaths and other

568     vital events;

569              (xvii)  Such public health programs and services as

570     may be assigned to the State Board of Health by the Legislature or

571     by executive order; and

572              (xviii)  Regulation of domestic and imported fish

573     for human consumption.

574          (b)  The State Board of Health and State Department of

575     Health shall not be authorized to sell, transfer, alienate or

576     otherwise dispose of any of the home health agencies owned and

577     operated by the department on January 1, 1995, and shall not be

578     authorized to sell, transfer, assign, alienate or otherwise

579     dispose of the license of any of those home health agencies,

580     except upon the specific authorization of the Legislature by an

581     amendment to this section.  However, this paragraph (b) shall not

582     prevent the board or the department from closing or terminating

583     the operation of any home health agency owned and operated by the

584     department, or closing or terminating any office, branch office or

585     clinic of any such home health agency, or otherwise discontinuing

586     the providing of home health services through any such home health

587     agency, office, branch office or clinic, if the board first

588     demonstrates that there are other providers of home health

589     services in the area being served by the department's home health

590     agency, office, branch office or clinic that will be able to

591     provide adequate home health services to the residents of the area

592     if the department's home health agency, office, branch office or

593     clinic is closed or otherwise discontinues the providing of home

S. B. No. 2822
22/SS36/R560CS               ~ OFFICIAL ~
PAGE 24

594   health services.  This demonstration by the board that there are

595   other providers of adequate home health services in the area shall

596   be spread at length upon the minutes of the board at a regular or

597   special meeting of the board at least thirty (30) days before a

598   home health agency, office, branch office or clinic is proposed to

599   be closed or otherwise discontinue the providing of home health

600   services.

601          (c)   The State Department of Health may undertake such

602   technical programs and activities as may be required for the

603   support and operation of those programs, including maintaining

604   physical, chemical, bacteriological and radiological laboratories,

605   and may make such diagnostic tests for diseases and tests for the

606   evaluation of health hazards as may be deemed necessary for the

607   protection of the people of the state.

608      (6)   (a)   The State Board of Health shall administer the

609   local governments and rural water systems improvements loan

610   program in accordance with the provisions of Section 41-3-16.

611          (b)   The State Board of Health shall have authority:

612              (i)   To enter into capitalization grant agreements

613   with the United States Environmental Protection Agency, or any

614   successor agency thereto;

615              (ii)   To accept capitalization grant awards made

616   under the federal Safe Drinking Water Act, as amended;

~ OFFICIAL ~

617                    (iii)  To provide annual reports and audits to the

618     United States Environmental Protection Agency, as may be required

619     by federal capitalization grant agreements; and

620                    (iv)  To establish and collect fees to defray the

621     reasonable costs of administering the revolving fund or emergency

622     fund if the State Board of Health determines that those costs will

623     exceed the limitations established in the federal Safe Drinking

624     Water Act, as amended.  The administration fees may be included in

625     loan amounts to loan recipients for the purpose of facilitating

626     payment to the board; however, those fees may not exceed five

627     percent (5%) of the loan amount.

628        (7)  Notwithstanding any other provision to the contrary, the

629     State Department of Health shall have the following specific

630     powers:  The department shall issue a license to Alexander Milne

631     Home for Women, Inc., a 501(c)(3) nonprofit corporation, for the

632     construction, conversion, expansion and operation of not more than

633     forty-five (45) beds for developmentally disabled adults who have

634     been displaced from New Orleans, Louisiana, with the beds to be

635     located in a certified ICF-MR facility in the City of Laurel,

636     Mississippi.  There shall be no prohibition or restrictions on

637     participation in the Medicaid program for the person receiving the

638     license under this subsection (7).  The license described in this

639     subsection shall expire five (5) years from the date of its issue.

640     The license authorized by this subsection shall be issued upon the

641     initial payment by the licensee of an application fee of

642   Sixty-seven Thousand Dollars ($67,000.00) and a monthly fee of

643   Sixty-seven Thousand Dollars ($67,000.00) after the issuance of

644   the license, to be paid as long as the licensee continues to

645   operate.  The initial and monthly licensing fees shall be

646   deposited by the State Department of Health into the special fund

647   created under Section 41-7-188.

648        (8)  Notwithstanding any other provision to the contrary, the

649   State Department of Health shall have the following specific

650   powers:  The State Department of Health is authorized to issue a

651   license to an existing home health agency for the transfer of a

652   county from that agency to another existing home health agency,

653   and to charge a fee for reviewing and making a determination on

654   the application for such transfer not to exceed one-half (1/2) of

655   the authorized fee assessed for the original application for the

656   home health agency, with the revenue to be deposited by the State

657   Department of Health into the special fund created under Section

658   41-7-188.

659        (9)  Notwithstanding any other provision to the contrary, the

660   State Department of Health shall have the following specific

661   powers:  For the period beginning July 1, 2010, through July 1,

662   2017, the State Department of Health is authorized and empowered

663   to assess a fee in addition to the fee prescribed in Section

664   41-7-188 for reviewing applications for certificates of need in an

665   amount not to exceed twenty-five one-hundredths of one percent

666   (.25 of 1%) of the amount of a proposed capital expenditure, but

667  shall be not less than Two Hundred Fifty Dollars ($250.00)

668  regardless of the amount of the proposed capital expenditure, and

669  the maximum additional fee permitted shall not exceed Fifty

670  Thousand Dollars ($50,000.00).  Provided that the total

671  assessments of fees for certificate of need applications under

672  Section 41-7-188 and this section shall not exceed the actual cost

673  of operating the certificate of need program.

674      (10)  Notwithstanding any other provision to the contrary,

675  the State Department of Health shall have the following specific

676  powers:  The State Department of Health is authorized to extend

677  and renew any certificate of need that has expired, and to charge

678  a fee for reviewing and making a determination on the application

679  for such action not to exceed one-half (1/2) of the authorized fee

680  assessed for the original application for the certificate of need,

681  with the revenue to be deposited by the State Department of Health

682  into the special fund created under Section 41-7-188.

683      (11)  Notwithstanding any other provision to the contrary,

684  the State Department of Health shall have the following specific

685  powers:  The State Department of Health is authorized and

686  empowered, to revoke, immediately, the license and require closure

687  of any institution for the aged or infirm, including any other

688  remedy less than closure to protect the health and safety of the

689  residents of said institution or the health and safety of the

690  general public.

691          (12)  Notwithstanding any other provision to the contrary,

692    the State Department of Health shall have the following specific

693    powers:  The State Department of Health is authorized and

694    empowered, to require the temporary detainment of individuals for

695    disease control purposes based upon violation of any order of the

696    State Health Officer, as provided in Section 41-23-5.  For the

697    purpose of enforcing such orders of the State Health Officer,

698    persons employed by the department as investigators shall have

699    general arrest powers.  All law enforcement officers are

700    authorized and directed to assist in the enforcement of such

701    orders of the State Health Officer.

702          (13)  The State Board of Health shall have as additional

703    responsibilities the formulation of technical advice and

704    recommendations to the Mississippi Department of Environmental

705    Quality relative to the administration of the Mississippi Water

706    Infrastructure Act of 2022 and recommendations for the approval of

707    grant applications under said program.

708          **SECTION 4.**  This act shall take effect and be in force from

709    and after its passage.

Mississippi House of Representatives
2022 Regular Session

The conference report on S. B. No. 2822 was adopted by the following vote:

Yeas--Aguirre, Anderson (110th), Anderson (122nd), Anthony, Arnold, Bailey, Bain, Banks, Barnett, Barton, Beckett, Bell (21st), Bell (65th), Bennett, Blackmon, Bounds, Boyd, Brown (70th), Burnett, Busby, Byrd, Calvert, Carpenter, Clarke, Cockerham, Crawford, Creekmore IV, Crudup, Currie, Darnell, Denton, Deweese, Eubanks, Eure, Evans (45th), Evans (91st), Faulkner, Felsher, Ford (54th), Ford (73rd), Foster, Gibbs (36th), Gibbs (72nd), Goodin, Guice, Hale, Haney, Harness, Hines, Holloway, Hood, Horan, Horne, Huddleston, Jackson, Johnson, Karriem, Kinkade, Ladner, Lamar, Lancaster, Mangold, Massengill, McCarty, McCray, McGee, McKnight, McLean, McLeod, Mickens, Miles, Mims, Morgan, Newman, Oliver, Osborne, Owen, Paden, Patterson, Pigott, Porter, Powell, Read, Reynolds, Roberson, Robinson, Rushing, Sanders, Shanks, Smith, Stamps, Steverson, Straughter, Taylor, Thompson, Tubb, Turner, Walker, Wallace, Watson, Weathersby, White, Williams-Barnes, Wright, Yancey, Yates, Zuber, Mr. Speaker.  Total--108.

Nays--None.

Absent or those not voting--Bomgar, Brown (20th), Clark, Criswell, Hobgood-Wilkes, Hopkins, Sanford, Scoggin, Scott, Summers, Tullos, Williamson.  Total--12.

Present--Rosebud, Young.  Total--2.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.

The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

Mississippi State Senate
2022 Regular Session

YEAS AND NAYS.  The yeas and nays being taken, the Report of Conference Committee on S. B. No. 2822 (version 2) was adopted:

Yeas--Barnett, Barrett, Blackmon, Blackwell, Blount, Boyd, Branning, Bryan, Butler A. (36th), Butler K. (38th), Carter, Caughman, Chassaniol, Chism, DeBar, DeLano, England, Fillingane, Frazier, Harkins, Hickman, Hopson, Horhn, Jackson (11th), Johnson, Jordan, Kirby, McCaughn, McDaniel, McLendon, McMahan, Michel, Moran, Norwood, Parker, Polk, Seymour, Simmons D. T. (12th), Simmons S. (13th), Sojourner, Sparks, Suber, Tate, Thomas, Thompson, Turner-Ford, Whaley, Wiggins, Williams, Younger.  Total--50.
    Nays--None.
    Absent and those not voting--Hill, Parks.  Total--2.

DISCLAIMER

All information provided on the *Mississippi Legislative Website* is believed to be correct. However, no liability is assumed for errors in substance or form of any of the materials published on this website. Electronic versions of legislation available on this site do not display the text of these documents exactly as the printed versions.
    The information contained on this website is provided as a service to the Internet community. We try to provide quality information, but we make no claims, promises or guarantees about the accuracy, completeness or adequacy of the information contained in or linked to this website.

**STATE OF MISSISSIPPI**
**LOCAL GOVERNMENTS AND RURAL WATER SYSTEMS IMPROVEMENTS BOARD**
Title 33:  Public Health - Local Governments & Rural Water Systems Improvements Board
Part 13:  Drinking Water Systems Improvements Revolving Loan Fund Program Regulations

**STATE OF MISSISSIPPI**
**DRINKING WATER SYSTEMS IMPROVEMENTS**
**REVOLVING LOAN FUND PROGRAM**

**FFY-2022 INTENDED USE PLAN**

**Approved by the Board**
**August 26, 2022**



MISSISSIPPI STATE DEPARTMENT OF HEALTH

**LOCAL GOVERNMENTS AND RURAL WATER SYSTEMS**

**IMPROVEMENTS BOARD**

**P. O.  BOX 1700 SUITE U-232**

**JACKSON, MISSISSIPPI 39215-1700**

i

(Blank)

**STATE OF MISSISSIPPI**
**LOCAL GOVERNMENTS AND RURAL WATER SYSTEMS IMPROVEMENTS BOARD**
Title 33:  Public Health - Local Governments & Rural Water Systems Improvements Board
Part 13:  Drinking Water Systems Improvements Revolving Loan Fund Program Regulations

**DRINKING WATER SYSTEMS IMPROVEMENTS REVOLVING LOAN FUND**

**FFY-2022 INTENDED USE PLAN**

**TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................................. 1

  A.  STATE OF MISSISSIPPI'S DRINKING WATER STATE REVOLVING LOAN FUND ................... 1
  B.  PROGRAM OVERVIEW ........................................................................................ 2
  C.  PUBLIC INPUT, REVIEW, AND COMMENT PROCEDURES .......................................... 3

II.  GOALS OF MISSISSIPPI'S DRINKING WATER SYSTEMS IMPROVEMENTS
REVOLVING LOAN FUND (DWSIRLF) PROGRAM ............................................... 3

  A.  BASIC GOALS ..................................................................................................... 3
  B.  LONG-TERM DWSIRLF GOALS ........................................................................ 4
  C.  SHORT-TERM DWSIRLF GOALS ....................................................................... 4

III.  STRUCTURE OF THE MISSISSIPPI DWSIRLF .................................................. 6

  A.  DWSIRLF LOAN/OPERATIONS FUND ................................................................ 6
    1.  Types of Eligible Projects: .............................................................................. 6
    2.  Set-aside Accounts: ........................................................................................ 6
  B.  DWSIRLF STATE MATCH FUNDS .................................................................... 6
  C.  DRINKING WATER SYSTEMS EMERGENCY LOAN FUND (DWSELF) ....................... 7

IV.  FINANCIAL STATUS OF THE DWSIRLF .......................................................... 7

  A.  SOURCE AND USE OF FUNDS ............................................................................. 7
    1.  Federal Allotment ........................................................................................... 7
    2.  State Match Requirements ............................................................................... 7
    3.  Loan Increase Reserve .................................................................................... 8
  B.  FINANCIAL PLANNING PROCESS ......................................................................... 8
    1.  Efficient Bond Management ............................................................................. 8
    2.  Interest Rate Determination ............................................................................ 8
    3.  Investment ...................................................................................................... 8
  C.  FINANCIAL TERMS OF LOANS ............................................................................ 9
    1.  Funding Limit ................................................................................................. 9
    2.  Interest Rate ................................................................................................... 9
    3.  Administration Fee .......................................................................................... 9
    4.  FFY-2022 Appropriation Special Provisions .................................................. 10
    5.  Other Related Issues ..................................................................................... 10

V.  SET-ASIDE ACTIVITIES ................................................................................... 11

  A.  ADMINISTRATION ............................................................................................ 11
  B.  SMALL SYSTEM TECHNICAL ASSISTANCE ......................................................... 12
  C.  STATE PROGRAM MANAGEMENT ...................................................................... 12
  D.  LOCAL ASSISTANCE AND OTHER STATE PROGRAMS .......................................... 12

VI.  PRIORITY SYSTEM .......................................................................................... 13

iii

    **A.**    **FUNDING AND RANKING RATIONALE** ................................................... **13**
        1.   *Funding Lists and Bypass Procedure* ............................................... *13*
        2.   *FFY-2022 Green Infrastructure Requirement* ............................... *14*
        3.   *Loan Decreases* .......................................................................... *15*
        4.   *Match for Special Appropriations Project (SPAP) Grants* ............ *15*
        5.   *Subsidization from FFY-2022 Federal Appropriation* ................. *15*
    **B.**    **PRIORITY SYSTEM CATEGORIES** ................................................ **17**
    **C.**    **PRIORITY RANKING CRITERIA** ................................................... **20**
    **D.**    **PRIORITY SYSTEM DEADLINES** ................................................. **22**

**VII.**  **FFY-2022 PRIORITY LIST** ................................................................ **24**

**VIII.**  **EXPECTED PUBLIC HEALTH OUTCOMES & PERFORMANCE MEASURES** .............. **26**


**APPENDICES**

**APPENDIX A - FFY-2022 BEGINNING OF THE YEAR  ANTICIPATED FUNDS REPORT FOR THE MISSISSIPPI DRINKING WATER  IMPROVEMENTS REVOLVING LOAN FUND (DWSIRLF) PROGRAM** ............................................................... **I**

**APPENDIX B - PROJECTED SCHEDULE OF OUTLAYS  FOR STANDARD CAPITALIZATION GRANT SET-ASIDES** ............................................... **III**

**APPENDIX C - PROJECTED PAYMENT (FEDERAL LETTER OF CREDIT) SCHEDULE** ...... **IV**

**APPENDIX D - PROJECTED SCHEDULE OF DRAWDOWNS AGAINST FEDERAL LETTER OF CREDIT  (ACH DRAW SCHEDULE)** ............................................. **V**

**APPENDIX E - MISSISSIPPI SMALL SYSTEMS TECHNICAL ASSISTANCE SET-ASIDE WORK PLAN** ................................................................... **VI**

**APPENDIX F - MISSISSIPPI STATE PROGRAM MANAGEMENT  SET-ASIDE ANNUAL WORK PLAN** ........................................................... **XI**

**APPENDIX G - LOCAL ASSISTANCE AND OTHER STATE PROGRAMS ANNUAL WORK PLAN** ................................................................... **XVI**

**APPENDIX H - COORDINATION SCHEDULES FOR JOINTLY FUNDED PROJECTS** ..... **XVIII**

**APPENDIX I - DRINKING WATER SYSTEMS EMERGENCY LOAN FUND PROGRAM** .. **XXVI**

**APPENDIX J - CERTIFICATIONS** ....................................................... **XXVII**

**APPENDIX K – INFRASTRUCTURE INVESTMENT AND JOBS ACT** .................... **XXIX**

**APPENDIX L - LOCAL ASSISTANCE AND OTHER STATE PROGRAMS ANNUAL WORK PLAN** ................................................................... **XXX**

| FISCAL YEAR 2021 Project | Project Description | Zip Code | County | Service Area Population | MHI of Population Served by the Project | White alone, percent | Black or African American alone, percent | Loan Amount Requested | Loan Amount Received |
|---|---|---|---|---|---|---|---|---|---|
| 1 City of Jackson | Water and Distribution System Improvements | 39201 | Hinds | 165000 | $ 38,819 | 16.2% | 82.5% | $ 27,953,300 | $ 27,953,300 |
| 2 City of Lexington | Elevated Tank Rehab | 39095 | Holmes * | 1735 | $ 24,631 | 15.7% | 83.1% | $ 326,350 | 326,350 |
| 3 St Thomas Water Association | Water System Improvements | 39041 | Hinds | 732 | $ 43,338 | 23.2% | 72.7% | $ 135,523 | 135,523 |
| 4 Thomasville Water Association | Water and Distribution Systems Improvements | 39073 | Rankin | 1294 | $ 43,825 | 70.1% | 20.1% | $ 1,800,000 | 1,800,000 |
| 5 Plum Point Community W/A | Water and Distribution System Improvements/New Well | 38658 | Panola* | 115 | $ 41,111 | 47.9% | 50.4% | $ 308,532 | 308,532 |
| 6 Sylvarena W/A | New Water Well | 39153 | Smith* | 786 | $ 37,835 | 74.8% | 23.8% | $ 711,000 | 711,000 |
| 7 Days W/A | Install 12" Water Lines/Electrical Controls | 38651 | Desoto * | 3500 | $ 56,787 | 63.5% | 32.6% | $ 733,290 | 733,290 |
| 8 Leesburg W/A | Replace Approx. 165,000 LF Water Mains W/4"-8" PVC | 39145 | Rankin^ | 4182 | $ 37,491 | 75.8% | 13.6% | $ 2,505,000 | 2,505,000 |
| 9 Central Yazoo W/A | New Water Well, Distribution Improvements, & | 39194 | Yazoo* | 9960 | $ 34,968 | 40.0% | 57.7% | $ 2,075,000 | 2,075,000 |
| 10 City of Pearl | Distribution Ph./Water Ph. 2 Systems Improvements | 39208 | Rankin | 26500 | $ 37,782 | 63.9% | 31.8% | $ 1,850,000 | 1,850,000 |
| 11 Town of Mount Olive | Replacement of Water Lines | 39119 | Covington * | 1000 | $ 30,467 | 61.4% | 35.6% | $ 1,032,027 | 1,032,027 |
| 12 Town of Raleigh | Water System Improvements | 39153 | Smith* | 1462 | $ 32,133 | 74.8% | 23.8% | $ 922,000 | 922,000 |
| 13 Rose Hill W/A | Replace 5.5 Miles of 4"-6" Water Mains/Appurtenance | 39356 | Jasper* | 1188 | $ 31,814 | 45.0% | 53.4% | $ 506,623 | 506,623 |

Note: This demographic data is not normally collected by the program. Staff used the system zip code and the Census QuickFacts to collect this data.
The Program defines Disadvantaged Communities as a project's service population with an MHI less than the State's MHI.

Zip code information was not available. Therefore, the county data was used.

| FISCAL YEAR 2022 Project | Project Description | Zip Code | County | Service Area Population | MHI of Population Served by the Project | White alone, percent | Black or African American alone, percent | Loan Amount Requested | Loan Amount Received |
|---|---|---|---|---|---|---|---|---|---|
| 1 Hazlehurst, Town of | Water Treatment Facility/Water System Improvements | 39083 | Copiah* | 3838 | $26,883 | 46.2% | 51.7% | $4,490,015 | $4,490,015 |
| 2 Golding Acres W/A | New Water Well | 38701 | Washington* | 105 | $29,083 | 25.5% | 72.7% | $444,012 | 444,012 |
| 3 Central Yazoo W/A | Water Distribution Improvements | 39194 | Yazoo* | 9960 | $34,568 | 40.0% | 57.7% | $1,589,330 | 1,589,330 |
| 4 Pearl, City of | Distribution Improvements | 39208 | Rankin | 26500 | $38,391 | 63.9% | 31.8% | $1,150,000 | 1,150,000 |
| 5 NE Itawamba W/A | Water System Improvements | 38847 | Itawamba | 4700 | $33,496 | 91.0% | 7.0% | $1,589,330 | 1,589,330 |
| 6 Southern Rankin W/A | Water System Improvements | 39073 | Rankin* | 3975 | $44,138 | 74.5% | 22.5% | $2,400,000 | 2,400,000 |
| 7 Eudora Utilities | New W.T. Plant/300,000. Gal Tank/12" Water Lines | 38632 | Desoto | 3702 | $68,806 | 63.5% | 32.6% | $906,000 | 906,000 |
| 8 Rocky Creek W/A | New Elevated Storage Tank | 39452 | George | 2200 | $44,922 | 89.1% | 8.0% | $1,445,256 | 1,445,256 |
| 9 Central W/A | Rehab/ Replacement of Existing Facilities | 39350 | Neshoba* | 12082 | $36,820 | 58.7% | 21.4% | $4,038,251 | 4,038,251 |
| 10 North Hinds W/A | Rehab Storage Facilities | 39071 | Madison* | 10150 | $49,927 | 57.3% | 38.5% | $537,000 | 537,000 |
| 11 Hattiesburg, City of | Rehab/ Replacement of Existing Facilities | 39403 | Forrest | 45951 | $45,022 | 40.4% | 54.6% | $1,511,937 | 1,511,937 |
| 12 Brandon, City of | Replace Water Lines | 39042 | Rankin | 26355 | $66,676 | 76.0% | 21.8% | $5,000,000 | 5,000,000 |
| 13 Magee's Creek W/A | Water System Improvements | 39667 | Walthall | 7194 | $35,822 | 54.2% | 43.0% | $780,500 | 780,500 |
| 14 Hub W/A | 50,000 G Tank/400 GPM Well/Valves/Elec. Controls | 39429 | Marion* | 3300 | $39,285 | 66.3% | 31.6% | $2,458,500 | 2,458,500 |
| 15 Union Church W/A | Treatment plant rehabilitation and backup well | 39668 | Jefferson | 1508 | $33,113 | 13.8% | 84.9% | $3,242,000 | 3,242,000 |
| 16 Friar's Point, Town of | Distribution System Improvements | 38631 | Coahoma* | 1200 | $21,818 | 20.7% | 77.7% | $1,337,914 | 1,337,914 |
| 17 Thomasville W/A | New Well | 39073 | Rankin* | 1294 | $43,825 | 74.5% | 22.5% | $1,450,000 | 1,450,000 |
| 18 Culkin Water District | Rehab/ Replacement of Existing Facilities | 39183 | Warren* | 11409 | $43,907 | 27.0% | 69.4% | $5,000,000 | 5,000,000 |
| 19 Decatur, Town of | Rehab/ Replacement of Existing Facilities | 39327 | Newton* | 1705 | $48,252 | 61.4% | 31.4% | $3,300,725 | 3,300,725 |

Note: This demographic data is not normally collected by the program. Staff used the system zip code and the Census QuickFacts to collect this data.
The Program defines Disadvantaged Communities as a project's service population with an MHI less than the State's MHI.

Zip code information was not available.
Therefore, the county data was used.

# U.S. Census Bureau QuickFacts: Jackson city, Mississippi; Mississippi

| | Jackson city, Mississippi | Mississippi |
|---|---|---|
| Population Estimates, July 1 2021, (V2021) | 149,761 People | 2,949,965 |

### Population

| | | Jackson city, Mississippi | Mississippi |
|---|---|---|---|
| Population Estimates, July 1 2021, (V2021) | | 149,761 | 2,949,965 |
| Population estimates base, April 1, 2020, (V2021) | | 153,643 | 2,961,279 |
| Population, percent change - April 1, 2020 (estimates base) to July 1, 2021, (V2021) | | -2.5% | -0.4% |
| Population, Census, April 1, 2020 | | 153,701 | 2,961,279 |
| Population, Census, April 1, 2010 | | 173,514 | 2,967,297 |

### Age and Sex

| | | Jackson city, Mississippi | Mississippi |
|---|---|---|---|
| Persons under 5 years, percent | | 7.1% | 6.0% |
| Persons under 18 years, percent | | 24.5% | 23.5% |
| Persons 65 years and over, percent | | 13.0% | 16.8% |
| Female persons, percent | | 54.0% | 51.3% |

### Race and Hispanic Origin

| | | Jackson city, Mississippi | Mississippi |
|---|---|---|---|
| White alone, percent | | 16.2% | 58.8% |

| | | |
|---|---|---|
| Black or African American alone, percent(a) | | |
| | 82.5% | 38.0% |
| American Indian and Alaska Native alone, percent(a) | | |
| | 0.1% | 0.6% |
| Asian alone, percent(a) | | |
| | 0.3% | 1.1% |
| Native Hawaiian and Other Pacific Islander alone, percent(a) | | |
| | 0.0% | 0.1% |
| Two or More Races, percent | | |
| | 0.7% | 1.4% |
| Hispanic or Latino, percent(b) | | |
| | 1.3% | 3.5% |
| White alone, not Hispanic or Latino, percent | | |
| | 15.4% | 56.0% |

## Population Characteristics

| | | |
|---|---|---|
| Veterans, 2016-2020 | 6,609 | 164,687 |
| Foreign born persons, percent, 2016-2020 | 1.1% | 2.3% |

## Housing

| | | |
|---|---|---|
| Housing units, July 1, 2021, (V2021) | X | 1,332,050 |
| Owner-occupied housing unit rate, 2016-2020 | 49.0% | 68.8% |
| Median value of owner-occupied housing units, 2016-2020 | $91,400 | $125,500 |
| Median selected monthly owner costs -with a mortgage, 2016-2020 | $1,066 | $1,161 |
| Median selected monthly owner costs -without a mortgage, 2016-2020 | $368 | $358 |
| Median gross rent, 2016-2020 | $856 | $789 |
| Building permits, 2021 | X | 7,988 |

## Families & Living Arrangements

| | | |
|---|---|---|
| Households, 2016-2020 | 62,861 | 1,116,649 |
| Persons per household, 2016-2020 | 2.49 | 2.59 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2016-2020 | 81.6% | 87.5% |
| Language other than English spoken at home, percent of persons age 5 years+, 2016-2020 | 2.0% | 4.0% |

## Computer and Internet Use

| | | |
|---|---|---|
| Households with a computer, percent, 2016-2020 | 88.7% | 86.5% |
| Households with a broadband Internet subscription, percent, 2016-2020 | 83.6% | 75.8% |

U.S. Census Bureau QuickFacts: Jackson city, Mississippi; Mississippi          https://www.census.gov/quickfacts/fact/table/jacksoncitymississip...

## Education

| | | |
|---|---|---|
| High school graduate or higher, percent of persons age 25 years+, 2016-2020 | 86.8% | 85.3% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2016-2020 | 28.4% | 22.8% |

## Health

| | | |
|---|---|---|
| With a disability, under age 65 years, percent, 2016-2020 | 9.0% | 11.9% |
| Persons without health insurance, under age 65 years, percent | 🔲🔲 | 🔲🔲 |
| | 16.5% | 14.2% |

## Economy

| | | |
|---|---|---|
| In civilian labor force, total, percent of population age 16 years+, 2016-2020 | 62.9% | 56.8% |
| In civilian labor force, female, percent of population age 16 years+, 2016-2020 | 61.2% | 53.8% |
| Total accommodation and food services sales, 2017 ($1,000)(c) | 433,595 | 8,181,285 |
| Total health care and social assistance receipts/revenue, 2017 ($1,000)(c) | 3,812,314 | 18,752,296 |
| Total transportation and warehousing receipts/revenue, 2017 ($1,000)(c) | 326,251 | 5,564,028 |
| Total retail sales, 2017 ($1,000)(c) | 2,630,794 | 36,920,630 |
| Total retail sales per capita, 2017(c) | $15,766 | $12,345 |

## Transportation

| | | |
|---|---|---|
| Mean travel time to work (minutes), workers age 16 years+, 2016-2020 | 21.0 | 25.2 |

## Income & Poverty

| | | |
|---|---|---|
| Median household income (in 2020 dollars), 2016-2020 | $40,064 | $46,511 |
| Per capita income in past 12 months (in 2020 dollars), 2016-2020 | $22,815 | $25,444 |
| Persons in poverty, percent | 🔲🔲 | 🔲🔲 |
| | 24.5% | 19.4% |

Businesses

## Businesses

| | | |
|---|---|---|
| Total employer establishments, 2020 | X | 58,897 |
| Total employment, 2020 | X | 949,927 |
| Total annual payroll, 2020 ($1,000) | X | 38,104,261 |
| Total employment, percent change, 2019-2020 | X | -0.9% |
| Total nonemployer establishments, 2019 | X | 228,123 |
| All employer firms, Reference year 2017 | 3,326 | 41,265 |
| Men-owned employer firms, Reference year 2017 | 1,822 | 25,349 |
| Women-owned employer firms, Reference year 2017 | 509 | 6,653 |
| Minority-owned employer firms, Reference year 2017 | 479 | 4,503 |
| Nonminority-owned employer firms, Reference year 2017 | 2,109 | 32,683 |
| Veteran-owned employer firms, Reference year 2017 | S | 2,914 |
| Nonveteran-owned employer firms, Reference year 2017 | 2,267 | 33,214 |

Geography

## Geography

U.S. Census Bureau QuickFacts: Jackson city, Mississippi; Mississippi          https://www.census.gov/quickfacts/fact/table/jacksoncitymississip...

| | | |
|---|---|---|
| Population per square mile, 2020 | 1,375.8 | 63.1 |
| Population per square mile, 2010 | 1,562.5 | 63.2 |
| Land area in square miles, 2020 | 111.72 | 46,923.96 |
| Land area in square miles, 2010 | 111.05 | 46,923.27 |
| FIPS Code | 2836000 | 28 |

10/31/2022, 11:15 AM



# State of Mississippi

**TATE REEVES**
Governor

## MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY

CHRIS WELLS, EXECUTIVE DIRECTOR

December 16, 2022

Anthu Hoang
*Acting* Director, Office of Environmental Justice & External Civil Rights
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, D.C. 20460
hoang.anthu@epa.gov

Re:    MDEQ's Response to EPA Complaint No: 07R-22-R4

Dear Acting Director Hoang:

The recipient, the state of Mississippi Department of Environment Quality ("MDEQ"), submits this response to the Complaint No: 07R-22-R4 ("Complaint") that the National Association for the Advancement of Colored People ("NAACP") filed with the United States Environmental Protection Agency ("EPA") Office of Environmental Justice and External Civil Rights and Office of External Civil Rights Compliance ("OECRC") on September 27, 2022.[1] The Complaint alleges that MDEQ violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7 ("Title VI"), by failing to fund the City of Jackson's ("Jackson" or "the City") drinking water infrastructure needs. NAACP contends that the MDEQ, along with the state of Mississippi, the Governor, the Legislature, the Mississippi Department of Health ("MSDOH"), and the Mississippi Department of Finance and Administration, failed to properly allocate federal funding, resulting in unjustified disparate adverse impacts against African Americans, based on race. OECRC has accepted for investigation the following two issues:

> 1. Whether MDEQ discriminated against the majority Black population of Jackson, Mississippi, on the basis of race and color, by intent or effect, in its funding of water infrastructure and treatment programs and activities, in violation of Title VI and EPA's implementing regulation at 40 C.F.R. Part 7; and

> 2. Whether MDEQ has and is implementing the procedural safeguards required under 40 C.F.R. Parts 5 and 7 that all recipients of federal assistance must have in place to comply with their general nondiscrimination obligations, including specific policies and procedures to ensure meaningful access to

---

[1] EPA issued its Final Acceptance of the Complaint on October 20, 2020.  By agreement, EPA extended the time for MDEQ to file its initial response by 30 days, with an allowance for continued submission of information, with the response complete by January 17, 2023.

POST OFFICE BOX 2261 • JACKSON, MISSISSIPPI 39225-2261 • TEL: (601) 961-5000 • FAX: (601) 961-5794 • www.mdeq.ms.gov
Facebook: @mdeq.ms • Twitter: @MDEQ • Instagram: @MDEQ
AN EQUAL OPPORTUNITY EMPLOYER

MDEQ's services, programs, and activities, for individuals with limited English proficiency (LEP) and individuals with disabilities, and whether MDEQ has public participation policies and processes that are consistent with Title VI and the other federal civil rights laws, and EPA's implementing regulation at 40 C.F.R. Parts 5 and 7.

## INTRODUCTION AND SUMMARY OF MDEQ'S POSITION

MDEQ is designated as the pollution control agency for the State of Mississippi, and is charged with safeguarding the health, safety, and welfare of present and future generations of Mississippians by conserving and improving our environment and fostering wise economic growth through focused research and responsible regulation. It does this by adhering to statutes and regulations and operating its programs in a manner that includes a meaningful public engagement process.

In response to the first issue, the Complainant NAACP failed to allege a *single fact* to support any argument that MDEQ discriminated against the City of Jackson, either through intent or effect, in providing funding for wastewater treatment infrastructure. MDEQ has approved *every* complete application the City of Jackson has ever submitted for loans under MDEQ's state revolving loan program. The amounts of those loans were determined by the costs of the projects for which the loans were requested, as represented by the City. Thus, MDEQ has never denied funding to Jackson under the terms of the revolving loan program.  MDEQ did not discriminate against the City of Jackson.

In response to the second issue, MDEQ has policies, procedures, and processes in place to comply with its general nondiscrimination obligations under Title VI, including meaningful public participation policies and processes, and MDEQ provides meaningful access for individuals with limited English proficiency and individuals with disabilities. Thus, MDEQ has the requisite procedural safeguards in place to ensure it complies with Title VI and EPA's Title VI regulations.

## FACTUAL BACKGROUND

### I.   Overview of MDEQ and the infrastructure funding managed by MDEQ

#### a.  MDEQ

MDEQ is a state of Mississippi executive agency created under Mississippi Code Annotated §49-2-4. MDEQ is designated as the single state agency to receive and expend any federal funds made available for matters within the jurisdiction of the department.[2]

The mission of the Mississippi Department of Environmental Quality is to safeguard the health, safety, and welfare of present and future generations of Mississippians by conserving and improving our environment and fostering wise economic growth through focused research and responsible regulation.[3]

---

[2] Miss. Code Ann. §49-2-7.
[3] About MDEQ – MDEQ (ms.gov)

2

MDEQ is tasked with protecting not just the environment, but also public health and welfare, wildlife, fish and aquatic life; to support domestic, agricultural, industrial, recreational and other legitimate beneficial uses; to provide for the prevention, abatement and control of air and water pollution; and to cooperate not just with the other agencies of the state, but also with other states and the federal government to carry out these objectives.[4]  In doing so, MDEQ operates some of its regulatory programs under federal delegations of authority in the form of either delegated program authority or authority provided pursuant to formal agreements with EPA. EPA has delegated to MDEQ the authority to regulate programs under the following federal laws: the Clean Air Act; the Clean Water Act; the Resource Conservation and Recovery Act; and the Comprehensive Environmental Response, Compensation, and Liability Act. [5]

The NAACP Complaint filed in this matter primarily alleges discrimination associated with drinking water and the Drinking Water Revolving Loan Fund program. The Mississippi Safe Drinking Water Act of 1997 assigns the duty to regulate drinking water to the Mississippi Department of Health.[6]  Accordingly, MDEQ does not regulate drinking water in Mississippi and it does not manage the Drinking Water Revolving Loan Fund. However, the Complaint generally alleges discrimination regarding funding of the City of Jackson's wastewater treatment infrastructure. MDEQ regulates wastewater treatment in Mississippi and manages the Water Pollution Control Revolving Fund; thus, the Complaint included MDEQ as a respondent in this matter and made nebulous claims of discrimination against MDEQ unrelated to the City of Jackson's long-standing issues with its drinking water infrastructure.

### b.  Water Pollution Control Revolving Fund

The Water Pollution Control Revolving Fund ("WPCRF" or "SRF") is created by state statute and is administered by the Mississippi Commission on Environmental Quality ("Commission") through MDEQ.[7]  The purpose of the WPCRF is to provide loans to help political subdivisions construct water pollution control projects. The long-term goals of the WPCRF include maintaining a financially sound revolving loan fund in perpetuity and meeting a substantial portion of the wastewater needs in the state within a reasonable period of time, while continuing to maintain a program that is attractive to the communities in the state.[8]  According to statute, the revolving funds may be used only for specifically enumerated purposes:

(a) To make loans conditioned on certain factors:
(b) To buy or refinance the debt obligation of political subdivisions at or below market rates, where the debt obligations were incurred after March 7, 1985, and where the projects were constructed in compliance with applicable federal and state regulations;
(c) To guarantee, or purchase insurance for, obligations of political subdivisions where the action would improve credit market access or reduce interest rates;
(d) To provide loan guarantees for similar revolving funds established by municipalities or intermunicipal agencies;

---

[4] Miss. Code § 49-17-3.
[5] For the purpose of this response, see SRF Operating Agreement (1989) and SRF Operating Agreement (1995) as Attachments 1a and 1b.
[6] Miss. Code Ann. §41-26-1.
[7] Miss. Code Ann. §49-17-85(1).
[8] Attachment 2 - FY-2022 Intended Use Plan, WATER POLLUTION CONTROL (CLEAN WATER) (ms.gov)

**(e)** To earn interest on fund accounts;

**(f)** To establish nonpoint source pollution control management programs;

**(g)** To establish estuary conservation and management programs;

**(h)** For the reasonable costs of administering the revolving fund and conducting activities under this act, subject to the limitations established in Section 603(d)(7) of Title VI of the federal Clean Water Act, as amended, and subject to annual appropriation by the Legislature;

**(i)** In connection with the issuance, sale and purchase of bonds under Section 31-25-1 *et seq.*, related to the funding of projects, to provide security or a pledge of revenues for the repayment of the bonds; and

**(j)** To pay the principal and interest on bonds[9] issued [pursuant to legislation in 2007, 2008, 2009, 2010, 2011, 2013, 2018, 2019, 2020, and 2021], as they become due; however, only interest and investment earnings on money in the fund may be utilized for this purpose.[10]

Loans issued pursuant to this statute may only be made pursuant to certain conditions:

**(i)** The loans are made at or below market interest rates, at terms not to exceed the maximum time allowed by federal law after project completion; the interest rate and term may vary from time to time and from loan to loan at the discretion of the commission;

**(ii)** Periodic principal and interest payments will commence when required by the commission but not later than one (1) year after project completion and all loans will be fully amortized when required by the commission but not later than the maximum time allowed by federal law after project completion; and

**(iii)** The recipient of a loan will establish a dedicated source of revenue for repayment of loans.[11]

The WPCRF is a loan program, not a grant program.[12] However, some loans issued through the WPCRF may qualify for subsidization. The affordability criteria used to determine whether a loan recipient qualifies for a subsidy is defined in the annual Intended Use Plan[13] ("IUP") for the WPCRF program. MDEQ has always set the maximum subsidization amount at 30 percent of the federal capitalization grant, which is the maximum percentage allowed by EPA.[14] The subsidization of WPCRF loans is based on affordability criteria which have historically been designed to ensure that the communities of greatest need—i.e., small and economically disadvantaged communities—qualify for subsidization. To qualify, a community or loan applicant must have a population of 4,000

---

[9] The SRF program is a 5:1 match for federal funding, and the state of Mississippi receives less than 1% of the federal (Congressional) CWSRF appropriation through the EPA CWSRF Capitalization Grant. . The state's matching portion is funded in some years by the issuance of bonds. The debt service on those bonds is paid using interest and investment earnings on money in the fund.

[10] Miss. Code Ann. § 49-17-85(7).

[11] Miss. Code Ann. § 49-17-85(7)(a).

[12] Although Miss. Code Ann. § 49-17-85(2) also established the Water Pollution Control Hardship Grants Fund, that fund was associated with the EPA administered hardship grants program, which was funded in 1996 and disbursed only in 1997.

[13] The IUP identifies the intended uses of the amount of the SRF funds available for each fiscal year. 11 Miss. Admin. Code, Pt. 6, R. 4.1.C(32).

[14] 33 USCS § 1383(i)(3)(B)(i)(I)

4

or fewer and a median household income of $40,000 or less.[15] [16] Projects which qualify for subsidization are eligible to receive a loan subsidy in the form of principal forgiveness equal to 75 percent of the total loan amount. Notwithstanding the subsidy percentage, the cumulative subsidy provided to any single recipient for projects ranked on this Small/Low Income priority list shall not exceed $2,000,000.[17] The affordability criteria for subsidization is re-evaluated and proposed every year in the draft IUP which, as required by state and federal law, goes to public notice and is followed by a public hearing. The draft IUP is published on MDEQ's website and in the state of Mississippi's Administrative Bulletin, and the current IUP may be viewed on MDEQ's website and the Mississippi Secretary of State's website.[18] The EPA conducts an annual oversight review of the State's IUP, as well as the State's annual report.[19] During the entire term of MDEQ's operation and management of the WPCRF, EPA has had the opportunity, year after year after year, to state if it felt the program's affordability criteria was discriminatory. This has never happened.

### c.  Water Pollution Control Emergency Loan Fund Program

The state established the Water Pollution Control Emergency Loan Fund Program ("WPCELF") to assist political subdivisions in making emergency improvements such as repairs to or replacement of machinery, equipment, materials, structures, or devices in existing water pollution abatement projects or such other emergency water pollution abatement projects as the Commission deems necessary.[20] The WPCELF is funded entirely by state funds and is designed to provide limited, low-interest, shorter-term loan assistance for emergency repairs, replacement, and improvements that cannot wait for a regular funding cycle. The intent of the fund is to quickly provide monies to communities to handle emergencies.

### d.  The City of Jackson and Funding Provided through MDEQ Programs

Since 1989, MDEQ has issued 355 loans under the WPCRF program.[21] MDEQ has never denied a completed loan application submitted by any applicant including the City of Jackson.[22] The amount of the loans is determined by the costs of the project described in the loan application. MDEQ does not determine when or if any applicant will apply for a loan; rather, its role is to review loan applications for completeness and compliance with the WPCRF program rules and regulations. It is up to recipients such as the City of Jackson to decide whether and when to apply for a WPCRF loan.

Allegations that MDEQ has denied funding to Jackson through the WPCRF program are untrue.[23] Beginning in 1992 and continuing through 2018, MDEQ approved twelve loans to the City

---

[15] The population and median household income used in this determination is defined in the ESRI Business Analyst 2021 Demographics and Income Profile (the same source which previously published the Community Sourcebook of Zip Code Demographics, historically used for such determinations in the WPCRF Program).
[16] The affordability criteria was changed from a population of 3,000 or fewer and a median household income of $30,000 or less in 2020 to increase the number of communities that would qualify for subsidy loans.
[17] WPCRLF Program FY_2022 Intended Use Plan, p. 32, WATER POLLUTION CONTROL (CLEAN WATER) (ms.gov)
[18] Administrative Bulletin | Michael Watson Secretary of state (ms.gov)
[19] 33 USCS 1386(e)
[20] Miss Code Ann. § 49-17-86.
[21] Attachment 3 – Loan Award History
[22] Loan applicants will sometimes decide to delay a project after beginning the loan application process or failed to complete the application process, and some have declined the loan offer for other reasons, unrelated to the WPCRF program.
[23] Attachment 4 Jackson Loan History

of Jackson totaling $84,403,304.78. Four of those loans have been repaid, and eight are currently in repayment with a remaining balance due of $47,772,824.50. In addition, the City of Jackson has one active project in progress; the design of that project is underway, and construction is estimated to start July 12, 2023. The amount of the loan for the active project is $31,683,000.00. Thus, to date, MDEQ has approved a total of $116,086,304.78 in WPCRF funding for wastewater infrastructure projects in the City of Jackson.

In addition, the City of Jackson has begun the process to acquire funding for other projects. Six future projects have facilities plans approved, and it is possible these projects could be ready for a loan award in this fiscal year. The loans for those future projects in active planning total $163,438,893.00. Three additional projects that have been brought to MDEQ's attention by the City of Jackson may also qualify for loans; however, these projects are not currently in active planning. Initial steps in the process include submission of estimated costs. For these three possible future projects, potential loan amounts based on the estimated costs would be $349,000,000.00. The total possible amount of WPCRLF funding for these future projects totals $512,438,893.00.

In 2018, the City of Jackson was awarded two emergency loans under the WPCELF Program. The loans were for $340,249.00 and $327,049.00, and total $667,298.00. Both loans are in repayment at this time, with a remaining balance of $433,000.86.

MDEQ also managed an EPA Special Appropriations Grant awarded to the City of Jackson in 2001. That funding totaled $2,787,800.00. Construction was completed for that project in May 2007. Because the funding was a grant, the City of Jackson is not required to repay that amount.

Because the Complaint alleges that the City of Jackson received an inequitable portion of the available infrastructure funds, it is helpful to discuss the percentage of total SRF funding the City has received from the SRF program. The population of the City of Jackson is less than 5 percent of the total state population.[24] It is important to note that the WPCRLF program is a statewide program and is intended to fund wastewater infrastructure needs for entities across the entire state.

Over the City of Jackson's loan history, in those years that the City received a loan, the City of Jackson received an average of 27.54 percent of the total funds loaned out through the WPCRLF program. In 2021, Jackson received 49.42 percent of the total loans issued, and in 2018, Jackson received 54.10 percent of the total loans issued under the program.[25] Thus, despite the fact that the City of Jackson's population is less than 5 percent of the total state population, the City of Jackson has received loans that are significantly greater than 5 percent of the total amount of WPCRLF loans issued in a year in which it received funding. Accordingly, any allegation that the percentage of funding provided to the City of Jackson through the WPCRLF was not equitable is false.

### e.  Small Community/Low Income Subsidy Awards

MDEQ has issued a total of 37 small community/low income subsidy awards under the WPCRLF Program. The total amount of those loans is $38,860,235.00. The subsidized portion of those loans totaled $24,692,612.00.[26] As stated previously, the Small/Low Income Subsidy Awards

---

[24] According to the US Census for April 1, 2020, the population of the City of Jackson was 153,701. The population of the entire state of Mississippi was 2,961,279.
[25] Attachment 5 – Jackson Award Percentage
[26] Attachment 6 – Subsidization Loans

are awarded based on the affordability criteria established in the IUP.[27] All of these communities are economically challenged communities. Significantly, 70 percent of the communities who have received subsidized loans are also minority-population communities.[28] Accordingly, the predominately Black citizens of the City of Jackson were not disparately impacted by not receiving a subsidy because there is no evidence that a greater number of non-minority communities received subsidies to the exclusion of minority communities.

## II.   MDEQ and Title VI

As a recipient of federal funds, MDEQ understands its obligations to comply with Title VI of the Civil Rights Act of 1964 ("Title VI").[29] [30] In accordance with Title VI, MDEQ assures that no person, on the grounds of race, color or national origin is excluded from participation in, is denied the benefits of, or is subjected to discrimination under, any program managed or administered by MDEQ.[31] Indeed, MDEQ has a long history of actively supporting initiatives that impact the agency's requirement to comply with Title VI.[32] For example:

**1994**   President Clinton issued Executive Order 12898 to incorporate environmental justice as part of each federal agency's mission.

**1995**   MDEQ began work on an environmental comparative risk assessment, assembling a Public Advisory Committee consisting of 21 organizations representing environmental concerns, businesses, industry, agriculture, academia, local governments, and public health to provide input in this process.

**1997**   MDEQ published the *Comparative Environmental Risks in Mississippi.*
- Over 200 pages examining 23 environmentally related issues and their impact in Mississippi.
- Included a specific Chapter on environmental justice, referred to as environmental equity, resulting     in a list of action items including the following:
  o   Involve all segments of a community with an opportunity to participate in public comment process.
  o   Identify a staff person responsible for responding to environmental equity issues.

---

[27] 33 USCS § 1383(i)(2)(A)(i)

[28] Population percentage using EPA EJScreen reports, cross-referenced with latest US Census data

[29] 42 U.S.C. § 2000d

[30] See www.mdeq.ms.gov, with link on the Homepage entitled "Accessibility"; on the About page, with links for "Notice of Title VI of the Civil Rights Act," "Census I Speak Cards, " and "Know Your Rights: Workplace Discrimination is Illegal" ("In accordance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d ("Title VI"), MDEQ assures that no person, on the grounds of race, color, or national origin shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity for which MDEQ receives federal assistance."), "For Individuals" with link entitled "Accessibility."

[31] Attachment 7 - About MDEQ – MDEQ (ms.gov) "In accordance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d ("Title VI"), MDEQ assures that no person, on the grounds of race, color, or national origin shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity for which MDEQ receives federal assistance."

[32] MDEQ has targeted environmental justice concerns for many years. Although environmental justice is a separate issue, and is not the equivalent of Title VI statutory requirements, activities related to environmental justice concerns may also relate to Title VI requirements.

7

    o     Collect GIS data to aid in locating potential environmental equity areas.

    o     Integrate environmental equity activities into community-industry relations.[33]

**1998**  MDEQ issued the Strategic Plan for Fiscal Years 1998-2002 addressing the action items above.

**1998**  MDEQ re-engineered to a multimedia approach to permitting and compliance and enforcement in order to take a more holistic approach to the environmental activities of any given site.

**2001**  Mississippi Environmental Justice Summit[34]

    ■    Co-sponsored by MDEQ, EPA Region 4, Jesus People against Pollution, Jackson State University, and other community and industry groups.

**2001**  First pre-permitting checklist developed addressing EJ considerations.

**2002**  Assigned first EJ Coordinator, responsible for developing and implementing an EJ strategy.

**2003**  MDEQ's EJ Strategy Finalized.

**2003**  Cultural Diversity training provided to all staff and public participation/public hearing training provided to permitting staff.

**2004**  Standard Operating Procedures for Informing the Public Regarding the Cleanup of Contaminated Sites Finalized.

**2004**  Creation of a small business assistance point-of-contact and dedicated website to help these facilities with the permitting process, including making them aware of environmental regulations, siting criteria, and pre-permitting considerations they may not otherwise consider.

**2008**  MDEQ coordinated with EPA Region 4 to train over 80 staff members from the permitting, compliance and enforcement, field services, and groundwater assessment and remediation divisions.

    ■    Specific case studies discussed by Mississippi staff and training given on EnviroMapper.

    ■    EPA addressed getting to know the community and affected people groups.

**2010**  Office of Community Engagement (OCE) created.

**2013**  General Overview of Environmental Justice and Executive Order 12898 (OCE provided training).

**2015**  The Basics of Environmental Justice Course (OCE provided Training).

**2021**  MDEQ Limited English Proficiency Language Access Plan policy adopted.[35]

In addition, in 2021, MDEQ established a work group composed of members from diverse programs throughout the agency. The group worked to review of the processes and activities of the agency's programs by identifying existing checklists, databases, mapping tools, and online resources that have the potential to assess Title VI compliance.

As part of its efforts to ensure current and future compliance with Title VI, MDEQ posted its Notice of Title VI of the Civil Rights Act prominently on its website; the notice includes provisions

---

[33] Attachment 8 – Chapter 4, Environmental Equity

[34] Attachment 9 - [CPEO-BIF] Mississippi Statewide Environmental Justice Summit

[35] Attachment 10 - Limited English Proficiency Language Access Plan, MDEQ Policy Manual (as of 7.2022).pdf (ms.gov)

regarding how to file a discrimination complaint.[36] MDEQ has also issued a policy related to Low English Proficiency ("LEP") and posted on its website.[37] In compliance with that policy, MDEQ provides Census "I Speak" cards on its website,[38] and translates written documents and provides translators when public interaction occurs in areas making LEP services reasonable and necessary. For example, public meetings relating to Gulf Restoration efforts frequently occur on the Mississippi Gulf Coast in counties with high numbers of Vietnamese and Hispanic populations. Written documents are translated into both Vietnamese and Spanish, and translators are available at public meetings, as are Census Bureau "I Speak" cards.[39]

MDEQ also has a policy related to the Americans with Disabilities Act ("ADA").[40] Under the policy, all events of the agency, whether job related or social activities, shall be conducted to ensure employees or any invited visitors or class of visitors with a disability are able to participate. MDEQ is located in a state governmental building which is ADA compliant.[41] Public meetings held away from MDEQ are held in public buildings that are compliant with ADA standards. MDEQ also provides information on its website regarding assistance to disabled persons.[42]

In addition to internal activities at MDEQ to ensure compliance with Title VI, several MDEQ employees have attended and participated in EPA presentations and question-and-answer sessions regarding Title VI compliance. Of particular note, EPA has stated publicly in a number of these meetings that it does not provide *any* level of guidance or regulatory authority that sets the standard for Title VI compliance by a state agency. The guidelines that do exist were compiled at a time prior to current case law authorities, especially as it relates to disparate impact discrimination claims. EPA has publicly stated that it does not provide any safe harbor provisions in its guidelines, and even if a recipient follows every single provision in the EPA guidance, EPA can still make a finding of noncompliance with Title VI. Notwithstanding EPA's ambiguity regarding whether there is an accepted standard of conduct, MDEQ's position is that its policies, procedures, and processes for managing and operating its programs comply with Title VI and do not discriminate on the basis of race, color or national origin, and comply with federal statutes to address LEP populations and handicapped individuals.

## ARGUMENT

**I.  The Complaint in this matter should be dismissed or, in the alternative, limited to loans for which the City of Jackson submitted an application for SRF funding within 180 days of the filing of the Complaint on September 27, 2022.**

EPA's implementing regulations limit the time for filing of complaints of discrimination.[43]

---

[36] Attachment 11 - Notice of Title VI of the Civil Rights Act, Notice-of-Title-VI-of-the-Civil-Rights-Act.pdf (ms.gov)
[37] See *fn. 30*
[38] Census "I Speak Cards", I Speak Flashcard (ms.gov)
[39] Not one person has requested copies of translated documents, or use of translator services, or completed an "I Speak" card for the last four years.
[40] Attachment 13 – MDEQ Disabilities Policy
[41] Within the last year, the State contracted to provide new interior and exterior handrails to correct the installment of older handrails, which were not compliant with ADA standards. This work occurred at MDEQ's request.
[42] Attachment 14 – Accessibility – MDEQ;  Accessibility – MDEQ (ms.gov)
[43] 40 C.F.R. Part 7.

Specifically, the complaint must be filed within 180 days of the alleged discriminatory acts.[44] In this matter, the allegations made against MDEQ are so general it is impossible to know exactly what discriminatory acts are alleged other than MDEQ, in some unspecified way, failed or refused to fund the City of Jackson's infrastructure needs. Given that the only mechanism MDEQ has had to provide funding to Jackson for wastewater infrastructure projects is through the WPCRLF[45], the only possible failure or refusal MDEQ could undertake would be to refuse to award a loan.[46] That act is something that is unquestionably tied to a date certain. EPA can and should apply the 180 day time limit for filing of a complaint to this matter, and dismiss the Complaint because MDEQ has not refused to award an SRF loan within 180 days prior to the filing of the Complaint. In the alternative, and at a minimum, EPA should limit its investigation to any specifically identified acts of discrimination within the 180-day time period before the date of filing of the Complaint.

**II. MDEQ did not discriminate against the majority Black population of Jackson, Mississippi, on the basis of race and color, by intent or effect, in its funding of water infrastructure and treatment programs and activities, in violation of Title VI and EPA's implementing regulation at 40 C.F.R. Part 7.**

       **a. Disparate treatment.**

Federal civil rights laws and EPA's implementing regulation prohibit recipients of federal funding such as MDEQ from intentionally discriminating in their programs and activities based on race, color, or national origin, disability, sex, or age.[47] This is referred to as "disparate treatment."[48] The regulation at 40 C.F.R. § 7.35(a), states that "a recipient shall not on the basis of race, color, or national origin provide a person any service, aid, or other benefit that is different, or is provided differently from that provided to others under the program or activity."

Intentional discrimination requires a showing that a "challenged action was motivated by an intent to discriminate."[49] Evidence of "bad faith, ill will or any evil motive on the part of the [recipient]" is not necessary.[50] However, evidence in a disparate treatment case must generally show that the recipient was not only aware of the complainant's protected status, but that the recipient acted, at least in part, because of the complainant's protected status.[51] The "totality of the

---

[44] 40 C.F.R. §7.120(b)(2).

[45] WPCELF may provide some funding in emergency situations and has provided some funding to the City of Jackson.

[46] In 2022, the Mississippi Legislature created the Mississippi Municipality & County Water Infrastructure Grant Program Act (MCWI) to provide matching funds for eligible entities for making necessary investments in water, wastewater and stormwater infrastructure. Senate Bill 2822 provided the funding and parameters for the program, which is derived from the American Rescue Plan Act. MDEQ was selected to manage the program. The first round of project selection has concluded, with the City of Jackson receiving awards for seven projects including five drinking water projects and two wastewater projects. Round two of the MCWI match program is currently underway. No funds have been paid under the program as yet. Any claims related to this program would be premature, given that no projects had been approved nor any funds disbursed prior to the filing of the Complaint. HOME - Mississippi Water Infrastructure (mswaterinfrastructure.com)

[47] 40 C.F.R. § 7.30 et seq.; 42 U.S.C. §§ 2000d to 2000d-7.

[48] *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) ("Title VII prohibits [] intentional discrimination (known as 'disparate treatment'"). Title VII standards are instructive in Title VI cases. *See NAACP v. Medical Center, Inc.*, 657 F.2d 1322, 1331 (3d Cir. 1981) (en banc); *New York Urban League v. New York*, 71 F.3d 1031, 1036 (2d Cir. 1995) (courts in Title VI disparate impact cases look to Title VII cases for guidance).

[49] *Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993).

[50] *Williams v. City of Dothan*, 745 F.2d 1406, 1414 (11th Cir. 1984).

[51] *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011).

10

relevant facts" determine whether intentional discrimination has occurred.[52] Intentional discrimination under Title VI may be proven by either direct or indirect evidence.[53]

A policy or decision that is discriminatory on its face is direct evidence of intentional discrimination. [54] Comments expressing a discriminatory motive such as racist statements are also direct evidence that can establish intentional discrimination.[55] In the Complaint filed in this matter, there is no allegation asserting direct evidence of intentional discrimination by MDEQ. The Complaint asserts a refusal to provide funding for infrastructure—assertions which are outright disproven by the millions of dollars in loans provided to the City of Jackson. MDEQ made these loans consistent with the provisions of the revolving loan program in both law and regulation, and by agreement with EPA, and at no time has MDEQ departed from the standard procedures associated with the program. Thus, the allegations in the Complaint do not support a finding that MDEQ intentionally discriminated against the City of Jackson.

In this case, there is simply no prima facie case of discrimination. The City of Jackson received a loan for every completed application it submitted. Every recipient of SRF dollars received a loan for every completed application submitted. No applicants were denied. And, because the amount of a loan is based on the cost of the project, no loans were reduced for any reason that could be considered discriminatory.

There is no evidence whatsoever that MDEQ intentionally discriminated against the City of Jackson; thus, NAACP's Title VI Complaint must fail.

### b. MDEQ did not operate its SRF Program in a manner that disparately impacted the City of Jackson.

While Title VI itself only bars *intentional* discrimination, EPA's regulation also prohibits disparate impact discrimination.[56] The regulation, at 40 C.F.R. § 7.35(6), states in relevant part, that "[a] recipient shall not use criteria or methods of administering its program or activity which have the effect of subjecting individuals to discrimination because of their race, color, or national origin."

MDEQ expressly reserves its right to challenge EPA's disparate impact regulations. The United States Supreme Court has held that Title VI forbids only intentional discrimination.[57] While

---

[52] *See Washington v. Davis*, 426 U.S. 229, 242 (1976) ("an invidious discriminatory purpose may often be inferred from the totality of the relevant facts.").

[53] *Saqr v. Univ. of Cincinnati*, No. 1:18-cv-542, 2019 U.S. Dist. LEXIS 26467, at *39 (S.D. Ohio Feb. 20, 2019).

[54] EPA Toolkit, p. 3.

[55] *Id.*

[56] *See Sandoval*, 532 U.S. at 281-82 ("we must assume for purposes of deciding this case that regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601."); *see also Villanueva v. Carere*, 85 F.3d 481, 486 (10th Cir. 1996); *New York Urban league*, 71 F.3d at 1036 ("In *Guardians Association v. Civil Service Commission*, 463 U.S. 582, 77 L. Ed. 2d 866, 103 S. Ct. 3221 (1983), the Supreme Court held that [Title VI] only prohibits *intentional* discrimination, not actions that have a disparate impact upon minorities. Nonetheless, the Court concluded that Title VI delegated to federal agencies the authority to promulgate regulations incorporating a disparate impact standard."(citations omitted)).

[57] *Sandoval, 532 US at 281.* "[W]e must assume for purposes of deciding this case that regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601. Though no opinion of this Court has held that, five Justices in *Guardians* voiced that view of the law at least as alternative grounds for their decisions, see 463 U.S. at 591-592 (opinion of White,

11

the Court has assumed that federal agencies may promulgate disparate impact regulations pursuant to Section 602 of the Civil Rights Act, the Court seems to have questioned whether agencies may promulgate disparate impact regulation pursuant to Title VI. Some judges on the US Fifth Circuit Court of Appeals have opined that extending Title VI to include disparate impacts through federal regulation is unlawful.[58]

Assuming, as the *Sandoval* Court did, that disparate impact regulations are valid, MDEQ did not operate its SRF program in a manner that disparately impacted the City of Jackson. Investigations of disparate impact complaints focus on the consequences of the recipient's practices and not the intent.[59] EPA must consider whether there is a policy or practice that falls disproportionately on a group protected by Title VI, whether there is a substantial legitimate justification for the policy or practice and, if so, whether there is an alternative that would achieve the same legitimate objective with less discriminatory effect. [60]"EPA must determine whether the recipient uses a facially neutral policy or practice that has a sufficiently adverse (harmful) and disproportionate effect based on race, color, or national origin." [61]To determine whether there is a prima facie case of disparate impact, EPA must: identify the specific, facially neutral policy or practice at issue; establish adversity or harm; establish disparity; **and** establish causation.[62]The focus is on the consequences of the questioned policy or decision and not on the recipient's intent.[63]

### 1. Facially neutral policy or practice

EPA must "accurately and completely define the policy or practice at issue."[64] This is a fact-specific inquiry, and in some instances EPA may need to "broaden its inquiry beyond the specific complaint allegations" to define the policy or practice.[65] The policy or practice could be overt. For example, a policy or practice of issuing environmental permits to applicants who have complied with environmental laws and regulations is a facially neutral practice.[66] Sometimes the challenged policy

---

J.); *id.,* at 623, n. 15 (Marshall, J., dissenting); *id.,* at 643-645 (STEVENS, J., joined by Brennan and Blackmun, JJ., dissenting), and dictum in *Alexander* v. *Choate* is to the same effect, see 469 U.S. at 293, 295, n. 11. These statements are in considerable tension with the rule of *Bakke* and *Guardians* that § 601 forbids only intentional discrimination, see, *e.g., Guardians Assn.* v. *Civil Serv. Comm'n of New York City, supra,* at 612-613 (O'CONNOR, J., concurring in judgment), but petitioners have not challenged the regulations here. We therefore assume for the purposes of deciding this case that the DOJ and DOT regulations proscribing activities that have a disparate impact on the basis of race are valid.

[58] "For my own part, I think Justice Thomas has the better of the argument that statutes prohibiting on their face intentional discrimination should not be extended by judicial or administrative fiat to encompass disparate impact theories.(citing *See id.* at 550-55, 135 S. Ct. at 2528-29 (Thomas, J., dissenting). Rollerson v. Brazos River Harbor Navigation Dist., 6 F.4th 633, 647 (5th Cir. 2021) (Jones, E., concurring); *also* "My point is simply this: If disparate impact theory is going to be incorporated into federal law, it should be done by Congress—not agency regulators. *See generally Inclusive Cmtys.,* 576 U.S. at 550-53 (Thomas, J., dissenting). "[S]ubstantive federal law . . . must be created by Congress." *Sandoval,* 532 U.S. at 286.

*Rollerson v. Brazos River Harbor Navigation Dist.,* 6 F.4th 633, 648 (5th Cir. 2021) (Ho, J., concurring in part and concurring in the judgment)

[59] DOJ Manual, Section VII, p. 3

[60] EPA Toolkit, p. 9.

[61] *Id.* at p. 8.

[62] *Id.*

[63] *Id.* at 9.

[64] DOJ Manual, Section VII.C.1.a, p. 9.

[65] *Id.*

[66] *See, e.g., S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.,* 145 F. Supp. 2d 446, 484, (D. N.J. 2001), *rev'd on other grounds,* 274 F. 3d 771 (3d Cir. 2001) (state environmental agency's policy of issuing air permits to proposed facilities that comply with national ambient air quality standards was facially neutral).

or practice could be the absence of a policy or practice.[67] For example, if a recipient does not have a policy of providing language assistance to individuals with limited English proficiency, such individuals will potentially not have equal access to agency programs.[68] Under either of these scenarios, the facially neutral policy or practice could constitute disparate impact discrimination *if* adversity, disparity, and causation are established.

In this matter, the only relevant policies or practices would be those policies or practices governing the providing of funding for infrastructure under the WPCRF program. As stated previously—and repeatedly—MDEQ funded 100 percent of the costs of every single loan awarded to the City of Jackson and approved every single loan to the City for which the City submitted a completed application. Indeed, MDEQ approved funding for every single SRF loan applicant who submitted a completed application. MDEQ's application process was the same for every single applicant, and the repayment requirements were the same for every single loan recipient. Subsidization of loans was defined by specific affordability criteria—criteria that was annually reviewed and approved by EPA. These criteria were submitted for public comment but have never been questioned or criticized. Further, MDEQ's application of these criteria has produced its intended objective to ensure that smaller, economically challenged communities have funds available to improve their wastewater infrastructure; indeed, more than 70 percent of subsidy recipients have been minority communities, and 100 percent of the recipients have been economically challenged communities.

There is simply no evidence that the policies and practices associated with MDEQ's operation of the SRF program resulted in disparate impact discrimination as contemplated by EPA's Title VI regulations.

### 2. *Adversity or harm*

"Adversity exists if a fact specific inquiry determines that the nature, size, or likelihood of the impact is sufficient to make it an actionable harm."[69] To determine whether there has been an adverse and disproportionate impact, EPA considers environmental harms and adverse health effects (e.g., asthma, cancer, cardiac disease, etc.) that have allegedly been caused disproportionately based on race, color, or national origin.[70] EPA also considers non-health harms including economic harms (lowered property values), nuisance odors, traffic congestion, noise, and vermin.[71] In *S. Camden*, the court considered evidence of current health conditions and existing environmental burdens on a minority community where a cement processing facility was to be located and found that siting the facility in the community would likely adversely affect the community's health to a degree that meets the adversity standard.[72] The court determined the community would likely meet the adversity standard even though the environmental permit issued to the facility complied with environmental standards.

Unlike the potential harm to the minority citizens in *S. Camden*, there is neither adversity nor harm to the minority residents of the City of Jackson resulting from any action or inaction by MDEQ

---

[67] DOJ Manual, Section VII.C.1.a, p. 12.
[68] *Id.*
[69] EPA Toolkit, p. 18 (n. 41).
[70] EPA Toolkit *FAQs*, p. 4.
[71] *Id.*
[72] *S. Camden*, 145 F. Supp. 2d at 190.

in relation to WPCRF. The City received every single loan for which it completed an application in amounts universally determined by the cost of the projects for which it applied. MDEQ does not determine what entities apply for SRF loans—that is a decision made by the applicant. If the City of Jackson had applied for other loans, there is no evidence to suggest those loans would have been denied. Indeed, based on MDEQ's years-long practice of approving every complete loan application, it is likely that MDEQ would have approved other loans had the City of Jackson applied for them. The proposition that MDEQ caused the City of Jackson harm despite approving every single complete loan application—including those submitted by the City—is ludicrous, but that is essentially what the Complaint alleges. Again, there is simply no evidence that the policies and practices associated with MDEQ's operation of the SRF program constitute disparate impact discrimination pursuant to EPA's Title VI regulations.

### 3. Disparity

Disparity occurs where "a disproportionate share of the adversity or harm is borne by individuals based on their race, color, national origin, age, disability, or sex."[73] Disparity may be determined by comparing the proportion of the members of the protected class who are adversely affected to the proportion of those not in the protected class who are adversely affected.[74] Once the investigating agency identifies the protected class, it must evaluate whether there is available statistical evidence necessary to evaluate a disparity claim.[75] EPA will "evaluate population or demographic information of the impacted community as compared to an appropriate comparison population that is similarly situated."[76] In *S. Camden*, the court considered expert testimony based on census and other data showing that facilities that produced pollutants in New Jersey were disproportionately located in communities of color.[77] Disparity can also be obvious.[78] For example if a recipient's policy or practice would effectively exclude people with limited English proficiency, disparity is evident without the need for statistics.[79]

An imbalance in the statistical racial demographic, in and of itself, does not violate the disparate impact rule or mean that a Title VI violation has necessarily occurred.[80] "[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."[81] This protects a recipient from being held liable for racial disparities the recipient did not create.[82] "As the disparate impact rule only prohibits *causing* disparate impacts, not the mere existence of disparate impacts or conditions, neither Title VI nor the disparate impact rule necessarily requires a racially balanced result or condition."[83] Courts decline to find disparate impact discrimination where any policy or action taken with respect to a certain group will necessarily affect more protected individuals than those

---

[73] EPA Toolkit, p. 18 (n. 42).

[74] *Id.* at n.42 (citing *Tsombanidis v. W. Haven Fire Dep't*, 352 F. 3d 565, 576–77 (2d Cir. 2003)).

[75] DOJ Manual, Section VII.C.1.c, p. 17.

[76] EPA Toolkit, p. 15.

[77] *S.Camden*, 145 F. Supp. 2d at 491.

[78] DOJ Manual, Section VII.C.1.c, p. 19.

[79] *Id.*

[80] Mattheisen, Michael D., *Applying the Disparate Impact Rule of Law to Environmental Permitting under Title VI of the Civil Rights Act of 1964*, 24 Wm. & Mary Envtl. L. & Pol'y Rev. 1, 23 (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971))

[81] *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015).

[82] *Id.*

[83] *Id.* (citing *United States v. Lowndes County Bd. of Educ.*, 878 F.2d 1301, 1305 (11th Cir. 1989)).

who are not protected, when allegations of discrimination involve nothing more than statistical disparity.[84] Proving disparate impact under Title VI requires "a reliable indicator of disparate impact" and "an appropriate statistical measure" that takes into account all relevant bases of comparison.[85]

The SRF program is a statewide program that offers loans to any county, municipality, utility, district, political subdivision, or other governmental unit created under state law.[86] The City of Jackson is but one such entity in the entire state. And while its population is majority Black, so too is the population of many other governmental units across the state. The allegations in the Complaint fail on the most fundamental level of a disparate impact analysis: showing the existence of a disparate impact. According to EPA's compliance toolkit, this means that there is insufficient evidence to show that MDEQ engaged in discrimination.[87]

   *4. Causation*

There must be a causal connection between the recipient's facially neutral policy and a disproportionate and adverse impact on the protected class.[88] In other words, "did the recipient *actually cause* that effect?"[89] Statistics are frequently used as evidence of causation.[90] When EPA investigates complaints alleging adverse impacts from facilities permitted by recipients, it may consider "scientific proof of a direct link, prediction of potentially significant exposures and risks resulting from stressors created by the permitted activities or other sources, and other complex methodologies."[91] There must be "'a robust causality requirement' in ensuring entities are not 'held liable for racial disparities they did not create.'"[92]

There is no plausible assertion or conclusion that the processes or procedures used to manage the WPCRF program resulted in a disproportionate or adverse impact on a protected class. The City of Jackson, and the City of Jackson alone, determined each year whether or not to complete an application for an SRF loan. And MDEQ has approved not just the City of Jackson's completed WPCRF loan applications, every other entity's completed WPCRF loan applications. Thus, MDEQ's facially neutral administration of its SRF program did not cause a disproportionate and adverse impact on the City of Jackson because there were no such impacts.

   *5. Is there a substantial legitimate justification for the policy or practice?*

If EPA determines that there is a prima facie case of adverse disparate impacts, which MDEQ asserts does not exist, EPA must then consider whether the recipient has stated a "substantial legitimate justification" for the challenged policy or practice.[93] EPA must consider whether the

---

[84] *See, e.g., Edwards v. Johnston Cty. Health Dep't*, 885 F.2d 1215, 1223-24 (4th Cir. 1989).
[85] *S. Bronx Coal. for Clean Air v. Conroy*, 20 F. Supp. 2d 565, 573 (S.D.N.Y. 1998) (citing *New York Urban League, Inc. v. State of New York*, 71 F.3d 1031, 1038 (2d Cir. 1995)).
[86] Miss Code Ann. § 49-17-83(h).
[87] U.S. EPA's External Civil Rights Compliance Office Toolkit, at p. 11 (Jan. 18, 2017),
https://www.epa.gov/sites/production/files/2017-01/documents/toolkit-chapter1-transmittal_letter-faqs.pdf
[88] EPA Toolkit, p. 19 (n.43) (citing *N.Y.C. Envtl. Justice All. v. Giuliani* 214 F. 3d 65, 69 (2d Cir. 2000)).
[89] DOJ Manual, Section VII.C.1.d, p. 26.
[90] *Id.* at 27.
[91] *Id.* at 28 (citing EPA investigations Guidance, 65 Fed. Reg. at 39,679).
[92] *Id.* (citing *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project Inc.*, 576 U.S. 519 (2015)).
[93] EPA Toolkit, p. 9.

recipient can show that the challenged policy was "'necessary to meeting a goal that was *legitimate, important, and integral to the [recipient's] institutional mission.*'" [94] This analysis "requires balancing the recipients' interests in implementing their policies with the substantial public interest in preventing discrimination." [95] An example of a substantial legitimate justification for the recipient's policy or practice could be public health or environmental benefits to the affected community. [96] There could be broader interests such as economic development interests in the affected community that would directly benefit the community. [97]

MDEQ manages a revolving loan program. The long-term goals of the program include maintaining a financially sound SRF in perpetuity and meeting a substantial portion of the wastewater needs in the state within a reasonable period of time, while continuing to maintain a program that is attractive to the communities in the state. Among the factors EPA should consider is that the state match for the program has been funded on occasion with bonds, and that these bonds may only be repaid from the interest and investments of the program. These factors all go toward the development and implementation of the IUP. Consider then these facts:

a.   The City of Jackson has received a loan for every completed application submitted;

b.   The City of Jackson alone determines whether or not to apply for a loan;

c.   The City of Jackson has received loans covering 100 percent of the costs of every project for which a loan was sought;

d.   The City of Jackson has received a far greater percentage of the total amount of loans issued than any other entity during those years in which it received a loan;

e.   The City of Jackson has received a far greater percentage of funding based on population compared to every other entity in the state (i.e., 27.54, 49.42, and 54.10 percent of funding for less than 5 percent of the total population of the state)

It is hard to determine exactly what policy or procedure is being challenged or claimed to be discriminatory in this matter. Moreover, to the extent that the Complaint is premised on potential environmental impacts, any such impacts were not caused by any failure by MDEQ to provide funding to the City of Jackson for wastewater treatment infrastructure but instead would be the result of the City's own failure to properly operate and manage its infrastructure. [98] Absent any demonstration of disproportionate impact, there is no need to demonstrate a substantial, legitimate justification for having operated the SRF program in the nondiscriminatory manner in which it is operated.

### 6.   Are there less discriminatory alternatives or mitigation measures?

If the recipient demonstrates a substantial legitimate justification for the challenged policy or practice, EPA must determine whether there are any equally effective, less discriminatory alternatives. [99] For example, if a recipient considers issuing an environmental permit in a minority community that could adversely and disproportionately affect the community, the recipient must

---

[94] *Id.* (citing *Elston v. Talladega County Bd. of Educ.*, 997 F. 3d 1394, 1413 (11th Cir. 1993)).
[95] EPA Toolkit *FAQs*, pp. 2–3.
[96] EPA Toolkit, p. 15.
[97] *Id.*
[98] Attachment 15 - Letter from Mayor Tony Yarber to Heather McTeer Toney, EPA R4 Administrator, dated October 6, 2016; Attachment 16 - Letter from Governor Tate Reeves to U.S. Reps. Carolyn Maloney and Bennie Thompson dated October 31, 2022.
[99] EPA Toolkit, p. 9.

16

consider whether it can prevent such adverse and disproportionate effects by requiring the facility to operate in a manner that would eliminate or mitigate its disproportionate impact (e.g., by modifying the permit operating conditions, employing practicable mitigation measures to lessen or eliminate the demonstrated adverse impacts), or by not renewing the permit.[100] If there are no available mitigation measures, whether within or outside the permitting program, denial of the permit may be the only way to avoid a Title VI violation.[101]

This is not that situation. MDEQ awarded every loan to every applicant who submitted a complete application for SRF funding. The only alternative or mitigation measure that would seem to be acceptable to the Complainant is for MDEQ to award the City loans for which it has not applied in amounts that would exclude any other entities in the state from such funding—even minority communities—and to subsidize the loans 100 percent even though to do so would contravene applicable laws and regulations.

As demonstrated above, MDEQ has not discriminated against the City of Jackson's citizens on the basis of race and color, by intent or effect, in its funding of water infrastructure and treatment programs and activities, in violation of Title VI and EPA's implementing regulation at 40 C.F.R. Part 7. This portion of the Complaint should be dismissed.

### III.   MDEQ has and is implementing the procedural safeguards required under 40 C.F.R. Parts 5 and 7 that all recipients of federal assistance must have in place to comply with their general nondiscrimination obligations.

As a recipient of federal funds, MDEQ understands its Title VI obligations. In accordance with Title VI, MDEQ assures that no person, on the grounds of race, color or national origin is excluded from participation in, is denied the benefits of, or subjected to discrimination for any program managed or administered by MDEQ. These obligations are satisfied by through public notice, provision of services, and general agency policies and procedures. This includes Title VI related activities across MDEQ's various offices and divisions and efforts to continually improve the agency's path forward for compliance with nondiscrimination obligations.

These efforts are demonstrated by MDEQ's development and adoption of its plan for Limited English Proficiency (LEP) access. MDEQ has fulfilled its obligations to the LEP population, including providing translated written materials and providing translation services when reasonable and necessary. Census Bureau "I Speak" cards are made available online on the MDEQ website and are used by MDEQ when public meetings or hearings occur, especially in areas where LEP community members are likely to attend. In addition, a Notice of Title VI is provided and includes contact information and a complaint procedure. MDEQ's Title VI complaint procedure is designed to convey every complaint directly to the Executive Director, who then oversees the handling of the complaint. The procedures related to complaints are set forth in the Notice of Title VI of the Civil Rights Act found on the MDEQ website, ensuring the public is aware of the process to appeal discrimination concerns.

In addition to multiple notices across the MDEQ website, MDEQ has posted both on its internal website, in personnel manuals,[102] and prominently in its workplaces, notices regarding

---

[100] *Id.* at p.15.
[101] EPA FAQs, p. 15 (FAQ 14).
[102] Mississippi State Employee Handbook, MSPB Policies :: MSPB

protections of employees and prohibiting workplace discrimination.[103]

MDEQ is and continues to implement the procedural safeguards required under 40 C.F.R. Parts 5 and 7 that all recipients of federal assistance must have in place to comply with their general nondiscrimination obligations.

## IV.   OBJECTIONS TO THE INVESTIGATION AND FUTURE FINDINGS

MDEQ has grave concerns regarding the unfettered and effectively standardless nature of this investigation relative to EPA's Title VI authorities. MDEQ expressly reserves all rights as to whether the scope and procedures employed in connection with this investigation (and any future findings) exceed EPA's statutory authority under Title VI. For instance, in regard to the second issue presented for investigation, EPA has failed to provide adequate and meaningful guidance to inform recipients how or whether recipients are in compliance with Title VI. EPA's External Civil Rights Compliance Office published Chapter 1 of its Toolkit in 2017 ("Toolkit") discussing the legal standards for reviewing disparate treatment and disparate impact complaints. However, this Toolkit does not provide adequate guidance regarding what recipients must include in their Title VI programs or inform recipients what measures recipients must implement to comply with Title VI. While EPA offers a checklist of programs recipients should have (e.g., LEP policy, public participation policy, etc.), EPA does not commit to whether adherence to these programs shield recipients from putative actions by EPA under Title VI. These vague standards do not provide an adequate basis on which MDEQ can defend against the allegations or upon which EPA can judge compliance with Title VI.

Threatening to withdraw federal funds—the ultimate penalty if EPA determines MDEQ violated Title VI – based on unarticulated and evolving standards largely untethered to Title VI runs counter to this nation's system of federalism.[104] Moreover, requiring MDEQ to participate in this investigation in the absence of clearly established standards under threat of coercion by way of a Spending Clause program likewise implicates issues of federalism and raises a host of other fundamental legal principles. Simply stated, "The Toolkit highlights legal standards applicable to disparate treatment and disparate impact claims but falls far short of a comprehensive programmatic guidance clarifying the obligations of recipients of EPA funding."[105] Under this framework, MDEQ has no meaningful opportunity defend itself.

In addition, EPA now appears to be overcompensating for its historical deficiencies in processing Title VI complaints by encouraging communities to file Title VI complaints, while ensuring that compliance with standards remains a moving target. What is lacking are standards that are tied to Title VI. EPA has stated on more than one occasion in meetings that entities adopting—and following—the policies in EPA's checklist into a recipient's Title VI program will not necessarily satisfy EPA that the recipient has complied with Title VI. This is especially disconcerting given that EPA has extended Title VI by administrative fiat to encompass disparate impact theories.

With regard to the City of Jackson, the EPA Administrator has visited the City at least four times to date to discuss the City's infrastructure problems. The Administrator has repeatedly voiced

---

[103] Attachment 17 - EEOC Know Your Rights: Workplace Discrimination is Illegal, Workplace-Discrimination-1.pdf (ms.gov)

[104] And doing so will effectively deprive other entities across the state of funds they need to build their wastewater systems, including many minority and economically disadvantaged communities.

[105] Lado, Marianne Engelman "No More Excuses: Building a New Vision of Civil Rights Enforcement in the Context of Environmental Justice," 22 U. Pa. J.L. & Soc. Change 281, 303 (2019) (emphasis added).

his concerns about "longstanding injustice" in regard to the City of Jackson, [106] and has stated EPA is focusing "on discrimination through years of infrastructure neglect."[107]   However, EPA is well aware that the City of Jackson's longstanding infrastructure problems are not caused by discrimination by either the state or, more specifically relevant to this matter, by MDEQ. EPA has significant information within its agency regarding Jackson's persistent failures to operate and maintain its wastewater infrastructure system going back to 2007. Indeed, these failures culminated in a lawsuit filed by the Department of Justice and EPA in 2012 and a federal consent decree between DOJ, EPA, MDEQ, and the City of Jackson designed to address these issues. Before EPA enters a finding that MDEQ discriminated against the City of Jackson, the Administrator should consider, as an alternative to the baseless racial discrimination claims asserted in the present matter, that the facts which led to the filing of the lawsuit and the entry of the consent decree caused the City's infrastructure failures.[108]  Significant amounts of financial information have been provided to EPA during the course of that federal court proceeding which is essential to a complete understanding of the City of Jackson and its financial resources, including loans provided by MDEQ through the SRF program. [109]  Additional information regarding the City of Jackson was included in Governor Tate Reeves's Letter to U.S. Representatives Bennie Thompson and Carolyn Maloney of October 31, 2022, and MDEQ asks that those facts be considered as part of this response.

MDEQ believes that this investigation by EPA is part and parcel of a political effort to divert attention from the City of Jackson's own failures. MDEQ objects to this effort by EPA and the City of Jackson, through the Complainant NAACP, and requests that EPA make an express finding that MDEQ did not discriminate against the City of Jackson—not just that there is insufficient evidence to prove discrimination.  MDEQ respectfully requests that EPA return preliminary findings that MDEQ did not violate Title VI in its funding of infrastructure loans to the City of Jackson and that MDEQ has and is implementing the procedural safeguards required under 40 C.F.R. Parts 5 and 7.

If you have any questions or require any further information, please do not hesitate to contact MDEQ. You may direct any questions or concerns to MDEQ Senior Counsel Donna Hodges at dhodges@mdeq.ms.gov.

Sincerely,

Christopher G. Wells
Executive Director

---

[106] Statement by Administrator Regan on the Ongoing Water Crisis in Jackson, Mississippi | US EPA
[107] EPA administrator visits Jackson to discuss infrastructure (mpbonline.org)
[108] See The United States of America and The State of Mississippi v. The City of Jackson, Mississippi, Case Number 3:12cv790 ( U.S.D.C., S.D. Miss.)
[109] MDEQ has submitted a FOIA request to EPA for internal documents to further support its response in this matter. MDEQ believes that those documents will demonstrate to OECRO that EPA has information of which OECRO may not be aware, as it has not participated in meetings relevant to the ongoing federal court action.  No documents have been received, and the request for expedited handling was denied.

Cc:    Monique Wright-Hudson, EPA
       Douglas Miracle, MSAG

Attachments:  Attachment 1a – SRF Operating Agreement 1989
               Attachment 1b – SRF Operating Agreement 1995
               Attachment 2 – FY-2002 Intended Use Plan
               Attachment 3 – Loan Award History
               Attachment 4 – Jackson Loan History
               Attachment 5 – Jackson Award Percentage
               Attachment 6 – Subsidization Loans
               Attachment 7 – Title VI Notice
               Attachment 8 – Chapter 4, Environmental Equity
               Attachment 9 – Mississippi Statewide Environmental Justice Summit
               Attachment 10 – LEP Policy
               Attachment 11 – Notice of Title VI of the Civil Rights Act
               Attachment 12 – Census I Speak Cards
               Attachment 13 – MDEQ Disabilities Policy
               Attachment 14 – Accessibility – MDEQ
               Attachment 15 – Yarber 2016.10.6
               Attachment 16 – Reeves 2022.10.31
               Attachment 17 – EEOC Workplace Discrimination



MISSISSIPPI STATE DEPARTMENT OF HEALTH

January 13, 2023

Anthu Hoang
Acting Director, Office of Environmental Justice & External Civil Rights
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, D.C. 20460
Hoang.anthu@epa.gov

Re:     MSDH's Response to EPA Complaint No: 06R-22-R4

Dear Ms. Hoang:

The recipient, Mississippi State Department of Health ("MSDH"), submits this response to NAACP's complaint filed with the United States Environmental Protection Agency ("EPA") Office of Environment Justice and External Civil Rights and Office of External Civil Rights Compliance ("OECRC") on September 27, 2022.[1] NAACP alleges that MSDH violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7 ("Title VI"), through its administration of EPA funding.     For consideration are the following two issues:

1. Whether MSDH, including the Local Governments and Rural Water Systems Improvements Boards, discriminated against the majority Black population of Jackson, Mississippi, on the basis of race and color, by intent or effect, in its funding of water infrastructure and treatment programs and activities in violation of Title VI and EPA's implementing regulation at 40. C.F.R. Part 7.

2. Whether MSDH has and is implementing the procedural safeguards required under 40 C.F.R. Parts 5 and 7 that all recipients of federal assistance must have in place to comply with their general nondiscrimination obligations, including specific policies and procedures to ensure meaningful access to MSDH's services, programs, and activities, for individuals with limited English proficiency and individuals with disabilities, and whether MSDH has public participation policies and processes that are consistent with Title VI and the other federal civil laws, and EPA's implementation regulation at 40 C.F.R. Parts 5 and 7.5.

---

[1] EPA issued its Final Acceptance on October 20, 2022. The deadline for MSDH's response was extended to January 19, 2023.

1

## MSDH'S POSITION SUMMARY

Mississippi State Department of Health (MSDH) is a public health agency with a mission to protect and advance the health, well-being, and safety of Mississippians. Public health protection takes on many forms from ensuring the safety of food and water to setting standards for health and care facilities.[2] MSDH consists of more than 2,300 employees, including physicians, nurses, engineers, environmentalists, clerks, medical aides, social workers, nutritionists, disease intervention specialists, laboratory technologists, pharmacists, and others who deliver public health services throughout the state. MSDH has policies and procedures to ensure that all individuals are treated fairly without regard to political affiliation, race, national origin, sex, religious creed, age, or disability.

Now, turning to the first issue. Complainant NAACP failed to show how MSDH racially discriminated against the City of Jackson based on MSDH's administration of EPA funds— either intentionally or by way of disparate treatment. Contrary to the allegations, MSDH has never denied funding to the City of Jackson when requested through the Drinking Water Systems Improvements Revolving Loan Fund. Requests for loan funding are made by systems like the City of Jackson when they are seeking funding to meet their infrastructure needs. In short, the public water system must initiate the process of pursuing funding. Moreover, other water supply systems comprised of majority African Americans have received funding throughout the life of the program. MSDH's process for loan funding is uniform and applied the same to each water system, regardless of race. Therefore, MSDH did not discriminate against the City of Jackson.

As to the second issue, MSDH has policies and procedures in place to comply with the nondiscrimination obligations under Title VI, including meaningful public participation policies and procedures, and MSDH provides meaningful access for individuals with limited English proficiency and individuals with disabilities. Thus, MSDH has the requisite procedural safeguards in place to ensure it complies with Title VI and EPA's Title VI regulation.

## FACTUAL BACKGROUND

### Overview of MSDH's Water Funding Programs

#### a. Public Water Supply Program

MSDH was established in 1982.[3] Its mission is to advance the health, well-being and safety of all Mississippians. MSDH accomplishes this by establishing standards, recommendations, and regulations in areas affecting public health. Safe drinking water consumption is regulated by both federal and state law. MSDH's Bureau of Public Water Supply Program ("BPWS") was created to ensure that Mississippians are consuming water that is meeting the appropriate standards set forth in the Safe Drinking Water Act.[4]

---

[2] https://www.msdh.ms.gov/page/19,0,378.html
[3] *Id.*
[4] www.msdh.ms.gov

BPWS is implemented through five program areas: (1) microbiological, chemical, and radiological monitoring of drinking water quality; (2) negotiation with consulting engineers on the final design of engineering plans and specifications for all new or substantially modified public water supplies; (3) annual surveys of each community public water supply to identify and eliminate operational and maintenance problems that may potentially affect drinking water quality; (4) enforcement to ensure that all public water supplies follow SDWA standards; and (5) licensure of water system operators and back flow assembly testers and training of water supply officials.[5]

To assist MSDH with maintaining the standards mandated by SDWA and to ensure that all water supply systems are able to maintain or achieve compliance status, MSDH receives federal funding from the EPA. At issue is with respect to the NAACP's complaint is the EPA funding MSDH receives to operate the State's Drinking Water System Improvements Revolving Loan Fund ("DWSIRLF") Program.

### b. Drinking Water Systems Improvement Revolving Loan Fund

The DWSIRLF Program is a construction loan program created in 1997.[6] The program's purpose is to provide low interest loan funding to water systems to assist in the expansion or repair of existing water systems based on federal guidance and state regulations.[7] Pursuant to state statute, the Local Governments and Rural Water Systems Improvements Board ("Board") was created to oversee the administration of the DWSIRLF program.[8] MSDH, as the state's primacy agency for the SDWA, is tasked with supplying the staff and facilities necessary to administer the program.[9]

MSDH's DWSIRLF Program is a voluntary financial infrastructure loan program. Hence, MSDH does not seek out water systems to provide funding to them. Funding is readily available for any eligible water system to access, but it is completely up to the water system to seek assistance from MSDH. The process to apply for funding is the same for all eligible water systems throughout the state of Mississippi.

Despite the program's long-standing existence, the City of Jackson has only applied for DWSIRLF funding three times in the program's twenty-five years plus existence; the first loan application was submitted in 2016. The second and third loan applications were submitted in 2019 and 2021 respectively.

### a. Drinking Water Systems Emergency Loan Fund

Section 41-3-16, Mississippi Code of 1972, as amended, created the Drinking Water Systems Emergency Loan Fund Program (DWSELF).[10] This program provides loans to

---

[5] *Id.*
[6] Miss. Code Ann. § 41-3-16.
[7] Miss. Code Ann. § 41-26-3 defines water system as "a system for providing to the public piped water for human consumption through pipes or other constructed conveyances if the system has at least fifteen (15) service connections or regularly serves at least twenty-five (25) individuals."
[8] Miss. Code Ann. § 41-3-16(3)(a)-(h) provides a list of duties for the Board.
[9] Attachment 1 - DWSIRLF's Regulation.
[10] Miss. Code Ann § 41-3-16.

counties, municipalities, districts, or other (tax exempt) water organizations for emergency construction, repair, or replacement of drinking water facilities. This entirely state-funded loan program provides a ready funding source for such emergency projects without the federal crosscutter requirements required in (DWSIRLF) Program, thereby saving valuable time and expense. This Program eliminates the need to address emergency loans in the DWSIRLF. The basic provisions of this program are: 1) a current interest rate of 2.0%; 2) a maximum single loan amount as determined by the Board; 3) a maximum repayment period of five (5) years; and 4) the project must meet the definition of an emergency as established in the program regulations. It is also important to note that loan recipients do not pay interest during the original construction period (capitalized interest) up to a year, and that loan repayments do not begin until after project completion.[11]

The City of Jackson applied for emergency funding in 2016 and was awarded funding.

### b.  MSDH's Intended Use Plans

As required by the Safe Drinking Water Act Amendments of 1996 ("SDWA"), MSDH prepares an annual Intended Use Plan (IUP). The IUP outlines how the State of Mississippi will use the funding received from the EPA Capitalization grant which is received annually. Specifically, the IUP shows in detail the goals (basic, long-term, and short- term), the structure, the associated funding sources, and the financial status of the Program; the role of the set-aside activities within the state; and most importantly, the distribution of funds towards public water system improvements projects and the criteria used to determine their ranking within the priority system in accordance with the federal law.[12]

#### 1.  Funding Limits

Each IUP discusses the funding guidelines and restrictions. Under state law, the Board has the discretion to set the maximum amount for DWSIRLF loans, which is a statewide program.[13] In order to ensure that assistance is dispersed to as many water supply systems in need of water infrastructure improvements, the Board has set a maximum loan amount of $5,000,000.00 per borrower.[14] However, the Board allows, on a case-by-case basis, the maximum loan limit to be exceeded by a vote of the Board. Principle loan forgiveness is also provided for water supply systems designated as a disadvantaged community. The maximum principal loan forgiveness is set at $500,000.00.

Despite NAACP's criticism of the Board's $5,000,000.00cap on borrowers, the City of Jackson has repeatedly requested funds that exceeded the $5,000,000.00maximum cap. Each request resulted in an approval with funds being awarded when the City requested it in 2016, 2019, and 2021.

---

[11] Id.
[12] Attachment 2 - Intended Use Plans for years 2016, 2019, and 2021. (Collective)
[13] Miss. Code. § 41-3-16.
[14] Id.

## 2.  *Priority and Ranking System*

Priority ranking are given to water systems that involve the following: (1) address the most serious risk to human health, (2) are necessary to ensure compliance with the SDWA requirements, and (3) assist systems most in need, on a per household basis.[15]

The criteria for ranking projects within each category is intended to give priority to projects that:

(1) benefit the most people per dollar expended;
(2) assist systems most in need on a per household affordability basis as required by the SDWA;
(3) use consolidation with other systems to correct existing deficiencies and improve management;
(4) take into consideration the system's current capacity;
(5) encourage participation in short-term and long-term technical assistance programs; and
(6) encourage an Asset Management Plan participation in the Drinking Water Needs Survey.

Based on the funding criteria established in MSDH's IUPs, the City of Jackson received priority ranking status and received funding in the amounts that they requested to assist the city in its water infrastructure efforts.[16]

### c.  **MSDH's Funding Provided to the City of Jackson**

Since 1997, MSDH has provided loans to eligible water systems in need. Again, DWSIRLF is a voluntary loan funding program. It is solely up to the individual water systems, not MSDH, to seek funding assistance. In its 25 years existence, MSDH has never denied funding to any eligible water system. This includes any requests for funding through the DWSIRLF program by the City of Jackson. The City of Jackson has only applied for DWSRLF funding three times within a twenty-five-year period. Each time the City of Jackson has applied for funding, it has been awarded the amount of funding requested..

On August 1, 2016, the City of Jackson was awarded an emergency loan in the award amount of $466,913.00. Loan repayment started via tax diversion of $ 8,891.43 monthly beginning in August 2018. [17]

On September 30, 2016, the City of Jackson received its first improvements loan in the amount of $10,861,920.00. The final loan principal amount was $6,986,416.00. Loan repayment started via tax diversion of $ 35,915.79 monthly in April 2021. With the final principal amount of $6,986,416.00, the city opted to not utilize their full award

---

[15] Attachment 2 - Intended Use Plans for years 2016, 2019, and 2021. (Collective).
[16] *Id.*
[17] Attachment 3 - Loan Agreements executed by the City of Jackson for years 2016, 2019, and 2021.

5

amount. The remaining unused funding of $3,875,504.00 could have been utilized for additional system improvements at that time.[18]

On September 30, 2019, the City of Jackson was received another improvement loan in the amount of $12,903.093.00. Currently, $8,964.394.00 has been disbursed. This loan is still currently open.[19]

On September 30, 2021, the City of Jackson received the amount of $ 27,953,300.00. This loan is still currently open.[20]

Therefore, the allegation that the City of Jackson has not been properly funded by the program administered by the MSDH is untrue and without evidence. To the contrary, the above loan agreements show that the City of Jackson has been awarded and continues to be awarded loan amounts that far exceed the maximum loan limits established by the Board.

### d. EPA Oversight of MSDH's DWSIRLF Program

To further ensure that MSDH's DWSIRLF Program complies with federal guidelines, EPA conducts an annual review of the state's program. If there are issues of concerns, an EPA investigator has an obligation to inform the agency so that it may take corrective action to resolve the matter. On July 28, 2022, EPA conducted its annual review of the DWSIRLF program and determined the following:

> "The Mississippi DWSRF has been administered in accordance with Section 1452 of the Safe Drinking Water Act (SDWA) as amended. The program is following all terms, schedules, provisions, assurances of the IUP, the operating agreement between MSDH and the EPA, and the conditions of the capitalization grant agreement."[21]

NAACP's Complaint ultimately alleges discrimination due to the MSDH's administration of federal funding resources; however, EPA has routinely reviewed the state's program, including its IUPs and the state's funding criteria, and have determined that the program follows federal law. Moreover, an annual report as recent as July 28, 2022, shows the EPA did *not* determine that MSDH's program or funding criteria was discriminatory as to the City of Jackson or to other African American population. [22]

### ARGUMENT

I.   **The Complaint's discrimination claim should be dismissed because the complaint is untimely; or in the alternative, limited to loans for which the City of Jackson applied for DWSIRLF funding within 180 days of the filing of the Complaint on September 27, 2022.**

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] See Attachment 4 - June 2022 EPA Program Evaluation Report.
[22] *Id.*

6

According to the EPA's regulations, a complaint must be filed within 180 days of the alleged discriminatory action.[23] Here, the complaint makes the general claim that the state of Mississippi discriminated against the City of Jackson based on its administration of federal funds. It further suggests that underfunding has occurred for over a decade.[24] However, these claims are so general that it is difficult to pinpoint when the alleged discriminatory action took place by MSDH. Notably, the NAACP admits that the only DWSIRLF funding the City of Jackson applied for to improve its drinking water infrastructure was in the years 2016, 2019, and 2021. Again, each of these three loan requests were approved. Hence, it is difficult to determine how and when the City of Jackson has been racially discriminated against by MSDH. Furthermore, even though the Board implemented a funding limit of $5,000,000.00, the City of Jackson has requested and received DWSIRLF funding that exceeded the maximum.

Based on the most recent DWSIRLF loan agreement executed by the City of Jackson to apply the 180-day filing period, the Complaint should have been filed by March 30, 2022. Instead, the complaint was filed on September 27, 2022. Thus, NAACP's racial discrimination complaint is time-barred. In the alternative, EPA's investigation must be limited to any specifically identified acts of discrimination within the 180-day time period before the filing of the Complaint.

II.   **MSDH, including the Board, did not discriminate against the majority Black population of Jackson, Mississippi, on the basis of race and color, by intent or effect, in its funding of water infrastructure and treatment programs and activities in violation of Title VI and EPA's implementing regulation at 40. C.F.R. Part 7.**

a.   **Disparate treatment**

Federal civil rights laws and EPA's implementing regulation prohibits recipients of federal funding, such as MSDH, from intentionally discriminating in their programs and activities based on race, color, or national origin, disability, sex, or age.[25] This is referred to as "disparate treatment."[26] The regulation at 40 C.F.R. Section 7.35 (a), states that "a recipient shall not on the basis of race, color, or national origin provide a person any service, aid, or other benefit that is different, or is provided differently from the provided to others under the program or activity."

Intentional discrimination requires a showing that a "challenged action was motivated by an intent to discriminate."[27] Evidence of "bad faith", ill will, or any evil motive on the part of the recipient is not necessary. However, evidence in a disparate treatment case must generally show that the recipient acted, at least in part, because of

---

[23] 40 C.F.R. Part 7.

[24] *See Complaint*, page 13, paragraph 37.

[25] 40 C.F.R. § 7. 30 et seq; 42 U.S.C.§§ 2000d to 2000d-7.

[26] *See Ricci v. DeStefano*, 557, 577 (2009) ("Title VII prohibits intentional discrimination known as 'disparate treatment).

[27] *Elston v. Talladega Cty. Bd. Of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1984).

the complainant's protected status.[28] The totality of the relevant facts" determine whether intentional discrimination has occurred.[29] Intentional discrimination under Title VI may be proven by either direct or indirect evidence.[30] A policy or decision that is discriminatory on its face is direct evidence of intentional discrimination[31].

Here, there is simply no evidence that MSDH, including the Board, discriminated against the City of Jackson based on race. The application process for all loans is the same for every applicant, regardless of race. In fact, MSDH's application process mirrors other DWSIRLF programs throughout the country. MSDH has and continues to create its annual IUPs that details its funding processes and procedures. The previous and the current IUPs do not and have never focused on race demographics. The focus has always been on providing financial assistance to applicants with water systems infrastructure needs throughout the state of Mississippi. The City of Jackson has never been denied a loan nor has any other applicant. In fact, the City of Jackson continues to receive funds in excess of the Board's maximum funding limits so that the city can operate and maintain its water facilities.

Moreover, the Complaint erroneously places blame on MSDH. For example, the complaint states *"MSDH both received funds from EPA to provide safe drinking water and wastewater, and were aware of Jackson's severe needs, but distributed to the city only a small portion fraction and disproportionate low amount."*[32] Again this statement is incorrect as the City of Jackson has always been able to petition the Board and ask for funding, as can any other applicant. This has been the case since the program's inception. The complaint further asserts, *"MSDH have engaged in a long-standing pattern and practice of systematically depriving Jackson the funds that it needs to operate and maintain its water facilities in a safe and reliable... State agencies awarded federal funds from DWSRF just (3) three times in the (25) twenty-five years that the program has been in existence."*[33] Additionally, funding for wastewater infrastructure is provided through the Mississippi Department of Environmental Quality, a separate and distinct agency. Federal Clean Water State Revolving Loan Fund dollars are provided to that agency from the EPA in much the same way as MSDH.

The reason that the City of Jackson has received funding from MSDH three (3) times since the program's existence is because that is how many requests for funding have been made by the City of Jackson. As previously mentioned, the program is a voluntary statewide program. This means that is up solely up to the City of Jackson to seek DWSIRLF. The City of Jackson was aware of its drinking water issues, however, the City of Jackson failed to request funding from MSDH until 2016, (15) fifteen years after the program's existence. Therefore, it is completely impossible for *MSDH to engage in a long-standing practice of systematically depriving the City of Jackson with funds* when, in fact, the City of Jackson did not ask for funding until recently and was approved. Further as the loan agreements shows, MSDH has never *"deprived"* the City of Jackson

---

[28] *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011).
[29] *See Washington v. Davis*, 426 U.S.229, 242 (1976) ("an invidious discriminatory purpose may often be inferred from the totality of the relevant facts.").
[30] *Saqr v. Univ. of Cincinnati*, No. 1:18-cv-542, 2019 U.S.District. LEXIS 26467, at *39 (S.D.Ohio Feb.20, 2019).
[31] EPA Toolkit, p.3.
[32] *See Complaint*, Page 4, Paragraph 1.
[33] *Id.*

8

of funding. Other water organizations comprised of majority African American have applied for and received funding throughout the program's (25) twenty-five-year existence using the same requirement and funding model that is afforded to the City of Jackson.

Therefore, MSDH does not bear the responsibility for the City of Jackson's long-standing water issues. MSDH is only responsible for equitable distribution of funds to any water system in need, regardless of race, color, national origin, sex, or religion. MSDH has done this. MSDH has met its obligations in this regard to the City of Jackson and all other water systems that have requested funding.

### b. MSDH did not operate its DWSIRILF Program in a manner that disparately impacted the City of Jackson.

#### i. Facially neutral policy or practice

EPA must "accurately and completely define the policy or practice at issue."[34] This is a fact-specific inquiry, and in some instances, EPA may need to "burden its inquiry beyond the specific complaint allegations" to define the policy or practice.[35] The policy or practice could be overt. For example, a policy or practice of issuing wastewater permits to applicants who have complied with the environmental laws and regulations is a facially neutral policy. Sometimes the challenged policy or practice could be the absence of a policy or practice.[36] For example, if a recipient does not have a policy of providing language assistance to individuals with limited English proficiency, such individuals will potentially not have equal access to agency programs.[37]

Here, MSDH's policies and practices did not and do not disparately impact the City of Jackson. The policies at issue are the policies established to properly operate the DWSIRLF Program. Of significance, these policies were created pursuant to federal and state guidelines. MSDH operates its program the same statewide. All applicants are held to the same standard, regardless of race or color. Moreover, the City of Jackson's water issues occurred long before 2016— the year the City of Jackson first applied for a DWSIRLF loan. Hence the long-standing issues involving the City of Jackson's water system are not a result of MSDH's policies or lack thereof. Instead, MSDH has helped by providing loans to assist the City of Jackson any time a request has been made to the agency.

#### ii. Adversity of harm

"Adversity exists if a fact specific inquiry determines that the nature, size, or likelihood of the impact is sufficient to make it an actionable harm."[38] To determine whether there has been an adverse and disproportionate impact, EPA considers environmental harms and adverse health effects on race, color, or national origin. EPA

---

[34] DOJ Manual, Section VII.C.1.a, p.9.
[35] Id.
[36] DOJ Manual, Section VII. C.1.a, p. 12.
[37] Id.
[38] EPA Toolkit, p. 18 (n.41).

also considers non health harms including economic harms, nuisance odors, traffic congestion, noise, and vermin.[39]

In this matter, there is simply no adversity nor harm that has occurred to the majority of African American residents of the City of Jackson resulting from MSDH's action or inaction as it relates to its administration of funds through the DWSIRLF Program. Again, the City of Jackson has never been denied a loan nor has any other applicant. In fact, the City of Jackson continues to receive funds in excess of the Board's maximum funding limits so that the city can operate and maintain its water facilities. Furthermore, MSDH has always been available to provide funding to the City of Jackson earlier than year 2016; however, the City of Jackson failed to seek assistance from MSDH prior to year 2016. Thus, there is no evidence to suggest that MSDH discriminated against the majority population of the City of Jackson through its administration of EPA funding.

### iii. Disparity

Disparity occurs when "a disproportionate share of the adversity or harm is borne by individuals based on their race, color, national origin, age, disability, or sex."[40] Disparity may be determined by comparing the proportion of the members of the protected class who are adversely affected to the proportion of those not in the protected class who are adversely affected.[41] Once the investigation agency identifies the protected class, it must evaluate whether there is available statistical evidence necessary to evaluate a disparity claim.[42] EPA will "evaluate population or demographic information of the impacted community as compared to an appropriate comparison population that is similarly situated.[43] Disparity can also be obvious.[44] For example, if a recipient's policy or practice would effectively exclude people with limited English proficiency, disparity is evident without the need for statistics.[45]

"The disparate impact rule only prohibits causing disparate impacts, not the mere existence of disparate impacts or conditions, neither Title VI nor the disparate impact rule necessarily requires a racially balanced result or condition."[46] Courts decline to find disparate impact discrimination where any policy or action taken with respect to a certain group will necessarily affect more protected individuals than those who are not protected, when allegations of discrimination involve nothing more than statistical disparity.[47] Proving disparate impact under Title VI requires "a reliable indicator of disparate impact" and "an appropriate statistical measure" that takes into account all relevant bases of comparison."[48]

---

[39] EPA Toolkit FAQs, p.4.

[40] EPA Toolkit, p. 18 (n. 42).

[41] *Id.* at n. 42 (citing *Tsombanidis v. W. Haven Fire Dep't*, 352 F. 3d 565, 576-77 (2d Cir. 2003)).

[42] DOJ Manual, Section VII. C.1.c, p. 17.

[43] EPA Toolkit, p. 15.

[44] DOJ Manual, Section VII. C.1.c, p. 19.

[45] *Id.*

[46] *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (*citing United States v. Lowndes County Bd. Of Educ.*, 878 F.2d 1301, 1305 (11 th Cir. 1989)).

[47] *See, e.g., Ewards v. Johnson Cty. Health Dep't*, 855 F.2d 1215, 1223-24 (4 th Cir. 1989).

[48] *S. Bronx Coal.forCleanAir v. Conroy, 20 F.* Supp. 2d 565, 573 (S.D.N.Y. 1998) (citing *New York UrbanLeague, Inc. v. State of New York*, 71 F.3d 1031, 1038 (2d Cir. 1995)).

The disparity element cannot be proven in this instance because the majority population of the City of Jackson suffered no harm or adversity on the part of MSDH in any capacity. Moreover, other water supply systems comprised of majority African Americans have also received funding throughout the life of the program. MSDH's process required to receive funding is uniform and applied the same to each water system throughout the state of Mississippi, regardless of race. To add, MSDH's application process mirrors other DWSIRLF programs throughout the country.

### iv.   Causation

There must be a causal connection between the recipient's facially neutral policy and a disproportionate and adverse impact on the protected class.[49] "When EPA investigates complaints alleging adverse impacts from facilities permitted by recipients, it may consider "scientific proof of a direct link, prediction of potential significant exposure and risk resulting from stressors created by permitted activities or other sources, and other complex methodologies."[50] There must be "robust causalities requirement" in ensuring entities are not 'held liable for racial disparities they did not create'"[51]

MSDH's DWSIRLF Program is a voluntary financial infrastructure loan program. Hence, MSDH cannot seek out water systems to provide funding to them. Funding is readily available for any eligible water system to access, but it is completely up to the water system to seek assistance from MSDH. In this instance, the City of Jackson's failure to timely seek assistance from MSDH is what contributed to the ongoing water issues and the adverse impact to the majority of its resident, not MSDH's policies or practices.

### v.   Is there a substantial legitimate justification for the policy or practice?

If EPA determines that there is a prima facie case of adverse disparate impact, which MSDH asserts does not exist, EPA must then consider whether the recipient has stated a "substantial legitimate justification" for the challenged policy or practice.[52] Further, EPA must consider whether the recipient can show that the challenged policy was "necessary to meeting a goal that was legitimate, important, and integral to the recipient institutional mission."[53]

MSDH did not discriminate against the majority Black population of the City of Jackson via its policies and procedures relating to the DWSIRLF Program. Although it is still unclear as to what specific policy or practice is being challenged here, all of MSDH's policies are applied fairly and pursuant to its program's objectives. DWSIRLF's purpose is to provide low interest loan funding to water systems to assist in the expansion or repair of existing water systems based on federal guidance and state regulations. The funding MSDH receives is for the betterment of all water systems in Mississippi. Therefore, the

---

[49] EPA Toolkit, p. 19 (n.43) (citing *N.Y.C. Envtl. Justice All. V. Giuliani* 214 F. 3d 65, 69 (2d Cir. 2000)).

[50] DOJ Manual, Section VII.C.1.d, p. 28 (citing EPA investigations Guidance, 65 Fed. Reg. at 39, 679).

[51] *Id.* (citing *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015)).

[52] EPA Toolkit, p. 9.

[53] *Id.* (*citing Elston v. Talladega County Bd. of Educ.*, 997 F. 3d 1394, 1413 (11 th Cir. 1993)).

application process is the same for all applicants. If policies and procedures are not applied uniformly, the effect could leave some water systems without any funds. In order to ensure that assistance is dispersed to as many water supply systems in need of water infrastructure improvements, the Board has set a maximum loan amount of $5,000,000.00 per borrower. Despite this loan cap, applicants are still able to petition the Board for loan amounts in excess of $5,000,000.00, which is what the City of Jackson did.

### vi.  Are there less discriminatory alternative or mitigation

If the recipient demonstrates a substantial legitimate justification for the challenged policy or practice, EPA must determine whether there are any equally effective, less discriminatory alternatives.[54] For example, if a recipient considers issuing an environmental permit in a minority community that could adversely and disproportionately affect the community, the recipient must consider whether it can prevent such adverse and disproportionate effects by requiring the facility to operate in a manner that would eliminate or mitigate its disproportionate impact, or by not renewing the permit.[55] If there are no available mitigation measures, whether within or outside the permitting program, denial of the permit may be the only way to avoid a Title VI violation.[56]

Contrary to NACCP's allegations, the City of Jackson has never been deprived of requested funding by MSDH. The only DWSIRLF funding the City of Jackson applied for to improve its drinking water infrastructure was in the years 2016, 2019, and 2021. Again, each of these three loan requests were approved. There are simply no other alternative measures that can be done as MSDH has operated its program uniformly and fairly across the board.

### III.  MSDH has and is implementing the procedural safeguards required under 40. C.F.R. Parts 5 and 7 that all recipients of federal assistance must have in place to comply with their general nondiscrimination obligation.

In accordance with Title VI, MSDH maintains policies and procedures such that all employees and individuals are treated fairly without regard to political affiliation, race, national origin, sex, religious creed, age, disability, or limited English proficiency.[57] MSDH is constantly changing its policy to ensure it meets the standards set out in Title VI.

For example, health equity policy and procedures has been implemented throughout the agency.[58] This policy is intended to promote health equity in all policies, practices, and processes within MSDH. Moreover, MSDH employees are provided health equity training so employees are able to explain, describe, and apply core principles of health

---

[54] EPA Toolkit, p. 9.
[55] *Id.* at p. 15
[56] EPA FAQs, p. 15 (FAQ 14).
[57] Attachment 5 - MDHS's Equal Opportunity Policy
[58] Attachment 6 – MDHS's Health Equity Policy and Procedures

equity. MSDH has also developed a communication policy that strictly prohibits its employees from discriminating against individuals via social media platforms.[59]

Recently, MSDH's employees attended a training held on August 1, 2022; August 2, 2022; and August 5, 2022. This training provided instructions on how employees can reach interpreters. The training was uploaded to the MSDH's Health Stream on August 23, 2022. Each staff member that attended the training was provided with a certificate. The training was conducted by Cesco staff Gabriela Siebach and Camila Prado-Irwin. MSDH employee, and Director of the Language Access Program, Selma Alford moderated the training. [60]

Limited English proficiency (LEP) notices are now provided every place where the community is served.[61] This includes all county health departments, Women and Children ("WIC") offices and dental offices. On MSDH's website, individuals can find the process for filing a grievance or complaint and review MSDH's nondiscrimination notice.[62] LEP individuals can access information about availability of no-cost, qualified language interpreters by going to MSDH's website or by contacting the Office of Preventative Health and Health Equity. While MSDH does not have an official Plan published at this time, a proposed plan is currently being reviewed for publication this month. [63]

MSDH has staff members who are bilingual and multilingual. Additionally, MSDH also has a language access department which has contracted with the providers to provide interpretation services in more than 200 languages. These services are available throughout all MSDH Offices statewide. LEP or individuals with American Sign Language needs can access these services in person, by telephone, online or through video service delivery.[64]

## IV.   OBJECTIONS TO THE INVESTIGATION AND FUTURE FINDINGS

MSDH is gravely concerned with EPA's failure to provide adequate and meaningful standards in which MSDH can adhere to and defend against as it relates to Title VI compliance. MSDH expressly reserves all rights to whether the scope and procedures employed in connection with this investigation (and any future findings) exceed EPA's statutory authority under Title VI. EPA's External Civil Rights Compliance Office published Chapter 1 of its Toolkit in 2017 ("Toolkit"). However, this Toolkit fails to provide recipients with proper guidance as to what is required and what measures recipients must implement to comply with Title VI.[65] Hence, threatening to withdraw federal funds from MSDH for its failure to meet standards— that have not been fully articulated or established— goes against this nation's system of federalism.

Moreover, the EPA is well aware that the City of Jackson's longstanding water system infrastructure issues are not caused by any discrimination from MSDH. On

---

[59] Attachment 7 - MSDH's Communication Policy on Social Media
[60] Attachment 8- Title VI Training
[61] Attachment 9 - MSDH's LEP Notices
[62] Attachment 10 - MSDH's External Complaint Process and Nondiscrimination Notice
[63] Attachment 11 - Language Access Plan Draft
[64] Attachment 12 - Cesco Agreements and Uniform Technical Translation. (Collective).
[65] The Toolkit focuses on legal standards for disparate treatment and disparate impact claims only.

February 28, 2020, MSDH sent a letter to EPA expressing its concerns with the City of Jackson's failure to comply with the Safe Drinking Water Act ("SDWA").[66] The EPA, after conducting its own investigation, cited the City of Jackson for multiple violations.[67] The City of Jackson's failure to properly maintain its water systems was further evidenced through the written Administrative Compliance Order of Consent.[68] The Consent Order showed the City of Jackson water systems could not perform membrane integrity testing; their turbidity exceeded recommended levels, equipment was not properly being maintained, and the City of Jackson failed to develop a Comprehensive Equipment Repair Plan approved by the EPA.[69] Furthermore, the EPA found additional violations beyond what was identified in the Emergency Order.

Therefore, for the reasons provided above, MSDH respectfully requests that EPA return preliminary findings that MSDH, including the Board, did not violate Title VI in its administration of EPA funding to the City of Jackson and that MSDH has and is implementing the procedural safeguards required under 40 C.F.R. Parts 5 and 7.

Should you have any further questions or concerns, please contact me directly at Demetrica.olabintan@ago.ms.gov.

Sincerely,

*Demetrica Olabintan*

Demetrica Olabintan
Special Assistant Attorney General

Cc:   Monique Wright-Hudson, EPA
Jim Craig, MSDH Senior Deputy
Christin Williams, MSDH Attorney
Lateysha Martin, Special Assistant Attorney General

---

[66] Attachment 13- MSDH's Letter to EPA (February 2020)
[67] Attachment 14- EPA City of Jackson Emergency Administrative Order 1431 03272020
[68] Attachment 15- Administrative Compliance Order of Consent
[69] *Id.*

Attachments:

Attachment 1 - DWSIRLF's Regulation
Attachment 2 a - MSDH's Intended Use Plan (2016)
Attachment 2 b - MSDH's Intended Use Plan (2019)
Attachment 2 c - MSDH's Intended Use Plan (2021)
Attachment 3 a-1 - Loan Agreement executed by the City of Jackson Initial (2016)
Attachment 3 a-2 - Loan Agreement executed by the City of Jackson Final (2016)
Attachment 3 b - Loan Agreement executed by the City of Jackson (2019)
Attachment 3 c - Loan Agreement executed by the City of Jackson (2021)
Attachment 3 d - Emergency Loan Agreement (2016)
Attachment 4 - June 2022 EPA Program Evaluation Report
Attachment 5 - MSDH's Equal Opportunity Policy
Attachment 6 - MSDH's Health Equity Policy and Procedures
Attachment 7 - MSDH's Communication Policy
Attachment 8 - Title VI Training
Attachment 9 - MSDH's LEP Notices
Attachment10 - MSDH's External Complaint Process and
            Nondiscrimination Notice
Attachment 11 - Language Access Plan Draft
Attachment 12 a - Cesco Agreement 1
Attachment 12 b - Cesco Agreement 2
Attachment 12 c - Cesco Agreement 3
Attachment 12 d - Cesco Agreement 4
Attachment 12 e - Universe Technical Translation 1
Attachment 12 f - Universe Technical Translation 2
Attachment 12 e - Universe Technical Translation 3
Attachment 13 - MSDH's Letter to EPA (2020)
Attachment 14 - EPA City of Jackson Emergency Administrative Order
            1431 03272020
Attachment 15 - Administrative Compliance Order of Consent (July 2021)