**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL., <br><br> *Plaintiffs*, <br><br> v. <br><br> TATE REEVES, in his official capacity as Governor of the State of Mississippi, ET AL., <br><br> *Defendants*. | Case No. 3:23-cv-272-HTW-LGI <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

For the reasons set forth below, the Court should reject Defendants' opposition arguments and craft a preliminary injunction to guarantee that Plaintiffs and the other residents of Hinds County enjoy the same benefits of an elected, resident judiciary that the residents of all other counties in Mississippi enjoy.

**I.     The Chief Justice Is Not Immune From Declaratory Relief, and This Court Can Temporarily Restrict Him From Making Judicial Appointments Until the Court Can Enter a Declaratory Judgment.**

Defendants contend that Plaintiffs can obtain no relief because the Chief Justice has been dismissed from the case.  Plaintiffs demonstrated in ECF No. 47 at 2-4 (which they incorporate by reference) that the Chief Justice is not immune from Plaintiffs' claims for declaratory relief. *See also* ECF No. 52 at 2-4 (also incorporated by reference).  But, by its terms, H.B. 1020 provides no opportunity for declaratory relief before the Chief Justice makes the appointments the statute requires, because H.B. 1020 § 1(2) mandates that he make these appointments "no later than fifteen (15) days after the passage of this act."  In this unique circumstance, the Court has temporarily restricted the Chief Justice from making appointments pursuant to § 1 of H.B. 1020—and should continue to do so—in order to maintain the status quo until the Court can enter a final declaratory judgment.  *See* ECF No. 47 at 2-4.  Absent preliminary relief, the Chief

1

Justice's repeated representations to this Court that he will abide by a declaratory judgment will be meaningless, because he will have discharged his statutory duty under H.B. 1020 to make the appointments before the declaratory judgment can be entered. *See id.* at 1-2.

As the Supreme Court has instructed, "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents," so a court should "mold its decree to meet the exigencies of the particular case." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579-80 (2017) ("*IRAP*"). The equities and exigencies of this case require continued restriction of the appointments to maintain the status quo until the Court can decide whether to grant the declaratory relief that the Chief Justice has agreed to follow.

If this Court determines that declaratory relief is nonetheless available under these circumstances now, then it should use its equitable powers to issue a decree stating that H.B. 1020's appointment provision is substantially likely to be unconstitutional, for the reasons discussed in ECF No. 41 at 9-25, and *infra*, at 6-11. Such a preliminary decree would be entirely consistent with the principle that the Court can and should "mold its decree to meet the exigencies of the particular case." *IRAP*, 582 U.S. at 580.

## II.     Plaintiffs Have Standing Because H.B. 1020 Denies Plaintiffs Rights and Benefits Afforded to All Other Mississippi Residents.

Defendants' opposition to Plaintiffs' standing can be distilled into two related and flawed arguments. First, they argue that Plaintiffs suffer no harm because there is no right to elect *temporary* judges, as opposed to *permanent* ones, in Mississippi. Second, they argue that Miss. Code § 9-1-105(2) authorizes similar temporary judicial appointments, so enjoining H.B. 1020 would not provide any relief. Because these propositions rely on a warped version of the facts and law, this Court should reject Defendants' arguments and find that Plaintiffs have standing.

As to the first argument, Defendants argue that H.B. 1020 does not affect residents' "right to vote for all judges with general jurisdiction over their county," *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993) ("*LULAC*"), because there is no right to vote for temporary judges in Mississippi. Opp. at 13-14.[1]  According to Defendants, this means that Voting Rights Act cases recognizing voters' standing like *LULAC* do not apply to Plaintiffs. This argument fails because H.B. 1020's judicial appointments are "temporary" in name only. Unlike the temporary judges created by the earlier Miss Code Ann. § 9-1-105(2) for times of "emergency," H.B. 1020 creates judges (1) in Hinds County only, (2) who have terms of almost four years (the term of a permanent judge), and (3) who are, unlike temporary judges, not limited to times of emergency. Thus, while H.B. 1020 may use the term "temporary" to describe its judicial appointments, it creates judgeships that are effectively permanent because these judges would serve nearly the full term of a permanent judge, and their appointments are not limited to times of emergency. *Compare* Miss. Code § 9-1-105(2), with ECF No. 12-1, § 1(1). The label used to describe the H.B. 1020 appointees does not excise them from the bench of "all judges with general jurisdiction over [Plaintiffs'] county" that Plaintiffs formerly had the right to elect. *LULAC*, 999 F.2d at 845.

Next, Defendants argue that even if the Court rules that H.B. 1020, § 1 is unconstitutional, the Chief Justice could make the same appointments under Miss. Code § 9-1-105(2), and therefore an injunction in this case would not redress any recognizable harm. Opp. at 13, 15. But if H.B. 1020 were superfluous, it would not have been enacted. By enjoining

---

[1] Defendants' argument is based on the Chancery Court's ruling in *Saunders v. Randolph*, Case No. 23-cv-00421 (Miss. Ch. Ct. May 15, 2023). *Saunders*, however, was a state court case limited to state law causes of action. The federal Equal Protection Clause is not circumscribed by this state court ruling.

H.B. 1020's requirement that the Chief Justice make four appointments to the Seventh Circuit, this Court will ensure that Plaintiffs are free from the discriminatory harm of H.B. 1020, regardless of what more limited actions the Chief Justice might take pursuant to § 9-1-105(2).[2]

Plaintiffs demonstrated in their opening brief that the denial of elected and resident judges harms all residents of Hinds County, regardless of whether they will ever be litigants in the Circuit Court.  Defendants mistakenly contend that *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283 (5th Cir. 1992), requires Plaintiffs to show that they will be future litigants in front of the appointed judges in order to show standing.  Opp. at 13.  But that case bears no resemblance to the facts here.  The plaintiff there sued for prospective injunctive relief because she was denied the right to serve on a jury for having previously refused to take a juror's oath. The court held that she had no standing for *prospective* injunctive relief because she could not show "a real and immediate threat that she will again appear before [the] Judge" as a juror in the near future.  *Herman*, 959 F.2d at 1285.  In contrast, here, Plaintiffs complain of a completely different harm: the loss of the rights to and benefits that flow from elected, resident judges.  That harm will attach regardless of whether Plaintiffs ever set foot in a courthouse.  The declarations submitted by Plaintiffs and third parties demonstrate concrete examples of the effects of this loss, and Defendants have not even attempted to challenge those declarations.[3]  Because Plaintiffs here do not claim "injury at the hands of a judge," Opp. at 13, *Herman* is inapposite.

---

[2] Were the Chief Justice to use § 9-1-105(2) as a transparent ploy to try to achieve the same unconstitutional appointments in Hinds County attempted under H.B. 1020 § 1, Plaintiffs would seek to enjoin those appointments as an end-run around the Court's jurisdiction over this dispute.

[3] *See, e.g.*, Taylor Decl., ECF No. 12-2, ¶¶ 3-8; Figgers Decl., ECF No. 12-3 ¶¶ 8-17; Lambright-Haynes Decl., ECF 12-4, ¶¶ 11-14.  To a similar end is the Second Declaration of Tomie Green attached hereto.  *See* Ex. 1 ¶ 19 ("I and many other Black lawyers like me have become judges on Mississippi's state and federal courts—something that would have been unthinkable when I was a child. I believe this progress has been possible because Mississippi has elected judges.").

The State also argues that Plaintiffs have not pled stigmatic injury because they have not alleged that they are personally subjected to discriminatory treatment.  Opp. at 16 (citing *Moore v. Bryant*, 853 F.3d 245, 249 (5th Cir 2017)).  To the contrary, the State's brief reiterates in detail the Legislature's underlying rationale for H.B. 1020 and the related S.B. 2343—the paternalistic belief that Hinds County residents cannot be trusted to elect worthy officials to manage the County's affairs and must be rescued by State intervention.  This plainly is a stigmatizing trope.  This Court should reject Defendants' baseless claim that individual Plaintiffs—who stand to lose the ability to vote for accountable judges—have not alleged a personal denial of equal treatment.

### III.    Defendants Ignore the Bulk of Plaintiffs' Arguments and Evidence Showing Likelihood of Success on the Merits.

Rather than contest the voluminous evidence of H.B. 1020's discriminatory effect and purpose, Defendants invite the Court to rewrite equal protection law and flyspeck the margins of Plaintiffs' evidence while leaving their core contentions untouched.

#### A.    *Defendants distort the law.*

First, contrary to Defendants' arguments, Plaintiffs need not show that H.B. 1020 lacks any rational basis (Opp. at 19) but rather that its disparate impact was likely motivated in part by a discriminatory purpose.  *See Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc).

Defendants also misunderstand the minimal showing required for a disparate impact.  Opp. at 20-22.  "The discriminatory-impact element of an equal protection claim may be satisfied with statistical evidence" of differential burden, *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 359–60 (5th Cir. 2015), as here.  *See* Mot. at 11-12 & n.3.  Defendants theorize that residents of a state's capitol or largest city cannot possibly be "similarly situated" to residents elsewhere.  Opp. at 21.  But this theory would carve those cities out from the Fourteenth Amendment's protections altogether.  Unsurprisingly, Defendants' novel view is unsupported.

Then, in looking to evidence of discriminatory purpose, Defendants flip the preliminary

injunction evidentiary standard on its head by arguing that the "fact-intensive nature" of

Plaintiffs' claim militates against relief.  Opp. at 31.  To the contrary, relief is warranted on a

mere "prima facie showing" even if Plaintiffs are not "entitle[d] [] to summary judgment."  Mot.

at 9 (quoting *Asbury MS Gray-Daniels, L.L.C. v. Daniels*, 812 F. Supp. 2d 771, 776 (S.D. Miss.

2011)).  Plaintiffs' evidence more than demonstrates a "fair ground for litigation and thus for

more deliberate investigation" that "will ordinarily be enough" for preliminary injunctive relief.

*Id.* (quoting *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011)).[4]

### B.    *Defendants do not dispute Plaintiffs' key facts.*

Nearly all of Plaintiffs' evidence is undisputed.  Defendants have "failed to present any

evidence contradicting [Plaintiffs' facts] that are central to the court's resolution of the merits of

[the] motion for preliminary injunction and [have] failed to attack the credibility of [Plaintiffs']

declarants."  *ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 684 (N.D. Tex. 2015).  At

this stage of the litigation, where Plaintiffs do not have to win every factual dispute, *see Janvey*

*v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011), they have prevailed by a wide margin due to

Defendants' failure to controvert Plaintiffs' evidence.

*Substantive Departures*.  Most striking is Defendants' failure to dispute that H.B. 1020

departs from the substantive legal considerations for apportioning State-funded judgeships.  *See*

Opp. at 29.  Defendants point to no instance in which the Mississippi legislature has ever

previously required a circuit court to have one appointed judge, let alone four, serving a nearly

---

[4] Defendants' cases are not to the contrary.  *Metal Mgmt. Miss., Inc. v. Barbour*, No. 3:08-CV-
00431 HTW-LRA, 2008 WL 3842979, at *5 (S.D. Miss. Aug. 13, 2008), relied on *Cong. of
Racial Equal. v. Douglas*, 318 F.2d 95 (5th Cir. 1963), which required only a "prima facie case"
for a preliminary injunction.  *Id.* at 97.  Their only other citation is a "*cf.*" cite to a 30-year-old
unpublished out-of-district labor law case, which is so strained as to reveal their lack of support.

four-year term to manage a court's docket.  Conversely, Plaintiffs showed that all six statutory factors that the Legislature "shall" consider in determining "[t]he number of judges in each circuit court district" have favored adding permanent, elected judges for years.  Mot. at 20-23 (quoting Miss. Code § 9-7-3(3)).  Defendants do not dispute five of these factors, failing to even mention the Legislature's contemporaneous "study and review of the caseloads" in considering a related bill, H.B. 834.  Mot. at 21-22; *see* Opp. at 29.  Defendants quibble only with Hinds County's having the *second* largest population (Opp. at 29)—which, if anything, means that *both* Hinds County and the most populous district (the Second District) need more judges.  The contrary interpretation that "Hinds County should need *fewer* judges" is self-defeating.  *Id.*  If true, H.B. 1020 would lose its veneer of addressing a purported need for judicial capacity and would further undermine the State's defense of the law.

To the extent Defendants' evidence is at all relevant—focusing on another statute's temporary judge appointments, police staffing, and lurid descriptions of criminal conduct (Opp. at 4-9)—it supports at best authorizing permanent judges, not thrice extended "temporary" judges.  And while summarizing the October 2022 legislative committee hearing at length (Opp. at 7-9), Defendants conveniently omit that Jackson's Police Chief asked for a better resourced crime lab rather than temporary judges to solve Jackson's crime problem:

> [T]hank you for all the judges, thank you for the attorneys, but what the City of Jackson needs, because all our evidence ha[s] to go to the State -- the State collects the whole State['s] evidence.  So [if] we had a Capitol City Crime Lab so that we can address the crimes in Capitol City[,] that would help. . . .  [E]ven though we have all these attorneys, we're still in the same situation, waiting on evidence.

ECF No. 50-2 at 197.[5]  Defendants also omit that Hinds County D.A. Jody Owens testified: "We certainly need a [new] permanent judicial seat in the capitol city."  *Id.* at 189.  He explained that

---

[5] *See also* Ex. 1, Second Green Decl. ¶¶ 5-6, 11.

"our existing judges are doing more than any other judges in the State of Mississippi." *Id.* at 187. "[I]n the last ten months," he said, those four judges "had 25 jury trials. We've had 500 cases resolved, 275 guilty pleas." *Id.*  Defendant Luckey echoed the comments: "I tell people all the time, Hinds County is one of the few courtrooms that operates pretty much all day, every day.  I mean, It's going -- it's just a backlog that has been inherited from past administrations that has only grown." *Id.* at 180.  Even Chief Justice Randolph mentioned that he "tried to try a case up here in Jackson before [he] went on the Supreme Court almost 20 years ago and [he] couldn't get a trial.  So that's not a new thing.  That's not new." *Id.* at 204.

Perhaps the most glaring substantive departure was the Legislature's failure to consult with the sitting and former elected judges of the Hinds County Circuit Court.  All of the sitting judges opposed H.B. 1020.  Second Green Decl. Appx.  The Second Declaration of the Hon. Tomie Green demonstrates what the Legislature would have learned if it had listened to the judges familiar with the court and the experience with appointed judges.  To highlight just a few examples of that exceptionally illuminating declaration:

- The "overcrowded docket" and "backlog" cannot be resolved without increasing the number of elected judges in Hinds County, and this alone will be insufficient.  ¶ 3.
- The backlog is primarily due to problems investigating, indicting, and prosecuting crimes.  *Id.*
- The underfunding of the State's crime lab and the lack of staff in the probation and parole systems are insurmountable problems.  ¶¶ 3-6.
- The Hinds County Circuit Court has had experience with "a slew of temporary special judges since 2006," and they have not solved the problems.  ¶¶ 7-11.
- Based on this experience, temporary judges are "more trouble than they are worth." ¶ 8; *see* ¶ 9.
- "The result since 2020 has been an administrative and judicial mess." ¶ 10.
- "The special judges ended up creating more problems than they solved." ¶ 11.
- Adding appointed judges does not address the causes of crime in Jackson." ¶ 12.
- H.B. 1020's "appointment scheme is likely to lead to an even worse criminal legal crisis with special judges unfamiliar with Hinds County." ¶ 14.

Judge Green's Second Declaration thoroughly controverts the narrative in Defendants' brief.

*Procedural Departures*.  The main procedural irregularities that the State used to force H.B. 1020 into law are also undisputed.  Defendants do not dispute that H.B. 1020's principal author (Rep. Trey Lamar) stuffed the original bill with 1,000 pages of irrelevant revenue provisions he then struck in order to steer the bill to the committee he chaired rather than a potentially unfavorable committee.  Mot. at 18; *see* Opp. at 27-28.  Defendants do not address the Conference Committee closing its meetings to the public in violation of the Joint Rules of the Senate and House (Mot. at 19). Instead, they attempt to misrepresent *Veasey* as forbidding reliance on this evidence merely because it was from a legislator who ultimately voted against the bill.  Opp. at 28; *see also Veasey*, 830 F.3d at 233 (disapproving of reliance "on speculation by [a] bill's opponents about proponents' motives (rather than evidence of their statements and actions)").  Nor do Defendants controvert the irregularity of authorizing multi-year judicial appointments on the eve of judicial redistricting.  They identify no prior instances of such a judicial usurpation in Mississippi's history.  And they completely ignore that the Chair of the Senate Judiciary Division A announced on the Senate floor the Legislature's "duty to do . . . judicial redistricting . . . next year."  Mot. at 19; *see* Opp. at 28.

*Specific Sequence of Events*.  Defendants assert that the Legislature engaged in a "robust debate" over H.B. 1020 as a whole (Opp. at 27), overlooking that the Legislature sidelined Hinds County's representatives and circuit judges and shot down amendments to remedy the disparate treatment of § 1 in particular.  Mot. at 16-17.

*Historical Background*.  Defendants say nothing about the fact that the Legislature has established new judgeships elsewhere in the State to serve growing ***populations*** even as Hinds County Circuit Court judges have been increasingly overworked with a growing share of the State's ***criminal caseload***, which nearly doubled in the past two decades.  Mot. at 15; *see* Opp. at

25.  In contrast, Defendants' cherry-picking of data to claim that whiter districts' population growth warranted new judgeships (Opp. at 26) ignores that since 1990, the Thirteenth Circuit grew by a mere 2,000 people (2.8%) and the Fifteenth Circuit grew by less than 7,000 people (5.2%).  *See* ECF No. 50-4, -5.  Moreover, Defendants' assertion that Plaintiffs rely on ancient history, too old to be relevant, does not survive the Supreme Court's decision just the day before this filing in *Allen v. Milligan*, No. 21-1086, 2023 WL 3872517 (U.S. June 8, 2023).[6]  In that Voting Rights Act case, the Supreme Court approved the district court's consideration, as part of the "totality of the circumstances" inquiry (which this Court must apply under *Arlington Heights*), of "Alabama's extensive history of repugnant racial and voting-related discrimination." *Id.* at *11 (citing *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1018-24 (N.D. Ala. 2022)).  In the portion of the district court opinion cited approvingly by the Supreme Court, the district court took into account history far older than what Plaintiffs rely on here.  *See Singleton*, 582 F. Supp. 3d at 1020 (jailings for voting in the 1960s).

<u>Legislative History</u>.  Finally, Defendants try to explain away disparaging remarks by H.B. 1020's proponents, calling the principal author and originating committee chair (Rep. Trey Lamar) just "one legislator."  Opp. at 30.  Defendants quote anodyne remarks he made nearly two months later (*id.*), which do nothing to remove the taint of his original statements.  The offensive meaning of Rep. Lamar's "best and the brightest" comment was clear to Black lawyers and judges in Hinds County.  Second Green Decl. ¶ 18.

---

[6] Defendants' assertion also fails to mention the recent history of the State's takeover of Jackson's airport (S.B. 2162 (2016)), onerous State financial structures placed only on Jackson to tap into Federal recovery assistance (H.B. 1031 § 1(2) (2022); S.B. 2822 § 1(10) (2022)), or limits placed on the City's ability to assess fair, equitable, and sustainable water rates (H.B. 698).

**IV.     Public Safety Interests Cannot Overcome Constitutional Limitations.**

Throughout Defendants' opposition, they emphasize that the City of Jackson has a

serious crime problem and that the appointment of special judges will help to solve this problem

and serve the public interest by increasing public safety.  Defendants invoke public safety to

support their contentions that the appointments provision is constitutional because it rationally

advances legitimate purposes (Opp. at 19), that the Legislators who supported H.B. 1020 had no

discriminatory intent (*id*. at 31), and that a preliminary injunction would cause far more harm to

the State than any purported harm to Plaintiffs (*id*. at 3, 33-35).  The asserted interest in public

safety is at the core of their case.

Plaintiffs do not dispute that Jackson has a crime problem.  As residents of Jackson, they

share in the desire to make the City and County a safer place to live and work.  But no matter

how serious the problem may be, the State may not use unconstitutional means to fight crime,

and the interest in public safety can never justify the violation of constitutional rights.  *Phillips v.

Cole*, 298 F. Supp. 1049, 1053 (N.D. Miss. 1968) ("The State of Mississippi, in undertaking to

define crime and prosecution thereof, must, at all events, comply with the demands of the

Constitution of the United States."); *see McDonald v. Chicago*, 561 U.S. 742, 783 (2010)

(recognizing "no case in which we have refrained from holding that a provision of the Bill of

Rights is binding on the States on the ground that the right at issue has disputed public safety

implications"); *District of Columbia v. Heller,* 554 U.S. 570, 636 (2008) ("the enshrinement of

constitutional rights necessarily takes certain policy choices off the table" in efforts to reduce

crime and improve public safety); *Mugler v. Kansas*, 123 U.S. 623, 661 (1887) ("If, therefore, a

statute purporting to have been enacted to protect . . . the public safety . . . is a palpable invasion

of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby

give effect to the constitution.").  As this long line of authority demonstrates, Defendants are

profoundly wrong when they assert that Plaintiffs' constitutional rights are "substantially outweighed by the public interest in enhancing public safety and supporting the criminal-justice system in Hind County's courts . . . ." Opp. at 3. Moreover, the simple non-discriminatory alternative available to the State—authorizing more elected judges—reveals the law's pretext.

In ruling on Chief Justice Randolph's claim of judicial immunity, the Court was deeply concerned about, and gave great weight to, the precedential effect that rejection of immunity might have on future cases. *E.g.*, ECF No. 45 at 16. Plaintiffs urge the Court to be equally vigilant about the precedential effect of accepting Defendants' argument that public safety outweighs Plaintiffs' right to equal protection of the law. If that constitutional protection can be sacrificed in the name of law and order, how many other constitutional rights will be in jeopardy—the protections against unreasonable searches and seizures, coercive interrogations, use of excessive force by law enforcement officers? And the list goes on. A ruling that the interest in fighting crime outweighs the Equal Protection Clause would be an invitation to the State to legitimize other serious violations of constitutional rights.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting the Chief Justice from appointing judges pursuant to H.B. 1020 § 1, or granting other relief the Court deems appropriate, pending the resolution of this litigation.

12

Respectfully submitted this 9th day of June, 2023.

/s/ Eric H. Holder, Jr.
Eric H. Holder, Jr.,* DC Bar # 303115
Carol M. Browner,† DC Bar # 90004293
Megan A. Crowley,* DC Bar # 1049027
Gary S. Guzy,* DC Bar # 375977
Mark H. Lynch,* DC Bar # 193110
Brenden J. Cline,* DC Bar # 1021317
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6291
eholder@cov.com
cbrowner@cov.com
mcrowley@cov.com
gguzy@cov.com
mlynch@cov.com
bcline@cov.com

*Counsel for NAACP*

\*Pro Hac Vice
†*Pro Hac Vice* Applications to be Filed

/s/ Carroll Rhodes
Carroll Rhodes, Esq. MS Bar, # 5314
**LAW OFFICES OF CARROLL RHODES**
POST OFFICE BOX 588
HAZLEHURST, MS 39083
Telephone: (601) 894-4323
Fax: (601) 894-1464
crhode@bellsouth.net

Janette Louard,† OH Bar # 066257
Anthony Ashton,† MD Bar # 9712160021
Joe R. Schottenfeld,* DC Bar # 1735796
**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
Fax: (410) 358-9350
jlouard@naacpnet.org
aashton@naacpnet.org
jschottenfeld@naacpnet.org

*Counsel for All Plaintiffs*

\*Pro Hac Vice
†*Pro Hac Vice* Applications to be Filed

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2023, I electronically filed the foregoing Plaintiffs' Reply in Support of Motion for Preliminary Injunction with the Clerk of the Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Mark H. Lynch
Mark H. Lynch