## SECOND DECLARATION OF TOMIE GREEN

I, Tomie Green, hereby submit this supplemental declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. Due to its large population, special statutory role, and original jurisdiction over criminal and civil cases, to include those involving Mississippi government, Hinds County circuit judges preside over a heavy load of cases in the Seventh Circuit District of Mississippi. Appointing special judges will not prevent heavy caseloads or the case backlogs. Nor will it prevent crime in Jackson or the seven other cities in Hinds County. For instance, I do not know of a single case in which the District Attorney was ready to try, plea, or otherwise dispose of a case but could not because there was not an available Seventh Circuit judge.

2. As Senior Judge of the Seventh Circuit District, I was always concerned about the large number of criminal cases in Hinds County. During my tenure, I spent two years leading a federally mandated committee focused on addressing crime in Hinds County and the housing of defendants in our county jail. The committee met regularly and included the Hinds County District Attorney, stakeholders from the eight localities and their governments, and county agencies. I also had meetings and training sessions with municipal judges from Jackson and the assigned Youth Court judge handling felony cases and preliminary hearings. As a result, I gained additional insights into the problems that our criminal legal system faces and the factors that create higher rates of crime in Hinds County.

3. The heavy load of cases in the Seventh Circuit district has been referred to as both an "overcrowded docket" and a "backlog." This cannot be resolved without increasing the number of permanent, elected judges in Hinds County; and this alone will not be sufficient. The backlog is primarily due to problems investigating, indicting, and prosecuting crimes. These problems are not specific to Hinds County: Mississippi's crime lab's underfunding and the lack of staff in our prison's probation and parole oversight system seem to be insurmountable problems which contribute to crime and case backlogs in Hinds County and throughout our state.

4. In the Seventh Circuit, roughly 75-80% of defendants plead guilty, and only 20%-25% of criminal matters go to trial after pretrial management. Many defendants reached plea agreements for some form of pre-trial intervention, like drug court, non-adjudication, or suspended time with probation. Some of these cases remain on file for the circuit judge assigned to the cases until the defendant's probation was completed and a dismissal order was entered on the docket. If there were problems during probation the cases were subject to other dispositions. This meant that many cases would administratively appear to be part of a "backlog" even when there was no further judicial intervention required.

5. The heavy caseload in the Seventh Circuit Court District were exacerbated by things like Hurricane Katrina, other natural disasters, and COVID-19. These problems made worse the underlying issues with investigations, indictments, and prosecutions. Under rules issued by the Mississippi Supreme Court in 2017, as senior judge, I became responsible for conducting a monthly review of the number of detainees who had been incarcerated in the Hinds County Jail and had not been indicted 90 days or more after their arrest. Frequently there were 100-200 people on this list. On reviewing this list, I would

routinely issue a Show Cause demand to the District Attorney ordering him to show cause for the delay in indictments. The DA's office would quickly indict the detainees, agree to lower bonds, or respond that they had no police reports, had not gotten crime lab reports, or had not been able to find witnesses. If the detainee was released, the DA often would indict defendants once they were out of custody—only to be unable to serve the indictment on the defendant. These cases would be assigned to judges, but because the defendant could not be served, it would appear that there were many cases on the judges' dockets which were not active and could not move forward or be resolved until bench warrants had been issued and indictments served. After such a bench warrant, if a defendant was arrested, they would be re-charged with the crime, making it appear as if there were two different cases for one underlying incident.

6.     In cases where the defendant was indicted, if the prosecution required forensic evidence, the District Attorney's office was frequently unable to obtain the evidence due to a backlog in Hinds County's crime labs. The crime lab's backlog is a real bottleneck that delays and sometimes prevents the administration of justice throughout Mississippi.

7.     Adding temporary special judges is unlikely to help with the crime problem or the quick resolution of criminal cases that remain on the Seventh Circuit's docket now or in the future. Hinds County has had a slew of temporary special judges and the heavy loads still exist.

8.     As a judge on the Seventh Circuit, I witnessed two rounds of temporary appointed judges that showed how adding temporary special judges often created more administrative and legal headaches than it solved. Whatever I and my colleagues thought in 2006 about special judges before these episodes, they convinced me, and I believe my fellow Seventh

3

Circuit judges as well, that temporary appointed special judges would be more trouble than help. This—and the constitutional problems depriving the residents of Hinds County of their right to elected judges—is why I and my colleagues all supported adding elected judges but not temporary special appointed judges to the Circuit Court. See Appendix A.

9. After Miss. Code § 9-1-105(2) was enacted, special judges began to be added in to the Seventh Circuit District regularly in 2006. This was part of a "rocket docket" experiment to speed up the criminal docket in order to get rid of a backlog. However, the temporary special appointments ended up simply not working. First, it was disruptive to have cases reassigned from one judge to another. Second, there were administrative problems in terms of securing courtrooms and having enough staff while hearings and trials occurred at the same time. Third, several of these judges were inexperienced with criminal cases or jury trials. Some appointed judges were lawyers, some were retired county judges, and some were chancery judges. If cases were tried and not pled, there were often legal errors, and the cases would have to be retried or handled in other ways. Lawyers also appealed because the judges were appointed and not elected. As a result, these rocket docket cases were not taken off the court's docket in any meaningful way—even if they temporarily left, they returned for disposition by the elected judges.

10. The second round involved the recently appointed special judges on the Seventh Circuit in response to COVID-19. From when they were first appointed in 2020, the Clerk of the Seventh Circuit reassigned them appeals, prison letters, and cases that had only administrative tasks. This allowed the judges to quickly clear those dockets, but this work could have been done by the Clerk's office itself because it was primarily administrative. Then, in 2022, Chief Justice Randolph participated in assigning cases, over my objection.

4

The result since 2020 has been an administrative and judicial mess. The addition of new judges without new courtrooms, court reporters (of whom there is a statewide shortage), bailiffs, or sufficient jurors meant that the elected judges spent large amounts of time and energy juggling the administrative concerns around special judges. COVID-19 introduced many problems. Many times there were not enough potential jurors for *voir dire*, and other times empaneled jurors would not show up because they had been exposed to COVID-19, contracted COVID-19, or had not been vaccinated. Unfortunately, some jurors and witnesses died from COVID-19, and the judges did not know until the decedents were summoned to trial. Some special judges contacted the court and the clerk about trials, but there were no available accommodations. We even had one judge who needed off-site accommodations for a six-week trial that had to be arranged with staff, bailiffs, and security. The Sheriff indicated he did not have the staff to accommodate these requirements in addition to those of the elected judges. Throughout this time, these appointed judges rarely actively managed cases and were often unprepared for both civil and criminal hearings or trials.

11. The special judges ended up creating more problems than they solved. The addition of judges and the reassignment of cases did nothing to address the real backlog: the Hinds County District Attorney's need for crime lab forensic processing. Additional judges were unnecessary to help address crime or COVID-related caseloads because these administrative, prosecutorial, and forensic problems were so pervasive.

12. Adding appointed judges also missed an important part of the causes of crime in Jackson. Jackson is an important economic center in Mississippi. As a result, it is very common for people who have served time in prison to come to Jackson on their release to

5

try to find a job and housing. The Mississippi Department of Corrections advised me that roughly 3,000 defendants who were released from prison from 2013–2015 told the Department they were moving to Hinds County. This increased the number of people with felony convictions coming into Hinds County and reoffending. From what I have observed, it is common that, due to a combination of drug problems, lack of jobs, and the presence of too many guns on the street, many returning citizens end up returning to crime. That often means drug dealing that leads to gun violence. In my opinion, until we can get the guns and drugs off the street, Hinds County will not be able to fully address its high rates of crime. These problems of recidivism have not received enough attention from state, county, or city policymakers. But they are the driving reason for crime in Hinds County.

13.     My understanding of the Jackson community, derived from my having been elected as a judge, was directly relevant for my overseeing criminal pleas, which is perhaps even more important than overseeing criminal trials. I understood the impact of a criminal sentence on each member of our community—and our community as a whole. When I was a prosecutor early in my career, I did not even know that plea bargains could include pre-trial interventions. At that time, every Black person I saw get a criminal charge either accepted a guilty plea and went to prison or went to trial. Few of them were offered or even knew of pre-trial interventions. But as a judge, I and my colleagues frequently used pre-trial interventions to ensure that people face appropriate consequences for crimes they are accused of committing—but that they are not removed from the community in a way that harms their families and the community and essentially forces people with felony convictions back into criminal activity.

6

14. If the Chief Justice is able to make appointments to the Seventh Circuit under H.B. 1020, this unconstitutional appointment scheme is likely to lead to an even worse criminal legal crisis with special judges unfamiliar with Hinds County. Because H.B. 1020 is unconstitutional, I fear that the cases these judges oversee could return to the Seventh Circuit's docket because the defendant was tried by an appointed judge. I also worry that, like with many of the 2006–2010 rocket docket judges, these cases could end up with trial errors and come right back. This will not resolve or even help address crime or the heavy case load of the Seventh Circuit judges.

15. Were the constitutionality of H.B. 1020 to be decided only after the appointment of judges—and after criminal pleas were accepted by appointed judges and trials with appointed judges had been initiated or concluded—it would drive confusion, foster litigation by affected parties, delay further the timely resolution of cases, and cause irreparable harm to our community and its citizens. Regardless of the outcome of those challenges, one could expect a range of appeals and creative litigation tactics that would only impede the swift and certain administration of justice.

16. Because of my time as a circuit trial judge, prosecutor, defense attorney, civil lawyer, law professor, and practicing attorney in Hinds County, I have come to know members of the Mississippi bar from throughout Mississippi. I have practiced with, watched, and presided over cases brought by lawyers from all over the state. Many of the best lawyers in Mississippi work in the Seventh Circuit Court District and Hinds County.

17. Jackson is the state capitol; it is the center for business and the seat of our government in our state. When Representative Trey Lamar suggested during the hearings for H.B. 1020 that the "best and brightest" lawyers in Mississippi were not in Jackson, he

7

was wrong. There are many competent and qualified lawyers in Jackson who have been elected as circuit judges. And unlike lawyers from outside of Hinds County, these elected judges are familiar with the Hinds County community, its culture, its problems, its assets, and its citizens.

18. I heard the widely reported comment by Representative Trey Lamar that the judges appointed under H.B. 1020 need not be from Jackson because they needed to be the "best and brightest." I understood this to imply that the state had to look beyond the extensive and talented pool of Black lawyers in Hinds County for white lawyers from other all parts of the state. The comment was offensive to me and other Black lawyers with whom I discussed it.

19. Mississippi's constitutional guarantee of elected judges provides racial and political minorities with the right and power to choose the judges who will preside over their criminal and civil cases. Over the course of my legal career, I have watched the number of barred Black lawyers in Mississippi expand greatly. Likewise, I and many other Black lawyers like me have become judges on Mississippi's state and federal courts—something that would have been unthinkable when I was a child. I believe this progress has been possible because Mississippi has elected judges. The election of judges enhances confidence in the fair administration of justice and thus provides benefits to all citizens, not just those with direct interactions with our system of justice. H.B. 1020 would undermine this progress, expressed by our electorate across many elections, toward a more diverse and inclusive judiciary and threaten to reverse these hard-won gains.

I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct, to the best of my ability.

Respectfully Submitted and Executed this 9th day of June, 2023.

_____
TOMIE GREEN

Winston L. Kidd,
Senior Circuit Judge

Adrienne Wooten,
Circuit Judge



E. Faye Peterson,
Circuit Judge

Debra Gibbs,
Circuit Judge

OFFICIAL STATEMENT OF THE
HINDS COUNTY CIRCUIT COURT JUDGES
IN SUPPORT OF ADDITIONAL ELECTED JUDGES
IN THE
HINDS COUNTY CIRCUIT COURT

The Circuit Judges of the 7th Circuit District of Hinds County, hereby support the addition of two elected permanent Judges to the 7th Circuit. The current elected Judges hereby oppose the addition of any appointed Judges to the 7th Circuit other than those Judges appointed to hear matters in which all of the elected Judges have entered an Order of Recusal.

DATED: March 3, 2023

_____
WINSTON L. KIDD
SENIOR CIRCUIT JUDGE, 7TH CIRCUIT
(signing on behalf of Hinds County Circuit Judges)