Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al*.; <br><br> *Plaintiffs*, <br><br> and <br><br> UNITED STATES OF AMERICA, <br><br> *Plaintiff-Intervenor*, <br><br> v. <br><br> LYNN FITCH, in her official capacity as Attorney General of the State of Mississippi, and STATE OF MISSISSIPPI, *et al*., <br><br> *Defendants*. | Case No. 3:23-cv-272-HTW-LGI |

## <u>COMPLAINT IN INTERVENTION</u>

Plaintiff-Intervenor, the United States of America ("United States"), alleges:

1.     For decades, the Mississippi Legislature has shortchanged Hinds County's criminal justice system.  The Legislature has failed to provide the County with the resources, funding, and personnel that it needs.  This has strained the system and made it harder for local police, prosecutors, judges, and other officials to do their work effectively and efficiently.

2.     Instead of addressing this situation by providing needed support for prosecutors and judges—and police managed by Black officials, the State has compounded the problem.  It has singled out Hinds County as the only place in Mississippi whose residents are subject to new special judges and prosecutors appointed by White statewide officers whom, because of racially polarized voting, they cannot hold democratically accountable.

3.     In this action, the United States challenges portions of Mississippi House Bill 1020 ("H.B. 1020") that deny to the Black residents of Hinds County the rights of self-government and local control over local institutions enjoyed by all other Mississippians.

4.     H.B. 1020 intentionally discriminates against minority voters in Hinds County by creating a system of judicial and prosecutorial appointments specifically designed to undermine the historical power of Black residents, through their elected officials, to self-govern.

5.      Hinds County's population is 70 percent Black.  While Mississippi has not elected a single Black statewide official since Reconstruction, Black residents of Jackson and Hinds County elect their preferred candidates to many local governmental bodies.  All four elected judges sitting on the court of the Seventh Circuit Court District ("Hinds County Circuit Court") are Black, as is the elected District Attorney.  The mayor of Jackson and a majority of the Jackson City Council are also Black.

6.     H.B. 1020 undermines the power of Hinds County's Black electorate.  The bill creates a new, novel court system for part of Jackson, called the Capitol Complex Improvement District ("CCID") inferior court ("CCID court").  It presides over a special district that was originally created to fund and administer infrastructure projects for state buildings like the State Capitol and its surroundings.  The new court has a state-appointed judge and state-appointed prosecutors.  The state-operated Capitol Police directs cases to the court.

7.     H.B. 1020 doubles the size of the CCID by annexing neighborhoods with heavily-White populations; these changes make the CCID a plurality-White enclave within Jackson, which has a 79.5 percent Black population.  This ensures that the appointed CCID judge will have jurisdiction over crimes committed in many more of Jackson's predominantly White, upscale neighborhoods and allows the Capitol Police to funnel cases to CCID prosecutors and

2

judges instead of the district attorney and the municipal courts.  The CCID court—the only specially created court system of its kind in Mississippi—insulates residents within its boundaries from judges accountable to the Black voters of Jackson and Hinds County.

8.      H.B. 1020 also mandates the appointment of four new special circuit judges to the Hinds County Circuit Court.  In Mississippi, under the state constitution, citizens have the right to elect judges to circuit courts.  The Hinds County Circuit Court was created in its current form—with four permanent elected judges—in 1994.  While the number of permanent elected judges on that court has not changed since, many other circuit court districts in Mississippi have gained at least one elected judge.  The number of elected circuit judges statewide has grown by nearly 20 percent.  Although Hinds County's share of the overall pool of elected circuit court judges relative to the rest of the State has decreased, publicly available data suggest that the County's share of the caseload relative to the rest of the State has increased.

9.      Evidence is present here of the relevant indicators of intentional discrimination set forth by the U.S. Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977).  With respect to the sequence of events, H.B. 1020's legislative history, as well as the context in which it was passed—following the election of an all-Black bench to the Hinds County Circuit Court for the first time in 2018 and appointments of mostly White circuit court judges in 2020 and 2022—indicate that the Legislature adopted H.B. 1020's appointment provisions for the purpose of transferring control of portions of Jackson and Hinds County's criminal legal and judicial system to statewide actors more accountable to White voters and shifting authority away from local officials elected by Black voters, rather than bolstering support for existing court systems, judges, or prosecutors accountable to the people of Jackson and Hinds County.

10.     The Mississippi Legislature passed H.B. 1020 in the wake of other efforts to place control of local institutions in the hands of statewide officials and to deny Hinds County—or attach strings to—critical resources.  For example, in recent years, the Mississippi Legislature has tried to strip Jackson of local control over its municipal airport, conditioned disbursement of federal funds to Jackson on oversight by state officials, and denied the funding needed to address Jackson's ongoing water crisis.  Further, the Governor has repeatedly used his line-item veto power to cut funding appropriations to Jackson institutions, while leaving appropriations for other cities almost entirely untouched.

11.     The legislative process for H.B. 1020 was unusual and departed from normal procedures.  Bill sponsors refused to consult Black Hinds County legislators before introducing H.B. 1020.  The sponsors then sought to avoid and ignore the input of Black legislators during the legislative process.  They steered the bill out of the normal legislative channels to a specific committee to reduce scrutiny by Black Hinds County legislators and members of the public. They rejected multiple amendments that would have respected the democratic preferences of the Black electorate of Hinds County, refusing to create elected judgeships, require judges to reside in Hinds County, or otherwise to circumscribe the broad appointment powers conferred by H.B. 1020.  Proponents of H.B. 1020 also made racially tinged statements in support of the bill, treating Hinds County and Jackson as if they were incapable of effective self-governance, stating that Jackson "belongs" to all of Mississippi, not only to the people who live, work, and pay taxes there, and suggesting that state leaders may look outside Hinds County to find the "best and the brightest" judges and other leaders.

12.     Proponents of H.B. 1020 argue that the new appointed officials—both in the CCID court and Hinds County Circuit Court—are needed to address high crime rates.  However,

4

proponents do not explain why crime rates could not be addressed by creating new elected offices, rather than singling out Hinds County residents by imposing a surfeit of largely unaccountable state-appointed officials.

13.     The Mississippi Legislature enacted H.B. 1020 not only being aware of its discriminatory effect—that the bill's appointment provisions, independently and collectively, will undermine the agency of Black residents in Hinds County in deciding how their criminal justice system is run, will effectively revoke control over critical portions of that system from current Black local officials in Jackson and Hinds County, and will carve out a special enclave within Jackson to insulate predominantly-White neighborhoods from judges and prosecutors elected by Black voters—but also desiring that effect.

14.     The Equal Protection Clause prohibits singling out Black residents of Hinds County for second-class treatment and favoring White residents for special treatment.  Because the appointment provisions of H.B. 1020 were created by the State to intentionally discriminate based on race, they violate the Fourteenth Amendment.

<u>**JURISDICTION AND VENUE**</u>

15.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

16.     The United States is authorized to intervene in this action pursuant to 42 U.S.C. § 2000h-2.  The Attorney General of the United States has certified that this case is of general public importance.

17.     Venue is proper pursuant to 28 U.S.C. §§ 104(b) and 1391(b).

18.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

19.     Plaintiff-Intervenor is the United States of America.

20.     Defendant State of Mississippi is one of the fifty states of the United States of America.

21.     Defendant Lynn Fitch is the Attorney General of the State of Mississippi.  H.B. 1020 requires Attorney General Fitch to designate two prosecutors to the newly-created CCID court.  Her principal place of business is in Jackson, Mississippi.  Attorney General Fitch is being sued solely in her official capacity.

## FACTUAL ALLEGATIONS

22.     According to the 2020 Census, the State of Mississippi has a total population of 2,961,279.  Of those residents, 1,104,233 (37.3%) identified as non-Hispanic Black and 1,639,077 (55.4%) identified as non-Hispanic White.

23.     According to the 2020 Census, Hinds County has a total population of 227,742, of whom 159,390 (70%) identified as non-Hispanic Black and 58,012 (25.5%) identified as non-Hispanic White.

24.     According to the 2020 Census, the City of Jackson has a total population of 153,701.  Of those residents, 122,131 (79.5%) identified as non-Hispanic Black and 25,424 (16.5%) identified as non-Hispanic White.

25.     The City of Jackson has one of the highest proportions of Black residents of any large city in the United States.

**Historical Discrimination**

26.    Mississippi has a long history of discrimination against Black residents of Jackson and Hinds County.

27.    Based on its history of racial discrimination, Mississippi was designated as subject to the preclearance requirement of Section 5 of the Voting Rights Act when it was enacted in 1965.  Under Section 5, covered jurisdictions were required to obtain preclearance from the United States Attorney General or from a three-judge court of the United States District Court for the District of Columbia prior to implementing any voting change.  Mississippi, Jackson, and Hinds County remained subject to Section 5 until the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013).

28.    To obtain Section 5 preclearance, covered jurisdictions were required to demonstrate that voting changes neither had the purpose nor would have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  *See* 52 U.S.C. §§ 10304(a), 10303(f)(2).

29.    While the State of Mississippi and its political subdivisions were subject to the requirements of Section 5, the United States Attorney General interposed objections under Section 5 of the Voting Rights Act to about 170 submissions of their voting changes.

30.    Five of those Section 5 objections halted attempts by the State of Mississippi and four of its political subdivisions to change local elective offices to appointive offices.  They include a state law that would have changed the Office of County Superintendent of Education from an elective to an appointive position in several counties, as well as local efforts to convert school trustee, city clerk, and superintendent of education positions from elected to appointed.

31.     The Attorney General interposed four Section 5 objections to voting changes proposed by Hinds County and its political subdivisions, all of which involved the redrawing of political boundaries in ways that would have been retrogressive to minority voters.  These objections included two Hinds County redistricting plans, an attempt by the then-all-White City Council for the City of Jackson to undertake a large annexation of majority-White areas into Jackson that would have significantly offset Black population growth, as well as a redistricting plan by the City of Clinton.

32.     Prior to a successful lawsuit under Section 2 of the Voting Rights Act, Hinds County Circuit Court judges—like those in other counties—were elected under a multi-member at-large system using numbered posts.  In 1987, a federal court held that the use of that system for electing Hinds County Circuit Court judges violated Section 2 because it provided Black residents less opportunity to participate in the political process.  *See Martin v. Allain*, 658 F. Supp. 1183, 1204 (S.D. Miss. 1987).

33.     The district court's ruling in that case observed that Mississippi's "history of discrimination has extended to the bar and consequently to the judiciary."  *Id.* at 1192.  The court also held that the Seventh Circuit Court District, which included Hinds and Yazoo Counties at that time, had an "over-all white majority population[,]" that Black voters are "politically cohesive in the district," and that "white voters vote sufficiently as a bloc to enable them usually to defeat black candidates who oppose white candidates."  *Id.* at 1196-97.

34.     As a result of *Martin*, Hinds County Circuit Court judges are elected from single-member subdistricts.

35.     The *Martin* court also found that at-large judicial elections in other local courts— the Hinds County Court and the Fifth Chancery Court District, which was coterminous with

Hinds County—violated Section 2.  Those courts were also ordered to hold elections in subdistricts.

36.     Voting remains racially polarized in Mississippi, in Hinds County, and in Jackson.

37.     Black Jacksonians have a long history of voting as a bloc for candidates in local and statewide elections, most of whom are Black.

38.     The first Black city representatives in Jackson were elected after the governing body changed from a three-person commission to a seven-member mayor-council form of government in 1985.  The first Black mayor of Jackson was elected in 1997.

39.     Today, Jackson's mayor, a majority of its City Council, the interim Chief of Police—appointed by the mayor—and Hinds County's District Attorney and Sheriff are Black.

40.     In recent decades, as residents began electing predominantly Black officials, White Mississippi elected officials have expressed a lack of trust in Jackson, Hinds County, and their Black elected officials.  State officials have made public statements criticizing local Black leadership.  State officials have also been accused of failing to adequately invest in the City of Jackson and attempting to erode the control of the Black government officials from the Jackson area.

41.     In 2015, Mississippi State Representative Lester "Bubba" Carpenter—a proponent of H.B. 1020 and currently the Chair of the Mississippi House Military Affairs Committee and a member of the Mississippi House Municipalities Committee—encouraged his supporters to vote against a funding initiative because it would permit a "Black judge" in Hinds County "to tell us where the state education money goes."

42.     In 2016, lawmakers approved S.B. 2162, which would take authority over Jackson's airport from the Joint Municipal Airport Authority ("JMAA").  The bill would abolish

9

the JMAA and replace it with a larger authority made up of state, regional, and city representatives.  Four of the five leadership members of the JMAA are Black; they are appointed by the mayor and confirmed by the City Council.  S.B. 2162 is currently being challenged in federal court.

43.     More recently, the mayor of Jackson stated in an interview that infrastructure funding received recently by Jackson was inadequate and came subject to conditions and oversight by the Mississippi Department of Finance and Administration.  On information and belief, no other Mississippi cities were subjected to this level of burdening and second-guessing.

44.     In 2022, Governor Reeves issued a line-item veto to block discretionary spending for Jackson, stating that the City is not "one suburban golf course and one planetarium away from thriving."  The money would have provided upgrades for a large park, in addition to other projects.  In total, Governor Reeves line-item vetoed more than $17 million of appropriations for projects in the greater Jackson metropolitan area, compared to less than $2 million worth of line-item vetoes for projects outside of the Jackson area.

45.     The Mississippi Legislature has declined to fund the existing Hinds County criminal justice system on multiple occasions; in the Legislature's 2022 session, Mississippi declined to pass legislation that would have used federal COVID-19 aid to fund a youth mental health program in Jackson, funded assistance to the Jackson Police Department, funded repairs for local detention centers, and created a new detention center to help manage misdemeanor offenders.  In the same session, Mississippi granted $360,000 in funds to assist the Neshoba County Criminal Justice System.  The population of Neshoba County is less than one-seventh that of Hinds County, but it is 56.5 percent White, while Jackson is 79.5 percent Black.  The State also granted $3,250,000 to the Capitol Police, which serves the CCID.

46.     Members of Congress sent a letter to Governor Reeves on October 17, 2022, alleging that the State of Mississippi failed to adequately fund water treatment programs in Jackson.  The letter includes a comparison between Jackson's water system and a neighboring majority-White city, as being as different as "night and day."

47.     Governor Reeves has played a significant role in the State's takeover of functions historically exercised by local officials.  Last year, while providing an update on Jackson's water crisis to a crowd in Hattiesburg, he called it "a great day to not be in Jackson" because, he suggested, he did not have to direct the City's emergency response and public works efforts.

**The Hinds County Circuit Court**

48.     In Mississippi, circuit courts are trial courts of general jurisdiction where circuit judges preside over felony prosecutions and civil lawsuits involving damages.

49.     Circuit courts act as an appellate court for appeals from justice, county, and municipal courts, as well as administrative boards and commissions.  Circuit court judges run in nonpartisan elections and serve four-year terms.  There are 23 circuit court districts within Mississippi.  Each district has between one and four judges.

50.     Hinds County's boundaries are coterminous with the Seventh Circuit Court District.

51.     The Mississippi Constitution directs that circuit court judges "shall be elected by the people" for "a term of four years."  Miss. Const. art. 6, § 153.  The Mississippi Constitution further provides that "the Legislature shall, by statute, establish certain criteria by which the number of judges in each district shall be determined, such criteria to be based on population, the number of cases filed and other appropriate data."  Miss. Const. art. 6, § 152.

52.     Implementing this directive, Mississippi Code § 9-7-3(3) requires that the number of judges in each circuit court district be determined based on six factors: (1) the district's "population," (2) "[t]he number of cases filed in the district," (3) "[t]he case load of each judge in the district," (4) the district's "geographic area," (5) "[a]n analysis of the needs of the district by the court personnel of the district," and (6) "[a]ny other appropriate criteria."

53.     There are four elected circuit judges in the Seventh Circuit Court District, each of whom is elected from a subdistrict.  The Legislature codified this structure in 1994 by enacting Chapter 564.

54.     Since that time, the Legislature has never increased the number of judges on the Hinds County Circuit Court.  However, nine other circuit court districts in Mississippi have gained an elected judge, and the number of elected circuit judges statewide has risen nearly 20 percent.  Eight of the nine circuit court districts in Mississippi that have received new judges are majority-White, and the ninth is plurality-White.

55.     There have been repeated requests from Black judges, elected officials, and other leadership in Hinds County to add elected judgeships in the County, which have gone unheeded.

56.     In 2001, the Commission on the Mississippi Judicial System created by the Legislature recognized that Hinds County courts receive more case filings than other districts.

57.     In 2018, Hinds County voters elected four Black judges to all four of the elective judgeships in the Seventh Circuit Court District for the first time.

58.     There are currently four elected Hinds County Circuit Court judges: Judge Adrienne Wooten (Subdistrict 1), Judge Debra Gibbs (Subdistrict 2), Senior Judge Winston Kidd (Subdistrict 3), and Judge E. Faye Peterson (Subdistrict 4).  All are Black.

59.     In 2020, after the Mississippi Legislature enacted a bill allocating more assistant district attorneys and criminal investigators statewide, including in Hinds County and other jurisdictions around the State, the Hinds County Circuit court requested two new elected judgeships.  Hinds County did not receive any new elected judgeships—instead, it received four special circuit court judges appointed by the Chief Justice of the Mississippi Supreme Court.

60.     While the preceding paragraphs address permanent elected judges, state law also provides for the temporary appointment of special circuit judges by the Chief Justice of the Mississippi Supreme Court, subject to the advice and consent of a majority of justices of the Mississippi Supreme Court, in the event of an emergency or overcrowded docket.  Miss. Code § 9-1-105(2).

61.     Between 2006 and 2022, Chief Justices of the Mississippi Supreme Court have appointed or continued the appointments of at least 13 special circuit judges in Hinds County under § 9-1-105(2).  Of those 13 special judges, nine were White and four were Black.

62.     Most recently, Chief Justice Michael Randolph appointed a total of seven judges under § 9-1-105(2) to the Hinds County Circuit Court—four in 2020 and four in 2022 (one of whom was the same judge appointed in 2020).  Of those seven judges, five were White and two were Black.

63.     Three of the four special judges appointed to the Hinds County Circuit Court in 2022 currently remain on the court—Judge Betty Sanders, who is Black, Judge Stephen Simpson, who is White, and Judge Frank Vollor, who is White.

64.     On information and belief, no circuit court other than Hinds County has had a temporary judge appointed to it pursuant to § 9-1-105(2)'s "emergency or overcrowded docket" provision since 2020.

65.     An elected District Attorney is responsible for prosecuting all felony cases in Hinds County.  The District Attorney leads a team of assistant district attorneys, criminal investigators, program coordinators, and support staff.  The current Hinds County District Attorney is Black.

66.     The Legislature sets and funds the number of prosecutors for each circuit court.

**Appointing Four Special Circuit Judges to the Hinds County Circuit Court**

67.     Section 1 of H.B. 1020 requires the Chief Justice of the Mississippi Supreme Court to appoint four "temporary special circuit judges" to the Seventh Circuit Court District.

68.     The four special judgeships created by H.B. 1020 are equal to elected circuit judges in several significant respects.

69.     First, Section 1(3) of H.B. 1020 provides that the appointed judges "shall receive an office and operating allowance to be used for the purposes described and in amounts equal to those authorized in Section 9-1-36 [of the Mississippi Code]," which is the statute that provides allowances for elected circuit judges.

70.     Second, the new appointed judges serve a statutorily-mandated term of three-and-one-half years, just shy of the elected judges' four-year terms.

71.     Third, the powers and duties of these appointed judges are identical to those of the four permanent elected circuit judges on the Hinds County Circuit Court.  Section 1 of H.B. 1020 provides that "[n]o limitation whatsoever shall be placed upon the powers and duties of the judges other than those provided by the Constitution and laws of this state."

72.     The new appointed judges serve until December 31, 2026.

73.     The four special judgeships created by H.B. 1020 are different from the judicial appointments made by the Chief Justice under Miss. Code § 9-1-105(2) in at least two critical

ways.  First, Judges selected for appointment under Miss. Code § 9-1-105(2) are subject to the advice and consent of a majority of Mississippi Supreme Court justices—but not for the judgeships created under H.B. 1020.  And second, § 9-1-105(2) requires an emergency or overcrowded docket—H.B. 1020 has no such requirement, and there is no indication that the Mississippi Legislature considered the existence of these elements when legislating the bill.

74.     Section 1 of H.B. 1020 provides that the Chief Justice "may elect to reappoint circuit judges that are serving on a temporary basis" in the Hinds County Circuit Court.  This appears to provide the option for the Chief Justice either to allow the three current circuit judges appointed under § 9-1-105(2) to continue their terms while the Chief Justice appoints four new circuit judges under H.B. 1020, or to allow the Chief Justice to "reappoint" under H.B. 1020 any or all of the three current circuit judges currently appointed under § 9-1-105(2).  The former would result in 11 circuit judges in the Hinds County Circuit Court (4 elected, 7 appointed), whereas the latter would result in 8 circuit judges (4 elected, 4 appointed) (reappointment of the three current appointed judges, and the appointment of an additional judge to make a total of 4 appointed judges).  Although unspecified by H.B. 1020, a third scenario could exist whereby the terms of the current judges appointed under § 9-1-105(2) will be allowed to expire upon the appointment of the four judges appointed under H.B. 1020, with the same numerical result as the previously-stated second scenario.

75.     In any scenario, the composition of the Hinds County Circuit Court will be between 50 and 64 percent appointed judges should H.B. 1020 go into effect.

76.     Further, unlike elected circuit court judges, special circuit judges appointed under H.B. 1020 are not required to be residents of Hinds County.

15

### Creation of the Capitol Complex Improvement District and
### Expanding the Jurisdiction of the Capitol Police

77.     In 2017, the Mississippi Legislature passed H.B. 1226, which created the Capitol Complex Improvement District ("CCID").

78.     The CCID was created to fund infrastructure and improvement projects and administer services within an 8.7 square mile area around the State Capitol by diverting a portion of sales tax revenue collected within the City of Jackson.

79.     H.B. 1226 established the "CCID Project Fund" to finance improvement projects and personnel.  CCID improvement projects authorized by H.B. 1226 include resurfacing roadways, repairing sidewalks, and installing or replacing new street lighting and traffic signals.

80.     In 2021, the Legislature enacted H.B. 974, which transferred authority over the Office of Capitol Police from the Department of Finance and Administration to the Department of Public Safety.  Under H.B. 974, the Commissioner of the Department of Public Safety—who is appointed by the governor—appoints the chief of the Capitol Police and oversees all Capitol Police activities in Jackson.

81.     H.B. 974 also provided the Capitol Police—which previously only operated in the area immediately surrounding the Mississippi Capitol building—with criminal law enforcement authority and the ability to "make arrests for any violation of any law of the State of Mississippi which occurs within the boundaries of the [CCID]."

82.     Under its pre-H.B. 1020 boundaries, the CCID has an estimated total population of 14,374, of which a majority, or approximately 7,183 (50.0%) persons, identified as non-Hispanic Black, while 6,184 (43.0%) persons identified as non-Hispanic White.

83.     H.B. 1020 expands the CCID's boundaries, doubling its size from approximately 8.7 square miles to approximately 17.5 square miles, and nearly doubles its population.

84.     The most significant alterations include an expansion of the northern and eastern boundaries of the CCID to incorporate neighborhoods such as Fondren, Belhaven, and Eastover, with some of the highest property values in the City of Jackson.

85.     As a result of these boundary changes, the CCID will no longer have a majority-Black total population; instead, it will have a plurality-White total population and a majority-White voting age population.  The CCID's population will grow to 26,457 after H.B. 1020 goes into effect, of whom 12,698 (48.0%) are non-Hispanic White and 12,038 (45.5%) are non-Hispanic Black.   Here is the estimated racial breakdown of the population added to the expanded CCID:

**Total population added to CCID by H.B. 1020**

| Race | Total Pop | % |
|---|---|---|
| White NH | 6,514 | 53.9% |
| Black NH | 4,855 | 40.2% |
| Hispanic | 305 | 2.5% |
| Asian NH | 211 | 1.7% |
| Nat Am NH | 85 | 0.7% |
| Other | 113 | 0.9% |
| Total | 12,083 | |

**Voting age population added to CCID**

| Race | 18+ Pop | % |
|---|---|---|
| White NH | 5,435 | 56.7% |
| Black NH | 3,591 | 37.5% |
| Hispanic | 217 | 2.3% |
| Asian NH | 186 | 1.9% |
| Nat Am NH | 72 | 0.8% |
| Other | 80 | 0.8% |
| Total | 9,581 | |

86.     Senate Bill 2343, a different piece of legislation enacted during the 2023 legislative session, further expands the jurisdiction of the Capitol Police to cover the entire City of Jackson.  It empowers "any person or persons appointed by the Department of Public Safety"—namely, the Capitol Police—to have jurisdiction within the city limits of Jackson.   The law creates primary jurisdiction for the Capitol Police within the CCID and "concurrent jurisdiction" over the remainder of the entire City of Jackson.

87.     On information and belief, Jackson is the only jurisdiction in Mississippi subject to the operation of a law enforcement agency run by statewide officials aside from two sets of

state-owned buildings—the Bolton properties in Biloxi and the State Service Center in

Hattiesburg.

88.     The Chief of the Capitol Police described this arrangement as "uncharted

territory" and "not [] common."

89.     Senate Bill 2343 requires the Chief of the Capitol Police to call "regular

meeting[s] . . . to address the concerns of the public" but does not otherwise provide for any

input, much less oversight, by Jackson residents.

90.     By contrast, the Hinds County Sheriff's Office is accountable to county residents,

who can vote for their county sheriff.

91.     The Jackson Police Department is accountable to Jackson's residents who,

through electing their mayor, influence the appointment or dismissal of their police chief.

**The Creation of the Capitol Complex Improvement District Court**

92.     Section 4 of H.B. 1020 establishes a new court system called the "CCID inferior

court" ("CCID court").  The CCID court has "jurisdiction to hear and determine all preliminary

matters and criminal matters authorized by law for municipal courts that accrue or occur, in

whole or in part, within the boundaries of the Capitol Complex Improvement District."

93.     Under H.B. 1020, the CCID court can hear civil and criminal cases.

94.     Section 4 of H.B. 1020 grants authority to the CCID court "to hear and determine

all cases charging violations of the motor vehicle and traffic laws of this state, and violations of

the City of Jackson's traffic ordinance or ordinances related to the disturbance of the public

peace "that accrue or occur, in whole or in part, within the boundaries of the [CCID]."  This

authority previously was vested in local courts in which judges are accountable to the people of

Jackson and Hinds County because they are appointed by local elected officials.

18

95.     Section 4 of H.B. 1020 creates a judgeship to hear cases brought before the CCID court.  Section 4 provides that the judge who sits on the CCID court shall be appointed by the Chief Justice of the Mississippi Supreme Court for a term extending from January 1, 2024, until July 1, 2027, rather than being accountable to the people of Jackson or Hinds County.

96.     Section 4 of H.B. 1020 provides that any "qualified elector of [Mississippi]" who "possess[es] all qualifications required by law for municipal court judges" is eligible to be appointed judge of the CCID inferior court.  H.B. 1020 does not require that the CCID judge reside in Jackson or Hinds County.

97.     Section 4 of H.B. 1020 provides that "[a]ny person convicted in the CCID inferior court may be placed in the custody of the Mississippi Department of Corrections, Central Mississippi facility."

98.     The Central Mississippi Correctional Facility is a state prison and not a local jail.

99.     The CCID court is not permanent and "shall stand repealed on July 1, 2027."

100.    Section 5 of H.B. 1020 establishes offices for two new prosecutors who will have jurisdiction to prosecute offenses within the boundaries of the CCID.  These prosecutors "shall prosecute cases in the [CCID court] and also in the same manner and with the same authority of law provided for district attorneys."

101.    Section 5 of H.B. 1020 vests the appointment authority for these prosecutor positions with the Mississippi Attorney General.  Their terms of office end on July 1, 2027.

102.    With respect to crimes committed within the CCID, the CCID prosecutors have the same power as, and are not subject to oversight by, the Hinds County District Attorney.

103.    Section 5 of H.B. 1020 also authorizes the Hinds County District Attorney to prosecute cases in the CCID court.

104.    Section 1(6)(a) of Mississippi Senate Bill 2343 vests the Department of Public Safety and the Capitol Police with discretion to present criminal cases emerging from acts committed within the CCID to either the Hinds County District Attorney or the two new CCID prosecutors.

105.    Thus, under H.B. 1020, unlike anywhere else in Mississippi, anyone within the CCID accused of violating a local ordinance can be arrested, prosecuted, and punished entirely by state authorities unaccountable to the local Black-majority electorate.

**H.B. 1020's Caseload Generation and Funding Provisions**

106.    Mississippi state law provides for criteria to determine the number of judges for each circuit court, such as the district's population and the number of cases filed in the district.

107.    The Legislature failed to conduct an adequate study into whether a judicial backlog exists in the Hinds County Circuit Court relative to other circuit courts in Mississippi.

108.    H.B. 1020 provides for a potential study after the fact.  Section 12 of H.B. 1020 requires that the clerk of the Hinds County Circuit Court generate caseload and case disposition data from the period beginning January 1, 2017, and ending September 15, 2023, and send that information to the Legislature by October 1, 2023.

109.    That information is being provided "for the purpose of assisting the Legislature in its consideration to authorize one (1) circuit judge for the Seventh Circuit Court District in addition to the judges authorized in subsection (1) of this section" under Section 12 of H.B. 1020.  That permanent circuit judge would be an elected position.

110.    Section 9(1)(c) of H.B. 1020 increases the revenue diverted from the City of Jackson to the CCID Project Fund—which pays for CCID operations—from 6 percent of Jackson's sales tax revenue to 9 percent.

111.    Section 1 and Section 6 of H.B. 1020 provide for the compensation of support staff for the new special circuit judges, the compensation of support staff for the CCID inferior court's operations, and the compensation of the CCID inferior judge and his/her support staff.

### The Legislative History of H.B. 1020

112.    The legislative process for passing H.B. 1020 was unusual.  Legislative leadership and H.B. 1020 proponents failed to consult Black Hinds County legislators, leaders, and judges before dropping the more than 1,000-page original version of the bill, routed it through the House Ways and Means Committee instead of the Judiciary Committee, failed to refer it to the Local and Private Legislation Committee, rejected ameliorative amendments, and largely excluded the only Black member of the conference committee from committee deliberations.

113.    The Mississippi State House consists of 122 members, 38 of whom are Black.  At the time H.B. 1020 was passed, there were 39 Black Representatives, one of whom resigned in April 2023.

114.    The Mississippi State Senate consists of 52 members, 14 of whom are Black.

115.    H.B. 1020 was introduced on January 16, 2023 by Representative Trey Lamar. Rep. Lamar, who is White, represents Mississippi's 8th House district, which is composed of Tate and Lafayette Counties in northern Mississippi.

116.    H.B. 1020's two other authors, Representatives David Shanks and Price Wallace, are also White and do not reside in Hinds County.  Rep. Shanks represents District 60 in Rankin County and Rep. Wallace represents District 77 in Rankin and Simpson Counties.

117.    The original version of H.B. 1020 was 1,040 pages long.

118.    Representative Lamar did not consult any Black state legislators or local Hinds County or City of Jackson leadership before introducing H.B. 1020.

119.     Neither Representative Lamar nor other proponents of H.B. 1020 consulted Hinds County Circuit Court judges or other local judges during the legislative process.

120.     House Speaker Philip Gunn referred H.B. 1020 to the House Ways and Means Committee, which Representative Lamar chairs, on January 16, 2023.

121.     Under normal procedures, legislation affecting the structure and design of Mississippi local courts such as H.B. 1020 is referred to the House Judiciary Committee.

122.     After the fact, bill proponents cited hundreds of code sections addressing state revenues included in the original more than 1,000-page version of H.B. 1020 as the reason for this committee assignment.  Hundreds of pages of those code sections were later struck from the bill.

123.     Although H.B. 1020 does not impact any county other than Hinds County, the bill was never referred to the standing committee on local and private legislation.  Under the Mississippi Constitution, legislation impacting a particular jurisdiction is constitutionally required to pass through this committee before becoming law.  Miss. Const. art. 4, § 89.

124.     H.B. 1020 was voted out of the House Ways and Means Committee on January 25, 2023.

125.     On January 30, 2023, the judges of the Circuit, Chancery, County, and Justice Courts of all Judicial Districts of Hinds County issued a public statement condemning H.B. 1020 for "disenfranchising the voters of Hinds County."  The Hinds County District Attorney issued a comparable statement the same day.

126.     On February 7, 2023, the House debated H.B. 1020 on the floor.  Black State Representatives criticized H.B. 1020 for its harmful effect on the voting power of voters of color in Hinds County.

127.    Representative Robert Johnson proposed an amendment requiring that for every dollar the Legislature allocated to the CCID, the City of Jackson would receive a proportional amount to fund its policing and judicial services.  The House rejected that proposed amendment.

128.    A companion amendment was proposed requiring that any new CCID judges be residents of Hinds County.  Representative Lamar responded to this proposal by saying, "If we're going to make an additional court in the City of Jackson, do we not want our best and brightest sitting in judgment, whether that may come from Holmes County or Madison County or wherever they may be?  Why would we limit the talent pool to here?"  The amendment was then voted down.

129.    Rep. Bryant Clark, a Black representative from Hinds County, proposed an amendment to allow for the election of new CCID judges rather than appointment.  The House rejected that proposed amendment.

130.    Later, during an interview conducted in connection with a Law360 news article, Representative Lamar, the principal author of H.B. 1020, was asked why the Legislature did not consider adding elected judgeships to Hinds County.  He stated that "[y]ou run into problems getting votes to do that across the state," and that "a lot of people believe that four judges should be able to get the job done in Hinds County.  And you know, there's a lot of factors that go into that as to why they're not."  The clear implication of this statement is that the four elected Black judges in Hinds County were deficient in some respect.  Asked to clarify what specifically the elected Black judges in Hinds County were doing wrong, Rep. Lamar declined to elaborate.

131.    After Rep. Lamar stated that the bill's purpose is to make the City of Jackson safer, bill opponents replied that Black representatives of Jackson, rather than White statewide officials, should oversee their city.  Representative Lamar responded that "the city of Jackson is

the capital city of the State of Mississippi, whether you are from Southaven or Gulfport.  It is our capital city.  It does not belong solely to the citizens of Jackson, OK?"

132.     Opponents of H.B. 1020, including Black representatives from Jackson, repeatedly highlighted during the legislative debate the negative impact H.B. 1020 would have on Black voters and elected officials in Hinds County.

133.     After the final legislative debate, the Mississippi House of Representatives voted on H.B. 1020.  The bill passed by a vote of 76 to 38.  Four members were absent or not voting, two members voted "Present," and two seats were vacant.

134.     Of the 39 Black representatives in the House, 36 voted against the bill, 2 voted for the bill, and 1 voted "Present."

135.     Only two White representatives joined the Black representatives in voting against the bill.  Of the 38 representatives who voted against H.B. 1020, 36 (approximately 95 percent) are Black.

136.     A total of 74 White representatives voted in favor of H.B. 1020.  Thus, of the 76 state representatives who voted in favor of H.B. 1020, approximately 97 percent are White.

137.     The bill then moved to the Senate, where it was amended in committee and shortened to 37 pages.  The new bill was voted out of committee on February 23.

138.     On March 6, the day before the vote on the Senate floor, the Jackson legislative delegation hosted a hearing on H.B. 1020 and invited local stakeholders to testify about the bill.  The Hinds County District Attorney stated that his office had been excluded from discussions about the bill and strongly opposed it.  The Hinds County Public Defender stated that "nobody at this point has asked me . . . about what our [office's] real needs are."  The Assistant Chief of Police stated that the Jackson Police Department had also not been consulted about the bill.

24

139.    On March 7, the bill went to the Senate floor for a final vote.

140.    While the bill was on the Senate floor, Black senators offered two amendments requiring that any new CCID judges be elected.

141.    The Senate voted to reject those amendments.

142.    The Senate passed H.B. 1020 by a vote of 34 to 15.  All 14 Black state senators and one White senator voted against the bill; two White senators were absent or did not vote, and one voted "Present."   All yea votes came from White senators; all but one of the nay votes came from Black senators.

143.    In March, H.B. 1020 went to a conference committee, which had six members.

144.    The only Black member of the conference committee was State Representative Earle Banks of Hinds County.

145.    Representative Banks was excluded from conference committee meetings in which revised versions of H.B. 1020 were prepared.  He was handed the final version of H.B. 1020 only minutes before the conference committee vote.

146.    The conference committee passed the bill and issued a conference report on March 31.  Representative Banks refused to sign the conference report.

147.    On April 21, 2023, Governor Reeves signed H.B. 1020 into law.

## <u>CAUSE OF ACTION</u>

### Equal Protection Clause of the Fourteenth Amendment
### Against Defendants State of Mississippi and Attorney General Fitch

148.    The United States re-alleges and incorporates by reference the allegations set forth in all prior paragraphs of this Complaint.

149.   The Equal Protection Clause of the Fourteenth Amendment prohibits the State of Mississippi from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

150.   The challenged appointment provisions of H.B. 1020 were adopted, at least in part, with the purpose of denying or abridging Black citizens' equal access to the political process in violation of the Equal Protection Clause.   Those provisions include the following:

(a)   the appointment of the four special circuit court judges by the Chief Justice of the Mississippi Supreme Court (Section 1);

(b)   the appointment of the CCID judge by the Chief Justice of the Mississippi Supreme Court (Section 4); and

(c)   the designation of the CCID prosecutors by the Mississippi Attorney General (Section 5).

151.   H.B. 1020 has a severe discriminatory impact.   Both Jackson and Hinds County have an overwhelmingly Black population that consistently elects Black local leadership.   H.B. 1020 takes power from Black voters and leadership and subjects the local population to the oversight of state-appointed judges and prosecutors who need not reside in Hinds County, and who are not accountable to the local electorate.

152.   Black voters will not have the opportunity to elect or even have a meaningful voice in the selection of these new officials, some of whom will preside over and manage a new, state-created court system.

153.   On information and belief, in all majority-White counties in Mississippi, voters elect their circuit judges and district attorneys, and local elected officials exercise control over the appointment of municipal court judges.

154.   Unlike every other jurisdiction in Mississippi, at least half the judges on the Hinds County Circuit Court will be appointed under H.B. 1020.

26

155.    H.B. 1020's appointment provisions divest authority from Black voters in Hinds County who have elected the four Black Hinds County Circuit Court judges and the Black Hinds County District Attorney.  H.B. 1020 also takes authority from Black elected officials in Jackson who play a role in managing the local court system.

156.    H.B. 1020 doubles the size of the CCID, adding a substantial majority-White population to what had previously been a majority-Black district.  Under the new CCID, the Capitol Police force will serve many of the City's most White and affluent neighborhoods, funded in part by diverted tax revenue from the majority-Black City of Jackson.

157.    H.B. 1020 permits a Black person allegedly committing a crime within the CCID to be (1) arrested by the Capitol Police, which is led by a White State-appointed official who is not accountable to the people of Jackson, who are predominantly-Black, (2) charged by a prosecutor appointed by a White statewide official who is not accountable to the people of Jackson, (3) tried before a judge appointed by a White statewide official who is not accountable to the people of Jackson, and (4) sentenced to imprisonment in a State penitentiary for a minor infraction of a local ordinance.  In no other county in Mississippi could a criminal defendant encounter such a possibility.

158.    The historical background of H.B. 1020 provides important context for discerning the Legislature's intent.  Mississippi has a long history of discriminating against Black voters, including by creating appointive offices to strip Black voters of their right to elect leaders who represent them and diluting Black voters' ability to elect judges to the Hinds County Circuit Court.

159.    The State Legislature also played a role in creating the problem that it now cites to justify H.B. 1020.  The State starved Hinds County of judicial resources, refusing to add any

new elected judges for Hinds County while repeatedly adding elected judges in judicial districts that are more heavily White in population percentage.

160.    H.B. 1020 was passed in a sequence of events that deliberately excluded Black participation, ignored local opposition, and reflects discriminatory intent.  No Black representatives of Hinds County were consulted on H.B. 1020 before it was introduced.  And, despite numerous warnings of H.B. 1020's inevitable impact on Hinds County's Black voters, Mississippi enacted H.B. 1020 over opposition from Black representatives, Hinds County Circuit Court judges, the Hinds County District Attorney, and other local officials, while rejecting ameliorative amendments offered by Black representatives.

161.    To exclude Black participation from consideration of the bill, Mississippi substantially departed from its normal legislative procedures in enacting H.B. 1020.  The Mississippi Legislature directed H.B. 1020 to a different committee than would normally consider such legislation, failed to have H.B. 1020 reviewed by the standing committee on local and private legislation, and refused to show the text of the bill to the only Black member of the conference committee until minutes before a vote was to be taken.

162.    Contemporaneous statements made during the passage of the bill, including from the bill's sponsor, evince a distrust in Jackson's and Hinds County's capacity for self-governance as well as in their elected officials, nearly all of whom are Black.

163.    The non-racial justifications offered for the appointment provisions are pretextual. Rather than consulting Hinds County's Black elected Circuit Court judges, its Black District Attorney, its Black Public Defender, or other Black local officials and legislators who were closest to the problem, White legislators worked in secret to devise a plan that divests many of those officials of their authority in key areas.  The Legislature could have bolstered support for

existing court systems, judges, and prosecutors within Hinds County.  But it didn't.  Instead, it

created a new white enclave within Jackson that is served by state-appointed judges, prosecutors,

and police, and foisted four new appointed judges on the people on Hinds County.  Those

judges—and the new CCID judge—need not reside in Hinds County, and the new CCID court

system has the authority to hear civil cases, which have no relation to reducing crime in Jackson.

Meanwhile, Hinds County continues to have the same number of elected judges that it has had

for a generation even though the Legislature has added many elected judgeships to other circuit

courts in the interim.

164.    Under the totality of the circumstances, the evidence surrounding H.B. 1020's

passage shows that Mississippi acted with racially discriminatory intent, in violation of the Equal

Protection Clause of the Fourteenth Amendment to the United States Constitution.

165.    Unless enjoined by order of this Court, Defendants will continue to violate the

Constitution by implementing the challenged provisions of H.B. 1020.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests that this Court:

A.    Declare that Section 1 of H.B. 1020, to the extent it mandates that the new judgeships

on the Hinds County Circuit Court be appointed solely by the Chief Justice of the

Mississippi Supreme Court, discriminates on the basis of race in violation of the

Equal Protection Clause of the Fourteenth Amendment;

B.    Declare that Section 4 of H.B. 1020, to the extent it mandates that the CCID court

judge be appointed solely by the Chief Justice of the Mississippi Supreme Court,

discriminates on the basis of race in violation of the Equal Protection Clause of the

Fourteenth Amendment;

C.      Declare that Section 5 of H.B. 1020, to the extent it mandates that CCID prosecutors be designated by the Mississippi Attorney General, discriminates on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment;

D.      Enjoin the appointment of any judge to the Hinds County Circuit Court or the CCID court pursuant to H.B. 1020;

E.      Enjoin the appointment of prosecutors to the CCID court pursuant to H.B. 1020;

F.      Retain jurisdiction to render any and all further orders that this Court may enter; and

G.      Grant such other and further relief as this Court deems just and proper.

Dated: July 12, 2023

Respectfully submitted,


DARREN J. LAMARCA                                  KRISTEN CLARKE
United States Attorney                             Assistant Attorney General
Southern District of Mississippi                   Civil Rights Division


*/s/ Angela Givens Williams*
ANGELA GIVENS WILLIAMS (#102469)
MITZI DEASE PAIGE (#6014)                          T. CHRISTIAN HERREN, JR. (AL 6671R63T)
Assistant U.S. Attorneys                           JOHN A. RUSS IV (CA 192471)
501 E. Court St.                                   VICTOR J. WILLIAMSON (DC 495783)
Suite 4.430                                        J. ERIC RICH (MD 0012130218)
Jackson, MS  39201                                 KAITLIN TOYAMA (CA 318993)
Phone: (601) 965-4480                              JOHN POWERS (DC 1024831)
Angela.Williams3@usdoj.gov                         ROBERT WEINER (DC 298133)
Mitzi.Paige@usdoj.gov                              Attorneys
                                                   Civil Rights Division
                                                   U.S. Department of Justice
                                                   950 Pennsylvania Ave NW – 4CON
                                                   Washington, D.C. 20530
                                                   Phone: (800) 253-3931
                                                   chris.herren@usdoj.gov
                                                   john.russ@usdoj.gov
                                                   j.rich@usdoj.gov
                                                   victor.williamson@usdoj.gov
                                                   kaitlin.toyama@usdoj.gov
                                                   john.powers@usdoj.gov
                                                   robert.weiner@usdoj.gov