# <u>EXHIBIT 1</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE;
MISSISSIPPI STATE CONFERENCE OF
THE NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE;
JACKSON CITY BRANCH OF THE
NAACP; DERRICK JOHNSON; FRANK
FIGGERS; CHARLES TAYLOR;
MARKYEL PITTMAN; CHARLES JONES;
and NSOMBI LAMBRIGHT-HAYNES,

                    *Plaintiffs*,

    v.

SEAN TINDELL, in his official capacity
as Commissioner of the Mississippi
Department of Public Safety; BO
LUCKEY, in his official capacity as
Chief of the Mississippi Department of
Public Safety Office of Capitol Police;
MICHAEL K. RANDOLPH, in his
official capacity as Chief Justice of the
Mississippi Supreme Court; LYNN
FITCH, in her official capacity as
Attorney General of the State of
Mississippi; GREG SNOWDEN, in his
official capacity as Director of the
Mississippi Administrative Office of
Courts; LIZ WELCH, in her official
capacity as Executive Director of the
Mississippi Department of Finance and
Administration; JOHN/JANE DOES 1–
4, in their individual capacities as
pending appointees as temporary special
judges of the Seventh Circuit District
Court for the State of Mississippi, or in
their official capacities as sitting

Case No. 3:23-cv-272-HTW-LGI

**PLAINTIFFS' FIRST AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

temporary special judges of the Seventh
Circuit District Court for the State of
Mississippi; JOHN/JANE DOE 5, in
their individual capacity as a pending
appointee as Capitol Complex
Improvement District Judge, or in their
official capacity as a sitting Capitol
Complex Improvement District Judge;
and JOHN/JANE DOES 6–7, in their
individual capacities as pending
appointees as Capitol Complex
Improvement District Prosecutors, or in
their official capacities as serving
Capitol Complex Improvement District
Prosecutors,

*Defendants*.

## INTRODUCTION

1.     The National Association for the Advancement of Colored People
("NAACP"), the Mississippi State Conference of the NAACP ("Mississippi NAACP"), the
Jackson City Branch of the NAACP ("Jackson NAACP"), Derrick Johnson, Nsombi
Lambright-Haynes, Frank Figgers, Charles Taylor, Markyel Pittman, and Charles Jones
(collectively, "Plaintiffs") bring this action to challenge the State of Mississippi's
enactment of House Bill 1020 ("H.B. 1020") and Senate Bill 2343 ("S.B. 2343"), which
are unconstitutional on their faces.

2.     In violation of the Fourteenth Amendment, these laws target Jackson's
majority-Black residents on the basis of race for a separate and unequal policing structure
and criminal justice system to which no other residents of the State are subjected.  Under
this new regime and unlike in any other jurisdiction in Mississippi, in certain areas of
Jackson, a citizen can be arrested by a police department led by a State-appointed official,

2

be charged by a State-appointed prosecutor, be tried before a State-appointed judge, and be sentenced to imprisonment in a State penitentiary regardless of the severity of the act.

3.      S.B. 2343 compounds this violation of Jackson's residents' right to equal protection under the law by providing State actors with the unfettered discretion to restrict the rights of Jackson's residents to freedom of speech, expression, association, assembly, and to petition the government—the very means through which they might protest the State's equal protection violations.

4.      Jackson's residents live in a city that has one of the highest proportions of Black residents in the United States (more than 80%).  In municipal and county elections, these residents wield significant political power.  There is a longstanding tradition of Black leadership in Jackson; the City of Jackson is currently governed by a Black mayor and majority-Black city council.  All four of the elected judges in Hinds County, which is primarily comprised of the City of Jackson, are Black.

5.      H.B. 1020 and S.B. 2343 are designed to, and will in fact, suppress and chill Black residents' exercise of their First Amendment rights and strip Black residents of the political control they have fought to obtain and to which they are entitled.

6.      The Capitol Complex Improvement District ("CCID"), which H.B. 1020 and S.B. 2343 expand, was conceived as part of a beautification project.  The CCID was created by the Mississippi legislature in 2017 "in order to establish regular funding and administration of infrastructure projects within a defined area of the capital city of Jackson." Its boundaries originally covered 8.7 square miles around the State Capitol and "were drawn to encompass the major state properties in Jackson."  Capitol Complex

Improvement     District,     *CCID     Informational     Pamphlet*,     available     at     1,
https://www.dfa.ms.gov/sites/default/files/CCID%20Home/Master%20Plan%20Docume
nts/2019-0306-ccid-pamphlet.pdf.

7.     H.B. 1020 expands the CCID to approximately 17.5 square miles to include
roughly half of the white population of Jackson, when only 15 percent of the entire
population of Jackson is white.

8.     H.B. 1020 and S.B. 2343 are designed to create a system of separate but
unequal law enforcement and criminal justice, and to significantly impede the ability of
Jackson's residents to exercise their First Amendment rights to challenge State actions.

9.     These statutes unlawfully erode the political power of the majority-Black
residents of Jackson and their governmental institutions through three linked sets of
provisions:

- One that extends the jurisdiction of the Department of Public Safety ("DPS"),
through the Capitol Police, on a "primary" basis across the CCID and on a
"concurrent" basis across the entirety of Jackson, singling out Jackson and
its predominantly Black population for an entirely new form of electorally
unaccountable law enforcement *(the "policing takeover provision")*;

- One that seizes control of Jackson's criminal justice system by (1) packing
the existing Circuit Court with unelected judges, thus stripping Jackson
residents of the right enjoyed by all other Mississippi residents to Circuit
Court judges who live in the community and are locally elected, (2) creating
a parallel and locally unaccountable judicial system within the CCID (the

"CCID Court"), making Jackson the only municipality in Mississippi with a population over 10,000 where a judge exercising the powers of a Municipal Court need not be a resident of the City and is not appointed by the City's elected leadership, and (3) installing prosecutors appointed by the Attorney General (who is white and is appointed by a white Governor) to bring charges within the CCID, singling out Jackson's residents for prosecution by officials who are not overseen by a locally elected member of their community *(the "judicial takeover provisions")*;

- And one that imposes a vague and overbroad prior restraint on free expression *(the "prior restraint provision")*.

10.     The prior restraint provision profoundly limits the exercise of First Amendment rights by Plaintiffs and others like them and exacerbates H.B. 1020 and S.B. 2343's Equal Protection Clause violations.  Because it is not yet known what bearing, if any, the rules and regulations DPS is required to promulgate to "effectuate" this statute will have on these restraints, Plaintiffs do not at this time pray for any relief with respect to that provision and may amend this Complaint as circumstances require.

11.     Taken together, and as explained more fully below, these provisions strip Jackson residents, including Plaintiffs, of their rights to enjoy the full protections of the law and to exercise the same civil liberties as other Mississippi citizens.

### PARTIES

12.     The NAACP is the oldest and one of the largest nonprofit, nonpartisan civil rights organizations in the United States.  Founded in 1909, the NAACP uses litigation,

5

policy advocacy, public education, and community organizing to ensure the educational, political, social and economic equality of all persons and to eliminate all forms of race-based discrimination.   Securing the fundamental rights of communities of color and protecting against discrimination are core to this mission.

13.     The NAACP is incorporated in Delaware and has more than two million members and supporters nationally, including thousands of members in Mississippi. NAACP members are predominantly people of color; the majority are Black.  The NAACP has members who live, work, and vote in Jackson, Mississippi.  These members will be directly injured by S.B. 2343 and H.B. 1020.

14.     The Mississippi NAACP, which is headquartered in Jackson, is a subsidiary unit of the national NAACP.  The Mississippi NAACP has been on the forefront of major battles for civil rights since its first branch was chartered in 1918.  The Mississippi NAACP represents over 11,000 members across the State of Mississippi.   These members are predominantly people of color and a majority are Black.  Members live, work, and vote in Jackson, Mississippi.  These members will be directly injured by H.B. 1020 and S.B. 2343.

15.     The Jackson NAACP is headquartered in Jackson and is a subsidiary unit of the Mississippi State Conference of the NAACP and of the national NAACP.  The Jackson NAACP has been a civil rights leader in Mississippi since its founding in 1926.  It has more than 200 members across the City of Jackson.  These members are predominantly people of color and a majority are Black.  Members live, work, and vote in Jackson, Mississippi. These members will be directly injured by H.B. 1020 and S.B. 2343.

16.     Plaintiff Derrick Johnson is a resident of and registered voter in Jackson, Mississippi.  Mr. Johnson, who is the President and CEO of the NAACP, has participated in many free speech events in Jackson that now require approval by State officials under the prior restraint provision.  He has protested, marched, and engaged in a range of collective actions designed to amplify his political voice on behalf of Black and other people of color nationwide.  As a voter, Mr. Johnson considers law enforcement policies when voting for mayor or other local elected offices, and judicial qualifications when voting for local elected judges.  As a resident of Jackson, Mr. Johnson is now subject to policing by Capitol Police and the jurisdiction of the new, unelected prosecutors and judges in Jackson.

17.     Plaintiff Frank Figgers is a resident of and registered voter in Jackson.  Mr. Figgers, who is a member of the NAACP, is 73 years old and has lived in Jackson his entire life.  Like Mr. Johnson, Mr. Figgers has participated in all sorts of events in Jackson that now require approval by the Chief of Capitol Police or Commissioner of DPS.  Mr. Figgers also considers law enforcement policies when voting for mayor or other local elected offices, and judicial qualifications when voting for local elected judges.  But, as a resident of Jackson, Mr. Figgers is now subject to policing by Capitol Police and the jurisdiction of the new, unelected prosecutors and judges in Jackson.

18.     Plaintiff Charles Taylor is a resident of and registered voter in Jackson, where he has lived since he was four years old.  He is the Executive Director of the Mississippi NAACP.  In his personal and official capacities, he has attended numerous demonstrations and rallies in areas that are now covered by S.B. 2343, including the Capitol Building and

the Governor's Mansion.  Mr. Taylor considers law enforcement policies when voting for mayor or other local elected offices, and judicial qualifications when voting for local elected judges.  But, as a resident of Jackson, Mr. Taylor is now subject to policing by Capitol Police and the jurisdiction of the new, unelected prosecutors and judges in Jackson.

19.     Plaintiff Markyel Pittman is a resident of and registered voter in Jackson. Mr. Pittman is a student at Jackson State University; he is president of the Mississippi State Youth and College Chapter of the NAACP and President of the Jackson State University College Chapter of the NAACP.  In his roles with the NAACP and as a community organizer, Mr. Pittman has attended and planned a number of events that will now be covered by S.B. 2343's prior restraint provision.  Most recently, for example, he spoke at a rally on the steps of the Mississippi State Capitol to call out the repressive nature of the law.  Mr. Pittman has already felt firsthand the effects of the Capitol Police: Jackson State University, which has a student body that is more than 90% Black, falls within the pre-S.B. 2343 jurisdiction of the Capitol Police, and Mr. Pittman and his classmates have been followed and targeted by the Capitol Police.  Mr. Pittman considers law enforcement policies when voting for local elected offices, and judicial qualifications when voting for local elected judges.  As a resident of Jackson, Mr. Pittman is now subject to expanded policing by Capitol Police and the jurisdiction of the new, unelected prosecutors and judges in Jackson.

20.     Plaintiff Charles Jones is a resident of and registered voter in Jackson. He has lived in the city for more than 50 years.  He is a member of the NAACP and has previously served on the Jackson Branch NAACP's executive committee.  He is a life-long

activist and has attended various rallies and demonstrations in Jackson—including numerous voter registration drives across the city—which are covered by the prior restraint provision of S.B. 2343.  Law enforcement policy is a key consideration for Mr. Jones when voting for mayor or other local elected offices, as are judicial qualifications when voting for local elected judges.  But, as a resident of Jackson, Mr. Jones is now subject to policing by Capitol Police and the jurisdiction of the new, unelected prosecutors and judges in Jackson.

21.     Plaintiff Nsombi Lambright-Haynes is a resident and registered voter in Jackson where she was born and has lived on and off her entire life.  She is the president of the Jackson City Branch of the NAACP and a long-time activist and organizer.  She has attended and organized numerous protests, rallies, demonstrations and other events throughout Jackson, including in areas now covered by the CCID.  The prior restraint provision of S.B. 2343 will make this essential expression of her First Amendment rights more difficult, if not altogether negate her ability to speak her mind in parts of the State Capitol where First Amendment rights should be afforded their greatest protection.  Additionally, democratic accountability for those involved in the enforcement of the law, from police officers to judges and prosecuting attorneys, is of the utmost importance to her.  Because of H.B. 1020 and S.B. 2343 she will now be subject, as a resident of Jackson, to the authority of unelected law enforcement leadership, prosecutors, and judges.

22.     The NAACP, the Mississippi NAACP, and the Jackson NAACP bring this action on behalf of their members.  The organizational Plaintiffs' membership includes Black residents of Jackson who reside or work within the CCID's boundaries.  By virtue

of where they live or earn their living, these members are included in a governmental subdivision designed in reliance on racial criteria, with the goal of controlling Black residents through a parallel policing and judicial system that does not answer to them.  These members are also subject to a credible and significantly higher risk of harsher and unchecked exercises of discretion by the CCID's unaccountable police force, prosecution by the CCID Court's unaccountable prosecutors, and judging by the unaccountable temporary Circuit Court judges or CCID Judge.  Without moving or quitting their jobs, these members cannot escape these second-class law enforcement and criminal justice systems.

23.     The organizational Plaintiffs and their members also routinely organize and participate in marches, protests, demonstrations, and public gatherings to advocate for racial, social, and economic justice. Many of these gatherings have been at places that now will be covered by S.B. 2343's prior restraint regime. Indeed, the regime is designed to—and will in fact—hinder the organizational Plaintiffs and other groups the State wishes to bar from organizing and engaging in such marches, protests, demonstrations, and public gatherings.  Absent this regime, the organizational Plaintiffs' members would continue protesting, marching, demonstrating, and engaging in expressive activities at these places.

24.     The NAACP, Mississippi NAACP, and the Jackson NAACP also bring this action on their own behalf.  The organizational Plaintiffs worked to prevent passage of H.B. 1020 and S.B. 2343, and, with the passage of these bills, they will be forced to divert resources from their routine activities.  For example, they will have to train and educate their members and local residents about the new prior restraint regime, the

expanded police jurisdiction, and the judicial takeover authorized by H.B. 1020 and S.B. 2343. Doing so will require designing and paying for training sessions to educate members on how to navigate the new application process for "event" approvals from the DPS. Plaintiffs will also need to divert time and resources to consult with attorneys to create accurate guidance materials for members and will need to reallocate time and resources to distribute those materials. It will also require designing new educational programs to ensure that residents of Jackson know and understand their rights in the new court system. None of these expenditures are needed under the current legal regime. These new education programs will divert significant funds away from the ordinary work of the NAACP, the Mississippi NAACP, and the Jackson NAACP and will limit their advocacy.

25. Defendant Sean Tindell is the Commissioner of DPS. Mississippi law charges Commissioner Tindell with overseeing the operation of DPS, which includes the Capitol Police, and with appointing the Chief of the Capitol Police. *See* Miss. Code § 45-1-2. Under S.B. 2343, Defendant Tindell shares responsibility with Defendant Luckey for approving all events in areas covered by the statute. Sec. 6(c). His principal place of business is in Jackson, Mississippi. He is being sued solely in his official capacity.

26. Defendant Bo Luckey is the Chief of DPS's Office of Capitol Police. As Chief, Luckey is responsible for the operation and oversight of the Capitol Police. Under S.B. 2343, Defendant Luckey shares responsibility for approving all events in areas covered by the statute and is responsible for carrying out law enforcement duties in the

11

CCID and across the City.  Secs. 1(1), 6(a), (c).  His principal place of business is in Jackson, Mississippi.  He is being sued solely in his official capacity.

27.     Defendant Michael K. Randolph is the Chief Justice of the Mississippi Supreme Court.  As Chief Justice, Defendant Randolph serves as chief administrative officer of all Mississippi courts.  H.B. 1020 requires the Chief Justice to appoint four temporary special circuit court judges to the Seventh Circuit Court District (§ 1(1)) and a judge to the new CCID Court (§ 4(2)).  His principal place of business is in Jackson, Mississippi.  He is being sued solely in his official capacity.[1]

28.     Defendant Lynn Fitch is the Attorney General of the State of Mississippi. H.B. 1020 § 5 authorizes Attorney General Fitch to appoint prosecuting attorneys (John/Jane Does 6 and 7) for the new court that the law creates.  Her principal place of business is in Jackson, Mississippi.  She is being sued solely in her official capacity.

29.     Defendant Greg Snowden is the Director of the Mississippi Administrative Office of Courts ("AOC").  H.B. 1020 § 4(3) requires the AOC to provide compensation for the CCID Judge.  Section 7 requires the AOC, in conjunction with the Department of Finance and Administration ("DFA"), to designate a location for the CCID Court to hold court.  On information and belief, the AOC, in conjunction with the DFA, also plays a role in compensating the temporary special circuit court judges created by H.B. 1020. Defendant Snowden is being sued solely in his official capacity.

---

[1] Plaintiffs acknowledge that the Court concluded that Defendant Randolph enjoys judicial immunity under § 1983 (ECF No. 45) and reserve all rights with respect to that conclusion.

30.     Defendant Liz Welch is the Executive Director of the Mississippi Department of Finance and Administration.  H.B. 1020 § 7 requires the DFA, in conjunction with the AOC, to designate a location for the CCID Court to hold court.  The DFA provides payroll functions for both internal agency operations and programs that have statewide implications, which, on information and belief, will include the payroll functions for the temporary special circuit Court judges of the Seventh Circuit Court District and the CCID Judge.  Defendant Welch is being sued solely in her official capacity.

31.     John/Jane Does 1–4 are the individuals, as yet unknown to Plaintiffs, whom Chief Justice Randolph will appoint as the temporary special judges of the Seventh Circuit Court District under H.B. 1020 § 1 if the current order restricting Defendant Randolph from making those appointments (ECF Nos. 26, 38) is lifted.  The statute requires Defendant Randolph to make the appointments within 15 days of passage, and the Governor signed the bill on April 21, 2023.  When the identities of these John/Jane Does become known, Plaintiffs will substitute their actual names.  So long as John/Jane Does 1-4 have not yet taken the oath of office or otherwise assumed office as temporary special judges of the Seventh Circuit Court District, they are being sued solely in their individual capacities for the purpose of enjoining them from taking the oath of office or otherwise assuming office. If they take the oath of office or otherwise assume office, they will instead be sued solely in their official capacities.

32.     John/Jane Doe 5 is the individual, as yet unknown to Plaintiffs, whom Chief Justice Randolph must appoint as the CCID Judge under H.B. 1020 § 4(2).  When the identity of this John/Jane Doe becomes known, Plaintiffs will substitute his/her actual

name.  So long as John/Jane Doe 5 has not yet taken the oath of office or otherwise assumed office as the CCID Judge, he/she is being sued solely in his/her individual capacity for the purpose of enjoining him/her from taking the oath of office or otherwise assuming office. If John/Jane Doe 5 takes the oath of office or otherwise assumes office, he/she will instead be sued solely in his/her official capacity.

33.    John/Jane Does 6 and 7 are the CCID Prosecutors, who must be appointed by the Attorney General under H.B. 1020 § 5 to serve as prosecuting attorneys for any cause of action within the jurisdiction of the CCID Court.  When the identities of these John/Jane Does become known, Plaintiffs will substitute their actual names.  So long as John/Jane Does 6 and 7 have not yet taken the oath of office or otherwise assumed office as CCID Prosecutors, they are being sued solely in their individual capacities for the purpose of enjoining them from taking the oath of office or otherwise assuming office.  If they take the oath of office or otherwise assume office, they will instead be sued solely in their official capacities.

## JURISDICTION AND VENUE

34.    This action arises under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.  This Court therefore has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

35.    In addition, this Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

36.    Venue is proper in the Southern District of Mississippi because a substantial part of the events giving rise to the claims have occurred or will occur within this District

and because the Mississippi NAACP, Jackson NAACP, all individual Plaintiffs, and at least one Defendant resides in this District. 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

37.     On April 21, 2023, Governor Tate Reeves signed H.B. 1020 and S.B. 2343 into law. The Acts' provisions take effect at different times. Section 1 of H.B. 1020 requires the appointment of four new judges to the Seventh Circuit Court District within 15 days after passage of the Act. Section 8 expands the boundaries of the CCID as of July 1, 2024. Section 9 increases the portion of Jackson's sales taxes that are diverted to the CCID from 6% to 9% starting "[o]n or before August 15, 2023." Unless otherwise specified, the remainder of H.B. 1020 is scheduled to "take effect and be in force from and after July 1, 2023." Sec. 18. S.B. 2343 will go into effect on July 1, 2023. Sec. 2.

38.     Residents of Jackson are no strangers to attempts by the State to diminish their access to the political process and infringe on their fundamental rights. The enactment of H.B. 1020 and S.B. 2343 is the latest chapter in a long history of discriminatory efforts to diminish the City of Jackson's capabilities and resources.

39.     For years, the State has discriminated on the basis of race against Jackson and its majority-Black population. Over the decades, the State has routinely gerrymandered Hinds County so as to deprive Jackson's residents of their full political power. It has denied Jackson access to the federal transportation funds the city merits due to its size and needs; sought to strip the city of control over its municipal airport; and diverted and constrained the city's share of the sales tax revenue collected in Jackson. It has deprived Jackson, its leadership, and its residents of the funds they need to operate

Jackson's water systems, and even considered fully taking control of Jackson's water systems in order to hijack the approximately $800 million that Jackson's Black representative in Congress, Congressman Bennie Thompson, fought to have appropriated for remediating the Jackson water crisis.  *See* Michael Goldberg, *Federal money driving Jackson water bill, DOJ appointee says*, Associated Press (Jan. 25, 2023), https://apnews.com/article/politics-health-us-department-of-justice-mississippi-jackson-09ce15c2f03c6893ca85d755bd176376.

40.   During this legislative session, for example, the State enacted legislation, H.B. 698, which limits Jackson's ability to establish equitable and financially sustainable water billing rates in the manner proposed by the court-appointed Interim Third Party Manager in *United States v. City of Jackson*, Case 3:22-cv-00686-HTW-LGI.  The State has also enacted new provisions targeting Jackson with enhanced scrutiny and reporting regarding the consistency of special sales tax revenue expenditures with sales tax commission priorities.  H.B. 1168.

41.   These efforts to control Jackson's infrastructure, assets, and the rights of its citizens—in a manner unlike that experienced by any other area or citizens of Mississippi—constitute prohibited discriminatory conduct that continues with H.B. 1020 and S.B. 2343.

42.   In keeping with that discriminatory intent, Jackson's majority-Black elected leadership was excluded from significant portions of the political process surrounding H.B. 1020 and S.B. 2343.  For example, neither Jackson's elected leadership nor legislative delegation was consulted before the legislation was introduced.  No member of Jackson's delegation was included in the conference committee that ultimately drafted and approved

S.B. 2343.  And the only Black member of the conference committee that drafted and approved H.B. 1020 was never shown the amended text of the bill; after initially voting in favor of the conference report, that conference member voted against the report.  *See* Michael Wines, *Revised Plan for Justice System in Mississippi Capital Leaves Same Bitter Divide*, N.Y. Times (Apr. 10, 2023), available at https://www.nytimes.com/2023/04/10/us/jackson-mississippi-crime-police.html.

43.     As one of Jackson's elected representatives stated in opposition to these bills, "This has been the most tiring legislative session I've had in the 31 years I've been down here.  It's been also one of the most disappointing sessions that I've had when I look at the kind of toxic legislation that's being directed towards me—and when I say 'me' I mean the people that I represent."  Wicker Perlis, *MS Senate passes HB 1020, as clock ticks for House to do the same before end of session*, Miss. Clarion Ledger (Mar. 30, 2023), available at https://news.yahoo.com/ms-senate-passes-hb-1020-023427548.html.

44.     That "toxic legislation" has now passed.  As enacted, H.B. 1020 and S.B. 2343 radically and unconstitutionally circumscribe the ability of Jackson's singled-out, majority-Black residents to live as full citizens with full rights in their own city.

## I.     S.B. 2343's Expansion of the Jurisdiction of DPS and the Capitol Police Intentionally Discriminates Against Jackson's Majority-Black Residents

45.     S.B. 2343's policing takeover provision violates the Fourteenth Amendment by denying Plaintiffs equal protection of the law.  Prior to the enactment of S.B. 2343, the Capitol Police were responsible for protecting the Capitol Building, State Legislature, and other major State properties in Jackson, and they had jurisdiction over only certain State

properties and the CCID.  The policing takeover provision of S.B. 2343 extends the jurisdiction of the Capitol Police to cover the entire City of Jackson, including residential neighborhoods miles away from the Capitol Complex.  In doing so, it discriminatorily subjects Jackson's residents, including Plaintiffs, to an additional and unaccountable layer of policing.

46.    S.B. 2343's policing takeover provision expands the direct policing power of the DPS by empowering "any person or persons appointed by the Department of Public Safety"—namely, the Capitol Police—to have jurisdiction within the city limits of Jackson. The law creates "primary jurisdiction" for the Capitol Police within the CCID and "concurrent jurisdiction" over the remainder of the entire City of Jackson.

47.    The expansion of this jurisdiction to cover the entirety of Jackson is significantly motivated by the desire to control the majority-Black residents of Jackson and, in turn, deprive these majority-Black residents of the ability to influence the ways in which they are policed. Similarly, the expansion of the CCID brings within it more of the highest priced homes in Jackson, with lines drawn to include Jackson's predominantly white and most affluent neighborhoods in addition to state facilities, so as to divert resources from and not provide support for the rest of the city.

48.    Under the policing takeover provision, the City of Jackson is now subject to policing not only by its municipal police agency and county sheriff's office, but also by a newly extended and empowered State-run police agency.  No other locality in Mississippi has been singled out for a similar law enforcement scheme. Jackson's residents alone are deprived of local, democratic control over the vital governmental function of policing.

49.    Jackson's residents can vote directly for their sheriff and, through electing their mayor, influence the appointment of their police chief.  But they have no such power with respect to the DPS or the Capitol Police. The Chief of the Capitol Police is appointed and supervised by a State official—the Commissioner of the DPS, who is, in turn, appointed and supervised by the Governor of the State of Mississippi.  Jackson's elected mayor, appointed police chief, and the elected Hinds County sheriff are all Black; all three of the State officials tasked with overseeing the Capitol Police are white.

50.    Nothing in the short history of the Capitol Police suggests that that department is equal to the task of protecting the largest city in the state, or that the Capitol Police will do anything other than compound the over-policing of Black Mississippians. Indeed, while H.B. 1020 and S.B. 2343 purport to enhance public safety, they provide no additional tools or resources to the existing City-run police department, crime lab, or correctional institutions.

51.    Instead, the Acts create a separate 911 emergency response system for the CCID—diverting vital resources from the Black-populated and Black-led portions of the City.  H.B. 1020, § 13.  These laws siphon critical sales tax revenues from the City of Jackson to the CCID by expanding the proportion of the sales tax taken from Jackson by half.  H.B. 1020, § 9.  And while these laws purport to supply solutions to public safety challenges facing Jackson, they do not. They were developed without input from Jackson's local elected officials and adopted over the vehement objections of the area's legislative representatives and numerous residents.

52.    S.B. 2343's policing takeover provision works in tandem with the prior restraint provision to ensure that Jackson's residents have limited means of expressing their discontent if they disapprove of the policing they endure. They have almost no ability to elect or change the officials in charge of DPS or the Capitol Police, who are not elected by the residents of Jackson or appointed by the elected leadership of Jackson.  And under the prior restraint provision, they must first receive written approval from these very same officials in order to protest actions by those officials.

53.    This expansion of the jurisdiction of the DPS and the Capitol Police exposes Jackson's residents and *only* Jackson's residents to what amounts to triple policing.  Prior to the enactment of S.B. 2343, these residents were already policed, as many municipalities in Mississippi are, by two local law enforcement agencies—here, the Jackson Police Department ("JPD") and the Hinds County Sheriff's Office ("HCSO").  The JPD patrols the city and is subject to municipal authority.  *See* Miss. Code § 21-21-1.  The HCSO has jurisdiction across Hinds County.  *See* Miss. Code § 19-25-1; 19-25-67.

54.    Unlike HCSO and JPD, the DPS and Capitol Police are effectively unaccountable to those they police.  Jackson's voters make up most of the electorate in Hinds County that elects the Hinds County Sheriff, and they elect the mayor who appoints the chief of the JPD.  As residents of a city that comprises merely 5% of the overall State population, however, they have almost no say in elections or appointments to statewide offices.

55.    Mississippi's racially polarized voting further limits Jackson's residents' ability to affect statewide elections.  Black voters in Jackson vote for different candidates

for statewide office than their white counterparts throughout the State.  Mississippi has not elected a Black official to statewide office since Reconstruction, and statewide officials often do not need to appeal to Black voters in Jackson to get elected.

56.     Unsurprisingly, both the current appointed chief of the JPD and the Hinds County sheriff are Black, but both Defendant Tindell, the appointed Commissioner of the statewide DPS, and Defendant Luckey, whom Defendant Tindell appointed to be the Capitol Police Chief, are white.

57.     Rather than real electoral control, S.B. 2343 establishes only that the Chief of the Capitol Police will call "regular meeting[s] . . . to address the concerns of the public." S.B. 2343, Sec. 1(6)(d).

58.     The lack of accountability of the Capitol Police to Jackson's residents currently extends to specific policing policies.  For example, while the JPD has strict restrictions governing when officers may engage in a car chase, the Capitol Police's vehicle pursuit policies, which are set by the Mississippi DPS, date back to the early 2000s, despite significant changes in policing policy since then.  Bracey Harris & Jon Schuppe, *The Mississippi Capitol Police, under fire for a string of shootings, is rewriting the rules*, NBC News (Mar. 3, 2023) available at https://www.nbcnews.com/news/us-news/mississippi-capitol-police-shootings-use-force-policy-rcna72802.  DPS, however, has resisted public accountability on these policies, providing only a redacted copy of its "pursuit decision matrix," even though it is common practice to provide the public with unredacted copies of the policy.  Martin Kaste, *As state-run police expand into Jackson, some welcome the help. Others see racism*, NPR (Mar. 8, 2023), available at

https://www.npr.org/2023/03/08/1161305763/as-state-run-police-expand-into-jackson-some-welcome-the-help-others-see-racism.

59.   S.B. 2343's expansion of the jurisdiction and policing power of the DPS and the Capitol Police occurs against the backdrop of the over-policing of Black Americans across the country and, in particular, in Mississippi.   On numerous metrics Black Americans are policed harder, more violently, and to a greater degree than any other race in the United States.   *See, e.g.*, Leah Wang, *New data: Police use of force rising for Black, female, and older people; racial bias persists*, Prison Policy Initiative (Dec. 22, 2022), available at https://www.prisonpolicy.org/blog/2022/12/22/policing_survey/.

60.   Black residents in Mississippi have historically been arrested at much higher rates than white residents.   Therese Apel, *Mississippi race, arrest rates examined*, Clarion Ledger   (Nov.   19,   2014),   available   at https://www.clarionledger.com/story/news/2014/11/19/race-arrest-rates-examined/19307959/.   Over one-half of Mississippi's incarcerated population is Black; Black Mississippians are incarcerated at nearly three times the rate of their white counterparts.   *Mississippi   Profile*,   Prison   Policy   Initiative,   available   at https://www.prisonpolicy.org/profiles/MS.html.   Black Mississippians are also one and a half times more likely than their white counterparts to be killed by police. Mapping Police Violence, (updated Jan. 31, 2023), available at https://mappingpoliceviolence.org/.

61.   Amidst these stark racial disparities, the policing takeover provision targets the largest Black population in the State of Mississippi for policing by a force entirely unaccountable to that population.   According to the 2020 Census, Jackson's population is

more than 80% Black, which is the highest percentage of Black residents of any major U.S. city. Across the State, less than 40% of the population is Black; more than 10% of Mississippi's total Black population lives in Jackson alone. But no other jurisdiction, municipality, or county—even those with similar crime rates—is subject to this expanded policing.

62.     As one news report described the effects of the provisions eventually enacted in S.B. 2343, "the legislation would grant currently all-white State officials control over policing in the 82% Black capital city of the 38% Black state." Kayode Crown, *State-Run Capitol Police's Jurisdiction Would Cover All Jackson If Bill Becomes Law*, Miss. Free Press (Feb. 13, 2023), available at https://www.mississippifreepress.org/31048/state-run-capitol-polices-jurisdiction-would-cover-all-jackson-if-bill-becomes-law.

63.     Although the Legislature pointed to Jackson's crime rates in enacting S.B. 2343, there is no reason to believe that the policing takeover provision is actually intended to, or will in any way, helpfully protect Jackson's residents.

64.     Before S.B. 2343, the Capitol Police was a small force with jurisdiction over an area that was limited almost exclusively to the CCID as then constituted, which was comprised of a limited number of State facilities and buildings that made up only around 8% of the city. C.J. LeMaster, *Capitol Police adding patrols, street suppression unit in coming months, chief says*, WLBT3 (July 20, 2022), available at https://www.wlbt.com/2022/07/21/capitol-police-adding-patrols-street-suppression-unit-coming-months-chief-says/. Moreover, that jurisdiction was comprised largely of non-residential office buildings open only during typical office hours.

65.     In fact, the Capitol Police was initially situated within Mississippi's Department of Finance and Administration and was almost exclusively responsible merely for overseeing the operation of security in and around State buildings as well as traffic and parking enforcement in those same areas.  Only in 2021 did the Mississippi legislature transfer the Capitol Police to DPS and expand its jurisdiction across the then-limits of the CCID.  *See* Julian Mills, *Governor's Policing Surge In Jackson May not Prevent Violence, Address Causes*, Mississippi Free Press (Aug. 4, 2021), available at https://www.jacksonfreepress.com/news/2021/aug/04/governors-policing-surge-jackson-may-not-prevent-v/.

66.     Any argument that doubling the Capitol Police's primary geographic jurisdiction from 8.7 to roughly 17.5 square miles and giving that department jurisdiction over Jackson's residential neighborhoods will somehow be advantageous to the Black residents who live nowhere near the Capitol Complex and have little or no contact with it is disingenuous.  Instead, the expansion comes at the cost of providing the funds and programs that Jackson's residents have actually tasked their elected representatives with developing.  In the 2022 session alone, for example, the Legislature refused to pass six different bills aimed at funding various programs for local agencies and diversion efforts in Jackson aimed at preventing crime in the first instance.  *See* Kayode Crown, *Jackson Senators Push for Big Funding for Jails, Police Over Reversing Crime Causes*, Mississippi Free Press (Feb. 7, 2022), available at https://www.mississippifreepress.org/20549/jackson-senators-push-for-big-funding-for-jails-police-over-reversing-crime-causes.

67.     Even exercising the Capitol Police's limited jurisdiction over the Capitol itself and nearby buildings has strained the ability of the Capitol Police—sometimes with devastating consequences for Jackson's Black residents.

68.     In just the last few months, members of the Capitol Police have shot at least four individuals. One victim, a 25-year-old Black father of two, was killed during a routine traffic stop; another, a 49-year-old Black woman, was shot through her apartment wall while she was in bed.  Bracey Harris & Jon Schuppe, *Mississippi wants to expand an aggressive police force responsible for recent shootings* (Feb. 24, 2023), available at https://www.nbcnews.com/news/us-news/mississippi-capitol-police-jackson-shootings-rcna70474.

69.     The Capitol Police has also struggled with the more basic aspects of protecting Jackson's residents—something S.B. 2343 asks them to do much more.  As of the passage of S.B. 2343, the Capitol Police has only one investigator (detective) and has none of the infrastructure traditionally associated with investigating or responding to criminal activity.

70.     The Capitol Police does not have any holding facilities.  Consequently, any uptick in arrests, which proponents of S.B. 2343 cited as a prime benefit in advocating for the bill, will likely only further strain Jackson's pretrial detention facilities.  Kayode Crown, *State-Run Capitol Police's Jurisdiction Would Cover All Jackson If Bill Becomes Law*, Mississippi Free Press (Feb. 13, 2023), available at https://www.mississippifreepress.org/31048/state-run-capitol-polices-jurisdiction-would-cover-all-jackson-if-bill-becomes-law.

71.     Of note, JPD officers are subject to the June 26, 2020 Mayoral Executive Order Amending the City of Jackson Police Department's Use of Force Policy.   The Executive Order, which was issued by the duly-elected mayor of Jackson to be "transparent" with the residents of Jackson, noted that "police officers nationwide have shot and/or killed by other means (i.e. chokeholds) nearly 1,000 people annually since 2015" and that African Americans are killed by police officers at more than twice the rate of white Americans."   Consequently, the Executive Order amends the City of Jackson Police Department's use of force policies and procedures to:

1. Require sworn officers with the Jackson Police Department ("officers") to de-escalate situations, where possible, by communicating with subjects, maintaining distance, and otherwise eliminating the need to use force; and

2. Ban the use of chokeholds, strangleholds, hogtying, knee on neck, or any other use of force that limits a person's ability to breathe, preventing the unnecessary death or serious injury of community members; and

3. Require officers to intervene and stop excessive force used by other officers and report these incidents immediately to a supervisor; and

4. Restrict officers from shooting at moving vehicles, a particularly dangerous and ineffective tactic; and

5. Develop a Use of Force Continuum that limits the types of force that can be used to respond to specific types of resistance; and

6. Require officers to exhaust all other reasonable means before resorting to deadly force; and

7. Require officers to give verbal warnings before shooting at a person unless there are extenuating circumstances where giving a verbal warning is impossible; and

8. Require comprehensive reporting where officers have to report each time they use force or threaten to use force.

*See* Mayoral Executive Order Amending the City of Jackson's Use of Force Policy

(June 19, 2020), available at

https://storage.googleapis.com/proudcity/jacksonms/uploads/2020/06/AMENDED-

USE-OF-FORCE-POLICY.pdf

72.     By contrast, the Capitol Police have failed to establish basic modern policing

policies.  As noted, the Capitol Police's vehicle pursuit policy is out of date.  Capitol Police

officers have reportedly shot at fleeing cars, a widely disparaged form of policing because

of its potential to injure bystanders that is prohibited by the City of Jackson Police

Department under Executive Order of Jackson's Mayor.  *See* Mayoral Executive Order

Amending the City of Jackson's Use of Force Policy, *supra*, ¶ 4; Simon Seiver, *Cops*

*Shooting at Cars: A Really Bad Idea*, The Marshall Project (June 10, 2015) available at

https://www.themarshallproject.org/2015/06/10/cops-shooting-at-cars-a-really-bad-idea.

73.     Moreover, on information and belief, the existing use of force policy appears

to allow "lateral vascular neck restraint[s]"—otherwise known as chokeholds.  Bracey

Harris & John Schuppe, *The Mississippi Capitol Police, under fire for a string of shootings,*

*is    rewriting    the    rules*,    NBC    News    (Mar.    3,    2023),    available    at

https://www.nbcnews.com/news/us-news/mississippi-capitol-police-shootings-use-force-

policy-rcna72802.  Because of redactions to the portions of the policy that the Capitol

Police has released, it is impossible to tell when or how Capitol Police officers can use

chokeholds, *see id.*, but discovery will resolve this ambiguity.

74.     Chokeholds are banned by most police departments—including Jackson's, pursuant to the Mayor of Jackson's Executive Order.  *See* Mayoral Executive Order Amending the City of Jackson's Use of Force Policy, *supra*, ¶ 2.

75.     Because the white-run Capitol Police are free to engage in tactics—like shooting at fleeing cars and possibly chokeholds—that are forbidden to the Jackson Police, Jackson's majority-Black residents are subject not only to multiple law enforcement agencies, but may also face different consequences, including different uses of force, depending on whether it is the Capitol Police or the JPD that stops them.  And whether they are stopped at all may depend on which agency happens to be on site.

76.     Furthermore, although the Capitol Police has been given the power to arrest Black residents throughout the city, it lacks the resources to capably respond to emergencies or thoroughly investigate crimes.

77.     As Defendant Luckey acknowledged with respect to even the Capitol Police's previously more limited jurisdiction, "[h]istorically, the function of state law enforcement is not to be the primary response agency in the area. You know, we're in uncharted territory.  It's not a common circumstance that you have state agency like this, which has concurrent jurisdiction in the city for 8.7 square miles of the city." *Capitol Police adding patrols, street suppression unit in coming months, chief says*, WLBT (July 20, 2022), available at https://www.wlbt.com/2022/07/21/capitol-police-adding-patrols-street-suppression-unit-coming-months-chief-says/.

78.     S.B. 2343 has made this uncommon circumstance only more unworkable. The statute expands the CCID, where the Capitol Police exercise primary jurisdiction, from

8.7 to roughly 17.5 square miles, and it gives the Capitol Police concurrent jurisdiction over the rest of Jackson.  The policing system it establishes is fundamentally at odds with the structure of law enforcement elsewhere in Mississippi.  No other city in Mississippi is subject to a local police force whose leadership is appointed by officials who are not locally elected and therefore are not locally accountable, and whose residents are subject to this unequal and discriminatory treatment.

79.     S.B. 2343's policing takeover provision is not only an outlier in Mississippi, but also in the region.  Many nearby states have capitol police forces.  But none have forces with as expansive a jurisdiction or purpose as Mississippi's.  The Louisiana capitol security force, for example, is limited to "the areas within the state capitol complex."  La. R.S. § 24:682.  Texas' capitol police are restricted "to the capitol complex."  Tex. Gov't. Code § 411.061–.062.  The Texas capitol police may enter into an agreement with the Austin police to engage in law enforcement activity outside their jurisdiction, but that activity is limited to traffic and parking enforcement. The Arkansas equivalent is restricted to the area "in and around the State Capitol." Ark. Code § 12-14 101 (a), (c).

80.     At most, Alabama's capitol police can exercise their authority throughout the State incidental to their purpose of protecting "the Capitol and all state buildings occupied by the state departments and agencies within the State of Alabama" and may serve as peace officers across Alabama.  *See* Ala. Code § 32-2-100 (a), (d).

81.     These states' capitol police are limited forces generally meant to serve the specific function of providing police services for the State Capitol and government buildings.  The Capitol Police, however, will now operate as a highly unusual third local

29

law enforcement arm across the entire City of Jackson.  Although unprecedented as a law enforcement effort, the expansion of the Capitol Police is entirely in keeping with broader discriminatory efforts by the Legislature to strip Jackson's residents of their power and resources and deprive them of the equal protection of the laws.  The policing takeover provision embodies the false and racist notion that safety in Jackson cannot possibly be achieved by a police force responsible for, and accountable to, the people of Jackson, but only by a wholly different, State-run, white-run institution that operates outside the control of the majority-Black population.

82.    The lack of any electoral accountability is particularly pronounced when combined with S.B. 2343's unconstitutionally vague prior restraint provision.  Almost any effort to use protests or demonstrations to challenge the Capitol Police will require the approval of the very same unelected officials tasked with running the Capitol Police—the Commissioner of DPS, Defendant Tindell, and the Chief of the Capitol Police, Defendant Luckey.  Put bluntly, S.B. 2343 effectively provides that the Black residents and leaders of Jackson cannot engage in political expression unless white officials give their permission.

83.    The Equal Protection Clause of the Fourteenth Amendment guarantees that those who are similarly situated not be discriminated against on account of their race.  The expansion of the jurisdiction of the Capitol Police, however, does just that.

84.    S.B. 2343 singles out for disparate treatment the residents of a large city whose population is more than 80% Black.  These residents, unlike the residents of any other municipality in Mississippi, are targeted for a new layer of unaccountable policing.  That singling out disproportionately burdens Jackson's predominantly Black residents,

including Plaintiffs in this case.  And there is no basis to expect this expansion to achieve any of its purported goals other than further burdening this community; the Capitol Police have not demonstrated any ability to protect or be accountable to Jackson's residents, and the new reach of the Capitol Police is unprecedented in Mississippi and neighboring states. In other words, even among states with long and ugly histories of racial discrimination, none has recently dared to do what S.B. 2343 does.  In fact, the only recent analogues to this expansion come from Mississippi's longstanding pattern of stripping power and control from Jackson's majority-Black residents.

## II.   H.B. 1020's takeover of the judicial system in Jackson deprives residents of the Equal Protection of Laws.

85.    The unlawfulness of S.B. 2343's policing takeover provision is compounded by H.B. 1020's judicial takeover provision, which supplants the long-established system of judges who are locally elected or appointed by locally elected bodies and who are residents of the jurisdiction where they preside.  On top of the policing takeover provision, this takeover of the Hinds County courts further deprives majority-Black Jackson residents of any political control over their police, prosecutors, and judges.  No other municipality or county in the state faces these deprivations.  This special and discriminatory treatment of Jackson's residents violates their rights to the Equal Protection of the laws.  And like the expansion of the DPS and Capitol Police, the judicial takeover provisions' singling out of Jackson is significantly motivated by race—that is, the desire to deprive the majority-Black residents of Jackson of the political representation to which they are entitled.

86.     Before H.B. 1020, all Mississippi residents enjoyed a court system that was defined by its accountability to local voters.  The Mississippi Constitution creates two types of courts of general jurisdiction: (1) Circuit Courts, which have original jurisdiction over civil and criminal matters that are not vested in another court, and appellate jurisdiction over cases originating in County, Justice, and Municipal Courts and administrative agencies; and (2) Chancery Courts, which have jurisdiction over family matters and other causes in equity.  *See* Miss. Const. art. 6, §§ 156, 159–60; *see also About the Courts*, State of Mississippi Judiciary, https://courts.ms.gov/aboutcourts/aboutthecourts.php.  Under the Mississippi Constitution, Circuit Court and Chancery Court judges "shall be elected by the people" and "shall hold their office for a term of four years."  Miss. Const. art. 6, § 153. Mississippi law further requires that Circuit Court and Chancery Court judges "shall be a resident of the district" in which they serve and "shall be elected for and from" their local districts. Miss. Code §§ 9-5-1, 9-7-1.

87.     To regulate the size of the Circuit Courts and Chancery Courts, the Mississippi Constitution requires that "[t]he Legislature shall, by statute, establish certain criteria by which the number of judges in each district shall be determined, such criteria to be based on population, the number of cases filed and other appropriate data." Miss. Const. art. 6, § 152.  Accordingly, Mississippi law establishes that "[t]he number of judges in each circuit court district shall be determined" based on "[t]he population of the district; [t]he number of cases filed in the district; [t]he case load of each judge in the district; [t]he geographic area of the district; [a]n analysis of the needs of the district by the court personnel of the district; and [a]ny other appropriate criteria." Miss. Code § 9-7-3(3).  That

32

law assigns to the Judicial College of the University of Mississippi Law Center and the Administrative Office of Courts responsibility for determining the appropriate data to be collected "as a basis for applying the above criteria." *Id.* § 9-7-3(3).

88.     The Seventh Circuit Judicial District encompasses Hinds County. Miss. Code § 9-7-23(1). Over 70% of Hinds County's residents are Black, and a majority live in Jackson. *Compare QuickFacts: Jackson City, Mississippi*, U.S. Census Bureau, https://www.census.gov/quickfacts/jacksoncitymississippi, *with QuickFacts: Hinds County, Mississippi*, U.S. Census Bureau, https://www.census.gov/quickfacts/hindscountymississippi. Within the Seventh Circuit Judicial District, there are four subdistricts, Miss. Code § 9-7-23(2), each of which encompasses part of the City of Jackson and is majority-Black. *See Hinds Circuit Court Subdistricts*, Central Mississippi Planning and Development District, https://cmpdd.org/hinds-circuit-court-subdistricts/. The Seventh Circuit has four permanent judges, with one elected from each subdistrict. Miss. Code § 9-7-25(1). Reflecting Mississippi's racially polarized voting, all four elected Seventh Circuit judges, like most of their constituents, are Black. The Mississippi court system also has inferior courts of limited jurisdiction, including Municipal Courts, that are likewise responsive to their local communities. Jackson's municipal judges, like others in the State with a population of over 10,000, are appointed by the municipality's governing body and must be "a qualified elector of the county in which the municipality is located." Miss. Code § 21-23-3; *see also About the Courts*, State of Mississippi Judiciary, https://courts.ms.gov/aboutcourts/aboutthecourts.php.

89.   H.B. 1020 dramatically departs from these norms.

### *The Circuit Court*

90.   First, the statute doubles the size of the Hinds County Circuit Court and packs it with State-appointed judges.  Section 1 commands the Chief Justice of the Mississippi Supreme Court to appoint four temporary special circuit judges for Hinds County's Seventh Circuit Court District—Defendants John/Jane Does 1–4.

91.   Pre-existing law allowed the Chief Justice "to appoint a special judge to serve on a temporary basis in a circuit . . . court in the event of an emergency or overcrowded docket." Miss. Code § 9-1-105(2).  In August 2020, the Chief Justice invoked this authority to appoint four temporary judges to the Seventh Circuit to help with the "backlog of cases that have resulted from delays caused by COVID-19" for five months.  *See Four special judges appointed to assist Hinds Circuit Court*, State of Mississippi Judiciary (Aug. 4, 2020), https://courts.ms.gov/news/2020/08.04.20%20Hinds%20Circuit%20appointment.php.  In September 2022, the Chief Justice again invoked this authority and appointed four temporary judges to help "reduc[e] the number of pending cases caused by the pandemic," though the term of the judges' appointments was not made public.  *See Four special judges appointed to assist Hinds Circuit Courts*, State of Mississippi Judiciary (Sept. 22, 2022), https://courts.ms.gov/news/2022/09.22.22%20Hinds%20Circuit%20special%20judges%20appointed.php.

92.   Without identifying an "emergency or overcrowded docket," H.B. 1020 instructs the Chief Justice to appoint, no later than 15 days after passage, four temporary

special circuit judges to the Seventh Circuit to serve until December 31, 2026—well beyond any reasonable expectation of a backlog "caused by the pandemic." H.B. 1020 even authorizes the Chief Justice to "reappoint" the temporary judges who have been serving since September 2022, thus ignoring the Mississippi Constitution's requirement that circuit judges "shall be elected" and "shall hold their office for a term of four years." Miss. Const. art. 6, § 153.

93.     Although Miss. Code §§ 9-7-3 & -4 require the that "the number of judges in each circuit court shall be determined by the Legislature based upon" specific metrics, with the assistance of the Judicial College of the University Law Center and the Administrative Office of Court, H.B. 1020 does not attempt to justify appointment of four temporary special circuit judges. Indeed, in a classic example of closing the barn door after the horse has escaped, H.B. 1020 itself calls for the *post hoc* generation of case load and case disposition data ***after*** these four appointments are made in order to consider whether to add just ***one*** permanent elected judge. Sec. 12.

94.     The Circuit Court judicial appointment provisions in H.B. 1020 come in the context of a long-established history of discriminatory Circuit Court elector structures in Mississippi. *See, e.g.*, *Martin v. Mabus*, 700 F. Supp. 327 (S.D. Miss. 1988). And they undermine the well-established practice of predominantly Black voters electing Black judges for these positions.

### *The CCID Court*

95.     Second, H.B. 1020 further undermines the local political accountability of Jackson's judiciary by establishing a new court for the CCID.

96.     Section 4 requires the Chief Justice of the Mississippi Supreme Court to appoint a judge to this court—Defendant John/Jane Doe 5—for a term from January 1, 2024 to July 1, 2027, which is likewise well beyond any reasonable expectation of a backlog "caused by the pandemic."  The statute requires the DFA in conjunction with the AOC to designate a location for the CCID Court to hold court.  Unlike Municipal Court judges in Jackson and other municipalities with a population of 10,000 or more, *see* Miss. Code § 21-23-3, the CCID Judge is not appointed by the governing authorities of the municipality, nor is the CCID Judge required to be "a qualified elector in the county where the municipality is located," *id*., but only "a qualified elector of this state." H.B. 1020, Sec. 4(2).

97.     The CCID Court is granted the same jurisdiction as the Jackson Municipal Court over preliminary matters, criminal matters, violations of motor vehicle and traffic laws, and disturbances of the peace that accrue or occur, in whole or in part, within the boundaries of the CCID.  Sec. 4(1)(a).  The upshot of this provision is that the State-appointed CCID Judge will set the terms of bail and release for any Jackson residents unfortunate enough to have charges filed in the CCID Court rather than the Jackson Municipal Court.  According to the most recent data available, the duration of pre-trial detention in Hinds County has been trending downward.  *See December 2021 - Trending number of inmates and days held*, MacArthur Justice Center, https://www.msjaildata.com/data/202112-december-2021/trending-inmates-days-held/. The CCID Court threatens to reverse this trend by taking pre-trial detention decisions out of the hands of locally accountable judges.  Instead, those pre-trial detention decisions will

36

be made by a judge appointed by the Chief Justice of the Mississippi Supreme Court, who is white and was appointed by a white Governor.

98. The CCID Court also has powers that no other Municipal Courts have. Unlike Municipal Court convictions, for example, convictions in the CCID Court—even for misdemeanor offenses—can subject a defendant to a prison term in a Mississippi Department of Corrections facility rather than a city or county jail. Sec. 4(1)(b). That facility, the Central Mississippi Correctional Facility, is currently the subject of a U.S. Department of Justice investigation into dangerous and substandard conditions of confinement. Wines, *Revised Plan for Justice System in Mississippi Capital Leaves Same Bitter Divide*, *supra*.

### The CCID Prosecutors

99. Third, H.B. 1020 usurps Jackson residents' political influence over their local prosecutors by establishing two prosecuting attorney positions for any cause of action within the jurisdiction of the CCID Court. Under Section 5, the CCID Prosecutors (Defendants John/Jane Does 6 and 7) are to be appointed by the Mississippi Attorney General and serve through July 1, 2027.

100. This section also sets up a system of vast discretion in determining in which court criminal cases are filed, supplanting the role of existing Circuit Court judges within the CCID. The law states that the newly appointed prosecuting attorneys "shall prosecute cases in the court provided for the CCID inferior court *and also in the same manner and with the same* authority of law provided for district attorneys and county prosecuting attorneys *by filing an indictment or any other criminal action that accrues, in whole or*

*in part, in the CCID*." Sec. 5(1) (emphasis added). This provision allows a CCID prosecutor to bring charges for any criminal matter in the CCID Court. This provision presents the opportunity for abusive forum shopping that will supplant the existing Circuit Courts, particularly when paired with S.B. 2343's authorization that "[t]he Department of Public Safety may choose to present cases to either the District Attorney or the prosecuting attorneys designated by the Attorney General *for prosecution of any violation of law* that accrues or occurs, in whole or in part, within the boundaries [of the CCID]." Sec. 1(6)(a) (emphasis added).

101. The lead-up to the enactment of this legislation also demonstrates repeated instances of recent racial discrimination against Jackson and its citizens by the State government. The insidious trope that Black-led Jackson is incapable of governing itself, or simply should not be allowed to govern itself, is a common thread animating activities ranging from the attempted takeover of the City's airport, of its drinking water system— and now of its courts, police, and prosecutors.

102. This theme was sounded in 2015, for example, when a Mississippi State legislator opposed a statewide ballot initiative which would have allowed individuals to sue if the State fails to provide an adequate and efficient system of free public schools, because it would allow "a judge in Hinds County, Mississippi, predominantly Black—it's going to be a Black judge—they're going to tell us where the state education money goes." Comments of Representative Lester "Bubba" Carpenter on Initiative 42 (Oct. 19, 2015).

103. That discriminatory motivation was sounded again during consideration of H.B. 1020, when the bill's sponsor, Trey Lamar (R-Senatobia) suggested that others

(presumably white Mississippians) know better than Jackson's predominantly Black residents about how to administer their city.  Representative Lamar remarked, "If we're going to make an additional court in the city of Jackson, do we not want our best and brightest sitting in judgment, whether that may come from Holmes County or Madison County or wherever they may be?  Why would we limit the talent pool to here?"  Trey Lamar, *MS House Floor - 7 February, 2023; 10:00 AM*, YouTube (Feb. 7, 2023), https://www.youtube.com/live/HtruSFI0avs?feature=share&t=24394.

104.    As with the appointment of temporary Circuit Court judges, the creation of the new CCID Court singles out Jackson for the creation of a substitute judicial system that predominantly white cities in Mississippi are not subject to.  Nor did the Mississippi Legislature, in enacting the law, consider comparative differential caseload or case resolution time data to support any contention that Jackson's courts are overloaded or unable to meet current needs as currently constituted and as compared to other jurisdictions.  Indeed, recent reporting indicates that comparative data on courts' pending criminal cases does not exist.  *See* Mina Corpuz, *Does a backlog in Hinds County courts justify appointing five judges? Other counties could be far worse*, Mississippi Today (Mar. 6, 2023), available at https://mississippitoday.org/2023/03/06/hinds-county-court-backlog-docket/.

105.    Chief Justice Randolph has previously advocated for the greater use of unelected judges in Hinds County. In 2022, for example, the Chief Justice testified before a Mississippi House Committee to request funding for additional temporary judges in Hinds County. Rather than expand the existing Seventh Circuit and its elected judges, Chief

Justice Randolph sought to have the ability to appoint judges who would resolve cases in Hinds County. Michael Randolph, *Judiciary B - Room 113 - 10 October, 2022; 9:00 AM*, YouTube (Oct. 10, 2021), https://www.youtube.com/watch?v=qc6fTrAwW4E.

106.   In contrast to the Chief Justice's preference for unelected judges in Hinds County, the Circuit Judges of the Seventh Judicial District, the Judges of the Hinds County Court, and the Justice Court Judges of Hinds County objected in vain to the creation of a substitute unelected court and prosecutors. Those jurists noted that the new law "takes the constitutional power of elected judges and gives it to Judges appointed by the Supreme Court."

107.   The creation of the unelected CCID Court deprives Jackson's Black residents of their political autonomy and democratic representation.  Citizens throughout Mississippi have the right to have their legal cases adjudicated before judges whom they have elected or their local representatives have chosen, and to vote for their community's prosecutors as well; but that is no longer the case for Jackson's residents under H.B. 1020.  Instead, unlike any other Mississippian, they will be subject to an expansive new court that is neither elected by them nor accountable to their democratic institutions, and which does not serve their interests.

## III.   S.B. 2343's Permitting Regime Creates an Unconstitutionally Vague and Overbroad Prior Restraint

108.   Finally, S.B. 2343's prior restraint provision imposes a state-controlled permitting system across Jackson that will gravely interfere with Jackson's residents' ability to exercise their First Amendment rights.

109.   Through its ordinances, the City of Jackson has an already-established extensive permitting regime that applies to certain types of public events held across the city.  *See* Jackson, Miss., Code of Ordinances Ch. 14, §§ 176–95.  Although the potential for abuse is always present, this ordinance has, for the most part, provided an onerous but workable approach.  *See, e.g.*, *id.* § 14-178 (confining permit requirements to limited set of events); *id.* § 14-184 (providing only limited reasons for why approval committee may deny permit).  So too has the State's preexisting regime prohibiting demonstrations that inhibit access to public property state-wide.  *See* Miss. Code § 97-7-63.

110.   Unlike Jackson's existing permitting regime, S.B. 2343's prior restraint provision has no regard for the First Amendment and its protections for the right to speak, assemble, associate, and petition freely.  It instead delegates all responsibility for creating a valid permitting regime to DPS, in terms so vague, broad, and standard-less that it suppresses and chills Plaintiffs' right to free expression.

### A.    The Prior Restraint Provision, as Enacted, Regulates a Vast Amount of Activity at an Indeterminate Set of Sites

111.   Under the prior restraint provision, the Chief of the Capitol Police or the Commissioner of DPS must provide "written approval" before "any event occurs which will take place on any street or sidewalk immediately adjacent to any building or property owned or occupied by any official, agency, board, commission, office or other entity of the State of Mississippi, or which can reasonably be expected to block, impede or otherwise hinder ingress thereto and/or egress therefrom."  S.B. 2343, Sec. 1(6)(c).  That section also

requires that DPS "shall promulgate rules and regulations to effectuate the provisions of this paragraph."

112.    By its terms, the provision is both vague and overly broad.  The provision leaves it to DPS's discretion whether and how to define what qualifies as an "event" that will require written approval, and it provides no criteria by which DPS is supposed to exercise this discretion.

113.    The only clarity provided by the text of the prior restraint provision is that the provision reaches broadly. It refers to "*any* event"—not, for example, "major events," as related statutory provisions do. *See* Miss. Code § 29-5-217 (establishing that "[t]he City of Jackson shall provide police coverage for major events conducted within the district").

114.    Further, the provision is not even limited to locations around State buildings in the vicinity of the State Capitol.  Instead, S.B. 2343's prior restraint provision covers "any building or property owned or occupied by any official, agency, board, commission, office or other entity of the State of Mississippi," again leaving it to DPS to provide much-needed clarity regarding how members of the public are supposed to know whether a non-government building happens to be "owned or occupied" by a State official.  By extending the reach of the prior restraint provision to a variable set of places "owned or occupied by any state officials," the statute's terms authorize DPS to control what speech State officials hear.  Sec. 1(6)(c).

115.    Moreover, the provision does not specify how it interacts with Jackson's existing permitting regime. Because Jackson's permitting regime overlaps with that of the prior restraint provision, an event organizer will need permits for the same event from both

Jackson and DPS or the Chief of the Capitol Police; because of the discretion afforded to the State officials, a permit might be granted by Jackson but not by the State officials.

116.   S.B. 2343 does make clear, however, that DPS and the Capitol Police—headed by the same officials empowered to approve events—will be tasked with enforcing violations of the prior restraint provision: S.B. 2343 specifically charges these agencies with making arrests for any violations of "ordinances related to the disturbance of the public peace."

### B.   The Prior Restraint Provision, as Enacted, Provides Officials with Unbounded Discretion

117.   The prior restraint provision's vast breadth is coupled with a glaring set of omissions.  The provision's text provides no criteria against which proposed events must be evaluated; no process under which an adverse determination must be set forth and explained; and no process for an adverse determination to be appealed.

118.   This provision threatens to be precisely the type of statutory delegation that "time-tested knowledge" has shown "plac[es] unbridled discretion in the hands of a government official or agency" and therefore "constitutes a prior restraint and may result in censorship."  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

119.   To start, the provision gives DPS unlimited discretion to come up with content-neutral criteria—such as number of persons present, time of day, duration, or audible volume—that could lead either the Commissioner or the Chief to deny approval for an event.

120.   By contrast, the City of Jackson's current permitting regime—and others like it—establish that city officials may deny a permit only in narrowly circumscribed circumstances.  *See* Jackson Code of Ordinances, Sec. 14-184(a)(1) (allowing city officials to deny a permit if, for example, a permit application "is found to be false in any material detail").

121.   Indeed, the Senate ***voted down*** an amendment that would have at least required that approvals not be unreasonably withheld.  *See* Mississippi Legislature, *Judiciary A - Room 216, 23 Feb., 2023; 3:00 P.M.*, at 1:03:18–05:05, YouTube (Feb. 23, 2023), https://www.youtube.com/live/vj6QKjsksB8?feature=share&t=3798.

122.   Further, the provision leaves it to DPS to establish a timeline for how quickly applications must be adjudicated, allowing DPS to set lengthy deadlines or delay approval to such an extent that events become impracticable or irrelevant.

123.   The provision also lets DPS decide whether the Commissioner or the Chief of Capitol Police must provide a written explanation of the grounds for denying an event application.  Absent DPS's issuance of self-limiting rules and regulations, there is no way to guarantee that an applicant will be able to discern what formed the basis for the denial of an event application or be able to seek meaningful judicial review of such a decision.

124.   Should Plaintiffs or others be denied approval for an event, there is no requirement in the statute that they be allowed to appeal that denial—or any guidelines for how or to whom they might appeal.  *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 562 (1975).

125.    To be sure, S.B. 2343 requires DPS to "promulgate rules and regulations to effectuate" the prior restraint provision.  But this broad command does not specify what rules and regulations are required and in no way limits the discretion of the Department. As the Supreme Court has held, "the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969); *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (concluding that a permitting regime "may not delegate overly broad licensing discretion to a government official").

126.    Until those "effectuating" regulations are issued, the prior restraint provision suppresses and chills Plaintiffs' exercise of their First Amendment rights.  Even then, unless DPS promulgates rules and regulations to significantly limit their authority—a rare sacrifice for any bureaucracy to voluntarily make—Plaintiffs will have no certainty about what activity might require approval, why approval might be denied, or how to challenge such standard-less determinations, nor any protection from prohibitions on activities that are imposed purely based of the content of the views expressed.

## C.    As Enacted, the Prior Restraint Provision Will Suppress and Chill First Amendment Activity

127.    By its terms, S.B. 2343's prior restraint provision can be used to deny permission to hold an "event" due to the content of that event.  Plaintiffs and others like them are also at peril that they will unknowingly fail to get permission, because they do not know what DPS will decide qualifies as an "event" or what areas DPS believes will be covered by the statute.  Unless these critical ambiguities are resolved to avoid

unconstitutionality, Plaintiffs will be forced to decline to engage in the core associational and speech activities protected under the First Amendment after the law's July 1, 2023 effective date.   Specifically, Plaintiffs will be deterred from organizing or attending marches, protests, demonstrations, and public gatherings and from associating with other members of the NAACP or other civil rights organizations in such activities because the risk of doing so will run afoul of S.B. 2343.

128.   Rather than risk violating the law pending the results of DPS's rulemaking activities, the organizational Plaintiffs' members and other Jackson citizens may find it safer to avoid the provision altogether and not plan or organize "any events" for July 1, 2023, and thereafter that might be covered by the provision.

129.   A statute that exerts such an intimidating influence on the exercise of free speech violates the First Amendment rights of Plaintiffs and others, because it precludes them from organizing or participating in the type of activities that are fundamental to Plaintiffs' ability to speak, assemble, associate, freely express themselves, and petition their government.

130.   The text of the prior restraint provision proscribes protected First Amendment activity in which Plaintiffs and others like them regularly engage.   For example, the NAACP, the Mississippi NAACP, and the Jackson NAACP routinely use marches, parades, and all manner of public gatherings in Jackson to educate the public, seek to influence lawmakers, and petition the government.   These events often draw large crowds and occupy both sidewalks and roadways with participants chanting, singing, yelling and carrying signs and banners.

131.    Similarly, Mr. Johnson, Ms. Lambright-Haynes, Mr. Figgers, Mr. Pittman, Mr. Jones, and Mr. Taylor all frequently engage in these events and in an array of public activity across Jackson—and especially around the Mississippi State Capitol given its importance as a public forum for protected speech—that are designed to use their voices to influence governmental actors and public opinion.  They march, protest, and gather together for news conferences, sit-ins, and educational opportunities—all events that will be suppressed and deterred by the new law's requirements.

132.    As recently as February 21, 2023, for example, members and leaders of the NAACP, including Mr. Pittman and Mr. Taylor, stood on the steps of the Mississippi Capitol to protest the initial versions of H.B. 1020 and S.B. 2343.  They were joined by hundreds of others and used their protected speech to attempt to exert influence over the legislative process, as is squarely within their First Amendment rights.

133.    On its face, S.B. 2343 leaves the NAACP and its members with no way of knowing whether their rally was an "event," or what standard they will have to meet to ensure that such an application would be approved under S.B. 2343's prior restraint provision.

134.    Unless DPS issues valid regulations that substantially limit its own authority under the statute, its officials will be empowered to refuse to issue written authorization on the basis of their views of Plaintiffs' message, the speaker, or the event attendees.

135.    To avoid the provision, particularly during a potentially lengthy DPS rulemaking process—the results of which Plaintiffs will challenge if the rules and regulations fail to remedy the provision's constitutional defects—Plaintiff and others may

be required to "restrict[] their conduct to that which is unquestionably safe." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). But, because the regime established by S.B. 2343 is so broadly defined, covers such a wide range of potential conduct, and lacks any clear evaluative standards without regulatory narrowing, Plaintiffs cannot restrict their conduct so as to be "unquestionably safe" at locations in proximity to any buildings or properties that are owned or occupied by any State entity or official. Under the prior restraint provision, the only "unquestionably safe" activity at such locations is ***no*** activity.

## CLAIMS FOR RELIEF

### COUNT I

*42 U.S.C. § 1983*

***S.B. 2343's policing takeover provision intentionally discriminates against the majority-Black residents of Jackson on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution***

**(Defendants Sean Tindell and Bo Luckey)**

136.    Plaintiffs restate and incorporate all foregoing paragraphs of this Complaint as though fully set forth herein.

137.    The Equal Protection Clause of the Fourteenth Amendment prohibits the State of Mississippi from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

138.    S.B. 2343 singles out the predominantly Black population of Jackson for policing in an unprecedented, unaccountable, and overly intrusive manner under the expanded authority of DPS and the Capitol Police.

139.    S.B. 2343 takes democratic control away from Jackson's residents and Jackson's Black-elected officials, exposing them to a State-appointed police force that has already proven itself unable to safely and fairly serve Jackson's predominantly Black population.  The law does this by creating "primary jurisdiction" for the Capitol Police within the CCID and "concurrent jurisdiction" over the remainder of the entire City of Jackson.

140.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case.  A failure to enjoin Defendants Tindell and Luckey from exercising the expanded jurisdiction of the Capitol Police will immediately irreparably harm Plaintiffs and the more than 100,000 Black residents of Jackson who will be subjected to disparate policing because of their race.

## COUNT II

### *42 U.S.C. § 1983*

### *H.B. 1020's packing of the Hinds County Circuit Court intentionally discriminates against the majority-Black residents of Jackson on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution*

### (Defendants Chief Justice Michael K. Randolph,

### Greg Snowden, Liz Welch, and John/Jane Does 1–4)

141.    Plaintiffs restate and incorporate all foregoing paragraphs of this Complaint as though fully set forth herein.

142.    The Equal Protection Clause of the Fourteenth Amendment prohibits the State of Mississippi from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

143.    H.B. 1020 deprives and disenfranchises the predominantly Black population of Jackson of the rights accorded to every other Mississippi resident to elect their Circuit Court judges.  While there is no federal right to elected judges, there is a federal equal protection right for Black residents to be treated like white residents when a state makes elected judges available.

144.    By first considering an offer from the Chief Justice to accept an appointment pursuant to H.B. 1020 and then by accepting the offer, John/Jane Does 1-4 will be willful participants in the H.B. 1020's plan to place appointed judges on the Hinds County Circuit Court, and they may be sued under 42 U.S.C. § 1983 to prevent them from accepting the appointments as temporary special judges of that court, taking the oath of that office, or otherwise assuming office.

145.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case.  A failure to enjoin Defendant Chief Justice Randolph from appointing the temporary special judges to the Hinds County Circuit Court—or, alternatively, to enjoin Defendant Does 1–4 from accepting the appointments as temporary special judges of that court, taking the oath of that office, or otherwise assuming that office—will immediately irreparably harm Plaintiffs and the more than 100,000 Black residents of Jackson who will be denied political representation and the benefits thereof that are afforded to all other residents of the State.

146.    If Defendant Randolph nonetheless appoints Defendant Does 1–4 to the Hinds County Circuit Court and they begin to perform the functions of appointed temporary special judges, Plaintiffs' irreparable harm will be ongoing every day they remain in office but can be abated in part by an order enjoining Defendants Randolph, Snowden, and Welch from taking any actions with respect to those judges or their offices, such as compensating Defendant Does 1–4.  Additionally, Plaintiffs' ongoing irreparable harm can be avoided by an order enjoining Defendant Does 1–4 from exercising the powers and performing the duties of Hinds County Circuit Court judges in the event that (1) the Court issues a prospective declaratory decree that temporary special circuit court judges appointed pursuant to H.B. 1020 § 1 violate the Equal Protection Clause, and (2) that decree is violated.

## COUNT III

### 42 U.S.C. § 1983

### H.B. 1020's creation of the CCID Court intentionally discriminates against the majority-Black residents of Jackson on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution

### (Defendants Chief Justice Michael K. Randolph,

### Greg Snowden, Liz Welch, and John/Jane Doe 5)

147.    Plaintiffs restate and incorporate all foregoing paragraphs of this Complaint as though fully set forth herein.

148.   The Equal Protection Clause of the Fourteenth Amendment prohibits the State of Mississippi from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

149.   H.B. 1020 singles out the predominantly Black population of Jackson for prosecution in a second-class criminal justice system, in which a politically unaccountable judge sets the terms of bail and release and can sentence misdemeanants to jail time in a State prison.

150.   H.B. 1020 deprives and disenfranchises the predominantly Black population of Jackson of the rights accorded to every other Mississippi resident to have their local governing authorities select the judges who exercise the powers of a Municipal Court. While there is no federal right to locally accountable judges, there is a federal equal protection right for Black residents to be treated like white residents when a state makes such judges available.

151.   By first considering an offer from the Chief Justice to accept an appointment pursuant to H.B. 1020 and then by accepting the offer, John/Jane Doe 5 will be a willful participant in the H.B. 1020's plan to deprive and disenfranchise the predominantly Black population of Jackson of the rights accorded to every other Mississippi resident to have their local governing authorities select the judges who exercise the powers of a Municipal Court.  John/Jane Doe 5 thus may be sued under 42 U.S.C. § 1983 to prevent them from accepting the appointments as temporary special judges of that court, taking the oath of that office, or otherwise assuming office.

152.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case.  A failure to enjoin Defendant Chief Justice Randolph from appointing the CCID Judge—or, alternatively, to enjoin Defendant Doe 5 from accepting the appointment to that office, taking the oath of that office, or otherwise assuming that office—will immediately irreparably harm Plaintiffs and the more than 100,000 Black residents of Jackson who will be denied political representation and the benefits thereof that are afforded to all other residents of the State, and instead will be subjected to a second-class criminal justice system because of their race.

153.    If Defendant Randolph nonetheless appoints Defendant Doe 5 to the CCID Court and he/she begins to perform the functions of the CCID Judge, Plaintiffs' irreparable harm will be ongoing every day he/she remains in office but can be abated in part by an order enjoining Defendants Randolph, Snowden, and Welch from taking any actions with respect to Defendant Doe 5, the CCID Court, or the office of CCID Judge, such as compensating Defendant Doe 5 or designating a location for the CCID Court to hold court. Additionally, Plaintiffs' ongoing irreparable harm can be avoided by an order enjoining Defendant Doe 5 from exercising the powers and performing the duties of the CCID Judge in the event that (1) a prospective declaratory decree that the CCID Judge appointed pursuant to H.B. 1020 § 4 violates the Equal Protection Clause, and (2) that decree is violated.

## COUNT IV

### 42 U.S.C. § 1983

### H.B. 1020's appointment of CCID prosecutors intentionally discriminates against the majority-Black residents of Jackson on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution

**(Defendants Lynn Fitch and John/Jane Does 6 and 7)**

154.   Plaintiffs restate and incorporate all foregoing paragraphs of this Complaint as though fully set forth herein.

155.   The Equal Protection Clause of the Fourteenth Amendment prohibits the State of Mississippi from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

156.   H.B. 1020 singles out the predominantly Black population of Jackson for prosecution in a second-class criminal justice system in which the vast power and the immense discretion to enforce the law is placed in the hands of politically unaccountable prosecutors.

157.   H.B. 1020 deprives and disenfranchises the predominantly Black population of Jackson of the rights accorded to every other Mississippi resident to elect their local prosecutors.   *See* Miss. Code § 23-15-193.   While there is no federal right to elected prosecutors per se, there is a federal equal protection right for Black residents to be treated like white residents when a state makes elected prosecutors available.

158.   By first considering an offer from the Attorney General to accept an appointment pursuant to H.B. 1020 and then by accepting the offer, John/Jane Does 6 and

7 will be willful participants in H.B. 1020's plan to place appointed prosecutors in Jackson, and they may be sued under 42 U.S.C. § 1983 to prevent them from accepting the appointments as temporary special judges of that court, taking the oath of that office, or otherwise assuming office.

159.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case.  A failure to enjoin Defendant Fitch from appointing the CCID Prosecutors— or, alternatively, to enjoin Defendant Does 6 and 7 from accepting the appointments to that office, taking the oath of that office, or otherwise assuming that office—will immediately irreparably harm Plaintiffs and the more than 100,000 Black residents of Jackson who will be denied political representation afforded to all other residents of the State, subjected to a second-class criminal justice system, and suffer disparate prosecution because of their race.

160.    If Defendant Fitch nonetheless appoints Defendant Does 6 and 7 as CCID Prosecutors, Plaintiffs' irreparable harm will be ongoing every day they remain in office but can be avoided by enjoining Defendant Does 6 and 7 from exercising the powers and performing the duties of that office.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants, as follows:

A.  Declare that S.B. 2343 § 1(6)(a)-(b)'s expansion of the Capitol Police's jurisdiction by creating "primary jurisdiction" for the Capitol Police within the expanded CCID and "concurrent jurisdiction" over the remainder of the entire

City of Jackson intentionally discriminates against Jackson's residents on the basis of race in violation of the Equal Protection Clause;

B. Declare that the appointment of temporary special judges to the Hinds County Circuit Court under H.B. 1020 § 1 intentionally discriminates against Jackson's residents on the basis of race in violation of the Equal Protection Clause;

C. Declare that H.B. 1020's creation of the CCID Court under H.B. 1020 § 4 intentionally discriminates against Jackson's residents on the basis of race in violation of the Equal Protection Clause;

D. Declare that H.B. 1020's appointment of CCID Prosecutors under H.B. 1020 § 5 intentionally discriminates against Jackson's residents on the basis of race in violation of the Equal Protection Clause;

E. Preliminarily and permanently enjoin the expansion of Capitol Police's jurisdiction under S.B. 2343 § 1(6)(a)-(b), which creates "primary jurisdiction" for the Capitol Police within the expanded CCID and "concurrent jurisdiction" over the remainder of the entire City of Jackson;

F. Preliminarily and permanently enjoin the Chief Justice from appointing any individual to become a temporary special judge of the Hinds County Circuit Court under H.B. 1020 § 1;

G. Preliminarily and permanently enjoin John/Jane Does 1-4 in their individual capacities from accepting appointment as a temporary special judge of the Hinds County Circuit Court under H.B. 1020 § 1, taking the oath of that office, or otherwise assuming that office;

56

H. If any of John/Jane Does 1-4 are appointed and assume office as a temporary special judge of the Hinds County Circuit Court, preliminarily and permanently enjoin Defendants Randolph, Snowden, and Welch from taking any actions with respect to those judges or their offices;

I. If the declaratory decree sought in Prayer for Relief (B) is violated or is unavailable, preliminarily and permanently enjoin Defendant Does 1–4 from exercising the powers and performing the duties of Hinds County Circuit Court judges;

J. Preliminarily and permanently enjoin the Chief Justice's appointment of any individual to become the CCID Judge under H.B. 1020 § 4;

K. Preliminarily and permanently enjoin John/Jane Doe 5 in their individual capacity from accepting appointment to  the office of CCID Judge under H.B. 1020 § 4, taking the oath of that office, or otherwise assuming that office;

L. If John/Jane Doe 5 is appointed and assumes office as the CCID Judge, (1) preliminarily and permanently enjoin Defendants Randolph, Snowden, and Welch from taking any actions with respect to John/Jane Doe 5, the CCID Court, or the office of CCID Judge;

M. If the declaratory decree sought in Prayer for Relief (C) is violated or is unavailable, preliminarily and permanently enjoin Defendant Doe 5 from exercising the powers and performing the duties of the CCID Judge;

N. Preliminarily and permanently enjoin the Attorney General from appointing any individual to become a CCID Prosecutor;

O.  Preliminarily and permanently enjoin John/Jane Does 6 and 7 in their individual capacities from accepting appointment to the office of CCID Prosecutor under H.B. 1020 § 5, taking the oath of that office, or otherwise assuming that office;

P.  If any of John/Jane Does 6 and 7 are appointed and assume office as CCID Prosecutor, preliminarily and permanently enjoin them from exercising the powers and performing the duties of that office;

Q.  Award Plaintiffs their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against State officials;

R.  Retain jurisdiction to render any and all further orders that this Court may enter; and

S.  Grant such other and further relief as this Court deems just and proper.