# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-CA-00584-SCT

*ANN SAUNDERS, SABREEN SHARRIEF, AND DOROTHY TRIPLETT*

*v.*

*STATE OF MISSISSIPPI; STATE OF MISSISSIPPI, EX REL. TATE REEVES, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF MISSISSIPPI; STATE OF MISSISSIPPI, EX REL. LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI; HONORABLE MICHAEL K. RANDOLPH, IN HIS OFFICIAL CAPACITY AS CHIEF JUSTICE OF THE MISSISSIPPI SUPREME COURT; ZACK WALLACE, IN HIS OFFICIAL CAPACITY AS CIRCUIT CLERK OF THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI; AND GREG SNOWDEN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE ADMINISTRATIVE OFFICE OF COURTS*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/15/2023 |
| TRIAL JUDGE: | HON. J. DEWAYNE THOMAS |
| TRIAL COURT ATTORNEYS: | PALOMA WU |
| | JOSHUA FIYENN TOM |
| | ROBERT B. McDUFF |
| | SCHERRIE LONNETTE PRINCE |
| | PIETER JOHN TEEUWISSEN |
| | ANTHONY RENARD SIMON |
| | MARK A. NELSON |
| | NED ANDREW NELSON |
| | WILSON DOUGLAS MINOR |
| | REX MORRIS SHANNON III |
| | GERALD LEE KUCIA |
| | DOUGLAS T. MIRACLE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |



EXHIBIT
A

| ATTORNEYS FOR APPELLANTS: | J. CLIFTON JOHNSON II |
| | ROBERT B. McDUFF |
| | PALOMA WU |
| | JACOB WAYNE HOWARD |
| | JOSHUA TOM |
| | TANNER JOHN LOCKHEAD |
| | BRENDA WRIGHT |
| | BRITTANY CARTER |
| ATTORNEYS FOR APPELLEES: | JUSTIN L. MATHENY |
| | REX MORRIS SHANNON III |
| | GERALD L. KUCIA |
| | SCOTT G. STEWART |
| | ANTHONY RENARD SIMON |
| | PIETER JOHN TEEUWISSEN |
| | SCHERRIE LONNETTE PRINCE |
| | MARK A. NELSON |
| | NED A. NELSON |
| | WILSON DOUGLAS MINOR |
| NATURE OF THE CASE: | CIVIL - UNCONSTITUTIONAL STATUTE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 09/21/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     This appeal stems from the Legislature's passing and the Governor's recent signing of House Bill 1020.[1]  The catalyst for the Legislature's passing of House Bill 1020 is what one judge recently described as the "sweltering, undisputed and suffocating" crime problem in Jackson, Mississippi—a problem that has "crippled the criminal justice system."[2]

¶2.     While political and social controversy have surrounded this bill, the bulk of the bill's

---

[1] H.B. 1020, Reg. Sess., 2023 Miss. Laws ch. 546.

[2] Order, ***NAACP v. Reeves***, No. 3:23-CV-272-HTW-LGI, 2023 WL 3767059, at **5-6 (S.D. Miss. June 1, 2023).

provisions, which are aimed at improving public safety and bolstering judicial resources in Jackson, are not at issue.

¶3.     For example, the petitioners—Ann Saunders, Sabreen Sharrief, and Dorothy Triplett (collectively, Saunders)—all residents of Jackson—have not challenged the bill's expansion of the boundaries and overall footprint of the Capitol Complex Improvement District (CCID).[3]  Nor have they challenged the diversion of taxes collected in Jackson to the CCID Project Fund or the authorization for additional appointed assistant district attorneys and public defenders for the Seventh Circuit Court District.[4]  There are also no complaints about the legislative directive that the Department of Public Safety develop a 911 system within the CCID boundaries.[5]  Instead, the petitioners challenge just two provisions in House Bill 1020—Section 1 and Section 4.

¶4.     Section 1 of House Bill 1020, directs this Court's Chief Justice to appoint four additional (and unelected) circuit judges to the existing Seventh Circuit Court District—the district comprised of the City of Jackson and all of Hinds County—for a term ending December 31, 2026.[6]  The second challenged provision, Section 4 of House Bill 1020, is a more ambitious endeavor that creates a new statutory inferior court, much like a municipal court, to serve the CCID.[7]

---

[3] H.B. 1020, Reg. Sess., 2023 Miss. Laws ch. 546, § 8.

[4] *Id.* §§ 2, 3, & 9.

[5] *Id.* § 13.

[6] *Id.* § 1.

[7] *Id.* § 4.

3

¶5.     Saunders's lawsuit claims both provisions violate Mississippi's Constitution.  But Hinds County Chancellor J. Dewayne Thomas, who held hearings on Saunders's challenges, disagreed and dismissed her complaint.  She now appeals.

¶6.     After review, we agree with the chancellor that the creation of the CCID inferior court in Section 4 of House Bill 1020 is constitutional.  Article 6, Section 172, of the Mississippi Constitution expressly and undeniably confers on the Legislature the authority to establish inferior courts, such as the CCID inferior court, as needed.  And here the Legislature exercised this authority, creating a municipal-like court to serve the CCID.

¶7.     But we agree with Saunders that Section 1's creation of four new appointed "temporary special circuit judges" in the Seventh Circuit Court District for a specified, almost-four-year term violates our Constitution's requirement that circuit judges be elected for a four-year term.[8]  While Section 1 calls these new judges "special circuit judges" on paper, we see nothing special or unique about them—certainly nothing expressly tethering them to a specific judicial need or exigency.   Rather, Section 1's text merely creates four unelected circuit court judgeships, appointed into Hinds County to serve three-and-a-half years instead of four.

¶8.     That said, we emphasize there is no constitutional impediment to the Chief Justice temporarily appointing special judges to assist the Seventh Circuit Court District—or any other judicial district in Mississippi facing *exigent circumstances*.  Additionally, the Chief Justice enjoys statutory authority, under Mississippi Code Section 9-1-105(2) (Rev. 2019),

_____

[8] Miss. Const. art. 6, § 153.

4

expressly authorizing appointment of temporary special judges to address "emergenc[ies] or overcrowded dockets" like those plaguing the Seventh Circuit Court District. Such special judges may serve "for whatever period of time is designated by the Chief Justice." *Id.* This statutory authority has existed in various forms for more than thirty years. And it has been utilized routinely by past Chief Justices and the present Chief Justice to address backlogs and emergencies in the Seventh Circuit Court District and other Mississippi courts.

¶9.    While Saunders claimed this statute is likewise unconstitutional, we disagree. Contrary to House Bill 1020, Section 1, Section 9-1-105(2) does not codify new unelected circuit judge positions in an already existing circuit court district, then direct the Chief Justice to fill them for a specified term of office. Instead, Section 9-1-105(2) permits the Chief Justice, in his discretion, and with advice and consent of a majority of the justices of this Court, to make temporary appointments, either sua sponte or at the request of a court, tailored to address specific emergencies or docket crises—judicial acts not prohibited by Mississippi's Constitution.

¶10.   For these reasons, we affirm in part and reverse and render in part the chancellor's order dismissing Saunders's complaint. Specifically, we affirm the dismissal of her claims that House Bill 1020, Section 4, and Section 9-1-105(2) are unconstitutional. And we reverse and render judgment on her claim that House Bill 1020, Section 1, is unconstitutional. Finally, we affirm the dismissal of Chief Justice Randolph as a defendant in this suit based on judicial immunity. We also affirm the dismissal of Hinds County Circuit Clerk Zack Wallace.

## Background Facts & Procedural History

### I.      The Legislature enacted Mississippi Code Section 9-1-105 in 1989.

¶11.    In 1989, the Legislature enacted Section 9-1-105.  Subsection 1 concerns judicial

appointments when a judicial officer is unwilling or unable to serve.  Miss. Code Ann. § 9-1-

105(1) (Rev. 2019).  Subsection 2 authorizes the Chief Justice of the Mississippi Supreme

Court to appoint a special judge on a temporary basis "in the event of an emergency or

overcrowded docket."[9]  Miss. Code Ann. § 9-1-105(2).

### II.     Chief Justices have utilized Section 9-1-105(2) to appoint special judges to the Seventh Circuit Court District for years.

¶12.    In the almost thirty-five years of its existence, Section 9-1-105(2) has been routinely

utilized numerous times by Chief Justices of this Court to assist trial courts facing

emergencies or overcrowded dockets.

¶13.    In 2003, at the request of the senior judge of the Twelfth Circuit Court District

---

[9] Subsection (2) provides:

Upon the request of the Chief Judge of the Court of Appeals, the senior judge of a chancery or circuit court district, the senior judge of a county court, or upon his own motion, the Chief Justice of the Mississippi Supreme Court, with the advice and consent of a majority of the justices of the Mississippi Supreme Court, shall have the authority to appoint a special judge to serve on a temporary basis in a circuit, chancery or county court in the event of an emergency or overcrowded docket. It shall be the duty of any special judge so appointed to assist the court to which he is assigned in the disposition of causes so pending in such court for whatever period of time is designated by the Chief Justice. The Chief Justice, in his discretion, may appoint the special judge to hear particular cases, a particular type of case, or a particular portion of the court's docket.

Miss. Code Ann. § 9-1-105(2).

(Forrest and Perry Counties), Chief Justice Edwin L. Pittman appointed Jess H. Dickinson to serve as a special circuit judge.[10]  And in 2004, at the request of the Seventh Circuit Court District judges—the very circuit court district at issue here—Chief Justice James W. Smith, Jr., appointed retired judge L. Breland Hilburn as special circuit court judge to help handle the surge of criminal matters in Hinds County.[11]

¶14.    Over the next eight years, Chief Justice Smith and his successor Chief Justice William L. Waller, Jr., utilized Section 9-1-105(2) continually to extend Judge Hilburn's special appointment through April 2012.  During this time period, additional judges were also appointed to help Hinds County's overcrowded criminal docket.  The Chief Justice appointed some of these special judges sua sponte.[12]  Others were appointed after consulting the Seventh Circuit Court District judges about the criminal case backlog.[13]  Two judges were

_____

[10] Order, *In re: Appointment of Special Judge for Twelfth Circuit Court District*, No. 2003-AP-00766-SCT (Miss. Apr. 14, 2003); Order, *In re: Appointment of Special Judge for Twelfth Circuit Court District*, No. 2003-AP-00766-SCT (Miss. July 9, 2003); Order, *In re: Appointment of Special Judge for Twelfth Circuit Court District*, No. 2003-AP-00766-SCT (Miss. Oct. 13, 2003).

[11] Order, *In re: Appointment of Special Judge for Seventh Circuit Court District*, No. 2004-AP-01426-SCT (Miss. July 23, 2004).

[12] *E.g.*, Order, *In re: Appointment of Special Judge for Seventh Circuit Court District*, No. 2004-AP-01426-SCT (Miss. Aug. 29, 2007) (additionally appointing Judge Billy Bridges); Order, *In re: Appointment of Special Judge for Seventh Circuit Court District*, No. 2004-AP-01426-SCT (Miss. Feb. 4, 2008) (additionally appointing Judge Trent Walker); Order, *In re: Appointment of Special Judge for Seventh Circuit Court District*, No. 2004-AP-01426-SCT (Miss. Oct. 10, 2008) (additionally appointing Judge Pieter Teeuwissen).

[13] *E.g.*, Order, *In re: Appointment of Special Judge for Seventh Circuit Court District*, No. 2004-AP-01426-SCT (Miss. May 24, 2006) (reappointing Judge Hilburn and additionally appointing Judge William Coleman).

even appointed by the Chief Justice using federal grant money aimed at combating crime.[14]

¶15.    All told, from 2003 to 2012, this Court's Chief Justices appointed seven different special judges. And as many as six of these special appointed circuit judges were utilized to tackle the Seventh Circuit Court District's criminal docket *at the same time*—serving with and in addition to the four elected circuit court judges.[15]

¶16.    Beginning in mid-2020, the present Chief Justice, at the various courts' request, began exercising his statutory authority to appoint special judges to Circuit Court Districts, Chancery Court Districts, County Courts, and Youth Courts throughout the State in response to the COVID-19 emergency.[16] And in 2022, the Chief Justice appointed four special judges

_____

[14] Order, ***In re: Appointment of Special Judge for Seventh Circuit Court District***, No. 2004-AP-01426-SCT (Miss. July 11, 2008) (appointing "two additional Special Judges to handle criminal cases on the overcrowded docket of the Seventh Circuit Court District as authorized by Miss. Code Ann. § 9-1-105 (Supp. 2007), and pursuant to [a] Grant . . . from the Federal Office of Justice Programs and a sub-grant from the Mississippi Department of Public Safety Planning . . .").

[15] *See id.* (appointing Judge Gowan and Judge Melvin Priester to serve in addition to already appointed Judges Hilburn, Bridges, Coleman, and Walker).

[16] *See, e.g.*, Order Appointing Special Judge, ***In re: Judicial Appointment Related to Coronavirus: (COVID-19): Special Judge for Eighth Circuit Court District***, No. 2020-AP-00823-SCT (Miss. Aug. 4, 2020) (Eight Circuit Court District, encompassing Leake, Neshoba, Newton, and Scott Counties); Order Appointing Special Judge, ***In re: Judicial Appointment Related to Coronavirus (COVID-19): Special Judge for Circuit Court of Hinds County, Miss.***, Nos. 2020-AP-00814-SCT, 2020-AP-00815, 2020-AP-00821-SCT, 2020-AP-00822-SCT (Miss. Jan. 5, 2021) (Seventh Circuit Court District, encompassing Hinds County); Order Appointing Special Judge, ***In re: Judicial Appointment Related to Coronavirus (COVID-19): Special Judge for Circuit Court of Twenty-First Judicial District of Miss.***, No. 2020-AP-00787-SCT (Miss. Jan. 5, 2021) (Twenty-First Circuit Court District, encompassing Holmes, Humphreys, and Yazoo Counties); Order Appointing Special Judge, ***In re: Judicial Appointment Related to Coronavirus (COVID-19): Special Judge for Chancery Court of Hinds County, Miss.***, Nos. 2020-AP-00757-SCT, 2020-AP-00758-SCT (Miss. Feb. 2, 2021) (Hinds County Chancery Court, First and Second Judicial

to the Seventh Circuit Court District "to alleviate the strain on the Hinds County courts
caused or exacerbated by the COVID-19 pandemic."[17]

_____

Districts); Order Appointing Special Judge, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Special Judge for Chancery Court of Sixteenth Chancery Court District*, No. 2020-AP-00794-SCT (Miss. Jan. 6, 2021) (Sixteenth Chancery Court District, encompassing George, Greene, and Jackson Counties); Order Appointing Special Chancellor, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Special Judge for Fifteenth Chancery Court District*, No. 2021-AP-00110-SCT (Miss. Feb. 2, 2021) (Fifteenth Chancery Court District, encompassing Copiah and Lincoln Counties); Order Appointing Special Judge, *In re: Judicial Appointment  Related to Coronavirus (COVID-19): Special Judge for County Court of Warren County, Miss.*, No. 2020-AP-00808-SCT (Miss. July 31, 2020) (County Court of Warren County); Order Appointing Special Judge, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Special Judge for County Court of Forrest County, Miss.*, No. 2020-AP-01062-SCT (Miss. Sept. 24, 2021) (County Court of Forrest County);  Order Appointing Special Judge, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Special Judge for County Court of Hinds County, Miss.*, Nos. 2020-AP-00751-SCT, 2020-AP-00756-SCT (Miss. Jan. 5, 2021) (County Court of Hinds County, First and Second Districts); Order Appointing Special Judge, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Special Judge for County Court of Hinds County, Miss.*, No. 2020-AP-00756-SCT (Miss. Jan. 5, 2021) (County Court of Hinds County, First and Second Judicial Districts); Order Appointing Special Judge, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Special Judge for Youth Court of Harrison County*, Nos. 2019-AP-00427-SCT, 2020-AP-01120 (Miss. Jan. 5, 2021) (Harrison County Youth Court); Order Appointing Special Judge, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Special Judge for Youth Court of Hinds County, Miss.*, No. 2020-AP-00755-SCT (Miss. Jan. 5, 2021) (Hinds County Youth Court).

[17] *E.g.*, Order Appointing Special Judge, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Hon. Frank G. Vollor Appointed as Special Judge for Circuit Court of Hinds County, Miss.*, No. 2022-AP-00849-SCT (Miss. Sept. 22, 2022); Order Appointing Special Judge, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Hon. Betty W. Sanders Appointed as Special Judge for Circuit Court of Hinds County, Miss.*, No. 2022-AP-00970-SCT (Miss. Sept. 22, 2022); Order Appointing Special Judge, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Hon. Andrew K. Howorth Appointed as Special Judge for Circuit Court of Hinds County, Miss.*, No. 2022-AP-00971-SCT (Miss. Sept. 22, 2022); Order Appointing Special Judge, *In re: Judicial Appointment Related to Coronavirus (COVID-19): Hon. Stephen B. Simpson Appointed as Special Judge for Circuit Court of Hinds County, Miss.*, No. 2022-AP-00972-SCT (Miss. Sept. 22, 2022).

### III.    The Legislature passed House Bill 1020 in 2023.

¶17.    At the close of the 2023 legislative session, the Legislature passed and the Governor signed House Bill 1020.  While the bill contains no express purpose statement, it is obvious from its face this legislation is aimed directly at the City of Jackson's "crime cancer."  Order, **NAACP**, 2023 WL 3767059, at *6.

¶18.    Section 1 directs the Chief Justice of this Court to appoint four temporary special circuit judges for the Seventh Circuit Court District for terms that expire on December 31, 2026.[18]  H.B. 1020, Reg. Sess., 2023 Miss. Laws ch. 546, § 1.  Section 2 permits the public defender for the Seventh Circuit Judicial District to appoint three additional full-time assistant public defenders.  *Id.* §2.  And Section 3 allows the district attorney to appoint two

---

[18] In its entirety, Section 1 provides:

(1) The Chief Justice of the Supreme Court shall appoint four (4) temporary special circuit judges for the Seventh Circuit Court District. No limitation whatsoever shall be placed upon the powers and duties of the judges other than those provided by the Constitution and laws of this state. The term of the temporary special circuit judges shall expire on December 31, 2026.

(2) The judges shall be appointed no later than fifteen (15) days after the passage of this act according to applicable state laws. The Chief Justice of the Supreme Court may elect to reappoint circuit judges that are serving on a temporary basis as of the effective date of this act in the Seventh Circuit Court District.

(3) (a) Each temporary special circuit judge shall receive an office operating allowance to be used for the purposes described and in amounts equal to those authorized in Section 9-1-36.

    (b) The Administrative Office of Courts shall establish personnel policies to compensate the support staff for each temporary special circuit judge.

(4) This section shall stand repealed on December 31, 2026.

additional full-time assistant district attorneys.  *Id.* §3.

¶19.    The Capitol Complex Improvement District (CCID), which overlays a portion of the City of Jackson and includes the State Capitol and other state buildings, had been created by earlier legislation.  House Bill 1020, Section 4, creates an inferior court for the CCID, which shall have the same jurisdiction as municipal courts.[19]  *Id.* § 4.  And Sections 5 through 7

---

[19] In its entirety, Section 4 provides:

(1) (a) From and after January 1, 2024, there shall be created one (1) inferior court as authorized by Article 6, Section 172 of the Mississippi Constitution of 1890, to be located within the boundaries established in Section 29-5-203 for the Capitol Complex Improvement District, hereinafter referred to as "CCID".  The CCID inferior court shall have jurisdiction to hear and determine all preliminary matters and criminal matters authorized by law for municipal courts that accrue or occur, in whole or in part, within the boundaries of the Capitol Complex Improvement District; and shall have the same jurisdiction as municipal courts to hear and determine all cases charging violations of the motor vehicle and traffic laws of this state, and violations of the City of Jackson's traffic ordinance or ordinances related to the disturbance of the public peace that accrue or occur, in whole or in part, within the boundaries of the Capitol Complex Improvement District.

(b) Any person convicted in the CCID inferior court may be placed in the custody of the Mississippi Department of Corrections, Central Mississippi facility.

(2) The Chief Justice of the Mississippi Supreme Court shall appoint the CCID inferior court judge authorized by this section.  The judge shall possess all qualifications required by law for municipal court judges. Such judge shall be a qualified elector of this state, and shall have such other qualifications as provided by law for municipal judges.

(3) The Administrative Office of Courts shall provide compensation for the CCID inferior court judge and the support staff of the judge. Such compensation shall not be in an amount less than the compensation paid to municipal court judges and their support staff in the City of Jackson.

(4) All fines, penalties, fees and costs imposed and  collected by the CCID

provide for prosecuting attorneys, a clerk, and a suitable building for the CCID inferior court. *Id.* §§ 5 to 7.

¶20.    Section 8 extends the CCID's geographical boundaries. *Id.* § 8. And Section 9 diverts a portion of sales tax collected in Jackson to the CCID Project Fund.  *Id.* § 9.  Additional sections provide for the full staffing of the Jackson Police Department, body cameras for the Capitol Police, and a 911 emergency call system for the CCID.  *Id.* §§ 10, 11, and 13.

¶21.    Only Section 1—which calls for the appointment of four special circuit judges for the Seventh Circuit Court District—and Section 4—which creates the CCID inferior court—are at issue here.

### IV.    Saunders filed a complaint for declaratory and injunctive relief.

¶22.    Three days after House Bill 1020 was signed into law on April 21, 2023, Saunders filed a complaint for declaratory and injunctive relief in the Hinds County Chancery Court. She asserted three counts in her complaint.

¶23.    She first alleged the appointment scheme of House Bill 1020, Section 1, violated the constitutional requirement that circuit judges be elected.  In adding appointed, instead of elected, circuit judges to the existing Seventh Circuit Court District, Saunders claimed the Legislature had deprived Hinds County citizens of the right to vote for their judges.

¶24.    Next, Saunders claimed House Bill 1020, Section 4, created an unconstitutional inferior court for the CCID.  Saunders contended the CCID court was not truly inferior

---

inferior court shall be deposited with the City of Jackson municipal treasurer or equivalent officer.

(5) This section shall stand repealed on July 1, 2027.

because House Bill 1020, Section 4, lacks an express right to appeal from the CCID court to the superior circuit court.

¶25.    Finally, Saunders alleged Section 9-1-105(2) is unconstitutional for the same reasons she argues House Bill 1020, Section 1, is unconstitutional—because the Constitution requires circuit judges be elected.

¶26.    In her complaint, Saunders did not name the State as a defendant.  Instead, she sued the Honorable Michael K. Randolph, in his official capacity as Chief Justice of the Mississippi Supreme Court.  She also sued Zack Wallace, in his official capacity as Circuit Clerk of the Circuit Court of Hinds County, Mississippi, and Greg Snowden, in his official capacity as Director of the Administrative Office of Courts.  Saunders asked for a preliminary and permanent injunction that enjoined Chief Justice Randolph from appointing any temporary special judges under House Bill 1020, Section 1, or Section 9-1-105(2).  She also asked for a similar injunction against Circuit Clerk Zack Wallace, enjoining him from assigning any cases to temporary special judges.  And she requested termination of any temporary special judges already appointed under Section 9-1-105(2) and further sought to enjoin the creation of the CCID court.

## V.    Chief Justice Randolph and Zack Wallace moved for dismissal.

¶27.    Both Chief Justice Randolph and Circuit Clerk Zack Wallace responded with separate motions to dismiss.  After a hearing, the chancellor granted both motions.

¶28.    The chancellor dismissed the Chief Justice based on the doctrine of judicial immunity. The chancellor was not persuaded by Saunders's assertion that judicial immunity was

inapplicable to prospective injunctive relief.  Because the appointment of judges is clearly a judicial act, the chancellor held judicial immunity applies to any actions taken by the Chief Justice under House Bill 1020, Section 1, or Section 9-1-105(2) that Saunders sought to enjoin.

¶29.    The chancellor similarly dismissed Circuit Clerk Wallace.  He found Wallace had no personal stake in the lawsuit's outcome and no discretionary enforcement authority.  Because Wallace merely assigns cases as part of his ministerial clerk duties, the chancellor found his continued presence unnecessary.

### VI.    The State moved to dismiss Saunders's Complaint.

¶30.    Before dismissing the Chief Justice and Circuit Clerk Wallace, the chancellor permitted the Attorney General to intervene on the State of Mississippi's behalf to defend the constitutionality of the challenged legislation.  Once in court, the State moved to dismiss Saunders's complaint.  According to the State, Saunders could not establish a violation of Mississippi's Constitution.  This prompted Saunders to amend her complaint to add as defendants the State, the Attorney General, and the Governor.[20]

¶31.    The chancellor held that Saunders could show no constitutional violation.  So he granted the State's motion to dismiss. In his memorandum opinion, the chancellor acknowledged criticisms of the Legislature's passing House Bill 1020, including alleged racial motives.  But he emphasized the limited question before his court was whether he could find the statutes unconstitutional beyond a reasonable doubt.  And the chancellor

---

[20] Despite the chancellor's having granted the Chief Justice's and Zack Wallace's motions to dismiss, Saunders's amended complaint continued to name both as defendants.

determined he could not.

¶32.    First, the chancellor could not find the judicial-appointment statutes violated Article 6, Sections 153 and 165, of the Mississippi Constitution.  The chancellor agreed with the Court of Appeals, which—when faced with a similar argument that Section 9-1-105 was unconstitutional—determined that Section 165 was not the "exclusive mechanism" for appointing special judges. *McDonald v. McDonald*, 850 So. 2d 1182, 1187 (Miss. Ct. App. 2002).    Moreover, the chancellor recognized, as a three-judge district court panel did in 1993, that Section 9-1-105's limited appointive power "reflects nothing more than a slight shift in the appointive authority between the executive and the judicial branches of government in Mississippi." *Prewitt v. Moore*, 840 F. Supp. 428, 435 (N.D. Miss. 1993). "[T]he Legislature has all political power not denied by the state or national constitutions[.]" *Wheeler v. Shoemake*, 213 Miss. 374, 402, 57 So. 2d 267, 280 (1952). And finding no relevant limitations, the chancellor ruled the Legislature could extend appointment authority to the Chief Justice under both Section 9-1-105 and House Bill 1020, Section 1.

¶33.    The chancellor further emphasized neither statute creates additional permanent judgeships.  Instead, by their respective terms, the appointments are temporary and based on exigent circumstances and did not dilute the power or duties of the elected Hinds County circuit judges.

¶34.    As to the CCID inferior court, the chancellor rejected Saunders's argument that House Bill 1020, Section 4, violated Article 6, Section 172, of the Mississippi Constitution. According to the chancellor, "[t]he lack of specific language regarding the right of appeal,

while perhaps not ideal, does not necessitate that there exists no right of appeal." The CCID inferior court has the same jurisdiction as municipal courts to hear and determine preliminary and criminal matters. And other, already existing statutory law permits anyone adjudicated guilty by a municipal court to appeal to the county court, or if there is no county court to the circuit court. Miss. Code Ann. § 11-51-81 (Rev. 2019). Because House Bill 1020, Section 4, can be reasonably read with other existing law to provide a right to appeal from the CCID court to a constitutional court, the chancellor ruled Saunders could not show the CCID court is unconstitutional.

### VII.    Saunders appealed.

¶35.    On May 15, 2023, the chancellor entered a final order denying all relief requested by Saunders. Saunders immediately appealed all three dismissal orders—the order dismissing Chief Justice Randolph, the order dismissing Circuit Clerk Zack Wallace, and the final order denying Saunders's motion for a preliminary injunction and dismissing Saunders's complaint and amended complaint for declaratory and injunctive relief.

### Discussion

¶36.    On appeal, our guiding principle is our standard of review. And regardless of public sentiment for or against House Bill 1020, our standard of review remains the same—legislative enactments are presumed valid.

¶37.    This Court "adhere[s] to the rule that one who assails a legislative enactment must overcome the strong presumption of validity and such assailant must prove his conclusion affirmatively, and clearly establish it beyond a reasonable doubt." ***Loden v. Miss. Pub. Serv.***

*Comm'n*, 279 So. 2d 636, 640 (Miss. 1973).   In reviewing attacks on duly enacted legislation, "[a]ll doubt must be resolved in favor of the validity of a statute." *Id.*  And "[i]f possible, courts should construe statutes so as to render them constitutional rather than unconstitutional if the statute under attack does not clearly and apparently conflict with organic law after first resolving all doubts in favor of validity." *Id.* (citing ***Bd. of Educ. v. State Educ. Fin. Comm'n***, 243 Miss. 782, 138 So. 2d 912 (1962)).

I.      **CCID Inferior Court**

¶38.    We first apply this standard to the new CCID inferior court.  And in doing so, we find Saunders cannot overcome the strong presumption that the Legislature's creation of the CCID inferior court is constitutional.

¶39.    Again, no one before this Court is questioning the creation of the Capitol Complex Improvement District.   Nor is Saunders challenging Section 8 of House Bill 1020 that expands the CCID's geographical boundaries.  The other provisions that provide tax funding, increased law enforcement, and a 911 call system for the CCID are also not at issue.  What Saunders complains about is the Legislature's creation of an inferior statutory court, akin to a municipal court, to serve the CCID.

A.      ***Article 6, Section 172, of the Mississippi Constitution directs the Legislature to establish inferior courts as necessary.***

¶40.    Article 6, Section 172, of the Mississippi Constitution does not merely permit but actually *directs* the Legislature to establish and abolish inferior courts as needed.  Miss. Const. art. 6, § 172 ("*The Legislature shall, from time to time, establish such other inferior*

17

*courts as may be necessary*, and abolish the same whenever deemed expedient." (emphasis added)).   And Saunders does not—and indeed cannot—deny this clear constitutional mandate.[21]   Rather, Saunders insists that, despite Section 4's express statutory language creating an inferior municipal-type court with jurisdiction over the CCID, the CCID inferior court is not really inferior.  The chancellor rejected this argument, and so do we.

### B.   The CCID Court meets the definition of an inferior court.

¶41.   As this Court has explained, "what constitutes an 'inferior court' as created by legislative act pursuant to constitutional authority is based upon its relation to the constitutionally created court from which the inferior court's jurisdiction is carved." ***Marshall v. State***, 662 So. 2d 566, 570 (Miss. 1995).  So "when the legislature creates a court and bestows jurisdiction upon it, that court must be inferior in ultimate authority to the constitutionally created court which exercises the same jurisdiction." ***Id.***  "This superiority is shown by giving the constitutional court controlling authority over the legislative court, by appeal or certiorari, for example." ***Id.***  Saunders latches onto this "by appeal or certiorari" language.  She argues that, because Section 4 of House Bill 1020 does not *expressly* grant an appeal from the CCID inferior court to the circuit court, the CCID court does not meet ***Marshall***'s definition of an inferior court.

¶42.   But Saunders's view runs afoul of our law and its directive about how we examine duly enacted statutes.  In other words, what she asks this Court to do is to resolve Section 4's

---

[21]   In fact, when arguing against the appointment of special temporary judges, Saunders suggests the Legislature utilize Section 172 to "creat[e] . . . inferior courts exercising some or all of the jurisdiction of the circuit courts" as an available alternate solution to tackling the Seventh Circuit Court District's overcrowded docket.

omission of appeals language *against* the CCID court's validity when our law directs we do the exact opposite—strongly presume properly enacted legislation is valid. ***Loden***, 279 So. 2d at 640.

¶43.    While we agree with the chancellor that Section 4's absence of an express appeal provision is perhaps not ideal, we equally agree this absence is not fatal.  Simply put, Section 4 does not have to expressly include a right to appeal.  This is because other existing statutes—which the Legislature was certainly entitled to consider and rely on—already govern the appeals process.

>     ### C.    *The Legislature intended the CCID Inferior Court to function as a municipal court for the CCID.*

¶44.    House Bill 1020 made crystal clear that the Legislature intended the CCID inferior court *function* as a municipal court.  Section 4 expressly confers onto the CCID court the jurisdiction to hear and determine preliminary and criminal matters within the CCID authorized by law for "municipal courts."  H.B. 1020, Reg. Sess., 2023 Miss. Laws ch. 546, § 4(1)(a).  It also expressly confers onto the CCID inferior court "the same jurisdiction as municipal courts" to hear and determine violations of city and state traffic ordinances and motor vehicle and traffic laws and ordinances related to disturbances of the public peace within the CCID.  *Id.*  CCID inferior judges must have the same "qualifications as provided by law for municipal judges."  *Id.* § 4(2).  Salaries for the judge and support staff must not be less than Jackson's municipal court judges and staff.  *Id.* § 4(3).  And "fines, penalties, fees and costs imposed and collected by the CCID inferior court shall be deposited with the City of Jackson municipal treasurer or equivalent office."  *Id.* § 4(4).

¶45.    Given that the CCID court has the same jurisdiction and function as a municipal court—and resolving any doubt in favor of the CCID court's validity, as we must—we conclude the Legislature intended appeals from this inferior court to proceed just like typical municipal court appeals.[22]

### D.    *The existing appeals process applies.*

¶46.    Under Mississippi Code Section 11-51-81, appeals from municipal courts first go to county court.  Miss. Code Ann. § 11-51-81.  And from there, further appeal may be taken to the circuit court.  *Id.*  Recognizing this existing appeals process applies to the CCID inferior court is not legislative mind reading as the dissent suggests.  Rather, it is a straightforward common sense reading of the legislation and Section 11-51-81—one that resolves doubt in favor of the CCID court and stays true to our law's directive to strongly presume the *validity* of duly enacted statutes.  *See **Loden***, 279 So. 2d at 640 ("All doubt must be resolved in favor of the *validity* of a statute." (emphasis added)).

¶47.    But the dissent ignores this directive.  In fact it does the opposite.  It reads this duly enacted statute with an eye towards finding it *invalid*—hunting for a reason to throw it out. It does so by resolving doubt against the statute and negatively presuming the Legislature intended there be *no right to appeal from a CCID court, ever.*  With respect for the dissent, our law forbids this approach.

¶48.    Because the Legislature created the functional equivalent of a municipal court for the CCID, appeals from the CCID will follow the same statutory appeals process as municipal

---

[22] *See* Miss. Code Ann. § 11-51-81.

courts.  So the circuit court—the constitutional court from which the CCID inferior court's jurisdiction was carved—has controlling authority via the appellate process outlined in Section 11-51-81.

¶49.    But available appellate review of CCID decisions does not stop there.

### E.    The CCID Inferior Court also enjoys additional review.

¶50.    The CCID inferior court also enjoys additional certiorari review under Mississippi Code Section 11-51-95 (Rev. 2019).  That section grants express, controlling authority to the circuit court to review judgments by "all tribunals inferior to the circuit court" through the procedure of writ of certiorari.  *Id.*  And this long-established statutory mechanism for certiorari review of inferior courts exists  "whether an appeal be provided by law from the judgment sought to be reviewed or not."  *Id.*

¶51.    As discussed, constitutionally required superiority over an inferior court can be "shown by giving the constitutional court controlling authority over the legislative court, by appeal *or certiorari*[.]"  ***Marshall***, 662 So. 2d at 570 (emphasis added)).  And while our law says only one of the two methods of review—appeal *or* certiorari—is necessary for a legislatively created inferior court to survive scrutiny, here, the constitutional court has controlling authority over the CCID inferior court by both appeal *and* certiorari.  So the CCID court clearly meets ***Marshall***'s definition of a constitutional inferior court.

### F.    The novel aspects of the CCID Court do not render it unconstitutional.

¶52.    Saunders's response is to argue that the CCID inferior court should not be treated like a municipal court because House Bill 1020, Section 4, differs some from the statutes that

govern municipal courts. But the CCID does not *literally* have to be a municipal court to function like one, subject to the same appellate jurisdiction. Section 172 tasks the Legislature with creating a variety of inferior courts "as may be necessary." The Legislature had discretion to adopt many but not all features of municipal courts when creating the CCID inferior court. To be sure, some of the CCID inferior court's features are novel.[23] Saunders has raised specific concerns that persons convicted by the CCID court *may* be placed in the custody of the Mississippi Department of Correction's Central Mississippi facility. *Id.* § 4(1)(b). But deciding where those convicted of misdemeanors may be housed is a legislative policy decision outside this Court's scope of review. And the legislation's inclusion of this permissive feature does not render CCID inferior court unconstitutional.

¶53.    The bottom line is that the Legislature took decisive action to craft an inferior court, an act it deemed necessary to serve the CCID. And it is the constitutionality of this new court that is before us, not whether its creation is a good or a bad idea. Resolving any doubt in favor of the CCID inferior court—considering it has the same jurisdiction as a municipal court, with statutory tracks for appellate and certiorari review of *any* CCID judgment—we find the circuit court is duly superior to the CCID inferior court. Thus, Saunders cannot meet her burden to prove Section 4 is unconstitutional beyond a reasonable doubt.

¶54.    Just as the chancellor did, we too find the CCID inferior court is exactly what the Legislature says it is, an inferior court within the meaning of Article 6, Section 172 of the

---

[23] For example, the Chief Justice shall appoint the CCID judge, as opposed to a mayor. H.B. 1020, Reg. Sess., 2023 Miss. Laws. ch. 546, § 4(2). And the court's enacting legislation shall stand repealed on July 1, 2027. *Id.* § 4(5).

Mississippi Constitution.

## II.    Appointment of Special Temporary Judges

¶55.    Saunders's other constitutional challenge focuses on the Chief Justice's appointment of special temporary judges.  Saunders argues both House Bill 1020, Section 1,  and Section 9-1-105(2) violate the plain language of Article 6, Sections 153 and 165, of the Mississippi Constitution.

¶56.    Section 153 provides, "The judges of the circuit and chancery courts shall be elected by the people in a manner and at a time to be provided by the legislature and the judges shall hold their office for a term of four years."  And under Section 165, "Whenever any judge of the Supreme Court or the judge or chancellor of any district in this State shall, for any reason, be unable or disqualified to preside at any term of court, . . . the Governor may commission another, or others, of law knowledge, to preside at such term or during such disability or disqualification in the place of the judge or judges so disqualified."

¶57.    Construing these two provisions together, Saunders argues Section 165 provides a narrow and exclusive exception to the constitutional requirement that circuit judges be elected.  Specifically, Saunders argues Mississippi's Constitution prohibits appointment of *any* temporary special circuit judges to serve on a need basis in addition to elected circuit judges.  Instead, as she sees it, only when an elected circuit judge is disabled or disqualified may a special judge be appointed to preside over circuit court cases.  And even then, only the Governor may make the appointment.[24]

---

[24] Saunders suit is aimed specifically at subsection 2 of Section 9-1-105.  She does not challenge subsection 1, which permits the Chief Justice to make an appointment when

### A.    House Bill 1020, Section 1, Versus Section 9-1-105(2)

¶58.    After review, we agree with Saunders that Section 1 of House Bill 1020 violates Article 6, Section 153, of the Mississippi Constitution's express requirement that "[t]he judges of the circuit . . . courts shall be elected by the people" for "a term of four years."

¶59.    Section 1 does not create a constitutionally allowed inferior court, like the legislatively crafted CCID court in Section 4.  Neither does it add additional elected circuit judges to the current Seventh Circuit Court District nor create a new and distinct circuit court district, staffed with newly elected judges.

¶60.    Instead, Section 1 creates four additional, unelected circuit court judgeships.  These new judgeships are posted within the already existing Seventh Circuit Court District.  And instead of election, the legislation mandates the Chief Justice appoint these four new judges. These Section 1 judges have the same power and serve alongside the four already-serving, elected judges.  While Section 1 calls the new judges "temporary special circuit judges," they serve for an almost four-year term.  And the text of Section1 shows nothing special or unique about their appointment—it neither is expressly tied to nor even mentions any enumerated exigency or case backlog.  In short, reading the plain language of the statute, we find the new

---

a judge is disabled, disqualified, or otherwise unable to serve.  Miss. Code Ann. § 9-1-105(1).  But we note that her argument—that Article 6, Section 165, provides the *only* exception to the election of circuit judges and thus is the *exclusive mechanism* for appointing special judges—necessarily is an attack on the constitutionality of Section 9-1-105(1) and any other statutory provision authorizing the appointment of special circuit judges.  *See, e.g.*, Miss. Code Ann. § 23-15-961(5) (Rev. 2018) (directing the Chief Justice to appoint a special circuit judge to review a candidate-qualification action or inaction by an executive committee).  We agree with the State that Saunders interprets the interplay between Sections 153 and 165 much too narrowly.

Section 1 judges are just unelected circuit judges, appointed into the Seventh Circuit Court District to serve three-and-a-half years instead of four.

¶61.    Even viewing Section 1's language with a strong eye towards validity, we find Section 153's express election requirement prohibits these particular circuit court judgeships, which are appointed for a term, and not elected.    Thus, Section 1 cannot survive constitutional scrutiny.[25]

¶62.    That does not mean, however, there is no current constitutional mechanism for appointment of temporary special circuit judges.    Indeed, the Chief Justice *unquestionably* has authority under Section 9-1-105(2) to appoint special temporary judges to the Seventh Circuit Court District—or any other Mississippi court—to address overcrowded dockets or other emergencies.

¶63.    Section 9-1-105(2), which statutorily authorizes such temporary appointments, lacks the constitutional infirmities found in House Bill, Section 1.  Section 9-1-105(2) does not create a specified number of circuit judge positions to be served for a fixed term in a specially designated, already-existing circuit court district, then mandate the Chief Justice fill them by appointment.  Instead, Section 9-1-105(2) provides the Chief Justice of this

---

[25] Our holding applies to House Bill 1020, Section 1, only.  No other section or provision of House Bill 1020 is affected.  Under Section 17 of House Bill 1020,

> [i]f any section, paragraph, sentence, clause, phrase or any part of this act is declared to be unconstitutional or void, or if for any reason is declared to be invalid or of no effect, the remaining sections, paragraphs, sentences, clauses, phrases or parts of this act shall be in no manner affected thereby but shall remain in full force and effect.

H.B. 1020, Reg. Sess., 2023 Miss. Laws ch. 546, § 17.

Court—with the advice and consent of a majority of justices of the Mississippi Supreme Court—the discretion to appoint, either sua sponte or at the request of a court, temporary special judges "in the event of an emergency or overcrowded docket."

¶64.    As a three-judge federal district court panel concluded, when faced with the claim Section 9-1-105(2) violated the Voting Rights Act of 1965, "Section 9-1-105 does not provide for the creation of additional permanent judgeships." *Prewitt*, 840 F. Supp. at 435. Rather, Section 9-1-105(2) "allows for the appointment on an emergency basis." *Id.*

¶65.    Nor does Section 9-1-105(2) violate Article 6, Section 165.  As the Mississippi Court of Appeals observed two decades ago, Section 165 "does not state that it is the exclusive mechanism for selection of special judges." *McDonald*, 850 So. 2d at 1187.  As Judge Southwick, writing for the appellate court, explained, "[t]he Governor's authority is prefaced with the word '*may*,' perhaps that the use of this procedure is optional as opposed to using some other feasible but unstated procedure." *Id.* (emphasis added); *see also Vinson v. Prather*, 879 So. 2d 1053, 1057 (Miss. Ct. App. 2004).

¶66.    Section 9-1-105 provides such a procedure—one a unanimous Court of Appeals has determined, and we agree, "is an exclusive tool of the chief justice." *Vinson*, 879 So. 2d at 1057.  In fact, for the more than three decades Section 9-1-105 has existed, three different Chief Justices have utilized it to assist Hinds County's overcrowded criminal docket.  The present Chief Justice has also turned to Section 9-1-105 when special judges were needed. Most recently, the Chief Justice used Section 9-1-105 to appoint special judges to address the crisis in the Seventh Circuit Court District and other judicial districts throughout the State

brought on by the COVID-19 pandemic.[26]

¶67.    There is additional flexibility in the Chief Justice's discretionary appointment authority, further distinguishing it from Section 1's mandatory application. As Section 9-1-105(2) explains, "[t]he Chief Justice, in his discretion, may appoint the special judge to hear particular cases, a particular type of case, or a particular portion of the court's docket."

### B.    Using Section 9-1-105(2) Temporary Appointments to Handle Criminal Cases

¶68.    Before the chancellor, the State argued, "House Bill 1020 inescapably was designed in large part to address Jackson's crime problem . . . that may be the elephant in the room, but we've got a crime problem in this city, period." While appellate courts do not make independent findings, we would have to bury our head in the sand to suggest crime is not surging in Jackson.

¶69.    A district judge in a parallel proceeding challenging House Bill 1020 in federal court recently found the "facts of Jackson"—which include a nation-leading per capita murder rate in 2021 ("[h]igher than Birmingham, Atlanta, Detroit, and even Chicago") and a slightly decreased homicide rate in 2022 that "still managed to surpass every other major city," combined with similarly high percentages of other violent crimes and ever-recruiting street gangs—"have crippled the criminal justice system."[27] We mention this because just as the

---

[26] *See supra* n.16.

[27] Order, ***NAACP v. Reeves***, No. 3:23-CV-272-HTW-LGI, 2023 WL 3767059, at **5-6 (S.D. Miss. June 1, 2023). As Judge Wingate's order observes:

The FBI crime statistics tell the sorrowful story: In 2020, Jackson reported 130 homicides—a record number at that time. In 2021, Jackson surpassed

Chief Justice utilized Section 9-1-105(2) to mobilize additional judges during the COVID-19 pandemic, the Chief Justice has discretionary statutory authority to appoint temporary, special judges, as his predecessors have, to assist continuing backlogs and mounting crime problems.

¶70.    In her attempt to curtail this authority, Saunders insists we must read into Section 9-1-105(2) some time limitation for special temporary appointments. She says this is necessary to ensure they are indeed "temporary." But we decline to preemptively and arbitrarily limit the period a special temporary judge may serve. Section 9-1-105(2) directs that appointed

---

that record with at least 155 reported homicides—"the highest per capita murder rate in the nation . . . . [h]igher than Birmingham, Atlanta, Detroit, and even Chicago." In 2022, even with a 14% decline in homicides, Jackson reported 138 homicides that year, and Jackson's "homicide rate still managed to surpass every other major city in the U.S. for the second straight year."

Homicides may be the headline grabber, but Jackson's other violent crime categories battle for equal condemnation: Rape, Robbery, Aggravated Assault, Sexual Assault, and Burglary rates continue to be among the highest nationwide, per capita.

Caught in this "race to the grave" are the most innocent—young children whose still developing lungs had barely tasted the nutritious air which was their birthright. On the other end of this "killfest", are the senior citizens hoping to spend their golden years in retired harmony with family and friends, instead of outfitting their homes as fortresses, fearing any strange noise around their houses and dreading the prospect of having to arm themselves.

Jackson street gangs, who successfully recruit the impressed baby school dropouts who "wannabe gangsters" when they grow up, figure prominently in this story of a City coming apart and in search of enduring glue to hold it together.

These "facts of Jackson" have crippled the criminal justice system, especially with a police presence which is crying for reinforcement.

*Id.* (citations omitted).

judges assist the court "for whatever period of time is designated by the Chief Justice." So the Legislature has conferred on the Chief Justice discretion to assure the temporary appointment is commensurate with the emergency addressed. For example, Judge Hilburn served as an appointed special judge for the Seventh Circuit Court District for around eight years without constitutional complaint. His continued appointment was tied to efforts to address Jackson's crime problem and its impact on Hinds County's criminal docket.

¶71.   What makes Section 9-1-105(2) appointments "temporary" is not simply the appointment's duration but that it is tethered to a specific emergency or docket backlog. Once the emergency subsides or the docket returns to a manageable state, the need for the appointment ceases. For this reason, we do not share Saunders's concerns that special temporary judges appointed to help during the COVID-19 pandemic might be reappointed under Section 9-1-105(2) to address continuing problems in Hinds County.

¶72.   The undeniable truth is that various Chief Justices have utilized Section 9-1-105 to appoint temporary special judges in exigent circumstances for more than thirty years. And the appointment statute has survived scrutiny by the Court of Appeals and a federal district court. Because Section 9-1-105(2) can be reasonably harmonized with Article 6, Sections 153 and 165, complementing those constitutional provisions to address exigent circumstances when additional circuit judges are needed on an emergency, temporary basis, Section 9-1-105 must continue to stand.

### III.   Judicial Immunity

¶73.   Finally, we affirm the judicial-immunity-based dismissal of Chief Justice Randolph

29

as a defendant.[28]

¶74.   Mississippi has long recognized the doctrine of judicial immunity.   *Wheeler v. Stewart*, 798 So. 2d 386, 392 (Miss. 2001) (citing *DeWitt v. Thompson*, 192 Miss. 615, 7 So. 2d 529 (1942); *Bell v. McKinney*, 63 Miss. 187 (1885)).   Judicial immunity applies to judicial acts.   *Loyacono v. Ellis*, 571 So. 2d 237, 238 (Miss. 1990) (citing *DeWitt*, 7 So. 2d at 532).   And the Chief Justice's appointing a special judge is clearly a judicial act.   *Vinson*, 879 So. 2d at 1057 (holding that Chief Justice Prather's appointment of a special judge under Section 9-1-105 was a "judicial act" entitled to judicial immunity); *see also Kemp ex rel. Kemp v. Perkins*, 324 Fed. App'x 409, 412 (5th Cir. 2009).

¶75.   Still, Saunders asks this Court to recognize for the first time a remedies-based exception to our judicial-immunity doctrine.   Saunders requests we permit judges to be sued for their judicial acts when only prospective injunctive relief is sought, and not money damages.   But we are unpersuaded an exception should apply here.

¶76.   As support for her remedies-based exception, Saunders primarily leans on *Pulliam v. Allen*, a federal § 1983 case in which the United States Supreme Court held that "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Pulliam v. Allen*, 466 U.S. 522, 541-42, 104 S. Ct. 1970, 1981, 80 L. Ed. 2d 565 (1984).   But in the wake of *Pulliam*, Congress amended § 1983 to make clear that "in

---

[28] We emphasize the Chief Justice has maintained he is not a proper party to this suit. He denied Saunders's motion to recuse on appeal, finding no basis for recusal existed because he had no interest in the outcome of a case challenging the constitutionality of a statute.   Still, in his discretion, the Chief Justice recused *sua sponte* from considering this appeal to prevent delay and to shield this Court from unnecessary criticism.   Order, *Saunders v. State*, No. 2023-CA-00584-SCT (Miss. July 3, 2023).

any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, *injunctive relief shall not be granted* unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983 (emphasis added); *see also* **Bauer v. Texas**, 341 F.3d 352, 357 (5th Cir. 2003).

¶77.    While § 1983's express immunity provision is of federal lineage, we find the policy behind it is both sound and consistent with Mississippi's judicial-immunity doctrine.  As Saunders's counsel acknowledged at oral argument, this Court has never carved out an exception for prospective injunctive relief.  And we find it makes no sense to do so when declaratory relief is readily available.

¶78.    Here, not only is declaratory relief available, but it is the very relief Saunders pursued. Saunders's counsel admitted at the dismissal hearing that his clients' "concern is with the statute."  And Saunders acknowledged that "the Attorney General's Office is here in force and has been zealous . . . in defending the constitutionality of the state statutes."  Because the proper defendant against which to obtain the declaratory relief is present and active, we find no reason to create an exception to Mississippi's judicial immunity doctrine to permit Saunders to seek an injunction against the Chief Justice.

¶79.    This is especially so here because the acts Saunders sought to enjoin were the Chief Justice's compliance with duly-enacted statutes.  Saunders did not allege the Chief Justice made any decision or took any action apart from acting under statutes she claimed were unconstitutional.  That is what distinguishes this case from others Saunders cited to support her claim that injunctive relief may be obtained against a judge.  In most of these cases, the

judge had made an allegedly unconstitutional administrative decision—something much different than following an enacted law that is alleged to be unconstitutional.[29]

¶80.     By suing the Chief Justice as a defendant in an action solely aimed at having statutes declared unconstitutional, Saunders pitted the Chief Justice in the constitutionally untenable position of seemingly having to defend himself over a statute passed by the Legislature and signed by the Governor.  The tension with this is obvious because "[j]udges exist to resolve controversies about a law's meaning or its conformance to the Federal and State Constitutions, *not to wage battle as contestants in the parties' litigation*."  ***Whole Woman's Health v. Jackson***, 595 U.S. 30, 40, 142 S. Ct. 522, 211 L. Ed. 2d 316 (2021) (emphasis added).   "As [the United States Supreme] Court has explained, 'no case or controversy' exists 'between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute.'"  ***Id.*** (quoting ***Pulliam***, 466 U.S. at 538 n.18).  While an existing "case or controversy" is a federal standing requirement, Mississippi's more lax standing rules by no means green light the suing of judges when the sole claim is that a statute is unconstitutional.  As Saunders's counsel put it at the dismissal hearing, "the Chief Justice doesn't have a dog in that fight regarding the constitutionality" of House Bill 1020 and Section 9-1-105(2).  Taking counsel at his word, we conclude the Chief Justice should not have been sued.

---

[29] For example, in ***Amato v. Wilentz***, 952 F.2d 742 (3d Cir. 1991), the action sought to be enjoined was the denial of a request to use a courthouse to film a movie.  And in ***Glasssrooth v. Moore***, 335 F.3d 1282 (11th Cir. 2003), the Eleventh Circuit enjoined Alabama Supreme Court Chief Justice Roy Moore from placing a monument to the Ten Commandments in the State Judicial Building rotunda.

¶81.   We have found no cases, in this Court or others, where a Chief Justice has been successfully sued in like circumstances.   And we hold these claims for injunctive relief against the Chief Justice were unnecessary, contrary to existing law, and violated the doctrine of judicial immunity.   Even after the State appeared in chancery court, Saunders maintained—and still maintains on appeal—that the Chief Justice's presence is necessary to obtain her requested relief.   But we see no such necessity.   Judges take oaths to uphold the law and the Constitution.   And this case provides no exception.   There is no proof before the chancellor or this Court to suggest the Chief Justice will disobey this Court's mandate declaring House Bill 1020, Section 1, unconstitutional.   So there is no merit to Saunders's attempt to enjoin the Chief Justice.   Our allowing such a strategy, which is unnecessary to declare a statute unconstitutional, would set a dangerous precedent—one that creates needless strain in the bench and bar, and one that could be used as an attempt to manufacture a recusal issue.   Thus, where declaratory relief is available or no declaratory decree has been violated, we affirmatively rule that such tactics violate the doctrine of judicial immunity and are not permitted in Mississippi courts.

¶82.   For similar reasons, we affirm the dismissal of Circuit Clerk Zack Wallace.   Wallace's presence was likewise unnecessary.   The United States Supreme Court explained clearly, "[c]lerks serve to file cases as they arrive, not to participate as adversaries in those disputes." *Whole Woman's Health*, 595 U.S. at 40.   There was no reason to sue Wallace, since the sole issue was whether House Bill 1020 and Section 9-1-105(2) are constitutional. *See Chancery Clerk of Chickasaw Cnty., Miss. v. Wallace*, 646 F.2d 151, 160 (5th Cir. 1981) ("Because

33

of the judicial nature of their responsibility, the chancery clerks and judges do not have a sufficiently 'personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues on which the court so largely depends for illumination of difficult constitutional questions.'" (quoting ***Baker v. Carr***, 369 U.S. 186, 204, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962))).  Akin to her action against the Chief Justice, Saunders made no allegation that Circuit Clerk Wallace has acted on his own, contrary to Mississippi statute or Constitution.  So the same words spoken about the Chief Justice can be said of Circuit Clerk Wallace—he has no dog in this fight.  We find the chancellor properly granted Wallace's motion to dismiss.

### Conclusion

¶83.   We affirm the dismissal of Saunders's complaint and amended complaint to the extent it sought Section 4 of House Bill 1020 and Mississippi Code Section 9-1-105(2) be declared unconstitutional.  But we reverse and render on Saunders's claim that Section 1 of House Bill 1020 is unconstitutional.  We declare Section 1—and Section 1 only—is unconstitutional and thus void.  We affirm the dismissals of the Chief Justice and Circuit Clerk Wallace as defendants in this suit.

¶84.   **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J.  RANDOLPH, C.J., NOT PARTICIPATING.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶85.    I concur with the majority on all issues except its decision to uphold the Capitol Complex Improvement District (CCID) court. Because of a fatal constitutional deficiency in the Legislature's failure to place the CCID court under the supervision of a constitutional court, I dissent in part.

¶86.    The parties and this Court are in agreement on the nature of a legislatively created "inferior court" as contemplated by the Mississippi Constitution. *See* Miss. Const. art. 6, § 172. The jurisdiction of an inferior court must be carved from that of a "constitutionally created court." ***Marshall v. State***, 662 So. 2d 566, 570 (Miss. 1995). Inferior courts may have part or all of the jurisdiction of a superior constitutional court. ***State v. Speakes***, 144 Miss. 125, 109 So. 129, 133 (1926); ***Houston v. Royston***, 8 Miss. 543, 549-50 (Miss. 1843). An inferior court must be subject to the supervision of a constitutional court with the same or greater jurisdiction than the inferior court exercises. ***Marshall***, 662 So. 2d at 571. Such supervision is effectuated by a statutory mechanism of a right of appeal and/or *certiorari*. ***Id.***

¶87.    A statutory mechanism must operate to facilitate a constitutional court's supervision over the inferior court. *See* ***Marshall***, 662 So. 2d 570. County courts, for example, are legislatively created inferior courts that have some of the same jurisdiction as circuit courts and are under circuit court supervision via a statutory right of appeal. Miss. Code Ann. § 9-9-21 (Rev. 2019). The Mississippi Court of Appeals is a legislatively created inferior court that has part of the jurisdiction of the Mississippi Supreme Court and is overseen by it via a broadly defined statutory mechanism of *certiorari*. Miss. Code Ann. § 9-4-3 (Rev. 2019).[30]

---

[30] The Supreme Court has other significant supervisory authority over the Court of Appeals that is not applicable here.

Municipal courts are legislatively created inferior courts that are invested with some of the jurisdiction of the circuit court and are supervised by the circuit court via a right to appeal. Miss. Code Ann. § 99-35-1 (Rev. 2020).[31]

¶88.   Here, however, while House Bill 1020 may seem to carve the jurisdiction of the CCID court (a criminal trial court) from that of the circuit court, no statutory mechanism operates to place the CCID court under the controlling authority of the circuit court. This is a fatal constitutional deficiency that cannot be rectified by the judicial branch of government. The majority, while finding that the absence of an explicit right to appeal is "perhaps not ideal," holds that this Court can construe the statutory right of appeal from municipal court as applicable to the CCID court. Maj. Op. ¶ 43. It further holds that the limited *certiorari* mechanism from justice court to circuit court found in Mississippi Code Section 11-51-93 (Rev. 2019) and extended to inferior tribunals in Mississippi Code Section 11-51-95 (Rev. 2019) operates as a sufficient means of constitutional supervision.

¶89.   I disagree. We do not have the constitutional authority to amend the statutory definition of a municipal court, and well-established principles of statutory construction do not permit us to engraft a right of appeal into the plain language of House Bill 1020. The *certiorari* procedure under Section 11-51-95 confines the circuit court to a review of questions of law apparent from the face of the record of lower court proceedings. This limitation precludes superior court oversight of evidentiary, procedural, and adjudicatory

---

[31] Other examples exist in Mississippi's judiciary, including youth court. *See* Miss. Code Ann. § 43-21-651(1) (Rev. 2021).

decisions normally reviewed under an abuse of discretion standard. Therefore this particular *certiorari* mechanism is insufficient to place the CCID court under the supervision of a constitutional court.

### A. Section 11-51-81 does not provide an avenue of appeal from the CCID court to a constitutional court.

#### 1. *Municipal Court Appeals to County Court under Mississippi Code Section 11-51-81*

¶90.    The State, in apparent recognition that an express right of appeal must apply to the CCID court for it to qualify as an inferior court, declared in its brief, and then reasserted at oral argument, that the CCID court "is a municipal court." The only authoritative definition of municipal court is that established by statute, lawyers' arguments to the contrary notwithstanding. The judicial branch of our state government lacks the authority to legislate this definition away. If the CCID court does not meet the statutory definition of a municipal court, this Court is not constitutionally empowered to proclaim that the CCID court is embraced by the term municipal court wherever that term is found in our statutes.

¶91.    The CCID court does not satisfy the statutory definition of a municipal court, beginning with the obvious deficiency that its jurisdiction is not defined by the boundaries of a municipality. *See* Miss. Code Ann. § 21-3-1 (Rev. 2015). Its one and only judge is not appointed by the governing authorities of a municipality. *See* Miss. Code § 21-3-3 (Rev. 2015).[32] Instead, and unlike any Mississippi municipal court, its judge is to be appointed by

---

[32] Up to ten judges are permitted in a municipality, depending on population size.

the Chief Justice of the Mississippi Supreme Court.[33] Additionally, and unlike any Mississippi municipal court, persons convicted of misdemeanors in the CCID court can be placed in the custody of the state prison system at the Central Mississippi Correctional Facility. House Bill 1020 selectively adopts certain provisions of the municipal court statute but has other characteristics that conflict with the same statute, an approach impossible if it were, by fundamental operation, a municipal court.

¶92.    The majority "conclude[s] [that] the Legislature intended appeals from this inferior court to proceed just like typical municipal court appeals." Maj. Op. ¶ 45. We cannot arrive at this conclusion without adding language to the statute that simply is not there. "The function of the Court is not to decide what a statute should provide, but to determine what it does provide." *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011) (citing *Russell v. State*, 231 Miss. 176, 94 So. 2d 916, 917 (1957)). "This Court 'cannot . . . add to the plain meaning of the statute.[']" *Id.* at 1030 (quoting *His Way Homes, Inc., v. Miss. Gaming Comm'n*, 733 So. 2d 764, 769 (Miss. 1999)). The presumption of constitutionality can be rebutted and does not require one to guess the Legislature's intent when no intent related to constitutional supervision is apparent from the plain language of the statute.

¶93.    When this Court declares a state statute unconstitutional, such action does not imply that the Legislature set out with the goal of creating constitutionally deficient legislation. *See* Maj. Op. ¶ 47. Our presumption of constitutionality is tempered by the separation of powers

---

[33] This mandatory directive arguably implicates separation of powers concerns, especially when contrasted with the permissive appointment power under Mississippi Code Section 9-1-105(2) (Rev. 2019) which is done not exclusively by the Chief Justice but with the "advice and consent" of the entire Supreme Court.

doctrine and our well-established principles of statutory construction. Here, the practical outcome of House Bill 1020 is that the CCID court has not been placed by statute under the supervision of a constitutional court.

¶94.    We have no constitutional or legislative prerogative to amend the statutory definition of municipal court, and we have no such prerogative to add to the plain language of the statute that appeals from the CCID court shall proceed the same way as appeals from municipal court. The majority asserts that the Legislature's intent is "crystal clear[,]" but for support cites the *express* provisions of the statute that *electively* adopt some aspects of municipal court. Maj. Op. ¶ 44. What is clear is that the Legislature was aware that to make a municipal court provision applicable to the CCID court, such a provision had to be incorporated by express reference. The Legislature did not view itself bound by provisions it did not expressly adopt, as evidenced by the House Bill 1020 provisions which are directly inconsistent with the municipal statutes.

¶95.    It is not the judiciary's place to follow behind the Legislature and choose additional municipal court provisions to add to the plain language of an enacted statute. Therefore, this Court cannot classify or uphold the CCID court as an "inferior court." While the CCID court is—metaphorically speaking—a peg in need of a hole, it, being a square peg, simply will not fit into the round hole that is our municipal courts. The Legislature has created a one-of-a-kind misfit. This Court has no authority to make adjustments to the peg or the hole in an attempt to make them fit.

> 2.    *Appeals to Circuit Court of "Other Tribunals" under Section 11-51-81*

¶96.    The catch-all language "other tribunals" in Section 11-51-81 does not operate to create a right of appeal from the CCID court. Section 11-51-81 created a right of appeal to county court from justice courts and municipal courts. Previously, appeals from municipal court went directly to circuit court for a *de novo* trial under Mississippi Code Section 99-35-1.[34] After declaring that the new appeal process to county court "shall be . . . under the same rules and regulations as are provided on appeals to the circuit court[,]" Section 11-51-81 clarifies further that the new appeal to county court applies only to justice and municipal courts and is not applicable to other appeals proceeding —as justice and municipal court appeals have been doing via Section 99-35-1—pursuant to other appeal statutes. Instead, "appeals from orders of the board of supervisors, municipal boards, and other tribunals . . . shall be direct to the circuit court **as heretofore**." Miss. Code Ann. § 11-51-81 (emphasis added).

¶97.    Section 11-51-81 provides in relevant part:

> All appeals from courts of justices of the peace,[[35]] special and general, and from all municipal courts shall be to the county court under the same rules and regulations as are provided on appeals to the circuit court, but appeals from orders of the board of supervisors, municipal boards, and other tribunals other than courts of justice of the peace and municipal courts, shall be direct to the circuit court as heretofore. And from the final judgment of the county court in a case appealed to it under this section, a further appeal may be taken to the circuit court on the same terms and in the same manner as other appeals from the county court to the circuit court are taken . . . .

---

[34] *See also* Miss. R. Crim. P. 30.1 (providing for appeals from county court). "[W]here there is conflict between a statute and a procedural rule created by the Supreme Court, the rule controls and the statute is void and of no effect." ***Murray v. State***, 870 So. 2d 1182, 1184 (Miss. 2004) (citing ***State v. Blenden***, 748 So. 2d 77, 88 (Miss. 1999)) .

[35] Justice Courts

40

The express right to appeal to circuit court from boards of supervisors and municipal boards is found in Mississippi Code Section 11-51-75 (Rev. 2019).

¶98.    Therefore, considering Section 11-51-81 as a whole, the reference to "other tribunals" merely clarifies that a litigant possessed of an express statutory right to appeal to circuit court is not diverted to county court by this new statute, other than from a justice court or a municipal court. Under the plain language of Section 11-51-81, the CCID court could not be governed by both the "municipal court" provision and the "other tribunals" provision. Appeals from municipal court go to county court, if one exists in the county. Appeals from "other tribunals" such as boards of supervisors and municipal boards continue (under their respective express rights of appeal) to go to circuit court. Appeals from the board of supervisors and municipal boards are not reviewed *de novo*. If we were to categorize the CCID court as an "other tribunal," we would face the problem that no statutory provision makes that appeal (from a criminal court that is not a court of record) for a trial *de novo*. This Court would not have the authority to add to the plain language of the statute to correct this problem.

¶99.    Accordingly, principles of statutory construction forbid the use of Section 11-51-81 to legitimize the CCID court. As with all other inferior courts our Legislature has created, the mechanism that brings an inferior court under the supervision of a constitutional court must be express.

**B.    Certiorari Review under Sections 11-51-93 & 95**

¶100.  The *certiorari* procedure under Sections 11-51-93 & 95 is patently insufficient to

provide constitutionally sufficient oversight of the CCID court. An inferior court "must be inferior in ultimate authority to the constitutionally created court which exercises the same jurisdiction[]" and "[t]his superiority is shown by giving the constitutional court controlling authority over the legislative court[.]" *Marshall*, 662 So. 2d at 570. "[S]uperiority is accomplished by giving the circuit court the controlling authority of reversal, revisal, correction, and direction over the new court . . . ." *Ex parte Tucker*, 164 Miss. 20, 143 So. 700, 701 (1932)).

¶101.   The *certiorari* mechanism of Section 11-51-93 mandates that "the [circuit] court shall be confined to the examination of questions of law arising or appearing on the face of the record and proceedings." This limitation precludes the circuit court's exercise of "controlling authority" over CCID court determinations of matters that are not questions of law, including evidentiary issues that would be reviewed for abuse of discretion. This limitation is particularly problematic given that the CCID court would hear criminal cases and is not a court of record.

¶102.   *Certiorari* review can be an appropriate mechanism for supervision of an inferior court. *Id.* This Court, for example, has unfettered authority over our inferior Court of Appeals via writ of *certiorari*. The statute creating our Court of Appeals provides in relevant part that "[d]ecisions of the Court of Appeals are final and are not subject to review by the Supreme Court, except by writ of certiorari." § 9-4-3. Mississippi Rule of Appellate Procedure 17 provides that "the Supreme Court may . . . review *any* decision of the Court of Appeals . . . ." Miss. R. App. P. 17(a) (Emphasis added). The rule lists multiple factors that

make *certiorari* review particularly appropriate, such as that "the Court of Appeals has rendered a decision which is in conflict with a prior decision" or that it "has not considered a controlling constitutional provision[.]" Miss. R. App. P. 17(a)(1), (2). The rule concludes with the following: "The Court may, in the absence of these factors, grant a writ of certiorari." Miss. R. App. P. 17(a).

¶103.  In short, no limitation or confinement, by statute or by our rules, is placed on this Court's controlling authority to review decisions rendered by our Court of Appeals. This parallels the level of controlling statutory authority a circuit court has over municipal and justice courts via trials *de novo* or by hearing an appeal from county court, an appellate proceeding not confined to questions of law.

¶104.  Taking the CCID court to be an "inferior tribunal" as contemplated by Section 11-51-95, *certiorari* review could be pursued from the CCID court for efficient review of questions of law. This confined review, however, is insufficient to confer upon the circuit court controlling authority over all decisions of the CCID court. Importantly, this *certiorari* procedure established by Section 11-51-93 originally was created to be applicable to justice court—a court from which *de novo* appeals can be taken. Appeals from justice court can be *de novo* (either to circuit court or county court, depending on the county) *or* direct to circuit court under the more limited *certiorari* procedure.

¶105.  A holding that the *certiorari* procedure of Section 11-51-95 provides sufficient independent review of the CCID court would result practically in a concerning, disparate impact on criminal defendants tried in the CCID court compared to criminal defendants tried

for the same crime in municipal or justice court.[36] Consider a motorist who is ticketed for a traffic violation (or arrested for some other misdemeanor) within the boundaries of the CCID. The ticketing officer could be a state trooper, a Jackson police officer, a capitol police officer, the sheriff, a sheriff's deputy, or a constable. The officer could elect to make the ticket returnable to the Jackson municipal court, the CCID court, the justice court, or the county court.

¶106. A person tried in municipal court or justice court could appeal directly the misdemeanor conviction directly to a court of record for a trial *de novo*. If that *de novo* trial is in county court, a convicted defendant could appeal to the circuit court sitting as an appellate court, with the benefit of a full record and no restriction limiting the appeal to questions of law. A CCID court defendant, however, would be limited to petitioning for discretionary *certiorari* review only on questions of law. *See Abraham v. State*, 61 So. 3d 199 (Miss. Ct. App. 2010) (the circuit court properly denied *certiorari* review of conviction *in absentia* for speeding and following too closely); *Lott v. City of Bay Springs*, 960 So. 2d 525, 526 (Miss. Ct. App. 2006) (circuit court properly denied *certiorari* from a conviction *in absentia* for driving under the influence).[37]

---

[36] The majority appears to hold that this *certiorari* review would alone be sufficient oversight: "while our law says only one of the two methods of review—appeal *or* certiorari—is necessary for a legislatively created inferior court to survive scrutiny, here the constitutional court has controlling authority over the CCID inferior court by both appeal *and* certiorari." Maj. Op. ¶ 51.

[37] In both of these examples, the defendants possessed an express right to a direct appeal for a *de novo* trial but missed the deadline. The deadline for the *certiorari* petition is six months.

¶107.   In practice, this *certiorari* procedure typically is used for the appeal of civil matters. *See Spears v. Miss. Dep't of Wildlife, Fisheries & Parks*, 997 So. 2d 946 (Miss. Ct. App. 2008); *Bynum v. Miss. Dep't of Educ.*, 906 So. 2d 81 (Miss. Ct. App. 2004); *Bd. of Trs. of State Insts. of Higher Learning v. Brewer*, 732 So. 2d 934 (Miss. 1999); *Hall v. Bd. of Trs. of State Insts. of Higher Learning*, 712 So. 2d 312 (Miss. 1998); *Miss. Emp. Sec. Comm'n v. Collins*, 629 So. 2d 576 (Miss. 1993); *Mills v. Churchwell Motor Co.*, 154 Miss. 631, 122 So. 773 (1929).

¶108.   In a quest for a Mississippi statute that makes the criminal CCID court an inferior court, Section 11-51-81 and the *certiorari* procedure of Section 11-51-95 fall short.

## CONCLUSION

¶109.   Upholding the CCID court requires one to resort to a mind-reading exercise in statutory construction—that, because a statutory mechanism facilitating controlling authority by the circuit court must be present and should have been enacted, we will simply pretend that it is present and proceed as if it had been enacted in the real world. This fiction of convenience overreaches our judicial function and, of ultimate importance, our constitutional duty. I therefore dissent in part.

**KING, P.J., JOINS THIS OPINION.**