# Exhibit 5A

Capitol Complex Improvement District, *CCID Informational Pamphlet*, available at https://www.dfa.ms.gov/sites/default/files/CCID%20Home/Master%20Plan%20Documents/2019-0306-ccid-pamphlet.pdf



The Capitol Complex Improvement District (CCID) was created during the 2017 session of the Mississippi Legislature under MS Code of 1972 as amended Section 29-5-201 et al in order to establish regular funding and administration of infrastructure projects within a defined area of the capital city of Jackson.



**THE BILL**

CCID projects will be determined and managed by the Department of Finance & Administration (DFA). Projects can include the following: street construction and repairs, bridge construction and repair, surface water drainage system repairs and reconstruction, installation of street lighting and traffic signals, installation and replacement of water and sewer lines, relocation of underground power and communication lines, reconstruction and repair of parks and public rights-of-way, planting and replacing landscaping materials, infrastructure, public safety, and other improvements as determined necessary by DFA.



**FUNDS**

Funds will be transferred to the CCID project fund as a percentage of monthly total State sales tax revenue collected within the corporate limits of the City of Jackson. 2% from August 2018 to August 2019. 4% from August 2019 to August 2020. 6% each succeeding month thereafter.



**MASTER PLAN**

DFA shall develop and adopt a comprehensive master plan in consultation with the CCID Project Advisory Committee, which consists of representatives and appointees by the Governor, Lt. Governor, Speaker of the House, City of Jackson, Jackson State University, and University of Mississippi Medical Center. The plan may be updated at any time, but must be completely updated every five years.



**THE DISTRICT**

The boundaries of the Capitol Complex Improvement District were drawn to encompass the major state properties in Jackson. The western boundary captures Jackson State University and the Jackson Medical Mall. The eastern boundary extends across Interstate 55 to capture Lefleur's Bluff, the Natural Science Museum, the Children's Museum, and the Mississippi Agriculture & Forestry Museum, The northern boundary extends beyond the Fondren Commercial District to Meadowbrook Road. The southern boundary is South Street to include all of downtown.

Within the District lie many of the city's major institutions and assets - UMMC, JSU, Downtown Jackson, Fondren, the Capitol Building, Millsaps College, Belhaven University, and many more. See the map of the Capitol Complex Improvement District on the back of this page.





JACKSON, MISSISSIPPI

# Exhibit 5B

U.S. Census Bureau, *QuickFacts: Jackson City, Mississippi Population, Census, April 1, 2020*, available at https://www.census.gov/quickfacts/fact/table/jacksoncitymississippi/POP010220.



United States®
**Census**
Bureau

## QuickFacts
### Jackson city, Mississippi

QuickFacts provides statistics for all states and counties, and for cities and towns with a ***population of 5,000 or more***.

| All Topics | Jackson city, Mississippi |
|---|---|
| **Population, Census, April 1, 2020** | **153,701** |
| 👤 **PEOPLE** | |
| **Population** | |
| Population Estimates, July 1, 2022, (V2022) | ⚠ 145,995 |
| Population estimates base, April 1, 2020, (V2022) | ⚠ 153,705 |
| Population, percent change - April 1, 2020 (estimates base) to July 1, 2022, (V2022) | ⚠ -5.0% |
| **Population, Census, April 1, 2020** | **153,701** |
| Population, Census, April 1, 2010 | 173,514 |
| **Age and Sex** | |
| Persons under 5 years, percent | ⚠ 7.0% |
| Persons under 18 years, percent | ⚠ 24.5% |
| Persons 65 years and over, percent | ⚠ 13.2% |
| Female persons, percent | ⚠ 53.8% |
| **Race and Hispanic Origin** | |
| White alone, percent | ⚠ 15.0% |
| Black or African American alone, percent  (a) | ⚠ 82.8% |
| American Indian and Alaska Native alone, percent  (a) | ⚠ 0.2% |
| Asian alone, percent  (a) | ⚠ 0.3% |
| Native Hawaiian and Other Pacific Islander alone, percent  (a) | ⚠ 0.0% |
| Two or More Races, percent | ⚠ 1.2% |
| Hispanic or Latino, percent  (b) | ⚠ 1.5% |
| White alone, not Hispanic or Latino, percent | ⚠ 14.5% |
| **Population Characteristics** | |
| Veterans, 2017-2021 | 6,105 |
| Foreign born persons, percent, 2017-2021 | 1.3% |
| **Housing** | |
| Housing units, July 1, 2022, (V2022) | X |
| Owner-occupied housing unit rate, 2017-2021 | 47.8% |
| Median value of owner-occupied housing units, 2017-2021 | $92,900 |
| Median selected monthly owner costs -with a mortgage, 2017-2021 | $1,123 |
| Median selected monthly owner costs -without a mortgage, 2017-2021 | $377 |
| Median gross rent, 2017-2021 | $905 |
| Building permits, 2022 | X |
| **Families & Living Arrangements** | |
| Households, 2017-2021 | 61,942 |
| Persons per household, 2017-2021 | 2.42 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2017-2021 | 81.8% |
| Language other than English spoken at home, percent of persons age 5 years+, 2017-2021 | 2.4% |
| **Computer and Internet Use** | |
| Households with a computer, percent, 2017-2021 | 89.8% |
| Households with a broadband Internet subscription, percent, 2017-2021 | 85.3% |
| **Education** | |
| High school graduate or higher, percent of persons age 25 years+, 2017-2021 | 86.2% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2017-2021 | 27.9% |
| **Health** | |
| With a disability, under age 65 years, percent, 2017-2021 | 9.5% |
| Persons without health insurance, under age 65 years, percent | ⚠ 17.2% |

| | |
|---|---|
| In civilian labor force, total, percent of population age 16 years+, 2017-2021 | 62.2% |
| In civilian labor force, female, percent of population age 16 years+, 2017-2021 | 60.9% |
| Total accommodation and food services sales, 2017 ($1,000)   (c) | 433,595 |
| Total health care and social assistance receipts/revenue, 2017 ($1,000)   (c) | 3,812,314 |
| Total transportation and warehousing receipts/revenue, 2017 ($1,000)   (c) | 326,251 |
| Total retail sales, 2017 ($1,000)   (c) | 2,630,794 |
| Total retail sales per capita, 2017   (c) | $15,766 |
| **Transportation** | |
| Mean travel time to work (minutes), workers age 16 years+, 2017-2021 | 20.6 |
| **Income & Poverty** | |
| Median household income (in 2021 dollars), 2017-2021 | $39,969 |
| Per capita income in past 12 months (in 2021 dollars), 2017-2021 | $23,176 |
| Persons in poverty, percent | ⚠ 26.1% |

### 📊 BUSINESSES

| | |
|---|---|
| **Businesses** | |
| Total employer establishments, 2021 | X |
| Total employment, 2021 | X |
| Total annual payroll, 2021 ($1,000) | X |
| Total employment, percent change, 2020-2021 | X |
| Total nonemployer establishments, 2020 | X |
| All employer firms, Reference year 2017 | 3,326 |
| Men-owned employer firms, Reference year 2017 | 1,822 |
| Women-owned employer firms, Reference year 2017 | 509 |
| Minority-owned employer firms, Reference year 2017 | 479 |
| Nonminority-owned employer firms, Reference year 2017 | 2,109 |
| Veteran-owned employer firms, Reference year 2017 | S |
| Nonveteran-owned employer firms, Reference year 2017 | 2,267 |

### 🌐 GEOGRAPHY

| | |
|---|---|
| **Geography** | |
| Population per square mile, 2020 | 1,375.8 |
| Population per square mile, 2010 | 1,562.5 |
| Land area in square miles, 2020 | 111.72 |
| Land area in square miles, 2010 | 111.05 |
| FIPS Code | 2836000 |

About datasets used in this table

**Value Notes**

⚠ Estimates are not comparable to other geographic levels due to methodology differences that may exist between different data sources.

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. ] Click the Quick Info ⓘ icon to the left of each row in T/ learn about sampling error.

In Vintage 2022, as a result of the formal request from the state, Connecticut transitioned from eight counties to nine planning regions. For more details, please see the Vintage 2022 release notes available here: Release Notes.

The vintage year (e.g., V2022) refers to the final year of the series (2020 thru 2022). Different vintage years of estimates are not comparable.

Users should exercise caution when comparing 2017-2021 ACS 5-year estimates to other ACS estimates. For more information, please visit the 2021 5-year ACS Comparison Guidance page.

**Fact Notes**

    **(a)**    Includes persons reporting only one race
    **(b)**    Hispanics may be of any race, so also are included in applicable race categories
    **(c)**    Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data

**Value Flags**

    **D**    Suppressed to avoid disclosure of confidential information
    **F**    Fewer than 25 firms
    **FN**    Footnote on this item in place of data
    **NA**    Not available
    **S**    Suppressed; does not meet publication standards
    **X**    Not applicable
    **Z**    Value greater than zero but less than half unit of measure shown
    **-**    Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest or upper interval of an open ende
    **N**    Data for this geographic area cannot be displayed because the number of sample cases is too small.

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Income and Poverty Estimates, Stat Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

# Exhibit 5C

U.S. Dep't of Just., Off. of Pub. Affs., *Justice Department Finds Conditions at Mississippi State Penitentiary Violate the Constitution* (Apr. 20, 2022), available at https://www.justice.gov/opa/pr/justice-department-finds-conditions-mississippi-state-penitentiary-violate-constitution

# Justice Department Finds Conditions at Mississippi State Penitentiary Violate the Constitution

justice.gov/opa/pr/justice-department-finds-conditions-mississippi-state-penitentiary-violate-constitution



Welcome to the new look of justice.gov. In the coming months you'll see more pages in this new design. Please share your feedback with our webmaster.

Press Release

Wednesday, April 20, 2022

**For Immediate Release**
Office of Public Affairs

The Justice Department concluded today, based upon a thorough investigation, that there is reasonable cause to believe that conditions and practices at the Mississippi State Penitentiary (also known as Parchman) violate the Eighth and Fourteenth Amendments to the U.S. Constitution. Assistant Attorney General Kristen Clarke of the Civil Rights Division, U.S. Attorney Clay Joyner for the Northern District of Mississippi and U.S. Attorney Darren J. LaMarca for the Southern District of Mississippi made the announcement.

Specifically, the department concluded that there is reasonable cause to believe Mississippi routinely violates the constitutional rights of people incarcerated at Parchman by:

- failing to provide adequate mental health treatment to people with serious mental health needs;
- failing to take sufficient suicide prevention measures to protect people at risk of self-harm;
- subjecting people to prolonged isolation in solitary confinement in egregious conditions that place their physical and mental health at substantial risk of serious harm; and
- failing to protect incarcerated people from violence at the hands of other incarcerated people.

As required by the Civil Rights of Institutionalized Persons Act (CRIPA), the Justice Department provided the state of Mississippi with written notice of the supporting facts for these findings and the minimum remedial measures necessary to address them in a

comprehensive 59-page findings letter.

"The Constitution guarantees that all people incarcerated in jails and prisons are treated humanely, that reasonable measures are taken to keep them safe, and that they receive necessary mental health care, treatment, and services to address their needs," said Assistant Attorney General Clarke. "Our investigation uncovered evidence of systemic violations that have generated a violent and unsafe environment for people incarcerated at Parchman. We are committed to taking action that will ensure the safety of all people held at Parchman and other state prison facilities. We look forward to working with state officials to institute comprehensive reforms."

"Prisons have a constitutional obligation to keep safe the incarcerated persons who depend on them for their basic needs," said U.S. Attorney Joyner. "Mississippi violated the rights of persons incarcerated at Parchman by failing to keep them safe from physical violence and for failing to provide constitutionally adequate mental health care and that people confined to Parchman experience serious physical and psychological harm as a result. Our office is dedicated to defending the civil rights of all our district's residents, including those who are incarcerated. We look forward to continuing to work with the Mississippi Department of Corrections to protect the civil rights of those incarcerated at Parchman."

"The action taken today by the Department of Justice will ensure that the Mississippi State Penitentiary at Parchman fulfills its constitutional obligations," said U.S. Attorney LaMarca. "Those obligations extend to reasonable efforts to provide basic mental health care, prevent violence between incarcerated persons and prevent suicides. Those who owe a debt to society should have these basic needs while paying that debt. We are committed to working with state officials to ensure that the State of Mississippi abides by its constitutional obligations."

The department's investigation began in February 2020. Our investigation of conditions at Southern Mississippi Correctional Institution, Central Mississippi Correctional Facility, and Wilkinson County Correctional Facility is ongoing. Individuals with relevant information are encouraged to contact the department by phone at (833) 591-0288, or by email at Community.MSDoc@usdoj.gov.

For more information about the Civil Rights Division and the Special Litigation Section, please visit https://www.justice.gov/crt/special-litigation-section.

Additional information about the Northern and Southern U.S. Attorneys' Offices is available at: https://www.justice.gov/usao-ndms and https://www.justice.gov/usao-sdms. You can contact the Northern District's Civil Division at (662) 234-3318, and the Southern District at (601) 965-4480. You can also report civil rights violations to the Section by completing the complaint form available at https://civilrights.justice.gov/.
Updated April 20, 2022

**Attachment**
Findings Report.pdf   [PDF, 3 MB]

**Topic**

Civil Rights

Press Release Number: 22-404

# Exhibit 5D

Robert H. Jackson, *The Federal Prosecutor, Address at the Second Annual Conference of United States Attorneys* (Apr. 1, 1940), available at
https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf.

For Release Afternoon Papers
Monday, April 1, 1940

"THE FEDERAL PROSECUTOR"

An Address

by

ROBERT H. JACKSON,
Attorney General of the United States

----------

Delivered at

The Second Annual Conference of
United States Attorneys

----------

Great Hall
Department of Justice Building
Washington, D. C.

April 1, 1940
10 A.M.

## THE FEDERAL PROSECUTOR

It would probably be within the range of that exaggeration permitted in Washington to say that assembled in this room is one of the most powerful peace-time forces known to our country.  The prosecutor has more control over life, liberty, and reputation than any other person in America.  His discretion is tremendous.  He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimations.  Or the prosecutor may choose a more subtle course and simply have a citizen's friends interviewed.  The prosecutor can order arrests, present cases to the grand jury in secret session, and on the basis of his one-sided presentation of the facts, can cause the citizen to be indicted and held for trial.  He may dismiss the case before trial, in which case the defense never has a chance to be heard.  Or he may go on with a public trial.  If he obtains a conviction, the prosecutor can still make recommendations as to sentence, as to whether the prisoner should get probation or a suspended sentence, and after he is put away, as to whether he is a fit subject for parole.  While the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base motives, he is one of the worst.

These powers have been granted to our law-enforcement agencies because it seems necessary that such a power to prosecute be lodged somewhere.  This authority has been granted by people who really wanted the right thing done - wanted crime eliminated - but also wanted the best in our American traditions preserved.

Because of this immense power to strike at citizens, not with mere individual strength, but with all the force of government itself, the post of Federal District Attorney from the very beginning has been safeguarded by presidential appointment, requiring confirmation of the Senate of the United States.  You are thus required to win an expression of confidence in your character by both the legislative and the executive branches of the government before assuming the responsibilities of a federal prosecutor.

Your responsibility in your several districts for law enforcement and for its methods cannot be wholly surrendered to Washington, and ought not to be assumed by a centralized Department of Justice.  It is an unusual and rare instance in which the local District Attorney should be superseded in the handling of litigation, except where he requests help of Washington. It is also clear that with his knowledge of local sentiment and opinion, his contact with and intimate knowledge of the views of the court, and his acquaintance with the feelings of the group from which jurors are drawn, it is an unusual case in which his judgment should be overruled.

Experience, however, has demonstrated that some measure of centralized control is necessary.  In the absence of it different district attorneys were striving for different interpretations or applications of an Act, or were pursuing different conceptions of policy.  Also, to put it mildly, there were differences in the degree of diligence and zeal in different districts.  To promote uniformity of policy and action, to establish some standards of performance, and to make available specialized help, some degree of centralized administration was found necessary.

Our problem, of course, is to balance these opposing considerations. I desire to avoid any lessening of the prestige and influence of the

district attorneys in their districts. At the same time we must proceed

in all districts with that uniformity of policy which is necessary to

the prestige of federal law.

Nothing better can come out of this meeting of law enforcement offi-
cers than a rededication to the spirit of fair play and decency·that

should animate the federal prosecutor. Your positions are of such inde-
pendence and importance that while you are being diligent, strict, and

vigorous in law enforcement you can also afford to be just. Although the

government technically loses its case, it has really won if justice has

been done. The lawyer in public office is justified in seeking to leave

behind him a good record. But he must remember that his most alert and

severe, but just, judges will be the members of his own profession, and

that lawyers rest their good opinion of each other not merely on results

accomplished but on the quality of the performance. Reputation has been

called "the shadow cast by one's daily life." Any prosecutor who risks

his day-to-day professional name for fair dealing to build up statistics

of success has a perverted sense of practical values, as well as defects

of character. Whether one seeks promotion to a judgeship, as many prose-
cutors rightly do, or whether he returns to private practice, he can have

no better asset than to have his profession recognize that his attitude

toward those who feel his power has been dispassionate, reasonable and

just.

The federal prosecutor has now been prohibited from engaging in

political activities. I am convinced that a good-faith acceptance of the

spirit and letter of that doctrine will relieve many district attorneys

from the embarrassment of what have heretofore been regarded as legitimate

-3-

expectations of political service. There can also be no doubt that to be closely identified with the intrigue, the money raising, and the machinery of a particular party or faction may present a prosecuting officer with embarrassing alignments and associations. I think the Hatch Act should be utilized by federal prosecutors as a protection against demands on their time and their prestige to participate in the operation of the machinery of practical politics.

There is a most important reason why the prosecutor should have, as nearly as possible, a detached and impartial view of all groups in his community. Law enforcement is not automatic. It isn't blind. One of the greatest difficulties of the position of prosecutor is that he must pick his cases, because no prosecutor can even investigate all of the cases in which he receives complaints. If the Department of Justice were to make even a pretense of reaching every probable violation of federal law, ten times its present staff would be inadequate. We know that no local police force can strictly enforce the traffic laws, or it would arrest half the driving population on any given morning. What every prosecutor is practically required to do is to select the cases for prosecution and to select those in which the offense is the most flagrant, the public harm the greatest, and the proof the most certain.

If the prosecutor is obliged to choose his cases, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted. With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost

-4-

anyone.  In such a case, it is not a question of discovering the commission
of a crime and then looking for the man who has committed it, it is a
question of picking the man and then searching the law books, or putting
investigators to work, to pin some offense on him.  It is in this realm -
in which the prosecutor picks some person whom he dislikes or desires to
embarrass, or selects some group of unpopular persons and then looks for
an offense, that the greatest danger of abuse of prosecuting power lies.
It is here that law enforcement becomes personal, and the real crime be-
comes that of being unpopular with the predominant or governing group,
being attached to the wrong political views, or being personally obnoxious
to or in the way of the prosecutor himself.

In times of fear or hysteria political, racial, religious, social,
and economic groups, often from the best of motives, cry for the scalps
of individuals or groups because they do not like their views.  Particu-
larly do we need to be dispassionate and courageous in those cases which
deal with so-called "subversive activities."  They are dangerous to
civil liberty because the prosecutor has no definite standards to determine
what constitutes a "subversive activity," such as we have for murder or
larceny.  Activities which seem benevolent and helpful to wage earners,
persons on relief, or those who are disadvantaged in the struggle for ex-
istence may be regarded as "subversive" by those whose property interests
might be burdened or affected thereby.  Those who are in office are apt
to regard as "subversive" the activities of any of those who would bring
about a change of administration.  Some of our soundest constitutional
doctrines were once punished as subversive.  We must not forget that it
was not so long ago that both the term "Republican" and the term "Democrat"

were epithets with sinister meaning to denote persons of radical tendencies that were "subversive" of the order of things then dominant.

In the enforcement of laws which protect our national integrity and existence, we should prosecute any and every <u>act</u> of violation, but only overt acts, not the expression of opinion, or activities such as the holding of meetings, petitioning of Congress, or dissemination of news or opinions.  Only by extreme care can we protect the spirit as well as the letter of our civil liberties, and to do so is a responsibility of the federal prosecutor.

Another delicate task is to distinguish between the federal and the local in law-enforcement activities.  We must bear in mind that we are concerned only with the prosecution of acts which the Congress has made federal offenses.  Those acts we should prosecute regardless of local sentiment, regardless of whether it exposes lax local enforcement, regardless of whether it makes or breaks local politicians.

But outside of federal law each locality has the right under our system of government to fix its own standards of law enforcement and of morals.  And the moral climate of the United States is as varied as its physical climate.  For example, some states legalize and permit gambling, some states prohibit it legislatively and protect it administratively, and some try to prohibit it entirely.  The same variation of attitudes towards other law-enforcement problems exists.  The federal government could not enforce one kind of law in one place and another kind elsewhere. It could hardly adopt strict standards for loose states or loose standards for strict states without doing violence to local sentiment.  In spite of the temptation to divert our power to local conditions where they have

-6-

become offensive to our sense of decency, the only long-term policy that will save federal justice from being discredited by entanglements with local politics is that it confine itself to strict and impartial enforcement of federal law, letting the chips fall in the community where they may. Just as there should be no permitting of local considerations to stop federal enforcement, so there should be no striving to enlarge our power over local affairs and no use of federal prosecutions to exert an indirect influence that would be unlawful if exerted directly.

The qualities of a good prosecutor are as elusive and as impossible to define as those which mark a gentleman.  And those who need to be told would not understand it anyway.  A sensitiveness to fair play and sportsmanship is perhaps the best protection against the abuse of power, and the citizen's safety lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the law and not factional purposes, and who approaches his task with humility.

# Exhibit 5E

U.S. Census Bureau, *City and Town Population Totals: 2020-2022* available at
https://www2.census.gov/programs-surveys/popest/tables/2020-2022/cities/totals/SUB-IP-
EST2022-POP-28.xlsx.

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022**

| Geographic Area | April 1, 2020 Estimates Base | Population Estimate (as of July | |
|---|---|---|---|
| | | 2020 | 2021 |
| Abbeville town, Mississippi | 369 | 369 | 374 |
| Aberdeen city, Mississippi | 4,953 | 4,962 | 4,914 |
| Ackerman town, Mississippi | 1,588 | 1,582 | 1,564 |
| Algoma town, Mississippi | 705 | 706 | 708 |
| Alligator town, Mississippi | 114 | 113 | 111 |
| Amory city, Mississippi | 6,673 | 6,654 | 6,576 |
| Anguilla town, Mississippi | 498 | 494 | 479 |
| Arcola town, Mississippi | 306 | 304 | 298 |
| Artesia town, Mississippi | 326 | 325 | 323 |
| Ashland town, Mississippi | 553 | 554 | 547 |
| Baldwyn city, Mississippi | 3,073 | 3,069 | 3,065 |
| Bassfield town, Mississippi | 192 | 191 | 188 |
| Batesville city, Mississippi | 7,518 | 7,507 | 7,426 |
| Bay St. Louis city, Mississippi | 9,289 | 9,433 | 9,971 |
| Bay Springs city, Mississippi | 1,666 | 1,663 | 1,644 |
| Beaumont town, Mississippi | 669 | 665 | 665 |
| Beauregard village, Mississippi | 289 | 288 | 288 |
| Belmont town, Mississippi | 1,861 | 1,859 | 1,845 |
| Belzoni city, Mississippi | 1,897 | 1,884 | 1,833 |
| Benoit town, Mississippi | 364 | 362 | 356 |
| Bentonia town, Mississippi | 319 | 318 | 313 |
| Beulah town, Mississippi | 242 | 241 | 241 |
| Big Creek village, Mississippi | 133 | 132 | 129 |
| Biloxi city, Mississippi | 49,442 | 49,424 | 49,205 |
| Blue Mountain town, Mississippi | 946 | 943 | 936 |
| Blue Springs village, Mississippi | 436 | 436 | 439 |
| Bolton town, Mississippi | 439 | 437 | 431 |
| Booneville city, Mississippi | 9,110 | 9,090 | 9,038 |
| Boyle town, Mississippi | 528 | 528 | 515 |
| Brandon city, Mississippi | 25,127 | 25,157 | 25,406 |

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022**

| | | | |
|---|---|---|---|
| Braxton village, Mississippi | 184 | 183 | 181 |
| Brookhaven city, Mississippi | 11,677 | 11,644 | 11,713 |
| Brooksville town, Mississippi | 918 | 913 | 902 |
| Bruce town, Mississippi | 1,709 | 1,701 | 1,660 |
| Bude town, Mississippi | 789 | 788 | 791 |
| Burnsville town, Mississippi | 862 | 861 | 856 |
| Byhalia town, Mississippi | 1,343 | 1,343 | 1,371 |
| Byram city, Mississippi | 13,091 | 13,033 | 12,854 |
| Caledonia town, Mississippi | 1,132 | 1,131 | 1,121 |
| Calhoun City town, Mississippi | 1,533 | 1,528 | 1,489 |
| Canton city, Mississippi | 10,931 | 10,907 | 10,811 |
| Carrollton town, Mississippi | 435 | 433 | 430 |
| Carthage city, Mississippi | 4,898 | 4,888 | 4,866 |
| Cary town, Mississippi | 242 | 240 | 233 |
| Centreville town, Mississippi | 1,256 | 1,247 | 1,211 |
| Charleston city, Mississippi | 1,882 | 1,870 | 1,809 |
| Chunky town, Mississippi | 271 | 270 | 269 |
| Clarksdale city, Mississippi | 14,895 | 14,772 | 14,394 |
| Cleveland city, Mississippi | 11,196 | 11,137 | 10,866 |
| Clinton city, Mississippi | 28,102 | 27,978 | 27,461 |
| Coahoma town, Mississippi | 232 | 230 | 224 |
| Coffeeville town, Mississippi | 801 | 797 | 789 |
| Coldwater town, Mississippi | 1,382 | 1,383 | 1,369 |
| Collins city, Mississippi | 2,338 | 2,334 | 2,318 |
| Columbia city, Mississippi | 5,870 | 5,848 | 5,795 |
| Columbus city, Mississippi | 24,070 | 23,994 | 23,602 |
| Como town, Mississippi | 1,117 | 1,115 | 1,098 |
| Corinth city, Mississippi | 14,623 | 14,608 | 14,451 |
| Courtland town, Mississippi | 473 | 472 | 471 |
| Crawford town, Mississippi | 416 | 415 | 414 |
| Crenshaw town, Mississippi | 631 | 629 | 621 |
| Crosby town, Mississippi | 242 | 240 | 236 |

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022**

| | | | |
|---|---:|---:|---:|
| Crowder town, Mississippi | 565 | 563 | 552 |
| Cruger town, Mississippi | 268 | 266 | 258 |
| Crystal Springs city, Mississippi | 4,856 | 4,835 | 4,760 |
| Decatur town, Mississippi | 1,945 | 1,940 | 1,919 |
| De Kalb town, Mississippi | 877 | 876 | 859 |
| Derma town, Mississippi | 958 | 954 | 933 |
| Diamondhead city, Mississippi | 9,521 | 9,505 | 9,371 |
| D'Iberville city, Mississippi | 12,715 | 12,713 | 13,259 |
| D'Lo town, Mississippi | 375 | 376 | 370 |
| Doddsville town, Mississippi | 69 | 69 | 67 |
| Drew city, Mississippi | 1,845 | 1,833 | 1,786 |
| Duck Hill town, Mississippi | 619 | 657 | 800 |
| Dumas town, Mississippi | 464 | 462 | 459 |
| Duncan town, Mississippi | 281 | 280 | 278 |
| Durant city, Mississippi | 2,224 | 2,205 | 2,139 |
| Ecru town, Mississippi | 903 | 909 | 906 |
| Eden village, Mississippi | 134 | 133 | 137 |
| Edwards town, Mississippi | 995 | 990 | 972 |
| Ellisville city, Mississippi | 4,643 | 4,636 | 4,589 |
| Enterprise town, Mississippi | 500 | 497 | 492 |
| Ethel town, Mississippi | 344 | 343 | 341 |
| Eupora city, Mississippi | 2,093 | 2,087 | 2,096 |
| Falcon town, Mississippi | 125 | 125 | 121 |
| Falkner town, Mississippi | 438 | 438 | 436 |
| Farmington town, Mississippi | 2,055 | 2,053 | 2,033 |
| Fayette city, Mississippi | 1,446 | 1,442 | 1,414 |
| Flora town, Mississippi | 1,651 | 1,652 | 1,644 |
| Florence city, Mississippi | 4,569 | 4,582 | 4,637 |
| Flowood city, Mississippi | 10,199 | 10,239 | 10,380 |
| Forest city, Mississippi | 5,428 | 5,418 | 5,349 |
| French Camp town, Mississippi | 262 | 261 | 258 |
| Friars Point town, Mississippi | 898 | 891 | 869 |

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022**

| | | | |
|---|---:|---:|---:|
| Fulton city, Mississippi | 4,531 | 4,525 | 4,499 |
| Gattman village, Mississippi | 80 | 80 | 82 |
| Gautier city, Mississippi | 19,024 | 19,015 | 19,059 |
| Georgetown town, Mississippi | 256 | 255 | 251 |
| Glen town, Mississippi | 379 | 378 | 377 |
| Glendora village, Mississippi | 152 | 151 | 145 |
| Gloster town, Mississippi | 901 | 898 | 887 |
| Golden town, Mississippi | 187 | 187 | 187 |
| Goodman town, Mississippi | 1,260 | 1,253 | 1,220 |
| Greenville city, Mississippi | 29,689 | 29,489 | 28,789 |
| Greenwood city, Mississippi | 14,504 | 14,418 | 13,996 |
| Grenada city, Mississippi | 12,692 | 12,654 | 12,470 |
| Gulfport city, Mississippi | 72,923 | 72,872 | 72,220 |
| Gunnison town, Mississippi | 295 | 293 | 289 |
| Guntown town, Mississippi | 2,407 | 2,408 | 2,414 |
| Hatley town, Mississippi | 496 | 495 | 492 |
| Hattiesburg city, Mississippi | 48,731 | 48,737 | 48,482 |
| Hazlehurst city, Mississippi | 3,619 | 3,602 | 3,544 |
| Heidelberg town, Mississippi | 637 | 634 | 627 |
| Hernando city, Mississippi | 17,135 | 17,256 | 17,542 |
| Hickory town, Mississippi | 408 | 407 | 407 |
| Hickory Flat town, Mississippi | 495 | 496 | 493 |
| Hollandale city, Mississippi | 2,332 | 2,317 | 2,261 |
| Holly Springs city, Mississippi | 6,963 | 6,950 | 6,868 |
| Horn Lake city, Mississippi | 26,738 | 26,741 | 26,768 |
| Houston city, Mississippi | 3,800 | 3,792 | 3,759 |
| Indianola city, Mississippi | 9,640 | 9,589 | 9,368 |
| Inverness town, Mississippi | 868 | 864 | 842 |
| Isola town, Mississippi | 637 | 632 | 615 |
| Itta Bena city, Mississippi | 1,677 | 1,668 | 1,617 |
| Iuka city, Mississippi | 3,144 | 3,142 | 3,119 |
| Jackson city, Mississippi | 153,705 | 152,992 | 149,727 |

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022**

| | | | |
|---|---|---|---|
| Jonestown town, Mississippi | 964 | 957 | 935 |
| Jumpertown town, Mississippi | 424 | 423 | 423 |
| Kilmichael town, Mississippi | 641 | 637 | 620 |
| Kosciusko city, Mississippi | 7,111 | 7,079 | 7,003 |
| Kossuth village, Mississippi | 164 | 164 | 162 |
| Lake town, Mississippi | 476 | 475 | 472 |
| Lambert town, Mississippi | 1,272 | 1,268 | 1,214 |
| Laurel city, Mississippi | 17,177 | 17,148 | 17,123 |
| Leakesville town, Mississippi | 3,779 | 3,777 | 3,789 |
| Learned town, Mississippi | 56 | 56 | 55 |
| Leland city, Mississippi | 3,986 | 3,958 | 3,859 |
| Lena town, Mississippi | 158 | 157 | 157 |
| Lexington city, Mississippi | 1,603 | 1,589 | 1,539 |
| Liberty town, Mississippi | 558 | 556 | 551 |
| Long Beach city, Mississippi | 16,775 | 16,806 | 16,901 |
| Louin town, Mississippi | 274 | 274 | 272 |
| Louise town, Mississippi | 184 | 183 | 178 |
| Louisville city, Mississippi | 6,072 | 6,059 | 6,012 |
| Lucedale city, Mississippi | 2,868 | 2,871 | 2,920 |
| Lula town, Mississippi | 206 | 204 | 199 |
| Lumberton city, Mississippi | 1,625 | 1,627 | 1,644 |
| Lyon town, Mississippi | 295 | 293 | 284 |
| Maben town, Mississippi | 771 | 769 | 773 |
| McComb city, Mississippi | 12,412 | 12,356 | 12,219 |
| McCool town, Mississippi | 105 | 105 | 105 |
| McLain town, Mississippi | 314 | 314 | 318 |
| Macon city, Mississippi | 2,572 | 2,556 | 2,518 |
| Madison city, Mississippi | 27,747 | 27,750 | 27,726 |
| Magee city, Mississippi | 3,987 | 3,974 | 3,925 |
| Magnolia city, Mississippi | 1,888 | 1,880 | 1,867 |
| Mantachie town, Mississippi | 1,127 | 1,128 | 1,131 |
| Mantee village, Mississippi | 237 | 236 | 239 |

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022**

| | | | |
|---|---:|---:|---:|
| Marietta town, Mississippi | 195 | 195 | 194 |
| Marion town, Mississippi | 1,747 | 1,739 | 1,723 |
| Marks city, Mississippi | 1,441 | 1,435 | 1,375 |
| Mathiston town, Mississippi | 837 | 837 | 846 |
| Mayersville town, Mississippi | 432 | 429 | 420 |
| Meadville town, Mississippi | 446 | 445 | 445 |
| Mendenhall city, Mississippi | 2,205 | 2,199 | 2,170 |
| Meridian city, Mississippi | 35,050 | 34,865 | 34,379 |
| Merigold town, Mississippi | 378 | 376 | 367 |
| Metcalfe town, Mississippi | 817 | 812 | 794 |
| Mize town, Mississippi | 315 | 314 | 314 |
| Monticello town, Mississippi | 1,445 | 1,440 | 1,406 |
| Montrose town, Mississippi | 107 | 107 | 106 |
| Moorhead city, Mississippi | 1,945 | 1,936 | 1,889 |
| Morgan City town, Mississippi | 208 | 207 | 203 |
| Morton city, Mississippi | 3,711 | 3,707 | 3,652 |
| Moss Point city, Mississippi | 12,145 | 12,123 | 12,064 |
| Mound Bayou city, Mississippi | 1,533 | 1,525 | 1,487 |
| Mount Olive town, Mississippi | 890 | 888 | 887 |
| Myrtle town, Mississippi | 483 | 483 | 484 |
| Natchez city, Mississippi | 14,507 | 14,434 | 14,074 |
| Nettleton city, Mississippi | 1,936 | 1,932 | 1,910 |
| New Albany city, Mississippi | 7,621 | 7,625 | 7,654 |
| New Augusta town, Mississippi | 556 | 553 | 552 |
| New Hebron town, Mississippi | 387 | 386 | 377 |
| New Houlka town, Mississippi | 698 | 696 | 692 |
| Newton city, Mississippi | 3,196 | 3,188 | 3,154 |
| North Carrollton town, Mississippi | 405 | 402 | 395 |
| Noxapater town, Mississippi | 388 | 387 | 384 |
| Oakland town, Mississippi | 465 | 463 | 462 |
| Ocean Springs city, Mississippi | 18,433 | 18,425 | 18,425 |
| Okolona city, Mississippi | 2,507 | 2,502 | 2,478 |

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022**

| | | | |
|---|---|---|---|
| Olive Branch city, Mississippi | 46,419 | 46,580 | 46,958 |
| Osyka town, Mississippi | 377 | 375 | 373 |
| Oxford city, Mississippi | 25,424 | 25,501 | 26,015 |
| Pace town, Mississippi | 182 | 181 | 179 |
| Pachuta town, Mississippi | 206 | 205 | 203 |
| Paden village, Mississippi | 105 | 105 | 104 |
| Pascagoula city, Mississippi | 22,003 | 21,970 | 21,884 |
| Pass Christian city, Mississippi | 5,691 | 5,746 | 5,892 |
| Pearl city, Mississippi | 27,117 | 27,142 | 27,364 |
| Pelahatchie town, Mississippi | 1,266 | 1,265 | 1,269 |
| Petal city, Mississippi | 11,006 | 11,017 | 11,090 |
| Philadelphia city, Mississippi | 7,123 | 7,088 | 7,019 |
| Picayune city, Mississippi | 11,888 | 11,867 | 11,781 |
| Pickens town, Mississippi | 924 | 916 | 890 |
| Pittsboro village, Mississippi | 163 | 162 | 159 |
| Plantersville town, Mississippi | 866 | 864 | 856 |
| Polkville town, Mississippi | 591 | 590 | 592 |
| Pontotoc city, Mississippi | 5,634 | 5,642 | 5,708 |
| Pope village, Mississippi | 268 | 267 | 266 |
| Poplarville city, Mississippi | 2,822 | 2,818 | 2,791 |
| Port Gibson city, Mississippi | 1,275 | 1,268 | 1,233 |
| Potts Camp town, Mississippi | 419 | 418 | 413 |
| Prentiss town, Mississippi | 969 | 966 | 950 |
| Puckett village, Mississippi | 343 | 343 | 343 |
| Purvis city, Mississippi | 1,901 | 1,902 | 1,932 |
| Quitman city, Mississippi | 2,062 | 2,050 | 2,026 |
| Raleigh town, Mississippi | 1,089 | 1,089 | 1,089 |
| Raymond city, Mississippi | 1,942 | 1,936 | 1,890 |
| Renova town, Mississippi | 672 | 675 | 688 |
| Richland city, Mississippi | 7,138 | 7,145 | 7,227 |
| Richton town, Mississippi | 925 | 920 | 918 |
| Ridgeland city, Mississippi | 24,664 | 24,612 | 24,466 |

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022**

| | | | |
|---|---|---|---|
| Rienzi town, Mississippi | 279 | 279 | 275 |
| Ripley city, Mississippi | 5,463 | 5,442 | 5,416 |
| Rolling Fork city, Mississippi | 1,871 | 1,856 | 1,798 |
| Rosedale city, Mississippi | 1,583 | 1,575 | 1,535 |
| Roxie town, Mississippi | 474 | 473 | 476 |
| Ruleville city, Mississippi | 2,640 | 2,627 | 2,571 |
| Sallis town, Mississippi | 131 | 130 | 129 |
| Saltillo city, Mississippi | 4,919 | 4,918 | 4,914 |
| Sandersville town, Mississippi | 636 | 635 | 630 |
| Sardis town, Mississippi | 1,753 | 1,747 | 1,723 |
| Satartia village, Mississippi | 39 | 39 | 38 |
| Schlater town, Mississippi | 237 | 236 | 229 |
| Scooba town, Mississippi | 743 | 741 | 723 |
| Sebastopol town, Mississippi | 266 | 266 | 263 |
| Seminary town, Mississippi | 301 | 300 | 298 |
| Senatobia city, Mississippi | 8,353 | 8,359 | 8,321 |
| Shannon town, Mississippi | 1,495 | 1,492 | 1,487 |
| Shaw city, Mississippi | 1,458 | 1,450 | 1,421 |
| Shelby city, Mississippi | 2,021 | 2,011 | 1,962 |
| Sherman town, Mississippi | 596 | 597 | 603 |
| Shubuta town, Mississippi | 408 | 406 | 401 |
| Shuqualak town, Mississippi | 404 | 402 | 396 |
| Sidon town, Mississippi | 314 | 312 | 306 |
| Silver City town, Mississippi | 222 | 220 | 215 |
| Silver Creek town, Mississippi | 179 | 178 | 174 |
| Slate Springs village, Mississippi | 103 | 103 | 100 |
| Sledge town, Mississippi | 372 | 371 | 356 |
| Smithville town, Mississippi | 508 | 508 | 515 |
| Snow Lake Shores town, Mississippi | 307 | 307 | 304 |
| Soso town, Mississippi | 423 | 411 | 408 |
| Southaven city, Mississippi | 54,647 | 54,841 | 55,565 |
| Starkville city, Mississippi | 24,356 | 24,327 | 24,395 |

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022**

| | | | |
|---|---:|---:|---:|
| State Line town, Mississippi | 452 | 452 | 457 |
| Stonewall town, Mississippi | 880 | 876 | 866 |
| Sturgis town, Mississippi | 207 | 206 | 206 |
| Summit town, Mississippi | 1,497 | 1,491 | 1,480 |
| Sumner town, Mississippi | 276 | 274 | 265 |
| Sumrall town, Mississippi | 1,759 | 1,775 | 1,848 |
| Sunflower town, Mississippi | 967 | 962 | 938 |
| Sylvarena village, Mississippi | 86 | 86 | 85 |
| Taylor village, Mississippi | 352 | 354 | 370 |
| Taylorsville town, Mississippi | 1,145 | 1,142 | 1,134 |
| Tchula town, Mississippi | 1,653 | 1,643 | 1,625 |
| Terry town, Mississippi | 1,300 | 1,310 | 1,365 |
| Thaxton town, Mississippi | 696 | 695 | 697 |
| Tishomingo town, Mississippi | 373 | 373 | 369 |
| Toccopola town, Mississippi | 286 | 286 | 289 |
| Tremont town, Mississippi | 468 | 468 | 468 |
| Tunica town, Mississippi | 1,028 | 1,018 | 984 |
| Tupelo city, Mississippi | 37,923 | 37,918 | 37,825 |
| Tutwiler town, Mississippi | 2,480 | 2,476 | 2,446 |
| Tylertown town, Mississippi | 1,498 | 1,495 | 1,481 |
| Union town, Mississippi | 2,043 | 2,037 | 2,020 |
| Utica town, Mississippi | 638 | 639 | 632 |
| Vaiden town, Mississippi | 897 | 895 | 891 |
| Vardaman town, Mississippi | 1,115 | 1,111 | 1,086 |
| Verona city, Mississippi | 2,796 | 2,791 | 2,766 |
| Vicksburg city, Mississippi | 21,564 | 21,466 | 20,866 |
| Walls town, Mississippi | 1,344 | 1,351 | 1,362 |
| Walnut town, Mississippi | 705 | 702 | 695 |
| Walnut Grove town, Mississippi | 511 | 510 | 509 |
| Walthall village, Mississippi | 115 | 115 | 115 |
| Water Valley city, Mississippi | 3,384 | 3,374 | 3,366 |
| Waveland city, Mississippi | 7,207 | 7,195 | 7,072 |

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022**

| | | | |
|---|---|---|---|
| Waynesboro city, Mississippi | 4,565 | 4,570 | 4,550 |
| Webb town, Mississippi | 413 | 410 | 399 |
| Weir town, Mississippi | 443 | 440 | 438 |
| Wesson town, Mississippi | 1,841 | 1,834 | 1,808 |
| West town, Mississippi | 153 | 152 | 147 |
| West Point city, Mississippi | 10,106 | 10,091 | 9,991 |
| Wiggins city, Mississippi | 4,270 | 4,265 | 4,292 |
| Winona city, Mississippi | 4,499 | 4,466 | 4,340 |
| Winstonville town, Mississippi | 152 | 151 | 148 |
| Woodland village, Mississippi | 110 | 110 | 110 |
| Woodville town, Mississippi | 927 | 919 | 888 |
| Yazoo City city, Mississippi | 10,316 | 10,269 | 10,116 |

Note: The estimates are based on the 2020 Census and reflect changes to the April 1, 2020 population due to the Count Question Resolution program, geographic program revisions, an avoidance to protect confidentiality. For population estimates methodology statements, see https://www.census.gov/programs-surveys/popest/technical-documentation/methodology.htm the 2022 population estimates series are as of January 1, 2022. For updates on Legal Boundary Change/Annexation Data, see https://www.census.gov/geographies/reference-files/time- Additional information on these localities can be found in the Geographic Boundary Change Notes (see https://www.census.gov/programs-surveys/geography/technical-documentation/b

**Suggested Citation:**

**Annual Estimates of the Resident Population for Incorporated Places in Mississippi: April 1, 2020 to July 1, 2022 (SUB-IP-EST2022-POP-28)**

**Source: U.S. Census Bureau, Population Division**

**Release Date: May 2023**

| Annual Estimates of the Resident Population for Incorporated Pl | y 1) |
|---|---|
| **Geographic Area** | **2022** |
| Abbeville town, Mississippi | 379 |
| Aberdeen city, Mississippi | 4,848 |
| Ackerman town, Mississippi | 1,549 |
| Algoma town, Mississippi | 708 |
| Alligator town, Mississippi | 107 |
| Amory city, Mississippi | 6,476 |
| Anguilla town, Mississippi | 458 |
| Arcola town, Mississippi | 290 |
| Artesia town, Mississippi | 321 |
| Ashland town, Mississippi | 538 |
| Baldwyn city, Mississippi | 3,046 |
| Bassfield town, Mississippi | 186 |
| Batesville city, Mississippi | 7,334 |
| Bay St. Louis city, Mississippi | 10,596 |
| Bay Springs city, Mississippi | 1,622 |
| Beaumont town, Mississippi | 656 |
| Beauregard village, Mississippi | 287 |
| Belmont town, Mississippi | 1,830 |
| Belzoni city, Mississippi | 1,776 |
| Benoit town, Mississippi | 345 |
| Bentonia town, Mississippi | 307 |
| Beulah town, Mississippi | 238 |
| Big Creek village, Mississippi | 127 |
| Biloxi city, Mississippi | 49,118 |
| Blue Mountain town, Mississippi | 932 |
| Blue Springs village, Mississippi | 439 |
| Bolton town, Mississippi | 424 |
| Booneville city, Mississippi | 8,978 |
| Boyle town, Mississippi | 499 |
| Brandon city, Mississippi | 25,502 |

| Annual Estimates of the Resident Population for Incorporated Pl | |
|---|---|
| Braxton village, Mississippi | 181 |
| Brookhaven city, Mississippi | 11,608 |
| Brooksville town, Mississippi | 891 |
| Bruce town, Mississippi | 1,632 |
| Bude town, Mississippi | 787 |
| Burnsville town, Mississippi | 851 |
| Byhalia town, Mississippi | 1,367 |
| Byram city, Mississippi | 12,721 |
| Caledonia town, Mississippi | 1,113 |
| Calhoun City town, Mississippi | 1,465 |
| Canton city, Mississippi | 10,744 |
| Carrollton town, Mississippi | 426 |
| Carthage city, Mississippi | 4,813 |
| Cary town, Mississippi | 222 |
| Centreville town, Mississippi | 1,188 |
| Charleston city, Mississippi | 1,757 |
| Chunky town, Mississippi | 269 |
| Clarksdale city, Mississippi | 13,969 |
| Cleveland city, Mississippi | 10,545 |
| Clinton city, Mississippi | 26,996 |
| Coahoma town, Mississippi | 218 |
| Coffeeville town, Mississippi | 779 |
| Coldwater town, Mississippi | 1,359 |
| Collins city, Mississippi | 2,286 |
| Columbia city, Mississippi | 5,711 |
| Columbus city, Mississippi | 23,273 |
| Como town, Mississippi | 1,081 |
| Corinth city, Mississippi | 14,312 |
| Courtland town, Mississippi | 467 |
| Crawford town, Mississippi | 412 |
| Crenshaw town, Mississippi | 616 |
| Crosby town, Mississippi | 233 |

| Annual Estimates of the Resident Population for Incorporated Pl | |
|---|---:|
| Crowder town, Mississippi | 541 |
| Cruger town, Mississippi | 251 |
| Crystal Springs city, Mississippi | 4,700 |
| Decatur town, Mississippi | 1,920 |
| De Kalb town, Mississippi | 845 |
| Derma town, Mississippi | 921 |
| Diamondhead city, Mississippi | 9,211 |
| D'Iberville city, Mississippi | 13,309 |
| D'Lo town, Mississippi | 366 |
| Doddsville town, Mississippi | 68 |
| Drew city, Mississippi | 1,737 |
| Duck Hill town, Mississippi | 966 |
| Dumas town, Mississippi | 455 |
| Duncan town, Mississippi | 273 |
| Durant city, Mississippi | 2,073 |
| Ecru town, Mississippi | 919 |
| Eden village, Mississippi | 136 |
| Edwards town, Mississippi | 953 |
| Ellisville city, Mississippi | 4,563 |
| Enterprise town, Mississippi | 483 |
| Ethel town, Mississippi | 335 |
| Eupora city, Mississippi | 2,093 |
| Falcon town, Mississippi | 117 |
| Falkner town, Mississippi | 431 |
| Farmington town, Mississippi | 2,018 |
| Fayette city, Mississippi | 1,390 |
| Flora town, Mississippi | 1,633 |
| Florence city, Mississippi | 4,704 |
| Flowood city, Mississippi | 10,530 |
| Forest city, Mississippi | 5,330 |
| French Camp town, Mississippi | 254 |
| Friars Point town, Mississippi | 846 |

| Annual Estimates of the Resident Population for Incorporated Pl | |
|---|---|
| Fulton city, Mississippi | 4,503 |
| Gattman village, Mississippi | 83 |
| Gautier city, Mississippi | 18,977 |
| Georgetown town, Mississippi | 248 |
| Glen town, Mississippi | 375 |
| Glendora village, Mississippi | 144 |
| Gloster town, Mississippi | 877 |
| Golden town, Mississippi | 185 |
| Goodman town, Mississippi | 1,203 |
| Greenville city, Mississippi | 28,017 |
| Greenwood city, Mississippi | 13,541 |
| Grenada city, Mississippi | 12,302 |
| Gulfport city, Mississippi | 72,236 |
| Gunnison town, Mississippi | 282 |
| Guntown town, Mississippi | 2,419 |
| Hatley town, Mississippi | 486 |
| Hattiesburg city, Mississippi | 48,455 |
| Hazlehurst city, Mississippi | 3,497 |
| Heidelberg town, Mississippi | 621 |
| Hernando city, Mississippi | 18,053 |
| Hickory town, Mississippi | 404 |
| Hickory Flat town, Mississippi | 486 |
| Hollandale city, Mississippi | 2,198 |
| Holly Springs city, Mississippi | 6,823 |
| Horn Lake city, Mississippi | 26,550 |
| Houston city, Mississippi | 3,709 |
| Indianola city, Mississippi | 9,134 |
| Inverness town, Mississippi | 821 |
| Isola town, Mississippi | 597 |
| Itta Bena city, Mississippi | 1,563 |
| Iuka city, Mississippi | 3,096 |
| Jackson city, Mississippi | 145,995 |

| Annual Estimates of the Resident Population for Incorporated Pl | |
|---|---|
| Jonestown town, Mississippi | 909 |
| Jumpertown town, Mississippi | 421 |
| Kilmichael town, Mississippi | 599 |
| Kosciusko city, Mississippi | 6,922 |
| Kossuth village, Mississippi | 160 |
| Lake town, Mississippi | 469 |
| Lambert town, Mississippi | 1,167 |
| Laurel city, Mississippi | 17,066 |
| Leakesville town, Mississippi | 3,771 |
| Learned town, Mississippi | 55 |
| Leland city, Mississippi | 3,750 |
| Lena town, Mississippi | 155 |
| Lexington city, Mississippi | 1,491 |
| Liberty town, Mississippi | 546 |
| Long Beach city, Mississippi | 17,101 |
| Louin town, Mississippi | 269 |
| Louise town, Mississippi | 173 |
| Louisville city, Mississippi | 5,964 |
| Lucedale city, Mississippi | 2,988 |
| Lula town, Mississippi | 194 |
| Lumberton city, Mississippi | 1,642 |
| Lyon town, Mississippi | 276 |
| Maben town, Mississippi | 763 |
| McComb city, Mississippi | 12,041 |
| McCool town, Mississippi | 106 |
| McLain town, Mississippi | 316 |
| Macon city, Mississippi | 2,479 |
| Madison city, Mississippi | 27,775 |
| Magee city, Mississippi | 3,891 |
| Magnolia city, Mississippi | 1,847 |
| Mantachie town, Mississippi | 1,134 |
| Mantee village, Mississippi | 242 |

| Annual Estimates of the Resident Population for Incorporated Pl | |
|---|---|
| Marietta town, Mississippi | 193 |
| Marion town, Mississippi | 1,700 |
| Marks city, Mississippi | 1,322 |
| Mathiston town, Mississippi | 854 |
| Mayersville town, Mississippi | 411 |
| Meadville town, Mississippi | 440 |
| Mendenhall city, Mississippi | 2,148 |
| Meridian city, Mississippi | 33,816 |
| Merigold town, Mississippi | 356 |
| Metcalfe town, Mississippi | 771 |
| Mize town, Mississippi | 312 |
| Monticello town, Mississippi | 1,388 |
| Montrose town, Mississippi | 106 |
| Moorhead city, Mississippi | 1,859 |
| Morgan City town, Mississippi | 197 |
| Morton city, Mississippi | 3,650 |
| Moss Point city, Mississippi | 11,931 |
| Mound Bayou city, Mississippi | 1,440 |
| Mount Olive town, Mississippi | 878 |
| Myrtle town, Mississippi | 486 |
| Natchez city, Mississippi | 13,812 |
| Nettleton city, Mississippi | 1,893 |
| New Albany city, Mississippi | 7,667 |
| New Augusta town, Mississippi | 542 |
| New Hebron town, Mississippi | 370 |
| New Houlka town, Mississippi | 686 |
| Newton city, Mississippi | 3,121 |
| North Carrollton town, Mississippi | 391 |
| Noxapater town, Mississippi | 381 |
| Oakland town, Mississippi | 458 |
| Ocean Springs city, Mississippi | 18,662 |
| Okolona city, Mississippi | 2,441 |

| Annual Estimates of the Resident Population for Incorporated Pl | |
|---|---|
| Olive Branch city, Mississippi | 47,086 |
| Osyka town, Mississippi | 369 |
| Oxford city, Mississippi | 26,437 |
| Pace town, Mississippi | 173 |
| Pachuta town, Mississippi | 199 |
| Paden village, Mississippi | 103 |
| Pascagoula city, Mississippi | 21,650 |
| Pass Christian city, Mississippi | 6,154 |
| Pearl city, Mississippi | 27,682 |
| Pelahatchie town, Mississippi | 1,267 |
| Petal city, Mississippi | 11,230 |
| Philadelphia city, Mississippi | 6,927 |
| Picayune city, Mississippi | 11,826 |
| Pickens town, Mississippi | 862 |
| Pittsboro village, Mississippi | 157 |
| Plantersville town, Mississippi | 849 |
| Polkville town, Mississippi | 589 |
| Pontotoc city, Mississippi | 5,765 |
| Pope village, Mississippi | 263 |
| Poplarville city, Mississippi | 2,811 |
| Port Gibson city, Mississippi | 1,206 |
| Potts Camp town, Mississippi | 409 |
| Prentiss town, Mississippi | 938 |
| Puckett village, Mississippi | 345 |
| Purvis city, Mississippi | 1,942 |
| Quitman city, Mississippi | 1,985 |
| Raleigh town, Mississippi | 1,081 |
| Raymond city, Mississippi | 1,892 |
| Renova town, Mississippi | 702 |
| Richland city, Mississippi | 7,297 |
| Richton town, Mississippi | 902 |
| Ridgeland city, Mississippi | 24,404 |

| Annual Estimates of the Resident Population for Incorporated Pl | |
|---|---|
| Rienzi town, Mississippi | 272 |
| Ripley city, Mississippi | 5,370 |
| Rolling Fork city, Mississippi | 1,720 |
| Rosedale city, Mississippi | 1,486 |
| Roxie town, Mississippi | 474 |
| Ruleville city, Mississippi | 2,516 |
| Sallis town, Mississippi | 129 |
| Saltillo city, Mississippi | 4,940 |
| Sandersville town, Mississippi | 624 |
| Sardis town, Mississippi | 1,696 |
| Satartia village, Mississippi | 37 |
| Schlater town, Mississippi | 224 |
| Scooba town, Mississippi | 727 |
| Sebastopol town, Mississippi | 261 |
| Seminary town, Mississippi | 293 |
| Senatobia city, Mississippi | 8,330 |
| Shannon town, Mississippi | 1,484 |
| Shaw city, Mississippi | 1,385 |
| Shelby city, Mississippi | 1,903 |
| Sherman town, Mississippi | 604 |
| Shubuta town, Mississippi | 396 |
| Shuqualak town, Mississippi | 388 |
| Sidon town, Mississippi | 298 |
| Silver City town, Mississippi | 209 |
| Silver Creek town, Mississippi | 172 |
| Slate Springs village, Mississippi | 100 |
| Sledge town, Mississippi | 346 |
| Smithville town, Mississippi | 511 |
| Snow Lake Shores town, Mississippi | 298 |
| Soso town, Mississippi | 408 |
| Southaven city, Mississippi | 56,360 |
| Starkville city, Mississippi | 24,168 |

| Annual Estimates of the Resident Population for Incorporated Pl | |
|---|---:|
| State Line town, Mississippi | 458 |
| Stonewall town, Mississippi | 850 |
| Sturgis town, Mississippi | 203 |
| Summit town, Mississippi | 1,464 |
| Sumner town, Mississippi | 257 |
| Sumrall town, Mississippi | 1,911 |
| Sunflower town, Mississippi | 912 |
| Sylvarena village, Mississippi | 84 |
| Taylor village, Mississippi | 384 |
| Taylorsville town, Mississippi | 1,118 |
| Tchula town, Mississippi | 1,631 |
| Terry town, Mississippi | 1,423 |
| Thaxton town, Mississippi | 696 |
| Tishomingo town, Mississippi | 365 |
| Toccopola town, Mississippi | 292 |
| Tremont town, Mississippi | 471 |
| Tunica town, Mississippi | 939 |
| Tupelo city, Mississippi | 37,748 |
| Tutwiler town, Mississippi | 2,435 |
| Tylertown town, Mississippi | 1,467 |
| Union town, Mississippi | 2,006 |
| Utica town, Mississippi | 621 |
| Vaiden town, Mississippi | 886 |
| Vardaman town, Mississippi | 1,071 |
| Verona city, Mississippi | 2,747 |
| Vicksburg city, Mississippi | 20,391 |
| Walls town, Mississippi | 1,376 |
| Walnut town, Mississippi | 687 |
| Walnut Grove town, Mississippi | 506 |
| Walthall village, Mississippi | 115 |
| Water Valley city, Mississippi | 3,361 |
| Waveland city, Mississippi | 6,943 |

| Annual Estimates of the Resident Population for Incorporated Pl | |
|---|---:|
| Waynesboro city, Mississippi | 4,530 |
| Webb town, Mississippi | 390 |
| Weir town, Mississippi | 434 |
| Wesson town, Mississippi | 1,805 |
| West town, Mississippi | 141 |
| West Point city, Mississippi | 9,885 |
| Wiggins city, Mississippi | 4,266 |
| Winona city, Mississippi | 4,159 |
| Winstonville town, Mississippi | 143 |
| Woodland village, Mississippi | 113 |
| Woodville town, Mississippi | 869 |
| Yazoo City city, Mississippi | 9,844 |

Note: The estimates are based on the 2020 Census and reflect changes to the Aprid the application of disclosure avoidance to protect confidentiality. For population estimates methodology statemel. All geographic boundaries for the 2022 population estimates series are as of January 1, 2022. For updates on Le-series/geo/bas/annex.html. Additional information on these localities can be found in the Geographic Boundaryoundary-change-notes.html).

**Suggested Citation:**

**Annual Estimates of the Resident Population for Incorporated Places in Missi**

**Source: U.S. Census Bureau, Population Division**

**Release Date: May 2023**

# Exhibit 5F

Hearing Transcript (June 29, 2023)

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                        NORTHERN DIVISION

 3


 4   JXN UNDIVIDED COALITION, ET AL.,              PLAINTIFFS

 5   VERSUS              CIVIL ACTION NO. 3:23-cv-00351-TSL-RPM

 6   SEAN TINDELL, ET AL.,                         DEFENDANTS

 7

 8                      MOTIONS PROCEEDINGS
 9          BEFORE THE HONORABLE HENRY T. WINGATE,
             UNITED STATES DISTRICT COURT JUDGE,
10                      JUNE 29, 2023,
                      JACKSON, MISSISSIPPI
11

12

13

14                 (APPEARANCES NOTED HEREIN.)
15

16

17

18

19

20

21
     REPORTED BY:
22
         CAROLINE MORGAN, CCR #1957
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4188
25       E-mail:  Caroline_Morgan@mssd.uscourts.gov
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:      PALOMA WU, ESQ.
                               J. CLIFF JOHNSON, II, ESQ.
 3

 4

 5    FOR THE DEFENDANTS:      J. CHADWICK WILLIAMS, ESQ.
                               WILSON D. MINOR, ESQ.
 6

 7    ALSO PRESENT:            GERALD KUCIA
                               REX SHANNON
 8                             CARROLL RHODES
                               BLAKE FELDMAN
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          So before me, then, is this plaintiffs' motion for a

2     preliminary injunction which focuses upon Section 2343, the

3     admonition therein that would require protesters in the

4     vicinity of public buildings to obtain prior permission from

5     two individuals who are herein named as defendants.  Failure

6     to obtain permission from either one of those individuals

7     would subject the violator to penalty, which could include a

8     criminal penalty.

9          Now, we all know, since you all practice law in this

10    particular area, that where a statute proscribes certain

11    conduct and where the statute prescribes -- the first word

12    was "proscribe," P-R-O-S; the second one is "prescribes" --

13    the possibility of criminal entanglement that the statute is

14    to be looked at sternly.  And where there is a suggestion

15    that First Amendment rights are being proscribed, then the

16    Court is called upon to examine the statute for its chilling

17    effect, chilling effect that is where persons who feel

18    justifiably that they could be caught in the snare of the

19    statute's reach may be deterred from exercising their First

20    Amendment rights because of fear of criminal penalty.

21          So this Court naturally, recognizing all of this, has

22    shone its eyes on the statute itself, the penalty, and of

23    course the law that governs this whole matter, the law under

24    the injunctive rule which tells the Court to apply these

25    four factors that are quite ancient, being promulgated back

1 **COURT REPORTER'S CERTIFICATE**

2

3          I, Caroline Morgan, Official Court Reporter for the

4   United States District Court for the Southern District of

5   Mississippi, do hereby certify that the above and foregoing

6   pages contain a full, true, and correct transcript of the

7   proceedings had in the forenamed case at the time and place

8   indicated, which proceedings were stenographically reported by

9   me to the best of my skill and ability.

10          I further certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13          THIS, the 6th day of July, 2023.

14

15                         /s/ Caroline Morgan, CCR

16                         Caroline Morgan CCR #1957
                           Official Court Reporter
17                         United States District Court
                           Caroline_Morgan@mssd.uscourts.gov
18

19

20

21

22

23

24

25

# Exhibit 5G

Howard Ballou, *Historical marker recognizing Freedom Riders unveiled at Parchman*, WLBT3 (Jan. 25, 2023), available at  https://www.wlbt.com/2023/01/25/historical-marker-recognizing-freedom-riders-unveiled-parchman/.

# Historical marker recognizing Freedom Riders unveiled at Parchman

**wlbt.com**/2023/01/25/historical-marker-recognizing-freedom-riders-unveiled-parchman

By Howard Ballou                                                            January 25, 2023



JACKSON, Miss. (WLBT) - History was made at Parchman prison Tuesday when a historical marker was unveiled and a former Freedom Rider returned, this time, not as an inmate, but as a guest of honor.

"I dread coming here today," said Hezekiah Watkins.

It has taken Watkins 62 years to confront what he describes as the worst day of his life, revisiting Cell Block 17 at Parchman Prison.

It's where he and 328 other Freedom Riders were taken as punishment for protesting segregated bus and train terminals in Mississippi and across the Deep South.

Hezekiah Watkins said, "I really wasn't a Freedom Rider. I was just a 13-year-old boy who went to the bus station to look at the freedom riders; not to be one, I just wanted to see what a Freedom Rider looked like."

A friend had pushed Watkins into the bus terminal in Jackson that day and he ended up spending at least 5 days in the notorious prison before then Governor Ross Barnett released him.

"So you have to remember that I was a 13-year-old boy who had not been exposed to anything. Had not been outside of my boundaries, which was my neighborhood. Didn't know nothing about nothing," said Watkins.

But time has a way of offering, at least, some semblance of healing and Watkins' dread soon turned to joy.

The now 74-year-old was guest of honor at a ceremony unveiling the historic marker recognizing the Freedom Riders on Highway 49 West across from the front gate of Parchman.

Watkins also accepted a ceremonial key to his one-time cell and an apology from MDOC's chief legal counsel.

So now, Watkins said his dread is no more.

"I feel much greater right now than I did when we drove through the gates," said Watkins.

*Want more WLBT news in your inbox? Click here to subscribe to our newsletter.*

*Copyright 2023 WLBT. All rights reserved.*

# Exhibit 5H

Tyler Englander, *Natchez remembers "Parchman Ordeal" on the final day of Black History Month*, KNOE8 News (Mar. 1, 2022), available at  https://www.knoe.com/2022/03/01/natchez-remembers-parchman-ordeal-final-day-black-history-month/.

# Natchez remembers "Parchman Ordeal" on the final day of Black History Month

knoe.com/2022/03/01/natchez-remembers-parchman-ordeal-final-day-black-history-month

March 1, 2022



Over 400 Natchez residents were wrongfully arrested in October 1965 fighting for civil and voting rights, with 150 sent to the Mississippi State Penitentiary

By Tyler Englander

Natchez, Ms. (KNOE) - The City of Natchez celebrated the final day of Black History Month by rededicating a monument to those who fought for civil rights.

The "Proud To Take A Stand" monument, erected in 2019, recognized the over 450 Natchez residents who were wrongfully arrested in October 1965, fighting for equality.

Over 150 of them were sent to the Mississippi State Penitentiary at Parchman in what is now known as the "Parchman Ordeal."

In 2019, then Natchez Mayor Darryl Grennell tasked his team with erecting a monument to commemorate the bravery and sacrifices of those men, women, and children.

"They were proud to take a stand for what they believed in," Grenell said on Monday.

Grennell said with two-thirds of the monument paid for, he went to the State Capitol in 2019 to see if he could get the remaining needed funds. He says within a minute, then Missippi Governor Phil Bryant agreed to fund the project.

"These brave children and their parents and grandparents stood against oppression and injustice knowing that their very lives could be taken," the 64th Governor said in a speech after the rededication. "Being put on a bus for four hours in that cold dark October night, to be taken to the state penitentiary. A penitentiary whose lessons had been learned over the decades of how horrible the conditions existed there. What bravery."

Current Natchez Mayor Dan Gibson revealed when the monument was initially built, several names were accidentally omitted. Those names were added to the memorial and revealed on February 28.

*Copyright 2022 KNOE. All rights reserved.*

# Exhibit 5I

R.L. Nave, *Disturbing the Peace Law: Ludicrous?*, Jackson Free Press (June 10, 2015), available at https://www.jacksonfreepress.com/news/2015/jun/10/disturbing-peace-law-ludicrous/.

# Disturbing the Peace Law: Ludicrous?

jacksonfreepress.com/news/2015/jun/10/disturbing-peace-law-ludicrous



The charges were dropped against several people, including Henry Walker (left) and Ursula Miller (right), who cheered last month at a Senatobia graduation. Still, legal experts question whether the law that almost landed the people in jail is too broad to be enforced fairly. Photo courtesy Youtube/The Lyrical Elitist

By R.L. Nave Wednesday, June 10, 2015 6 a.m. CDT

#Fifty years ago, at least 13 people were arrested and charged with disturbing the peace in Mississippi. As far as anyone can tell, these people were not being drunk and disorderly, trespassing or even whooping and hollering at a commencement ceremony. In the eyes of Mississippi authorities, they were doing something much more disturbing—registering blacks to vote.

#According to the University of Mississippi's Civil Rights in Mississippi Digital Archive, during Freedom Summer in 1964, local police regularly arrested young people during voter registration drives. On July 31 of that year, two white organizers with the Student Nonviolent Coordinating Committee, were assaulted by a white mob at a doctor's office. The Rev. Edward K. Heininger and John Polacheck were arrested and charged with disturbing the peace because the doctor claimed the men used profanity while they were assaulted.

#In August of that year, a volunteer named John Luther Bell was jailed in West Point for disturbance of the peace and larceny during voter canvassing. The same month, in Amory, black volunteers Adair Howell, Andrew Moore and Essie Carr were charged with disturbing the peace and coercing a woman to sign a voter registration form.

#After the Civil Rights Act of 1964 outlawed explicit racism and discrimination in public accommodation segregation laws, authorities had to find more creative ways to punish African Americans for drinking out of a whites-only water fountain or attempting to exercise the franchise.

#Usually, that was relying on Mississippi's disturbance of the peace statute, which legal experts say is broad enough to mean whatever police and judges want it to mean. Legal experts say it's important to know the history of this sweeping law when it comes to understanding Senatobia City Schools Superintendent Jay Foster's decision to press charges against people for cheering at a high school graduation last month. This week, Foster dropped the charges. Before that happened, Ursula Miller told WREG-TV that when her niece, Lakaydra Hearn, walked across the stage, "I just called her name out. 'Lakaydra!' Just like that." Henry Walker, whose daughter, Lanarcia, also graduated, yelled on his way out of the auditorium, "You did it baby!"

#Walker, Miller and two other people who were not identified in media reports were asked to leave because Foster said he wanted the ceremony to be solemn and dignified and asked that audience members hold their applause and celebration

#Weeks later, court summonses showed up; a hearing was scheduled for June 9. Under state law, a conviction for peace disturbance can come with a fine of $500 and up to six months in jail.

#"We were instructed to remove anyone that cheered during the ceremony, which was done," Zabe Davis, the chief of the campus police and a Senatobia High alumnus. "And then Jay Foster, the superintendent, came and pressed charges against those people."

#Matt Steffey, who teaches constitutional law at Mississippi College School of Law, said the Senatobia case harks back to the Jim Crow era when white authorities frequently used disturbing the peace and disorderly conduct laws, and their wide interpretations, to maintain control over every aspect of African Americans' lives and behavior.

#"I just think this is heavy-handed and obtuse and seems designed to make the minority conform to the norms the white superintendent wants to impose," Steffey told the Jackson Free Press.

#Early on, Foster scoffed at the idea that the move was racially motivated, telling The Clarion-Ledger that of those asked to leave the commencement, two (Miller and Walker) are black and two are white.

#Even without the element of racial discrimination, the ACLU of Mississippi believes the charges infringe on the Constitution's protections for freedom of expression.

#"Citizens should be able to enjoy the right of free speech, especially at a congratulatory event, like a high school graduation. The cheering by the family does not qualify as a disturbance of the peace and should not have elicited a criminal response.

#Additionally, the family's celebration was not calculated to provoke a breach of the peace, nor would it have led to a breach of the peace," the ACLU of Mississippi said in a statement.

#So far, the ACLU isn't actively involved in the case. Charles Irvin, the organization's legal director, said his group is watching the Senatobia case closely and believes the disturbing-the-peace law mainly applies to acts of violence and intimidation that are intended to cause a disturbance.

#"I don't think they intended to disturb anyone's peace," Irvin told the Jackson Free Press. "The whole thing sends a message of overreach."

**Support our reporting -- Follow the MFP.**

# Exhibit 5J

Off. of the Hinds Cnty. Dist. Att'y, *DA Owens Releases Statement Opposing House Bill 1020* (Jan. 30, 2023), available at https://hindsda.com/da-owens-releases-statement-opposing-house-bill-1020/.

# DA Owens Releases Statement Opposing House Bill 1020

offoff

hindsda.com/da-owens-releases-statement-opposing-house-bill-1020

**OFFICE OF THE DISTRICT ATTORNEY**
Seventh Circuit Court District
Post Office Box 22747
Jackson, MS 39225-2747



January 30, 2023

**MEDIA ADVISORY**

**FOR IMMEDIATE RELEASE**
CONTACT SAMANTHA GRANT 601.968.6568

(Jackson, MS) The Hinds County District Attorney's Office adamantly opposes House Bill 1020. The bill would place the appointment of Hinds County judges in the hands of the Chief Justice of the Mississippi Supreme Court. The bill would place the appointment of prosecutors in the hands of the Attorney General. This is a blatant attempt to steal the right to vote and elect officials from the citizens of Hinds County. All citizens of Hinds County and the State of Mississippi should be alarmed at the attempted disenfranchisement of citizens.

The truth is that the Hinds County District Attorney's Office is and always has been, underfunded and understaffed by the legislature. The legislature sets and funds the number of prosecutors for each circuit court district. We do not need a new criminal justice system; we need to invest in the one we have.

Over the past 3 years, State leadership has temporarily invested more resources for criminal justice in Hinds County and we have made great progress. In 2022, we have had 133% more trials, secured over 1,000 convictions, and over 425 guilty pleas. Instead of permanently investing these resources, House Bill 1020 will create a separate criminal justice system with no input from the citizens of Hinds County. As a State, we have come too far in ensuring all citizens have equal rights. To take this monumental step backwards, removes self-government and minimizes the voices of our citizens.

# Exhibit 5K

Tracking Jackson's Homicides, WLBT3, available at https://www.wlbt.com/news/crime/jackson-homicides/.

Jackson, MS

ADVERTISEMENT

# Jackson Homicides







*DISCLAIMER: This number now includes the Jackson Police Department's internal homicide count, plus any additional homicides that are investigated by other agencies. WLBT records specific information about all homicides, including the incident date and age of the victim. In October 2023, JPD included additional homicides in their count with very little information, only providing the month and year. Our graphs reflect those homcides as

Data Source: Jackson Police Dept./WLBT      Design/Layout: C.J. LeMaster

ADVERTISEMENT

News   Watch Live   3 On Your Side Investigates   First Alert Weather   Traffic   Studio 3

ADVERTISEMENT

News
Sports
About Us

Watch Live
Programming
Send In News Tips

First Alert Weather
Careers

**WLBT**
715 South Jefferson Street
Jackson, MS 39201
(601)948-3333

Public Inspection File     PUBLICFILE@WLBT.COM - 601-960-4436     Closed Captioning/Audio Description     Terms of Service     Privacy Policy     EEO Report

FCC Applications     Advertising Non-Discrimination Certification     Promote Your Business

At Gray, our journalists report, write, edit and produce the news content that informs the communities we serve. Click here to learn more about our approach to artificial intelligence.

A Gray Media Group, Inc. Station - © 2002-2023 Gray Television, Inc.

# Exhibit 5L

2023 H.B. 1020, Amend. No. 1, available at
http://billstatus.ls.state.ms.us/documents/2023/pdf/ham/HB1020_H_Amend_01.pdf.

**Adopted**
**AMENDMENT NO 1 PROPOSED TO**

**House Bill No. 1020**

**BY: Representative Lamar**

**Amend by striking all after the enacting clause and inserting in lieu thereof the following:**

26    <u>**SECTION 1.**</u>  There shall be created two (2) inferior courts as
27 authorized by Article 6, Section 172 of the Mississippi
28 Constitution of 1890, to be located within the boundaries
29 established in Section 29-5-203 for the Capitol Complex
30 Improvement District, hereinafter referred to as "CCID".
31    <u>**SECTION 2.**</u>  (1)  Each Capitol Complex Improvement District
32 (CCID) inferior court judge shall possess all qualifications
33 required by law for circuit and chancery court judges.  Each judge
34 of such court shall be a qualified elector of this state, and
35 shall have such other qualifications as provided for by law.  Each



36  judge shall be appointed by the Chief Justice of the Mississippi
37  Supreme Court to serve four (4) year terms.

38      (2)  The persons appointed as judges for the CCID inferior
39  courts shall not practice law in any of the courts of the state.

40      (3)  Each CCID inferior court judge shall be paid an annual
41  salary equal to the amount provided by law for circuit and
42  chancery judges.  The annual compensation of the judges shall be
43  increased any time the annual salaries for circuit and chancery
44  judges are increased.

45      (4)  Each CCID inferior judge shall be provided an operating
46  allowance equal to the amounts authorized in Section 9-1-36.

47      (5)  The Administrative Office of Courts shall provide
48  monies for the office operating allowances, salaries for support
49  staff and judges in the same manner as provided to circuit and
50  chancery judges upon annual appropriation by the Legislature.

51      **SECTION 3.**  (1)  (a)  The Attorney General shall appoint four
52  (4) attorneys to serve as prosecuting attorneys for the Capitol
53  Complex Improvement District (CCID) inferior courts.  Such
54  prosecuting attorneys may be employees with the Office of the
55  Attorney General or contracted by the Attorney General for such
56  purposes.  The attorneys shall prosecute cases therein, in the
57  same manner and with the same authority of law provided for
58  district attorneys and county prosecuting attorneys.  The CCID
59  inferior courts prosecuting attorneys are authorized to file
60  indictments or other criminal actions in the Circuit Court of the



61  First Judicial District of Hinds County.  The provisions of this
62  section shall not be construed to prohibit or in any way limit the
63  Hinds County District Attorney from filing an indictment or any
64  other criminal action that occurred or accrued, in whole or in
65  part, within the boundaries of the CCID in the CCID inferior
66  courts.

67          (b)  The Attorney General shall provide support staff
68  and any other staff necessary to assist such prosecuting attorneys
69  in carrying out their functions and duties as prosecuting
70  attorneys.

71          (c)  The Attorney General shall provide funding for the
72  salaries for support staff and prosecuting attorneys in the same
73  amounts and in the same manner as provided to district attorneys
74  and assistant district attorneys by law.

75      (2)  (a)  The State Defender of the Office of State Public
76  Defender shall appoint four (4) attorneys to serve as public
77  defenders on an as needed basis within the CCID inferior courts.

78          (b)  The State Defender shall provide support staff and
79  any other staff necessary to assist the public defenders in
80  carrying out their functions and duties.

81          (c)  The State Defender shall provide salaries for the
82  defenders in the same manner as provided by law for public
83  defenders.

84          (d)  In addition to any other authority provided by law
85  for the State Defender, the State Defender may represent indigent



86  persons in legal proceedings where the person has a constitutional
87  right to appointed counsel and may provide representation to
88  parents or guardians who have been determined by the youth court
89  judge to be indigent and in need of representation in an abuse,
90  neglect or termination of parental rights proceeding or appeal
91  therefrom.  The State Defender shall promulgate, implement and
92  enforce standards that define how effective indigent defense
93  services should be provided in all such cases, subject to the
94  approval of the Mississippi Supreme Court.  In addition to the
95  representation that may be provided by staff or contract counsel,
96  county public defender programs shall also be included.

97       (3)  (a)  The Administrative Office of Courts, in
98  consultation with the Chief Justice of the Supreme Court, shall
99  appoint a clerk and a deputy clerk for the CCID inferior courts.

100          (b)  The Administrative Office of Courts shall provide
101 support staff and any other staff necessary to carry out the
102 functions and duties for the clerk and deputy clerk for the CCID
103 inferior courts.

104          (c)  The Administrative Office of Courts shall provide
105 monies for the salaries of support staff, the clerk and the deputy
106 clerk with monies appropriated by the Legislature for such
107 purpose.

108      **SECTION 4.**  (1)  The clerk of the Capitol Complex Improvement
109 District (CCID) inferior courts shall maintain a jury box and
110 shall place therein the names or identifying numbers of all



111  prospective jurors drawn from the jury wheel.  The names of all

112  qualified electors in Hinds County shall be placed in the jury

113  wheel.

114       (2)  A CCID inferior court judge may direct the CCID inferior

115  courts clerk to draw and assign to the CCID inferior court or

116  official the number of jurors he deems necessary for one or more

117  jury panels or as required by law for a grand jury, except as

118  otherwise provided by subsection (3) of this section.  Upon

119  receipt of the direction, and in a manner prescribed by the CCID

120  inferior court, the CCID inferior court clerk shall publicly draw

121  at random from the jury box the number of jurors specified.

122       (3)  The CCID inferior court may order that the drawing and

123  assigning of jurors pursuant to subsection (2) of this section may

124  be performed by random selection of a computer or electronic

125  device pursuant to such rules and regulations as may be prescribed

126  by the court.  The jurors drawn for jury service shall be assigned

127  at random by such clerk to each jury panel in a manner prescribed

128  by such court.

129       (4)  If any person receives a jury summons from the Circuit

130  Court of the First Judicial District of Hinds County and a jury

131  summons from the CCID inferior court to serve as a juror for the

132  respective courts during the same time period, the summons by the

133  circuit court shall supersede and take precedence over the summons

134  from the CCID inferior court.  The person who receives such

135  summons shall notify the Clerk of the CCID inferior court that he

136  or she has received a summons from the Circuit Court of the First
137  Judicial District of Hinds County.

138      **SECTION 5.**  (1)  The Capitol Complex Improvement District
139  (CCID) inferior courts shall have jurisdiction over criminal and
140  civil matters authorized by this act which occurred or accrued, in
141  whole or in part, within the boundaries established for the
142  Capitol Complex Improvement District in Section 29-5-203.  CCID
143  inferior courts shall have jurisdiction concurrent with the
144  justice court in all matters, civil and criminal of which the
145  justice court has jurisdiction for actions.  It shall also have
146  concurrent jurisdiction with the county court of Hinds County in
147  all criminal matters that are not excluded by the provisions of
148  this section.  It shall also have concurrent jurisdiction with the
149  Circuit Court and Chancery Court of the First Judicial District of
150  Hinds County regarding all civil and criminal matters that are not
151  excluded by the provisions of this section.  The jurisdiction of
152  the CCID inferior courts shall not include:  (a) matters regarding
153  treason, (b) actions filed against a municipality or a county of
154  this state, (c) appeals from a decision of any agency, board,
155  commission or department of this state, (d) bond validations, (e)
156  divorce, (f) alimony, (g) all matters relating to adoptions, (h)
157  matters of testamentary and administration, (i) minor's business
158  and (j) cases of idiocy, lunacy and persons of unsound mind.  For
159  jurisdiction in civil actions, the amount of value of the thing in
160  controversy shall be more than Two Hundred Thousand Dollars

161  ($200,000.00), but shall not exceed, exclusive of costs and
162  interest, the sum of Twenty Million Dollars ($20,000,000.00), and
163  the jurisdiction of the CCID inferior courts shall not be affected
164  by any setoff, counterclaim or cross bill in such actions where
165  the amount sought to be recovered in such setoff, counterclaim or
166  cross bill is less than Two Hundred Thousand Dollars ($200,000.00)
167  or less, or exceeds Twenty Million Dollars ($20,000,000.00).
168  However, the party filing such setoff, counterclaim or cross bill
169  which exceeds Twenty Million Dollars ($20,000,000.00) shall give
170  notice to the opposite party or parties as provided by law, and on
171  motion of all parties filed within twenty (20) days after the
172  filing of such setoff, counterclaim or cross bill, the CCID
173  inferior court shall transfer the case to the Circuit Court of the
174  First Judicial District of Hinds County.
175      (2)  (a)  Appeals from CCID inferior courts shall be made to
176  the Circuit Court of the First Judicial District of Hinds County
177  (Hinds County Circuit Court).  Appeals shall be considered solely
178  upon the record as made in CCID inferior courts.  If no
179  prejudicial error is found, the matter shall be affirmed and
180  judgment or decree entered in the same manner and against the like
181  parties and with like penalties as is provided in affirmances in
182  the Supreme Court.  If prejudicial error is found, the court shall
183  reverse and shall enter judgment or decree in the manner and
184  against like parties and with like penalties as is provided in
185  reversals in the Supreme Court.

Case 3:23-cv-00272-HTW-LGI   Document 110-5   Filed 11/13/23   Page 70 of 147

186          (b)   Appeals from CCID inferior courts shall be filed
187    with the Hinds County Clerk within thirty (30) days from the date
188    of the entry of the final judgment or decree on the minutes of the
189    court.

190          (c)   Any party to an action in the CCID inferior courts
191    may appeal directly to the Supreme Court on the thirty-first day
192    after the earlier of:  (i) the Hinds County Circuit Court fails to
193    render a final appellate judgment within thirty (30) days after
194    the Hinds County Clerk receives the notice of appeal and the full
195    appellate record as described in paragraph (b) of this subsection;
196    (ii) the Hinds County Circuit Court issues its final appellate
197    judgement in written form; or (iii) the Hinds County Circuit Court
198    issues a written refusal to hear such action on appeal.

199    **SECTION 6.**  Each Capitol Complex Improvement District (CCID)
200    inferior court judge shall have power to issue writs, and to try
201    matters, of habeas corpus on application therefor, or when made
202    returnable before the judge by a superior judge.  Each CCID
203    inferior court judge shall also have the power to order the
204    issuance of writs of certiorari, supersedeas, attachments, and
205    other remedial writs in all cases pending in, or within the
206    jurisdiction of, his or her court.  He or she shall have the
207    authority to issue search warrants returnable to the CCID inferior
208    court or to any justice court judge within Hinds County in the
209    same manner as is provided by law for the issuance of search
210    warrants by justice court judges.  In all cases pending in, or

23/HR26/HB1020A.14J
PAGE 8
 (GT/KW)

211  within the jurisdiction of, his or her court, he or she shall
212  have, in term time, and in vacation, the power to order, do or
213  determine to the same extent and in the same manner as a judge
214  with concurrent jurisdiction.

215      **SECTION 7.**  In any civil cases authorized under the
216  jurisdiction of the CCID inferior courts that are instituted in
217  the Circuit Court of the First Judicial District of Hinds County
218  (Hinds County Circuit Court), wherein all parties file a motion to
219  transfer the case to the CCID inferior court for trial, or wherein
220  all parties file an instrument of writing consenting to such a
221  transfer, the Hinds County Circuit Court shall transfer the case
222  to the CCID inferior court for trial, provided that such order of
223  transfer is rendered prior to the empaneling of the jury in such
224  cases.  The CCID inferior court shall have full jurisdiction of
225  and shall proceed to try any case so transferred.

226      In any misdemeanor cases and in felony cases, wherein
227  indictments have been returned by the grand jury and instituted in
228  the Hinds County Circuit Court, wherein the district attorney and
229  the defendant or defendants file a motion to transfer the case to
230  the CCID inferior court for trial provided that the CCID inferior
231  court would otherwise have jurisdiction of such matters, or
232  wherein the district attorney and the defendant or defendants all
233  file an instrument of writing consenting to such a transfer, the
234  Hinds County Circuit Court shall transfer the case to the CCID
235  inferior court for trial, provided that such order of transfer is

236  rendered prior to the empaneling of the jury in such cases.  The
237  CCID inferior court shall have full jurisdiction of and shall
238  proceed to try any case so transferred.

239      In addition, any reputable citizen may make an affidavit
240  charging crime before the judge of the CCID inferior court
241  provided that the CCID inferior court would otherwise have
242  jurisdiction of such matters, and such affidavit shall be filed
243  with the clerk of the CCID inferior court, and if the crime
244  charged is a misdemeanor, the CCID inferior court shall have
245  jurisdiction to try and dispose of the charge and, if the crime
246  charged is a felony, such judge shall have jurisdiction to hear
247  and determine the cause, the same as now provided by law to be
248  done by justice court judges, and to commit the person so charged,
249  with or without bail as the evidence may warrant, or to discharge
250  the defendant.

251      **SECTION 8.**  The Capitol Complex Improvement District (CCID)
252  inferior court shall be a court of record, and the clerk or his or
253  her deputy shall attend all the sessions of such court, and have
254  present at all sessions, all books, records, files, and papers
255  pertaining to the term then in session.  The dockets, minutes, and
256  records of the CCID inferior court shall be kept, so far as is
257  practicable, in the same manner as are those of the circuit court
258  as provided by statute and the Mississippi Rules of Civil
259  Procedure.  The Capitol Police Chief shall be the executive
260  officer of the CCID inferior court; he shall by himself, or

261  deputy, attend all its sessions, and he shall serve all process
262  and execute all writs issued therefrom in the manner as such
263  process and writs would be served and executed when issued by the
264  courts.

265      **SECTION 9.**  (1)  The Capitol Complex Improvement District
266  (CCID) inferior court judges shall hold regular terms of their
267  courts, at such times as they may appoint, not exceeding two (2)
268  and not less than one (1) in every month, in the Joint Legislative
269  Budget Committee hearing room in the Woolfolk Building and/or any
270  other suitable location designated by the Department of Finance
271  and Administration, and they may continue to hold their courts
272  from day to day so long as business may require.  All process
273  shall be returnable, and all trials shall take place at such
274  regular terms, except where it is otherwise provided.  However,
275  where the defendant is a nonresident of the Capitol Complex
276  Improvement District or transient person, and it is shown by the
277  oath of either party that a delay of the trial until the regular
278  term will be of material injury to him or her, it shall be lawful
279  for the judge to have the parties brought before him or her at any
280  reasonable time and hear the evidence and give judgment, or where
281  the defendant is a nonresident or transient person and the judge
282  and all parties agree, it shall be lawful for the judge to have
283  the parties brought before him or her on the day a citation is
284  made and hear the evidence and give judgment.  Such court shall be
285  a court of record, with all the power incident to a court of

286 record, including power to fine in the amount of fine and length
287 of imprisonment as is authorized by law for contempt of court.

288      (2)   The Department of Finance and Administration shall
289 provide the necessary support to renovate and repair the Joint
290 Legislative Budget Committee hearing room in the Woolfolk Building
291 to properly and safely accommodate the proceedings of the CCID
292 inferior courts.  The Department of Finance and Administration may
293 also designate other suitable locations to properly and safely
294 accommodate the proceedings of the CCID inferior courts.

295      **SECTION 10.**  Section 29-5-203, Mississippi Code of 1972, is
296 amended as follows:

297      29-5-203.  There is created the Capitol Complex Improvement
298 District to be composed of the following described area in the
299 City of Jackson, Mississippi, and the City of Ridgeland,
300 Mississippi, that surrounds the State Capitol Building:

301                  CAPITOL COMPLEX PROPOSED BOUNDARIES

302      •  Beginning at a point on the west bank of the Pearl River
303 determined by extending the south curb line of High Street east
304 until it meets the bank of the Pearl River;

305      •  Then north along the west bank of the Pearl River * * *
306 until it reaches a point on such bank determined by extending
307 the * * * north curb line of County Line Road until it meets the
308 bank of the Pearl River;



309    • Then west along the north curb line of County Line Road
310 until it reaches the west curb line of North State Street - U.S.
311 Highway 51;
312  * * *
313    • Then south along the west curb line of North State Street
314 - U.S. Highway 51 to the north curb line of Hartfield Street;
315    • Then west along the north curb line of Hartfield Street to
316 the west curb line of Oxford Avenue;
317    • Then south on the west curb line of Oxford Avenue to the
318 north curb line of Mitchell Avenue which becomes Stonewall Street;
319    • Then west along the north curb line of Mitchell Street and
320 then Stonewall Street until it reaches the west curb line of
321 Livingston Road;
322    • Then south along the west curb line of Livingston Road
323 until it reaches the south curb line of Woodrow Wilson Drive;
324    • Then east along the south curb line of Woodrow Wilson
325 Drive to the west curb line of Bailey Avenue (which becomes
326 Gallatin Street);
327    • Then south along the west curb line of Bailey Avenue and
328 then Gallatin Street until it reaches the north curb line of * * *
329 West Monument Street;
330    • Then west and south along the north curb line of * * *
331 West Monument Street until it intersects with the north curb line
332 of Robinson Road;

333        • Then west on the north curb line of Robinson Road until it
334   intersects with the west curb line of Prentiss Street;

335        • Then south along the west curb line of Prentiss Street
336   until it intersects with the north curb line of John R. Lynch
337   Street on the west side of Jackson State University;

338        • Then west on the north curb line of John R. Lynch Street
339   until it reaches the west curb line of Valley Street;

340        • Then south along the west curb line of Valley Street until
341   it reaches the south curb line of Morehouse Street;

342        • Then east along the south curb line of Morehouse Street
343   until it reaches the west curb line of Dalton Street;

344        • Then south along the west curb line of Dalton Street until
345   it reaches the south curb line of Florence Avenue;

346        • Then east along the south curb line of Florence Avenue
347   until it reaches the east curb line of University Blvd. (Terry
348   Road);

349        • Then **\*** south along the east curb line of University
350   Blvd. (Terry Road) until it reaches the south curb line of **\***
351   U.S. Highway 80;

352        • Then east along the south curb line of **\*** U.S. Highway
353   80 until it reaches the western edge of Interstate 55;

354   **\***

355        • Then north along the western edge of I-55 until it reaches
356   the south curb line of High Street;



357        •  Then east along the south curb line of High Street and
358   extending such line to the Pearl River and the point of the
359   beginning.

360        **SECTION 11.**  Section 27-65-75, Mississippi Code of 1972, is
361   amended as follows:

362        27-65-75.  On or before the fifteenth day of each month, the
363   revenue collected under the provisions of this chapter during the
364   preceding month shall be paid and distributed as follows:

365        (1)  (a)  On or before August 15, 1992, and each succeeding
366   month thereafter through July 15, 1993, eighteen percent (18%) of
367   the total sales tax revenue collected during the preceding month
368   under the provisions of this chapter, except that collected under
369   the provisions of Sections 27-65-15, 27-65-19(3) and 27-65-21, on
370   business activities within a municipal corporation shall be
371   allocated for distribution to the municipality and paid to the
372   municipal corporation.  Except as otherwise provided in this
373   paragraph (a), on or before August 15, 1993, and each succeeding
374   month thereafter, eighteen and one-half percent (18-1/2%) of the
375   total sales tax revenue collected during the preceding month under
376   the provisions of this chapter, except that collected under the
377   provisions of Sections 27-65-15, 27-65-19(3), 27-65-21 and
378   27-65-24, on business activities within a municipal corporation
379   shall be allocated for distribution to the municipality and paid
380   to the municipal corporation.  However, in the event the State
381   Auditor issues a certificate of noncompliance pursuant to Section

382  21-35-31, the Department of Revenue shall withhold ten percent
383  (10%) of the allocations and payments to the municipality that
384  would otherwise be payable to the municipality under this
385  paragraph (a) until such time that the department receives written
386  notice of the cancellation of a certificate of noncompliance from
387  the State Auditor.

388      A municipal corporation, for the purpose of distributing the
389  tax under this subsection, shall mean and include all incorporated
390  cities, towns and villages.

391      Monies allocated for distribution and credited to a municipal
392  corporation under this paragraph may be pledged as security for a
393  loan if the distribution received by the municipal corporation is
394  otherwise authorized or required by law to be pledged as security
395  for such a loan.

396      In any county having a county seat that is not an
397  incorporated municipality, the distribution provided under this
398  subsection shall be made as though the county seat was an
399  incorporated municipality; however, the distribution to the
400  municipality shall be paid to the county treasury in which the
401  municipality is located, and those funds shall be used for road,
402  bridge and street construction or maintenance in the county.

403          (b)  On or before August 15, 2006, and each succeeding
404  month thereafter, eighteen and one-half percent (18-1/2%) of the
405  total sales tax revenue collected during the preceding month under
406  the provisions of this chapter, except that collected under the

407    provisions of Sections 27-65-15, 27-65-19(3) and 27-65-21, on
408    business activities on the campus of a state institution of higher
409    learning or community or junior college whose campus is not
410    located within the corporate limits of a municipality, shall be
411    allocated for distribution to the state institution of higher
412    learning or community or junior college and paid to the state
413    institution of higher learning or community or junior college.

414            (c)   On or before August 15, 2018, and each succeeding
415    month thereafter until August 14, 2019, two percent (2%) of the
416    total sales tax revenue collected during the preceding month under
417    the provisions of this chapter, except that collected under the
418    provisions of Sections 27-65-15, 27-65-19(3), 27-65-21 and
419    27-65-24, on business activities within the corporate limits of
420    the City of Jackson, Mississippi, shall be deposited into the
421    Capitol Complex Improvement District Project Fund created in
422    Section 29-5-215.  On or before August 15, 2019, and each
423    succeeding month thereafter until August 14, 2020, four percent
424    (4%) of the total sales tax revenue collected during the preceding
425    month under the provisions of this chapter, except that collected
426    under the provisions of Sections 27-65-15, 27-65-19(3), 27-65-21
427    and 27-65-24, on business activities within the corporate limits
428    of the City of Jackson, Mississippi, shall be deposited into the
429    Capitol Complex Improvement District Project Fund created in
430    Section 29-5-215.  On or before August 15, 2020, and each
431    succeeding month thereafter through July 15, 2023, six percent

432  (6%) of the total sales tax revenue collected during the preceding
433  month under the provisions of this chapter, except that collected
434  under the provisions of Sections 27-65-15, 27-65-19(3), 27-65-21
435  and 27-65-24, on business activities within the corporate limits
436  of the City of Jackson, Mississippi, shall be deposited into the
437  Capitol Complex Improvement District Project Fund created in
438  Section 29-5-215.  On or before August 15, 2023, and each
439  succeeding month thereafter, twelve percent (12%) of the total
440  sales tax revenue collected during the preceding month under the
441  provisions of this chapter, except that collected under the
442  provisions of Sections 27-65-15, 27-65-19(3), 27-65-21 and
443  27-65-24, on business activities within the corporate limits of
444  the City of Jackson, Mississippi, shall be deposited into the
445  Capitol Complex Improvement District Project Fund created in
446  Section 29-5-215.

447              (d)   (i)   On or before the fifteenth day of the month
448  that the diversion authorized by this section begins, and each
449  succeeding month thereafter, eighteen and one-half percent
450  (18-1/2%) of the total sales tax revenue collected during the
451  preceding month under the provisions of this chapter, except that
452  collected under the provisions of Sections 27-65-15, 27-65-19(3)
453  and 27-65-21, on business activities within a redevelopment
454  project area developed under a redevelopment plan adopted under
455  the Tax Increment Financing Act (Section 21-45-1 et seq.) shall be

456   allocated for distribution to the county in which the project area
457   is located if:

458          1.  The county:

459                 a.  Borders on the Mississippi Sound and
460   the State of Alabama, or

461                 b.  Is Harrison County, Mississippi, and
462   the project area is within a radius of two (2) miles from the
463   intersection of Interstate 10 and Menge Avenue;

464          2.  The county has issued bonds under Section
465   21-45-9 to finance all or a portion of a redevelopment project in
466   the redevelopment project area;

467          3.  Any debt service for the indebtedness
468   incurred is outstanding; and

469          4.  A development with a value of Ten Million
470   Dollars ($10,000,000.00) or more is, or will be, located in the
471   redevelopment area.

472          (ii)  Before any sales tax revenue may be allocated
473   for distribution to a county under this paragraph, the county
474   shall certify to the Department of Revenue that the requirements
475   of this paragraph have been met, the amount of bonded indebtedness
476   that has been incurred by the county for the redevelopment project
477   and the expected date the indebtedness incurred by the county will
478   be satisfied.

479          (iii)  The diversion of sales tax revenue
480   authorized by this paragraph shall begin the month following the

481  month in which the Department of Revenue determines that the

482  requirements of this paragraph have been met.  The diversion shall

483  end the month the indebtedness incurred by the county is

484  satisfied.  All revenue received by the county under this

485  paragraph shall be deposited in the fund required to be created in

486  the tax increment financing plan under Section 21-45-11 and be

487  utilized solely to satisfy the indebtedness incurred by the

488  county.

489        (2)  On or before September 15, 1987, and each succeeding

490  month thereafter, from the revenue collected under this chapter

491  during the preceding month, One Million One Hundred Twenty-five

492  Thousand Dollars ($1,125,000.00) shall be allocated for

493  distribution to municipal corporations as defined under subsection

494  (1) of this section in the proportion that the number of gallons

495  of gasoline and diesel fuel sold by distributors to consumers and

496  retailers in each such municipality during the preceding fiscal

497  year bears to the total gallons of gasoline and diesel fuel sold

498  by distributors to consumers and retailers in municipalities

499  statewide during the preceding fiscal year.  The Department of

500  Revenue shall require all distributors of gasoline and diesel fuel

501  to report to the department monthly the total number of gallons of

502  gasoline and diesel fuel sold by them to consumers and retailers

503  in each municipality during the preceding month.  The Department

504  of Revenue shall have the authority to promulgate such rules and

505  regulations as is necessary to determine the number of gallons of

506    gasoline and diesel fuel sold by distributors to consumers and
507    retailers in each municipality.  In determining the percentage
508    allocation of funds under this subsection for the fiscal year
509    beginning July 1, 1987, and ending June 30, 1988, the Department
510    of Revenue may consider gallons of gasoline and diesel fuel sold
511    for a period of less than one (1) fiscal year.  For the purposes
512    of this subsection, the term "fiscal year" means the fiscal year
513    beginning July 1 of a year.

514         (3)  On or before September 15, 1987, and on or before the
515    fifteenth day of each succeeding month, until the date specified
516    in Section 65-39-35, the proceeds derived from contractors' taxes
517    levied under Section 27-65-21 on contracts for the construction or
518    reconstruction of highways designated under the highway program
519    created under Section 65-3-97 shall, except as otherwise provided
520    in Section 31-17-127, be deposited into the State Treasury to the
521    credit of the State Highway Fund to be used to fund that highway
522    program.  The Mississippi Department of Transportation shall
523    provide to the Department of Revenue such information as is
524    necessary to determine the amount of proceeds to be distributed
525    under this subsection.

526         (4)  On or before August 15, 1994, and on or before the
527    fifteenth day of each succeeding month through July 15, 1999, from
528    the proceeds of gasoline, diesel fuel or kerosene taxes as
529    provided in Section 27-5-101(a)(ii)1, Four Million Dollars
530    ($4,000,000.00) shall be deposited in the State Treasury to the

531  credit of a special fund designated as the "State Aid Road Fund,"
532  created by Section 65-9-17.  On or before August 15, 1999, and on
533  or before the fifteenth day of each succeeding month, from the
534  total amount of the proceeds of gasoline, diesel fuel or kerosene
535  taxes apportioned by Section 27-5-101(a)(ii)1, Four Million
536  Dollars ($4,000,000.00) or an amount equal to twenty-three and
537  one-fourth percent (23-1/4%) of those funds, whichever is the
538  greater amount, shall be deposited in the State Treasury to the
539  credit of the "State Aid Road Fund," created by Section 65-9-17.
540  Those funds shall be pledged to pay the principal of and interest
541  on state aid road bonds heretofore issued under Sections 19-9-51
542  through 19-9-77, in lieu of and in substitution for the funds
543  previously allocated to counties under this section.  Those funds
544  may not be pledged for the payment of any state aid road bonds
545  issued after April 1, 1981; however, this prohibition against the
546  pledging of any such funds for the payment of bonds shall not
547  apply to any bonds for which intent to issue those bonds has been
548  published for the first time, as provided by law before March 29,
549  1981.  From the amount of taxes paid into the special fund under
550  this subsection and subsection (9) of this section, there shall be
551  first deducted and paid the amount necessary to pay the expenses
552  of the Office of State Aid Road Construction, as authorized by the
553  Legislature for all other general and special fund agencies.  The
554  remainder of the fund shall be allocated monthly to the several
555  counties in accordance with the following formula:

556          (a)  One-third (1/3) shall be allocated to all counties
557   in equal shares;

558          (b)  One-third (1/3) shall be allocated to counties
559   based on the proportion that the total number of rural road miles
560   in a county bears to the total number of rural road miles in all
561   counties of the state; and

562          (c)  One-third (1/3) shall be allocated to counties
563   based on the proportion that the rural population of the county
564   bears to the total rural population in all counties of the state,
565   according to the latest federal decennial census.

566          For the purposes of this subsection, the term "gasoline,
567   diesel fuel or kerosene taxes" means such taxes as defined in
568   paragraph (f) of Section 27-5-101.

569          The amount of funds allocated to any county under this
570   subsection for any fiscal year after fiscal year 1994 shall not be
571   less than the amount allocated to the county for fiscal year 1994.

572          Any reference in the general laws of this state or the
573   Mississippi Code of 1972 to Section 27-5-105 shall mean and be
574   construed to refer and apply to subsection (4) of Section
575   27-65-75.

576          (5)  One Million Six Hundred Sixty-six Thousand Six Hundred
577   Sixty-six Dollars ($1,666,666.00) each month shall be paid into
578   the special fund known as the "Educational Facilities Revolving
579   Loan Fund" created and existing under the provisions of Section
580   37-47-24.  Those payments into that fund are to be made on the

581   last day of each succeeding month hereafter.  This subsection (5)
582   shall stand repealed on July 1, 2023.

583        (6)  An amount each month beginning August 15, 1983, through
584   November 15, 1986, as specified in Section 6, Chapter 542, Laws of
585   1983, shall be paid into the special fund known as the
586   Correctional Facilities Construction Fund created in Section 6,
587   Chapter 542, Laws of 1983.

588        (7)  On or before August 15, 1992, and each succeeding month
589   thereafter through July 15, 2000, two and two hundred sixty-six
590   one-thousandths percent (2.266%) of the total sales tax revenue
591   collected during the preceding month under the provisions of this
592   chapter, except that collected under the provisions of Section
593   27-65-17(2), shall be deposited by the department into the School
594   Ad Valorem Tax Reduction Fund created under Section 37-61-35.  On
595   or before August 15, 2000, and each succeeding month thereafter,
596   two and two hundred sixty-six one-thousandths percent (2.266%) of
597   the total sales tax revenue collected during the preceding month
598   under the provisions of this chapter, except that collected under
599   the provisions of Section 27-65-17(2), shall be deposited into the
600   School Ad Valorem Tax Reduction Fund created under Section
601   37-61-35 until such time that the total amount deposited into the
602   fund during a fiscal year equals Forty-two Million Dollars
603   ($42,000,000.00).  Thereafter, the amounts diverted under this
604   subsection (7) during the fiscal year in excess of Forty-two
605   Million Dollars ($42,000,000.00) shall be deposited into the

606  Education Enhancement Fund created under Section 37-61-33 for
607  appropriation by the Legislature as other education needs and
608  shall not be subject to the percentage appropriation requirements
609  set forth in Section 37-61-33.

610      (8)  On or before August 15, 1992, and each succeeding month
611  thereafter, nine and seventy-three one-thousandths percent
612  (9.073%) of the total sales tax revenue collected during the
613  preceding month under the provisions of this chapter, except that
614  collected under the provisions of Section 27-65-17(2), shall be
615  deposited into the Education Enhancement Fund created under
616  Section 37-61-33.

617      (9)  On or before August 15, 1994, and each succeeding month
618  thereafter, from the revenue collected under this chapter during
619  the preceding month, Two Hundred Fifty Thousand Dollars
620  ($250,000.00) shall be paid into the State Aid Road Fund.

621      (10)  On or before August 15, 1994, and each succeeding month
622  thereafter through August 15, 1995, from the revenue collected
623  under this chapter during the preceding month, Two Million Dollars
624  ($2,000,000.00) shall be deposited into the Motor Vehicle Ad
625  Valorem Tax Reduction Fund established in Section 27-51-105.

626      (11)  Notwithstanding any other provision of this section to
627  the contrary, on or before February 15, 1995, and each succeeding
628  month thereafter, the sales tax revenue collected during the
629  preceding month under the provisions of Section 27-65-17(2) and
630  the corresponding levy in Section 27-65-23 on the rental or lease

631   of private carriers of passengers and light carriers of property
632   as defined in Section 27-51-101 shall be deposited, without
633   diversion, into the Motor Vehicle Ad Valorem Tax Reduction Fund
634   established in Section 27-51-105.

635   (12)  Notwithstanding any other provision of this section to
636   the contrary, on or before August 15, 1995, and each succeeding
637   month thereafter, the sales tax revenue collected during the
638   preceding month under the provisions of Section 27-65-17(1) on
639   retail sales of private carriers of passengers and light carriers
640   of property, as defined in Section 27-51-101 and the corresponding
641   levy in Section 27-65-23 on the rental or lease of these vehicles,
642   shall be deposited, after diversion, into the Motor Vehicle Ad
643   Valorem Tax Reduction Fund established in Section 27-51-105.

644   (13)  On or before July 15, 1994, and on or before the
645   fifteenth day of each succeeding month thereafter, that portion of
646   the avails of the tax imposed in Section 27-65-22 that is derived
647   from activities held on the Mississippi State Fairgrounds Complex
648   shall be paid into a special fund that is created in the State
649   Treasury and shall be expended upon legislative appropriation
650   solely to defray the costs of repairs and renovation at the Trade
651   Mart and Coliseum.

652   (14)  On or before August 15, 1998, and each succeeding month
653   thereafter through July 15, 2005, that portion of the avails of
654   the tax imposed in Section 27-65-23 that is derived from sales by
655   cotton compresses or cotton warehouses and that would otherwise be



656  paid into the General Fund shall be deposited in an amount not to
657  exceed Two Million Dollars ($2,000,000.00) into the special fund
658  created under Section 69-37-39.  On or before August 15, 2007, and
659  each succeeding month thereafter through July 15, 2010, that
660  portion of the avails of the tax imposed in Section 27-65-23 that
661  is derived from sales by cotton compresses or cotton warehouses
662  and that would otherwise be paid into the General Fund shall be
663  deposited in an amount not to exceed Two Million Dollars
664  ($2,000,000.00) into the special fund created under Section
665  69-37-39 until all debts or other obligations incurred by the
666  Certified Cotton Growers Organization under the Mississippi Boll
667  Weevil Management Act before January 1, 2007, are satisfied in
668  full.  On or before August 15, 2010, and each succeeding month
669  thereafter through July 15, 2011, fifty percent (50%) of that
670  portion of the avails of the tax imposed in Section 27-65-23 that
671  is derived from sales by cotton compresses or cotton warehouses
672  and that would otherwise be paid into the General Fund shall be
673  deposited into the special fund created under Section 69-37-39
674  until such time that the total amount deposited into the fund
675  during a fiscal year equals One Million Dollars ($1,000,000.00).
676  On or before August 15, 2011, and each succeeding month
677  thereafter, that portion of the avails of the tax imposed in
678  Section 27-65-23 that is derived from sales by cotton compresses
679  or cotton warehouses and that would otherwise be paid into the
680  General Fund shall be deposited into the special fund created

681    under Section 69-37-39 until such time that the total amount

682    deposited into the fund during a fiscal year equals One Million

683    Dollars ($1,000,000.00).

684        (15)  Notwithstanding any other provision of this section to

685    the contrary, on or before September 15, 2000, and each succeeding

686    month thereafter, the sales tax revenue collected during the

687    preceding month under the provisions of Section

688    27-65-19(1)(d)(i)2, and 27-65-19(1)(d)(i)3 shall be deposited,

689    without diversion, into the Telecommunications Ad Valorem Tax

690    Reduction Fund established in Section 27-38-7.

691        (16)  (a)  On or before August 15, 2000, and each succeeding

692    month thereafter, the sales tax revenue collected during the

693    preceding month under the provisions of this chapter on the gross

694    proceeds of sales of a project as defined in Section 57-30-1 shall

695    be deposited, after all diversions except the diversion provided

696    for in subsection (1) of this section, into the Sales Tax

697    Incentive Fund created in Section 57-30-3.

698            (b)  On or before August 15, 2007, and each succeeding

699    month thereafter, eighty percent (80%) of the sales tax revenue

700    collected during the preceding month under the provisions of this

701    chapter from the operation of a tourism project under the

702    provisions of Sections 57-26-1 through 57-26-5, shall be

703    deposited, after the diversions required in subsections (7) and

704    (8) of this section, into the Tourism Project Sales Tax Incentive

705    Fund created in Section 57-26-3.



706          (17)   Notwithstanding any other provision of this section to
707    the contrary, on or before April 15, 2002, and each succeeding
708    month thereafter, the sales tax revenue collected during the
709    preceding month under Section 27-65-23 on sales of parking
710    services of parking garages and lots at airports shall be
711    deposited, without diversion, into the special fund created under
712    Section 27-5-101(d).

713          (18)   [Repealed]

714          (19)   (a)   On or before August 15, 2005, and each succeeding
715    month thereafter, the sales tax revenue collected during the
716    preceding month under the provisions of this chapter on the gross
717    proceeds of sales of a business enterprise located within a
718    redevelopment project area under the provisions of Sections
719    57-91-1 through 57-91-11, and the revenue collected on the gross
720    proceeds of sales from sales made to a business enterprise located
721    in a redevelopment project area under the provisions of Sections
722    57-91-1 through 57-91-11 (provided that such sales made to a
723    business enterprise are made on the premises of the business
724    enterprise), shall, except as otherwise provided in this
725    subsection (19), be deposited, after all diversions, into the
726    Redevelopment Project Incentive Fund as created in Section
727    57-91-9.

728                (b)   For a municipality participating in the Economic
729    Redevelopment Act created in Sections 57-91-1 through 57-91-11,
730    the diversion provided for in subsection (1) of this section

731  attributable to the gross proceeds of sales of a business
732  enterprise located within a redevelopment project area under the
733  provisions of Sections 57-91-1 through 57-91-11, and attributable
734  to the gross proceeds of sales from sales made to a business
735  enterprise located in a redevelopment project area under the
736  provisions of Sections 57-91-1 through 57-91-11 (provided that
737  such sales made to a business enterprise are made on the premises
738  of the business enterprise), shall be deposited into the
739  Redevelopment Project Incentive Fund as created in Section
740  57-91-9, as follows:

741                (i)  For the first six (6) years in which payments
742  are made to a developer from the Redevelopment Project Incentive
743  Fund, one hundred percent (100%) of the diversion shall be
744  deposited into the fund;

745                (ii)  For the seventh year in which such payments
746  are made to a developer from the Redevelopment Project Incentive
747  Fund, eighty percent (80%) of the diversion shall be deposited
748  into the fund;

749                (iii)  For the eighth year in which such payments
750  are made to a developer from the Redevelopment Project Incentive
751  Fund, seventy percent (70%) of the diversion shall be deposited
752  into the fund;

753                (iv)  For the ninth year in which such payments are
754  made to a developer from the Redevelopment Project Incentive Fund,

755  sixty percent (60%) of the diversion shall be deposited into the
756  fund; and

757              (v)  For the tenth year in which such payments are
758  made to a developer from the Redevelopment Project Incentive Fund,
759  fifty percent (50%) of the funds shall be deposited into the fund.

760      (20)  On or before January 15, 2007, and each succeeding
761  month thereafter, eighty percent (80%) of the sales tax revenue
762  collected during the preceding month under the provisions of this
763  chapter from the operation of a tourism project under the
764  provisions of Sections 57-28-1 through 57-28-5 shall be deposited,
765  after the diversions required in subsections (7) and (8) of this
766  section, into the Tourism Sales Tax Incentive Fund created in
767  Section 57-28-3.

768      (21)  (a)  On or before April 15, 2007, and each succeeding
769  month thereafter through June 15, 2013, One Hundred Fifty Thousand
770  Dollars ($150,000.00) of the sales tax revenue collected during
771  the preceding month under the provisions of this chapter shall be
772  deposited into the MMEIA Tax Incentive Fund created in Section
773  57-101-3.

774              (b)  On or before July 15, 2013, and each succeeding
775  month thereafter, One Hundred Fifty Thousand Dollars ($150,000.00)
776  of the sales tax revenue collected during the preceding month
777  under the provisions of this chapter shall be deposited into the
778  Mississippi Development Authority Job Training Grant Fund created
779  in Section 57-1-451.

780          (22)   Notwithstanding any other provision of this section to
781     the contrary, on or before August 15, 2009, and each succeeding
782     month thereafter, the sales tax revenue collected during the
783     preceding month under the provisions of Section 27-65-201 shall be
784     deposited, without diversion, into the Motor Vehicle Ad Valorem
785     Tax Reduction Fund established in Section 27-51-105.
786          (23)   (a)   On or before August 15, 2019, and each month
787     thereafter through July 15, 2020, one percent (1%) of the total
788     sales tax revenue collected during the preceding month from
789     restaurants and hotels shall be allocated for distribution to the
790     Mississippi Development Authority Tourism Advertising Fund
791     established under Section 57-1-64, to be used exclusively for the
792     purpose stated therein.   On or before August 15, 2020, and each
793     month thereafter through July 15, 2021, two percent (2%) of the
794     total sales tax revenue collected during the preceding month from
795     restaurants and hotels shall be allocated for distribution to the
796     Mississippi Development Authority Tourism Advertising Fund
797     established under Section 57-1-64, to be used exclusively for the
798     purpose stated therein.   On or before August 15, 2021, and each
799     month thereafter, three percent (3%) of the total sales tax
800     revenue collected during the preceding month from restaurants and
801     hotels shall be allocated for distribution to the Mississippi
802     Development Authority Tourism Advertising Fund established under
803     Section 57-1-64, to be used exclusively for the purpose stated

804   therein.  The revenue diverted pursuant to this subsection shall
805   not be available for expenditure until February 1, 2020.

806        (b)   The Joint Legislative Committee on Performance
807   Evaluation and Expenditure Review (PEER) must provide an annual
808   report to the Legislature indicating the amount of funds deposited
809   into the Mississippi Development Authority Tourism Advertising
810   Fund established under Section 57-1-64, and a detailed record of
811   how the funds are spent.

812        (24)  The remainder of the amounts collected under the
813   provisions of this chapter shall be paid into the State Treasury
814   to the credit of the General Fund.

815        (25)  (a)  It shall be the duty of the municipal officials of
816   any municipality that expands its limits, or of any community that
817   incorporates as a municipality, to notify the commissioner of that
818   action thirty (30) days before the effective date.  Failure to so
819   notify the commissioner shall cause the municipality to forfeit
820   the revenue that it would have been entitled to receive during
821   this period of time when the commissioner had no knowledge of the
822   action.

823        (b)  (i)  Except as otherwise provided in subparagraph
824   (ii) of this paragraph, if any funds have been erroneously
825   disbursed to any municipality or any overpayment of tax is
826   recovered by the taxpayer, the commissioner may make correction
827   and adjust the error or overpayment with the municipality by

828    withholding the necessary funds from any later payment to be made
829    to the municipality.

830                    (ii)   Subject to the provisions of Sections
831    27-65-51 and 27-65-53, if any funds have been erroneously
832    disbursed to a municipality under subsection (1) of this section
833    for a period of three (3) years or more, the maximum amount that
834    may be recovered or withheld from the municipality is the total
835    amount of funds erroneously disbursed for a period of three (3)
836    years beginning with the date of the first erroneous disbursement.
837    However, if during such period, a municipality provides written
838    notice to the Department of Revenue indicating the erroneous
839    disbursement of funds, then the maximum amount that may be
840    recovered or withheld from the municipality is the total amount of
841    funds erroneously disbursed for a period of one (1) year beginning
842    with the date of the first erroneous disbursement.

843        **SECTION 12.**   If any section, paragraph, sentence, clause,
844    phrase or any part of this act is declared to be unconstitutional
845    or void, or if for any reason is declared to be invalid or of no
846    effect, the remaining sections, paragraphs, sentences, clauses,
847    phrases or  parts of this act shall be in no manner affected
848    thereby but shall remain in full force and effect.

849        **SECTION 13.**   This act shall take effect and be in force from
850    and after July 1, 2023.

            **Further, amend by striking the title in its entirety and
    inserting in lieu thereof the following:**



```
 1         AN ACT TO CREATE INFERIOR COURTS IN THE CAPITOL COMPLEX
 2    IMPROVEMENT DISTRICT (CCID) TO HEAR CERTAIN CRIMINAL AND CIVIL
 3    MATTERS OCCURRING OR ACCRUING IN THE BOUNDARIES OF THE CAPITOL
 4    COMPLEX IMPROVEMENT DISTRICT; TO PROVIDE JUDGES FOR THE CCID
 5    INFERIOR COURTS THAT SHALL POSSESS THE SAME QUALIFICATIONS AS
 6    CIRCUIT AND CHANCERY COURT JUDGES; TO PROVIDE FOR THE APPOINTMENT
 7    OF THE JUDGES BY THE CHIEF JUSTICE OF THE MISSISSIPPI SUPREME
 8    COURT; TO PROVIDE FOR THE SALARY AND OPERATING ALLOWANCE OF THE
 9    JUDGES; TO REQUIRE THE ATTORNEY GENERAL TO APPOINT ATTORNEYS TO
10    PROSECUTE CASES WITHIN THE JURISDICTION OF THE CCID INFERIOR
11    COURTS; TO REQUIRE THE STATE DEFENDER TO APPOINT PUBLIC DEFENDERS
12    FOR DEFENDANTS WHO FALL WITHIN THE JURISDICTION OF THE CCID
13    INFERIOR COURTS; TO PROVIDE FOR THE APPOINTMENT OF A CLERK AND
14    DEPUTY CLERK FOR THE CCID INFERIOR COURTS; TO REQUIRE THE CLERK TO
15    MAINTAIN A JURY BOX; TO DESCRIBE THE JURISDICTION OF THE CCID
16    INFERIOR COURTS AS ALL MATTERS THAT OCCUR OR ACCRUE WITHIN THE
17    BOUNDARIES OF THE CAPITAL COMPLEX IMPROVEMENT DISTRICT; TO PROVIDE
18    FOR THE POWERS OF THE JUDGES OF THE COURTS; TO AUTHORIZE
19    JURISDICTION FOR CERTAIN ACTIONS THAT OCCUR OR ACCRUE WITHIN THE
20    CCID INFERIOR COURTS; TO AMEND SECTION 29-5-203, MISSISSIPPI CODE
21    OF 1972, TO REVISE THE BOUNDARIES OF THE CAPITOL COMPLEX
22    IMPROVEMENT DISTRICT, FOR PURPOSES OF AMENDMENT; TO AMEND SECTION
23    27-65-75, MISSISSIPPI CODE OF 1972, TO REVISE THE DISTRIBUTION OF
24    STATE SALES TAX REVENUE FOR THE CCID; AND FOR RELATED PURPOSES.
```

# Exhibit 5M

2023 H.B. 1020, Comm. Amend. No. 1 (2023),
http://billstatus.ls.state.ms.us/documents/2023/pdf/sam/HB1020_S_Cmte_Amend_01.pdf.

**Adopted**
**COMMITTEE AMENDMENT NO 1 PROPOSED TO**

**House Bill No. 1020**

**BY: Committee**

      **Amend by striking all after the enacting clause and inserting in lieu thereof the following:**

37    **SECTION 1.**  (1)  There shall be three (3) temporary special
38  circuit judges for the Seventh Circuit Court District with no
39  limitation whatsoever upon the powers and duties of the said
40  judges other than as cast upon them by the Constitution and laws
41  of this state.
42    (2)  There shall be two (2) temporary special circuit judges
43  for the Seventh Circuit Court District with the limitation upon
44  the powers and duties of the judges authorized under this
45  subsection that the judges shall hear only criminal matters, as



46  well as those limitations cast upon them by the Constitution and

47  laws of this state.

48      (3)  No later than fifteen (15) days after the passage of

49  this act, the Chief Justice of the Supreme Court shall appoint the

50  judges authorized under this section.  The Chief Justice of the

51  Supreme Court may elect to reappoint circuit judges currently

52  serving on a temporary basis in the Seventh Circuit Court

53  District.

54      (4)  This section shall stand repealed on December 1, 2026.

55      **SECTION 2.**  Three (3) full-time legal assistants are

56  authorized in the Seventh Circuit Court District in addition to

57  the full-time legal assistants authorized by Section

58  25-31-5(1)(g).

59      **SECTION 3.**  The public defender of the Seventh Circuit Court

60  District may appoint three (3) full-time assistant public

61  defenders in addition to those authorized by Section 25-32-3.  The

62  full-time assistant public defenders shall receive the same

63  compensation as provided by law for full-time assistant public

64  defenders to be paid from funds specifically appropriated therefor

65  by the Legislature.

66      **SECTION 4.**  Section 19-23-21, Mississippi Code of 1972, is

67  amended as follows:

68      19-23-21.  (1)  The county attorney of any county bordering

69  on the Gulf of Mexico and having two (2) judicial districts may

70  appoint an assistant county attorney from the judicial district in

71  which the county attorney does not reside, to serve for a term

72  commensurate with the county attorney; the assistant county

73  attorney shall receive the same salary, mileage expense account

74  and secretarial assistance as provided by law for the county

75  attorney and shall have the same duties and powers as the county

76  attorney, subject to the direction of the county attorney.

77      (2)  (a)  The county attorney of any county housing the seat

78  of state government, wherein U.S. Highways 80 and 49 intersect,

79  and having two (2) judicial districts, may appoint two (2)

80  temporary assistant county attorneys; the temporary assistant

81  county attorneys shall receive the same salary, mileage expense

82  account and secretarial assistance as provided by law for the

83  county attorney to be paid from funds specifically appropriated

84  therefor by the Legislature; the temporary assistant county

85  attorneys shall have the same duties and powers as the county

86  attorney, subject to the direction of the county attorney.

87          (b)  This subsection shall stand repealed on December 1,

88  2026.

89      **SECTION 5.**  Section 9-7-25, Mississippi Code of 1972, is

90  amended as follows:

91      9-7-25.  (1)  There shall be four (4) circuit judges for the

92  Seventh Circuit Court District.  One (1) judge shall be elected

93  from each subdistrict as provided by Section 9-7-23(2)(a) through

94  (d).

95      (2)  While there shall be no limitation whatsoever upon the

96  powers and duties of the said judges other than as cast upon them

97  by the Constitution and laws of this state, the court in the First

98  Judicial District of Hinds County, in the discretion of the senior

99  circuit judge, may be divided into civil and criminal divisions as

100  a matter of convenience, by the entry of an order upon the minutes

101  of the court.

102     (3)  On January 1, 2026, there shall be one (1) circuit judge

103  for the Seventh Circuit Court District in addition to the judges

104  authorized in subsection (1) of this section.  The judge

105  authorized under this subsection shall be elected from the

106  subdistrict as provided by Section 9-7-23(2)(e).

107     **SECTION 6.**  Section 9-7-23, Mississippi Code of 1972, is

108  amended as follows:

109     9-7-23.  (1)  The Seventh Circuit Court District shall be

110  Hinds County.

111     (2)  The Seventh Circuit Court District shall be divided into

112  four (4) subdistricts in Hinds County as follows:

113          (a)  Subdistrict 7-1 shall consist of the following

114  precincts in Hinds County:  1, 2, 4, 5, 6, 8, 9, 10, 32, 33, 34,

115  35, 36, 44, 45, 46, 47, 72, 73, 74, 75, 76, 77, 78, 79, 92, 93, 96

116  and 97.

117          (b)  Subdistrict 7-2 shall consist of the following

118  precincts in Hinds County:  11, 12, 13, 14, 15, 16, 17, 23, 27,

119   28, 29, 30, 37, 38, 39, 40, 41, 42, 43, 80, 81, 82, 83, 84, 85,

120   Brownsville, Cynthia, Pocahontas and Tinnin.

121         (c)   Subdistrict 7-3 shall consist of the following

122   precincts in Hinds County:  18, 19, 20, 21, 22, 24, 25, 26, 31,

123   50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 66,

124   67, 68, 69, 70, 71, 86, 89, and Jackson State.

125         (d)   Subdistrict 7-4 shall consist of the following

126   precincts in Hinds County:  87, 88, 90, 91, 94, 95, Bolton, Byram

127   1, Byram 2, Cayuga, Chapel Hill, Clinton 1, Clinton 2, Clinton 3,

128   Clinton 4, Clinton 5, Clinton 6, Dry Grove, Edwards, Learned, Old

129   Byram, Pinehaven, Raymond 1, Raymond 2, Spring Ridge, St. Thomas,

130   Terry, Utica 1 and Utica 2.

131         (e)   Subdistrict 7-5 shall consist of the precincts in

132   Hinds County to be determined by the Legislature before January 1,

133   2026.

134   **SECTION 7.**   The Department of Public Safety shall issue all

135   patrol police officers within the Office of Capitol Police

136   body-worn cameras that shall be worn on the uniforms of the patrol

137   officers.  As used in this section, "body-worn cameras" means

138   devices that are worn by police officers which electronically

139   record audio and video of the activities of the officers.

140   **SECTION 8.**  Section 45-1-19, Mississippi Code of 1972, is

141   amended as follows:

142       45-1-19.  (1)  The Department of Public Safety, through the

143   Office of Capitol Police, shall have jurisdiction relative to the

144  enforcement of all laws of the State of Mississippi on the
145  properties, from curb to curb, including adjoining streets,
146  sidewalks and leased parking lots within the Capitol Complex, set
147  forth in Section 29-5-2, the Governor's Mansion, the Court of
148  Appeals Building, the Mississippi Department of Transportation
149  Building and the Public Employees' Retirement System Building, and
150  any property purchased, constructed or otherwise acquired by the
151  State of Mississippi for conducting state business and not
152  specifically under the supervision and care by any other state
153  entity, but which is reasonably assumed the Department of Public
154  Safety would be responsible for such.  The Department of Public
155  Safety shall, through any person or persons appointed by the
156  commissioner, make arrests for any violation of any law of the
157  State of Mississippi on the grounds of or within those properties.
158  The Department of Public Safety shall, in addition, enforce the
159  provisions of this section and Sections 29-5-57 through 29-5-67,
160  29-5-73 through 29-5-75, and 29-5-81 through 29-5-95, and
161  prescribe such rules and regulations as are necessary therefor.
162  The powers and duties related to the administration of Sections
163  29-5-57 through 29-5-67, 29-5-73 through 29-5-75, and 29-5-81
164  through 29-5-95 shall remain with the Department of Finance and
165  Administration.

166      (2)  Subject to the approval of the Board of Trustees of
167  State Institutions of Higher Learning, the Board of Trustees and
168  the Department of Public Safety shall be authorized to enter into

169  a contract for the Department of Public Safety to supply the

170  security personnel with jurisdiction to enforce all laws of the

171  State of Mississippi on the property of the Board of Trustees

172  located at the corner of Ridgewood Road and Lakeland Drive in the

173  City of Jackson.

174       (3)  The Department of Public Safety and the Department of

175  Agriculture are authorized to enter into a contract for the

176  Department of Public Safety to have jurisdiction and enforce all

177  laws of the State of Mississippi on the property of the Department

178  of Agriculture located at 121 North Jefferson Street and the new

179  Farmers Market Building located at the corner of High and

180  Jefferson Streets in the City of Jackson, Hinds County,

181  Mississippi.  It is the intent of the Legislature that the

182  Department of Public Safety will not post any security personnel

183  at such buildings, but will provide regular vehicle patrols and

184  responses to security system alarms.

185       (4)  The Department of Public Safety and the Mississippi Fair

186  Commission are authorized to enter into a contract for the

187  Department of Public Safety to have jurisdiction and enforce all

188  laws of the State of Mississippi on the property of the

189  Mississippi Fair Commission known as the "Mississippi State

190  Fairgrounds Complex" and any and all of its outlying buildings and

191  property.  The Department of Public Safety and the Mississippi

192  Fair Commission are authorized to enter into a contract for the

193  Department of Public Safety to supply the security personnel to

194   the Mississippi Fair Commission with jurisdiction to enforce all
195   laws of the State of Mississippi on this property and any and all
196   buildings on this property.

197         (5)   The Department of Public Safety and the Department of
198   Revenue are authorized to enter into a contract for the Department
199   of Public Safety to supply the security personnel with
200   jurisdiction to enforce all laws of the State of Mississippi at
201   the Alcoholic Beverage Control facility and the Department of
202   Revenue main office.

203         (6)   The Department of Public Safety shall have jurisdiction
204   relative to the enforcement of all laws of the State of
205   Mississippi within the boundaries of the Capitol Complex
206   Improvement District created in Section 29-5-203 and within the
207   boundaries of the City of Jackson, Mississippi.   The Department of
208   Public Safety shall, through any person or persons appointed by
209   the Department of Public Safety, make arrests for any violation of
210   any law of the State of Mississippi which occurs within the
211   boundaries of the district and the City of Jackson.   The
212   jurisdiction of the Department of Public Safety granted under this
213   subsection (6) shall be concurrent with the jurisdiction of the
214   City of Jackson, Mississippi, and that of Hinds County,
215   Mississippi.   The Commissioner of the Department of Public Safety
216   and City of Jackson shall enter into a Memorandum of Understanding
217   by July 1, 2023, which shall be mutually beneficial to both
218   parties detailing the expectations of both parties.   The execution



219  of or failure to execute such a memorandum shall not affect any
220  grant of jurisdiction under this subsection.  In the event the
221  memorandum is not executed any dispute related to the law
222  enforcement functions of the Office of Capitol Police within the
223  boundaries of the City of Jackson, Mississippi, shall be resolved
224  in favor of the Commissioner of the Department of Public Safety.
225  At any time and/or during any event necessitating the coordination
226  of and/or utilization at multiple jurisdictions, as determined by
227  the Chief of Capitol Police or the Commissioner, the Department of
228  Public Safety shall be the lead agency when the event occurs on
229  property as defined herein that is owned or leased by the state as
230  provided in subsection (1) of this section.  Written authorization
231  of the Chief of the Capitol Police or the Commissioner shall be
232  required prior to the approval of any event which is to take place
233  on any street or sidewalk immediately adjacent to any building or
234  property owned or occupied by any official, agency, board,
235  commission, office or other entity of the State of Mississippi, or
236  which can reasonably be expected to block, impede or otherwise
237  hinder ingress thereto and/or egress therefrom.  The jurisdiction
238  and authority of the Department of Public Safety under this
239  subsection (6) shall be in addition to any other jurisdiction and
240  authority provided to the department under this section or any
241  other law.
242      (7)  The Department of Public Safety is authorized to enter
243  into a contract with any county for the county to take custody of

244  the misdemeanor offenders arrested under the authority granted
245  under this section.

246       (8)  All accrued personal leave earned pursuant to Section
247  25-3-93, accrued major medical leave earned pursuant to Section
248  25-3-95, accrued state compensatory leave earned pursuant to
249  Section 25-3-92, and compensatory leave earned pursuant to the
250  Fair Labor Standards Act (FLSA) shall transfer from the Department
251  of Finance and Administration to the Department of Public Safety
252  for all employees transferred under this section.

253       **SECTION 9.**  Candidates for the judgeship authorized in
254  Section 9-7-25(2) shall qualify as provided by Section 23-15-977
255  and shall run for office and be elected as provided in Sections
256  23-15-974 through 23-15-985 (Nonpartisan Judicial Election Act).
257  The term of the office of the circuit court judgeship authorized
258  in Section 9-7-25(2) shall begin on January 1, 2027, and their
259  terms shall continue for four (4) years as is otherwise provided
260  by law.

261       **SECTION 10.**  Except for Section 8 of this act, this act shall
262  take effect and be in force from and after July 1, 2023.  Section
263  8 of this act shall take effect and be in force from and after
264  October 1, 2023.

         **Further, amend by striking the title in its entirety and
         inserting in lieu thereof the following:**

1       AN ACT TO PROVIDE FIVE TEMPORARY CIRCUIT JUDGES FOR THE FIRST
2  JUDICIAL DISTRICT OF THE SEVENTH CIRCUIT COURT DISTRICT UNTIL



```
 3   DECEMBER 1, 2026; TO PROVIDE THAT TWO OF THE TEMPORARY CIRCUIT
 4   JUDGES OF THE FIVE AUTHORIZED IN THIS ACT BE LIMITED TO HEAR ONLY
 5   CRIMINAL MATTERS; TO AUTHORIZE THREE FULL-TIME LEGAL ASSISTANTS IN
 6   THE SEVENTH CIRCUIT COURT DISTRICT IN ADDITION TO THE FULL-TIME
 7   LEGAL ASSISTANTS AUTHORIZED BY SECTION 25-31-5(1)(G); TO AUTHORIZE
 8   THREE FULL-TIME ASSISTANT PUBLIC DEFENDERS IN THE SEVENTH CIRCUIT
 9   COURT DISTRICT IN ADDITION TO THE FULL-TIME ASSISTANT PUBLIC
10   DEFENDERS AUTHORIZED BY SECTION 25-32-3; TO AMEND SECTION
11   19-23-21, MISSISSIPPI CODE OF 1972, TO AUTHORIZE THE COUNTY
12   PROSECUTING ATTORNEY OF HINDS COUNTY TO APPOINT TWO TEMPORARY
13   ASSISTANT COUNTY ATTORNEYS; TO AMEND SECTION 9-7-25, MISSISSIPPI
14   CODE OF 1972, TO PROVIDE THAT THE ADDITIONAL CIRCUIT JUDGE TO BE
15   ELECTED IN THE 2026 GENERAL ELECTION SHALL BE ELECTED FROM A
16   SUBDISTRICT TO BE DETERMINED BY THE LEGISLATURE; TO AMEND SECTION
17   9-7-23, MISSISSIPPI CODE OF 1972, TO PROVIDE ONE ADDITIONAL
18   CIRCUIT JUDGE TO BE ELECTED FROM THE SEVENTH CIRCUIT COURT
19   DISTRICT IN THE 2026 GENERAL ELECTION; TO REQUIRE THE DEPARTMENT
20   OF PUBLIC SAFETY TO ISSUE ALL CAPITOL POLICE PATROL OFFICERS
21   BODY-WORN CAMERAS; TO AMEND SECTION 45-1-19, MISSISSIPPI CODE OF
22   1972, TO INCLUDE THE GOVERNOR'S MANSION WITHIN THE LIST OF
23   STATE-OWNED BUILDINGS OVER WHICH THE OFFICE OF CAPITOL POLICE HAS
24   JURISDICTION; TO PROVIDE THAT THE DEPARTMENT OF PUBLIC SAFETY
25   SHALL HAVE JURISDICTION RELATIVE TO THE ENFORCEMENT OF ALL LAWS OF
26   THE STATE OF MISSISSIPPI WITHIN THE BOUNDARIES OF THE CITY OF
27   JACKSON, MISSISSIPPI; TO REQUIRE THE DEPARTMENT OF PUBLIC SAFETY
28   AND THE CITY OF JACKSON TO ENTER INTO A MEMORANDUM OF
29   UNDERSTANDING BY A CERTAIN DATE; TO REQUIRE THE WRITTEN
30   AUTHORIZATION OF THE CHIEF OF THE CAPITOL POLICE OR THE
31   COMMISSIONER PRIOR TO THE APPROVAL OF ANY EVENT WHICH IS TO TAKE
32   PLACE ON ANY STREET OR SIDEWALK IMMEDIATELY ADJACENT TO ANY
33   BUILDING OR PROPERTY OWNED OR OCCUPIED BY ANY OFFICIAL, AGENCY,
34   BOARD, COMMISSION, OFFICE OR OTHER ENTITY OF THE STATE OF
35   MISSISSIPPI; AND FOR RELATED PURPOSES.
```

# Exhibit 5N

2023 H.B. 1020, Report of Conf. Comm. No. 2, available at
http://billstatus.ls.state.ms.us/documents/2023/pdf/cr/HB1020CR_2.pdf.

## REPORT OF CONFERENCE COMMITTEE                # 2

**MR. SPEAKER AND MR. PRESIDENT:**

 We, the undersigned conferees, have had under consideration the amendments to the following entitled BILL:

H. B. No. 1020:  Capitol Complex Improvement District courts; authorize.

 We, therefore, respectfully submit the following report and recommendation:

 1.  **That the Senate recede from its Amendment No. 1.**

 2.  **That the House and Senate adopt the following amendment:**


 **Amend by striking all after the enacting clause and inserting in lieu thereof the following:**


36    <u>**SECTION 1.**</u>  (1)  The Chief Justice of the Supreme Court shall

37    appoint four (4) temporary special circuit judges for the Seventh

38    Circuit Court District. No limitation whatsoever shall be placed

39    upon the powers and duties of the judges other than those provided

40    by the Constitution and laws of this state.  The term of the

41    temporary special circuit judges shall expire on December 31,

42    2026.

43         (2)  The judges shall be appointed no later than fifteen (15)

44    days after the passage of this act according to applicable state

45    laws.  The Chief Justice of the Supreme Court may elect to

46    reappoint circuit judges that are serving on a temporary basis as

47    of the effective date of this act in the Seventh Circuit Court

48    District.



49          (3)  (a)  Each temporary special circuit judge shall receive

50     an office operating allowance to be used for the purposes

51     described and in amounts equal to those authorized in Section

52     9-1-36.

53                (b)   The Administrative Office of Courts shall establish

54     personnel policies to compensate the support staff for each

55     temporary special circuit judge.

56          (4)  This section shall stand repealed on December 31, 2026.

57          **SECTION 2.**   The public defender of the Seventh Circuit Court

58     District may appoint three (3) full-time assistant public

59     defenders who shall perform duties in the Seventh Circuit Court

60     District and the Capitol Complex Improvement District (CCID)

61     Inferior Court.  Such appointments shall be made in addition to

62     those authorized as of the effective date of this act in Section

63     25-32-3.  The full-time assistant public defenders shall receive

64     compensation in an amount equal to the compensation paid to

65     full-time assistant public defenders in the Seventh Circuit Court

66     District subject to available funds specifically appropriated by

67     the Legislature.

68          **SECTION 3.**   (1)  The District Attorney of the Seventh Circuit

69     Court District may appoint two (2) full-time assistant district

70     attorneys in addition to those authorized as the effective date of

71     this act in Section 25-31-5. The full-time assistant district

72     attorneys shall receive compensation in an amount equal to the

73     compensation paid to full-time assistant district attorneys in the

74   Seventh Circuit Court District subject to available funds

75   specifically appropriated therefor by the Legislature.

76      (2)  The District Attorney of the Seventh Circuit Court

77   District may appoint one (1) full-time criminal investigator in

78   addition to the criminal investigators authorized as of the

79   effective date of this act in Section 25-31-10.

80      **SECTION 4.**  (1) (a)  From and after January 1, 2024, there

81   shall be created one (1) inferior court as authorized by Article

82   6, Section 172 of the Mississippi Constitution of 1890, to be

83   located within the boundaries established in Section 29-5-203 for

84   the Capitol Complex Improvement District, hereinafter referred to

85   as "CCID".  The CCID inferior court shall have jurisdiction to

86   hear and determine all preliminary matters and criminal matters

87   authorized by law for municipal courts that accrue or occur, in

88   whole or in part, within the boundaries of the Capitol Complex

89   Improvement District; and shall have the same jurisdiction as

90   municipal courts to hear and determine all cases charging

91   violations of the motor vehicle and traffic laws of this state,

92   and violations of the City of Jackson's traffic ordinance or

93   ordinances related to the disturbance of the public peace that

94   accrue or occur, in whole or in part, within the boundaries of the

95   Capitol Complex Improvement District.

96          (b)  Any person convicted in the CCID inferior court may

97   be placed in the custody of the Mississippi Department of

98   Corrections, Central Mississippi facility.

23/HR26/HB1020CR.10J   ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖   (H)WM (S)JA
PAGE 3                                                             G1/2
  (GT/KW)

99      (2)  The Chief Justice of the Mississippi Supreme Court shall
100  appoint the CCID inferior court judge authorized by this section.
101  The judge shall possess all qualifications required by law for
102  municipal court judges.  Such judge shall be a qualified elector
103  of this state, and shall have such other qualifications as
104  provided by law for municipal judges.

105      (3)  The Administrative Office of Courts shall provide
106  compensation for the CCID inferior court judge and the support
107  staff of the judge.  Such compensation shall not be in an amount
108  less than the compensation paid to municipal court judges and
109  their support staff in the City of Jackson.

110      (4)  All fines, penalties, fees and costs imposed and
111  collected by the CCID inferior court shall be deposited with the
112  City of Jackson municipal treasurer or equivalent officer.

113      (5)  This section shall stand repealed on July 1, 2027.

114      **SECTION 5.**  (1)  The Attorney General shall designate two (2)
115  attorneys to serve as prosecuting attorneys for any cause of
116  action within the jurisdiction of the Capitol Complex Improvement
117  District (CCID) inferior court.  The prosecuting attorneys may be
118  employees of the Office of the Attorney General or contracted by
119  the Attorney General for such purposes.  The attorneys shall
120  prosecute cases in the court provided for the CCID inferior court
121  and also in the same manner and with the same authority of law
122  provided for district attorneys and county prosecuting attorneys

123   by filing an indictment or any other criminal action that accrues

124   or occurs, in whole or in part, in the CCID.

125        (2)  The Hinds County District Attorney shall be authorized

126   to prosecute cases in the CCID inferior court.  The provisions of

127   this section shall not be construed to prohibit or in any way

128   limit the Hinds County District Attorney from filing an indictment

129   or any other criminal action that occurred or accrued, in whole or

130   in part, within the boundaries of the CCID.

131        (3)  This section shall stand repealed on July 1, 2027.

132        **SECTION 6.**  (1)  The Administrative Office of Courts, in

133   consultation with the Chief Justice of the Mississippi Supreme

134   Court, shall appoint a clerk for the Capitol Complex Improvement

135   District (CCID) inferior court.

136        (2)  The Administrative Office of Courts shall provide

137   support staff and any other staff necessary to carry out the

138   functions and duties for the clerk of the CCID inferior court.

139        (3)  The Administrative Office of Courts shall pay the

140   salaries of the clerk and support staff of the CCID, subject to

141   available funds specifically appropriated by the Legislature for

142   such purpose.  Such salaries shall not be in amounts less than the

143   salaries paid to the clerk and staff of the municipal courts in

144   the City of Jackson.

145        (4)  This section shall stand repealed on July 1, 2027.

146        **SECTION 7.**  The Department of Finance and Administration in

147   conjunction with the Administrative Office of Courts shall

148 designate a suitable location or building for the purpose of

149 allowing the Capitol Complex Improvement District (CCID) inferior

150 court to hold court.

151    **SECTION 8.**  Section 29-5-203, Mississippi Code of 1972, is

152 amended as follows:

153    [Through June 30, 2024, this section shall read as follows:]

154    29-5-203.  There is created the Capitol Complex Improvement

155 District to be composed of the following described area in the

156 City of Jackson, Mississippi, that surrounds the State Capitol

157 Building:

158            CAPITOL COMPLEX PROPOSED BOUNDARIES

159    •  Beginning at a point on the west bank of the Pearl River

160 determined by extending the south curb line of High Street east

161 until it meets the bank of the Pearl River;

162    •  Then north along the west bank of the Pearl River

163 (extending along the southern boundary of LeFleur's Bluff State

164 Park) until it reaches a point on such bank determined by

165 extending the east curb line of Ridgewood Road south until it

166 meets the bank of the Pearl River;

167    •  Then north along such line determined by extending the

168 east curb line of Ridgewood Road and continuing along such curb

169 line until it reaches the northern drainage ditch of Eastover

170 Drive;

171      •   Then west along the northern drainage ditch and curb line
172  of Eastover Drive until it reaches the western curb line of the
173  west frontage road of I-55;
174      •   Then south along the west curb line of such frontage road
175  until it reaches the northern curb line of Lakeland Drive;
176      •   Then west along the northern curb line of Lakeland Drive
177  until it reaches the eastern curb line of Old Canton Road;
178      •   Then north along the east curb line of Old Canton Road
179  until it reaches the northern curb line of Meadowbrook Road;
180      •   Then west along the north curb line of Meadowbrook Road to
181  the west curb line of North State Street;
182      •   Then south along the west curb line of North State Street
183  to the north curb line of Hartfield Street;
184      •   Then west along the north curb line of Hartfield Street to
185  the west curb line of Oxford Avenue;
186      •   Then south on the west curb line of Oxford Avenue to the
187  north curb line of Mitchell Avenue which becomes Stonewall Street;
188      •   Then west along the north curb line of Mitchell Street and
189  then Stonewall Street until it reaches the west curb line of
190  Livingston Road;
191      •   Then south along the west curb line of Livingston Road
192  until it reaches the south curb line of Woodrow Wilson Drive;
193      •   Then east along the south curb line of Woodrow Wilson
194  Drive to the west curb line of Bailey Avenue (which becomes
195  Gallatin Street);

196       • Then south along the west curb line of Bailey Avenue and
197 then Gallatin Street until it reaches the north curb line of West
198 Capitol Street;

199       • Then west along the north curb line of West Capitol Street
200 until it intersects with the north curb line of Robinson Road;

201       • Then west on the north curb line of Robinson Road until it
202 intersects with the west curb line of Prentiss Street;

203       • Then south along the west curb line of Prentiss Street
204 until it intersects with the north curb line of John R. Lynch
205 Street on the west side of Jackson State University;

206       • Then west on the north curb line of John R. Lynch Street
207 until it reaches the west curb line of Valley Street;

208       • Then south along the west curb line of Valley Street until
209 it reaches the south curb line of Morehouse Street;

210       • Then east along the south curb line of Morehouse Street
211 until it reaches the west curb line of Dalton Street;

212       • Then south along the west curb line of Dalton Street until
213 it reaches the south curb line of Florence Avenue;

214       • Then east along the south curb line of Florence Avenue
215 until it reaches the east curb line of University Blvd. (Terry
216 Road);

217       • Then north and along the east curb line of University
218 Blvd. until it reaches the south curb line of Hooker Street;

219       • Then east along the south curb line of Hooker Street
220 extending in a straight line to the railroad tracks;

23/HR26/HB1020CR.10J    |||||||||||||||||||||||||||       (H)WM (S)JA
PAGE 8                                               G1/2
 (GT/KW)

221      •  Then north on the west side of such railroad tracks to the
222 south curb line of South Street;

223      •  Then east on South Street to the east curb line of
224 Jefferson Street and extend the south curb line of South Street in
225 a straight line to the east to the western edge of I-55;

226      •  Then north along the western edge of I-55 until it reaches
227 the south curb line of High Street;

228      •  Then east along the south curb line of High Street and
229 extending such line to the Pearl River and the point of the
230 beginning.

231      [From and after July 1, 2024, this section shall read as
232 follows:

233      29-5-203.  There is created the Capitol Complex Improvement
234 District to be composed of the following described area in the
235 City of Jackson, Mississippi, that surrounds the State Capitol
236 Building:

237                 CAPITOL COMPLEX PROPOSED BOUNDARIES

238      •  Beginning at a point on the west bank of the Pearl River
239 determined by extending the south curb line of High Street east
240 until it meets the bank of the Pearl River;

241      •  Then north along the west bank of the Pearl River * * *
242 until it reaches a point on such bank determined by extending
243 the * * * north curb line of Northside Drive until it meets the
244 bank of the Pearl River;



245      • Then west along the north curb line of Northside Drive
246 until it reaches the west track of the Illinois Central Railroad
247 line;
248 * * *
249      • Then south * * * along the west track of the Illinois
250 Central Railroad line to the north curb line of Mitchell Avenue
251 which becomes Stonewall Street;
252      • Then west along the north curb line of Mitchell Street and
253 then Stonewall Street until it reaches the west curb line of
254 Livingston Road;
255      • Then south along the west curb line of Livingston Road
256 until it reaches the south curb line of Woodrow Wilson Drive;
257      • Then east along the south curb line of Woodrow Wilson
258 Drive to the west curb line of Bailey Avenue (which becomes
259 Gallatin Street);
260      • Then south along the west curb line of Bailey Avenue and
261 then Gallatin Street until it reaches the north curb line of * * *
262 West Monument Street;
263      • Then west along the north curb line of * * * West Monument
264 Street until it intersects with * * * West Capitol Street and
265 becomes Rose Street;
266      • Then south along the west curb line of Rose Street until
267 it intersects with the north curb line of Robinson Road;
268      • Then west on the north curb line of Robinson Road until it
269 intersects with the west curb line of Prentiss Street;

23/HR26/HB1020CR.10J    ‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖    (H)WM (S)JA
PAGE 10                                                 G1/2
(GT/KW)

270     &bull;   Then south along the west curb line of Prentiss Street
271 until it intersects with the north curb line of John R. Lynch
272 Street on the west side of Jackson State University;

273     &bull;   Then west on the north curb line of John R. Lynch Street
274 until it reaches the west curb line of **\*** Ellis Avenue;

275 **\***

276     &bull;   Then south along the west curb line of Ellis Avenue until
277 it reaches the south curb line of Raymond Road;

278     &bull;   Then east along the south curb line of Raymond Road until
279 it reaches the north edge of Interstate 20 westbound;

280     &bull;  **\*** Then east along the north edge of Interstate 20
281 until it overlaps with Interstate 55 and continues along such edge
282 of Interstate 55/20 to the western edge of where it becomes
283 Interstate 55;

284 **\***

285     &bull;   Then north along the western edge of I-55 until it reaches
286 the south curb line of High Street;

287     &bull;   Then east along the south curb line of High Street and
288 extending such line to the Pearl River and the point of the
289 beginning.

290     **SECTION 9.**  Section 27-65-75, Mississippi Code of 1972, as
291 amended by Senate Bill No. 2664, 2023 Regular Session, is amended
292 as follows:

23/HR26/HB1020CR.10J      (H)WM (S)JA
PAGE 11                                       G1/2
(GT/KW)

293        27-65-75.  On or before the fifteenth day of each month, the

294   revenue collected under the provisions of this chapter during the

295   preceding month shall be paid and distributed as follows:

296        (1)   (a)   On or before August 15, 1992, and each succeeding

297   month thereafter through July 15, 1993, eighteen percent (18%) of

298   the total sales tax revenue collected during the preceding month

299   under the provisions of this chapter, except that collected under

300   the provisions of Sections 27-65-15, 27-65-19(3) and 27-65-21, on

301   business activities within a municipal corporation shall be

302   allocated for distribution to the municipality and paid to the

303   municipal corporation.  Except as otherwise provided in this

304   paragraph (a), on or before August 15, 1993, and each succeeding

305   month thereafter, eighteen and one-half percent (18-1/2%) of the

306   total sales tax revenue collected during the preceding month under

307   the provisions of this chapter, except that collected under the

308   provisions of Sections 27-65-15, 27-65-19(3), 27-65-21 and

309   27-65-24, on business activities within a municipal corporation

310   shall be allocated for distribution to the municipality and paid

311   to the municipal corporation.  However, in the event the State

312   Auditor issues a certificate of noncompliance pursuant to Section

313   21-35-31, the Department of Revenue shall withhold ten percent

314   (10%) of the allocations and payments to the municipality that

315   would otherwise be payable to the municipality under this

316   paragraph (a) until such time that the department receives written

317 notice of the cancellation of a certificate of noncompliance from
318 the State Auditor.

319     A municipal corporation, for the purpose of distributing the
320 tax under this subsection, shall mean and include all incorporated
321 cities, towns and villages.

322     Monies allocated for distribution and credited to a municipal
323 corporation under this paragraph may be pledged as security for a
324 loan if the distribution received by the municipal corporation is
325 otherwise authorized or required by law to be pledged as security
326 for such a loan.

327     In any county having a county seat that is not an
328 incorporated municipality, the distribution provided under this
329 subsection shall be made as though the county seat was an
330 incorporated municipality; however, the distribution to the
331 municipality shall be paid to the county treasury in which the
332 municipality is located, and those funds shall be used for road,
333 bridge and street construction or maintenance in the county.

334       (b)  On or before August 15, 2006, and each succeeding
335 month thereafter, eighteen and one-half percent (18-1/2%) of the
336 total sales tax revenue collected during the preceding month under
337 the provisions of this chapter, except that collected under the
338 provisions of Sections 27-65-15, 27-65-19(3) and 27-65-21, on
339 business activities on the campus of a state institution of higher
340 learning or community or junior college whose campus is not
341 located within the corporate limits of a municipality, shall be

342  allocated for distribution to the state institution of higher

343  learning or community or junior college and paid to the state

344  institution of higher learning or community or junior college.

345          (c)  On or before August 15, 2018, and each succeeding

346  month thereafter until August 14, 2019, two percent (2%) of the

347  total sales tax revenue collected during the preceding month under

348  the provisions of this chapter, except that collected under the

349  provisions of Sections 27-65-15, 27-65-19(3), 27-65-21 and

350  27-65-24, on business activities within the corporate limits of

351  the City of Jackson, Mississippi, shall be deposited into the

352  Capitol Complex Improvement District Project Fund created in

353  Section 29-5-215.  On or before August 15, 2019, and each

354  succeeding month thereafter until August 14, 2020, four percent

355  (4%) of the total sales tax revenue collected during the preceding

356  month under the provisions of this chapter, except that collected

357  under the provisions of Sections 27-65-15, 27-65-19(3), 27-65-21

358  and 27-65-24, on business activities within the corporate limits

359  of the City of Jackson, Mississippi, shall be deposited into the

360  Capitol Complex Improvement District Project Fund created in

361  Section 29-5-215.  On or before August 15, 2020, and each

362  succeeding month thereafter through July 15, 2023, six percent

363  (6%) of the total sales tax revenue collected during the preceding

364  month under the provisions of this chapter, except that collected

365  under the provisions of Sections 27-65-15, 27-65-19(3), 27-65-21

366  and 27-65-24, on business activities within the corporate limits

367  of the City of Jackson, Mississippi, shall be deposited into the

368  Capitol Complex Improvement District Project Fund created in

369  Section 29-5-215.  <u>On or before August 15, 2023, and each</u>

370  <u>succeeding month thereafter, nine percent (9%) of the total sales</u>

371  <u>tax revenue collected during the preceding month under the</u>

372  <u>provisions of this chapter, except that collected under the</u>

373  <u>provisions of Sections 27-65-15, 27-65-19(3), 27-65-21 and</u>

374  <u>27-65-24, on business activities within the corporate limits of</u>

375  <u>the City of Jackson, Mississippi, shall be deposited into the</u>

376  <u>Capitol Complex Improvement District Project Fund created in</u>

377  <u>Section 29-5-215.</u>

378           (d)   (i)   On or before the fifteenth day of the month

379  that the diversion authorized by this section begins, and each

380  succeeding month thereafter, eighteen and one-half percent

381  (18-1/2%) of the total sales tax revenue collected during the

382  preceding month under the provisions of this chapter, except that

383  collected under the provisions of Sections 27-65-15, 27-65-19(3)

384  and 27-65-21, on business activities within a redevelopment

385  project area developed under a redevelopment plan adopted under

386  the Tax Increment Financing Act (Section 21-45-1 et seq.) shall be

387  allocated for distribution to the county in which the project area

388  is located if:

389                1.   The county:

390                     a.   Borders on the Mississippi Sound and

391  the State of Alabama, or

392                     b.  Is Harrison County, Mississippi, and
393     the project area is within a radius of two (2) miles from the
394     intersection of Interstate 10 and Menge Avenue;
395                     2.  The county has issued bonds under Section
396     21-45-9 to finance all or a portion of a redevelopment project in
397     the redevelopment project area;
398                     3.  Any debt service for the indebtedness
399     incurred is outstanding; and
400                     4.  A development with a value of Ten Million
401     Dollars ($10,000,000.00) or more is, or will be, located in the
402     redevelopment area.
403                 (ii)  Before any sales tax revenue may be allocated
404     for distribution to a county under this paragraph, the county
405     shall certify to the Department of Revenue that the requirements
406     of this paragraph have been met, the amount of bonded indebtedness
407     that has been incurred by the county for the redevelopment project
408     and the expected date the indebtedness incurred by the county will
409     be satisfied.
410                 (iii)  The diversion of sales tax revenue
411     authorized by this paragraph shall begin the month following the
412     month in which the Department of Revenue determines that the
413     requirements of this paragraph have been met.  The diversion shall
414     end the month the indebtedness incurred by the county is
415     satisfied.  All revenue received by the county under this
416     paragraph shall be deposited in the fund required to be created in

417  the tax increment financing plan under Section 21-45-11 and be

418  utilized solely to satisfy the indebtedness incurred by the

419  county.

420       (2)  On or before September 15, 1987, and each succeeding

421  month thereafter, from the revenue collected under this chapter

422  during the preceding month, One Million One Hundred Twenty-five

423  Thousand Dollars ($1,125,000.00) shall be allocated for

424  distribution to municipal corporations as defined under subsection

425  (1) of this section in the proportion that the number of gallons

426  of gasoline and diesel fuel sold by distributors to consumers and

427  retailers in each such municipality during the preceding fiscal

428  year bears to the total gallons of gasoline and diesel fuel sold

429  by distributors to consumers and retailers in municipalities

430  statewide during the preceding fiscal year.  The Department of

431  Revenue shall require all distributors of gasoline and diesel fuel

432  to report to the department monthly the total number of gallons of

433  gasoline and diesel fuel sold by them to consumers and retailers

434  in each municipality during the preceding month.  The Department

435  of Revenue shall have the authority to promulgate such rules and

436  regulations as is necessary to determine the number of gallons of

437  gasoline and diesel fuel sold by distributors to consumers and

438  retailers in each municipality.  In determining the percentage

439  allocation of funds under this subsection for the fiscal year

440  beginning July 1, 1987, and ending June 30, 1988, the Department

441  of Revenue may consider gallons of gasoline and diesel fuel sold

442  for a period of less than one (1) fiscal year.  For the purposes
443  of this subsection, the term "fiscal year" means the fiscal year
444  beginning July 1 of a year.
445       (3)  On or before September 15, 1987, and on or before the
446  fifteenth day of each succeeding month, until the date specified
447  in Section 65-39-35, the proceeds derived from contractors' taxes
448  levied under Section 27-65-21 on contracts for the construction or
449  reconstruction of highways designated under the highway program
450  created under Section 65-3-97 shall, except as otherwise provided
451  in Section 31-17-127, be deposited into the State Treasury to the
452  credit of the State Highway Fund to be used to fund that highway
453  program.  The Mississippi Department of Transportation shall
454  provide to the Department of Revenue such information as is
455  necessary to determine the amount of proceeds to be distributed
456  under this subsection.
457       (4)  On or before August 15, 1994, and on or before the
458  fifteenth day of each succeeding month through July 15, 1999, from
459  the proceeds of gasoline, diesel fuel or kerosene taxes as
460  provided in Section 27-5-101(a)(ii)1, Four Million Dollars
461  ($4,000,000.00) shall be deposited in the State Treasury to the
462  credit of a special fund designated as the "State Aid Road Fund,"
463  created by Section 65-9-17.  On or before August 15, 1999, and on
464  or before the fifteenth day of each succeeding month, from the
465  total amount of the proceeds of gasoline, diesel fuel or kerosene
466  taxes apportioned by Section 27-5-101(a)(ii)1, Four Million

467  Dollars ($4,000,000.00) or an amount equal to twenty-three and

468  one-fourth percent (23-1/4%) of those funds, whichever is the

469  greater amount, shall be deposited in the State Treasury to the

470  credit of the "State Aid Road Fund," created by Section 65-9-17.

471  Those funds shall be pledged to pay the principal of and interest

472  on state aid road bonds heretofore issued under Sections 19-9-51

473  through 19-9-77, in lieu of and in substitution for the funds

474  previously allocated to counties under this section.  Those funds

475  may not be pledged for the payment of any state aid road bonds

476  issued after April 1, 1981; however, this prohibition against the

477  pledging of any such funds for the payment of bonds shall not

478  apply to any bonds for which intent to issue those bonds has been

479  published for the first time, as provided by law before March 29,

480  1981.  From the amount of taxes paid into the special fund under

481  this subsection and subsection (9) of this section, there shall be

482  first deducted and paid the amount necessary to pay the expenses

483  of the Office of State Aid Road Construction, as authorized by the

484  Legislature for all other general and special fund agencies.  The

485  remainder of the fund shall be allocated monthly to the several

486  counties in accordance with the following formula:

487          (a)  One-third (1/3) shall be allocated to all counties

488  in equal shares;

489          (b)  One-third (1/3) shall be allocated to counties

490  based on the proportion that the total number of rural road miles

491  in a county bears to the total number of rural road miles in all
492  counties of the state; and

493       (c)  One-third (1/3) shall be allocated to counties
494  based on the proportion that the rural population of the county
495  bears to the total rural population in all counties of the state,
496  according to the latest federal decennial census.

497       For the purposes of this subsection, the term "gasoline,
498  diesel fuel or kerosene taxes" means such taxes as defined in
499  paragraph (f) of Section 27-5-101.

500       The amount of funds allocated to any county under this
501  subsection for any fiscal year after fiscal year 1994 shall not be
502  less than the amount allocated to the county for fiscal year 1994.

503       Any reference in the general laws of this state or the
504  Mississippi Code of 1972 to Section 27-5-105 shall mean and be
505  construed to refer and apply to subsection (4) of Section
506  27-65-75.

507       (5)  One Million Six Hundred Sixty-six Thousand Six Hundred
508  Sixty-six Dollars ($1,666,666.00) each month shall be paid into
509  the special fund known as the "Educational Facilities Revolving
510  Loan Fund" created and existing under the provisions of Section
511  37-47-24.  Those payments into that fund are to be made on the
512  last day of each succeeding month hereafter.  This subsection (5)
513  shall stand repealed on July 1, * * * 2026.

514       (6)  An amount each month beginning August 15, 1983, through
515  November 15, 1986, as specified in Section 6, Chapter 542, Laws of

516   1983, shall be paid into the special fund known as the

517   Correctional Facilities Construction Fund created in Section 6,

518   Chapter 542, Laws of 1983.

519       (7)  On or before August 15, 1992, and each succeeding month

520   thereafter through July 15, 2000, two and two hundred sixty-six

521   one-thousandths percent (2.266%) of the total sales tax revenue

522   collected during the preceding month under the provisions of this

523   chapter, except that collected under the provisions of Section

524   27-65-17(2), shall be deposited by the department into the School

525   Ad Valorem Tax Reduction Fund created under Section 37-61-35.  On

526   or before August 15, 2000, and each succeeding month thereafter,

527   two and two hundred sixty-six one-thousandths percent (2.266%) of

528   the total sales tax revenue collected during the preceding month

529   under the provisions of this chapter, except that collected under

530   the provisions of Section 27-65-17(2), shall be deposited into the

531   School Ad Valorem Tax Reduction Fund created under Section

532   37-61-35 until such time that the total amount deposited into the

533   fund during a fiscal year equals Forty-two Million Dollars

534   ($42,000,000.00).  Thereafter, the amounts diverted under this

535   subsection (7) during the fiscal year in excess of Forty-two

536   Million Dollars ($42,000,000.00) shall be deposited into the

537   Education Enhancement Fund created under Section 37-61-33 for

538   appropriation by the Legislature as other education needs and

539   shall not be subject to the percentage appropriation requirements

540   set forth in Section 37-61-33.

541          (8)  On or before August 15, 1992, and each succeeding month
542     thereafter, nine and seventy-three one-thousandths percent
543     (9.073%) of the total sales tax revenue collected during the
544     preceding month under the provisions of this chapter, except that
545     collected under the provisions of Section 27-65-17(2), shall be
546     deposited into the Education Enhancement Fund created under
547     Section 37-61-33.

548          (9)  On or before August 15, 1994, and each succeeding month
549     thereafter, from the revenue collected under this chapter during
550     the preceding month, Two Hundred Fifty Thousand Dollars
551     ($250,000.00) shall be paid into the State Aid Road Fund.

552          (10)  On or before August 15, 1994, and each succeeding month
553     thereafter through August 15, 1995, from the revenue collected
554     under this chapter during the preceding month, Two Million Dollars
555     ($2,000,000.00) shall be deposited into the Motor Vehicle Ad
556     Valorem Tax Reduction Fund established in Section 27-51-105.

557          (11)  Notwithstanding any other provision of this section to
558     the contrary, on or before February 15, 1995, and each succeeding
559     month thereafter, the sales tax revenue collected during the
560     preceding month under the provisions of Section 27-65-17(2) and
561     the corresponding levy in Section 27-65-23 on the rental or lease
562     of private carriers of passengers and light carriers of property
563     as defined in Section 27-51-101 shall be deposited, without
564     diversion, into the Motor Vehicle Ad Valorem Tax Reduction Fund
565     established in Section 27-51-105.

566         (12)   Notwithstanding any other provision of this section to
567    the contrary, on or before August 15, 1995, and each succeeding
568    month thereafter, the sales tax revenue collected during the
569    preceding month under the provisions of Section 27-65-17(1) on
570    retail sales of private carriers of passengers and light carriers
571    of property, as defined in Section 27-51-101 and the corresponding
572    levy in Section 27-65-23 on the rental or lease of these vehicles,
573    shall be deposited, after diversion, into the Motor Vehicle Ad
574    Valorem Tax Reduction Fund established in Section 27-51-105.

575         (13)   On or before July 15, 1994, and on or before the
576    fifteenth day of each succeeding month thereafter, that portion of
577    the avails of the tax imposed in Section 27-65-22 that is derived
578    from activities held on the Mississippi State Fairgrounds Complex
579    shall be paid into a special fund that is created in the State
580    Treasury and shall be expended upon legislative appropriation
581    solely to defray the costs of repairs and renovation at the Trade
582    Mart and Coliseum.

583         (14)   On or before August 15, 1998, and each succeeding month
584    thereafter through July 15, 2005, that portion of the avails of
585    the tax imposed in Section 27-65-23 that is derived from sales by
586    cotton compresses or cotton warehouses and that would otherwise be
587    paid into the General Fund shall be deposited in an amount not to
588    exceed Two Million Dollars ($2,000,000.00) into the special fund
589    created under Section 69-37-39.  On or before August 15, 2007, and
590    each succeeding month thereafter through July 15, 2010, that

591    portion of the avails of the tax imposed in Section 27-65-23 that
592    is derived from sales by cotton compresses or cotton warehouses
593    and that would otherwise be paid into the General Fund shall be
594    deposited in an amount not to exceed Two Million Dollars
595    ($2,000,000.00) into the special fund created under Section
596    69-37-39 until all debts or other obligations incurred by the
597    Certified Cotton Growers Organization under the Mississippi Boll
598    Weevil Management Act before January 1, 2007, are satisfied in
599    full.  On or before August 15, 2010, and each succeeding month
600    thereafter through July 15, 2011, fifty percent (50%) of that
601    portion of the avails of the tax imposed in Section 27-65-23 that
602    is derived from sales by cotton compresses or cotton warehouses
603    and that would otherwise be paid into the General Fund shall be
604    deposited into the special fund created under Section 69-37-39
605    until such time that the total amount deposited into the fund
606    during a fiscal year equals One Million Dollars ($1,000,000.00).
607    On or before August 15, 2011, and each succeeding month
608    thereafter, that portion of the avails of the tax imposed in
609    Section 27-65-23 that is derived from sales by cotton compresses
610    or cotton warehouses and that would otherwise be paid into the
611    General Fund shall be deposited into the special fund created
612    under Section 69-37-39 until such time that the total amount
613    deposited into the fund during a fiscal year equals One Million
614    Dollars ($1,000,000.00).

615          (15)  Notwithstanding any other provision of this section to

616     the contrary, on or before September 15, 2000, and each succeeding

617     month thereafter, the sales tax revenue collected during the

618     preceding month under the provisions of Section

619     27-65-19(1)(d)(i)2, and 27-65-19(1)(d)(i)3 shall be deposited,

620     without diversion, into the Telecommunications Ad Valorem Tax

621     Reduction Fund established in Section 27-38-7.

622          (16)  (a)  On or before August 15, 2000, and each succeeding

623     month thereafter, the sales tax revenue collected during the

624     preceding month under the provisions of this chapter on the gross

625     proceeds of sales of a project as defined in Section 57-30-1 shall

626     be deposited, after all diversions except the diversion provided

627     for in subsection (1) of this section, into the Sales Tax

628     Incentive Fund created in Section 57-30-3.

629               (b)  On or before August 15, 2007, and each succeeding

630     month thereafter, eighty percent (80%) of the sales tax revenue

631     collected during the preceding month under the provisions of this

632     chapter from the operation of a tourism project under the

633     provisions of Sections 57-26-1 through 57-26-5, shall be

634     deposited, after the diversions required in subsections (7) and

635     (8) of this section, into the Tourism Project Sales Tax Incentive

636     Fund created in Section 57-26-3.

637          (17)  Notwithstanding any other provision of this section to

638     the contrary, on or before April 15, 2002, and each succeeding

639     month thereafter, the sales tax revenue collected during the

640   preceding month under Section 27-65-23 on sales of parking

641   services of parking garages and lots at airports shall be

642   deposited, without diversion, into the special fund created under

643   Section 27-5-101(d).

644        (18)   [Repealed]

645        (19)   (a)   On or before August 15, 2005, and each succeeding

646   month thereafter, the sales tax revenue collected during the

647   preceding month under the provisions of this chapter on the gross

648   proceeds of sales of a business enterprise located within a

649   redevelopment project area under the provisions of Sections

650   57-91-1 through 57-91-11, and the revenue collected on the gross

651   proceeds of sales from sales made to a business enterprise located

652   in a redevelopment project area under the provisions of Sections

653   57-91-1 through 57-91-11 (provided that such sales made to a

654   business enterprise are made on the premises of the business

655   enterprise), shall, except as otherwise provided in this

656   subsection (19), be deposited, after all diversions, into the

657   Redevelopment Project Incentive Fund as created in Section

658   57-91-9.

659        (b)   For a municipality participating in the Economic

660   Redevelopment Act created in Sections 57-91-1 through 57-91-11,

661   the diversion provided for in subsection (1) of this section

662   attributable to the gross proceeds of sales of a business

663   enterprise located within a redevelopment project area under the

664   provisions of Sections 57-91-1 through 57-91-11, and attributable

665    to the gross proceeds of sales from sales made to a business

666    enterprise located in a redevelopment project area under the

667    provisions of Sections 57-91-1 through 57-91-11 (provided that

668    such sales made to a business enterprise are made on the premises

669    of the business enterprise), shall be deposited into the

670    Redevelopment Project Incentive Fund as created in Section

671    57-91-9, as follows:

672                    (i)   For the first six (6) years in which payments

673    are made to a developer from the Redevelopment Project Incentive

674    Fund, one hundred percent (100%) of the diversion shall be

675    deposited into the fund;

676                    (ii)   For the seventh year in which such payments

677    are made to a developer from the Redevelopment Project Incentive

678    Fund, eighty percent (80%) of the diversion shall be deposited

679    into the fund;

680                    (iii)   For the eighth year in which such payments

681    are made to a developer from the Redevelopment Project Incentive

682    Fund, seventy percent (70%) of the diversion shall be deposited

683    into the fund;

684                    (iv)   For the ninth year in which such payments are

685    made to a developer from the Redevelopment Project Incentive Fund,

686    sixty percent (60%) of the diversion shall be deposited into the

687    fund; and

688                  (v)  For the tenth year in which such payments are
689      made to a developer from the Redevelopment Project Incentive Fund,
690      fifty percent (50%) of the funds shall be deposited into the fund.
691          (20)  On or before January 15, 2007, and each succeeding
692      month thereafter, eighty percent (80%) of the sales tax revenue
693      collected during the preceding month under the provisions of this
694      chapter from the operation of a tourism project under the
695      provisions of Sections 57-28-1 through 57-28-5 shall be deposited,
696      after the diversions required in subsections (7) and (8) of this
697      section, into the Tourism Sales Tax Incentive Fund created in
698      Section 57-28-3.
699          (21)  (a)  On or before April 15, 2007, and each succeeding
700      month thereafter through June 15, 2013, One Hundred Fifty Thousand
701      Dollars ($150,000.00) of the sales tax revenue collected during
702      the preceding month under the provisions of this chapter shall be
703      deposited into the MMEIA Tax Incentive Fund created in Section
704      57-101-3.
705              (b)  On or before July 15, 2013, and each succeeding
706      month thereafter, One Hundred Fifty Thousand Dollars ($150,000.00)
707      of the sales tax revenue collected during the preceding month
708      under the provisions of this chapter shall be deposited into the
709      Mississippi Development Authority Job Training Grant Fund created
710      in Section 57-1-451.
711          (22)  Notwithstanding any other provision of this section to
712      the contrary, on or before August 15, 2009, and each succeeding

713  month thereafter, the sales tax revenue collected during the
714  preceding month under the provisions of Section 27-65-201 shall be
715  deposited, without diversion, into the Motor Vehicle Ad Valorem
716  Tax Reduction Fund established in Section 27-51-105.

717      (23)   (a)   On or before August 15, 2019, and each month
718  thereafter through July 15, 2020, one percent (1%) of the total
719  sales tax revenue collected during the preceding month from
720  restaurants and hotels shall be allocated for distribution to the
721  Mississippi Development Authority Tourism Advertising Fund
722  established under Section 57-1-64, to be used exclusively for the
723  purpose stated therein.   On or before August 15, 2020, and each
724  month thereafter through July 15, 2021, two percent (2%) of the
725  total sales tax revenue collected during the preceding month from
726  restaurants and hotels shall be allocated for distribution to the
727  Mississippi Development Authority Tourism Advertising Fund
728  established under Section 57-1-64, to be used exclusively for the
729  purpose stated therein.   On or before August 15, 2021, and each
730  month thereafter, three percent (3%) of the total sales tax
731  revenue collected during the preceding month from restaurants and
732  hotels shall be allocated for distribution to the Mississippi
733  Development Authority Tourism Advertising Fund established under
734  Section 57-1-64, to be used exclusively for the purpose stated
735  therein.   The revenue diverted pursuant to this subsection shall
736  not be available for expenditure until February 1, 2020.

737              (b)   The Joint Legislative Committee on Performance
738    Evaluation and Expenditure Review (PEER) must provide an annual
739    report to the Legislature indicating the amount of funds deposited
740    into the Mississippi Development Authority Tourism Advertising
741    Fund established under Section 57-1-64, and a detailed record of
742    how the funds are spent.

743       (24)   The remainder of the amounts collected under the
744    provisions of this chapter shall be paid into the State Treasury
745    to the credit of the General Fund.

746       (25)   (a)   It shall be the duty of the municipal officials of
747    any municipality that expands its limits, or of any community that
748    incorporates as a municipality, to notify the commissioner of that
749    action thirty (30) days before the effective date.  Failure to so
750    notify the commissioner shall cause the municipality to forfeit
751    the revenue that it would have been entitled to receive during
752    this period of time when the commissioner had no knowledge of the
753    action.

754              (b)   (i)   Except as otherwise provided in subparagraph
755    (ii) of this paragraph, if any funds have been erroneously
756    disbursed to any municipality or any overpayment of tax is
757    recovered by the taxpayer, the commissioner may make correction
758    and adjust the error or overpayment with the municipality by
759    withholding the necessary funds from any later payment to be made
760    to the municipality.

761                    (ii)   Subject to the provisions of Sections

762    27-65-51 and 27-65-53, if any funds have been erroneously

763    disbursed to a municipality under subsection (1) of this section

764    for a period of three (3) years or more, the maximum amount that

765    may be recovered or withheld from the municipality is the total

766    amount of funds erroneously disbursed for a period of three (3)

767    years beginning with the date of the first erroneous disbursement.

768    However, if during such period, a municipality provides written

769    notice to the Department of Revenue indicating the erroneous

770    disbursement of funds, then the maximum amount that may be

771    recovered or withheld from the municipality is the total amount of

772    funds erroneously disbursed for a period of one (1) year beginning

773    with the date of the first erroneous disbursement.

774       **SECTION 10.**   The City of Jackson, at all times, shall

775    adequately staff its police department with the necessary number

776    of law enforcement officers.   The Jackson Police Department shall

777    continue to enforce all ordinances of the City of Jackson.

778       **SECTION 11.**   (1)   Subject to the availability of funds

779    specifically appropriated therefor, the Department of Public

780    Safety shall provide body-worn cameras to each patrol law

781    enforcement officer within the Office of Capitol Police.   The

782    body-worn cameras shall be kept in good working condition, worn on

783    the uniform of any patrol law enforcement officer while the

784    officer is on duty and shall be fully operational while any

785    officer is on patrol.

786          (2)  For purposes of this section, "Body-worn camera" means a
787     device that is worn by a law enforcement officer which has the
788     capability of electronically recording audio and video of the
789     activities of the officer.

790          **SECTION 12.**  By October 1, 2023, the clerk of the Seventh
791     Circuit Court District in conjunction with the Administrative
792     Office of Courts shall provide case disposition and caseload data
793     in the district from January 1, 2017, to September 15, 2023, to
794     the Chairs of the Senate Judiciary, Division A and the House
795     Judiciary A Committees and the Chairs of the Senate and House
796     Appropriations Committees for the purpose of assisting the
797     Legislature in its consideration to authorize one (1) circuit
798     judge for the Seventh Circuit Court District in addition to the
799     judges authorized in subsection (1) of this section.  Any judge to
800     be authorized under this subsection shall be elected from the
801     subdistrict as provided by Section 9-7-23(2)(e).

802          **SECTION 13.**  The Commissioner of the Department of Public
803     Safety shall develop a 911 system which can be used by any person
804     within the boundaries of the Capitol Complex Improvement District.

805          **SECTION 14.**  The Department of Public Safety may purchase and
806     issue all patrol law enforcement officers within the department
807     any equipment deemed necessary by the commissioner for use to
808     enforce any traffic related law of the State of Mississippi, City
809     of Jackson's traffic ordinances or ordinances related to the
810     disturbance of the public peace, or agency regulation on any

811  property, public street, road or highway upon which it has
812  jurisdiction.

813      **SECTION 15.**  The Chief Justice of the Supreme Court, in
814  consultation with the Administrative Office of Courts shall
815  appoint a court administrator whose primary duty is to manage the
816  caseload of the special judges appointed in Section 1 of this act.
817  The Chief Justice of the Supreme Court, in consultation with the
818  Administrative Office of Courts, shall set the compensation for
819  the court administrator authorized in this section.

820      **SECTION 16.**  The Hinds County Circuit Clerk shall enter the
821  names or identifying numbers of all qualified electors in Hinds
822  County when selecting a jury for any hearing, trial or cause of
823  action that comes before any of the four (4) temporary special
824  circuit judges authorized by Section 1 of this act for the Seventh
825  Circuit Court District.

826      **SECTION 17.**  If any section, paragraph, sentence, clause,
827  phrase or any part of this act is declared to be unconstitutional
828  or void, or if for any reason is declared to be invalid or of no
829  effect, the remaining sections, paragraphs, sentences, clauses,
830  phrases or  parts of this act shall be in no manner affected
831  thereby but shall remain in full force and effect.

832      **SECTION 18.**  This act shall take effect and be in force from
833  and after July 1, 2023.

        **Further, amend by striking the title in its entirety and**
        **inserting in lieu thereof the following:**

```
 1          AN ACT TO AUTHORIZE FOUR TEMPORARY SPECIAL CIRCUIT JUDGES FOR
 2    THE SEVENTH CIRCUIT COURT DISTRICT TO BE APPOINTED BY THE CHIEF
 3    JUSTICE OF THE SUPREME COURT; TO AUTHORIZE THE PUBLIC DEFENDER OF
 4    THE SEVENTH CIRCUIT COURT DISTRICT TO APPOINT THREE FULL-TIME
 5    ASSISTANT PUBLIC DEFENDERS; TO AUTHORIZE THE DISTRICT ATTORNEY OF
 6    THE SEVENTH CIRCUIT COURT DISTRICT TO APPOINT TWO FULL-TIME
 7    ASSISTANT DISTRICT ATTORNEYS; TO CREATE AN INFERIOR COURT WITHIN
 8    THE CAPITOL COMPLEX IMPROVEMENT DISTRICT TO HEAR AND DETERMINE
 9    CERTAIN MATTERS THAT ARE UNDER THE JURISDICTION OF MUNICIPAL
10    COURTS JURISDICTION OF A MUNICIPAL COURT; TO AUTHORIZE THE
11    ATTORNEY GENERAL TO DESIGNATE TWO ATTORNEYS TO SERVE AS
12    PROSECUTING ATTORNEYS FOR ANY CAUSE OF ACTION WITHIN THE
13    JURISDICTION OF THE CAPITOL COMPLEX IMPROVEMENT DISTRICT; TO
14    REQUIRE THE ADMINISTRATIVE OFFICE OF COURTS, IN CONSULTATION WITH
15    THE CHIEF JUSTICE OF THE MISSISSIPPI SUPREME COURT TO APPOINT A
16    CLERK FOR THE CCID INFERIOR COURT; TO REQUIRE THE DEPARTMENT OF
17    FINANCE AND ADMINISTRATION TO DESIGNATE A SUITABLE LOCATION OR
18    BUILDING FOR THE PURPOSE OF ALLOWING THE CCID INFERIOR COURT TO
19    HOLD COURT; TO AMEND SECTION 29-5-203, MISSISSIPPI CODE OF 1972, TO
20    REVISE THE BOUNDARIES OF THE CAPITOL COMPLEX IMPROVEMENT DISTRICT,
21    FOR PURPOSES OF AMENDMENT; TO AMEND SECTION 27-65-75, MISSISSIPPI
22    CODE OF 1972, AS AMENDED BY SENATE BILL NO. 2664, 2023 REGULAR
23    SESSION, TO REVISE THE DISTRIBUTION OF STATE SALES TAX REVENUE TO
24    THE CAPITOL COMPLEX IMPROVEMENT DISTRICT PROJECT FUND; TO REQUIRE
25    THE COMMISSIONER OF THE DEPARTMENT OF PUBLIC SAFETY TO DEVELOP A
26    911 SYSTEM FOR EMERGENCIES WITHIN THE CAPITOL COMPLEX IMPROVEMENT
27    DISTRICT; TO REQUIRE THE CHIEF JUSTICE OF THE SUPREME COURT, IN
28    CONSULTATION WITH THE ADMINISTRATIVE OFFICE OF COURTS, TO APPOINT
29    A COURT ADMINISTRATOR TO MANAGE THE CASELOAD OF THE SPECIAL JUDGES
30    APPOINTED IN SECTION 1 OF THIS ACT; TO REQUIRE THE HINDS COUNTY
31    CIRCUIT CLERK TO SELECT JURORS FROM ALL QUALIFIED ELECTORS IN
32    HINDS COUNTY; TO PROVIDE HOW JURORS ARE CHOSEN FOR PROCEEDINGS
33    BEFORE SPECIAL COURT JUDGES AUTHORIZED BY THIS ACT FOR THE SEVENTH
34    CIRCUIT COURT DISTRICT; AND FOR RELATED PURPOSES.
```

CONFEREES FOR THE HOUSE            CONFEREES FOR THE SENATE

X (SIGNED)                         X (SIGNED)
Lamar                              Wiggins


X (SIGNED)                         X (SIGNED)
Bain                               Michel


(NOT SIGNED)                       X (SIGNED)
Banks                              Parker



# Exhibit 5O

2023 H.B. 1020, Amend. No. 5 to Comm. Amend. No. 1, available at
http://billstatus.ls.state.ms.us/documents/2023/pdf/sam/HB1020_S_Amend_05_to_Cmte_Amend
_01.pdf.

**Lost**

**AMENDMENT NO 5 TO AMENDMENT NO 1 PROPOSED TO**

**House Bill No. 1020**

**BY: Representative Clark**

# AMENDMENT PROPOSED TO

HOUSE BILL NO. _1020_

BY _B. Clark_

Amend on line ~~92~~ *31* by striking the entire Section 2. (1) language through the period on line 100, and inserting in lieu thereof, the following:

"SECTION 2. (1) Each Capitol Complex Improvement District (CCID) judge shall possess all qualifications required by law for circuit and chancery court judges. Each judge of the court shall be a qualified elector of the City of Jackson, and shall have such other qualifications as provided for by law. Each judge shall be elected to serve four (4) year terms. One Judge shall be elected from a district that is compose of the entire City of Jackson and one Judge shall be elected from a district that is composed of the Capitol Complex Improvement District. The election to elect all Judges shall be held at the same general election which the president is elected. Vacancies in the office shall be filled in the same manner provided by law for vacancies in the office of circuit judge."

Further amend on line ~~101~~ *38* by striking the word "appointed" and inserting in lieu thereof "elected"

AMEND TITLE (to conform) (as follows):