# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL., <br><br> *Plaintiffs*, <br><br> v. <br><br> TATE REEVES, in his official capacity as Governor of the State of Mississippi, ET AL., <br><br> *Defendants*. | Case No. 3:23-cv-272-HTW-LGI <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION RE H.B. 1020 § 4 AND § 5** |

With H.B. 1020's requirement that a State official (the Chief Justice) appoint judges to the Hinds County Circuit Court struck down as unconstitutional, *see Saunders v. State of Mississippi*, No. 2023-CA-00584-SCT, 2023 WL 6154416, at *15 ¶ 83 (Miss. 2023), Plaintiffs turn their attention to the other unconstitutional requirements that State officials appoint the local prosecutors and judge for the new Jackson court that comes into existence on January 1, 2024.

On January 1, the CCID—a disproportionately white enclave in Jackson—will become the only area in all of Mississippi in which a State-run police force (the Capitol Police) can refer criminal charges to a State-appointed prosecutor (the CCID Inferior Court prosecutors) for prosecution before a State-appointed judge (the CCID Inferior Court judge). The Legislature offered no coherent reason for the creation of this superfluous court or the discriminatory impact of its appointment provisions on Jackson residents. And the law cannot be justified on public safety grounds because it denies the CCID Inferior Court jurisdiction to hear felony cases.

The inescapable conclusion is that the CCID Inferior Court appointment provisions were enacted not to address Jackson's felony crime problem, but instead to use the public safety crisis as an excuse to take power from Jackson's predominantly Black population. At minimum, this

discriminatory intent unconstitutionally influenced the Legislature's decision to have State officials, rather than local officials, appoint the CCID Inferior Court prosecutors and judge.

The Court should therefore preliminarily enjoin Attorney General Lynn Fitch from appointing the CCID Inferior Court prosecutors under H.B. 1020 § 5 and preliminarily enjoin Chief Justice Michael Randolph from appointing the CCID Inferior Court judge under § 4. As an alternative to enjoining the Chief Justice, if the Court will grant Plaintiffs' pending motion for leave to amend the complaint, the Court can instead enjoin the proposed alternative defendants John/Jane Doe 5 from accepting appointment as the CCID Inferior Court judge, and Greg Snowden and Liz Welch from taking any actions to compensate that judge or designate a location for them to hold court. *See* Dkts. 80-81.

## STATEMENT OF FACTS

### I.  Jurisdiction of the CCID Inferior Court Under H.B. 1020.

The Capitol Complex Improvement District ("CCID") was created by the Mississippi Legislature in 2017 "to establish regular funding and administration of infrastructure projects within a defined area of the capital city of Jackson." Ex. 5A at 1. Its boundaries "encompass the major state properties in Jackson," covering 8.7 square miles surrounding the State Capitol. *Id.*

H.B. 1020 transforms the CCID's purpose and doubles its size, effective July 1, 2024, so that it will cover approximately 17.5 square miles. *See* H.B. 1020 § 8. While Jackson as a whole is only 15% white, this expanded area is nearly 50% white. *See* Ex. 5B; Ex. 6 at 202.[1]

On January 1, 2024, H.B. 1020 will create the CCID Inferior Court. The CCID Inferior Court will have "the same jurisdiction and function as a municipal court" over crimes that occur

---

[1] Rep. Trey Lamar, MS House Floor - 7 February, 2023; 10:00 AM, YouTube at 8:44:50 (Feb. 7, 2023), https://www.youtube.com/watch?v=HtruSFI0avs ("I've been told that the proposed area is approximately 53% African-American.").

within the CCID's boundaries.  *Saunders*, 2023 WL 6154416, at *8 ¶ 45.  That is, the CCID

Inferior Court will have concurrent criminal jurisdiction with the Jackson Municipal Court over

offenses committed within the CCID such that it can (1) hear and decide misdemeanor violations

of Mississippi law and Jackson ordinances, and (2) handle "preliminary matters" in felony cases.

*Compare* H.B. 1020 § 4(1)(a), *with* Miss. Code § 21-23-7(1).  By "preliminary matters," H.B.

1020 refers to "determining probable cause, issuing warrants, setting bonds and conducting

initial appearances and preliminary hearings."  Op. Atty. Gen., Hedgepeth, 2021 WL 6882455

(Nov. 29, 2021) (citation omitted); *see also* Miss. R. Crim. P. 2.2, 3.1, 5.2, 6.2.  These

preliminary matters culminate in the CCID Inferior Court binding a defendant over to the grand

jury upon a determination that probable cause exists to believe that the defendant committed a

felony, and "the court clerk . . . transfer[s] the case to the circuit clerk."  *See* Op. Atty. Gen.,

Hedgepeth, 2001 WL 334197 (Mar. 22, 2001); Miss. R. Cr. P. 6.2(f).  The defendant is released

on bail or committed to the county jail pending action of the grand jury, which presents an

indictment to the Hinds County Circuit Court or County Court for the felony to be tried.  *See*

Miss. Code §§ 9-7-81, 9-9-27, 99-15-3, -5; Miss. R. Cr. P. 2.2, 14.5.

**II.    CCID Inferior Court Prosecutors.**

On January 1, 2024, H.B. 1020 § 5 requires the Mississippi Attorney General to appoint

two prosecuting attorneys to prosecute criminal actions in the CCID Inferior Court.  H.B. 1020

§ 5(1).  In other words, the law tasks these CCID Inferior Court prosecutors with (1) prosecuting

misdemeanor violations of Mississippi law and Jackson ordinances, and (2) handling preliminary

matters in felony cases.  *Compare* H.B. 1020 §§ 4(1)(a), 5(1), *with* Miss. Code § 21-23-7(1).

H.B. 1020 gives these prosecutors "the same authority of law provided for district attorneys and

county prosecuting attorneys" to commence a criminal action.  H.B. 1020 § 5(1).  Accordingly,

the appointed CCID Inferior Court prosecutors will have concurrent jurisdiction over their cases

with the Jackson Municipal Court Prosecutor and Hinds County District Attorney and County Prosecutor.  *See* Miss. Code §§ 19-23-11(1), (4), (7), 21-23-7(1), 25-31-11(1), (4).  The CCID Inferior Court prosecutors will serve 3.5-year terms through July 1, 2027.  *See* H.B. 1020 § 5(3).

The appointment of the CCID Inferior Court prosecutors departs from the longstanding system for selecting local prosecutors in Mississippi.  Unlike all comparable prosecutors in the State—including the other prosecutors in Hinds County and Jackson whose concurrent jurisdiction they intrude upon—the CCID Inferior Court prosecutors will not be selected by the voters or governing authorities of the local community they serve, and need not be a resident of their court's county or city.  *Compare* H.B. 1020 § 5(1), *with* Miss. Const. of 1890, art. 12, §§ 241, 250; Miss. Code §§ 19-23-1, -9, 21-23-3, 23-15-193, -300, 25-31-1(1).  Unlike a district attorney or county prosecutor, the CCID Inferior Court prosecutors will not be restricted from engaging in the private practice of law.  *Compare* H.B. 1020 § 5(1), *with* Miss. Code §§ 19-23-13, 25-31-35.  And unlike municipal court prosecutors, the CCID Inferior Court prosecutors will not be subject to oversight and potential removal by their city's governing authorities.  *Compare* H.B. 1020 § 5(1), *with* Miss. Code § 21-23-3.[2]

Worse still, the appointed CCID Inferior Court prosecutors will have far greater prosecutorial discretion than any comparable prosecutors in Mississippi because by deciding to prosecute someone for a misdemeanor, they can have that person suffer felony punishment.  H.B. 1020 § 4(1)(b) authorizes the CCID Inferior Court to place a misdemeanant in the custody of the Mississippi Department of Corrections' Central Mississippi facility.  That facility is currently under U.S. Department of Justice investigation for dangerous and substandard conditions of

---

[2] *See, e.g.*, Op. Atty. Gen., Doty, 1999 WL 1075177 (Sept. 3, 1999) ("The mayor in a mayor-council municipality has the authority to remove or terminate a municipal judge and a prosecuting attorney.").

confinement. *See* Ex. 5C. Furthermore, under Mississippi law, "[i]mprisonment in a penitentiary is the key feature by which a felony is distinguishable from a misdemeanor." *McLaughlin v. City of Canton*, 947 F. Supp. 954, 974 (S.D. Miss. 1995) (Wingate, J.); *see also* Miss. Code § 1-3-11 ("The term 'felony,' when used in any statute, shall mean any violation of law punished with death or confinement in the penitentiary."). As a result, the politically unaccountable CCID Inferior Court prosecutors will have the discretion to prosecute Jackson residents for misdemeanors (such as traffic tickets) and have them imprisoned like a felon, with the collateral consequence of stripping them of their civil rights as if they had committed a felony. *See, e.g.*, Miss. Const. of 1890, art. 4, § 44 (disqualifying from public office anyone convicted of an "infamous crime"); Miss. Code § 13-5-1 (disqualifying from jury eligibility anyone convicted of an "infamous crime"); *id.* §§ 1-3-19, 47-5-3 (defining "infamous crime" as "offenses punished with . . . confinement in the penitentiary," i.e., "any facility under the jurisdiction of the Department of Corrections").[3]

### III.     CCID Inferior Court Judge.

Also on January 1, 2024, H.B. 1020 § 4 requires the Chief Justice of the Mississippi Supreme Court to appoint an attorney who resides in the State as the CCID Inferior Court judge. H.B. 1020 § 4(2). This appointment likewise conflicts with the system for selecting local judges in Mississippi. Unlike municipal court judges, the CCID Inferior Court judge will not be selected by the city's governing authorities. *Compare id.*, *with* Miss. Code § 21-23-3. And unlike the judges of a justice, county, or circuit court—who will have concurrent jurisdiction over the CCID Inferior Court's cases—the CCID Inferior Court judge will not be elected by

---

[3] *See also Mauney v. State ex rel. Moore*, 707 So. 2d 1093, 1096 (Miss. 1998) ("adopt[ing] the statutory definition of 'infamous crime' as the constitutional definition").

voters in their county.  *Compare* H.B. 1020 § 4(2), *with* Miss. Code §§ 9-7-25(1), 9-9-5(1), 9-11-2(2).[4]  Finally, unlike the judges of a municipal, justice, county, or circuit court, the CCID Inferior Court judge need not be a resident of the court's county.  *Compare* H.B. 1020 § 4(2), *with* Miss. Const. art. 6, § 171, Miss. Code §§ 9-7-1, 9-9-5(1), 21-23-3.

As noted above, the CCID Inferior Court judge will also be the only judge in Mississippi who can impose felony punishments on a misdemeanant.  *See* H.B. 1020 § 4(1)(b).

## ARGUMENT

Justice Robert H. Jackson, when he was President Franklin D. Roosevelt's Attorney General, once memorably declared: "The prosecutor has more control over life, liberty, and reputation than any other person in America."  He explained:

> One of the greatest difficulties of the position of prosecutor is that he must pick his cases, because no prosecutor can even investigate all of the cases in which he receives complaints. . . .  We know that no local police force can strictly enforce the traffic laws, or it would arrest half the driving population on any given morning.  What every prosecutor is practically required to do is to select the cases for prosecution and to select those in which the offense is the most flagrant, the public harm the greatest, and the proof the most certain.

> If the prosecutor is obliged to choose his case, it follows that he can choose his defendants.  Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than cases that need to be prosecuted.  With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone.  In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.  It is in this realm—in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies.  It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular with the predominant

---

[4] Judges of municipal courts, justice courts, county courts, or circuit courts can all hear and decide misdemeanor violations of State law and handle felony preliminary matters.  *See* Miss. Code §§ 9-7-81, 9-9-21(1), 9-9-27, 21-13-19, 21-23-7(1), 99-15-1, -5, 99-33-1(2).

or governing group, being attached to the wrong political views, or being personally
obnoxious to or in the way of the prosecutor himself.

Ex. 5D at 5-6. Justice Scalia quoted this language in his famous dissent in *Morrison v. Olson*, the

challenge to the Independent Counsel Act, and remarked: "Under our system of government, the

primary check against prosecutorial abuse is a political one."  487 U.S. 654, 728 (1988).

H.B. 1020 takes that political check away from Jackson's majority-Black population.

Under the law, Jackson residents who encounter the criminal justice system for even petty

offenses like traffic tickets within the CCID will be singled out for prosecution in a second-class

criminal justice system in which "the vast power and the immense discretion" to enforce the law

is placed in the hands of politically unaccountable prosecutors, with the only remaining check

being an equally politically unaccountable judge. *Id.* at 727 (Scalia, J., dissenting).  Although

nearly all of Jackson's judges are Black, Plaintiffs are concerned not with the race of their judges

but with whether the judges are accountable and responsive to their community.  *See* Decl. of

Frank Figgers ("Figgers Decl."), Ex. 2 ¶ 5.  Because H.B. 1020 strips Jackson's majority-Black

residents of "local control rights given to all other [] voters in the State" to select their local

prosecutors and judges, it denies them equal protection of law.  *City of Greensboro v. Guilford

Cnty. Bd. of Elections*, 120 F. Supp. 3d 479, 489 (M.D.N.C. 2015).

Plaintiffs are entitled to a preliminary injunction where, as here, they show: (1) a

substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the

injunction is not issued; (3) the threatened injury outweighs any harm the injunction might cause

defendants; and (4) the injunction will not disserve the public interest.  *Byrum v. Landreth*, 566

F.3d 442, 445 (5th Cir. 2009).  Each factor favors granting the preliminary injunction request.[5]

---

[5] As explained in Plaintiffs' prior preliminary injunction briefing (Dkt. 41), Plaintiffs also easily
satisfy their burden of showing that "standing is likely to obtain in the case at hand."  *Speech*

## I.     Plaintiffs Are Likely to Succeed on the Merits.

This Court has recognized that plaintiffs seeking a preliminary injunction "must provide evidence sufficient to support a prima facie case, but the evidentiary standard is not as high as would be required to entitle them to summary judgment." *Asbury MS Gray-Daniels, L.L.C. v. Daniels*, 812 F. Supp. 2d 771, 776 (S.D. Miss. 2011); *accord Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Accordingly, Plaintiffs need not prevail on every disputed issue of material fact nor show that they are "certain to win." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011); *see also Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011) ("[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."). Plaintiffs set forth much more than a prima facie case here.

The Fourteenth Amendment's Equal Protection Clause forbids states from enacting legislation that disproportionately burdens racial minorities and is motivated by racial discrimination. *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000). H.B. 1020 violates that prohibition on establishing selection processes for government officials with the "purpose and

---

*First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). Plaintiffs include Black voters who regularly vote in Jackson and Hinds County elections, who live in Jackson and the CCID, who are threatened with prosecution and conviction by the CCID Inferior Court prosecutors and judge, and who stand to lose the benefits they enjoyed from having locally accountable prosecutors and judges. *See* Decl. of Markyel Pittman ("Pittman Decl."), Ex. 1 ¶¶ 1-2, 4-7, 9-10; Figgers Decl., Ex. 2 ¶¶ 1-2, 5-7, 9-10; Decl. of Charles Taylor ("Taylor Decl."), Ex. 3 ¶¶ 1-2, 7, 9, 13-14; *see also* Decl. of Jed Handelsman Shugerman ("Shugerman Decl."), Dkt. 40-4 ¶¶ 6, 11, 15 (describing benefits of local control). For substantially the same reasons discussed previously (Dkt. 41 at 5-9), unless Defendant Fitch is enjoined from appointing CCID Inferior Court prosecutors under H.B. 1020 § 5, and Defendant Randolph is enjoined from appointing the CCID Inferior Court judge under § 4 (or the substitute defendants proposed in Plaintiffs' motion for leave to amend the complaint are enjoined from taking steps to effectuate the appointment), Plaintiffs will imminently suffer injuries to their rights as voters and interests as residents.

operative effect" of denying or "dilut[ing] the voting strength of [B]lack citizens." *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 212 (5th Cir. 1980).  H.B. 1020 also deprives Jackson's majority-Black residents of the benefits of "local control rights given to all other [] voters in the State," further denying them equal protection of the laws.  *City of Greensboro*, 120 F. Supp. 3d at 489.  H.B. 1020 transfers responsibility for selecting two prosecutors and a judge exercising the powers of the Jackson Municipal Court from local officials elected by Jackson's majority-Black voters to the Mississippi Attorney General, who is elected in a State-wide election, and Chief Justice, who is elected in a district that does not include Jackson.  *See Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626–27 (1969) ("Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives.").

Plaintiffs need only show that racial discrimination was a "substantial" or "motivating" factor behind enactment of the law to shift the burden "to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).  Notably, "[r]acial discrimination need only be one purpose, and not even a primary purpose," to violate the Equal Protection Clause. *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*) (citation omitted).  For example, legislators who voted to create the CCID Inferior Court with its appointed prosecutors and judge may have had a sincere intention to reduce crime in Jackson (even though they did not design the CCID Inferior Court to address Jackson's felony crime problem, *see infra* Part III), but they may also have been motivated by the discriminatory trope that Black residents do not know how to police themselves or are not sufficiently "tough on crime."  *See* Decl. of Judge Tomie Green, Dkt. 40-3, ¶ 15 (noting that such complaints were frequently aimed at the Black judges on the Hinds County Circuit Court);

Second Decl. of Nsombi Lambright-Haynes, Dkt. 40-2, ¶¶ 13, 16 (describing different views on criminal justice issues between Black residents of Hinds County and statewide elected leadership).  When evaluating intent, a court may consider "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions." *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (citations omitted).

A.      **Section 4 and 5's Disproportionate Impact Is Sufficiently Great to Establish Discriminatory Intent.**

When evaluating whether racial discrimination was a motivating factor behind an official action, a disparate impact on one race can be an "important starting point." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  But generally "[p]roof of racially discriminatory intent or purpose" is also required.  *Id*. at 265.  In some cases, however, "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id*. at 266 (citing as an example *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)).

This is such a case.  Like the "uncouth twenty-eight-sided" voting district in *Gomillion* that operated to exclude nearly all of Tuskegee's Black voters, which the Supreme Court deemed sufficient evidence by itself of impermissible discrimination, the CCID is a ***twenty-nine***-sided district that on July 1, 2024 will expand to be a larger eighteen-sided district with over ***three times*** the share of white residents found in the City overall.  364 U.S. at 341; *see also* H.B. 1020 § 8; Ex. 5B; Ex. 6 at 202.[6]  The Court should not shut its eyes to "[t]he essential inevitable effect" of converting the CCID from a public works district to a court district with politically

---

[6] Rep. Trey Lamar, MS House Floor - 7 February, 2023; 10:00 AM, YouTube at 8:44:50 (Feb. 7, 2023), https://www.youtube.com/watch?v=HtruSFI0avs ("I've been told that the proposed area is approximately 53% African-American.").

unaccountable prosecution and judging, which will be to deprive Jackson's disproportionately Black voters of the benefits of locally accountable prosecutors and judges who will enforce the law whenever they step foot in the CCID's white enclave.  364 U.S. at 341.

The disparate impact of the appointment provisions on the Black citizens of Jackson versus all other Mississippi citizens is beyond dispute.  About 40 other Mississippi cities and towns are required to have municipal courts.  *See* Miss. Code § 21-23-3 (requiring municipal courts for municipalities with at least 10,000 people); Ex. 5E (listing municipalities by population).  But H.B. 1020 creates a new municipal court with State appointees only in Jackson. Jackson has one of the highest proportions of Black residents of cities in the United States (more than 80%, Ex. 5B), compared with only 38% of Mississippi's residents overall.  Dkt. 12-2 at 76. The overwhelmingly Black residents of Jackson—alone among Mississippi residents—will be stripped of the right to vote, directly or indirectly, for their prosecutors and criminal court judges, and to have those officials reside in their city or county.  The obvious "foreseeability" of H.B. 1020's impact supports "a strong inference" that the Legislature intended to adversely impact Black citizens in service of a white minority that is disproportionately located in Jackson's CCID area.  *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979); *see also Veasey*, 830 F.3d at 235 ("To find discriminatory intent, direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions may be considered.").

B.   **The *Arlington Heights* Factors Further Demonstrate Section 4 and 5's Discriminatory Purpose.**

The discriminatory purpose of H.B. 1020's enactment is further demonstrated by the factors set forth in *Arlington Heights*.  Those factors include: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from

11

the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989).  Each of these *Arlington Heights* factors supports Plaintiffs' likelihood of succeeding on the merits of their equal protection challenge.

### 1.   Substantive departures

Perhaps most significant among the *Arlington Heights* factors is whether, as here, the law demonstrates a stark departure from substantive legal principles "usually considered important" in Mississippi.  *See* 429 U.S. at 267.  Mississippi has a centuries' long legal tradition of giving communities political power over their prosecutors and judges, and H.B. 1020 represents a striking departure from that principle of local control.  Mississippi law also recognizes that persons innocent of felonies should not be punished as felons, yet H.B. 1020 does so anyway.

*Principle of local control over the criminal justice system.*

Mississippi was a pioneer in developing local control over the criminal justice system in the 1800s, and its innovations spread nationwide.  *See* Shugerman Decl., Dkt. 40-4 ¶¶ 5, 7, 10, 13.  H.B. 1020's appointment provisions sharply depart from the State's distinguished tradition.

The prosecutors tasked with prosecuting violations of State misdemeanor and felony laws have a long history of being selected locally.  District attorneys have been elected since the Mississippi Constitution of 1832, *see* Miss. Const. of 1832, art. 4, § 25, while the more recently created county prosecutors' office has been filled by popular election since at least 1930.  *See* Miss. Code § 19-23-1 (citing Miss. Code of 1930, § 4220).  Municipal court prosecutors, as local government employees, have always been selected by local government officials.

The same tradition is found in Mississippi's criminal courts.  Originally called "police courts," Miss. Code § 21-23-1, municipal courts have existed in Mississippi for nearly two centuries.  *See, e.g.*, *Crapoo v. Town of Grand Gulf*, 17 Miss. 205, 206 (Miss. Err. & App. 1848).

For example, the City of Jackson created its modern municipal court under generally applicable State law in 1912. *Gober v. Phillips*, 117 So. 600, 602 (1928). Throughout this time, municipal courts have been vital to local law enforcement and thus locally elected leadership has had the authority to select the judges (and prosecutors) for those courts. *See id.* at 601 (under the Mississippi Code of 1892, "the mayor and board of aldermen of cities of certain specified population were authorized to elect a police justice").

Judges in justice courts, which have concurrent jurisdiction with municipal courts over State misdemeanors and felony preliminary matters, were originally called "justices of the peace" and date back to Mississippi's Constitution of 1817. *See* Miss. Const. of 1890, art. 6, § 171; Miss. Const. of 1817, art. 6, § 8; *see also* Miss. Code §§ 21-13-19, 21-23-7(1), 99-15-1, -5, 99-33-1(2). For decades, they have been elected in single-member districts within their county, Miss. Code § 9-11-2(2), and they have been popularly elected since 1832, *see* Miss. Const. of 1832, art. 4, § 23.

Circuit and county courts, which also have concurrent jurisdiction with municipal courts over State misdemeanors and felony preliminary matters, have a similarly long tradition of local control. *See* Miss. Code §§ 9-7-81, 9-9-21(1), 9-9-27, 21-13-19, 21-23-7(1), 99-15-1, -5, 99-33-1(2). Circuit court judges have been popularly elected since 1832. *See* Miss. Const. of 1832, art. 4, § 11; *see also* Miss. Const. of 1890 art. 6, § 153. County courts, which were more recently created by the Legislature, have been popularly elected since at least 1926. *See State v. Speakes*, 109 So. 129, 130 (1926) (quoting County Court Act of 1926 § 6).

Relatedly, the Mississippi Constitution of 1890 has required that all holders of a public office be a qualified elector (i.e., registered voter) of that jurisdiction. Miss. Const. of 1890, art. 12, § 250; *see also id.* § 241 (requiring that a qualified elector be "a resident . . . for one (1) year

in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote"); *McCool v. State*, 115 So. 121, 125 (1928) ("[S]ection 250 applies to municipal and statutory officers as well as to constitutional officers . . . ."). All of the aforementioned prosecutorial and judicial offices thus require that an official be a resident of the county or city they serve—yet the CCID prosecutors and judge need not be.

*Principle of reserving felony punishment for felonious conduct.*

The Legislature has recognized that "persons who have been wrongly convicted of felony crimes and subsequently imprisoned have been uniquely victimized [and] have distinct problems reentering society." Miss. Code § 11-44-1. Such a wrongful felony conviction includes when "the conduct for which [a defendant] was convicted, sentenced, and imprisoned constituted only a misdemeanor." *Moore v. State*, 203 So. 3d 775, 784 (Miss. Ct. App. 2016). But H.B. 1020 ignores the Legislature's prior policy and permits the CCID Inferior Court prosecutors and judge to impose felony punishments on Jackson misdemeanants convicted in the CCID Inferior Court. It does this by authorizing the CCID Inferior Court to imprison misdemeanants in a state penitentiary, which is a felony punishment that strips defendants of civil rights like eligibility to serve on a jury or hold public office—even if the judge decides not to sentence someone to the penitentiary. *See* H.B. 1020 § 4(1)(b); Miss. Const. of 1890, art. 4, § 44; Miss. Code §§ 1-3-11, -19, 13-5-1, 47-5-3; *McLaughlin v. City of Canton*, 947 F. Supp. 954, 972-73 (S.D. Miss. 1995) (Wingate, J.) ("[W]hen the court or the jury is given the discretion to fix punishment for an offense by imprisonment in the penitentiary . . . , such offense is held to be a felony regardless of the penalty actually imposed." (quoting *Anthony v. State*, 349 So.2d 1066, 1067 (Miss. 1977)). H.B. 1020 is "presumed to have been enacted in light of earlier enactments," and the Legislature "is presumed to know the effect which its former laws had." *Britton v. Univ. of Mississippi Med.*

*Ctr.*, 2012 WL 1969136, at *7 (S.D. Miss. May 31, 2012) (quoting *Parkerson v. Smith*, 817 So. 2d 529, 533 (Miss. 2002); *Gully v. Harrison Cnty.*, 162 So. 166, 169 (1935)).  Accordingly, the Legislature is presumed to have intended for H.B. 1020 to have this extreme punitive effect on Jackson residents—alone in the State—who may merely be ticketed for a traffic violation or other petty offense.[7]

Even more troubling, H.B. 1020 directs the CCID Inferior Court prosecutors and judge to use this felony punishment for any "disturbance of the public peace" in the CCID, which will chill and suppress unpopular speech around the State Capitol.  Much like the companion law that this Court preliminarily enjoined at the June 29, 2023 hearing, H.B. 1020's unique prosecutorial power threatens to stifle political speech where protests, rallies, and demonstrations regularly take place and First Amendment interests are at an apex.  *See Dallas Ass'n of Cmty. Orgs. for Reform Now v. Dallas Cnty. Hosp. Dist.*, 656 F.2d 1175, 1179 (5th Cir. 1981) ("[S]tate capitol grounds are 'public forums' for First Amendment activities."); *see also City Council v. Taxpayers for Vincent*, 466 U.S. 789, 813 (1984) ("Traditional public forum property occupies a special position in terms of First Amendment protection[.]" (citation omitted)).  A person can be sentenced to six months in jail for disturbance of the peace, *see* Miss. Code § 21-13-19, which H.B. 1020 transforms into a felony punishment and assigns to the CCID appointees to prosecute. Providing the power to treat political protest as a felony to a judge and prosecutor appointed by State officials will most directly affect the citizens of Jackson who are ***most*** politically active.

---

[7] *See* Miss. Code § 63-9-11(2) (authorizing 10 days' imprisonment for a person's first traffic violation); *see also* Miss. Code § 21-13-1 (authorizing municipalities to punish violations of municipal ordinances with 90 days' imprisonment); Jackson, Miss., Code of Ordinances § 1-10(a) (authorizing "imprisonment up to but not exceeding the maximum allowed under state law" for any violation of Jackson's ordinances for which no specific penalty is provided).

Other examples of petty crimes that could now be punished like felonies include "[s]pitting on sidewalks" and loitering.  *See* Jackson, Miss., Code of Ordinances § 86-2 to -4.

That is, a person protesting near the Capitol Building will risk being arrested by the Capitol Police, prosecuted by the CCID Inferior Court prosecutor, and sentenced by its judge to the State penitentiary, thus stripping a public-minded citizen of their civil rights to participate in a jury and hold public office.  Unless enjoined by this Court, sections 4 and 5 of H.B. 1020 will bring to fruition in Jackson the dangers that Justice Jackson foresaw in 1940, and "being unpopular with the predominant or governing group [or] attached to the wrong political views" will become a felony for those who dare to protest and express their views in the CCID, while many more citizens will be deterred from exercising their First Amendment rights of free expression.[8]

H.B. 1020's felony punishment of misdemeanants in Jackson also evokes the State's infamous history of weaponizing the criminal justice system for racist ends.  The last time misdemeanants were sent to a penitentiary was the Civil Rights era, when 328 Freedom Riders and more than 450 Natchez residents were sent to the Parchman Prison in separate incidents.  *See* Exs. 5G, 5H; *see also Anderson v. Nosser*, 456 F.2d 835, 841 (5th Cir. 1972) (en banc) (describing the cruel and unusual punishment inflicted on civil rights marchers jailed at Parchman).  In those days, people were also charged under the disturbance of the peace law for registering Black people to vote.  Ex. 5I.  And white authorities in the Jim Crow era "frequently used disturbing the peace and disorderly conduct laws, and their wide interpretations, to maintain control over every aspect of African Americans' lives and behavior."  *Id.* at 2.  H.B. 1020 threatens to revive this shameful history in the CCID.

---

[8] At the June 29, 2023 hearing, the Court noted the significance of the criminal punishment to its analysis, stating: "[W]here there is a suggestion that First Amendment rights are being proscribed, then the Court is called upon to examine the statute for its chilling effect, . . . where persons who feel justifiably that they could be caught in the snare of the statute's reach may be deterred from exercising their First Amendment rights because of fear of criminal penalty.  So this Court naturally, recognizing all of this, has shone its eyes on the statute itself [and] the penalty . . . ."  Ex. 5F at 72.

\*       \*       \*

The Legislature's decision to carve out a swath of the City of Jackson to have a new court with State appointees as the prosecutors and judge, none of whom need reside locally, and who can impose felony punishments on Jackson residents for petty offenses radically departs from the legal principles that have long guided the Legislature in regulating the State's criminal justice system. The Legislature's "convenient disregard of [these] substantive standards" supports the inference that H.B. 1020 was motivated at least in part by discriminatory intent. *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1222 (2d Cir. 1987).

### 2.      Procedural departures

As we have previously explained (Dkt. 41 at 18-19), H.B. 1020's departures from the normal legislative procedures also demonstrate its discriminatory intent. *See Arlington Heights*, 429 U.S. at 267. From the outset, H.B. 1020's proponents departed from the standard legislative process by both skewing committee referrals and blocking the participation of Black legislators.

To briefly recap, H.B. 1020's principal author, Rep. Trey Lamar, steered this criminal justice bill to the House Ways and Means Committee that he chaired by stuffing the bill with 1,000 pages featuring "hundreds of code sections on state revenues." Dkt. 41 at 18 (citations omitted). After avoiding the scrutiny of the House Judiciary Committee, Rep. Lamar passed the bill out of his committee and promptly cut the irrelevant 1,000 pages from the bill. *See id.* The bill was also never referred to the Local and Private Legislation Committee, even though the CCID provisions are quintessential examples of legislation that it would routinely review. *See id.* at 18-19. When the bill reached the House and Senate Conference Committee, which was supposed to be open to the public, the legislators excluded the only Black conferee from committee meetings. *See id.* at 19. These actions all evince the procedural departures and racial discrimination surrounding H.B. 1020's enactment.

### 3.      Legislative history

We have previously demonstrated that both the Supreme Court and the Fifth Circuit have recognized that outright admissions of discriminatory intent by legislators are rare, and plaintiffs often must rely upon other evidence.  *See* Dkt. 41 at 23 (citations omitted).  Here, however, discriminatory intent was publicly expressed regarding the purported need to staff the CCID Inferior Court via non-resident appointments.  *Id.*  It bears emphasis that the notorious "best and brightest" comment by H.B. 1020's principal author, Rep. Trey Lamar, was with specific reference to appointing the CCID Inferior Court judge from a different "talent pool" than Jackson.  *Id.* (citation omitted).  And just eight years ago, one of Rep. Lamar's colleagues in the House Ways and Means Committee that fast-tracked the bill to appoint a CCID court judge criticized the prospect of judicial review by "a Black judge."  *Id.* (citation omitted).

### 4.      Specific sequence of events

We have previously demonstrated that the sequence of events leading up to passage of H.B. 1020 demonstrated a focus on race and that "[c]ontext matters."  *See* Dkt. 41 at 16-17 (quoting *Veasey*, 830 F.3d at 236).

Specifically with regard to the proposal for the CCID court, Rep. Bryant Clark offered a targeted amendment that would have required the original proposal of two appointed CCID judges to be residents of the City of Jackson and to be elected—one by Jackson voters overall, and the other by voters within the CCID's boundaries.  Ex. 5O.  This modest attempt to partially remedy the bill's discriminatory treatment of Jackson residents was promptly voted down.  *See id.*  This vote provides further evidence that the Legislature intended to treat the Black citizens of Jackson less favorably than white citizens of Mississippi.  *See Veasey*, 830 F.3d at 236 (rejecting ameliorative amendments can be evidence of discriminatory intent).

### 5.     Historical background

Our prior briefing also detailed Mississippi's "long history of official discrimination" that impaired Black Mississippians' right to vote and "extended to the bar and consequently to the judiciary," which necessarily also extended to prosecutors' offices.  *See* Dkt. 41 at 12-15 (quoting *Martin v. Allain*, 658 F. Supp. 1183, 1192 (S.D. Miss. 1987)).  We have also detailed more recent actions by the Legislature to deny Jackson's majority-Black citizens and elected leadership of Jackson access to the various federal funds; strip the city of control over its municipal airport; and divert and constrain the City's share of the sales tax revenue collected in Jackson.  *See id.* at 14.  The Legislature even considered fully taking control of Jackson's water systems in order to hijack the approximately $800 million that Congress appropriated to remediate the Jackson water crisis.  *See id.*  H.B. 1020's appointment of prosecutors and a judge who will prosecute and sit in judgment of Jackson's Black residents without being accountable to these voters or their locally elected leadership represents the latest step in the Mississippi Legislature's campaign to deny Black residents equal political power.

### C.     Defendants Cannot Show Sections 4 and 5 Would Have Been Enacted Absent Racial Discrimination.

Defendants may respond that any racial prejudice was irrelevant to H.B. 1020's enactment.  But they cannot carry their burden of showing that H.B. 1020's CCID appointments provisions for both the prosecutors and judge would have been enacted without the "substantial" or "motivating" factor of racial discrimination.  *Hunter*, 471 U.S. at 228.

The law's pretext is revealed by the obvious non-discriminatory alternatives available to the Legislature.  The Legislature plainly could have allowed the CCID Inferior Court prosecutor and judge to be appointed locally, just as H.B. 1020 authorized additional public defenders, criminal investigators, and assistant district attorneys to be appointed locally.  *See* H.B. 1020

§§ 2-3 (assigning appointment authority to the Hinds County Public Defender and District Attorney).  Even simpler, instead of going to the trouble of creating and staffing the new CCID Inferior Court, the Legislature could have directed the funds that will be required to pay and support the new prosecutors and judge to Jackson to employ additional locally accountable prosecutors and another judge in its municipal court, or given those funds to others with similar jurisdiction such as the Hinds County County Prosecutor and Justice Court.  *See, e.g.*, Miss. Code § 25-31-5(2)(g) (authorizing Hinds County to have two more assistant district attorneys "if funds are appropriated by the Legislature to adequately fund the salaries, expenses and fringe benefits").  As the Hinds County District Attorney stated in opposition to H.B. 1020, "The truth is that the Hinds County District Attorney's Office is, and always has been, underfunded and understaffed by the legislature. . . .  We do not need a new criminal justice system; we need to invest in the one we have."  Ex. 5J.  If the Legislature had merely sought to address Jackson's crime problem without the influence of racial discrimination, it would not have created the CCID Inferior Court and then staffed it with State appointees as H.B. 1020 does.

## II.     Plaintiffs Will Suffer Irreparable Harm if Sections 4 and 5 Take Effect.

Because imminent constitutional violations like those threatened here "cannot be undone through monetary remedies," they are necessarily irreparable.  *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).  Indeed, courts often find that "irreparable injury is present as a matter of law" where a motion for emergency injunctive relief is based on a violation of the Equal Protection Clause, as it is here.  *Killebrew v. City of Greenwood*, 988 F. Supp. 1014, 1016 (N.D. Miss. 1997); *see, e.g.*, *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 529 (S.D. Tex. 2020) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law").  As this Court noted in *Church at Jackson v. Hinds County,* No. 3:21-CV-298-HTW-LGI, 2021

WL 4344886 (S.D. Miss. Sept. 23, 2021), "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.* at *6 (citation omitted); *see also id.* (noting that because "there is an 'equal terms' violation . . . there is a presumption of irreparable harm).

### III.    The Balance of Hardships and Public Interest Favor a Preliminary Injunction.

Because this case is "in effect a suit against the State," the balance of hardships and public interest factors "merge." *Bosarge v. Edney*, No. 1:22CV233-HSO-BWR, 2023 WL 2998484, at *3, *14 (S.D. Miss. Apr. 18, 2023). The balance of hardships greatly favors Plaintiffs because a preliminary injunction will merely preserve the status quo and shield Plaintiffs' constitutional rights from violation while causing the State and restrained individuals no injury whatsoever. Parties cannot be harmed by being prevented from violating the Constitution. *See Deerfield Med. Ctr.*, 661 F.2d at 338–39.

Plaintiffs have made a prima facie case that H.B. 1020 is "unconstitutional [and] so the public interest [is] not disserved by an injunction preventing [their] implementation." *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). "It is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted). And the public interest is served by "maintaining the status quo pending a full trial on the merits" to make a final determination as to constitutionality. *United States v. Texas*, 508 F.2d 98, 101 (5th Cir. 1975).

As Plaintiffs have explained previously, they do not dispute that Jackson has a felony crime problem. As residents of Jackson and the CCID, they share in the desire to make the City a safer place to live and work. But no matter how serious the problem may be, the State may not use unconstitutional means to fight crime, and the interest in public safety can never justify the

violation of constitutional rights. *Phillips v. Cole*, 298 F. Supp. 1049, 1053 (N.D. Miss. 1968) ("The State of Mississippi, in undertaking to define crime and prosecution thereof, must, at all events, comply with the demands of the Constitution of the United States.").[9]

Furthermore, enjoining the appointments of the CCID Inferior Court's prosecutors and judge will not disserve the public interest because the court was not designed to address Jackson's felony crime problem. H.B. 1020 instead stresses the CCID Inferior Court's role as a misdemeanor court, reiterating that its misdemeanor jurisdiction expressly includes "all cases charging violations of the motor vehicle and traffic laws of this state, and violations of the City of Jackson's traffic ordinance or ordinances related to the disturbance of the public peace" within the CCID. H.B. 1020 § 4(1)(a). The law does not mention felony prosecutions. *See id.*

By giving the CCID Inferior Court only municipal court jurisdiction, H.B. 1020 prevents it from helping with the Hinds County Circuit Court's backlog of felony cases because it has no jurisdiction over felony defendants who have been bound over to the grand jury and indicted. Moreover, opponents of the bill correctly pointed out that approximately 70% percent of Jackson's homicides have occurred outside of the CCID. *Id.* at 6 at 196.[10] Within its limited geographic jurisdiction, the CCID Inferior Court's limited criminal jurisdiction emerged as a

---

[9] *See also McDonald v. Chicago*, 561 U.S. 742, 783 (2010) (recognizing "no case in which we have refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications"); *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008) ("constitutional rights necessarily take[] certain policy choices off the table" in efforts to reduce crime and improve public safety); *Mugler v. Kansas*, 123 U.S. 623, 661 (1887) ("If, therefore, a statute purporting to have been enacted to protect . . . the public safety . . . is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution.").

[10] Rep. Bryant Clark, MS House Floor - 7 February, 2023; 10:00 AM, YouTube at 8:32:55 (Feb. 7, 2023), https://www.youtube.com/watch?v=HtruSFI0avs; *see also* Ex. 5K (showing roughly 150 of the 631 homicides in Jackson since 2016 occurred within the new CCID boundaries).

last-minute legislative compromise. The House bill had proposed granting the court jurisdiction

to try felony cases like the Hinds County Circuit Court, while the Senate bill proposed scrapping

the court. *See* Exs. 5L-5N.[11]  But in reaching a compromise, no legislator ever identified a

backlog in the Jackson Municipal Court for there to be any public interest in allowing the

unconstitutional CCID Inferior Court appointments to take effect. *See generally* Ex. 6.

      Instead of helping with Jackson's felony crime problem, allowing the CCID Inferior

Court to go into effect could make that problem worse by clogging the Hinds County Circuit

Court's docket with misdemeanor appeals.  The CCID Inferior Court is an "inferior" court in the

Mississippi judiciary.  That means a constitutional court—here, the Hinds County Circuit

Court—has "controlling authority" over the CCID Inferior Court through the appellate process.

*Saunders*, 2023 WL 6154416, at *9 ¶¶ 48-51.  Criminal defendants may appeal the CCID

Inferior Court's decisions "just like typical municipal court appeals," first to the Hinds County

County Court, and then to the Circuit Court. *Id.* at *8 ¶¶ 45-46 (citing Miss. Code § 11-51-81).

The purpose of an inferior court is to "more expeditiously and economically handle[]" matters

for a constitutional court. *Ex parte Tucker*, 143 So. 700, 700 (Miss. 1932).  An inferior court

serves its function of increasing judicial efficiency only if criminal defendants forego their right

to appeal, *i.e.*, because they do not anticipate a more favorable hearing in the constitutional

---

[11] In the Senate, sponsoring Sen. Brice Wiggins appears not to have appreciated this change and repeated the original talking point that the new CCID court (now lacking jurisdiction to try felony cases) would help address the Hinds County Circuit Court's felony backlog. *See* Ex. 6 at 1037, MS Senate Floor - 30 March, 2023; 9:00 AM, YouTube at 8:00:50 https://www.youtube.com/watch?v=0alwh50heYg ("Remember we're here to get through the backlog and the cases that we have.").  In the House, Rep. Lamar offered only that the CCID Inferior Court would ***benefit*** defendants accused of committing a felony by increasing the judicial resources to hold an initial appearance within 48 hours of a person's arrest—which would do nothing for public safety. *Id.* at 1108, MS House Floor - 31 March, 2023; 10:00 AM, YouTube at 1:08:25, https://www.youtube.com/watch?v=OOXgDRIDEpM.

court.[12]  The CCID Inferior Court will therefore improve the efficient administration of justice only if its judge's decisions are not out of step with those of the Hinds County Circuit Court judges.  But the CCID Inferior Court's lack of local responsiveness and felony punishments of misdemeanants create an incentive for criminal defendants to appeal more often from this court than from the Jackson Municipal Court—threatening to burden the already backlogged Hinds County Circuit Court docket.  *See* Third Decl. of Tomie Green ("Green Decl."), Ex. 4, ¶ 9.

The status quo is particularly important to preserve here because waiting to vacate H.B. 1020 § 4 and § 5 until after the appointments have been made would mean unseating the appointed CCID Inferior Court prosecutors and judge, possibly after they have begun to charge and try cases.  This would be highly disruptive to the criminal justice system.  *See Ioppolo v. Rumana*, 581 F. App'x 321, 332 (5th Cir. 2014) (noting the "public[] interest in the proper administration of the judicial system").  Enjoining these unnecessary appointments before they are made while this Court adjudicates Plaintiffs' claims will thus serve the public interest.

## CONCLUSION

For the reasons above, the Court should preliminarily enjoin Attorney General Fitch from appointing CCID Inferior Court prosecutors under H.B. 1020 § 5, and preliminarily enjoin Chief Justice Randolph from appointing the CCID Inferior Court judge under H.B. 1020 § 4.  In the alternative to enjoining Chief Justice Randolph, the Court should grant Plaintiffs' motion for leave to amend the complaint (Dkt. 80) and enjoin proposed defendants John/Jane Doe 5 from

---

[12] *See, e.g.*, *Ex parte Tucker*, 143 So. at 701 ("[W]e can well envisage the day when the business of a county, or of each of several counties, shall have grown to the extent that . . . the entire time of the circuit judge would be occupied in the hearing of appeals, certiorari, and the like to and from inferior courts.  In such a situation it can be clearly seen that it would be the better method to require all law suits to be filed in the first instance in the circuit court . . . .").

accepting appointment as the CCID Inferior Court judge, and Greg Snowden and Liz Welch from taking any actions to compensate that judge or designate a location for them to hold court.

Respectfully submitted this 13th day of November, 2023.

/s/ Mark H. Lynch
Eric H. Holder, Jr.,* DC Bar # 303115
Megan A. Crowley,* DC Bar # 1049027
Gary S. Guzy,* DC Bar # 375977
Mark H. Lynch,* DC Bar # 193110
Brenden J. Cline,* DC Bar # 1021317
David Leapheart,* DC Bar # 1032122
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6291
eholder@cov.com
mcrowley@cov.com
gguzy@cov.com
mlynch@cov.com
bcline@cov.com
dleapheart@cov.com

*Counsel for NAACP*

*\*Pro Hac Vice*

/s/ Carroll Rhodes
Carroll Rhodes, MS Bar # 5314
**LAW OFFICES OF CARROLL RHODES**
POST OFFICE BOX 588
HAZLEHURST, MS 39083
Telephone: (601) 894-4323
Fax: (601) 894-1464
crhode@bellsouth.net

Joe R. Schottenfeld,* DC Bar # 1735796
**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
Fax: (410) 358-9350
jschottenfeld@naacpnet.org

*Counsel for All Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2023, I electronically filed the foregoing with the Clerk of the Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Brenden J. Cline
Brenden J. Cline