IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, *et
al.*,

               Plaintiffs,

        v.

TATE REEVES, in his official capacity as
Governor of the State of Mississippi, *et al.*,

              Defendants.

No. 3:23-cv-272-HTW-LGI

**STATEMENT OF INTEREST OF THE UNITED STATES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**PRELIMINARY STATEMENT**

    The United States filed a motion to intervene in this action on July 12, 2023.  That

motion is fully briefed.[1]  Because its intervention motion remains pending, the United States

submits this Statement of Interest in support of Plaintiffs' pending motion to preliminarily enjoin

Sections 4 and 5 of House Bill 1020, ECF No. 110,[2] pursuant to 28 U.S.C. § 517, which

authorizes the Attorney General "to attend to the interests of the United States in a suit pending

in a court of the United States."  The United States' proposed Complaint in Intervention also

---

[1] U.S. Proposed Compl. in Intervention, ECF No. 69-2; U.S. Mem. in Supp., ECF No. 70; Defs.'
Br.'s in Opp'n, ECF Nos. 73 & 74; U.S. Reply, ECF No. 79.
[2] On November 13, 2023, Plaintiffs filed a Motion for a Preliminary Injunction re HB 1020 § 4
and § 5, ECF No. 110.

alleges that Sections 4 and 5 of House Bill 1020 violate the Fourteenth Amendment to the United States Constitution.[3]

## I.    INTRODUCTION

Municipal courts throughout Mississippi are local bodies subject to local control.  These courts have jurisdiction over local municipal ordinances, city traffic violations, and misdemeanor crimes.  The judges overseeing these courts are typically appointed by the governing bodies for each municipality.  Under state law, in all cities with populations greater than 10,000, like the City of Jackson, all municipal court judges and prosecutors are appointed by the municipality's elected officials, who in turn are accountable to the municipality's voters.  And the judges they appoint must be electors from the county where the municipality is located.  Taken together, this structure, mandated by state law, reflects the distinctly local character and control of municipal courts in Mississippi.

House Bill 1020 targets only the City of Jackson for taking away some of this local control over its court system.  It doubles the area of a previously created infrastructure improvement district within Jackson (the Capitol Complex Improvement District, or CCID) and creates a new court to serve concurrently with the Jackson Municipal Court within the CCID's boundaries.  Unlike Jackson's existing municipal court, however, and most other municipal courts statewide, the State chose not to give appointment power over the CCID court to the municipality's elected officials.  Instead, the power to appoint the CCID's sole judge lies with the Chief Justice of the Mississippi Supreme Court, who is elected from a district that does not include Jackson, and the power to appoint the CCID's two prosecuting attorneys with the

---

[3] Should the Court grant the United States' motion to intervene while Plaintiffs' motion is pending, it intends to file a motion for preliminary injunction specifying the relief sought.

Mississippi Attorney General, who is elected statewide.  Unlike every other municipality in Mississippi, this targeted legislation substantially diminishes Jacksonians' control over this quintessentially local court system.

House Bill 1020's disparate treatment of Jackson from the rest of the State violates the Fourteenth Amendment's guarantee of equal protection, and a preliminary injunction preventing appointment of the CCID judge and prosecuting attorneys by statewide officials is warranted. House Bill 1020 violates the Equal Protection Clause in two ways.  First, the factors articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), demonstrate that House Bill 1020 was enacted with an impermissible discriminatory purpose, subjecting the law to strict scrutiny which it cannot survive.  These factors include the State's long history of resistance to Black self-governance paired with contemporaneous statements and procedural and substantive departures during the bill's enactment, as well as the resulting disparate impact to the City of Jackson.  Taken together, the mosaic of factors shows that House Bill 1020 was motivated, at least in part, by race.  Stripping local control from the Black-majority City of Jackson is not narrowly tailored to achieve a compelling government interest and thus violates the Fourteenth Amendment.

Second, the legislation places Jacksonians in a class different from all other Mississippians with respect to their exercise of local control.  It does so without a rational basis tying the legislation's chosen means to its intended ends.  Creating a new court analogous to Jackson's existing municipal court but removing local control over appointment of the court's judge and prosecutors is not rationally related to a legitimate state interest.  Because Plaintiffs are likely to succeed on the merits of their claim, would be irreparably harmed without preliminary

relief, and the balance of equities and public interest favor an injunction to maintain the status quo, this Court should grant a preliminary injunction.

## II.    Factual Background

### A.  House Bill 1226 (2017)

In 2017, the Mississippi Legislature created the Capitol Complex Improvement District (CCID).  *See* H.B. No. 1226, 2017 Miss. Laws Ch. 444.  The purpose of the district, comprised of State-owned properties and facilities within the City of Jackson, was to "implement, supervise and administer certain infrastructure improvement projects."  *Id.*  The original March 2019 master plan for the CCID, prepared for the Mississippi Department of Finance and Administration (DFA), included various construction, reconstruction, traffic, lighting, and utility projects for that area.  *See Capitol Complex Improvement District Master Plan*, Miss. Dep't of Fin. & Admin. (2019), https://perma.cc/JK8V-QGL8.  Neither the enacting legislation nor the 2019 master plan evinced an intent that the CCID would or could become a distinct judicial or prosecutorial district.[4]

### B.  House Bill 1020 (2023)

Six years after it created the CCID, the legislature enacted House Bill 1020, Reg. Sess., 2023 Miss. Laws. Ch. 546 ("HB 1020"), which is the focus of this litigation.  It effectively overrode the local control that voters and elected officials in Jackson and Hinds County had over their local justice system, while leaving the same judicial and prosecutorial structures untouched

---

[4] In 2021, the legislature enacted Chapter 403 (H.B. 974), which transferred authority over the CCID from the DFA to the Mississippi Department of Public Safety (DPS).  *See* H.B. 974 § 2, http://billstatus.ls.state.ms.us/documents/2021/pdf/HB/0900-0999/HB0974SG.pdf.  H.B. 974 provided the Capitol Police with "jurisdiction relative to the enforcement of all laws of the State of Mississippi on the properties" and the ability to "make arrests for any violation of any law of the State of Mississippi which occurs within the boundaries of the district."  H.B. 974 designates DPS as the "lead agency" for coordination and enforcement purposes within the CCID.  *Id.*

everywhere else in Mississippi.[5]  It did so in two ways.  First, on the county level, it attempted to make Hinds County the only county in Mississippi where a portion of the non-emergency circuit court judges, who are ordinarily elected by county residents, would be appointed by a statewide official.  *See* HB 1020 § 1; *Saunders v. Mississippi*, No. 2023-CA-00584-SCT, 2023 WL 6154416, at *11 (Miss. Sept. 21, 2023).  The Mississippi Supreme Court invalidated the provision on state constitutional grounds.  *See Saunders*, 2023 WL 6154416, at *10-11 (Miss. Sept. 21, 2023).  Claims against that provision are now moot.

Second, HB 1020 made two coordinated changes to Jackson's municipal court system.  First, it more than doubled the area of the existing CCID, expanding it beyond the original boundaries that "were drawn to capture a majority of the State-owned properties and State of Mississippi offices and facilities operating within [Jackson]."  *Capitol Complex Improvement District Master Plan 2023 Update 1*, Miss. Dep't of Fin. & Admin.  (Oct. 2023), https://perma.cc/G8ST-R8WA (*CCID Master Plan 2023 Update*); HB 1020 § 8.  The racial implications of this expansion are stark—carving out a majority-White enclave from the majority-Black City of Jackson.  This is apparent, both statistically in terms of the demographic characteristics and geographically in terms of which areas were selected as part of the expansion.

The map below presents the boundaries of the original CCID and those of the expanded district laid over the 2020 Census data[6] for the City of Jackson.  Brooks Decl., App. A, at ¶¶ 3-

---

[5] A more complete description of the state judicial system, particularly municipal courts can be found at https://www.msbar.org/media/2223/understanding-the-court-system-brochure.pdf.
[6] The United States requests the Court take judicial notice of the census data cited herein pursuant to Federal Rule of Evidence 201.  Courts have frequently recognized that "United States census data is an appropriate and frequent subject of judicial notice."  *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 572-73 (5th Cir. 2011).

10.   As the map indicates, the district's boundaries move mostly north and east grabbing population concentrations that are overwhelmingly White in composition.



*Id.* at Att. C.

The census statistics support the visual impact of the map.

|  | Total | White  NH (%) | Black  NH (%) |
|---|---|---|---|
| City of Jackson | 153,701 | 25,424 (16.5) | 122,131 (79.5) |
| CCID (HB 1226)(2017) | 14,374 | 6,184 (43.0) | 7,183 (50.0) |
| CCID (HB 1020)(2023) | 26,457 | 12,698 (48.0) | 12,038 (45.5) |
| Population added by HB 1020 | 12,083 | 6,514 (53.9) | 4,855 (40.2) |

*Id.* at ¶¶ 9, 10.

Even though White residents are 16.5% of the City's total population, they are 53.9% of the population added to the CCID.  The White population percentage within the CCID rose from 43.0% under the 2017 boundaries to 48.0% under HB 1020.  More significantly, as the data

above indicate, 6,184 of the City's total White population of 25,424 resided in the original CCID, but under HB 1020, this number increased to 12,698, a jump from 24.3 to 49.9% of the total number of White city residents.

HB 1020's second change to Jackson's municipal court system was the creation of a new court functionally equivalent to a municipal justice system within this expanded CCID area.  *See* HB 1020 § 4.  Mississippi law long predating HB 1020 established that every municipality in the State with a population of at least 10,000 is to be served by a municipal court.  Miss. Code Ann. §§ 21-23-1—21-23-3 (1979).[7]  These courts have jurisdiction over misdemeanor crimes, municipal ordinances, and city traffic violations.  *Id.* § 21-31-7.  There are currently 239 municipal courts.  *About the Courts*, State of Miss. Judiciary, https://perma.cc/GJK6-Y5JA.[8] The number of municipal judges and prosecutors varies by the size of the relevant municipality, but in all municipalities with a population of at least 10,000, Mississippi law provides that these officials "shall be appointed by the governing authorities of the municipality at the time provided for the appointment of other officers," Miss. Code Ann. § 21-23-3, and "shall be a qualified elector of the county in which the municipality is located," Miss. Code Ann. § 21-23-3.  The Jackson Municipal Court currently has six municipal judges[9] who are appointed by the mayor of Jackson and confirmed by a majority vote of the Jackson City Council.[10]

---

[7] Appointment of a municipal judge and prosecutor is discretionary in a municipality with a population under 10,000.  Miss. Code Ann. § 21-23-5.  However, "without a municipal judge, a town cannot enforce its municipal ordinances."  Op. Atty. Gen. Hatcher, 1999 WL 1075209 (Miss. A.G. Sept. 24, 1999).  *See also About the Courts*, State of Miss. Judiciary, https://perma.cc/GJK6-Y5JA (most municipal judges of the State's 239 municipal courts are appointed by governing bodies of municipalities).

[8] The Mississippi Bar Association, https://www.msbar.org/media/2223/understanding-the-court-system-brochure.pdf, reports that there are 226 municipal courts.

[9] Jackson Municipal Court, https://perma.cc/A9GQ-Z7A6.

[10] Jackson, Miss., Code § 11-32 (1971); Ord. No. 1996-53(1), § 1, 9-24-95 (referencing Miss.

Starting on January 1, 2024, however, HB 1020 creates a targeted exception to local control over municipal courts in Mississippi.  It creates a "CCID inferior court" within Jackson overseen by a judge who has jurisdiction similar to that of Mississippi's municipal courts, and prosecuting attorneys empowered to practice in the CCID court in the same way as other district attorneys throughout the state.  HB 1020 §§ 4-5.  In most substantive respects, the CCID court is crafted to be similar to the already-existing Jackson Municipal Court.  The CCID court judge is empowered "to hear and determine all preliminary matters and criminal matters authorized by law for municipal courts" and has "the same jurisdiction as municipal courts to hear and determine all cases charging violations of the motor vehicle and traffic laws of this state, and violations of the City of Jackson's traffic ordinance or ordinances related to the disturbance of the public peace," provided such cases arise within the CCID.  *Id.* § 4(1)(a); *see also* Miss. Code Ann. § 21-23-7(1) (jurisdiction of municipal judge).  The compensation for a CCID judge and support staff is likewise tied to the compensation "paid to municipal court judges and their support staff in the City of Jackson," and the judge must "possess all qualifications required by law for municipal court judges," one notable exception being residency in the City of Jackson.  HB 1020 § 4(2)-(3).  HB 1020 also creates two prosecuting attorney positions for the CCID court, who are empowered to prosecute cases in that court "in the same manner and with the same authority of law provided for district attorneys and county prosecuting attorneys by filing an indictment or any other criminal action that accrues or occurs, in whole or in part, in the CCID."  *Id.* § 5(1).

---

Code. § 21-23-3).

But unlike all municipal court judges in the State, the CCID judge established by HB 1020 must be appointed by the Chief Justice of the Mississippi Supreme Court, a state official, instead of being appointed by local elected leaders in the municipality of Jackson, where the court exercises jurisdiction. *Id.* § 4(2). In Mississippi, supreme court justices are elected from three multi-member districts, with each electing three justices to the Court for staggered eight-year terms. Miss. Code Ann. § 9-3-1 (districts); Miss. Const. art. 6, § 145B (number of justices); Miss. Const. art. 6, § 149 (terms); *see Supreme Court*, State of Miss. Judiciary Admin. Office of the Cts., https://perma.cc/2VGR-22AU; *Mississippi Supreme Court Judicial Map*, State of Miss. Judiciary Admin. Office of the Cts., https://perma.cc/VE7R-CZV5. The longest-tenured Justice serves as Chief. Miss. Code Ann. § 9-3-11. The current Chief Justice comes from District 2, which does not include Hinds County. *See Supreme Court Justices*, State of Miss. Judiciary Admin. Office of the Cts., https://perma.cc/BB9D-TD5L.

Like the CCID judge, the prosecuting attorneys in the CCID would be the only local prosecutors appointed by a statewide official within a municipality where State law requires municipal prosecuting attorneys to "be appointed by the governing authorities of the municipality []." Miss. Code Ann. § 21-23-3. The two CCID prosecuting attorneys are to be appointed by the Mississippi Attorney General. HB 1020 § 5(1). The current Mississippi Attorney General, Lynn Fitch, was first elected in 2019 with 57.8% of the statewide general election vote,[11] but in Jackson, 83.4% of the vote went to her general election opponent.[12] She

---

[11] Mississippi Secretary of State, 2019 General Election Certified Results, https://sos.ms.gov/elections/electionresults_aspx/elections_results_2019_certifiedG.aspx.
[12] Past Election Results, Hinds County, https://www.co.hinds.ms.us/pgs/apps/electionresults.asp?YearId=2019 (percentage excludes write-in votes). In Hinds County, her opponent received 73.6% of the vote. https://www.co.hinds.ms.us/pgs/elections/11052019Summary.txt.

was reelected on November 7, 2023, with 63.4% of the statewide vote, but her general election opponent received 83.5% of the vote in Jackson.[13]  Thus unlike in every other municipality where municipal prosecutors are appointed by local leaders, the CCID prosecuting attorneys would be appointed by an official who would not be the candidate of choice of the majority of Jacksonians.

### C.  Background on Local Control in Mississippi

Mississippi has a long, undisputed history of state-led resistance to Black citizens participating in the political process and exercising control over local governing institutions. This resistance has played a prominent role in the City of Jackson and Hinds County, where meaningful progress in Black political participation and the election of candidates of choice goes back less than 50 years.

In Hinds County, a decade of federal court litigation, including constitutional and Voting Rights Act challenges, eventually led to the drawing of county supervisor district lines that included two districts in which Black voters could elect their preferred candidates.  *See Kirksey v. Bd. of Supervisors*, 468 F. Supp. 285, 303-05 (S.D. Miss. 1979).

State and local resistance to Black self-governance also delayed the advance of Black political participation in Jackson at the municipal level.  In 1962, the Mississippi legislature passed a bill that required all cities and towns organized under the state municipal code to adopt at-large elections for aldermen.  *See* Frank Parker, *Black Votes Count: Political Empowerment*

---

[13] Unofficial Precinct Report, Hinds County, https://www.co.hinds.ms.us/pgs/results/ElectionNightResults.asp (percentage excludes write-in votes).  In Hinds County, her opponent received 73.6% of the vote. https://www.co.hinds.ms.us/pgs/results/Unofficial%20Election%20Results.pdf.

*in Mississippi after 1965* 53 (1990); *see also Stewart v. Waller*, 404 F. Supp. 206, 213–14 (N.D. Miss. 1975).

State resistance to Black political participation played a crucial role in suppressing Black-preferred candidates' election to the judiciary long after progress had been made in other areas of state and local government.  In 1986, the Attorney General imposed an objection under Section 5 of the Voting Rights Act to the conversion of 24 single-member judicial districts to multi-member districts with anti-single-shot voting requirements.[14]

A year later, this Court found the use of multi-member districts for the election of judges in numerous state courts violated Section 2 of the Voting Rights Act.  *Martin v. Allain*, 658 F. Supp. 1183, 1204 (S.D. Miss. 1987).  The decision led to the realignment of the Seventh Circuit Court District to be coterminous with Hinds County and divided it into four, single-member judicial subdistricts.  *See Martin v. Mabus*, 700 F. Supp. 327, 341-42 (S.D. Miss. 1988) (remedial phase); Hinds County, Mississippi, *Facts about Mississippi's Seventh Circuit Court District and its Jurisdiction*,

https://www.hindscountyms.com/sites/default/files/SEVENTH_CIRCUIT_COURT_DISTRICT_OF_STATE_OF_MISSISSIPPI_JURISDICTION.pdf.  Under these lines, Black voters began having success electing their preferred candidates.  By 1998, two of the Seventh District's four single-member subdistricts had repeatedly elected Black judges.  *Voting Rights Act: Evidence of Continued Need: Hearing Before the Subcomm. on the Const. of the Comm. on the Judiciary*, 109th Cong. 5566-71 (2006).  In 2018, Black candidates succeeded in being elected to all four judicial subdistricts in the Seventh Circuit.  Jimmie E. Gates, *Hinds County judicial runoffs*

---

[14] https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/MS-1970.pdf.

*shake up Circuit Court makeup*, Clarion Ledger (Nov. 27, 2018, 10:51 PM),

https://perma.cc/FKN2-YGQS.

Since the Seventh Circuit court's realignment, the state has increased the overall number of circuit judges statewide by approximately 20 percent, though it has declined to add any elected judgeships to the Seventh Circuit itself.  Instead, the seventh circuit's heavy caseload has been addressed on an *ad hoc* basis by a series of temporary appointments by the Chief Justice of the Mississippi Supreme Court.  Between 2004 and 2022, the Chief Justice appointed at least fourteen special circuit court judges in Hinds County.[15]

At the same time, politicians have increasingly criticized Black-led cities such as Jackson, accusing city leaders of mismanagement, corruption, and an inability to address crime. In 2003, gubernatorial candidate Haley Barbour, without consulting city officials, pledged to unveil a "crime plan" for Jackson.  Sid Salter, *The Changing Face of Jackson*, The Clarion-Ledger, November 16, 2003, at 2G (reporting that Jackson city leaders asked Barbour why Jackson had a specific "crime plan" but other municipalities in the state did not); Patrice Sawyer,

---

[15] *See Supreme Court appoints two special judges for Hinds County Circuit Court*, State of Miss. Judiciary Admin. Off. of Cts. (May 24, 2006), https://courts.ms.gov/news/2006/052405HindsSpecialJudges.php; *Supreme Court appoints special judge for Hinds County Circuit Court*, State of Miss. Judiciary Admin. Off. of Cts. (Aug. 29, 2007), https://courts.ms.gov/news/2007/82907Hindsspecialjudge.php; *Supreme Court appoints special judge for Hinds County Circuit Court*, State of Miss. Judiciary Admin. Off. of Cts. (Oct. 9, 2008), https://courts.ms.gov/news/2008/100808teeuwissen_specialjudge.php; *Supreme Court appoints Special Judge for Hinds County*, State of Miss. Judiciary Admin. Off. of Cts. (Dec. 30, 2010), https://courts.ms.gov/news/2010/12.30.10Hinds_Special_Judge.php; *Four special judges appointed to assist Hinds Circuit Court*, State of Miss. Judiciary Admin. Off. of Cts. (Aug. 4, 2020), https://courts.ms.gov/news/2020/08.04.20%20Hinds%20Circuit%20appointment.php; *Four special judges appointed to assist Hinds Circuit Courts*, State of Miss. Judiciary Admin. Off. of Cts. (Sept. 22, 2022), https://courts.ms.gov/news/2022/09.22.22%20Hinds%20Circuit%20special%20judges%20appointed.php.

*Election 2003*, The Clarion-Ledger, October 5, 2003, at 1A (reporting that Jackson's mayor was "not familiar with Barbour's crime plan" and that the Hinds County Sheriff was "not privy to any parts of the plan").  At the end of his term, Barbour's successor, Phil Bryant suggested that unilateral executive action might be necessary if local leadership in Jackson proved uncooperative.  Justin Vicory, *Lumumba, Phil Bryant trade jabs over weekend homicides at church, Walmart*, Clarion Ledger (Jan. 14, 2019, 5:14 PM), https://perma.cc/228N-PAND.

Discussing Jackson's crime problems in 2021, Governor Tate Reeves claimed, "Many of these murders and homicides … are being committed by individuals who appear to have been arrested recently and let out on bail," implying that judges in Jackson were contributing to the crime problem by failing to ensure that violent criminals remained incarcerated pending trial. Justin Vicory, *Jackson mayor says state supplying additional police to help to fight crime not enough*, Clarion Ledger (July 15, 2021, 1:09 PM), https://perma.cc/K7K9-MEJ6.  In 2023, during a press conference where he promoted HB 1020, Governor Reeves justified state intervention in local courts and law enforcement on the grounds that Jackson was the "murder capital of the world."  Ross Reily, *Gov. Tate Reeves calls Jackson the 'murder capital of the world'*, Clarion Ledger (Feb. 16, 2023, 3:28 PM), https://perma.cc/Z76H-5T7X.

Amidst growing criticism of Jackson's crime problems, state leaders withheld requested resources for Jackson's and Hinds County's criminal justice systems.  For example, in a legislative session that allocated $3 million to the Capitol Police, the Mississippi legislature declined to fund youth mental health programs, detention center improvements, and Jackson Police Department initiatives.  *See* H.B. 865, H.B. 1227, H.B. 1384, H.B. 1679, H.B. 943, H.B. 1519, 2023 Leg., Reg. Sess. (Miss. 2023).  Members of the local delegation introduced over thirty bills—*see, e.g.*, H.B. 1131 (2022) (add ADAs and criminal investigators in the Seventh

- 13 -

Circuit); H.B. 988 (2002) (add Seventh Circuit judges)[16]—seeking to improve the Hinds County criminal justice system with increases in judges, ADAs, and criminal investigators between 2006 and 2022.  The legislature rejected all.  *See also* Section I.A.2.c., *infra*.

## LEGAL STANDARD

To obtain a preliminary injunction, a movant must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jones v. Texas Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018).  Whether to grant a preliminary injunction "lies within the discretion of the district court."  *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984).

## ARGUMENT

### I.	Plaintiffs Are Likely to Succeed on the Merits of Their Claim that HB 1020 Violates the Fourteenth Amendment.

Plaintiffs are likely to succeed on the merits because the culmination of factors analyzed under an *Arlington Heights* framework demonstrate that HB 1020 was motivated, at least in part, by race.  *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  As such, HB 1020 is subject to strict scrutiny which it cannot pass because the law's

---

[16] These bills, introduced by local delegation leaders, Senator John Horhn, and Representatives Earle Banks, Christopher Bell, and Edward Blackmon, Jr., to address the local criminal justice system infrastructure, are available at http://www.legislature.ms.gov/legislation/previous-sessions, and included (all in their respective regular legislative sessions):  H.B. 1288 (2006); H.B. 1357 (2006); H.B. 1505 (2007); H.B. 1515 (2007); H.B. 992 (2008); H.B. 1202 (2008); H.B. 1204 (2008); H.B. 1080 (2009); H.B. 991 (2010); H.B. 1166 (2010); H.B. 1254 (2011); H.B. 1480 (2012); H.B. 665 (2013); H.B. 1093 (2014); H.B. 1230 (2015); H.B. 628 (2016); H.B. 642 (2016); H.B. 678 (2016); H.B. 775 (2017); H.B. 779 (2017); H.B. 780 (2017); H.B. 603 (2018); H.B. 624 (2018); H.B. 664 (2018); H.B. 412 (2019); H.B. 470 (2019); H.B. 555 (2019); H.B. 389 (2020); S.B. 2778 (2020); H.B. 393 (2021); S.B. 2634 (2021).

targeting of the majority-Black City of Jackson for loss of local control is not narrowly tailored to achieve a compelling state interest.  In the alternative, HB 1020 also fails rational basis review as it is not rationally related to a legitimate state interest.  Under either test, Plaintiffs have a substantial likelihood of success on the merits.

### A. HB 1020 Unconstitutionally Discriminates on the Basis of Race in Violation of the Equal Protection Clause.

Applying the well-established factors set forth in *Arlington Heights* reveals HB 1020 was passed with an impermissible discriminatory purpose.

#### 1. The Fourteenth Amendment Forbids Legislation Enacted with a Discriminatory Purpose.

The Equal Protection Clause of the Fourteenth Amendment forbids any state to "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."  *Washington v. Davis*, 426 U.S. 229, 239 (1976).  "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Arlington Heights*, 429 U.S. at 265.  But "[t]his is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute . . . ."  *Washington*, 426 U.S. at 241.  "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if true, that the law bears more heavily on one race than another."  *Id.* at 242.  The ultimate inquiry is whether legislation was enacted at least in part "because of," and not "in spite of," a law's "adverse effects upon an identifiable group."  *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  Although the law recognizes that "legislators and administrators are properly concerned with balancing numerous competing considerations . . . racial discrimination is not just another competing consideration.  When there is proof that a discriminatory purpose has

- 15 -

been a motivating factor in the decision, this judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 265-66. This belongs to the "unremarkable principle that the State may not alter the procedures of government to target racial minorities." *Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291, 304 (2014) (plurality op.). Accordingly, the Fourteenth Amendment forbids government action where "invidious discrimination would be the necessary result of the procedural restructuring" of governmental authority. *Id.* (citing *Hunter v. Erickson*, 393 U.S. 385, 390-91 (1969)).

Whether provisions that are "facially neutral but have racially disproportionate effects" violate the Fourteenth Amendment's Equal Protection Clause is evaluated under the standard articulated in *Arlington Heights*. *Harness v. Watson*, 47 F.4th 296, 303 (5th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 2426 (2023); *see also Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc). *Arlington Heights* contemplates two ways a plaintiff can prove such ostensibly neutral laws were enacted with a discriminatory purpose. First, "sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Arlington Heights*, 429 U.S. at 266. Aspects of HB 1020 display such a pattern. However, the Supreme Court also recognized such "stark" cases are "rare," and where "impact alone is not determinative," *id.*, "*Arlington Heights* adopted a two-stage process," *Harness*, 47 F.4th at 304. Thus, a plaintiff may also prove discrimination under a burden-shifting framework. To do so, they must "prove by an evidentiary preponderance that racial discrimination was a substantial or motivating factor in enacting the challenged provision." *Id.* (citing *Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985)). If this showing is successful, "the burden shifts to the state to demonstrate that the provision would have been enacted without an impermissible purpose." *Id.* (quoting *Underwood*, 471 U.S. at

228).  Under either a "clear pattern" or discriminatory intent theory, "[i]f the government is found to have acted with a discriminatory purpose, strict scrutiny review places the burden on the government to prove that its actions are narrowly tailored to achieve a compelling government interest."  *Lewis v. Ascension Par. Sch. Bd.*, 662 F.3d 343, 348 (5th Cir. 2011).

When evaluating discriminatory intent, the *Arlington Heights* framework requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.  A discriminatory intent claim "need not be proved by direct evidence."  *Rogers v. Lodge*, 458 U.S. 613, 618 (1982).  Rather, "courts may consider both circumstantial and direct evidence of intent as may be available."  *Veasey*, 830 F.3d at 235 (citing *Arlington Heights*, 429 U.S. at 266.  The "true purpose" behind a challenged scheme may be "cleverly cloaked in the guise of propriety," and "[t]he existence of a right to redress does not turn on the degree of subtlety with which a discriminatory plan is effectuated."  *Lodge v. Buxton*, 639 F.2d 1358, 1363 (5th Cir. 1981), *aff'd sub nom. Rogers*, 458 U.S. 613 (1982); *see also Veasey*, 830 F.3d at 235-36 ("[W]e rarely have legislators announcing an intent to discriminate based on race.").

In *Arlington Heights*, the Supreme Court established a non-exclusive list of evidentiary factors to evaluate legislative intent.  This analysis begins assessing with whether "[t]he impact of the official action [] bears more heavily on one race than another," which "may provide an important starting point."  *Arlington Heights*, 429 U.S. at 266 (citation and internal quotation marks omitted).  Where a law "continues to have a disparate racial impact," factors pertinent to determine discriminatory intent include "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are

- 17 -

contemporary statements by members of the decision-making body." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989) (citing *Arlington Heights*, 429 U.S. at 267–68); *see also Harness*, 47 F.4th at 308 ("Under *Arlington Heights*, the indicia to evaluate lawmakers' discriminatory purpose are found in circumstantial evidence such as legislative history, legislators' public comments, a 'clear pattern' of otherwise inexplicable racial impacts, and a 'series' of invidious actions."); *Veasey*, 830 F.3d at 231.  A plaintiff need not prove discrimination was the sole or primary purpose of legislation to demonstrate its invalidity. Instead, "racial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *Veasey*, 830 F.3d at 230 (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)) (alteration and internal quotation marks omitted).

### 2. The *Arlington Heights* Factors Demonstrate that HB 1020 Has a Discriminatory Purpose Forbidden by the Fourteenth Amendment.

#### a. HB 1020 Has a Substantial Discriminatory Impact.

The "starting point" of the *Arlington Heights* analysis is "whether the challenged action bears more heavily on one race than another." *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*, 6 F.4th 633, 639 (5th Cir. 2021) (quoting *Arlington Heights*, 429 U.S. at 266) (internal quotation marks omitted).  Census data establish that HB 1020's targeting of the majority-Black City of Jackson and Hinds County[17] has a substantial disparate impact.

The impact of HB 1020's expanded borders for the CCID further gives rise to an inference of discriminatory intent.  In fact, the revision of the CCID boundaries is so "stark" as

---

[17] Although Section 1 of HB 1020, which established four additional circuit judges for Hinds County to be appointed by the Chief Justice and not elected as the Mississippi Constitution requires, was invalidated on state-law grounds, *see Saunders*, 2023 WL 6154416, at \*11, the inclusion of this provision in the original text of HB 1020 and the foreseeable effects it would have remain evidence of the discriminatory intent of the legislation.

to give rise to an inference that this is one of those "rare" cases where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Arlington Heights*, 429 U.S. at 266.

The boundaries of the expanded district surgically capture the predominantly White areas of Jackson such that an intent to do so becomes all but self-evident. Moreover, the State has proffered no rationale for how it chose to include or exclude areas for the expanded CCID,[18] and the new areas do not advance the CCID's original goal of capturing predominantly state-owned land within Jackson. The CCID's primary expansion northward captured almost exclusively predominantly White areas but stopped before reaching predominantly Black areas of Jackson. Its western border, which already abutted or began to capture majority-Black areas, remained mostly unchanged in the expansion. In short, HB 1020's selective expansion of the CCID creates a new White-majority enclave within the Black-majority City of Jackson, demonstrating the legislature's intent to carve out a subset of the populace along racial lines. It creates a new majority-White enclave no longer under the local control of the majority-Black City of Jackson. That HB 1020 cuts a boundary so brazenly between where majority-White and Black residents reside presents clear evidence that race was a factor in this legislation. Even if the Court concludes this pattern is not enough to give rise to an inference of impermissible intent on its own, it certainly weighs heavily when evaluating the totality of the circumstances for evidence of

---

[18] Despite testimony during legislative hearings about the need to revise the CCID's borders, the State provided no rationale for why specific geographies were included while others were excluded. *See, e.g.*, Capitol Police Chief Bo Lucky, Judiciary B – Room 113, 10 October 2022; 9:00 AM, House Judiciary B Committee, Oct. 10, 2022, YouTube at 1:13:00, https://youtu.be/qc6fTrAwW4E?t=4394 (calling existing lines irregular and muddled); Rep. Trey Lamar, MS House Floor - 7 February 2023; 10:00 AM; YouTube at 8:30:11, https://youtu.be/HtruSFI0avs?t=30611 (indicating the changes came at the request of law enforcement).

intent.  *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 647 (1993) ("reapportionment is one area in which appearances do matter," and "[i]n some exceptional cases, a reapportionment plan may be so highly irregular that, on its face, it rationally cannot be understood as anything other than an effort to segregate voters on the basis of race.") (citation and internal quotation marks omitted).

### b.   Historical Background of the Decision

Since emancipation, Black Mississippians have faced a gauntlet of measures by state and local leaders to undermine their political power, ranging from violent attacks to facially neutral laws designed to dilute Black voting strength.  *See* Section I.C., *supra*.  Hinds County and Jackson, both centers of Black political power in the state, have repeatedly borne the brunt of such resistance.  HB 1020 continues the long history in Mississippi of state resistance to Black Mississippians exercising increasing levels of control over their elected and locally appointed representatives.  By creating a functionally equivalent municipal court in Jackson with a state-appointed judge and state appointed prosecutors, HB 1020 deprives elected city officials of the ability to appoint a judge and prosecutors accountable to the people they serve.  Just like many past efforts to undermine Black political power, HB 1020 singles out the majority-Black City of Jackson for loss of local control of its judicial system and ability to self-govern and enforce its own municipal laws.

### c.   Substantive Departures

Implementing HB 1020 will result in numerous substantive departures that further give rise to an inference of discriminatory intent.  The provision for creating appointed circuit judgeships was contrary to the express guarantees of the Mississippi Constitution.  *See Saunders*, 2023 WL 6154416, at *11.  The appointment of CCID officials with the powers of municipal

judges and prosecutors by statewide rather than municipal officials departs from the procedures used everywhere else in Mississippi. *See* Miss. Code Ann. § 21-23-3.

Creating a new court system as a response to concerns over public safety is a significant departure from other solutions typically employed—namely funding, staffing, and improving existing systems.[19]  And moreover a significant departure from what the City of Jackson and its law enforcement officers specifically requested—again, funding, staffing, and improving existing systems—which members of the legislature themselves acknowledged were priorities.[20]

### d.  Procedural Departures & Legislative History

During the adoption of HB 1020, its proponents departed procedurally from standard legislative processes, further evincing discriminatory intent under *Arlington Heights*.  429 U.S. at 267.  Although, pursuant to the Mississippi Constitution and House Rules the normal, if not

---

[19] The Mississippi Office of Forensics Laboratories, for example, has approximately "15,000 backlogged cases for analysis" that "may continue to increase without preventative and corrective measures," and that office's "ability to continue operations and provide quality services [] depends on availability of funding . . . needed to . . . recruit new talent, maintain current talent, continue scientist training, and replace equipment." *Mississippi Department of Public Safety Strategic Plan 2024-2028* at 10, https://perma.cc/PL3Y-Y7U4.

[20] *See, e.g.*, Judiciary B - Room 113, 10 October 2022; 9:00 AM, YouTube at 3:05:49, https://youtu.be/qc6fTrAwW4E?t=11149 (more money needed and was requested to address backlog); Judiciary B - Room 113, 21 November 2022; 9:00 AM, YouTube at 4:27 – 1:00:48, https://youtu.be/mrBKZY8Be_Y?t=267 (Jackson Mayor, police chief, and others asking for more money to:  address backlog; improve crime lab with ballistic technology; secure a new holding facility and command center; hire new officers; install more cameras; fund JPD; add more municipal court judges, prosecutors, and public defenders; repairs; and additional staffing); Hinds County District Attorney Jody Owens, Judiciary B – Room 113, 10 October 2022; 9:00 AM, YouTube at 1:19:30, https://youtu.be/qc6fTrAwW4E?t=4770 (temporary funding in July 2022 allowing office to hire six extra ADAs "for a limited period of time" was a "game changer"); Sen. Brice Wiggins, Judiciary A - Room 216, 23 February 2023; 3:00 P.M., YouTube at 26:42, https://youtu.be/vj6QKjsksB8?t=1602 (spoke with DA Owens; data indicate that assistance from State to address caseloads, criminal in particular, is working); *but see* MS Senate Floor - 7 March 2023; 10:00 AM, YouTube at 2:20:32, https://youtu.be/4J_8j_RMMJY?t=8430 (no effort to look into adding funds to synchronize 9-1-1 system in Jackson).

required, destinations for a bill affecting only a local judiciary is the House standing committee on Local and Private Legislation and the House Judiciary committee, Bill sponsor Representative Lamar directed the bill to the committee he chaired: the House Ways and Means Committee.[21] Rep. Lamar weaved this unusual path for the bill by pre-loading it with 1,000 extraneous pages that he later removed with his own amendment.[22]  In essence, he constructed the bill to allow him to navigate it through a legislative process tailored to avoid scrutiny by the committees normally designated to review such judicial legislation.  Rep. Lamar's departure from normal procedure is even more suspect because nothing under House Rule 49 prevented this local bill from being heard in more than one committee.

Black legislators were excluded from normal legislative procedures, and their criticisms were all but ignored.  The only Black member of the conference committee, and the only member of that committee from Jackson, was Representative Earle Banks of Hinds County. Rep. Banks was excluded from conference committee meetings in which revised versions of HB 1020 were prepared and is reported to have indicated that the committee never met with him on HB 1020.[23]  Finally, he received the final committee report for review only moments prior to the

---

[21] Miss. Const. art. IV, § 89. ("No local or private bill shall be passed by either House until it shall have been referred to" the "standing committee on local and private legislation"); Mississippi House Rule 48 requires that "Bills . . . addressed to the House shall, upon introduction, be referred by the Speaker to the committee having jurisdiction over the subject matter, and shall be considered by the House only after having been reported by such committee."  Rules of the House of Representatives, http://www.legislature.ms.gov/general-information.

[22] Rep. Trey Lamar, MS House Floor - 7 February 2023; 10:00 AM; YouTube at 6:22:41, https://www.youtube.com/watch?v=HtruSFI0avs&t=22960s.

[23] Courtney Ann Jackson, *House Bill 1020 conference report filed but recommitted for more work*, WLBT, (Mar. 28, 2023, 9:07 PM), https://perma.cc/F6LM-GJGV.

final committee meeting, and ultimately did not sign the final conference committee report on HB 1020, the only committee member not to do so.[24]

Despite the proffered purpose of HB 1020 to address the criminal docket backlog, Senator Wiggins, who spoke extensively on the Senate floor in favor of the bill, never spoke with the elected Hinds County circuit court judges, the very judges tasked with handling that docket. In fact, he did not even know if anyone else in the Senate had done so.[25]  Bill sponsor Rep. Lamar was questioned repeatedly throughout legislative debates about why he had not reached out to local officials before introducing HB 1020.  Rep. Christopher Bell, who is Black, asked why the Hinds County delegation was not consulted.   Rep. Lamar responded that he would not "name names," but that he spoke to "several people who reside inside Hinds County."[26]  Rep. Bell replied pointedly, "Do they look like me?"  Amid laughter from the chamber, and his own nervous laughter, Rep. Lamar deflected: "All God's children are unique. . . .  We all are God's children."[27]  Throughout the legislative session Rep. Lamar continued to evade similar questions

---

[24] Michael Wines, *Revised plan for justice system in Mississippi capital leaves same bitter divide*, The New York Times (April 10, 2023), www.nytimes.com/2023/04/10/us/jackson-mississippi-crime-police.html (reporting that Rep. Banks said that he was excluded from committee meetings where the final versions of the bills were prepared, and that he was not provided with proposed changes until minutes before the vote was to be held; refusing to sign the conference report, Rep. Banks is reported to have said, "They decided what they were going to do, and I was one vote out of six. . . .   They really did not need me."); Conference Report # 2, House Bill 1020, http://billstatus.ls.state.ms.us/documents/2023/pdf/cr/HB1020CR_2.pdf (no signature from Rep. Banks).

[25] Sen. Brice Wiggins, MS Senate Floor – 7 March 2023; 10:00 AM; YouTube at 2:15:40 (Mar. 7, 2023), https://youtu.be/4J_8j_RMMJY?t=8140.

[26] Rep. Christopher Bell and Rep. Trey Lamar, MS House Floor - 7 February 2023; 10:00 AM; YouTube at 8:02:46 (Feb. 7, 2023), https://youtu.be/HtruSFI0avs?t=28966.

[27] *Id.* at 8:03:12, https://youtu.be/HtruSFI0avs?t=28995s.

about whether bill sponsors reached out to the Jackson legislative delegation and other Black

local leadership regarding HB 1020's changes.[28]

During the legislative process, lawmakers also launched criticisms of Jackson's

predominately Black local officials and residents.  *Arlington Heights*, 429 U.S. at 268.  An early

version of HB 1020 required the state Department of Public Safety and the City of Jackson to

enter a Memorandum of Understanding "detailing the expectations of both parties," and if that

memorandum was not executed, the law provided that "any dispute related to the law

enforcement functions of the Office of Capitol Police within the boundaries of the City of

Jackson, Mississippi, shall be resolved in favor of the Commissioner of the Department of Public

Safety."[29]  During a committee meeting on HB 1020 in response to a question asking why

disputes would automatically be in the favor of the Capitol Police, particularly if it were the State

refusing execute the memorandum, Senator Wiggins, a proponent of HB 1020 and chair of the

Senate Committee on the Judiciary A, turned to criticism of Jackson's mayor, saying that "in the

law enforcement space, if you go back and you look at where things happen, at certain points

there tends to be a question of who's in charge . . . somebody needed to be in charge, because

you have problems when that doesn't happen.  It is well-documented in the media and it's well-

documented in the court system that there's been issues with the City of Jackson and particularly

---

[28] *Id.* at 8:42:33, https://youtu.be/HtruSFI0avs?t=31351 (responding to Rep. Ronnie Crudup's question whether "it would have been proper to get with the Jackson delegation and bring us to a room and see what's the best way to handle this," Rep. Lamar said, "If you're asking if I've spoken with people of Hinds County, and Jackson [], the CCID, then the answer is yes, I have," but the allegation that the "whole Jackson delegation . . . and I say 'delegation' I don't mean just limited to people in this room are against the bill [is] not factual, either, because I've heard from many people that are associated with Jackson, Jackson leadership, and just citizens of Jackson that are in favor of this.").

[29] Committee Amendment No. 1, House Bill 1020, http://billstatus.ls.state.ms.us/documents/2023/pdf/sam/HB1020_S_Cmte_Amend_01.pdf.

the Mayor entering into contracts, and so that language [in the bill] is to provide for the safety of the citizens of Jackson so that they are no longer caught . . . between disputes between the City of Jackson and I would say the mayor and Capitol Police."[30]  As another example, bill sponsor Rep. Lamar suggested among other things during the House floor debate that the "best and brightest" judges were not to be found in Hinds County.[31]

### e.  Totality of the Circumstances & Lack of Nondiscriminatory Explanation

In addition to the foregoing evidence, *Arlington Heights* makes clear that its list of relevant factors is not exhaustive.  *See* 429 U.S. at 268.  Here, such additional factors would include an automatic sunset provision such that no official other than the current Chief Justice, who is not a resident of Hinds County, would appoint a CCID judge.  Similarly, because the current Attorney General's next term also runs past the expiration of the CCID court provisions, she will be the only individual to appoint CCID prosecuting attorneys.  Moreover, she will be able to appoint municipal-equivalent prosecutors in a jurisdiction where she was disfavored four-to-one by voters in the municipality.  *See* HB 1020 §§ 4(5) & 5(2) ("This section shall stand repealed on July 1, 2027.").

The totality of the circumstances demonstrate that race was a substantial or motivating factor in enacting HB 1020.  This thus turns the burden to the State to demonstrate that HB 1020 would have been enacted without an impermissible purpose.  *Harness*, 47 F.4th at 304 ("*Hunter* step two").  The State cannot satisfy this burden.  There is no nondiscriminatory explanation for straying from the State's normal procedures that circuit court judges are elected by voters in their

---

[30] Sen. Brice Wiggins, Judiciary A - Room 216, 23 Feb 2023; 3:00 P.M.; YouTube at 56:56 (Feb. 23, 2023), https://youtu.be/vj6QKjsksB8?t=3395.
[31] Rep. Trey Lamar, MS House Floor – 7 February 2023; 10:00 AM; YouTube at 6:46:47 (Feb. 7, 2023), https://www.youtube.com/live/HtruSFI0avs?feature=share&t=24394.

district, and municipal-equivalent judges and prosecutors are appointed by local officials.  As explained above, the rationale of addressing crime may explain the creation of additional judicial or prosecutorial resources, but not the decision to sidestep the otherwise standard statewide practice that these officials are elected or appointed by individuals in the jurisdictions they serve and must be from the jurisdictions they serve.  *See supra*, Part I.A.2.  Defendants thus cannot show that the law would have passed absent a discriminatory purpose.

Taken as a whole, the *Arlington Heights* factors lead to an inference that HB 1020 was enacted with a discriminatory purpose, motivated at least in part by race.  As such, HB 1020 is subject to strict scrutiny.

### 3.  HB 1020 Fails Strict Scrutiny.

To satisfy strict scrutiny, the State bears the burden to prove that HB 1020 is "narrowly tailored to achieve a compelling government interest." *Lewis*, 662 F.3d at 348.  Stripping local control over the local court system in the largest majority-Black municipality in the State is not narrowly tailored to any proffered government interest.

Even assuming for purposes of this Statement of Interest that Defendants have articulated a compelling interest,[32] HB 1020's CCID court provisions are not narrowly tailored to achieve that interest.  HB 1020's CCID court provisions make no substantive change, either subtraction or addition, to the powers of the CCID court compared with the existing municipal courts to detect, prosecute, or punish crime.  *See* HB 1020 §§ 4(1), 5(1).  Instead, it creates a duplicative court that will likely be plagued by the same infrastructure and resource deficiencies impacting

---

[32] Although the bill's proponents have generally cited crime rates in Jackson as a rationale for the legislation, the United States is not aware of any evidence put forth regarding crime rates within the expanded CCID as compared with the rest of Jackson.

existing municipal courts, such as the lack of a holding facility where individuals who are arrested can be booked, the lack of modern technology, and the lack of attorney and other staff resources needed to process evidence and prepare cases to be tried. *See, e.g.*, examples cited in Section I.A.2.c., *supra*. Moreover, to the extent the CCID court provides an additional resource, it did not require removing local control. Such a usurpation is not narrowly tailored to a compelling interest as the Equal Protection Clause demands. Thus, Plaintiffs are likely to succeed on the merits.

### B. In the Alternative, HB 1020 Impermissibly Discriminates Against Jacksonians in Violation of the Equal Protection Clause.

Where a law differentiates between classes of persons not based on an inherently suspect characteristic, the Equal Protection Clause requires that the classification rationally further a legitimate state interest. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Indeed, "most laws differentiate in some fashion between classes of persons," and "[t]he Equal Protection Clause does not forbid classification. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.* (citing *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415 (1920)). However, "the classification must be reasonable, not arbitrary and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co.*, 253 U.S. at 415; *see also Baxstrom v. Herold*, 383 U.S. 107, 111 (1966) ("Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.").

In addition to being racially motivated, as described above, HB 1020 singles out only the people of the City of Jackson for loss of control over their judicial system. No other residents of

any other municipality are targeted in this way.  This discrimination against those residing only in the City of Jackson creates a functional classification between Jacksonians and other Mississippians and therefore it must "rationally further a legitimate state interest."  *Nordlinger*, 505 U.S. at 10.  This requires "a plausible policy reason for the classification" and that "the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker."  *Id.* at 11.  Importantly here, it also requires a rational connection between the State's purported ends and the means used to achieve it; "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).  Accordingly, Mississippi's reallocation of appointment power away from local elected officials to statewide officeholders in Jackson alone, while retaining local control in all other Mississippi municipalities, "cannot survive constitutional scrutiny unless there is a rational basis for distinguishing between [Jacksonians] and [residents] in every other [Mississippi] municipality."  *City of Greensboro v. Guilford Cnty. Bd. of Elections*, 120 F. Supp. 3d 479, 487 (M.D.N.C. 2015).

The classification HB 1020 draws between Jacksonians and all other municipal residents in Mississippi, depriving the former of local control over the municipal judge system by having the Chief Justice and Attorney General appoint the CCID court officials in Jackson while maintaining local control everywhere else, is "so attenuated" from any legitimate rationale "as to render the distinction arbitrary or irrational."  *City of Cleburne*, 473 U.S. at 446.

HB 1020 singles out Jackson residents from their counterparts everywhere else in Mississippi.  The CCID court and its officials are in all but name a municipal court, judge, and prosecutors.  The statutory definitions of the CCID judge's substantive jurisdiction as well as the

powers and duties of the CCID judge and prosecuting attorneys are explicitly delineated to match those of municipal judges and prosecutors.[33]  If the law's new titles for existing roles are put aside, it becomes clear HB 1020 simply added a municipal judge and prosecutors to Jackson, only with a more limited geographic jurisdiction than their preexisting counterparts.

Except for the CCID subdistrict of Jackson, which appears to function as a "city within the city"[34] with a population of almost 26,500, in every municipality in the state with a population over 10,000, such judges and prosecutors are "appointed by the governing authorities of the municipality at the time provided for the appointment of other officers."  Miss. Code Ann. § 21-23-3.  HB 1020's automatic repeal provisions in advance of the next election for the sitting Chief Justice's seat and for the Attorney General ensures that, absent early departure from their roles, these will be the sole individuals empowered to appoint the municipal CCID judge and prosecuting attorneys.

---

[33] *See* HB 1020 §§ 4(1), 5 (explicitly defining roles of CCID judge and CCID prosecuting attorneys by reference to municipal judge and prosecutors); *see also* Miss. Code Ann. § 21-23-7(1) (defining jurisdiction of municipal judge).  The CCID judge's substantive jurisdiction is defined to include "all preliminary matters and criminal matters authorized by law *for municipal courts*" and "*the same jurisdiction as municipal courts* to hear and determine all cases charging violations of the motor vehicle and traffic laws of this state, and violations of the City of Jackson's traffic ordinance or ordinances related to the disturbance of the public peace" that occur within the CCID.  HB 1020 § 4(1)(a) (emphasis added).  The qualifications and compensation for CCID judges are likewise tied to those for Jackson's municipal court.  *Id.* § 4(2)-(3).  And the CCID prosecuting attorneys also must "prosecute cases . . . in the same manner and with the same authority of law provided for district attorneys and county prosecuting attorneys."  HB 1020 § 5(1).

[34] Rep. Robert L. Johnson III, MS House Floor – 7 February 2023; 10:00 AM, YouTube at 7:01:42 (Feb. 7, 2023), https://youtu.be/HtruSFI0avs?t=25302 (imploring the legislature not to create a "city within a city," as that is "not what the idea was behind the Capitol Complex").

Mississippi law makes municipal judges of paramount importance to the overall system of local government, because "without a municipal judge, a town cannot enforce its municipal ordinances."  Op. Atty. Gen. Hatcher, 1999 WL 1075209 (Miss. A.G. Sept. 24, 1999).

Even assuming for purposes of this Statement of Interest that Defendants have articulated a legitimate state interest, HB 1020's CCID court provisions are not a rational means to advance that interest.  As discussed above, HB 1020 makes no substantive changes, instead, it only creates a duplicative court for a subset of Jacksonians that will likely be plagued by the same infrastructure and resource deficiencies impacting existing municipal courts.  *See*, Section I.A.3., *supra*; *see also, e.g.*, examples cited in Section I.A.2.c., *supra*.  To the extent the CCID court provides an additional resource, it did not require singling out the people of Jackson and removing from them local control.  Such an action is not rationally connected with the interest served by the legislation that deprives Jackson, and Jackson alone, the full local control over municipal courts that all other municipalities in Mississippi enjoy.

The relationship between the "asserted goal" of crime reduction and the means of singling out Jackson to lose local control over municipal court positions "is so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne*, 473 U.S. at 446.  The decision in *City of Greensboro* is instructive.  As here, the North Carolina Legislature "withdr[ew] from the City of Greensboro and its voters certain statutory rights available to all other municipalities and municipal voters statewide."  *City of Greensboro*, 120 F. Supp. 3d at 483.  In that instance it was the right of a city council to change its structure, and the right of voters to initiate or reject a restructuring through referendum.  *Id*.  Because the legislation itself and state officials did not offer any "interest that is protected or promoted by excluding Greensboro and its voters from rights given to other municipal voters," *id.* at 488, the "unequal treatment of Greensboro voters

- 30 -

likely violate[d] their equal protection rights," *id.* at 489.  Moreover, like HB 1020, the restrictions on Greensboro residents were "part and parcel of a larger statutory scheme that treats Greensboro voters differently."  *Id.* at 488.

Ultimately, the State cannot draw the classification it has drawn between Jacksonians and residents of other Mississippi municipalities with respect to local control over municipal-equivalent courts.  Plaintiffs are therefore likely to succeed on the merits of their Fourteenth Amendment claim.

### III.    Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Plaintiffs have shown the "substantial threat of irreparable injury if the injunction is not issued" required for a preliminary injunction.  *Jones*, 880 F.3d at 759.  Defendants' removal of Jacksonians' local control over the municipal courts that govern them strikes at that heart of democratic accountability and voters' ability to influence local appointments by electing the officials who appoint them.  "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."  *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  Restrictions on the fundamental right to vote are "routinely" found to constitute irreparable injury, and "discriminatory voting procedures in particular are the kind of serious violation of the Constitution . . . for which courts have granted immediate relief."  *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (enjoining elimination of same-day registration and counting wrong-precinct votes under Section 2 of the Voting Rights Act) (quoting *United States v. City of Cambridge,* 799 F.2d 137, 140 (4th Cir.1986)) (internal quotation marks omitted); *see also Murphree v. Winter*, 589 F. Supp. 374, 381 (S.D. Miss. 1984) (citing *Elrod v. Burns,* 427 U.S. 347, 373–74 (1976)) ("[T]he deprivation of a fundamental right constitutes irreparable harm requiring the issuance of a preliminary injunction.").

It is no answer, as Defendants may suggest, that municipal judges are not directly elected. Mississippi law establishes an intimate connection between municipal courts and the local community, one key aspect of which is that judges and prosecutors "shall be appointed by the governing authorities of the municipality."  Miss. Code Ann. § 21-23-3; *see also id.* (generally requiring municipal judges to be a "qualified elector" in the county where the municipality is located).  Moreover, local officials maintain the ongoing ability to oversee and remove municipal judges, who are at-will employees.  *See Jones v. City of Hattiesburg*, 228 So. 3d 816, 819 (Miss. Ct. App. 2017).  Municipal judges are thus accountable to local voters through local elected officials, and the State's creation of a municipal-equivalent court to have judges and prosecutors play explicitly the same role, but severing local control over these officials, thus burdens the rights of local voters.

This imposition of direct state intervention into the municipal justice system cannot later be recompensed; every day that Jacksonians live with this arrangement constitutes a discrete, irreparable denial of equal protection.  Plaintiffs have accordingly demonstrated they will suffer irreparable harm absent an injunction.

## IV.    The Balance of Equities and the Public Interest Support a Preliminary Injunction.

The balance of equities and public interest also weigh in favor of a preliminary injunction.  "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Free Speech Coal., Inc. v. Colmenero*, No. 1:23-cv-917, 2023 WL 5655712, at *29 (W.D. Tex. Aug. 31, 2023), *appeal filed*, No. 23-50637 (5th Cir. 2023) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)) (alteration in original omitted); *see also Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) ("[T]he public interest

[is] not disserved by an injunction preventing [the] implementation" of an unconstitutional statute.); *Texas*, 566 F. Supp. 3d at 690.

In addition, allowing the provisions of HB 1020 to proceed prior to a full hearing on the merits of the claims here has the potential to create substantial confusion in Jackson's municipal justice system.  Individuals subject to prosecution or preliminary matters in a court that is later declared unconstitutional could raise complicated issues that would not be present if Jackson's existing municipal courts were allowed to proceed unchanged.  The existing municipal judges and prosecutors appointed by local leaders will continue to have jurisdiction both within and outside the CCID, as they would have with HB 1020 in effect.  Furthermore, an injunction would not prevent the Mississippi legislature from enacting other measures intended to combat crime that are consistent with the Equal Protection Clause, or from adding additional resources to the existing circuit and municipal courts in Hinds County and Jackson, provided they do not unconstitutionally burden the rights of voters in those jurisdictions.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant Plaintiffs' preliminary injunction.

Dated:  December 5, 2023

Respectfully submitted,

TODD W. GEE
United States Attorney
Southern District of Mississippi

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division


*/s/ Angela Givens Williams*
ANGELA GIVENS WILLIAMS (#102469)
MITZI DEASE PAIGE (#6014)
Assistant U.S. Attorneys
501 E. Court St.
Suite 4.430
Jackson, MS  39201
Phone: (601) 965-4480
Angela.Williams3@usdoj.gov
Mitzi.Paige@usdoj.gov

*/s/ Victor J. Williamson*
T. CHRISTIAN HERREN, JR. (AL 6671R63T)
JOHN A. RUSS IV (CA 192471)
VICTOR J. WILLIAMSON (DC 495783)
J. ERIC RICH (MD 0012130218)
KAITLIN TOYAMA (CA 318993)
JOHN POWERS (DC 1024831)
ROBERT WEINER (DC 298133)
Attorneys
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave NW – 4CON
Washington, D.C. 20530
Phone: (800) 253-3931
chris.herren@usdoj.gov
john.russ@usdoj.gov
j.rich@usdoj.gov
victor.williamson@usdoj.gov
kaitlin.toyama@usdoj.gov
john.powers@usdoj.gov
robert.weiner@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 5, 2023, I electronically filed the foregoing with the clerk of the court using the Court's ECF system, which will send notification of this filing to counsel of record.

*/s/ Victor J. Williamson*
VICTOR J. WILLIAMSON
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
