IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CIVIL CASE NO. 3:23CV272-HTW-LGI

NAACP, MISSISSIPPI NAACP,                          PLAINTIFFS
JACKSON NAACP, DERRICK JOHNSON,
FRANK FIGGERS, CHARLES TAYLOR
MARKYEL PITTMAN, CHARLES JONES


**AND**

UNITED STATES OF AMERICA                   PLAINTIFF INTERVENOR

**VERSUS**

SEAN TINDELL, COMMISSIONER OF                      DEFENDANTS
PUBLIC SAFETY; BO LUCKEY, CHIEF
OF THE OFFICE OF CAPITOL POLICE;
CHIEF JUSTICE MICHAEL K. RANDOLPH;
LYNN FITCH, ATTORNEY GENERAL

**CONSOLIDATED WITH**

JXN UNDIVIDED COALITION,                           PLAINTIFFS
MISSISSIPPI VOTES, PEOPLES
ADVOCACY INSTITUTE, MISSISSIPPI
POOR PEOPLES CAMPAIGN, BLACK VOTERS,
MATTER, RUKIA LUMUMBA, AREKIA
BENNETT-SCOTT, DANYELLE HOLMES

**VERSUS**

SEAN TINDELL, COMMISSIONER OF                      DEFENDANTS
PUBLIC SAFETY; BO LUCKEY, CHIEF
OF THE OFFICE OF CAPITOL POLICE


**TRANSCRIPT OF STATUS CONFERENCE**

BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE

SEPTEMBER 5, 2023
JACKSON, MISSISSIPPI


Exhibit 1

1    APPEARANCES:

2

3    FOR THE PLAINTIFFS, NAACP, ET AL:

4         CARROLL EDWARD RHODES, ESQUIRE
          LAW OFFICES OF CARROLL RHODES
5         POST OFFICE BOX 588
          HAZLEHURST, MISSISSIPPI  39083
6
          BRENDEN CLINE, ESQUIRE
7         MARK H. LYNCH, ESQUIRE
          DAVID LEAPHEART, ESQUIRE
8         COVINGTON & BURLING, LLP
          ONE CITY CENTER
9         850 10TH STREET N.W.
          WASHINGTON, DC  20001
10
          EVAN WALKER-WELLS, ESQUIRE
11        NAACP OFFICE OF GENERAL COUNSEL
          4805 MT. HOPE DRIVE
12        BALTIMORE, MD  21215

13   FOR THE CONSOLIDATED PLAINTIFF, JXN UNDIVIDED COALITION, ET AL:

14        PALOMA WU, ESQUIRE
          MISSISSIPPI CENTER FOR JUSTICE
15        210 E. CAPITOL STREET, SUITE 1800
          JACKSON, MISSISSIPPI  39201
16

17   FOR THE PLAINTIFF INTERVENOR, UNITED STATES:

18        JOHN ALBERT RUSS, ESQUIRE
          U.S. DEPARTMENT OF JUSTICE
19        950 PENNSYLVANIA AVENUE, N.W.
          ROOM NWB-7254
20        WASHINGTON, DC  20530

21        ANGELA GIVENS WILLIAMS, ESQUIRE
          MITZI DEASE PAIGE, ESQUIRE
22        U.S. ATTORNEY'S OFFICE
          501 EAST COURT STREET
23        SUITE 4.430
          JACKSON, MISSISSIPPI  39201

24

25

```
 1   APPEARANCES:  (Continued)

 2   FOR THE DEFENDANTS, SEAN TINDELL, BO LUCKEY, LYNN FITCH:
          REX M. SHANNON, III, ESQUIRE
 3        GERALD L. KUCIA, ESQUIRE
          MISSISSIPPI ATTORNEY GERNERAL'S OFFICE
 4        550 HIGH STREET, SUITE 1100
          JACKSON, MISSISSIPPI  39201

 5

 6   FOR THE DEFENDANT, CHIEF JUSTICE MICHAEL K. RANDOLPH:

 7        MARK A. NELSON, ESQUIRE
          NED ANDREW NELSON, ESQUIRE
 8        NELSON LAW, PLLC
          7 WOODSTONE PLAZA, SUITE 7
 9        HATTIESBURG, MISSISSIPPI  39402

10   FOR THE CONSOLIDATED DEFENDANTS:

11        J. CHADWICK WILLIAMS, ESQUIRE
          WILSON D. MINOR, ESQUIRE
12        OFFICE OF THE ATTORNEY GENERAL
          550 HIGH STREET's
13        JACKSON, MISSISSIPPI  39201

14


15   REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
                   501 E. COURT STREET, SUITE 2.500
16                 JACKSON, MISSISSIPPI  39201
                   (601)608-4186
17

18

19

20

21

22

23

24

25
```

1          **THE COURT:**  Terri, call the case, please.

2          **THE CLERK:**  Your Honor, this is National Association

3    for the Advancement of Colored People, et al versus Tate Reeves

4    et al, Civil Action Number 3:23cv272-HTW-LGI.

5          We are here this morning for a status conference, and at

6    this time, we are going to ask all counsel to introduce

7    themselves for the record, starting with the plaintiff.

8          **MR. RHODES:**  Good morning, Your Honor.  Carroll

9    Rhodes, one of the counsel for the plaintiff, and I'm joined by

10   Mr. Brenden Cline, Mark Lynch, David Leapheart, and Evan

11   Walker-Wells.

12         **THE COURT:**  Hi there.  Good morning to all of you.

13   Let's go to the second row.

14         **MR. RUSS:**  Hello, Your Honor.  My name is Bert Russ.

15   I'm with the U.S. Department of Justice.  And I'll let my

16   colleagues introduce themselves.

17         **MS. WILLIAMS:**  Good morning, Your Honor.  Angela

18   Williams with the U.S. Attorney's Office.

19         **MS. PAIGE:**  Good morning, Your Honor.  Mitzi Dease

20   Paige with the U.S. Attorney's Office.

21         **THE COURT:**  Good morning.  All right.

22         **MS. WU:**  Good morning, Your Honor.  I'm Paloma Wu,

23   counsel for the plaintiffs in the consolidated case, JXN

24   Undivided Coalition versus Tindell.  Thank you.

25         **THE COURT:**  All right.  Do I have everybody on this

1   side?  Terri, was there somebody to whom you were sending a

2   link?

3          **THE CLERK:**  Yes, sir, I'm sending it now.  They are

4   not on the Zoom yet.

5          **THE COURT:**  Okay.  Now, on the other side, please.

6          **MR. SHANNON:**  Good morning, Your Honor.  Rex Shannon

7   with the Mississippi Attorney General's office.  I'm here with

8   my co-counsel in the NAACP case, Gerald Kucia.

9          **THE COURT:**  All right.  Good morning to both of you.

10          **MR. WILLIAMS:**  Good morning, Your Honor.  Chad

11   Williams with the Mississippi Attorney General's Office, and I

12   have Wilson Minor here as well.  We are in the consolidated

13   case with Ms. Wu, and we represent Chief Luckey and

14   Commissioner Tindell.

15          **THE COURT:**  All right.  Thank you.  And good morning

16   to both of you.

17          **MR. NED NELSON:**  Good morning, Your Honor.  Ned

18   Nelson here, along with my co-counsel, Mark Nelson, for Chief

19   Justice Randolph.

20          **THE COURT:**  All right.  Thank You.  And Chief

21   Justice, good morning to you.

22          **CHIEF JUSTICE RANDOLPH:**  Good morning, Your Honor.

23          **THE COURT:**  Now, then, Terri, am I still waiting on

24   someone?

25          **DEPUTY CLERK:**  Yes, I'm send it now.  They should be

1    on shortly.  Gary Guzy.

2              **MR. RHODES:**  Your Honor, the person who is supposed

3    to be joining by Zoom is also co-counsel for the plaintiff,

4    Gary Guzy, but we are supposed to go ahead and get started

5    without him, not necessarily wait on him.

6              **THE COURT:**  Okay.  And Terri, have you heard from

7    him?

8              **THE CLERK:**  No, sir, I didn't get a response.  I just

9    forwarded him the link to get on Zoom.

10             **THE COURT:**  So Mr. Rhodes, you say we can proceed

11   without him?

12             **MR. RHODES:**  Yes, Your Honor.

13             **THE COURT:**  Okay, then.  I will proceed.

14        There are a number of cases -- excuse me, motions that are

15   pending in this case.  There's the motion for interrogatory

16   restraining order, Docket Number 11.  There's a renewed motion

17   for a temporary restraining order, Docket Number 24.  There's a

18   motion for a preliminary injunction regarding the appointment

19   of judges, and that's Docket Number 40.  Then there is a motion

20   to clarify the June 1st, 2023 order on judicial immunity,

21   Docket Number 51; a motion for a certificate of appealability

22   by Chief Justice Randolph, Docket Number 54; unopposed motion

23   for leave to file excess pages, Docket Number 56; motion to

24   intervene, Docket Number 69; motion to amend complaint, Docket

25   Number 80; motion for a temporary restraining order, Docket

1    Number 82.  Now -- oh, and yes, there's a motion to expedite

2    discovery, Docket Number 91.

3         First of all, relative to these motions that have been

4    filed, are there any deletions or abandonments of any of these

5    motions, or are all of these motions still pending?  Yes?

6              **MR. CLINE:**  Yes, Your Honor.  I can speak to that.

7              **THE COURT:**  Now, whenever someone stands to address,

8    would you please identify yourself so that we have a complete

9    record of all who are speaking.  Go right ahead.

10             **MR. CLINE:**  Yes.  Brenden Cline with plaintiffs.

11   So Your Honor, plaintiffs' position is that if Your Honor

12   takes three actions today, it can dispose of all the pending

13   motions, and some of the later filed motions will render some

14   of the earlier filed motions moot or will resolve them.

15             **THE COURT:**  Check to see if your mic is on.

16             **MR. CLINE:**  Yes, it is.  Sorry.  I can lean forward.

17             **THE COURT:**  Well, if you want to, why don't you go to

18   the podium, and it will be easier if you go to the podium.

19             **MR. CLINE:**  So plaintiffs have filed more recent

20   motions, Your Honor, that would render some of the earlier

21   filed motions moot or would otherwise resolve them.  So our

22   position is if Your Honor takes three actions today, granting

23   the motion for leave to amend, granting this replacement TRO

24   against the John Doe defendants --

25             **THE COURT:**  One second.  Hold it.  Motion to amend.

1     All right.  That motion was filed August 3rd, 2023?

2              **MR. CLINE:**  That's right.

3              **THE COURT:**  Okay.  That was number 8 on the list I

4     read.  All right.  Go ahead.

5              **MR. CLINE:**  And ECF, I believe it was 82, that new

6     TRO motion against John Doe defendants named in that amended

7     complaint.

8              **THE COURT:**  That would be -- that's the motion also

9     filed on August 3rd, 2023.

10             **MR. CLINE:**  That's right.

11             **THE COURT:**  Okay.

12             **MR. CLINE:**  And the final issue would be that very

13    last motion, ECF 91, ordering discovery to start in the case.

14             **THE COURT:**  Motion to expedite discovery.  That's

15    correct?

16             **MR. CLINE:**  Yes, sir.

17             **THE COURT:**  Filed on August 18, 2023.

18             **MR. CLINE:**  That's right.

19             **THE COURT:**  Okay.  So now, what is then your

20    statement relative to these three motions as they impact on all

21    the other outstanding motions?

22             **MR. CLINE:**  So motion by motion, they would resolve

23    some of the earlier filed ones.  For example, the motion for

24    leave to amend, our position is that that would resolve the

25    motion for clarification and the Chief Justice's motion for the

1    54(b) certification.

2          **THE COURT:**  Okay.  Hold it.  Motion for clarification

3    that was filed on June 5, 2023?

4          **MR. CLINE:**  I believe so, yes.

5          **THE COURT:**  And that docket number is 51?

6          **MR. CLINE:**  51.  That's right.

7          **THE COURT:**  Next.  Keep going.

8          **MR. CLINE:**  The first two TRO motions Your Honor

9    mentioned, those have been granted previously.

10         **THE COURT:**  So you are saying they are not before the

11   Court now?

12         **MR. CLINE:**  That's right.

13         **THE COURT:**  Okay.  So that's Docket Number 11 and

14   Docket Number 24 for motions that were filed respectively on

15   April 28th, 2023 and May 11, 2023.  You said they are not

16   before the Court now?

17         **MR. CLINE:**  That's right.

18         **THE COURT:**  Okay.

19         **MR. CLINE:**  And I believe the final one would be the

20   pending motion for preliminary injunction against the Chief

21   Justice.

22         **THE COURT:**  For the appointment of judges?

23         **MR. CLINE:**  That's right.

24         **THE COURT:**  Docket Number 40.  And that was filed on

25   May 24, 2023.

1               **MR. CLINE:**  Yes, Your Honor.

2               **THE COURT:**  Okay.  Now, you are saying that motion is

3      still outstanding, correct?

4               **MR. CLINE:**  It is still outstanding, but our

5      position, as we will explain today is that if Your Honor grants

6      the replacement TRO against these new John Doe defendants, who

7      are those judges who the Chief Justice will appoint, that once

8      that replacement TRO is entered, the Court can lift the

9      existing TRO restraining the Chief Justice from issuing those

10     appointments, and then plaintiffs can withdraw that pending

11     preliminary injunction motion directed to the Chief Justice,

12     and we can proceed on that TRO and proceed to have a hearing on

13     the TRO being converted into a preliminary injunction against

14     the Doe defendants based on that preexisting briefing.

15              **THE COURT:**  Okay.  Thank you so much.

16              **MR. CLINE:**  Okay.

17              **THE COURT:**  I will come back to you in moment.  Now,

18     with regard to these motions that you have identified that are

19     still before the Court, will you be making the argument on

20     those motions?

21              **MR. CLINE:**  Yes, Your Honor.  If I may introduce the

22     team and who we plan to have cover which issue.

23              **THE COURT:**  Okay.

24              **MR. CLINE:**  So first, I would plan to cover the

25     issues concerning the Chief Justice, so specifically the

```
 1   section of the motion for leave to amend the complaint that

 2   concerns those claims against the Chief Justice.  This is HB

 3   1020, Section 4, for the CCID court, and HB 1020, Section 1,

 4   for declaratory relief only.

 5        And then I would hand it over to my colleague, Mr. Mark

 6   Lynch.  He would plan to cover the remainder of the motion for

 7   leave to amend, specifically with regard to these John Doe

 8   judge defendants, who are not yet judges, who are currently

 9   just private citizens who have not yet been appointed.  Mr.

10   Lynch would cover that section of that, motion for leave to

11   amend and the TRO motion.

12        And if Your Honor would like argument on the merits of the

13   TRO motion, which are the same as the merits of the prior TRO

14   motions that Your Honor already granted, Mr. Rhodes could cover

15   that today.

16        Then we would proceed to have -- if the Court is

17   agreeable, we could have Mr. Leapheart finally address the

18   motion to start discovery in the case.

19             THE COURT:  Okay.  Let's see.  All right.  Thank you

20   very much.  Anyone else on this side of the aisle need to

21   address the Court on these potentially outstanding motions?

22             MR. RUSS:  Your Honor, Bert Russ for the U.S.

23   Department of Justice.  The motion to intervene, which you

24   mentioned, is apart from the other motions and would need to be

25   addressed separately from those.
```

1          **THE COURT:**  All right.  And let me get back over here

2     to that one.  That was on number 7 on my list.  That was filed

3     July 12, 2023.

4          **MR. RUSS:**  Yes, Your Honor.

5          **THE COURT:**  Docket Number 69.  And this motion is

6     opposed by the other defendants.  And who will be arguing that

7     motion?

8          **MR. RUSS:**  I will, Your Honor.

9          **THE COURT:**  Thank you so much.  I will come back to

10    you.  Now let me go to the other side of the aisle.  Good

11    morning again.

12         **MR. SHANNON:**  Good morning, Your Honor.  Rex Shannon

13    with the Attorney General's Office for the state defendants.

14         **THE COURT:**  All right.  Do you agree with the

15    recitation of motions that I mentioned earlier?

16         **MR. SHANNON:**  Yes, Your Honor, I believe that is an

17    accurate representation of the pending motions.

18         **THE COURT:**  And are there any additional ones, to

19    your knowledge?

20         **MR. SHANNON:**  Not to my knowledge, Your Honor.  Give

21    me a moment to think.  I believe the Court has covered all of

22    the outstanding motions and recitations at this point.  And the

23    four from the folks on the other side have said that would need

24    to be heard today, the state defendants have opposed, filed

25    written oppositions to all four those motions.

1          **THE COURT:**  Who will be arguing on your side?

2          **MR. SHANNON:**  I will, Your Honor.

3          **THE COURT:**  On all of them?

4          **MR. SHANNON:**  Yes, Your Honor.

5          **THE COURT:**  Thank you so much.

6          **MR. SHANNON:**  Thank you, Your Honor.

7          **MR. NED NELSON:**  Good morning, Your Honor.  Ned

8   Nelson for the Chief Justice.  Can you hear me all right?

9          **THE COURT:**  I can.  Thank you.

10          **MR. NED NELSON:**  Your Honor, the only motion that the

11   Chief Justice has filed in this matter is the motion for 54(b),

12   certification of appealability.  I believe that was entered --

13          **THE COURT:**  June 9, 2023.

14          **MR. NED NELSON:**  Yes, sir, as Docket Number 54.

15          **THE COURT:**  That is correct.

16          **MR. NED NELSON:**  Any response to the plaintiffs'

17   motions will be handled by me, as well as the arguments for the

18   54(b) certification.

19          **THE COURT:**  Okay, then.  All right.  Then -- thank

20   you so much.

21          Now, did I miss anything from anybody?  All right.  The

22   answer appears to be no.

23          I'm going to start with this motion to intervene.  Are you

24   ready to start?

25          **MR. RUSS:**  Yes, Your Honor.

1          **THE COURT:**  Please go to the podium.

2          **MR. RUSS:**  Hello, Your Honor.  My name is Bert Russ

3    with the U.S. Department of Justice.  We have a motion to

4    intervene in this case pursuant to Section 902 of the Civil

5    Rights Act.  Section 902 allows the U.S. Department of Justice,

6    the United States, to intervene in cases involving violations

7    of the Equal Protection Clause on the basis of race and some

8    additional categories.

9          We are not seeking to relitigate issues that have already

10   come before the Court.  We filed our motion to intervene less

11   than three months after the law was signed.  We believe our

12   motion is timely.

13         The defendants have raised a few issues in their

14   opposition brief that I just wanted to address.  Many of the

15   cases that they cite in their opposition brief involve private

16   plaintiffs versus the United States, not -- that don't involve

17   the United States, or if they do involve the United States,

18   they often do not involve Section 902.

19         The cause of action here is under the Fourteenth

20   Amendment, and Section 902 of the Civil Rights Act is the

21   statutory authority Congress has given us to be able to enter

22   this case in intervention.

23         One of the other arguments that defendants have raised is

24   that they mention abrogation of sovereign immunity.  Many of

25   those cases involve private plaintiffs suing states where that

1    is an issue.  We cite some cases, the *Franchise Tax Board* case

2    before the U.S. Supreme Court, the matter of *Fernandez* before

3    the Fifth Circuit, that have recognized that the United States

4    can sue states in federal court that went -- as part of being

5    the federal system, states give up some of their sovereign

6    immunity, allowing the United States to bring suit.

7         The United States interests here are ensuring that the

8    residents of Hinds County are free from discrimination under

9    the Equal Protection Clause.  We have brought a number of cases

10   under 902, most recently the *LW* case in the Middle District of

11   Tennessee, where the Court recognized we had an intervention as

12   a right and that we could bring additional relief beyond that

13   of the original plaintiffs.

14        I would also add in the *Pasadena School Board* case before

15   the U.S. Supreme Court.  The Supreme Court recognized that the

16   United States can continue a case even if the original

17   plaintiffs were not in the case.  So we believe it is

18   appropriate for us to be in the case and that the Court should

19   grant our motion to intervene.  I'm happy to answer any

20   questions the Court has.

21             **THE COURT:**  Of the cases that you've cited, what is

22   your best case?

23             **MR. RUSS:**  The best case -- there are several that I

24   would point to.  I think on the question of the United States

25   being able to sue states, I would look at the *Franchise Tax*

1    *Board* case, 139 S. Ct. 1485 decided in 2019.  Some other cases

2    that I would cite, that *LW* case, and let me find the citation

3    for you, Your Honor.  This was a decision in the Middle

4    District of Tennessee decided in May of this year where the

5    Court recognized -- that was on the basis of sex.  Section 902

6    includes race, sex, color, national origin.  And *LW*, the

7    citation is in the Westlaw 2023, Westlaw 3513302, again, Middle

8    District of Tennessee.

9         The last case I might cite is an older case from the

10   Southern District of Mississippi, *Coffey v. State Educational*

11   *Finance Committee*, 296 F. Supp. 1389, Southern District of

12   Mississippi, that allowed the United States to intervene under

13   Section 902 and seek relief against the State of Mississippi.

14             **THE COURT:**  And should the Court allow you to

15   intervene, then on what side would your arguments primarily

16   fall?

17             **MR. RUSS:**  Primarily on the plaintiffs' side, Your

18   Honor.

19             **THE COURT:**  So then your argument would be what?

20             **MR. RUSS:**  Our argument is that the HB 1020 making

21   changes to the criminal justice system in Hinds County and the

22   City of Jackson did so in a way that violates the Equal

23   Protection Clause.  There are three provisions particularly we

24   are challenging:  The appointment of the temporary circuit

25   judges; the appointment of the CCID, the special district

1    that's being created; the appointment of the judge there and

2    the appointment of the prosecutors.  It is our belief that

3    Hinds County and the residents of Hinds County, which, you

4    know, 70 to 80-percent African American, are being treated

5    differently than other parts of the state in the way the state

6    legislature has restructured the criminal justice system,

7    taking their voice away.

8         Usually circuit judges are elected, and this change with

9    HB 1020 would mean that over half and maybe more of the circuit

10   judges are appointed, and by officials where, in light of

11   polarized voting in the state, the residents of Hinds County

12   really do not have a meaningful voice.  They are not going to

13   have a meaningful voice over the criminal justice system.  So

14   that is the heart of our equal protection claim that we are

15   pursuing in this case.

16        **THE COURT:**  Previously this Court determined that

17   Chief Justice Randolph enjoys judicial immunity.  You did not

18   mention that you would also be addressing that.  Would you?

19        **MR. RUSS:**  So the defendants that we have named in

20   our proposed complaint and intervention do not include the

21   Chief Justice.  They include the State of Mississippi and the

22   Attorney General.  We believe that if the State of Mississippi

23   is included as a defendant, that any state officials, if the

24   State of Mississippi were enjoined, for example, from

25   appointing temporary judges, that that would bind other state

1   officials, even if they are not explicitly named.

2        We saw -- of course, we read your prior ruling on the

3   Chief Justice.  We did not name the Chief Justice as a

4   defendant, and we didn't want to revisit any prior rulings that

5   your Court has made on that issue.

6        **THE COURT:**  So then relative to this dispute as to

7   whether he can make appointments, then you would not be

8   weighing in on that determination?

9        **MR. RUSS:**  Not the pending motions today, Your Honor.

10  We were mindful in intervening not to upset what has come

11  before.  We wanted to not prejudice anybody.  We wanted to be

12  timely.  And so we have not taken the position on the prior

13  motions regarding the Chief Justice.

14       **THE COURT:**  So then how would your intervention be

15  structured in argument where you are saying that you would be

16  aggrieved over the appointment of these special circuit judges,

17  but you are not seeking to enjoin the Chief Justice from doing

18  so?

19       **MR. RUSS:**  That is correct.  We believe that if the

20  state were enjoined, that it would affect state officials as

21  well, without having to name each of the state officials.

22       **THE COURT:**  In other words, what you are saying is

23  that your motion would be an end around judicial immunity.  Is

24  that it?

25       **MR. RUSS:**  I might not describe it as an end around.

1    It would bind the state, and then anyone who is part of the

2    state would be bound by it as well.  So we weren't trying to

3    revisit the Court's earlier ruling on judicial immunity.

4            **THE COURT:**  Well, I'm still a bit confused.

5            **MR. RUSS:**  Okay.

6            **THE COURT:**  You are saying that you are not naming

7    the Chief Justice?

8            **MR. RUSS:**  That is correct.

9            **THE COURT:**  And that you do not have -- you would not

10    anticipate any direct attack on the Chief Justice's ability to

11    name judges.  Is that so?

12            **MR. RUSS:**  That is correct, not a direct.  That is

13    correct.

14            **THE COURT:**  But you are saying that you would have an

15    indirect attack by naming the State of Mississippi and

16    enjoining the State of Mississippi from appointing these judges

17    even though the appointing agent himself enjoys judicial

18    immunity?

19            **MR. RUSS:**  That is correct, Your Honor.  When we

20    brought cases, and we have some examples in I think footnote 6

21    of our reply brief, we usually sue the state, which sometimes

22    includes state officials as well, but we sued the state to make

23    sure we could get all of the relief that we potentially could

24    need.

25            I am aware that the private plaintiffs with their amended

1   complaint have named additional individuals, the Doe defendants

2   and others, that might also get at this question of the

3   appointments without including the Chief Justice.  And so we

4   don't have a view one way or the other about if you allow them

5   to amend their complaint and they have these additional

6   defendants.  We don't have a view on that.  That is maybe

7   another way also to make sure that judges aren't appointed

8   under this statute until a decision can be made on the merits.

9        **THE COURT:**  Thank you.  I will come back to you on

10   this matter of amendment.

11        **MR. RUSS:**  Thank you, Your Honor.

12        **THE COURT:**  And this matter of intervention.

13   Now, I'm not going to get further into your argument here

14   because the Court first has to make a determination whether you

15   can intervene.

16        **MR. RUSS:**  Yes, Your Honor.

17        **THE COURT:**  Do you challenge any opposition on your

18   motion to intervene?

19        **MR. RUSS:**  We do not agree with the arguments made in

20   the opposition brief, and we had filed a reply brief responding

21   to those.

22        **THE COURT:**  All right.  Thank you.  Let's stay over

23   here for a moment on the plaintiffs' side.  Is there any

24   opposition to this motion to intervene?

25        **MR. RHODES:**  Not from the NAACP plaintiffs, Your

1    Honor.

2          **THE COURT:**  Okay.  So then there are no voices in

3    opposition on this side of the aisle; is that correct?

4          **MR. RHODES:**  Yes, Your Honor, I believe you did

5    announce on the bench earlier that you were allowing the JXN

6    Undivided to intervene.  I don't know if they have any

7    opposition, but from the NAACP plaintiffs, from the original

8    plaintiffs in the case, there is no opposition.

9          **THE COURT:**  All right.

10         **MS. WU:**  Your Honor, the JXN Undivided Coalition

11   plaintiffs don't have any opposition to the pending motion to

12   intervene by the Department of Justice.

13         **THE COURT:**  All right.  Thank you so much.

14       So then hearing no opposition on this side of the aisle, I

15   turn now to the other side.  I will start with you, Mr.

16   Shannon.

17         **MR. SHANNON:**  Yes, Your Honor.  Rex Shannon.

18         **THE COURT:**  Could you go to the podium, please.

19         **MR. SHANNON:**  Yes, Your Honor.

20       Good morning again, Your Honor.  Rex Shannon with the

21   Attorney General's Office for the state defendants.

22       Yes, Your Honor, the state defendants oppose the motion

23   and have filed a written response in opposition.  I will be

24   happy to present those arguments here this morning orally.

25         **THE COURT:**  Go right ahead.

1          **MR. SHANNON:**  Thank you, Your Honor.

2     Your Honor, the state defendants submit that the motion

3     should be denied outright because it's untimely, number one.

4     Alternatively, Your Honor, the motion should be denied to the

5     extent it seeks to add the State of Mississippi as a defendant,

6     and further to the extent the government seeks to assert claims

7     against the Mississippi Attorney General.

8     For one thing, Your Honor, the government lacks standing

9     to assert an equal protection claim against the State of

10    Mississippi or the Attorney General.  Additionally, Your Honor,

11    the Department of Justice has no cause of action to enforce the

12    Fourteenth Amendment against the State in connection with House

13    Bill 1020.

14    At a minimum, Your Honor, this Court should deny any

15    attempt to join the State of Mississippi as an additional

16    defendant in this case.

17    Your Honor, all of the claims that the plaintiffs have

18    asserted against the named defendants, as Your Honor knows, are

19    Fourteenth Amendment equal protection claims.  In filing the

20    motion to intervene, the government seeks to assert the same

21    equal protection claim it's own right against the Attorney

22    General.  The government is further seeking to add the State of

23    Mississippi as an additional defendant and to assert the

24    Fourteenth Amendment equal protection claim against the State

25    itself relative to House Bill 1020.

1        First of all, Your Honor, the motion to intervene should

2   be denied outright because it is untimely.  Whether the

3   government seeks intervention of right or permissive

4   intervention makes no difference where timeliness is concerned.

5   Intervention of right here is governed by Rule 24(a) and 42

6   U.S.C. Section 2000h-2.  Permissive intervention is governed by

7   Rule 24(b).  All of those authorities mandate that timeliness

8   is a necessary prerequisite to intervention.

9        Your Honor, in evaluating timeliness in this context, the

10  Fifth Circuit requires the District Court to consider four

11  factors.  I will briefly walk through each one of those in

12  turn.

13       The first factor is the length of time that the would-be

14  intervenor actually knew or reasonably should have known of its

15  interest in the case before it petitioned for leave to

16  intervene.  Your Honor, the government has known of its

17  purported interest in this case since at least as early as

18  February the 22nd of this year.  That's when Congressman Bennie

19  Thompson disclosed that he had been discussing House Bill 1020

20  and possible civil rights concerns with the U.S. Department of

21  Justice.  We have attached an article from WLBT confirming

22  that.  That means DOJ has been aware of House Bill 1020 for at

23  least as long as two months prior to its enactment.  The

24  government, I don't believe, disputes that.

25       House Bill 1020 was signed into law on April 21st of this

 1    year.  That same day, Your Honor, the plaintiffs in this case

 2    filed their 51-page 149-paragraph complaint initiating this

 3    litigation.  There's no question that plans were underway to

 4    sue certain State defendants over House Bill 1020 even before

 5    it was signed into law by the governor.

 6         As Your Honor knows, almost everything about this case has

 7    received widespread media attention.  There is no way DOJ can

 8    say that it didn't know or shouldn't have known about this

 9    litigation since its inception.  And I don't believe they are

10    saying that.  Yet instead of intervening in this case at the

11    outset, Your Honor, DOJ sat by while the parties duked it out

12    over various motions over the course of three lengthy hearings

13    before Your Honor earlier this spring and then in early summer.

14         As Your Honor will recall, between April and June, Your

15    Honor, the parties engaged in extensive briefing on numerous

16    motions.  We had three lengthy hearings, as I say.  Prior to

17    today, we had a subsequently filed lawsuit get consolidated

18    with this case.  And most significantly, Your Honor, the

19    plaintiffs and Chief Justice Randolph, as Your Honor is well

20    aware, fought a hot battle over judicial immunity which this

21    Court resolved in the Chief Justice's favor, dismissing him

22    from this case.

23         The DOJ has undoubtedly been aware of House Bill 1020

24    since its infancy in the legislature.  Surely they have been

25    following this litigation ever since suit was filed.  It was

 1     not until, Your Honor, this Court dismissed Chief Justice
 2     Randolph that DOJ apparently decided it was necessary to
 3     intervene, almost certainly because the plaintiffs finally
 4     appreciated that the dismissal of the Chief Justice foreclosed
 5     any avenue to relief on their judicial appointment claim.  If
 6     the government really thought there was any good reason to
 7     intervene in this case, they should have made it at the outset.
 8     The government made no effort to show why that didn't occur.
 9     And for all of these reasons, the first factor we submit with
10     respect, Your Honor, weighs against intervention.

11          The second factor is the extent of the prejudice that the
12     existing parties to the litigation may suffer as a result of
13     the would-be intervenor's failure to seek intervention as soon
14     as it reasonably knew or should have known of its interest in
15     this case.  Your Honor, allowing the government to intervene at
16     this point we submit would prejudice the State defendants by
17     further prolonging a resolution of plaintiffs' judicial
18     appointment claim.

19          Your Honor, the TRO entered against Chief Justice Randolph
20     in May currently remains in effect for going on 116 days, which
21     is 88 days longer than the 28-day period authorized by Rule 65.
22     Chief Justice Randolph, Your Honor, was dismissed on June 1st
23     of this year.  The plaintiffs' motion for preliminary
24     injunction has been fully briefed and awaiting disposition
25     since June 9th.  Your Honor, allowing the United States to

1    intervene at this late date will almost certainly invite

2    additional briefing on additional issues and more hearings.   It

3    is a virtual certainty that DOJ's intervention will further

4    delay resolution of the judicial appointment issue, thereby

5    prejudicing the interest of the State defendants.   Thus, Your

6    Honor, we submit the second factor likewise weighs against

7    intervention.

8         The third factor, Your Honor, is the extent of the

9    prejudice that the would-be intervenor may suffer if

10   intervention is denied.   Your Honor, the government won't

11   suffer any prejudice if its motion is denied.   And the

12   plaintiffs in this case, Your Honor, have the financial backing

13   of the NAACP.   They are represented by a team of highly skilled

14   attorneys, including a former U.S. Attorney General.   There is

15   no reason to believe that the plaintiffs' rights won't be

16   zealously protected by their own lawyers in this case.

17        Your Honor, DOJ says it needs to be in this case to

18   protect what it calls the government's sovereign interest in

19   ensuring that all citizens will be afforded equal protection of

20   the laws in accordance with the Fourteenth Amendment.   But,

21   Your Honor, under the government's reasoning, any ruling that

22   this Court makes that favors the plaintiffs would ostensibly

23   inure to the benefit of the United States.   There is no reason

24   to believe that the rights of citizens at large will somehow be

25   prejudiced by any ruling that Your Honor makes in this case

1    unless DOJ is a party.

2         Your Honor, in support of the argument on prejudice, DOJ

3    has cited the *Cooper* case and the *General Telephone Company*

4    case.  Your Honor, *Cooper* doesn't address intervention or

5    prejudice, nor does it directly speak to any sovereign interest

6    to the United States.  The *General Telephone Company* case says

7    that the public interest is vindicated when the EEOC acts at

8    the specific behest of individuals, specific individuals, by

9    filing suit on their behalf.  Your Honor, that case has no

10   application here where the plaintiffs are already represented

11   by counsel.  Their interests are ostensibly aligned with what

12   DOJ purports to be the interest of all citizens.

13        DOJ has made no showing of any actual prejudice to the

14   United States Government if it is not allowed to be a plaintiff

15   in this case.  Given the absence of any prejudice to the

16   government, Your Honor, we submit that the third factor

17   likewise weighs against intervention.

18        The fourth and final timeliness factor, Your Honor, is the

19   existence of unusual circumstances militating for or against

20   intervention.  Your Honor, here the whole point of House Bill

21   1020's judicial appointment provision is to relieve the

22   judicial backlog of criminal cases in Hinds County.  Your Honor

23   has previously found that, and I quote, The criminal justice

24   system in Hinds County is in crisis, end quote.  The State has

25   a legitimate interest in reducing overcrowded criminal dockets

1   in Hinds County.

2        Your Honor, House Bill 1020's judicial appointment

3   provision is critical to ensuring that both crime victims and

4   criminal defendants alike both have timely access to justice in

5   Hinds County's criminal court system.  Your Honor, at this

6   juncture, DOJ's belated intervention would only prolong any

7   assistance to Hinds County that is to result from the

8   appointment of temporary special circuit judges.

9        Your Honor, these unusual circumstances militate against

10  intervention.  I would point out that the government has not

11  identified any unusual circumstances militating in favor of

12  intervention.  Therefore, Your Honor, we submit that this

13  fourth and final factor likewise weighs against granting the

14  motion to intervene.

15       Your Honor, it is fairly obvious that this belated motion

16  to intervene is an attempt to circumvent this Court's dismissal

17  of the Chief Justice by suing the State of Mississippi.  The

18  plaintiffs know they can't sue the State.  For one thing, the

19  State is not a person amenable to sue under Section 1983.

20       Your Honor, additionally, any claims that the plaintiffs

21  could make in this case would be barred by sovereign immunity,

22  as far as claims against the State of Mississippi.  But as I

23  will discuss momentarily, Your Honor, the State of Mississippi

24  is no more amenable to suit by DOJ in this case than it is by

25  the plaintiffs.  If DOJ truly believed that its intervention

1   was necessary in this case for any purpose, Your Honor, it

2   should have sought intervention at the beginning of this case

3   and before this Court and the parties expended considerable

4   resources litigating this case and litigating key issues in

5   this case.

6       Your Honor, the interests of the plaintiffs and DOJ are

7   ostensibly aligned.  The government's dilatory intrusion in

8   this matter we submit would do nothing to further this Court's

9   consideration of the issues.  For all of these reasons, Your

10  Honor, the United States' motion to intervene is untimely and

11  the State defendants submit should be denied in its entirety.

12      Shifting gears, Your Honor, if the Court finds that the

13  motion is timely, the motion, we submit, should nevertheless be

14  denied in part because the government lacks standing and has no

15  cause of action against the State of Mississippi.

16      First of all, Your Honor, the government lacks standing to

17  assert an equal protection claim against the State or the

18  Attorney General in connection with House Bill 1020.  The

19  Supreme Court has held that an intervenor of right must

20  demonstrate Article III standing when it seeks additional

21  relief beyond what the plaintiffs in the case are seeking.

22  That's the *Town of Chester* case, the *Little Sisters* case we

23  cited in our brief.

24      Your Honor, in the cases before Your Honor today, the

25  plaintiffs didn't sue the State of Mississippi.  Therefore,

1    they are not seeking any relief against the State.  DOJ, on the

2    other hand, Your Honor, is attempting to add the State as a

3    defendant and to pursue declaratory and injunctive relief

4    against the State.  That means that pursuant to *Town of*

5    *Chester*, DOJ is required to separately demonstrate Article III

6    standing.

7          Your Honor, to establish standing, DOJ has to show some

8    injury in fact that is both concrete and particularized, as

9    well as actual or imminent and not merely conjectural or

10   hypothetical.  Your Honor, there is no way that DOJ can make

11   that showing here because the enactment of House Bill 1020 does

12   not injure the federal government at all.

13         Your Honor, as we cited in our brief, merely disagreeing

14   with the State regarding the constitutionality of House Bill

15   1020 is not an injury sufficient to confer Article III

16   standing.  Your Honor, that's the *Valley Forge Christian*

17   *College* case that we cited in our brief.

18         DOJ has not even attempted to articulate any concrete

19   actual injury to the United States caused by House Bill 1020.

20   Instead, Your Honor, they say that this case, and I will quote,

21   implicates the United States' ability to protect its sovereign

22   interest in ensuring that persons of all races are afforded

23   equal protection of the laws in accordance with the Fourteenth

24   Amendment, end quote.

25         Your Honor, House Bill 1020 is no threat to the sovereign

1    interest of the United States Government.  This purported

2    sovereign interest that DOJ is advancing in truth is nothing

3    more than an attempt to vindicate the plaintiffs' personal

4    claims.  Your Honor, as we've cited in our brief, a sovereign

5    cannot merely act as a volunteer to litigate personal claims of

6    its citizens.  That's the *Pennsylvania v. New Jersey* case that

7    we cited.  Nor may a sovereign step in to represent the

8    interest of particular citizens for any reason.  That's the

9    *Alfred L. Snapp & Son* case we have cited.

10        Furthermore, Your Honor, as I will discuss momentarily,

11   importantly, Congress has not authorized a cause of action for

12   the U.S. Attorney General to enforce the Fourteenth Amendment

13   against the State of Mississippi in connection with this bill.

14   Your Honor, the State defendants submit that this fact alone

15   precludes the government from establishing standing in this

16   case.  We cited *U.S. v. City of Philadelphia* and *U.S. v.*

17   *Solomon*.

18        Your Honor, in its reply brief, DOJ failed to cite a

19   single case supporting the proposition that it has standing to

20   sue in connection with House Bill 1020 under a sovereign

21   interest theory or otherwise.  In fact, Your Honor, the only

22   authority that DOJ cites with respect to standing are several

23   excerpts from the Congressional record in discussing 42 U.S.C.

24   Section 2000h-2, which is the intervention statute that DOJ is

25   traveling under here.

1        But, Your Honor, it's settled law in the Fifth Circuit

2   that a court cannot consider legislative history in construing

3   a statute that is unambiguous on its face.  In fact, just last

4   year, Your Honor, the Fifth Circuit reaffirmed that, quote, The

5   Supreme Court has repeatedly and emphatically rejected the use

6   of legislative history where the text is unambiguous, end

7   quote.  In so doing, Your Honor, the Fifth Circuit reiterated

8   that, quote, No amount of legislative history can defeat

9   unambiguous statutory text, end quote.  That case is *United*

10  *States v. Palomares*, 52 F.4th 640.

11       Your Honor, the plain language of Section 2000h-2 is

12  unambiguous.  That statute allows for intervention, period.  It

13  says nothing that can remotely be read as exempting the

14  government from establishing standing to assert independent

15  claims in a case in which it intervenes.  Your Honor,

16  therefore, this Court is precluded from considering any of the

17  legislative history that is cited in DOJ's reply brief.

18       Your Honor, the United States cannot make the requisite

19  showing to establish Article III standing against the State of

20  Mississippi or against the Attorney General.  Thus, it cannot

21  assert claims against the State or the AG in this case.  Your

22  Honor, therefore, if for no reason -- if for any reason the

23  Court finds that intervention is timely, the motion should

24  nevertheless be denied to the extent the government seeks to

25  add the State of Mississippi as a defendant or to assert claims

1    against the Mississippi Attorney General.

2        Moving on, Your Honor, even if the Court finds that the

3    government has standing, Your Honor, the State defendants

4    submit that the motion should nevertheless be denied, to the

5    extent DOJ seeks to add the State of Mississippi as a

6    defendant, the reason being DOJ has no cause of action against

7    the State of Mississippi.

8        Your Honor, the government is attempting to sue the State

9    to enforce the Fourteenth Amendment in connection with House

10   Bill 1020.  But Your Honor, the Fourteenth Amendment does not

11   supply a generalized cause of action whereby the government can

12   sue on behalf of its citizens, nor does the Fourteenth

13   Amendment authorize the federal executive or the federal

14   judiciary to create causes of action to enforce the Fourteenth

15   amendment.

16       Your Honor, as we have set out in our brief, even

17   traditional principles of equity cannot be used as a source of

18   judicial power to create a cause of action here.  Instead, Your

19   Honor, the Fourteenth Amendment gives Congress the exclusive

20   authority to create causes of action to remedy alleged

21   violations of the Fourteenth Amendment.

22       Federal courts have recognized a Congressional policy

23   denying the federal government broad authority to initiate

24   enforcement actions whenever a civil rights violation is

25   alleged.  That is the *Mattson* case that we have cited in our

1   brief.

2       Your Honor, when Congress has acted to create causes of
3   action entitling the federal government to sue to enforce the
4   Fourteenth Amendment, it has conferred that power only
5   sparingly.  For instance, Your Honor, the federal government
6   has authorized the U.S. Attorney General to sue state entities
7   that enforce racially segregated public facilities.  That is 42
8   U.S.C. Section 2000b-8.  Congress has also authorized the U.S.
9   Attorney General to sue State entities that maintain racially
10  segregated schools.  That is 42 U.S.C. 2000c-6A.

11      Your Honor, both of these statutes impose multiple
12  pre-conditions that must be satisfied before the U.S. Attorney
13  General is authorized to sue a State entity.  The government
14  has not pointed to a single statute authorizing it to sue a
15  state over a crime reduction statute like House Bill 1020.

16      Your Honor, to the extent DOJ would argue that it has an
17  implied cause of action to sue the State, that argument doesn't
18  work either.  Your Honor, any notion of an implied cause of
19  action to enforce the Fourteenth Amendment was rejected by the
20  Third Circuit in *United States v. City of Philadelphia*, 644
21  F.2d 187.

22      The key point, Your Honor, is that Congress has not
23  expressly created a cause of action that specifically
24  authorizes the U.S. Attorney General to sue states over
25  allegedly unconstitutional crime reduction statutes, like House

1    Bill 1020.

2         Your Honor, DOJ takes the position that a cause of action

3    is created by 42 U.S.C. Section 2000h-2, the intervention

4    statute.  But, Your Honor, that is just simply wrong.  For one

5    thing, Section 2000h-2 only authorizes intervention.  It does

6    not contain any language authorizing an independent cause of

7    action.  Your Honor, Section 2000h-2 says that the U.S.

8    Attorney General can intervene upon timely application in a

9    pending action asserting Fourteenth Amendment equal protection

10   claims predicated on race.  It also says the Attorney General,

11   the U.S. Attorney General can pursue, quote, the same relief as

12   if it had instituted the pending action.

13        Your Honor, multiple courts have recognized this Section

14   2000h-2, the intervention statute, merely provides a process

15   for the U.S. Attorney General to intervene in equal protection

16   civil rights actions.  It does not create an independent

17   federal claim.  Your Honor, we have cited the *Kennedy* case from

18   the Southern District of Alabama to that effect.  We have also

19   cited the Sayman case from the Northern District of Illinois

20   for the same proposition.

21        Your Honor, it is clear from the plain language of Section

22   2000h-2 that this statute does not create a cause of action.

23   Your Honor, it is true that federal courts have taken different

24   views on whether Section 2000h-2 limits DOJ to the precise

25   relief requested by the plaintiffs in the pending underlying

1       action.  Some courts have said that it does.  Others, like the

2       courts in *Spangler* and *the Sanders* cases, have said that it

3       does not.  But, Your Honor, whether or not Section 2000h-2

4       allows DOJ to exceed relief requested by the plaintiff is a

5       different question entirely from whether that statute creates a

6       cause of action.

7            Your Honor, even in the *Spangler* case, which the

8       plaintiffs cite -- excuse me, which DOJ cites, the Ninth

9       Circuit quite obviously in that case recognized that DOJ still

10      needed an independent cause of action to seek relief under the

11      intervention statute.  DOJ cites *Spangler* and *Sanders* in

12      support of their position, but Your Honor, neither one of those

13      holds that the intervention statute creates a cause of action

14      in the federal government.

15           The government argues, Your Honor, that unless this

16      statute is read to create a cause of action, that it will be

17      rendered meaningless, but Your Honor, that is simply not the

18      case.  For instance, I mentioned the federal statute that

19      creates a cause of action for the government to enforce school

20      desegregation.  The government can initiate a lawsuit in the

21      first instance pursuant to that school desegregation statute.

22      What Section 2000h-2 does is it permits the government to

23      intervene in an equal protection action that is already filed

24      and pending, allowing the government to assert the cause of

25      action created by the school desegregation statute in the

1    pending action.  So it's not correct to say that the

2    intervention statute is rendered meaningless unless it is read

3    to itself independently create a cause of action.  That is

4    simply not the case.

5         Your Honor, counsel for the United States mentioned the

6    *Coffey* case from 1969.  Your Honor, in that case, the federal

7    government intervened pursuant to Section 2000h-2 enjoining the

8    State of Mississippi as a defendant.  But Your Honor, the issue

9    of whether Section 2000h-2 creates a cause of action against

10   the State was not before the Court in the *Coffey* case.  As far

11   as we can tell, it was not raised.

12        Additionally, Your Honor, in *Coffey*, an arm of the State

13   was already made a defendant by the private plaintiffs in that

14   case.  Regardless, Your Honor, subsequent case law makes it

15   clear that when properly analyzed, any claim by private

16   plaintiffs against the State of Mississippi would be precluded

17   by Section 1983 and would likewise be barred by sovereign

18   immunity.  We have cited the *Will* case and the *Duncan* case,

19   both of which stand for the proposition that the State is not a

20   person under Section 1983.  Therefore, the State cannot be sued

21   by a private plaintiff under 1983.  We have also cited *Alabama*

22   *v. Pugh*, along with the *McCardell* case and the *Briggs* for the

23   proposition that sovereign immunity bars any private suit

24   against the State or state entity in federal courts without the

25   State's consent.  Your Honor, those precepts were not applied

1    in *Coffey*.  Had they been, the State would have never been a

2    party to begin with in that case.  Thus, Your Honor, we submit

3    the *Coffey* case is no help to DOJ.

4         The only other cases that were cited by DOJ, Your Honor,

5    are *LW ex rel Williams* and the *Marcaida* case and the *Pasadena*

6    *City Board of Education v. Spangler case*.  Your Honor, DOJ

7    cites the *Williams* case for the proposition that nothing in

8    Section 2000h-2 was intended to change the ordinary rules

9    applicable to intervenors.  They cite the *Marcaida* case for the

10   proposition that if the government is allowed to intervene, it

11   would be treated as if it were -- just as if it were an

12   original party.

13        DOJ says that nothing in the case law supports the

14   argument that the United States has fewer rights as a party or

15   some lesser status in a lawsuit merely because it has

16   intervened pursuant to Section 2000h-2.  But Your Honor, that

17   is not the State defendants' argument at all.  Your Honor, the

18   State defendants' argument is that whether the United States

19   enters a lawsuit as an intervenor or as an original plaintiff,

20   it must having a congressionally authorized cause of action to

21   sue the State of Mississippi to enforce an alleged Fourteenth

22   Amendment violation.  That authorization is not found in

23   Section 2000h-2 or anywhere else in the U.S. Code, for that

24   matter.

25        Your Honor, DOJ cites the *Pasadena* case for the

1    proposition that once it intervenes, it can maintain an equal

2    protection claim even if the Court were to dismiss the original

3    plaintiffs.  But, Your Honor, the *Pasadena* case is a school

4    desegregation case.  Again, Congress has expressly authorized

5    the government to sue in school desegregation cases.

6         Your Honor, the U.S. Supreme Court has never said that

7    Section 2000h-2 itself creates an independent cause of action,

8    and certainly not in a case that is unrelated to desegregation.

9         Finally, Your Honor, the government argues that the

10   Eleventh Amendment doesn't bar suit against the State when the

11   plaintiff is the federal government.  But, Your Honor, the

12   State defendants' argument does not turn on the effect of the

13   Eleventh Amendment vis-a-vis the government.  Whether the

14   Eleventh Amendment bar applies or not, the government must

15   still have a cause of action to sue and enforce the Fourteenth

16   Amendment.

17        The bottom line here, Your Honor, is DOJ has not

18   identified a single case wherein a court has held that Section

19   2000h-2, the intervention statute, itself creates a cause of

20   action by which DOJ may enforce the Fourteenth Amendment

21   against the State of Mississippi.

22        Your Honor, Section 2000h-2 merely provides a vehicle by

23   which DOJ can intervene in a pending Fourteenth Amendment equal

24   protection claim subject to certain requirements.  Your Honor,

25   the case law makes it clear that this Court cannot recognize a

1   cause of action for DOJ that Congress has denied it by only

2   authorizing intervention in Section 2000h-2.  That is the

3   *Lexmark* case and the *Sandoval* case we have cited in our

4   briefing.

5       Your Honor, Congress knows how to provide a cause of

6   action to DOJ when it wants to.  It has done so in the context

7   of desegregating public facilities and schools, and it has not

8   done so here.  DOJ simply does not have a cause of action to

9   enforce the Fourteenth Amendment against the State of

10  Mississippi in connection with a crime reduction statute like

11  House Bill 1020.  Therefore, Your Honor, it cannot state an

12  equal protection claim against the State of Mississippi.

13      Your Honor, if the motion to intervene is to be granted at

14  all, and if the Court finds that DOJ has standing, the State

15  defendants would submit that the motion should nevertheless be

16  denied to the extent DOJ seeks to add the State of Mississippi

17  as a defendant, for the reasons I've stated.

18      Your Honor, DOJ raises permissive intervention as an

19  afterthought in a footnote in its original brief.  Suffice it

20  to say that everything I've said here today in opposition to

21  the motion for intervention as of right applies with equal

22  force to permissive intervention.  Your Honor, as we have set

23  out in our brief, DOJ is not entitled to intervene in this case

24  under either theory.

25      In conclusion, Your Honor, DOJ does not have plenary

1    authority to sue the State of Mississippi or any other state

2    under the guise of the Fourteenth Amendment anytime it is

3    politically expedient.  There is no federal statute vesting the

4    U.S. Department of Justice with roaming authority to sue a

5    state under the Fourteenth Amendment at the whim of the U.S.

6    Attorney General.  Under the express terms of the Fourteenth

7    Amendment itself, only Congress can give the U.S. Attorney

8    General that right, and Congress has not done so here.

9         For all of these reasons, Your Honor, the State defendants

10   respectfully request that the Court would deny the motion to

11   intervene in its entirety as untimely.  Alternatively, Your

12   Honor, because the United States lacks standing, the State

13   defendants request that the Court would deny the motion to the

14   extent the United States seeks to add the State of Mississippi

15   as a defendant and to assert claims against Mississippi's

16   Attorney General.

17        And finally, Your Honor, in the further alternative,

18   because the United States has no cause of action against the

19   State of Mississippi, the State defendants request that the

20   motion be denied to the extent it seeks to add the State of

21   Mississippi as a defendant.  Thank you, Your Honor.

22             **THE COURT:**  All right.  Thank you.

23             **MR. NED NELSON:**  Good morning, Your Honor.  Ned

24   Nelson for Chief Justice Randolph.  I intend to keep this

25   short.

1     The Department of Justice correctly acknowledges Your

2  Honor's order of June 1 dismissing the Chief Justice.  The

3  proposed complaint and intervention as noted previously does

4  not name him as a party.  As a previously dismissed party, we

5  take no position on the government's motion to intervene.  The

6  Chief Justice remains neutral on the merits of those issues.

7     I'm happy to answer any questions you have, Your Honor.

8         **THE COURT:**  But the import of the intervention would

9  have some impact upon the Chief Justice's ability to act under

10  the statute, correct?

11        **MR. NED NELSON:**  Yes, sir.

12        **THE COURT:**  And you said you take no position on that

13  intervention?

14        **MR. NED NELSON:**  I believe you are asking about the

15  government's ability to obtain an injunction against the State,

16  its impact --

17        **THE COURT:**  What I'm looking at is the State of

18  Mississippi disagrees entirely with this matter of

19  intervention.  You said, on the other hand, that the Chief

20  Justice does not take any position on the intervention.  Is

21  that correct?

22        **MR. NED NELSON:**  Because he is not named as a party

23  and no allegations are made against him, it's not really within

24  the Chief Justice's prerogative to object to something which he

25  is not a party to, Your Honor.

1    **THE COURT:**  But the intervention aims to limit his

2    right or to appoint or his obligation under the statute to

3    appoint, and even though he is not directly named as a party,

4    the effect of the argument on the other side would impact upon

5    those prerogatives if he still wishes to exercise them.  Am I

6    correct?

7    **MR. NED NELSON:**  Yes, Your Honor.  Again, I believe

8    you are referencing the enforceability of an injunction against

9    the State against the Chief Justice and whether or not that

10   would apply to him.  Is that --

11   **THE COURT:**  That is correct.

12   **MR. NED NELSON:**  Yes, sir, I think we have previously

13   stated numerous times that the Chief Justice has no desire to

14   litigate this matter and would abide by the Court -- by the

15   ruling of the Court.

16   **THE COURT:**  So if the intervention is allowed, and if

17   after the intervention this intervenor wishes to side step this

18   matter of judicial immunity, as I've mentioned earlier, you

19   still would not have any response or retort to that?

20   **MR. NED NELSON:**  To side step without naming the

21   Chief Justice as a party?

22   **THE COURT:**  That is correct.

23   **MR. NED NELSON:**  Well, Your Honor, if we are not a

24   party, and that's been our position all along, that since

25   June 1st he has been dismissed, I mean, I would have to confirm

1    that with my client, but our position is we are not going to

2    take a position on something that doesn't name us or accuse us

3    of anything.

4         **THE COURT:**  As I would appreciate the intervenor's

5    position, the intervenor would want to preclude what the State

6    of Mississippi can do in this instance, and that prohibition on

7    the State's actions would also envelope any official of the

8    state, including your client.

9         **MR. NED NELSON:**  Yes, sir, and I think that the

10   parties that are necessary and equipped to defend its actions

11   are the gentlemen sitting at this table.

12        **THE COURT:**  Okay.

13        **MR. NED NELSON:**  And I think they would be aptly

14   positioned to defend and oppose any injunction.  There is good

15   case law out there that says exactly that, that the Attorney

16   General is there for that specific role, and it maintains and

17   preserves the Chief Justice's neutrality and his ability to

18   conduct his official duty as Chief Justice.

19        **THE COURT:**  All right.  Would you check with your

20   client and then see if you have anything else you would like to

21   add on your argument?

22        **MR. NED NELSON:**  Yes, sir.

23        (Mr. Nelson confers with Chief Justice Randolph.)

24        **MR. NED NELSON:**  Your Honor, my client points out a

25   pretty fundamental issue that really had not been clear to me,

1    that if this Court entered an order enjoining or prohibiting

2    the effectuation of House Bill 1020, regardless of the

3    appointment power or authority, there would be no mechanism or

4    structure to which the appointments could take effect.

5         So it really would -- as long as the Chief Justice is left

6    out of that, so to speak, then it's -- that's our position is

7    that we just want to be left out of it.

8              **THE COURT:**  Okay.  Thank you very much.

9              **MR. NED NELSON:**  I'm sorry.  If I didn't say this

10   previously, Your Honor, that would apply primarily to funding.

11   The funding structure of these appointees would not take

12   effect.  So it really would be a nullity.  It would pre-close

13   it.  And I have other arguments to make on any of the other

14   pending motions, but this is just limited to the government's

15   motion to intervene.

16             **THE COURT:**  Thank you so much.

17             **MR. NED NELSON:**  Thank you, Your Honor.

18             **THE COURT:**  Reply.  After I hear this reply argument,

19   I'm going to take a recess.  So go ahead and do your reply.

20             **MR. RUSS:**  Thank you, Your Honor.  Again, Bert Russ

21   for the Department of Justice.

22        The State defendants have raised a number of arguments

23   made to our position brief, and we have many responses in our

24   reply.  Let me address a few of those here.

25        On the question of timeliness, the United States, as you

1    know, takes its time when deciding whether to get involved, to

2    spend the resources to get involved in a case, looking at the

3    facts and the law.  We don't take action before a statute is

4    finalized.  Compromises can be offered.  Various proposals were

5    considered in this legislation that might have ameliorated some

6    of the effects and they were not adopted.

7         Once the law was passed, it is, in my experience doing

8    other litigation with the civil rights division, it's not

9    unusual that it would take a few months for the department to

10   decide if it's going to get involved in a case and what

11   arguments and defendants that it would seek.

12        So we believe it is timely.  As I understand, discovery

13   has not begun.  There has not been a 26(f) conference.  This is

14   early stage of the litigation.  Although there have been a lot

15   of motions that have been considered, we are trying to stay out

16   of those and not -- you know, trying to leave those be.  So we

17   believe that it is timely.

18        In terms of the prejudice, we believe -- certainly the

19   State would not like us in this case, but any intervenor

20   joining the case is not necessarily welcomed from the other

21   side.  We believe that we would be prejudiced.  The Courts have

22   recognized that we have an interest in defending the

23   constitutional rights of citizens.  The Fifth Circuit in the

24   *City of Jackson* case has recognized the United States' interest

25   in protecting the rights of its citizens.  And we will be

1    harmed if we are not able to do that.

2         In terms of the unusual circumstances, I feel some of that

3    is getting more to the substance.  That is not something for

4    the motion to intervene.  At a later stage, if the State wants

5    to bring an appropriate action, if they believe we have not

6    stated an Equal Protection Clause claim, that's for another

7    day.  The question of intervention as of right, where we are

8    timely, we believe we should be allowed in the case.

9         On the question of standing, I feel like the State's

10   arguments kind of ignore what 902 does.  902 does not say you

11   have to comply with a different provision of the U.S. Code.  It

12   simply says, and let me get the language here, that "Whenever

13   any action has been commenced in any court of the United States

14   seeking relief for the denial of the equal protection of laws

15   under the Fourteenth Amendment on the basis of race, color,

16   religion, sex or national origin, the Attorney General for or

17   in the name of the United States may intervene on such action

18   on timely application if the Attorney General certifies that

19   case is of general public importance.  In such action, the

20   United States shall be entitled to the same relief as if it has

21   instituted the action."  And that's 42 U.S.C. 2000h-2.

22        Congress did not set any limitations there.  Passing this

23   in the 1960s, Congress wanted to address violations of the

24   Equal Protection Clause on the basis of race.  And it didn't

25   say you have to meet some other -- you have to meet some

1    criteria from another part of the U.S. Code.  It is broad

2    authority.  Congress chose to allow us to intervene versus

3    bringing cases on our own.  That is how Congress decided to set

4    this up, and that is what we are attempting to do here.

5         Addressing some of the cases that the State has brought

6    up, they bring up the *Kennedy* case in the Southern District of

7    Alabama, and the Sayman case in the Northern District of

8    Illinois to make the argument that 902 itself cannot be a cause

9    of action.  Those cases are pro se plaintiffs, not the United

10   States, citing a variety of Civil Rights Act provisions to

11   bring claims, and what those courts hold is that pro se

12   plaintiffs don't have a cause of action under Section 902,

13   which talks explicitly about the United States intervening.  So

14   those cases don't tell us anything about the United States'

15   right to intervene.

16        Again, our cause of action is the Equal Protection Clause

17   and Section 902 is the Congressional authority that let's us

18   come to court in the posture of an intervenor.

19        Another case brought that the defendants mentioned was the

20   *Lexmark* case, and it claims the United States cannot create a

21   cause of action.  *Lexmark* again was a private individual.  It

22   was a toner cartridge business looking to sue under a

23   particular statute.  The case did not involve the United

24   States.  It did not involve Section 902.  And the Fifth

25   Circuit, in the *City of Jackson* case, 318 F.2d 1, 1963,

1   recognized the ability of the United States to have standing to

2   challenge state actions that violate the Constitution.

3       The State mentioned the Pennsylvania case before the

4   Supreme Court and the Puerto Rico case before the Supreme

5   Court.  In those cases, the Supreme Court cautioned that

6   Pennsylvania and the territory of Puerto Rico cannot get

7   involved in litigation where they had no real interest at

8   stake.  Again, neither case involved the United States, and

9   neither case involved Section 902.  Congress found such an

10  interest in passing Section 902 that the United States had an

11  interest in vindicating the rights of citizens when there are

12  violations of the Equal Protection Clause.

13      The defendants talk about the *Town of Chester* case,

14  arguing that the U.S. must demonstrate Article III standing to

15  pursue relief beyond the original defendants.  That, again,

16  involved private plaintiffs.  It did not involve the United

17  States.  It doesn't address the ability of the United States to

18  sue states.  The matter of *the Fernandez* case, which I

19  mentioned earlier, before the Fifth Circuit, recognized that

20  states give up their sovereign immunity from lawsuits in

21  federal court by the United States, which we have here, and

22  ultimately the United States does have standing to be here

23  because of 902.

24      One moment, Your Honor.  I will look and see if there are

25  other points that I wanted to address from the arguments that

1    the State has made.

2           Congress, in passing 902, this is how they decided to set

3    it up, that the United States could address violations of the

4    Equal Protection Clause but only if there was an existing case

5    and only if the United States was intervening.  It would make

6    that statute meaningless if we were not allowed to intervene

7    absent pointing to some other statutory provision.  In crafting

8    902, Congress didn't connect it to other statutes, and it

9    wanted to give the Congress -- wanted to give the United

10   States, as we talk about it in our brief, broad authority to

11   address violations of the Equal Protection Clause.

12          We believe we have a cause of action here.  We believe we

13   have standing.  Our interests are implicated, and we say more

14   about all of this in our reply brief.  I'm happy to answer any

15   questions the Court may have.

16               **THE COURT:**  Talk to me about prejudice.

17               **MR. RUSS:**  The prejudice here, the courts, such as

18   City of Jackson, recognized that there is harm to the United

19   States when citizens are denied their rights under the Equal

20   Protection Clause.  So it's true the private plaintiffs have

21   brought their own lawsuit, but Congress understood this.  By

22   granting us the ability to intervene, that presupposes there's

23   already a private lawsuit out there.  And Congress' judgment in

24   crafting 902 was that it was not duplicative for the United

25   States to come in and to be able to make its own arguments.

1    Otherwise, it wouldn't have crafted this intervention.

2    Intervention presupposes that private plaintiffs have brought

3    their own case.

4            **THE COURT:**  Well, then here --

5            **MR. CLINE:**  In this case, yes.

6            **THE COURT:**  Now, here, what additional argument or

7    what additional relief would you be seeking which is over and

8    beyond what the original plaintiffs were seeking?

9            **MR. RUSS:**  There are I think two elements that

10   answer.  One is adding an additional defendant, the State of

11   Mississippi, to make sure that we have all the defendants that

12   are needed to have relief.

13       In terms of our specific claims, I believe we focus on

14   three things:  The appointment of the temporary circuit judges;

15   the appointment of the judge to the CCID; and the appointment

16   of the prosecutors.

17       As I understand, in reading the private plaintiffs'

18   amended complaint, they have some additional things in the

19   statute and related statute they would like to enjoin, but

20   there is overlap between those claims and our claims.  What we

21   bring is obviously the United States' interest in making sure

22   people's equal protection rights are not violated, and we would

23   also bring an additional defendant.

24           **THE COURT:**  And of those two factors there, bringing

25   in the additional defendant seems to be the primary purpose of

1    the intervention.  Is that correct?

2             **MR. RUSS:**  I would not describe it that way.  I mean,

3    because, you know, we were thinking about this statute.

4    Obviously we were paying attention to the news, we were

5    watching the litigation and deciding whether it was appropriate

6    to intervene.  This is an unusual thing the legislature has

7    done compared to other parts of the state in the way they have

8    changed their criminal justice system, specifically for Hinds

9    County.  There is nothing wrong with obviously addressing crime

10    with reforming criminal justice systems, but to do it in a way

11    that denies the voice of the people of Hinds County is the

12    problem here.  So that's why we are here.

13         When we were thinking about the appropriate defendants, we

14    took into account what this Court had already ruled at that

15    point, and we thought who were the appropriate defendants to

16    include.  As we mentioned in our brief, we routinely sue states

17    for relief, and that is just kind of our usual practice.  Our

18    reply brief, footnote 6, has a long list of cases in the last

19    decade where we have done that.

20             **THE COURT:**  What I'm addressing here is what

21    advantage to this litigation would the United States bring at

22    this point?  And let me just elaborate on that.  Where you

23    already have private plaintiffs who have been traveling down

24    this road for quite some time with their arguments and their

25    perspectives on the law concerning all of these matters.  So at

1    this moment in time, with the United States entering this

2    matter, what would the United States bring to this litigation

3    that's not already present?

4            **MR. RUSS:**  I think what --

5            **THE COURT:**  Or -- I'm sorry.  I have to do that

6    again.  Or promising to elicit later on.  I mean, what would

7    the presence of the United States add to this litigation?

8            Now you can go ahead and answer.

9            **MR. RUSS:**  Thank you, Your Honor.  The Attorney

10   General, in looking at the facts going on in Hinds County,

11   found that this was of general public importance.  He had to

12   certify that.  And it was the judgment of the Attorney General

13   that it was important for the United States to be in this case,

14   that the interest of the United States to vindicate equal

15   protection rights were important.

16       Obviously, we have very talented private plaintiff

17   counsel.  We have experience with equal protection and civil

18   rights claims.  We have experts that we could point to to talk

19   about why we believe the statute violates the Equal Protection

20   Clause.  We have a lot of experience with *Arlington Heights*

21   litigation.

22       And again, Congress understood, when it created 902, there

23   would be private plaintiffs.  By setting it up for the United

24   States to get involved through intervention, Congress

25   understood there would already be other lawyers who could

1    litigate it, but if the Attorney General felt the case was of

2    importance, significant importance, then the United States

3    could intervene, and that is what we are doing here.

4         **THE COURT:** But still, at this juncture, if you are

5    intervening, allowed to intervene, what would you bring to the

6    arguments that would not be redundant with what the original

7    plaintiffs are already bringing?

8         **MR. RUSS:** Certainly we have the ability to sue the

9    State, and I think our case law supports that. There has been

10   the question of can the private plaintiffs get the relief that

11   they need to stop the appointment of the temporary judges if

12   the Chief Justice is no longer in the case. Certainly if we

13   can bring the State in, then that ensures that if this Court

14   agrees that there is a violation, that relief can be granted to

15   stop the appointment of the temporary judges.

16        **THE COURT:** So then was the Court correct in its

17   analysis from the start that the primary reason for the

18   intervention was to bring in the State of Mississippi, which is

19   not in this litigation at this point?

20        **MR. RUSS:** I would not say it's the primary. It is

21   obviously a reason for us to be here. But again, the Attorney

22   General doesn't do these certifications every day. He made the

23   judgment that what is going on with this bill is a significant

24   problem under the Equal Protection Clause. And that is -- so I

25   would not say that adding the State is a primary purpose. It

1   is a purpose, but not -- to me, the main purpose is, we believe

2   there is a serious violation of the Equal Protection Clause and

3   we want to have it addressed.

4        **THE COURT:**  And would you agree with me that by

5   bringing in the State, there would be an indirect address of

6   the Chief Justice's power to make appointments?

7        **MR. RUSS:**  I think that is correct, Your Honor.  If

8   the law is enjoined, then there's nothing for the Chief Justice

9   to -- if the State is enjoined and the law is not in effect on

10  the appointments, then there is nothing for the Chief Justice

11  to do.  I would agree with I think your description.

12       **THE COURT:**  And then what is your position as to the

13  Chief Justice's right to involve himself in this litigation

14  further, even though he is not currently involved, when this

15  indirect end around consideration would impact upon him as an

16  officer of the State of Mississippi and also with his

17  obligations under the statute?

18       **MR. RUSS:**  I don't think we have thought about what

19  our position would be about the role of the Chief Justice going

20  forward.  We have tried not to insert ourselves in that

21  question of declaratory relief, injunctive relief.  I don't

22  believe we have a position.  If the Court wanted to allow him

23  to remain in as a nominal defendant, we take no position on

24  that.

25       **THE COURT:**  And what about other state officials?

1        **MR. RUSS:**  We brought relief against the defendants

2   that we thought were necessary.  We understand private

3   plaintiffs have other defendants that they would like to add.

4   We have no opposition to them amending their complaint.

5        **THE COURT:**  Then this matter of delay, would your

6   intervention cause delay in this litigation?

7        **MR. RUSS:**  I do not believe so, Your Honor, because

8   we are trying to stay out of the motions that have already

9   come.  We would, you know, begin discovery, we would work with

10  the plaintiffs to ensure an efficient presentation of the

11  issues, and I don't believe it would cause further delay.

12       **THE COURT:**  The State says that your intervention

13  allowance would necessarily involve -- not necessarily, but

14  certainly probably involve additional briefing, additional

15  arguments on the -- against the State, and that all of these

16  matters would have an effect upon this litigation moving

17  forward as expeditiously as it could without your intervention.

18  What is your comment on that?

19       **MR. RUSS:**  I would not agree with that.  I know the

20  private plaintiffs have moved to expedite discovery.  We do not

21  oppose that motion.  If the Court wants to move efficiently,

22  will do so.  I think anytime there is an intervenor, there's

23  the potential the intervenor would write their own brief on a

24  particular motion or join the motion or file their own

25  opposition.  I mean, that is the nature of intervention.  But I

 1    don't believe it would delay these proceedings or getting to

 2    the ultimate conclusion about these laws.

 3         **THE COURT:**  How would the interest of justice be

 4    frustrated or prejudiced by your nonintervention if the

 5    Court -- how would the interests of justice be frustrated if

 6    this Court denies your intervention?  How would the -- how

 7    would the country be prejudiced if you are not allowed to

 8    intervene here?

 9         **MR. RUSS:**  I think as Congress recognized with the

10    statute, we have an interest in ensuring that there are not

11    equal protection violations on the basis of race.  And Congress

12    has entrusted the United States, as well as private plaintiffs,

13    through other provisions, 1983, to address these violations.

14    You know, as I said, the Attorney General found this to be a

15    case of general public importance, found this to be a serious

16    problem under the Equal Protection Clause, and so we are taking

17    action to help vindicate that.

18         If down the road, if private plaintiffs for some reason

19    didn't have standing, weren't allowed in the case, we would

20    still be allowed to pursue the case as the Supreme Court

21    recognized in the *Pasadena School Board* case.  So there's a --

22    you never know what might happen down the road.  We would be

23    able to continue the action regardless of what happens with the

24    private plaintiffs.

25         **THE COURT:**  One more time.  What case would you cite

1    that makes a point of your major premises here?

2         **MR. RUSS:**  I would say the case I just cited about

3    the Pasadena School Board.  I have the citation for you,

4    *Pasadena City Board of Education v. Spangler*, at 427 U.S. 424,

5    1976, where the United States -- it authorized the United

6    States to continue as a party plaintiff despite the

7    disappearance of the original plaintiffs.  I mean, if we had no

8    business being in court, the Supreme Court would not have ruled

9    that way.

10        **THE COURT:**  Now, what do you say about the other

11   side's attempted distinguishment of that case?

12        **MR. RUSS:**  Give me a moment to reflect.  I don't

13   remember what they had said about it.  I think they were

14   talking about causes of action, and I think it's a creative

15   argument that the State is raising, but in our complaint we

16   name equal protection as a cause of action.

17        I would say *City of Jackson* from the Fifth Circuit back in

18   the '60s, suggested you might not need a statutory basis to

19   come to court.  We do have a statutory basis here.  We have

20   902, which is our avenue to court.

21        I think in terms of the arguments the State is raising,

22   the *LW* case recently kind of looked at this question about the

23   United States coming in, suing the State.  That's the *LW ex rel*

24   *Williams* case.  And I think that is -- if you are looking for a

25   more recent case, it basically says we have an unconditional

1    right to intervene, and once we are in the case, the ordinary

2    rules for an intervenor would apply.  So I think if you are

3    looking for a recent case that addresses the ability, the

4    authority for the United States to intervene in a case that

5    already has private plaintiffs, that would be one to look to.

6         **THE COURT:**  And then, finally, on a matter I raised a

7    few moments ago, if allowed to intervene, would that

8    intervention enlarge this litigation so much so that it would

9    cause a large delay?

10        **MR. RUSS:**  I do not believe so, Your Honor.  Other

11   than the motion to intervene, presently on the pending motion,

12   we would work carefully with the private plaintiffs to avoid

13   duplication to ensure an efficient operation.

14        I have been involved in other cases with multiple private

15   plaintiffs, and we worked together to make sure to be as

16   efficient as possible with the district judges that we are

17   before.

18        **THE COURT:**  You might have had counsel on your side

19   who wanted to add something.  Did you, when you stood up?

20        **MS. WU:**  No, Your Honor.

21        **THE COURT:**  Okay.  I thought you were standing a few

22   moments ago because you were seeking to rush to the podium to

23   advise, to advise the speaker here that you had another facet

24   to the argument.  That was not a case?

25        **MS. WU:**  No, Your Honor.

1          **THE COURT:**  All right.  Were you just sort of

2     pre-gauging this recess the Court is about to take?  Is that

3     it?

4          All right.  Thank you very much.

5          **MR. RUSS:**  Thank you, Your Honor.

6          **THE COURT:**  As I said earlier, when this argument on

7     this matter, when its reply is completed, the Court was going

8     to take its recess.  We will be in recess for 15 minutes.

9          **(RECESS TAKEN ).**

10         **THE COURT:**  The next matter I want to take up is the

11    matter of the Chief Justice.  Mr. Rhodes, you have campaigned

12    to keep the Chief Justice in this lawsuit.  I have heard

13    arguments from you as to why he should remain in the lawsuit,

14    notwithstanding the Court's order on judicial immunity, you

15    maintain that because he was sued in more than one capacity,

16    that this Court's order on judicial immunity primarily

17    concerned only one aspect of your complaint and not another

18    aspect about which you were raising claims so that he should

19    still remain in the lawsuit on that other matter.

20         Now, that judicial immunity opinion I crafted says that

21    he's immune from suit, and if that's the case, why shouldn't

22    that holding be expansive enough to address everything in your

23    complaint that concerns the Chief Justice?

24         So would you go to the podium and make your argument on

25    that or -- I think you were the one who raised the argument.

1    Now, if I'm wrong and someone else is prepared to go forward,

2    then I will hear it from that person.

3        So Mr. Rhodes, am I wrong that that was your argument or

4    was that co-counsel's argument?

5          **MR. RHODES:**  Your Honor, you are right except I don't

6    think I was that persuasive, so that's why we are going to let

7    co-counsel make this argument at this time.

8          **THE COURT:**  Okay.  And Mr. Shannon, will you be

9    responding to this?

10         **MR. SHANNON:**  Your Honor, I will be happy to make any

11    response on behalf of the State, if a response is necessary.

12         **THE COURT:**  And in addition to Chief Justice's -- the

13    Chief Justice's attorney, you will make a response too?

14         **MR. SHANNON:**  Well, I'm not real clear at this point

15    what the plaintiffs intend to present to the Court right now.

16    I don't know if there is a pending motion --

17         **THE COURT:**  Then after you all have heard it, you all

18    can tell me who wishes to make the response.

19         **MR. SHANNON:**  All right.

20         **THE COURT:**  Thank you.

21         **MR. NED NELSON:**  Your Honor, any arguments on behalf

22    of the Chief Justice, I will be making.

23         **THE COURT:**  Thank you.

24       Now, then, how much time do you think you need on this

25    argument?

1    **MR. CLINE:**  Your Honor, if I may cover the entirety

2    of the argument, I think it would be 45 minutes.

3    **THE COURT:**  I don't need that much time.  So you

4    don't have to cover, as you said, the entirety of the argument.

5    But the part of the argument which addresses judicial immunity

6    and whether that judicial immunity grant that's recognized by

7    this Court is expansive enough to cover the claims that are

8    made in the complaint in toto, that is what I need addressed.

9    **MR. CLINE:**  Yes, Your Honor.

10    So without rehashing too much of what we discussed at the

11    prior hearing on June 14th, the reason that Your Honor's order

12    was only addressing Section 1 of HB 1020 and only injunctive

13    relief under that claim was that counsel for the Chief Justice

14    read plaintiffs' claim -- plaintiffs' complaint to only include

15    that one single claim, so that was the one thing that he

16    attacked in their motion to dismiss, as I discussed previously,

17    and that is what Your Honor picked up on and ruled on in that

18    order on June 1st.

19    So I pointed out previously at footnote 2, Your Honor

20    says, This order is limited solely to Section 1.  On page 6 of

21    Your Honor's order, you quote in full the language from Section

22    1.  And then on page 11, Your Honor says it's addressing

23    plaintiffs' request to enjoin preliminarily and permanently the

24    Chief Justice from making those appointments under Section 1.

25    So that was the only argument raised previously, and that

1    was the only argument that Your Honor addressed.  So we

2    previously moved for clarification of Your Honor's order

3    because we believed that we had adequately pleaded these other

4    claims in the complaint.  And I explained previously how we

5    thought that we had done so adequately.

6         We have now moved for leave to amend the complaint to

7    provide extra clarity to avoid any possible ambiguity there.

8    We have added the Chief Justice's name where relevant in those

9    two counts, and we've clarified the prayers for relief so that

10   there is no ambiguity and we can proceed on those other claims

11   against the Chief Justice.

12        **THE COURT:**  But why would not any attempt to amend be

13   an act in futility when the Court has already ruled that he has

14   judicial immunity?

15        **MR. CLINE:**  That's because the judicial immunity

16   question is a claim-by-claim function-by-function analysis.

17   Your Honor's order said judicial immunity is a fact-intensive

18   inquiry.  The Supreme Court in the *Forester v. White* case has

19   said that -- if I can find the quote here, "Judicial immunity

20   is justified and defined by the functions it protects and

21   serves, not by the person to whom it attaches."

22        And under the standard of review here, the Chief Justice

23   bore the burden of proof for each function at issue.  So we had

24   one function at Section 1, another function at Section 4.

25        **THE COURT:**  So then tell me what the distinctions are

1    between 1 and 4 that, in your argument, would affect this

2    Court's determination of judicial immunity.

3                **MR. CLINE:**  Yes, Your Honor.  So under Section 1,

4    counsel for the Chief Justice argued and Your Honor agreed that

5    both Section 1 of HB 1020 and preexisting Mississippi law,

6    Mississippi Code 9-1-105, allow the Chief Justice to make

7    special temporary circuit judge appointments.  So as part of

8    the judicial immunity analysis, Your Honor looked to that and

9    found that the appointment of special temporary circuit judges

10   was a normal judicial function, and therefore the Chief Justice

11   enjoys judicial immunity as to a claim for injunctive relief.

12       You said this at page 21 to 22 or your order.  You said,

13   "Both allow the Chief Justice to appoint special temporary

14   circuit judges."  Section 4 does not involve special temporary

15   circuit judges.  It does not involve any judge who is listed in

16   9-1-105.  It involves a new type of judge, a CCID inferior

17   court judge who is given authority equal to a municipal court

18   judge.  And in the state of Mississippi, a municipal court

19   judge has never been appointed by the Chief Justice.

20       The Chief Justice previously submitted a table of

21   statistics showing the over 1500 prior judicial appointments he

22   had made.  Not one of those appointments was a municipal court

23   judge.  Mississippi Code 21-23-3 and -9 explain that municipal

24   court judges and the alternates, these temporary judges,

25   municipal court judges pro tem, they are both selected by the

 1    governing authorities of the municipality.  So that is the city
 2    council, that is the mayor, or that is both.  They are never
 3    selected by a judge, and they are never selected by the Chief
 4    Justice himself.
 5          The Chief Justice and his counsel, notably, in over six
 6    pages of briefing across over I think seven filings now has not
 7    once tried to argue that judicial immunity would cover the
 8    Section 4 claim.  They have never tried to carry their burden
 9    on that.  They have never pointed to any reason why finding
10    Section 1 judicial immunity would apply to a different function
11    for a different type of judicial appointment under Section 4.
12          So that argument has been waived repeatedly.  That
13    argument was not recognized in the original motion to dismiss.
14    There was no acknowledgment of our Section 4 claim.  So either
15    that claim was part of our case generally and we adequately
16    pleaded it in our original complaint, in which case we think
17    that the motion for clarification would be appropriate, or if
18    there is any ambiguity there, we have cured that ambiguity by
19    pleading this new first amended complaint where we've, as I
20    mentioned, clarified where the Chief Justice is listed as a
21    defendant and that leave to amend should be granted to resolve
22    that ambiguity.
23          **THE COURT:**  And a proposed amended complaint, you
24    would be only attacking the judicial immunity holding under
25    Section 4; is that correct?

1          **MR. CLINE:**  Well, we wouldn't be attacking the

2     judicial immunity holding under Section 4 because there was no

3     judicial immunity holding --

4          **THE COURT:**  Okay.  But you are only addressing

5     Section 4?

6          **MR. CLINE:**  So we would primarily be addressing

7     Section 4, where because there is no judicial immunity, we can

8     proceed as to injunctive and declaratory relief.  We would also

9     be pursuing a Section 1 claim for declaratory relief for which

10    the Chief Justice's counsel has now belatedly abandoned the

11    prior argument that they were making at the June 14th hearing.

12    They have a supplemental filing, ECF 66, at page 1, they now

13    say, "Plaintiffs correctly note that Section 1983 does not

14    expressly bar purely declaratory relief against a state court

15    judge."  So they have now abandoned the prior argument that we

16    cannot get declaratory relief due to judicial immunity.  So we

17    think we should be able to proceed on that Section 1 claim for

18    declaratory relief as well.

19         **THE COURT:**  Explain how you see the definition of

20    judicial act as not embracing this matter of the latter

21    judgeship that is still outstanding.

22         **MR. CLINE:**  Is Your Honor referring to the Section 4?

23         **THE COURT:**  Section 4, yes.  So talk to me about your

24    definition of judicial act.  Why would that be a judicial act

25    under the statute?

1          **MR. CLINE:**  So I would point the Court to *the Davis*

2     *v. Tarrant County* case that we covered it in the briefings --

3     this is going back to the motion to dismiss papers.  Both sides

4     have cited this Fifth Circuit case.  Footnote 3 of that case

5     cites approvingly the case *Lewis v. Blackburn*.  In that case,

6     the Fifth Circuit described -- held that a state court judge's,

7     quote, appointment of magistrates is a ministerial act.  So not

8     every judicial appointment, as the Fifth Circuit has

9     recognized, will be a judicial act.  Some appointments of

10    particularly inferior court judges will be a nonjudicial act.

11         And a court, a district court following the *Davis v.*

12    *Tarrant County* case, *Watts v. Bibb County*, which we've also

13    covered in our briefs, that case subsequently agreed with *Davis*

14    *v. Tarrant County*, and said, yes, an appointment of a

15    magistrate judge is a ministerial act in a state court system

16    that does not enjoy judicial immunity.

17         So here, again, like I said, we are talking about an

18    inferior court judge, the municipal court judges there -- this

19    is not the superior court judge, like a circuit or a county

20    court.  This is a municipal court, so a lower level judge.

21    Those judges are a different type of action, an appointment,

22    and there has been no argument to the contrary.

23              **THE COURT:**  How do you define ministerial?

24              **MR. CLINE:**  I'm sorry.  What was the question?

25              **THE COURT:**  How do you define ministerial?

1          **MR. CLINE:**  Ministerial.  Well, ministerial is one

2     type of nonjudicial action.  It's ministerial, administrative.

3     I think those are maybe equivalent.

4          **THE COURT:**  Are you defining it as simply the

5     negative of judicial?

6          **MR. CLINE:**  I think for these purposes, that is all

7     that is relevant, Your Honor.

8          **THE COURT:**  So then you are saying that if it is not

9     a judicial act, then it is a ministerial act?  Is that what you

10    are saying?

11         **MR. CLINE:**  I think that is fair to say.

12         **THE COURT:**  And then are you further saying that if

13    it's not a ministerial act, it is a judicial act?

14         **MR. CLINE:**  I think for these purposes, we can take

15    that assumption.  I think there are other types of acts that

16    are nonjudicial.  There are legislative acts.  There are

17    executive.  There are enforcement type of acts.  These are all

18    just ways of distinguishing what is a judicial act from a

19    nonjudicial act.

20         The core of the judicial acts, Your Honor, are

21    adjudicatory acts.  These are acts that counsel for the Chief

22    Justice has raised as kind of a pivot argument now.  They are

23    going back to their standing arguments.  They are focusing not

24    on judicial acts more broadly but on the narrow subset that is

25    adjudicatory acts.  That is the heart of judicial immunity.

1    You are not allowed to sue the judge presiding over your case

2    in court, even if you believe he has violated your rights.

3         We are way outside of the bounds there once we start

4    getting into the selection, the appointment of a CCID inferior

5    court judge, which is not based on findings of fact, not based

6    on determinations of law, not based on one party bringing a

7    petition or a claim or cause of action, complaint, and having

8    another party on the other side and adjudicating the dispute

9    between those two parties.  So we are well outside the

10   heartland of what a judicial and adjudicatory act is, and I

11   don't believe we are within even a broad construction of the

12   term "judicial act."

13        But consistent with *Davis v. Tarrant County*, consistent

14   with *Watts v. Bibb County*, the appointment of an inferior court

15   judge, who has never previously been appointed by the Chief

16   Justice before, that that is not a judicial function, that it's

17   not a normal judicial act.  It is unprecedented in the state's

18   history, as far as we are aware.  And for those reasons, he

19   does not enjoy judicial immunity over that action.

20        **THE COURT:**  Can you narrow down the elements of what

21   celebrates or what separates these two definitions, ministerial

22   versus judicial?  Do you have a test for that?

23        **MR. CLINE:**  I have not come across a test in the case

24   law.

25        **THE COURT:**  Well, then, do you have a test that you

1    could distill from case law?

2         **MR. CLINE:**   I think the test that I would distill is

3    the appointment of a judge who is inferior to a superior court

4    judge of general jurisdiction is not a judicial act.  I think

5    all that matters is the narrow question that we have here.  I

6    don't have a grand theory of how a ministerial act can be

7    defined or not defined.  All I know is, based on Fifth Circuit

8    law and cases applying Fifth Circuit law, the only cases we

9    have found on either side are in agreement that this type of

10   action that we have here is not a judicial act.  There is no

11   precedent for it.  It doesn't fit within the test.  There has

12   been no argument to the contrary.

13       I believe that counsel -- the Chief Justice's able

14   counsel, across seven filings, would have mentioned an argument

15   by now if there were an argument to the contrary.  We have yet

16   to see that from them.

17       **THE COURT:**  Thank you very much.

18       **MR. CLINE:**  Your Honor, may I cover some of the other

19   issues within the motion for leave to amend concerning the

20   Chief Justice or --

21       **THE COURT:**  Go ahead, then.

22       **MR. CLINE:**  Okay.  So just another point that I would

23   raise just in terms of clarifying the posture we are in here.

24   As I mentioned, Your Honor's order was operating on the

25   assumption that only that Section 1 claim for injunctive relief

1    was at issue in this case because that's all that had been

2    challenged.  Just to refresh Your Honor's recollection, that

3    was because plaintiffs had previously filed a TRO motion only

4    on Section 1, only seeking injunctive relief, and that was the

5    motion to dismiss that was filed in response.  They raised

6    arguments attacking just that claim as well as complete

7    dismissal from the case, arguments that Your Honor did not

8    address, did not adopt.  There were public policy reasons,

9    reasons of the Chancery Court assuming jurisdiction over this

10   case.  Those arguments we have argued against.  They don't work

11   in this case.  So all that was actually attacked was Section 1

12   for injunctive relief.

13        And also, proceeding forward on this motion for leave to

14   amend would be adequate to proceed against the Chief Justice on

15   those claims.  As I mentioned, there's a dispute about whether

16   they were in the case before.  We think clarifying in the

17   complaint can do that.  And I would point to just that there is

18   Fifth Circuit language that is clear that a district court's

19   conclusion must be read in light of the arguments presented to

20   it by the parties.  We think that is the situation that we have

21   here and that that confusion was understandable but that we can

22   proceed on the understanding that we have those claims in the

23   case on the amended complaint.

24        I could respond to the leading cases from opposing

25   counsel, but if Your Honor would like, I can sit down and

1    address the ones that he raises in response.

2           **THE COURT:**  One other question I have, though, before

3    you do sit down.  The length of time this TRO has been waged

4    against the Chief Justice, does that cause you any heartburn

5    that it's been awhile for that TRO to have been in existence?

6           **MR. CLINE:**  It does not, Your Honor.  My co-counsel,

7    Mr. Lynch, will speak to why a TRO enjoining the effectiveness

8    of Section 1 is appropriate in this case.  We just view the

9    matter of who that is directed to as a procedural matter,

10   whether it applies to the Chief Justice who is issuing that

11   appointment or to the judges who have not yet accepted their

12   appointments, currently are just private citizens, whether it

13   prevents them from accepting those offers, or whether if the

14   State were to come in and the State as a whole is enjoined, the

15   bottom line is we believe that an injunction is appropriate in

16   this case, that the statute is unconstitutional, and that it

17   should be prevented from going into effect, because as soon as

18   it does take effect and as soon as the TRO is lifted,

19   plaintiffs' constitutional rights will be violated.

20      So we would like to preserve the status quo.  We have no

21   heartburn over the amount of time the TRO has remained in

22   place.  We have a pending preliminary injunction motion against

23   the Chief Justice, but like I said at the start, we are just

24   trying to orient those briefing toward the proper defendant in

25   this case:  If Your Honor doesn't believe that that is the

1   Chief Justice, notwithstanding some of the issues that I
2   discussed previously on June 14th, we think there are ways.  We
3   discussed a tentative declaratory decree, or if that wasn't
4   available, that that would mean under the 1983 exception to the
5   exception that declaratory relief was unavailable, therefore
6   injunctive relief becomes available again.

7        So there are these statutory complexities in this case
8   that we believe could make an injunction against the Chief
9   Justice appropriate.  But given that we have a motion for leave
10  to amend on file now, we think the simplest thing to do, going
11  forward, would be to grant that, grant the replacement TRO
12  there that we'll discuss later on today, and that the status of
13  the existing TRO is of no moment in this case.

14       **THE COURT:**  All right.  Thank you.  I want to hear
15  now from the co-counsel making the argument about the other
16  aspect concerning the Chief Justice.  So go ahead.  Make your
17  argument.

18       **MR. CLINE:**  Concerning the Chief Justice or
19  concerning the John Doe --

20       **THE COURT:**  The Chief Justice and the John Does, the
21  whole thing.  Go ahead.

22       **MR. LYNCH:**  Thank you, Your Honor.  Mark Lynch for
23  the plaintiffs.  Thank you, Your Honor, for the privilege of
24  appearing here.  We appreciate your courtesy in hearing from us
25  out-of-towners.

1          Our objective has been from the start and remains getting

2      an injunction that will prevent the appointments from being

3      made, because if they are made, then our theory of harm to

4      equal protection rights kicks in.  And I believe the Court has

5      recognized that by having granted a TRO earlier.

6          Now, because HB 1020 directed the Chief Justice of the

7      Mississippi Supreme Court to appoint four temporary special

8      judges to the Hinds County Circuit Court within 15 days of the

9      passage of the act, we had to move quickly, and we filed that

10     first TRO.  Then the state court entered an injunction for a

11     few days, so this Court didn't have to act.  But then that

12     state court order was removed, lifted, and the issue became

13     ripe again in this court, and we filed our second motion for a

14     TRO.

15         Now, the Court granted both of our motions for a TRO, and

16     they remain in effect.  But then after the TRO had been

17     granted, the Court issued its order on immunity.  And the Court

18     said, as we have discussed, that the Chief Justice enjoys

19     judicial immunity for making appointments under HB 1020 to the

20     Hinds County Circuit Court.

21         Now, our proposed first amended complaint primarily adds

22     alternative defendants to prevent the judicial appointments in

23     the event that the Court lifts the current TRO against the

24     Chief Justice.  The urgency of this situation with respect to

25     the appointments to the Hinds County Court --

1          **THE COURT:**  Now, Counsel, let me interrupt you here

2    for just a moment.  Why shouldn't the Court lift that TRO

3    against the Chief Justice?

4          **MR. LYNCH:**  Why should it?

5          **THE COURT:**  Why should it not lift that TRO at this

6    point?

7          **MR. LYNCH:**  If the Court accepts the procedure we

8    have proposed through our amended complaint, you can do that.

9    We will have no complaints about that.  We are seeking an

10   alternative way to prevent the appointments from taking place

11   without having to implicate the Chief Justice.  That's the

12   primary -- there are several points, but that is the primary

13   point of our motion to amend the complaint.

14         **THE COURT:**  Because by not enjoining the Chief

15   Justice, you are saying that the Court instead can enjoin the

16   appointees --

17         **MR. LYNCH:**  Yes.

18         **THE COURT:**  -- from taking office?

19         **MR. LYNCH:**  Yes.

20         **THE COURT:**  Therefore, you do not have to wage any

21   struggle against the Chief Justice, but instead, you would be

22   focusing upon any appointees that he might name.

23         **MR. LYNCH:**  That is precisely right with respect to

24   the Hinds County Circuit Court.  As Mr. Cline explained, the

25   appointment of the CCID judge, this inferior municipal court

1    type judge stands on a different footing.  But if you decide
2    against us on that, the addition of the -- we have a Doe
3    plaintiff that was a place holder for the CCID appointee, and
4    that would be covered under the same theory that we would be
5    covering ourselves with respect to the Hinds County Circuit
6    Court.

7                **THE COURT:**  And towards that end, you have caused an
8    ad to be placed in the *Clarion Ledger*?

9                **MR. LYNCH:**  Yes.  You know, under Rule 65(b) dealing
10   with temporary restraining orders, temporary restraining orders
11   can be issued without notice, but we did place that ad in an
12   attempt to provide as much notice as we can that we are seeking
13   to enjoin the appointees.  And if you grant the TRO, we will
14   get that order published in the *Clarion Ledger*.  And we will
15   also ask you, as a further additional step, please direct the
16   director of the office, the administrative office of the
17   courts, Mr. Greg Snowden, to please ask him to give a copy of
18   the TRO to the appointees before they take the oath of office.

19       So while 65(b) permits TROs to be issued without notice,
20   we have a number of steps here to make notice before the event
21   happens.

22               **THE COURT:**  Do you have any direct authority where
23   this course of action has been followed before?

24               **MR. LYNCH:**  Well, we have cited a case, district
25   court case from Louisiana, obviously in the Fifth Circuit, that

1   says that it's been a long established practice that parties

2   can name John Doe defendants when the identity of the defendant

3   is not yet known.

4        Now, it's true we don't know the identity of the Doe

5   defendants, but they are very clearly defined.  They are the

6   people that the Chief Justice will appoint.  So the Doe

7   function is well established, and in fact, I don't think the

8   State has really made much of an attack on our use of the Does.

9   They have other arguments.  Maybe I had better leave it there

10   and see what questions you have next.  I don't want to

11   interrupt the Court's train of thought.

12        **THE COURT:**  No, I'm fine.  Go ahead.

13        **MR. LYNCH:**  So in terms of the authority for this, it

14   is also the case that the Fifth Circuit has held, and we have

15   cited the case in our papers, that a preliminary injunction,

16   Rule 65(a), can be issued before service of process.  The State

17   claims that you can't enjoin the Does because they're not part

18   of the case yet.  But for purposes of a preliminary injunction,

19   and if it's all right for a preliminary injunction, it is

20   certainly all right for a temporary restraining order, service

21   is not necessary.  In other words, a temporary restraining

22   order can run against non-parties.  That's well established, I

23   believe.

24        **THE COURT:**  And again, what is your best case on

25   that?

1          **MR. LYNCH:**   The best case I will give you in a

2     moment.   The case on the use of Does is *Vega versus Gusman*,

3     2022 Westlaw 912232, and that says, "It has long been an

4     accepted practice to allow claims against an unknown defendant

5     to be amended to identify the defendant when his identity is

6     discovered."   So the identities of the Does will be discovered

7     when the Chief Justice announces who they are.

8          And we are asking for a TRO to be put into effect before

9     the oath of office can be administered so we will have a

10    seemless transfer from the old TRO to this new TRO that we are

11    seeking.

12         And on the other point I made about Rule 65, the Fifth

13    Circuit held in *Corrigan Dispatch versus Casa Guzman*, 569 F.2d

14    300, that it is not grounds for reversal of a preliminary

15    injunction that the trial court's interlocutory order was

16    issued prior to the time that the defendant was made a party by

17    substitute service of process.   Rule 65(a) does not require

18    service of process.   And that was at page 302 of this decision

19    at 569 F.2d from the Fifth Circuit.

20         **THE COURT:**   Okay.   Continue your argument.

21         **MR. LYNCH:**   All right.   Now, Rule 15(a) provides that

22    amendments shall be granted, freely granted, when justice so

23    requires.   Now, we think that justice requires this amendment.

24    We, as I pointed out, we had -- the Court had issued a TRO

25    enjoining the Chief Justice, but then the immunity issue popped

1    up.  After the TRO had been issued, the Court reached its

2    ruling that the appointment of the Hinds County judges was a

3    judicial act.

4         Now, we disagree with that respectfully, Your Honor, but

5    we haven't challenged that.  We are not trying to relitigate

6    that.  The Court made that ruling, and what we are doing is

7    coming up with an alternative that allows us to go forward to

8    prevent the harm which we seek to avoid, which is the

9    appointment of nonelected judges to the circuit court.  So

10   justice requires this.

11        And I think the logic of the Court's earlier TROs compels

12   that result.  You found that the status quo should be

13   maintained so that the harms that we claim would not befall the

14   plaintiffs.  And the same logic would apply to the current

15   request for a TRO.  The only thing that is different, it's not

16   against the Chief Justice, it is against the Does, who are

17   amenable to enjoy any immunity as long as they are civilians.

18   They don't get any immunity.  They are not clothed with

19   immunity.  You pointed this out in your June 1st ruling.  They

20   are not clothed with immunity until they assume office.  So

21   they can be -- if they are enjoined prior to taking the oath,

22   there's no immunity problem.

23        So justice requires, as Rule 15(a)(2) says, and then you

24   go on to the question is there any reason to deny the motion

25   for amendment.  And here we would submit that there is no good

1    reason to deny the amendment.

2          And those -- I'm sorry, Judge.  I'm jumping around here

3    because --

4          **THE COURT:**  I know I might have moved you around by

5    asking questions.

6          **MR. LYNCH:**  And I would much rather answer your

7    questions than talk.

8          **THE COURT:**  Take your time.

9          **MR. LYNCH:**  All right.  The arguments for denying the

10   amendment are -- well, let me go back.  Let me go back to what

11   the Fifth Circuit has said on this, because I wanted to get

12   back to Rule 15.  The Fifth Circuit said in *Lyn-Lea Travel*, 283

13   F.3d at 286, that a motion for leave to amend the complaint may

14   only be denied for a substantial reason.  And it gave the -- in

15   the *Thomas* case, *Thomas versus Chevron*, 832 F.3d 386, the Court

16   gave the following examples:  Undue delay, bad faith or

17   dilatory motive on the part of the movant, repeated failure to

18   cure deficiencies by amendments previously allowed, undue

19   prejudice to the opposing party by virtue of allowance of the

20   amendment, or futility of the amendment.  None of these reasons

21   apply in this case.  There is no reason, let alone a

22   substantial reason, to deny the motion for leave to amend.

23         Now, in their opposition, the defendants -- the State

24   defendants argue that the plaintiffs lack standing to challenge

25   the judicial appointments, and therefore the proposed amendment

1    is futile.  The State defendants assert that they will be

2    prejudiced by further proceedings over an injunction against

3    the judicial appointments, and the plaintiffs have unduly

4    delayed moving to amend.

5         Now, I will address these three points in order, but first

6    let me make a threshold point.  The State defendants don't have

7    standing to make those arguments.  These arguments are for the

8    new defendants to make, if they choose to make them, when they

9    are brought in.  I assume they will make them because they will

10   be represented by the Attorney General.

11        As the State defendants concede at page 3 of their

12   opposition to the motion for leave to amend, the Fifth Circuit

13   in *United Planters*, 687 F.2d 117, "Courts considering whether

14   to grant leave to amend should ask whether the amendments will

15   cause, among other things, prejudice to the opposing party."

16   The opposing party.

17        So in opposing a motion for leave to amend, a defendant

18   may only raise those defenses that are personal to that

19   defendant, rather than to a proposed new defendant who at this

20   point is a nonparty.  Here, the State defendants are the

21   Attorney General, the Commissioner of Public Safety, and the

22   chief of the Capitol Police.  The proposed amendment does not

23   relate to these three officials at all.  They are not named in

24   Counts 1 or 2 of the -- I'm sorry, Counts 2 or 3 of the

25   complaint, which deal respectively with the Section 1

1    appointments to the Hinds County Court and the Section 4

2    appointments to the inferior CCID court.

3         Now, in our reply we have cited two cases that make this

4    point, the first is *Bell versus Reeves*, 219 Westlaw 4305814, in

5    the Eastern District of Louisiana, and there the Court said,

6    "In the present matter, the defendants raise futility on behalf

7    of the proposed new defendants.  It is unclear on what basis

8    the defendants have standing to raise such arguments.

9    Moreover, at this stage arguments concerning futility are

10   premature and may be raised by the proposed new defendants when

11   they make their appearances."

12        And secondly, in a case called -- this is a tough one to

13   pronounce, *Ntakirutimana* -- let me pronounce that for the court

14   reporter, N-T-A-K-I-R-U-T-I-M-A-N-A -- *versus Community Health*

15   *Service*.  This is 2012 Westlaw 12894294, in the Southern

16   District of Texas.  And there the Court said, "The original

17   defendants' attorneys should not have raised personal defenses

18   on behalf of the new defendants in an attempt to obtain a

19   ruling that the plaintiffs should be denied leave to amend to

20   add the new defendants."

21        So here the proposed first amended complaint makes no

22   material changes to the claims and allegations against the

23   original State defendants, the Attorney General, the

24   Commissioner of Public Safety, and the Chief of the Capitol

25   Police.  And they don't contend otherwise.  The defendants

1    haven't contended otherwise.  Therefore, they should not be

2    heard to complain about alleged prejudice to the parties we

3    propose to add or to nonparties or to the general public.

4         The two cases that the State defendants cite in support of

5    their argument that Count 2 of the proposed amended complaint

6    should be dismissed for lack of standing are inapposite because

7    they involve amendments directed at the original defendants who

8    had standing to assert futility, rather than as here, the new

9    defendants, and the current defendants don't have standing to

10   raise their arguments.

11        Those two cases -- so new defendants must make their own

12   futility argument.  They can't be made on behalf of the new

13   defendants by the current defendants when the claims are not

14   made against the current defendants.  The two cases are *Moore*

15   *versus Bryant*, 853 F.3d 245, Fifth Circuit, and *Kasprzak versus*

16   *American General Life*, 942 F.Supp. 303, from the Eastern

17   District of Texas.  And those cases stand for the proposition

18   that when the amendments are directed against new defendants,

19   the current defendants aren't the parties to raise the futility

20   argument.  The current defendants may raise futility against

21   claims brought against them but not claims brought against the

22   new parties.  And the State defendants' opposition has missed

23   this important distinction.

24        Now, the State also, the State defendants claim that the

25   State of Mississippi will somehow be prejudiced by allowing

1  plaintiffs' first amended complaint.  That claim does not bear

2  on the motion for leave to amend because the State and the

3  public at large are not parties to the proposed first amended

4  complaint.

5      So the bulk of the State defendants' arguments in

6  opposition to plaintiffs' motion to amend are not properly

7  before Court.  They are not the right parties to be advancing

8  those arguments.  Those defenses are, at best, premature, and

9  they may be raised only by the parties to whom they belong and

10  only after the plaintiffs are granted leave to amend, which

11  will bring those proposed new defendants into the case.

12      Now, nonetheless, I will go ahead and address those

13  arguments on the merits, even though they were not properly

14  raised.  And here we go back to the text of -- or to the law of

15  Rule 15 -- I'm sorry, the rule -- go back to the law of Rule

16  15(a)(2), that a motion to dismiss -- an amendment is not

17  futile -- excuse me.  I mixed this up.  An amendment is not

18  futile if it would fail to survive a Rule 12(b)(6) motion to

19  dismiss.  And that's the *Thomas* case which I previously cited.

20  Here the proposed first amended complaint passes that test.

21      Now, first the defendants, the State defendants, claim

22  that the plaintiffs lack standing.  To have standing to

23  challenge a state law, a plaintiff must show an injury in fact

24  to the plaintiff that is concrete, particularized, and actual

25  or imminent; two, the injury was caused by the defendant; and

1    three, the injury would likely be redressed by the requested

2    judicial relief.  A recent Fifth Circuit on that case is *Texas*

3    *Democratic Party versus Abbott*, 978 F.3d 168, and that case

4    reflects a lot of Supreme Court -- very consistent with the

5    Supreme Court rulings on standing.

6         Now, plaintiffs claim that judicial appointments violate

7    the Equal Protection Clause plainly satisfies the injury

8    requirement.  I don't think there's any serious dispute about

9    that.

10         As we explained in our preliminary injunction briefing,

11    the challenged laws will imminently deprive plaintiffs of the

12    right to elect their judges, which is a right that is available

13    to every other -- the citizens of every other county in

14    Mississippi, and it will impair their rights as voters and

15    interests as residents by depriving and diluting their voting

16    rights, stigmatizing them as less worthy participants in the

17    political community.

18         The same is true of HB 1020 Section 4's appointment of the

19    CCID prosecutors because municipal court judges are to be

20    appointed by governing bodies of the jurisdiction, as Mr. Cline

21    pointed out.

22         Now, as the causation and redressability, the Fifth

23    Circuit has held also in the *Texas Democratic Party* that it is

24    enough to confer standing to sue a government official who has

25    a role in the claimed injury, and he is in a position to

1    redress the injury at least in part.

2         Now, clearly, the individuals who would accept the

3    appointments to the bench play a role in causing the alleged

4    injury.  And just as clearly, the plaintiff's injury arising

5    from unlawful appointments can be averted, i.e., redressed, by

6    an order enjoining Does 1 through 5 from accepting appointment

7    and taking the oath of office as a Hinds County Circuit Court

8    or as the CCID court judge.  And Does 6 and 7 can also -- the

9    injury will also be redressed if Does 6 and 7 are enjoined from

10   accepting appointment as the CCID prosecutors and by preventing

11   them from taking the oath of office.

12        Now, the State defendants' principal point about standing

13   in their opposition to our motion for preliminary injunction

14   that they incorporate by reference here was that because Chief

15   Justice Randolph is no longer a party to the action, there is

16   no longer anyone with subject power of appointment who is left

17   to enjoin in this case, and that, therefore, plaintiffs could

18   not show how any purported injury is redressable given the

19   Chief Justice's dismissal.

20        So what we are doing is presenting an alternative way to

21   stop the appointments without the Chief Justice.  And granting

22   leave to file the first amended complaint will add defendants

23   who have no immunity before they take the oath of office and

24   who are enjoined from taking the oath of office or otherwise

25   assuming the office will redress plaintiffs' injuries.

1          Now, another point that the State defendants made

2     prominently in their prior briefing that they incorporate by

3     reference is that plaintiffs have not alleged an injury that is

4     actual and imminent.  They cite *Clapper versus Amnesty*

5     *International*, 133 S.Ct. 1138 for that proposition.  But to the

6     contrary, if the current TRO is lifted, the Chief Justice will

7     be certain, as certain as can be, absent some catastrophic

8     event, tornado or the earth is hit by a meteor, it is as

9     certain as it can be that if the TRO is lifted, the Chief

10    Justice will do what the statute tells him to do, which is to

11    make these appointments, because he is required by HB 1020 to

12    do that.  In fact, he could do it within minutes of the TRO

13    being lifted.  That is as actual and imminent and certain a

14    future injury can be if the TRO is lifted.  But if the Court

15    grants the motion to bring the Does in as defendants and issues

16    a TRO against them, then that injury will be averted.

17         I've already pointed out there's no immunity issue here

18    because the immunity does not kick in until they assume the

19    bench and they start performing the roles of judges.  And if

20    they are enjoined from accepting the appointment, from taking

21    the oath of office, they will not be clothed with any judicial

22    immunity at that point.

23         And the same is true for Does 6 and 7, who are the place

24    holders for the CCID prosecutors, and Section 1983 does not

25    recognize prosecutorial immunity -- excuse me, Section 1983

1 does not recognize prosecutorial immunity from prospective

2 relief.  The Fifth Circuit has held that in *Reed versus Goertz*,

3 995 F.3d 425.  That case said prosecutorial immunity applies

4 only in lawsuits for damages, not for prospective relief.  That

5 case, by the way, was reversed on other grounds by the Supreme

6 Court, but on other grounds.

7      Now, the second argument that the State defendants make

8 against the motion for leave to amend, and again, I believe

9 this is an argument that they really don't have standing to

10 make but we will address it anyway, is that they allege -- they

11 assert that the plaintiffs have unduly delayed in moving to

12 amend the complaint.  There's been no undue delay here, Your

13 Honor.  The plaintiffs filed their motion to amend three and a

14 half months after they filed the complaint.  In *De La Garza*

15 *Gutierrez versus Pompeo*, the Fifth Circuit held that there was

16 no undue delay in moving to amend when the case was less than 6

17 months old.  So we are clearly in the zone that's acceptable

18 for motions for leave to amend.

19      The State defendants also cannot complain about the first

20 amendment complaint against certain defendants as a means to

21 obtain the relief that we seek on our constitutional claims if

22 Chief Justice Randolph is unrestrained from making the

23 appointments.  Those aren't arguments for the State defendants

24 to make.

25      Defendant Randolph, for his part, has maintained

1   throughout this litigation that the plaintiffs should seek

2   relief against other parties, while the remaining defendants

3   have argued that they are not the proper defendants.  So what

4   we have done is we have answered both of those arguments.  We

5   have now proposed to bring in defendants who are proper and

6   resolved the complaints that have been made previously against

7   the way we set the complaint up.

8       The limited edits to the allegations regarding the State

9   defendants are really just minor typographical exchanges and

10  are not the kind of change that really makes any -- or presents

11  any grounds for denying a leave to amend.

12      Then the State plaintiffs go on to argue that the motion

13  for leave to amend should be denied because we have engaged in

14  piecemeal litigation and waited too long to move to amend.

15  This charge is without merit, Your Honor.  The plaintiffs'

16  first amended complaint will not require the existing TRO

17  against Defendant Randolph to be in place any longer than

18  necessary to issue the new TRO against the Doe defendants 1

19  through 4.  Indeed, the very point of the proposed first

20  amended complaint is to present nonimmune defendants for

21  injunctive relief on Count 2 if the TRO against Defendant

22  Randolph is lifted.

23      If anything, allowing the first amended complaint and

24  granting the motion for a TRO could facilitate the Court's

25  resolution of Defendant Randolph's insistence that the TRO

1    against him be lifted while still maintaining the status quo by

2    allowing the proposed new defendants to be enjoined instead.

3         And furthermore, even if the Court did extend the TRO or

4    grant a new one, that is not a cognizable injury that would

5    support a claim of undue prejudice because a party cannot be

6    harmed by being prevented from violating the Constitution.  The

7    Fifth Circuit held that in *Deerfield Medical Center*, 661 F.2d

8    328.

9         Furthermore, the premises of the prejudice argument are

10   also faulty.  The timing and the sequence of the issues that

11   the plaintiffs have presented to the Court have been dictated

12   by the different dates on which different provisions, HB 1020,

13   take effect.  As I mentioned earlier, there were 15 days to act

14   with respect to the Hinds County appointments.  The CCID

15   appointment won't happen until January 1st, and there are other

16   dates.  There are dates scattered all over this statute

17   providing different times for different aspects of the statute

18   to come into effect, and that is what has dictated the pace at

19   which we have presented issues for the Court's resolution.  The

20   inherently piecemeal nature of this litigation was thus

21   directed by the -- was the choice of the legislature, not of

22   the plaintiffs.

23        Excuse me for a moment.  Furthermore, the charge that the

24   plaintiffs have been dilatory ignores that this case was filed

25   only four and a half months ago, and no initial order, no

1    attorney conference, no discovery, and no scheduling order has

2    been entered to date.  These are early days of a piece of

3    litigation, Your Honor.  And this is in sharp contrast to the

4    *Union Planters* case that the State defendants cite, 687 F.2d

5    117.  That's been cited as an example of a case that denied

6    leave to amend based on undue delay.  In that case, a sharp

7    contrast to this case, the defendant sought to amend his answer

8    more than a year after the case was filed, after discovery was

9    completed, and after the Court had entered summary judgment on

10   the issue of liability against the defendant, a very, very

11   different posture than this case.

12       The State defendants also ignore the facts of the actual

13   history of this litigation.  And just to remind the Court, we

14   had this very urgent necessitous situation presented by the

15   15-day deadline, and we had to attempt to enjoin those

16   appointments on an urgent schedule.  We sought a TRO on

17   April 28th, just one week after filing the complaint.  That

18   motion was mooted, however, on May 4 by the action of the

19   Chancery Court, and then the Chancery Court vacated its

20   injunction on May 11th, and that very day we renewed our motion

21   for a TRO.

22       On May 12, the Court entered the immunity order -- I'm

23   sorry, on May 12, the Court entered a TRO restricting the Chief

24   Justice from making the appointments until the Court had

25   conducted a hearing on the second motion for a TRO and until it

1  rendered its ruling on the Chief Justice's immunity defense,

2  which he had raised in a motion to dismiss filed on May 4.

3      By May 24, the plaintiffs -- and on May 24, the plaintiffs

4  move for a preliminary injunction.

5      Now, up until this point, up until this point, the most

6  obvious party to target for an injunction to prevent the

7  judicial appointment in Count 2 was the Chief Justice because

8  he was the person designated by the legislature to make the

9  appointments.  We have made no allegation.  We don't intend in

10  any way to disparage his good faith, his fidelity to the law.

11  We are not making any allegations about discrimination on his

12  part.  He was just, unfortunately for him, the person put in

13  this position by the legislature.

14      Now, we had a good faith belief that the Chief Justice was

15  not immune from injunctive relief, because based on our reading

16  of the cases, the Fifth Circuit's four-factor test indicated

17  the appointment of circuit court judges to nearly full

18  four-year terms was not a judicial act, and the immunity in 42

19  U.S.C. Section 1983 for judicial officers applies only to

20  actions brought against the judicial officer for an act or

21  omission in such officer's judicial capacity.  We had a good

22  faith basis for that, Your Honor, and you disagreed with that.

23  And now we take our lumps in that regard, and we are not

24  contesting that ruling.  We are moving forward to deal with the

25  obstacle that that ruling placed in the path to vindicating the

1    rights of our clients.

2        So then that was on June 1.  There were several hearings

3    and more papers filed and colloquies between the Court and the

4    parties in the period after June 1.  But then on August 3rd, it

5    was August 3rd when we moved to add the new parties, just two

6    months after the immunity ruling came down, which upset the

7    apple cart from our perspective.  And there is no way that two

8    months can be characterized as undue delay.

9        And particularly, particularly that is not undue delay

10   where the State defendants have not filed a motion to dismiss,

11   discovery has not yet begun, no trial has been scheduled.  The

12   proposed amendment does not raise new substantive claims.  It

13   doesn't change the underlying theory of our case.  And most of

14   the activity to date has whirled around the efforts of the

15   Chief Justice to extricate himself from parts of the case for

16   which he doesn't enjoy immunity.

17       Defendants have cited no case and plaintiffs are aware of

18   none where a Court in similar circumstances has found two

19   months to be undue delay in pursuing the course that plaintiffs

20   pursue here to remedy an early adverse ruling.

21       Now, we point out that Rule 15(a)(2) is intended to remedy

22   problems like the one we faced following the immunity ruling.

23   The State defendants cite the leading case of *Foman versus*

24   *Davis*.  That's the case we all read in law school.  It was

25   decided in 1962, the leading case on Rule 15.  And that case

1  says, "The Federal Rules reject the approach that pleading is a
2  game of skill in which one misstep by counsel may be decisive
3  to the outcome and accept the principle that the purpose of
4  pleading is to facilitate a proper decision on the merits."

5         The immunity ruling was not a ruling on the merits.  It
6  was a ruling on a procedural issue, i.e., whether the Chief
7  Justice enjoys immunity.  And the fact that it was not a ruling
8  on the merits and that we've come up with an alternative to the
9  non-merits ruling is very consistent with the goal of Rule 15,
10  which was to allow parties to breach the merits of the case.
11  As Wright & Miller put it, Rule 15's purpose is, among other
12  things, to provide maximum opportunity for each claim to be
13  decided on the merits rather than on procedural technicalities.
14  No longer is a party irrevocably bound to the legal or factual
15  theory of the party's first pleading.  That is Section 1471 of
16  Wright & Miller.

17         Here the State defendants, as well as Defendant Randolph,
18  contend that the plaintiffs are prevented by a non-merits
19  defense of immunity from gaining an injunction against the
20  amendments.  In response to that obstacle, which is unrelated
21  to the merits, the substantive merits of the complaint, the
22  substantive merits of their claim, the plaintiff are seeking to
23  pivot the other defendants who until they take the oath of
24  office and assume office do not enjoy immunity.

25         If I said it, I will say it again because I think it is

1     important.  The underlying legal theory is the same.  The

2     appointments violate the plaintiffs' right to equal protection

3     because the statute deprives only the residents of Hinds County

4     of the opportunity to elect their judges, and the overwhelming

5     percentage of those residents are black.

6          But I might point out here, Judge, the white residents of

7     Hinds County are injured by this appointment.  They have a

8     right to elect judges just as much as everybody else, and it's

9     being taken away from them.  This is a case of denial of a

10    fundamental constitutional right, even without the race issue

11    or the race factor being taken into consideration.

12         So for all of these reasons, we think that the amendment

13    should be granted.

14         And then finally, in their opposition, and Mr. Shannon

15    averted to this earlier today, they claim that the crime

16    reduction goal of HB 1020 is so important that it trumps -- it

17    outweighs the assertion of our constitutional rights.  That is

18    a wrong and a dangerous theory.  We briefed that earlier in the

19    preliminary injunction hearings.  And we have explained that

20    the interest in public safety cannot trump an individual's

21    constitutional rights.  Public safety must be pursued

22    consistently with the constitutional rights of the citizens.

23         Thank you, Your Honor.  I realize this is kind of a long

24    presentation, but it is a complicated situation, and I hope

25    I've been able to win my way through it with some degree of

1    clarity for you.

2              **THE COURT:**  Thank you.

3              **MR. SHANNON:**  Your Honor, before I respond, may we

4    take a brief five-minute recess?

5              **THE COURT:**  Sure.

6              **MR. SHANNON:**  Thank you, Your Honor.

7              **THE COURT:**  Let's make it ten minutes.  Well, let's

8    see.  12:37.  Why don't we take our lunch break then.  Did I

9    hear some rumbling out there?  Okay.  It's 12:37.  Let's make

10   it 2:00, so everyone can find somewhere to eat.

11             **(RECESS TAKEN AT 12:37 P.M. UNTIL 2:00 P.M.)**

12             **THE COURT:**  All right.  Let's pick up where we left

13   off.

14             **MR. SHANNON:**  Good afternoon, Your Honor.

15             **THE COURT:**  Good afternoon.

16             **MR. SHANNON:**  May it please the Court.

17        Rex Shannon with the Attorney General's office.  Your

18   Honor, I want to first respond to something counsel opposite

19   said in his argument.  I believe I heard him to say that I had

20   said something from this podium along the lines that public

21   safety considerations should somehow trump the constitutional

22   rights of the plaintiffs.  I don't think I have ever made that

23   statement.  Certainly there's a disagreement as to whether the

24   plaintiffs' constitutional rights have been violated.  That's

25   what we are here about in this lawsuit.

1          Your Honor, as to the judicial immunity issue, the State

2     defendants have never taken a position on judicial immunity per

3     se.  We don't take a position on that today.  We accept on the

4     face of the Court's order of dismissal the fact that Chief

5     Justice Randolph was previously dismissed from this action in

6     its entirety.  All the claims against him were dismissed in

7     accordance with the order that Your Honor entered previously.

8          On that basis, we have previously argued and reurge today

9     that the pending TRO that's still in place, that there's no

10    longer any basis for that TRO to remain in place, given the

11    Chief Justice's dismissal, because there's no longer any

12    defendant currently in this lawsuit who is susceptible to a

13    federal injunction enjoining the judicial appointments that are

14    required under House Bill 1020.

15         Beyond that, we take no position on the judicial immunity

16    issue, Your Honor.  We did respond to the motion for

17    clarification.  We would stand on that response.

18         Moving on, Your Honor, counsel opposite, prior to our

19    lunch break, essentially argued a motion for leave to amend

20    their complaint and a motion for a second TRO as to certain

21    prospective appointees, and I would like to respond briefly,

22    very briefly to both of those motions.

23              **THE COURT:**  Go ahead.

24              **MR. SHANNON:**  As to the motion to amend the

25    complaint, the State defendants oppose that motion for two

 1    reasons:  Number one, we submit the motion is futile because

 2    the plaintiffs lack standing.  Number two, Your Honor, we

 3    submit that the motion will unfairly prejudice the State

 4    defendants by unduly delaying the resolution of the improper

 5    TRO that continues to bar judicial appointments under House

 6    Bill 1020.

 7         As to standing, Your Honor, it is well settled that a

 8    plaintiff's motion to amend their complaint should be denied

 9    where the amendment is futile.  We have cited the

10    *Crenshaw-Logal* case and the *Briggs* case in our brief, both from

11    the Fifth Circuit.  It is also well settled that an amendment

12    is futile where the proposed amended complaint would be subject

13    to dismissal for lack of standing.  We cited *Moore v. Bryant*

14    from the Fifth Circuit, as well as the Casper's Act case out of

15    the Eastern District of Texas for that proposition.

16         Your Honor, the State defendants have argued standing at

17    length in previously filed responses opposing the plaintiffs'

18    first renewed TRO motion and their motion for preliminary

19    injunction, both of which were directed to the plaintiffs'

20    judicial appointment claim.  Those arguments appear in the

21    record at Docket Number 34 at pages 5 through 7 and at Docket

22    Number 50 at pages 11 through 18.  I believe we have also

23    argued standing orally before this Court prior to today.  I

24    won't rehash or belabor those arguments here today.  I will

25    just say that all of the standing arguments made in opposition

1   to the judicial appointment claim apply with equal force to

2   each of the claims sought to be asserted in the plaintiffs'

3   proposed amended complaint.

4        Your Honor, the plaintiffs' proposed joinder of additional

5   defendants doesn't cure their lack of standing as to the State

6   defendants.  If the Court agrees and accepts the State

7   defendants' argument on standing, then the proposed amended

8   complaint would be subject to dismissal, at least as to my

9   clients, for lack of standing.  In other words, Your Honor, the

10  lack of standing renders the proposed amended complaint futile

11  at least in regards to my clients, the three current State

12  defendants.

13       Contrary to what the plaintiffs have said in their reply

14  brief, my clients absolutely have standing themselves to assert

15  futility on the basis of the plaintiffs' lack of standing with

16  respect to the proposed amended complaint as it relates to the

17  State defendants because they are attempting to amend to once

18  again sue my clients.

19       Your Honor, all three of my clients plead lack of standing

20  as the fourth defense in their answer to the original

21  complaint.  That defense applies to the proposed amended

22  complaint as well.  Your Honor, the State defendants have every

23  right to reurge that defense now in opposition to the

24  plaintiffs' proposed amended complaint, which fails to cure the

25  plaintiffs' lack of standing.  Based on the lack of standing

1  here alone, Your Honor, the motion for leave to amend should be

2  denied as futile.

3       Moving on, Your Honor, briefly, the motion to amend should

4  further be denied because the proposed amended complaint we

5  submit, Your Honor, would unfairly prejudice the State

6  defendants.  It is well established that a Court may consider

7  such factors as prejudice and undue delay in denying a motion

8  to amend the complaint.  We cited the *Woods* case and the *Blue*

9  *Cross* case to that effect in our brief.

10       Your Honor, in our response, we noted that the plaintiffs

11  are asking this Court to let them refile their lawsuit to add

12  seven additional defendants.  That was in fact a misstatement.

13  They are actually seeking to add nine additional defendants,

14  that is, the director of the Mississippi Administrative Office

15  of Courts, Greg Snowden, the executive director of the

16  Department of Finance and Administration, Liz Welch, are both

17  in their official capacities, as well as seven John and Jane

18  Doe defendants.  Your Honor, nothing prevented the plaintiffs

19  from naming these folks as defendants at the time suit was

20  originally filed.

21       The plaintiffs continued piecemeal prosecution of this

22  case is unfairly prolonging any decision on a key piece of

23  state legislation designed to reduce crime in Hinds County.

24  Your Honor, this whole motion is obviously an attempt to get

25  around this Court's dismissal of Chief Justice Randolph.  At

1    the very latest, Your Honor, the plaintiffs could have sought

2    to amend over two months ago when Chief Justice Randolph was

3    dismissed on judicial immunity grounds.

4         Your Honor, as we stand here today, the TRO blocking these

5    critical judicial appointments in Hinds County has been in

6    effect for 116 days and counting.  That is 88 days longer than

7    the 28-day period authorized by Rule 65(b)(2).

8         Your Honor, the State defendants submit that this

9    continued enjoinder of state crime reduction legislation is

10   unfairly prejudicial to the interest of the people of the state

11   of Mississippi and living and working in a safer capital city.

12   Your Honor, allowing these plaintiffs to amend their complaint

13   at this late date to add nine new defendants will almost

14   certainly contribute to further delay in resolving the de facto

15   injunction that continues to bar critical judicial

16   appointments.  Your Honor, we submit that this is a piecemeal

17   and dilatory attempt at amendment, and the Court should reject

18   it as unfairly prejudicial to the State defendants.

19        Your Honor, in their reply brief, the plaintiffs say that

20   my clients should have nothing relevant to say about the

21   proposed amended complaint.  Your Honor, they say my clients

22   have no personal stake in the Hinds County judicial

23   appointments, and therefore they can't possibly be prejudiced

24   by the proposed amendment, but that is simply not the case.

25   The whole point of House Bill 1020 is to help make the city of

1    Jackson and Hinds County a safer place for all of us who

2    actually live and work here on a daily basis.

3         One of my clients is the Attorney General of the State of

4    Mississippi who was sued in her official capacity, and my other

5    two clients are the director -- or the commissioner of the

6    Department of Public Safety, which includes the Mississippi

7    Highway Patrol and other entities, as well as the Capitol

8    Police Chief, also both sued in their respective official

9    capacities.  Certainly, Your Honor, all three of these state

10   officials have an interest in public safety and law and order.

11   They have as much right to assert the State's sovereign

12   interest in enforcing its duly enacted legislation, duly

13   enacted public safety laws.  They have as much right to assert

14   those as these plaintiffs have in attempting to invalidate

15   those laws.  Respectfully, Your Honor, for all of these

16   reasons, the State defendants respectfully request that the

17   Court would deny the motion to amend the complaint.

18        Moving on, Your Honor, to the second motion that the

19   plaintiffs have argued just prior to lunch, the motion for a

20   second TRO, this being a TRO to enjoin prospective appointees,

21   Your Honor, the State defendants submit that this newly filed

22   TRO motion should be denied because it is premature.  And I

23   will explain briefly, Your Honor.

24        The plaintiffs are asking the Court to enter a TRO to

25   prohibit prospective judicial appointees and a prospective

1    prosecutor from accepting appointment or taking the oath of

2    office or otherwise assuming office in Hinds County.  Your

3    Honor, as things stand today, we don't know who these

4    prospective appointees will be.  Regardless, Your Honor, those

5    individuals are not now nor have they ever been parties to this

6    litigation.  They will only become parties, even as fictitious

7    John or Jane Doe defendants, if and when this Court grants the

8    plaintiffs' motion to amend their complaint to make them

9    parties and the plaintiffs actually file their complaint, their

10   amended complaint.

11        Your Honor, unless and until that occurs and the

12   plaintiffs file their amended complaint, there is no operative

13   complaint by which this Court can assert personal jurisdiction

14   over these prospective judicial appointees.  Your Honor, that

15   means the Court presently has no authority, respectfully, Your

16   Honor, to temporarily restrain any prospective appointees

17   pursuant to Rule 65 or otherwise.  Your Honor, for that reason,

18   any injunctive relief presently directed against such

19   prospective appointees is premature and should be denied.

20        Your Honor, the plaintiffs say these individuals don't

21   have to be parties to be enjoined.  That may be a semantics

22   issue, but the State defendants will submit that is not the

23   case.  Your Honor, certainly Rule 65 permits the Court to

24   enjoin a defendant before they are served and even without

25   notice.  But they still have to be named as a defendant in an

```
 1   operative complaint that is filed and pending on the Court's
 2   docket.
 3        For one thing, Your Honor, a Court has no jurisdiction to
 4   issue a restraining order against somebody who is not even a
 5   named defendant in a pending lawsuit.  Your Honor,
 6   additionally, it is well settled that injunctive relief cannot
 7   be awarded in the ether.  I mean, there has to be an operative
 8   complaint stating some cause of action against a person who has
 9   sought to be enjoined when that particular type of equitable
10   relief is pursued.
11        Your Honor, if this Court allows the plaintiffs to file an
12   amended complaint naming these prospective appointees as
13   defendants, and if the plaintiffs in fact file such amended
14   complaint, that may be a different story, but Your Honor, I
15   would submit that, nevertheless, the plaintiffs have not made
16   the requisite showing to support a TRO.  And to make that
17   showing, Your Honor would have to make findings of fact on each
18   of the different four factors of the motion for temporary
19   restraining order.  We've briefed all that previously in regard
20   to two prior TRO motions, as well as a motion for preliminary
21   injunction, and I would incorporate those arguments today
22   without belaboring the point.
23        But unless and until an amended complaint is authorized
24   and filed, this Court can't issue a TRO to somebody who is not
25   even a named party in a pending lawsuit.  That goes for any
```

1    appointees as well as the AOC director, Mr. Snowden.  I heard

2    counsel opposite earlier ask the Court about the prospect of

3    enjoining him or instructing him to do something.  He's not a

4    party to this lawsuit yet, so I don't believe the Court has

5    jurisdiction to order him at this point to do anything.

6        Your Honor, respectfully, the plaintiffs have cited a

7    single case in support of their argument that a TRO can be

8    issued against a prospective defendant who has not yet been

9    named in an operative pending complaint.  In their brief, that

10   case is *Corrigan Dispatch Company v. Casa Guzman, SA*, 569 F.2d

11   300.  That's a 1978 Fifth Circuit case.  But Your Honor, that

12   case, as I read it, doesn't say what the plaintiffs imply that

13   it says.  That case merely says that Rule 65 does not require

14   service of process before a named defendant can be enjoined.

15       Your Honor, as I read that case, the entity sought to be

16   enjoined had already been named as a defendant in an operative

17   interpleader action.  They just haven't been served yet.

18   That's not the case here.

19       Your Honor, in the cases before Your Honor today, none of

20   the John or Jane Doe defendants has even been named in an

21   operative complaint yet.  Until they are, Your Honor,

22   respectfully, this Court has no authority to order them to do

23   anything, and the current TRO motion should be denied.

24       Your Honor, as I say, the motion should further be denied

25   for all of the reasons set forth in the State defendants'

1    previously filed responses to the plaintiffs' renewed TRO

2    motion and motion for preliminary injunction.  Your Honor,

3    those responses appear at Docket Number 34 and Docket Number 50

4    on the Court's docket.

5         Your Honor, the State defendants would hereby adopt and

6    incorporate by reference the arguments and authorities set

7    forth in those responses.  Once again, a critical public safety

8    feature of House Bill 1020 continues to be barred by this

9    Court's TRO entered on May 12th of this year.  That TRO has now

10   been in effect for 116 days.  Again, that is 88 days longer

11   than the 28-day timeframe permitted by Rule 65(b)(2).

12        Your Honor, for all of these reasons, the State defendants

13   respectfully request that the Court would deny the plaintiffs'

14   motion for a TRO as to the John and Jane Doe defendants and

15   dissolve the current TRO directed to Chief Justice Randolph.

16   Thank you, Your Honor.

17            **THE COURT:**  Your jurisdictional argument, is that

18   subject matter jurisdiction or in personam or both.

19            **MR. SHANNON:**  That is in personam jurisdiction, Your

20   Honor.

21            **THE COURT:**  Thank you.

22            **MR. NED NELSON:**  Your Honor, Ned Nelson for the Chief

23   Justice.  Before I begin, I want to clarify something real

24   quickly that we discussed before lunch.  Plaintiff's counsel

25   made some arguments about the motion to amend, and in doing so

1    conceded the reality of Your Honor's dismissal order of June 1,

2    and recognized that the Chief Justice had been dismissed as a

3    party.  If I have heard him correctly, then we would ask that

4    the Court take up again the Chief Justice's motion for 54(b)

5    certification and I will sit down.

6         I'm not asking for arguments, but that was my impression

7    of what counsel said before lunch, is that the motion to amend

8    and the amended complaint proposed would alleviate Chief

9    Justice Randolph's dismissal and would ameliorate them somehow.

10   Am I accurate in saying that?

11             **THE COURT:**  Not quite.  Make your argument.

12             **MR. NED NELSON:**  Would you like me to continue to

13   make my argument?

14             **THE COURT:**  Make your argument.

15             **MR. NED NELSON:**  Yes, sir.

16        Number one, the motion to dismiss that was filed by the

17   Chief Justice in May was not a partial motion to dismiss or a

18   motion to dismiss some claims but not all claims.  It was a

19   motion to dismiss the complaint against him.  It addressed all

20   claims versus the Chief Justice.  In doing so, it requested

21   that the complaint, not claims, be dismissed.

22        Your Honor's order granting that motion reads as follows:

23   "It is therefore ordered and adjudged that Defendant Michael K.

24   Randolph, in his official capacity as the Chief Justice of the

25   Mississippi Supreme Court, be dismissed from this litigation

1    because of judicial immunity.  The motion to dismiss, Docket

2    Number 19, filed by the Chief Justice hereby is granted."

3         Your Honor, the motion for clarification, the plaintiffs'

4    position statement on the continuity of the TRO, which is

5    Docket 47, and all of the subsequent motion practice is an

6    attempt to avoid that one-sentence order and to confuse the

7    issues and to bring things up that were available to the

8    plaintiffs prior to the Court entering its motion to dismiss.

9         The judicial immunity definition, and all of this was

10   addressed in the motion to dismiss back in May and ruled upon

11   by Your Honor in June, is not qualified -- the application of

12   judicial immunity is not qualified based on the remedy sought

13   with the cause of action alleged by the plaintiff.  As simply

14   as possible, it is defined as when a judge acts within their

15   jurisdiction, then they are shielded by judicial immunity.

16   That's not qualified based on the relief sought.

17        Section 1983 states, real quickly, "In an action against a

18   judicial officer for an act or omission taken in such officer's

19   judicial capacity, injunctive relief shall not be granted

20   unless a declaratory decree was violated or a declaratory

21   relief was unavailable."

22        That requires that a judge take an act or omission in

23   order to, number one, to qualify him as a defendant.  And we

24   can all -- I think it's all been conceded multiple times that

25   the Chief Justice has done nothing wrong.  He has violated no

1    one's constitutional rights.  Even by the plaintiffs' position

2    thus far, he has made no appointments.  No judges have taken

3    office pursuant to 1020.

4         So that does not fit within the definition of 1983.  There

5    is no -- and that is limited to the availability of an

6    injunction where a declaratory order was violated.  It doesn't

7    mean that that judge has to be a party to that declaratory

8    order.  It is just that one is violated or was unavailable.

9    But where one is sought, a declaration is sought, it is

10   inherently available.  That does not change the definition of

11   judicial immunity.

12        So when plaintiffs' counsel states that those arguments

13   about declaratory judgment have been waived by counsel for the

14   Chief Justice, that is simply untrue.  That was all raised.

15   The standing arguments on adversity, adverseness of the

16   parties, case or controversy, and standing were all addressed

17   and briefed in the motion to dismiss in May.  And in granting

18   the Chief Justice's motion to dismiss, that was before the

19   Court.

20        The declaratory judgment claim that plaintiffs now say was

21   not disposed of by Your Honor's ruling was first raised after

22   the motion to dismiss.  And again, their complaint was their

23   complaint when it was filed in April, they knew the claims that

24   were made then, and that issue could have been addressed in

25   response to the motion to dismiss, but it was not.  It was not

1    until after the Court granted the motion to dismiss before that

2    ever became an issue.

3         Your Honor, another thing I would like to point out,

4    plaintiffs' counsel stated that somehow Section 4 of House Bill

5    1020 is distinguishable because it compels the Chief Justice to

6    appoint inferior court judges, and that is somehow unique and

7    different than any other appointment regiment that is available

8    to the Chief Justice, and that is not true.  The Chief Justice

9    appoints judges to inferior courts as defined by the

10   Mississippi Constitution on a regular basis, specifically the

11   county court judges.  There's a statutory court as opposed to a

12   constitutional court.

13        **THE COURT:**  So give me a listing of the various court

14   judges whereby the Chief Justice has made appointments.  We

15   know he has done it in special circuit court matters, county

16   court matters.

17        **MR. NED NELSON:**  Yes, sir.

18        **THE COURT:**  Chancery court matters.

19        **MR. NED NELSON:**  Yes, sir.

20        **THE COURT:**  There's a chancery court matter he made

21   an appointment.

22        **MR. NED NELSON:**  Yes, sir.

23        **THE COURT:**  And there are other positions beyond the

24   judges, but what times did the Chief Justice make appointments

25   to, let's see, justice court judges, city judges, municipal

1    judges, any of those?

2              **MR. NED NELSON:**  I would have to defer to my client

3    on that, on specific appointments to justice court

4    appointments.  Can I confer with my client?

5              **THE COURT:**  Why don't you confer.

6         (Mr. Nelson confers with Chief Justice Randolph.)

7              **CHIEF JUSTICE RANDOLPH:**  Judge, the first question

8    you asked about justice court, typically when a justice court

9    judge has a recusal that comes up, one of the other four or

10   five in the county sit in that position, so there's no request

11   made.  The municipal court, they generally have a judge pro

12   tem.  I don't recall making either.  I don't know of any

13   prohibition.  I just never had a request.

14             **THE COURT:**  All right.  Thank you.

15             **CHIEF JUSTICE RANDOLPH:**  You're welcome.

16             **MR. NED NELSON:**  Your Honor, as of today, it's been

17   96 days since the Court's order granting the Chief Justice's

18   dismissal.  Since then, it's been 96 days that he's been a

19   dismissed party.  He has filed since then one motion, and that

20   was a motion for 54(b) certification.

21        This Court's ruling on that motion, the 54(b)

22   certification, in all fairness, our position is that that

23   should be addressed prior to considering the plaintiffs' motion

24   for leave.  As filed, the proposed amended complaint names the

25   Chief Justice as a party and does not recognize the Court's

1    order dismissing him and makes materially the same allegations

2    against the Chief Justice as the original complaint and

3    delineates what causes of action reference him, what prayers

4    for relief are directed towards him, but the factual

5    allegations and the actual claims are materially the same.

6         As a result of the post-order motion practice, the Chief

7    Justice has been held in limbo defending repeated attempts to

8    bring him back into litigation which he is no longer a party

9    to.  And for three months now, the Chief Justice has endured

10   this practice seemingly without relief.  The continued

11   involvement of the Chief Justice in this practice has been at

12   great expense and distraction from his duties on the court,

13   duties which he would much rather be attending to.

14        Respectfully, the Chief Justice respectfully requests that

15   the Court determine what role he should be playing moving

16   forward, and that would inherently define what objections

17   specifically we have to any proposed amended complaint, if that

18   is necessary.  We are hesitant to respond to plaintiffs' motion

19   for leave on the merits if it is unnecessary.  If we are indeed

20   dismissed, then that's no longer an issue for my client.

21        As you know, the Chief Justice's position from the outset

22   has been that he takes no positions on the merits of the case

23   and does not intend to participate in the case beyond what is

24   necessary or compelled.  If the Court affirms its June 1st

25   order, which we believe was the right decision when it was

1    made, his neutrality in this matter can be preserved.  The

2    Chief Justice has no interest in arguing for or against a

3    legislative act, something he had nothing to do with.  As

4    stated all along, he owes duties to the Court and the Court

5    alone.

6         Specifically addressing the declaratory judgment arguments

7    raised by the plaintiffs, Your Honor, that was raised, as I

8    mentioned, for the first time on June 6th after the Chief

9    Justice was dismissed.  That position statement, Docket 47, was

10   filed in response to an inquiry from chambers to the remaining

11   counsel.  It was not addressed to counsel for the Chief

12   Justice.

13        It said -- and I've read it, I don't have it before me,

14   but that e-mail invited that filing to be made, and we were not

15   party to that.  The Court's own docket, as of yesterday,

16   recognizes that the Court -- that the Chief Justice was, quote,

17   terminated, closed quote, next to his name on the docket sheet.

18   Clearly, he was a dismissed party.  By all indications, it's

19   left us in this amorphous position, and we are here today

20   specifically simply because the amended complaint names him in

21   the suit, and there have been repeated attempts to draw him

22   back into litigation.  And there's nothing unambiguous about

23   that to us that needs to be clarified, Your Honor.

24        The law is clear that judicial immunity bars the

25   plaintiffs' claims against the Chief Justice.  That was the

1    Court's decision on June 1st.  That is unequivocal when it

2    comes to injunctive relief, and any claim for declaratory

3    relief was not raised prior to the Court entering its order,

4    and those arguments were waived when the Court made its

5    decision granting the Chief Justice's dismissal.

6         The Chief Justice raised the issue -- as mentioned, the

7    issues of standing, case or controversy, and adverseness,

8    Docket 20, at page 2 through 6.  Those independent grounds for

9    dismissal were properly raised before the Court when it made

10   its decision.  Plaintiffs state that their motion to clarify is

11   distinct somehow from a motion to alter or amend under Rule 59

12   or 60.  But if this Court is to take up that motion or grant

13   the relief that it requests or somehow continue to maintain the

14   Chief Justice as a defendant, it would require the Court to go

15   back and undo the decision it had already reached in its

16   June 1st order.  So that, by our definition, is inherently a

17   motion to reconsider.  It requires the Court to change its

18   mind.

19        Plaintiffs' counsel goes to great lengths to take out of

20   context statements made in pleadings about what arguments have

21   been waived or what arguments were included.  It is true that

22   the text definition or the text of Section 1983 itself does not

23   expressly prohibit declaratory judgments against a judge.  And

24   this is set out in our pleadings that there is no case law that

25   suggests that a state court judge or a justice of the Supreme

1    Court in this instance to be a proper party in a facial

2    constitutionality challenge where there has been no past

3    conduct to be declared unconstitutional.  That is because 28

4    U.S.C. 2201 itself mandates the plaintiffs must establish the

5    existence of a live case or controversy.

6        The cases cited by the plaintiffs were instances by and

7    large where judges' actual conduct operating under state law

8    were being challenged as unconstitutional, thus establishing

9    adversity between the parties, in turn Article III, case or

10   controversy.  Again, the motion for clarification and all of

11   the pleadings since then, the plaintiffs' position statement,

12   the motion for clarification, its notice of additional

13   authorities was filed in the end of June, all of those were

14   brought as a thinly veiled attempt to raise legal arguments

15   that were before the Court and could have been raised prior in

16   response to the motion to dismiss.

17       Even assuming that the plaintiffs' claims for declaratory

18   judgment were not disposed of by the Court's June 1st order,

19   the plaintiffs have completely failed to satisfy case or

20   controversy requirements.  Multiple courts have held in any

21   federal challenge of the state law's constitutionality, a judge

22   is simply not a proper party.

23       I would like to just point out a couple of the holdings,

24   and these are all cited in our papers, Your Honor, that in

25   order to receive declaratory or injunctive relief, a plaintiff

 1     must establish a violation of a constitutional right, the risk

 2     of continued irreparable harm if the relief is not granted, and

 3     the absence of an adequate remedy at law.  It is a very common

 4     quote.  They cannot meet the first element, a violation, a past

 5     violation under color of state law made by my client.  Again,

 6     no case or controversy exists between a judge who adjudicates

 7     claims under a statute, that is, takes a judicial act under a

 8     statute and a litigant who attacks the constitutionality of

 9     that statute.  A judge acting in an adjudicative capacity is

10     not a party, proper party to a lawsuit challenging that law,

11     because the judge, unlike the legislature or the Attorney

12     General's office, has no personal interest in defending the law

13     as constitutional.

14          This Court has already held that the Chief Justice

15     received a legislative grant of jurisdiction to appoint the

16     judges contemplated by House Bill 1020.  And that's from Your

17     Honor's order at page 21.  Separately, this Court found that if

18     the Chief Justice is to act within his jurisdiction and appoint

19     those judges, they are inherently judicial in nature,

20     subjecting him to judicial immunity.  It is a well-worn path,

21     Your Honor, and we have been down -- we were there three months

22     ago.  That is the only requisite to shield the Chief Justice

23     with immunity:  Did he act within his jurisdiction?  And it

24     doesn't matter whether it's a circuit court appointment or a

25     county court appointment.  It's is it within his jurisdiction

1   of the law to do.  And that requirement of a justiciable

2   controversy cannot be satisfied where a judge acts in their

3   adjudicatory capacity.  That is from *Bauer v. Texas*, and that's

4   quoted at Docket 66, at page 3.

5       Excuse me, Your Honor.  May I get some water?

6       The Fifth Circuit has repeatedly held that where a

7   plaintiff cannot establish an ongoing injury caused by the

8   defendant state judge and the threat of any future injury is

9   not imminent, there exists no case or controversy for the Court

10   to resolve rendering a declaratory judgment inappropriate.

11       So in conclusion, Your Honor, this Court has already

12   determined that judicial immunity shields the Chief Justice

13   from any claims for injunctive relief.

14       Second, any declaratory judgment claims that were not

15   somehow disposed of by your Court's comprehensive order, those

16   are nonetheless meritless because they failed case or

17   controversy standing requirements.

18       Your Honor, we are not here to relitigate those issues

19   that were before Your Honor and decided by the Court.  We are

20   here to respectfully request that the Court decide how it

21   intends to proceed with my client.  We believe the Court was

22   correct when it made its decision on June 1st, and the

23   unreasonable motion practice that has taken place since then is

24   certainly no fault of the Court.  However, the Court alone can

25   do something about it and bring finality to the Chief Justice's

118

1    involvement in this matter.  And that is all we request, Your

2    Honor, is just some closure and resolution as it relates to my

3    client so he can go back to his business down the road.

4         I will open it to any questions Your Honor may have.

5              **THE COURT:**  Yes.  This looming appointment of CCID

6    personnel, in what arena do you place that?

7              **MR. NED NELSON:**  The appointment of CCID personnel?

8              **THE COURT:**  No, judge.

9              **MR. NED NELSON:**  Judge.

10             **THE COURT:**  Is that similar to a special circuit

11   court judge, county court judge, justice court judge or what?

12             **MR. NED NELSON:**  Yes, sir, Your Honor.  The

13   Mississippi Court of Appeals has thus far -- and that, again,

14   is Mississippi law as interpreted.  The appointment of judges

15   by the Chief Justice of the Supreme Court without caveat or

16   exception qualifies as a judicial act for purposes of judicial

17   immunity.

18             **THE COURT:**  And how do you distinguish the

19   functionality of this CCID judge from other judges?

20             **MR. NED NELSON:**  From other judges?  I've not

21   specifically studied the CCID court's jurisdictional limits or

22   anything like that.  As opposed to circuit court appointments

23   or -- I couldn't answer that without studying the specific

24   functions of it, Your Honor.

25             **THE COURT:**  Do you have someone on your side over

1    there who could?

2         **MR. NED NELSON:**  Not my side specifically, but I

3    believe the attorney in this room equipped to argue that would

4    be someone at this table.

5         For purposes of judicial immunity, Your Honor --

6         **THE COURT:**  No, I just want the functions.

7         **MR. NED NELSON:**  Okay.

8         **THE COURT:**  And who will then argue that over there?

9         **MR. SHANNON:**  Your Honor, if you are speaking to

10   counsel for the state defense, I'm not prepared to make any

11   argument on the functionality of the CCID court today.  It

12   doesn't pertain to any motion that our clients have responded

13   to, I don't believe, today.  If the Court has specific

14   questions, we would be happy to try to answer those.

15        **THE COURT:**  I just want to know how you view the

16   functions and how those functions differ from the functions of

17   other courts.

18        **MR. SHANNON:**  Again, Your Honor, I'm not prepared to

19   comment on that today.  We would certainly be happy to address

20   that later on if the Court would like us to.

21        **THE COURT:**  Okay.  I will get back to you in just a

22   moment.

23        **MR. SHANNON:**  All right.

24        **THE COURT:**  What about anybody else over here who can

25   tell me the functions of the CCID court?

1          **MR. MARK NELSON:**  Mark Nelson.  We see no difference

2    in the appointment of CCID judges or the municipal judges or

3    county judges or circuit judges or chancery judges or any other

4    judge that the Chief Justice appoints.  They all fall under the

5    same penumbra of the judicial act.  As far as the functionality

6    of the Chief Justice when he is about making his order and

7    signing it at his desk, it is all the same.

8          Now, the functionality of the Court would be different.  A

9    chancellor, of course, has a different type of jurisdiction in

10   Mississippi, unlike the other 49 states.  It is a unique court

11   of equity.  That is where all the divorces take place, and

12   that's where the land issues are.  So yes, they do function

13   differently.

14         Criminal defendants are, as you know, exclusively jury

15   trials in circuit court.  But the functionality of the two

16   judges makes no difference to the Justice when he is appointing

17   a person, either a man or woman, to that position.  It is a

18   judicial act.

19         **THE COURT:**  I understand the argument that it is a

20   judicial act.  But I'm asking about the functionality of the

21   different courts.  And do you know of any distinctions?

22         **MR. MARK NELSON:**  No, sir, I see no distinction in it

23   at all.

24         **THE COURT:**  Well, there is a distinction between

25   chancery court, county court, circuit court.  Is there a

1    distinction with the CCID court?

2            **MR. MARK NELSON:**  Personally, I see the CCID court as

3    a circuit court, as a court of criminal process.  That's the

4    purpose for which the court is set up.

5            **THE COURT:**  But does it say that in the act?

6            **MR. MARK NELSON:**  No, sir, the act doesn't

7    necessarily say that.

8            **THE COURT:**  So then what's in the act concerning

9    CCID?

10           **MR. MARK NELSON:**  It's ambiguous, Your Honor.  It

11   just doesn't say.

12           **MR. NED NELSON:**  Well, any definition to that court's

13   jurisdiction is spelled out in how it is described.  But from

14   my client's perspective for that purpose of judicial immunity,

15   Your Honor, I will echo what my co-counsel said, that

16   appointments are appointments are appointments.  Appointment of

17   judges is appointment of judges.

18           **THE COURT:**  Well, do you have anything else over here

19   relative to the powers of the CCID court?

20           **MR. SHANNON:**  Your Honor, if I may, Rex Shannon, on

21   behalf of the State defendants.  As far as the State defendants

22   go, we would stand on the statutory text.  It is outlined in

23   the bill.  I believe the section addressing the CCID court is

24   Section 4.  To my knowledge, no Court has yet construed any

25   substance of this bill or this statute at this point for us to

1    have any guidance in terms of interpretive guidance.  We would

2    just stand on the statutory text, Your Honor.

3              **THE COURT:**  Well, tell me what the statutory text

4    says, then.

5              **MR. SHANNON:**  Would you like me to read it into the

6    record, Your Honor?

7              **THE COURT:**  Yes, please.  Would you do so?

8              **MR. SHANNON:**  Yes, Your Honor.

9              **THE COURT:**  Why don't you go to the podium so you can

10   get the benefit of the microphone.

11             **MR. SHANNON:**  Yes, Your Honor.  Your Honor, I'm

12   reading from House Bill 1020, the final version as sent to the

13   Governor, which is now the statutory language.  Specifically

14   Section 4, subsection 1A reads as follows, and I shall quote

15   verbatim.

16        "From and after January 1, 2024, there shall be created

17   one inferior court as authorized by Article VI, Section 172 of

18   the Mississippi Constitution of 1890, to be located within the

19   boundaries established in Section 29-5-203 for the Capitol

20   Complex Improvement District, hereinafter referred to as CCID.

21   The CCID inferior court shall have jurisdiction to hear and

22   determine all preliminary matters and criminal matters

23   authorized by law for municipal courts that accrue and occur in

24   whole and in part within the boundaries of the Capitol Complex

25   Improvement District, and shall have the same jurisdiction as

1    municipal courts to hear and determine all cases charging

2    violations of the motor vehicle and traffic laws of this state

3    and violations of the City of Jackson's traffic ordinance or

4    ordinances related to the disturbance of the public peace that

5    accrue or occur in whole or in part within the boundaries of

6    the Capitol Complex Improvement District."

7         Subsection B reads as follows, quoting verbatim:   "Any

8    person convicted in the CCID inferior court may be placed in

9    the custody of the Mississippi Department of Corrections

10   Central Mississippi facility."

11        Reading from Subsection 2, which is the successive next

12   subsection, quoting verbatim:   "The Chief Justice of the

13   Mississippi Supreme Court shall appoint a CCID inferior court

14   judge authorized by this section.   The judge shall possess all

15   qualifications required by law for municipal court judges.

16   Such judge shall be a qualified elector of this state and shall

17   have such other qualifications as provided by law for municipal

18   judges."

19        Continuing, Subsection 3, and I quote:   "The

20   Administrative Office of Courts shall provide compensation for

21   the CCID inferior court judge and the support staff of the

22   judge.   Such compensation shall not be in an amount less than

23   the compensation paid to municipal court judges and their

24   support staff in the city of Jackson."

25        Subsection 4:   "All fines, penalties, fees and costs

124

1    imposed and collected by the CCID inferior court shall be

2    deposited with the City of Jackson municipal treasurer or

3    equivalent officer."

4        Subsection 5:  "This section shall stand repealed on

5    July 1, 2027."

6        Your Honor, from there, Section 5 of the statute goes on

7    to discuss the Attorney General's designation of prosecuting

8    attorneys.  But I believe in reference to your Court's question

9    about the jurisdiction of the CCID court, the text I just read

10   would explain that, Your Honor.

11            THE COURT:  It would appear, then, that that court

12   would be a misdemeanor court.  Do you agree with that?

13            MR. SHANNON:  Your Honor, I'm not prepared to make

14   that characterization standing here today.  I know we have made

15   arguments in the Mississippi Supreme Court regarding the nature

16   of the CCID court, that it has equivalent jurisdiction to a

17   municipal court, but I would stand on those arguments.  I'm not

18   prepared today to comment further on it.

19            THE COURT:  Go a little further on if it is there,

20   the maximum sentence in a criminal case that the CCID court

21   could impose.

22            MR. SHANNON:  Your Honor, I don't have that

23   knowledge.

24            THE COURT:  You don't think it's in the statute?

25            MR. SHANNON:  It may be in the statute, but off the

1    top of my head, what I just read, I would stand on that.  I'm

2    just not prepared to comment.  I'm not knowledgeable of the

3    text well enough to give Your Honor that information standing

4    here today.

5              **THE COURT:**  Okay.  Thank you.

6              **MR. SHANNON:**  Yes, Your Honor.  Thank you.

7              **MR. NED NELSON:**  Your Honor, do you have any

8    additional questions?

9              **THE COURT:**  I do.  The Chief Justice has informed

10   that if there's a vacancy on the municipal court, that

11   ordinarily he would not be making an appointment there.  So

12   then on this matter of judicial immunity, you are saying that

13   he's covered because he is a judge empowered to act as a judge

14   when he might make an appointment.  So even if he were going to

15   make an appointment to a municipal court, are you saying, then,

16   that he would still enjoy judicial immunity?

17             **MR. NED NELSON:**  Yes, sir.

18             **THE COURT:**  Even though ordinarily he would not be

19   making an appointment to a municipal court?

20             **MR. NED NELSON:**  Yes, sir.  His inclusion in a

21   statute that authorizes him to make that appointment has

22   nothing to do with that statute's legality any more than it

23   does make him an adequate or proper party to challenge that

24   statute.

25             **THE COURT:**  One of the factors that I pointed out in

1    my opinion on the road to his judicial immunity was that in the

2    past he had made appointments of circuit court judges and other

3    judges, county judges, et cetera, and that that was a

4    traditional function that the Chief Justices had been allowed

5    over the years.  But in this matter concerning a misdemeanor

6    court appointment, are you agreeing that there will be no

7    tradition of a Chief Justice ever appointing a municipal court

8    officer?

9              **MR. NED NELSON:**  In that limited circumstance, there

10   are none to my knowledge, Your Honor.  The definition, or the

11   exceptions to judicial immunity, and this is -- again, I'm

12   going to rely on our pleadings -- are where a judge acts

13   without jurisdiction to do so.  Even if it is a judicial act,

14   if it is taken without jurisdiction -- again, I think we have

15   said this before on the record, Your Honor, that we are not

16   saying that the legislature cannot authorize the Chief Justice

17   to assault someone or commit a crime of some sort.  That would

18   be -- he has no jurisdiction to do that.  But he does have

19   jurisdiction to make judicial appointments.  But he would be

20   acting within his jurisdiction in doing so.

21             **THE COURT:**  All right.  Thank you.

22             **MR. NED NELSON:**  Yes, sir.

23             **THE COURT:**  Let me turn to the other side.  Thank you

24   so much.  Counsel, I have a question for you now.

25             **MR. LYNCH:**  Thank you, Your Honor.

1    **THE COURT:**  If the Mississippi Legislature empowered

2    the Chief Justice to make appointments in vacancy situations to

3    municipal courts, would that affect your argument on the denial

4    of judicial immunity?

5    **MR. LYNCH:**  I didn't get the first part of the

6    question, Judge.

7    **THE COURT:**  If the legislature allowed the Chief

8    Justice to make appointments in cases of vacancy to municipal

9    courts, even though the Chief Justice traditionally has not

10   been making such appointments in such cases of vacancies, would

11   then your argument on judicial immunity be different?

12   **MR. LYNCH:**  Here's how I think we would respond to

13   that, Your Honor.  The legislature has a lot of power, and if

14   they say that the Chief Justice can appoint somebody to a court

15   that he has never appointed anybody to, the question is not

16   whether the legislature can do that.  I think the legislature

17   could.  But is it a judicial act?  And because there is no

18   tradition, no history of the Chief Justice appointing judges to

19   this misdemeanor court, inferior court, because there is no

20   tradition in history, then it should not be characterized as a

21   judicial act.

22   Furthermore, supporting that proposition is that the

23   normal way to select a municipal court judge in municipalities

24   of a certain size threshold, which Jackson clearly meets, it's

25   the responsibility of the governing board of the jurisdiction.

1    So I would be very hesitant to say that the judge enjoys

2    immunity for invading a historic prerogative of the local

3    municipality.

4         **THE COURT:**  But how would the Chief Justice be

5    invading that traditionally recognized approach if the

6    Mississippi Legislature empowered him to do so?

7         **MR. LYNCH:**  It would be a conflict of law situation

8    that the Court would have to sort out.  And I recognize it

9    would be two acts of the legislature whereas authorizing the

10   Chief Justice to appoint circuit court judges invades the

11   constitutional provision of the Mississippi Constitution, which

12   are such judges should be elected.  But I think because of the

13   absence of the tradition, any background, it would -- in

14   interpreting what might seem to be a conflict -- conflicting

15   pieces of legislation, that in analyzing whether it is a

16   judicial act, the lack of any experience, which we have now on

17   the record from the Chief Justice, would be very persuasive and

18   should be given a lot of weight.

19        **THE COURT:**  But why would the Mississippi Legislature

20   not be empowered to do that?

21        **MR. LYNCH:**  I don't think you should assume that the

22   legislature was invalidating the tradition and statutory

23   authority of jurisdictions -- the governing bodies of

24   municipalities who appoint their municipal court judges.  I

25   would be very hesitant to think that this statute intended to

1   override and invalidate that statute.

2          **THE COURT:**  But on the other hand, wouldn't the

3   Mississippi Legislature be presumed to know all of its

4   statutes?

5          **MR. LYNCH:**  I think that is probably a recognized

6   proposition, Your Honor, but --

7          **THE COURT:**  And if it knows all of its statutes and

8   then renders a statute of first blush providing --

9          **MR. LYNCH:**  But also --

10          **THE COURT:**  Excuse me.  Let me finish this --

11   providing the Chief Justice the power to appoint vacancies in

12   municipal courts, wouldn't then that be a valid exercise of the

13   Mississippi Legislature and also a recognition that in so doing

14   the Mississippi Legislature that would have had implicit

15   knowledge of its own statutes, be acting within its power and

16   thus could enlarge the power for the Chief Justice to make that

17   appointment?

18          **MR. LYNCH:**  To do so, I would think it would be

19   necessary to have an explicit repeal of the statute that sets

20   up the authority of municipalities -- the governing boards of

21   municipalities to select their circuit court judges.  I don't

22   think you can -- I think it is very -- there are a lot of

23   canons of statutory construction, and one of them is that the

24   legislature doesn't repeal its own statutes sub silentio.

25          **THE COURT:**  Well, what about an implicit repeal?

1          **MR. LYNCH:**  I think those are highly disfavored.

2          **THE COURT:**  It might be disfavored, but you're not

3     saying that it is powerless to do so?

4          **MR. LYNCH:**  Oh, they certainly have the power to

5     amend or repeal existing statutes, but when they don't say

6     that's what they are doing, a Court should be reluctant to

7     infer or imply that that's what they did.

8          **THE COURT:**  Let me go to another angle on this same

9     question.  The CCID court is a new court.  Thus, it has no

10    traditional path to tell us what is ordinarily done relative to

11    that court.  So then that court -- this court would be a court

12    of first impression, correct?

13         **MR. LYNCH:**  It is a first of its kind, but it shares

14    so many characteristics of a traditional municipal court that

15    it's not that much of a new wine, so to speak.  It has so many

16    of the characteristics of a traditional municipal court that I

17    don't think counsel on the other side of the podium here get

18    that much mileage out of that fact.

19         **THE COURT:**  Now, this CCID court, this court

20    allegedly would have powers of a municipal court, and thus by

21    extrapolation, one would expect, then, that court to be limited

22    relative to punishment for one year or less.

23         **MR. LYNCH:**  Yes.

24         **THE COURT:**  So then can't the Mississippi Legislature

25    determine the terms and the sentences that should be imposed in

1    the various courts?

2         And furthermore, I want to add one other thing.  With

3    regard to the CCID court, since all of its powers have not been

4    explicitly determined at this point, then can this court

5    actually function constitutionally if one does not know the

6    powers, duties, restraints, limitations of said court?

7         **MR. LYNCH:**  I think there are a lot of problems with

8    the vagueness of this creation of the CCID.

9         Your Honor, I've got to follow the lead of Mr. Shannon and

10   say that we need to study these issues in a little more depth

11   before I can confidently speak on all of them.  I've gone a

12   little further than he did, but I would like to make the same

13   reservation he did.

14        **THE COURT:**  Okay.  But what you have concluded, I

15   believe, is that this CCID court is essentially a misdemeanor

16   court which is similar to municipal courts that are already in

17   existence in Mississippi.  Is that correct?

18        **MR. LYNCH:**  Yes, it has some additional powers and

19   some pretty potent powers, one of them being the authority to

20   bind -- to sentence people to serve periods of incarceration in

21   the state penitentiary, which is a huge departure.

22        **THE COURT:**  Now, are you saying that they could do

23   that?

24        **MR. LYNCH:**  It's in the statute, yes.

25        **THE COURT:**  That they could sentence persons to the

1   state penitentiary?

2          **MR. LYNCH:**  Yes, Your Honor, that's one of the big

3   objections.

4          **THE COURT:**  You know, I think I saw that, but at the

5   time that I saw some of these matters, I wondered, then, what

6   was the penalties that were involved, which is why I asked a

7   few minutes ago about what penalties.

8          Now, I heard some of the offenses that were mentioned, but

9   is there anything in the Mississippi statutes that says that a

10  person who goes to the penitentiary is being sentenced more

11  akin to a felon as opposed to a misdemeanant?

12         **MR. LYNCH:**  I believe the -- I believe that

13  incarceration in the state penitentiary is an attribute of a

14  felony conviction and that people don't get sent to the state

15  penitentiary for misdemeanor violations.

16         **THE COURT:**  Well, people have gone to the state

17  penitentiary for misdemeanors.

18         **MR. LYNCH:**  Your Honor, again, we need to study this

19  more.  This isn't a great excuse, but let me just speak about

20  what we have been dealing with.  Again, it's the cadence that

21  was set by the legislature of the different effective dates,

22  and we have focused like a laser beam on the Hinds County

23  appointments because they were to be done within 15 days of

24  passage.

25         The CCID doesn't come into effect until January 1, 2024.

1    And for better or for worse, we have proceeded to -- we have

2    proceeded to address these issues on the clock that the

3    legislature set for their effective dates.

4           **THE COURT:**  Okay.  But I asked about the civil rights

5    days, the '60s, and I have a clear memory of civil righters who

6    were arrested who were sentenced to the penitentiary.

7           **MR. LYNCH:**  Yes.  And I -- there's a lot of history

8    there, Judge, and I think that was recognized as a terrible

9    violation and a terrible departure from Mississippi practice,

10   but again, I, like Mr. Shannon, need more time to look into

11   this.

12          **THE COURT:**  Thank you very much.

13          **MR. LYNCH:**  Can I respond to Mr. Shannon's comments?

14          **THE COURT:**  Yes, he is waiting on you to respond.

15   Mr. Shannon, just hold on.

16          **MR. LYNCH:**  It's actually a fairly short presentation

17   for such a long lunch break.

18          **THE COURT:**  Go ahead.

19          **MR. LYNCH:**  As oftentimes is true in life, timing is

20   everything.  And to a large extent, Mr. Shannon's argument

21   distorts the timing of what we are proposing.  So let me be

22   very clear about that.

23          Step one, we asked the Court to grant the motion for leave

24   to amend the complaint.  So then we will have an operative

25   complaint.

1    Step two, we asked the Court to enter a TRO against the

2 Doe defendants -- well, 1 through 4, the Hinds County Circuit

3 Court appointees, issue a TRO.

4    And point three, of great importance, to issue that TRO

5 before you lift the TRO that is currently restraining the Chief

6 Justice so that there's not a sliver of opportunity to have

7 these appointments made.  And this will extricate the Chief

8 Justice at least from the issues on injunctive relief with

9 respect to the Hinds County Circuit Court.

10    So, you know, the way Mr. Shannon presented what we are

11 proposing, he kind of mixed up the order of battle or the

12 sequence that we are proposing, and it did sound kind of crazy.

13 We were asking you to issue a TRO before there was a complaint.

14 No.  We are asking you to grant the motion for leave to amend,

15 that will take care of the complaint, and then move on to the

16 TRO, and then the Court would be in a position at that point to

17 lift the TRO against the Chief Justice.  That's what we are

18 proposing.  And that timing and sequencing is very important so

19 that there's not a sliver of opportunity for the Chief Justice

20 to do what the statute commands him to do.

21    When we get him out of the way, we get the Doe plaintiffs

22 in, and then we can get the Chief Justice out of the way on

23 that Hinds County issue.

24    Now, we have other issues with the Chief Justice.

25 Mr. Cline can respond to that.  But that's what I really wanted

1    to make in response to Mr. Shannon.

2         Secondly, he says that his clients, the State defendants

3    who are in the case now, are named in the complaint with

4    respect to the appointments.  I'm sorry.  That is just wrong.

5    If you look at the preface to Count 2, which starts at

6    paragraph 141 of the proposed amended complaint, and the

7    preface to Count 3, which begins at paragraph 147 of the

8    amended complaint, the Attorney General, the director of public

9    safety, and the chief of the Capitol Police are not named in

10   those counts.  They don't concern him.  That's why I say they

11   don't have standing to raise these arguments.  They are not

12   implicated by these counts.  And this is one of the changes.

13   This is one of the changes we made in the amended complaint.

14   We spelled out, we itemized the names of the people that were

15   being sued on each count, and those three State defendants are

16   not brought in on Counts 2 and 3.

17        I think that that responds to the principal points that I

18   wanted to make -- that makes the dual points I wanted to make

19   in response to Mr. Shannon.  If the Court has any questions,

20   I'm happy to answer them.  Thank you very much.

21            **THE COURT:**  Thank you.  But Mr. Shannon, what about

22   his argument just then that they are not named?

23            **MR. SHANNON:**  Well, Your Honor, the Attorney General

24   and the two -- the DPS commissioner and the Capitol Police

25   chief are named as defendants in the proposed first amended

1   complaint.  It's our argument and always has been that the

2   plaintiffs don't have standing to sue any of these defendants

3   because they have not demonstrated any legally cognizable

4   injury.  We have argued that at length in previous briefing and

5   from this podium in previous hearings.

6        That same defense would apply with respect to the proposed

7   first amended complaint.  I'm just simply making the point that

8   I believe we have standing to assert standing as a defense to

9   the proposed first amended complaint, just like we did with

10  respect to the original complaint.  None of the claims against

11  my client has changed, as I appreciate it, in the first amended

12  complaint.  It's the same claims, albeit the plaintiffs are

13  attempting to add I believe nine additional defendants, if I

14  have it right, seven John and Jane Does, the AOC director and

15  the BFA director.  Thank you, Your Honor.

16           **THE COURT:**  Thank you.

17           **MR. CLINE:**  Thank you, Your Honor.  I would like to

18  start with one of the questions Your Honor was asking about the

19  pending state court challenge.  There's been no motion for the

20  Court to abstain in this case, so those issues haven't been

21  briefed.  I would direct Your Honor back to our original --

22           **MR. MARK NELSON:**  Your Honor, we cannot hear counsel.

23  Please speak into the mic.

24           **MR. CLINE:**  I would direct Your Honor back to our

25  opposition to the motion to dismiss where we cited the Fifth

1     Circuit case, *Murphy v. Uncle Ben's.*  That's 168 F.3d 734.  The

2     Court there said, "Courts have a virtually flagging obligation

3     to exercise the jurisdiction given them."

4          There's been no request for the Court not to exercise that

5     jurisdiction, so we believe continuing with the case is proper.

6               **THE COURT:**  Did you say flagging or unflagging?

7               **MR. CLINE:**  Unflagging.  Virtually unflagging.

8               **THE COURT:**  Yeah, it should be unflagging.  Go ahead.

9               **MR. CLINE:**  I heard two important concessions in what

10    Mr. Nelson was saying here.  First, that the Chief Justice has

11    never before appointed a judge who exercises the powers of a

12    municipal court judge.  There are mentions of a county court

13    judge, of a justice court judge.  Neither of those have the

14    same authority and function as a municipal court judge.

15         Second --

16              **THE COURT:**  You say they don't have the authority of

17    what now?

18              **MR. CLINE:**  A municipal court judge.

19              **THE COURT:**  You are saying county judges don't have

20    that same authority?

21              **MR. CLINE:**  They are not equivalent to.  They have

22    greater authority.  They have, I believe -- actually, I don't

23    have --

24              **THE COURT:**  Doesn't county court have jurisdiction

25    over misdemeanor cases too?

1          **MR. CLINE:**  I believe they may have greater

2     jurisdiction, Your Honor, but that goes back to our point that

3     the Fifth Circuit cases, we have *Davis v. Tarrant*, we have a

4     case citing that, *Watts v. Bibb County*, and *Davis v. Tarrant*

5     was citing *Lewis v. Blackburn*.  All of those cases are saying

6     that for an inferior appointment, such as a magistrate judge,

7     that that is not a judicial act.

8          So it is of no importance that a county court, which the

9     Chief Justice has previously appointed, will have greater

10     authority, because here we are talking about the CCID inferior

11     court, which has lesser authority.  And that lesser authority

12     is usually appointed by the governing authorities of the

13     municipality, so it's not a judicial function.

14          I would just point Your Honor back to page 17 of Your

15     Honor's order.  You talk about the guidepost factors.  You say

16     there are four factors for determining whether a judge's

17     actions were judicial in nature and thus protected by the

18     shield of judicial immunity:  One, was a normal judicial

19     function involved?  Two, did the relevant act occur in or

20     adjacent to a courtroom?  Three, did the controversy involve a

21     pending case in some matter?  And four, did the act arise

22     directly out of a visit to the judge in his official capacity?

23          If Your Honor will recall, when looking at the Section 1

24     analysis, the only factor that was found, as we read Your

25     Honor's order, the only factor that was found to weigh in favor

1   of judicial immunity was that first factor, was it a normal

2   judicial function.  Your Honor said yes.  Looking to 9-1-105,

3   that statute had historically allowed appointments of temporary

4   special circuit judges.  Even that factor is lacking here.  So

5   we are zero for four.

6        My friend on the other side is simply mistaken to say

7   whenever a judge acts within their jurisdiction, they get

8   immunity.  That has it backwards.  Courts apply the test.  Your

9   Honor, properly applied here, looking to those four factors,

10  that is the test.  The question of whether they are acting

11  within their jurisdiction is an exception to that.

12       So even if the judge satisfies this test for judicial

13  immunity, they may nevertheless be subject to liability if they

14  are acting beyond their jurisdiction.  So if they are doing

15  something that is normally something a judge does, you know,

16  adjudicating a dispute, but it turns out they had no business

17  adjudicating that dispute in the first place, say it was a

18  judge from Alabama here in Mississippi, way outside their

19  jurisdiction, it's a normal judicial act.  That would get

20  judicial immunity normally.  But if they are beyond their

21  jurisdiction, then they can be subject to liability.  That's

22  not what we have here.  So they are misconstruing the test.

23  They are putting it backward there.

24       We went over some of this before at the June 14th hearing,

25  but they have made this point again, that we could have

1    addressed Section 4 in our opposition to the motion to dismiss.

2    I've said this before, but we framed our response as posed by

3    the motion itself.  We had no obligation to preempt any

4    affirmative defenses that were not raised in the motion to

5    dismiss itself.  And one would have thought that if we had

6    waived any argument there, that would have been pointed out in

7    the reply brief.  It was nowhere mentioned in the reply.

8         But because we are in a new posture here than we were on

9    June 14th, I think it bears repeating.  If it is true that, as

10   counsel for the Chief Justice is saying, that for the first

11   time we raised the Section 4 claim and a declaratory relief

12   claim only after Your Honor's order, then I think that is all

13   the more reason for Your Honor to grant the motion for leave to

14   amend.  That concedes those issues were not before the Court

15   when Your Honor was considering and issuing your order, and we

16   now have new issues that are not precluded for the reasons I've

17   said.  By the Court's prior order, there is no reason to not

18   allow us to go forward on that motion to amend.

19        There is also -- reading -- my friend on the other side

20   was reading the one sentence or so conclusion of Your Honor's

21   order, that the Chief Justice was dismissed from the

22   litigation.  It bears repeating.  But note 2 of Your Honor's

23   order says, This order, however, only addresses HB 1020, and

24   more specifically, that allows specific provision Section 1.

25   So whenever Your Honor said that Chief Justice was dismissed

 1   from this litigation, it's from the litigation concerning

 2   Section 1.  And as I've said before, page 11 points out that

 3   that was with respect to the pending TRO request for injunctive

 4   relief.

 5        Now, possibly the final point, there may be one after,

 6   there is this pivot from arguing that now that they can see

 7   that the declaratory relief claim is allowed by Section 1983, I

 8   heard nothing to the contrary.  This is what they have conceded

 9   before.  This is, of course, why injunctive relief may be

10   allowed under 1983 if declaratory relief has not been available

11   or was violated.  That presupposes that declaratory relief

12   could have been granted in the first place.

13        I take it they maintain their concession that that is

14   allowed under Section 1983.  They now pivot to say that even

15   though the statute allows it, the Constitution doesn't, because

16   there is no standing to raise that type of claim.  They haven't

17   cited to cases for that today, but they have in their briefs,

18   so I can just talk through some of or all of them.

19        Their leading case is *Bauer v. Texas*.  They've mentioned

20   this one before.  We talked about it last time.  That case

21   involved a trust beneficiary who had a guardian ad litem

22   appointed on a petition to a probate judge, and she was

23   dissatisfied with that process.  She didn't want the guardian

24   ad litem to have been appointed, so she subsequently brought a

25   federal lawsuit against the probate judge under the guise of

1    challenging the guardian ad litem statute.

2         The Fifth Circuit there said that is unacceptable for two

3    reasons:  First, there is no likelihood that a future guardian

4    ad litem petition would be filed against this woman and

5    adjudicated by this judge, so there is no threatened harm, no

6    imminent likelihood of future harm.  That was the first issue.

7    Of course, there is nothing like that here.  For reasons my

8    co-counsel said, we face a very imminent risk that there will

9    be injuries to the constitutional rights here if the TRO is

10   lifted, if the Chief Justice is allowed to comply with HB 1020.

11        The Court went on, then, and said that, quote, Judges

12   enjoy absolute immunity from liability for judicial or

13   adjudicatory acts, end quote.  Because determinations made

14   under Section 875 are within a judge's adjudicatory capacity,

15   there is no adversity between Bauer and Olsen, the probate

16   judge, as to whether Section 875 is facially unconstitutional.

17        So the posture you had there was a facial challenge to a

18   state law with the defendant being the judge who adjudicates

19   that petition.  So that is a collateral attack on that other

20   adjudication in that judge's adjudicatory capacity where he

21   would make determinations under that state law.  That is not

22   the situation we have here.  We just have a regular appointment

23   with no determinations, no claims, no petition, no adjudication

24   at all.

25        I could walk through the rest of their cases if Your Honor

1    would like.  All of their cases are like this.  *In Re: Justices*
2    *of Supreme Court of Puerto Rico* is one example.  They say,
3    There is no standing where judges, quote, sit as adjudicators,
4    finding facts and determining law.

5        *Whole Woman's Health,* for example, no standing to sue
6    State Court judges who decide SB8, quote, private civil
7    actions.  The  most recent case that they cited, *Machetta v.*
8    *Moren*, "Gary Machetta is a party to an ongoing child custody
9    proceeding with his ex-wife in Texas state court.  Unsatisfied
10   with the outcome of those proceedings, Machetta filed a
11   complaint in federal district court against the Texas state
12   judges presiding over his case."

13       So we have nothing like that here.  There is no reason
14   that the Constitution, that Article III standing, should be an
15   obstacle to us pursuing what they have conceded is allowed
16   under Section 1983 itself.  And that's why in addition to the
17   Section 4 claim, we should be able to proceed under Section 1
18   for declaratory relief.

19       We have two cases that we could offer as an example of how
20   this happens.  They have made the claim that never in the
21   nation's history has a Court declared a statute or actions
22   taken under a statute unconstitutional with a judge as a
23   defendant.  That just isn't true.  *Rivera Puig*, 785 F. Supp.
24   278, this was a decision within the First Circuit that was
25   decided a decade after *In re Justices of the Supreme Court of*

1    *Puerto Rico*.  They allowed an attack on the constitutionality

2    of a state law against the judge, despite a judicial immunity

3    defense, and found, "declaratory relief was proper."

4         In that case, this was a reporter who was trying to report

5    on a criminal matter with a high profile defendant, and the

6    state criminal code allowed the judge to exclude members of the

7    public from the courtroom if there was a very sensitive matter

8    that was coming up, and the reporter wanted to access the

9    courtroom and wasn't able to and so brought suit.

10        So this is a prospective suit because nothing had happened

11   yet.  This was about an upcoming matter.  They were seeking

12   immediate relief.  Because there was a judge, because there was

13   this worry about judicial immunity, they sought a declaratory

14   judgment.  They weren't seeking -- or they may have sought an

15   injunction, but the Court granted only the milder form of

16   relief, this declaratory relief.  And that is one of these

17   cases that saying, of course, it is assumed that a state court

18   judge is going to abide by a declaration of the

19   constitutionality of the law, so they didn't find it necessary

20   to go all the way and to issue an injunction.  This is one of

21   those types of cases.  Because of this, judicial immunity

22   defense had been interposed.

23        Just to clarify where we are, the judicial immunity

24   defense has not been properly argued for Section 4.  I'm just

25   talking about Section 1 here for declaratory relief.

1          The second case I will mention -- so that was pretty

2   squarely on point outside of the Fifth Circuit.  Within the

3   Fifth Circuit, we have slightly more indirect but also

4   instructive, *Caliste v. Cantrell*.  That is the case we

5   discussed previously that that appears in our briefing.  That

6   case involved Louisiana state judges who would get a percent of

7   the fees from commercial surety bonds sent back to their court

8   district for them to use on their support staff and for other

9   things, to keep the courts running.

10          The plaintiffs in those cases were concerned that the

11  judges were increasing the bonds that they were requiring in

12  order to direct more fees to the court, and all the judges in

13  that court sat on a panel that chose what to do with the fees

14  that were collected.  So the Fifth Circuit upheld the

15  declaration that those actions pursuant to that law of setting

16  these bond rates and then having those fees directed back to

17  the court, that that fact was unconstitutional where a state

18  court judge was a defendant.

19          And as I said previously at the June 14th hearing, there

20  is a footnote in there saying that they don't need to decide

21  the issue of judicial immunity because it didn't matter,

22  because they were only seeking a declaration there.

23          So at the end of that case, the Fifth Circuit is kind of

24  agnostic about whether what they were saying was a declaration

25  of unconstitutionality of a state law or what the individual

1    judge was doing, but they did then say, quote, It may well turn

2    out that the only way to eliminate the unconstitutional

3    temptation is to sever the direct link between the money the

4    criminal court generates and the general expense fund that

5    supports its operations.

6         On remand, after further proceedings, that's exactly what

7    the Louisiana Legislature did.  To avoid the

8    unconstitutionality of the statute, in their view, they amended

9    that so that the fees that were generated from the commercial

10   surety bonds were not directed to the judicial district in

11   which they arose.

12        So that is just an example.  That is instructive within

13   the Fifth Circuit how the Court can issue a declaration of

14   unconstitutionality that applies more broadly to the statute

15   itself with the judge as a defendant.

16        **THE COURT:**  But that addressed the statute, right?  I

17   mean, the Louisiana Legislature amended the statute --

18        **MR. CLINE:**  Yes, sir.

19        **THE COURT:**  -- relative to the practice of collecting

20   the fees and what could be done with the fees.  But now the

21   judge who was sued did not suffer any prejudice under that

22   decision; is that correct?

23        **MR. CLINE:**  So the judge, as the defendant, received

24   this declaration that his actions under or related to that

25   statute, that those actions were unconstitutional.  So the

1    Court withheld deciding whether it was him specifically, that

2    he could avoid the unconstitutionality, or whether the law was

3    creating this impermissible temptation.

4         So, for example, the Court didn't decide if this judge

5    were to step down from the panel that was allocating the funds,

6    if that would suddenly make it constitutional.  But maybe the

7    chief judge of the court could direct where the funds would go,

8    or maybe that would still be constitutionally problematic under

9    the state statute as well.  So they withheld judgment on that

10   issue of how to cure it.  They just said that this has set up

11   an unconstitutional situation, and the Louisiana Legislature

12   responded by fixing the statute.

13        **THE COURT:**  Well, but the Louisiana Legislature

14   didn't say that we are going to deny judicial immunity.

15        **MR. CLINE:**  The Louisiana Legislature did not say so.

16   This is the case, recall, where in a footnote, I believe it was

17   footnote 7, the Fifth Circuit said judicial immunity has no

18   relevance to this case, because whether he is judicially

19   immune, whether he is not, this is an action for declaratory

20   relief, and declaratory relief is allowed against immune

21   judges.

22        **THE COURT:**  That's what I was saying.  It did not

23   make a pronouncement that had an effect on judicial immunity,

24   the decision by the appellate court.

25        **MR. CLINE:**  They did not make a decision that had an

1    effect on judicial immunity, but they assumed he wasn't immune.
2    Remember, this was a situation where a judge is setting a bond
3    amount for a criminal defendant.  So that's quite judicial.  In
4    all likelihood, he did enjoy judicial immunity.  I think there
5    is actually other Fifth Circuit law saying setting the bond
6    rates is a judicial function.
7            **THE COURT:**  Well, the judges were setting the bond,
8    but then the other aspect of it is, it is collecting the bond,
9    the bond moneys, and referring them to their own courts.
10           **MR. CLINE:**  That's right.  So that is what the
11   statute was doing, though.  The statute was taking the money
12   that had been deposited and directing it to the court.
13           **THE COURT:**  And the appellate court said that a way
14   to get around even having to rule on judicial immunity in this
15   action is simply to say that you can't do that, and that other
16   statute should be changed, and they changed the statute.  And
17   there was never a ruling on judicial immunity.
18           **MR. CLINE:**  That was despite judicial immunity.
19           **THE COURT:**  But there was never a ruling on judicial
20   immunity.
21           **MR. CLINE:**  There was no ruling on it, though,
22   because it wouldn't have changed things.
23           **THE COURT:**  Okay.
24           **MR. CLINE:**  Yes.  I mean, so they could have assumed
25   that they did enjoy judicial immunity and proceeded anyway to

1    that.  That was the point that I was trying to make.

2         **THE COURT:**  And that was the same point I was making

3    just then, that there was no ruling on judicial immunity.

4         **MR. CLINE:**  No ruling was necessary, though.

5         **THE COURT:**  I understand what you are saying.

6         **MR. CLINE:**  Okay.  Thank you.  Just making sure.

7    Excuse me one second while I check my notes here.

8         I think that covers all of the issues that I was planning

9    to discuss.  Again, I think these two concessions within the

10   framework of the test for judicial immunity, that four-factor

11   test I mentioned, it is dispositive that the Chief Justice has

12   never before appointed someone who has municipal court judge

13   powers, who is that type of inferior court judge.  As in *Davis*

14   *v. Tarrant*, *Watts v. Bibb County*, *Lewis v. Blackburn*, those

15   cases are all in accord.  Those cases foreclosed the idea that

16   an appointment is an appointment is an appointment.  That would

17   be inconsistent with what the Fifth Circuit was recognizing to

18   be the law in that case.

19        And I think we have no dispute now that Section 1983

20   allows that declaratory relief claim regardless of judicial

21   immunity.  It is just a question of this adjudicatory capacity.

22   And for the reasons I explained, under the case law, that

23   requires an actual adjudication, findings of fact,

24   determinations of law, and there is no such thing where you are

25   looking to adjust the appointment of a municipal court judge or

1   CCID inferior court judge.  Unless the Court has any other

2   questions.

3           THE COURT:  Thank you.

4           MR. NED NELSON:  Your Honor, if I may, just to have a

5   few short comments.

6           THE COURT:  I'll give a few short comments.

7           MR. NED NELSON:  Your Honor, I didn't come here -- we

8   didn't come here prepared to relitigate and rehash arguments

9   that have been submitted in June and July that were argued

10  before the Court on June 14th and taken under submission and

11  argued again at the end of June, June 29th, and submitted again

12  in July.  If I had known that was the case, we could be here a

13  long time.  There have been hundreds of pages of briefs and

14  pleadings submitted, and we rest on those specifically.

15      Just a couple of the points, and I didn't follow all of

16  the citations made by Mr. Cline.  Again, and I know there was a

17  number of cases cited, but I did want to point out that *Davis*

18  *versus Tarrant County*, one of the only Fifth Circuit cases

19  cited, the Fifth Circuit did not enter a declaratory judgment

20  in that case.  They disposed of that issue as being moot.

21      One of the cases cited by plaintiffs is *Caliste versus*

22  *Cantrell*.  Again, it is a Fifth Circuit case from 2019.  That's

23  one of the bail cases, bail setting and collection cases.  That

24  role of judges assumed in that case was not mandated by state

25  law.  It was a voluntary obligation assumed by the judge in

1    that case.

2         The number of cases out of the Eleventh Circuit,

3    specifically from Georgia, dealing with nonlawyer magistrate

4    appointments are the Mississippi equivalent of a special

5    master.  Those are qualified by those courts as being employees

6    who answered directly to that judge in that case.  I can't tell

7    you everything about 1020 or the judges that it contemplates,

8    but they are not the employees of the Chief Justice.  They are

9    judges within the definition of the statute.  They don't answer

10   day to day to the Chief Justice.  The appointments are made by

11   the Chief Justice.

12        All of the cases that talk about special appointments or

13   appointments of trial judges, regardless of the qualifications

14   or their jurisdictional qualifications, uniformly hold them to

15   be judicial acts for purposes of immunity.  I have nothing

16   further, Your Honor.

17             **MR. MARK NELSON:**  May I say something on that, Your

18   Honor?  Mark Nelson.  I went back and looked at the amended

19   complaint, proposed amended complaint, which is filed as

20   Document 80-2, and as to my client, the Chief, Count 2 says

21   that he intentionally discriminates against the majority-Black

22   residents in violation of the Equal Protection Clause.  Then

23   Count 3 says that Mike Randolph, the Chief Justice,

24   "discriminates against the majority-Black residents of Jackson

25   as protected by the Equal Protection Clause."  It is only a

1   four-count complaint.

2        Then we flip over to the prayer for relief, Your Honor,

3   paragraph E, enjoining the Chief Justice from appointing anyone

4   under Section 1.  Then you go to paragraph J, and it says,

5   enjoining the Chief Justice from appointing anyone under

6   Section 4.  There is no declaratory relief asked by the Chief

7   Justice in this amended complaint.  What it asks for is a

8   relitigation of the injunction provisions that Your Honor has

9   already addressed, that the Chief Justice is immune from that.

10        Now, I understand that my client wants to make a

11   statement.  Do you want to do that?  May we have leave to --

12        **THE COURT:**  Why don't you hold off on that.  Just

13   hold off on that.  Thank you so much.

14        **MR. MARK NELSON:**  May I answer any questions the

15   Court may have?

16        **THE COURT:**  No, no.  Thank you very much.

17        **(OFF-RECORD)**

18        **MR. LYNCH:**  Your Honor, if I may, for purposes of

19   clarifying the record, Mr. Nelson got up and said that our

20   complaint says that the Chief Justice potentially

21   discriminates.  That's not what it says in the part of the

22   complaint.  It says that HB 1020 discriminates.  We don't say

23   -- he misquoted what is in our complaint.  And I want the

24   record to reflect that.

25        **THE COURT:**  All right.  Thank you.  Is there any

1    disagreement to his last statement?

2            **MR. MARK NELSON:**  Yes, sir.  I read from the

3    complaint.

4            **THE COURT:**  Pardon me?

5            **MR. MARK NELSON:**  Yes, sir.  I read from the

6    complaint.  I can do it again.  It is in black and white in the

7    motion for leave.

8            **MR. LYNCH:**  Could you state the case again, please?

9            **THE COURT:**  Let's get the record straight as to what

10   it says.

11           **MR. MARK NELSON:**  Page 51, Count 2, it says that --

12   Count 2 under Section 1983, "1020's packing of the Hinds County

13   Circuit Court intentionally discriminates against the

14   majority-Black residents of Jackson on the basis of race in

15   violation of the Equal Protection Clause of the Fourteenth

16   Amendment of the United States Constitution.  (Defendants Chief

17   Justice Michael K. Randolph and others, Greg Snowden, Liz

18   Welch, and John/Jane Does 1 through 4)."  That's on page 51.

19       On page 52 of Document Number 80-2, it says, Count 3, 42

20   U.S.C., Section 1983, "HB 1020's creation of the CCID court

21   intentionally discriminates against the majority-Black

22   residents of Jackson on the basis of race in violation of the

23   Equal Protection Clause --

24           **THE COURT:**  Slow down.

25           **MR. MARK NELSON:**  I'm sorry.  "(Defendants Chief

1    Justice Michael K. Randolph, Snowden, Welch, and John Doe)."

2       And then on page 58 is the prayer for relief, which begins

3    on page 57, "Wherefore, plaintiffs respectfully request that

4    this Court enter judgment in favor of the plaintiffs and

5    against defendants, as follows."

6       Paragraph E (sic):  "Preliminarily and permanently enjoin

7    the Chief Justice from appointing any individual to become a

8    temporary special judge of the Hinds County Circuit Court under

9    HB 1020, Section 1."

10      Skipping over to page 59, at paragraph J:  "Preliminarily

11   and permanently enjoin the Chief Justice's appointment of any

12   individual to become the CCID judge under HB 1020, Section 4."

13   That is what I wanted to point out to the Court.

14         **MR. LYNCH:**  Judge, I think it is clear now that we

15   said that the statute does the discriminating, and we named the

16   people that we need relief from to alleviate that

17   discrimination.  We are not saying that they personally are

18   discriminating.  They are the executors of the statute, and

19   that's why they are in there.

20      I don't know why the Chief Justice keeps wanting to insist

21   that we are making allegations against him that we haven't

22   made.  We have made some allegations against him, but these are

23   exaggerations.

24         **MR. MARK NELSON:**  Your Honor, I will let that pass.

25         **THE COURT:**  All right.  The complaint itself is of

1    record, and any inquisitive soul can read the complaint.

2         Now, then, with regard to these matters that we have heard

3    today, this Court intends to write an opinion as fast as

4    possible.  The opinion is going to be released on or before

5    Wednesday week.  And I'm hoping that all of us are available a

6    week from Wednesday.  We wanted to do it a week from Tuesday,

7    but I have another hearing that cannot be moved on that

8    Tuesday.

9         But on that Wednesday that we will congregate again, if

10   that's okay -- if not, please tell my courtroom deputy when we

11   all can be present -- the first thing I want to start with will

12   be the status of the Chief Justice in this lawsuit.  I have

13   some determinations that I have rendered that I'm writing up

14   that's going to address his presence in this lawsuit for all

15   purposes, and I then will make that known at the next time we

16   meet.  If it is Wednesday by our calendar, that is fine.  I

17   can't do it Tuesday, but if there's some conflict with all of

18   these schedules, then we will find some time to do it, but I

19   would like to do it as fast as possible.

20        So then I ask next Wednesday at 9:30, are we available?

21   Anyone has a problem?

22        **MR. SHANNON:**  Is that Wednesday the 13th you are

23   referencing?

24        **THE COURT:**  Yes.

25        **MR. SHANNON:**  Thank you, Your Honor.

1          **MR. NED NELSON:**  Your Honor, the Chief Justice and

2     counsel are available next Wednesday, the 13th.

3          **THE COURT:**  Okay.  Anybody who cannot be available?

4          **MR. LYNCH:**  I'm sorry.  Is it both Wednesday and

5     Thursday?

6          **THE COURT:**  Just Wednesday.

7          **MR. LYNCH:**  Just Wednesday.  That's fine.

8          **THE COURT:**  All right.  Just Wednesday the 13th.

9          **MR. CLINE:**  Your Honor, may I check my personal

10    calendar?  I believe I may have --

11         **THE COURT:**  Do so.

12         **MR. CLINE:**  Thank you, Your Honor.  No conflicts on

13    my end.

14         **THE COURT:**  Anybody?  All right.  Failing to see any

15    conflict hands, then we will go forward on the 13th at 9:30.

16    And so I will see you then.

17         But as I said, at that time, when I start off our session,

18    I intend to address the status of the Chief Justice in the

19    lawsuit.  Then I will have other matters that we will take up

20    that I didn't get a chance to get to today, but I'm just

21    pointing out those things are going to occur on the 13th.

22         I do not need any additional submissions.  The Court has

23    enough already and has read them, and at this juncture, it

24    would probably be redundant.

25         Thank you very much for those you have submitted because

1    they have been very, very, very helpful.  Thank you much.  I
2    will see you then on the 13th.
3                         (HEARING CONCLUDED)

1

2

3                        CERTIFICATE OF COURT REPORTER

4

5          I, Teri B. Norton, RMR, FCRR, RDR, Official Court

6    Reporter for the United States District Court for the Southern

7    District of Mississippi, appointed pursuant to the provisions

8    of Title 28, United States Code, Section 753, do hereby certify

9    that the foregoing is a correct transcript of the proceedings

10   reported by me using the stenotype reporting method in

11   conjunction with computer-aided transcription, and that same is

12   a true and correct transcript to the best of my ability and

13   understanding.

14         I further certify that the transcript fees and format

15   comply with those prescribed by the Court and the Judicial

16   Conference of the United States.

17

18

19

20   s/ *Teri B. Norton*
     TERI B. NORTON, RMR, FCRR, RDR
21   OFFICIAL COURT REPORTER

22

23

24

25