IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CIVIL CASE NO. 3:23CV272-HTW-LGI

| | |
|---|---|
| NAACP, MISSISSIPPI NAACP, | PLAINTIFFS |
| JACKSON NAACP, DERRICK JOHNSON, | |
| FRANK FIGGERS, CHARLES TAYLOR | |
| MARKYEL PITTMAN, CHARLES JONES | |

**AND**

UNITED STATES OF AMERICA                    PLAINTIFF INTERVENOR

VERSUS

| | |
|---|---|
| SEAN TINDELL, COMMISSIONER OF | DEFENDANTS |
| PUBLIC SAFETY; BO LUCKEY, CHIEF | |
| OF THE OFFICE OF CAPITOL POLICE; | |
| CHIEF JUSTICE MICHAEL K. RANDOLPH; | |
| LYNN FITCH, ATTORNEY GENERAL | |

**CONSOLIDATED WITH**

| | |
|---|---|
| JXN UNDIVIDED COALITION, | PLAINTIFFS |
| MISSISSIPPI VOTES, PEOPLES | |
| ADVOCACY INSTITUTE, MISSISSIPPI | |
| POOR PEOPLES CAMPAIGN, BLACK VOTERS, | |
| MATTER, RUKIA LUMUMBA, AREKIA | |
| BENNETT-SCOTT, DANYELLE HOLMES | |

VERSUS

| | |
|---|---|
| SEAN TINDELL, COMMISSIONER OF | DEFENDANTS |
| PUBLIC SAFETY; BO LUCKEY, CHIEF | |
| OF THE OFFICE OF CAPITOL POLICE | |

**TRANSCRIPT OF STATUS CONFERENCE**

BEFORE THE HONORABLE HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE

SEPTEMBER 13, 2023
JACKSON, MISSISSIPPI

Exhibit 2

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFFS, NAACP, ET AL:

 4         CARROLL EDWARD RHODES, ESQUIRE
           LAW OFFICES OF CARROLL RHODES
 5         POST OFFICE BOX 588
           HAZLEHURST, MISSISSIPPI  39083
 6
           BRENDEN CLINE, ESQUIRE (VIA ZOOM)
 7         MARK H. LYNCH, ESQUIRE
           DAVID LEAPHEART, ESQUIRE  (VIA ZOOM)
 8         COVINGTON & BURLING, LLP
           ONE CITY CENTER
 9         850 10TH STREET N.W.
           WASHINGTON, DC  20001
10
           EVAN WALKER-WELLS, ESQUIRE
11         JOSEPH SCHOTTENFELD, ESQUIRE  (VIA ZOOM)
           NAACP OFFICE OF GENERAL COUNSEL
12         4805 MT. HOPE DRIVE
           BALTIMORE, MD  21215
13
14    FOR THE CONSOLIDATED PLAINTIFF, JXN UNDIVIDED COALITION, ET AL:

15         PALOMA WU, ESQUIRE
           MISSISSIPPI CENTER FOR JUSTICE
16         210 E. CAPITOL STREET, SUITE 1800
           JACKSON, MISSISSIPPI  39201
17
18    FOR THE PLAINTIFF INTERVENOR, UNITED STATES:

19         JOHN ALBERT RUSS, ESQUIRE
           U.S. DEPARTMENT OF JUSTICE
20         950 PENNSYLVANIA AVENUE, N.W.
           ROOM NWB-7254
21         WASHINGTON, DC  20530

22         ANGELA GIVENS WILLIAMS, ESQUIRE
           MITZI DEASE PAIGE, ESQUIRE
23         U.S. ATTORNEY'S OFFICE
           501 EAST COURT STREET
24         SUITE 4.430
           JACKSON, MISSISSIPPI  39201
25
```

```
 1    APPEARANCES:  (Continued)

 2    FOR THE DEFENDANTS, SEAN TINDELL, BO LUCKEY, LYNN FITCH:
           REX M. SHANNON, III, ESQUIRE
 3         GERALD L. KUCIA, ESQUIRE
           MISSISSIPPI ATTORNEY GERNERAL'S OFFICE
 4         550 HIGH STREET, SUITE 1100
           JACKSON, MISSISSIPPI  39201
 5

 6    FOR THE DEFENDANT, CHIEF JUSTICE MICHAEL K. RANDOLPH:

 7         MARK A. NELSON, ESQUIRE
           NELSON LAW, PLLC
 8         7 WOODSTONE PLAZA, SUITE 7
           HATTIESBURG, MISSISSIPPI  39402
 9

10    FOR THE CONSOLIDATED DEFENDANTS:

11         J. CHADWICK WILLIAMS, ESQUIRE
           OFFICE OF THE ATTORNEY GENERAL
12         550 HIGH STREET's
           JACKSON, MISSISSIPPI  39201
13

14

15

16

17

18

19

20

21

22    REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
                     501 E. COURT STREET, SUITE 2.500
23                   JACKSON, MISSISSIPPI  39201
                     (601)608-4186
24

25
```

 1             **THE COURT:**  Terri, call the case.

 2             **DEPUTY CLERK:**  Your Honor, this is National

 3   Association for the Advancement of Colored People, et al.

 4   versus Tate Reeves, et al., Civil Action No. 3:23cv272-HTW-LGI.

 5   This morning we are here for a continuation of the

 6   September 5th status conference, and at this time, I'm going to

 7   ask all counsel to state their names for the record, starting

 8   with the plaintiff.

 9             **MR. RHODES:**  Good morning, Your Honor, Carroll Rhodes

10   for the plaintiff, joined by Mark Lynch -- my co-counsel, Mark

11   Lynch, and Evan Walker-Wells.

12             **THE COURT:**  Good morning to you.  Next?

13             **MR. RUSS:**  Hello, Your Honor.  Bert Russ with the

14   U.S. Department of Justice.  I'll let my colleagues introduce

15   themselves.

16             **MS. WILLIAMS:**  Good morning, Your Honor, Angela

17   Givens Williams for the United States.

18             **MS. PAIGE:**  Good morning, Your Honor, Mitzi Dease

19   Paige with the United States Attorney's office.

20             **THE COURT:**  Good morning.

21             **MS. WU:**  Good morning, Your Honor, Paloma Wu for the

22   JXN Undivided Coalition versus Tindall plaintiffs in the

23   consolidated case.

24             **THE COURT:**  Good morning to you, too.

25             **MR. RHODES:**  Your Honor, I forgot to mention joining

```
 1    us by zoom for the plaintiffs, the NAACP, are Brenden Cline,

 2    David Leapheart, and I think Joe Schottenfeld was supposed to

 3    be on, but I don't see him.

 4              THE COURT:  All right.  Good morning to you, too.

 5    All right.  The other side?

 6              MR. SHANNON:  Good morning, Your Honor.  Rex Shannon

 7    with my co-counsel, Gerald Kucia.  We are here on behalf of the

 8    state defendants in the NAACP case.

 9              THE COURT:  All right.

10              MR. WILLIAMS:  Good morning, Your Honor.  Chad

11    Williams from the Attorney General's Office here on behalf of

12    Commissioner Sean Tindell and Bo Luckey in the JXN Undivided

13    Coalition consolidated case.

14              THE COURT:  Thank you, now.  Next.

15              MR. MARK NELSON:  Good morning, Your Honor, Mark

16    Nelson on behalf of the Chief.

17              THE COURT:  Good morning.  And the Chief is present.

18              MR. MARK NELSON:  Yes, sir.

19              THE COURT:  Good morning.

20              CHIEF JUSTICE RANDOLPH:  Good morning.

21              THE COURT:  Now, I believe that is all of the parties

22    and persons, attorneys, who are here at counsel table.  Now, is

23    there anyone who has sat him or herself out in the audience

24    instead?  No, I don't see anyone else, don't see any hands.

25    Ready to proceed.
```

1       I had said that when we start today, I wanted to address

2  the matter of the status of the Chief Justice, and I intend to

3  do that now.  What I'm going to do is provide an abbreviated

4  opinion, and when I say abbreviated, I mean this is an opinion

5  that is not to be accorded appealable status at this point

6  because I have a couple of other points that I'm adding, and I

7  want to add those before I contend that it is appealable by

8  either side.  That full opinion will be out shortly in the next

9  couple of days, if not tomorrow, but it will be just -- it will

10 not be today, but it will be out very soon.

11      After I go over these abbreviated points, then I want to

12 hear from the parties on the matter of the Jane and John Does

13 who are being notified by publication of the pending

14 possibility of an injunctive -- of injunctive relief concerning

15 any appointment that might be made.  I have not had the

16 argument on that point yet, and I would like to have that

17 following this abbreviated matter here.

18      So, then, whoever is going to make those arguments should

19 be prepared to deliver those arguments as soon as I finish this

20 abbreviated opinion.

21      So then the abbreviated opinion:  On June 1, 2023, this

22 Court issued its order, Docket No. 45, holding that the Chief

23 Justice of the Mississippi Supreme Court must be dismissed from

24 this Section 1983 lawsuit under the doctrine of judicial

25 immunity.  This Court in this 24-page memorandum opinion

described how judicial immunity shelters judges, such as the
Chief Justice, from civil lawsuits when the judge within the
jurisdiction, within his jurisdiction, performs a quote-unquote
judicial act or is about to perform a judicial act.

This Court's order citing precedent established by the
United States Court of Appeals for the Fifth Circuit and the
United States Supreme Court held that, quote, there are only
two circumstances under which judicial immunity may be
overcome:  First, a judge is not immune from liability for
nonjudicial actions, that is, actions not taken in the judge's
judicial capacity; secondly, a judge is not immune for actions,
although judicial in nature, taken in the complete absence of
all jurisdictions.  And I cited cases throughout my previous
opinion, and I will not do so now.  However, when I submit the
completed opinion, all such relevant case authority will be
submitted, as well as some that were not a part of the prior
order.

Continuing, this Court previously found that neither of
the above exceptions to judicial immunity exists here.  This
Court held that a judicial appointment by the Chief Justice
constitutes a, quote-unquote judicial act, and that House Bill
1020 bestows upon the Chief Justice a, quote, legislative grant
of jurisdiction, unquote, to appoint special temporary judges.

At the time this Court issued its order, the pleadings and
submissions before this Court addressed only Section 1 of House

1   Bill 1020.  The newly enacted Mississippi law at the heart of

2   the conflict between the parties herein, HB 1020, Section 1,

3   signed into law on April 21, 2023, prescribes the appointment

4   mechanism that was at issue at the last session and what the

5   Court addressed by its last opinion.  I will not read that

6   section again here, but the parties all know that section, and

7   it was in the prior order, and the Court will recite it in its

8   entirety in this order.  That section indicated that it should

9   stand repealed on December 31, 2026.

10       Continuing, skipping over some other cites and some other

11  matters that I will enlarge later, plaintiffs allege that they

12  addressed only the above Section 1 in their request for

13  preliminary injunctive relief against the Chief Justice due to

14  the exigent nature of the pending special judges' appointments.

15  The pending special judges' appointments were to be made no

16  later than 15 days after the passage of the act or 15 days from

17  April 21, 2023.  This Court's order, Docket No. 45,

18  accordingly, addressed only House Bill 1020's specific

19  provision, Section 1, which mandates appointment of special

20  judges by the Chief Justice of the Mississippi Supreme Court.

21       Plaintiffs thereafter filed a motion to clarify, Docket

22  No. 51, wherein plaintiffs assert that their complaint, Docket

23  No. 1, raised two separate claims against the Chief Justice,

24  Count 2, based on House Bill 1020, Section 1, and Count 3,

25  based on House Bill 1020, Section 4.

1        House Bill 1020, Section 4 concerns the creation of a new

2   court for the Capitol Complex Improvement District, CCID, in

3   Hinds County, Mississippi, beginning on January 1, 2024.  The

4   Chief Justice, under this provision, quote, shall appoint the

5   CCID inferior court judge, unquote.  This provision in its

6   entirety reads -- and I set out in the opinion exactly what

7   that section provides.  And that section indicates that it

8   should stand repealed on July 1, 2027.  As I said, this is the

9   abbreviated version, and in the final version, all these

10  matters will be mentioned, as well as some other observations.

11       Plaintiffs, by way of their motion to clarify, sought a

12  ruling that plaintiffs' claims for declaratory relief regarding

13  Section 1 are still alive, despite this Court's ruling, and

14  that judicial immunity does not bar plaintiffs' Section 4 claim

15  against the Chief Justice.  Plaintiffs allege that these CCID

16  inferior court judges, under House Bill 1020, Section 4, are

17  akin to municipal court judges.

18       Plaintiffs point to Mississippi Code annotated Section

19  21-23-3 and Section 21-23-9 whereby the Mississippi Legislature

20  has authorized the governing authorities of the municipality to

21  appoint municipal judges and municipal judges pro tem.  In the

22  state of Mississippi, assert the plaintiffs, a municipal court

23  judge has never been appointed by the Chief Justice.

24  Therefore, the Chief Justice's appointment of a CCID judge is

25  not a traditional, quote-unquote, judicial act protected by

1    judicial immunity.

2        First, this Court notes that its previous order dismissing

3    the Chief Justice did not limit its dismissal to a specific

4    claim by the plaintiffs.  Rather, this Court found that

5    judicial immunity shielded the Chief Justice from this

6    litigation in its entirety.

7        This Court next addressed the plaintiffs' assertion that

8    the Chief Justice's appointment -- excuse me.  Let me back up.

9    This Court next addresses the plaintiffs' assertion that the

10   Chief Justice's appointment of a CCID judge amounts to a

11   ministerial or administrative act, one that does not provide

12   the Chief Justice the shield of judicial immunity.

13       If the plaintiffs' assertion is to be taken as true,

14   however, then the Mississippi Legislature allegedly has placed

15   the office of the Chief Justice in a precarious position.  The

16   legislature, by way of Section 4, has commanded that the Chief

17   Justice of the Mississippi Supreme Court shall appoint the CCID

18   inferior court judge.

19       Under the plaintiffs' theory, then, the Chief Justice

20   could either be:  A, in contempt for refusing to follow the

21   mandate issued by the Mississippi Legislature; or B, subjected

22   to personal attacks, declaratory and injunctive, for performing

23   a nonjudicial act.

24       The Mississippi Legislature has established the creation

25   of the CCID court pursuant to the authority vested in the

1   legislature by the Constitution of the State of Mississippi.

2   Article 6, Section 172 of the Mississippi Constitution states,

3   "The legislature shall from time to time establish such other

4   inferior courts as may be necessary and abolish the same

5   whenever deemed expedient."

6        The Mississippi Legislature under this provision, then,

7   has the authority to create misdemeanor-type cases, such as the

8   CCID court.

9        Plaintiffs are correct in their assertion that under

10  Mississippi law, a judge has not traditionally appointed judges

11  to a municipal court.  In this Court's eye, however, the CCID

12  court is akin to a municipal-hybrid court, although House Bill

13  1020, Section 4 bestows upon the CCID judge such powers, quote,

14  as authorized by law for municipal courts, closed quote.

15       Several differences exist between the Mississippi

16  municipal courts and the CCID inferior court.  Some of these

17  differences are illustrated as follows:  One, House Bill 1020,

18  Section 1D states that any person convicted in the CCID

19  inferior court may be placed in the custody of the Mississippi

20  Department of Corrections Central Mississippi Facility.

21  Traditionally, however, persons convicted in municipal court

22  are housed within the city of their conviction.

23       Two, CCID court judges shall be appointed by the Chief

24  Justice, not the mayor nor governing municipal authority.

25       Three, the CCID judge shall be a qualified elector of

1    anywhere in the State of Mississippi, whereas a municipal judge

2    shall be a qualified elector of the county in which the

3    municipality is located.

4         Four, the CCID court shall be repealed in 2027, while

5    municipal courts traditionally have no established ending date.

6         This Court, thus, is not persuaded by the plaintiffs'

7    argument that because the Chief Justice does not traditionally

8    appoint municipal judges in Mississippi, his appointment of a

9    judge in a municipal-like court is a nonjudicial act.

10        As I said before, this judgeship, CCID, this judgeship is

11   not a traditional municipal court.  It is a municipal-hybrid

12   court which the legislature has full authority to create.  So

13   this court is the first of its kind, not a court in a long line

14   of such courts, but it appears to this Court that it is a

15   hybrid court.  And being a hybrid court, it needs to be

16   accorded the status of such.

17        The Court finally addresses plaintiffs' argument that

18   despite this Court's grant of judicial immunity, the Chief

19   Justice is subject to claims for declaratory relief under

20   Section 1 and under Section 4.  The Fifth Circuit has held that

21   a judge is not a proper party to a lawsuit challenging a state

22   law's constitutionality because "no case or controversy exists

23   between a judge to adjudicate claims under a statute and a

24   litigant who attacks the constitutionality of the statute,

25   unquote.

1     As I said, the cites to the various supporting opinions,
2   in this Court's opinion, are there but not to be read off at
3   this time.

4     A judge acting purely in his adjudicative capacity is not
5   a proper party to a lawsuit challenging a state law, explained
6   the Court, because the judge, unlike the legislature or State
7   Attorney General, has no personal interest in defending the
8   law.  Indeed, in the matter here before the Court, the Chief
9   Justice has constantly intoned that he has no personal interest
10   in defending the law under attack here, that he is a part of
11   this lawsuit because the plaintiffs brought him into the
12   lawsuit because the law commands him to perform certain
13   functions.  But that command to perform functions does not make
14   him a -- an interested party.  He is simply commanded and must
15   obey.

16     Further, the Fifth Circuit in its Section 1983 suit
17   challenging the constitutionality of Mississippi's statutory
18   procedures for the involuntary commitment proceedings held that
19   the defendant judges, quote, do not have a sufficiently
20   personal stake in the outcome of the controversy as to assure
21   that concrete adverseness.  Again, the Court is not citing here
22   the authority for these matters, but they will be found in the
23   Court's more detailed opinion.

24     So, then, in summary, this Court in this abbreviated
25   opinion states that, one, it adheres to its prior ruling

1    according to Chief Justice judicial immunity relative to

2    injunctive matters under Section 1.

3           This Court adheres to its prior ruling excusing the Chief

4    Justice from this lawsuit in toto.  This Court enlarges its

5    prior opinion to embrace the same rulings for Section 4 for the

6    same reasons and because the CCID judge in Section 4 is a

7    municipal-hybrid which places that judgeship on a different

8    level, and the analysis not quite congenial to the analysis

9    conducted by the plaintiffs upon their challenge of the Chief

10   Justice's judicial protection here.

11          The Court then dismisses plaintiffs' declaratory relief

12   claims in both Section 1 and Section 4 because the Chief

13   Justice is not a proper party, as I stated before.

14          As I mentioned earlier, all of this is set out in the

15   Court's opinion and will be expounded upon because there are a

16   couple of things that are going to be added, but they will not

17   change the directive of this abbreviated opinion.  And also, as

18   I stated, this abbreviated opinion at this stage is not an

19   appealable one, but the parties will have an appealable one

20   shortly.

21          I also said at the top of my entry into the courtroom that

22   I wanted to hear argument on the John and Jane Does who are

23   noticed by the plaintiffs upon publication, that should they

24   accept an appointment as a special circuit judge by the Chief

25   Justice, that they may be subject to an injunction, and I have

1    not had an argument -- heard argument on that, and I now wish

2    to have argument on that.  All other matters that are before

3    the Court will be addressed when the Court finishes its

4    appealable order on the matter I've just stated.

5         Now, then, let's move to the arguments on the John and

6    Jane Does.  Who will make that argument on behalf of the

7    plaintiffs?

8              **MR. LYNCH:**  I would, Your Honor, Mark Lynch for the

9    plaintiffs.

10             **THE COURT:**  Would you please go to the podium.

11             **MR. LYNCH:**  All right.  So where we are now -- excuse

12   me for a second.  Where we are now, in light of Your Honor's

13   abbreviated ruling that the Chief Justice is out of the case,

14   the Court, as I understand it or heard today or heard just now,

15   has not announced what it's going to do with respect to the

16   temporary restraining order against the Chief Justice.  If that

17   temporary restraining order is lifted, the Chief Justice will

18   presumably do what the legislature told him to do and make

19   these appointments very quickly.

20             **THE COURT:**  Now, I don't quite understand that last

21   comment.  I have dismissed the Chief Justice from this lawsuit.

22             **MR. LYNCH:**  Right.

23             **THE COURT:**  Therefore, that dismissal obviates the

24   injunctive relief that the Court initially filed against the

25   Chief Justice.  So he is not under an injunction once this

1    matter goes into effect pursuant to the Court's ruling.

2              **MR. LYNCH:**  So it will be effective when you issue

3    your final ruling, not today?

4              **THE COURT:**  That's right.  As soon as I issue the

5    final ruling, which is going to be -- not a ruling but simply

6    the full opinion, then at that point the Chief Justice is

7    completely out of this lawsuit as to Section 1 and Section 4,

8    and that ruling, or at least that order is imminent.

9              **MR. LYNCH:**  Thank you for that clarification, Judge.

10        So we have a very urgent, necessitous and acute need for

11   the Court to grant the motion for leave to amend to bring in

12   John Does 1 through 4 and to enter a temporary restraining

13   order against them from accepting any appointment.

14        Recalling that the Court has held the Chief Justice under

15   a temporary restraining order now for some time, that was based

16   on the need to prevent imminent irreparable harm and to

17   maintain the status quo.

18        By bringing in the Doe defendants, entering the TRO

19   against them, I think that follows clearly from the logic of

20   the Court's original TRO against the Chief Justice.  That TRO

21   now has become a cropper because of judicial immunity.  But the

22   irreparable harm and the need to maintain the status quo are

23   the same, and that can be achieved by granting the motion for

24   leave to amend and then entering a TRO against those four

25   people.  And we would implore the Court to do that

1   simultaneously with the issuance of your final order so that

2   there will be no gap where the Chief Justice would be

3   constrained to make the appointments, and they would go into

4   effect.

5       I think the force of the situation, the force of the

6   actual circumstances are so exigent here in terms of preventing

7   irreparable harm to constitutional rights and in maintaining

8   the status quo until we can have a preliminary injunction,

9   which we can move to quite quickly, that this relief that we

10  have asked for in both the motion for leave to amend and in the

11  motion for the TRO against the John and Jane Does, once the

12  motion for leave has been granted.  That has to happen.  That

13  is step one.  Then step two would be entering the TRO.

14          **THE COURT:**  Counsel, let me interject here and put a

15  mark on your presentation so you can go right back to where you

16  were in case I have a discussion of some length with you so

17  that you won't forget the points you want to raise, because I

18  don't want to disrupt your chain of thought.

19          **MR. LYNCH:**  No, no.

20          **THE COURT:**  But I do want to ask this question.  You

21  are asking that you be allowed to submit the appropriate

22  paperwork to hold a Jane Doe or a John Doe who might be one of

23  the persons to be appointed by the Chief Justice as a special

24  circuit court judge under Section 1.

25      Now, you don't know the identities of those persons nor do

1    you know any other aspects of those persons, not their profile,

2    not their race, not their county of residence.  You don't know

3    anything at all about them at this point because no action has

4    been done by the Chief Justice at this point.  He will be free

5    to do whatever he feels obligated to do under Section 1 as soon

6    as I submit the detailed opinion that I'm going to file

7    imminently.  But as of right now, he has not made any

8    appointments.  So at this juncture, how can you tell me that

9    your attempt at an injunction against any one of the four, and

10   also I'm asking you whether this injunction is against all four

11   or just four who meet certain profiles, that that profile will

12   be in line with the allegations in your complaint?

13         **MR. LYNCH:**  Judge, no matter who the Chief Justice

14   appoints, those appointments are what we -- are the foundation

15   for our claim.  He could pick four African American judges that

16   would be entirely acceptable, but the harm that we allege is

17   that the citizens of Hinds County have been deprived of the

18   right to elect these circuit court judges.  And that is why it

19   doesn't -- the profile of the appointees is irrelevant at this

20   point.  It's the deprivation of the right to elect that is the

21   gravamen of our complaint in Section -- in Section 1, Count 2.

22         **THE COURT:**  Counsel, the Chief Justice in the past

23   has been allowed the authority to appoint special circuit

24   judges.  In fact, he has appointed quite a few of the white

25   race, as well as the African American race.  He has done that a

1    number of times.  And in each one of those instances, he made

2    the appointment, and thus your argument seemingly is that when

3    he did this in the past, that that was some sort of violation

4    as you are now describing here.  Is that correct?

5         **MR. LYNCH:**  We haven't challenged the temporary

6    appointment statute, Your Honor.  And there are distinctions

7    between the temporary appointment statute and the Section 1

8    statute.  Under Section 1, the appointments are temporary in

9    name only.  They are almost the full length of a four-year

10   elected term, from the date of passage of the act, it was about

11   three and three-quarter years.  That's one distinction.

12        Another distinction is that that appointment statute

13   authorizes judges to handle cases that are pending, still

14   pending.  The temporary judges -- and the reason for that, I

15   believe, is that the temporary judges are designed to deal with

16   an emergency, backlogs or natural catastrophes and so forth.

17   The appointed judges will be free to take brand new cases, and

18   that is the distinction between the temporary statute.

19        So the fact that the Chief Justice has in the past

20   appointed temporary judges, we don't -- we don't attack that in

21   our complaint.  But with the Section 1 appointees, the length,

22   the fact that they have complete jurisdiction over the entire

23   docket, new cases, they are not being there to deal with the

24   backlog, they are being there to function as circuit court

25   judges ab initio, these are distinctions that make this

1    different.  And that's why the harm or the deprivation of the

2    right to vote for these circuit court judges is different than

3    any complaint one might have about the appointees under the

4    other statute which we are not challenging in this case.

5            **THE COURT:**  Are you saying in the appointment

6    previously of these judges, that that was a limitation on the

7    type of cases they could handle, namely --

8            **MR. LYNCH:**  Yes, Your Honor.

9            **THE COURT:**  -- namely whether they were -- namely

10   whether they were pending or new cases?

11           **MR. LYNCH:**  The statute is quite clear that these

12   judges are to handle cases that are pending.  That's in the

13   statute.  And they are truly temporary.  They are truly

14   temporary.

15           **THE COURT:**  But now this special judgeship, these

16   four, they are, in essence, temporary too, aren't they?

17           **MR. LYNCH:**  Well, respectfully, we disagree on that,

18   Your Honor.

19           **THE COURT:**  Well, but doesn't the statute itself say

20   that that section shall stand repealed after a certain time

21   period?

22           **MR. LYNCH:**  Yes, but that's after a full -- that's

23   after nearly a full term.

24           **THE COURT:**  But not quite a full term, but

25   nevertheless --

1          **MR. LYNCH:**  Maybe a quarter of a year short of a full

2     term under the statute, I believe.

3          **THE COURT:**  But still, they are limited in their

4     duration.

5          **MR. LYNCH:**  Well, like any -- yes, all circuit court

6     judges are.  Let me put it this way.  Not all.  An elected

7     circuit court judge is limited to a four-year term.

8          **THE COURT:**  Yeah, limited to a four-year term where

9     they can run again.

10         **MR. LYNCH:**  Yes.

11         **THE COURT:**  But again, on these circuit court judges

12    to be appointed here, they are limited by statute, and as it

13    stands right now, they would be phased out after a certain time

14    period.

15         **MR. LYNCH:**  But one of the problems here is that the

16    Chief Justice would appoint as one of these Section 1 judges

17    one of the currently sitting or previously sitting temporary

18    judges, and they would end up with more than a four-year term.

19    And there's the question of, you know -- let me not go there.

20         If you have a judge who is currently a temporary judge,

21    truly a temporary judge, appointed pursuant to the statute,

22    sitting on the court now, one of the four appointees could be

23    one of those people, in which case that person is going to end

24    up with a more than four-year term.

25         **THE COURT:**  I think I know what you are going to say,

1   but tell me, what would be your solution to this backlog if

2   your position is supported here by the Court?  What would be

3   your solution?

4        **MR. LYNCH:**  The preferred solution would be for the

5   legislature to provide for more elected judges.

6        **THE COURT:**  And the legislature, before it provides

7   for more judges, should take us through some sort of analysis

8   of the number of cases, type of cases, expected longevity of

9   the cases, and the amount of money that's going to be needed to

10  support that judgeship indefinitely, as well as the court

11  administrator, as well as other people who necessarily become

12  part of the court system.

13       Now, do you have any idea what that inquiry should be and

14  what form it would take?

15       **MR. LYNCH:**  Well, that is prescribed.  And in fact,

16  HB 1020 directs the administrative office to conduct exactly

17  that kind of survey.  That's a survey that, had the legislature

18  gone about this the right way, they would have -- it would have

19  -- let me say the preferred way --

20       **THE COURT:**  And if they had determined on a benefit

21  cost analysis that the benefit of a permanent circuit court

22  judge is outweighed by the cost of only having so many cases

23  temporarily that could be addressed over a short period of time

24  would result in the nonappointment or noncreation of a

25  permanent circuit judge, then would your answer be different,

1    and in that possibility, that there should be special judges

2    created over a temporary time period?

3              **MR. LYNCH:**  Well, if -- if there is a backlog that

4    can be addressed that doesn't take a near full term, the

5    backlog may be resolved before the end of the full -- before

6    the statute sunsets.  It may be extended, too, of course.  But

7    the backlog could be resolved.  And if it's a true emergency, a

8    true emergency, there's the existent statute for the

9    appointment of temporary judges that could be relied on.

10        But for some reason the legislature went further and gave

11   these Section 1 judges a longer tenure, a wider authorization

12   in terms of the docket they handle, and these are significant

13   substantial distinctions between the way the temporary statute

14   has operated.

15             **THE COURT:**  In preparing for your argument and

16   contemplating the type of question I just asked, have you made

17   any assertion analysis on the Mississippi Legislature and how,

18   as a full body, it might stand relative to creation of

19   additional special judges, that is, whether that topic is a

20   divisional one which would have no chance of passage?

21             **MR. LYNCH:**  I'm sorry.  I missed the word --

22             **THE COURT:**  Would have no chance of passage.

23             **MR. LYNCH:**  I don't have those powers of prophecy,

24   Your Honor, to --

25             **THE COURT:**  I mean, when this matter was before the

1    legislature, do you know whether there was intense debate on

2    this position?

3            **MR. LYNCH:**  Oh, there certainly was.  There was

4    debate over whether the legislature should be appointing

5    regular elected -- I'm sorry -- they wouldn't have been

6    appointed -- whether they should have been authorizing elected

7    judges.  That certainly was put forward and it was shot down.

8            **THE COURT:**  And do you know whether there was a

9    considerable body of legislators who were opposed to appointing

10   new circuit judges?

11           **MR. LYNCH:**  There were.

12           **THE COURT:**  Okay.  So then do you have any idea how

13   substantial that conflict was?

14           **MR. LYNCH:**  I don't have it off the top of my head,

15   I'm sorry, Your Honor, but we certainly can put our hands on

16   that relatively quickly.

17           **THE COURT:**  Okay.  Go ahead.  I said put a mark where

18   we started.  Now, go ahead and continue your argument.

19           **MR. LYNCH:**  Okay.  So as I said, step one, we hope

20   that Your Honor will grant the motion for leave to amend, and

21   then, step two, once that amendment has been approved, you will

22   issue the temporary restraining order that would prevent the

23   John and Jane Does from accepting appointment, specifically

24   from taking the oath of office, which I think is the clear

25   dividing line between when you are not a judge and when you

1    become a judge.  The Constitution requires all judges to take

2    that oath of office, and that seems to us to be the clear

3    dividing line.

4        Now, I suspect Your Honor would like to hear about the

5    permissibility of this John and Jane Doe device.  Should I move

6    on to that?

7            **THE COURT:**  Yes.  Go ahead.

8            **MR. LYNCH:**  We have cited authority from Fifth

9    Circuit cases that the John and Jane Doe device is an accepted

10   procedure when a plaintiff doesn't know the identity of the

11   person who has or will cause the harm.  I think this is a

12   particularly compelling situation to do that because while we

13   don't know the name of these people, they are -- they are

14   identifiable with crystal clarity.  They are the four people

15   that the Chief Justice will appoint.  So it's not going to be

16   hard to figure -- it's not going to take a lot of discovery to

17   figure out the actual identity of the John and Jane Does.  They

18   will be known when the Chief Justice decides who he wants to

19   appoint and who accepts those -- and who are prepared to accept

20   those appointments.

21       Now, the question of whether injunctive relief can be

22   entered against a John or Jane Doe I think is answered by both

23   Rule 65(a), dealing with preliminary injunctions, and Rule

24   65(b), dealing with temporary restraining orders.  It's clear

25   in the face of the rule that a temporary restraining order can

1  be granted without notice.  Here we have done the best we can

2  to provide notice by publishing our intentions in the *Clarion*

3  *Ledger*.  And if Your Honor enters the TRO we are asking for, we

4  will get that published in the *Clarion Ledger*.

5       We would also request that the administrator of the

6  courts, Mr. Snowden, be directed to give a copy of your

7  temporary restraining order, the one that we hope you will

8  issue, give a copy of that to the four appointees before they

9  take the oath of office.  So they will have notice of this

10 temporary restraining order before the critical moment.  And

11 that is certainly a permissible under Rule 65(a).

12      And then we further note that Rule 65(b), according to the

13 Fifth Circuit in the *Corrigan* case, that a preliminary

14 injunction can be issued against a party who has not yet been

15 served.  So the technicality that we may not have yet been able

16 to serve the John Does and Jane Does isn't an obstacle to

17 issuing a preliminary injunction.  And, of course, you already

18 issued a temporary restraining order.

19      This is admittedly an unusual procedure, but I believe, as

20 we've demonstrated in our papers, and hopefully, if I'm getting

21 across today, it is entirely consistent with the rules.  And it

22 has the ultimate perhaps, ultimate benefit of maintaining the

23 status quo.

24          **THE COURT:**  I don't recall any case authority

25 directly on point cited by you.  Am I correct?

1          **MR. LYNCH:**  I believe we did, Your Honor.  Which

2     point did you think you were lacking?

3          **THE COURT:**  I'm saying that the anonymous -- the

4     anonymity of the persons to be affected and their profiles,

5     because you don't even know who they are yet, what race they

6     are, even what county they are from or anything else.  So what

7     is your best case, then?  Let me put it that way.

8          **MR. LYNCH:**  All right.  Our best case -- our best

9     case is *Vega versus Gusman*, 2022 Westlaw 912232.  This is from

10    the Eastern District of Louisiana.  "It has long been an

11    accepted practice to allow claims against an unknown defendant

12    to be amended to identify the defendant when his identity is

13    discovered."

14         And as I said, because it's so clear who fits the

15    definition of the -- who fits the definition of the appointee,

16    that they are going to be the four people that the Chief

17    Justice appoints, they will be quickly discovered without

18    delay.  So that's on the Doe point.  On --

19         **THE COURT:**  Excuse me, Counsel.  But you are asking

20    this Court to enjoin them, are you not?

21         **MR. LYNCH:**  Temporary restraining order, yes.

22         **THE COURT:**  All right.  On these cases you have

23    cited, aren't they cases that appear -- excuse me.  Aren't

24    these directions of substitutions, don't they appear where a

25    lawsuit has already been filed setting out the prerogatives of

1      the lawsuit, and the John Does are listed anonymously 1 through

2      10, et cetera, and as soon as they are identified, then they

3      are inserted, because we know that from the suggestions of the

4      complaint that then they would be proper parties.  Is that what

5      you are saying here, that they are called fictitious defendants

6      and they are to be substituted as soon as their identities are

7      known?

8              **MR. LYNCH:**  Yes, although I would disagree with the

9      characterization of fictitious.

10             **THE COURT:**  Well, there's a statute that calls them

11     fictitious.

12             **MR. LYNCH:**  Yes, but as I've said, these four people

13     will be clearly identifiable.

14         The typical case, if there is a typical case, if you think

15     of a 1983 case where a person is picked up by the police and

16     beaten up pretty badly, and that person may not know -- not be

17     able to allege in the complaint which of the officers actually

18     did the beating, and so it's going to take discovery, going to

19     take depositions to sort it out, who actually did what to whom,

20     that is a circumstance in which -- I'm not saying this happens

21     every day, but that's a circumstance in which the Doe device is

22     used with some regularity.

23         Here, we don't need discovery.  We are not going to have

24     to wait very long at all to find out who the four John or Jane

25     Does are.  So I think it fits very comfortably with this

1    principle that I read from the District of Louisiana case where

2    it says until the true identity is discovered -- we are going

3    to know the true identity very quickly.

4         **THE COURT:**  When I said fictitious, I was referring

5    to when they were still John or Jane Does.  And there's a

6    matter under removal, et cetera, or also on just regular

7    lawsuits, which says they are fictitious until they are named.

8    And then the one I was referring to, they are called fictitious

9    for purposes of removal and for purposes of federal court

10   jurisdiction until they are substituted, and then we know

11   whether we have 1332 jurisdiction, that is, diversity.  That's

12   what I was saying.  I wasn't saying that the individuals who

13   might be named were fictitious.  I was not saying that.  So

14   then, continue your argument.

15        **MR. LYNCH:**  Then the case on granting an injunction

16   before the party enjoined has been made part of the suit by

17   service of process, that's *Corrigan Dispatch versus Casa*

18   *Guzman*, 569 F.2d 300.  Those are the leading cases we have been

19   able to locate in the Fifth Circuit.

20        **THE COURT:**  Okay.  Continue.  Do you have anything

21   else on that?

22        **MR. LYNCH:**  I don't think so, Your Honor.  Unless you

23   have more questions, I think you've got our points.  Again, I

24   just want to emphasize the urgency involved here so that we

25   have a seamless transfer from the current TRO against the Chief

1    Justice to this new TRO that I hope you will enter so that

2    there is no window, no sliver with which the Does could take

3    the oath of office and assume office, because then the status

4    quo is going to be very badly altered.   Thank you.

5           **THE COURT:**  All right.   Thank you.   Response?

6           **MR. SHANNON:**  May it please the Court.   Good morning,

7    Your Honor, Rex Shannon for the state defendants.

8           Your Honor, we have filed a response opposing the motion

9    for a new TRO in this case.   We submit that the newly filed TRO

10   motion should be denied because it is premature, number one.

11   Number two, because the plaintiffs have not made the requisite

12   showing for a TRO pursuant to the four governing factors set

13   out in the case law, number two.   And number three, because we

14   don't believe a TRO is authorized by the Federal Rules of Civil

15   Procedure in these circumstances.

16          Your Honor, the plaintiffs are asking the Court to enter a

17   TRO to prohibit prospective appointees from accepting

18   appointment, from taking the oath of office, or otherwise

19   assuming office as temporary special circuit judges in Hinds

20   County.   As things stand today, as Your Honor has rightly

21   pointed out, we don't know the identity of those appointees.

22   Regardless, Your Honor, those individuals are not now nor have

23   they ever been parties to this litigation.   They will only

24   become parties, even as fictitious John and Jane Doe

25   defendants, if and when this Court grants the plaintiffs'

1    motion to amend their complaint to make them parties.

2         Unless and until that occurs, Your Honor, and unless the

3    plaintiffs file an amended complaint naming those folks as

4    parties, there is no operative complaint by which this Court

5    can assert personal jurisdiction over these prospective

6    appointees.  Your Honor, that means this Court presently has no

7    authority to temporarily restrain any prospective appointees

8    pursuant to Rule 65 or otherwise.

9         Your Honor, for that reason, we submit that any injunctive

10   relief to be presently directed against such prospective

11   appointees should be denied.  Your Honor, the plaintiffs say

12   these individuals don't have to be parties, as I understand

13   their argument, to be enjoined, but Your Honor, respectively,

14   that's not the case.  Certainly where the defendant's identity

15   is known, Rule 65 does permit the Court to enjoin a defendant

16   before they are served and even without notice, but they still

17   have to be named as a defendant in an operative complaint that

18   is filed on this Court's docket.

19        Your Honor, for one thing, a Court has no jurisdiction to

20   enter a restraining order against somebody who is not even a

21   named defendant in a pending lawsuit.  I think that is

22   axiomatic, Your Honor.  Additionally, it is well settled that

23   injunctive relief cannot be awarded on its own.  There has to

24   be some operative complaint stating a cause of action against a

25   person who is sought to be enjoined.

1    Your Honor, this Court can't just issue a TRO against

2    somebody who is not even named in a pending lawsuit as a

3    defendant.  Your Honor, as I appreciate the plaintiffs'

4    argument, they have cited a single case in support of their

5    specific argument that a TRO can be issued against a

6    prospective defendant who has not yet been named in an

7    operative complaint.  That case is *Corrigan Dispatch Company v.*

8    *Casa Guzman SA*.  That's a 1978 Fifth Circuit case, 569 F.2d

9    300.  But Your Honor, as I mentioned when we were here last

10   week, that case doesn't say what I understand the plaintiffs

11   are saying that it does.  As I read that case, that case merely

12   says that Rule 65 does not require service of process before a

13   named defendant can be enjoined.

14   Your Honor, as I read that case, the entity sought to be

15   enjoined in that case had already been named as a defendant in

16   an operative interpleader action.  They just hadn't been served

17   yet.  That's not the case here.  Your Honor, in the case that's

18   before the Court today, none of the fictitious John or Jane Doe

19   defendants has even been named yet in an operative complaint.

20   Until they are, Your Honor, respectfully, this Court has no

21   authority to order them to do anything, and the current TRO

22   motion should be denied.

23   Moving on, Your Honor, the State defendants submit that

24   the motion should further be denied for all the reasons set

25   forth in the State defendants' previously filed responses to

1    the plaintiffs' renewed TRO motion that was filed previously,

2    as well as their previously filed motion for preliminary

3    injunction.  Your Honor, those responses of the State

4    defendants appear at ECF Docket No. 34 and No. 50 on the

5    court's docket.  Your Honor, they set forth in detail the

6    reasons why the State defendants would submit that a TRO should

7    be denied in this case.

8         Your Honor, the plaintiffs -- I will say the State

9    defendants would adopt and incorporate by reference all the

10   arguments and authorities set out in ECF Docket No. 34 and

11   Docket No. 50.

12        Your Honor, the plaintiffs simply have not made the

13   requisite showing under the four governing factors set out in

14   the case law for a TRO.  Your Honor, this Court has not made

15   any findings regarding these four factors.  No testimony or

16   documentary evidence has been submitted in conjunction with the

17   current motion that's pending before the Court for a TRO in

18   support of those four factors.  Your Honor, the plaintiffs have

19   not shown a substantial likelihood of success on the merits in

20   this case.  They have not shown or demonstrated irreparable

21   harm.  They have not made any showing in connection with this

22   motion as to the balance of harms.  And they certainly haven't

23   shown how the requested TRO against prospective appointees

24   would serve the public interest.

25        Your Honor, those four factors have to be satisfied

1    conjunctively, all four of them, before this Court can enter a

2    TRO, specifically the TRO that's being requested now to enjoin

3    prospective appointees from taking the oath of office and

4    serving in the capacity in which they are appointed.

5        Your Honor, I would also mention the State defendants are

6    not aware of any authority permitting the entry of a TRO

7    against fictitious John or Jane Doe defendants.  We haven't

8    found anything authorizing that sort of TRO in our research.  I

9    know counsel opposite this morning mentioned I believe it was a

10   district court case out of Louisiana.  As I appreciate it, that

11   case spoke to fictitious defendants and joinder of fictitious

12   defendants in general.  I didn't hear him to say that it had

13   anything to do consideration of whether a TRO could be

14   authorized against a fictitious defendant.

15       Your Honor, additionally, there is the matter of service

16   of process.  I don't know how the Court can enjoin a defendant

17   in a case that it has no ability to serve with process

18   ultimately.  Your Honor, as I read the rules, the Federal Rules

19   of Civil Procedure don't contemplate service of process on a

20   fictitious defendant.  That defendant has to be identified at

21   some point and then named and then they are served under the

22   Rules of Civil Procedure.  The Federal Rules don't, I don't

23   believe, reference service by publication.  The Federal Rules

24   do authorize service under the state rules.  The Mississippi

25   Rules of Civil Procedure do authorize service by publication,

1    but not in these circumstances.  They authorize service by

2    publication in certain chancery proceedings, in certain

3    proceedings authorized by statute, but they certainly don't

4    contemplate service by publication against unknown fictitious

5    John or Jane Doe defendants.

6         So I don't know how the Court can proceed to enter a TRO

7    against a fictitious party that it has no ability to even serve

8    with process, regardless of whether that TRO comes before or

9    after service.

10        Your Honor, I did hear counsel opposite mention something

11   about enjoining or directing Mr. Snowden to take some action

12   regarding notification.  Your Honor, Mr. Snowden, as it stands

13   now, is not a party to this lawsuit.  Respectfully, this Court

14   has no jurisdiction to direct Mr. Snowden at this juncture to

15   do anything, so I don't know how that solves anything.

16        Your Honor, again, a TRO, as we have discussed previously,

17   under Rule 65, is authorized when the showing is made to last

18   for 14 days.  It can be renewed one time for 14 additional

19   days, for a total of 28 days.  As I understand counsel

20   opposite, they are asking this Court to enter a TRO

21   indefinitely.  Your Honor, that is simply not authorized by

22   Rule 65.

23        And finally, Your Honor, we had previously argued lack of

24   standing.  In connection with the two filings I mentioned

25   earlier, Docket No. 34 and Docket No. 50, I would reurge that

1    motion -- that grounds for opposing a TRO.  I won't belabor

2    that point now.  But Your Honor, once again, as I've tried to

3    stress every time I've come up to the podium in this case, a

4    critical public safety feature of House Bill 1020 continues to

5    be barred by this Court's current TRO that was entered on

6    May the 12th.  Your Honor, that TRO has now been in effect for

7    96 days longer than the 28-day timeframe permitted by Rule 65.

8    Your Honor, in light of that and in light of Your Honor's

9    ruling read from the bench this morning reaffirming the

10    dismissal of the Chief Justice, we would again ask the Court to

11    dissolve what the State defendants respectfully submit is an

12    improper TRO enjoining Chief Justice Randolph.  If he is no

13    longer a party in this case, then certainly that TRO can no

14    longer be in force and effect, Your Honor.

15    For all of these reasons, Your Honor, the State defendants

16    respectfully request that the Court would deny the plaintiffs'

17    motion for a TRO to restrain these prospective appointees.

18    Thank you, Your Honor.

19    **THE COURT:**  Rebuttal, if any?

20    **MR. LYNCH:**  Thank you, Your Honor.

21    First, on the operative complaint point, that's what the

22    motion to amend, if granted, will do.  If the Court grants our

23    motion for leave to file the operative -- if the Court grants

24    our motion for leave to amend, we will very promptly file the

25    pleading, and then we will have an operative complaint.  At

1    that point -- so I've tried to be very clear about this.  Step

2    one is granting the motion for leave to amend.  Then there is

3    an operative complaint.  Step two is issuing the temporary

4    restraining order.

5        Now, counsel opposite mentioned that the

6    *Corrigan* complaint -- first of all, he discussed the Louisiana

7    case that we rely on, *Vega versus Gusman*.  No, I'm sorry.  It

8    wasn't *Vega versus Gusman* he was referring to.  He was

9    referring to the *Corrigan* -- I was right the first time,

10   *Corrigan Dispatch*.  The Court said there, Your Honor, I'm going

11   to read this, "It is not grounds for reversal that the trial

12   court's interlocutory order was issued prior to the time that

13   the appellant was made a party by substitute evidence of

14   process."

15       Now, counsel opposite also said that party, the enjoined

16   party, had been previously entered -- I'm sorry, had been

17   previously made a party to the suit by an interpleader.

18   Respectfully, that is wrong.  The opinion is very clear that

19   Mr. Guzman had not been one of the parties that was

20   interpleaded.  And then the Court issued a preliminary

21   injunction against him before service of process had been made,

22   and the Fifth Circuit said that was all right.

23       So it's a little complicated to follow the ins and outs of

24   that case, but that's what it boils down to.  He was a

25   nonparty, he was enjoined, he said I shouldn't have been

1    enjoined because I wasn't a party to this case, and the Court

2    said, no, Rule 65(a) does not require that.

3         Let me say a word about the quantum of proof required at

4    this stage.  Counsel opposite has asserted that we haven't met

5    any of the requirements for a temporary restraining order, and

6    I think it's worth remembering a number of cases that we have

7    cited.  In *Asbury MS Gray-Daniels*, 812 F.Supp. 2d 771, this is

8    Southern District of Mississippi, "Plaintiffs must provide

9    sufficient evidence to support a prima facie case, but the

10   evidentiary standard is not as high as would be required to

11   entitle them to summary judgment."

12        Next case, Fifth Circuit in *Daniels Health Sciences*, 710

13   F.3d 579, and also in *Janvey versus Alguire*, 647 F.3d 857, in

14   those cases the Court said that plaintiff does not have to

15   prevail on every disputed issue of material fact or demonstrate

16   that they are certain to win at the temporary restraining order

17   level.

18        And similarly, in *Allied Home Mortgage Corporation* 830

19   F.Supp. 233, the Southern District of Texas said, "It would

20   ordinarily be enough that the plaintiff has raised questions

21   going to the merits so serious, substantial, difficult, and

22   doubtful as to make them a fair ground for litigation and thus

23   for more deliberate investigation."

24        So we have made a prima facie case.  The prima facie case

25   is that while every -- the citizens of every other county in

1   Mississippi continue to vote for circuit court judges, that

2   right has been taken away from the citizens of Hinds County,

3   black and white alike.  And the sheer statistics here, the

4   sheer starkness of the disparate treatment of the citizens of

5   one county is a prima facie showing of an equal protection

6   claim.

7        And as to irreparable injury, the cases are legion,

8   including one by Your Honor in the *Church of Jackson* case, the

9   cases are legion that depravation of constitutional rights,

10  even for minimal amounts of time, are sufficient to establish

11  irreparable injury.

12       And as to balance of the hardships, we have cited cases

13  that the government -- and no -- any defendant is never

14  prejudiced by being prevented from violating the law.  Here at

15  this temporary restraining order level or stage, we have made a

16  prima facie case that the citizens of Hinds County, black and

17  white alike, are being deprived of a right, a valuable right, a

18  precious right, that is available to the citizens of every

19  other county of Mississippi, and that is enough to get an equal

20  protection claim going and subject to further study, further

21  litigation.

22       As to Mr. Snowden, he would be added by the amended

23  complaint.  We seek to add him in the amended complaint.  So

24  that objection is responded to.

25       I think I hit the highlights, as I understood them, of

```
 1    counsel opposite's presentation on standing.  I, too, will rest
 2    on the prior briefing and the argument we had last week.  I
 3    think it is clear there is really not a serious doubt that the
 4    plaintiffs here are injured.  The injury is traceable to the
 5    four Does who will take these appointed seats, if not enjoined.
 6    And an injunction against the Does will redress that injury.
 7    So the black letter standards of standing, cause of injury,
 8    traceability and causation are all clearly met.  Unless the
 9    Court has any questions, I can sit down now.
10         THE COURT:  I don't have any additional questions.
11    Thank you so much.
12         MR. CLINE:  Your Honor, may I offer a brief response
13    to some of the questions before?
14         THE COURT:  But now you will be speaking on behalf of
15    whom?
16         MR. CLINE:  I apologize.  I think there was some
17    noise.  I was going to try to offer a response to your
18    questions about the record before the legislature.
19         MR. SHANNON:  Your Honor, I'm going to object to a
20    second attorney arguing on rebuttal.  I think the parties have
21    already made their argument on that point.
22         THE COURT:  I'm going to sustain the objection.
23         MR. CLINE:  Yes, sir.  Thank you, Your Honor.
24         MR. LYNCH:  Just for completeness of the record, I
25    did say when I was up here the first time that I couldn't pull
```

1    that -- didn't have the information off the top of my head, but

2    we could quickly locate it in the record, and that is what

3    Mr. Cline has done.  If Your Honor is going to sustain the

4    objection, so be it, but I think this is directly referring

5    back to something I said in my opening.

6         **THE COURT:**  Well, then you can talk to him and see

7    what he has to offer, and since you are the one who is up here

8    delivering the presentation, then you can get the information

9    from him and you can deliver it yourself.

10        **MR. LYNCH:**  It will probably be more expeditious if

11   we just let him -- rather than he and I conferring offline, he

12   has the information at the tip of his tongue or tip of his

13   fingertips and he can give it to you right now.

14        **MR. SHANNON:**  Your Honor has already sustained the

15   objection.

16        **THE COURT:**  I have already sustained the objection.

17   So if you want to talk to him off record, go right ahead.

18        **MR. LYNCH:**  Should I do that right now?

19        **THE COURT:**  Yes, go right ahead.

20        **MR. LYNCH:**  Can we take a brief recess to do that?

21        **THE COURT:**  I will take a ten-minute recess.

22      **(RECESS TAKEN AT 11:09 A.M. UNTIL 11:30 A.M.)**

23        **THE COURT:**  Counsel, return to the podium, please.

24        **MR. LYNCH:**  Thank you, Your Honor.  I believe that

25   the information responsive to the questions you asked about the

 1    legislature appears in ECF 41, which is our memorandum in

 2    support of the motion for preliminary injunction.  But in there

 3    you will find answers to many of the questions, if not all of

 4    the questions that you asked.  And that's pages 19 through 23,

 5    which is discussing some of the *Arlington Heights* factors with

 6    respect to procedural and substantive deviations that the

 7    legislature engaged in in the process of considering HB 1020.

 8    And in particular, the legislative history reflects that the

 9    legislature was aware that there's been a recent redistricting

10    and a recent census, and a redistricting is due.  And they are

11    going to take that up next year.

12         Now, you know, you asked what could have been done

13    differently?  Well, temporary judges until the redistricting

14    instead of appointing people -- putting appointed judges on for

15    three and three-quarter years, there could have been a

16    short-term temporary appointment until the redistricting

17    exercise was completed.  And it is really quite extraordinary

18    and irregular to appoint judges to three and

19    three-quarter terms, where within a few months you are going to

20    be looking at the whole question of redistricting and potential

21    assignment of new judges.

22         The statute that deals with the study that the legislature

23    is supposed to take is Mississippi Code -- sorry, Your Honor,

24    just give me a moment -- Mississippi Code 9-7-3(3).  And there

25    are six factors that are supposed to be considered in

1    considering the establishment of new judgeships.  And at our

2    brief, ECF 40, pages 20 through 21, we go through those six

3    factors and we cite the legislative history that shows what the

4    legislature did and most particularly what they didn't do.  So

5    that section of our briefing would be responsive to the Court's

6    questions that you asked when I was originally up.  Thank you.

7              **THE COURT:**  Thank you so much.

8              **MR. LYNCH:**  And one other thing that I recommend or

9    highly urge the Court to review are the two declarations

10   submitted by retired Chief Judge Tomie Green, particularly the

11   second one, which is ECF -- it's ECF 47 and ECF 51.  And she

12   provides an account of what has really gone on during her

13   tenure, what really went on during her tenure as a chief judge

14   of the Hinds County Circuit Court, and it really is quite a

15   different narrative than the one that the defendants propound.

16   So I would urge the Court to take a look at that.  Thank you.

17             **THE COURT:**  Well, hold it now.  She submitted two

18   affidavits, didn't she?

19             **MR. LYNCH:**  Yes.

20             **THE COURT:**  And in her first one, didn't she say that

21   she was very appreciative of the special circuit judges who had

22   been appointed to assist her court in the backlog?

23             **MR. LYNCH:**  Yes, but she also pointed out the

24   limitations in her declaration.  You know, I think, fairly

25   read, she appreciated the help she got, but it really wasn't an

 1    answer to the underlying problems.

 2            **THE COURT:**  Such as what?

 3            **MR. LYNCH:**  The crime lab, the lack of tenure of

 4    these judges, the fact that they were limited to pending cases,

 5    they were frequently reversed in their dispositions of criminal

 6    matters.

 7            **THE COURT:**  That must have been in her second

 8    affidavit, correct?

 9            **MR. LYNCH:**  Yes, it's all laid out in her second

10    affidavit.

11            **THE COURT:**  But that was not in her first affidavit,

12    was it?

13            **MR. LYNCH:**  No.

14            **THE COURT:**  In her first affidavit, she supported the

15    Chief Justice, didn't she?

16            **MR. LYNCH:**  I don't believe so, Your Honor.

17            **THE COURT:**  Well, look at that affidavit then,

18    because in her first affidavit, didn't she say she was

19    appreciative --

20            **MR. LYNCH:**  She was appreciative.

21            **THE COURT:**  -- of the appointment of special judges?

22            **MR. LYNCH:**  She was appreciative of the help they

23    got, but she was in great disagreement with what the

24    legislature did because it didn't address the problems she

25    experienced.

1          **THE COURT:**  In the second affidavit?

2          **MR. LYNCH:**  Yes, the second affidavit is a fuller

3     account.

4          **THE COURT:**  But in the first affidavit, it was

5     submitted by her, as well as by some other persons who

6     benefited, other judges.  They all were in support of the Chief

7     Justice's appointments.

8          **MR. LYNCH:**  Of the temporary appointments, Judge.

9     Those weren't three and three-quarter-year appointments.  Those

10    were genuine temporary appointments.  They are two very

11    different things.

12         **THE COURT:**  I know that that is part of your

13    argument.  I know understand that's part of your argument, but

14    they did not make that argument.

15         **MR. LYNCH:**  Pardon?

16         **THE COURT:**  I said that they didn't make that

17    argument in the first wave of affidavits that were submitted.

18    They just simply acknowledged their appreciation in the first

19    wave of affidavits that were submitted because the Chief

20    Justice submitted those.

21         **MR. LYNCH:**  I think the first wave of affidavits,

22    Your Honor, while they give credit where credit is due, they

23    are also quite clear that the appointments authorized by

24    Section 1 are not the answers to the problems, and that they

25    create new problems.  But they are what they are.

1          **THE COURT:**  Okay.

2          **MR. LYNCH:**  Thank you, Your Honor.

3          **THE COURT:**  All right.  Is there anything else from

4    any of the other parties?

5          All right.  I don't see that there is.  Therefore, thank

6    you for the argument.  And I expect all of these matters to be

7    resolved very, very expeditiously.  I know there are some other

8    motions outstanding.  I had said that I will address them

9    probably by paper, but all of those will be dealt with.  Thank

10   you all very much.

11                    (HEARING CONCLUDED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                      CERTIFICATE OF COURT REPORTER

4

5        I, Teri B. Norton, RMR, FCRR, RDR, Official Court

6   Reporter for the United States District Court for the Southern

7   District of Mississippi, appointed pursuant to the provisions

8   of Title 28, United States Code, Section 753, do hereby certify

9   that the foregoing is a correct transcript of the proceedings

10  reported by me using the stenotype reporting method in

11  conjunction with computer-aided transcription, and that same is

12  a true and correct transcript to the best of my ability and

13  understanding.

14       I further certify that the transcript fees and format

15  comply with those prescribed by the Court and the Judicial

16  Conference of the United States.

17

18

19

20       s/ Teri B. Norton
         TERI B. NORTON, RMR, FCRR, RDR
21       OFFICIAL COURT REPORTER

22

23

24

25