**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE, ET AL.**                    **PLAINTIFFS**

**VS.**                                                  **CASE NO. 3:23-cv-00272-HTW-LGI**

**TATE REEVES, in his official capacity
As Governor of the State of Mississippi, ET AL.**          **DEFENDANTS**

**MEMORANDUM OF AUTHORITIES IN SUPPORT OF STATE DEFENDANTS'
RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY
INJUNCTION RE H.B. 1020 § 4 AND § 5 [DKT. #110]**

**INTRODUCTION**

This Court should deny Plaintiffs' motion for preliminary injunction [Dkt. #110], which seeks to halt State officials from implementing important provisions of state law authorizing the establishment of a criminal court to enhance public safety by complementing the expansion of the Capitol Police force.  Plaintiffs contend that the Legislature's establishment of a municipal court to serve the Capitol Complex Improvement District ("CCID Court") violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and seek immediate relief on that basis.  Plaintiffs' request fails for multiple reasons:  (1) they lack standing to obtain the extraordinary relief that they demand; (2) their claim fails on the merits; and (3) they flunk all remaining preliminary injunction requirements.  Granting them relief would cause irreparable harm to the people of Mississippi by exacerbating the very public-safety and criminal-justice emergencies that the challenged law seeks to address.

To start, Plaintiffs have no basis to seek relief—especially extraordinary injunctive relief—against the CCID Court provisions because they have failed to establish that the law will ever harm

them.  None of the individual plaintiffs has shown that he or she is or will be a defendant processed or prosecuted in any proceeding to be conducted in the CCID Court.  Nor have the NAACP plaintiffs shown that they or their members will suffer any actual injury from the CCID Court. Plaintiffs claim that establishing the CCID Court is unlawful, but that does not establish their standing.  They have done nothing to show that the CCID Court will harm *them* or affect *them* in any way that is different from how the law "affects" any other member of the public.  This failure to establish standing dooms Plaintiffs' motion for preliminary injunction, and their CCID Court claims should be dismissed on that basis.

Next, even if Plaintiffs could show standing for injunctive relief, they cannot be granted a preliminary injunction because their equal-protection claim fails on the merits. The challenged CCID Court provisions are race-neutral on their face and rationally advance legitimate purposes. The law is therefore constitutional unless Plaintiffs show that it was driven by a discriminatory purpose and has a discriminatory effect.  They have not made and cannot make either showing. The Legislature established the CCID Court to address Jackson's clearly-recognized, ongoing public-safety and criminal-justice emergencies.  Those emergencies gravely affect not just those living in Jackson, but all Mississippians:  the many Mississippians who work in and visit Jackson; the many Mississippians affected by public-safety and criminal-justice problems that cannot be confined to Jackson; and every Mississippian who is entitled to a functioning capital city or is concerned for the future of their capital.  Plaintiffs disregard these realities and rely instead on tired talking points claiming that the challenged law was improperly motivated by race—despite widespread acknowledgement of Jackson's glaring crime problem and the need for decisive action. Plaintiffs' claims are irreconcilable with the grim reality that so many Jacksonians and non-Jacksonians alike must constantly confront the consequences of Jackson's ongoing crime problem,

"dysfunctional city government," Dkt. #45 at 10, and perpetual inability to sustain basic city and human services—problems that affect all Mississippians, regardless of race. The Legislature acted to address those problems, without regard to race. The CCID Court provisions satisfy the Equal Protection Clause.

Finally, Plaintiffs' motion flunks all of the remaining preliminary injunction factors. For reasons already explained, Plaintiffs cannot show that they stand to suffer any imminent injury as a result of the challenged CCID Court provisions. The challenged law does not affect any plaintiff in any personal way. Plaintiffs' vague notions of constitutional injury are substantially outweighed by the public interest in enhancing public safety and supporting the criminal-justice system in Jackson—interests that Plaintiffs ignore. As this Court has recognized, "Jackson has a crime cancer"—a "crime problem [that] is sweltering, undisputed and suffocating"—and "[t]he criminal justice system in Hinds Count is in crisis." Dkt. #45 at 9-10, 21. But on the equitable factors, Plaintiffs do little more than repeat their claim of an equal-protection violation. That cannot carry their burden on the distinct factors of irreparable harm, the equities, and the public interest. Those are separate requirements for preliminary injunctive relief, and Plaintiffs have not satisfied them.

The defendants respectfully submit that the Court should rule promptly. The State is entitled to resolution of these issues that have now been mired in this baseless litigation for months. The law at hand is tremendously important—to the State, to Jackson, and to the many thousands of citizens affected by crime in the State Capital. Each day of delayed resolution is a grave threat to public safety. If the Court does anything but summarily deny Plaintiffs' motion for preliminary injunction, it should issue a reasoned opinion to facilitate appellate review.

For these reasons and those set forth herein, Plaintiffs fail to make the requisite showing for a preliminary injunction. Their motion should be denied, and their CCID Court claims should be dismissed for lack of standing.

## **STATEMENT OF FACTS**

**Factual Background.** On April 21, 2023, H.B. 1020 was signed into law. Dkt. #34-1 at 2193-2226. H.B. 1020 "is aimed directly at the City of Jackson's 'crime cancer.'" *Saunders v. State*, No. 2023-CA-00584-SCT, 2023 WL 6154416, at *4 (Miss. Sept. 21, 2023) (quoting this Court's Order herein, Dkt. #45 at 10).

Among other things, the challenged law requires the establishment of one inferior criminal court to serve the CCID. 2023 H.B. 1020, § 4(1)(a). The CCID Court shall function as a municipal court, having the same jurisdiction as municipal courts to hear and determine criminal matters accruing within the CCID. *Id.* The law provides that any person convicted in the CCID Court "may" be placed in the custody of the Mississippi Department of Corrections' Central Mississippi facility. *Id.* § 4(1)(b). It requires the Chief Justice of the Mississippi Supreme Court to appoint to the CCID Court a judge having all qualifications required by law for municipal court judges, and it requires the Administrative Office of Courts to provide compensation for the judge and support staff. *Id.* § 4(3). The law further requires the Attorney General to designate two attorneys to serve as prosecuting attorneys for the CCID court. *Id.* § 5(1). Additionally, the law authorizes the Hinds County District Attorney to prosecute cases in the CCID court. *Id.* § 5(2). And it expressly provides that the Hinds County District Attorney shall not be prohibited from filing criminal indictments or actions in other appropriate courts for matters that accrued within the boundaries of the CCID. *See id.* Finally, the law provides that all of the above-mentioned provisions shall take effect January 1, 2024, and "shall stand repealed on July 1, 2027." *Id.* §§ 4(1)(a), 4(5), 5(3).

The events of 2020 brought to the capital city a new emergency concomitant with the COVID-19 pandemic—namely, an unprecedented surge in crime. As this Court has recognized, "[i]n 2020, Jackson reported 130 homicides—a record number at that time. In 2021, Jackson surpassed that record with at least 155 reported homicides—'the highest per capita murder rate in the nation . . . . [h]igher than Birmingham, Atlanta, Detroit, and even Chicago.' [Citations omitted.] In 2022, even with a 14% decline in homicides, Jackson reported 138 homicides that year, and Jackson's 'homicide rate still managed to surpass every other major city in the U.S. for the second straight year.'" Dkt. #45 at 9. As this Court has further noted, "[h]omicides may be the headline grabber, but Jackson's other violent crime categories battle for equal condemnation: Rape, Robbery, Aggravated Assault, Sexual Assault, and Burglary rates continue to be among the highest nationwide, per capita." *Id.* In the words of this Court, "Jackson has a crime cancer"—a "crime problem [that] is sweltering, undisputed and suffocating." *Id.* at 9-10.[1]

The city's escalating crime rate is attributable in part to Jackson's failure to provide an adequately staffed police force. As this Court has recognized, Jackson's "police presence is crying for reinforcement." Dkt. #45 at 9. Estimates have placed the necessary number of police officers for Jackson at approximately 600. *See* Dkt. #34-4 at 15-16. But "Jackson now has a police force of approximately 258 sworn officers." Dkt. #45 at 9. It is no surprise that "one of the factors leading to the surge of crime in Jackson is a shortage of officers from dispatcher to sworn officers." *See* Dkt. #34-4 at 7. *See also id.* at 19, 76.[2]

---

[1] Jackson's ongoing crime epidemic has been widely reported. The following sampling of additional reports is illustrative: Dkt. #34-4 at 3, 10, 20, 29-30, 31-33, 34-38, 39-40, 41-44, 45-46, 47-65, 67, 86-88.

[2] As this Court stated in *United States of America v. City of Jackson*: "Jackson is better than that. The majority of its citizens have remained loyal to this metropolis, convinced that they will solve the crime problem which has placed Jackson number one in homicides per capita in 2021 and 2022; the fastest shrinking city in the United States as described in the latest United States Census Bureau data[ ], because of white and black flight premised on fears generated by a perceived lack of police protection; a declining tax

Against this backdrop of escalating crime and a good-faith effort by stakeholders to seek solutions, H.B. 1020 was introduced in the House at the outset of the 2023 Legislative Session. *See* Dkt. #34-1 at 1. Originally a revenue bill assigned to the House Ways and Means Committee, H.B. 1020, as initially approved by the House, provided for two new inferior courts within the CCID, each to be staffed by a judge to be appointed by the Chief Justice. Dkt. #34-1 at 6. A competing version of the bill approved by the Senate provided for temporary special judges through 2026 with a new elected, permanent circuit judge to take office in 2027. *See* Dkt. #34-1 at 2299-2309. *See also* Video 5.[3] Over nearly four months from January to April 2023, the Legislature reviewed, negotiated, amended, and debated H.B. 1020. *See* Dkt. #34-1 at 1-2. *See also* Videos 1-8. As the submitted videos of the hours-long floor debates confirm, the debate was robust and exhaustive. H.B. 1020 passed in the House by a vote of 76-38 and in the Senate by a vote of 34-15. Dkt. #34-1 at 2227-2228.

H.B. 1020's CCID Court provisions are consistent with a multifaceted effort by the Legislature to address Jackson's undeniable crime problem. To complement the expanded role of the Capitol Police in protecting Jackson's State Capitol Complex, central business district, medical corridor, and surrounding areas, the Legislature deemed it appropriate to establish an additional municipal court specifically tasked with serving the CCID. To that end, § 4 of challenged law "creates an inferior court for the CCID, which shall have the same jurisdiction as municipal courts," *Saunders*, 2023 WL 6154416 at *4.

---

base; and a challenging water/sewage system, which for decades, has frustrated Jacksonians and caused too many to go elsewhere." No. 3:22-cv-00686-HTW-LGI (S.D. Miss., July 21, 2023), Dkt. #38 at 3.

[3] All video clips cited herein are keyed to the Appendix appearing at Dkt. #50 at 35-36.

As the Mississippi Supreme Court has noted, "[t]he [CCID], which overlays a portion of the City of Jackson and includes the State Capitol and other state buildings, had been created by earlier legislation." *Saunders*, 2023 WL 6154416 at *4.   By its terms, H.B. 1020's establishment of the CCID Court provides the heart of the capital city with additional judicial resources for processing and adjudicating certain criminal matters accruing in the CCID.  Specifically, for crimes committed in the CCID, the CCID Court—like all municipal courts in Mississippi—will be authorized to handle preliminary matters (such as initial appearances and felony preliminary hearings), to set bail in misdemeanor and felony cases, to hear and determine misdemeanor cases, and to sit as a committing court in felony cases.  *See* MISS. CODE ANN. § 21-23-7(1).  Coupled with statutory provisions expanding the jurisdiction of the Capitol Police, and as discussed in greater detail *infra*, the CCID Court will provide the capital city's criminal justice system with additional needed operational bandwidth to accommodate the increased Capitol Police presence.

The Mississippi Supreme Court has held that the Legislature's establishment of the CCID Court does not violate the Mississippi Constitution.  *Saunders*, 2023 WL 6154416 at *9-10.  To the contrary, the Court concluded that a "clear constitutional mandate" to create such a court "cannot be denied."  *Id.* at 7.  Mississippi's Constitution "does not merely permit but actually *directs* the Legislature to establish . . . inferior courts [such as the CCID court] as needed."  *Id.* (italics in original).  "The bottom line is that the Legislature took decisive action to craft [the CCID Court], an act it deemed necessary to serve the CCID."  *Id.* at 9.

**Procedural Background.**  On April 21, 2023, six alleged residents of Jackson and three NAACP entities filed *Plaintiffs' Complaint for Declaratory and Injunctive Relief* against Mississippi Governor Tate Reeves, Mississippi Department of Public Safety Commissioner Sean Tindell, Chief of the Mississippi Department of Public Safety Office of the Capitol Police Bo

Luckey, Chief Justice of the Mississippi Supreme Court Michael K. Randolph, and Mississippi Attorney General Lynn Fitch, in their official capacities.  Dkt. #1.  (Plaintiffs later voluntarily dismissed their claims against Governor Reeves.  Dkt. #44.)  Plaintiffs claim that certain provisions of H.B. 1020 violate the Fourteenth Amendment's Equal Protection Clause.  *Id.* at 46-50, ¶¶ 131-49.  They seek declaratory and injunctive relief.  *Id.* at 50-51, ¶¶ A-J.

Following numerous hearings on a bevy of motions in this hotly-litigated case, Plaintiffs on November 13, 2023, filed a long-delayed motion for preliminary injunction regarding §§ 4 and 5 of the challenged law, *viz.*, the CCID Court provisions.  Plaintiffs seek generally to halt State officials from implementing the CCID Court and, specifically, to enjoin the appointment of its judge and prosecutors.  While §§ 4 and 5 of the law do not take effect until January 1, 2024, nothing prevented Plaintiffs from seeking earlier injunctive relief as to these provisions.  Instead, Plaintiffs now seek eleventh-hour injunctive relief, manufacturing an artificial "emergency."  Defendants Commissioner Sean Tindell, Chief Bo Luckey, and Attorney General Lynn Fitch (collectively "Defendants") file this response in opposition to Plaintiffs' motion for preliminary injunction.

## ARGUMENT

## I. PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE PLAINTIFFS LACK STANDING TO OBTAIN A PRELIMINARY INJUNCTION.

### A. Plaintiffs cannot show any actual or imminent, concrete and particularized injury.

To maintain any lawsuit in federal court, plaintiffs must establish Article III standing by showing injury in fact, traceability, and redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  But plaintiffs bear a heavier burden where they seek prospective injunctive relief.  Plaintiffs must always show an injury, traceable to the defendant's conduct, that is "concrete, particularized, and actual or imminent."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quotation marks omitted).  But when plaintiffs seek relief aimed at future conduct,

their "threatened injury must be *certainly impending* to constitute injury in fact," and "[a]llegations of *possible* future injury are not sufficient."  *Id.* (quotation marks omitted; emphasis in original).[4]

Here, none of the individual plaintiffs has standing to seek a preliminary injunction because none can show any concrete, imminent injury flowing from the challenged CCID Court provisions. The individual plaintiffs purport to be residents of and registered voters in Jackson.  Dkt. #1 at 6-9, ¶¶ 16-21.  They do not claim any specific anticipated future status as a criminal defendant in any CCID Court proceeding.  While they allege generally that they "are threatened with prosecution and conviction" by the CCID Court, Dkt. #111 at 8, n.5, Plaintiffs have neither shown nor alleged that they are in actual or imminent danger of experiencing any concrete and particularized injury resulting from the establishment of the CCID Court or the challenged appointment of a judge or prosecutors for that court.  None of the individual plaintiffs can show that he or she is or will be a party to any CCID Court proceeding.  For this reason alone, this Court should deny Plaintiffs' motion for preliminary injunction and dismiss their CCID Court claims.

**B.  <u>Plaintiffs' alleged status as voters does not confer standing.</u>**

Plaintiffs contend that their status as registered voters in Jackson gives them standing, see Dkt. #111 at 8, n.5, but that assertion is baseless, as Plaintiffs' right to vote is not impaired or implicated <u>at all</u> in this matter.  Sections 4 and 5 of the challenged law do not alter the manner in which any existing municipal judge or prosecutor is selected.  Nor does the law "prohibit or in any way limit" the elected Hinds County District Attorney from prosecuting cases in the CCID Court. *See* H.B. 1020, § 5(2).  Plaintiffs cite no authority for the proposition that municipal voters have a

---

[4] *See also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019); *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285-86 (5th Cir. 1992) (en banc).

right to elect officials with the exclusive authority to select municipal court personnel—or that any alleged "stripping" of local authority by the State confers standing. *Cf. Stallworth v. Bryant*, 936 F.3d 224, 231 (5th Cir. 2019) (rejecting theory of standing that "Jackson voters have a right to elect officials with the exclusive authority to select municipal airport commissioners"). Given the foregoing, and since Mississippi's Constitution does not provide for a right to elect municipal judges or prosecutors, Plaintiffs' purported status as registered voters does not confer standing.

**C. Plaintiffs cannot establish "stigmatic-injury" standing or standing predicated on a purported loss of "benefits" by all citizens of Jackson.**

Plaintiffs assert that the challenged law "treats them like second-class citizens and imposes a stigmatizing injury sufficient for standing." Dkt. #41 at 7. They cite *Allen v. Wright*, 468 U.S. 737 (1984), for the proposition that "'[s]tigmatic injur[ies]' provide standing to 'those persons who are personally denied equal treatment by the challenged discriminatory conduct.'" *Id.* But "to plead stigmatic injury standing," a plaintiff "must plead that he was personally subjected to discriminatory treatment." *Moore v. Bryant*, 853 F.3d 245, 249 (5th Cir. 2017). "Being subject to a racial classification differs materially from having personally been denied equal treatment," and "racial classification alone" does not "amount[] to a showing of individualized harm." *Id.* Where the plaintiff fails to plead that he was "personally subject to discriminatory treatment," he "fails to plead injury" and lacks "stigmatic-injury" standing. *See id.*

Here, Plaintiffs have neither shown nor alleged that any of them have been "personally subjected" to any "discriminatory treatment" as a result of the CCID Court. They allege only that the challenged law will "single out" Jackson residents as a whole "for prosecution in a second-class criminal justice system." Dkt. #111 at 7. Having failed to show that they will be *personally* subjected to some discriminatory treatment via the establishment of the CCID Court, Plaintiffs cannot establish standing via any alternative theory of "stigmatic injury."

Plaintiffs further assert that they "stand to lose the benefits they enjoyed from having locally accountable prosecutors and judges." *Id.* at 8 n.5. But in truth, Plaintiffs will continue to enjoy the same "benefits" of local control of Jackson's criminal-justice system. First, the challenged law does not eliminate a single elected judgeship or prosecutor's office in Jackson or Hinds County. Neither the occupants of these offices nor the offices themselves are jeopardized by any provision of this law. Second, local citizens will in fact retain electoral control over the decisions of the CCID Court judge and prosecutors. Any defendant aggrieved by the judgment of the CCID Court may appeal that judgment to the Hinds County Court and, ultimately, to the Hinds County Circuit Court—both of which are presided over by locally-elected judges. *See Saunders*, 2023 WL 6154416 at *8-9. Ultimately, it is the Hinds County Circuit Court that will have "controlling authority via the appellate process." *Id.* at *9. Furthermore, pursuant to § 5(2) of the law, the "Hinds County District Attorney shall be authorized to prosecute cases in the CCID inferior court." Thus, there will be no loss of "benefits" to confer standing on Plaintiffs.

Under settled federal standing law, none of the individual plaintiffs has experienced or will experience any actual or imminent, concrete and particularized harm as a result of the CCID Court. Thus, none of them has standing to seek a preliminary injunction.

**D. <u>Plaintiffs cannot establish associational or organizational standing.</u>**

None of the three NAACP entity plaintiffs has associational or organizational standing to seek preliminary injunctive relief. Associational standing requires an association to show that its members would independently meet Article III standing requirements. *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006). Organizational standing requires an organization to establish standing in its own name by meeting the same standing test that applies to individuals. *Tenth Street Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020). The

NAACP plaintiffs do not make the showings required under either doctrine.  Because their members cannot independently establish standing, see *supra*, the NAACP plaintiffs lack associational standing.  Similarly, the NAACP plaintiffs have not shown any concrete, imminent injury arising from the CCID Court.  They have not explained how this law has caused or will cause them to undertake any actions that "differ from the [NAACP]'s routine lobbying activities," nor have they identified "any specific project that [they] had to put on hold or otherwise curtail in order to respond to" this law.  *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010).  Thus, the NAACP plaintiffs likewise lack organizational standing.

Having failed to show any concrete, imminent injury caused by the challenged law, Plaintiffs lack standing to obtain a preliminary injunction halting State officials from implementing § 4 and § 5 of the law.  This Court accordingly lacks jurisdiction to issue such relief and should deny Plaintiffs' motion for preliminary injunction and dismiss their CCID Court claims.

## II. ALTERNATIVELY, PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE NONE OF THE GOVERNING FACTORS SUPPORTS A PRELIMINARY INJUNCTION.

To obtain a preliminary injunction, Plaintiffs must establish:  (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant outweighs any harm to the nonmovant that may result from the injunction; and (4) that the injunction will not disserve the public interest.  *Beswick v. Barr*, Civil Action No. 5:20-cv-98-DCB-MTP, 2020 WL 3520312, at *3 (S.D. Miss. June 29, 2020).  The last two requirements merge when the government is the opposing party.  *Pacharne v. Dep't of Homeland Sec.*, 565 F. Supp. 3d 785, 802 (N.D. Miss. 2021).  A preliminary injunction is an "extraordinary remedy and should be granted only if the movant has clearly carried the burden

of persuasion with respect to all four factors." *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).  Plaintiffs fail to satisfy any of the preliminary injunction factors.

A. **Plaintiffs are likely to fail on the merits of their only claim—an equal-protection claim—so the Court should deny a preliminary injunction.**

1. **The challenged CCID Court provisions are race-neutral and rationally advance legitimate purposes; therefore, the law is constitutional.**

As acknowledged by the Mississippi Supreme Court, "it is obvious from [the] face [of H.B. 1020 that] this legislation is aimed directly at the City of Jackson's 'crime cancer.'" *Saunders*, 2023 WL 6154416 at *4 (quoting this Court's Order herein, Dkt. #45 at 10).  Even Plaintiffs no longer dispute that Jackson has a pressing crime problem, though they would apparently argue that only felonies—and not misdemeanors—are committed in Jackson.  *See* Dkt. #111 at 21.  That argument belies the conditions on the ground in Jackson, where—in the words of former Jackson Police Chief James Davis—misdemeanor offenders "are terrorizing the city of Jackson."  *See* 2/07/22 Mississippi Free Press Article (Ex. "A").

As this Court has recognized, Jackson's "police presence . . . is crying for reinforcement." Dkt. #45 at 9.  Part of recent legislative efforts to alleviate Jackson's crime problem involved providing such reinforcement by expanding the Capitol Police force and the geographic boundaries of its primary jurisdiction, the CCID.  When Defendant Capitol Police Chief Bo Luckey assumed command in May 2022, the Capitol Police force had approximately 63 officers and fielded 200-400 service calls per month.  Decl. of Luckey at 2, ¶ 4 (Ex. "B").  In the past year and half, the Capitol Police force has more than doubled in size, presently standing at approximately 160 officers with plans to increase that number to as many as 230 officers.  *Id.*  The Capitol Police force now fields 17,000-18,000 service calls per month.  *Id.*  Before the expansion, in 2021, Capitol Police made two felony arrests and issued no misdemeanor charges.  *Id.* at 2, ¶ 5.  Between January

1, 2023, and early November 2023, Capitol Police made approximately 610 felony arrests and issued approximately 223 misdemeanor charges.  *Id.*  These numbers are only expected to increase, as the CCID—the primary jurisdiction of the Capitol Police—will double in size from approximately nine square miles to approximately 18 square miles effective July 1, 2024.  *Id.* at 1-2, ¶ 3.  *See also* H.B. 1020, § 8.

To complement the expanded role and jurisdiction of the Capitol Police, the Legislature deemed it appropriate to establish an additional municipal court specifically tasked with serving the CCID.  To that end, § 4 of the challenged law "creates an inferior court for the CCID, which shall have the same jurisdiction as municipal courts," *Saunders*, 2023 WL 6154416 at *4, and provides for the appointment of a judge for that court.  Section 5 provides for the designation of two new prosecutors for the CCID Court and further authorizes the Hinds County District Attorney to prosecute cases in the CCID Court.

While the ultimate objective of any law enforcement presence is deterrence of crime, that can be achieved only if a complementary judicial apparatus exists to efficiently process felony arrests and adjudicate misdemeanors.  To that end, the CCID Court will provide important practical benefits.  For example, it will ensure that initial processing of the additional 600+ felony cases per year generated by the Capitol Police are not added to the existing backlog of criminal cases pending in the Hinds County court system.  Decl. of Luckey at 3, ¶ 9 (Ex. "B").  Additionally, it will increase the ease and speed with which Jackson citizens can complete the necessary witness affidavit paperwork required for the prosecution of certain crimes not witnessed by the police.  *Id.* at 3, ¶ 10.  Further, it will provide Capitol Police with an additional needed judicial vehicle for obtaining search warrants necessary to investigate crimes—warrants that some Hinds County

judges categorically refuse to sign for Capitol Police officers under any circumstances.  *Id.* at 3, ¶ 11.

The CCID Court provisions are race-neutral.  That is, they apply equally to people of all races.  Because this law does not implicate any fundamental right or suspect classification, it is subject only to rational-basis review.  *See Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016).  "Statutory classifications are given broad deference under rational basis review and will survive if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Id.* (quotation marks omitted).  "The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it whether or not the basis has a foundation in the record."  *Id.* (quotation marks omitted).

Plaintiffs cannot meet their burden to invalidate the CCID Court provisions.  The State of Mississippi has a legitimate interest in ensuring that sufficient judicial capacity exists in the CCID to process arrests made in the CCID by the expanded Capitol Police force.  Such additional capacity increases the likelihood that crime victims and defendants alike will have timely access to justice in the CCID.  The CCID Court provisions are rationally related to the State's legitimate interest.  By providing additional capacity to adjudicate misdemeanor offenses and handle preliminary felony proceedings, the CCID Court ensures that the expansion of the Capitol Police force is paired with a concomitant enlargement of judicial resources in the CCID.  Because the challenged law is rationally related to a legitimate governmental interest, it does not violate the Equal Protection Clause and is constitutional.

### 2.  Plaintiffs cannot show discriminatory effect or discriminatory purpose.

Plaintiffs contend that the CCID Court provisions violate the Equal Protection Clause because it discriminates based on race.  *See* Dkt. #111 at 8.  To prevail, Plaintiffs must show that

the judge and prosecutor appointment provisions of §§ 4 and 5 of the law have a "discriminatory effect and . . . discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Plaintiffs do not make either showing, so their merits argument doubly fails.

**First**, **Plaintiffs cannot show discriminatory effect.**  Plaintiffs have not established that the CCID Court provisions have any "discriminatory effect." *Armstrong*, 517 U.S. at 465.  To claim that this law has a "disparate impact . . . on the Black [*sic*] citizens of Jackson," Plaintiffs argue that Jackson has a higher percentage of black residents than other parts of the State and that only "[t]he overwhelmingly Black [*sic*] residents of Jackson . . . will be stripped of the right to vote, directly or indirectly, for their prosecutors and criminal court judges, and to have those officials reside in their city or county."  Dkt. #111 at 11.  But Plaintiffs' right to vote is not implicated at all in this matter.  As noted *supra*, §§ 4 and 5 of the challenged law do not alter the manner in which any existing municipal judge or prosecutor is selected.  Nor does Mississippi's Constitution provide for a right to elect municipal judges or prosecutors, or mandate where those officeholders reside.

Plaintiffs argue that the challenged law will subject Jackson's black citizens to judges who are not "accountable and responsive to their community."  Dkt. #111 at 7.  But there is no legal or factual predicate for assuming that the CCID Court judge will dispense justice in a racially-discriminatory manner.  To the contrary, as one federal court recently reaffirmed, "the law presumes that a judge is unbiased and unprejudiced in matters over which he or she presides." *Reese v. Ohio*, Case No. 3:21-CV-993, 2023 WL 5611611, at *10 (N.D. Ohio May 16, 2023).[5]

---

[5] *See also Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (There is "a presumption of honesty and integrity in those serving as adjudicators"); *O'Hair v. White*, 675 F.2d 680, 702 n.8 (5th Cir. 1982) (Tjoflat, J., concurring) (reaffirming "principle that since state judges are required to uphold the United States Constitution, federal courts should not presume that they will do otherwise"); *Kinney v. S. Miss. Planning & Dev. Dist., Inc.*, 202 So. 3d 187, 194 (Miss. 2016) (reaffirming presumption that "a judge, sworn to administer impartial justice, is qualified an unbiased").

Plaintiffs' entire claim is predicated on the assumption that a judge who is not selected locally cannot administer fair and impartial justice. Yet, paradoxically, Plaintiffs seek relief from a federal court system populated exclusively by unelected judges appointed by the President.

Regardless, contrary to Plaintiffs' assertions, the citizens of Jackson will in fact retain a "political check" on the CCID Court. As noted *supra*, any defendant aggrieved by the judgment of the CCID Court may appeal that judgment by trial de novo to the Hinds County Court and, ultimately, to the Hinds County Circuit Court—both of which are presided over by locally-elected judges. *See Saunders*, 2023 WL 6154416 at *8-9. *See also* MISS. CODE ANN. § 11-51-81. Ultimately, it is the Hinds County Circuit Court that will have "controlling authority via the appellate process." *Saunders*, 2023 WL 6154416 at *9. Thus, locally-elected judges will in fact have the final say on any judgment entered by the CCID Court judge, providing the so-called "political check," Dkt. #111 at 7, that Plaintiffs erroneously claim is lacking under this law.

Plaintiffs' claim has another fundamental problem. Equal-protection principles require comparing those who are "similarly situated." *Armstrong*, 517 U.S. at 465. Plaintiffs have given no reason to believe that the City of Jackson is similarly situated with any other municipality in Mississippi. They do not even try to make that showing. And indeed Jackson is <u>not</u> similarly situated to any other city or town in the State. It is by far the State's most populous city; the seat of State government; and the home of the State Capitol, museums, a medical center, State office buildings, and multiple universities. Unfortunately, Jackson also has a significant crime problem—one this Court has characterized as "sweltering, undisputed and suffocating." Dkt. #45 at 9. This reality is heightened by Jackson's size and by the apparent unwillingness of local leaders to acknowledge and address the City's many problems that hurt all Mississippians. For numerous reasons previously described—which have nothing to do with race—Jackson is unique among

municipalities in Mississippi.  No other locality in the State is similarly situated.  Plaintiffs "have not satisfied their burden of pointing to similarly situated comparators," *Lindquist v. City of Pasadena Tex.*, 669 F.3d 225, 234 (5th Cir. 2012), a burden they cannot meet due to Jackson's unique status among Mississippi cities.  Because Plaintiffs have not established a discriminatory effect, their equal-protection claim fails for this reason alone.

While conceding that the challenged law is race-neutral on its face, Plaintiffs nevertheless argue that "a clear pattern, unexplainable on grounds other than race," should obviate the need for any proof of discriminatory intent or purpose in this case. Dkt. #111 at 10-11.  In support, Plaintiffs cite only *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), which avails them nothing.  In *Gomillion*, the Supreme Court held that while race-neutral on its face, an Alabama law evidenced discriminatory intent where it altered the shape of a city from a square to a 28-sided figure, disenfranchising all but four or five of 400 black voters while not removing any white voters.  *See Gomillion*, 364 U.S. at 340-48.  Plaintiffs marshal no evidence of such racial animus here.  The CCID Court provisions apply equally to <u>all</u> citizens of Jackson—both black and white alike.

It bears noting that, on Plaintiffs' disparate-impact reasoning, every legislative action ever taken with regard to Jackson alone would—given the city's racial demographics—by definition have a discriminatory effect.  That is not a legally sound predicate upon which to establish discriminatory effect, nor does it prove invidious racial discrimination.  *Cf. Hearne v. Bd. of Educ. of City of Chicago*, 185 F.3d 770, 776 (7th Cir. 1999); *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002).  An equal-protection claim requires a demanding showing, and Plaintiffs' facile approach falls exceedingly short.

***Second*, Plaintiffs cannot show discriminatory purpose.**  Plaintiffs have not established that the CCID Court has any "discriminatory purpose."  *Armstrong*, 517 U.S. at 465.  As noted,

the law is race-neutral on its face and advances legitimate objectives.  Plaintiffs make several arguments to show discriminatory intent, Dkt. #111 at 11-19, but each fails.  And the burden of proof is squarely on Plaintiffs.  *See Abbott v. Perez*, 138 S. Ct. 2305, 2324-35 (2018).

As a threshold matter, Plaintiffs skip over several points of blackletter law.  These errors permeate their discriminatory-intent argument.

State legislators are entitled to a presumption of good faith.  *See Miller v. Johnson*, 515 U.S. 900, 915 (1995).  *See also Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020) ("state legislatures are afforded a presumption of good faith").  Furthermore, the subjective motivations of particular legislators in voting for a bill are not a sufficient basis from which to infer the purpose of the entire Legislature.  *See, e.g., United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); *Fusilier*, 963 F.3d at 466 (overemphasizing statements of individual legislators deemed improper).

Plaintiffs reject the presumption of legislative good faith.  The undercurrent running through their filings is that white legislators enacted the challenged law with racially discriminatory intent—specifically, that despite not eliminating a single municipal judgeship or prosecutor's office in Jackson or Hinds County, they wished to prevent the black citizens of Jackson from selecting the judge and prosecutors for the CCID Court.  But the objective facts tell a very different story.  Jackson is the State capital and is by far Mississippi's largest city.  As this Court has recognized, "Jackson is the seat of State government, the home of the State Capitol, multiple hospitals and medical providers, museums, several universities, and a plethora of retail and restaurant establishments."  *Id.* at 8-9.  The City of Jackson and Hinds County have both suffered undeniable crises of local leadership in recent years.  Citizens of Jackson have been forced

to contend almost continuously with all manner of infrastructure and related issues, including numerous and prolonged city-wide water outages, widespread sewage failures, indefinite disruption to garbage collection, ubiquitous potholes, urban blight, growing vagrancy, "a dysfunctional city government," Dkt. #45 at 10, physical fights at multiple county-board-of-supervisors meetings, ineptitude in the administration of county elections[6]—and a widespread increase in crime.  These problems affect not only the residents of the City of Jackson, but also the many people who commute to Jackson from surrounding areas daily to work and do business, as well as the many people who travel to Jackson to visit the state capital for medical care, retail opportunities, and tourism attractions.  The fallout from Jackson's problems does not stop at the city limits.

All of these attributes make Jackson unique among Mississippi cities—and thus the problems in Jackson warrant action from the State.  The State has a strong interest in the wellbeing of all area citizens and in creating conditions under which the capital city functions like a real city, with adequate resources to address not only infrastructure and related issues but—perhaps most importantly—surging crime.  Alarmed by Jackson's "dysfunctional city government," Dkt. #45 at 10, the Legislature justifiably is—in the words of this Court—"nervous about sending money to Jackson." *Id.*  Prudence and fiscal stewardship dictate that the State consider viable alternatives.

H.B. 1020 is an effort to focus additional resources on the Jackson-area crime problem—a problem the Legislature is entitled to address for the safety and wellbeing of all Mississippians who live in, live around, travel to, or care about Jackson.  There is nothing discriminatory about

---

[6] *See, e.g.*, Dkt. #34-5 at 9-10, 11-14, 15-17, 18-21, 22-28, 29-39, 40-42, 43-46, 47-53, 54-61, 62-65, 66-67, 68-75, 76-79, 80-83, 84-87.  *See also Lumumba v. City Council of Jackson*, 358 So. 3d 318 (Miss. 2023); 11/08/23 WAPT Article (Ex. "C"); 11/09/23 AP Article (Ex. "D").

that.  And every provision of this law—including the CCID Court provisions of §§ 4 and 5—is facially race-neutral and affects both black and white citizens equally.

With those points in mind, Defendants address, in turn, Plaintiffs' assertions regarding discriminatory intent.

Plaintiffs first argue that "substantive departures" and "procedural departures" from "the normal legislative procedures" suggest discriminatory intent.  Dkt. #111 at 12-17.  As set forth below, Plaintiffs' accusations of "departures" are meritless and fail to establish the "numerous and radical procedural departures that may lend credence to an inference of discriminatory intent" in this context.  *See Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016).  Moreover, as the Mississippi Supreme Court recently noted, "Article 6, Section 172, of the Mississippi Constitution does not merely permit but actually *directs* the Legislature to establish . . . inferior courts as needed." *Saunders*, 2023 WL 6154416 at *7 (italics in original).  The establishment of the CCID Court reflects a good-faith effort by the Legislature to fulfill its constitutional mandate by coupling enhanced law enforcement resources with enhanced judicial resources.

**Alleged "substantive departures."**  First, Plaintiffs argue that the appointment of a judge and prosecutors for the CCID Court "sharply depart[s] from the State's distinguished tradition" of retaining "local control over the criminal justice system."  Dkt. #111 at 12.  But as explained *supra*, Jackson residents <u>will</u> in fact retain local control over the CCID Court, since every judgment entered by that court will be subject to an appeal of right—first by trial de novo to the locally-elected County Court, then to the locally-elected Circuit Court.  Thus, locally-elected judges will have the final say on any conviction rendered in the CCID Court.

Plaintiffs contend that any novel attempt by the Legislature to address Jackson's unique crime problem can only be rooted in racism.  This is not a fair or valid assumption.  The U.S.

Supreme Court has recognized that governments "may need many innovations, numerous combinations of old and new devices, [and] great flexibility . . . to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation." *Hadley v. Junior Coll. Dist. of Metro. Kansas City*, 397 U.S. 50, 59 (1970) (quotation marks omitted). It stands to reason that the deterrent effect of an increased police presence in any locality is only as effective as the court system that exists to process arrests, including arrests for misdemeanor offenses. As set forth *supra*, the CCID Court is the judicial complement to the expansion of the Capitol Police.

At no time in its post-Reconstruction history has Jackson been locked in such a downward spiral as it is now. One of the principal causes of this decline is crime in the area now designated as the CCID—an area frequented by the many Mississippians who visit the State Capitol, tour the State's museums, shop in Fondren's retail district, and seek medical care at the many hospitals and clinics in Jackson's medical corridor. Most who reside in this State are painfully aware of this problem.[7] They hear of crimes occurring in Jackson and—fearing for their safety and the safety of their loved ones—take their livelihoods, their business, and their tax dollars elsewhere.

Unless the situation in the heart of the city is improved—such that Mississippians feel safe to live, work, and visit there—Jackson's current dire trajectory will not change. Its tax base will continue to erode to a point of no return. Key to enhancing public safety in the CCID is the

---

[7] They recall 69-year-old Carolyn Temple, pistol-whipped, robbed, and fatally shot while retrieving empty garbage cans from the curb of her friend's driveway in the CCID in 2015. 1/12/15 Clarion-Ledger Article (Ex. "E"). They remember 23-year-old Chelsie Lynn Kirschten, shot to death while she sat at a stoplight at the intersection of Fortification and State Streets next to Baptist Hospital in the CCID in 2017, by a random man who "fired a single gunshot through the front driver side window of the car then ran off." 8/18/17 WLBT Article (Ex. "F"). They know the ordeal of WAPT news anchor Megan West and her family, held at gunpoint—a gun to her child's head—by attempted carjackers while trick-or-treating in the CCID on Halloween in 2021. 11/01/21 WLBT Article (Ex. "G"). The list goes on. This is not to mention the myriad accounts of misdemeanor crimes—petty theft and the like—that drive safety-conscious citizens, both black and white, out of Jackson.

reassuring presence of the Capitol Police.  And critical to the effectiveness of the Capitol Police is additional judicial capacity to adjudicate misdemeanors and process felony arrests in the CCID.[8]

Plaintiffs further assert that § 4 of the challenged law is a substantive departure from existing law because it provides that "[a]ny person convicted in the CCID inferior court *may* be placed in the custody of the Mississippi Department of Corrections, Central Mississippi facility." H.B. 1020 § 4(1)(b) (emphasis added).  Dkt. #111 at 14-17.  Plaintiffs argue that this provision strips CCID Court defendants of civil rights guaranteed by State law and chills their First Amendment rights.  This argument is baseless.  The issue at hand is whether the inclusion of this State-custody confinement provision in the challenged law is evidence of racial animus by the Legislature.  Anyone who appreciates the state of affairs with the Hinds County jail will understand that it is not.  The Hinds County jail—i.e., the Raymond Detention Center—has in recent years been plagued by "fights, escapes and other security problems."  10/17/23 AP Article (Ex. "H"). "In July 2022, U.S. District Judge Carlton Reeves ordered a rare takeover of the jail in Raymond after he said deficiencies in supervision and staffing led to 'a stunning array of assaults, as well as deaths.'"  *Id.*  Applying the presumption of legislative good faith, it is only fair to conclude that the Legislature provided the option for jailing convicted misdemeanants in State custody not because of racial animus, but because of the uncertain status of the Hinds County jail.  The City of Jackson stopped operating its own jail in 1993, relying on "the county to handle all its jail

---

[8] To the extent Plaintiffs contend that the Capitol Police force is itself somehow inherently "racist," that assertion is baseless.  It bears noting that approximately 75% of the Capitol Police force is black, including two of its three Assistant Chiefs and multiple command-level officers.  Decl. of Luckey at 3, ¶ 8 (Ex. "B"). The Capitol Police has experienced a significant improvement in community relations in recent months, with support for the force being vocalized by Jackson citizens across racial lines.  *Id.* at 4, ¶ 12.  This may be attributable in large part to Chief Luckey's ongoing efforts at community engagement and professional partnering, which include regular public forum meetings with Jackson residents, as well as the positive and professional working relationship that Capitol Police has developed with the Jackson Police Department and the Hinds County Sheriff's Office.  *Id.*  Plaintiffs' disparagement of the Capitol Police has no basis in reality.

needs."  2/07/22 Mississippi Free Press article (Ex. "A").  Given the lack of a city jail and the precarious status of the Hinds County jail, it was only prudent for the Legislature to provide the option for State custody should that become necessary.  And that is all it is—an *option*.  The challenged law does not *require* convicted misdemeanants to be held in a State penitentiary.  Nor does it mandate that they be housed in general population with convicted felons as opposed to a special segregated unit.  Finally, it is worth noting here that, as a general rule, anyone convicted of a misdemeanor in the CCID Court has that conviction stayed during the pendency of any properly-perfected appeal—meaning they will not serve time in jail unless and until a locally-elected Hinds County judge affirms their conviction.  *See* MISS. CODE ANN. § 99-35-1.

Furthermore, Plaintiffs have not asserted any claim in this lawsuit for alleged deprivation of state-law civil rights.  And if they had, this Court would not have jurisdiction over such claims.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984).  Nor have Plaintiffs asserted any claim in this lawsuit predicated on the First Amendment.  Rather, all of Plaintiffs' claims are predicated on the Fourteenth Amendment exclusively.  *See* Dkt. #1 at 46-50.

**Alleged "procedural departures."**  Plaintiffs also claim that the original version of H.B. 1020 should not have been assigned to the House Ways and Means Committee.  *See* Dkt. #111 at 17.  But as Plaintiffs now acknowledge, see *id.*, the original version of H.B. 1020 was a revenue bill that brought forward hundreds of code sections on state revenues.  *See* Dkt. #34-1 at 4-1043.  Assigning revenue bills to the House committee charged with handling revenue bills is proper.  Plaintiffs also contend that a Democrat member of the House conference committee on H.B. 1020 was excluded from committee meetings.  Dkt. #111 at 17 (citing Dkt. #41 at 19, which cites Dkt. #12-2 at Ex. T).  But the newspaper-article source of Plaintiffs' accusation further states that Rep. Banks said that "he was able to add provisions that would benefit the city" and "requested the

changes" after the final version "was handed to him" before the deadline.  Dkt. #12-2 (Ex. T) at 153.  Even if Plaintiffs' characterization of Rep. Banks's reported statements was not misleading, it would not matter.  Statements of a law's opponents are not valid evidence to prove that the law's supporters acted with discriminatory intent.  *Veasey*, 830 F.3d at 233.

Plaintiffs further accuse the Legislature of violating Section 89 of the Mississippi Constitution by failing to run H.B. 1020 through the "Local and Private Legislation Committee." Dkt. #111 at 17.  But H.B. 1020 is not "local and private legislation," so there was no such violation.  *See*, *e.g.*, *Sec'y of State v. Wiesenberg*, 633 So. 2d 983, 995 (Miss. 1994) ("a general State problem, though confined to a specific geographical area, may require and benefit from State action, without that action violating the constitution").  *See also Loden v. Miss. Pub. Serv. Comm'n*, 279 So. 2d 636, 639 (Miss. 1973); *Culley v. Pearl River Industrial Comm'n*, 108 So. 2d 390, 397-98 (Miss. 1959).  And Plaintiffs have not asserted (let alone proved) any claim for a violation of Section 89.  Nor have they cited any authority for the proposition that the Legislature cannot establish a new inferior court at its discretion in any given municipality.  To the contrary, Mississippi's Constitution expressly authorizes such legislative action.  *Saunders*, 2023 WL 6154416 at *7 (citing MISS. CONST. art. VI, § 172).  There is nothing irregular about acting consistent with the State Constitution.

**Alleged "legislative history."**  Plaintiffs argue that legislators "publicly expressed" their discriminatory intent behind the challenged law.  Dkt. #111 at 18.  But their weak anecdotal references to statements by two legislators prove no such thing.  Dkt. #12 at 7-8.  During protracted floor debate on an early version of H.B. 1020, Rep. Lamar argued that the Legislature should not limit the "talent pool" of special judges by excluding the "best and brightest" judges from "Holmes County or Madison County or wherever they may be."  *See* Dkt. #41 at 23 & n.11.  But that quote—

excised from an argument that special judges could come from the home counties of principal opponents of H.B. 1020—fails to prove that Rep. Lamar's comments were racially motivated.

Plaintiffs point to only one other quotation attributed to Rep. Lamar.  They cite a March 24, 2023, article reporting that Rep. Lamar expressed a belief that "four judges should be able to get the job done in Hinds County."  *Id.* at 24.  *See also* Dkt. #40-1 at 852.  Plaintiffs argue that because Rep. Lamar reportedly declined to elaborate to the author on this comment, he was engaging in "a standard ploy of racial demagoguery" and that his view could be motivated only by racial discrimination toward the black citizens of Hinds County.  *See id.*  That is a baseless non sequitur.  And other snippets from Plaintiffs' own cherry-picked newspaper articles further undercut their attempt to vilify Rep. Lamar.  *See*, *e.g.*, Dkt. #12-2 at 88.  To the extent any question remains about the sincerity of Rep. Lamar's convictions, his closing remarks from the House floor on March 31, 2023, are perhaps the most demonstrative.  *See* Video 8 (Part 2) at 1:33:23-1:40:24 ("I'm doing this for the right reasons, in my heart, and that's it . . . .  And we are all . . . all of us, equal children of God.  I believe it's the right thing to provide protection from criminal activity and help the capital city of Mississippi.  And it is my hope, and it is my prayer, that this bill will assist.").  *See also* Video 9.  While Plaintiffs may disagree with Rep. Lamar's position, there is no evidence that his support for the law was motivated by racial discrimination.  Indeed, perhaps most telling is that Plaintiffs' so-called proof of "public expressions" of discriminatory intent consists of their imaginative spin on two statements made by one legislator as H.B. 1020 made its way through a robust, months-long legislative process.  Regardless, anything Rep. Lamar said about H.B. 1020 fails to prove that the entire Legislature's motive was unlawful.

Plaintiffs' only other piece of anecdotal proof of legislative statements is even weaker. They suggest that a single statement—made eight years ago, by one legislator, on a proposed

constitutional amendment that was voted down by the State's entire electorate—shows that discriminatory intent motivated other legislators to back H.B. 1020 in 2023. Dkt. #41 at 24. That eight-year-old quote proves nothing about any motivations behind this law. *See* Dkt. #12-2 at 90. And in any event, one legislator's statements cannot be extrapolated to cast doubt on the motivations of an entire Legislature. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349-50 (2021). Nor are legislators' statements made about unrelated legislation probative of discriminatory intent. *See, e.g., Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1325 (11th Cir. 2021). *See also Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1916 (2020) (statements "remote in time and made in unrelated contexts—do not qualify as 'contemporary statements' probative" of discriminatory motive).

Alleged "**specific sequence of events.**" Plaintiffs contend that the "sequence" of legislative "events" that produced the challenged law suggests discriminatory intent. Dkt. #111 at 18. But this law was the product of an intensive, protracted, and well-documented legislative process that is a matter of public record. *See* Dkt. #34-1. *See also* Videos 1-8. Plaintiffs' few cherry-picked complaints about what the Legislature did and did not do in that process fail to prove that legislators unlawfully "focus[ed] on race." Dkt. #111 at 18. Rather, the legislative record proves that legislators engaged in "sincere" and "serious legislative debate on the wisdom" of this law. *See Brnovich*, 141 S. Ct. at 2349. As a result of the legislative process and the robust debate during H.B. 1020's evolution, the version of H.B. 1020 that was enacted varied materially from the version first introduced, reflecting certain preferences of the bill's opponents.

Alleged "**historical background.**" Plaintiffs argue that Mississippi's history is somehow *ipso facto* indicative of discriminatory purpose. Dkt. #111 at 19. Plaintiffs rely primarily on a case decided more than 35 years ago about events dating back 60 years. *See id.* But "[p]ast

discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324. *See also Veasey*, 830 F.3d at 232 (5th Cir. 2016) (en banc) ("historical evidence" provides "little probative value" when it is not "reasonably contemporaneous" to a challenged enactment); *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 945 F.3d 206, 216 (5th Cir. 2019) (as to things cited in long-ago judicial opinions: "presumption of legislative good faith" is "not changed by a finding of past discrimination").

Plaintiffs further assert that the State of Mississippi has discriminated against Jackson's citizens and leadership in funding and in purported efforts to secure control of Jackson's infrastructure. Dkt. #111 at 19. The facts do not bear out Plaintiffs' allegations, which just parrot political talking points that have no basis in truth. For instance, the purported State-attempted "takeover" of Jackson's ever-failing water system, see *id.*, refers to 2023 S.B. 2889, a utility bill that died in the Legislature in March 2023. *See* Dkt. #50-1 at 138-194; Dkt. #50-2 at 1-159. The State is not "taking over" Jackson's water system, which—as this Court well knows—is currently under <u>federal</u> control. *See* Dkt. #50-6 at 107-143. In fact, the State has made considerable efforts in recent years to aid the City of Jackson in dealing with its extensive recurring water issues, including providing overwhelming State support to avoid a total collapse of Jackson's water system in 2022. *See* Dkt. #50-7. Nor has the State deprived the City of Jackson of access to federal ARPA funds. *See id.* at 1-195. The principal legislation paving the way for the appropriation of such funds passed on a bipartisan vote with the unanimous support of black members of the Mississippi Legislature. Dkt. #50-2 at 165-168. The tired partisan theme that the State is intent on harming its capital city—with racist motives, no less—is unfounded.

As a final point here: The fact-intensive nature of Plaintiffs' claims of intentional discrimination militates against blocking State officials from implementing a state law with a

preliminary injunction.  Where the plaintiffs' success on the merits will "require a difficult battle" in proving that the actions in question were done with a certain motive, the "likelihood of success prong" has not been satisfied.  *Cf. Fleishut v. Avondale Indus.*, Civ. A. No. 94–3500, 1995 WL 27464, at *4 (E.D. La. Jan. 23, 1995).  A preliminary injunction "should not be granted unless the question presented by the movant is free from doubt."  *See Metal Mgmt. Miss., Inc. v. Barbour*, Civil Action No. 3:08-CV-00431 HTW-LRA, 2008 WL 3842979, at *5 (S.D. Miss. Aug. 13, 2008).  This matter is—at best for Plaintiffs—rife with doubts regarding their ability to prove any discriminatory effect or intent in connection with the challenged law.

**B. <u>Plaintiffs cannot demonstrate irreparable harm.</u>**

Plaintiffs' failure to show irreparable harm also precludes a preliminary injunction. Irreparable injury is a separate preliminary injunction requirement:  Plaintiffs cannot satisfy it simply by pointing back to a showing on the merits requirement for injunctive relief.  *See White v. Calrucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) ("Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue.").

As noted, the individual plaintiffs purport to be residents of and registered voters in Jackson.  Dkt. #1 at 6-9, ¶¶ 16-21.  They do not claim any specific anticipated future status as a defendant in any CCID Court proceeding.  Plaintiffs have neither shown nor alleged that they are in actual or imminent danger of any concrete and particularized, real-world injury from the establishment of the CCID Court or the challenged appointment of a judge and prosecutors for that court.  No individual plaintiff has shown that he or she will be a party to any proceeding to be filed or adjudicated in the CCID Court.  Nor have the NAACP plaintiffs offered any proof that they or their members will suffer any irreparable injury from the challenged law.  To the extent Plaintiffs

contend that their right to vote is harmed, that argument fails because—as set forth *supra*—the CCID Court provisions do not affect voting rights.

The mere "possibility" of irreparable injury does not support preliminary injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Rather, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (citing *Lyons*, 461 U.S. at 103) (emphasis in original). There is no evidence that Plaintiffs will experience any irreparable harm from the establishment of the CCID Court. Plaintiffs allege that "irreparable injury is present as a matter of law where" their equal-protection rights have been violated. Dkt. #111 at 20. But that presupposes an equal-protection violation, which—as shown above—has not occurred here.

Furthermore, Plaintiffs had well over six months to prepare and file their motion for preliminary injunctive relief targeting §§ 4 and 5 of the challenged law. Yet Plaintiffs waited until November 13—a month and half before the January 1, 2024, implementation date—to file the instant motion, thereby "manufacturing an 'emergency.'" *Segars Props., LLC v. U.S. Bank Nat'l Ass'n*, Civil Action No. 3:13-CV-4895-L, 2014 WL 61159, at *2 (N.D. Tex. Jan. 6, 2014). Plaintiffs' "decision to wait until the eleventh hour undermines their conclusory assertion that there is a substantial threat that irreparable harm will result if the injunction is not granted." *Id.* Plaintiffs' dilatoriness "weigh[s] 'heavily' against a finding of irreparable injury." *Greenthal v. Joyce*, Civil Action No. 4:16-CV-41, 2016 WL 362312, at *7 (S.D. Tex. Jan. 29, 2016).

**C. <u>The harm to the State in granting an injunction would far exceed any purported harm to Plaintiffs, and the public interest thus favors denying Plaintiffs' motion.</u>**

As noted above, the balance of the equities and the public interest merge when the government is the opposing party. *Pacharne v. Dep't of Homeland Sec.*, 565 F. Supp. 3d 785, 802 (N.D. Miss. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Those features strongly

weigh against a preliminary injunction.  A preliminary injunction would undermine legislative efforts to mitigate Jackson's ongoing public-safety and criminal-justice emergencies.

First, H.B. 1020 is a duly-enacted law of the Mississippi Legislature—*viz.*, the people's representatives.  It reflects the will of the people of the State, and the Mississippi Supreme Court has upheld the CCID Court's constitutionality under state law.  *Saunders*, 2023 WL 6154416 at *9-10.  The State is harmed any time that will is enjoined by a federal court on behalf of a handful of individual plaintiffs who are unhappy with the actions of the Legislature.  *See Abbott*, 138 S. Ct. at 2324 n.17 ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State").  H.B. 1020 became state law on July 1, 2023.  It is the status quo.  An injunction barring any portion of the law set to become effective January 1, 2024, will *change*—not *preserve*—the status quo of Mississippi law.

Second, the City of Jackson—the seat of State government—is engulfed in a public-safety emergency stemming from a significant increase in crime, and a preliminary injunction would undercut efforts to address that emergency.  The challenged law is part of a broader legislative effort to address this ongoing public safety crisis with the objective of creating a safer capital city for all Jacksonians and all Mississippians.  It provides additional judicial resources designed to further this effort by ensuring that the expansion of the Capitol Police force is supported by a concomitant expansion in judicial resources, both to adjudicate misdemeanor crimes and to process felony arrests.  If the citizens of Jackson have a public interest in a properly-functioning water and sewer system—as they certainly do—then by the same token, a properly-functioning criminal justice system must also be in the public interest.  The harm in enjoining State officials from implementing the challenged law far exceeds any harm that the law could cause Plaintiffs.  And the harm to the State is not speculative.  Temporary space has already been secured to

accommodate operation of the CCID Court at the War Memorial Building beginning January 1, 2024.  Decl. of Kornbrek at 1, ¶ 3 (Ex. "I").  WFT Architects, P.A., has been retained to design a permanent space to house the CCID Court at the old Wright & Ferguson Funeral Home on High Street downtown, where renovations are already under way.  *Id.* at 2, ¶¶ 5-6.

While Plaintiffs claim to "share in the desire to make [Jackson] a safer place to live and work," Dkt. #111 at 21, they ask this to Court enjoin State officials from implementing a key component of the Legislature's considered effort to alleviate Jackson's crime problem—all based on the tired trope that the CCID Court will somehow usher in a revival of "Jim Crow," *id.* at 16.  The thrust of Plaintiffs' misplaced argument is that because the CCID Court will not adjudicate felony cases to final judgment, it can therefore serve no purpose in alleviating Jackson's crime problem.  That argument fails for the many reasons discussed *supra*.

Plaintiffs further posit the blanket assertion that the CCID Court will operate with a "lack of local responsiveness" and will impose "felony punishments of misdemeanants."  Dkt. #111 at 24.  That is baseless.  As noted *supra*, the CCID Court judge is entitled to a presumption that he or she will act in an unbiased and unprejudicial manner, upholding not only State law but the United States Constitution.

Equally baseless is the claim by former Hinds County Circuit Judge Tomie Green that "the CCID judge may well impose severe or unnecessary bail on many or all defendants" in the CCID Court.  Dkt. #110-4 at 4, ¶ 9.  In considering what Judge Green views as "severe or unnecessary bail," it bears noting that during her time on the bench, she was criticized by a former Hinds County District Attorney for releasing capital murder defendants on reduced bail without notifying prosecutors.  8/07/18 Clarion-Ledger Article (Ex. "J").  *See also* Misc. Articles (Composite) (Ex. "K").  Judge Green states that she "fear[s]" and "worrie[s]" that the CCID Court will lead to

increased appeals to Hinds County's locally-elected judges.  Dkt. #110-4 at 3-4, ¶ 9.  Should her speculative concerns come to fruition, the Legislature can address any issues with increased appeals in due course.  Judge Green further states—erroneously—that H.B. 1020 "*requires* the CCID Inferior Court to sentence people to time in the Central Mississippi Correctional Facility." *Id.* at 4, ¶ 11 (emphasis added).  But the law clearly provides that convicted misdemeanants "may"—not "shall"—be placed in State custody in the unlikely event that imprisonment is ordered at all.  H.B. 1020, § 4(1)(b).  At best, Judge Green's statements reflect a policy disagreement between her and the overwhelming majority of the Mississippi Legislature.

Finally, Plaintiffs contend that a preliminary injunction should issue now to avoid "unseating the appointed CCID Inferior Court prosecutors and judge, possibly after they have begun to charge and try cases."  Dkt. #111 at 24.  But that is no reason to deprive the public in the meantime of the benefit of these additional judicial resources authorized by the Legislature.  The transfer of cases is not a novel occurrence, and the municipal court system can adapt if needed.

As this Court found previously, "[t]he criminal justice system in Hinds County is in crisis." Dkt. #45 at 21.  Action is needed now.  The harm in enjoining State officials from implementing the CCID Court far exceeds any purported harm that could be experienced by plaintiffs who have shown only that they live and vote in Jackson.  Weighed in the balance against the legitimate legislative policy considerations of law and order, public safety, and increased access to justice, Plaintiffs' claim that a preliminary injunction would serve the public interest rings hollow.

## III. IF THE COURT GRANTS A PRELIMINARY INJUNCTION, IT SHOULD BE APPROPRIATELY LIMITED IN SCOPE.

The Constitution and equitable principles dictate that injunctive relief must be "tailored to redress" a "particular injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).  And equity requires that injunctive relief be no broader than "necessary to provide complete relief *to the plaintiffs*."

*See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (emphasis added; quotation marks omitted).  "The purpose of a preliminary injunction is always to prevent irreparable injury." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

Further, it is well settled that "the scope of injunctive relief is dictated by the extent of the violation established," and that a "court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) (quotation marks omitted).  An injunction cannot "encompass more conduct than was requested or exceed the legal basis of the lawsuit." *Scott v. Schedler*, 826 F.3d 207, 214 (5th Cir. 2016).  *See also E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021) (same). Generally, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (quotation marks omitted).   As a matter of law pursuant to FRCP 65, a preliminary injunction is only binding upon the parties, their respective agents/employees, and those acting in concert with them.  FED. R. CIV. P. 65(d)(2).

If the Court is inclined to grant a preliminary injunction, any relief should be limited to the named individual plaintiffs and members of the NAACP-entity plaintiffs who can demonstrate irreparable harm.  This is not a class action, nor do Plaintiffs seek to make it one.  A preliminary injunction granted only as to the named plaintiffs would provide full relief.  Any injunction should be narrowly tailored to enjoin the prosecution of the named plaintiffs in the CCID Court.  It should not be so broad as to apply to non-plaintiffs or prohibit the appointment of a CCID Court judge, the designation of CCID Court prosecutors, or any other provision of state law establishing the CCID Court.  Defendants respectfully submit that any broader injunction would exceed the bounds of this Court's jurisdiction under Article III and the limitations of equitable relief.

## CONCLUSION

For all these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction

[Dkt. #110] in its entirety and dismiss Plaintiffs' CCID Court claims.

THIS the 7th day of December, 2023.

<div style="margin-left: 40%;">

Respectfully submitted,

SEAN TINDELL, in his official capacity as
Commissioner of the Mississippi Department of
Public Safety; BO LUCKEY, in his official capacity
as Chief of the Mississippi Department of Public
Safety Office of Capitol Police; and LYNN FITCH,
in her official capacity as Attorney General of the
State of Mississippi, DEFENDANTS

By:   LYNN  FITCH,  ATTORNEY  GENERAL
      FOR THE STATE OF MISSISSIPPI

By:   s/Rex M. Shannon III
      REX M. SHANNON III (MSB #102974)
      Special Assistant Attorney General

</div>

REX M. SHANNON III (MSB #102974)
GERALD L. KUCIA (MSB #8716)
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVISION
Post Office Box 220
Jackson, Mississippi  39205-0220
Tel.:  (601) 359-4184
Fax:  (601) 359-2003
rex.shannon@ago.ms.gov
gerald.kucia@ago.ms.gov

ATTORNEYS FOR DEFENDANTS SEAN TINDELL,
in his official capacity as Commissioner of the Mississippi
Department of Public Safety; BO LUCKEY, in his
official capacity as Chief of the Mississippi Department
of Public Safety Office of Capitol Police; and LYNN FITCH,
in her official capacity as Attorney General of the State of Mississippi

## <u>CERTIFICATE OF SERVICE</u>

I, Rex M. Shannon III, Special Assistant Attorney General and one of the attorneys for the above-named defendants, do hereby certify that I have this date caused to be filed with the Clerk of the Court a true and correct copy of the above and foregoing via the Court's ECF filing system, which sent notification of such filing to all counsel of record.

THIS the 7th day of December, 2023.

s/Rex M. Shannon III
REX M. SHANNON III